# Exhibit A

The Arbitration Institute of the Stockholm Chamber of Commerce
19/12/2013
Arbitration no. V 2010/116
Doc. no. 2010/116-130

**SCC Arbitration V (116/2010)**
**1. Anatolie Stati**
**2. Gabriel Stati**
**3. Ascom Group S.A.**
**4. Terra Raf Trans Traiding Ltd.**
**versus**
**The Republic of Kazakhstan**

---

# AWARD

**Date of Award: 19 December 2013**

**The Arbitral Tribunal:**

**David R. Haigh QC (Co-Arbitrator)**
**Prof. Sergei N. Lebedev (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel (Chairman)**

Ms. Katherine Simpson (Secretary to the Tribunal)

| | |
|---|---|
| **Claimants:** | Anatolie Stati<br>Gabriel Stati<br>Ascom Group S.A.<br>Terra Raf Trans Traiding Ltd. |
| **Claimants' counsel:** | Reginald R. Smith<br>Héloise Hervé<br>Kenneth Fleuriet<br>King & Spalding<br>Bulboaca Asociatii |
| **Respondent:** | Republic of Kazakhstan |
| **Respondent's counsel:** | Dr. Patricia Nacimiento<br>Matthew Buckle<br>Norton Rose Fulbright LLP<br><br>Joseph Tiredo<br>Winston & Strawn London<br><br>Professor I. Zenkin<br>Moscow Regional Collegium of Advocates |

ARBITRATION INSTITUTE OF
THE STOCKHOLM CHAMBER OF COMMERCE
Certified true copy of original

Natalia Petrik, Legal Counsel
Date 28 January 2014

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

## Table of Contents


| | | | | | | |
|---|---|---|---|---|---|---|
| Abbreviations | | | | | | 6 |
| A. | The Parties and Their Counsel | | | | | 8 |
| B. | The Arbitral Tribunal | | | | | 9 |
| C. | Short Identification of the Case | | | | | 10 |
| | C.I. | The Claimants' Perspective | | | | 10 |
| | C.II. | The Respondent's Perspective | | | | 13 |
| D. | Procedural History | | | | | 18 |
| E. | Relief Sought by the Parties | | | | | 79 |
| | E.I. | Relief Sought by Claimants | | | | 79 |
| | E.II. | Relief Sought by the Respondent | | | | 80 |
| F. | Factual Background | | | | | 80 |
| | F.I. | General Background Information | | | | 80 |
| | F.II. | Timeline of Events | | | | 82 |
| | F.III. | Respondent's Alleged "*Playbook*" / Campaign of Harassment and Interference | | | | 128 |
| | | 1. | Arguments by Claimants | | | 128 |
| | | 2. | Arguments by Respondent | | | 135 |
| G. | Short Summary of Contentions | | | | | 142 |
| | G.I. | Summary of Contentions by Claimants | | | | 142 |
| | G.II. | Summary of Contentions by Respondent | | | | 146 |
| H. | Preliminary Considerations and Conclusions of the Tribunal | | | | | 151 |
| | H.I. | Jurisdiction | | | | 151 |
| | | 1. | The Parties' Consent to Arbitration before the SCC | | | 151 |
| | | | a. | Arguments by Claimants | | 151 |
| | | | b. | Arguments by Respondent | | 152 |
| | | | c. | The Tribunal | | 153 |
| | | 2. | Jurisdiction Ratione Personae | | | 154 |
| | | | a. | Arguments by Claimants | | 154 |
| | | | b. | Arguments by Respondent | | 157 |
| | | | c. | The Tribunal | | 161 |
| | | 3. | Jurisdiction Ratione Materiae – Existence of Investment | | | 162 |
| | | | a. | Arguments by Claimants | | 162 |
| | | | b. | Arguments by Respondent | | 169 |
| | | | c. | The Tribunal | | 176 |
| | | 4. | Jurisdiction – Compliance with Three-Month Waiting Period | | | 178 |
| | | | a. | Arguments by Claimants | | 178 |
| | | | b. | Arguments by Respondent | | 180 |
| | | | c. | The Tribunal | | 182 |
| | | 5 | Admissibility of Claimants' Claims Pursuant to ECT | | | 183 |
| | | | a. | Arguments by Claimants | | 183 |
| | | | b. | Arguments by Respondent | | 184 |
| | | | c. | The Tribunal | | 185 |
| | H.II. | Applicable Law | | | | 185 |
| | | 1. | Arguments by Claimants | | | 185 |
| | | 2. | Arguments by Respondent | | | 187 |
| | | 3. | The Tribunal | | | 188 |




| | | | | | |
|---|---|---|---|---|---|
| | H.III. | Considerations Regarding Arbitration Procedure | | | 189 |
| | | 1. | Arguments by Claimants | | 189 |
| | | 2. | Arguments by Respondent | | 190 |
| | | 3. | The Tribunal | | 194 |
| J. | Liability | | | | 195 |
| | J.I. | Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT | | | 195 |
| | | 1. | Arguments by Claimants | | 195 |
| | | 2. | Arguments by Respondent | | 202 |
| | | 3. | The Tribunal | | 209 |
| | J.II. | Whether Claimants' Interests were Expropriated (Art. 13 ECT) | | | 231 |
| | | 1. | Arguments by Claimants | | 231 |
| | | | a. | Law on Expropriation | 231 |
| | | | b. | Exhaustion of Remedies | 233 |
| | | | c. | Indirect Expropriation | 234 |
| | | | | i. General Principles and Jurisprudence Regarding Indirect Expropriation | 234 |
| | | | | ii. Right to Regulate | 235 |
| | | | | iii. Acts Allegedly Amounting to An Indirect Expropriation | 236 |
| | | | d. | Direct Expropriation | 240 |
| | | | | i. Transfer of Title | 240 |
| | | | | ii. Exercise of Regulatory Powers | 242 |
| | | 2. | Arguments by Respondent | | 244 |
| | | | a. | Law on Expropriation | 245 |
| | | | b. | Exhaustion of Remedies | 245 |
| | | | c. | Indirect Expropriation | 248 |
| | | | | i. General Principles and Jurisprudence Regarding Indirect Expropriation | 248 |
| | | | | ii. Right to Regulate | 249 |
| | | | | iii. Acts Allegedly Amounting to An Indirect Expropriation | 250 |
| | | | d. | Direct Expropriation | 255 |
| | | | | i. Transfer of Title | 255 |
| | | | | ii. Exercise of Regulatory Powers | 256 |
| | | 3. | The Tribunal | | 258 |
| | J.III. | Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT) | | | 259 |
| | | 1. | Arguments by Claimants | | 259 |
| | | 2. | Arguments by Respondent | | 260 |
| | | 3. | The Tribunal | | 264 |
| | J.IV. | Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1) ECT) | | | 264 |
| | | 1. | Arguments by Claimants | | 264 |
| | | 2. | Arguments by Respondent | | 268 |
| | | 3. | The Tribunal | | 270 |
| | J.V. | Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim) | | | 271 |



| | | | |
|---|---|---|---|
| | | 1. Arguments by Claimants | 271 |
| | | 2. Arguments by Respondent | 274 |
| | | 3. The Tribunal | 280 |
| | J.VI. | Respondent's Observance of Obligations It Entered Into with Respect to Claimants' Investments (Umbrella Clause in Art.10(1) ECT)) | 280 |
| | | 1. Arguments by Claimants | 280 |
| | | 2. Arguments by Respondent | 283 |
| | | 3. The Tribunal | 287 |
| | J.VII. | Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice (Art. 11 ECT) | 287 |
| | | 1. Arguments by Claimants | 287 |
| | | 2. Arguments by Respondent | 288 |
| | | 3. The Tribunal | 289 |
| K. | Causation | | 289 |
| | K.I. | Law on Causation | 289 |
| | | 1. Arguments by Claimants | 289 |
| | | 2. Arguments by Respondent | 290 |
| | | 3. The Tribunal | 290 |
| | K.II. | Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages | 291 |
| | | 1. Arguments by Claimants | 291 |
| | | 2. Arguments by Respondent | 294 |
| | | 3. The Tribunal | 295 |
| | K.III. | Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause) | 307 |
| | | 1. Arguments by Claimants | 307 |
| | | 2. Arguments by Respondent | 310 |
| | | 3. The Tribunal | 312 |
| L. | Quantum | | 314 |
| | L.I. | Preliminary Considerations | 314 |
| | L.II. | Valuation Date | 314 |
| | | 1. Arguments by Claimants | 314 |
| | | 2. Arguments by Respondent | 319 |
| | | 3. The Tribunal | 322 |
| | L.III. | Arguments Regarding the Treatment of Debt: Enterprise vs. Equity Value | 324 |
| | | 1. Arguments by Claimants | 324 |
| | | 2. Arguments by Respondent | 326 |
| | | 3. The Tribunal | 329 |
| | L.IV. | Quantum Related to Borankol Field and Tolkyn Field | 331 |
| | | 1. Arguments by Claimants | 331 |
| | | 2. Arguments by Respondent | 342 |
| | | 3. The Tribunal | 351 |
| | L.V. | Quantum Related to Contract 302 Properties | 353 |
| | | 1. Arguments by Claimants | 353 |
| | | 2. Arguments by Respondent | 358 |
| | | 3. The Tribunal | 367 |
| | L.VI. | Quantum Related to LPG Plant | 368 |
| | | 1. Arguments by Claimants | 368 |




| | | | |
|---|---|---|---|
| | | 2. Arguments by Respondent | 373 |
| | | 3. The Tribunal | 381 |
| | L.VII. | The Parties' Arguments Concerning the Tristan Notes | 382 |
| | | 1. Arguments by Claimants | 382 |
| | | 2. Arguments by Respondent | 385 |
| | | 3. The Tribunal | 387 |
| | L.VIII. | Moral Damages | 387 |
| | | 1. Arguments by Claimants | 387 |
| | | 2. Arguments by Respondent | 389 |
| | | 3. The Tribunal | 390 |
| | L.IX. | Tax Claims | 390 |
| | | 1. Arguments by Claimants | 390 |
| | | 2. Arguments by Respondent | 391 |
| | | 3. The Tribunal | 392 |
| | L.X. | Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV) | 393 |
| | | 1. Arguments by Claimants | 393 |
| | | 2. Arguments by Respondent | 394 |
| | | 3. The Tribunal | 398 |
| | L.XI. | Credibility of the Parties Experts | 398 |
| | | 1. Arguments by Claimants | 398 |
| | | 2. Arguments by Respondent | 399 |
| | | 3. The Tribunal | 402 |
| | L.XII. | Interest | 402 |
| | | 1. Arguments by Claimants | 402 |
| | | 2. Arguments by Respondent | 403 |
| | | 3. The Tribunal | 405 |
| | L.XIII. | Summary of Tribunal's Conclusions Regarding Quantum | 406 |
| M. | Arbitration Costs | | 407 |
| | M.I. | Arguments by Claimants | 407 |
| | M.II. | Arguments by Respondent | 409 |
| | M.III. | The Tribunal | 412 |
| N. | Decisions | | 414 |




# Abbreviations

| | |
|---|---|
| ¶ / ¶¶ | Paragraph / Paragraphs |
| § / §§ | Section or Clause / Sections or Clauses |
| ARNM | Agency for Regulation of Natural Monopolies |
| Ascom | Ascom Group S.A. |
| Art. | Article / Articles |
| $Bcm^3$ | Billion cubic meters |
| BIT | Bilateral Investment Treaty |
| BOE | Barrels of Oil Equivalent |
| C | Claimants' Exhibit |
| C-0 | Claimants' Request for Arbitration |
| C-I | Claimants' Statement of Claim (18 May 2011) |
| C-II | Claimants' Reply Memorial on Jurisdiction and Liability (7 May 2012) |
| C-III | Claimants' Reply Memorial on Quantum (28 May 2012) |
| CAC Pipeline | Center Asia Center Pipeline |
| CAPEX | Capital Expenditure |
| CC RF | Criminal Code of the Russian Federation |
| CC RK | Civil Code of the Republic of Kazakhstan |
| CPC | Criminal Procedure Code of the Republic of Kazakhstan |
| CPHB 1 | Claimants' First Post-Hearing Brief (8 April 2013) |
| CPHB 2 | Claimants' Second Post-Hearing Brief (3 June 2013) |
| C Costs | Claimants' Request for Costs (1 July 2013) |
| C Costs Reply | Claimants' Reply on Costs (8 July 2013) |
| DCF | Discounted Cash Flow |
| ECOS | Economic Chance of Success |
| ECT | The Energy Charter Treaty |
| ECtHR | European Court of Human Rights |
| EPT | Excess Profits Tax |
| FDP | Field Development Plan |
| FET | Fair and Equitable Treatment |
| FMV | Fair Market Value |
| FTI | FTI Consulting |
| GCA | Gaffney, Cline, & Associates |
| GCOS | Geological Chance of Success |
| GPO | General Prosecutor's Office (Kazakhstan) |
| ICC | International Chamber of Commerce |
| ICSID | International Centre for Settlement of Investment Disputes |
| IPO | Initial Public Offering |



| | |
|---|---|
| JSC | Joint Stock Company |
| KMG | KazMunaiGas / KazMunaiGaz |
| KMG EP | KazMunaiGaz Exploration Production |
| KMG NC | KazMunaiGaz National Company |
| KMT | KazMunaiTeniz JSC |
| KNOC | Korea National Oil Company |
| KPM | Kazpolmunay LLP |
| Law on Oil | Law of the Republic of Kazakhstan of 28 June 1995, No. 2350 "*On Petroleum*" (as amended in 2003) |
| LLP | Limited Liability Partnership |
| LPG | Liquefied Petroleum Gas |
| ltr. | Letter |
| MBbls /MMBbl | Million barrels |
| MEMR | State of Kazakhstan Ministry of Energy and Mineral Resources |
| MES | Ministry of Emergency Situations |
| Mln | Million |
| MOG | Kazakh Ministry of Oil and Gas |
| NPV | Net Present Value |
| OJSC | Open Joint Stock Company |
| OTP | Oil Treatment Plant |
| p. / pp. | Page / Pages |
| PO | Procedural Order |
| R | Respondent's Exhibit |
| R-I | Respondent's Statement of Defence (21 November 2011) |
| R-II | Respondent's Rejoinder on Jurisdiction and Liability (13 August 2012) |
| R-III | Respondent's Rejoinder Memorial on Quantum (1 December 2012) |
| RPHB 1 | Respondent's First Post-Hearing Brief (8 April 2013) |
| RPHB 2 | Respondent's Second Post-Hearing Brief (3 June 2013) |
| R Costs | Respondent's Submission on Costs (1 July 2013) |
| R Costs Reply | Respondent's Comments on Claimants' Costs Submission (8 July 2013) |
| SCC | Stockholm Chamber of Commerce |
| SM Law | Law of the Republic of Kazakhstan of 5 March 1997 , No. 77-1 On the Securities Market |
| Subsoil Law | Law of the Republic of Kazakhstan "*On Subsoil and Subsurface Use*" |
| TNG | Tolkynneftegaz LLP |
| TOO | Limited Liability Partnership |
| USD | United States Dollar(s) |
| VCLT | 1969 Vienna Convention on the Law of Treaties |
| WS | Witness Statement |



## A. The Parties and their Counsel

| | |
|---|---|
| **The Claimants** | Anatolie Stati<br>Gabriel Stati<br>Ascom Group S.A.<br>Terra Raf Trans Traiding Ltd. |
| *Represented by* | Héloise Hervé<br>Kenneth Fleuriet<br>King & Spalding<br>1100 Louisiana, Suite 4000<br>Houston, Texas 77002<br>**USA** |
| | King & Spalding<br>12, cours Albert 1er<br>75008 Paris<br>**FRANCE** |
| | Bulboaca & Asociatii<br>UTI Business Center, 9th Floor<br>31 Vasile Lascar Street, District 2<br>020492 Bucharest<br>**ROMANIA** |
| **The Respondent** | Republic of Kazakhstan |
| *Represented by* | Dr. Patricia Nacimiento<br>Norton Rose Fulbright LLP<br>Stephanstrasse 15<br>60313 Frankfurt<br>**GERMANY** |
| | Matthew Buckle<br>Norton Rose Fulbright LLP<br>3 More London Riverside<br>London SE1 2AQ<br>**UNITED KINGDOM** |
| | Joseph Tiredo<br>Winston & Strawn London<br>CityPoint<br>1 Ropemaker Street<br>London EC2Y 9HU<br>**UNITED KINGDOM** |
| | Professor I. Zenkin<br>Moscow Regional Collegium of Advocates<br>Aviazionnaya Street, 79-1-37<br>123182 Moscow<br>**RUSSIA** |



## B. The Arbitral Tribunal

Appointed as Chairman by SCC Letter dated 28 September 2010:

Professor Dr. Karl-Heinz Böckstiegel, Chairman
Parkstrasse 38
D-51427 Bergisch-Gladbach
GERMANY

Nominated by Claimants in their Request for Arbitration filed on 26 July 2010:

David Haigh, QC
Burnett, Duckworth & Palmer LLP
2400, 525 – 8 Avenue S.W.
Calgary, Alberta T2P 1G1
CANADA

Appointed by the SCC on behalf of Respondent by letter dated 23 September 2010 and confirmed on 15 December 2010:

Prof. Sergei N. Lebedev
Staroalexeevskaya Str., 16/49
129626 Moscow
RUSSIA



# C. Short Identification of the Case

1. The short identification below is without prejudice to the Parties' full presentation of the factual and legal details of this case, and the Tribunal's considerations and conclusions.

## C.I. The Claimants' Perspective

2. Claimants summarize the main aspects of the dispute at C-I ¶¶ 2 – 24 and C-II ¶¶ 1 - 31, partially quoted and summarized below; CPHB 1 ¶¶ 2 – 42, CPHB 2 ¶¶ 1 – 8:

> 2. *[...] In reliance on Kazakhstan's solemn commitments under international law, Claimants invested more than US$ 1 billion breathing new life into previously-neglected oil and gas fields, and constructing a state-of-the art LPG Plant that Kazakhstan itself described as having "great regional and industrial importance for development of the region." But just as those investments matured and began to generate returns, Kazakhstan launched a targeted campaign of intimidation and harassment designed to pressure Claimants into selling their investments to the state-owned oil company at a firesale price. Kazakhstan went so far as to imprison a senior KPM employee on patently bogus criminal charges, and to threaten other employees with the same fate, in furtherance of its strong arm tactics. When its plan failed — because Claimants defiantly refused to give in to Kazakhstan's pressure — the government simply seized the investments, deciding to take its chances in arbitration.*
>
> 3. *Perhaps most shocking, this plan originated from the highest level of the Kazakhstan government, namely, President Nazarbayev himself. That fact would sound far-fetched if it were not admitted, but Kazakhstan concedes that President Nazarbayev personally issued the order that led to the expropriation of Claimants' investments.*
>
> 4. *[...] Kazakhstan attempts to shroud its violations of international law in a cloak of legitimacy by focusing on each minute detail in isolation rather than the totality of its conduct as a whole. It argues that its extraordinary campaign of inspections was perfectly normal, and that its subsequent actions were appropriate responses to the information it discovered under arcane, Delphic, and often-misstated provisions of its own domestic law. These arguments, however, crumble under the weight of the evidence. Kazakhstan did not discover any wrongdoing by Claimants' companies, much less violations that would justify the extraordinary actions that followed. Viewing Kazakhstan's conduct in its entirety, it is evident that Kazakhstan's objective from the start was to devalue Claimants' investments by making it virtually impossible for Claimants to operate or sell the businesses, so that Claimants would sell to Kazakhstan at a firesale price. Moreover, Kazakhstan also anticipated this arbitration from the beginning, and cloaked its actions under mystifying interpretations of domestic laws and regulations in order to create an appearance of normalcy and legitimacy.*



5. *Furthermore, Kazakhstan has continued its blatant disregard for its obligations under international law in its conduct of this arbitration. Kazakhstan consistently attempts to obstruct this Tribunal's consideration of Claimants' claims by raising utterly baseless arguments, flatly misstating facts and law, and engaging in procedural misconduct of the worst kind. [Kazakhstan hopes that through the sophistry of focusing on each small fact individually, the Tribunal will lose sight of the fact that Kazakhstan launched the investigations for the precise purpose of acquiring Claimants' investments for less than fair value.] (C-II ¶¶ 2 – 5, 7). [...]*

15. *Moreover, while Kazakhstan publicly maintained that it would honor its earlier contracts, its practice has been quite to the contrary. [...] Kazakhstan has become adept at pressuring foreign investors to sell equity stakes to KazMunaiGaz through a combination of Financial Police investigations, baseless criminal allegations, fines, and tax threats. Kazakhstan makes it essentially impossible to continue normal operations, and then makes it known that the sale of a substantial equity stake to KazMunaiGaz would resolve the company's various legal difficulties. Kazakhstan has run this "playbook" on foreign investors — and especially, investors in 100% foreign-owned projects — time and again. [That is precisely what happened here. And when Claimants' refused Kazakhstan's below-average bid for Claimants' investments, Kazakhstan turned up the pressure. After six months of government harassment, they offered USD 150 million less. This is the Kazakhstan playbook to the letter.] (C-II ¶¶ 15 - 16). [...]*

17. *Moreover, when Claimants rejected KazMunaiGaz's lowball offer in June 2009, Kazakhstan simply turned up the pressure. It interfered in the trial of Mr. Cornegruta to ensure a guilty verdict, then sentenced him to four years in Kazakhstan's notoriously dangerous prison system as punishment. It continued to threaten the same fate for KPM and TNG's other directors. It engineered a massive fine against KPM (which was not even a party to the criminal trial) that was large enough to bankrupt the company and provide a ground for seizing its assets. And it continued to interfere with the day-to-day operations of the businesses, including more inspections and audits, asset seizures, and apparent interference with TNG's access to gas markets that choked the company's cash flows. Then, in November 2009, KazMunaiGaz made another bid to buy the companies, this time attempting to circumvent the Claimants by negotiating with the companies' note-holders, and then offering even less to the Claimants than it had offered in June 2009.*

18. *Despite all this, Claimants continued to resist Kazakhstan's coercion, and ultimately found a Kazakhstan-based buyer for the companies. In February 2010, Claimants signed an agreement to sell their Kazakhstan investments to the Cliffson company for more than US$ 920 million — which was nearly 70% higher than KazMunaiGaz's lowball offer in June 2009. And that presented a dilemma for Kazakhstan. Cliffson was owned by the wealthy and politically connected Assaubayev family. In the course of those negotiations, it became clear to all involved (and no doubt to*



*Kazakhstan as well) that Claimants intended to bring arbitration claims against Kazakhstan once the sale closed for the diminution in the sale price caused by Kazakhstan's harassment campaign. Thus, Kazakhstan faced the prospect of either allowing the companies to slip out of its hands or exercising its pre-emptive rights (which would have required it to match Cliffson's offer), while still facing arbitration claims for the diminution in value. Kazakhstan delayed approval of the transaction for several months with requests for additional details and documentation, but Claimants submitted everything the Government requested in June 2010. Within a week, on June 29, 2010, Kazakhstan launched the final inspection blitz that led to the outright seizure of the companies on July 21, 2010. Kazakhstan apparently concluded that if it was going to face arbitration claims anyway, it might as well take the assets for free and posture a termination basis for the coming arbitration fight. (C-II ¶ 18).*

*19. This tale of conspiracy coordinated at the highest levels of government might seem contrived if it were not both a familiar pattern of behavior in Kazakhstan and admitted in this case that President Nazarbayev was personally involved. But viewed in the context of all the facts, this is a far more plausible explanation than Kazakhstan's suggestion that this was just the normal operation of law in Kazakhstan. Only Kazakhstan knows precisely why it chose this path: a favor to a regional ally, punishment for a 100% foreign-owned company that had refused purchase overtures in the past, an old-fashioned money grab, or some combination of all three. But it is beyond serious dispute that it occurred. [And, Kazakhstan's own documents and admissions in this proceeding confirm that it did. (C-II ¶¶ 19 – 20)]. [...]*

*30. [In these proceedings, Kazakhstan's] conduct goes beyond zealous advocacy in a contentious arbitration. [Kazakhstan has delayed proceedings, unfairly and obstructionistically submitted evidence, and has made meritless jurisdictional objections.] Kazakhstan seeks to obscure the truth from this Tribunal and make it as costly, time-consuming, and difficult as possible for Claimants to obtain justice, in furtherance of its strategy of harassment and intimidation. Indeed, if Kazakhstan can bully or mislead this Tribunal into an award favoring Kazakhstan — or even an award for Claimants that undervalues damages — then Kazakhstan will have accomplished its objective of seizing Claimants investments for less than fair value, and also can discourage other foreign investors from resisting its coercion in the future based on hope of obtaining redress in arbitration. (C-II ¶¶ 22 – 30).*

3. Prior to the Hearing on Quantum, Claimants summarized the main aspects of the dispute at C-III ¶¶ 1-7, partially quoted and summarized below:

*1. [...] Kazakhstan's harassment campaign had as its principal objective a devaluation of Claimants' investments in an effort to acquire them for far less than their fair market value. Kazakhstan saddled KPM and TNG with unfounded liabilities, interfered with the companies' cash flows, and obstructed the sale of the companies, all as part of its strategy to force Claimants to sell to KazMunaiGas at a firesale price. When that strategy*



*failed, Kazakhstan seized the investments, deciding to take its chances in arbitration.*

2. *Respondent has continued that strategy in this arbitration, making a series of disingenuous arguments about the value of Claimants' investments in an effort to enlist the Tribunal in accomplishing the objective Respondent could not accomplish in negotiations with Claimants — namely, acquiring Claimants' investments for far less than their actual worth. In summary, Kazakhstan argues that the value of Claimants' investments as of October 14, 2008 (the valuation date used by Claimants) was significantly less than Claimants calculate; that Claimants' investments were of de minimis value by the time of their final seizure in July 2010; and that, between October 2008 and July 2010, "there are other possible causes of a reduction in the value of the Claimants' investments that cannot possibly be attributable to the Republic and may even be attributable to the Claimants."*

4. *Respondent purportedly arrives at a range for the total market value of Claimants' investments, as of its chosen July 21, 2010 valuation date, of US $161 to US $237 million on an enterprise value basis (i.e., without considering debt). To arrive at this exceedingly low value, Respondent fabricates capital costs, overstates operating costs, ignores existing reserves, fabricates artificially low gas prices, attributes no value at all to five of the six resource areas at issue in the Contract 302 Properties, relegates the LPG Plant to scrap value, and ignores entirely any attributes of the investments that would be of uniquely enhanced value to the State itself.*

## C.II. The Respondent's Perspective

4. Respondent summarizes the main aspects of the dispute at R-I ¶¶ 2 *et seq.*, and R-II ¶¶ 1 – 9, RPHB 2 ¶¶ 1 – 3, 59 partially quoted and summarized below:

1. *[...] A claimant raising claims must state and prove his case. Stating one's case means that the claimant must present to a tribunal a complete, plausible and logical factual story without contradictions. Proving one's case means that the investor must prove that the tribunal has jurisdiction to hear the case and that the applicable treaty was breached by the state. The claiming investor must further prove causation, [...][i.e.] that he incurred damages as a result of such breach. And finally the claiming investor must prove and specify the precise amount of the damages he requests the tribunal to award based on a certain valuation date which also needs to be correctly determined by the claiming investor. [...]*

3 *[...] [The]need for the claimant to fulfil its procedural duties cannot be replaced by mere reference to an alleged discretion of a tribunal. A claimant may not simply anchor the highest possible value and the earliest valuation date he could think of and leave it to the tribunal to award a portion of this maximum threshold established by a claimant. Rather, any claimant must submit a specified request for damages based on specific and proven facts. A claimant must further establish a causal link between the alleged breach by a respondent and the requested damages. And this*



*must be linked to a specific date for the valuation of the damages requested. Once the claimant has done so, he is bound by the choices he made as to facts, causation, amount requested and valuation date. Equally, the tribunal is bound by those choices and bound to verify whether the claimant has discharged its various procedural duties. Where this is not the case, the tribunal cannot put its own discretion to cover up for claimant's failure. Rather, if a claimant fails in any of the mandatory steps required of a claiming party, his claim must also fail. [...]*

59. *Claimants have in many instances failed to coherently state their case. Where they did present a coherent set of factual allegations, they generally failed to provide proof of their contentions: Their witnesses are non-credible, many of their documents are tainted with procedural misconduct, and their experts lack independence as well as the competence necessary to provide useful opinions on valuation issues. The latter is evidenced not least by Claimants' ever changing prayers for relief. Ultimately, all of this does not matter, as Claimants have not presented a valuation corresponding to the facts of this case and the timing of the alleged breaches of the law. In summary, Claimants' claims must be dismissed (RPHB 2 ¶¶ 1 -3, 59).*

1 *Anatolie Stati is a Moldovan businessman [who] [...] claims to have acquired two relativley minor oil and gas companies in Kazakhstan, KPM and TNG. The mechanism of the supposed acquisition and holding of these companies is opaque, involving multiple intermediate entities outside Kazakhstan, some disclosed others not.*

2 *The rationale for this complex holding structure is unknown, but liabilities seemed to gravitate to KPM and TNG from their owners and their owner's afiliates, whilst cash flowed out to a number of afiliated companies outside Kazakhstan.*

3 *Tristan Oil, a BVI registered entity has no disclosed stake in KPM or TNG, but since the end of 2006, it has issued over half a billion dollars in debt, ostensibly for the purpose of funding KPM and TNG. Whilst KPM and TNG are apprently guarantors of this debt, it is by no means clear that they benefited from all of the funds this brought into Tristan Oil. As a BVI registered entity Tristan Oil does not benefit from the protection of the ECT.*

4 *In late 2008, when at a domestic level the Republic began to become aware of problems with KPM and TNG, it seems that KPM and TNG's precarious debt laden ownership structure was pushed to the brink by the financial crisis, resulting in yet more funds being stripped from the companies.*

5 *In late 2008 little of the above was known to the agencies of the Republic that regulated the performance of KPM and TNG. At that time their principal concern was a littany of breaches by KPM and TNG of their contractual and other legal obligations. There were also wider social consequences for the area in which the companies operated, caused by what, at the time, seemed an inexplicable decline in the companies' performance and indiference of their management.*



6 *The Republic was ultimately driven to terminate KPM and TNG's contract contracts and place their subsoil use assets into trust management to preserve them from decay. That was not the outcome that anyone wanted, least of all the Republic, which generates much of its income from active subsoil users. However, KPM and TNG's apparent disinterest in remedying their desructive poor performance made it unavoidable.*

7 *Since this Arbitration was commenced, the Republic has learned rather more about KPM and TNG and Mr Stati, though perhaps not enough fully to explain the decline of KPM and TNG. However, what it has learned has re-inforced its view that fundamentally the Claimants are seeking to use international arbitration to shield them from the consequences of their wrongdoing in Kazakhstan and perhaps from matters outside Kazakhstan as well.*

8 *In the Republic's respectful submission, the Tribunal should not allow its power to be abused either to protect the Claimants from the Republic's legitimate reaction to KPM and TNG's illegal conduct or from the apparent wider troubles of Mr Stati's buiness empire in which the Republic plays no part.*

9 *In dealing with this case, the Tribunal should keep four basic points in mind:*

*(a)* *First, the Claimants' illegal and bad faith conduct already excludes any protection under the ECT and any jurisdiction of the Tribunal. A foreigner breaching the laws of a state cannot expect protection under international law. Conversely, a state making promises in the expectation of (i) lawful investor conduct, (ii) mutual cooperation and (iii) mutual profiting of both the state and the investor from the investment cannot be held to such promises when the investor acts illegally and contrary to the purposes of admission of foreign investment.*

*(b)* *Second, Claimants claims are in any event completely without merit. Claimants suggest that they fell victim to a "harassment campaign" initiated by the President of the Republic for the purpose of expropriating the Claimants' assets and that this "harassment campaign" was based on a "Kazakhstan playbook". These are mere pretty words with which Claimants try to turn the case on its head. Claimants, as foreign subsoil use contractors in Kazakhstan, were not respecting the laws that Kazakhstan had enacted in order to safeguard its interests and ensure its subsoil use policies. The Republic's audits, inspections and investigations were the lawful reaction to Claimants' illegal conduct. This is not harassment but the legitimate measures any state in the position of the Republic would have taken.*

*(c)* *Third, Claimants are trying to blame the Republic for the demise of their companies, when it was in fact the Claimants' own conduct,*



*as well as external circumstances, which made the Claimants' project companies KPM and TNG fail in the end. Claimants overburdened KPM and TNG with debt. This approach backfired when the global financial crisis hit the markets in 2008, energy prices took a dive and important local customers of KPM and TNG could no longer fulfil their contracts with Claimants. Yet, in this severe situation, instead of supporting the companies, Claimants decided to strip them of cash even more. The ultimate failure of the companies can come as no surprise against this background.*

*(d)* *Fourth, Claimants also largely overstate the importance of their alleged investment within the Republic. Claimants' activities were of a rather minor scale compared to many other exploration and production projects in the Republic. This has two consequences: For one, this further undermines Claimants' spurious allegation of a "harassment campaign" initiated by the President of the Republic. Apart from all other reasons excluding this argument, Claimants' assets were simply not valuable enough to merit such action in the first place. Moreover, this also shows that Claimants' claim for compensation is artificially inflated. In fact, Claimants claim for compensation runs into billions, a sum which no interested third party ever offered to pay for KPM and TNG.*

5. Prior to the Hearing on Quantum, Respondent summarized the main aspects of the dispute at R-III ¶¶ 1 – 12, partially quoted and summarized below (citations omitted):

*3* *[T]he billions of USD claimed by Claimants in this arbitration, are reached by a blatant breach of universally accepted valuation standards. Moreover, they are reached by simply disregarding a whole range of inconvenient facts and substituting reality by wishful thinking. [...]*

*5* *The largest part of Claimants' damages claim is taken up by the claim relating to Contract No. 302. Claimants demand a whopping USD 1.58 billion in compensation for the "loss of opportunity" to develop the Contract 302 Properties. However, as even Claimants' expert confirms, the chances of success were minimal and this must be reflected in the valuation. [Claimants disregard risk in their valuation.] [...]*

*10* *The central element of Claimants' wishful thinking approach is Claimants' improperly early valuation date. Claimants set their valuation date to 14 October 2008, a date on which no state action had any actual effect on KPM and TNG and, moreover, a date which is months or even more than a year prior to many of the state measures Claimants complain of. By choosing 14 October 2008 as their valuation date, Claimants find a way to disregard many developments after that date[,] which drive down the value of their assets. In particular, Claimants ignore the sharp drop in oil prices, the sharp drop in demand for TNG's gas[,] and the failure to conclude the so-called tri-partite agreement with KazAzot. Taking into account these developments, as international law requires, Claimants' claims shrink decisively.*



11 *There are also other instances throughout Claimants' case on damages in which Claimants completely disregard the existing facts or the legal framework surrounding KPM and TNG. For example, Claimants ignore that KPM and TNG were never able to export gas because they could not secure a contract for export. Claimants simply apply export prices – even though their own reserves reports from 2008 and 2009 reveal that at the time of events, they did not actually expect that they would be able to achieve export prices.*

12 *In a final attempt at inflating their damage claims, Claimants demand the compensation of moral damages in the amount of "at least" 10% of compensatory damages awarded. Since Claimants inflated damage claim comprises approximately USD 2.7 billion, their moral damages claim thus amounts to at least USD 270 million. This further inflation of Claimants' claim borders on the ridiculous as is reflected by the fact that the highest amount of moral damages ever awarded by an investment tribunal was USD 1 million. (R-III ¶¶ 1 – 12, partially quoted).*



## D. Procedural History

6. On **26 July 2010** Claimants filed of their **Request for Arbitration** (C-0) and appointed Mr. David R. Haigh, QC of Canada as arbitrator. (C-0 ¶ 112).

7. On **23 September 2010**, Arbitration Institute of the SCC appointed Prof. Sergei Lebedev as an arbitrator.

8. On **28 September 2010**, Prof. Karl-Heinz Böckstiegel accepted his appointment as Chairman of the Tribunal.

9. On **10 November 2010**, the Chairman, on behalf of the Tribunal, issued his first email to the Parties and the Tribunal members, inviting the Parties to prepare for an in-person procedural meeting and to inform the Tribunal as to when and where to hold that meeting.

10. Respondent's then-counsel, Curtis, Mallet-Prevost, Colt & Mosle LLP, advised that it had been retained on 8 November 2010 but had only received the file on 12 November.

11. On **22 November 2010**, the Chairman, on behalf of the Tribunal, sent the Parties an **Annotated Preliminary Agenda of Issues Regarding the Further Procedure** in preparation for the First Procedural Meeting with the Parties in Stockholm, scheduled for 15 December 2010.

12. On **2 December 2010**, Respondent challenged the 23 September 2010 appointment of Prof. Sergei Lebedev as arbitrator. Respondent argued that, especially in light of the necessary translation issues and the fact that the arbitration involves a State as Respondent, the 21 and even 35-day time limits within which Respondent was to have filed its Answer were exceptionally short – even shorter than would have been demanded in a commercial arbitration. Respondent also noted that a member of the SCC Board is a Consultant in the King & Spalding firm, which is representing Claimants in this case, and indicated that this fact raises concerns about the undue haste. Respondent indicated that it has been prejudiced and that procedural fairness has been impaired by the hasty appointment.

13. On **15 December 2010** and after considering comments from the Parties, the Arbitration Institute of the SCC dismissed Respondent's challenge of Prof. Lebedev, having found no ground for disqualification.

14. On **20 December 2010**, the Chairman circulated the draft Procedural Order 1 (PO-1), which resulted from the First Meeting in Stockholm, to the Parties for their comment by 3 January 2011.

15. On **27 December 2010**, Respondent wrote to the Secretary General of the Arbitration Institute of the SCC, expressing disappointment with the Decision of 15 December and noting that no explanation had been provided for the decision. Neither the SCC nor Claimants' comments addressed whether Ms. Margrete Stevens of King & Spalding participated in any way in the consultations regarding the selection or appointment of Prof. Lebedev. Respondent again protested Prof.



Lebedev's appointment and argued that "*the SCC's own rules do not prescribe a specific time period for filing an Answer and appointing an arbitrator, and the short time given by the SCC was unreasonable and constitutes clear procedural unfairness.*" Respondent maintained that the necessities of governmental procedures required due consideration in the setting of time limits. Respondent maintained its objections and indicated that it participates in these proceedings in good faith and with full reservation of all of its rights, defenses, and objections.

16. The Arbitration Institute of the SCC responded by letter dated **29 December 2010** and stated that Ms. Margrete Stevens, a member of the SCC Board, did not take part in the decisions made by the SCC Board on this case.

17. On **3 January 2011,** Claimants wrote to the Tribunal, indicating that they had no comments to the draft procedural order. They made two comments related to potential jurisdictional objections by Respondent and requested that the Tribunal "*clarify that, in the event Kazakhstan elects to make a jurisdictional objection, 1) it must do so in its Counter-Memorial, and 2) if Kazakhstan submits a reply on its jurisdictional objection in its Rejoinder, Claimants will be entitled to submit a brief rejoinder, on jurisdictional issues only, on 10 May 2012 (i.e., 30 days after receipt of Kazakhstan's Rejoinder).*"

18. On **3 January 2011**, Respondent submitted comments to the draft procedural order, objecting to calling the second week of the hearing an "*extension.*" In response to Claimants' email of 3 January 2011, Respondent objected to any limitations on its right to assert jurisdictional objections. Respondent also objected to Claimants' request for an additional round of briefing on jurisdictional issues, explaining that Claimants had "*opposed bifurcation and agreed to the briefing schedule discussed at the December 15 meeting, fully aware that Respondent contemplated asserting jurisdictional objections. There is no reason to alter that arrangement.*"

19. In a second email on **3 January 2011**, Claimants stated that they are merely seeking to ensure that both Parties have an equal opportunity to address jurisdictional objections and indicated that the issue of bifurcation had not been entirely decided at the meeting. Claimants then stated that, since the Tribunal had indicated that there would be no bifurcation, it would be appropriate to address the schedule for jurisdictional submissions.

20. On **12 January 2011**, the Tribunal issued **Procedural Order No. 1** (PO-1) The operative text is provided below for convenience:

***Procedural Order (PO) No.1***
***Regarding the further procedure***

***1. Procedural Meeting Stockholm 15 December 2010***

*The Procedural Meeting was attended by:*

*For Claimants:* *Mr. Ken Fleuriet, Esq. (King & Spalding)*



| | |
|---|---|
| *For Respondent:* | *Ms. Miriam K. Harwood, Esq. (Curtis, Mallet-Prevost, Colt & Mosle LLP)* |
| | *Ms. Aizhan Galimovna Irgaliyeva (Deputy Director, Legal Service Department, Ministry of Oil and Gas, Republic of Kazakhstan)* |
| *The Tribunal:* | *David R. Haigh QC*<br>*Prof. Sergei Lebedev*<br>*Prof. Karl-Heinz Böckstiegel (Chairman)* |

**2. Results of Meeting**

*2.1.* *This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

*2.2.* *At the beginning of the Meeting Respondent declared that it maintained its objections raised in its letter of 2 December 2010 regarding the appointment of Prof. Lebedev.*

**3. Communications**

*3.1.* *The Tribunal shall address communications to by e-mail to all Counsel of the Parties. In so far as such communications are confirmed by courier, such courier mail will be addressed to the lead counsel indicated by each Party.*

*3.2.* *Counsel of the Parties shall address communications directly to each member of the Tribunal (with a copy to counsel for the other Party and to the SCC)*

* *by e- mail, to allow direct access during travel,*

* *and in addition, longer letters and substantial submissions as well as memorials shall be confirmed either by courier or by fax ( but fax communications shall not exceed 10 pages).*

*3.3.* *Deadlines for submissions shall be considered as complied with if the submission is received by the Tribunal and the other Party in electronic form or by courier on the respective date.*

*3.4.* *Longer submissions and memorials shall be preceded by a Table of Contents.*

*3.5.* *To facilitate word-processing and citations in the deliberations and later decisions of the Tribunal, the e-mail transmission of*



*memorials and substantial or longer submissions shall be in Windows Word, or in a PDF document that can be word-searched and from which text can be copied and pasted into Windows Word.*

3.6. *To facilitate that parts can be taken out and copies can be made, submissions of all documents including statements of witnesses and experts shall be submitted separated from Memorials,* ***unbound in A5 size binders*** *and preceded by a list of such documents, consecutively numbered with consecutive numbering in later submissions (C-1, C-2 etc. for Claimant; R-1, R-2 etc. for Respondents) and with dividers between the documents. In addition, documents shall also be submitted in electronic form on a CD or USB-device (preferably in Windows Word to facilitate word processing and citations).*

## ***4. Particulars Regarding the Procedure***

4.1. *The Procedure shall be in accordance with the SCC Rules of Arbitration in force as from 2010.*

4.2. *As decided by the SCC Board according to SCC letter of 23 September 2010, the seat of arbitration for this case is Stockholm.*

4.3. *The language of the arbitral procedure shall be English.*

4.4. *In view of Art. 37 SCC Rules and in order to avoid the considerable delay caused by bifurcation, the procedure will not be bifurcated. It will deal with any jurisdictional objections, liability and quantum in one procedural phase.*

## ***5. Timetable***

5.1. ***By 1 March 2011****, the Claimant shall submit its Statement of Claim according to Art. 24 SCC Rules together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.2. ***By 1 September 2011****, the Respondent shall file its Statement of Defence according to Art. 24 SCC Rules, including objections to jurisdiction if any, together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.3. ***By 9 September 2011****, the Parties may request disclosure of documents from the other Party (with a copy to Tribunal).*

5.4. ***By 23 September 2011****, the receiving Party either produces the requested documents or replies by a reasoned objection to the other Party (with a copy to Tribunal).*



5.5. ***By 30 September 2011***, *the Parties try to agree regarding the documents to which objections have been made.*

5.6. ***By 10 October 2011***, *insofar as they cannot agree, the Parties may submit reasoned applications in the form of Redfern Schedules to the Tribunal to order production of documents.*

5.7. ***By 21 October 2011***, *the Tribunal decides on such applications.*

5.8. ***By 4 November 2011***, *the Parties produce documents as ordered by the Tribunal.*

5.9. ***By 16 January 2012***, *the Claimant files its Reply Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production above.*

5.10. ***By 10 April 2012***, *the Respondent files its Rejoinder Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimant's Reply memorial or regarding new evidence from the procedure for document production above.*

5.11. *Should Respondent's submission according to section 5.10. contain further arguments regarding objections to jurisdiction, Claimant may submit a brief Rejoinder on Jurisdiction, but only in rebuttal to these further arguments by Respondent,* ***by 23 April 2012.***

5.12. *Thereafter, no new evidence may be submitted, unless agreed between the Parties or expressly authorized by the Tribunal.*

5.13. ***By 30 April 2012***, *the Parties submit*

**notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing including any information which witness or expert cannot testify in English,*

** and an updated list of all exhibits with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

5.14. ***By 7 May 2012***, *a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*



5.15. *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

5.16. ***Within 3 weeks later****, at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

5.17. *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing.*

5.18. ***Hearing from 23 (afternoon) to 27 July 2012****, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* ***30 July to 3 August 2012.***

5.19. *Towards the end of the Hearing, the Tribunal will consult with the Parties whether the Parties shall submit Post-Hearing Briefs and further details of such briefs.*

## 6. *Evidence*

*The Parties and the Tribunal may use, as an additional guideline, the 2010 version of the "IBA Rules on the Taking of Evidence in International Arbitration", always subject to the SCC Rules and changes considered appropriate in this case by the Tribunal.*

## 7. *Documentary Evidence*

7.1. *All documents ( including texts and translations into English of all substantive law provisions, cases and authorities) considered relevant by the Parties shall be submitted with their Briefs, as established in the Timetable.*

7.2. *All documents shall be submitted in the form established above in the section on communications.*

7.3. *New factual allegations or evidence shall not be any more permitted after the respective dates for the Rebuttal Briefs indicated in the above Timetable unless agreed between the Parties or expressly authorized by the Tribunal.*

7.4. *Documents in a language other than English shall be accompanied by a translation into English.*

## 8. *Witness Evidence*

8.1. *Written Witness Statements of all witnesses shall be submitted together with the Briefs mentioned above by the time limits established in the Timetable.*



8.2. *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as such witnesses are invited by the presenting Party or asked to attend the hearing at the request of the other Party, the available hearing time should mostly be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

## *9. Expert Evidence*

*Should the Parties wish to present expert testimony, the same procedure would apply as for witnesses.*

## *10. Hearing*

*Subject to changes in view of the further procedure up to the Hearing:*

10.1. *The dates of the hearing shall be as given in the Timetable above.*

10.2. *The hearing shall be held in Paris. (See Art. 20(2) SCC Rules) The chairman of the Tribunal will proceed with making appropriate reservations and then inform the Parties regarding further details and steps to be taken.*

10.3. *The Parties may present short opening statements of not more than two hours, unless decided otherwise by the Tribunal after receiving an application in that respect from a Party.*

10.4. *No new documents may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.*

10.5. *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest* ***by 25 April 2012****.*

10.6. *A live* ***transcript*** *shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e.* ***23 May 2012.***

10.7. *Should the Parties be presenting a witness or expert not testifying in English and thus requiring* ***interpretation****, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of*



*double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e.* ***23 May 2012.***

***11. Extensions of Deadlines and Other Procedural Decisions***

*11.1. Short extensions may be agreed between the Parties as long as they do not affect later dates in the Timetable and the Tribunal is informed before the original date due.*

*11.2. Extensions of deadlines shall only be granted by the Tribunal on exceptional grounds and provided that a request is submitted immediately after an event has occurred which prevents a Party from complying with the deadline.*

*11.3. The Tribunal indicated to the Parties, and the Parties took note thereof, that in view of travels and other commitments of the Arbitrators, it might sometimes take a certain period for the Tribunal to respond to submissions of the Parties and decide on them.*

*11.4. Procedural decisions will be issued by the chairman of the Tribunal after consultation with his co-arbitrators or, in cases of urgency or if a co- arbitrator cannot be reached, by him alone.*

*11.5. In view of the expected volume and complexity of the file in this procedure, the Tribunal may appoint an Administrative Secretary. The Tribunal will inform the Parties of such an appointment and of the fees of the Secretary. The costs for the Secretary shall be treated as expenses of the arbitration.*

***12. Other Issues***

*At the Meeting, Claimants notified the Respondents and the Tribunal that they may in the future seek interim measures in the event that the Government of Kazakhstan seeks to dispose of some or all of the assets that it has seized and are subject to these proceedings.*

21. On **18 January 2011,** Respondent requested that the Tribunal "*order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three—month period in satisfaction of that jurisdictional requirement.*" Respondent argued that the Art. 26 ECT requirement that parties refrain from submitting a dispute to international arbitration unless and until three months have elapsed from the date on which a party requested amicable settlement of the dispute had not been met. Claimants asserted that Respondent breached its obligations on 21 July 2010 – five days before Claimants filed their Request for Arbitration. In addition, Claimants never gave notice that they intended to assert treaty claims under the ECT and this is in



violation of the requirements of the ECT. Claimants' reliance on two letters from 2009 was misplaced and did not satisfy the ECT requirements.

22. On **24 January 2010**, Claimants replied that they have observed the three-month notice period set forth in Art. 26(2) ECT. Claimants reject Respondent's arguments that there was insufficient notice of the dispute, and offered instances where, between 2008 and mid-2010, the Parties attempted to resolve their dispute. Claimants rejected Respondent's reliance on a recent decision, *Murphy Exploration and Production Co. Int'l. v. Republic of Ecuador*, calling it an aberration in terms of the weight of investment treaty case law on this subject. Alternatively, Claimants indicated that, although they would be willing to suspend the arbitration in order to attempt to achieve settlement, they are not willing to delay the merits hearing. Claimants would allow for a sixty-day extension of the proceedings if Respondent were to (1) agree to waive its objections to the notice period and (2) apportion the suspension time equally between the parties, and (3) make a settlement proposal or propose a settlement meeting, in a neutral location, within one week of the letter.

23. On **28 January 2011**, Respondent answered Claimants' letter.

24. The Tribunal responded to the Parties on **1 February 2011**. The Tribunal encouraged the Parties to make a good faith effort to agree on a solution, hopefully maintaining the agreed hearing dates. The Tribunal also indicated its willingness to select a new, later hearing date in October 2012.

25. On **2 February 2011**, Claimants responded to the Tribunal's letter of 1 February, and to Respondent's letters of 18 and 28 January 2011. Maintaining its objections to Respondent's points, Claimants proposed a 90-day suspension of the arbitration and proposed some changes to the submissions schedule, while maintaining the hearing date. Claimants indicated their agreement to this would be subject to Respondent's agreement that it will not use the suspension period to aggravate the dispute and requested a response by 4 February 2011 at 17:00 CET.

26. Respondent replied to Claimants' letter on **6 February 2011**, rejecting Claimants' arguments that there had been notice and that such notice had been sufficient under the ECT. Respondent proposed an alternative time table that would allow for a suspension of the hearing.

27. On **8 February 2011**, Claimants requested that that Tribunal advise the Parties as to its availability for a 2-week hearing in October 2012.

28. On **14 February 2011**, the Arbitration Institute of the SCC wrote to the Tribunal, stating that "*the final award in the above arbitration shall be rendered on 26 April 2011*" and that the Tribunal must request an extension of time for rendering the final award.

29. On **22 February 2011**, the Tribunal, in consultation with the Parties, created a revised time table for the dates in Section 5 of PO-1.

| ***Procedural Order*** | ***Event*** | ***Current Schedule*** | ***Revised Schedule*** |
|---|---|---|---|



| | | | |
|---|---|---|---|
| *5.1* | *Statement of Claim* | *March 1, 2011* | *May 16, 2011* |
| *5.2* | *Statement of Defense* | *September 1, 2011* | *November 16, 2011* |
| *5.3* | *Document Requests* | *September 9, 2011* | *November 28 , 2011* |
| *5.4* | *Responses/Objections to Document Requests* | *September 23, 2011* | *December 9, 2011* |
| *5.5* | *Agreement on Documents* | *September 30, 2011* | *December 20, 2011* |
| *5.6* | *Redfern Schedule on Document Objections* | *October 10, 2011* | *December 30, 2011* |
| *5.7* | *Decision on Document Objections* | *October 21, 2011* | *January 10, 2012* |
| *5.8* | *Produce Remaining Documents (if any)* | *November 4, 2011* | *January 23, 2012* |
| *5.9* | *Claimants' Reply* | *January 16, 2012* | *April 2, 2012* |
| *5.10* | *Respondent's Rejoinder* | *April 10, 2012* | *June 26, 2012* |
| *5.11* | *Rejoinder on Jurisdiction (if any)* | *April 23, 2012* | *July 9, 2012* |
| *5.13* | *Pre-Hearing Witness Notifications and Exhibit Lists* | *April 30, 2012* | *July 16, 2012* |
| *5.14* | *Amended Pre-Hearing Witness Notifications* | *May 7, 2012* | *July 23, 2012* |
| *5.16* | *Pre-Hearing Telephone Conference (if necessary)* | *By May 28, 2012* | *By August 13, 2012* |
| *5.18* | *Hearing* | *July 23-27, 2012*<br>*July 30-August 3, 2012* | *October 1-5, 8-12, 2012* |

30. In its **Statement of Defence** (R-I), Respondent characterized this as the Tribunal having awarded a stay of proceedings with the intention of providing a window for settlement on 22 February 2011. (R-I ¶ 7.2; C-II ¶ 72).

31. On **4 March 2011**, the Arbitration Institute of the SCC granted the Tribunal an extension until 31 July 2013 render an Award.

32. The Parties met on **10 March 2011** in London for a settlement negotiation. (C-I ¶ 40).

33. On **18 May 2011**, Claimants submitted their **Statement of Claim** (C-I) to the Tribunal.



34. On **16 June 2011**, Respondent retained the law firm Norton Rose to represent it in this dispute, in place of the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP. The SCC reacted on 20 June 2011, sending a "*Power of Attorney*" for Respondent's new counsel.

35. On **29 June 2011**, Respondent returned the completed Power of Attorney forms to the SCC and informed the Tribunal and Claimants that the interests of the Republic of Kazakhstan will be represented by the Norton Rose law firm and by Prof. I. Zenkin, Attorney of Moscow Regional Collegium of Attorneys.

36. On **21 November 2011**, Respondent submitted its **Statement of Defence** to the Tribunal.

37. In a separate writing on **21 November 2011**, Respondent proposed trifurcation of the proceedings. Respondent argued that the Tribunal's reasons for refusing bifurcation were not compelling and that trifurcation would be necessary to re-balance the time table, especially in light of the size and complexity of the case.

38. On **8 December 2011**, Respondent submitted its **Request for Disclosure of Documents and the Explanatory Note thereto** to the Tribunal.

39. On **8 December 2011**, Claimants submitted their **Request for Production of Documents**. Claimants also requested production of the documents referred to and relied upon in the expert reports, which were not submitted with those reports. Claimants indicated that they would seek an order striking the so-called "*sleeper exhibits*" (witness statements disguised as exhibits) from the record.

40. Claimants produced 30 documents on **15 December 2011** and 14 documents on **22 December 2011**.

41. On **5 January 2012**, Claimants submitted their **Request for Production of Documents** and a cover letter detailing the request and responses to Respondent's production objections to the Tribunal. Claimants objected to Respondent's provision of so-called "*sleeper*" witness statements.

42. On **5 January 2012**, Respondent submitted its **Redfern Schedule** to the Tribunal.

43. On **5 January 2012**, Claimants submitted their **Redfern Schedule** to the Tribunal, along with lengthy arguments refuting Respondent's position.

44. On **16 January 2012**, Respondent submitted its WORD version of the **Redfern Schedule** to the Tribunal.

45. On **26 January 2012**, the Tribunal proposed the appointment of Katherine Simpson as Administrative Secretary to the Parties and requested their comment by 2 February 2012.

46. On **2 February 2012**, the Tribunal, after consultation with the Parties, appointed Ms. Simpson as Administrative Secretary.



47. The Tribunal issued **Procedural Order No. 2 on Production of Documents** (PO-2) on **3 February 2012**. The operative parts of that PO, but not the attached completed **Redfern Schedules**, is provided below:

***Procedural Order (PO) No. 2***
***On Production of Documents***

***1. Introduction***

*1.1. The Tribunal has taken note of the submissions of the Parties regarding document production.*

*1.2. The Tribunal recalls **Art. 26 SCC Rules** regarding evidence.*

*1.3. The Tribunal further recalls **section 5.6. of PO-1 providing for the submission of Redfern Schedules,** and that, by the Chairman's mails of 5 and 12 January 2012, the Tribunal had asked Respondent to submit its Redfern schedule in WORD format so that the Tribunal can insert its decisions. The Tribunal notes that, only on 16 January 2012, Respondent provided such a submission. Due to this delay, the Tribunal could only issue the present decision today.*

*1.4. According to section 6 of PO-1, the **"IBA Rules on the Taking of Evidence in International Arbitration"** can be used as a guideline giving indications regarding the relevant criteria for what documents may be requested and ordered to be produced. The Tribunal will use the IBA Rules (as re-issued 29 May 2010), taking into account the relevant practice of their application in international arbitration. In this context, the Tribunal has taken note of the Parties' submissions regarding the applicable criteria and will take them into account insofar as they are not in conflict to the IBA Rules.*

*1.5. The Tribunal recognizes that, on the one hand, ordering the production of documents can be helpful for a party to present its case and in the Tribunal's task of establishing the facts of the case relevant for the issues to be decided. On the other hand, the process of disclosure may be time-consuming, excessively burdensome, and even oppressive. Unless carefully limited, the burden may be disproportionate to the value of the result. Further, the Parties may have a legitimate interest in confidentiality.*

*1.6. Further, the Tribunal notes that, insofar as a Party has the **burden of proof**, it is sufficient for the other Party to deny what the respective Party has alleged and then respond to and rebut the evidence provided by that respective Party to comply with its burden of proof.*

***2. Documents to be produced***

*All documents identified in requests to be "admitted" **in the Annexes I and II attached** to this Order shall be produced **by 17 February 2012** to the other Party in this procedure, but not yet to the Tribunal, subject to the further qualifications and limitations in this Order. The receiving Party may then decide the extent to which it wishes to rely on such documents in*



*its further submissions to the Tribunal and may submit the respective documents with its next Memorial.*

***3. Qualifications and Limitations of Document Production***

*3.1. All documents produced under this Order may be utilized by the other Parties only in direct connection with the present arbitration procedure.*

*3.2. Of the documents ordered by the Tribunal, the following documents or categories of documents **need not be produced, but the reason for the non-production must be identified.** If they:*

*do not exist or do not yet exist,*

*or are not in the possession, custody or control of a Party,*

*or have already been sent or copied to the requesting Party,*

*or contain commercially sensitive information,*

*or include information regarding third parties for which the ordered Party has an obligation of confidentiality,*

*or are subject to attorney-client privilege under the legal or ethical rules by which Counsel of the Parties are bound in their respective jurisdictions,*

*or which reflect the seeking or rendering of a legal opinion by internal or external counsel.*

*3.3. If a document or category of documents ordered by the Tribunal only contains some information or sections which do not have to be produced according to Section 3.3 above, the respective document **may be redacted** in such a way that those sections are excluded from the production. **But the reason** for non-production or redaction and the extent of such redaction **must be indicated** in a separate note or in the document.*

*3.4. "Documents" should be understood to include permanent records in any form, including on paper and electronic.*

***4. Adverse Inference***

*Insofar as documents ordered are not produced or are not produced as ruled in this Order, the Tribunal may take this into account in its evaluation of the respective factual allegations and evidence and may draw an inference against the Party refusing production.*

***5. Tribunal's Decisions in attached Redfern Schedules***

*According to Section 2 above, as Annexes I and II, the following Redfern Schedules submitted by the Parties are attached in which the respective decisions of the Tribunal are added in the last column:*



*Claimants' Redfern Schedule dated 5 January 2012,*

*Respondent's Redfern Schedule dated 5 January 2012, but submitted in WORD format on 16 January 2012.*

***6. Claimants' application dated 5 January 2012 regarding "Sleeper Expert reports and Witness Statements"***

*6.1. The Tribunal has taken note of Claimants' earlier letter of 8 December 2011 and Claimant's applications in its letter of 5 January 2012, to which Respondent has not yet replied.*

*6.2. The Tribunal invites both Claimants and Respondent, after having taken note of the Tribunal's decisions on their Redfern schedules, to submit any further comments in this regard* ***by 17 February 2012****.*

48. The Chairman's email of **3 February 2012** is also provided for convenience:

*Dear colleagues,*

***1. Production of Documents***

*Attached please find Procedural Order No.2 (PO-2) together with its two Annexes containing the Tribunal's decisions on the Parties' Redfern Schedules.*

*Since, due to the delayed submission of the WORD version of Respondent's Redfern schedule, PO-2 could not be issued in time, as you see, the production is now ordered to be* ***by 17 February*** *which is the period of two weeks after the Tribunal's decisions originally provided in the agreed revised timetable confirmed by my mail of 2 December 2011.*

***2. New date for Claimant's Reply Memorial***

*In view of the above mentioned delay, the date by which Claimant is to submit its Reply Memorial is now set two weeks later, i.e.* ***16 April 2012.***
*As, thereafter, Respondent's Rejoinder is only due by 26 June 2012, the remainder of the agreed timetable up to the hearing is maintained without prejudice to the further exchange under section 3 hereafter.*

***3. Respondent's Procedural Applications dated 21 November 2011***

*After the decisions on document disclosure have now been issued,* ***Claimants*** *are hereby invited to comment* ***by 17 February 2012*** *on Respondent's procedural applications submitted by letter of 21 November 2011.*

***4. Communications to Tribunal's Administrative Secretary***

*In follow-up to my mail of 26 January 2012, the Parties are from now on invited to send copies of all electronic and hard copy communications, in*



*addition to each member of the Tribunal, also to the Administrative Secretary:*

*Katherine Simpson*
*Graeffstr. 1*
*Zi. 1908*
*50823 Köln*
*Germany*
*Ksimpson.llm@hotmail.com*

***5. Correct Address of Prof. Lebedev***

*As communications to Co-Arbitrator Prof. Lebedev have been sent to different addresses, the Parties are invited to submit further communications only to his following address:*

*Moscow 129626, Staroalexeevskaya 16/49.*

49. On **7 February 2012**, the SCC confirmed the appointment of Ms. Simpson.

50. On **16 February 2012**, Claimants wrote to Respondent, requesting the production of the documents and data referred to and relied upon by its party-appointed experts, Deloitte and GCA.

51. On **17 February 2012**, Claimants wrote to Respondent in response to PO-2. Claimants would provide Respondent's counsel 285 documents, in addition to those produced on 15 and 22 December 2011. Claimants indicated reasons for non-production of some of the requested documents.

52. On **17 February 2012**, Claimants requested that the Tribunal:

- *Order Kazakhstan to produce immediately all materials upon which Deloitte and GCA relied when preparing their expert reports;*
- *Clarify its decision with respect to Kazakhstan's "sleeper" expert reports and witness statements to the extent necessary;*
- *Order Kazakhstan to identify immediately all of the individuals who authored the twenty "sleeper" expert reports and witness statements;*
- *Reject Kazakhstan's application to trifurcate this proceeding;*
- *Reject Kazakhstan's request to "rebalance" the procedural calendar; and*
- *Reject Kazakhstan's request to extend the currently-scheduled 10 day hearing to 22 days in length.*

53. On **21 February 2012**, Claimants requested that the Tribunal instruct Respondent to comply with its document production obligations, or suffer the consequences of its failure to comply with the Tribunal's document production decision.



54. On **22 February 2012**, the Tribunal invited the Parties to submit any comments to the other's submissions of 16 and 17 February by 12 March 2012.

55. On **12 March 2012**, Claimants wrote in response to the Tribunal's 22 February 2012 request for additional comments, reiterating its earlier arguments and urging the Tribunal not to allow Respondent to benefit from its obstructionism, while protecting Claimants' right to a fair hearing.

56. On **24 March 2012**, the Tribunal issued Procedural Order No. 3 (PO-3). The entire text of PO-3 is set out below:

***Procedural Order (PO) No. 3***

***1. Introduction***

*1.1. The Tribunal has taken note of the recent submissions of the Parties regarding document production and regarding the further procedure. Since the Parties had the opportunity to file two rounds of submissions and since the arguments put forward in these submissions are well known to the Parties, the Tribunal sees no need to repeat the many arguments of the Parties.*

*1.2. Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

***2. Document Production***

*2.1. The earlier rulings of the Tribunal, particularly in PO-2, its Annexes, and the Chairman's letter of 3 February 2012, are maintained and are hereby confirmed.*

*2.2. Due to a clerical error, Claimant's Request no. 48 in Annex 1 of PO-2 was not decided. It is now decided as follows:*

*"Admitted in so far as documents are referenced or relied upon in Exhibit R-118."*

*2.3. Regarding supporting documents to the reports by Deloitte, GCA, and Neftegazconsult, as well as to other reports submitted by Claimants and Respondent, it is confirmed that these have to be produced now, in so far as they have not yet been produced. If a Party chooses not to produce them, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*

*2.4. Regarding what the Claimants refer to as "Sleeper" reports and statements, the Tribunal has already admitted the respective requests by Claimants in Annex 1 to PO-2, as explained in the last paragraph on the title page of Annex 1 to PO-2. It is clarified that the required disclosure includes the identification of the authors of such documents. And, it is confirmed that, if Respondent chooses not to produce, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*



2.5. *Insofar as the Parties in view of PO-2, in view of their further submissions thereafter regarding their own or the othe rParty's production up to now, and in view of the above clarifications in this PO, choose to still produce documents, they shall do so by **2 April 2012** in order to provide for the next procedural step according to the agreed timetable, i.e. to enable Claimant to take such documents into account in its Reply Memorial now due by 16 April 2012 according to my letter of 3 February 2012. Otherwise it will be assumed that the Party has chosen not to produce with the consequences mentioned above.*

2.6. *Finally, the Tribunal confirms that it is left to each Party whether or not it will produce documents. However the Tribunal stresses, that both the Parties and the Tribunal have an interest that all relevant evidence is available for an orderly discussion and for decisions by the Tribunal and also an interest that neither non-production leads to adverse inferences nor that submitted evidence may be considered of little or even no evidentiary value due to non-production of supporting documents or information.*

3. ***Further Procedure***

3.1. *Regarding the **further procedure**, the Tribunal recalls Section 2.1 of PO-1:*

> *2.1. This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

3.2. *The Tribunal notes that Respondent is well acquainted with international arbitration procedures from other earlier cases and was represented at the Stockholm meeting by counsel also regularly active in this field.*

3.3. *It is further recalled that, in February 2011, the Parties submitted a joint proposal for a new timetable, which the Tribunal accepted by the Chairman's letter of 22 February 2011.*

3.4. *The Tribunal considers that changing the agreed and so far implemented procedure at the present stage would considerably disrupt the procedure and would only be acceptable for mandatory and urgent reasons. The Tribunal does not see any such reasons in the present case.*

3.5. *Therefore, the procedure shall proceed as established in PO-1 and later rulings of the Tribunal slightly adapting the timetable.*

3.6. *According to the agreement recorded in Sections 4.3 and 7.4 of PO-1, English will remain the **language of this procedure**. However, while accordingly, the hearing shall also be conducted in English, the Parties may make arrangements at the hearing for simultaneous interpretation to Russian. Anyhow, if witnesses or experts are examined at the hearing who do not testify in English, such arrangement will have to be made by the*



*Parties in accordance with Section 10.7 of PO-1. Therefore, it is suggested that the Parties when they contact the ICC Hearing Centre in accordance with the Chairman's mail of 4 April 2011 regarding the logistics of the hearing (it is suggested that they do so soon), they also request to use the logistics for simultaneous interpretation which are available at the Centre.*

*3.7.* *Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in section 6.18 o fPo-1 which, taking into account the dates of the jointly proposed and accepted new timetable provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 12 October 2012.*

*3.8.* *Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:*

*Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.*

*3.9.* *To clarify the intention of the Tribunal regarding the conduct of the hearing, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings, which have proved to be efficient and acceptable to the parties in similar cases:*

*A.* *In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as, at the Hearing, such witnesses or experts are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness or expert for up to 10 minutes and add direct examination on issues, if any, which have occurred after the last written statement or report of the witness or expert has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

*B.* *The following Agenda is intended to be established for the Hearing:*

*1.* *Introduction by the Chairman of the Tribunal.*

*2.* *Opening Statements of not more than total of two hours for each Party*

*First on jurisdiction*



*a) Respondent up to 30 minutes*

*b) Claimants up to 30 minutes*

*Second on all other issues including the Merits*

*a) Claimants up to 90 minutes*

*b) Respondent up to 30 minutes*

3. *Unless otherwise agreed by the Parties: Examination of Claimants' fact witnesses:*

*a) Affirmation of witness to tell the truth.*

*b) Short introduction by Claimants*

*c) Cross-examination by Respondent.*

*d) Re-direct examination by Claimants, but only on issues raised in cross-examination.*

*e) Re-cross examination by Respondent but only on issues raised in re-direct examination.*

*f) Remaining questions by members of the Tribunal, but they may raise questions at any time.*

4. *Examination of Respondent's fact witnesses. For each: vice versa as under 3.a) to f) above.*

5. *Examination of experts as under 3.a) to f) above.*

6. *Any witness or expert may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness and expert during the time of the Hearing.*

7. *Oral closing arguments of up to 2 hours (or longer if authorized by the Tribunal after consultation with the Parties during the hearing) each for the*

*a) Claimants,*

*b) Respondent.*

8. *Remaining questions by the members of the Tribunal, if any.*

9. *Discussion regarding the timing and details of post-hearing submissions and other procedural issues.*

3.10. *Taking into account the above rulings and intended conduct of the hearing, and also taking into account, from the submissions already received, the*



*volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the period blocked for the hearing in accordance with the agreed timetable is sufficient.*

*4. Beyond the above observations and rulings, the Tribunal does not consider any action necessary from its side.*

57. On **2 April 2012**, Respondent confirmed that it had sent Claimants approximately 32,000 pages of requested documents. Respondent also contacted the ICC Hearing Center. Finally, Respondent stated that the time period for the oral hearing on jurisdictional matters is not sufficient and proposed devoting the period from 1 – 5 October to jurisdictional matters.

58. On **4 April 2012**, Claimants requested an extension of six weeks for the preparation of their Reply, since that amount of time would be necessary to translate and read the 32,000 pages of documents sent by Respondent – sent 14 days prior to Claimants' deadline to submit the Reply.

59. On **10 April 2012**, the Tribunal wrote to the Arbitration Institute of the SCC. In light of changes in the case, it became necessary for the Tribunal to ask that its fees and the Security for Expenses be doubled.

60. On **11 April 2012**, Respondent wrote to the Tribunal, objecting to Claimants' requests for extensions of time unless the same time period would be granted for Respondent's Rejoinder.

61. On **21 April 2012**, the Tribunal circulated a draft of Procedural Order No. 4 (PO-4) to the Parties for their review and comment by 30 April 2012.

62. On **23 April 2012**, the Arbitration Institute of the SCC forwarded the Parties the Tribunal's letter of 10 April 2012 and requested their response by 30 April 2012.

63. On **24 April 2012**, Claimants provided their comments to draft PO-4. Claimants objected to moving the hearing date and proposed alternatives.

64. On **4 May 2012**, the Tribunal issued **Procedural Order No. 4** to the Parties. The entire text is provided below, for ease of reference:

***Procedural Order (PO) No.4***

*A draft of this PO was sent to the Parties for comments by 30 April 2012. Taking into account the comments received from the Parties, the Tribunal now issues the PO in its final form.*

***1. Introduction***

*1.1. The Tribunal has taken note of Claimants' Application of 4 April and letter of 24 April 2012 and of Respondent's comments of 11 April and letters of 30 April 2012, both with attachments and proposals for a new timetable. Since the arguments put forward in*



*these submissions are well-known to the Parties, the Tribunal sees no need to repeat them here.*

*1.2. Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

## ***2. Relevant aspects of the procedure up to now***

*2.1. The Tribunal recalls* ***Procedural Order No.3 (PO-3)****, particularly its Section 3. The respective rulings are confirmed, subject to changes hereafter in this PO.*

*2.2. The Tribunal notes that both Parties now agree that the timetable as confirmed by PO-3 should be changed. But they disagree in which way it should be changed.*

*2.3. The Tribunal recalls the second introductory paragraph of Annex I to PO-2 dated 3 February 2012:*

*Further, the Tribunal clarifies that, in so far as Respondent has submitted exhibits, in particular statements and reports (which Claimants refer to as "Sleeper" Reports and Statements), the Tribunal has admitted Claimants' requests that documents on which such exhibits rely, etc., shall be produced. However, if Respondent chooses not to produce such documents, this will be taken into account by the Tribunal regarding the evidentiary value of such exhibits. The same may apply, if persons who have produced such exhibits and who are called for cross-examination by Claimants, do not appear at the hearing for cross examination.*

*2.4. In their submissions dated 17 and 21 February 2012, Claimants identified and listed a number of such documents alleging that they had not been produced by Respondent and requested (pages 11 and 12 of the letter of 17 February 2012) that the Tribunal order Respondent to produce them "immediately."*

*2.5. The Tribunal understands that, rather than relying on the Tribunal's reaction concerning ordered but not produced documents identified in the paragraph quoted above from Annex I, Claimants considered the disclosure of these documents so essential for their Reply Memorial that they insisted on their production.*

*2.6. Taking into account Claimants' submissions and Respondent's further submissions, in Section 2 of PO-3, the Tribunal provided further clarifications and a further opportunity to the Parties to produce further documents by the new deadline of 2 April 2012.*

*2.7. By that date of 2 April 2012, Respondent submitted its letter of that date announcing the disclosure of a great number of documents which seem to include all those requested by Claimants.*



2.8. *By letter of 4 April 2012, Claimants submitted that they could not address this volume of documents now disclosed by Respondent by the deadline of 16 April set for their Reply Memorial. Therefore, they proposed a new timetable.*

2.9. *By letter of 11 April 2012, Respondent submitted comments on Claimants' letter. Particularly, Respondent listed a number of documents which it alleged Claimants should have disclosed according to PO-3 and proposed a new timetable different from that proposed by Claimants.*

2.10. *By letter of 24 April 2012, Claimants submitted comments on the draft PO and, particularly, declared themselves ready to submit their Reply Memorial on Jurisdiction and Liability by 7 May and their Reply Memorial on Quantum by 28 May 2012. On that basis, Claimants suggested new alternative timetables.*

2.11. *By letters of 30 April 2012, Respondent submitted letters and appended comments on the draft PO-4 and on Claimants' letter of 24 April 2012.*

## ***3. The Tribunal's Conclusions***

3.1. *The Tribunal understands that the Parties prefer to have as many relevant documents as possible available for their final Memorials before the hearing on the merits.*

3.2. *The Tribunal also feels that every effort should be made to have all relevant documentation on file in order to fully evaluate the Parties' submissions and evidence.*

3.3. *The Tribunal agrees with the Parties that, therefore, the timetable should be changed. The Tribunal recalls that, in its draft PO-4, it already asked for the Parties' views regarding a bifurcation with an early hearing on jurisdiction. The Tribunal notes that both the Claimants (in their Alternative 2) and the Respondent now accept bifurcation, though they do not agree on its scope.*

3.4. *Since the great majority of the large volume of documents which Respondent should have produced by 17 February 2012 according to the second introductory paragraph of Annex I to PO-2, but were produced only by 2 April 2012, concerns the quantum of the claims, the Tribunal finds that bifurcating the procedure into a first phase on jurisdiction and liability and a second phase on quantum, is the relatively best solution in order to avoid undue delay for the entire procedure under the present circumstances.*

3.5. *In this context, the Tribunal finds it helpful that Claimants now accept 7 May 2012 as an earlier deadline for their Reply Memorial on jurisdiction and liability, and still the originally suggested*



*deadline of 28 May 2012 for their Reply Memorial on quantum, and also foregoes its Rejoinder on Jurisdiction. Insofar as, from the list of allegedly missing documents according to Respondent's letter of 11 April 2012, Claimants are ready to submit such documents, they should at the latest be submitted with these Memorials.*

3.6. *While the Tribunal agreed with Respondent that the deadline originally suggested by Claimants for Respondent's Rejoinder Memorial, i.e. 6 August 2012, was not sufficient, bifurcation would allow different deadlines for Respondent's two Rejoinder Memorials in the two phases. Since Claimants' Reply Memorial on Jurisdiction and Liability can now be submitted* ***by 7 May 2012****, the Tribunal considers that Respondent can now be expected to submit its Rejoinder Memorial restricted to jurisdiction and liability* ***by 26 July 2012****.*

3.7. *Thereafter, as Claimants have forgone their right to submit a Rejoinder on Jurisdiction, there will be sufficient time for the further procedural steps up to a hearing starting at the originally agreed date of 1 October 2012, but restricted to jurisdiction and liability.*

3.8. *Regarding the procedure on quantum, a separate timetable could, thus, be set up leading to a shorter hearing on quantum only at a later time.*

## *4. New Timetable*

4.1. *Taking into account its above conclusions, the Tribunal hereby sets the following new* ***Timetable*** *for the further procedure using and adapting the originally agreed procedural steps in Sections 5.9 to 5.19 of PO-1.*

4.2. ***By 7 May 2012****, the Claimants file their Reply Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.*

4.3. ***By 28 May 2012****, the Claimants file their Reply Memorial on quantum with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.*

4.4. ***By 26 July 2012****, the Respondent files its Rejoinder Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimants' Reply Memorial or regarding new evidence from the procedure for document production.*



4.5. *Thereafter, no new evidence may be submitted regarding jurisdiction and liability, unless agreed between the Parties or expressly authorized by the Tribunal.*

4.6. ***By 3 August 2012**, the Parties submit*

* *notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing on jurisdiction and liability including any information which witness or expert cannot testify in English,*

* *and an updated list of all exhibits regarding jurisdiction and liability with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

4.7. ***By 10 August 2012**, a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*

4.8. *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

4.9. ***Within 3 weeks later**, at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

4.10. *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing on jurisdiction and liability.*

4.11. ***Hearing from 1 to 5 October 2012**, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from **8 to 9 October 2012**.*

4.12. *Towards the end of the Hearing, the Tribunal will consult with the Parties regarding the further procedure up to the hearing on quantum.*

4.13. *Subject to any changes resulting from the discussion at the above hearing in October, **by 21 November 2012**, Respondent's Rejoinder on quantum.*

4.14. *Dates for a period of up to 4 days for the **hearing on quantum** will be determined after further exchanges between the Tribunal and the Parties as soon as possible.*

***5. Logistics at the Hearing***



> *5.1. The Tribunal recalls regarding the logistics at the Hearing:*
>
> * *Section 10.6 of PO-1 (transcript)*
> * *Section 10.7 of PO-1 (interpretation)*
> * *the Chairman's mail of 4 April to the ICC Hearing Centre in Paris, which was copied to the Parties (arrangements and billing at the Centre).*
>
> *5.2. The Parties are invited to jointly make the necessary arrangements and inform the Tribunal accordingly **by 26 July 2012**.*

65. On **7 May 2012**, Claimants notified the Tribunal that it required an extension until 14:00 CET on 8 May in order to make its submission, due to the size of the submission, as well as lingering issues of obtaining signatures and translations across various jurisdictions.

66. On **8 May 2012**, Claimants submitted **Claimants' Reply Memorial on Jurisdiction and Liability** (C-II), together with 7 witness statements and 5 expert reports, to the Tribunal.

67. On **9 May 2012**, the Arbitration Institute of the SCC decided that additional advances, in the amount of EUR 422 000 shall be paid by Respondent by 23 May 2013 and so notified the Parties.

68. On **24 May 2012**, the Arbitration Institute of the SCC wrote to the Parties, reminding Respondent to pay the outstanding advance of EUR 422 000 and extending the deadline to 1 June 2012.

69. On **28 May 2012**, Claimants submitted **Claimants' Reply Memorial on Quantum** (C-III) to the Tribunal.

70. On **30 May 2012**, Respondent advised the Tribunal that Respondent appointed Dr. Patricia Nacimiento of Norton Rose LLP as counsel.

71. On **30 May 2012**, Respondent applied for an extension of the deadline to submit **Respondent's Rejoinder on Jurisdiction and Liability** (R-II).

72. On **31 May 2012**, the Tribunal confirmed receipt of Respondent's two letters of 30 May 2012 and invited Claimants to submit any comments thereto by 4 June 2012.

73. On **4 June 2012**, Claimants responded that they do not object to Respondent being provided a brief extension of one week or less for its Rejoinder, and left the matter to the Tribunal's discretion.

74. On **5 June 2012**, Respondent urged the Tribunal to grant the requested extension and arguing that an extension was necessary in order that Respondent adequately reply to Claimants' new evidence.

75. On **5 June 2012**, Claimants urged the Tribunal to grant a shorter extension that would leave the bulk of August and September available to prepare for the October hearing.



76. On **6 June 2012**, the Tribunal sent the following email to the Parties.

> *[T]he Tribunal has taken note of the Parties' recent communications. Since they are well known to all concerned, there is no need to repeat or summarize them again.*
>
> ***1. Regarding Respondent's 1st letter of 30 May 2012.***
>
> *In this regard, I as Chairman disclose the following.*
>
> *Dr. Patricia Nacimiento, who is announced as a new additional counsel, is one of my two co-editors of the book "Arbitration in Germany" published some years ago and planned for a 2nd edition in the future. I have not ever had and still do not have any other professional contact with her. I do not consider that her appointment raises any professional conflict either for her or for my involvement in this arbitration. However, as a precaution, I inform the parties of the above (which anyhow can be seen from the book having been on the market for some years). I add that the other members of the Tribunal also do not see any conflict. Unless we receive an objection from one of the Parties within one week of this letter, we consider this matter as closed.*
>
> ***2. Regarding Respondent's 2nd letter of 30 May 2012.***
>
> *After an examination of the Respondent's extension application and the comments received from the Parties, mainly for the reasons mentioned in the Respondent's letter of 30 May, the Tribunal concludes that the requested extension shall be granted as follows:*
>
> *The dates in PO-4 are changed as hereafter:*
> - ***Section 4.4. to 13 August 2012***
> - ***Section 4.6. to 20 August 2012***
> - ***Section 4.7. to 27 August 2012***
> - ***with the later sections and, of course, the hearing dates remaining unchanged.***
>
> ***3. Hearing on Quantum.***
>
> *Pursuant to 4.14 of PO-4, the Tribunal has had an exchange on possible dates for the Hearing on Quantum. It has turned out that, after the Respondent's Rejoinder due by 21 November 2012, the only period prior to April 2012 at which all three members of the Tribunal are available for the 4 day hearing, is **28 to 31 January 2013.***
>
> *Therefore, the Tribunal sets the hearing for these dates and requests the Parties to block that period for a hearing in Paris. Further details will be determined later.*

77. On **12 June 2012**, the Arbitration Institute of the SCC advised that Respondent still has not made the required EUR 422 000 payment. Claimants were, therefore, invited to make the payment by 19 June 2012.



78. On **20 June 2012**, the Arbitration Institute of the SCC advised that Claimants provided the additional advance of EUR 422 000, as ordered.

79. On **24 June 2012**, the Tribunal provided the Parties the ICC Centre's revised reservation confirmation for the shortened hearing in October 2012 and the ICC Centre's Quotation for the 2nd hearing to take place in January 2013. The Tribunal invited the Parties to confirm the reservation to the ICC Centre by 9 July 2012 and to inform the Tribunal by the same date.

80. On **4 July 2012**, Claimants announced the confirmation of the reservations with the ICC Centre for the October 2012 and the January 2013 hearings and also announced the relocation of its counsel's Paris office.

81. On **1 August 2012**, the Tribunal requested that the Parties submit Microsoft WORD versions of each of the Memorials to the Tribunal. The Parties complied on **3 August 2012**.

82. On **13 August 2012**, Respondent filed its **Rejoinder on Jurisdiction and Liability**, and the accompanying witness statements and export reports, with the Tribunal.

83. On **20 August 2012**, the Parties submitted their respective notifications of witnesses and experts for examination at the hearing, pursuant to PO-4 as amended on 6 June 2012, to the Tribunal.

84. On **23 August 2012**, the Chairman distributed the **Tribunal's draft for a Procedural Order No. 5 regarding the details of the hearing in October** to the Parties. The Tribunal requested responses by 7 September.

85. On **27 August 2012**, Respondent emailed the Tribunal. Respondent confirmed receipt of draft PO-5 and requested that the Tribunal confirm that, by the attached draft, the deadline initially established for 27 August 2012 for the Parties' comments to the respective letters of 20 August 2012 is superseded and that the next relevant deadline is 7 September 2012.

86. On **27 August 2012**, the Tribunal confirmed the 27 August deadline.

87. On **27 August 2012**, the Parties, in separate emails, confirmed their 20 August 2012 notifications of witnesses and experts for examination at the hearing and indicated that neither wished to make any changes to those lists.

88. On **7 September 2012**, Claimants and Respondent, in separate letters, submitted their comments to draft PO-5 to the Tribunal.

89. On **8 September 2012**, Respondent wrote in response to Claimants' letter of 7 September 2012, indicating that the contents of Claimants' letter deviated in part from the Parties' discussions. In particular, Respondent strongly objected to using the January hearing for any purpose other than quantum.



90. On **11 September 2012**, the Tribunal thanked the Parties for their cooperation on logistics and arrangements with the ICC Hearing Centre and invited them to a telephone conference at 15:00 Paris time on 15 September.

91. On **13 September 2012**, Claimants confirmed their attendance for the October hearing. While Claimants would prefer to hear expert testimony at the hearing, they are mindful that the Tribunal considers that oral testimony from the experts may be unnecessary. Instead, Claimants stated that they will not insist on presenting experts or on cross-examining Respondent's experts at the October hearing unless Respondent calls an expert. Finally, Claimants stated that they did not consider a pre-hearing telephone conference with the Tribunal to be necessary.

92. On **14 September 2012**, Respondent wrote to the Tribunal with comments on PO-5. Respondent suggested that the order of witnesses should be notified by 26 September, at the latest. Respondent also requested that witnesses Messrs. Smagulov, Aubakirov, and Aldashev be heard by video-conferencing. Respondent asked that the deadline for Post-Hearing Briefs be set after the January 2013 hearing.

93. On **14 September 2012** the Chairman replied, stating that Respondent would need to make witnesses Smagulov, Aubakirov, and Aldashev available for oral testimony at the hearing or, alternatively, could withdraw their witness statements, per section 3.6 of draft PO-5.

94. On **14 September 2012**, Claimants requested the Tribunal's permission to submit a limited number of documents into evidence in advance of the October hearing, pursuant to points 7.3 and 10.4 of PO-1.

95. On **16 September 2012**, Respondent urged dismissal of the request.

96. On **16 September 2012**, Claimants replied to Respondent's email, explaining that the evidence sought to be admitted is pertinent and responsive to new arguments made by Respondent.

97. On **18 September 2012**, the Tribunal issued **Procedural Order (PO) No. 5 Regarding further details of the Hearing on Jurisdiction and Liability** (PO-5). The entire text is provided below for ease of reference:

***<u>Procedural Order (PO) No.5</u>***
***Regarding further details of the Hearing on Jurisdiction and Liability***

*A draft of this PO was sent to the Parties for comments by 7 September 2012.*

*Thereafter, taking into account:*

- *the comments on the draft and further submissions received from the Parties,*
- *the Tribunal's letter to the Parties dated 11 September 2012*
- *and the submissions received from the Parties thereafter,*

*the Tribunal now issues the PO in its final form.*



## *1. Earlier Agreements and Rulings*

*1.1.* *In order to have all rulings relevant for the hearing available in one document, this Order recalls the* ***earlier agreements and rulings*** *of the Tribunal and confirms them, to the extent that they are not amended in this PO, in bracketed text or elsewhere. The Tribunal particularly takes into account the recent submissions and letters of the Parties.*

*1.2.* *In particular, with reference to section 2.1 of PO-4, the* ***following sections of PO-3*** *are recalled and again confirmed:*

> *3.7.* *Regarding the* ***length of the hearing****, the Tribunal recalls the agreement recorded in Section 6.18 of PO-1 which, taking into account the dates of the jointly proposed and accepted new timetable, provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 9 October 2012. [In this regard, section 4.11 of PO-4 decided on the bifurcation of the proceedings and ruled that extension days would include only 8 to 9 October.].*
>
> *3.8.* *Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:*
>
> *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish* ***equal maximum time periods*** *both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.*
>
> *3.9.* *To clarify the* ***intention of the Tribunal regarding the conduct of the hearing****, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings which have proved to be efficient and acceptable to the parties in similar cases:*
>
> *[The later provisions of § 3.9 of PO-3 are not recalled, but are later included in this PO-5 in their amended form as now valid for the hearing.]*
>
> *3.10.* *Taking into account the above rulings and intended conduct of the hearing and also taking into account, from the submissions already received, the volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the* ***period blocked for the hearing in accordance with the agreed timetable is sufficient.***

*1.3* *Further, the Tribunal recalls from* ***PO-1 the following sections:***

> *10.4.* ***No new documents*** *may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the*



*credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.*

10.5. *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.*

10.6. *A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.*

10.7. *Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.*

1.4 *Further, the Tribunal recalls from **the Tribunal's letter dated 11 September 2012** the following sections:*

***1. Logistics of the Hearing***

1.1. *The Tribunal thanks the Parties for their arrangements with the ICC Hearing Centre.*

1.2. *The Parties' selection of Mr. McGowan as **court reporter** is an excellent one. It should be pointed out to him that very few interruptions of the hearing will be possible so that he can bring a colleague in case he considers that necessary.*

1.3. *For the same reasons, the **interpreters** should be notified and it may be necessary for them to bring a second team to allow un-interrupted simultaneous interpretation.*

1.4. *In order to make sure that all the **logistics are ready before the beginning of the hearing Monday 1 October 2012 at 9:30,** it should be assured early enough (either on Sunday or very early Monday morning) that the hearing room is set up, including in particular that:*

* *All files of the Parties are set up,*
* *There is sufficient room for the members of the Tribunal to spread their files on their desks,*
* *The hearing binders for the Tribunal on separate carts behind every member of the Tribunal,*



- *Microphones for all speaking connected to loud speakers,*
- *All of the equipment of the court reporter is set up,*
- *All of the equipment for the simultaneous interpretation is set up, and*
- *There are sufficient plugs available for the individual laptops of the Parties, of the members of the Tribunal, and of the Tribunal Secretary, in addition to the live laptops of the court reporter.*

*The Parties are invited to inform the Tribunal in advance at which time this preparation will be done so that the Tribunal Secretary can join them at an appropriate time.*

*1.6.* *Subject to the provisions below, for the case that Mr. Seong-Hoon Kim is to be examined orally, the Parties should make all arrangements for a* ***video examination*** *from Korea for an appropriate time during the hearing agreed between the Parties and notified to the Tribunal.*

***2. Fact Witnesses***

*2.1.* *The Tribunal thanks the Parties for reducing the number of fact witnesses to be heard at the hearing.*

*2.2.* *As agreed between the Parties, they are invited to notify the other Party and the Tribunal as early as possible and at the latest by the beginning of the hearing regarding the order in which the fact witnesses should be heard.*

***3. Experts***

*3.1* *The Tribunal thanks the Parties for their efforts and suggestions regarding the examination of experts.*

*3.2.* *The Tribunal recalls from the chairman's letter of 23 August 2012 the indication that, in view of the extensive reports of most experts, the Tribunal considers that oral examination of most experts may not be necessary.*

*3.3.* *Having reviewed the various considerations and suggestions of the Parties in their recent communications in this regard, the Tribunal rules as follows:*

*3.3.1.* *With their 1st round of Post-Hearing Briefs after the October hearing, the Parties may submit comments of their experts, but only regarding any new developments or issues which they have not addressed in their earlier reports, if considered necessary.*

*3.3.2.* *With their 2nd round of Post-Hearing Briefs after the October hearing, the Parties may submit reply comments of their experts to the comments of the experts of the other Party submitted in the 1st round, if considered necessary.*



3.3.2. *[sic] If, in spite of the above opportunity for written additional comments by the experts, a Party insists that oral examination should take place at the hearing, the examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

3.3.3. *In so far as a Party insists on oral examination of an expert according to section 3.3.2. above, it shall notify the Tribunal* ***by noon (Paris time) Friday 14 September 2012***

- *of the respective expert who should be examined,*
- *the respective expert from the other side who should join the conferencing, and*
- *the issues on which the conferencing examination should focus.*

3.3.4. *In so far as a notification is made according to section 3.3.3. above, the Parties shall make the respective experts available at the hearing.*

3.3.5. *In preparation of the hearing, the notified experts regarding the same issues, in so far as they will attend the hearing, are invited to try to agree on a note, or otherwise send separate notes, listing major points of agreement and disagreement, and the* ***Parties*** *shall submit such notes to the Tribunal* ***by 24 September 2012****.*

***4. Further procedure***

4.1. *As the Parties must have sufficient time to prepare the hearing and assure attendance (including getting visas etc) of the witnesses and experts required at the hearing, the Tribunal intends to issue* ***PO-5*** *as soon as possible after 14 September 2012 and any possible notifications received by that time. The Parties are invited to start their preparations for the hearing already now on the basis of the provisions in the draft PO-5 they received in so far as these are not affected by the rulings in this letter of the Tribunal.*

4.2. *At the present time and in view of the above rulings, the Tribunal does not consider it necessary to, additionally, hold a telephone conference for which an option is provided in section 4.9 of PO-4," if considered necessary by the Tribunal".*



4.3. *In view of other commitments of the members of the Tribunal, the only possible date on which Mr. Haigh and the chairman would be available for a telephone conference on any further details would be Saturday 15 September. But Prof. Lebedev, who is travelling, is not sure he could join in.*

4.4. *If the Parties agree that a telephone conference is still necessary and if they are available on that day, they are invited to arrange a telephone conference for that day which, in view of the time differences involved, should start at* ***15:00 hours Paris time on 15 September****.*

4.5. *If it turns out that the Parties are not available on that date, the Tribunal will issue PO-5 taking into account any notifications and comments received from the Parties.*

4.6. *At the end of the January hearing, the Tribunal will consult with the Parties whether a one day hearing should be set for final pleadings in April 2013.*

**2. Procedural Steps before the Hearing**

2.1. *Claimants are authorized to submit,* ***by 21 September 2012****, the new documents mentioned in its letter dated 14 September 2012. If Respondent wishes to submit any new documents in rebuttal to these documents, it may do so* ***by 27 September 2012****.*

2.2. *In view of the great number of exhibits submitted by the Parties and in order to facilitate references and using these exhibits at the Hearing and to avoid that each member of the Tribunal has to bring all of them to the Hearing, the* ***Parties*** *are invited to bring to the Hearing:*

- *for the other Party and for* ***each*** *member of the Tribunal* ***Hearing Binders in A5 format*** *of those exhibits or parts thereof on which they intend to rely in their oral presentations at the hearing, together with a separate consolidated Table of Contents of the Hearing Binders of each Party.*
- *a* ***USB-Device*** *with the contents of the Hearing Binders for the other Party, for each member of the Tribunal, and for the Tribunal Secretary.*
- *for the use of the Tribunal, in* ***A5 format one full set of all exhibits*** *the Parties have submitted in this procedure, together with a separate consolidated Table of Contents of these exhibits.*

**3. Further Details regarding the Hearing**

3.1. *As ruled in section 4.11 of PO-4, the Hearing shall be held at the* ***ICC Hearing Centre in Paris from 1 to 5 October 2012****, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* ***8 to 9 October 2012.***

3.2. *No extension of the hearing will be possible due to other commitments of members of the Tribunal.*



3.3. *To give sufficient time to the Parties and the Arbitrators to prepare for and evaluate each part of the Hearings, the daily sessions shall not go beyond the period between 9:30 a.m. and 5:30 p.m. However, the Tribunal, in consultation with the Parties, may change the timing during the course of the Hearings.*

3.4. *In accordance with section 10.5 of PO-1, the Tribunal establishes the following maximum time periods which the Parties shall have available for their presentations and examination and cross-examination of all witnesses and experts. Taking into account the Calculation of Hearing Time attached to this Order, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

*15.5 hours for Claimants*
*15.5 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items above, as long as the total time period allotted to them is maintained.*

3.5. *The Parties shall prepare their presentations and examinations at the Hearing on the basis of the time limits established.*

3.6. *If a witness whose statement has been submitted by a Party and whose examination at the Hearing has been requested by the other Party, does not appear at the Hearing, his or her statement will not be taken into account by the Tribunal. A Party may apply with reasons for an exception from that rule.*

**4. Conduct of the Hearing**

4.1. *In addition to the above cited provisions of PO-1, PO-3, and the Tribunal's letter dated 11 September 2012, the following shall apply:*

4.2. *The following **Agenda** is established for the Hearing:*

1. *Introduction by the Chairman of the Tribunal.*

2. *Opening Statements of not more than a total of two hours for each Party:*

*First on jurisdiction*
- a) *Respondent up to 30 minutes*
- b) *Claimants up to 30 minutes*

*Second on all other issues including the merits*
- a) *Claimants up to 90 minutes,*
- b) *Respondent up to 90 minutes.*

**3. Fact Witnesses:**

3.1. *In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar*



*as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness for up to 5 minutes and add a short direct examination on issues, if any, which have occurred after the last written statement or report of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

*3.2. Unless otherwise agreed by the Parties: Examination of **Claimant's fact witnesses** in the order set by Claimant:*

*a) Affirmation of witness to tell the truth.*
*b) Short introduction by Claimants*
*c) Cross-examination by Respondent.*
*d) Re-direct examination by Claimants, but only on issues raised in cross-examination*
*e) Re-cross examination by Respondent but only on issues raised in re-direct examination*
*f) Remaining questions by members of the Tribunal, but they may raise questions at any time.*

*3.3. Examination of **Respondent's fact witnesses** in the order set by Respondent:*

*For each:*
*vice versa as under 3.a) to f) above.*

***4. Examination of experts**:*

*No experts will be examined orally at the hearing. But attention is drawn to the respective rulings in the Tribunal's letter dated 11 September 2012, quoted above.*

*5. Any witness may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness during the time of the Hearing.*

*6. Remaining questions by the members of the Tribunal, if any.*

*7. Discussion regarding the timing and details of post-hearing submissions and other procedural issues, including the question whether Post-hearing Briefs shall be submitted soon after the October Hearing or only after the January Hearing.*

*4.3. Unless otherwise agreed between the Parties or ruled by the Tribunal, witnesses may be present in the Hearing room during the testimony of other witnesses.*



***5. Other Matters***

*5.1 The Tribunal may change any of the rulings in this Order, after consultation with the Parties, if considered appropriate under the circumstances.*

*5.2. The Parties are invited to submit,* ***by 19 October 2012****, a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration costs to the SCC, and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.*

***Attachment to Procedural Order No. 5:***

***Calculation of Hearing Time***

| ***Time available*** | *Hours* |
|---|---|
| *Hours* | |
| | *56* |
| *7 days of 8 hours* | *56* |
| ***Time needed*** | |
| *Lunch breaks: 7 x 1 hour* | *7* |
| *Various breaks (procedural and coffee)* | *7* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *6.5* |
| *Total time for other purposes* | *25.0* |
| *Total time available to Parties* | *31* |
| ***Time available to each Party (including their opening statements and closing arguments, if any)*** | ***15.5*** |

98. On **20 September 2012**, Claimants sent exhibits C-700 – C-717 to the Tribunal and to Respondent.

99. On **21 September 2012,** Respondent stated that it had not received any documents from Claimants prior to the deadline and requested that the Tribunal exclude the documents.

100. On **22 September 2012**, Claimants sent Respondent the allegedly outstanding exhibits, via email.

101. On **22 September 2012**, Respondent requested that the Tribunal exclude Claimants' new and allegedly late exhibits from the arbitration.

102. On **22 September 2012**, Claimants sent the Tribunal the FedEx tracking report, demonstrating that Claimants had met the Tribunal's deadline.



103. On **23 September 2012**, Claimants wrote in response to Respondent's request to exclude certain exhibits submitted on 21 September, explaining that Respondent's complaints are without merit and should be rejected.

104. On **24 September 2012**, Respondent again objected to Claimants' exhibits.

105. On **27 September 2012**, the Chairman invited the Parties to submit a final list of all persons attending the hearing, and their respective sides identifying their function, at the start of the hearing.

106. On **27 September 2012**, Respondent submitted new exhibits in reply to Claimants' new documents submitted on 21 September 2012. Respondent requested that the Tribunal order the Claimants to indicate specific parts of the documents they intend to rely upon.

107. On **28 September 2012**, the Tribunal wrote to the Parties in reference to Respondent's applications of 24 and 27 September. The Tribunal indicated that the application to exclude documents would be decided after the Tribunal has had an opportunity to discuss it at the beginning of the hearing. The Tribunal invited Claimants to indicate, at the beginning of the hearing, the specific parts of the exhibits submitted on 21 September 2012 upon which they intend to rely. The Tribunal also allowed Respondent to extend its direct examinations beyond 5 minutes, so far as the new exhibits would concern matters not previously addressed in the witness statements.

108. On **28 September 2012**, Claimants stated that they would not object to Respondent's new witness statements and agreed to withdraw the documents not accompanied by English translations. Claimants requested leave under PO-1 ¶ 5.12 to submit two additional documents.

109. On **1 October 2012**, Respondent had no objection to Claimants' withdrawal of its documents submitted on 21 September 2012. Respondent stated, however, that its preparation for the hearing would be prejudiced by the late submission of additional material. Respondent offered to allow the admission of new documents in exchange for Mr. Rakhimov being allowed to submit a third witness statement on the matter.

110. The **Hearing on Jurisdiction and Liability** was held at the ICC Hearing Centre in Paris from **1 – 8 October 2012**. A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Joseph Tirado, Simon Ramsden, Zhanibek Saurbek, Max Stein, and Sven Lange of Norton Rose LLP and Prof. Igor V. Zenkin of the Moscow Regional Collegium of Advocates appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding and Mihail Popovici of the Ascom Group SA. Also appearing for Respondent were Anastasia Maltseva and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Alan Tlenchiev, Head of the Division on the Supervision over Compliance with Environmental



Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO Office, Aman Sagatov, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Chief Expert of the Department of Protection of State Property Rights of the Ministry of Justice, and Prof. Martha Brill Olcott, Carnegie Endowment for International Peace. Anatolie Stati, Artur Lungu, Grigore Pisica, and Alexandru Condorachi were also present.

111. On **1 October 2012**, the Tribunal heard the Parties' respective opening statements on jurisdiction / merits and heard testimony from Artur Lungu.

112. On **2 October 2012**, the Tribunal heard testimony from Mr. Anatolie Stati, Mr. Grigore Pisica, Mr. Victor Romanosov, and Mr. Alexandru Condorachi.

113. On **3 October 2012**, the Tribunal heard testimony from Alexandru Condorachi, Mr. Alexandru Cojin, Mr. Veaceslav Stejar, Mr. Eduard Calancea, and Minister Sauat Mukhametbayevich Mynbayev.

114. On **4 October 2012**, the Tribunal heard testimony from Mr. Herve Chagnoux, Mr. Andrey Kravchenko, and Mr. Medet Suleymenov.

115. On **5 October 2012**, the Tribunal heard testimony from Mr. Arman Testemirovich Rakhimov and Mr. Daniyar Mukanovich Turganbayev.

116. On **6 October 2012**, Respondent notified the Tribunal of its intention to call Mr. Akhmetov for direct examination.

117. On **8 October 2012**, the Tribunal heard testimony from Dr. Seong Hoon Kim, Mr. Serik Dosymovich Rakhimov, Mr. Rustam Nurlanovich Akhmetov, Mr. Mirbulat Zarifovich Ongarbaev, and Mr. Salamat Sartevich Baymaganbetov. At the close of the hearing, the Chairman asked the Parties if they had any objections to the procedure, as conducted to date. The Parties each answered that they had no objections.

118. On **15 October 2012**, the Tribunal issued **Procedural Order No. 6** (PO-6):

***Procedural Order (PO) No. 6***
***Regarding the further procedure after the Hearing on Jurisdiction and Liability***

***1. Timetable***

*Resulting from the discussion between the Parties and the Tribunal at the end of the Hearing on Jurisdiction and Liability in Paris, the following timetable is set for the further procedure:*

*1.1.* ***By 19 October 2012****, as ruled in § 5.1 of PO-5, the Parties are invited to submit a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration*



*costs to the SCC and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.*

*1.2.* *By* ***21 November 2012****, as ruled in § 4.13 of PO-4, Respondent is invited to submit Respondent's Rejoinder on Quantum.*

***No new evidence*** *on quantum may be submitted after this date unless the Tribunal has authorized such submission in reply to a reasoned request by a Party.*

*1.3.* ***By 3 December 2012****, the Parties are invited to notify which witnesses and experts on quantum presented by themselves or the other side they wish to examine at the January Hearing.*

*1.4.* ***By 10 December 2012****, the Parties are invited to notify whether they wish to change their notifications of 3 December in view of the notification received from the other side.*

*1.5.* *In preparation of a possible expert conferencing at the hearing,* ***experts*** *that have been notified for examination at the January hearing are invited to contact, either directly or with the help of the Parties, the expert from the other side addressing the same issues and try to agree on a short note identifying the major sub-issues on which they agree and disagree.*

*1.6.* ***By 11 January 2013****, the Parties are invited to submit*

- *either the notes agreed by the experts according to section 1.5 above or separate notes of each expert in so far as they cannot agree on a joint note,*
- *lists of the persons which intend to participate in the hearing from their respective sides.*

*1.7.* ***28 to 31 January 2013****, starting at 9:30,* ***Hearing on Quantum*** *at the ICC Hearing Centre, 112 Avenue Klebèr, Paris. The Parties are invited to make the necessary logistical arrangements as they did for the October hearing. The Tribunal intends to issue a Procedural Order closer to the time of the hearing regarding further details, in a similar fashion as it did for the October hearing.*

*1.8.* ***By 8 March 2013****, simultaneous submission of 1st Round Post Hearing Briefs by the Parties regarding all issues addressed in the October and January hearings. As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, the submissions may include comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports. Further details regarding the Post Hearing Briefs may be determined in a discussion with the Parties at the end of the January hearing.*



*1.9.* ***By 29 March 2013****, simultaneous submission of 2nd Round Post Hearing Briefs, but only addressing issues in rebuttal of the 1st Round Post Hearing Brief of the other side.*

*1.10.* ***By 19 April 2013****, simultaneous submission of Cost Statements will be made by the Parties.*

*1.11.* ***By 26 April 2013****, simultaneous submission of comments, if any, regarding the Cost Statement of the other side.*

***2. Other rulings***

*The Tribunal may change or amend the above rulings if considered appropriate after consultation with the Parties.*

119. On **17 October 2012**, Respondent requested a two-week extension on its deadline to make its submission on quantum, to 5 December 2012.

120. On **18 October 2012**, the Tribunal granted the extension until 1 December 2012, so long as both Parties could agree and confirm that they could maintain the procedural steps in the timetable in PO-6.

121. On **18 and 19 October 2012**, respectively, Claimants and Respondent confirmed that they could maintain the procedural timetable and consented to the extension.

122. On **19 October 2012,** Claimants submitted a costs summary to the Tribunal, detailing Claimants payment of the SCC costs to date, amounting to € 1,034,000.00.

123. On **19 October 2012**, Respondent stated that it will pay its share of the costs upon receipt of the invoices.

124. On **1 December 2012**, Respondent filed its **Rejoinder on Quantum,** together with supplementary evidence, to the Tribunal.

125. On **3 December 2012**, Respondent submitted the English version of Mr. Khalelov's witness statement to the Tribunal.

126. On **3 December 2012,** Claimants and Respondent each submitted their respective notifications of witnesses and experts to the Tribunal.

127. On **7 December 2012**, Claimants wrote to Respondent, renewing requests that Respondent produce the four referenced enclosures to R-41.1.

128. On **10 December 2012**, Claimants and Respondent each submitted their updated notifications of witnesses and experts to the Tribunal. Each commented on the other's notifications. Claimants moved to exclude newly submitted evidence and renewed arguments to exclude other evidence.

129. On **13 December 2012**, Respondent answered Claimants' arguments from their 10 December 2012 letter.



130. On **17 December 2012**, the Tribunal issued **Procedural Order No. 7** (PO-7):

***Procedural Order (PO) No.7***
***Regarding the Preparation and Conduct of the Hearing on Quantum***

***1. Introduction***

*In view of the recent submissions of the Parties, the Tribunal considers that it should already now issue its Procedural Order provided for in section 1.7 of* ***PO-6****.*

***2. Preparation of the Hearing***

*2.1. The Tribunal also confirms its earlier rulings on the form and contents and on the timetable for the Parties' submissions including those on the still outstanding procedural steps according to PO-6.*

*2.2. The Tribunal considers that, at this stage, it should not exclude any evidence provided by the Parties. But this is without prejudice to later decisions during or after the hearing in view of the following.*

*2.3. As is clear from the earlier rulings of the Tribunal, the hearing in January is strictly limited to matters of QUANTUM.*

*2.4. The Parties are invited to prepare their presentations and examination of witnesses and experts at the hearing accordingly. Any parts of submissions or any evidence going beyond that limit will not be considered by the Tribunal. In so far as the Parties disagree in this regard, they may explain their positions at the hearing and the Tribunal will take that into account.*

*2.5. The Parties may, in direct contact, try to reach agreement on the final list of witnesses and experts to be examined at the hearing and on the order of examination, and inform the Tribunal in this regard* ***by 11 January 2013****.*

***3. Conduct of the Hearing***

*3.1. The hearing shall take place at the ICC Hearing Centre from 28 to 31 January 2013.*

*3.2. Subject to PO-6 and to the following provisions, the rulings on the conduct of the October Hearing in* ***PO-5*** *apply, mutatis mutandis, also to the January Hearing.*

*3.3. Particular attention is drawn to the following provisions of PO-5:*

*3.3.1. § 2.2. on* ***Hearing Binders***

*3.3.2. § 3.4. on* ***time slots*** *attributed to the Parties.*



*In this context, according to the adapted calculation of hearing time as annexed to this PO, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

*8 hours for Claimants*
*8 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items, as long as the total time period allotted to them is maintained.*

*At the beginning of the hearing, the Parties are invited to nominate one member of their teams who will coordinate the time keeping with the Tribunal Secretary.*

3.3.3. *§ 4.2. on the **Agenda of the Hearing***

3.3.4. *After the preparation according to sections 1.5 and 1.6 of PO 6, § 1.4.3. of PO-5 provided on **expert conferencing**:*

*(T)he examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

***Attachment to Procedural Order No. 7:***

***Calculation of Hearing Time***

| ***Time available*** | *Hours* |
|---|---|
| *4 days of 8 hours* | *32* |
| ***Time needed*** | |
| *Lunch breaks: 4 x 1 hour* | *4* |
| *Various breaks (procedural and coffee)* | *4* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *3.5* |



| | |
|---|---|
| *Total time for other purposes* | *16.0* |
| *Total time available to Parties* | *16* |
| ***Time available to each Party (including their opening statements and closing arguments, if any)*** | ***8*** |

131. On **18 December 2012**, Suvi Lappalainen of the SCC wrote to the Parties. In reference to the correspondence between the Tribunal and the Parties about appointing an Administrative Secretary, the SCC decided that additional advances in the amount of EUR 60 000 shall be paid in equal shares and will cover the fee of the secretary. The Parties were requested to make payment by 2 January 2013.

132. On **18 December 2012**, Claimants requested that Respondent provide the documentation or data relied upon in the expert reports submitted on 1 December 2012, pursuant to Art. 5(2)(e) IBA Rules. Claimants pointed out that Respondent had already failed to provide such information earlier in the procedure, requiring a procedural order to be issued. Claimants argued that they are highly prejudiced by Respondent's failure to provide this documentation, since it hinders their trial preparation.

133. On **31 December 2012**, Claimants informed Respondent and the Tribunal that, on 17 December 2012, Claimants entered into a Sharing Agreement with the holders of the majority of the notes issued by Tristan Oil Limited.

134. On **2 January 2013,** Claimants sought instruction from the Tribunal that Respondent is not excused from bringing Mr. Mynbayev and Mr. Suleymenov to the Quantum Hearing.

135. On **2 January 2013**, Claimants submitted **Claimants' Application to Compel Production** to the Tribunal. Therein, Claimants requested the production of four documents that the Tribunal ordered produced in PO-2. Claimants requested that the Tribunal draw specific adverse inferences against Respondent, should Respondent fail to produce these documents.

136. On **3 January 2013,** the Arbitration Institute of the SCC notified the Tribunal and the Parties that payment of 30 000 Euro had been made by Claimants, and that 30 000 from Respondent was still outstanding. Later that day, Respondent confirmed that payment had been made.

137. On **4 January 2013**, Respondent submitted **Respondent's Application for Postponement of the Hearing on Quantum**. Respondent also requested that the Tribunal grant it leave to reply to Claimants' "Application to Compel Production" and to submit a response to the Sharing Agreement and to dismiss Claimants' Application to Compel Production.

138. On **7 January 2013**, Claimants submitted their **Opposition to Respondent's Application for Postponement of Hearing on Quantum**.



139. On **9 January 2013**, Respondent argued that postponement of the Hearing and the dismissal of Claimants' "Application to Compel Production" is the only way to safeguard procedural justice and to restore procedural equality.

140. On **10 January 2013**, the Tribunal issued **Procedural Order (PO) No. 8 Regarding several Applications of the Parties**, provided below:

***Procedural Order (PO) No.8***
***Regarding several Applications of the Parties***

***1. Introduction***

*The Parties have submitted several Applications before the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these Applications or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these Applications decided without any delay, to avoid longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in dealing with the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions on the Applications.*

***2. Claimants' Application dated 2 January 2013 for Document Production***

*The procedure to compel document production has been concluded at a much earlier stage of the proceedings in this case. Insofar as a Party has not produced as ordered by the Tribunal, the consequences of such have already been identified in section 4 of PO-2. Issuing a further order on document production is not provided in the timetables of POs 6 and 7 and would seriously disturb the preparation of the Hearing both for the Parties and the Tribunal.*

***Therefore, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.***

***3. Claimants' Application dated 2 January 2013 to instruct Respondent that it is not excused from bringing Mr. Mynbaev and Mr. Suleimenov to the Hearing on Quantum***

*The timetable of PO 6 provided that the last changes to the Parties' requests to have witnesses of the other side attending had to be submitted by 10 December 2012. On 20 December 2012, Claimants submitted a further change regarding the above mentioned witnesses. Claimants point out that Respondent has not articulated any prejudice by this late request. However, in view of the clear timetable set by PO 6, the Tribunal concludes that it is not appropriate to order the attendance of the two witnesses.*



***Therefore, this Application is dismissed. However, Respondent is free to bring these witnesses to the Hearing and Parties are free to submit any arguments in this regard at the Hearing or in their Post-Hearing Briefs.***

***4. Claimants' submission on 31 December 2012 of the Sharing Agreement with Tristan Noteholders, and Respondent's request for leave to submit a written statement thereto***

*The Sharing Agreement is a new development with relevance for the Hearing on Quantum and the submission could not be filed earlier in the procedure. Indeed, not filing it would have been inappropriate.*

***Therefore, the Tribunal accepts this submission. The Parties are free to argue in this regard at the Hearing and in their Post-Hearing Briefs.***

***5. Respondent's Application to Postpone the Hearing on Quantum***

*In view of the dismissal of Claimants' Applications in sections 2 and 3, above, the major reasons for this Application of Respondent are moot. The Tribunal is not persuaded by Respondent's arguments that, even in case of such dismissals, it would be prejudiced in its preparation of the Hearing. As provided above, the Parties are free to submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs. For the same reason, the late submission of the Sharing Agreement does not justify a postponement of the Hearing. After the bifurcated and very long procedure in this case, a postponement of the hearing (which would probably delay the procedure for at least several months in order to find a new hearing period at which all concerned would be available) could only be justified for absolutely compelling reasons. In view of the above considerations and conclusions, such reasons do not exist.*

***Therefore, this Application is dismissed. However, again, the Parties may submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs.***

141. On **11 January 2013**, Respondent made a Procedural Objection regarding the Tribunal's decision to dismiss Respondent's Application for Postponement of the Hearing on Quantum.

142. On **11 January 2013**, Claimants and Respondent provided the Tribunal information regarding the Hearing on Quantum, pursuant to PO-6 and PO-7.

143. On **18 January 2013**, the SCC informed the Tribunal that the additional advance on costs has been paid as ordered.

144. On **18 January 2013**, Claimants requested authorization from the Tribunal to submit documents into evidence in advance of the Quantum Hearing.

145. On **19 January 2013**, the Tribunal invited Respondent to submit comments on Claimants' Applications of 18 January 2013 by 22 January 2013.



146. On **22 January 2013**, Respondent (1) requested that the Tribunal deny Claimants' request for leave to submit new documents, (2) proposed the order of witness and expert examination, (3) requested the Tribunal's guidance on whether the presence of Mr. Sachsalber would be necessary at the Hearing, (4) requested that Ms. Hardin appear at the Hearing, and (5) remarked on proposed corrections to the valuation experts' testimony.

147. On **23 January 2013**, the Tribunal issued **Procedural Order (PO) No. 9 Regarding further Applications of the Parties and further Details of the Hearing (PO-9)**, provided below:

***Procedural Order (PO) No.9***
***Regarding further Applications of the Parties and further Details of the Hearing***

***1. Introduction***

*By letters dated 11, 18, and 22 January 2013, the Parties have submitted several further Applications and some information and suggestions regarding the conduct of the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these matters decided without any delay, to avoid the need of longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in considering the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions.*

***2. Claimants' Application dated 18 January 2013 for leave to submit certain documents***

*The submission of a considerable number of further documents just a few days before the hearing would seriously disturb the preparation of the Hearing, both for the Parties and the Tribunal, and would not provide Respondent sufficient time to evaluate the documents, formulate replies, and try to find any rebuttal evidence. The Sharing Agreement has already been accepted by section 4 of PO-8 and, as mentioned in section 1 of Respondent's letter of 22 January 2013, has been available to Respondent since 31 December 2012.*

***Therefore, with the exception of the admission of the Sharing Agreement, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.***

***3. Respondent's Application to submit a two-page note correcting minor errors in Deloitte's valuation report of 30 November 2012.***

***Since such a note would be more convenient for all concerned than oral corrections at the beginning of the examination of the expert, the submission is admitted.***

***4. Agenda of the Hearing***



*Taking into account the submissions from the Parties, and subject to any final changes agreed at the beginning of the Hearing, the Tribunal intends to follow the following Agenda:*

1. ***Introduction*** *by the Chairman of the Tribunal.*

2. ***Opening Statements*** *of a length determined by each Party*

3. ***Examination of Fact Witnesses***

   3.1. *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination, though exceptions may be admitted by the Tribunal. Therefore, insofar as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the* ***presenting Party may introduce the witness for up to 5 minutes, and add a short direct examination*** *on issues, if any, which have occurred after the last written statement of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

   3.2. *Unless otherwise agreed by the Parties: first, there will be the Examination of* ***Claimants' fact witnesses*** *in the order set by Claimants:*

   *For each witness, the examination will be conducted as follows:*

   a) *Affirmation of witness to tell the truth*
   b) *Short introduction by Claimants*
   c) *Cross-examination by Respondent.*
   d) *Re-direct examination by Claimants, but only on issues raised in cross-examination*
   e) *Re-cross examination by Respondent but only on issues raised in re-direct examination*
   f) *Remaining questions by members of the Tribunal, but they may raise questions at any time.*

   3.3. *Examination of* ***Respondent's fact witnesses*** *in the order set by Respondent:*

   *For each: the examination will be conducted in the same pattern vice versa as mentioned for Claimants' witnesses.*

4. ***Examination of Experts***



*4.1 By letters of 11 January 2013, the Parties have communicated an agreement, and the Tribunal agrees, on the following order of examination:*

*a) Claimants' experts*

* *Direct examination of Claimants' expert by Claimants*
* *Cross-examination by Respondent*
* *Re-direct examination by Claimants, but only on issues raised in cross- examination*
* *Re-cross examination by Respondent but only on issues raised in re-direct examination*

*b) Respondent's experts*

*The same order vice versa as for Claimants' expert shall apply*

*c). Experts conferencing by the Tribunal*

*d) Follow-up questions by the Parties on the questions raised by the Tribunal, if any*

*5. Any witness or expert may only be **recalled** for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness during the time allotted to the Parties at the Hearing.*

*6. Remaining **questions by the members of the Tribunal**, if any.*

*7. **Discussion of the further procedure**, taking into account the timetable already established by PO-6, and any new developments and submissions after that PO.*

## ***5. Certain Further Details of the Conduct of the Hearing***

*5.1. The Tribunal has taken note of the Parties' communications regarding the attendance of witnesses and experts.*

*5.2. Unless, in reply to Respondent's letter of 22 January 2013, Claimants notify Respondent no later than **12 noon Friday 25 January 2013 Paris time**, that they insist on orally examining **Mr. Sachsalber, Mr. Powell and Mr. Rhodes,** these persons do not have to attend the hearing.*

*5.3. In view of the explanation in Respondent's letter of 22 January 2013, the Tribunal accepts that **Mr. Seitinger**, who is situated in Pakistan, will be examined at the hearing in the morning of the last day of the hearing, i.e. 31 January 2013.*



5.4. *If, as notified by Claimants' letter of 11 January 2013,* ***Ms. Hardin*** *will not be available for examination at the hearing, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.*

***6. Respondent's Application to Extend the Time limits for Submission of the Post-Hearing Briefs and Cost Submissions***

***This matter will be discussed with the Parties at the end of the Hearing on Quantum in order to find an agreement between and with the Parties, and otherwise will be decided by the Tribunal.***

148. On **23 January 2013**, Respondent submitted its "*Additional Note to the Expert Report dated 30 November 2012*" to the Tribunal.

149. On **24 January 2013**, Claimants requested leave to submit an explanatory note from FTI to correct errors that FTI discovered in reviewing the Deloitte GmbH expert report and preparing for the expert conferences.

150. On **25 January 2013** the Tribunal admitted FTI's 6 page correction note.

151. On **25 January 2013**, Respondent submitted the joint issue list of Claimants' expert Ryder Scott and Respondent's expert GCA.

152. On **25 January 2013**, Claimants submitted (1) the Sharing Agreement (C-721), (2) the Explanatory Note of FTI, and (3) a revised translation of Catalin Broscaru's witness statement, to the Tribunal. Claimants also gave notice that they intend to call Mr. Romanosov for direct examination.

153. On **26 January 2013,** Respondent wrote to the Tribunal with regard to Claimants' submission of the "*FTI Amendments to Expert Report*" and the Direct Examination of Mr. Romanosov and other witnesses.

154. On **27 January 2013**, Claimants submitted the revised schedules and supporting documents requested by Respondent on 26 January 2013.

155. The Hearing on Quantum was held at the ICC Hearing Centre in Paris from **28 – 31 January 2013.** A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, James Toher, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Max Stein, and Sven Lange of Norton Rose, LLP and Joseph Tirado of Winston & Strawn appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding, and Mihail Popovici of Ascom Group, SA. Also appearing for Respondent were Zhanibek Saurbek, Anastasia Maltseva, and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Aman Sagatove, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Director of the Department of Protection of the States Property Rights, Ministry of Justice, and



Done Tulegen, Deputy Director of the Legal Services Department, and the Ministry of Oil and Gas.

156. On **28 January 2013**, the Tribunal heard opening statements on Quantum from Claimants and from Respondent. The Tribunal also heard testimony from Mr. Artur Lungu. Counsel for Claimants and counsel for the Respondent also indicated that they had agreed to request "*an additional hour or two*" per side, to present their case. The Tribunal indicated that the hearing could not go beyond Thursday evening, but stated that it may be possible to add time at the end.

157. On **29 January 2013**, the Tribunal heard testimony from Mr. Victor Romanosov, Mr. Catalin Broscaru, Mr. Alexandru Cojin, Mr. Anatolie Stati, and Mr. Nurlan Rahimgaliev.

158. On **30 January 2013**, the Tribunal heard testimony from Prof. Martha Brill Olcott, Prof. Tomas Balco, Mr. Michael Nowicki, and James Latham of Ryder Scott, and Dr. Stephen Wright, Mr. Tony Goodearl, and Mr. Michael Wood of GCA. The Tribunal, after considering arguments from both Parties, decided to give each Party an additional hour to present its case, over Dr. Nacimiento's objection.

159. On **31 January 2013**, the Tribunal heard testimony from Mr. Michael Nowicki, Jr. James Latham, Dr. Stephan Wright, Mr. Michael Wood, and Mr. Tony Goodearl via witness conferencing. The Tribunal also heard testimony from Mr. Howard Rosen of FTI and Mr. Tomas Gruhn of Deloitte GmbH, separately, before taking testimony from both via witness conferencing. The Tribunal also heard testimony from Mr. Peter Seitinger. Finally, the Tribunal discussed the further procedure with the Parties. At the close of the hearing, the Chairman asked the Parties if they had any objections to the way the Tribunal has conducted the procedure up until that point. Dr. Nacimiento, on behalf of the Respondent, answered "*we have filed objections and, with all due respect, we uphold our objections*." Mr. Smith for Claimants answered that there were no objections on behalf of Claimants.

160. On **4 February 2013**, Claimants provided Respondent and the Tribunal access to the 3D seismic data, via a secured website and a CD/DVD.

161. On **6 February 2013**, the Tribunal sent its draft of PO-10 to the Parties and requested comments thereto by 13 February 2013.

162. On **13 February 2013**, Respondent submitted its response to draft PO-10, together with a reiteration of Respondent's objections and 5 Annexes.

163. On **13 February 2013**, Claimants stated that they have no comments to PO-10.

164. On **14 February 2013**, the Chairman, on behalf of the Tribunal, invited Claimants to submit any comments it may have to Respondent's submission, no later than Saturday, 16 February 2013.

165. On **16 February 2013**, Claimants responded to Respondent's submission of 13 February 2013 by letter supported by three annexes.



166. On **17 February 2013,** Respondent responded to Claimants' letter of 16 February 2013.

167. On **20 February 2013**, the Tribunal issued **Procedural Order (PO) No. 10 Regarding the Further Procedure**:

***Procedural Order (PO) No. 10***
***Regarding the Further Procedure***

***1. Introduction***

*1.1 This PO contains rulings resulting from the discussion between the Parties and the Tribunal at the January Hearing. On 6 February 2013, a draft of this PO was circulated to the Parties for comments within one week. Taking into account the discussion at the hearing and the comments received from the Parties, this PO is now issued in its final form.*

*1.2 The Tribunal records that, at the end of the hearing, Claimants agreed to provide, by Monday 4 February 2013, the 3D Seismic data discussed at the hearing and the related documentation to Respondent.*

***2. Respondent's Applications dated 13 February 2013.***

*2.1. In reply to the Tribunal's invitation to comment on the Tribunal's draft of PO-10, on 13 February 2013, Respondent filed a submission which included the following Applications:*

*(a) Allow for an opportunity to submit an expert report on the new subject matter introduced by Claimants within a period of three months as of submission of the full data information and documents as specified below;*

*(b) Provide for a hearing with the opportunity to address the new subject matter introduced by Claimants, in particular through examination of the parties' experts and witnesses;*

*(c) Order Claimants to submit data, information and documents as specified below;*

*(d) Allow Respondent to submit further witness and/or expert testimony relating to the new subject matter introduced by Claimants as specified below;*

*(e) The proposed periods for the two rounds of post-hearing briefs and the oral closing submissions shall be maintained and shall commence after the hearing on the new subject matter introduced by Claimants*

*91 In addition, Respondent seeks clarification as to the scope of the first round of Post Hearing Briefs as specified in the second bullet point of section 2.1 and the admissibility of new documents as specified in the last bullet point of section 2.1.*



2.2. *On 14 February 2013, the Tribunal invited Claimants to submit any comments they may have. On 16 February 2013, Claimants filed a submission which included the following request:*

*Claimants firmly oppose the bulk of the relief requested in Respondent's Submission. Claimants do acknowledge that the Munaibay 3D information has only recently been analyzed by Ryder Scott and GCA, and Claimants do not object to cross-examination of the quantum experts regarding, and limited to, the Munaibay 3D information – if that examination is scheduled in a manner that does not delay the procedural calendar.*

2.3. *Thereafter, the Parties filed further submissions providing further arguments and maintaining their above requests.*

2.4. *As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions of the Parties or the arguments put forward by the Parties. Indeed, many of the arguments presented in the most recent submissions by Respondent and, in reply, by Claimants, were already presented during the January hearing and taken into account in the Tribunal's deliberations after that hearing and in the draft PO-10 resulting from these deliberations which was sent to the Parties for comments. While all arguments of the Parties have been considered by the Tribunal, in this PO the Tribunal will thus focus on the arguments it considers determinative for its conclusions and decisions.*

2.5. *It is recalled that, according to Art. 19 SCC Rules, the Tribunal **may** conduct the arbitration in such a manner as it considers appropriate (19.1), but **shall** conduct the procedure in an expeditious manner (19.2). It is further recalled that, for the same purpose, Art. 37 SCC Rules provides a time limit of 6 months for the final award, and that this time limit has already been extended considerably in the present case.*

2.6. *The Tribunal's duty to conduct the procedure in an impartial manner (Art. 19.2) includes an obligation to take into account the interests of both Claimants and Respondent. In that context, obviously, due process does not mean that every application of a party must be accepted. In particular, it is the Tribunal's authority and duty to decide on the most efficient consideration of evidence in a given phase of the procedure as long as both sides have an opportunity to present their case.*

2.7. *In the present case, there have been long and many opportunities for the Parties to submit evidence and two hearings to orally examine witnesses and experts presented by the Parties.*

2.8. *In the judgment of the Tribunal, any new information and evidence that became available to the Parties before and at the hearing on quantum, can be commented by the Parties in a following written procedure without the need for another evidentiary hearing. Therefore, the Tribunal had suggested, in its draft for this PO*



- * *a first round of Post-Hearing Briefs within a period of more than two months after the hearing,*
- * *a hearing for oral closing arguments three weeks later,*
- * *a final round of Post-Hearing Briefs within a period of one further month after that hearing.*

2.9. *Nevertheless, the Tribunal considers that the hearing scheduled for 2 May 2013 could also be used for an oral examination of the technical experts of both sides on the update of the Munaibay 3D information. The Tribunal considers that these further three rounds provide the Parties more than ample opportunities to evaluate, comment, and rebut whatever they consider new information and evidence that became available before, at, and immediately after the hearing on quantum.*

2.10. *Taking all these considerations into account, Respondent's Applications are therefore dismissed in so far as they are not covered by the timetable set hereafter.*

***3. New Timetable***

*The **timetable originally set in PO-6** is changed and amended as follows:*

3.1. ***By 8 April 2013,*** *the Parties shall simultaneously submit their respective **1st round Post Hearing Briefs** to the Tribunal:*

- *Regarding all issues addressed in the October 2012 and January 2013 hearings,*
- *Regarding any submissions and documents admitted by the Tribunal and filed by the other side after the October 2012 hearing.*
- *The Tribunal recalls that, according to section 4.5 of PO-4 and section 1.2 of PO-6, no new evidence may be submitted unless authorized by the Tribunal. However, the Parties may attach to the Post Hearing Briefs the following:*
    - * *As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports,*
    - * *updates of the Reports of Claimants' and Respondent's technical experts and quantum experts heard at the hearing on quantum,*



- *new documents, but only in rebuttal to submissions and documents filed by the other side filed after the October hearing and admitted by the Tribunal.*

*As a precaution, the Tribunal notifies the Parties that it does not intend to grant any extensions of the above deadline for submissions, since the following period until the Final Hearing on 2 May 2013 is required for the preparation of all concerned, and a postponement of that hearing would lead to unacceptable further delays in the procedure.*

3.2. ***On 2 and 3 May 2013, a two day Final Hearing*** *will be held at the ICC Hearing Centre in Paris. The Tribunal has made a provisional reservation of rooms for this hearing at the Centre. The Parties are invited to confirm this reservation with the Centre in the same manner as they did for the two earlier hearings. Details of the conduct of this Hearing will be set by the Tribunal after consultation with the Parties closer to the time of the hearing.*

*In the morning of 2 May, the Parties' technical experts, Ryder Scott and GCA, will be examined, but exclusively limited to the update of the Munaibay 3D information. Unless the Parties agree otherwise, this examination will be conducted by conferencing similar to the manner used at the January hearing.*

*Starting in the afternoon of 2 May, the Parties may present a first round of final oral arguments.*

*In the morning of 3 May 2013, the Parties may present a second round of final oral arguments.*

*Further details of the hearing will be set by the Tribunal after the Parties' submissions have been received by 8 April 2013.*

3.3. ***By 3 June 2013****, the Parties shall simultaneously submit their respective* ***2nd Round Post Hearing Briefs****, but only addressing issues in rebuttal to the other side's 1st Round Post Hearing Brief and regarding issues addressed in the hearing of 2 and 3 May 2013.*

*As earlier listings partly overlapped or were incomplete since focusing on one hearing only, with these 2nd round submissions, the Parties shall file:*

- *Final complete lists of all witness statements and expert reports including their updates and attachments if any,*
- *Final complete lists of all documents submitted or handed out at the hearings with their exhibit numbers,*
- *Hyperlinked versions of the above lists on two new master USB devices, one from Claimants and one from Respondent, enabling easy access to all statements, reports, and documents listed.*



*3.4. **By 1 July 2013**, simultaneous submission of Cost Statements by the Parties.*

*3.5. **By 8 July 2013**, simultaneous submission of comments, if any, regarding the Cost Statement of the other side.*

***4. Questions***

*At any time during or after the above timetable, the Tribunal may address the Parties inviting comments on specific questions on which the Tribunal feels further clarifications may be helpful.*

168. On **21 February 2013**, the Parties attempted to resolve issues with the 2D data.

169. On **22 February 2013**, Respondent sent Respondent's opening Presentation for the Hearing on Quantum in PDF format, to the Tribunal.

170. On **6 March 2013**, Respondent filed a Procedural Objection with the Tribunal.

171. By email of **7 March 2013**, the Chairman, on behalf of the Tribunal, invited Claimants to respond to this objection, by 22 March 2013.

172. On **14 March 2013**, Respondent submitted the Squire Sanders Legal Due Diligence Report, the PwC Financial and Tax Due Diligence Report, the KMG EP Presentation on Asset Assessment as at September 2008, and the RBS Presentation on Asset Assessment as at 31 July 2009, as listed in Exhibit R 41.1 and as requested by Claimants, to Claimants and to the Tribunal.

173. Claimants submitted their response to Respondent's procedural objection on **22 March 2013**.

174. On **8 April 2013**, the Parties simultaneously submitted their respective first Post Hearing Briefs and related Expert Reports to the Tribunal.

175. On **12 April 2013**, the Tribunal issued PO-11, provided below:

***Procedural Order (PO) No.11***
***Regarding Further Details of the Hearing***

***1. Earlier Rulings***

*The Tribunal recalls its earlier rulings in section 3.2 of PO-10:*

***On 2 and 3 May 2013, a two day Final Hearing** will be held at the ICC Hearing Centre in Paris. The Tribunal has made a provisional reservation of rooms for this hearing at the Centre. The Parties are invited to confirm this reservation with the Centre in the same manner as they did for the two earlier hearings. Details of the conduct of this Hearing will be set by the Tribunal after consultation with the Parties closer to the time of the hearing.*



*In the morning of 2 May, the Parties' technical experts, Ryder Scott and GCA, will be examined, but exclusively limited to the update of the Munaibay 3D information. Unless the Parties agree otherwise, this examination will be conducted by conferencing similar to the manner used at the January hearing.*

*Starting in the afternoon of 2 May, the Parties may present a first round of final oral arguments.*

*In the morning of 3 May 2013, the Parties may present a second round of final oral arguments.*

*Further details of the hearing will be set by the Tribunal after the Parties' submissions have been received by 8 April 2013.*

***2. Procedural Steps before the Hearing***

*2.1. A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly by **25 April 2013**.*

*2.2. By **25 April 2013**, the Parties shall inform the Tribunal which persons in which functions will attend the hearing from their respective sides.*

*2.3. In view of the great number of exhibits submitted by the Parties and in order to facilitate references and using these exhibits at the Hearing and to avoid that each member of the Tribunal has to bring all of them to the Hearing, the Parties are invited to **bring to the Hearing:***

- *for the other Party and for each member of the Tribunal **Hearing Binders** in A5 format of those exhibits or parts thereof on which they intend to rely **in their expert examination** at this hearing,*
- *together with a separate consolidated **Table of Contents** of the Hearing Binders of each Party,*
- *a **USB-Device** with the contents of the Hearing Binders for the other Party, for each member of the Tribunal, and for the Tribunal Secretary.*

***3. Further Details Regarding the Hearing***

*3.1. **No new documents** may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of an expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.*

*3.2. The Hearing shall be held at the **ICC Hearing Centre in Paris** on 2 May and in the morning of 3 May 2013. No extension of the hearing will be possible due to other commitments of members of the Tribunal.*

*3.3. The Tribunal sets the following **Agenda:***



1. *Short* ***Introduction*** *by the Chairman of the Tribunal.*

2. ***Opening Statements*** *of up to 10 minutes by each Party*

3. ***Examination of the Parties' technical experts****, Ryder Scott and GCA,* ***but exclusively limited to the update of the Munaibay 3D information.*** *In view of the limited time available,* ***each Party has a total of one hour*** *for all of its following examinations:*

   a) *Claimants' experts*
      * *Direct examination by Claimants*
      * *Cross-examination by Respondent*
      * *Re-Direct, if any*
      * *Re-Cross, if any*

   b) *Respondent's experts*
      * *Direct examination by Respondent*
      * *Cross-examination by Claimants*
      * *Re-Direct, if any*
      * *Re-Cross, if any*

   c) *Experts conferencing by questions of the Tribunal only*

   d) *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

   e) *Remaining questions by the members of the Tribunal, if any.*

   *The above examination shall be finished by 13:00 hours, before the lunch break.*

4. *Starting at 14:00 hours:* ***1st Round Closing Statements by the Parties***

   a) *Claimants up to 90 minutes*

   *Coffee Break*

   b) *Respondents up to 90 minutes*

5. *Starting at 9:30 on 3 May:* ***2nd Round Closing Statements by the Parties****, but only in rebuttal of the other side's 1st Round Statement:*

   b) *Claimants up to one hour*

   *Coffee Break*

   c) *Respondent up to one hour*



> 6. *Final Questions of the Tribunal, if any.*
>
> 7. *Discussion of any remaining procedural issues, if any.*
>
> 3.4. *The Hearing shall end no later than 13:00 hours. An extension is not possible.*

176. On **16 April 2013**, the Tribunal wrote to the Parties to confirm that the hearing on 2 May would begin at 9:30 a.m., as usual.

177. On **17 April 2013**, Respondent wrote to the Tribunal in reference to the May hearing.

178. On **18 April 2013**, the Tribunal responded with the following email

> *As the hearing is fast approaching, the Tribunal replies without delay to Respondent's letter dated 17 April 2013.*
>
> *Point 1 of the letter regarding the 2nd Round PostHBs can be discussed at the Hearing.*
>
> *Point 2: The Tribunal encourages the Parties to make an effort similar to, mutatis mutandis, sections 1.5 and 1.6 of PO-6:*
>
> *In preparation of the examination of the experts at the 2 May Hearing, the **experts** are invited to contact, either directly or with the help of the Parties, the expert from the other side and try to agree on a short note identifying the major sub-issues on which they agree and disagree.*
>
> *The Tribunal would be grateful if, **by 29 April 2013**, the Parties could submit either the notes agreed by the experts according to section 1.5 above or separate notes of each expert in so far as they cannot agree on a joint note.*

179. On **22 April 2012**, Claimants and Respondent each wrote to the Tribunal in reference to the Hearing and explained procedural objections against the other. Respondent also submitted an updated translation of R-360.

180. On **24 April 2013**, Respondent wrote in response to Claimants' letter of 22 April 2013. In a separate email, Respondent informed the Tribunal that it had made grids prepared by GCA for its 3D seismic analysis available to Claimants through an FTP server and provided the Tribunal that data.

181. On **24 April 2013**, Claimants responded to Respondent's letter of the same date.

182. On **25 April 2013**, Respondent replied to Claimants' letter of 24 April 2013.

183. On **25 April 2013**, Claimants and Respondent provided the Tribunal a list of hearing attendees.

184. On **29 April 2013**, Respondent wrote to the Tribunal and objected to Claimants' amendments to the transcript.



185. On **29 April 2013**, Respondent sent the Joint Issue List of Ryder Scott and GCA for the testimony at the hearing to the Tribunal.

186. On **1 May 2013**, Claimants wrote in response to Respondent's letter concerning the issue of corrections to the hearing transcripts.

187. A hearing was held in Paris from **2 – 3 May 2013**. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, James Toher, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachova and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Max Stein and Sven Lange of Norton Rose LLP and Joseph Tirado of Winston & Strawn LLP appeared on behalf of Respondent. A transcript was made.

188. At the end of his introduction at the start of the hearing, the Chairman informed the Parties of the following rulings from the Tribunal's deliberations prior to the hearing (quoted from the manuscript read by the Chairman, Tr. May 2013 pp. 4 – 5):

*By their recent letters, the Parties addressed the following issues in particular:*

*1.* ***Regarding the Testimony of Mr. Wood (Respondent's expert from GCA)****:*

*Taking into account [...]*

- *section 3.2 of PO-10,*
- *and the arguments submitted by the Parties,*
- *and the* ***Experts' Joint List of Issues*** *submitted by Respondent by its mail of 30 April 2013,*

*the Tribunal has concluded that*

- *Mr. Wood* ***can*** *be examined at this hearing*
- *But that the 2nd Round of Post-Hearing Briefs provides an opportunity for the Parties and their experts to submit further comments on the issues addressed.*

*2.* ***Regarding Comments on expert reports and Claimant's objection to the 2nd Deloitte report****:*

*The Tribunal has taken note that, at the end of their letters of 24 April, the* ***Parties agree*** *that, with their 2nd Round Post-Hearing briefs, the Parties may submit further comments*

- *Both by Ryder Scott and GCA*
- *And by FTI and Deloitte.*

*In fact, taking into account also the Tribunal's letter of 11 September 2012 admitting such comments as well for the experts at the Hearing on*



*Jurisdiction and Liability, this means that comments by __all__ the experts may be submitted with the Parties' 2nd Round Post-Hearing Briefs,* ***but only in rebuttal*** *to the previous reports by the respective experts from the other side.*

*And from all these rulings it is obvious and confirmed by the Tribunal that these 2nd Round submissions are the final round of submissions, and that* ***NO further comments*** *may be submitted thereafter either by the Parties or by their experts.*

*However, in case it turns out that the* ***Tribunal has further questions*** *to the Parties, the Tribunal may address the Parties during the time of its deliberations.*

*3.* ***Regarding Transcript Corrections***

*The Tribunal points out that corrections are only necessary in so far as the transcript is incorrect* ***with relevance to substantial issues****.*

*Regarding the* ***first two*** *hearings, the Parties had ample time to examine the transcripts while drafting their 1st Round Post-Hearing Briefs. Regarding the very short* ***final hearing****, such examination can easily be done while drafting their 2nd Round Post-Hearing Briefs which are due by 3 June 2013.*

*The Tribunal* ***encourages the Parties*** *to agree on a timely procedure for joint corrections. If that cannot be achieved, each Party may submit suggested corrections to the other side* ***by 15 May 2013****.*

*If or in so far as the Parties cannot agree on joint proposals, each Party may submit, together with its 2nd Round Post-Hearing Briefs, its suggested corrections and comments on the suggestions of the other side. The Tribunal will examine such suggestions and take them into account in so far as they are relevant for its conclusions.*

*In view of the above,* ***an extension of the date set for the Post-Hearing Briefs is NOT necessary*** *in the view of the Tribunal, but also not possible as the planning of the Tribunal for its deliberations shortly after the deadline for the 2nd Round Post-Hearing Briefs would otherwise be delayed considerably.*

*4.* ***If the Parties feel*** *that any* ***__other__ procedural issue*** *has to be addressed at the beginning of this Hearing, this can be done in the short Opening Statements which follow now.*

189. After brief opening statements by Mr. Smith and Dr. Nacimiento, respectively, the Tribunal heard testimony from Mr. Michael Nowicki, Dr. Stephen Wright, and Mr. Mike Wood. The three experts also testified through witness conferencing.

190. As recorded in the transcript (page 100), at the end of the Hearing the Chairman of the Tribunal raised the following question:



*The Tribunal has, of course, taken note of the procedural objections that were put on record at an earlier stage, and we take it that these will be maintained. So my usual question at the end of a hearing only is: are there any further procedural objections at this stage regarding the way the Tribunal has conducted this procedure?*

191. The Parties replied as follows:

*For Claimant MR SMITH: None from the Claimants.*

*For Respondent DR NACIMIENTO: And none from Respondent.*

192. On **29 May 2013**, the Chairman, on behalf of the Tribunal, sent a letter to the Arbitration Institute of the SCC, suggesting that the SCC extend the deadline for the issuance of the Award to 31 December 2013.

193. On **3 June 2013**, Respondent sent its **Second Round Post-Hearing Brief** (RPHB 2) to the Tribunal. Respondent also submitted Deloitte GmbH 2nd Supplemental Expert Report, GCA Fourth Expert Report, the Second Expert Report of Tomas Balco, the Third Expert Report of Prof. Didenko, and the Third Expert Report of Prof. Ilyassova to the Tribunal.

194. On **3 June 2013**, Claimants submitted their **Second Round Post-Hearing Brief** (CPHB 2) to the Tribunal. Claimants also submitted the Third Maggs Report, the Third Suleymenov Report, The Second Malinovsky Opinion, the Corrected Final Hearing Transcripts, the Fourth Expert Report of Howard Rosen (FTI), the Fourth Expert Report of the Ryder Scott Company, and a photo array of all witnesses.

195. By letter of **10 June 2013**, the Arbitration Institute of the SCC decided that the Final Award shall be rendered by 2 January 2014.

196. On **1 July 2013**, Claimants and Respondent each submitted their respective Statements on Costs to the Tribunal.

197. On **8 July 2013**, Claimants and Respondent each submitted their responses to the Costs Submissions submitted by the other side.

198. On **12 December 2013**, the Arbitration Institute of the SCC issued its decision on costs, recorded later in this Award.



## E. Relief Sought by the Parties

### E.I. Relief Sought by the Claimants

199. Claimants' most current Request for Relief is found at ¶ 396 of their Second Post-Hearing Brief of 3 June 2013. This Request for Relief replaces those found at ¶ 664 of **Claimants' First Post-Hearing Brief** of **8 April 2013**, ¶ 626 of **Claimants' Reply Memorial on Jurisdiction and Liability** of **7 May 2011**, ¶ 99 of **Claimants' Reply Memorial on Quantum**, dated **28 May 2012** at ¶¶ 116 and 117 of **Claimants' Request for Arbitration** submitted on **26 July 2010**, and ¶ 470 of **Claimants' Statement of Claim** submitted on **18 May 2011**.

***VI. REQUEST FOR RELIEF***

*396. For the reasons set forth herein, Claimants respectfully request an award granting them the following relief:*

- *A declaration that Kazakhstan has violated the ECT and international law with respect to Claimants' investments;*
- *Compensation to Claimants for all damages they have suffered, as set forth in Claimants' Statement of Claim and Reply on Quantum and as further updated at the January 2013 Hearing and in Claimants' First Post-Hearing Brief, corresponding to the following amounts:*

| ***Tolkyn*** | ***US $478,927,000*** |
|---|---|
| ***Borankol*** | ***US $197,013,000*** |
| ***Munaibay Oil*** | ***US $96,808,000*** |
| ***LPG Plant*** | ***US $245,000,000 cost plus discretionary portion of US $84,077,000*** |
| ***Contract 302 (other than Munaibay Oil)*** | ***US $31,330,000 cost plus discretionary portion of US $1,498,017,000*** |

- *All costs of this proceeding, including Claimants' attorneys' fees and expenses as well as fees and expenses of the Tribunal and the SCC;*
- *Pre-award compound interest at a rate of 10.5% from October 14, 2008 to the date of the Award;*
- *An award of compound interest at a rate of 10.5% until the date of Kazakhstan's final satisfaction of the Award; and*
- *Any other relief the Tribunal may deem just and proper.*



### E.II. Relief Sought by the Respondent

200. Respondent's most recent Request for Relief is found at Part VI of its Second Post-Hearing Brief of 3 June 2013. This replaces the Requests for Relief found in **Part IV of its First Post-Hearing Brief** of **8 April 2013**, Section F of **Respondent's Rejoinder on Jurisdiction and Liability**, dated **13 August 2012**, and at ¶ 58 of **Respondent's Statement of Defence**, dated **21 November 2011**.

> *1069. The Republic requests the Arbitral Tribunal to issue:*
>
> *(a) an order dismissing Claimants' claims in their entirety;*
>
> *(b) an order that Claimans [sic] must bear all costs of this arbitration and must reimburse Respondent all costs which Respondent incurred and will incur in this arbitration, including inter alia fees and expenses of the SCC, the Arbitral Tribunal, experts, consultants, witnesses and legal counsel plus interest. Respondent hereby reserves the right to detail and document its claim for such foregoing costs, which by their very nature are continuing, at the appropriate future time as directed by the Arbitral Tribunal*

## F. Factual Background

201. The Tribunal has considered all of the facts presented by the Parties, even if not explicitly stated below. This section summarizes the facts and events leading to the current dispute, as presented by the Parties in their submissions and testimony and without prejudice to the relevance the Tribunal may give to facts and issues. More comprehensive coverage of the facts can be found in C-0 ¶¶ 5 *et seq.*, C-I ¶¶ 2 - 238, C-II ¶¶ 16 - 42 and 210 – 422, CPHB 2 ¶¶ 37 – 196; R-I ¶¶ 4,17 – 31, R-II ¶¶ 241 – 832, RPHB 1 ¶¶ 15 – 413; and RPHB 2 ¶¶ 15 – 382.

### F.I. General Background Information

202. Natural hydrocarbon resources are one of the principal assets of the Republic. Within the next ten years, Kazakhstan will be among the top five oil producers, holding 30 billion barrels of proven oil and 85 trillion cubic feet of gas reserves. KPM and TNG were important to the economic framework of and have played a strategic role in the Mangystau region's economy, providing 80% of the fuel needed for the local power plant and employing a considerable number of people. (R-I ¶¶ 4.1, 31.52; R-II ¶ 322).

203. The Borankol and Tolkyn fields are approximately 50 km apart in the Mangystau region. Aktau, the capital of the Mangystau region, is approximately 400 and 500 km from the Borankol and the Tolkyn fields, respectively. The closest town to the Borankol field is Opornaya, which is approximately 15 km away. (C-I ¶ 52).

204. The Respondent is the government of the Republic of Kazakhstan, which is the sovereign body responsible for managing the investment in and exploitation of Kazakhstan's natural resources. (R-I ¶ 4.4).



205. Claimant Anatolie Stati is a natural citizen of Moldova and Romania who has invested in Turkmenistan since 1995. Based on his testimony and the testimony of Prof. Olcott at the Hearing on Jurisdiction and Liability, Respondent argues that Anatolie Stati was a "*novice*" in the oil and gas industry when he entered Kazakhstan. Respondent presents a history of the Stati family's involvement in Moldova's politics, as well as in the politics and businesses of other states. Claimants and Respondent agree that Anatolie Stati is not a political opponent of President Nazarbayev. (C-0 ¶ 10; C-II ¶ 79; R-II ¶¶ 24 – 33, 38 – 39, 267; RPHB 1 ¶¶ 21, 118).

206. Claimant Gabriel Stati is a natural citizen of Moldova and Romania and is the son of Anatolie Stati. (C-0 ¶ 11; C-II ¶¶ 79 - 80).

207. Claimant Ascom Group S.A. is a joint stock company incorporated under the laws of Moldova, with headquarters in Moldova. Ascom's operational subsidiaries were located in Kazakhstan. The Parties dispute whether Anatolie Stati owned 100% of Ascom, which owned 100% of KPM or that Ascom has substantial business activities in or is controlled from Moldova. Respondent argued that Anatolie Stati is Ascom's 100% shareholder. (C-0 ¶ 12; C-II ¶¶ 85, 86, 95, 128; R-II ¶¶ 51 – 54; RPHB 1 ¶ 124).

208. Claimant Terra Raf Trans Traiding Ltd. is a limited liability company incorporated under the laws of Gibraltar. (C-0 ¶ 13; C-II ¶ 96, 129; R-I ¶ 9.81, 14.9).

209. Respondent states that Tristan Oil Ltd. ("*Tristan*") is an affiliate of KPM and TNG and is 100 % owned by Anatolie Stati. Tristan was created as a special purpose vehicle with the purpose of issuing notes. (R-II ¶ 728).

210. Mr. Lungu is the Executive Vice President and CFO of Tristan and the Commercial Vice President of Ascom. (RPHB 1 ¶ 138).

211. TNG is a Kazakh company that owned the subsoil use rights to the Tolkyn field and the Tabyl Block pursuant to Contracts 210 and 302 on Exploration and Extraction of Hydrocarbons at the "*Tolkyn*" deposit and the Tabyl Block (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and TNG, and dated 12 August and 31 July 1998, respectively. Contract Nos. 210 and 302 were issued pursuant to the Licenses for the right to explore and/or exploit the hydrocarbons, Series MG No. 242-D (oil) and MG No. 243-D (oil), both dated 4 December 1997 and issued by the Government. (C-0 ¶ 18, partially quoted, citations omitted; C-I ¶¶ 3, 47; R-I ¶ 13.55).

212. KPM owned the subsoil use rights to the Borankol field pursuant to Contract 305 on Exploration and Extraction of Hydrocarbons at the "*Borankol*" deposit (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and KPM, and dated 30 March 1999. Contract 305 was issued pursuant to the license for the right to use subsoil, Series MG No. 309-D (oil) dated 23 May 1997, issued by the Government to KPM. (C-0 ¶ 16, quoted, citations omitted; C-I ¶¶ 3, 42; R-I ¶ 13.2).



213. Over 90% of KPM's and TNG's work force was comprised of local Kazakh citizens, nearly 1,000 of which were employed on a permanent basis. (CPHB 1 ¶ 123).

214. Respondent considers KMG to be two separate, distinct entities: KazMunaiGaz Exploration Production (KMG EP) and KazMunaiGaz National Company (KMG NC). Respondent explains that KMG EP is not a state entity, but is a commercial entity listed on the London Stock Exchange and the Kazakhstan Stock Exchange. KMG NC is a state entity that considers the social and economic implications of an acquisition to the Republic as a whole. (R-II ¶ 350 – 351; RPHB 2 ¶ 10).

215. Mr. Timur Kulibayev is President Nazarbayev's son-in-law and the Chairman of KMG NC, but not of KMG EP. (C-I ¶ 189, R-II ¶ 352).

## F.II. Timeline of Events

216. As will be seen later in this Award, in the present dispute the timeline of events is of particular importance to the considerations and conclusions by the Tribunal. It is, therefore, provided in much greater detail than would normally be necessary. The following timeline records events mentioned by the Parties in their submissions, without prejudice to the relevance the Tribunal may attach to each item.

217. The Borankol structure was discovered in 1959, with test drilling finalized in 1973. The Tolkyn field structure was discovered in 1992 (C-I ¶¶ 42, 46).

218. KPM was established as a closed JSC joint venture / non-commercial organization on 24 March 1997. The companies Polmak Sondazh Sanaii A.Şh. (from the Republic of Turkey) and CJSC Joint Kazakh-Estonian-Irish Company Aksai were the founders and equal 50% owners of the company. (R-I ¶¶ 13.1 – 13.3).

219. On 27 January 1999, Promtorgbank JSC Industrial and Trade Bank transferred 800 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

220. On 29 March 1999, Shagyrly-Shomyshty LLP transferred 1000 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

221. Claimants began investigating investment opportunities in Kazakhstan in 1999. (C-I ¶ 42).

222. On 18/19 November 1999, KPM submitted a request to the Agency of the Republic of Kazakhstan on Investment for consent to Ascom Group's acquisition of a 62% share of KPM. (C-I ¶ 45; C-II ¶¶ 169, 165; RPHB 2 ¶ 275).

223. On 9 December 1999, Ascom purchased the 62% share in KPM. Respondent disputes the legality of this purchase. (R-II ¶ 117).



224. On 13 December 1999, KPM was reorganized from a non-commercial to a commercial organization. Claimants dispute this and state that KPM was always a commercial entity. They suggest that the change could have been to remedy a registration error by the Republic. (R-I ¶ 13.12; C-II ¶ 155).

225. On 24 January 2000, KPM obtained a national identification number with respect to the initial issuance of its shares. (C-II ¶ 149).

226. Claimants' interest in TNG and the TNG Subsoil Use Contracts began with Ascom's acquisition of a 75% interest on 17 May 2000. Claimants requested and received consent for the transfer. The State believed its pre-emptive rights were inapplicable to the transfer. (C-0 ¶ 19).

227. Respondent acknowledges that, in relation to the TNG shares, Claimants have produced evidence of certain payments being made by Ascom to Kaihar TOO in the amounts of USD 421,000 and USD 1,137,000 at the time of the acquisition on 30 May 2000, but notes that this investment was made by Ascom and not Terra Raf. Respondent states that the formal shares themselves were purchased for USD 189,185 on 16 January 2009. Respondent states that this discrepancy has not been explained by Claimants. (R-I ¶ 14.3 (stating that the amount was USD 190,000); R-II ¶ 118).

228. On 30 May 2000, Kainar LTD transferred 3050 TNG shares to Ascom S.A. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

229. As of July 2000, Claimants were the operators for both the Borankol and Tolkyn fields. (C-I ¶ 49).

230. The MEMR was created on 13 December 2000. (C-II ¶ 167).

231. KazRosGas LLP was created in 2001 pursuant to an agreement between the governments of Kazakhstan and Russia. It was designated as the single operator to buy, sell, and market Kazakhstan's export gas. Gazprom owns 50% of KasRosGas. Domestic producers that wish to export gas must contract with Gazprom. (R-I ¶ 49.13; R-III ¶¶ 253 - 262).

232. In 2001, NIPI Neftegaz issued the Borankol Raw Materials Base Project, a design of KPM's gathering and treatment facility as a single technological process. (CPHB 2 ¶ 74; RPHB 2 ¶ 204).

233. On 25 April 2001, State Expert Review of Projects approved construction of KPM's pipelines, including the 18 km pipeline that is at issue. (CPHB 2 ¶ 74).

234. On 4 March 2002, the State Inspection for Emergency Situations, the Fire Safety Supervising Agency, the State Sanitary Surveillance Department, the Ministry of Environmental Protection for the Mangystau Region, the State Inspection for Architecture and Construction, and NIPI Neftegaz approved the commissioning of KPM's 18-kilometer pipeline. No mention was ever made of that pipeline being a trunk pipeline. (C-II ¶ 272; CPHB 2 ¶ 74; RPHB 2 ¶ 214).



235. On 13 March 2002, Ascom transferred its 75% interest in TNG to its subsidiary, Gheso S.A. ("*Gheso*"). (C-0 ¶ 19; C-I ¶¶ 50, 140 et seq.) Claimants did not obtain consent from either the Government or MEMR for this transfer. (R-I ¶ 13.28; R-II ¶ 158; RPHB 2 ¶ 273).

236. On 30 April 2002, Kainar LTD transferred 950 shares of TNG to Gheso. Claimants state that they received consent, and provide the Tribunal with Exhibit C-134, which Claimants say TNG received from the MEMR, granting permission for the share transfer. (C-II ¶ 168). In response, Respondent states that consent should never have been granted without a waiver of the Republic's pre-emptive right and that Exhibit C-134 cannot be deemed as consent by the appropriate body, as Claimants allege. (R-I ¶ 13.28, RPHB ¶ 273).

237. On 3 May 2002, Production-Commercial Firm Bobro and Anavi respectively transferred 100 and 200 TNG shares to Gheso, resulting in Gheso becoming the 100% owner of TNG. Respondent states that Claimants did not obtain consent from either the Government or MEMR for these transfers. (R-I ¶ 13.28).

238. In September 2002, KPM and TNG applied to the MEMR for licenses covering its new gathering system. On 26 September 2002, MEMR issued the requisite licenses to KPM and TNG for their production, treatment, and transportation activities. (C-I ¶ 83; C-II ¶ 274; CPHB 2 ¶ 74).

239. On 12 May 2003, Gheso transferred its 100% interest in TNG to Terra Raf. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that Claimants did not obtain consent for this transfer. (R-I ¶¶ 13.28 – 13.29).

240. Claimants state that the transfer was complete on 28 May 2003 when TNG's share registrar, Zerde, registered the Gheso-Terra Raf share transfer. (CPHB 2 ¶ 117). Respondent disagrees – a transfer cannot be validly registered under Kazakh law without consent being obtained under Art. 53(1). (RPHB 2 ¶ 273).

241. Starting in 2004, Claimants conducted the initial seismic work on the Contract 302 properties. (C-I ¶ 66).

242. In 2004, Claimants had discussion with GazImpex, a gas-exporting company which Claimants allege is controlled by Mr. Kulibayev, about the sale of a 35% stake in TNG. The parties were never able to reach agreement because Claimants valued TNG at USD 567 million, while GazImpex valued it at USD 27.8 – 32.9 million. (C-II ¶ 375). Respondent states that Claimants have failed to prove that Mr. Kulibayev owned or controlled GazImpex and argue that these negotiations are irrelevant to this arbitration. (R-II ¶¶ 341 – 344).

243. Respondent states that Claimants have produced a document identified as C-514, dated 15 September 2004, which expressly refers to Ascom being the owner of TNG as of that date. Claimants provide no explanation of how this could be the case, given that by this point, Terra Raf had acquired TNG from Gheso. Respondent states that, according to Claimants at C-I ¶ 50, the last time Ascom owned TNG was in 2002. (R-II ¶ 173).



244. In November 2004, Ascom acquired the remaining 38% interest in KPM. Respondent acknowledges that Claimants have provided evidence of USD 9 million having been provided by Ascom and Terra Raf for this purchase. (C-I ¶ 45; C-II ¶ 184; R-II ¶ 117).

245. On 1 December 2004, Kazakhstan passed a law giving the State a pre-emptive right over certain transfers of subsoil users. (CPHB 2 ¶ 117).

246. The 8 December 2004 enactment of Law No. 2-III, which amended Art. 71 of the 1996 Subsoil Use Law, gave Kazakhstan a pre-emptive right to acquire shares in subsoil users. (C-II ¶ 184).

247. In May 2005, KPM was reorganized from an OJSC to a LLP. Claimants state that the Government approved of this change by letter. (C-I ¶¶ 45, 51).

248. On 16 May 2005, Terra Raf reorganized TNG from an OJSC to a LLP. Claimants notified MEMR of this reorganization, and the change from TNG OJSC to TNG LLP was memorialized in the State-executed 2006 Supplements to the TNG Subsoil Use Contracts. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that when TNG was reorganized from an OJSC to a LLP in 2005, there was an error: Terra Raf never was a lawful shareholder of TNG and could not carry out its reorganization from an OJSC to a LLP. (R-I ¶¶ 13.32; 13.45).

249. After the alleged reorganizations, KPM and TNG applied to re-license their pipelines. MEMR re-issued licenses on 5 August 2005. (C-I ¶ 82; C-II ¶ 274; CPHB 2 ¶ 74).

250. In 2006, TNG contracted with Vitol to construct and operate the LPG Plant. The Parties dispute the amounts invested. (C-I ¶¶ 62, 64; R-II ¶ 123).

251. In May 2006, Claimants halted construction on the LPG Plant for financial reasons. (C-I ¶ 64).

252. On 31 July 2006, the exploration period for Contract 302 was extended. Flooding in the Caspian Sea basin, however, suspended exploration work for two years and eight months. The MEMR extended the exploration period until 30 March 2009, without counting this *force majeure* against the two permissible contractual extensions. (C-I ¶ 47; R-I ¶ 14.20).

253. On 19 October 2006, the State asked TNG whether Ascom had transferred any of its interest in TNG during the period of 1 December 2004 to 19 October 2006. TNG replied that Terra Raf was the sole interest holder in TNG since May 2003. (C-0 ¶ 21; C-I ¶ 143; CPHB 2 ¶ 117).

254. In 2006, Claimants began the "*Bonds Project*", under which Tristan Oil (a company under the control of Claimants), issued 3 tranches of bonds with maturity of 1 January 2012, for a total amount of USD 531 million. The bonds were issued at the EURO MTF Market of the Luxembourg Stock Exchange and were guaranteed by KPM and TNG. The charter capital of each company at the date of issuance of guarantees amounted to USD 50,000, *i.e.* 0.018% of the par bond issue. (R-I ¶¶ 9.59 – 9.62).



255. The first tranche of the Bonds Project was issued on 20 December 2006. (R-I ¶ 9.59).

256. On 11 January 2007, Kazakhstan adopted a new Law on Licensing, pursuant to which the MEMR would remain the licensing authority for production activities and operation of pipelines other than "*main*" or "*trunk*" pipelines. (C-II ¶ 275; CPHB 2 ¶ 74). Since the Parties have used the terms "*main*" and "*trunk*" pipelines interchangeably, so too shall this Award.

257. In early 2007, Kazakhstan approached Claimants with a proposal for the provision of gas to KazAzot as part of a project of national priority to allow the Republic to develop an Ammonia-Carbamide project, which required a secure gas supply. (C-I ¶ 58; R-I ¶ 15.5 et seq.). Claimants state that they agreed to provide specific volumes of gas to KazAzot, provided that Claimants would be allowed to export specific volumes of gas at international market prices. (C-I ¶ 58).

258. On 13 February 2007, Respondent notified Claimants that they had failed to obtain consent for the 2003 transfer of Gheso's 100% interest in TNG to Terra Raf and that Claimants had not notified the Republic that Ascom's shares had been transferred to Gheso. Respondent notified Claimants that they had failed to give the Republic the opportunity to exercise its pre-emptive right to purchase TNG. (R-I ¶ 13.47; RPHB 2 ¶ 277). Respondent requested that TNG apply for retroactive permission for the 2003 transfer and TNG complied. (C-I ¶ 143; CPHB 2 ¶ 117). Claimants state that MEMR also notified Claimants that the transfer had been proper and the pre-emptive right was not applicable. (CPHB 2 ¶ 117).

259. On 19 February 2007, TNG informed the MEMR that the Republic's pre-emptive right did not apply in February 2007. (RPHB 2 ¶ 277).

260. On 21 February 2007, Terra Raf noted KazRosGas's interest in acquiring a stake in TNG, and asked KazRosGas to send a written offer. (C-II ¶ 376). Respondent states that this is irrelevant to this arbitration, and there is no link to the Republic. Likewise, Claimants have not proven that Mr. Kulibayev controls this company. (R-II ¶¶ 341, 345).

261. On 7 May 2007, Claimants, the MEMR, the Governor of the Mangystau Region, the operator of the main gas pipeline KazTransGas (a subsidiary of the national oil company KMG), and the owner KazAzot agreed to enter into gas supply and transport arrangements and signed a Memorandum of Understanding. Pursuant to these arrangements, Claimants would sell certain volumes of gas at a price substantially above the discounted prices to KazAzot (first at near-market prices, then at the international market price after two years), and TNG, through KazTransGas, would be allowed to export certain volumes of gas at international market prices. Over the following year, Claimants conducted extensive negotiations to conclude the prices, volumes, and conditions of the agreement. (C-I ¶ 59). Respondent disputes that there was any reference to the ability to sell oil in the Memorandum of Understanding. (R-I ¶ 15.7).

262. On 14 June 2007, the second tranche in the Bonds Project was issued for USD 120 million. (R-I ¶ 9.59).



263. On 19 June 2007, President Nazarbayev issued a Presidential decree that transferred authority for licensing the operation of trunk pipelines from the MEMR to the ARNM – the regulator and controller of activities of natural monopolies and regulated markets. (R-II ¶ 589). Claimants state that the MEMR (later called the Ministry of Oil and Gas or "*MOG*") remained the licensing authority for activities related to production and to operation of pipelines other than trunk pipelines. (C-II ¶ 275). Respondent, however, states that the ARNM has the power of issuing licenses to operate transfer gas pipelines, oil pipelines, trunk pipelines, and oil product pipelines. It neither polices who owns trunk pipelines nor does it classify whether a pipeline was trunk. (R-I ¶ 25.2; R-II ¶¶ 544, 589; CPHB 2 ¶ 74). The Parties have acknowledged that, since 2007, competency to issue licenses in relation to trunk pipelines lies with the ARNM. The Parties are aware that anyone wishing to operate a trunk pipeline needs to apply for a license. (CPHB 1 ¶ 155, R-I ¶ 26.9; R-II ¶¶ 464 – 465, CPHB 2 ¶ 61; RPHB 1 ¶¶ 198 – 202).

264. On 6 December 2007, KPM and TNG each applied to the MEMR for permits to allow the transfer of their ownership interests to Tristan Oil for the purpose of conducting an IPO on the London Stock Exchange. (C-0 ¶ 22; C-I ¶ 144; R-I ¶ 9.70).

265. On 26 December 2007, the Kazakh Inter-institutional Committee recommended that the MEMR (1) grant permission for the transfer and (2) waive the State's pre-emptive rights to purchase 100% of KPM and TNG. (C-I ¶ 144; CPHB 2 ¶ 117).

266. By letters to KPM and TNG dated 29 December 2007, the MEMR granted permission for the transfers and expressly waived its pre-emptive rights. According to Claimants, the State indicated that it was interested in purchasing the assets within the IPO. (C-0 ¶¶ 22, 79; C-I ¶ 144; CPHB 2 ¶ 119).

267. Production in the Tolkyn Field declined from 2005 – 2007, until there was a jump in production from 2007 – 2008. This sudden increase in gas production led to an associated increase in water production ("*water cut*"), which led to a significant and sustained reduction in gas production, a situation that continues to date. In relation to the Borankol field, liquid production declined beginning in 2005 and gas production declined beginning in 2004. (R-I ¶¶ 15.2, 16.1, 46.13).

268. In April 2008, Claimants received the Miller & Lents reserves report, which showed that their estimates for production from Borankol had been overstated by 300%. (RPHB 2 ¶ 61).

269. On 8 April 2008, Kazakhstan amended its 2005 laws regarding the payment of export taxes. Pursuant to the 2008 amendments, a USD 109.91/ton duty was imposed on exported crude oil. The 2008 amendments contained specific provisions, pursuant to which no export tax would be applied to exported crude oil that had been extracted under Subsoil Use Contracts containing specific exemptions from the Crude Oil Export Tax. (C-I ¶ 162).

270. On 28 April 2008, the MEMR, TNG, KazAzot, and KazTransGas entered into a first agreement setting out their understanding, entitled "*Agreement for the Implementation of the Memorandum of Understanding of 7 May 2007*." (C-I ¶ 60).



271. On 5 May 2008, Mr. Cornegruta of KPM wrote to the MEMR for the re-issue of KPM's license for the performance of certain activities. The operation of trunk pipelines was not mentioned, but the exploitation and storage of gas were. Respondent states that, objectively, the letter specifically and deliberately requested a license for the operation of trunk pipelines. (RPHB 2 ¶ 162)

272. On 16 May 2008, the Prime Minister of Kazakhstan, the MEMR, KMG, KazTransGas, KazAzot, and TNG agreed that the parties should enter into tri-partite agreements to resolve the outstanding issues. (C-I ¶ 60).

273. On 26 May 2008, the MEMR wrote to KPM, directing KPM to apply to the ARNM for other licenses it may need, pursuant to the change of law and ARNM's new authority. (C-II ¶ 313, CPHB 2 ¶ 74; RPHB 1 ¶ 204).

274. On 29 May 2008, the MEMR re-issued KPM and TNG their licenses for various operations, including "*oil, gas, and oil products production*", pursuant to the 2007 Law on Licensing. (C-II ¶ 275; CPHB 2 ¶ 74).

275. On 13 June 2008, Mr. Cornegruta wrote to ARNM, requesting permission to carry out activities. The Parties dispute whether this letter was an admission that KPM operated a trunk pipeline. This is later referred to as the "*confession*" letter and was relied on by the Republic as the admission of certain facts. (C-II ¶¶ 313 – 317, R-I ¶¶ 9.83; 21.9, 25.11, 27.55 - 27.56; R-II ¶ 633, RPHB 1 ¶¶ 205 – 208). Respondent explains that the letter was clearly an incomplete application for a license and that it was only one piece of evidence of much more showing that the KPM Pipeline was trunk. (RPHB 1 ¶¶ 205, 209; RPHB 2 ¶ 215). Claimants state that KPM wrote to ARNM inquiring as to whether it needed to have its license re-issued by the ARNM in light of the changes in the new Law on Licensing. (CPHB 2 ¶ 74).

276. KPM's 13 June 2008 application was rejected in July 2008 because the submitted package of documents did not meet the requirements of the legislation. The ARNM suggested that KPM submit the documents in accordance with the legislation. KPM did not submit any documents after that. (R-I ¶¶ 21.9, 25.12; RPHB 1 ¶ 202; RPHB 2 ¶ 218).

277. On 3 July 2008, after KPM had notified the Customs Committee of its contractual exemption from specific export taxes, the Customs Committee notified KPM that "*Contract no. 305 contains no regulations as to the exemption from export tax and, thus, export tax shall be applicable to the crude oil exported under the foregoing contract.*" Pursuant to this notice from the Customs Committee, KPM was prohibited from exporting 22,000 tons of crude oil for August 2008 without payment of the Crude Oil Export Tax. KPM conditionally paid these export taxes and concurrently commenced a legal action challenging imposition of the tax. (C-0 ¶¶ 69 – 70; C-I ¶ 19).

278. In summer 2008, Claimants made an "*independent business decision*" to explore a sale of KPM, TNG, and the LPG Plant, excepting the Contract 302 properties (the so-called Tabyl Block). This was nicknamed "*Project Zenith*" and Claimants retained Renaissance Capital to facilitate the sale process. (C-I ¶¶ 69, 184, C-II ¶ 397; R-I ¶ 9.67).



279. On 14 July 2008, the ARNM responded to Mr. Cornegruta's letter of 13 June 2008, and stated that further documentation needed to be submitted. Both Parties accept that none was ever received. (RPHB 1 ¶¶ 210 – 211). Claimants state that the ARNM responded by informing KPM that the type of activities listed in KPM's 2005 license to not require separate licensing from the ARNM. (CPHB 2 ¶ 74).

280. On 18 July 2008, Renaissance Capital sent a "*teaser*" offer to 129 potential purchasers, including KMG. (C-I ¶ 69; R-II ¶ 775, RPHB 1 ¶ 82).

281. On 20 July 2008, TNG discovered gas and condensate deposits in the East Munaibay structure of the Tabyl Block. Productivity testing demonstrated a commercial flow of 120,000 cm/day and 150,000 cm/day of rich gas in the Asselian and Artinskian strata, respectively, without any treatment for productivity enhancement, and 3D seismic interpretation of the structure is commensurate with a substantial find. (C-0 ¶¶ 23, 57; C-I ¶ 13).

282. By letter dated 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay No. 1 well in Contract 302. (C-I ¶ 67 CPHB 1 ¶ 129; CPHB 2 ¶ 151).

283. Later in the summer of 2008, a tri-partite agreement between TNG, KazAzot, and KazTransGas containing the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export was created ("*KazAzot Tripartite Agreement*"). Subsequently, Kazakhstan replaced KazTransGas with its parent company, KMG. (C-I ¶ 60).

284. On 11 August 2008, TNG filed an application for the evaluation/appraisal phase for Munaibay No. 1. (C-I ¶ 67; CPHB 2 ¶ 151).

285. In mid-August 2008, Renaissance Capital distributed the Information Memorandum to 41 parties that had expressed an interest in the properties and signed a confidentiality agreement, including KMG. (C-I ¶ 70; RPHB 1 ¶ 82).

286. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith. (C-I ¶ 69).

287. On 25 September 2008, based on information provided by Claimants and upon invitation by Claimants, KMG EP tendered an indicative offer of USD 754 million in Project Zenith. Respondent states that, prior to Claimants' invitation, KMG EP was not interested in investing. Claimants state that this was among the lowest of the bids received, amounting to less than half the highest indicative offer (KNOC's offer of USD 1.55 billion), and more than 25% below the average of all eight indicative offers (USD 1.05 billion). Respondent alleges that Renaissance Capital "*tweaked*" the numbers by conditioning access to the data room on higher offers. (C-I ¶¶ 12, 16, 71; C-II ¶ 378; R-II ¶¶ 356 – 357, 781).

288. On 26 September 2008, KNOC submitted an indicative bid, based on the assumption that higher export prices could be achieved as a result of the KazAzot Tripartite Agreement. (RPHB 1 ¶ 95)



289. Based on Tristan's financial statements, on 30 September 2008, the cash on hand and cash equivalents of the Tristan group (KPM, TNG, and Tristan) were USD 9.7 million, despite the issuance of notes in mid-2006 for USD 300 million and at the beginning of 2007 for USD 120 million. (RPHB 1 ¶ 47)

290. By 1 October 2008, Claimants had received 8 non-binding indicative offers in Project Zenith. (C-I ¶ 12, 71; R-I ¶ 16.9; R-II ¶ 775).

291. On 6 October 2008, then-President of Moldova, Vladimir Voronin, wrote a letter to President Nazarbayev of Kazakhstan, stating that Mr. Anatolie Stati was using proceeds from Kazakhstan's mineral resources to invest in areas subject to UN sanctions, in particular, in South Sudan. At the time, Claimants did not view the letter as particularly problematic, since Anatolie Stati had frequently sparred with President Voronin over Moldova's democratic transformation. Claimants state that letter contained false and defamatory personal accusations against Anatolie Stati. Claimants state that Anatolie Stati is not funding terrorist groups in South Sudan. Claimants admit that Anatolie Stati has normal, commercial investments in the oil and gas industry in South Sudan and has contributed enormously to the well-being of the population of South Sudan by making substantial investments in oil and gas exploration and by building schools, a hospital, medical clinics, and means of transportation in the region where his investments are located. Claimants maintain that Anatolie Stati's investments in South Sudan have never been a secret and have never violated UN sanctions. Respondent states that there is no evidence that Stati's investments contribute to the well-being of the population of South Sudan. Respondent states that Claimants' insinuation that President Nazarbayev asked President Voronin to write the letter is ludicrous. (C-0 ¶ 25; C-I ¶ 74; C-II ¶ 194, 211; R-I ¶¶ 9.56, 19.21; R-II ¶¶ 43 – 44; RPHB 1 ¶¶ 188, 374 – 376; RPHB 2 ¶ 156).

292. On 7 October 2008, the MEMR acknowledged TNG's August 2008 application for evaluation of the discovery on the Contract 302 property. (C-I ¶¶ 13, 67).

293. On 10 October 2008, Claimants withdrew their statement of intention filed on 11 August 2008 because they felt it was still too early in the exploration stage to commence evaluation. (C-0 ¶ 57). In its Post-Hearing Brief, Claimants explained that TNG informed Kazakhstan that it was withdrawing its August 2008 application to move to the appraisal phase for Munaibay because it intended to fully and thoroughly explore the contractual territory because the Munaibay 1 well suggested "*a high probability of additional discovery of more deep-lying raw hydrocarbon reservoirs on Munaibay area.*" (CPHB 1 ¶¶ 129, 234; CPHB 2 ¶ 151).

294. On 14 October 2008, Claimants applied to MEMR to extend the exploration period in the Tabyl Block by two years. (C-II ¶ 175, CPHB 1 ¶ 129, CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416). In October 2008, Claimants commenced an exploratory well in the Tabyl Block's Bahyt structure, which had shown evidence of gas in the lower Triassic stratus. Through October 2008, Claimants had invested USD 43 million in exploration work in the Contract 302 properties. (C-0 ¶ 57, C-I ¶¶ 66 – 68).



295. As of 14 October 2008, the yield to maturity of the Tristan notes stood at 26.319%, meaning that the Tristan note course stood at USD 65.125 for a nominal value of USD 100. (RPHB 1 ¶¶ 48, 77)

296. On 14/16 October 2008, President Nazarbayev issued a document (Exhibit C-8), which contains both the dates of 14 and 16 October 2008 in the Russian original and in the English translation. (The Tribunal decided not to address these two different dates as the difference has no impact on the present dispute. Both dates are used in the Parties' submissions and in various parts of this Award.) In the document, the President instructed Kazakh Deputy Prime Minister, Umirzak Shukeyev, and the head of the Financial Police, Sarybai Kalmurzayev, to "*thoroughly investigate*" / "*thoroughly check[]*" all of Claimants' business activities in Kazakhstan. (C-0 ¶ 25; C-I ¶ 75; C-II ¶ 16 CPHB 2 ¶¶ 38, 61, 115, 117, 128; RPHB 1 ¶¶ 188, 377; RPHB 2 ¶ 10). Respondent disputes the translation of this order, and states that Claimants' ability to obtain this internal government document, points to serious corruption on behalf of Claimants. (R-I ¶¶ 19.22 – 19.23; R-II ¶ 214). Respondent nonetheless explains that the note is nothing more than a pro-forma document by which a complaint from one head of state is forwarded to the competent authorities, as is the etiquette of dealings between CIS leaders. As explained at the hearing, the letter received no special treatment from the Financial Police by virtue of the fact that it came from the President. Respondent stated that the fact that President Nazarbayev does not have any specific interest in Claimants' operations in Kazakhstan was confirmed by Minister Mynbayev during cross-examination. (RPHB 1 ¶¶ 377 – 383; RPHB 2 ¶¶ 42 – 44).

297. On 16 October 2008, the Deputy Prime Minister issued order No. 6497, pursuant to which the Financial Police, under the supervision of that office, ordered the MEMR and the Tax and Customs Committees to conduct comprehensive or complex audits of KPM and TNG, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Claimants report that the (1) MEMR, (2) Tax Committee, (3) Customs Committee, (4) National Bank of Kazakhstan, (5) Geology Committee, (6) Ecology Committee, and (7) MES were ordered to conduct audits and investigations of KPM and TNG. (C-0 ¶ 25, C-I ¶ 76; CPHB 2 ¶¶ 38, 128). Respondent states that Claimants have exaggerated the nature of the audits and that there has been no evidence that audits by the Customs Committee, the Ecology Committee, or the MES occurred. (R-I ¶¶ 20.3 – 20.6).

298. On 18 October 2008, the Financial Police instructed the Customs Committee to audit KPM's and TNG's compliance with export tax laws. (C-I ¶¶ 161 – 163, CPHB 2 fn. 209).

299. On 18 October 2008, the Financial Police wrote to the Customs Committee regarding Anatolie Stati's travel through Kazakhstan. (CPHB 2 ¶ 38, C-11).

300. On 19 or 20 October 2008, after deciding not to proceed to the firm bidding phase of Project Zenith, Mr. A. Stati learned of President Nazarbayev's 14 October 2008 Order. (Stati 2nd p. 4).

301. On 20 October 2008, the Financial Police wrote to the MEMR and an official in Moldova requesting information on Anatolie Stati, KPM, and TNG. (CPHB 2 ¶ 38).



302. On 24 October 2008, the Chief Inspector of the Financial Police, Mr. Turganbayev, reported that "*with respect to the companies controlled by A. Stati,[...] inspections regarding the completeness of payment of taxes, compliance with labor legislation, environmental protection legislation, as well as legislation in the sphere of subsoil use and industrial safety have been [initiated].*" He requested that the Deputy Head of the Department for Investigations of the Financial Police extend the inspection term two months to 16 December 2008. (C-430; C-II ¶ 213; CPHB 2 ¶ 38, 128).

303. On 24 October 2008, the Financial Police ordered comprehensive tax inspections of KPM and TNG. (CPHB 2 ¶¶ 38, 128).

304. On 24 October the MEMR responded to the Financial Police request for KPM's and TNG's corporate documents showing their shareholdings. (CPHB 2 ¶ 117).

305. By letter of 27 October 2008, Gazprom refused to accept KazTransGaz as the exporter. (RPHB 2 ¶ 499).

306. On 28 October 2008, the Financial Police ordered the Geology Committee, the Ecology Committee, the National Bank of Kazakhstan, the Tax Committee, and the MES to carry out inspections of KPM and TNG and insisted that Financial Police be permitted to participate. (C-0 ¶ 36, CPHB 2 ¶¶ 38, 61, 128).

307. On 30 October 2008, the Financial Police issued a finding that Anatolie Stati is not a registered businessman in Kazakhstan, but that he carries out his business through Ascom. They found that "*ASCOM SA owns 100% of the participation share in KPM.*" (C-II ¶ 86; CPHB 2 ¶ 38).

308. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities and noted specific items to inspect, but found that KPM and TNG were compliant with their investment obligations. (CPHB 2 ¶ 38).

309. In the fall of 2008, TNG's largest non-local customer, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382, partially quoted; R-II ¶¶ 751 - 752). Respondent notes that Kemikal is a commercial entity that cannot be attributed to the state. Likewise, KazRosGas is a joint venture under equal participation of Gazprom and KMG and the Republic is not responsible for its actions. Kemikal stopped payments toward the end of 2008 because of "*liquidity and insolvency*" issues, per the PwC Due Diligence Report. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124).

310. In November 2008, Renaissance Capital asked KNOC to revise their bid. (RPHB 1 ¶ 95).



311. By 1 November 2008, Financial Police informed the Deputy Prime Minister of Kazakhstan that it had discovered that Anatolie Stati left Kazakhstan in 2007. (C-II ¶ 212).

312. On 1 November 2008, Financial Police reported to Deputy Prime Minister, confirming the ownership of KPM and TNG and informing him that inspections were being carried out. (CPHB 2 ¶ 38).

313. On 4 November 2008, the Committee of Geology and Subsoil Resources Use of the MEMR commenced an audit of KPM and TNG regarding compliance on legislation on industrial safety. This inspection was organized and attended by the Financial Police and was scheduled to last until 15 November 2008. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 157).

314. On 7 November 2008, the Tax Committee initiated a targeted audit of KPM and TNG at the request of the Financial Police regarding transfer pricing ("*Transfer Price Audit*"). (C-I ¶ 172; CPHB 2 ¶¶ 38, 128). Respondent does not admit that the audit was instructed by the Financial Police. (R-I ¶ 30.62).

315. On 7 November 2008, Anatolie Stati wrote to President Nazarbayev, assuring him that there were no reasons to investigate KPM and TNG. (CPHB 2 ¶¶ 38, 142).

316. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (CPHB 2 ¶¶ 38, 128).

317. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. (C-0 ¶ 60; C-I ¶ 156; CPHB 2 ¶¶ 38, 128).

318. On 11 November 2008, the MEMR's Geology Committee concluded its audit (4 days ahead of schedule) and found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61). Respondent reports that an inspection was carried out to assess whether KPM and TNG were acting in compliance with their licenses. Reports were written after the inspection and were signed by Mr. Cornegruta (KPM) and Mr. Cojin (TNG). (RPHB 1 ¶ 192). The Financial Police attended this meeting, but the ARNM did not. (R-I ¶ 26.8; R-II ¶ 455). The Financial Police found that KPM did not have a trunk pipeline license. (C-II ¶¶ 16, 380). .

319. On 12 November 2008, following the site visit, the Financial Police asked ARNM whether KPM, TNG, and another Stati company called "*Kok Mai*" held a license for a trunk pipeline. (CPHB 1 ¶ 155; CPHB 2 ¶ 61; R-I ¶ 26.9; R-II ¶¶ 464 – 465; RPHB 1 ¶¶ 198 – 202).

320. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (CPHB 2 ¶ 38).



321. On 13 November 2008, the Tax Committee noted that including the Financial Police in inspections would be illegal and proposed that a working group be established instead to review inspection results. (CPHB 2 ¶¶ 38, 128).

322. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (CPHB 2 ¶ 38).

323. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for – but neither held - licenses to operate main pipelines, and that operation of a trunk pipeline requires such a license. (C-I ¶ 90, CPHB 2 ¶ 61; R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164).

324. Claimants allege that, on 14 November 2008, Financial Police insisted that Mr. Cojin and Mr. Cornegruta sign inspection reports "*admitting*" that KPM and TNG do not hold licenses to operate "*main*" pipelines. (CPHB 2 ¶ 61). Respondent contests this allegation and states that it is only supported by the incredible testimony of Mr. Cojin. (RPHB 2 ¶¶ 158 – 160).

325. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. (R-I ¶ 38.22; RPHB 2 ¶¶ 165 – 172). Claimants refer to this as the "*reclassification*" and Respondent calls it a "*discovery*." (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542).

326. On 17 November 2008, the Financial Police ordered a new audit of KPM and TNG to determine the income from its trunk pipeline operations, as well as KPM's entire revenue for onward sales of oil. (C-0 ¶ 42; C-I ¶ 92; CPHB 2 ¶¶ 38, 61, 81; R-II ¶ 469; RPHB 2 ¶¶ 172 – 173). .

327. A 17 November 2008 agreement memorialized the TNG, KazAzot, and KazTransGas (later replaced with its parent company KMG) tri-partite terms on price, volumes, and conditions. TNG and KMG signed the agreement and it was hand-delivered to KazAzot for signature, but KazAzot never signed the agreement. (C-I ¶ 60; CPHB 1 ¶ 130).

328. On 18 November 2008, the Financial Police issued a resolution for the inspection of unpaid customs taxes by TNG. (CPHB 2 ¶¶ 38, 128).

329. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198).

330. KPM and TNG first made contact with the MES, the state authority responsible for the supervision and control of industrial safety of in-field and main pipelines, on 19 November 2008. (R-I ¶ 28.10).

331. On 19 November 2008, the Tax Committee, at the request of the Financial Police, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM, and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (C-0 ¶ 42; C-I ¶ 92 (stating 2 December 2008); C-II ¶ 330; CPHB 1 ¶ 160; CPHB 2 ¶¶ 61,



81). Claimants state that these were crude calculations that amounted to all of KPM's and TNG's oil and gas production revenues from the Borankol and Tolkyn fields for the audited period 2005-2007. (C-0 ¶ 42). Claimants provide the Tribunal with a detailed explanation as to how the Tax Committee erred in its calculation at C-II ¶¶ 330 – 331, which Respondent contests at R-II ¶ 620. Respondent states that these calculations were based on TNG's own tax filings and were based on the underlying materials of KPM. (R-I ¶ 26.19).

332. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favor in response to KPM's challenge of export duties. The Court ruled that the imposition on KPM of the Crude Oil Export Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743; C-I ¶ 164).

333. On 19 November 2008, KPM and TNG obtained written confirmation from the MES that "***all pipelines operated by your enterprise**, from the place of extraction **to the point of transferring the hydrocarbons to the oil and gas main pipelines are not main pipelines**. We would also like to communicate that **the extraction of oil** (crude oil, gas condensate, and natural gas) to the surface, **treatment and transportation of oil to the place of transfer into a main pipeline and (or) another means of transport form a single technological process of oil production.***" (C-II ¶ 283, partially quoted, emphasis maintained; CPHB 1 ¶ 172; CPHB 2 ¶¶ 38, 61, 98).

334. Respondent clarifies that the 19 November 2008 letter from the MES states that only some of Claimants' pipelines are not trunk pipelines. In any event, the letters were beyond the competence of the MES. (R-I ¶¶ 28.11 - 28.13).

335. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72). They ordered an economics expert from the Ministry of Justice to confirm Tax Committee calculations and instructed that the calculation include transport fees received from TNG's and KPM's revenues from sales of oil. (CPHB 2 ¶ 81).

336. On 21 November 2008, Financial Police ordered the MES to withdraw its statements confirming that KPM's and TNG's pipelines are not "*main*" on the basis that the MES is not competent to provide that conclusion. (CPHB 2 ¶¶ 38, 61, 98; R-I ¶ 26.12).

337. On 25 November 2008, Financial Police wrote to Ministry of Finance inquiring into why the Customs Committee "*exonerated*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (CPHB 2 ¶¶ 38, 128).

338. In late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas, which KazAzot allegedly wanted reconsidered. KazAzot indicated that it would sign the 17 November 2008 agreement within six months, subject to the audit. (C-I ¶ 61).

339. On 28 November 2008, the Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (CPHB 2 ¶ 81).



340. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008 by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

341. On 2 December 2008, Financial Police sent an internal report confirming that KPM operated a "*main*" pipeline without a license and had gained illegal income of over 41 billion Tenge. (CPHB 2 ¶¶ 38, 61).

342. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5 December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381).

343. On 10 December 2008, Mr. Turganbayev (Financial Police) reported to the Prime Minister that KPM and TNG were operating trunk oil and gas pipelines, but further inquiries were necessary since the Financial Police are not competent to classify pipelines. (C-II ¶ 220, CPHB 2 ¶¶ 38, 61; R-II ¶ 473).

344. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407).

345. On 15 December 2008, the Financial Police opened a criminal investigation against KPM based on suspicions that KPM was operating a truck pipeline without a license, due to the following findings: (1) on 13 June 2008, KPM applied to the ARNM for re-issuance of a license, indicating that it believed it was operating a trunk pipeline, (2) on 14 July 2008 ARNM informed KPM that it needed to submit documents for the license to operate a trunk pipeline, (3) a 4 December 2008 MEMR report confirming that neither KPM nor TNG had been issued licenses for the operation of trunk pipelines, (4) confirmation that KPM had been operating the pipeline at least since 2005, (5) an expert report stating that TNG's pipeline was a trunk pipeline, and that this one was similar to KPM's, and (6) a 28 November 2008 report stating that KPM's income from operating the pipeline without a license amounted to 41,166,014,544 Tenge. (R-II ¶¶ 294; 475; RPHB 1 ¶ 222, RPHB 2 ¶¶ 177 – 179; CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61). Respondent concedes that the investigation phase started in December 2008 without a conclusive finding that the pipeline was trunk. (RPHB 2 ¶ 178).

346. On 18 December 2008, the yield to maturity on the Tristan notes increased from 26.319% to 45.666%. (RPHB 1 ¶¶ 77, 78).

347. On 18 December 2008, notified TNG of irregularities in the 2003 Gheso transfer and the corresponding potential violation of the State's pre-emptive right. The MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership



within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (C-0 ¶ 27; C-I ¶¶ 19, 145, 276; C-II ¶¶ 16, 189, 228, 380, 402, CPHB 1 ¶ 214; RPHB 2 ¶ 281).

348. On 18 December 2008, INTERFAX issued a report accusing Claimants of having altered documents in order to defraud the State of its pre-emptive right to purchase the companies. The Parties dispute whether the Tribunal should view this as a MEMR press release (Claimants) or whether this was an independent press item that cannot be attributed to Respondent (Respondent). Respondent states that INTERFAX received the information from unofficial sources. (C-II ¶¶ 400, 402; CPHB 1 ¶¶ 137, 215, 347 – 348, 350; CPHB 2 ¶¶ 38; 117; R-II ¶¶ 171, 747 – 749, 796; RPHB 2 ¶¶ 7, 97).

349. On 18 December 2008, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with the Kazakhstan government. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211). Respondent states that Claimants have not provided any proof that the news agency piece caused Credit Suisse to step back from providing the bridge loan. (R-II ¶¶ 747 – 749; RPHB 2 ¶¶ 95 – 99).

350. On 20 December 2008, the Financial Police began interrogation of KPM and TNG employees. (CPHB 2 ¶ 38).

351. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117).

352. On 23 December 2008, the Board of Appeal of the Mangystau Regional Court accepted an appeal by the Aktau territorial customs body of the 19 November 2008 court ruling in favour of KPM. Subsequent appeals of the Mangystau Regional Court's decision were dismissed. (C-0 ¶ 72; C-I ¶ 165, CPHB 2 ¶ 128).

353. Claimants received a letter dated 24 December 2008 from the Financial Police, but disagree as to the legal content of the letter. The letter requested information regarding (a) the level of protection of the company, and (b) sales made by KPM to agents, individuals, and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38). Claimants state the letter notified KPM that it was the subject of a criminal investigation for operating a main pipeline without a license. (C-0 ¶ 43; C-I ¶ 94). Respondent reports that this was not a notice of criminal investigation. (R-I ¶ 26.20).

354. On 24 December 2008, the Financial Police issued a summons for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (CPHB 2 ¶ 38).

355. On 24 December 2008, the State issued a decision that the Crude Oil Export Tax would not be applicable to crude oil exports subject to the Rent Tax, starting on 1 January 2009. (C-0 ¶ 73; C-I ¶ 166).

356. On 25 December 2008, Mr. Rakhimov of the Financial Police summoned and questioned KPM's General Manager, Mr. Cornegruta. Mr. Cornegruta was



considered a witness at the time. (C-I ¶ 95; R-I ¶¶ 26.21, 27.38). Claimants state that he was not allowed to be accompanied by counsel. (C-I ¶ 95). Respondent denies this and states that he was entitled to be accompanied by counsel. (R-I ¶ 27.39).

357. On 26 December 2008, Mr. Rakhimov summoned and questioned the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar. (C-I ¶ 95; R-I ¶ 26.21).

358. On 26 December 2008, Financial Police ordered the seizure of TNG documents regarding contracts with third parties and the construction of pipelines. (CPHB 2 ¶ 38).

359. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-I ¶ 147; CPHB 2 ¶ 117).

360. On 30 December 2008, KPM submitted a declaration for the quantities of crude oil to be exported by it in January 2009 (c.a. 21,000 tons) to the Aktau territorial customs body. KPM did not pay the Crude Oil Export Tax for these January 2009 exports and instead paid the newly applicable Rent Tax for Export. (C-0 ¶ 74; C-I ¶ 167).

361. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95; CPHB 2 ¶ 38). Respondent says that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (R-II ¶ 481).

362. Oil and gas prices were severely depressed in December 2008 and January 2009. (R-II ¶ 738). Respondent states that Tristan Oil's Annual Report for the Financial Year 2009 revealed a decrease in sales of 65.4%. (R-II ¶ 740).

363. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG cannot deduct 100% of drilling expenses the year they are incurred for corporate income tax purposes. (CPHB 2 ¶ 128).

364. The EPT for the year ending 31 December 2008 was USD 11.2 million for KPM and USD 20.8 million for TNG. Claimants have not contested the imposition of these tax payments. (R-II ¶¶ 761 – 762).

365. In January 2009, the second phase of Project Zenith began. Potential bidders, including KMG EP, were given access to the data room. (R-I ¶ 16.10; R-II ¶ 358).

366. On 5 January 2009, Mr. Rakhimov asked the MEMR to ascertain whether KPM's 17.9 km pipeline was a main pipeline. (CPHB 1 ¶ 171, CPHB 2 ¶ 61).

367. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines are not main pipelines. (CPHB 1 ¶ 173; CPHB 2 ¶¶ 61, 98).



368. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines. (CPHB 1 ¶ 172, CPHB 2 ¶¶ 61, 98).

369. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines are not "*main*." (CPHB 2 ¶¶ 61, 98).

370. On 14 January 2009, the Fitch ratings agency issued a rating watch for Tristan's long-term default rate, due to the cloud on TNG's title and the criminal investigation of KPM. (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117).

371. On 14 January 2009, the Financial Police issued a resolution to appoint three investigators to the criminal investigation. (CPHB 2 ¶ 38).

372. On 15 January 2009, Moody's reported a downgrade review, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).

373. The 16 January 2009 JSC Registrar Zerde for TNG shows 8 share transfers involving TNG. (RPHB 2 ¶ 273).

374. On 19 January 2009, KPM and TNG submitted complaints against the actions being taken by the Financial Police with the GPO, the Ministry of Justice of the Republic of Kazakhstan, the Financial Police itself, the MEMR, and the Western Regional Transport Prosecutor. They nevertheless complied with the request for documents. (C-I ¶¶ 96, 332; CPHB 2 ¶¶ 38, 117, 142).

375. On 20 January 2009, KPM and TNG submitted complaints to the Transport Prosecutor for Mangystau region, describing the illegal actions of the Financial Police and the fact that their pipelines are not "*main*" pipelines. (CPHB 2 ¶ 142).

376. On 20 January 2009, TNG complied with the MEMR's 29 December 2008 requested for notarized documents evidencing the change in ownership of TNG. (C-I ¶ 147).

377. On 21 January 2009, the Transport Prosecutor of the Mangystau Region forwarded KPM's and TNG's complaints to prosecutor for the Western Region. (CPHB 2 ¶ 142).

378. On 22 January 2009, Financial Police requested corporate documents from KPM. (CPHB 2 ¶ 38).

379. On 23 January 2009, Financial Police requested corporate documents from TNG. (CPHB 2 ¶ 38).

380. On 22 – 23 January 2009, the GPO forwarded KPM's and TNG's complaints to the Regional Prosecutor. (CPHB 2 ¶ 142).

381. On 26 January 2009, the GPO sent KPM, through Mr. Cornegruta, a letter (C-629). (CPHB 2 ¶ 38).



382. On 27 January 2009, the Transport Prosecutor forwarded KPM's and TNG's complaints to the prosecutor for the Western Region. (CPHB 2 ¶ 142).

383. On 29 January 2009, KPM and TNG sent complaints to the Financial Police regarding seizure orders and requested a copy of the order that was serving as the basis for the criminal investigation. (CPHB 2 ¶ 142).

384. On 30 January 2009, the Deputy Transport Prosecutor for the Western Region informed KPM and TNG that the complaints are under investigation pending responses from the Financial Police. (CPHB 2 ¶ 142).

385. On 2 February 2009, the Financial Police notified Claimants that their complaints were rejected and that TNG was the subject of a criminal investigation on the same basis, which led to criminal charges against the in-country manager of TNG from 2002 to 2009. The charges were later suspended. The Financial Police rejected the request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142). Respondent accuses Claimants of submitting a misleading translation of C-98. (RPHB 1 ¶ 1065).

386. On 4 February 2009, KPM and TNG wrote to the ARNM and asked to be included in the analysis for the classification of the pipelines. (CPHB 2 ¶ 142).

387. On 4 February 2009, the GPO forwarded complaints from KPM and TNG to the Transport Prosecutor of the Mangystau Region. (CPHB 2 ¶ 142).

388. On 4 February 2009, Financial Police interviewed Mr. Cojin (General Manager of TNG) to determine whether he or Mr. Cornegruta would be the appropriate defendant in any criminal proceedings. (R-II ¶ 480).

389. On 4 February 2009, the MEMR wrote to the Financial Police that the KPM pipeline "*belongs to pipelines working as a gathering manifold and is not a main pipeline.*" (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98). Respondent states that this MEMR letter was withdrawn on the MEMR's own accord on the basis that it had not been reviewed by the legal department. (RPHB 1 ¶¶ 229 – 230; RPHB 2 ¶ 183). The 4 February 2009 letter is an internal government document which was not included in Mr. Cornegruta's criminal file. In this regard, Respondent reiterated its concerns about Claimants' access to internal documents. (RPHB 2 ¶ 186).

390. On 5 February 2009, KPM and TNG wrote to the MEMR asking to be included in the analysis regarding the classification of the pipelines. (CPHB 2 ¶ 142).

391. On 5 February 2009, the Transport Prosecutor of Mangystau Region forwarded complaints of KPM and TNG to First Deputy Transport Prosecutor of the Western Region. (CPHB 2 ¶ 142).

392. On 9 February 2009, the Financial Police ordered the College of Experts of the MOJ to produce an expert report to classify the KPM pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61). Respondent states that the cover letter to the 9 February 2009 Order explained that the Financial Police were under time



pressure and required determination of the issue. Mr. Baymaganbetov stated that these resolutions were received frequently by the department in respect of investigations of companies. (R-II ¶ 553).

393. On 10 February 2009, Mr. Baymaganbetov met Mr. Turganbayev, who had previously been in charge of the inspection and of procuring a preliminary report on the classification of pipelines. (R-II ¶ 554). The two men set out the four documents that had been given to Mr. Baymaganbetov. (CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 195). Mr. Baymaganbetov was entitled to seek out as much further information as he needed. Respondent states that the four other so-called "*expert*" opinions procured by Claimants were not shown to Mr. Baymaganbetov because they could have unfairly tainted his opinion. (RPHB 2 ¶¶ 195 – 196).

394. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. (C-0 ¶ 61). On that date, the State sent notices/Acts of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (C-0 ¶ 61 and 53 partially quoted, cites 69 million; C-I ¶¶ 19, 159; C-II ¶¶ 16,223, 380; CPHB 1 ¶¶ 139, 243; CPHB 2 ¶¶ 38, 128).

395. On 11 February 2009, the letter prepared on 4 February was replaced by a letter dated 11 February, in which the MEMR wrote to KPM and TNG stating that it was not competent to resolve their complaints. (RPHB 1 ¶ 229).

396. On 13 February 2009, MEMR wrote to KPM and TNG stating that it is not competent to resolve their complaints regarding the criminal prosecution and suggested that they write to the GPO. (CPHB 2 ¶ 142).

397. On 13 February 2009, the MEMR wrote to the Financial Police and provided them information on how the definition of "*trunk pipeline*" in Art. 1 of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines. (RPHB 2 ¶ 183).

398. On 13 February 2009, Mr. Baymaganbetov issued the expert decision that KPM's pipelines were trunk pipelines. He based this decision only on the documents received from Mr. Turganbayev. Respondent states that Mr. Baymaganbetov came to his decision quickly because the matter at hand was not unduly complex and he had time to devote to the issue, which fitted with the Financial Police's need for a prompt opinion. In any event, Mr. Baymaganbetov required at least three times as long to issue his opinion than did Claimants' purported expert, Mr. Idrisov. (R-II ¶¶ 554 – 555; CPHB 2 ¶¶ 38, 61, 98; RPHB 2 ¶¶ 188, 193).

399. On 16 February 2009, TNG provided the 12 May 2003 SPA between Gheso and Terra Raf to the MEMR. (CPHB 2 ¶ 117).

400. On 18 February 2009, Moody's downgraded the Tristan debt due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).



401. In mid-February 2009, Turkish Petroleum Corporation and PSA Energy Holding SPC were granted access to the Project Zenith data room containing over 2,000 reports, agreements, surveys, maps, and other documents relating to KPM's and TNG's geological data, operations, and financial, tax, and legal matters. The geological data contained in the data room included 3D seismic data, interpreted seismic horizons, faults (cuts and boundaries), and well tops and coordinates. These companies later withdrew from the bid process. (C-I ¶ 186; R-II ¶ 763).

402. On 24 February 2009, Financial Police seized KPM's corporate documents. (CPHB 2 ¶ 38).

403. On 24 February 2009, TNG complained to MEMR regarding the negative effects of the December 2008 publication on its business and reputation. (CPHB 2 ¶ 117).

404. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for the consent to the transfer and waiver of the State's pre-emptive purchase right and that failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117). This was the last action from the MEMR with regard to the pre-emptive rights claim. (CPHB 2 ¶ 117).

405. On 27 February 2009 and 2 March 2009, respectively, KPM and TNG filed separate complaints before the Tax Committee requesting cancellation of the 10 February 2009 notices. The Tax Committee refused to consider the complaints and Claimants spent the next 1.5 years litigating the matter before Kazakh courts. (C-0 ¶ 63; C-I ¶ 159; CPHB 2 ¶¶ 128, 142).

406. Claimants report that, in February 2009, Claimants made a management presentation for TOTAL. After examining the data room and the management presentation, TOTAL stated that they were going to speak with the Kazakh authorities about the properties before they would be willing to move ahead with a binding proposal. Claimants state that TOTAL spoke with the Kazakh authorities in late February or early March 2009, and withdrew from the bid process, allegedly for technical reasons relating to the properties, but likely because Kazakh authorities discouraged them. (C-I ¶ 187). Respondent states that Claimants have not provided substantiation of their claim that Kazakh authorities spoke to TOTAL. (R-II ¶ 799).

407. On 3 March 2009, NIPI Neftegaz and the Kazakh Research and Design Institute of KMG confirmed to TNG that drilling wells amounts to construction and, thus, drilling expense can be deducted 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

408. On 3 and 4 March, 2009, Financial Police seized KPM's and TNG's corporate documents. (CPHB 2 ¶ 38).

409. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38).



410. On 9 March 2009, Claimants re-filed their notice of discovery in the East Munaibay structure and filed a notice of discovery in the Bahyt structure with the MEMR. Claimants also re-notified the MEMR of their intention to exercise their contractual right to extend the exploration period in the Tabyl Block by two years. (C-0 ¶ 58, partially quoted; C-I ¶ 176). Because there had been no response to the extension request, Claimants declared their intention to appraise those discoveries. (CPHB 2 ¶ 151).

411. On 11 March 2009, the MEMR confirmed to KPM that the drilling of wells amounts to construction and that, thus, drilling expenses can be deduced 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

412. On 18 March 2009, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit was denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-I ¶¶ 38, 149; CPHB 2 ¶ 117). Respondent cites this letter as an attempt to provoke the Republic. (R-I ¶ 9.76).

413. On 18 March 2009, KPM and TNG filed a complaint against initiation of criminal cases undertaken by the Financial Police, with the GPO. (C-I ¶¶ 96, 332; CPHB 2 ¶¶ 38, 142).

414. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A. B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. All of the State's actions against Claimants since President Nazarbayev's 14 October 2008 investigative directive were discussed. Claimants state that Mr. Batalov assured Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG simply submitted a new application for its transfer to Terra Raf and permitted the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Claimants state that the MEMR assured them that the pre-emptive right claim would be resolved in their favour. (C-0 ¶¶ 30 – 31, 82; CPHB 2 ¶¶ 38, 117, 151). Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, Claimants state that the MEMR also indicated that the Financial Police ought to rely on opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-I ¶¶ 106, 150, 152, 177). Respondent agrees with the above, but states that "*it is simply not the case*" that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in Claimants' favour, or that there was any "*reclassification*" of pipelines. (R-I ¶¶ 13.47(e)(v), 21.1).



415. On 24 March 2009, TNG applied for permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332).

416. On 24 March 2009, TNG applied to MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for 2 years into the agenda of the next meeting of the Expert Commission. (R-I ¶ 31.69).

417. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142).

418. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332).

419. On 27 March 2009, Financial Police order KPM and TNG to submit originals of their corporate documents. (CPHB 2 ¶ 38).

420. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested copies of the criminal investigation order. The Financial Police ordered TNG to submit additional original company documents. (CPHB 2 ¶ 38).

421. On 30 March 2009, the Transport Prosecutor for the Western Region wrote to KPM and TNG stating that complaints were under investigation and noted that it had received nothing from the Financial Police in response to inquiries. (CPHB 2 ¶ 142).

422. On 30 March 2009, Contract 302 expired. (R-II ¶ 411).

423. In April 2009, KMG received access to the complete Project Zenith data room. (C-I ¶ 191; C-II ¶ 383).

424. Claimants removed CASCo, a Stati-owned service company that was doing the service work in the fields, from the field in 2009. (C-II ¶ 409; R-I ¶ 9.70; R-II ¶ 791). Respondent notes that Anatolie Stati's testimony regarding ownership of CASCo was inconsistent with and, indeed, was contradicted by other witnesses, his previous statements, and Claimants' own due diligence of 29 August 2008. (RPHB 1 ¶¶ 117 – 136).

425. Respondent reports that, in April 2009, Gabriel Stati was arrested following elections in Moldova, amid allegations that he was involved in the organization and financing of civil unrest and attempting to overthrow the Moldovan government. Moldovan authorities extradited him from the Ukraine. (R-II ¶ 35).

426. On 2 April 2009, the Expert Commission passed the Decision, recommending the extension of Contract 302 for 2 years. (R-I ¶ 31.70; CPHB 1 ¶ 236, CPHB 2 ¶ 151).

