934. Respondent states, in response to paragraph 11 of Mr. Calancea's Witness Statement, that the Republic would never have been in a position to compensate Claimants for the transfer. (R-II ¶ 708). The transfer did not involve a transfer in title. (R-I ¶ 31.162). Accordingly, KMG NC's role was clearly as trust manager and therefore it had no business in taking on the debts and liabilities, which remained with KPM and TNG. (R-II ¶ 711).

935. Claimants' allegations regarding the tax assessments fail in their entirety, as they were also in compliance with domestic law. Claimants could not legitimately expect anything except a lawful tax assessment, or that there would not be back assessments in the event of an incorrect tax declaration. (R-I ¶¶ 37.53 – 37.55).

936. As for the transfer from TNG to Terra Raf, the alleged reversal does not harm Claimants' legitimate expectations, as the application for the alleged approval was based on a flawed and inaccurate application. (R-I ¶¶37.56 – 37.57; RPHB 2 ¶¶ 272 – 281).

937. Respondent's investigations were at all times lawful. Thus, the argument cannot stand that these investigations and proceedings – brought on by Claimants' own illegal behavior – can be the basis for a claim of unfair and inequitable treatment. Claimants always had a duty to apply for the appropriate licenses for their work, and even upon being notified that their application was incomplete, they chose not to. (R-I ¶ 37.58; RPHB 2 ¶¶ 151 – 218).

938. Claimants' argument that Respondent forced Mr. Cojin and Mr. Cornegruta to sign inspection protocols after the MEMR's 4 – 11 November 2008 inspection is only supported by the incredible testimony of Mr. Cojin. After the hearing, Respondent explained that, while initially Mr. Cojin had stated that he accompanied the Financial Police on behalf of TNG, he admitted in cross-examination that he did not actually attend the inspection. Respondent argues that, since Mr. Cojin has testified dishonestly, there is no proof that he was forced to sign the inspection protocols. Not even the minutes of the meeting signed by Mr. Cojin or Mr. Cornegruta reflect this event. (RPHB 1 ¶¶ 194 – 196; RPHB 2 ¶¶ 157 - 161). ,

939. At the Hearing on Quantum, Claimants alleged that the gas market in Kazakhstan amounts to a violation of the FET standard. Respondent states that Claimants are seeking not fair, but rather preferential treatment, something that is not guaranteed. Claimants received the same treatment as other investors and when they did not receive special treatment, they felt persecuted. The Republic was under no obligation to create or find a market for Claimants' oil and gas. The Republic reserves the right to submit further submission on this point. (RPHB 1 ¶¶ 612 – 618, 698 – 700).

940. Respondent states that Claimants' statements about the contract negotiations with Cliffson, especially those related to the investment arbitration clauses, are beyond Respondent's knowledge. (R-II ¶ 827).

### 3. The Tribunal

941. To a large extent, the Parties seem to be in agreement regarding the abstract definition of what fair and equitable treatment (FET) is and intends to protect. In



particular, they agree that the host state has to act in a manner that is consistent with the legitimate expectations of investors.

942. In view of the breadth of the terms "*fair*" and "*equitable*," their context in the ECT, and the object and purpose of the ECT, the Tribunal has to interpret the FET standard in the ECT. The two terms as such provide little guidance. The VCLT, however, provides such guidance:

- *Art. 31.1 requires an interpretation of a treaty provision in their context and in the light of its object and purpose,*

- *Art. 31.2 requires an interpretation of the purpose of a treaty including its preamble and annexes, and*

- *Art. 32 allows recourse to supplementary means of interpretation.*

943. In the latter context, the Tribunal may take into account that the FET standard has been interpreted and applied under international law by many international investment tribunals, thereby creating a considerable body of case law that has added specific meaning and content to the standard.

944. But the Parties also seem to agree, and the Tribunal agrees as well, that the FET standard needs to be considered against all of the factual circumstances. Indeed, the application of the FET standard can only be case specific, taking into account:

- *the specific factual circumstances of the present case, and*

- *that these have to be evaluated in the present case in the legal context of the ECT.*

945. In view of this approach, the Tribunal will now first consider the factual circumstances by summarizing the Respondent's conduct *vis-à-vis* Claimants' investment insofar as it is considered relevant. In doing so, the Tribunal considers that, at least in the present case, as the term "*treatment*" already indicates, not one particular action by the host state has to be considered, but rather Respondent's "*treatment*" of Claimants' investment over a longer period allows its legal evaluation. In view of that, above in this Award, the Tribunal has included a detailed timetable of all relevant actions of the Parties.

946. Regarding the events and steps of the Parties from the beginning of contacts in 1997 to 6 October 2008, the Tribunal refers to the timetable recorded above in a separate section of this Award. It needs not to be summarized or repeated here and shows what the Tribunal considers, with some exceptions described below, to be a normal sequence of contacts and cooperation between the Claimants and Respondent regarding the investments made. It provides no indication that Respondent considered major aspects of the investment or the conduct of the investors as illegal or that it intended to bring the investment to an end.

947. Hereafter, the Tribunal describes in detail the treatment after the above date, which in its view is relevant for the alleged breach of the FET standard.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

948. On 6 October 2008, Mr. Vladimir Voronin ("Voronin"), then-President of Moldova, wrote to Mr. Nursultan Nazarbayev, the President of Kazakhstan ("President Nazarbayev"). There is some indirect evidence (based on an unverified 24 January 2011 Moldovan television interview transcript) that President Nazarbayev may have requested that Voronin, at a meeting of CSI, provide him information about Anatolie Stati. (C-78). Respondent denies every allegation that President Nazarbayev asked Voronin for the letter as a pretext to any investigation, and disputes the translation of the interview – an interview where the name "Stati" was not even mentioned. (R-I ¶¶ 18, 19.21; RPHB 1 ¶ 375). The Tribunal, however, need not decide whether the content or translations of the interview, as presented by either side, are accurate in order to reach the conclusions, below.

949. The 6 October 2008 Voronin letter (C-77), in the interest of "*strengthen[ing] trust [and] develop[ing] relations free of any suspicious businessmen,*" informed President Nazarbayev that Anatolie Stati conceals profits from the states where he has earned them and even "*use[s] of his profits from the deposits in Kazakhstan for investments in areas, for example, in Southern Sudan, that are subject to sanctions by international organizations, in particular the U.N.*" The letter warns that this activity is damaging to the reputations of both Kazakhstan (as the state where Anatolie Stati earns his income) and Moldova (as "*the state of origin of the businessman*"). The letter also accuses Anatolie Stati of "*interfere[ing] with the development of the external and personnel policy of Moldova, creating a corrupt lobby of supporters of the trade agreements concluded with states subject to the U.N. sanctions.*" (C-77, R-II ¶ 277).

950. What is undisputed is that, expressly based on the letter from President Voronin, President Nazarbayev issued an Order dated 14/16 October 2008 to the Kazakh Deputy Prime Minister, U. Sukeev, and the head of the Agency of the Republic of Kazakhstan for Fighting Economic and Corruption Crimes (the "Financial Police"), S. Kalmurzaev ("the Order"). (C-8). The Order used the terms *"[a]t the request of the Moldovan party,*" to "*thoroughly check company's work and to take decision on its further work in the best interests of the country.*" (C-II ¶ 213; R-II ¶ 283; RPHB 1 ¶ 1162; C-8 (partially quoted); Tr. Hr. 1 Day 1 Opening by Tirado (R) p. 35; Opening by Smith (C) pp. 94, 155; Mynbaev Day 3 p. 86).At approximately the same time as the Nazarbayev Order, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km…*" and "*large deeply submerged reef fields…*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251). Prior to filing, On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal



application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66).

951.  Shortly after it was issued, President Nazarbayev's instruction came to the attention of Major A. Rakhimov of the Financial Police ("Major Rakhimov"). In his testimony, he acknowledged that he had never received a personal directive from the President of Kazakhstan previously. (Rakhimov Day 5 pp. 81 – 83).

952.  On 16 October 2008, the Deputy Prime Minister issued Order No. 6497 and, shortly thereafter, the Financial Police ordered the commencement of numerous audits and investigations of Anatolie Stati, KPM, and TNG (R-II ¶ 283), summarized by reference to the following events:

953.  On 18 October 2008, the Financial Police wrote to the Customs Committee to enquire about Anatolie Stati's travel through Kazakhstan. (C-11).

954.  By correspondence dated 20 October 2008, the Financial Police requested the Kazakh State Ministry of Energy and Mineral Resources ("MEMR") to investigate Anatolie Stati and his companies and to provide "*[c]opies of contracts, working schedules, LKU reports as well as the set of documents for obtaining the license*," as well as "*[i]nformation on the volume of extractions and investments at the closing date of the contracts.*" (C-9). An internal request was also made for Mr. Turganbayev to provide information regarding Anatolie Stati's activities in Kazakhstan and off shore. (C-444).

955.  On 24 October 2008, the Financial Police ordered the Tax Committee of the Ministry of Finance (the "*Tax Committee*") to conduct comprehensive or complex tax audits of KPM, TNG, and Kok Mai, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Members of the Financial Police were to be included in the Tax Committee. (C-10).

956.  On 24 October 2008, Mr. Turganbayev requested a prolongation of the inspection until 16 December 2008. (WS Turganbayev 2 ¶ 4.8; C-430).

957.  On 28 October 2008 the Financial Police ordered the Committee of Geology and Subsoil Resources Use of the MEMR to commence an audit of KPM's and TNG's compliance with their subsoil use licenses and to involve the Financial Police in the audit. (CPHB ¶ 38; WS Turganbayev 2 ¶¶ 4.1 – 4.2).

958.  By Order dated 28 October 2008, the Financial Police directed the Committee for Ecology Regulation and Control for the Ministry for Environmental Protection (the "*Ecology Committee*") to organize the inspection of KPM's and TNG's compliance with "*rational*" subsoil exploitation and petroleum operations (including burning gas over allowed limits) and to include members of the Financial Police in the inspection committee. (C-13; R-I ¶ 26.8).

959.  On 30 October 2008, the Financial Police reported that Anatolie Stati was not a registered businessman in Kazakhstan, but carried on business through Ascom which, in turn, owned KPM. (C-366).



960. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities, noting specific items to inspect, but finding that KPM and TNG were in compliance with all of their investment obligations. (C-438).

961. By correspondence dated 31 October 2008, the MES reported to the Financial Police on scheduling the examination of KPM's and TNG's compliance with industrial safety legislation for the years 2006 and 2007. (C-14).

962. Kemikal, which was TNG's largest non-local customer, which was under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev, through intervening entities he was said to control, namely, Gaz Impex and KazRosGas. Mr. Kulibayev was also the Chairman of KMG. In the Fall of 2008, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382; R-II ¶¶ 751 - 752).

963. On 1 November 2008, the Financial Police reported to the Deputy Prime Minister, confirming the ownership of KPM, TNG, and Kok Mai and informing him that inspections were being carried out. The letter also informed him that, based on the inspection, it had been ascertained that Anatolie Stati had left Kazakhstan on 29 March 2007. (CPHB 2 ¶ 38, C-600).

964. On 7 November 2008, the Tax Committee ordered a targeted audit of KPM and TNG regarding transfer pricing. Although the Respondent does not admit that the audit was instructed by the Financial Police, correspondence from the Tax Committee to the Financial Police, dated 11 November 2008 appears to acknowledge that such was the case. (C-38).

965. On 7 November 2008, Anatolie Stati sent a letter to President Nazarbayev assuring him that there was no reason to investigate KPM and TNG. (C-700). The President did not reply.

966. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (C-440).

967. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. Respondent does not admit that the audit was instructed by the Financial Police, although C-38 shows that the Tax Committee disclosed information relating to the audit at the request of the Financial Police. (R-I ¶¶ 30.48, 30.62; RPHB 1 ¶ 1062; C-38; C-149; C-150).

968. From 4 to 11 November 2008, pursuant to Art. 37 of the Law on Oil and Art. 51 of the Law on Subsoil Use, the Geology Committee of the MEMR, with the



involvement of the Financial Police, carried out an inspection of KPM and TNG regarding compliance with legislation on industrial safety and their licenses. (R-I ¶ 26.8; R-II ¶ 455; RPHB 1 ¶ 192, RPHB 2 ¶ 157; WS Turganbayev 2 ¶ 4.2; C-86; C-87; C-14; C-439). Claimants state that the MEMR found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89, CPHB 2 ¶¶ 38, 61; C-86; C-87).

969. On 12 November 2008, following the site visit, Mr. Turganbayev of the Financial Police asked the ARNM whether KPM, TNG, and Kok Mai held licenses for trunk pipelines. (R-I ¶ 26.9; R-II ¶¶ 464 – 465 (stating 14 November); RPHB 1 ¶¶ 198 – 202; WS Turganbayev 2 ¶ 5.1; C-441).

970. The Transfer Price Audit commenced on 12 November 2008. (R-II ¶ 407, WS Rahimgaliev ¶¶ 10.5, 10.6).

971. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (C-442).

972. On 13 November 2008, the Tax Committee noted that the inclusion of the Financial Police in inspections would be illegal and proposed that, instead, a working group be established to review inspection results. (C-38).

973. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for, but neither held licenses to operate main or trunk pipelines, and that the operation of a trunk pipeline required such a license. (R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164; WS Turganbayev ¶ 5.3).

974. On 14 November 2008, the Financial Police met with Messrs. Cojin and Cornegruta. The Parties dispute whether the Financial Police insisted that each sign inspection reports admitting that KPM and TNG did not hold licenses to operate main pipelines.

975. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (C-443).

976. KMG executed the 17 November 2008 Tripartite Agreement. The final signatory, KazAzot, however, never signed.

977. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. Claimants refer to this as the "*reclassification*." (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542; RPHB 2 ¶¶ 165 – 172).

978. On 17 November 2008, Mr. Turganbayev of the Financial Police ordered the Tax Committee to conduct a new audit to calculate the profit that KPM and TNG received from operating a main pipeline without a license and to determine KPM's revenue for onward sales of oil. (R-II ¶ 469; RPHB 2 ¶¶ 172 – 173; C-89; WS Turganbayev 2 ¶ 5.4).

979. On 18 November 2008, the Financial Police issued a resolution for an audit of any unpaid customs taxes by TNG. (C-446).



980. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198; C-88).

981. On 19 November 2008, the Tax Committee, at the request of the Financial Police and based on accounting information provided by TNG, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (R-I ¶ 26.19, C-202; C-450);

982. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favour in response to KPM's challenge of export duties. The Court ruled that the imposition of KPM on the Crude Oil Expert Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743). Despite this ruling in KPM's favour, the Financial Police and the Customs Committee challenged the ruling, resulting in further litigation. New claims were raised against KPM and TNG. On 31 March 2010, the Customs Committee conceded that neither KPM nor TNG was obliged to pay export duties. (C-161).

983. On 19 November 2008, KPM and TNG contacted the MES for a second opinion regarding the pipelines. (R-I ¶ 28.10). The MES confirmed that KPM's and TNG's pipelines were not main pipelines, but "*form a single technological process of all production.*" (C-90; C-91). Respondent admits that this was the MES response, but states that the opinion only stated that some of the pipelines were not trunk and, in any event, the statement was outside of their competency. (R-I ¶¶ 26.12, 28.11 – 28.13; R-189).

984. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72).

985. On 21 November 2008, the Financial Police requested that the MES withdraw its statements confirming that KPM's and TNG's pipelines were not main pipelines, on the basis that the MES was not competent to provide that conclusion. (R-I ¶ 26.12; C-92; R-189).

986. On 25 November 2008, the Financial Police wrote to the Ministry of Finance inquiring into why the Customs Committee "*exonerate[d]*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (C-162). The Customs Committee had, in fact, found that KPM was not contractually obliged to pay the export duty.

987. On 28 November 2008, a Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (R-I ¶ 26.23, CPHB 2 ¶ 81; C-452).

988. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008, by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that, although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions



regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

989. On 2 December 2008, the Financial Police circulated an internal report confirming that KPM operated a main pipeline without a license and had gained illegal income of over 41 billion Tenge. (C-85).

990. On 10 December 2008, the Financial Police reported to the Deputy Prime Minister that the Financial Police had determined that KPM and TNG were operating trunk oil and gas pipelines without licenses. They stated that the Financial Police, however, were not competent to make that decision, and reported that they had asked the ARNM to determine what type of pipelines KPM and TNG operated, taking their functions into account. Without a conclusion by the competent authority "*it is impossible to make a lawful procedural decision in respect of this case*." (C-II ¶ 220; C-448, partially quoted). Although Respondent states that "*no decision had been reached as to whether or not the pipelines were trunk at this point*" (RPHB 1 ¶ 197), this statement is belied by C-448. The Tribunal believes Respondent's earlier statement acknowledging that the Financial Police had, indeed, concluded that KPM and TNG were operating trunk pipelines, even though they were not legally competent to make that classification. (R-II ¶¶ 473 – 474).

991. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407; WS Rahimgaliev Exhibit 12).

992. On 15 December 2008, the Financial Police formally opened a criminal investigation against KPM for allegedly operating a main pipeline without a license. (CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61; R-II ¶ 294, 475, RPHB 1 ¶¶ 219 – 221; RPHB 2 ¶¶ 177 – 180; C-632; Rakhimov Day 5 p. 20 – 21, 24-25; WS Rakhimov 2 ¶¶ 3.5 – 3.8, 4.1, 4.3, 4.4). While Respondent has argued that this investigation was opened, but not in respect to a particular person, the Tribunal notes that KPM is expressly named in the order, which instructs "*[t]o initiate the criminal case under Article 190 Part 2 item "b" CC RK involving the illegal entrepreneurial activity carried out by Kazpolmunai LLP and to accept it for examination*." (RPHB 1 ¶ 222, C-632; Rakhimov Day 5 p. 25).

993. On 18 December 2008, the MEMR informed TNG that it was cancelling the State's decision of 20 February 2007 that had further allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice further required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Ilyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

994. The Parties are in agreement that an 18 December 2008 INTERFAX press release alleged that the State's pre-emptive rights had been violated and indicated illegal conduct by Terra Raf. They also agree that, on the same date, Credit Suisse sent Mr. Lungu of Ascom a copy of the INTERFAX press release and requested an explanation. (C-141). The Parties disagree as to where INTERFAX received its



information and whether that report is attributable to the Respondent. Respondent argues that the accusation that the INTERFAX report was somehow attributable to Respondent was not made contemporaneously. (R-II ¶ 171, *see e.g.* C-619; RPHB 2 ¶¶ 7). Indeed, while Mr. Lungu initially told Credit Suisse that "*there are a lot of errors in [the INTERFAX press release] which make us believe that this info is not from official sources,*" (C-625, partially quoted), Claimants now argue that the INTERFAX press release is attributable to Respondent, "*given the level of detail in the in the information that the INTERFAX article sources to the MEMR.*" (C-II ¶¶ 400; CPHB 1 ¶¶ 137, 215 – 216, 347 – 348, fn. 497 (partially quoted), 350; CPHB 2 ¶¶ 38, 117). Respondent dismissed Claimants' argument as speculative. (R-II ¶ 749). It provided evidence that the information did not originate in the Republic, including a 21 June 2012 letter from INTERFAX indicating that an inofficial source was used (R-264) and a 21 June 2012 letter from the MEMR that it did not provide the information (R-265). (RPHB 2 ¶¶ 7, 95 – 99). Respondent denies that the report was from official sources and Mr. Ongarbayev denied knowledge and stated that there was no official press release. (C-720, WS Ongarbaev (1 December 2012)). In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

995. On 20 December 2008, the Financial Police began conducting repeated interrogations of TNG and KPM employees. (CPHB 2 ¶ 38; R-I ¶ 26.22; C-46; C-96; C-620; C-621; C-622; C-623; C-624; C-626; C-627).

996. On 22 December 2008, TNG refused to submit the required application to the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

997. On 24 December 2008, the Financial Police requested information from KPM and TNG on their gas and condensate outputs. In particular, the letter requested information regarding (a) the level of production of the company and (b) sales made by KPM to agents, individuals and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38; C-94).

998. On 24 December 2008, the Financial Police issued summonses for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (C-654).

999. On 25 December 2008, Major Rakhimov of the Financial Police summoned and interviewed KPM's General Manager, Mr. Cornegruta. (R-I ¶ 26.21, 27.38; C-I ¶ 95). Mr. Cornegruta was considered a witness (R-II ¶ 480) and was, accordingly, not allowed to be accompanied by counsel (C-I ¶ 95). Respondent denies that Mr. Cornegruta was not permitted to have legal counsel in attendance for the interview. He was allowed to under Art. 82.3 CPC. (R-35). After the interview, Mr. Cornegruta was released and permitted to go about his business. (R-I ¶ 27.40).

1000. On 26 December 2008, Major Rakhimov summoned and interviewed the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar; (C-I ¶ 95, R-I ¶ 26.21).



1001. On 26 December 2008, the Financial Police ordered the seizure of TNG documents regarding contracts with third parties and construction of pipelines. (C-605, C-606).

1002. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-144).

1003. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95). The Respondent alleges that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (C-95). Mr. Turganbayev attended this inspection and confirms that it involved visiting KPM's pipeline. (R-I ¶¶ 13.47(e), 26.22; R-II ¶¶ 285, 481; WS Turganbayev 2 ¶ 6.3).

1004. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG could not deduct 100% of drilling expenses in the year they were incurred for corporate income tax purposes. (Maggs 2 Exhibit 2; CPHB 2 ¶ 128);

1005. On 5 January 2009, Major Rakhimov asked the MEMR to ascertain whether KPM's 17.9 kilometer pipeline was a main pipeline. (C-718, Rakhimov 3 ¶¶ 3.1 – 3.2; Rakhimov, Day 5 pp. 46 – 47).

1006. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines were not main pipelines (C-99, C-100);

1007. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines (C-101; C-104);

1008. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines were not main pipelines (C-101, C-102);

1009. On 14 January 2009, the Financial Police issued a resolution appointing three investigators to the criminal investigations of KPM and TNG. (C-453).

1010. In January-February 2009, KPM and TNG submitted various complaints regarding the illegality of the Financial Police's searches and seizures of documents and forwarded reports confirming that their pipelines were not main pipelines. (R-I ¶ 26.25; C-46, C-96, C-620, C-621, C-622, C-623, C-624, C-626, C-627, C-628, C-629, C-630).

1011. On 22 January 2009, the Financial Police requested corporate documents from KPM. (C-607).

1012. On 23 January 2009, the Financial Police requested corporate documents from TNG. (C-608).

1013. On 2 February 2009, the Financial Police informed TNG that, on 20 January 2009, they had formally opened a criminal investigation against TNG for the alleged



operation of main pipelines without a license. The Financial Police notified Claimants that TNG was the subject of a criminal investigation. The charges were later suspended. The Financial Police rejected a request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142; C-98 (translation disputed by Respondent); C-630; Condorachi ¶ 11).

1014. On 4 February 2009, the Financial Police interviewed Mr. Cojin, General Manager of TNG, to determine whether he or Mr. Cornegruta would be an appropriate defendant in any criminal proceeding; (R-II ¶¶ 298, 480; Rakhimov 2 ¶ 4.5).

1015. On 4 February 2009, MEMR wrote a letter to the Financial Police confirming that KPM's pipeline was part of its gathering system, and thus, was not a main pipeline. The Respondent alleges that this letter was later withdrawn as it was not reviewed by the legal department and/or because the MEMR has no authority to provide a classification regarding pipelines. (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98; RPHB 1 ¶ 229; RPHB 2 ¶¶ 183 – 186; C-719; Rakhimov 3 ¶¶ 3, Rakhimov Tr. Day 5 pp. 47 – 49).

1016. On 9 February 2009, the Financial Police ordered the College of Experts of the Ministry of Justice ("MOJ") to appoint an expert to classify KPM's pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61; R-II ¶¶ 549, RPHB 1 ¶ 226; C-109; R-245; R-362).

1017. On 10 February 2009, Mr. Turganbayev met with the MOJ expert, Mr. Baymaganbetov, and provided him with four documents on which to base his report. (R-II ¶ 554; Baymaganbetov. ¶¶ 3.2, 6.2; R-246).

1018. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. On that date, the State sent notices of an Act of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (Exhibits 3, 4, 5, and 6 to Maggs 2; C-155). The corporate tax dispute embroiled KPM and TNG in litigation until 22 June 2010, when the Kazakh Court of Cassation dismissed the claim. (Exhibit 11 to Second Maggs Report; C-155). In the course of this arbitration, Claimants first learned that Respondent had appealed the Court of Cassation's decision. They were, therefore, unable to participate in the process that led to the 3 November 2010 decision of the Kazakh Supreme Court, which overturned the decisions at the lower instances and found that the corporate income tax assessment was proper. (CPHB 1 ¶ 258; Rahimgaliev Exhibit 6).

1019. On 11 February 2009, the MEMR withdrew the letter prepared on 4 February 2009, allegedly on the basis that it had not been reviewed by the legal department of the MEMR. (Rakhimov 3 ¶ 3.5). A replacement letter was issued on 11 February 2009. (RPHB 1 ¶ 229).

1020. On 13 February 2009, three days after receiving the file and without having reviewed any other documents or visited KPM's pipeline, Mr. Baymaganbetov



issued his report. (R-II ¶¶ 549 – 568; RPHB 2 ¶ 188; C-110; Baymaganbetov ¶¶ 3, 4.1, 4.2, 6).

1021. On 13 February 2009, the MEMR wrote to the Financial Police to provide them with information on how the definition of trunk pipeline in Article I of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines in question. (Rakhimov 3 Exhibit 4; RPHB 2 ¶ 183).

1022. On 13 February 2009, the MEMR wrote to KPM and TNG and informed them that it was not competent to resolve their complaints. The MEMR suggested that they write to the GPO, instead. (C-629, C-630).

1023. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1024. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for its consent to the transfer and a waiver of the State's pre-emptive purchase right Failure to do so would result in termination of TNG's Subsoil Use Contracts. (CPHB 2 ¶ 117; C-146).

1025. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1026. On 18 March 2009, KPM and TNG complained to the GPO regarding the criminal investigations. (C-41; C-154; Condorachi ¶ 13).

1027. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A.B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. The Claimants say the MEMR assured them that the pre-emptive right claim would be resolved in their favour. The Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, the Claimants assert that the MEMR also indicated that the Financial Police ought to rely on the opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. The Respondent denies that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in the Claimants' favour, or that there was any



*"reclassification"* of pipelines. (C-1 ¶¶ 106, 150, 152, 177; R-I ¶ 13.47(e)(v), 21.1); C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 - 37, 43).

1028. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1029. On 24 March 2009, TNG applied to the MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for two years into the agenda of the next meeting of the Expert Commission. (R-I ¶ 31.69; R-162).

1030. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1031. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1032. On 27 March 2009, the Financial Police ordered TNG to submit originals of their corporate documents with reference to the criminal case against KPM. Claimants also allege that the same request was made of KPM. (C-614; C-615);

1033. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1034. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested a copy of the criminal investigation order. (C-615).

1035. On 31 March 2009, the Financial Police ordered TNG to submit additional original company documents. (C-616).

1036. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-I ¶ 31.70; R-163.2).

1037. On 6 April 2009, the Financial Police requested information on TNG's costs for oil and condensate in relation to the criminal case against KPM. (CPHB 2 ¶ 38; C-618).

1038. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension. (C-0 ¶ 58; C-I ¶¶ 22, 178; R-I ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68; RPHB 1 ¶ 323 – 325). Respondent states that the Parties agree that



Respondent was under no obligation to extend prior to the 9 April 2009 letter, at least. (Compare RPHB 2 fn 526 with C-II ¶ 242; see also CPHB 1 ¶ 224 (Parties experts' debate on obligation to extend contract after 9 April)).

1039. On 20 April 2009, Major Rakhimov decided to detain KMG's general manager, Mr. Cornegruta, and opened criminal proceedings against him for the crime of illegal entrepreneurial activity under Article 190(2)(b) of the Criminal Code of Kazakhstan. At that time, Mr. Cornegruta was named as a potential defendant. (R-II ¶ 487; RPHB 2 ¶ 189; R-243, Rakhimov 2 ¶ 7.1 - 7.5). On 22 April 2009, the Financial Police ordered additional company documents from KPM. (CPHB 2 ¶ 38; C-617).

1040. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2). Respondent admits that Mr. Cornegruta was denied bail, pursuant to Kazakh law. (R-I ¶ 27.45, R-35).

1041. On 26 April 2009, the Claimants filed complaints against the Financial Police, including its head investigator, Major Rakhimov. The same day, 900 employees of KMG, TNG, and CASCo that were on shift addressed and signed a letter to the Governor of the Mangystau Region expressing their concerns, particularly in relation to Mr. Cornegruta's welfare. (C-I ¶ 109; C-113; Condorachi ¶ 16, 19; Pisica ¶ 41; Romanosov ¶ 31; Stati ¶ 26).

1042. On 27 April 2009, Mr. Batalov was fired as Executive Secretary of the MEMR. (C-I ¶¶ 106, 332; Pisica ¶ 43).

1043. On 27 April 2009, a petition against Mr. Cornegruta's arrest was considered and rejected by the Court of Aktau. (RPHB 1 ¶ 244; Kravchenko ¶ 13.14; Exhibit 6 Kravchenko).

1044. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1045. The Claimants say that, on 30 April 2009 and on 4 May 2009, TNG submitted Addendum No. 9 of TNG's Tabyl Block Subsoil Use Contract to the MEMR for execution. TNG never received the MEMR's signature to the addendum extending TNG's exploration rights. (C-168).

1046. On 30 April 2009, the Deputy Minister of the MES wrote to the Claimants and asked them to withdraw his previous letters of 19 November 2008 (confirming that KPM's and TNG's pipelines were not main pipelines), as their issuance was beyond his competence. (R-189).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1047. On 1 May 2009, the decision to detain Mr. Cornegruta was confirmed on appeal. (R-II ¶ 487; RPHB 1 ¶ 244; Kravchenko 2 ¶ 13.15).

1048. On 4 May 2009, Major Rakhimov of the Financial Police ordered an unscheduled inspection to determine the amount of income KPM had obtained from operating a trunk pipeline without a license. (RPHB 2 ¶ 190; C-184).

1049. Pursuant to a search warrant dated 30 April 2009, on 6 and 7 May 2009, the Financial Police conducted an overnight search of KPM's and TNG's offices for the other General Managers of KPM, Messrs. Salgor and Spasov, and the General Manager of TNG, Mr. Cojin, as well as information on their whereabouts. The three in-country managers had by then been charged with the same offence as Mr. Cornegruta. The initial phase of the search started at 4:20 p.m. on 6 May 2009 and ended at 4:15 a.m. on 7 May 2009. The search was carried out in the presence of Deputy General for Economic and Financial Affairs of TNG, Mr. Stejar. The Respondent states that the Financial Police procured human resources and financial records from KPM and TNG and that it became clear during the course of the investigation that most senior managers had left Kazakhstan. The Parties dispute the level of inconvenience caused by the search. (R-I ¶ 27.47; R-II ¶ 301, 483, R-III ¶ 504 – 507, 511; RPHB 1 ¶ 170, 175 – 176, 233 – 238; C-114; Rakhimov 2 ¶¶ 4.09 – 4.20; Stejar ¶ 20; Pisica Day 2 p. 71; Rakhimov Day 5 pp. 1 - 6; Stejar Day 3 p. 35).

1050. On 7 May 2009, Anatolie Stati, allegedly on behalf of the Claimants, wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol. The Claimants also allege that this letter made clear that the Claimants intended to bring arbitration claims against Kazakhstan for the diminution in the value of their investments once the sale to Cliffson closed. Respondent admits that the letter was sent by Ascom and denies Claimants' allegations regarding notice. (R-II ¶ 226. The Respondent also notes that the Cliffson transaction, at earliest, could have started in February 2010. (C-43; Stati ¶ 28)

1051. On 13 May 2009, the Mangystau Regional Department of the MES withdrew its letters about whether the pipelines were trunk pipelines. (R-I ¶ 28.14; RPHB 2 ¶ 198; C-90; C-93).

1052. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).



1053. On 18 May 2009, the College of Experts of the Ministry of Justice calculated KPM's purported illegal profits from oil and gas transportation services at 5.9 million Tenge (approximately USD 48,300) for the period from 2002 through 2008. This calculation also showed "*illegal profits*" of approximately 1,935,547 Tenge (approximately USD 15,000) from March 2007 to May 2008. (C-I ¶ 92, C-184). The Respondent denies this and states that that expert considered that the value of income from illegally operating the trunk pipeline amounted to 65,479,414,197 Tenge for the period from April 2002 to 2008, and that its income during the relevant period in 2007 and 2008 was 21,673,919,031 Tenge. (R-I ¶ 27.59(c), (h); C-117, C-184). The Respondent states that this calculation was necessary to determine whether the crime of illegal entrepreneurship had been triggered. (R-II ¶ 484; C-184). The Respondent admits that the Court relied on this document when determining the amount of the fine to be imposed on KPM. In all other respects, the Claimants' assertions concerning this report are denied. (R-I ¶ 27.60).

1054. On 18 May 2009, Major Rakhimov issued an application to exclude Claimants' expert opinions about the classification of the pipelines. (R-II ¶¶ 632; RPHB 2 ¶ 206; Kravchenko 2 ¶¶ 11.13, 11.14, 11.22; Kravchenko 2 Exhibit 2). The expert reports included a report dated 5 January 2009 from the Kazakh Scientific, Research and Design Institute of Oil and Gas (a division of KMG) that found the pipelines owned by KPM and TNG "*do **not** belong to the category of **main** pipelines and are designated to ensure the process of hydrocarbons production.*" (C-I ¶ 98, emphasis maintained; C-99; C-100).The expert reports also included a report that the Scientific, Research, and Design Institute of Oil and Gas Industry of NIPI Neftegaz concluded on 9 January 2009 that the pipelines owned by KPM and TNG were correctly "*classified as in-field pipelines.*" The Court later deemed the Claimants' expert opinions to be inadmissible on the grounds that these so-called expert opinions did not evidence KPM and TNG's requests for such opinions, making it impossible for the court to divine the scope of the request. There was no indication that the bodies were independent of the Claimants, and some of the experts whose reports were excluded had a role in the construction of the pipelines and in the legal amendments regarding their status. In any event, they were not qualified to issue such opinions and had not been appointed pursuant to Article 243 of the CPC. (RPHB 2 ¶ 203 – 207; Kravchenko 2 Exhibit 2).

1055. On 19 May 2009, the Financial Police requested the valuation of sequestered property from KPM. (C-500).

1056. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1057. On 17 June 2009, the Financial Police issued a press release that announced that the investigative phase had concluded. The media reported on the ongoing criminal investigations and reported that KPM and TNG had obtained illegal profits of 147 billion Tenge and that the companies' assets had been sequestered. (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38; R-I ¶ 26.24; C-118).

1058. On 27 June 2009, the Regional Prosecutor's Office corresponded with Ascom and Terra Raf noting the international search underway for Mr. Cojin. (C-183).



1059. On 2 July 2009, the MEMR failed to execute the extension of the exploration period of Contract 302. (C-27; R-163.1);

1060. Mr. Cornegruta's trial was held between 30 July and 14 September 2009. (C-704; R-315.1 (in Russian); R-315.2 (in Russian); R-316; R-317; R-318; R-319).

1061. On 18 September 2009, Aktau City Court found Mr. Cornegruta guilty of "*illegal entrepreneurial activity in an especially large amount*" for operating a main pipeline without a license and ordered recovery of USD 145 million from KPM. (C-117) Respondent admits that KPM was not a party to the criminal proceeding against Mr. Cornegruta and explains that the Court was asked to rule on whether Mr. Cornegruta, on behalf of KPM, was guilty of the crime. Respondent denies that KPM was not represented in either the hearing or the appeal. (R-I ¶ 27.60; R-II ¶¶ 615, 645; RPHB 2 ¶¶ 246 – 261; C-117).

1062. On 21 September 2009, President Nazarbayev's Head of Administration issued an order regarding "*free of charge transfer of [Claimants'] assets*." (RPHB 1 ¶¶ 401; C-294; Mynbaev Day 3 pp. 159 – 167).

1063. On 30 September 2009, the Financial Police ordered a new audit of KPM regarding alleged failure to pay export taxes. (Condorachi WS ¶ 34).

1064. On 22 October 2009, the Financial Police questioned Mr. Condorachi regarding KPM's alleged obligation to pay export taxes. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128; Condorachi WS ¶ 35).

1065. On 3 November 2009, the Financial Police interviewed Mr. Cornegruta in jail regarding KPM's alleged obligation to pay export taxes. (Condorachi WS ¶ 36).

1066. On 12 November 2009, the Appeal Court upheld the criminal judgment of Aktau City Court finding Mr. Cornegruta guilty of illegal entrepreneurial activity in an especially large amount and ordering recovery of USD 145 million from KPM. (C-565).

1067. On 19 November 2009, President Nazarbayev issued an instruction to the Prime Minister, Minister Mynbayev, and Timur Kulibayev to look into and resolve the issue with respect to KPM and TNG. (R-II ¶ 332; C-23).

1068. On 29 December 2009, a Writ of Enforcement was issued against KPM for USD 145 million. (C-119).

1069. On 29 December 2009, the Tax Committee concluded an audit of transfer pricing and claimed that KPM and TNG owed approximately 700 million Tenge (US $5 million) in unpaid transfer prices and penalties. (R-I ¶ 30.63; C-137 and C-138).

1070. KPM and TNG commenced legal action challenging the transfer pricing claim (R-II ¶ 649). This was still pending as of the State's 21-22 July 2010 take-over. (CPHB 2 ¶ 128).



1071. On 10 January 2010, Kazakhstan froze the bank accounts of KPM to satisfy the USD 145 million judgment against it. (C-I ¶ 125; CPHB 1 ¶ 212; CPHB 2 ¶ 38; R-I ¶ 29.7; C-119; C-121).

1072. From 25 January to 6 February 2010, MEMR carried out unscheduled inspections of KPM and TNG regarding historical compliance with Subsoil Use Contracts and Kazakh law. (C-0 ¶ 55; C-II ¶ 290; CPHB 2 ¶¶ 38, 61; C-171, C-385, C-386, and C-599). Respondent states that the purpose was to ensure compliance with contractual obligations and legislation, not to assess legality from 1997 to present. (R-I ¶ 31.96; C-171; C-174). While Respondent states that the purpose was to ensure compliance with contractual obligations and legislation and not to assess legality from 1997 to present, this stands in contradiction to C-174, which Respondent has also cited.

1073. From January to June 2010, Kazakh enforcement officers took repeated measures to recover funds from KPM to satisfy the court's criminal judgment. (C-79; C-122; C-123; C-124; C-125; C-199; C-201; C-298; C-501; C-502; C-503; C-504; C-505; C-506; C-507).

1074. On 26 January 2010, the Ministry of Finance began bankruptcy proceedings against KPM. (CPHB 2 ¶¶ 38, 128; C-157).

1075. On 17 February 2010, the President of Kazakh social fund "*Blagovest*" wrote to Minister Mynbaev to make a suggestion to "*resolve the question of nationalization of the assets posed in 2008*". (CPHB 2 ¶ 38; RPHB 1 ¶ 404 (saying 7 February); C-23).

1076. On 24 February 2010, the Customs Committee informed both KPM and TNG that they were liable for unpaid export taxes. (C-44; C-479). One month later, on 31 March 2010, the Customs Committee retracted this claim and conceded that the Subsoil Use Contracts exempted KPM and TNG from export taxes. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56; C-130).

1077. By mid-March 2010, Kazakhstan's court administrators had seized nearly every asset of KPM, including key oil production equipment, and had prevented KPM from importing equipment and exporting oil. Nevertheless, the Claimants continued to pay the salaries of KPM's workers through TNG's accounts. While Respondent disputes that salaries were paid, Respondent, despite having access to information that would suggest otherwise, has not provided any. (CPHB 2 ¶ 194; RPHB 2 ¶ 349).

1078. On 30 April 2010, MOG informed KPM and TNG that a sale to Cliffson was not possible because the companies' shares were sequestered / arrested. (C-528; C-529). It would only be approved if KPM and TNG satisfied the requirements to release the attachment of their shares. (R-II ¶ 818).

1079. From 25 to 29 June 2010, on the order of the Prime Minister and with the involvement of the Financial Police, the GPO ordered unscheduled inspections of KPM and TNG from no fewer than seven different Kazakh agencies. (CPHB 2 ¶ 38; C-174; C-175; C-177; C-178; C-180; C-181; C-182; C-185; C-315; C-647; C-648; C-649; C-650; C-651; C-687; C-688; C-689; C-711).



1080. On 9 July 2010, while inspections were underway, TNG was notified that the Prime Minister had planned to visit the field facilities and the LPG Plant. TNG was instructed to make preparations for his 20 – 21/23 July visit. (C-186; C-299).

1081. On 14 July 2010, the MOG sent notices to KPM and TNG that the companies were in violation of Subsoil Use Contracts 210 and 305. (R-I ¶ 31.19; C-II ¶ 346, CPHB 1 ¶ 296, CPHB 2 ¶¶ 74, 178; RPHB 1 ¶ 360; RPHB 2 ¶ 354). The notices from the MOG were dated 14 July 2010, but were not received by KPM and TNG until 16 July 2010. (R-I ¶ 31.54). The notices set out (1) the contract to which the notice related, (2) the contractual breaches by KPM and TNG, (3) a deadline within which to respond, and (4) the consequences for failing to respond to the notice. (R-I ¶ 31.107). The notices gave KPM and TNG until 19 July 2010 to "submit explanations on reasons of non-execution of contract terms and all necessary documents, ascertaining removal of the above-mentioned violations, as well as to inform [the MOG] on measures taken in order to avoid violation of contract terms." Respondent reports that the violations in the notices included "admissions" by KPM and TNG that they had operated trunk oil and gas pipelines without a license and 13 additional alleged violations for which Claimants state that the State had provided no prior notice to KPM or TNG. (R-I ¶¶ 31.103 et seq.). Claimants report that the notices listed 16 alleged violations. The notice further provided that "[i]n case of failure to comply with the request set forth in this Notice within the established time limit, the Competent Body is entitled to terminate the Contract[s]." (C-0 ¶ 88; C-I ¶¶ 20, 206 – 208, 332). Respondent states that the violations contained in the notice of 14 July 2010 were detected by the competent authority as a result of permanent monitoring of the compliance by the subsurface users of their contractual obligations. (R-I ¶ 31.42). The audits proved that production activities at KPM and TNG had virtually stopped; there was little chance of employee salaries being paid. (R-II ¶ 692). The Parties state that, by this time, the majority of TNG and KPM senior and middle management had left Kazakhstan. (R-II ¶ 698; C-I ¶ 218).

1082. On 19 July 2010, Claimants submitted written answers and explanations concerning each violation alleged in the 14 July 2010 notice. (C-0 ¶ 89, CPHB 2 ¶ 178; RPHB 1 ¶ 361, RPHB 2 ¶ 354). Claimants had, previously, on 22 January and on 28 June 2010, provided evidence of their compliance with the work program requirements. (C-I ¶ 209). In July 2010, they provided all that they had. KPM explained that it failed to pay costs costs amounting to US 114,809, because KPM this figure was a direct result of the Financial Police seizing KPM's assets in May 2009 and the judicial executor seizing bank accounts in January 2010. These seizures were a result of the state-initiated criminal investigation, which in and of themselves constituted a force majeure under the contract. KPM explained that it was unable to pay the USD 10,000 owed to the liquidation fund and various taxes because of the financial constraints caused by the criminal investigations. KPM also stressed that its pipeline was never a trunk or main pipeline. KPM responded to the allegation regarding its obligation to purchase goods, works, and services, by simply referring the Ministry to its previously submitted "*notes and objections*" explaining how this issue too, like all of the other claims, was groundless. TNG replied similarly, and submitted documentation showing that none of the Ministry's claims were proper. With respect to Contract 302, TNG documented its work and training programs, the purchase of goods, works, and services, and demonstrated that the re-classified pipeline was not trunk. (C-I ¶¶ 211 – 216). Respondent states



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

that Claimants' responses were inadequate and failed to address the violations. (R-154). For example, in response to the notice of KPM's and TNG's failure to instruct and train a Kazakh specialist, KPM and TNG referred to funding allocated for the training of all employees. In response to the notice of KPM's failure to pay costs according to the Additional Agreement of 13 June 2008, KPM simply denied liability based on "force majeure." KPM and TNG also argued force majeure to excuse their failure to contribute to the liquidation funds, as required by Contracts 305 and 210, and KPM used that argument to excuse its non-payment of taxes. Both tried to re-open the discussion on whether the pipelines were trunk. Importantly, Claimants refused to "*remove the violations of their obligations THI*" (R-I ¶ 31.121; RPHB 2 ¶ 354). R-I ¶ 31.122; R-154).

1083. Respondent, in any event, disputes that these responses were received on time and argues that they were received by the MOG after 21 July 2010. (R-I ¶ 31.54; RPHB 1 ¶ 362).

1084. Between 21 and 22 July 2010, the Prime Minister and the Minister of Oil and Gas publicly declared the takeover and abrogation of the Claimants' Subsoil Use Contracts, seized the assets of KPM and TNG, and caused them, in due course, to be transferred to KMG, which later appointed its subsidiary KazMunaiTeniz as "trust manager" for the companies. (R-I ¶¶ 31.129, 31.150 et seq.; R-II ¶ 701; C-3, C-4, C-5, C-189, C-190; C-194; C-195; R-152; R-153, R-200; R-257).

1085. Having considered all of the Parties submissions, even where not expressly stated herein, the Tribunal draws the following conclusions:

1086. The Tribunal considers that it need not find that there was a "playbook", as alleged by Claimants and as recorded above in this Award, to find that the conduct presented in the above timeline constitutes a violation of the FET. Indeed, for the Tribunal, the evaluation of the objective timetable is sufficient. While Respondent's explanations and justifications regarding some specific actions it has taken affecting Claimants' investments may perhaps at least be arguable, even if not convincing to the Tribunal, (1) the picture of them seen cumulatively in context to each other and (2) the difference of treatment of Claimants' investments before and after the Order of the President of the Republic on 14/16 October 2008, permit only the conclusion that Respondent's conduct after the President's Order was a string of measures of coordinated harassment by various institutions of Respondent and has to be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

1087. The Parties are in agreement, and the Tribunal agrees as well, that prior to November 2008, Respondent's authorities regularly inspected KPM's and TNG's pipelines. The Parties are in agreement, and the Tribunal agrees as well, that there was no change in the pipeline from the date that Kazakh authorities approved the design and construction of the pipelines until the 18 November 2008 inspection where the Financial Police – who Respondent agrees are not the competent authority to classify a pipeline – declared that the pipelines at issue were a "*trunk*" rather than field pipelines. (R-II ¶ 451). The Tribunal, however, is not persuaded by Respondent's argument that the Financial Police, in pursuit of their lawful obligations, simply made this discovery during an inspection – a discovery that was not made during any of the prior routine inspections that were made by agencies



who were competent to classify pipelines. Rather, it is far more likely that this alleged "*discovery*", as well as the events leading to it and those stemming from it, constitute violations of the FET and, in particular Claimants' legitimate expectations toward proper and fair governmental conduct.

1088. The Tribunal need not opine on whether the pipeline was a field or trunk pipeline in order to find that the procedure surrounding the discovery was in violation of the FET standard. The Parties have presented that Claimants operated a pipeline system that was approved by Kazakh authorities. During routine inspections from 2002 – until November 2008, there was no indication that anyone believed that the pipelines were trunk pipelines and Respondent has provided no indication that the proper authorities were in any way prevented from having made the same discovery sooner. Instead, the evidence demonstrates that, it was not until immediately prior to the "*discovery*", namely on 12 November 2008, that the Financial Police began to seek information on whether KPM and TNG held licenses to operate trunk pipelines. On Friday, 14 November 2008, the Financial Police received confirmation that neither company held such licenses. Immediately thereafter, on the following Monday, 17 November 2008, the Financial Police "*discovered*" that KPM and TNG operated a trunk pipeline and ordered the Tax Committee to calculate profit earned from operating that pipeline.

1089. Following the "discovery", Claimants received confirmation from numerous Kazakh authorities that the pipeline at issue was a field, rather than a trunk pipeline. Often, however, the Financial Police compelled these authorities, in particular the MES and the MEMR, to withdraw their statements. The evidence also indicates that even the Judicial Executor admitted that the segment at issue was a mere "*field*" – and not "*trunk*" pipeline.

1090. Accordingly, the Tribunal is persuaded by Claimants' argument which demonstrates that this was not a mere "*discovery*" but that, rather, this was a re-classification. As indicated, there were no changes to the pipelines prior to their change in designation. The segments of Claimants' pipes that are at issue extend from the principal joint where the KPM wellhead pipes converge to KPM's processing facility, and from the processing facility to TNG's storage tanks, where services are also provided to KPM. For the TNG gathering system, the segment extends from the principal joint where the TNG wellhead pipes converge to TNG's processing facility; from the processing facility directly to the CAC Pipeline for gas; and from the processing facility to TNG's storage tanks for condensate. Claimants state that identical gathering systems are owned and operated by other oil and gas companies in the immediate vicinity – and indeed throughout Kazakhstan – none of which are classified as trunk pipelines requiring licensure. (C-0 ¶¶ 39 – 40, partially quoted). The Tribunal is persuaded that the at-issue pipelines, likewise, were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by Respondent. That the City Court of Aktau found that the pipes were trunk does not bind this Tribunal.

1091. The re-classification, viewed in light of President Nazarbayev's 23 November 2009 confidential instruction that was attached to the 7 February 2010 Blagovest letter (C-23), appears to have been an important step for the State to have obtained the assets of KPM and TNG, without sacrificing their working ability.



1092. While the Parties dispute many aspects of the June – July 2010 inspections, the Tribunal is satisfied that these sudden inspections, which involved no fewer than seven Kazakh agencies, unduly harassed Claimants. It appears from the evidence presented that these numerous agencies, each reacting to the same orders of the Prime Minister, the GPO, and the Financial Police, conducted inspections which, in some aspects, may have been duplicative of one another. In particular, the Tribunal notes that multiple agencies were tasked with reviewing KPM's and TNG's compliance with their Subsoil Use Contracts. These sudden inspections forced KPM and TNG to spend their time and resources addressing the inspections, rather than operating normally. Importantly, throughout this barrage of inspections, no remedies were available to Claimants. Despite filing complaints with relevant authorities, no help was forthcoming. Respondent's conduct and treatment of Claimants, therefore, violated the FET standard.

1093. The Tribunal is, finally, not convinced that Claimants violated Kazakh law. Even without determining whether the pipeline was trunk, the evidence indicates that the charge of "*illegal entrepreneurial activity in an especially large amount*" under Art. 190(2)(b) of the Kazakh Criminal Code did not comply with Kazakh law. Instead, the threshold calculation for "*illegal profits*" was only met by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. Kazakhstan assessed "*illegal profits*" from operating the trunk pipeline – and this fine amounted to more than 65 billion Tenge for KPM and more than 82 billion Tenge for TNG – reflecting all of the revenue that both companies had generated for oil, gas, and condensate production from 2002 – 2008. These calculations were unfair, did not consider expenses or costs, and did not correspond to the transportation fees that would have applied if the pipeline segment was truly a trunk pipeline. Importantly, the fine was contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The Tribunal is persuaded by Claimants' argument that the proper calculation could have yielded USD 12,000 – 13,000 in illegal profits – an amount below the USD 17,000 threshold for the crime.

1094. Respondent disputes whether Kemikal's actions are attributable to the state and argue that, per the PwC Due Diligence Report, Kemikal stopped making payments due to "*liquidity and insolvency*" issues. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124). Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State were the cause of the various difficulties they encountered in endeavouring to secure their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal finds that it is more probable than not that there was State influence at play with respect to the failure by KazAzot to sign the Tri-Partite Agreement. Similarly, the Tribunal finds that the relationship between Kemikal and Timur Kulibayev is established on the basis of Professor Olcott's evidence that Kemikal was managed by Samruk-Kazyna, which is the Kazakh state welfare fund and is 100% owned and controlled by Kazakhstan. Mr. Kulibayev was, as the Claimants



have submitted, close to Samruk-Kazyna, having served at one time as deputy manager of its holding company shortly after its launch in 2006 until 2007, later returning in 2008 as deputy CEO when Samruk's responsibilities increased. Considering these facts in the context of the familial ties between President Nazarbayev and Mr. Kulibayev, the Tribunal concludes that it is more probable than not that Kemikal's failure to provide the requisite bank guarantees to TNG in late 2008 was caused by Kazakhstan. While this evaluation of the evidence regarding non-implementation of the Agreement is by no means the sole reason for the Tribunal's conclusion, it does contribute to and confirm that it was part of and due to the Respondent's conduct found to be in breach of the ECT.

1095. Taking into account the above considerations, the Tribunal concludes that Respondent's measures, seen cumulatively in context to each other and compared with the treatment of Claimants' investments before the Order of the President of the Republic on 14/16 October 2008, constituted a string of measures of coordinated harassment by various institutions of Respondent. These measures must be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

## J.II.    Whether Claimants' Interests were Expropriated (Art 13 ECT)

### 1.    Arguments by Claimants

#### a.    Law on Expropriation

1096. Article 13 ECT prohibits direct and indirect expropriation, to the extent that expropriatory measures are not carried out in accordance with the requirements of Art. 13 ECT. (C-I ¶¶ 243 – 244). Under international law, as described in *Compañia del Desarrollo de Santa Elena, S.A. v. Costa Rica*, "*an expropriation occurs where the state takes measures which deprive the owner of title, possession or access to the benefit and economic use of his property. 'A deprivation or taking of property may occur under international law through interference by a state in the use of that property or with the enjoyment of its benefits, even where legal title to the property is not affected.*'" (C-I ¶ 246). Under Art. 13(3) ECT, expropriation may be of assets of a company that an investor owns, even as a shareholder. (C-I ¶¶ 246 – 247). Article 13 ECT expressly prohibits any measure of expropriation (direct or indirect) by Kazakhstan that does not cumulatively satisfy four distinct requirements: the expropriation must be "*(a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.*" Respondent's actions have met none of these requirements. (C-I ¶¶ 286 – 288, partially quoted).

1097. The minimum requirement for an expropriation to be lawful under Art. 13 ECT is that it be carried out in the public interest / for a bona fide public purpose. As the Tribunal in *ADC v. Hungary* found, a mere reference to "*public interest*" will not satisfy this requirement. Nevertheless, Respondent has never alleged that the taking was for the public interest, not that it in any event could satisfy that requirement. Instead, Respondent's many actions served an entirely different purpose, namely



the diminution of value in Claimants' investments, until the state seized them outright. Accordingly, since none of the actions of either indirect or direct expropriation were for a purpose that was in the public interest, the Tribunal should conclude that Kazakhstan's expropriation of Claimants' investments was unlawful under Art. 13 ECT and international law. (C-I ¶ 289 – 296).

1098. "*Due process*" encompasses procedural and substantive fairness, and this has been recognized by international tribunals. Claimants explain:

> *300.    The failures of due process at issue in this case are markedly more numerous and severe than those at issue in ADC and Kardassopoulos. The Tribunal in both of those cases found that the host States had not given the investors a reasonable opportunity to be heard following an expropriation. In the present case, Claimants were given no chance at all to be heard or to object to the direct expropriation that occurred in July 2010. Furthermore, despite their many efforts to contest Kazakhstan's various measures of indirect expropriation during the October 2008 – July 2010 period, all of Claimants' objections, explanations, and appeals for assistance fell on deaf ears. Claimants vigorously contested the various audits, inspections, findings, criminal charges, fines, and seizures levied during that period, but all of their complaints fell upon deaf ears. (C-I ¶ 300).*

1099. Respondent's actions of indirect and direct expropriation were not carried out under due process of law, as required by Art. 13 ECT. The most blatant due process violations occurred in relation to the prosecution, trial, and conviction of Mr. Cornegruta and the conviction of non-party KPM. Claimants allege that the criminal charges and the substantive evidence were entirely fabricated and the court was obviously partial. Not only that, but KPM – a non-party to the criminal proceedings, an entity that could not even be prosecuted under Kazakh law – was convicted and ordered to pay a fine of more than USD 145 million. Among other things, this sum bore no relation to the charges and constituted all of KPM's oil and gas revenues for March 2007 – May 2008. The court made no effort to deliver the verdict to KPM or to provide KPM notice of its content. It was only after enforcement that KPM finally received a copy. Appeals were unsuccessful – KPM's appeal, filed after it finally received a copy of the verdict on 25 January 2010 – nine days after receiving a copy, was refused as untimely. (C-I ¶¶ 297, 301 – 306; CPHB 1 ¶¶ 188 – 213; CPHB 2 ¶¶ 97 – 114).

1100. The incessant criminal investigations against KPM and TNG starting in 2008 were baseless, unfair, politically motivated, and pursued without regard to due process. KPM and TNG's complaints to the relevant authorities regarding these were either ignored or served only to prompt more investigations. (C-I ¶¶ 307 – 309).

1101. Respondent also committed due process violations with regard to Claimants' rights to extend the exploration period for the Contract 302 properties and to confirm ownership of TNG to Terra Raf. Requests for action and assistance were ignored. Finally, Claimants were promised an extension, and then the Republic failed to issue it. (C-I ¶¶ 310 – 311) At the hearing, Respondent's witness Mr. Ongarbaev, formerly of MEMR, confirmed that the MEMR had decided to allow the extension. Documents that Claimants withheld, including the PwC Due Diligence Report, also confirmed the extension. (CPHB 1 ¶¶ 221 – 230, 237).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1102. The total take over to KPM and TNG in July 2010 was accomplished without reference to due process. KPM and TNG were given only 3 days to respond to and explain the multiple allegations of violation of the Subsoil Use Contracts before the contracts were repudiated. This lack of reasonable time alone is sufficient for a finding of violation of due process. In any event, the responses were wholly ignored and Kazakhstan unilaterally repudiated the contracts and physically took over KPM and TNG. (C-I ¶¶ 311 – 313).

1103. Claimants also allege that Respondent's expropriatory measures were discriminatory, and incorporate by reference its arguments regarding the ECT's FET standard and the ECT's impairment clause. (C-I ¶ 317, C-I ¶¶ 337 *et seq.*, ¶¶ 352 *et seq.*).

1104. Respondent has also failed in its obligation to pay prompt, adequate, and effective compensation, as required by Art. 13 ECT and as firmly grounded in international law. To date, no compensation has been paid. (C-I ¶¶ 314 – 316).

### b. Exhaustion of Remedies

1105. Respondent's arguments that Claimants are precluded from bringing a claim of illegal expropriation under the ECT because they have failed to exhaust dispute resolution mechanisms or to exhaust domestic remedies available to them is simply wrong. Claimants' first argument in this respect is taken from their own words:

> *452.  There is a fundamental distinction between Kazakhstan's obligations to Claimants as qualified "Investors" under the Treaty, including the duty not to expropriate Claimants' investments unlawfully, and Kazakhstan's obligations to KPM and TNG under the contracts, including the duty not to terminate those contracts in violation of the contracts' termination provisions or applicable law. The respective parties and causes of action are different in the two situations. In short, "[a] treaty cause of action is not the same as a contractual cause of action." There would have been nothing preventing KPM and TNG, at least in a theoretical sense, from raising breach-of-contract claims against Kazakhstan while the Claimants commenced separate Treaty claims against Kazakhstan. In fact, KPM and TNG have not lost the right to pursue their contract claims against Kazakhstan, and whether they did so at the time or do so in the future has no bearing on either Claimants' right to bring an expropriation claim under the Treaty or whether Kazakhstan's unlawful termination of the Subsoil Use Contracts and takeover of KPM and TNG amounted to a direct expropriation of Claimants' investments. Kazakhstan is mistakenly conflating two different types of legal claims, only one of which (Claimants' claims for Kazakhstan's breaches of the ECT) is before this Tribunal. (C-II ¶ 452).*

1106. The ECT does not contain a requirement for exhaustion remedies, and investment case law affirms that no such requirement exists. The tribunal in *Helnan v. Egypt* (which Respondent cites elsewhere) rejected any requirement to pursue available remedies as an element of showing a treaty breach, since doing so "*would empty the development of investment arbitration of much of its force and effect, if, despite a clear intention of States parties not to require the pursuit of local remedies as a*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*pre-condition to arbitration, such a requirement were to be read back in as part of the substantive cause of action.*" (C-II ¶ 453, partially quoted).

1107. The ECT contains a "*fork-in-the-road*" clause, under which Kazakhstan only consents to submit disputes under the ECT to international arbitration where an investor has not already submitted the dispute for resolution before local courts or tribunals or in accordance with other previously agreed upon dispute resolution procedures. Thus, if Claimants (as opposed to KPM or TNG) had chosen to challenge the expropriation before Kazakhstan's courts, they might have been precluded from bringing the present action. This makes it clear that no requirement of exhausting domestic remedies can exist in this case. (C-II ¶¶ 454 – 455).

1108. Moreover, the Subsoil Use Contracts precluded recourse to local courts and instead obliged parties to arbitrate disputes before the SCC. The logical extension of Respondent's argument would lead to the absurd result of requiring KPM and TNG to file one SCC claim before a new tribunal and then for Claimants to file a separate action before the SCC. (C-II ¶ 456).

1109. In any event, resort to local remedies would have been futile. This is not a matter concerning a single act of low level maladministration, but rather these cases stem from treaty violations perpetrated at the highest level of the Kazakh government. No Kazakh court would overturn an expropriation ordered at the highest levels of Kazakhstan's government. (C-II ¶¶ 457 – 458).

1110. In its Post-Hearing submission, Claimants argued that there is direct evidence that the executive mandated the takings at issue. This is true despite Minister Mynbayev's testimony that the MEMR was actually attempting to protect KPM and TNG against the Kazakh authorities. In his position having direct authority over KPM's and TNG's operations, he had in depth knowledge that the companies would need protection from higher authorities. The evidence and testimony before the Tribunal strongly suggests the direct involvement of Kazakhstan's political elite. (CPHB 1 ¶¶ 309 – 339).

### c. Indirect Expropriation

#### i. General Principles and Jurisprudence Regarding Indirect Expropriation

1111. "*Indirect expropriation*" is widely understood as interference with an investment that "*leaves the investor's title untouched but deprives him of the possibility to utilize the investment in a meaningful way*", i.e. depriving the investor of its rights or attributes of ownership, without physically seizing the property. (C-I ¶¶ 259 – 269; C-II ¶ 469). The present case does not concern a "*creeping*" expropriation where numerous small events cumulatively amounted to an indirect expropriation. Rather, the measures were extreme and any number of them individually constitutes an act of indirect expropriation under international law. Cumulatively, the conclusion that Kazakhstan indirectly expropriated Claimants' investments is inescapable. (C-I ¶ 285; CPHB 2 ¶ 36).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1112. Respondent substantially deprived Claimants of the rights of ownership of their investments. There is a generous amount of jurisprudence describing the kinds of acts that can amount to indirect expropriation, which is often defined as a substantial deprivation of the rights or attributes of ownership of an investment. The deprivations and impacts that resulted from Kazakhstan's mistreatment of KPM and TNG over from October 2008 – July 2010 resemble those summarized by the tribunal in *PSEG v. Turkey*, when it summarized these constitutive aspects of an indirect expropriation:

> *[T]here must be some form of deprivation of the investor in the control of the investment, the management of day-to-day operations of the company, interfering in the administration, impeding the distribution of dividends, interfering in the appointment of officials and managers, or depriving the company of its property or control in total or in part. (C-II ¶¶ 474 – 476, partially quoted).*

1113. Investment tribunals have routinely found that substantial interference with an investor's ability to manage its investment entails indirect expropriation. Contrary to Respondent's argument, Claimants were not at fault for the start of these investigations. Respondent never alleged that KPM or TNG had violated the law before that date. Rather, the investigations were a pretext for Kazakhstan to prosecute Claimants' companies and ultimately gain control over them. Kazakhstan invented those grounds as early as November 2008, when the Financial Police reclassified the pipelines and ordered calculation of KPM's "*illegal*" profits (i.e., all of its revenues over the previous several years). The Court ignored and declared inadmissible evidence in Mr. Cornegruta's favor, and ignored the obvious fact that the "*illegal profits*" calculated as the penalty were actually not profits at all but were revenues, and were not even earned by Mr. Cornegruta. There should be no question that Kazakhstan's actions, which were carried out in bad faith, amount to indirect expropriation under the ECT and international law (C-II ¶¶ 479 – 480, partially quoted; CPHB 2 ¶¶ 97 – 100).

## ii. Right to Regulate

1114. Respondent's arguments that its actions from October 2008 – July 2010 were a proper exercise of its regulatory powers fail for the simple reason that its actions were not regulatory in nature. In this regard, Claimants state as follows:

*470.   [...] Kazakhstan's actions amounting to an indirect expropriation [...] did not stem from enactment of new laws or regulations or the legitimate enforcement of existing regulations, and they were not designed to maintain "public order, health, or morality." Instead, they consisted of an egregious campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG. The campaign involved a multitude of ministries led by the Financial Police, and it culminated in extraordinary denials of justice suffered by Mr. Cornegruta and KPM in the Kazakh courts. The campaign was carried out under an order from President Nazarbayev to investigate Mr. Stati. Far from being necessary to protect or promote a legitimate State interest, the Government's campaign intentionally interfered with Claimants' ability to manage, control, and dispose of their investments and*



*was designed to force Claimants to sell KPM and TNG (or parts of the companies) to the State at bargain-basement prices. [...]*

472.    *Moreover, even if Kazakhstan could show a legitimate purpose for its so-called "regulatory" conduct, and that its conduct was necessary and proportional to achieving that purpose, Kazakhstan would still be required to pay compensation to Claimants for its expropriatory measures. [...]*

473.    *Thus, even if Kazakhstan's measures could be said to fall within the scope of normal, regulatory actions — which is vehemently denied — their devastating impact on Claimants' investments was to such a degree as to require compensation from Kazakhstan.    Kazakhstan's failure to compensate Claimants alone establishes the unlawful nature of its indirect expropriation.  (C-II ¶¶ 471 – 473, partially quoted).*

1115. The case law cited by Respondent is inapplicable here, as those cases concern states that actually took regulatory measures that tribunals found to be tied to a legitimate state interest.

471.    *[...] In Tecmed, Mexico refused to renew the claimants' landfill permit on environmental protection grounds, which the tribunal found to fall within the state's regulatory powers (but which the Tribunal nevertheless found to amount to expropriation).    Further, the Glamis Gold case involved application of the U.S.'s environmental protection laws, which were designed to promote public health and safety and therefore were proper regulatory measures;  the Methanex case dealt with a ban on the MTBE additive in gasoline, which was a necessary regulatory measure to maintain public health and safety;  and the LG&E tribunal found that a measure that has a social or general welfare purpose may be accepted when it proportionally addresses an established need.  Kazakhstan has not even articulated what public purpose was served by its complete devastation of Claimants' investments through its harassment campaign and denials of justice, much less demonstrated that its measures were necessary and proportional to achieve such a purpose.  (C-II ¶ 471).*

1116. The Tribunal does not need to abandon common sense.  All of the legal and regulatory problems faced by KPM and TNG arise in the context of President Nazarbayev's October 2008 order and had never been experienced previously. (CPHB 2 ¶ 40).  The events following President Nazarbayev's 14 October 2008 Order were not a coincidence.  To argue so is to state that none of Kazakhstan's regulatory bodies had successfully carried out their functions for nearly a decade, by missing all of these serious infractions.  The Tribunal should recognize that the acts described below were designed to (and successfully did) discourage third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies. (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57).

### iii.    Acts Allegedly Amounting to An Indirect Expropriation

1117. Kazakhstan's measures from October 2008 to July 2010 interfered with Claimants' use and control of their investments and caused significant damage to the



alienability and economic potential of those investments. (C-I ¶ 270; CPHB 2 ¶ 38, 40).

271.   *Kazakhstan's campaign of indirect expropriation commenced on October 14, 2008, when President Nazarbayev personally ordered the Kazakh Financial Police and a variety of other Governmental agencies to "fully investigate" Claimants' business activities in Kazakhstan. The Financial Police and seven other ministries and agencies started their harassment campaign in earnest on the heels of President Nazarbayev's directive. Kazakhstan's harassment campaign – which included a groundless criminal prosecution and conviction of KPM's in-country manager (and a similarly groundless criminal verdict against KPM), freezing KPM's assets, multiple assessments of improper taxes, reversal of prior State approvals and waiver of the State's pre-emptive rights, and refusal to execute the agreed exploration period extension – entail "indirect" expropriation under Article 13 of the ECT and international law.* (C-I ¶ 271; CPHB 1 ¶ 112, stating that the difference between "*thoroughly check*", as Respondent translates, and "*thoroughly investigate*" is a difference without distinction. Claimants later use "*thoroughly check*" in their memorial at CPHB 2 ¶ 115).

1118. The events following President Nazarbayev's 14 October 2008 Order were not a coincidence. The measures described below discouraged third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57):

273.   *[The first measure taken against Claimants was Kazakhstan's refusal to extend the exploration for the Contract 302 properties. This wrongful refusal to execute prevented Claimants from proving the Contract 302 Properties' reserves and thereby affected the market value of that asset. This occurred after Claimants had begun to accept bids for the sale of KPM and TNG. To the extent that Kazakhstan argues that Contract 302 terminated on its own accord, Claimants state that it only terminated because of the State's refusal to extend, which was not in accordance with the contractual termination provisions. (see also CPHB 2 ¶¶ 149 – 176)]*

*[[T]he Financial Police effectively commandeered KPM's and TNG's offices for months, from late October 2008 until March 2009, while they oversaw numerous inspections, intimidated employees, seized company documents, and prevented KPM's and TNG's personnel from carrying out their normal daily activities. Those inspections substantially interfered with the day-to-day management and operations of the companies. (C-II ¶ 476)]*

274.   *[In] November 2008, [...] the Tax Committee initiated an audit of KPM and TNG and assessed approximately USD 6 million in back "transfer" price taxes and penalties. KPM and TNG spent the following months contesting this assessment in Kazakhstan's courts, legal actions that remained pending at the time Kazakhstan abrogated KPM's and TNG's Subsoil Use Contracts and directly expropriated Claimants' investments in July 2010.*



275.    *[...] The February 10, 2009, refusal by Kazakhstan to apply amortization
        rates as contractually agreed in the KPM and TNG Subsoil Use Contracts
        raised additional concerns about the companies' financial health. The
        State wrongfully assessed against the companies approximately USD 69
        million in back taxes on corporate income and associated penalties. In
        early 2010, the State pursued bankruptcy proceedings against KPM,
        further disrupting KPM's ability to operate and driving down the value of
        Claimants' investments.*

276.    *On December 18, 2008, the State reversed its earlier position and
        cancelled its prior approval of the 2003 transfer of TNG to Terra Raf, as
        well as its prior waiver of pre-emptive rights to purchase 100% of KPM
        and TNG, all amidst threats of termination of the Subsoil Use Contracts.
        Despite the Government's verbal assurances, it never granted the permit to
        "re-allow" the transfer of TNG's ownership to Terra Raf. From
        December 2008 onward, the lingering transfer and pre-emptive rights
        issues consumed an extraordinary amount of time, attention, and
        resources, and severely affected the marketability of TNG and KPM.
        [Kazakhstan's arbitrary reversal of its pre-emptive rights waiver, as well
        as its false announcements of "irregularities" at the companies and its
        later seizures of KPM's and TNG's assets, deprived Claimants of their
        ability to dispose of their investments.]*

277.    *[...] On September 30, 2009, the State revived a dispute with KPM
        regarding payment of the explicitly inapplicable Crude Oil Export Tax for
        KPM's January 2009 exports, resulting in a purported financial penalty of
        over USD 10 million. (C-I ¶¶ 273 – 277, partially quoted; C-II ¶¶ 476 –
        478, partially quoted; CPHB 2 ¶¶ 115 – 139).*

1119. The measures described above pale in comparison to the criminal proceedings that
      Kazakhstan waged against KPM, TNG, and their personnel. Claimants' employees
      were harassed and intimidated. They were coerced into signing inspection reports.
      Their families were intimidated. This harassment was in violation of the ECT.
      The baseless reclassification of KPM's and TNG's pipelines into trunk pipelines
      was the basis for Kazakhstan's prosecution of Mr. Cornegruta, and for
      Kazakhstan's "*conviction*" of KPM. Numerous expert reports were generated that
      confirmed by common sense that these pipelines had been wrongfully reclassified,
      and these were all rejected by the court. (C-I ¶¶ 279 – 280; CPHB 2 ¶¶ 48 - 51).

1120. The harassment and coercion constituted an illegal indirect expropriation by
      depriving Claimants of their incidents of ownership of KPM and TNG. (CPHB 2 ¶
      59). The constant investigations and then the conviction of Mr. Cornegruta and
      KPM seriously impaired the value of Claimants' investments, in a manner similar
      to those considered in the *Biloune* case, though more severe. The criminal
      proceeding cost Claimants considerably and severely impaired Claimants' right
      and ability to manage their investments, in particular in light of the hours and
      resources spent preparing Mr. Cornegruta's defense, as well as his and KPM's
      appeals. Kazakhstan callously argues that the imprisonment of Mr. Cornegruta had
      no impact on the Claimants' ability to operate their companies. Despite the fact
      that the Kazakh court specifically found (as if such a fact were in doubt) that while
      Mr. Cornegruta was in jail he "*could not fulfill any obligations related to the*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*management of [KPM and TNG],*" his arrest and imprisonment also caused other high-level KPM and TNG managers and personnel to flee the country, forcing Claimants to manage KPM and TNG remotely. There is, therefore, no question that Kazakhstan substantially interfered with Claimants' ability to manage KPM and TNG. (C-I ¶¶ 282 – 284; C-II ¶ 477; CPHB 2 ¶¶ 52 – 56).

> *281.    In conjunction with this case, the Financial Police issued seizure orders against (i) KPM's Subsoil Use Contract, oilfield pipelines, and vehicles; (ii) TNG's Subsoil Use Contracts, and oilfield gas and condensate pipelines; and (iii) Claimants' participatory interests in KPM and TNG. These seizures were designed to prevent KPM and TNG from selling or transferring their assets during the course of the criminal proceedings, thereby preventing Claimants from disposing of their investments in Kazakhstan.    Needless to say, those seizures and the criminal case massively interfered with Claimants' ability to enjoy or dispose of their investments, and they further diminished their market value.  (C-I ¶ 281, partially quoted).*

1121. Kazakhstan's attempts to enforce its "*fabricated*" USD 145 million fine against KPM also resulted in the inalienability of Claimants' investments. The seizure of Claimants' operations interfered with rights under the Subsoil Use Contracts, measures that the *CME* and *Alpha* Tribunals deemed to be expropriatory. Those execution measures also led to the flight of more key personnel and further paralyzed Claimants' operations in Kazakhstan. (C-I ¶ 284).

1122. Respondent's actions, described above, placed a "*cloud*" over Claimants' title to TNG. With KPM facing a pre-ordained conviction, a baseless USD 62 million back tax assessment, and this cloud hanging over TNG, no investor could be expected to purchase the companies. Claimants also argue that Respondent maliciously defamed Claimants by disclosing information to INTERFAX. These public allegations of forgery and fraud exacerbated the above mentioned injuries, and made it difficult for Claimants to obtaining financing for their projects at reasonable rates. (CPHB 1 ¶¶ 138 – 145, 214 – 220, 346 – 357).

1123. Three baseless tax disputes — concerning assessments of back corporate income taxes, transfer pricing, and oil export duties — formed part of Kazakhstan's onslaught of harassment that commenced immediately after October 14, 2008. The "*comprehensive tax audit*" that the Financial Police ordered in October 2008 gave rise to no valid complaint regarding the companies' tax payments or filings. So at the urging of the Financial Police, the Tax and Customs Committees simply created baseless claims. First, in November 2008, the Customs Committee claimed that a previous, disputed assessment of oil export duties, in an amount exceeding USD 10 million, should be paid, despite both an initial court ruling and a previous concession from the Customs Committee that the companies were contractually exempt from such duties. Second, in February 2009, the Tax Committee claimed that KPM and TNG owed USD 62 million in corporate back taxes for failing to properly deduct drilling expenses. Third, in December 2009, it claimed that KPM and TNG owed USD 5 million in back transfer pricing taxes. None of these three claims had any merit, but were instead spurious assessment whose only purpose was to harass Claimants and to pressure them to sell KPM and TNG to the state at firesale prices. (CPHB 2 ¶¶ 127 – 134, 137).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1124. As of 21 July 2010, the Kazakh courts resolved the corporate back tax dispute and ruled that KPM and TNG owed no such taxes. Thus, Kazakhstan's assertion in its First Post-Hearing Brief that this claim continued to increase "until the valuation date of 21 July 2010" is patently wrong. To the contrary, as of July 21, 2010, KPM's and TNG's corporate back tax liability was zero (CPHB 2 ¶ 135). Kazakhstan revived the matter after July 2010 in bad faith, thereby ensuring that Claimants would have no ability to defend their position before the Kazakh Supreme Court (whose decision, in any event, was substantively incorrect). (CPHB 2 ¶ 136).

1125. Despite the Supreme Court ordering taxes due from KPM's and TNG's purported trust manager in November 2010, no collection efforts have been undertaken. Thus, it is likely that these tax actions were simply part of Kazakhstan's coordinated attack on Claimants' investments. Along with Kazakhstan's other acts of harassment and coercion, the tax assessments were measures that, in the words of the *RosInvest* tribunal, were "*linked to the strategic objective of returning petroleum assets to the control of the [State] and to an effort to suppress [an investor]*." Because that tribunal found that the State's measures were "*structured in such a way to remove [the investment company's] assets from the control of [the investors]*," it concluded that the State had committed an illegal, indirect expropriation. The Tribunal should not hesitate to reach the same conclusion here. (CPHB 2 ¶¶ 137 – 138).

1126. In order for the Tribunal to find that Kazakhstan breached the ECT and owes compensation to Claimants, the Tribunal need only be satisfied that the Kazakhstan's actions were unlawful and harmed Claimants' investments. While Kazakhstan's actions clearly demonstrated an intention to devalue, impair, and harm Claimants' investments from October 2008 onward, Respondent's intention is relevant for determining the valuation date. (CPHB 2 ¶¶ 44 – 45). The wrongful verdict against KPM and its assets was a measure of "*indirect expropriation*", since the enforcement destroyed what little remained of Claimants' "*incidents of ownership*" over KPM by that time. (CPHB 2 ¶¶ 97 – 114).

### d.     Direct Expropriation

### i.     Transfer of Title

1127. "*Direct*" expropriation refers to the overt seizure of a foreign investor's property or the title to such property by the host state. Respondent's argument that a formal transfer of title to the state or to a third party nominated by the state is "*the decisive element*" for the Tribunal in finding a direct, rather than an indirect, expropriation occurred is wrong as a matter of law. (C-I ¶¶ 249 – 252; C-II ¶ 459). Claimants' arguments are best taken from their own words:

> 460.   *The Santa Elena case, on which Claimants rely for this (undisputed) principle of international law, was cited with approval by the Telnor v. Hungary tribunal. It quoted the Santa Elena finding that "[t]here is ample authority for the proposition that a property has been expropriated when the effect of measures taken by the state has been to deprive the owner of title, possession, or access to the benefit and economic use of his property."   The Metalclad tribunal similarly found that expropriation*



*includes "open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favor of the host State." Likewise, the Tecmed tribunal explained, "[u]nder international law, [direct expropriation occurs] where the use or enjoyment of benefits related thereto is exacted or interfered with . . . even where legal ownership over the assets in question is not affected. . . . " Thus, there is no requirement that Kazakhstan must have received title to Claimants' investments in order for this Tribunal to find that a direct expropriation occurred.*

461. *Kazakhstan admits that Claimants' legal ownership of KPM and TNG and their assets were substantially affected and transferred to State control. It explains that "[u]pon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist" and "the assets then had to be transferred to [State-owned KazMunaiGaz] so that they would be taken into trust management." That alone is sufficient to establish expropriation. By Kazakhstan's own case, Claimants lost their contracts and all the assets of KPM and TNG. That is precisely the kind of taking the Sempra tribunal, on which Kazakhstan relies, had in mind when it held that a direct expropriation requires that "at least some essential component of the property right has been transferred to a different beneficiary." (C-II ¶¶ 460 – 461).*

1128. It is beyond dispute that Kazakhstan directly expropriated Claimants' investments on 21-22 July 2010 by seizing Claimants' rights under the Subsoil Use Contracts and by seizing legal and physical control of the assets held by Claimants through KPM and TNG. The act of transferring Claimants' KPM and TNG Subsoil Use Contracts to KMG, as well as the subsoil area subject to those contracts was a compulsory transfer of title to property to the State. (C-I ¶¶ 253 – 254, CPHB 2 ¶ 196). As Respondent has confirmed, from the moment of termination, Claimants' contractual rights to ownership over the produced oil, gas, and condensate was terminated. Further, the MOG's and KMG's occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. Claimants' description of the transfer of legal title is as follows:

256. *Those seizures of legal title were personally instructed and overseen by the Kazakh Prime Minister, along with the Minister of Oil and Gas and the regional Governor, during their visit to Claimants' LPG plant to announce the seizures. The following day, Kazakhstan seized physical control of Claimants' investments. On July 22, 2010, Kazakhstan seized Claimants' offices, equipment, production, revenue, and other investments and operations, when a group of thirteen high-ranking officials from the MOG and KazMunaiGas arrived at Claimants' offices in Aktau, Kazakhstan. KazMunaiGas explained that government escrow accounts were being opened the same day, and "everything that has been extracted since [July] 22nd, extracted oil and payment for oil, gas and condensate - such income shall be deposited in the special account." The MOG's and KazMunaiGas' occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. (C-I ¶ 256).*



1129. Indeed, such an outright seizure of physical assets, contractual rights, and legal title are textbook examples of "*direct*" expropriation. Hence, it is indisputable that Kazakhstan directly expropriated Claimants' investments under Art. 13 ECT and international law in July 2010. (C-I ¶¶ 255 – 257; CPHB 2 ¶¶ 178 – 179).

## ii. Exercise of Regulatory Powers

1130. Respondent's argument that the unilateral termination of the Subsoil Use Contracts and its takeover of the companies was merely a normal exercise of its regulatory powers is fanciful, at best. (C-II ¶ 462).

> *464.* *Unilaterally terminating contracts and seizing rights and property are not the types of exercise of regulatory powers that normally exculpate a state from responsibility for harming investments protected by a treaty. Prima facie state measures comprising a lawful exercise of regulatory powers include taxation, trade restrictions, and/or measures of devaluation. But the outright taking of rights and property from an investor and transferring it to a State company — even if on a "trust management" basis until a third subsoil user can be found — is altogether different from regulating an interest of the state.*

> *463.* *Kazakhstan claims that its expropriatory acts were regulatory because they were in accordance with its Subsoil Law of 2010, the purpose of which was "to balance the host State's legitimate interest in furthering the wealth and well-being of its population and the investors' legitimate interest in making a return on its investment." Further, Kazakhstan contends that its regulatory powers under that Law require it to ensure that "investors [do not] take over the gas and oil production on a certain field forever but that production rights are tied to contracts which expire and have to be renegotiated regularly." (C-II ¶¶ 463 – 464).*

1131. Furthermore, the takeover was at odds with the interests allegedly expressed in the Subsoil Use Law. The takeover did not provide balance – like what may have been prior to 2008, when Claimants earned a return on their investments and paid taxes according to the Subsoil Use Contracts. After October 2008, there was no balance, as Respondent gradually took everything and left Claimants with nothing. The expropriation was aimed solely at expropriating the benefits of Claimants' production rights after Claimants had invested all the necessary time and money to make the fields productive. The July 2010 expropriation was largely a formality, formalizing Respondent's campaign of indirect expropriation. (C-II ¶¶ 465 – 468).

1132. In any event, Respondent cannot merely point to its domestic law to legalize its expropriation by way of the regulatory powers doctrine because Respondent would still be required to compensate Claimants for the taking. The Parties do not dispute that Respondent has paid no compensation to Claimants. (C-II ¶ 466).

1133. Respondent has been unable to point to any contemporaneously made allegation that would have supported its position. Instead, the justifications for the expropriation are based on snippets of witness testimony, which are contradicted by the contemporaneous evidence. (CPHB 2 ¶¶ 179 – 180).



1134. First, Minister Mynbayev's testimony at the October 2012 Hearing confirmed that the public policy grounds alleged do not justify the termination. He admitted that the inspections concluded that Claimants were in compliance with their subsoil use contract obligations. The reports also confirmed that Claimants exceeded their minimum work program for 1999 – 2009 by 6.6 times. For 2010, the MEMR noted that TNG had exceeded its contractual obligations by 3.4 times. (CPHB 2 ¶¶ 178 – 184). In any event, the alleged "*violations*" did not merit termination of the contracts. Three of the seven alleged violations against KPM were that it failed to satisfy financial obligations toward Kazakhstan. At the hearing, Claimants corrected the Respondent that KPM was accused of owing USD 114 thousand to Kazakhstan – not USD 114 million. KPM was accused of owing USD 10,000 for the liquidation and a vague amount in taxes, which KPM disputed and would not have been able to pay since the accounts were frozen. The other four grounds were completely baseless. These included that (a) KPM failed to train Kazakh specialists (at the hearing, Minister Mynbayev could not explain why this would be a valid ground for termination), (b) that KPM failed to provide information about compliance with the work program, (c) that it had breached obligations regarding the acquisition of goods, works, and services, and (d) that it operated a main pipeline without a license. The six allegations against TNG for Contract 210 were likewise meritless:

> *288.* *[…] Like KPM, TNG explained that information regarding fulfillment of its work programs had been sent to Kazakhstan on multiple previous occasions. Kazakhstan also accused TNG of failing to provide annexes regarding the training of employees. TNG explained that those had been provided, along with its annual reports, and TNG provided them again in its July 19, 2010 response. TNG also explained that, like KPM, it had written to the Ministry of Oil and Gas to determine where to send its excess funds for training Kazakh specialists, which the Ministry ignored. In response to the claim that TNG owed some US $84,000 in historic costs, TNG explained and demonstrated that it properly paid its historic costs on a quarterly basis and that it had no arrears. TNG also explained, just as KPM had done, that it did not operate a main pipeline and that it had not breached any obligations for the acquisition of goods, works, or services.*

> *289.* *Amazingly, Kazakhstan also issued a notice of alleged violations with respect to TNG's Contract No. 302. Kazakhstan claimed that TNG had violated Contract No. 302 on five grounds: (i) the same alleged failure to provide information regarding its work program; (ii) the same supposed failure to provide annexes regarding employee training; (iii) the same contention that TNG had not trained Kazakh specialists; (iv) the false criminal allegation that TNG operated a main pipeline without a license; and (v) the same vague obligation that TNG had breached its obligations regarding the acquisition of goods, works, and services. (CPHB 1 ¶¶ 273 – 289, partially quoted).*

1135. Respondent's allegation that the Table 1-p in the English version of the MEMR inspection report, which was not provided due to a cut-off in printing, showed underperformance and mismanagement of the business is incorrect. The Russian version was provided and the missing English section does not provide any



evidence of non-compliance with contract obligations or Kazakh law. (CPHB 2 ¶¶ 184 – 185).

1136. Respondent's selective reliance on the PwC due diligence report is also unavailing. That report indicated that TNG had fallen behind on its 2008 and 2009 aspirational work programs. The MEMR also recognized that the company's aspirational working program was not the same as their minimum work obligations. Mr. Lungu admitted to no breach of the minimum work programmes, but was instead referring to the companies' own more aggressive annual work program. And this is consistent with Claimants' historic over-fulfillment of their minimum work requirements. (CPHB 2 ¶¶ 187 – 188).

1137. By summer 2009, TNG had reduced gas production in Tolkyn and this was noted by the MEMR – who did not find that the reduction amounted to a violation of contract or law. The reason for the reduction in production was due to the loss of Kemikal as a contractual partner (due to Respondent's harassment campaign) and the fact that the LPG Plant was not completed. In any event, the production slump was temporary and the production and sale of gas increased during winter 2009. (CPHB 2 ¶¶ 189 – 190).

1138. Even if there had been non-compliance with the minimum work obligations in 2009, it would be immaterial, since (i) MEMR expressly stated that there were no problems in the field as of February 2010 and that "*any falldown [or non-compliance] for certain years is compensated by the significant exceedings registered in the next or previous years;*" (ii) any failure to meet minimum work obligations would have been solely as a result of Kazakhstan's harassment and interference with Claimants' normal business operations; and (iii) any minimal "*falldown*" that may have existed was not sufficient to terminate the contracts, because it was not a reason the MOG gave for contract termination in July 2010. (CPHB 2 ¶¶ 191 – 193).

1139. Kazakhstan has provided no contemporaneous evidence that mass employee dismissals were a serious concern or that there was a risk of social tension. The opposite was confirmed in Mr. Calancea's, Mr. Condorachi's, and Mr. Ongarbayev's testimony. Payment was even made when the accounts were frozen. Upon the government's take over, 900 workers went to work for the state. (CPHB 2 ¶ 194).

1140. Kazakhstan's claims that Claimants were unwilling to cooperate with the State to cure contract breaches are misleading, given that Claimants had a mere 3 days to cure the alleged breaches and, as indicated above, by the time of the expropriation, Claimants had been appealing to multiple Government agencies since late 2008. Further attempts would have been futile. (CPHB 2 ¶ 195).

1141. Importantly, in Minister Mynbayev's testimony, it was revealed the allegations for breach of Contract 302 actually reveal that Kazakhstan considered that it had been extended, because otherwise it would have expired in March 2009. Furthermore, since it was an exploration contract, Claimants did not own or operate any transport pipelines. (CPHB 1 ¶¶ 290 – 292).

## 2. Arguments by Respondent



### a.    Law on Expropriation

1142. Respondent agrees that expropriation is governed by Art. 13 ECT. (R-I ¶ 33.4).

1143. Respondent also highlights that expropriation needs to be differentiated from valid government activity. Respondent implies that, since no expropriation occurred, the four factors presented in Art. 13 ECT are irrelevant. Quoting *Marvin Feldman v. Mexico*, Respondent states that "*the essential determination is whether the actions of the Mexican government constitute an expropriation or nationalization, or are valid governmental activity. If there is no expropriatory action, factors a-d [i.e. (a) for a public purpose; (b) on a non-discriminatory basis; (c) in accordance with due process of law and article 1105(1); and (d) on payment of compensation] are of limited relevance, except to the extent that they have helped to differentiate between governmental acts that are expropriation and those that are not (...).*" (R-II ¶ 892).

1144. Respondent committed no due process violations with respect to the non-extension of Contract 302 and the 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. Claimants are incorrect to allege that Messrs. Mynbayev and Ongarbaev supported Claimants' interpretation of the 9 April 2009 letter. Mr. Ongarbaev never testified that MEMR had decided to extend Contract 302, but rather than the decision to recommend extension was made. (RPHB 2 ¶¶ 296 – 305). Minister Mynbayev's testimony was mistranslated:

> *304.    When Minister Mynbaev explained that the decision of the Export Commission had only recommendatory character, he was translated to have said that it gave recommendations as to whether the subsoil user may count on the extension or not. However, the Russian verb «paccgHTbIBaTb Ha» translated into English as "count on" was used by the witness in the ordinary meaning of «HageATbcA Ha», or English "hope for". And certainly, a decision of recommendatory nature may raise hopes but it cannot give rise to legitimate expectations. (RPHB 2 ¶ 304, emphasis in original).*

1145. Claimants created the irregularities in the title to TNG when they wrongly asserted that Respondent's pre-emptive rights did not apply to the Gheso – Terra Raf transfer. There were 8 transfers involving a majority interest in TNG, and the consequence of failure to obtain consent in any of those transfers is that none of the transfers involving Claimants' companies were completed. The belated consent to one transfer does not cure all previous failures to obtain consent. (RPHB 2 ¶¶ 272 – 281).

### b.    Exhaustion of Remedies

1146. Respondent argues that Claimants' expropriation arguments are precluded by Claimants' failure to pursue available remedies in pursuance of their contractual claims or domestic legal claims. After every alleged action, KPM and TNG could have turned to the contractually agreed upon arbitral tribunals or to the Republic's domestic courts, and they chose not to do so. (R-I ¶ 33.6; R-II ¶ 865).



1147. Turning first to Claimants' contractual claims and citing *Waste Management and Parkerings v. Lithuania*, Respondent presents that an expropriation of contractual rights is not perfected until available remedies to address the alleged contractual breach have been pursued. (R-I ¶¶ 33.7 – 33.10; R-II ¶¶ 865 - 866).

1148. Claimants' claims for actions making up the direct expropriation and many claims regarding the indirect expropriation are contractual in nature. These actions include (1) the refusal to prolong Contract 302, (2) the termination of Contract 302, (3) the Republic's alleged refusal to apply contractually agreed amortization rates leading to an assessment of back taxes and penalties of USD 69 million, (4) the alleged non-application of a contractually agreed exemption to the Crude Oil Export Tax, and (5) the alleged revocation of the Republic's purported approval of the transfer of TNG to Terra Raf. These claims each fail for the simple reason that in each and every case, the Claimants – alone or through TNG and KPM – could and should have pursued these claims by way of arbitration, as agreed in the Subsoil Use Contracts and Contract 302. To be clear: the present arbitration does not satisfy the contractual requirements. (R-I ¶ 33.17 – 33.22; R-I ¶ 33.22 represents that KPM and TNG would be suing).

1149. In respect of domestic law, so long as the state provides effective remedies for breaches of domestic law, an expropriation cannot occur so long as the investor's attempts at pursuing those remedies have not failed. Respondent cites *Generation Ukraine v. Ukraine* and *EnCana v. Ecuador* in support of this position and summarizes that there have been several reasons that lead tribunals consider that a failure to pursue available remedies is fatal to an expropriation claim:

   *(a)*   *Non-performance of a contract - and thus also termination of a contract - does not amount to an expropriation of the rights stemming from the contract as long as the loss of the right is not final, i.e. ultimately determined by the appropriate forum.*

   *(b)*   *An act of maladministration at the lowest level cannot amount to an expropriation. Otherwise, investors could invoke any minor mistake at the local level and bring investment arbitration claims.*

   *(c)*   *Tribunals generally are less knowledgeable about domestic law than domestic courts. Thus, in the absence of a valid reason for a failure to bring the claim to the appropriate forum, such failure puts into doubt that a right was actually taken from the investor.* *(R-I ¶¶ 33.10 – 33.15; quoting ¶ 33.15).*

1150. Claimants' other indirect expropriation claims could have and should have been addressed in domestic courts, which were open to Claimants. Claimants never pursued all available appeals against lower-instance decisions. (R-I ¶¶ 33.23 – 33.26; RPHB 2 ¶¶ 265 – 271). With regard to the prosecution of KPM, Claimants never exhausted the appeals system within the Republic, which stood open to Claimants. KPM missed the deadline to appeal. It was the Court's view that KPM had notice of the decision against it, since its senior management was present at the hearing. (R-II ¶ 635 – 638). This excludes the notion of expropriation. (R-I ¶ 34.9).



1151. Claimants' position that the contracts precluded them from submitting breaches of contract to domestic courts is untenable. Claimants base their allegation that Contracts 210 and 302 provided for arbitration before the SCC was based on an alleged footnote in Maiden Suleymenov's chapter in "*Oil and Gas Law in Kazakhstan*." Suleymenov, however, states the opposite of what Claimants allege. (R-II ¶¶ 870 – 873).

> 874. *Article 28 (2) of Contract No. 305 does indeed refer the parties, i.e. KPM and the Republic, to the SCC. However, the requirement for KPM to refer disputes to the SCC does not mean that "KPM and TNG would first have to commence arbitration proceedings at the Stockholm Chamber of Commerce for another international tribunal to determine whether Kazakhstan's actions amount to a breach of contract under Kazakh law". Firstly, only KPM is a party to Contract No. 305. Secondly, Claimants seem to suggest that the tribunal in the SCC proceedings would need to render a declaratory award in favor of KPM and on that basis, Claimants could then pursue their claim under the ECT. This is clearly not the case. Instead, there would only be two proceedings if KPM were unsuccessful in the SCC arbitration and Claimants then decided to pursue their claim under the ECT nonetheless. This is not at all "absurd". (R-II ¶ 874, emphasis maintained).*

1152. Respondent states that, having shown that remedies were available, it is for Claimants to prove their assertion that resort to local remedies would have been futile. Claimants have not even alleged that recourse to arbitration for the acts that they consider to be "*indirect*" expropriation would have been futile. The Republic refutes Claimants' contention that arbitration as a remedy against termination of the contracts would have been futile from the outset. Furthermore, Claimants have not explained why a tribunal constituted pursuant to the Subsoil Use Contracts would not have addressed their complaints. Finally, regarding Claimants' final futility argument regarding maladministration, Claimants cannot base any argument on their allegation that the termination notices were a result of a notification by the President of the Republic, which they were not. (R-II ¶¶ 875 – 878).

1153. Claimants misrepresent the contents of the decision taken in the *Helnan* annulment. *Helnan* was not an easy, one-way decision, but it was a quite nuanced ruling, striking a balance between an investor's interest in pursuing treaty arbitration and a state's interest in not being held liable for decisions of low-ranking officials. In pertinent part, that Tribunal stated "*Of course, a claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention.*" (R-II ¶¶ 866 – 867).

1154. Claimants allege that the Republic has failed to differentiate between treaty claims and contract claims. In response, Respondent state that, "*[o]bviously, a claim under a treaty is something quite different to a claim under a contract. However, this in no way precludes the fact that available remedies have to be pursued.*" (R-II ¶ 869).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1155. In response to Claimants' fork-in-the-road argument, Respondent explains that TNG and KPM – as distinct parties from Claimants in this arbitration, needed to have pursued their own contractual remedies, prior to Claimants' initiation of proceedings. This would not have triggered the fork-in-the-road clause for Claimants, as was explicitly held in *CMS v. Argentina.*

### c.   Indirect Expropriation

#### i.   General      Principles      and Jurisprudence   Regarding   Indirect Expropriation

1156. Indirect expropriation describes the rare situation in which no transfer of title occurs but the host State's measures nonetheless are "*tantamount*" to expropriation or have an equivalent effect. (R-I ¶ 35.2). The main criterion for a finding of an indirect expropriation is the effect that a governmental measure has on the rights of the investor. As stated by the tribunal in *Tecmed v. Mexico*:

*[…][M]easures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are **irreversible and permanent** and if the assets or rights subject to such measure have been affected in such a way that "…**any form of exploitation thereof…" has disappeared; i.e. the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed." (R-I ¶ 35.3, citing Tecmed v. Mexico, emphasis in original).*

1157. In order to succeed in their allegation that the inspections from October 2008 – March 2009 amounted to an expropriation, Claimants must demonstrate that the interference was in fact equivalent to an expropriation. Respondent argues that it did not interfere with the day-to-day management of KPM and TNG. Rather, the inspecting agencies made every effort to not disrupt the business of KPM and TNG, and Claimants have not proven that their day-to-day business was seriously disrupted, despite requests that they meet this burden of proof. Occasional and legitimate inspections and audits, clearly, do not prevent investors from directing the day-to-day operations of the investments, and Claimants have not proven otherwise. (R-I ¶¶ 35.21 – 35.23; R-II ¶¶ 907 - 910).

1158. In addition, at the Hearing on Jurisdiction and Liability, then-General Director of TNG, Mr. Cojin, stressed that the Financial Police "*could not disturb us too often because we were very busy with production […]*." (RPHB 2 ¶ 23).

1159. It is noteworthy that the Claimants have not complained – and indeed cannot complain – that the laws in and of themselves were expropriatory. If the laws themselves are not expropriatory, only there misapplication can be. Hence, a showing of lawfulness under domestic law will preclude a notion of expropriation. (R-I ¶¶ 35.9 – 35.10, partially quoted).

1160. Finally, other tribunals have formulated further requirements for the State's right to regulate, including due process of law and non-discrimination. Respondent also cites *Azurix v. Argentina*, where the Tribunal held that no indirect expropriation had occurred because the impact on the investment due to the State's measures



was, in the aggregate, not attributable for the loss to the claimant, which still had control over the investment. Likewise, in *LG&E v. Argentina*, the tribunal found that there was no expropriation because the investor had not lost control over the investment. (R-II ¶¶ 901 – 903).

1161. Finally, the Republic's alleged reversal of its pre-emptive rights waiver (which Respondent denies) and its supposedly false announcement of irregularities did not deprive Claimants of their ability to dispose of their investment. (R-II ¶ 918). Respondent lawfully revoked its authorisation of the transfer from Gheso to Terra Raf. None of the alleged problems with Claimants' disposal of their assets were Respondent's doing. (R-II ¶ 919; RPHB 2 ¶ 272 – 281).

## ii. Right to Regulate

1162. Prominent scholars in international law, including Ian Brownlie, Prof. Sornarajah, and Prof. Böckstiegel also agree that legitimate regulatory actions do not constitute a compensable expropriation. Extensive practice in international investment arbitration has also shown that valid state regulation is non-compensable. (R-II ¶¶ 950 – 956).

1163. A determination of whether there has been an indirect expropriation, even in cases similar to *Tecmed*, is limited by a state's police powers. Losses incurred by the investor which are "*incidental to the normal operation of laws of the State*" may be non-compensable. (R-I ¶¶ 35.5 – 35.6).

1164. The sovereignty of the state over its natural resources includes the right to regulate, and this has been confirmed in the Preamble to the 1991 European Energy Charter, the 1975 Helsinki Declaration, as well as other treaties. The laws of the host state are highly relevant, and the investor is entitled to compensation only for those damages, actions, or omissions by state bodies or officials that are contrary to the host state's legislation. (R-II ¶¶ 922 – 926).

1165. Respondent explains that a regulatory action does not constitute compensable expropriation. The definition of expropriation as provided in the Convention that establishes the Multilateral Investment Guarantee Agency, to which 176 states are party, defines expropriation in general terms, excluding "*non-discriminatory measures of general application which the governments normally take for the purpose of regulating economic activities in their territories.*" (R-I ¶¶ 927 – 932).

1166. This is confirmed by Art. 1 of the Protocol 1 to the European Convention of Human Rights (1952), which states that the "*enforcement of laws, necessary to control the use of property in accordance with the general interest cannot constitute a compensable taking.*"

1167. The approach taken by the ECtHR should be of guidance to this Tribunal. Respondent presents cases under the ECtHR where compulsory alienation of property, the imposition of a duty, or the withdrawal of a license, tax sanctions for violations of tax legislation, was found to be non-expropriatory. (R-I ¶¶ 933 – 940). The case practice of the ECtHR is relevant here, as that Court hears investment claims and its cases demonstrate that a deprivation of property in the form of fines, taxes, etc., does not constitute an expropriation and does not require



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

compensation. States are given a wide margin of discretion in determining the public interest and the measures required in the pursuance of these interests. The ECtHR first considers whether the measures were lawful under the laws of the host state and evaluates whether the law was sufficiently available, specified, and predictable. The ECtHR emphasizes throughout that its competence for assessment of the lawfulness of state authorities' actions is limited. Second, the ECtHR assesses measures in respect of their proportionality, taking into account the wrongfulness of the applicant's conduct, the interests of the host state and the investor, the requirements of public interests, and the requirements of protection of fundamental freedoms. (R-II ¶¶ 940 – 949).

1168. All of the measures at issue concerned the lawful enforcement of laws that are necessary to regulate the hazardous and strategically important exploration and extraction of oil and gas. (R-II ¶¶ 904 – 905). Contrary to Claimants' assertion, there was no "*campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG.*" Rather, the measures at issue were legitimate and the state was entitled to regulate. (R-I ¶¶ 35.15, 35.20; R-II ¶ 906).

### iii.  Acts Allegedly Amounting to An Indirect Expropriation

1169. Claimants incredibly and wildly assert that various alleged treaty breaches, slowly and quickly, individually and/or in combination, breached the ECT. Respondent explains that Claimants have argued that the following actions individually and cumulatively amount to an indirect expropriation of Claimants' rights in KPM and TNG: (1) the Republic's refusal to prolong the exploration rights under Contract 302, (2) the assessment of back transfer price taxes and back taxes on corporate income, (3) the alleged revocation of the purported approval of the transfer of TNG's shares to Terra Raf, (4) the dispute about the application of the Crude Oil Export Tax, (5) the classification of KPM's and TNG's pipelines as trunk pipelines, (6) the ensuing trial and conviction of Mr. Cornegruta and the verdict against KPM, and (7) the seizure orders against KPM and TNG. (R-I ¶ 35.11). The assertions have changed so frequently that they are not credible. (RPHB 2 ¶¶ 419 – 423).

1170. Respondent also notes that "*Claimants have clandestinely dropped all relevant tax measures from the list of alleged expropriations and only mention them in a footnote in this section in which they claim that they had been deprived of their ability to dispose of the investment. Apparently, Claimants have come to the conclusion that the tax measures cannot constitute an expropriation and quite rightly so. The taxation measures do not fall within the jurisdiction of the Tribunal. In any event, the tax measures do not constitute expropriations under Article 13 ECT.*" Further as has been demonstrated, the Tax Committee's assessment of corporate back taxes was legitimate, the 2008 crude oil export duties were lawful and were not paid by TNG, and the 2009 duties were withdrawn before either KPM or TNG made any payment. Respondent further states that "*the taxation measures were not expropriatory because neither was an 'acquired right' taken from Claimants nor could the tax measures be said to 'frustrate the complete operation of [Claimants'] activities in [Kazakhstan].*'" (R-II ¶ 920 - 921).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1171. Respondent's arguments and points on indirect expropriation are best taken from its own words:

> 899. *The Republic did not indirectly expropriate Claimants. Even Claimants do not seem to be certain which measure is supposed to have indirectly expropriated them when they refer to "expropriatory conduct over the October 2008-July 2010 period". They later enumerate four allegedly expropriatory measures taken by the Republic but remain very elusive as to whether each of these measures is supposed to have constituted an expropriation or whether they collectively expropriated Claimants: Firstly, the Republic allegedly interfered with the day-to-day management of KPM and TNG when the Financial Police "commandeered" their offices from October 2008 - March 2009, secondly, the Republic allegedly deprived Claimants of their ability to manage their companies by arresting KPM's General Director in April 2009 and "hunting" other KPM and TNG senior officials, thirdly, the cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 supposedly deprived Claimants of their ability to prove their reserves and finally, the Republic's alleged reversal of its pre-emptive rights waiver and its supposedly false announcement of irregularities are said to have deprived Claimants of their ability to dispose of their investment.*
>
> 900. *Claimants mischaracterise the Republic's actions in each of the above cases. Ironically, in the first two cases, the Republic's actions related to the need to investigate and later to punish the Claimants own misdeed or that of KPM and TNG and their employees. In each case, all measures taken by the Republic were legitimate and a legal applications of Kazakh law which were not expropriatory in nature. In any event, none of the measures even came close to the effect of a taking. (R-II ¶¶ 899 – 900; see also R-I ¶¶ 35.11 – 35.12 listing Claimants' claims).*

1172. Claimants operated trunk pipelines without a license, at least since 2002. Mr. Cornegruta wrote to the MEMR in May 2008 to apply for a trunk pipeline, but the application was incomplete. The investigation that led to this conclusion demonstrates clearly that nothing about the criminal charges against Mr. Cornegruta was premeditated – the relevant agencies (MEMR and the Financial Police) operated independently of one another and, on 15 December 2008, the Financial Police opened a criminal investigation based on reasonable suspicions that KPM was operating a trunk pipeline without a license. This investigation was based on the following evidence: (1) letters from KPM and TNG to the MEMR requesting the re-issue of a licence, (2) a letter from KPM to ARNM requesting the re-issue of a licence, (3) a geological committee report, (4) a letter from ARNM confirming that KPM and TNG held no licenses for trunk pipelines, (5) an expert review based on a similar pipeline, and (6) the design documentation for the pipelines. Witnesses were interviewed and there was a physical examination of the pipeline. Mr. Rakhimov of the Financial Police finally obtained an expert opinion from Mr. Baymaganbetov on 13 February 2009 about whether the pipelines were, indeed, trunk. Mr. Baymaganbetov reviewed four reports provided to him by the Financial Police and, although he was free to seek out other opinions, he did not. Claimants' four expert opinions were not shown to him because their independence could not be verified and they risked compromising his independence. Claimants' reliance on 5 opinions from other governmental agencies fared just as well, since



Claimants filed to provide the scope of the request for the issuance of those opinions, the agencies may have been involved in the design or other aspects of the pipeline and, most importantly, none of them were appointed in accordance with Art. 243 CPC. (RPHB 2 ¶¶ 151 – 207).

1173. To repeat from above, the conclusion that the at-issue pipelines were indeed trunk pipelines is both legally and factually correct. The Parties' witnesses agreed on the legal definition of a trunk pipeline, which is provided in the Law on Oil. Importantly, the Parties have agreed that the relevant section of pipeline extends beyond the Contract Area, for which KPM never had a license. Claimants' allegation that they had all of the licenses that they needed can only be true if they demonstrate that they have only field pipelines – a type of pipeline that cannot go beyond the Contract Area. Contrary to Prof. Suleymenov's opinion, the classification of a pipeline is not a matter of industry analysis or the visual size of the pipeline. The Parties' experts agree that it is a question of law. Since "*(i) the KPM Pipeline extends beyond the Contract Area (i.e. it is not a field / contractors pipeline), (ii) third party oil as well as commercial oil is carried by the pipeline, (iii) that the oil is commercial, and (iv) that the oil is transported to places of transshipment, transport, processing or consumption*", the pipeline is a trunk pipeline. Claimants' new assertion that the Law on Oil excludes pipelines that are involved in the single technological process of oil and gas production from the classification as "*main pipelines*" is incorrect and is based on a mishearing of Mr. Romanosov's testimony. (RPHB 2 ¶¶ 219 – 236).

1174. It is to be noted that Claimants always had the duty to obtain a license for operation of a trunk pipelines before operating one. Claimants knew of the licensing laws and it would have been easy for them to seek clarification if needed. Their most recent application was incomplete and Claimants chose not to procure a license. (RPHB 2 ¶¶ 208 – 218).

1175. Penal measures following the violation of a criminal statute cannot give rise to a compensatory taking. Mr. Cornegruta was prosecuted and convicted in accordance with due process and Kazakh law. His conviction cannot constitute an indirect expropriation, and Claimants have not demonstrated how his absence affected the "*promoting, financing, and managing*" of the investment. In this regard, the *Biloune* case, cited by Claimants, is easily distinguishable from this matter. There, the claimant (Biloune, the investor) had a central role in promoting, financing, and managing the investment, and was expulsed from the host state. Here, however, Claimants have not even attempted to show to what extent Mr. Cornegruta had a central role, or how his absence made it impossible to pursue KPM's investment activity. Claimants have only made the less forceful assertion, that he was only an employee. This case is, thus, clearly distinguishable from *Biloune*. Respondent rejects Claimants' assertion that it was "*hunting*" KPM and TNG senior officials. (R-I ¶¶ 35.17 – 35.18; R-II ¶¶ 911 – 913).

1176. Kazakh law uncontestedly provides for the recovery of income obtained by means of illegal activity. Such recovery is necessary to address unjust enrichment obtained by criminal means. As KPM earned income from its general manager's criminal behaviour, namely the illegal operation of a main pipeline without a license, it was the natural consequence that the court ordered the recovery of this income. Kazakh law foresees recovery of illegal income from a company, even



where the company is not named as a party in the criminal case, and there is no requirement that the Republic bring a civil claim in order to recover this unlawful income. The amount of illegal income received in the course of illegal entrepreneurial activity is unjust enrichment. (RPHB 2 ¶¶ 243 – 261).

1177. Claimants' criticism that the recovery was disproportionate misses the mark: the goal is to address and negate the unjust enrichment that results from the crime, not to punish the crime. The unjust enrichment is not limited to the hypothetical income for providing crude oil transportation services. Squire Sanders assessed the amount subject to recover to be reasonably over USD 80,000,000. (RPHB 2 ¶¶ 262 – 264).

1178. In response to cases cited by Claimants, Respondent states as follows:

*914.    In Benvenuti & Bonfant v. Congo the Tribunal held that the investor had been expropriated because the army had seized the premises of a bottling factory. The only relevance of the fact that the manager had fled the country due to the risk of criminal proceedings was that this was one of the arguments to refute Congo's allegation that the investor could return anytime to take repossession of his property.*

*915.    Likewise, the facts in Biwater Gauff (Tanzania) Ltd. v. Tanzania bear no resemblance to the case at hand. In this case, the investor's senior management was forcibly deported from Tanzania while simultaneously the premises of the investor were seized. This does not compare to the lawful prosecution and conviction of Mr. Cornegruta. (R-II ¶¶ 914 – 915).*

1179. In response to Claimants' allegation that they were deprived of the ability to prove reserves, Respondent states as follows:

*916.    The cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 did not deprive Claimants of the ability to prove reserves.*

*917.    The Republic has demonstrated that no such harassment campaign existed. The non-extension of Contract 302 cannot constitute an indirect expropriation. It is telling that Claimants' consider the non-extension to be both a direct and an indirect expropriation when in fact it does not constitute a taking at all. Contract 302 expired on 30 March 2009. Vain hope to prolong a contract cannot constitute a taking and as demonstrated above, Claimants did not obtain a right to prolong the contract. (R-II ¶¶ 916 – 917).*

1180. The 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. In any event, TNG's successful application for a renewal of its license would have been a pre-requisite to such an extension. The subsoil use contract and the license for subsoil use are different documents with different natures. The fact that the MEMR is both the Competent Authority and the Licensing Authority did not abolish the need to amend existing licenses, nor did it change the procedure for such amendments. Mr. Suleymenov's last minute expert submission provides no support for Claimants' unfounded allegation that the MEMR agreed to extend Contract 302 and to execute an extension. As explained



by Prof. Ilyassova, the decision of the Expert Commission to recommend extension is part of the Competent Authority's internal process and cannot be equated with a decision to actually extend, nor can the letter of 9 April 2009, since it was not ordered by the Minister. (RPHB 2 ¶¶ 292 – 305).

1181. In addition, Claimants would not have been able to prove reserves, as they allege. Even if the Contract 302 had been extended, TNG would have been bound by the working program of 14 October 2008 and the draft addendum of 30 April 2009, which only contained exploratory work on Munaibay and Bahyt. Neither contained a reference to the Interoil Reef. Claimants' allegation that TNG would not have been bound by these working programmes is contrary to the testimony of their own witnesses and their opening statement. These were not "*minimum*" working programs, but were working programs. Addendum 5 to contract 302, Art. 3.3 does not contain the word "*minimum*" – the relevant Law on Oil and the Subsoil Law in force from October 2008 to March 2011 and the terms of Contract 302 would have required changes to the work programme if the subsoil user intended to go beyond the agreed working program. (RPHB 2 ¶¶ 319 – 328).

1182. The non-extension of Contract 302 made no interference with Claimants' ability to use and dispose of their investments. The subsoil belongs to the State and, as of 30 March 2009, Claimants lost all right to that area because they failed to declare a commercial discovery. (RPHB 2 ¶¶ 329 – 330).

1183. The tribunal in *LG&E* respected the State's power to adopt measures having social or general welfare purposes. That tribunal stated that, such a measure must be accepted without the imposition of liability, except where such a measure was obviously disproportionate. The tribunal in *Tecmed* considered the issue of proportionality:

*[T]he Arbitral Tribunal will consider, in order to determine if they are to be characterized as expropriatory, **whether such actions or measures are proportional** to the public interest presumably protected thereby and to the protection legally granted to investments, taking into account that the significance of such impact has a key role upon deciding the proportionality. Although the analysis starts at the **due deference** owing to the State when defining the issues that affect its public policy or the interests of society as a whole, as well as the actions that will be implemented to protect such values, such situation does not prevent the Arbitral Tribunal, without thereby questioning such due deference, from examining the actions of the State in light of [the expropriation provision of the BIT] to determine whether such measures are reasonable with respect to their goals, the deprivation of economic rights and the legitimate expectations of who suffered such deprivation. **There must be a reasonable relationship of proportionality between the charge or weight imposed to the foreign investor and the aim sought to be realized by any expropriatory measure. (R-I ¶¶ 35.7 – 35.8, partially quoted, emphasis maintained).***

1184. Respondent reminds the Tribunal that KPM and TNG repeatedly broke Kazakh law by making incorrect tax assessments and operating a trunk pipeline without a license. The audit requests were reasonable given the strong suspicions of wrongdoing. Respondent states that it was Claimants' own fault that the authorities started investigations. (R-I ¶ 35.14).



### d. Direct Expropriation

#### i. Transfer of Title

1185. A direct expropriation requires a transfer of title. Here, Claimants have conceded that no transfer of title took place. Since there was no transfer of title, no direct expropriation occurred. (R-I ¶¶ 34.2 – 34.3; R-II ¶¶ 879 – 881, 888 – 890).

1186. Respondent at no point in time expropriated Claimants' assets. Given the numerous violations of the Subsoil Use Contracts, Respondent had no choice but to terminate the contracts and to transfer the contractual territory of KPM and TNG into trust management. Proceeds from the operation of the fields are held in an escrow account. (RPHB 2 ¶¶ 415 – 417).

1187. Respondent explains how the transfer of KPM and TNG to state custody did not constitute a transfer of title and, therefore, was not an expropriation:

> *34.5*    *[…] Upon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist. Under Article 72(10) of the Subsoil Law (Exhibit R-152) and due to the circumstances set out in detail above, the assets then had to be transferred to KMG so that they would be taken into trust management.*

> *34.6*    *As explained above, and unlike in certain common law national jurisdictions, this does not entail any transfer of the title of the assets, although, under the provisions of the law, the trust manager is entitled to possess and use the facilities and equipment. This arrangement is set up so as to enable continuing production.*

> *34.7*    *Therefore, there is no transfer of title envisaged under article 72(10) of the Subsoil Law. Moreover, the subsoil user has the opportunity to have its contract reinstate. Where this is not possible or desired, the contract can be transferred to a new subsoil user with the assets. At this point, the payment of the subsoil users' costs and its property must be provided for in the new agreement.*

> *34.8*    *This does not amount to an expropriation. Rather, an inherent limitation in the rights held by KPM and TNG came to bear. Moreover, there are opportunities for compensation within provided for within the mechanism. (R-I ¶¶ 34.5 – 34.8).*

1188. Respondent presents that Claimants have mis-cited *Telnor v. Hungary*, which considered not a direct expropriation, but a creeping expropriation. Likewise, Claimants' citation of *Metalclad* is also misleading, as that tribunal did not differentiate between direct and indirect expropriation. Instead, the tribunal in *Metalclad* enumerated several actions that could amount to an expropriation – direct and indirect. It, therefore, cannot be relied upon to identify the requirements for a direct expropriation.

1189. Respondent argues that *Tecmed* concerns indirect *de facto* expropriation and accuses Claimants of inserting the quote "*direct expropriation*" in brackets



throughout their quotation of that text, and states that they, instead, should have inserted the phrase "*indirect expropriation*" to correctly quote the tribunal in that case. (R-II ¶¶ 882 – 887). Finally, the *Santa Elena* tribunal merely explained the general principles of expropriation and – without differentiating between direct and indirect expropriation – affirmed that in some cases (indirect expropriation cases), expropriation can occur without a formal transfer of title. (R-I ¶ 34.4).

1190. With respect to the LPG Plant, it is even more obvious that there was no expropriation since TNG still owns the plant and the plant was not transferred into trust management. (RPHB 2 ¶ 418).

## ii. Exercise of Regulatory Power

1191. International law recognizes that, even in cases involving a transfer of title, there is not always an "*expropriation.*" States, in an exercise of their sovereignty, can take measures without being obliged to compensate investors, as explained by the *S.D. Myers* tribunal. Expropriatory acts must be differentiated from valid governmental activity. Here, the termination of the Subsoil Use Contracts, the non-extension of Contract 302, and the transfer to trust management of KPM's and TNG's assets were dictated by and consistent with Kazakh law and, thus, were a legitimate exertion of the Republic's regulatory power. (R-I ¶¶ 34.10 – 34.13; R-II ¶¶ 891 – 892). The assets have been protected and the monies held in escrow, where they will remain until a new subsoil user is found. (RPHB 2 ¶ 373).

1192. First, the non-extension of Contract 302 cannot constitute an expropriation, as it did not take anything from the investor. Second, the termination of the Subsoil Use Contracts cannot be a direct expropriation, as it was mandated by Kazakh law. The same is true for the transfer of the contractual territory into trust management – an action that was a legal consequence of KPM's and TNG's misconduct. (R-II ¶¶ 893 – 895; RPHB 2 ¶¶ 329 – 330).

1193. Claimants explain that an action that is legal under local law cannot constitute a treaty breach unless that law itself breaches the treaty. Claimants have not argued otherwise and, thus, concede that the relevant Kazakh laws are in accordance with international law. This is true, despite Claimants' arguments that the Republic cannot rely on domestic law to legalize the taking because the Republic must still provide compensation. As explained, neither the Republic nor any other state entity ever owned the contractual territories. Any compensation will be in the contract entered into with the new subsoil user that would compensate KPM and TNG. (R-II ¶¶ 896 – 897).

1194. Finally, Respondent states that any claim for expropriation must fail, because Claimants' own actions and external events were relevant in the demise of the companies. (R-II ¶ 898).

1195. Claimants were in continuing and serious breach of Contracts 210 and 305 as a result of their operation of a trunk pipeline without a license, their breaches of tax laws, their failure to comply with KPM's and TNG's minimum working programs, among others. Claimants have not disputed that KPM and TNG were in violation of labor laws in early 2010. In addition, Claimants' treatment of the fields can accurately be described as "*barbaric.*" The actual work promised under the



working programs – like the drilling of wells - was not carried out, despite alleged financial investment in KPM and TNG (investment which, nevertheless, was insufficient from 2007 – 2009). Claimants' arguments that KPM and TNG were given "*a clean bill of health*" are without merit. Minister Mynbayev's testimony expressly confirmed that prior to the June 2010 inspections, Claimants were in breach. He also stated that, by July 2010, the situation was no longer tolerable. (RPHB 2 ¶¶ 339 – 349).

1196. The Republic, due to the breaches of environmental law, reports of Claimants' failure to pay salaries and reports of mass employee dismissals, and the poor conditions in the field, was obliged if not entitled to carry out inspections of KPM and TNG in June and July 2010. These inspections revealed additional serious violations of Contracts 210 and 305 by KPM and TNG. (RPHB 2 ¶¶ 350 – 352).

1197. The severity of the breaches of Contracts 210 and 305 left the Republic with no option but to act and serve notices of breach. Although they had previously been given opportunities to cure, their responses to the 14 July 2010 notice for breach on 19 July 2010 was inadequate and focused only on procedural reasons to challenge termination. For example, Claimants claimed "*force majeur*" for their failure to make payments related to KPM and TNG's historical costs, KPM's contributions to the Kazakh liquidation fund, and KPM's tax obligations due to the fact that KPM's accounts were frozen as a result of the execution of the recovery order for the operation of a pipeline without a license. The execution orders were not *force majeur* and, allegedly, they did not (as Claimants state) prevent Claimants from paying employees. Importantly – Squire Sanders also raised the issue of payment of historical costs by KPM and TNG, as well as other failures to meet obligations regarding the acquisition of goods, works, and services, in its June 2009 report. (RPHB 2 ¶¶ 353 – 358).

1198. In addition, Claimants neglected and mistreated the investment, having effectively abandoned it. There were reports of salaries not being paid, complaints about KPM and TNG's treatment of the fields, and reports that production had stopped. Claimants provide not support for their argument that these were "*post hoc*" justification for termination. There were quite clearly social problems and issues that were being experienced in June and July 2010, due to KPM and TNG's failure to pay wages. Claimants have misquoted Mr. Ongarbaev that there was no risk of unemployment, since employees would just be re-hired under trust management. Claimants quote GCA for support of the statement that the fields were in good condition, but this is inaccurate – GCA only referred to the facilities being "*adequate for the region*." (RPHB 2 ¶¶ 359 – 366).

1199. The Republic terminated Contracts 210 and 305 in accordance with the law. The Republic fully complied with Section 38 of the Law of Private Business when conducting inspections and Claimants always had the right to appeal the inspections reports. They failed to appeal within the permitted three days. Claimants' attempts to contest the very different Notices of Breach served under Subsoil Law 2010 cannot be said to be an appeal of the Acts of Inspection pursuant to the Law of Private Business. In any event, contrary to Claimants' position, a breach of the Law of Private Business would not result in a breach of Art. 72 of the Subsoil Law 2010, pursuant to which the Contracts were terminated. The two laws are different and there were grounds for termination arising from the monitoring of



KPM and TNG as well as for the inspections in June and July 2010. (RPHB 2 ¶¶ 367 – 368).

1200. Claimants' arguments, based on Mr. Suleymenov's testimony that there was a conspiracy behind the timing of the termination and the date the Subsoil Law 2010 was passed have not been proven. The law was heavily debated and took almost two years to pass. Mr. Suleymenov's opinion is irrelevant in this arbitration. (RPHB 2 ¶ 369).

1201. Claimants were given enough time to respond to the Notices of Breach and were aware of the many breaches set out therein. They participated in the July 2010 audit and were regularly involved in findings. The limited period for response was also justified by the breaches of monetary obligations and the requirement to provide information. Since production had nearly stopped, there was little chance of employees being paid, as senior managers left the country. Delay was not an option for the Republic. Claimants, however, made no attempt to seek an extension to the deadline and responded – insufficiently – within the period. (RPHB 2 ¶¶ 371 – 372).

### 3. The Tribunal

1202. It is the Tribunal's task to decide on the relief sought by Claimants, as recorded above in a separate chapter of this Award:

- *A declaration that Kazakhstan has violated the ECT and international law with respect to Claimants' investments;*

- *Compensation to Claimants for all damages they have suffered, as set forth in Claimants' Statement of Claim and Reply on Quantum and as further updated at the January 2013 Hearing and in Claimants' First Post-Hearing Brief, corresponding to the following amounts:*

1203. Regarding the first relief sought and repeated above, a declaration that Respondent has violated the ECT is possible already after a breach of the FET obligation has been found by the Tribunal.

1204. Regarding the second relief sought repeated above, if such damages are granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1205. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 13 by expropriation, if there are any further damages sought by Claimants not covered by the FET breach.

1206. As will be seen later in the chapters of this Award on Causation and Quantum, the FET breach has caused a taking of Claimants' investment, resulting in respective damages.



1207. In view of this, there is no need to examine whether the same results also from a breach of Art. 13 ECT.

1208. However, as will be seen and addressed in the chapter of this Award on Quantum, Art. 13 ECT provides some guidance regarding the calculation of damages.

## J.III. Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT)

### 1. Arguments by Claimants

1209. Article 10(12) ECT obliges each Contracting Party to "*ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.*" This obligation is distinct from customary international law, and is distinct but similar to the concept of denial of justice. Article 10(12) ECT was designed "*to prevent the travesties of justice that occurred in this case, by ensuring that an investor has an effective means to enforce its legal rights. Claimants had no ability to enforce their legal rights, and Kazakhstan is indisputably liable under the ECT for denying them the ability to do so.*" (C-I ¶¶ 373 – 374, 379, partially quoted).

1210. The Tribunal in the *Chevron v. Ecuador* case stated that "*a failure of domestic courts to enforce rights 'effectively' will constitute a violation*" of the guarantee to provide effective means to assert claims and enforce rights. (C-I ¶¶ 373 – 374; C-II ¶ 548, partially quoted)

1211. The tribunal in *Chevron* also interpreted the "*effective means*" obligation as allowing the tribunal to examine the state's conduct, in addition to the system of laws and institutions in place. Claimants state that, in this way, the Tribunal is obliged to reassess the criminal case against Mr. Cornegruta. (C-I ¶¶ 375 – 376). Claimants explain as follows:

> 377. *In the present case, the Tribunal need not assess the criminal case against Mr. Cornegruta and KPM de novo to determine that the Kazakh court issued decisions against Claimants that a "fair and impartial" Kazakh judge would never have reached. A fair and impartial judge would not have convicted KPM, which was not even named as a party in the criminal proceeding and could not have been, since criminal charges may not be brought against a company under Kazakh law. It would not have convicted KPM and Mr. Cornegruta when KPM had never operated a "main" pipeline, as acknowledged by the State itself in MEMR reports, and when Mr. Cornegruta was not an "entrepreneur" under Kazakh law but merely an employee of KPM. Additionally, a fair and impartial judge would have considered all the evidence before it. The Kazakh judge disregarded multiple expert reports from Claimants and based his decision solely on an unfounded and conclusory opinion from a Ministry of Justice employee.*

> 378. *Further, a fair and impartial judge would have given KPM the opportunity to defend itself. It would not have confirmed the convictions on appeal and*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*effectively prevented KPM from exercising its right to appeal. (C-I ¶¶ 377 - 378).*

551.    *Finally, Kazakhstan's assertion that "it was legally correct and not to KPM's disadvantage that it was not a party to the [criminal] proceedings" is breathtaking. Claimants do not deny that "a measure of deference" is to be "afforded to the domestic justice system." However, Kazakhstan has far exceeded whatever "measure of deference" may exist under international law, as evidenced, inter alia, by its attempts to justify the findings of its courts ex post facto in the present arbitration. [...].* (C-II ¶ 551).

1212. Kazakhstan's misconduct makes it liable to Claimants under the ECT and international law as Respondent has violated nearly every protection afforded foreign investors under the ECT and international law. (C-I ¶¶ 380 – 383).

1213. Claimants state that Respondent is mistaken in its contention that Claimants cannot invoke Art. 10(12) ECT with regard to the Subsoil Use Contracts because they largely did not turn to courts or contractually agreed arbitral tribunals. First, a foreign investor faced with a plethora of wrongful measures by a host state has the right to choose the forum with the more comprehensive jurisdiction. Using the umbrella clause, international arbitration under the ECT is the appropriate choice since it covers both disputes relating to investments and contractual claims. Moreover, the forum selection clauses in the Subsoil Use Contracts refer to the Arbitration Institute of the SCC. Second, Claimants have made a *bona fide* attempt to resolve their dispute before Kazakh courts, and this has been acknowledged by Respondent. As to appeals, Claimants were either denied the possibility of appeal or were precluded from pursuing their pending law suits, at the latest by the July 2010 seizure of their investments. Thus, Claimants utilized the means made available to them. (C-II ¶¶ 548 – 550).

1214. At the Hearing on Liability, Mr. Condorachi explained Claimants' attempts to complain about the investigation, prosecution, and conviction of Mr. Cornegruta and KPM. Respondent's witnesses also confirmed that there were at least 8 complaints from KPM and TNG, and one more from Terra Raf and Ascom. Respondent's argument that KPM could have appealed, but failed to, is disingenuous since KPM was not a party and, therefore, could not appeal and, second, the Aktau City Court refused to provide KPM a certified copy of the judgment to enable them to appeal. The evidence even shows that KPM challenged the court's refusal to send KPM this copy. (CPHB 1 ¶¶ 205 – 210). Kazakhstan's conduct in relation to the trial and the appeal violate its obligations under the ECT to provide effective means to assert claims and enforce rights. (CPHB 2 ¶¶ 97 – 114).

1215. During the hearing, the judge refused to entertain Mr. Cornegruta's defense counsel's motion for a postponement in order to examine Mr. Baymaganbetov's evidence. The trial transcripts also establish that the Financial Police were involved in the prosecution and influenced the trial process. (CPHB 1 ¶¶ 201 – 204).

## 2.    Arguments by Respondent



1216. The text of Art. 10(12) ECT unambiguously establishes a legislative obligation to provide a fair and efficient system of justice, and does not encompass isolated failures of the judicial system in individual cases. (R-II ¶¶ 1108 – 1114, partially quoted).

1217. The availability of remedies hinders any claim if these remedies have not been pursued. Claimants, therefore, cannot bring a claim under Art. 10(12) ECT because they have failed to pursue remedies or exhaust appeals. As confirmed by other investment tribunals, the duty to exhaust remedies needs to be interpreted more strictly because of its specific meaning, which creates a legislative obligation to provide a fair and efficient system of justice. A high likelihood of success of these remedies is not required in order to expect a claimant to attempt them. (R-I ¶¶ 43.2 – 43.4, R-II ¶¶ 1125 – 1129, partially quoted; RPHB 2).

1218. Claimants conceded that they have not exhausted all remedies or appeals made available to them by Kazakh law. They have offered no evidence that pursuing such would have been ineffective or futile. With respect to their contract claims, they have not explained why they did not resort to the international arbitration proceedings as required in the Subsoil Use Contracts and in Contract 302. Contrary to their allegation, they did not have the right to choose the forum with the more comprehensive jurisdiction. The contract between the investor and the host state is the *lex specialis*, compared with the treaty between the two host states. Foreign investors must comply with exclusive forum selection clauses before they may rely on investment treaty guarantees. (R-I ¶¶ 40.1 – 40.4; R-II ¶¶ 1130 – 1134; RPHB 2 ¶ 374).

1219. Claimants did not appeal the Acts of Inspection of 15 July within the 3 days allowed as they could have under the Law of Private Business 2009. They, thus, have no basis to allege that they were denied the right to appeal the inspection reports. Claimants' contesting of the Notices of Breach served under the Subsoil Law 2010 are not appeals of the very different Acts of Inspection. In any event, Claimants were given enough time to respond to the Notices of Breach, and in any event, such allegations had been raised before. Claimants made no attempt to see an extension of either deadline. (RPHB 2 ¶¶ 368 – 372).

1220. Turning to Claimants' *Chevron* arguments, Respondent states that Claimants base their contention that *Chevron* is even applicable in this case on the allegation that case involved a similarly worded provision. Respondent compares these texts as follows (R-II ¶¶ 1110 – 1112, partially quoted, emphasis maintained):

> *1111. The relevant provision in the BIT between the USA and Ecuador, Article II(7), reads:*
>
> > *Each Party **shall provide effective means** of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations. (emphasis added)*
>
> *1112. In contrast, Article 10(12) of the ECT stipulates explicitly:*
>
> > *Each Contracting Party **shall ensure that its domestic law provides effective means** for the assertion of claims and the enforcement of rights*



> *with respect to Investments, investment agreements, and investment authorizations.*

1221. That these provisions involve different requirements was confirmed by the *Amto v. Ukraine* tribunal, which clarified that the prerequisites of Art. 10(12) ECT are fulfilled if the foreign investor contends and proves legislative failures by the host state to provide a fair and efficient system of justice. (R-II ¶ 1115). This meaning of Art. 10(12) ECT is in accordance with the decision of the *Chevron* tribunal. Further still, even where tribunals have applied *Chevron* and considered Article II(7) of the BIT between the USA and Ecuador, tribunals have paid special attention to the legislative failures of a host state to provide a fair and efficient system of justice. (R-II ¶¶ 1116 – 1118).

1222. Claimants have neither contended nor proven that there was a legislative failure to provide a fair and efficient justice system, which is Claimants' responsibility under the *onus probandi* rule. With respect to the prerequisites carved out by the tribunal in *Amto v. Ukraine*, Claimants are required to contend and prove in particular that there was no legislation for the recognition and enforcement of property and contractual rights or that this legislation was not made in accordance with the constitution or was not publicly available or that there were no secondary rules of procedure so that the principles and objectives of the legislation could not be translated by Claimants into effective action in the domestic tribunals. (R-II ¶ 1119).

1223. Indeed, even if Art. 10(12) ECT extended to individual failures of the judicial system, Claimants would be required to prove procedural irregularity and interference, which they have not. With respect to the criminal proceedings against Mr. Cornegruta on behalf of KPM, Claimants' objection is that the proceedings were wrong in law. The Tribunal, however, is not a court of appeal for decisions of Kazakh courts. (R-II ¶¶ 1119 – 1123, 1135).

> *1135. A tribunal's review of the host State's legislation is limited. This follows a fortiori from the fact, that even in cases which do not involve Article 10(12) of the ECT tribunals have concluded that their review of the decisions by local courts is limited. In Chevron v. Ecuador, for example, the tribunal stated that a measure of deference needs to be afforded to the domestic justice system and that the tribunal was not empowered to act as a court of appeal reviewing every alleged failure of the local judicial system de novo. (R-II ¶ 1135).*

1224. Claimants' argument that the *Chevron* decision allows the Tribunal to step into the shoes of the domestic courts and decide the merits of the case as would a fair and impartial judge relies on a statement that has been taken out of context. The *Chevron* tribunal did not assume the position of a host state judge in finding whether the assertion of claims clause had been breached. This Tribunal is not an appellate court. (R-I ¶¶ 40.6 – 40.7, 43.6 – 43.7).

1225. A tribunal's finding of a violation of 10(12) ECT is rare. The only published case in that respect is *Petrobart v. The Kyrgyz Republic*, which in any event is not convincing, since the Tribunal provided no reasons for its disregard of the express reference to domestic law in Art. 10(12) ECT. That case also involved a high degree of interference, which has not been alleged here. Cases where violations of



similar provisions have been found related to undue delays. In *Chevron*, there was an "*undue delay of judicial proceedings*" because Chevron's cases had been pending for 13 – 15 years. In *White Industries v. India*, a delay in jurisdictional proceedings of nine years and the Supreme Court's inability to hear a jurisdictional appeal for over five years amounted to undue delay. (R-II ¶¶ 1136 – 1141).

1226. Here, Claimants have neither contended nor proven that the criminal proceedings against Mr. Cornegruta on behalf of KPM suffered from undue delay. None of Claimants' allegations about the trial in any way being unfair or impartial is true – and the fact that the decision came out against Claimants does not automatically mean that they were unfair. While Respondent admits that certain evidence was excluded from trial, this was due to a number of reasons including the lack of attendance of witnesses at trial and non-compliance with procedures for appointing witnesses. None of the expert reports complied with Art. 243 CPC, which requires that experts be drawn from a limited pool of expertise. Claimants provided no evidence of KPM and TNG's requests for these opinions, making it impossible to divine the scope of their requests, and there was no guarantee that any of the bodies issuing opinions – some of which were involved in the design and construction of the pipelines – were independent from Claimants. (R-I ¶ 28; R-II ¶¶ 1140 – 1144; RPHB 2 ¶¶ 203 – 207).

1227. At the Hearing on Jurisdiction and Liability, Prof. Olcott demonstrated that the principles of justice in the Kazakh legal system are in place and are complied with sufficiently to prevent violations of due process. Prof. Olcott – who demonstrated her credibility by also criticizing some aspects of the Kazakh legal system – explained the training that judges receive as well as the transparency of decisions. That the Kazakh legal system complies with the legal principle of due process is also confirmed by the Global Integrity 2008 report. Although Claimants allege that the Kazakh judiciary does not meet Western standards, the Republic has the elementary principles of justice in place to prevent violations of due process. (RPHB 1 ¶ 486 – 495).

1228. Also at that Hearing, Claimants made the flawed contention that the trial against Mr. Cornegruta amounted to a denial of justice. While Respondent concedes that it is acknowledged that the FET standard includes the obligation not to deny justice in criminal proceedings, such a claim "*requires a manifest and gross failure to comply with the elementary principles of justice" that "offend[s] a sense of judicial propriety.*" Tribunals such as *Loewen v. U.S.* and *Thunderbird v. Mexico* confirm that his is a very high threshold, in absolute and in relative terms. For criminal proceedings, as elaborated in *Tokios Tokelés v Ukraine, "the sense of judicial propriety must be shocked by a manifest and gross failure to comply with elementary principles of justice.*" While this stands in stark contrast to the sophisticated legal framework in the Western world, this minimum standard has not been breached in the present case. With respect to the witnesses that "*were struck off*", Art. 311 CPC requires a witness to attend trial and to be examined in order that their evidence is accepted. None of the reports submitted complied with Kazakh law. Regarding the complaint that the criminal fine was assessed against KPM, this is consistent with Kazakh law and general principles of procedural fairness. KPM was always represented during the trial and had every opportunity to appeal. Regarding Claimants' allegation that the amount recovered was disproportionate to KPM's profits, this is not relevant in the denial of justice



analysis, which requires a manifest and gross violation of the elementary principles of justice. Finally, with respect to Claimants' contradictory complaint about the enforcement of the criminal fine, enforcement is a characteristic feature of the elementary principles of justice, not a failure to comply with those principles. (RPHB 1 ¶¶ 256 – 260; 496 – 520).

1229. Claimants could have appealed the 18 September 2009 decision against Mr. Cornegruta to the Supreme Court in Kazakhstan, but chose not to. KPM did not challenge the decision to not provide a copy of the hearing transcript or decision to KPM and its failure to appeal the decision – a decision that it always had access to – is not the fault of Respondent. (RPHB 2 ¶¶ 265 – 271).

### .3. The Tribunal

1230. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1231. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 10(12) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1232. Claimants' allegation of a breach of Art. 10(12) leads to no further relief sought than that resulting from the FET breach.

### J.IV.     Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1))

#### 1.     Arguments by Claimants

1233. The ECT offers a more robust level of protection than most BITs and Claimants' investment is entitled to such protection:

> *318.     Article 10(1) of the ECT provides that investments "shall enjoy the most constant protection and security."     This provision is similar to – but notably stronger than - the more commonly-used language in investment treaties that obligates host States to provide "full protection and security" to investments.  [...].  (C-I ¶ 318).*

1234. Earlier cases, like *AAPL v. Sri Lanka*, stated that the only "*due diligence*" required to be undertaken by the host state in order to provide "*most constant protection and security*" was to have reasonable measures of prevention in place.  This was confirmed in *AMT v. Zaire*, which added that the host state, Zaire, also needed to comply with its own national laws.  These cases have since been expanded upon, such as in the case *CME v. Czech Republic*, which expanded the definition so as to include full protection of licensing rights, among others.  (C-I ¶¶ 320 – 325).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1235. Claimants state that, while the "*most constant protection and security*" standard was at one time invoked for failure to provide physical protection to an investment, the standard today clearly encompasses legal security. This has been demonstrated by consideration of the standard by several investment treaty tribunals, including *Biwarter Gauff v. Tanzania*, *Siemens v. Argentina*, *Vivendi II*, and *National Grid v. Argentina*. These tribunals found that the standard was wider than mere physical protection – especially in cases involving intangible assets. (C-I ¶¶ 319, 326 - 328; C-II ¶¶ 482 - 484).

1236. In addition to failing to provide legal security, Respondent failed to provide physical security, as demonstrated by "*Kazakhstan's callous arrest of Mr. Cornegruta, its attempts to arrest the other senior in-country managers of KPM and TNG, and its harassment of company staff during its investigations[,] [which] clearly undermined the physical security of Claimants' investments and rendered them an unsafe place to work. Kazakhstan's outright physical seizure of KPM and TNG in July 2010 amounts to a breach of its duty to provide both physical and legal protection and security.*" (C-II ¶ 485).

1237. Respondent cites no authority for its proposition that including "*legal security*" in "*most constant protection and security*" would make the standard identical to FET. Other tribunals have recognized the obligations to be separate. In any event, the fact that two protections rely on the same facts does not obviate the need for the Tribunal to consider each protection. (C-II ¶ 486).

1238. Claimants contend that Respondent has conflated the "*most constant protection and security*" standard with the obligation to provide effective means to assert claims and enforce rights under Art. 10(12) ECT. In making this argument, Respondent overlooks that it was the instigator and perpetrator of the violations. (C-II ¶ 488).

> *489.   Kazakhstan cites three cases to support its argument that the obligation to ensure the most constant protection and security is one of mere diligence or vigilance of the host State. However, the issue arose in those three cases because the respective tribunals needed to determine whether the acts in question were attributable to the host state and whether the state could have protected claimants. In the present case, Kazakhstan does not — and cannot — dispute that the misconduct complained of was perpetrated by Kazakhstan. There is no issue of state attribution in this case. As the Tribunal in Wena v. Egypt concluded, where the host State is itself the instigator or a participant in the violations, there is "no question" that the obligation was breached. As it is Kazakhstan itself that instigated and carried out the breach of the ECT's most constant protection and security standard, it is not relevant that the standard might also import a due diligence standard in respect of the conduct of others. (C-II ¶ 489).*

1239. Claimants provide examples of Respondent's deliberate conduct and argue that Respondent's failures to respond to Claimants' requests for assistance make these violations even more severe. (C-I ¶¶ 332 – 333):

- *On January 19, 2009, Claimants filed complaints with the Western Regional Transport Prosecutor, the General Prosecutor's Office, the*



*Ministry of Justice, and the MEMR against the Financial Police in respect to its illegal actions and to obtain the dismissal of the criminal case against KPM. The only answer Claimants received was a notice from the Financial Police that their complaints were dismissed and that a criminal case also being initiated against TNG.*

· *On March 18, 2009, Claimants submitted a new complaint with the General Prosecutor's Office regarding the illegal initiation of criminal cases against KPM and TNG. Claimants never received an answer to this complaint.*

· *In the period from October 2008-March 2009, Claimants wrote to the MEMR to obtain the extension of the exploration period for Contract No. 302 prior to its expiration on March 30, 2009. The extension was never granted, in violation of the Government's commitments.*

· *As per the request of the MEMR, on April 30, 2009, Claimants submitted addendum No. 9 to Contract No. 302 for the extension of the exploration period for execution by the MEMR. Claimants never received an answer to this request for an extension.*

· *On March 24 and 25, 2009, Claimants requested that Kazakhstan confirm that Terra Raf was the legitimate owner of TNG and confirm its prior waiver of its pre-emptive rights. Claimants never received an answer to this request.*

· *On April 26-27, 2009, Claimants filed complaints with the Regional Prosecutor's Office and the Western Regional Transport Prosecutor regarding the arrest of Mr. Cornegruta. Claimants never received an answer to their complaints.*

· *On May 7, 2009, Claimants appealed directly to President Nazarbayev to obtain the release of Mr. Cornegruta, protect the former and current management of KPM and TNG, and end the dispute. President Nazarbayev ignored the request and never responded.*

· *After Mr. Cornegruta was sentenced to four years in prison, his wife and Claimants obtained an undertaking from Moldova to request the transfer of Mr. Cornegruta to serve his sentence in his home country, closer to his family. However, the Kazakh Prosecutor General, at the request of the Financial Police, always requested further assurances from Moldova that he would indeed serve his sentence. In the end, Kazakhstan refused to extradite him.*

· *Kazakhstan improperly assessed alleged corporate back taxes and penalties against KPM and TNG in the amount of approximately USD 62 million. While KPM's and TNG's court challenges to those assessments were pending, Kazakhstan issued a bankruptcy notice on February 3, 2010.*



- *On July 16, 2010, despite being only given three days to respond to the accusations of alleged violations of the Subsoil Use Contracts, KPM and TNG provided detailed explanations refuting the State's accusations. Claimants' timely responses were ignored, and Kazakhstan unilaterally repudiated the Subsoil Use Contracts. (C-I ¶ 332).*

1240. Kazakhstan failed to respond to Claimants' complaints, despite having the ability to do so, as it did upon receiving a hand-written complaint from four unknown residents of the Mangystau Region in July 2010. This conduct violates the most constant protection and security standard, as elaborated in *Siag v. Egypt* and *Wena Hotels v. Egypt*. (CPHB 2 ¶¶ 140 – 148).

1241. Kazakhstan's abrupt reversal of its 2007 commitment that it consented to the Gheso – Terra Raf transfer of TNG obliterated "*the agreed and approved security and protection*" of Terra Raf's ownership of TNG. This was in violation of Kazakhstan's duties to provide "*the most constant protection and security*" to Claimants' investments. In addition, Claimants have endeavored to have the MEMR withdraw its notices for breach of Contracts 210 and 302 for failure to honor the State's pre-emptive right, but Respondent took no action, effectively hanging an indefinite cloud over Claimants' reputation and title to TNG. (CPHB 2 ¶¶ 115 – 126).

1242. With regard to Kazakhstan's contention that "*Claimants have not attempted to show that Kazakhstan has failed to provide reasonable mechanisms of protection and that the facts put forward by Claimants are 'completely disconnected from Claimants' own legal understanding of the guarantee*", Claimants state that Respondent's assertion is contradicted by the facts. Claimants explain that "*[this] scheme was orchestrated by the President of Kazakhstan, other senior Government officials, and the Financial Police was carried out by officials, judges, and law enforcement and other agencies who, in violation of their duties and contrary to Kazakh and international law, conducted a campaign of harassment and coercion against Claimants from October 2008 until July 2010.*" Claimants' further arguments that Kazakhstan's conduct violated the most constant protection and security standard of the ECT are best taken from their own words: (C-II ¶ 491 – 492)

  *492.   [...] the pretext for Kazakhstan's conduct was a letter from President Voronin to President Nazarbayev that provided the justification for Kazakhstan's actions. President Nazarbayev seized upon the opportunity and ordered Kazakhstan's State organs to effectively destroy Claimants' investments in Kazakhstan.*

  *493.   In terms of physical security, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. The court decisions that sentenced Mr. Cornegruta to four years in jail and fined KPM in excess of US$ 145 million were entirely unfounded and unlawful because the provisions of Kazakh law relied on by the Kazakh courts did not, and could not, justify the reclassification of KPM's 18-km pipeline as a main pipeline. The ridiculous calculation of KPM's allegedly enormous "profits," and the sentencing of KPM — a non-party to the criminal trial – were further travesties of justice. Kazakhstan relied on the same frivolous legal grounds to initiate criminal*


ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF COMMERCE

> *actions against four other general managers of KPM and TNG and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations. Respondent also conducted searches and raids of KPM's and TNG's offices, all in clear violation of the most constant protection and security standard.*

> *494. Furthermore, the Kazakh courts, the Prosecutor's Office, the Financial Police, and numerous Government officials rejected Claimants' repeated protests, requests for assistance, lawsuits, and appeals filed by Claimants, KPM, TNG, and Mr. Cornegruta. From the President of Kazakhstan to the Financial Police, from the Governor of the Mangystau Region to the MEMR (and its successor, the MOG), Kazakhstan colluded to deprive Claimants of their investments.*

> *495. Those State organs, including the courts, the central Government, and local authorities, acting in blatant violation of Kazakh law and international law, also harassed and coerced Claimants by requesting payment of debilitating taxes and custom duties that were never due, by refusing to extend the exploration period of the Contract 302 Properties, and by reversing the State's prior waiver of its pre-emptive right for the transfer of TNG to Terra Raf. (C-II ¶¶ 492 – 495).*

1243. The intimidation, coercion, and threats by Kazakhstan, described in detail above, violate the standards of full protection and security. Other tribunals, like *Pope & Talbot v. Canada*, which found that the government's threat to refuse to grant future export quotas if the investor failed to cooperate with an audit, have found much less intense and less threatening conduct sufficient to constitute a violation of this standard. (CPHB 2 ¶¶ 49 – 51, 59).

## 2. Arguments by Respondent

1244. Contrary to Claimants' assertion, Article 10(1) ECT extends only to physical security and not to legal security. In addition, the prevailing view of tribunals in investment treaty arbitrations is that the standard encompasses solely physical protection and security. (R-II ¶¶ 957 – 960, 969 – 970).

1245. There are manifold reasons that tribunals have restricted the scope of the duty to provide full protection and security to only physical damage and violence. Some tribunals compare this duty with the customary international law duty relating to aliens to provide full protection and security of foreign nationals. Under customary international law, foreign nationals can expect to be protected from physical damage, but not from legal instability. This is because customary international law of aliens only establishes a minimum standard of protection. There is no reason to expect that "*legal security*" is included in the treaty, absent a statement to that effect. (R-I ¶¶ 36.3, 36.8 – 36.9; R-II ¶¶ 961 – 964).

1246. Respondent also contends that the standards FET and "*full protection and security*" have different substantive meanings. While the FET standard obliges the host state to abstain from a certain course of action, the full protection and security standard obliges the host state to actively create a framework which grants security.



Blurring these distinctions creates legal uncertainty. (R-I ¶ 36.11; R-II ¶¶ 965 – 967). A further argument is best taken from Respondent's words:

*964. Another reason for the need to restrict the scope of the provision of full protection and security to physical damage and violence is the fact that this guarantee must have a meaning beyond, and distinct from, the standard of fair and equitable treatment. Legal protection in terms of an investor's legitimate expectation and its interest in a stable and predictable business environment is already encompassed by the provision on fair and equitable treatment. Claimants' assumption that both provisions can be read as comprising legal protection although they are stipulated separately from each other violates the principle of systematic interpretation, whereby a legal system is self-consistent and therefore no provision can be contrary to another. Furthermore, Claimants' assumption violates the principle of effective interpretation, requiring a purpose and object oriented interpretation, because the separate stipulation of two provisions aims at establishing two distinct guarantees. (R-II ¶ 964).*

1247. *Siemens v. Argentina*, cited by Claimants in support of their contention that the standard of most constant protection and security includes legal security, is inapplicable here. That case concerned the Argentina-Germany BIT which contained the term "*legal security*" in the relevant provision on full protection and security. The ECT does not expressly refer to legal security, and these facts have been ignored by Claimants. As Respondent states, "*by argumentum e contrario, Claimants' conveniently partial quotation of Siemens v. Argentina illustrates once more that the guarantee of most constant protection and security does not encompass legal security unless the investment treaty explicitly states otherwise. Rather, it requires the host state solely to provide protection from physical damage and violence.*" (R-II ¶¶ 971 – 972).

1248. The duty of ensuring most constant protection and security requires a host state to diligently implement reasonable measures of protection, and the Republic has provided such measures. The broad consensus, as reflected in the *Noble v. Romania*, *AAPL v. Sri Lanka*, and *AMT v. Zaire* cases, is that reasonable measures are all that is required. Claimants even acknowledge that these cases confirm this argument. The facts in the present case do not alter the general principle that the duty of full protection and security is restricted by a concept of reasonableness. (R-I ¶¶ 36.4 – 36.5; R-II ¶¶ 973 – 978).

1249. Respondent's response to Claimants' comparison between Art. 10(1) ECT and Art. 10(12) ECT is best taken from its own words:

*981. Whilst Article 10 (12) of the ECT requires the host state to implement reasonable measures of assertion of claims and enforcement of rights, Article 10(1) of the ECT requires the host state to implement reasonable measures of protection and security. In particular, the guarantee under Article 10(12) of the ECT refers to the legislative obligation of a host State to provide a fair and efficient system of justice. This illustrates the systematic coherence of the individual provisions within the ECT, not their conflation. By drawing the comparison between Article 10(1) of the ECT and Article 10(12) of the ECT, Claimants thus reinforce the fact that the*



> *implementation of reasonable measures is sufficient in terms of Article 10(1) of the ECT. (R-II ¶ 981).*

1250. Further still, an obligation to provide "*legal security*" would run contrary to the purpose of the ECT. It would be vague and host states would be unable to determine whether their legal framework was adequate for future tribunals to rule in its favor. Such a standard, as expressed by the *Saluka* tribunal, would dissuade host states from admitting foreign investments, thereby undermining the purpose of the Treaty. (R-I ¶ 36.10).

1251. Claimants have not challenged that the Republic possesses the necessary legal framework to provide protection from physical damage and violence to foreign investors and investments. In order to prevail, however, Claimants must prove the absence of reasonable measures. They have not met this burden. (R-I ¶ 36.12; R-II ¶ 982 – 984). Respondent explains:

> *985. It is undisputed that Claimants and their assets have not been physically harmed and that not a single one of their representatives has been hurt. In particular, Mr. Cornegruta and the other senior in-country managers of KPM and TNG were not injured. As explained above, Mr. Cornegruta received a fair trial and the verdict was upheld upon appeal. The alleged harassment of company staff during the investigations did not result in any physical harm of the employees either. Although Claimants contend that the investigations rendered KPM and TNG an unsafe place to work, they have not offered any proof thereof because, again, not a single employee has been injured during these inspections and investigations. Apart from that, as has been established above, company staff have never been harassed but have rather experienced ordinary concomitants of lawful investigations. (R-II ¶ 985).*

1252. Further, Claimants' assets were not taken by use of force. Claimants' investments have not been taken, but rather have been held in trust management ever since they were abandoned by Claimants. To the extent that Claimants argue that their investments were taken by use of force, however, under the ruling in *SAUR International SA v. Republic of Argentina*, a take-over using police force does not violate the guarantee of full protection and security. (R-I ¶ 36.13; R-II ¶ 986).

1253. Finally, the facts pleaded by Claimants do not relate to the guarantee of most constant protection and security. Claimants have not proven that the alleged losses and injuries would have been prevented but for the alleged insufficiency of reasonable measures. As this has not been addressed by Claimants at all, Claimants have failed to establish a breach of the Art. 10(1) ECT guarantee of full protection and security. (R-I ¶¶ 36.2, 36.12 – 36.15; R-II ¶¶ 988 – 989).

### 3. The Tribunal

1254. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.



1255. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation to provide most constant protection and security to Claimants' investment according to Art. 10(1) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1256. Claimants' allegation of this further breach leads to no further relief than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1257. There is, therefore, no need to examine whether such a further breach has been shown.

### J.V. Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim)

#### 1. Arguments by Claimants

1258. Article 10(1) ECT provides that "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures*" the "*management, maintenance, use, enjoyment or disposal*" of an investment. To prevail in their argument under Article 10(1) ECT, it is sufficient for Claimants that Respondent's actions were either "*unreasonable*" or "*discriminatory*." Claimants present that Respondent's actions were both. (C-I ¶¶ 352 – 353).

1259. Claimants present that, "*over the past several years, the Tribunals in BG Group v. Argentina; Siemens v. Argentina; ADC v. Hungary; Azurix v. Argentina; and Saluka v. Czech Republic have all determined that conduct of a host State violated an impairment clause, thereby breaching the relevant treaty.*" (C-II ¶ 517). While Respondent does not dispute that measures need only to be arbitrary to violate the ECT, Respondent nevertheless considers that this is a high threshold. Respondent's reliance on *ELSI* for the position that it is a high threshold is misguided. The definition of arbitrariness used in *ELSI* has faced criticism, since it does not accord with the ordinary meaning of the term as required by Art. 31(1) VCLT. None of the cases cited by Respondent have eschewed the ordinary meaning of the term or limited the notion of "*arbitrary*" treatment to Kazakhstan's narrow articulation of the standard. (C-II ¶¶ 518 – 520).

1260. The term "*reasonable*" - interpreted according to its ordinary meaning as required by the VCLT - means "*based on or using good judgment and therefore fair and practical.*" In *Saluka v. Czech Republic*, the tribunal stated that "*reasonableness*" requires a state's conduct to bear "*a reasonable relationship to some rational policy.*" Likewise, the tribunal in *CME* found the state's actions to be unreasonable because they were unjustified and improper. (C-I ¶¶ 355 – 357). Likewise, "*unreasonable*" has been found to refer to a wider scope of acts that are intentional, shocking or improper. (C-II ¶ 523). As the *EDF v. Romania* tribunal found, such unreasonable measures could include:



*a.*     *a measure that inflicts damage on the investor without serving any apparent legitimate purpose;*

*b.*     *a measure that is not based on legal standards but on discretion, prejudice or personal preference;*

*c.*     *a measure taken for reasons that are different from those put forward by the decision maker;*

*d.*     *a measure taken in willful disregard of due process and proper procedure. (C-II ¶ 523).*

1261. In this regard, Claimants present seven examples of Respondent's conduct and argue why these were actions that were arbitrary, shocking, and in willful disregard to the due process of law. (C-II ¶ 524; CPHB ¶¶ 60 – 70, 97 - 114).

- *Kazakhstan's "reclassification" of KPM's and TNG's pipelines as "main" pipelines, despite there being no "main" pipeline as acknowledged by numerous State authorities and agencies;*

- *Kazakhstan's arrest, conviction, and incarceration of Mr. Cornegruta, which did not serve any legitimate purpose, were not based on legal standards, and were carried out in willful disregard of due process and proper procedure;*

- *Kazakhstan's criminal verdict against the non-party KPM, freezing of KPM's assets, and barring of KPM from lodging an appeal against its conviction, which inflicted considerable damage on Claimants without serving any legitimate purpose and violated applicable legal standards, due process and proper procedure;*

- *Kazakhstan's retroactive reversal of its approval of the transfer of TNG to Terra Raf and waiver of its pre-emptive rights, which did not serve any legitimate purpose, had no legal basis, and violated due process; [see also CPHB 2 ¶¶ 115 – 126).*

- *Kazakhstan's refusal to extend TNG's exploration period in the Contract 302 Properties, notwithstanding its express approval of the extension (CPHB 2 ¶¶ 149 – 176);*

- *Kazakhstan's imposition of the Crude Oil Export Tax on KPM, which violated exemption and legal stabilization clauses in the Subsoil Use Contract and inflicted damage on Claimants without serving any legitimate purpose; and [see also CPHB 2 ¶¶ 127 – 139]*

- *Kazakhstan's wrongful and unilateral repudiation of KPM's and TNG's Subsoil Use Contracts without any justifiable basis and without providing the companies any opportunity to cure the alleged deficiencies. (C-II ¶ 524).*

1262. Regarding the retro-active reversal, Respondent did not have a pre-emptive right to TNG in 2003 and, in any event, Respondent consented to the transfer in 2007. The



retroactive refusal of consent clouded Claimants' title to TNG and its reputation and prevented Claimants from selling. (CPHB 2 ¶¶ 115 – 126).

1263. The main pipeline charges were, in any event, reverse-engineered fabrications. The Financial Police first alleged that KPM and TNG did not have main pipeline licenses. They then confirmed that they could impose a devastating penalty. Then they sought out an authority to opine that the companies were operating trunk pipelines. At the time, Kazakhstan knew that it could potentially recover 41 billion Tenge (approx. USD 350 million) if the pipelines could be considered "*main*." (CPHB 2 ¶¶ 61 – 68).

1264. A reverse-engineered criminal conviction would meet every definition of an unreasonable measure provided in *EDF v. Romania*. (CPHB 2 ¶ 69). The same is true for every act of indirect expropriation. (CPHB 2 ¶¶ 69 – 70).

1265. The criminal allegation of "*illegal entrepreneurial activity in an especially large amount*" under 190(2)(b) of the Kazakh Criminal Code was malicious and contrived. They contrived the operation of the main pipeline to satisfy the "*illegal entrepreneurial activity*" element of the crime. The second element, "*in an especially large amount*" was manufactured by manipulating instructions to the Tax Committee and calculating the "*illegal profits*" by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. This is contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The proper calculation would have yielded 12,000 – 13,000 in illegal profits. The threshold for such a crime was USD 17,000. (CPHB 2 ¶¶ 80 – 84, 87).

1266. The term "*discrimination*", means "*differential treatment; especially, a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.*" It entails two elements: "*first, the measures directed against a particular party must be for reasons unrelated to the substance of the matter .... Second, discrimination entails like persons being treated in an inequivalent manner.*" (C-I ¶¶ 358 – 359, partially quoted). Claimants present that Respondent agrees with Claimants' and the *Saluka* tribunal's definition of discrimination that "*State conduct is discriminatory, if (i) similar cases are (ii) treated differently (iii) and without reasonable justification.*" (C-II ¶ 525).

1267. Claimants argue that they have met their burden of proof regarding the similarity of cases to establish discriminatory treatment. The extraordinary campaign of harassment and coercion between October 2008 and July 2010, and the outright seizure in July 2010 was discriminatory because these actions singled out KPM and TNG. Respondent's actions were also discriminatory because they singled out Claimants for different treatment from other investors in Kazakhstan's oil and gas industry. Claimants present that no other investor's in-field gathering systems were reclassified as trunk pipelines, and that no other investors were subjected to criminal prosecution based on that charge. Neighboring companies, including KTM, operate similar pipelines as part of their in-field gathering system. Furthermore, "*if Kazakhstan's contention that a contractor's pipeline extending outside the Contract Area is a [trunk] pipeline were correct, hundreds of oil and gas companies in Kazakhstan would operate [trunk] pipelines, but only Claimants' companies have faced that charge.*" All of the information available to the



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Tribunal suggests that the companies are comparable. Accordingly, as the tribunals in *Feldman v. Mexico* and *Nykomb* held, once *prima facie* evidence of *de facto* discrimination had been presented by the claimant, the burden of proof shifts to the respondent to rebut the presumption of discrimination. Respondent has not rebutted this presumption. (C-I ¶ 354 – 362; C-II ¶¶ 525 – 528).

1268. Respondent's violations of the ECT's impairment clause are beyond serious dispute. The *Saluka* tribunal defined "*impairment*" according to its ordinary meaning as required by Art. 31 VCLT as "*any negative impact or effect caused by measures taken by the host state.*" While Respondent disputes that its conduct "*impaired*" Claimants' management, maintenance, use, enjoyment, and disposal of their investments, this is belied by the facts. By the time of Respondent's outright seizure of Claimants' investments in July 2010, Claimants' investments in KPM and TNG had already been impaired for twenty months. The intrusive audits following President Nazarbayev's 14 October 2008 order had just such a negative impact. Likewise, the 18 December 2008 repudiation of the unequivocal approval of the 2003 transfer of TNG to Terra Raf and the accompanying press release that accused Claimants of forgery damaged Claimants' ability to dispose of their assets. In addition, Respondent cannot deny the financial burden that the audits and inspections led by the Kazakh Financial Police had on Claimants. These audits resulted in the improper assessment of USD 62 million of alleged corporate back taxes in February 2009, the imposition of illegal export duties against KPM in December 2008, and an intrusive 13-month audit of KPM and TNG with respect to transfer pricing that began in November 2008. Respondent's refusal to execute the agreed upon extension of TNG's exploration period for Contract 302 prohibited Claimants from establishing the full market value of those properties. Finally, "*Kazakhstan's reclassification of the KPM and TNG gathering systems as [trunk] pipelines, which resulted in criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta, clearly impaired Claimants' ability to manage their investments. Top personnel left the country and the conviction itself was used to ultimately take over the companies. Similarly, Kazakhstan froze KPM's assets in an effort to execute the US$ 145 million judgment against KPM, thereby directly impairing Claimants' management, use, and enjoyment of KPM.*" (C-II ¶¶ 529 – 535; CPHB 1 ¶ 207; CPHB 2 ¶¶ 149 – 176).

1269. The Subsoil Use Law changed on 24 June 2010 and permitted Kazakhstan to terminate contracts when a contractor failed to cure two or more violations. Respondent's failure to offer Claimants an opportunity to cure the alleged contract violations was not in good faith. As explained above, these minor violations did not merit termination of the contracts, making the termination unreasonable. As explained at the hearing, KPM and TNG received notices of alleged infringements on 16 July 2010 and were required to cure by 19 July 2010. This was confirmed in Mr. Pisica's testimony. Even if the claims had been valid – and they were not – it would have been impossible for Claimants to cure within the time given. (CPHB 1 ¶¶ 278 – 293).

## 2. Arguments by Respondent

1270. Respondent explains that is has adhered to its obligations under Article 10(1) ECT at all times. Its measures were neither unreasonable nor discriminatory. The



management, maintenance, use, enjoyment, or disposal of Claimants' investments was not impaired in any way. (R-II ¶ 1009).

1271. Using Art. 31 VCLT, which requires that a treaty term shall be interpreted in accordance with the ordinary meaning of the term, Respondent states that the ordinary meaning of "*unreasonable*" is "*irrational; foolish; unwise; absurd; silly; preposterous; senseless; stupid.*" Respondent submits that the Parties agree that the term "*unreasonable*" is interchangeable with the term "*arbitrary.*" For this reason, the *ESLI* court's definition of the term "*arbitrary*" can be transferred onto the term "*unreasonable*" in the sense of Art. 10(1) ECT. (R-II ¶¶ 1011 – 1013). The *ELSI* court's definition was as follows:

*[B]y itself, and without more, unlawfulness cannot be said to amount to arbitrariness. [...] To identify arbitrariness with mere unlawfulness would be to deprive it of any useful meaning in its own right. [...] Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law. [...] It is a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety. (R-II ¶ 1012).*

1272. While Claimants have noted the similarities between the definition of "*unreasonable*" and "*arbitrary*", they overlook the conclusion that, given the similarities of both definitions, customary international law and the *ELSI* case both establish a high threshold for measures to be considered "*unreasonable.*" (R-II ¶¶ 1013 – 1016). This is confirmed by scholars as well as by anecdotal evidence that, "*while 30 percent of arbitral tribunals find that certain state measures amount to unreasonable or arbitrary conduct over all, only 22 per cent of those applied the ELSI or a similarly high standard [...]. It is because of this high threshold established in the ELSI case that findings of unreasonableness or arbitrariness are rare.*" In three of the cases cited by Claimants, the tribunals did not find that the respective measures of the host state reached the allegedly low threshold of unreasonableness. These cases were *LG&E, National Grid PLC,* and *EDF v. Romania.* (R-II ¶¶ 1016 – 1018).

1273. It is untrue that the *ELSI* standard for arbitrary treatment has been "*the target of much criticism.*" Rather, the overwhelming majority of scholars and tribunals have applauded the reasoning in the *ELSI* case. The tribunal in *Siemens v. Argentina* even adopted it as "*the most authoritative interpretation of international law.*" (1019 – 1021).

1274. Respondent also presents an additional argument that "*unreasonableness*" is a high standard:

*1022. The adoption of a lower threshold would result in classifying all governmental regulations adversely affecting foreign investors as inherently suspect, thereby shifting the burden of proof from the foreign investor to the host state. Forcing host states to demonstrate that their measures were not unreasonable because there were no less restrictive alternatives available would clearly contradict the onus probandi rule. For this reason the ELSI standard is widely deemed to be the most authoritative interpretation of the term "unreasonable". Furthermore, in view of the vagueness of all definitions of "unreasonable", the legal assessment of whether a certain measure is unreasonable or not remains a*


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *subjective process prone to unequal treatment and misjudgement. This forms another reason why a high threshold is justified. (R-II ¶ 1022).*

1275. Respondent summarizes some case law on this point and presents how other tribunals have used the *ELSI* test. In *Genin v. Estonia* the test was further developed and refined, and the tribunal added the requirement "*willful disregard of due process of law.*" The tribunal in *CME v. The Czech Republic* added a subjective element, that "*the host state's intention to deprive the investor of its investment as a pretext of a decision based on law.*" Other tribunals, like *Enron v. Argentina* and *Sempra v. Argentina* considered the elements of arbitrariness, finding that "*regardless of intent, arbitrariness requires that some important measure of impropriety be manifest.*" Finally, the tribunal in *Nobel v. Romania* found that an action would not be unreasonable if the proceedings of the kind in question are provided in all legal systems for much of the same reasons. By *argumentum e contrario*, only a measure which falls short of even such minimum standard will be unreasonable. (R-II ¶¶ 1023 – 1027).

1276. The Republic's measures did not reach the threshold of unreasonableness incorporated by the ordinary meaning of the term, let alone the one stipulated by the ICJ in *ELSI*. Respondent's actions and inactions were lawful and were not irrational or senseless or "*unreasonable.*" The measures were not shocking to sense the judicial propriety in terms of the *ELSI* standard. This is confirmed by the fact that the Republic had no intention of depriving Claimants of their investments (unlike the respondent in the *CME* case), and the measures undertaken are provided for in all legal systems for much of the same reasons, just like Romania's measures in *Noble v. Romania*. (R-II ¶¶ 1028, 1037). Respondent's arguments related to each action alleged by Claimants are best taken from its own words:

> *1029. First, Claimants allege that the Republic's classification of KPM's and TNG's pipelines as trunk pipelines was unreasonable. However, Claimants had operated trunk pipelines without a licence. This was confirmed by the Republic's independent courts, warranting criminal proceedings and the levy of a fine. The due amount of this fine was equally assessed by an independent court. Also, the Republic only took enforcement measures and froze KPM's assets upon non-payment of the fine. In conclusion, the Republic applied the law correctly and its classification of KPM's and TNG's pipelines as trunk pipelines was not unreasonable. (see also RPHB 2 ¶¶ 151 – 218).*

> *1030. Claimants continue by suggesting it was unreasonable of the Republic to arrest, convict and incarcerate Mr. Cornegruta. As to arrest, Mr. Cornegruta had been identified by the Financial Police as the likely individual responsible on behalf of KPM for illegal entrepreneurship under Section 190(b) of the Criminal Code of Kazakhstan. The decision to arrest him was taken on valid ground by the court in accordance with the relevant provisions of the criminal code. As to the reasonableness of the decision to convict Mr. Cornegruta, [...] process was a key part of the way in which the decision and the later appeal of the decision against Mr. Cornegruta was taken. The actions of the various authorities were taken within the law.*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1031.   Subsequently, Claimants contend that the Republic's "criminal verdict against the non-party KPM" amounted to an unreasonable measure. However, as set out above, the recovery order was necessary in order to correct the unjust enrichment of KPM resulting from the criminal act of operating the main pipeline without a license. Importantly, contrary to Claimants' allegations, the recovery order was made in a perfectly proper procedure in which KPM was represented through its manager, Mr. Cornegruta. [see also RPHB 2 ¶¶ 243 – 264].

1032.   Claimants also contend that it was unreasonable for the Republic to "retroactive[ly] revers[e] [its] approval of the transfer of TNG to Terra Raf and the waiver of its pre-emptive rights". However, Claimants actually failed to apply for the Republic's consent at the time of the transfer itself and they failed to prove that their belated request (after being prompted by the MEMR) was legitimate under Kazakh law. Furthermore, under Kazakh law, the Republic had the discretion to either approve or disapprove the transfer. Even if the Republic had approved of the transfer in the first place, a revocation of this approval was completely lawful because Claimants wrongly informed the Republic about the significant details of the transfer including the date when the transfer occurred, which impacted on whether a waiver to its pre-emptive right was required.   Hence, the revocation of the alleged approval was not unreasonable. [see also RPHB 2 ¶¶ 272 – 281]

1033.   Moreover, Claimants complain that the Republic's refusal to extend TNG's exploration period in the Contract 302 Properties was unreasonable. In fact, under Kazakh law, the Republic was not legally bound to extend or refuse to extend the exploration period in the Contract 302 Properties. Also, since the Republic had not signed the necessary addendum, Claimants could not rely on a prolongation of the exploration period. Thus, the refusal to extend TNG's exploration period in the Contract 302 Properties was not an unreasonable measure. [RPHB 2 ¶¶ 282 – 318]

1034.   Claimants continue by alleging that the Republic's imposition of the Crude Oil Export Duties on KPM was another unreasonable measure. In reality, Claimants' invoked tax deductions which were provided for under Kazakh law or were withdrawn by the relevant authorities before any payment was made by KPM. This was confirmed by the independent Kazakh courts which found KPM to be liable for paying the Crude Oil Export Duties. Therefore, the Republic's assessment of Crude Oil Export Duties was lawful and not unreasonable.

1035.   Finally, Claimants contend that it was unreasonable to repudiate KPM's and TNG's Subsoil Use Contracts. The Republic was entitled to terminate these contracts because of valid grounds for termination. Hence, the termination of KPM's and TNG's Subsoil Use Contracts cannot be deemed an unreasonable measure.

1036.   In particular, as more specifically set out in the introduction to the section on direct expropriation, Claimants were in continuing and serious breach of the Contracts. In accordance with its rights to do so, the Republic



> *terminated the Contracts and Claimants' assets were taken into a specific*
> *trust arrangement. Claimants could have resolved this issue amicably by*
> *invoking one of the mechanisms in the Contracts or, indeed, complying*
> *with the voluntary mechanism in the Subsoil Law at article 72(10) for*
> *handing over of assets to the trust and appealing the decision in*
> *accordance with Article 73 of the Subsoil Law. The opportunity to resolve*
> *this issue in accordance with the Contracts themselves and/or the Subsoil*
> *Law was sidestepped by Claimants by filing substantive proceedings only*
> *five days after the terminations. It is difficult to see how this behavior can*
> *be considered unreasonable under the relevant test. (R-II ¶¶ 1029 – 1036,*
> *partially quoted; see also R-I ¶¶ 41.9 – 41.17).*

1277. Respondent's measures were not discriminatory. As the Parties agree, a state's conduct is discriminatory if similar cases are treated differently without reasonable justification. Once the investor has demonstrated that its case and a reference case are similar, the burden shifts to the host state to demonstrate that there is a reasonable justification for the differential treatment. Here, Claimants have not proven the similarity between the cases of classification of pipelines and the conviction of Mr. Cornegruta and respective other cases. In particular, they have not established that the pipelines owned by KTM have features which would require their classification as trunk pipelines, nor have they demonstrated whether KTM holds a trunk pipeline license. Further, Claimants have not named a single case where authorities did not initiate criminal proceedings after they discovered the operation of a trunk pipeline without a license. Instead, they continue to make the baseless accusations that the Republic singled KPM and TNG out for some campaign of harassment. (R-I ¶¶ 41.14 – 41.24; R-II ¶¶ 1038 – 1043).

1278. Respondent's conduct has not impaired Claimants' investments. Contrary to the *onus probandi* rule, Claimants have failed to prove that the Republic's actions or omissions had any negative impact on the management, maintenance, use, enjoyment, or disposal of their investments, given Claimants' own mismanagement of KPM and TNG. (R-II ¶¶ 1044 – 1045). Claimants have neither shown nor even addressed whether the allegedly arbitrary measures caused their alleged loss. (R-II ¶ 1052). Respondent's arguments are best taken from their own words:

> *1046.  First, [...] companies of KPM's and TNG's size operating in the subsoil*
> *sector must be prepared [...] [for] audits and inspections. [They] were not*
> *subject to any more audits or inspections than other subsoil users.*
> *Further, when companies fail to comply with the law, they must expect to*
> *be subject to audits and inspections. [...] Those audits were no more*
> *intrusive than those undertaken at other companies that did not comply*
> *with the law. Claimants have not proven that the audits and inspections*
> *impaired Claimants' management, use and enjoyment of their investments,*
> *[as they have not proven how their daily management activities were*
> *affected, whether there was a cut in dividends or why they could not sell*
> *KPM and TNG].*
>
> *1047.  Claimants continue by suggesting that a press release, which notified*
> *potential buyers that the Republic would assert a pre-emptive right over*
> *TNG and accused Claimants of having forged documents in order to*
> *defraud Kazakhstan, impaired the disposal of their investments. The so-*
> *called press release Claimants refer to is in fact the INTERFAX-*



*KAZAKHSTAN news agency piece about the reversal of the pre-emptive rights waiver dated 18 December 2008. Claimants ignore that the reversal of the pre-emptive rights waiver was perfectly lawful. Moreover, they have not provided sufficient proof that it was this news agency piece that caused Credit Suisse to step back from providing the bridge loan. Finally, the news agency piece is not attributable to the Republic. For this reason the so-called press release did not impair Claimants' disposal of their investments.*

1048. *Furthermore, Claimants contend that the financial burden of corporate back taxes, export duties and the audit of KPM and TNG with respect to transfer pricing impaired Claimants' management, use and enjoyment of their investments. However, neither KPM nor TNG paid any of the corporate back taxes or transfer price taxes. Claimants have made no complaint and produce no evidence concerning payments of export duties by TNG. Furthermore, the evidence suggests that Claimants were not prevented from managing and enjoying their investments in the period in question. In any event, Claimants could not reasonably expect that no back taxes would be assessed and that the export duties would not be imposed because the Republic was entitled to the payment of these levies. Therefore, the financial burden resulting from these taxes did not impair Claimants' management, use and enjoyment of their investments.*

1049. *Subsequently, Claimants allege that the Republic's refusal to extend the exploration period for the Contract 302 Properties impaired the management, use and enjoyment of their investments because this prohibited Claimants from establishing the full market value of these properties. Claimants ignore that KPM and TNG could not reasonably expect the exploration period under Contract 302 to be extended because the Republic was free to decide whether to prolong the contract or not. Hence, the Republic's refusal to extend the exploration period for the Contract 302 Properties did not impair the management, use and enjoyment of their investments. [RPHB 2 ¶ 329 – 330]*

1050. *Also, Claimants complain that the "criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta" impaired the management, use and enjoyment of their investments because top personnel left the country and the Republic froze KPM's assets. Again, Claimants have failed to prove to the necessary standard how the criminal proceedings affected their daily management activities, whether there was a cut in dividends and how and why Claimants could no longer dispose of KPM and TNG. Therefore, it is not evident that the criminal proceedings really impaired Claimants' management, use and enjoyment of their investments. In particular, in respect of the repudiation of the alleged pre-emptive rights waiver, and the press release on the same day, Claimants have produced no evidence to suggest that the Republic was wrong in highlighting its concerns about the legality of Terra Raf's activities. As set out in the Statement of Defence at paragraphs 13.47I(ii) and (iii) it was perfectly appropriate to air its concerns to INTERFAX, given the suspicions that Claimants had. It cannot be concluded from this that*



> *Claimants' investments were affected (or that if they were, that this was inappropriate). In respect of paragraph 534, Claimants have not produced any persuasive evidence that the top management left the country by reason of the Republic's investigations into Claimants' illegal activities or that this impaired their investments. (R-II ¶¶ 10–6 – 1050, summarized and partially quoted; see also R-I ¶¶ 41.25 – 41.30).*

1279. As recorded aboveRespondent also maintains that it terminated Contracts 210 and 305 in accordance with the law, and that Claimants failed to file a timely appeal or to request an extension, despite having ample time to do so. There was no conspiracy regarding the creation of the heavily debated Subsoil Law 2010, which took almost 2 years to pass. (RPHB 2 ¶¶ 367 – 372).

### 3. The Tribunal

1280. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1281. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 10(1) ECT not to impair by unreasonable or discriminatory measures Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1282. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1283. There is, therefore, no need to examine whether such a further breach has been shown.

### J.VI. Respondent's Observance of Obligations It Entered Into With Respect to Claimants' Investments (Umbrella Clause in Art. 10(1) ECT)

#### 1. Arguments by Claimants

1284. Article 10(1) ECT contains a broadly worded "*umbrella clause*." The purpose of this clause is to expand the reach of the ECT's protections to obligations that are not covered by the ECT's other substantive provisions. The plain language of the umbrella clause does not differentiate between contractual obligations and legislative/regulatory undertakings. Four language versions of the ECT clearly indicate that each Contracting Party shall observe any obligation that it has undertaken towards (or, in two ECT versions, has assumed with regard to) an investor or the investments of an investor of another Contracting Party. (C-I ¶¶ 363 – 370; C-II ¶ 537, 539, partially quoted).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1285. That the umbrella clause does not differentiate between contractual obligations and legislative undertakings has been confirmed by a number of investment treaty tribunals, such as the *Eureko v. Poland* and the *Enron v. Argentina* tribunals that have confirmed that the umbrella provision extends to obligations undertaken through law and regulation. Furthermore, in light of the other terms of the ECT, including the ECT's definition of investment, it is indisputable that Kazakhstan undertook a number of contractual, legislative, and regulatory obligations with regard to Claimants and their investments, which are protected under the umbrella clause. (C-I ¶¶ 363 – 370; C-II ¶¶ 537, 539).

1286. Neither case on which Respondent relies to support its argument that a restrictive reading of the umbrella clause is necessary actually stands for that contention. The tribunal in *Al-Bahloul v. Tajikistan* held that the ECT umbrella clause "*is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations.*" Likewise, the *CMS* ad hoc committee held that an even broader reading was possible – looking toward the law of the host state and possibly international law. (C-II ¶ 538).

1287. Respondent's argument that the arbitration provisions in the Subsoil Use Contracts bar claims relating to those contracts under the umbrella clause is wrong, and it conflates contract claims with treaty claims. Here, Claimants assert that Kazakhstan breached its obligation to observe all obligations undertaken with respect to their investments, and that includes its contractual obligations. This is permissible under the ECT, which provides jurisdiction over disputes relating to an investment for contractual claims that may arise under the umbrella clause. Contractual forum-selection provisions, on the other hand, would naturally cover only contractual claims (those belonging to KPM and TNG, rather than to Claimants). Thus, the cases cited by Respondent – *SGS v. Philippines* and *Bureau Veritas* – are plainly inapplicable to the present cases. In those cases, the claimants were parties to the contracts at issue, making it not surprising that the tribunal found that they were bound by the contract. Here, Claimants are not parties to the contracts at issue. Further, the cases cited do not involve the types of government measures that were involved here – and the tribunals in *SGS v. Philippines* and *BIVAC v. Paraguay* were not asked to consider whether the breaches constituted international treaty violations. Finally, in the *BIVAC* case, the tribunal held that "*a forum selection clause should not be permitted to override the jurisdiction to hear Treaty claims of a tribunal constituted under that Treaty.*" (C-II ¶¶ 540 – 542).

1288. Turning to Respondent's focus on the contractual forum selection clause, a cause of action under the ECT is not subject to the exclusive jurisdiction clauses contained in the underlying contracts, regardless of whether the treaty claims relate to contractual issues. Claimants state that Art. 26 ECT allows foreign investors to choose between a contractually agreed forum for international arbitration before ICSID, UNCITRAL, or the SCC. The claimant's choice is not constrained by the forum selected in the contract. (C-II ¶¶ 543 - 545).

1289. Article 26(3)(c) ECT permits Contracting Parties to exclude international arbitration for violation of the umbrella clause, but Kazakhstan has not exercised this option. (C-II ¶ 544).



1290.Each of the following measures constitutes a distinct violation of the umbrella clause:

  *[1]*   *Kazakhstan "reclassified" KPM's and TNG's pipelines as "main" pipelines, in violation of the approvals by its state authorities and agencies for the design, construction, and operation of the "reclassified" pipelines as in-field pipelines pursuant to Kazakhstan's Law on Oil and relevant regulations;*

  *[2]*   *Kazakhstan arrested, convicted, and incarcerated Mr. Cornegruta, in violation of general principles of due process and Articles 12 and 16 of the Kazakh Constitution recognizing each person's human rights and freedoms;*

  *[3]*   *Kazakhstan issued a criminal verdict against the non-party KPM, froze KPM's assets, and barred KPM from lodging an appeal against its conviction , in violation of general principles of due process and of Article 77(3) of the Kazakh Constitution;*

  *[4]*   *Kazakhstan approved the transfer of TNG to Terra Raf and waived its pre-emptive rights, and then later rescinded its express approval and waiver;*

  *[5]*   *Kazakhstan refused to extend TNG's exploration period in the Contract 302 Properties although it had expressly approved the extension;*

  *[6]*   *Kazakhstan imposed the Crude Oil Export Tax on KPM, in violation of exemption and legal stabilization clauses in the Subsoil Use Contract;*

  *[7]*   *Kazakhstan imposed amortization rates at higher than contractually-agreed rates, in violation of clear amortization and legal stabilization provisions in the Subsoil Use Contracts;*

  *[8]*   *Kazakhstan wrongfully and unilaterally repudiated KPM's and TNG's Subsoil Use Contracts, in violation of the contract terms; and*

  *[9]*   *Kazakhstan illegally seized Claimants' investments, in violation of general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property. (C-I ¶¶ 371 – 372; C-II ¶¶ 546 – 547, partially quoted; see generally CPHB 1 ¶¶ 122 – 422; CPHB 2 ¶¶ 97 - 114).*

1291.The 18 September 2009 judgment that sentenced Mr. Cornegruta to four years in prison and ordered the recovery of USD 145 million from non-party KPM constituted an egregious breach of Art. 10(1) ECT. Mr. Cornegruta was prevented from presenting evidence on his behalf and the judge relied only on information provided by the Financial Police. With regard to KPM, there is no theory of "*quasi-criminal*" liability in Kazakhstan – Kazakhstan has blatantly misconstrued clause 27 of the Regulatory Decree of the Supreme Court of June 20, 2005, "On hearing of a civil action in criminal proceedings" and Article 371, section 1(10) CPC to show otherwise. At most, Kazakhstan could have received compensation for "*property damage*" in cases where no civil action was filed – and this is totally inapposite to Mr. Cornegruta's case, where there is no issue of property damage.



In order to recover funds from a company for alleged criminal conduct, Kazakhstan would have had to have pursued a sanction under administrative law or file a civil suit. Simply imposing Mr. Cornegruta's fine on KPM was not an option. (CPHB 2 ¶¶ 97 – 114).

1292. Kazakhstan's 2007 commitments regarding Terra Raf's legal ownership of TNG (namely, that the State's pre-emptive right did not apply to the 2003 transfer) were breached in violation of the umbrella clause. (CPHB 2 ¶ 126).

1293. Respondent's *"spurious"* tax assessments violated the terms of the Subsoil Use Contracts and, likewise, were in violation of the ECT's umbrella clause. (CPHB 1 ¶ 261; CPHB 2 ¶ 139).

1294. When Kazakhstan failed to formalize the extension of Contract 302, which it expressed on 19 March 2009 and wrote on 9 April 2009, it breached the ECT's umbrella clause. The promise to extend the contract was an express *"obligation"*, giving rise to a treaty obligation under the umbrella clause, as well as a legal obligation under Kazakh law to formalize the extension. Claimants legitimately expected the contract to be extended, as it had been in the past. TNG made a significant discovery in the Contract 302 properties at the Munaibay prospect, but retracted the application in October 2008 after determining that Contract 302 held greater reserves. It applied for an extension on 14 October 2008. The fact that Claimants retracted the declaration of the commercial discoveries – discoveries which would have given them the exclusive right to produce oil and gas from those fields – is a demonstration of their legitimate belief that the contract would be extended. Had the government been timely in addressing the application to extend, Claimants would have had the opportunity to undertake the appraisal work and declare commercial discoveries in the Contract area. Since the extension was promised, Claimants had no need to do further appraisal. (CPHB 1 ¶¶ 221 – 237, CPHB 2 ¶¶ 152 – 162, 176).

1295. This is not a pre-contractual dispute. Kazakhstan undertook to extend the contract, during the life of the contract. In the past, Kazakhstan granted an extension six months after the previous exploration had expired, with no consequence in the validity of the contract. Further, Kazakhstan treated the Contract 302 area as if the contract were still in force, ordering the sequestration of those assets on 30 April 2009 and remarking on the fulfillment of the work conditions of Contract 302 in 2010. Kazakhstan's actions demonstrate that it believed the contract to still be in force through 22 July 2010, when it formally terminated Contract 302. Respondent's failure to execute the addendum after expressly committing to is a violation of the umbrella clause. (CPHB 2 ¶¶ 163 – 171).

1296. Respondent's repudiation of the Subsoil Use Contracts was also in violation of the umbrella clause. There was no evidence that Claimants were in breach of any aspect of the Subsoil Use Contracts, the minimum work requirements or of Kazakh law, nor were they treating the fields badly. (CPHB 2 ¶ 191).

## 2. Arguments by Respondent

1297. Contrary to Claimants' assertion, the scope of the umbrella clause is limited to contractual obligations and does not extend to alleged breaches of the Republic's



domestic law. According to the VCLT, the wording of the umbrella clause must be interpreted such that its scope is limited to contractual obligations. The language "*to enter into*" or "*to undertake to bind oneself*", interpreted according to its plain meaning as required by Art. 31(1) VCLT, illustrates the consensual nature of the obligations in question. In addition, the use of the term "*with*" further indicates contractual obligations because statutes and regulations are not concluded *with* an individual party in one individual case. (R-II ¶¶ 1053 – 1058).

1298. Article 31(1) VCLT clarifies that the context of each term is crucial. Thus, when taking into consideration the ordinary meaning of "*to enter into*", the reference to "*any obligation a party enters into*" means "*any obligation a party has undertaken to bind itself to perform by an agreement*" and thus "*any contractual obligation.*" (R-II ¶ 1059).

1299. Regarding the different language across each equally authoritative version of the ECT, Claimants contend that four versions of the ECT refer to "*obligations assumed with regard to*" whereas 2 versions can be translated to mean "*to enter into.*" Since all versions of the ECT are equally authentic, the ordinary meaning of these terms is significant:

> *1063.   The ordinary meaning of "to assume with regard to" in the context of Article 10(1) of the ECT is "to take upon oneself; undertake". When a party takes an obligation upon itself, the party commits voluntarily to performing the obligation. Therefore, both terms, "to enter into" and "to assume [with] regard to" contain an element of voluntary collaboration. This element of voluntary collaboration makes sense when referring to a contractual obligation because, self-evidently, both parties are free to enter into a contract. It makes no sense when referring to a statutory or regulatory obligation because these apply notwithstanding the intention of those involved. Furthermore, it is general linguistic usage to say that a party enters into a contract and assumes obligations with regard to a contract, but it is not commonly heard that a party enters into a statute or assumes obligations with regard to a regulation. (R-II ¶ 1063).*

1300. If four versions of the ECT limit the scope of the umbrella clause to contractual obligations, but two extend it to legislative, then there would be a difference in meaning between the texts. In such a situation, Article 33 VCLT demands that the Tribunal adopt the meaning which best reconciles the texts, having regard to the object and purpose of the Treaty. The "*contractual obligations only*" interpretation is, however, the common denominator of both meanings, best reconciling the texts. The Tribunal should adopt this meaning. (R-I ¶¶ 39.3 – 39.5; R-II ¶¶ 1064 – 1065).

1301. The interpretation of Art. 10(1) ECT as only encompassing contractual obligations is supported by the object and purpose of the ECT, which is to promote long-term cooperation between investors and host states. If the umbrella clause were to encompass regulatory or statutory obligations, every breach of a host state's domestic law would form a breach of the ECT. Had the contracting parties to the ECT really wished to commit themselves to such a large extent, they would have amended the wording of the umbrella clause accordingly. Construing the scope of the umbrella clause to encompass statutory and regulatory obligations would alienate the contracting parties to the ECT and might ultimately cause them to



withdraw from the treaty. This would run counter to the ECT's purpose of promoting long-term cooperation of investors and host states. (R-II ¶¶ 1066 – 1067).

1302. Renowned scholars and tribunals alike have agreed that the scope of the umbrella clause is limited to contractual obligations. The *CMS v. Argentina*, which Claimants cite in their favor, clearly referred to consensual obligations under the law of the host state or under international law. Statutes and regulations are not of a consensual nature – only contracts are. Hence, the reasoning in CMS *v. Argentina* demonstrates, contrary to Claimants' assertion, that tribunals agree that the scope of the umbrella clause is limited to contractual obligations. This view was confirmed by the tribunal in *Al-Bahloul v. Tajikistan*, which had to deliberate on the umbrella clause in Article 10(1) ECT. *Eureko v. Poland* can be read to mean that the tribunal regarded any contractual obligations with regard to investments as encompassed by the scope of the umbrella clause – that tribunal did not even deliberate on whether statutory or regulatory conduct toward an investor constituted a breach of the umbrella clause. Further still, in *SGS v. Philippines*, the issue under consideration arose from consensual obligations. As for *LG&E v. Argentina* and *Enron v. Argentina*, the tribunals found that Argentina's Gas Law and its regulations were encompassed under the umbrella clause – but they contrasted them from legal obligations of a general nature. Those cases concerned specific promises made by the state concerning the laws, and those promises transformed the laws and regulations into obligations within the meaning of the umbrella clause. Respondent, thus, presents that all of the cases cited by Claimants in support of their reasoning either does not support Claimants' proposition, or contradicts it. There is no reported investment law decision where the scope of the umbrella clause was unconditionally extended to domestic law. (R-I ¶¶ 39.6 – 39.8; R-II ¶¶ 1068 – 1080).

1303. The exclusive arbitration agreements in the Subsoil Use Contracts, as well as in Contract 302, bar claims relating to these contracts under the umbrella clause. Those contracts' arbitration clauses oblige both parties to resort exclusively to international commercial arbitration once a dispute arises with respect to those agreements. Claimants have never referred the disputes regarding the Subsoil Use Contracts or Contract 302 to international commercial arbitration. Foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause because this conforms to and enforces the maxim *pacta sunt servanda*. Therefore, the Subsoil Use Contracts and Contract 302 are utterly irrelevant in terms of the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1081 – 1086, 1097).

1304. Tribunals in investment treaty arbitrations have ruled that foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause. The tribunal in *SGS v. Philippines* clarified that a standard jurisdiction clause in an investment treaty between two states does not override the parties' binding selection of a forum to determine their contractual claims, because the contract between the parties needs to be regarded as *lex specialis* in relation to an investment treaty between two states. Respondent cites that this view has been confirmed by scholars and other tribunals, including *BIVAC v. Paraguay*, which added that contractual forum selection clauses needed to be regarded as a



"*voluntary waiver*" of resort to the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1087 – 1095).

1305. Even if the Tribunal considers that the umbrella clause covers statutory and regulatory obligations and that the Subsoil Use Contracts and Contract 302 were relevant under the umbrella clause – which Respondent denies – the Republic nevertheless complied with domestic law.    Each of the actions alleged by Claimants was consistent with and/or mandated by Kazakh law. (R-I ¶ 39.13; R-II ¶¶ 1098 – 1099).

1306. The classification of KPM's and TNG's pipelines as trunk pipelines was lawful. It was found that KPM were operating a trunk pipeline without the relevant licence. As a consequence, Mr. Cornegruta, KPM's representative, was found guilty of illegal entrepreneurship under Section 190(2)(b) of the Criminal Code of Kazakhstan. This decision was confirmed on appeal on 12 November 2009 by the Regional Court of Mangystau. It was Claimants that were in breach of Kazakh law, not the Republic. Due process and Art. 77(3) of the Kazakh Constitution were strictly adhered to in the investigation of the crime, as well as in the arrest, conviction, and incarceration of Mr. Cornegruta on behalf of KPM. The procedure of the recovery order – i.e. the recovery of illegal income of a company resulting from the crime of its manager – was at all times in accordance with Kazakh law. Procedural participation was safeguarded at all times through the presence of Mr. Cornegruta. (R-II ¶¶ 1100 – 1103; RPHB 2 ¶¶ 243 – 264).

1307. KPM and TNG were in serious breach of the terms of the Subsoil Use Contracts. Claimants were aware of these breaches and had unsuccessfully contested them in Kazakh courts.   After notifying the companies of their breaches, the Republic rightly terminated the Subsoil Use Contracts in accordance with Kazakh law and the terms of the contracts themselves. The Republic's termination of KPM's and TNG's Subsoil Use Contracts did not violate the respective contract terms. Rather, it was Claimants who breached the contractual terms, thus leading to a legitimate termination. (R-II ¶ 1104).

1308. There was no seizure of Claimants' investments.    There was a legitimate transfer into trust management in accordance with the Subsoil Law 2010, which is the lawful consequence following the termination of the Subsoil Use Contracts. This transfer in any event only took place well after Claimants had abandoned their investment. Since the Republic did not illegally seize Claimants' investments, it follows that the Republic did not violate general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property.   (R-II ¶ 1105, partially quoted; RPHB 2 ¶¶ 359 – 374).

1309. Regarding the transfer from Gheso to Terra Raf, there were 8 transfers that involved majority shares in TNG, the consequence being that none of the after-occurring transfers in TNG involving Claimants' companies was completed. Respondent's belated consent to one transfer does not cure all other previous failures.   Thus, Respondent was fully justified in inquiring as to Claimants' position with respect to TNG. (RPHB 2 ¶¶ 272 – 281).

1310. At the Hearing on Quantum, Claimants alleged that the Republic's gas market breached the ECT's protections under the umbrella clause, as well as the FET and



impairment provisions of the ECT. This argument fails since the Republic never guaranteed an export market to Claimants. (RPHB 1 ¶¶ 698 – 700). This argument did not appear in Claimants' First Post-Hearing Brief and was not made in the final hearing. It appears that Claimants have dropped this claim. (RPHB 2 ¶¶ 423 – 424).

1311. The scope of the umbrella clause is limited to contractual obligations, as explained in *Siemens v. Argentina* to mean "*obligations [which] originate in a contract between the State party to the Treaty and the foreign investor.*" (RPHB 2 ¶ 427).

1312. Claimants have attempted to argue that the non-extension of Contract 302 is a violation of the umbrella clause, but have failed to substantiate how such a claim could exist under investment law. Claimants have not demonstrated any reliance on the 9 April 2009 letter. In any event, Claimants have always accepted that Respondent was not under an obligation to extend Contract 302. Even if there had been no breach of the promise to extend the contract had not occurred, Claimants still would not have had a claim to develop the Contract 302 area because the contract would simply have terminated on 30 March 2009. Alternatively, even if the 9 April 2009 letter constituted a decision to agree to extend Contract 302 (which is denied), that was only a unilateral act, not a contract. Such unilateral acts are not covered by the umbrella clause. Additional steps, including an application for a new license, would have needed to be undertaken to perfect the extension. (RPHB 2 ¶¶ 292 – 305, 425 – 430).

### 3. The Tribunal

1313. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1314. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligations it entered into with respect to Claimants' investments by the Umbrella Clause in Art. 10(1) ECT), if there are any further damages sought by Claimants not covered by the FET breach.

1315. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1316. There is, therefore, no need to examine whether such a further breach has been shown.

### J.VII. Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice

#### 1. Arguments by Claimants



1317. Claimants encourage the Tribunal to interpret Art. 11(2) ECT in good faith and under its ordinary meaning, pursuant to Art. 31(1) VCLT. (C-II ¶¶ 553 – 554). Claimants' argument is best taken from its own words, found at C-II ¶ 555:

> *555.   According to the ordinary meaning of Article 11(2) of the ECT, Claimants were entitled to employ any key in-country personnel they wished. However, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. Moreover, Kazakhstan relied on the same spurious legal grounds to initiate criminal actions against four other general managers of Claimants and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations, so that Claimants had no choice but to recall all their key personnel from Kazakhstan. Therefore, Kazakhstan violated its obligation to permit Claimants to employ key personnel of their choice under Article 11(2) of the ECT.  (C-II ¶ 555).*

1318. Mr. Condorachi's testimony confirmed that Claimants' management decided that it would be best if he and several other middle managers leave Kazakhstan, based on their previous dealings with the Financial Police and the imprisonment of Mr. Cornegruta. (CPHB 1 ¶ 270). In addition, as explained by Mr. Broscaru, after the 14 October 2008 order, construction on the LPG Plant slowed significantly because the non-Kazakh workers on the project were unable to renew their work permits. (CPHB 1 ¶ 358).

## 2.   Arguments by Respondent

1319. Article 11(2) ECT permits foreign investors to employ key personnel of their choice, so long as such personnel have the required work and residence permits. It prevents a host State from enacting any domestic employment legislation or committing any forceful action that would prevent the foreign investor from hiring key personnel. As scholars agree, this provision is unambiguous and does not require interpretation. (R-II ¶¶ 1145 – 1147).

1320. In response to Claimants' argument that Art. 11(2) ECT needs to be interpreted using Art. 31(1) VCLT, Respondent disagrees that there is ambiguity in other terms, but agrees that the term "*key personnel*" could require interpretation, as it is not defined in the ECT or any other investment treaty. The ordinary meaning of "*key personnel*" refers to employees of the foreign investor which are indispensable to the running of the investment and/or are decisive to the success of the investment. The meaning of the term does not extend to other individuals. Claimants have not proven that Mr. Cornegruta or any of the other unnamed four general managers are part of such an exclusive group. It has not been alleged that these are essential personnel. (R-II ¶¶ 1151 – 1154).

1321. It is not true that the lawful interrogations and criminal proceedings against Mr. Cornegruta on behalf of KPM or against the other four managers forced Claimants to recall their key personnel from Kazakhstan. Respondent states, however, that it "*is notable that Claimants suggest that this should require the removal of their key personnel from the country. This suggests that Claimants are willing to assist their key personnel from facing the consequences of illegal behaviour. In turn this*


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*suggests that the detention of Mr Cornegruta in April 2009 (on suspicion that he would flee the country) was well-founded.*" (R-II ¶¶ 1156 – 1159).

### 3. The Tribunal

1322. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1323. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 11(2) ECT to permit to employ key personnel according to Art. 11(2) ECT for Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1324. Claimants' allegation of this further breach leads to no further damages sought than those resulting from the FET breach. There is, therefore, no need to examine whether such a further breach has been shown.

## K.    Causation

### K.I.    Law on Causation

#### 1.    Arguments by Claimants

1325. Claimants agree that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation flows from the host state's conduct. Tribunals have broad discretion in evaluating causation. As the tribunal in *Lemire v. Ukraine* explained, the element of causation requires the aggrieved party to "*prove that an uninterrupted and proximate logical chain leads from the initial cause ... to the final effect.*" As the *Lemire* tribunal explained, the causal link need not be direct, but can be established through a chain of connected events. The primary limitation on the principle of transitive causation is that the chain of events must be "*neither too remote nor too aleatory.*" Classically, what is necessary is to prove that there is "*no [break] in the chain and [that] the loss can be clearly, unmistakably and definitely traced, link by link, to [the State's] act, [whereby] indirect losses are covered [so long as] in the legal contemplation, the [state's] action was the efficient and proximate cause and the source from which they flowed.*" The requirement of proximate cause is closely related to the foreseeability of injury – the wrongdoer could have foreseen that through successive links, the irregular act would finally lead to damage. (CPHB 2 ¶¶ 199 – 202).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1326. The state is also responsible for all harm that proximately flows from its wrongful actions, even if concurrent causes contributed to the harm. As the tribunal in *CME v. Czech Republic* explained, the only exception to this would be in cases of contributory fault.

1327. The burden then shifts to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged. As the tribunal in *CME v. Czech Republic* explained, however, unless the injury can be shown to be severable in causal terms from that attributed to the state, the latter is held responsible. Kazakhstan, therefore, can only escape liability for the injuries that naturally flowed from its conduct if it can prove that an intervening cause completely superseded the effects of its actions into a severable injury, and not merely that other concurrent events contributed to or amplified Claimants' injury. (CPHB 2 ¶¶ 200, 203).

1328. Finally, as the Tribunal in *Lemire* found, it is often not possible for a claimant to prove with certainty what would have happened "*but for*" the State's wrongful actions. Thus, it is sufficient for the Claimants to prove that it was probable that they would have had a different outcome, but for the State's actions. (CPHB 2 ¶ 204).

## 2.    **Arguments by Respondent**

1329. Article 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. In investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss. Even in the *MDT v. Chile* case, cited favorably by Claimants in their "*full compensation*" arguments, the Tribunal reduced the damages otherwise due by 50 % to reflect the investors' negligent conduct. Here, there is a clear correlation in time between the companies' financial troubles and Claimants' conduct. (R-III ¶ 436 – 440).

## 3.    **The Tribunal**

1330. The Parties agree, and so does the Tribunal, that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation is caused by the host State's conduct.

1331. The Tribunal further agrees with Respondent that Art. 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. Indeed, in investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss.

1332. And the Tribunal agrees with Claimants that the burden then may shift to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged, unless, as the tribunal in *CME v. Czech Republic* explained, the injury can be shown to be severable in causal terms from that attributed to the state.



## K.II.       Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages

### 1.       Arguments by Claimants

1333. The campaign of harassment and coercion that began in October 2008 and was publicized in December 2008 initiated a chain of events that irreparably harmed Claimants' investments and prevented Claimants from fully developing or alienating them from that moment forward.

1334. Claimants' search for bridge financing in November 2008 began on recommendation from Renaissance Capital. It was necessary in order to obtain a partial advance on the proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices. Further, although Kazakhstan sabotaged the Credit Suisse financing in December 2008, the liquidity position at KPM and TNG did not become problematic until the June 2009 Laren transaction. Respondent's argument about the "*going concern*" qualification issued by the auditors' is also disingenuous and expressly states that the "*going concern*" qualification was based on events after 31 March 2009.   The reasons for this qualification were Kazakhstan's freezing of KPM and TNG's assets and Claimants' equity interests in KPM and TNG, the criminal investigations, and the USD 62 million back tax assessment. Finally, Claimants' financial position as of June 2009 was mainly due to Kazakhstan's conduct – it does not reduce the impact of Kazakhstan's interference on the Credit Suisse financing, but rather amplifies it. (CPHB 1 ¶¶ 405 – 408).

1335. Two events - the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's false accusations of forgery and violations of registration requirements, and the 15 December 2008 formal initiation of the criminal investigation against KPM – had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. Based on those events, on 14 January 2009, Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative. Fitch warned investors that the MEMR's cancellation of its pre-emptive rights waiver could result in the termination of TNG's Subsoil Use Contract. On 15 January 2009, Moody's placed Tristan's B2 rating on review for a possible downgrade, again based on both events. Accordingly, Kazakhstan's wrongful acts had a profound impact on the value of Claimants' investments not later than 14 January 2009. (CPHB 1 ¶¶ 346 – 357, 646 – 647; CPHB 2 ¶¶ 205 – 209).

1336. The INTERFAX article directly interfered with a specific financing transaction that Claimants were then negotiating with Credit Suisse. On 18 December 2008, Mr. Petrosius of Credit Suisse sent Mr. Lungu the INTERFAX article and requested his comments.   After that, Credit Suisse refused to provide the bridge loan until Claimants resolved their disputes with the Kazakh government.   Kazakhstan's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through is not persuasive. Moodys and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns to the companies' ability to service their existing debt. It would have been surprising if any lender would have gone forward with the new financing without resolution of the conflicts. (CPHB 2 ¶¶ 210 – 211).



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

1337. The financial crisis did not prevent the Credit Suisse transaction. Credit Suisse stated on 5 December 2008 – after the crisis erupted in September 2008 – that it aimed to execute the term sheet the following week. (CPHB 2 ¶ 212).

1338. The inability to receiving financing forced Claimants to enter into the Laren transaction in June 2009. It was a necessary transaction that was on horrible terms, which caused Moody's and Fitch ratings agencies to further downgrade Tristan's debt to the C level. Respondent's illogical and speculative argument that Claimants would have turned to the Laren loan sharks in August 2009 to refinance the Credit Suisse loan ignores the State's actions, completely. If Claimants had needed to refinance, they would have been able to do so on ordinary commercial terms, possibly even with Credit Suisse, on the same or better terms, since oil prices and credit markets had improved dramatically by that time. Respondent's argument that the Credit Suisse loan would not have helped Claimants to avoid the Laren loan is speculative and nonsensical. (CPHB 2 ¶ 213 – 214).

1339. The evidence that Kazakhstan's conduct interfered with Claimants' ability to sell their investments in KPM and TNG is overwhelming. First, the MEMR leak to INTERFAX clouded Claimants' title and reputation. Second, Kazakhstan sequestered Claimants' shares in KPM and TNG and KPM's and TNG's Subsoil Use Contracts, pipelines, and vehicles on 30 April 2009. Claimants were thereafter legally prohibited from selling their investments, through sale of either shares or assets. (CPHB 2 ¶¶ 233 – 235).

1340. The clouded title resulting from the INTERFAX press release interfered with Claimants' ability to sell KPM and TNG as of 30 April 2009, when Kazakhstan froze the shares in the companies. Kazakhstan's actions also affected several potential buyers in the Project Zenith sale process, to which Mr. Suleymenov testified. This affected price, as the RBS Report confirms that RBS and KMG E&P deducted liabilities attributable to Kazakhstan from their valuation. In addition, the KMG E&P confirmed its valuation by examining the trading price of the Tristan debt, which was also negatively affected by Kazakhstan's actions. (CPHB 1 ¶¶ 384 – 389).

1341. Kazakhstan's actions interfered with TNG's sales. Claimants inferred that Kemikal's sudden and inexplicable refusal to post bank guarantees that were required by its credit terms was part of Respondent's aggressive and hostile campaign to put pressure on Claimants. At the time, Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev. As a result, Claimants did not renew the contract with Kemikal when it expired at the end of 2008. Respondent frustrated TNG's attempts to find replacement buyers in summer 2009 in two ways. First, Respondent prevented TNG from selling gas on export markets (which required access to the CAC Pipeline, which required Claimants to sell through a Kazakh government affiliate, either Kemikal or KazRosGaz). Second, the arrest of Mr. Cornegruta and the inspections and harassment caused the management of TNG to devote much of their time responding to the State's harassment, rather than the day-to-day management of the company. Many managers wisely fled the country. As a result of being compelled not to renew the Kemikal contract and of being unable to find a replacement, TNG had to shut down production by 30 – 50% from March – July 2009, and by 100% for two weeks in



August 2009. TNG produced 17 BCF of gas and 311,000 barrels of condensate fewer than its own targets. (CPHB 2 ¶¶ 223 – 227).

1342. Advisors to the State controlled oil company, KMG EP, confirmed that the State's actions were material impediments to any acquisition of KPM and TNG. Squire Sanders recommended that KMG EP make the return of the companies' documents and the termination of the criminal proceedings and attachment orders a condition on any transaction. Those accounts posed an insurmountable obstacle to the sale of KPM and TNG to buyers other than KPM EP, who may have had the clout to stop the criminal actions. (CPHB 2 ¶ 236).

1343. PwC identified financial and tax issues that were directly attributable to Kazakhstan's wrongful actions as impediments to the purchase by KMG EP or, at least, issues to be considered in valuing KPM and TNG. The RBS valuation included USD 243.5 million in contingent liabilities, most of which are attributable to Kazakhstan. RBS disregarded the potential exposure of up to USD 1 billion in criminal fines, but suggested that those could be dealt with in the SPA – something only perhaps no other purchaser but KMG EP could have accomplished. Mr. Suleymenov testified that KMG EP valued the companies' equity in the range of negative USD 50 – 100 million after deducting the Tristan debt and contingent liabilities. Importantly, however, the Tristan debt alone would have been USD 111 million less but for Kazakhstan's action. Thus, KMG EP's valuation would have been positive, but for KMG EP's action. (CPHB 2 ¶¶ 237 – 238).

1344. The market price of the Tristan debt was negatively affected by Kazakhstan's illegal actions. It was also misquoted by Mr. Suleymenov, when he stated that the market price of the Tristan notes was only 25 – 28 cents on the dollar, when it was nearly double that on the date of the RBS valuation. Mr. Suleymenov acknowledged that the trading price of the Tristan notes no doubt incorporate Kazakhstan's actions. (CPHB 2 ¶ 239).

1345. Finally, when Claimants submitted the Cliffson transaction to the MOG for approval in 2010, the MOG conditioned the sale on the satisfaction on all legal obligations imposed by the state and the release of the sequestration orders. The sale could not be concluded. Claimants have proven that Kazakhstan's actions were the primary reasons that KMG EP did not buy KPM and TNG. Other potential buyers, like Total lost interest when the State precluded Claimants from completing the exploration well. Dr. Kim of KNOC testified that the inability of TNG to export gas was the principle reason that KNOC lost interest. Mr. Seitinger testified that OMV decided against the purchase for market reasons, but those were also influenced by Kazakhstan. Even with the global financial crisis, it is beyond serious doubt that KPM and TNG became unattractive assets as a result of Kazakhstan's actions, and that Kazakhstan is responsible for all of the injury to which its actions contributed. (CPHB 2 ¶¶ 240 – 245).

1346. The final expropriation in July 2010 caused the direct and egregious injury to Claimants, who thereby lost their remaining ability to sell the assets, to use them productively, and to direct the cash flows from those assets to the creditors. The seizure was just the final step in a series of actions starting in late 2008 that impaired Claimants ability to profitably and successfully operate, manage, control, and dispose of their investments. (CPHB 2 ¶ 246).



## 2. Arguments by Respondent

1347. Initially, Claimants argued that the inspections and investigations initiated in October 2008 had a severe impact on the operations of KPM and TNG. Now, however, they have abandoned that claim. At the hearing, Mr. Cojin even testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production*." Instead, Claimants now focus on the lack of funding of KPM and TNG which they allege to have been caused by the Republic. (RPHB 2 ¶¶ 92 – 94, 126).

1348. Claimants now argue that the INTERFAX press item of 18 December 2008 caused an injury to Claimants' reputation and ability to get credit. It should be pointed out that in the first hearing, when asked about what caused the cashflow problems in 2009, Mr. Lungu made no mention of the pre-emptive rights waiver issue. Regardless, the INTERFAX item cannot be attributed to the Republic. It was not issued by the Republic. INTERFAX obtained the information from unofficial sources. Claimants have not shown that the Republic was in any way involved in the publication of the item. (RPHB 2 ¶¶ 95 – 97).

1349. Claimants' case that the pre-emptive rights waiver issue harmed their ability to secure financing boils down to the negotiations with Credit Suisse for a bridge loan (which could have collapsed for any number of reasons) and Mr. Lungu's non-credible and illogical testimony. Under Mr. Lungu's testimony, the Credit Suisse loan would have needed to be refinanced in August 2009 already – Claimants, thus, would have needed to turn to the Laren loan sharks in August 2009 instead of June 2009. To the extent that Claimants have argued that the INTERFAX item prevented them from getting financing on more commercial terms, Claimants have provided no evidence to support this, especially in light of the other problems relating to the drop in demand and the increase in need for capital expenditure. Finally, Respondent denies the unproven contention that Laren is not an affiliate of Anatolie Stati. (RPHB 2 ¶¶ 98 – 104).

1350. Respondent denies interfering with gas sales of KPM and TNG. The loss of Kemikal as a customer is not attributable to the Respondent since, as confirmed by PwC, that was due to Kemikal's own liquidity issues. Kemikal is a private company that was not acting in any kind of governmental capacity. It has not been managed by the State. (RPHB 2 ¶¶ 124 – 126).

1351. Claimants have not shown any legal authority in favor of lowering the standard of proof regarding the alleged interference with the sale of KPM and TNG. None of the causes complained of mentioned by Claimants played any role in the companies' decisions not to purchase KPM and TNG. Claimants' failure to sell the companies had nothing to do with the Republic's actions. Rather, it was caused by the lack of commercial activity of KPM and TNG. Any interest that may have existed on behalf of some market players vanished upon closer review of the companies. (RPHB 2 ¶¶ 135 – 137, 150).

1352. Anatolie Stati was dishonest in his testimony in both hearings. His testimony was inconsistent with that of other witnesses. In particular, he informed the Tribunal



that Kazakh authorities allegedly told Total EP and KNOC that it would not permit sale. The testimony of Mr. Chagnoux of Total EP and Dr. Kim of KNOC, however, confirmed that no such talks with Kazakh authorities had taken place. (RPHB 1 ¶¶ 112).

1353. Claimants' arguments regarding the involvement of KMG EP are confusing and fundamentally inconsistent. On the one hand, KMG EP was part of the alleged harassment campaign, and on the other, Claimants treat KMG EP as a purely commercial entity for the purpose of their alienability arguments. In any event, it was not State actions that led to the KMG EP decision not to go forward with the deal. "*As the RBS valuation showed, KMG EP assumed in the base case an enterprise value between USD 473 million and USD 751 million for KPM and TNG (taking into account potential synergy effects). At the same time, KPM and TNG were liable for USD 531.1 million in noteholder debt with an interest of 10.5%. In other words: There was a considerable likelihood that the equity value of KPM and TNG was negative even disregarding any other liability but the noteholder debt.*" Neither the pre-emptive rights waiver issue nor the sequestration of shares played any role. (RPHB 2 ¶¶ 146 – 149).

1354. Total E&P's ultimate lack of interest in purchasing KPM and TNG was that Total E&P was looking for situations in which they could add value or increase the reserves. In KPM and TNG, there was no such additional value. There is nothing incredible about this testimony and Claimants' attempts to discredit the witness, Mr. Chagnoux, are ridiculous. Mr. Chagnoux testified credibility and even discussed Total E&P's strategic decision to gain access to the data room by putting a value on the worthless LPG Plant. In any event, the Respondent did not hinder the sale by preventing Claimants from proving the resources in the Interoil Reef. TNG failed to prove these reserves, failed to drill deeply enough after the drill broke down, and failed to conduct a full and thorough 3D seismic analysis that covered the entire reef. Claimants, and not Respondent, are at fault. (RPHB 2 ¶¶ 138 – 142).

1355. In a fundamental reversal to Claimants' earlier positions, Claimants now agree that the lack of gas sales contracts caused KNOC to lose interest in KPM and TNG, despite testimony of their own witnesses, Anatolie Stati and Mr. Lungu, that the Kazakh authorities deterred KNOC. TNG's inability to secure gas contracts had nothing to do with the Republic. (RPHB 2 ¶¶ 143 – 145).

### 3. The Tribunal

1356. As indicated above in this Award, the Tribunal notes that the Parties' submissions indicate that the Claimants' investment proceeded in a more or less normal fashion before the Order of the President of the Republic on 14/16 October 2008.

1357. Prior to the 14/16 October 2008 order, Claimants were involved in three-way negotiations, at the behest of Kazakhstan, beginning in 2007. On 7 May 2007, the MEMR, the Governor of the Mangystau Region, KMG, KazAzot, Ascom, KPM, and TNG entered into a MOU that TNG would sell certain volumes of gas to KazAzot first at near market prices followed by the international market price after



two years and, further, that through KazTransGas, TNG would be allowed to export certain volumes of gas at international market prices. (C-300). It was argued that TNG was ideally suited to be considered as the primary supplier to the ammonia-carbamide project as it was the fourth largest producer of gas, it was locally situated, and it was a reliable provider of gas in large quantities. Over the following year, extensive negotiations took place among the parties regarding such issues as prices, volumes, and other conditions of the agreement.

1358. Beginning in 2007, TNG, in addition to its efforts to pursue what became the Tri-Partite Agreement, had also pursued gas sales opportunities with Kemikal. Claimants argue that this entity was believed to be under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev. Deliveries to Kemikal began in October 2007 and continued throughout 2008.

1359. On 28 April 2008, the MEMR, KMG, TNG, KazTransGas, and KazAzot made a first agreement among TNG, KazAzot, and KazTransGas. (C-301). A further Tri-Partite Agreement followed between TNG, KazTransGas, and KazAzot setting out the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export. (C-302).

1360. TNG's Contract 302 initially had a six year term. As a result of flooding from the Caspian Sea basin, the MEMR extended the exploration term for two years and eight months, until 30 March 2009. The MEMR did not count this *force majeure* against the two permissible contract extensions, which in any event required consent of the Republic. (R-I ¶¶ 14.20 – 14.25; R-165). On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66). Instead, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. On 14 October 2008, TNG submitted its formal application to extend the exploration period Contract 302 by two years. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km…*" and "*large deeply submerged reef fields…*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251).

1361. Following the direction of President Nazarbayev on 14/16 October 2008, the Deputy Prime Minister promptly issued Order No. 6497 on 16 October 2008, which ordered the MEMR and the Tax and Customs Committees to conduct comprehensive and complex audits of KPM, TNG, and Kok Mai. These audits began on 28 October, 10 November, and 18 November 2008, respectively.



1362. Under the direction and sometimes even the supervision of the Financial Police, KPM and TNG faced relentless inspections, including by:

- The Customs Committee (18 October 2008, C-11);

- The MEMR (20 October 2008, C-9);

- The Tax Committee (24 October 2008, C-10);

- The Geology Committee (28 October 2008, C-12);

- The Ecology Committee (28 October 2008, C-13);

- The MES (31 October 2008, C-14); and

- The National Bank of Kazakhstan (November 2008, C-15);

1363. KPM's former General Manager and subsequently Deputy General Manager of TNG, Alexandru Cojin, stated that these investigations and inspections were voluminous and harassing. He testified that the process began around November 2008 and continued for nearly two years. (WS Cojin ¶¶ 6 – 8). Similarly, KPM's and TNG's Technical Director, Victor Romanosov, testified that "*normal*" inspections in the field had previously occurred once yearly, but commencing in late 2008 and continuing thereafter, the frequency of these inspections increased to every quarter, such that, "*[a]s a result, [he] met with representatives from nearly a dozen agencies for weeks at a time every three months*." (WS Romanosov 1 ¶ 26). These investigations were unprecedented for KPM and TNG. Claimants provided evidence that these actions became an almost daily intrusion into the operations of KPM and TNG, so much so that many staff members were more occupied with responding to the inspections than with their normal everyday responsibilities.

1364. The following events are also of relevance:

1365. In fall 2008, Kemikal – TNG's largest non-local customer – failed to post the bank guarantees that were part of its required payment terms. These terms were required because Kemikal's payment history was erratic and large arrears accrued. Accordingly, TNG did not renew the contract with Kemikal at the end of that year. It required collection efforts until June 2009 for TNG to receive payment from Kemikal.

1366. A 17 November 2008 Tri-Partite Agreement between TNG, KMG (who had replaced KazTransGas), and KazAzot memorialized their agreement on price, volumes, and related conditions of sale and export. (R-393). TNG and KMG signed this Tri-Partite Agreement. It was hand-delivered to KazAzot for its signature, but KazAzot never signed. Instead, in late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas. KazAzot allegedly indicated at that time that it would sign the Tri-Partite Agreement within six months, subject to the outcome of this audit.

1367. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5



December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381). Respondent states that this shows that Claimants likely began looking for financing in November 2008. (R-II fn. 775).

1368. On 18 December 2008, the MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Illyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

1369. The Parties agree that, on 18 December 2008, INTERFAX issued a press release containing allegations that the Claimants had altered documents in order to defraud the State of its pre-emptive right to purchase the companies.

1370. Immediately after its publication, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. (C-625). After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with Kazakhstan. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211; WS Lungu 1 ¶ 7).

1371. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

1372. Anatolie Stati testified that, following the State's actions in relation to its revocation of its previous waiver of pre-emptive rights regarding the transfer to Terra Raf, beginning December 18, 2008, he concluded he should be careful regarding the Kazakhstan Government's intentions. (Tr. January 2013 Hearing Day 2, pp. 84, 114 – 115). Thus, although this rig was ready for transport in January 2009, the newly purchased heavier drilling rig was not brought into Kazakhstan. (CPHB 2 ¶¶ 228 – 232). Respondent argues that Claimants would have needed to remove old rig, move the new rig in, assemble the new rig, and drill to 6000m in 3 months. Even if they had a new rig, it is unrealistic that a discovery would have been made. Not even Claimants foresaw it would go so quickly, having submitted a working program on 14 October 2008 that foresaw 7 months to drill Munaibay-1 from 5200 – 6000m. RPHB ¶ 119; fn. 209).

1373. On 14 January 2009, the Fitch Ratings agency issued a Rating Watch Negative report for Tristan's long-term default rate. A Dow Jones release indicated that the Rating Watch Negative report reflected Fitch's concern of "*a potential negative impact relating to the latest actions of the Kazakh authorities on Tristan's financial standing and business prospects.*" The Dow Jones report referenced KPM being "*subject to a criminal investigation.*" (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117; C-590). Although Respondent has argued that the Tristan Notes were risky from the outset, the Tribunal considers that the evidence reflects that Respondent's actions worsened the market's treatment of these notes, and this was explicitly noted by the ratings agencies.



1374. On 15 January 2009, Moody's reported a downgrade review of Tristan, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117; C-744).

1375. On 18 February 2009, Moody's downgraded the Tristan debt from B2 to B3 due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claimed by the State against TNG. (C-744).

1376. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1377. On 24 February 2009, TNG complained to MEMR regarding the negative effects that the December 2008 publication of Respondent's actions had had on its business and reputation. (CPHB 2 ¶ 117; R-II ¶ 171; C-619).

1378. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State explained that TNG was, therefore, in breach of Contracts 210 and 302. The State demanded that TNG submit a new application for Kazakhstan's consent to the transfer and waiver of the State's pre-emptive purchase right. Failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117; C-146).

1379. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1380. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38; C-744).

1381. In a hand-delivered letter dated 18 March 2009, which Respondent states should be viewed as an attempt to provoke the Republic, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit were denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-I ¶¶ 38, 149; CPHB 2 ¶ 117; R-I ¶¶ 9.75 – 9.76; C-41, WS Pisica 1 ¶ 31, WS Lungu 2 ¶ 42).

1382. On 19 March 2009, the day after this correspondence from TNG to MEMR, a group of representatives from KPM, TNG, Terra Raf, and Ascom met with the MEMR Executive Secretary, Mr. A. B. Batalov, at the offices of the MEMR. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14/16 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra



Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-I ¶¶ 106, 150, 152, 177; R-I ¶ 13.47(e)(v), 21.1; C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 – 37, 43).

1383. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1384. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1385. On 25 March 2009, TNG sent the State a separate request for another formal, written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1386. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1387. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-I ¶ 31.70; R-163.2).

1388. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension including, for example, that TNG needed to apply for a license renewal, as well. (C-0 ¶ 58; C-I ¶¶ 22, 178; R-I ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; RPHB 1 ¶ 323 – 325; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68).¶

1389. Despite these potentially promising developments of 2 and 9 April 2009, which indicated that an extension may be forthcoming, the MEMR never renewed Contract 302. This matter lingered over the following months, during which time, TNG occasionally followed up – on 30 April 2009 and on 4 May 2009 – and received hints that the renewal would be forthcoming. As a result of the State's inaction, however, following the expiration of Contract 302 on 30 March 2009, TNG was prevented from exercising its contractual rights under Contract 302 and, therefore, prevented from further exploration of the Tabyl Block. The East Munaibay discovery, first claimed by TNG in July 2008 and later further re-



notified to the MEMR on 9 March 2009, along with a further notice of discovery in the Bahyt structure, remained unfulfilled.

1390. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2).

1391. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline, and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1392. On 30 April 2009 and 4 May 2009, TNG followed up with the MEMR to inquire about the status of the Contract 302 extension.

1393. On 7 May 2009, Anatolie Stati wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol.

1394. On 15 May 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts and requested additional documents from KPM. (R-I ¶ 29.2; CPHB 2 ¶ 38).

1395. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).

1396. On 12 June 2009, Terra Raf and Ascom filed petitions to lift the seizures. (C-0 ¶ 45; C-I ¶ 122).

1397. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1398. By early summer of 2009, most of the senior management of KPM and TNG, in light of the case of Mr. Cornegruta, had fled Kazakhstan in order to avoid arrest. The assets of KPM and TNG were under seizure. Credit Suisse had refused to provide financing, and the companies urgently needed to renew financing



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

arrangements in order to meet their tax and interest obligations. It was against this setting that the Laren Loan Facility was negotiated. (CPHB 2 ¶ 213).

1399. On 16 June 2009, Claimants entered into the Laren Loan Facility, described in detail in the summaries of the Parties' positions, above.

1400. On 17 June 2009, the Financial Police publically announced that their investigative phase had concluded and that the four former and current managers of KPM and TNG would be prosecuted for having realized an "*illegal profit*" of 147 billion Tenge (approximately USD 980 million as of June 2009). (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38 (calling the 147 billion the potential fine); R-I ¶ 26.24; C-118).

1401. On 19 June 2009, the third tranche of the 2006 Bonds Project was issued, for USD 111.11 million. (R-I ¶ 9.59).

1402. On 27 June 2009, the Terra Raf and Ascom petitions to lift the seizures were denied. (C-0 ¶ 45; C-I ¶ 122).

1403. On 27 June 2009, the Regional Prosecutor's Office wrote to Ascom and Terra Raf noting that an international search was underway for Mr. Cojin. (CPHB 2 ¶ 38; RPHB 2 ¶ 191).

1404. On 2 July 2009, the MEMR's self-imposed deadline to extend Contract 302 expired, without an extension of that contract. (CPHB 2 ¶¶ 38, 151).

1405. On 10 July 2009, a Fitch Ratings press release indicated that market observers were concerned about "*weak corporate governance standards at Tristan*." (RPHB 2 ¶ 61).

1406. In August 2009, Kazakhstan, the Governor of the Mangystau Region, KazAzot, and Mitsubishi confirmed their intention to go forward with the ammonia-carbamide complex. A few days after that announcement, on 26 August 2009, the Governor of the Mangystau Region asked Prime Minister Massimov to cancel TNG's and KPM's Subsoil Use Contracts. Claimants allege that this letter implicitly sought the transfer of TNG's assets to KazAzot. (C-I ¶ 61; C-293).

1407. Notwithstanding several attempts to obtain his release, Mr. Cornegruta remained incarcerated until the conclusion of "*his trial*" on 18 September 2009. Thereafter, following his conviction and sentence of four years, he remained in jail until he escaped.

1408. From the above chain of events, the Tribunal considers that Respondent's series of actions starting in October 2008, which are breaches of the FET standard of the ECT as found above in this Award and which were publicized beginning in December 2008, harmed Claimants' investments and prevented Claimants from proceeding with their investment from that moment, forward.

1409. This affected Claimants' search for bridge financing, which they began in November 2008 on recommendation from Renaissance Capital. Bridge financing, they state, was necessary at that time in order to obtain a partial advance on the



proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices.

1410. Thereafter, the 15 December 2008 formal initiation of the criminal investigation against KPM and the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's accusations of forgery and violations of registration requirements, had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. This impact is easily understandable and obvious to the Tribunal. It is confirmed by the fact that, on 14 January 2009, the Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative.

1411. In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic as it was not issued by the Republic and INTERFAX obtained the information from unofficial sources, does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

1412. As well, Respondent's argument that, at the Hearing, Mr. Cojin testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production,*" does not change the negative impact of Respondent's chain of actions, as that impact is by no means limited to keeping the staff of Claimants from engaging in more work on their normal business.

1413. Further, the Tribunal is not persuaded by Respondent's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through. Moody's and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns about the companies' ability to service their existing debt. The Tribunal agrees with Claimants that it would have been surprising if any lender would have gone forward with the new financing without resolution of Claimants' conflicts with the government of Kazakhstan.

1414. It is apparent that, even before the trial of Mr. Cornegruta, the relentless onslaught of inspections and, eventually, charges against KPM's most senior officer had, when considered together with these pre-trial seizures of assets on 30 April 2009, seriously disabled Claimants' companies.

1415. The Parties agree, and the Tribunal also agrees, that Claimants were only able to weather the liquidity storm of summer 2009 by obtaining financing through the Laren Loan Facility. (RPHB 1 ¶ 58, CPHB 2 ¶ 257). The Parties agree, and the Tribunal also agrees, that the terms of the Laren Facility were terrible for Claimants. (CPHB 2 ¶ 213; RPHB 1 ¶ 60; RPHB 2 ¶ 69(e)). Likewise, the Parties agree, and the Tribunal also agrees, that had Claimants obtained financing from Credit Suisse in December 2008, they would not have needed to resort to other lenders in June 2009. (CPHB 1 ¶ 353; RPHB 2 ¶ 102; 961).

1416. What the Parties dispute is whether Respondent's actions caused Claimants to enter into the Laren Facility. The Tribunal finds that the Laren Facility, with its onerous terms, was arranged in June 2009 because it was necessary for KPM and TNG to



secure these funds and because Respondent's actions prevented them from doing so sooner. By June 2009, ordinary lenders would not lend to these companies on commercial terms. Although Claimants drove the best bargain they could, the cumulative effect of the barrage of inspections and the very public revelation in December 2008 of the alleged forgery and fraud said to have been committed in relation to the transfer to Terra Raf, as indicated above, led to the severe downgrades by Moody's and Fitch rating agencies. While the worldwide economic crisis was affecting these companies in late 2008 and early 2009, the State's aggressive and concerted actions, including the inspections, the criminal charges, and the asset seizures - even before Mr. Cornegruta's trial in August and September 2009 – forced Claimants to accept the "*horrendous*" Laren Facility.

1417. Furthermore, the Tribunal also notes that, despite TNG's apparent attempts to comply with Kazakhstan's requests, the State never responded to TNG's applications of 24 and 25 March 2009 – applications that the State requested. As a result, Kazakhstan's alleged pre-emptive rights claim lingered throughout the following two year period. It was, no doubt, a cloud on Terra Raf's ownership rights which created continuing difficulties for Claimants.

1418. The Claimants have also alleged that the inspections commencing in October 2008 interfered with their sales and marketing of gas. The Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State was the cause of the various difficulties they encountered in securing their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal notes Respondent's argument that the loss of Kemikal as a customer is not attributable to the Respondent since that was due to liquidity issues of its own, and that Kemikal is a private company that was not acting in any kind of governmental capacity. However, Kemikal's sudden refusal to post bank guarantees that were required by its credit terms was a change of its earlier business pattern for which the Tribunal sees no other convincing explanation than that it was part of Respondent's aggressive actions against the Claimants, irrespective of whether in that context the fact that Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev, played a role.

1419. The Tribunal notes in the present context the Parties' dispute whether the actions of the Kazakh State prevented the owners of KMP and TNG from selling their investments. The Claimants were persistent in their pursuit of selling KPM and TNG, with or without Contract 302. In order to consider any possible contribution to relevant causation, the following paragraphs highlight in a summary fashion the additional events which surround the Claimants' on-going efforts to sell KMP and TNG and the impact of the State's actions on those efforts.

1420. In the early summer 2008, Claimants decided that they wished to explore selling KPM, the LPG Plant, and TNG, excepting its Contract 302 properties (the Tabyl



Block). This activity was called Project Zenith. The Claimants engaged the services of Renaissance Capital to assist them.

1421. On 18 July 2008, Renaissance sent a preliminary "teaser" invitation to 129 potentially interested buyers, including KMG. In mid-August 2008, Renaissance distributed the Information Memorandum to 41 parties that had expressed interest in these companies and their properties and had signed confidentiality agreements. KMG was one of those companies.

1422. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith.

1423. By 1 October 2008, Claimants had received 8 non-binding indicative bids from various entities, including from KMG EP in the amount of USD 754 million and from KNOC in the amount of USD 1.55 billion. The average of the 8 indicative offers was USD 1.05 billion.

1424. On 30 April 2009, however, the Financial Police obtained a pre-trial order for the sequestration and arrest of all the shares of both KPM and TNG (C-486; C-487; C-488; and C-489). By their terms, these orders not only sequestered these shares, but also stated that all interested persons should be informed. The subsequent Minutes of 13 May 2009 stated, among other things, that 100% of the share ownership in the "statutory capital" of KPM and TNG had been sequestered and that, "*It is prohibited to carry out any actions related to the alienation or transfer of the sequestered property (100% share ownership in the statutory capital) to third parties.*"

1425. In addition to these difficulties, the Claimants were faced with on-going taxation claims by the State, as well as the State's efforts to collect on the judgement made by the court against KPM. On 18 September 2009, in addition to a 4-year prison term for Mr. Cornegruta, the criminal court ordered KPM to pay 21,675,578.00 Tenge (approximately USD 145,475,534.08) to the Kazakhstan state budget. On 30 September 2009, the Financial Police ordered the Aktau territorial customs body to conduct a new audit of KPM based on its failure to pay the Crude Oil Export Tax for its January 2009 exports. By December 2009, following a number of court procedures, the Specialized Interdistrict Economic Court issued a consolidation decision, rejecting KPM's and TNG's challenges to corporate back taxes. At the same time, the Financial Police pursued interrogations of KPM employees with respect to a potential tax assessment in relation to 2008 export taxes. In early 2010, KPM commenced a new action to challenge the Financial Police's claim that it owed 2008 export taxes on oil exports. On 31 March 2010, after having paid significant sums in relation to export taxes, KPM and TNG were successful before the Central Customs Committee which notified them that pursuant to their subsoil use contracts, they were not liable for export taxes from October 2008.

1426. A myriad of enforcement actions ensued. On 29 December 2009, the Aktau City Court issued a writ of execution against KPM for the execution of the criminal courts' order to pay the fine of approximately USD 145 million. In early 2010, the Aktau Division of the Enforcement Officers of the Mangystau Oblast issued a Decree on Initiating of the Enforcement Proceedings against KPM for the Recovery of Revenue for the amount of USD 145 million. Enforcement measures



followed this decree from January to June 2010, including seizures of various bank accounts on 10 January 2010, seizure and impounding of motor vehicles on 22 January 2009, a further order on 25 January 2010 of the Mangystau Oblast court with respect to the outstanding Writ of Execution for the payment of 21.6 billion Tenge, together with various additional audits to determine the particulars of remaining assets. By 3 February 2010, the Ministry of Finance notified KPM that it was being monitored for bankruptcy (as of 26 January 2010) for the sum of 3.8 billion Tenge, including interest relating to alleged back taxes and penalties for corporate taxes. On 19 February 2010, the Chief of the Aktau Territorial Department issued a further writ of execution while noting that previous collection orders had gone unfulfilled. This particular order (actually received on 1 March 2010) attached some 2,186 assets previously listed in the detailed inventory. On 23 February this same official issued a further order prohibiting KPM from executing import and export formalities regarding the transportation of oil. On 26 February 2010, this same official dismissed KPM's challenge to the writ of enforcement and issued an order "*to attach the oil pipeline from [the] OTP to Opornaya CRMB [Commoditiies and Raw Material Base of Opornaya Station] of 18 kilometers*" and KPM's accumulator oil tanks. This order also prohibited KPM from transferring oil to the main pipeline operated by KazTransOil once its accumulator tanks reached their capacity. Later, on 4 March 2010, the Chief of the Aktau Territorial Department, despite attachment of numerous accounts and assets, complained that these efforts had not so far been successful and, accordingly, he wished to change course by seeking an enforcement procedure to in-kind transfers of land lots, the 18km pipeline, KPM's Contract 305 over the Borankol field and KPM's subsoil use license No. 309. By 17 March 2010, the Acting Head of the Aktau Territorial Department of Judicial Executors relented and agreed with KPM to suspend the effect of the previous orders made on 23 and 26 February 2010 in order to avoid the suspension of production activity by KPM.

1427. In the meantime, in October, 2009, Starleigh had presented an initial bid of USD 450 million for Claimants' properties in Kazakhstan. Later, in November 2009, Starleigh reduced this bid by USD 100 million, ostensibly in recognition of the USD 145 million fine that had been imposed on KPM by the criminal court. Around this same time, KMG NC began to pursue a possible purchase of the Claimants' assets. At a meeting in Amsterdam in November 2009, the Claimants received an offer from KMG NC of USD 20 million for their equity interests in their companies (immediately following a meeting between KMG NC and representatives of certain of the noteholders in which they were supposedly offered 25 cents on the dollar for their notes). Subsequently, Starleigh made a further offer of USD 50 million on the assumption they could buy out the noteholders. Grand Petroleum offered to purchase KPM and TNG for USD 1.15 billion.

1428. On 13 February 2010, the Claimants successfully negotiated the sale of 100% of their shares and participatory interests in KPM and TNG to Cliffson Company S.A. The total value of that agreement, including buying out the companies' noteholders (including the purchase of Tristam), payment for the Claimants' equity interests, and assumption of liabilities was in the order of USD 920 to 930 million. Claimants say this was a reduced value for their assets in view of the impact of the criminal judgement and its enforcement against KPM. One condition of this potential sale was that the MOG would grant permission for the sale and waive the State's alleged pre-emptive right to purchase KPM and TNG. The MOG conditions



for approval of this potential sale included removal of the attachment orders as well as assurances concerning the financial solvency and technical and managerial capabilities of the Cliffson Company. The Respondent says it co-operated with the Claimants on this matter while the Claimants say that Kazakhstan did not co-operate.

1429. On 30 April 2010, the MOG responded to the Claimant's application, dated 12 April 2010, for approval of the intended sale of their assets to Cliffson Company. The MOG requested additional information regarding the terms of the proposed transaction, but more importantly, noted Kazakhstan's previous seizures of the companies' assets and stated that transfers of the shares of KPM and TNG were forbidden. The MOG stated that, as a result, the transaction would only be approved if KPM and TNG satisfied the requirements necessary to release the attachment of their shares.

1430. On 6 May 2010, the Cliffson Company signed an amendment to the SPA to extend the time for completing the transaction. On 1 June 2010 the MOG renewed its request for further information in relation to the Cliffson Company transaction. By 9 June 2010, however, the Court Execution Body of the Mangystau Region – the Acting Chief of Aktau Territorial Department of Judicial Executors - ordered the sale of KPM's assets as a single lot, so as to avoid any suspension of activities.

1431. On 15 June 2010, the Claimants wrote to Cliffson Company to express their concern that it was "*backing out*" of the proposed transaction. Shortly after, on 23 June 2010, the Claimants wrote to MOG in reply to MOG's earlier requests, on 30 April and 1 June, for further information in relation to the Cliffson Company transaction. The Claimants subsequently learned that Cliffson Company had submitted a letter to the MOG stating that it refused to purchase the interests in TNG and KPM under their 13 February 2010 agreement.

1432. It is the mandate of the Tribunal to decide on the Relief Sought by the Parties, no less, but also no more. The Tribunal notes that Claimants, in their Relief Sought as cited above in this Award, do not request a separate amount allegedly caused by their prevention from selling the investment, but rather base their amounts requested on alleged violations related to the Borankol and Tolkyn Fields and Munaibay Oil, to the Contract 302 Properties, and to the LPG Plant. Therefore, the Tribunal hereafter will focus on these claims and considers that it does not have to decide whether Respondent's actions prevented Claimants from selling their investments, unless this issue may become relevant for one of the claims raised. This will be taken into account in the Tribunal's examination of the respective claims hereafter.

**K.III.      Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause)**

      **1.      Arguments by Claimants**



1433. When the State argues that injury resulted from acts of the victim or the market, rather than its own wrongful acts, the burden is on the State to prove such an intervening cause. Respondent has not met that burden. Respondent argues that the Tristan debt structure, the financial crisis, the drop in oil prices, and the "*constant withdrawal of cash from the companies*" led to "*a severe underfunding of KPM and TNG and subsequently, to the companies no longer complying with their obligations under the Subsoil Use Contracts and Kazakh law. The eventual termination of the contracts was a logical consequence.*" While KPM and TNG experienced a short-term liquidity shortage in the first half of 2009, that problem was magnified by Kazakhstan's actions and, in any event, did not lead to the failure of the companies. There never were any lawful grounds for terminating the Subsoil Use Contracts of KPM and TNG, or seizing their assets. Claimants never abandoned their investments. (CPHB 2 ¶¶ 247 – 248).

1434. There is no credible evidence to support Respondent's argument that KPM and TNG were overleveraged prior to state action, and that that doomed them to fail after oil prices dropped due to the financial crisis. This argument is belied by the facts. Prior to 14 October 2008, KPM and TNG were neither insolvent nor overleveraged. Prof. Olcott's statement that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations is not credible and she was not qualified to make the statement. Likewise, Mr. Gruhn of Deloitte failed to perform any direct analysis of KPM and TNG's abilities to service their debt. Deloitte's argument concerning the trading value of the Tristan notes indicated financial distress is rubbish. As Howard Rosen of FTI explained, prior to the Lehman bankruptcy, Tristan notes were trading close to their USD 100 face value (at USD 95). The day immediately following, the trading price was USD 84.50 and the value steadily declined to around USD 65 on 14 October 2008. At the time, the markets were not trading on fundamentals, and investors sold securities for a variety of reasons, including raising cash to meet investor calls, to reduce risk, or simply due to panic. FTI analysed the finances of KPM and TNG and concluded that they were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0. (CPHB 1 ¶¶ 399 – 404; CPHB 2 ¶¶ 249 – 253).

1435. Kazakhstan partly caused and greatly exacerbated the liquidity problem that KPM and TNG experienced in 2009. When Kazakhstan argues that KPM and TNG only had USD 9 million in cash on hand at the end of September 2008, they ignore that they also held USD 22 million in inventory and USD 296 in trade receivables at that time. In total, their net working capital was USD 222 million. That was a solid cushion, and they were a very long way from insolvent. That the primary assets were in receivables did not create a liquidity issue, since KPM and TNG could use the prepayment provisions of the Vitol COMSA agreement as a revolving line of credit to manage their cash flow requirements. (CPHB 2 ¶¶ 254 – 255).

1436. In the first half of 2009, a number of factors nonetheless combined to produce a liquidity crunch, including (1) low prices and slow payments by customers, (2) reduction in gas and condensate sales due to the non-renewal of the Kemikal contract, and (3) Vitol's decision to stop funding LPG Plant, and to reduce the credit line under the prepayment terms of the COMSA agreements from USD 120 million to USD 40 million effective at the end of June 2009. As a result, Claimants



sought the Credit Suisse Loan, in order to protect the company in the event that prices should continue to decline. The decision to see bridge financing was not a sign of financial distress. Nevertheless, the cash problem came to a head in June 2009 when 2 large payments became due – the USD 22 million payment on the Tristan notes and an EPT of USD 25 million. The failure to make either of these payments would have jeopardized KPM and TNG, and this forced Claimants to seek out the Laren loan facility. (CPHB 2 ¶¶ 255 – 257).

1437. The market causes not attributable to Kazakhstan were temporary. The low oil price environment was over by the fourth quarter of 2009. 2008 was an anomalous year because oil climbed to unprecedented highs and shocking lows. The companies average realized gas price declined only 14.2 percent from 2008 – 2009. The 52.1% decline in the companies' gas sale revenue was due to reduced sales volumes, attributable to Kazakhstan's conduct. The companies nonetheless survived the temporary cash flow crisis and even continued paying employees. Even with low oil prices, KPM and TNG did not record substantial losses – KPM recorded a net loss of USD 13 million and TNG recorded a net profit of USD 9.4 million, after paying interest in Tristan debt. The companies were not overleveraged. (CPHB 1 ¶¶ 409 – 415). But for the actions of Kazakhstan, they would have been well positioned to rebound as oil prices climbed back toward historic highs in the second half of 2010. (CPHB 2 ¶¶ 258 – 261).

1438. The evidence shows that Claimants did not abandon their investments. Kazakhstan's argument that Claimants' stripped KPM and TNG of cash in preparation to abandon them is unsupported and wrong. KPM paid dividends in 2009 and 2010 to avoid seizure of the funds – not to prepare for voluntary abandonment. It was apparent that any money flowing into KPM's bank accounts was at risk to satisfy the USD 145 penalty illegal imposed on KPM on 18 September 2009. Further, allowing Tristan to collect funds that would otherwise have been frozen in KPM's bank accounts was reasonable. Tristan noteholders did not place Tristan in default based on those payments, indicating that the noteholders were satisfied with the steps that Claimants took to enable that coupon payment. Tristan Oil's payment of a USD 3.86 million bonus to Anatolie Stati is a non-issue, as he has a right to receive the profits of his investment. The payment did not exacerbate any liquidity problems at the end of 2009, because there were none. (CPHB 1 ¶¶ 416 – 422; CPHB 2 ¶¶ 262 – 264).

1439. The declaration of dividends was a reasonable effort to mitigate harm caused by Kazakhstan's actions. The assignment of receivables allowed Tristan to collect funds that otherwise may have been frozen and allowed Tristan to make the USD 28 million coupon payment in full. It prevented Tristan's default on the notes. (CPHB 2 ¶ 264).

1440. Claimants dispute Respondent's assertion that KPM and TNG had not collected USD 170 million in receivables from Montvale, because it invested funds from Vitol in certain non-liquid assets. In any event, this does not show that KPM and TNG's failure to collect receivables was part of a preparation to abandon the companies. (CPHB 2 ¶ 265).

1441. The evidence demonstrates that Claimants went to great lengths to protect their investments. The assignment of receivables prevented a default on the Tristan



notes. Claimants went to great lengths to pay KPM's employees after its accounts were frozen in 2010 by having TNG pay those employees from its accounts. The Laren loan was secured by a personal guarantee from Anatolie Stati and a pledge from Ascom of its assets in Iraq, and was necessary to keep the companies alive. Thus, Claimants made every effort to protect their assets, right up to seizure in July 2010. (CPHB 2 ¶ 266).

## 2. Arguments by Respondent

1442. KPM and TNG's demise, which was unrelated to Respondent and was related to self-inflicted and external financial stress, ultimately led to the breaches of the Subsoil Use Contracts and to the termination of those contracts and the invocation of the trust regime. In particular:

    *(a)*    *Claimants mismanaged their assets on numerous occasions, for example by putting alarmingly incompetent personnel in charge of important tasks and by promising sales to business partners that they could have never made. The mismanagement went so far that market observers were concerned about "weak corporate governance standards at Tristan". The overall level of mismanagement comes as no surprise given that Claimants had no prior experience in oil and gas production and in the Kazakh or international markets.*

    *(b)*    *KPM's and TNG's business was very risky from the start, as was set out clearly in the Tristan note prospectus.*

    *(c)*    *KPM's and TNG's financing structure, which aimed at removing capital from the companies, made them vulnerable to situations of crisis*

    *(d)*    *Claimants took business decisions aimed only at short-term profit. In particular the ramping up of production at the end of 2007 was short sighted, as it led to a loss of available gas production for the LPG Plant and the allegedly expected possibility of gas export (which the Republic denies).*

    *(e)*    *In April of 2008, Claimants found out that their estimates for production from Borankol had been overstated by 300%. At the time, Claimants received the new Miller&Lents reserves report which set out 2P reserves of 24.6 MMboe. The earlier report by Ryder Scott had provided for 2P reserves of 72.4 MMboe. The effect of this loss was particular significant because Borankol is a predominantly oil producing field and oil production is much more valuable than gas production.*

    *(f)*    *KPM and TNG were already in severe financial difficulties as of Claimants' valuation date, as is evidenced by the development of the Tristan notes price.*

    *(g)*    *Severe drops in energy prices and in demand, in particular due to the loss of Kemikal as a customer, led to a very restricted cash position for KPM and TNG. At the same time, the need for capital expenditure increased markedly, putting further pressure on the companies.*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

*(h)*   *Against this background, when uncontestedly legal tax demands were raised by the state in the summer of 2009, Claimants had to take out the horrendous Laren loan and issue new notes in the amount of USD 111.1 million in connection thereto.*

*(i)*   *Thereafter, Claimants deliberately chose to withdraw cash from KPM and TNG, all while not fulfilling the annual work programs. This was effectively the deliberate abandonment of the companies. (R-III ¶ 440; RPHB 2 ¶¶ 60 – 61).*

1443. KPM and TNG were in poor financial health prior to Claimants' valuation date. Importantly, the Tristan note trading price stood at USD 65.125 for a nominal value of USD 100, translating to a yield to maturity of 26.319%, indicating that the markets expected a default. While Claimants try to attribute this to the Lehman bankruptcy, that statement is misleading. At the same time, oil and gas prices strongly decreased, putting additional pressures on the companies' revenues and the market's risk perception made it difficult to obtain financing. Additional key financial figures indicate that KPM's and TNG's financial figures deteriorated prior to 14 October 2008, including their current ratios, (which decreased from 5.74 at year end 2007 to 3.06 on 30 June 2008), for example. (RPHB 2 ¶¶ 62 – 68).

1444. The PWC Due Diligence also confirmed that external circumstances were to blame for the demise of KPM and TNG. PwC found that the decline in condensate prices and the decline in oil prices were the key reasons for falling sales and profitability of TNG and KPM, respectively. The loss of Kemikal as a customer – which, contrary to Claimants' invention, was due to Kemikal's insolvency issues and not state action – also resulted in a drop in demand for Claimants' goods. Claimants' liquidity was further exacerbated by KPM and TNG's decision to have Montvale (the intermediary between KPM, TNG, and Vitol) invest USD 170 million from Vitol in non-liquid assets, rather than make payments on KPM and TNG's receivables. (RPHB 2 ¶ 69).

1445. These cash constraints caused KPM and TNG to stop their capital investment programs, putting them in breach of their annual work programs and causing them to stop the LPG Plant project. Thus, that work stoppage cannot be attributed to Respondent. An additional consequence of these cash constraints was the infamous Laren loan and the corresponding issuance of USD 11.1 million in new Tristan notes. (RPHB 2 ¶ 70).

1446. Regarding Claimants' criticisms of the PwC Due Diligence Report, Claimants could have objected to its introduction or have asked for an opportunity to produce counter evidence – they did not. PwC prepared a financial due diligence report that did not assess the legality of any state action, as that was beyond the scope of the report. PwC assessed all circumstances that could affect the financial situation, caused lawfully or unlawfully. (RPHB 2 ¶¶ 71 – 72).

1447. Claimants' contention that the auditor's going concern qualification in the Interim Report shows that the Republic's actions caused injury to Claimants is not true. Instead, the qualification demonstrates the severity of Claimants' situation due to the uncontestedly lawful tax claims (EPT which have never been objected to by



KPM or TNG), the non-payment of which led to the freezing of KPM and TNG's accounts and the Montvale payment issue. (RPHB 2 ¶¶ 73 – 76)

1448. The oil price decline in 2008 and 2009 had a severe impact and was one of many factors affecting KPM and TNG. The drop in demand persisted through 2009, where Tolkyn was producing at 2005/2006 levels and then in 2010, when it produced at 2002 levels. At the same time, Claimants own evidence from Miller & Lents shows that Claimants needed an additional capital expenditure of USD 276.2 million to keep the estimated 2P production near the levels estimated in the 2008 Miller & Lents report. Thus, 2007 and 2009 are not comparable at all and 2009 was particularly volatile. Prices even dropped below USD 70/barrel in 2010. Claimants' argument that gas prices did not decline significantly is contradicted by Anatolie Stati's testimony. The objective evidence also shows that Anatolie Stati was lying when he stated that gas prices had been going up from summer 2008 to the beginning of 2009. (RPHB 2 ¶¶ 77 – 82).

1449. Claimants effectively abandoned the companies in 2009 and 2010, stripping as much cash from KPM and TNG as possible, issuing a USD 72 million dividend in 2009 and 2010 and transferring receivables to Ascom. These were paid in violation of the Tristan note indenture. As a result, KPM had no cash inflow. Claimants admit that they stripped the assets to avoid seizure by the State. Claimants have not proven that any of the USD 72 million was used to repay interest on the Tristan notes. Since the noteholders had not placed Tristan in default at that time, Claimants had not obligation to pay the interest. Claimants also suggested that the USD 72 million was used to repay Laren lenders and to keep paying KPM's employees, but this is also unproven. Finally, Claimants extension of the payment terms for Stadoil and General Affinities further stripped their assets. To date, Claimants have not clarified whether Stadoil or General Affinities ever made payments on the trade receivables. Accordingly, the evidence demonstrates that Claimants indeed abandoned KPM and TNG and only kept the companies on life support in order to force the Republic to terminate the contracts, so that Claimants could then advance these claims in arbitration. (RPHB 2 ¶¶ 83 – 90, 128).

1450. Claimants likely siphoned off more moneys by extending the due date on accounts receivables due from affiliated companies. Even the Tristan Oil Annual Report (2009) mentions that Claimants would cancel delivery for equipment to the LPG Plant, and then a third company, Perkwood Investments, would return the advance paid. Claimants have provided no trace of this money (USD 36,800,212) and likely pocketed it. Claimants would also divert cash to operating companies, such as by paying Anatolie Stati's CASCO double the market price to do work. There were also opaque service agreements with Ascom. Likely, there are other transactions, but Claimants' opaque financing structure makes it impossible to see those. FTI estimates that diverted monies could be as much as USD 226.6 million. (R-III ¶ 441; RPHB 1 ¶¶ 1038 – 1049; RPHB 2 ¶ 17).

1451. Assuming liability and causality, these financial difficulties have major implications for the calculation of damages and the selection of a valuation date.

### 3. The Tribunal

