**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD., <br><br> Petitioners, <br><br> v. <br><br> REPUBLIC OF KAZAKHSTAN, <br><br> Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:14-cv-1638-ABJ |

**RESPONDENT REPUBLIC OF KAZAKHSTAN'S
<u>OPPOSITION TO PETITION TO CONFIRM ARBITRAL AWARD</u>**

# EXHIBIT 22



---

**BRIEF IN CASE NO T 2675-14**

---

**REPUBLIC OF KAZAKHSTAN**


**v.**


**ANATOLIE STATI ET. AL.**

---

**Svea Court of Appeal**

29 November 2014

---

MAQS Advokatbyrå Stockholm AB | Mäster Samuelsgatan 20, Box 7009, SE-103 86 Stockholm, Sweden
Tel +46 8 407 09 00 | Fax +46 8 407 09 10 | E-mail stockholm@se.maqs.com | Reg.No. 556950-7659
www.maqs.com

STOCKHOLM  GOTHENBURG  MALMÖ

**TABLE OF CONTENTS**

1      INTRODUCTION ............................................................................................................ 4

2      SWEDISH AND INTERNATIONAL PROCEDURAL LAW ACCORDING TO LEX ARBITRI ................... 8

3      GROUNDS FOR THE CHALLENGE ................................................. 13

      3.1     The fact that RoK has been deprived of the right to appoint its own arbitrator is clearly inconsistent with the fundamental principles of the Swedish legal system or, in the alternative, an error in the appointment or otherwise an impropriety in the proceeding which probably affected the outcome of the case............................................... 13

            3.1.1   The SCC is to ensure the parties' rights ................................................. 15

            3.1.2   The SCC has failed in its *prima facie* assessment in relation to the ECT ............... 19

            3.1.3   The SCC erroneously assumed that RoK should have appointed an arbitrator in its response ................................................................................................................... 21

            3.1.4   The SCC acted in contravention of the rules regarding due process and equal treatment by ordering deadlines which were entirely too short, giving unclear instructions, and committing other serious mistakes ............................................... 22

            3.1.5   The SCC did not give RoK the right to be heard when an arbitrator was appointed on RoK's behalf.............................................................................................................. 29

            3.1.6   The SCC has failed to reach the standard which the law imposes on the court when it acts as an elector ................................................................................................. 29

            3.1.7   The SCC did not give RoK the right to be heard when the chairperson of the arbitral tribunal was appointed ....................................................................................... 32

            3.1.8   The SCC failed to rectify its mistake by failing to give RoK an opportunity for a new appointment ................................................................................................. 33

            3.1.9   Summary of the SCC's infringement of RoK's fundamental procedural rights......... 33

      3.2     The arbitral award is not covered by an arbitration agreement which is binding on the parties since Stati failed to satisfy the requirement for first-stage negotiations as prescribed in article 26 of the ECT. ................................................................... 36

            3.2.1   Introduction ....................................................................................................... 36

            3.2.2   There is no arbitration agreement binding on the parties........................................... 38

            3.2.3   The provision regarding first stage negotiations is a jurisdictional issue................. 41

            3.2.4   Stati has failed to comply with the condition regarding first stage negotiations pursuant to article 26 of the ECT.................................................................... 53

            3.2.5   The stay of proceedings in the case has not cured the lack of jurisdiction in connection with the request for arbitration ...................................................... 60

            3.2.6   RoK has never waived its jurisdictional objection ............................................... 63

            3.2.7   The Arbitral Tribunal failed to correctly decide the issue........................................... 64

      3.3     The arbitral award is not covered by a valid arbitration agreement between RoK and Terra Raf .............................................................................................. 65

            3.3.1   Pursuant to article 40(2) of the ECT, the ECT does not apply to Gibraltar.............. 65

            3.3.2   The ECT is not provisionally applicable to Gibraltar.................................... 66

      3.4     The Arbitral Tribunal exceeded its mandate and committed several procedural errors by failing to take into consideration facts, objections, crucial evidence and relevant law........................................................................................ 68

3.4.1   Introduction ................................................................................................ 68

3.4.2   The Arbitral Tribunal based the arbitral award on facts which were not invoked or ignored facts and crucial evidence which RoK invoked ........................................................ 68

3.5    The Arbitral Tribunal failed to take into consideration crucial testimony in respect of the value of the LPG Plant .................................................................................................. 72

3.6    The Arbitral Tribunal failed to consider expert testimony and other evidence invoked by RoK regarding many important and disputed issues in the case ...................................... 75

3.6.1   The Arbitral Tribunal adjudicated the issue of the classification of pipelines under Kazakh law without considering Kazakh law and related expert witness testimony ............. 75

3.6.2   The Arbitral Tribunal decided issues regarding Kazakh civil law without considering crucial expert evidence regarding Kazakh civil law ............................................................. 77

3.6.3   The Arbitral Tribunal decided issues regarding Kazakhstan tax law without taking into consideration expert witness evidence regarding Kazakhstan tax law .......................... 77

3.6.4   The Arbitral Tribunal has decided the question of causality without taking into consideration RoK's economic experts ............................................................................... 79

3.6.5   The Arbitral Tribunal decided a question regarding international law and EU law without taking into consideration RoK's expert evidence regarding these legal areas ......... 80

3.6.6   The Arbitral Tribunal relied on Stati's geological experts without stating the reasons for this and therefore entirely failed to consider RoK's geological experts' opinions and testimony ..................................................................................................................... 80

3.7    The Arbitral Tribunal failed to take into consideration RoK's objections that certain deductions must be made from any damages awarded ...................................................... 82

3.7.1   The Arbitral Tribunal did not take a decision regarding RoK's arguments that all revenues accruing to Stati between the valuation date and the date of the termination of the agreement should be deducted from any damages ............................................................ 82

3.7.2   The Arbitral Tribunal did not take into consideration, or take a decision regarding, RoK's objection that an arbitral award for the LPG plant can only cover half of the assumed value  84

3.8    The Arbitral Tribunal has gone beyond the parties' arguments and failed to consider the parties' arguments and the applicable law ...................................................................... 88

3.8.1   The Arbitral Tribunal incorrectly handled the question of KazAzot as a liability question despite the fact that it was argued by both parties only in relation to the pricing of gas; as a consequence, the Arbitral Tribunal relied on circumstances never argued by any of the parties and failed to apply the correct legislation ............................................................ 88

3.8.2   In its decision regarding the press release from INTERFAX, the Arbitral Tribunal, by emphasising that RoK did not contest the fact, relied on a fact not argued by any of the parties 91

3.8.3   In its decision regarding the financial police, the Arbitral Tribunal relied on facts never argued by any of the parties and on an alleged admission by RoK which was never made  92

3.8.4   With respect to the issue of a lowering of the liability, the Arbitral Tribunal erroneously held that a certain legal agreement had been conceded by RoK and the Arbitral Tribunal thus failed to take into consideration legal arguments made by RoK ..................... 92

3.8.5   With respect to the valuation of Borankol and Tolkyn, the Arbitral Tribunal erroneously assumed that RoK has stipulated to a certain valuation result when, in reality, RoK had clearly and unambiguously stated that the valuation result was erroneous and inflated 93

4      REGARDING STATI'S MOTION FOR REMAND TO THE ARBITRAL TRIBUNAL .............................. 95

5      CITED CASE LAW ................................................................................................................. 97

In our capacity as counsel for Republic of Kazakhstan ("**RoK**"), we hereby submit a brief in reply to the statement of defence dated 27 June 2014 ("**Statement of Defence**") submitted by Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Traiding Ltd. (below "Stati") in accordance with the court's order of 19 September 2014.

Unless expressly stipulated by RoK, no facts alleged by Stati in the case shall be deemed admitted.

## 1      INTRODUCTION

(1)      RoK maintains its claims as set forth in the Statement of Claim dated 19 March 2014 ("**Statement of Claim**"), namely that the Arbitral Award is invalid, or, in the alternative, that it be set aside on a number of grounds.

(2)      It is a fundamental principle of international arbitration law that each party be ensured the right to appoint an arbitrator. The SCC itself, in an earlier proceeding to which RoK was a party and which was administered by the same administrative official, stated that the SCC may only appoint an arbitrator where a party "explicitly denies or neglects" this right. In the previous case, the SCC held that it is "a fundamental prerequisite of any international arbitration" that each party be ensured the right to appoint an arbitrator. The SCC also held that the Institution's (the SCC) exercise of its power to appoint an arbitrator in cases other than where necessary could jeopardise the arbitration proceedings and constitute grounds for a future challenge.

(3)      When the SCC appointed Professor Lebedev on RoK's behalf, it had not previously ordered RoK to appoint an arbitrator or otherwise voiced its expectation that RoK should appoint an arbitrator in its Answer. Moreover, the SCC had not informed RoK that if RoK failed to appoint an arbitrator, the SCC would (within the course of a few days) do so on its behalf. These failures in communication were aggravated by the short deadlines which the SCC set for RoK's Answer to Stati's Request. Unlike the 90-day deadline granted to states in the ICSID Convention, the SCC ordered an initial 15-day deadline from receipt of the Request, and then an additional 9-day deadline from receipt of the reminder letter. Stati seeks to justify these time frames by referring to the 14-day deadline under the old Swedish Arbitrators' Act of 1929, which has, however, been generally perceived as being far too short for even domestic, Swedish arbitration

(4)      The short deadlines which were set for RoK were particularly unfortunate since Stati failed to request the amicable settlement negotiations which, pursuant to article 26 of the ECT, must precede a request for arbitration by at least three months. While it is apparent from the scope of the request for arbitration (40 pages and 42 appendices) that Stati obviously put several months of work into its preparation, Stati failed to request amiable settlement under the ECT. This must have been obvious to the SCC (being one of two institutions entrusted with the administration of arbitration under the

ECT) when the SCC received the request for arbitration, where the alleged attempts to commence amicable settlement appear in Stati's appendices. Contrary to Stati's allegations, the letters sent by some, (but not all) of the claimants more than one year before the arbitration was initiated without any reference to the ECT would manifestly demonstrate that the alleged attempts to initiate amicable settlement within the meaning of article 26 ECT, were not in line with the requirements; a fact the SCC should have realised also during its *prima facie* review of the Request.

(5)    The absence of any clear order to appoint an arbitrator and the short deadlines were in clear contrast to the SCC's practice when RoK had previously been a party to an SCC arbitration. When the deadline set for RoK had passed, the SCC did not even verify that RoK had received Stati's request that an arbitrator be appointed on RoK's behalf. Moreover, RoK was not informed that the SCC intended to appoint an arbitrator on RoK's behalf. Instead, the SCC immediately appointed Professor Lebedev, who accepted the appointment within a few hours. The SCC then appointed Professor Böckstiegel within less than a week, again without consulting RoK (or Stati) on this appointment.

(6)    By denying - with the curt message that no "ground for disqualification" existed - RoK's request to revoke the appointment of Professor Lebedev as an arbitrator, which would allow RoK the opportunity to appoint its own arbitrator, the SCC failed, contrary to its prior practice, to rectify this mistake.

(7)    The arbitration that followed and the award which was rendered were affected by the SCC's unlawful appointment. One of the reasons why a party's right to appoint its own arbitrator is of such fundamental nature is the special role performed by a party-appointed arbitrator; it is his or her task to ensure that the party's case and arguments are properly understood and considered by all the arbitrators. The errors committed by the tribunal in the form of exceeding its mandate, failing to consider material evidence and making incorrect assumptions in respect of admissions or stipulations are typically the result of an arbitrator failing to do his or her job.

(8)    Professor Lebedev, by virtue of his improper appointment, is not the only person who should have been prevented from hearing the dispute. The entire arbitral tribunal lacked jurisdiction since RoK never consented to arbitration of the dispute with Stati within the scope of the ECT.

(9)    Under article 26 of the ECT, the signatory states make a standing offer to arbitrate but this offer is not unconditional. The language of article 26 ECT is clear in that it only constitutes an offer to arbitrate if the investor requests amicable settlement in accordance with the ECT and such attempts have proven to be fruitless for a period of at least three months.

(10)   Stati erroneously attempts to characterise the fact that the cooling off period constitutes a jurisdictional requirement as an untenable minority position. However, a

number of arbitral tribunals have held that the cooling off period is such a requirement, since it serves several important functions, not the least of which is to give the state an opportunity to formulate its defence, e.g. by retaining legal counsel, exploring the legal situation, and considering potential arbitrators.

(11) In the instant case, Stati never requested amicable settlement under the ECT. Since arbitration proceedings are conditional upon consent, such a failure cannot be cured by a subsequent stay of the proceedings. Commencing arbitration without having complied with the requirements encompassed by the offer to arbitrate cannot be cured. RoK refutes, in its entirety, Stati's allegation that the parties are bound to arbitrate. Rather, RoK has, at all times, maintained its objection to jurisdiction on the grounds of the failure to comply with the requirement for amicable settlement discussions, despite Stati's repeated attempts to have RoK waive this objection.

(12) In addition, Stati's failure to observe the requirement of amicable settlement discussions also contributed to the improper appointment of Professor Lebedev; this, as well, could not be rectified through a subsequent stay of the proceedings for settlement negotiations.

(13) The fundamental objections set forth above are addressed in an expert opinion by Professor Bengt Lindell (Exhibit 1), on which RoK relies in this case. Professor Lindell concludes, *inter alia*, that the cooling off period is a condition precedent for a valid arbitration agreement. The fact that the arbitration was subsequently stayed for three months did not cure the absence of a valid arbitration agreement. Moreover, the denial of RoK's right to appoint its arbitrator violates fundamental principles of the Swedish law. Accordingly, the Award is invalid under section 33, second paragraph, of the Arbitration Act as a violation of the public policy doctrine (*ordre public*).

(14) The Arbitral Tribunal also lacked jurisdiction to decide the dispute because one of the claimant parties, Terra Raf, was incorporated in Gibraltar, which is not a signatory to the ECT. Stati provides several explanations, albeit none which are sustainable, to establish the application of the ECT to Gibraltar. Stati argues, *inter alia*, that the ECT applied both provisionally and directly to Gibraltar, not taking into consideration that the treaty can only apply either provisionally or directly. Gibraltar's provisional accession to the ECT ended in 1966, when the United Kingdom ratified the ECT with regard to the United Kingdom, and the Isle of Man in 1996 - but not Gibraltar. Stati concedes that the arbitral tribunal's grounds for accepting jurisdiction, i.e. on the grounds of EU membership, was "somewhat simplistic", which can only be understood to mean that the arbitral tribunal was wrong.

(15) Moreover, in some cases, the arbitral tribunal has exceeded its mandate or committed procedural errors which had an impact on the outcome of the case. One of the more obvious of the arbitral tribunal's errors was its failure to consider the invocation of Khalelov's crucial testimony. The Arbitral Tribunal awarded Stati USD 199 million for an unfinished LPG Plant, notwithstanding that Stati had never proven that the plant,

once finished, would be economically viable and should have been valued as more than scrap. The Arbitral Tribunal rejected RoK's objections solely on the grounds that it believed, that RoK itself had continued the construction of the plant once Stati had left the country. The Arbitral Tribunal based this conclusion on two links to websites which, however, had not been offered into evidence. The allegation was, instead, disproven by the only witness on this issue - Khalelov the General Manager of the company and its administrator, who was therefore very familiar with the status of the LPG Plant. The Arbitral Tribunal completely failed to consider RoK's witness in its determination. Khalelov's evidence is not referred to in the arbitral tribunal's reasoning for its decision on this issue. It is clear from the arbitral tribunal's statement of the procedural history of the case, in which all witnesses are identified with the exception of Khalelov, that that the arbitral tribunal either forgot or failed to take into consideration Khalelov's testimony

(16)     In addition, on almost every disputed issue of the case, the arbitral tribunal failed to take into account material expert and witness evidence. To give one example, the arbitral tribunal held that Stati had not operated trunk pipelines in accordance with Kazakh law but failed to mention, even once, the expert opinions offered by RoK in respect of the relevant law to prove that Stati had operated such trunk pipelines. This assumption, which was made without considering material evidence, formed the basis for the arbitral tribunal's conclusion that the criminal proceedings regarding operation of trunk pipelines was an *ex post facto* reconstruction.

(17)     In respect of similar grounds which were invoked, Stati has alleged that the arbitral tribunal took the evidence into consideration but found it unreliable. However, this is pure speculation on Stati's part. Stati cannot submit any evidence in support of this allegation. The primary source of evidence on which the Court of Appeal is to proceed is the arbitral award, which must be regarded as a reflection of the evidence that the arbitral tribunal took into consideration. In light of the lack of references to material and relevant evidence, the conclusion must be that no such evidence was taken into consideration.

(18)     The Arbitral Tribunal disregarded more than just evidence. The Arbitral Tribunal also disregarded objections by RoK which can be equated with an objection that there has been set-off and which would have materially affected the amount awarded to Stati. The Arbitral Tribunal selected an early valuation date and awarded Stati the value of the assets which the arbitral tribunal assumed as of such date in respect of anticipated cashflow. However, Stati continued to operate the business for more than a year after the valuation date chosen by the arbitral tribunal, and thereby continued to generate revenue from the sale of oil and gas. Stati had thus already realised a large part of the future cashflow on which the value had been based. RoK proved how Stati, in several cases, transferred money from the business to closely-related companies and tendered the objection that, in order to avoid over-compensation, profits earned after the valuation date (which probably amounted to more than USD 200 million) should be

deducted from any damages awarded. Nevertheless, the arbitral tribunal failed to decide on this issue.

(19)     Finally, the arbitral tribunal proceeded on the basis of stipulations on the part of RoK where no such stipulations had been made. Moreover, it based decisions on facts which had never been argued by either of the parties. Most strikingly, the arbitral tribunal assumed that RoK had stipulated to a value of USD 277.8 million for the Tolkyn and Borankol fields should the arbitral tribunal accept Stati's valuation date and thus assigned this value to the assets. However, RoK had never made any such stipulation. Stati presented an alternative valuation method in support of their actual valuation which was based on the discounted cash flow method, which had been accepted by both parties. RoK had simply shown that based on the correct data the alternative valuation method presented by Stati would show a value of USD 277.8 million (the value which the arbitral tribunal subsequently decided to accept). RoK thus proved not only that Stati's actual discounted cash flow valuation was wrong, but that it was not supported by the alternative valuation. RoK never accepted this as a correct valuation, because the method applied was not accepted by *any* expert as a suitable method for calculating the correct value. RoK further emphasised that this amount would still need to be adjusted downwards because the data used for this calculation was not entirely comparable.

(20)     In summary, the arbitral tribunal, which lacked jurisdiction from the outset and which was comprised with one arbitrator who was appointed by SCC in breach of RoK's most fundamental procedural rights, exceeded its mandate in a number of respects and committed a number of procedural errors. The arbitral award is thus invalid or, in the alternative, it should be overturned on one or more grounds invoked by RoK.

## 2        SWEDISH AND INTERNATIONAL PROCEDURAL LAW ACCORDING TO LEX ARBITRI

(21)     In its Statement of Defence, Stati makes repeated references and analogies to the Swedish Code of Judicial Procedure as well as to Swedish employment law.[1] Contrary to Stati's suggestions,[2] RoK is not questioning that the appropriate system of law (*lex arbitri*) for the arbitration is Swedish law. However, it should be clarified that, as far as concerns the arbitration in this case, *lex arbitri* is Swedish arbitration law, i.e. the Swedish Arbitration Act (the "**SAA**") and related case law. What Stati is trying to do is to construct a purely national perspective in respect of this dispute, and to interpret the SAA based on the Code of Judicial Procedure and other domestic sources of law, which is, quite simply, wrong.

---

[1] See, e.g., the Statement of Defence, paras.102-103, 107, 123-124, 149-150 and 158.

[2] See the Statement of Defence, para.99

(22)    The arbitration law provisions in the SAA are primarily aimed at ensuring that the proceedings are conducted in accordance with due process.[3] In light of the principle of the autonomy of the parties, the provisions of the SAA are intentionally limited in order to allow the parties substantial scope for regulating the proceedings in the manner that they so desire. Consequently, even with respect to purely domestic proceedings, an application of the rules under the Code of Judicial Procedure should be avoided as far as possible; for this reason, there are no direct or indirect references to the Code of Judicial Procedure in the SAA.[4]

(23)    As regards international arbitration, it should be pointed out that national procedural provisions should not apply in such arbitration, since national procedural rules are drafted based on national circumstances that do not belong in international arbitrations.[5] This is also reflected in the SAA, the drafting of which aims at avoiding "*national peculiarities*".[6] In light of this, it follows that more extensive analogies, such as to rules governing proceedings within Swedish employment law, are not applicable to an international arbitration proceeding.[7]

(24)    This view is reflected in many foreign legal systems, where international arbitrations often occur. With respect to English law, the case of *Paul Smith Ltd. v. H & S International Holding Inc.*[8], in which Justice Steyn rendered an opinion on the issue of which law governs the arbitration, bears mentioning:

> "*What then is the law governing the arbitration? It is, as Martin Hunter and Alan Redfern, International Commercial Arbitration, p. 53, trenchantly explain, a body of rules which sets a standard external to the arbitration agreement, and the wishes of the parties, for the conduct of the arbitration. The law governing the arbitration comprises the rules governing interim measures (e.g. Court orders for the preservation or storage of goods), the rules empowering the exercise by the Court of supportive measures to assist an arbitration which has run into difficulties (e.g. filling a vacancy in the composition of the arbitral tribunal if there is no other mechanism) and the rules providing for the exercise by the Court of its supervisory jurisdiction over arbitrations (e.g. removing an arbitrator for misconduct).*"[9]

---

[3] Finn Madsen, *Commercial arbitration in Sweden*, 3rd ed., 2007, p. 48.

[4] Government Bill 1998/99:35, p. 47.

[5] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012  p. 66.

[6] Government Bill 1998/99:35, p. 46.

[7] It should be noted in this respect that, even if both parties in the case refer to Lindskog's standard work, *Arbitration - a commentary*, 2nd ed., 2012, this work mainly focuses on domestic arbitration, not international arbitration. On page 20 of the book, Lindskog sets out the scope of the proposition, stating that "[*non--Nordic law has largely not been touched upon in the broader sense […]*'.

[8] *Paul Smith Ltd. v. H & S International Holding Inc.* [1991] 2 Lloyd's Rep 127, para. 130.

[9] It must be noted that Justice Steyn makes reference to the second edition of Redfern and Hunter's *Law and Practice of International Commercial Arbitration*, which is a well-known work among arbitrators.

(25)     Gary Born, one of the most prominent arbitration law attorneys as well as a productive author and lecturer on the subject of international arbitration law, has further stated that:

> "*It is well-settled that local rules of civil procedure, applicable in national judicial proceedings, will generally not apply to international arbitral proceedings with their seat in the jurisdiction. Nonetheless, national arbitration legislation in the arbitral seat may impose rules regarding choice of law, procedural issues, statute of limitations, confidentiality, disclosure, provisional relief, and consolidation or joinder in locally-seated arbitrations.*"[10]

(26)     There is a similar view in France as well. In respect of the declaration of invalidity of an arbitration agreement, the following is stated in *Fouchard, Gaillard and Goldman on International Commercial Arbitration*[11]:

> "*… the courts now generally base their decisions as to the validity of the arbitration agreement on substantive rules of French international arbitration law.(…) In its 1993 Dalico decision, the Cour de cassation confirmed that French courts assessing the existence and validity of an arbitration agreement pursuant to Articles 1502 1° and 1504 of the New Code of Civil Procedure should only apply French substantive rules, which are described in that decision as "mandatory rules of French law and international public policy." We consider that approach to be perfectly justified for the purposes of determining the conditions subject to which an award can be given effect in France.*"

(27)     A motion to set aside an arbitral award is thus deemed, under the French international arbitration law and the courts, to be "*limited to protection of what French law considers to be the fundamental rights of parties to an arbitration, and to ensuring that relevant rules of French public policy are not infringed*".[12]

(28)     Thus, the rules in the Code of Judicial Procedure are neither directly nor analogously applicable in international arbitration proceedings. Rather, certain rules of Swedish procedural law should be viewed as an expression of general procedural law principles.[13] In this respect, there is even more reason to seek to strengthen the guarantees of due process *above and beyond* those that follow from domestic

---

[10] Born, *International Commercial Arbitration*, 2nd. ed., 2014, ¶ 14.02, p. 2058-2059.

[11] Gaillard and Savage (eds), *Fouchard Gaillard Goldman on International Commercial Arbitration*, 1999, ¶ 1611.

[12] Delvolvé, Pointon, et.al. *French Arbitration Law and Practice: A Dynamic Civil Law Approach to International Arbitration*, 2nd. ed., 2009, ¶ 389

[13] Marie Öhrström, *The Arbitration Institute of the Stockholm Chamber of Commerce – a handbook and commentary on arbitration rules*, 2009, p. 53, footnote 21; Lars Heuman also writes: "The *Code of Judicial Procedure governs a large number of issues which were left unresolved in the SAA. Where arbitrators are faced with these issues, they should definitely not apply the rules of the Code of Judicial Procedure automatically and slavishly.*" See Heuman, *Arbitration Law*, 1999, p. 306 et seq. See also the case reported on page 335 in NJA 2000.

procedural rules, instead of limiting general and fundamental principles through national legislation .[14]

(29)   In the instant case, the SAA is applied in international arbitration proceedings where there is a weak national connection. Parties, legal counsel and arbitrators can only rely on the statute (or a translation of the statute). It is in this respect that the SAA is more informative in certain regards than would have been the case if it only had a domestic readership.[15] Thus, the wording of the SAA and relevant arbitration rules are of interest. If it is not possible from the wording of a statute to resolve a situation that has arisen, the wording should be interpreted, and supplemented, by international principles, not domestic law.

(30)   In light of the above, caution should further be observed when interpreting the rules in the SAA based on its preparatory works. The reason for this is to achieve, to the extent possible, transparency and an interpretation of the SAA which does not come as a surprise to foreign arbitrators and legal counsel. Thus, fundamental principles, including, *inter alia*, the principle of *Kompetenz-Kompetenz*, the doctrine of separability and other common international arbitration rules should all be interpreted according to international custom and practice.[16]

(31)   In respect of the arbitration rules, this is a product of the parties' agreement – a type of general provisions which are part of the arbitration agreement. The arbitration rules are supplemented (just as is the arbitration agreement otherwise) by *lex arbitri*. In other words, the SCC rules are to be interpreted and fleshed out through the SAA and the SAA, in turn, is to be interpreted and fleshed-out pursuant to international legal principles.

(32)   The arbitration in this case has been distinctively international in nature. Neither the parties nor the arbitral tribunal have any connection to Sweden. The negotiations took place in Paris. The only connection to Swedish procedural law is the SCC's decision, dated 23 September 2010, that the arbitration be held in Stockholm. In light of the international nature of the case, including the cultural differences between Kazakhstan and other relevant countries, on the one hand, and Sweden, on the other hand, there are no grounds for assessing the proceedings and interpreting the rules from a Swedish point of view. This would be in conflict with the fundamental concept of the flexibility of arbitration.[17] Neither RoK, nor Stati, nor the legal counsel in the proceedings, nor the arbitral tribunal have had the opportunity - or had reason - to look in depth at individual Swedish legal principles, or the manner in which international legal principles are interpreted under Swedish law. RoK was not represented by Swedish counsel during the arbitration and Stati had also not retained Swedish

---

[14] Lars Heuman, *Skiljemannarätt [Arbitration Law]*, 1999, p. 307 et seq.

[15] Government Bill 1998/99:35, p. 47.

[16] Finn Madsen, *Commercial arbitration in Sweden*, 3rd. ed., 2007, p. 53

[17] Lars Heuman, *Skiljemannarätt [Arbitration Law]*, 1999, p. 308.

counsel. RoK retained German, English and Kazakh counsel, and Stati, which comprises parties from Moldavia, Rumania and Gibraltar, retained US, French, and (initially) Rumanian counsel. In other words, this involved a purely international proceeding. What is important in this case is that the application of the domestic rules, as far as concerns the arbitration proceedings, is in accordance with international principles.

## 3      GROUNDS FOR THE CHALLENGE

3.1      **The fact that RoK has been deprived of the right to appoint its own arbitrator is clearly inconsistent with the fundamental principles of the Swedish legal system or, in the alternative, an error in the appointment or otherwise an impropriety in the proceeding which probably affected the outcome of the case**

(33)     RoK's position in respect of the importance of a party's right to appoint its own arbitrator may be summarised as follows:

> "*Each party to an arbitral proceeding shall be afforded a right to appoint an arbitrator. This is a fundamental prerequisite of any international arbitration. Where a party explicitly denies or neglects such right, the appointment shall be made by an auxiliary jurisdiction (an arbitral institution or a court in ad hoc proceedings.*
>
> *The SCC rules empower the SCC Institute to make an appointment only where a party explicitly fails to make an appointment. The exercise of this power in excess, i.e. for the SCC Institute to appoint an arbitrator itself, could jeopardise the proceedings and may constitute a ground for a future challenge of the award. This power shall neither be used as a sanction against the party who failed to pay its advance on costs. Again, this is a universally accepted principle.*"[18]

(34)     This statement is a quote from a letter sent by the SCC in a previous action to which RoK was a party.[19] It was written as a response to RoK's opposing party to explain why the SCC had chosen to appoint a new arbitrator after the SCC had previously appointed an arbitrator on RoK's behalf (see further under section 3.1.1.). The same administrator who handled that case was also the administrator in the instant case.

(35)     As the SCC observed, a party's right to appoint an arbitrator is a fundamental right in arbitration proceedings. In the event a party is deprived of the right to appoint an arbitrator, in contrast to Stati's assertions, this would be contrary to *ordre public,* since the proceedings would have failed to meet reasonable requirements of due process.[20] This is particularly the case where, as in this case, a party is deprived of its right in a

---

[18] Letter from the SCC of 30 March 2006, Appendix 13.

[19] *Sudima Ltd and Kazakhstan Development Corporation Ltd v. Republic of Kazakhstan*, SCC Arbitration v (069/2005)

[20] See, *inter alia*, Lindell's expert legal opinion, Appendix 1, p. 26 *"[…]upon an overall assessment, the SCC's appointment of Lebedev as an arbitrator on RoK's behalf [should] be regarded as clearly incompatible with the grounds for due process in Sweden"; see also p. 27 et. seq.*

nonchalant manner.[21] The law cannot legitimise arbitration with fundamental deficiencies in due process irrespective of the approach taken by the party affected.[22]

(36)     Stati attempts to minimise the importance of the party-appointed arbitrator, e.g. by devoting three paragraphs in the Statement of Defence to explaining that arbitrators who are appointed by the parties are not to act as representatives of the parties.[23] RoK has never claimed or presumed this. Instead, in its Statement of Claim, RoK attempted to explain the role to be performed by a party-appointed arbitrator, specifically that a party-appointed arbitrator is to ensure that the case which is argued by the party which appointed the arbitrator is understood and treated in a correct manner by the entire arbitral tribunal.[24]

(37)     RoK maintains, in contrast to Stati's position, that the SCC has not administered the arbitration entirely in accordance with its rules[25], and that the SCC has acted in breach of international arbitration law principles and in contravention of its earlier practice.

(38)     The SCC states that one of its main tasks is to ensure that the dispute can be determined expeditiously since this is in the parties' interests.[26] At the same time, the SCC's overall task must, however, be to guarantee due process in its administration of the arbitration. The interest in due process can never be overshadowed by considerations of cost and efficiency. Particularly where investment disputes are involved, this interest must be weighed against other interests, such as due process, and the fact that a sovereign state is subjecting itself to an arbitration against private parties.

(39)     Arbitration constitutes an exception (approved by the legislature) to the right to a trial. Thus, the requirements of due process may not be made less stringent in an arbitral proceeding than would be the case in judicial proceedings. In light of the fact that arbitration proceedings take place in one instance, it is of particular importance that the parties are assured of their fundamental rights.

(40)     By being designated an authorised institution within the scope of the ECT, the SCC has taken over the role which is otherwise held by a court in ensuring that arbitration proceedings are conducted in accordance with fundamental requirements of due process. Thus, the SCC is required to observe fundamental legal principles in the

---

[21] *Cf.* Lindskog. *Skiljeförande – en kommentar* [*Arbitration – a commentary*], 2nd ed., 2012, p. 335.

[22] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 848 et seq. See also Heuman, *Skiljemannarätt [Arbitration Law], 1999,* p. 602 and Fouchard Gaillard Goldman, *On International Commercial Arbitration*, ¶.791.

[23] Statement of Defence, para. 95-97.

[24] Statement of Claim, para. 69.

[25] *Cf.* Statement of Defence, para.57

[26] See, *inter alia,* Öhrström, *Stockholms Handelskammares skiljedomsinstitut – en handbok och regelkommentar för skiljeförfaranden [The Arbitration Institute of the Stockholm Chamber of Commerce – a handbook and commentary on the arbitration rules],* 2009, p. 127.

same way as a court. Thus, the primary role of the SCC is to administer justice; its efforts to ensure that the arbitration proceedings are conducted efficiently and expeditiously should not thereupon result in a curtailment of due process.

(41)     As a point of departure, it must be emphasised that it appears undisputed between the parties that a party's right to appoint its own arbitrator is fundamental and that the SCC has an obligation to guarantee this and other fundamental procedural rights. Stati has not refuted RoK's position in this respect[27] but, instead, has attempted to prove that the SCC has satisfied this obligation.[28] RoK maintains that which was alleged in the Statement of Claim and does not intend to repeat that which was stated therein. Stati's assertions in its Statement of Defence have, however, given rise to the following comments.

### 3.1.1     The SCC is to ensure the parties' rights

(42)     Stati has referred to three SCC cases to which RoK has been a party. According to Stati, RoK must have understood, from these earlier cases, how an arbitrator is appointed pursuant to the SCC's rules.[29] This argument is *per se* problematic since RoK is a state. In addition, Stati draws erroneous conclusions from the fact that RoK has previously been a party in SCC arbitrations. As was emphasised in the Statement of Claim and as will be discussed in more detail below, the SCC has applied its rules differently. The knowledge of the SCC's rules which might be ascribed to RoK was thus of no help in the instant case.

(43)     There are two cases of particular importance, *CCL Oil v. RoK*, to which Stati has already referred, and *Sudima v. RoK*. RoK is aware that other parties were involved in these cases. However, it is RoK's understanding that the information which is provided below in respect of these cases is not of a confidential nature. Nevertheless, RoK suggests that the Court of Appeal order the information to be treated as classified *vis-à-vis* third parties.

*SCC's case V (122/2001); CCL Oil Ltd v. Republic of Kazakhstan*

(44)     Stati has referred to the *CCL Oil Ltd v. Republic of Kazakhstan* case. This case was initiated by the claimant requesting arbitration on 18 December 2001, i.e. approximately nine years before Stati brought its action. In that case, the SCC recognised the special role of a state by adopting a different position and expressed its understanding for the situation encountered by a state as a party to an arbitration.

(45)     In a letter dated 21 December 2001, the SCC granted RoK an extension of time until 18 January 2002, pursuant to section 10 of the SCC rules, to submit a response to the SCC, i.e. an extension of time of four weeks as from dispatch (Appendix 2). RoK did

---

[27] Statement of Claim, para. 64 -65.

[28] Statement of Claim, para. 57 -58.

[29] Statement of Defence, para. 59.

not observe the deadline. The SCC then granted, by letter dated 22 January 2002, a new extension of time, 19 February 2002, to submit a response, again a four-week extension of time from dispatch (Appendix 3).

(46)  On the last day before the second deadline, RoK's counsel (which had been retained the day prior thereto) submitted a short response contesting jurisdiction. However, RoK did not appoint any arbitrator since the SCC had not expressly requested it in the previous correspondence.

(47)  After having received the aforementioned response, the SCC then expressly requested, for the first time, that RoK appoint an arbitrator, and set a deadline of 27 February 2002 (Appendix 4). In this regard, the SCC stated the following:

> "*In light of aforementioned the SCC Institute has made preparation to appoint an arbitrator on behalf of the Respondent. However, you are hereby requested to appoint an arbitrator by 27 February 2002.*
>
> *In case you fail to appoint an arbitrator within the time stipulated, the SCC Institute will – pursuant to Article 16(2) of the SCC Rules – make such appointment.*"

(48)  The SCC should indeed be criticised for the fact that RoK, also in that case, was not initially ordered to appoint an arbitrator in its response, but at that time the SCC granted extensions of time which were significantly longer than those in the instant case. Upon the expiry of the last deadline, RoK submitted a response and appointed an arbitrator in accordance with the order.

*SCC's case V (069/2005); 1. Sudima Time Ltd 2. Kazakhstan Development Corporation Limited v. Republic of Kazakhstan*

(49)  In this case, the SCC forwarded the claimant's request for arbitration to the Kazakh Ministry of Finance by letter dated 5 October 2005 (Appendix 5) and ordered the department to submit a response. It must be noted that this letter contained an express request to submit information regarding the arbitrator which RoK had appointed:

> "*You are in accordance with article 10 of the SCC Rules, requested to submit a reply to the SCC Institute by 19 October 2005 at the latest. You are also requested to send us information on the arbitrator you have appointed.*" (emphasis added)

(50)  As stated above, the administrator in this case was the same person who administered the instant case. Unlike the case against *CCL Oil*, the deadline in this case was unduly short – slightly more than one week.

(51)     The case was special in that the Ministry of Finance was not the competent authority. The Ministry of Justice, which was in fact the competent authority, did not receive the letter until 9 November 2005. In a letter dated 17 November 2005, the department informed the SCC of this fact and requested an additional extension of time (Appendix 6). It must be noted that at this time, i.e. almost a month after the deadline for submitting a response, the SCC had still not appointed an arbitrator on RoK's behalf, but instead waited with such appointment, presumably to give RoK additional time. The SCC granted RoK an extension of time until 5 December 2005, to appoint an arbitrator but again erroneously failed to address the letter to the Ministry of Justice but, instead, it was sent to the Ministry of Finance (Appendix 7).

(52)     Without having received a request in this regard from RoK, the SCC extended the deadline (in a letter dated 16 December 2005) to 26 December 2005, again erroneously addressed to the Ministry of Finance (Appendix 8).

(53)     It must be pointed out that, unlike the case which was initiated by Stati, the SCC explicitly stated in its letter that in the event RoK failed to appoint an arbitrator within the deadline, the SCC would appoint an arbitrator on its behalf:

> "*If we have not received information of an arbitrator in due time, the SCC Institute will appoint an arbitrator on behalf of the Republic of Kazakhstan*"

(54)     Since the letter was erroneously addressed, RoK could not appoint an arbitrator in time. The SCC informed the parties, in a letter dated 12 January 2006 (again erroneously addressed to the Ministry of Finance) that Professor Zykin had been appointed as arbitrator on RoK's behalf, which meant that he was appointed more than three months after RoK had received the request for arbitration. In the same letter, SCC also informed the parties that a chairperson had been appointed (Appendix 9).

(55)     When the Ministry of Justice learned of the letters which had been sent to the Ministry of Finance, the SCC was informed of this fact by letter dated 8 February 2006. The Ministry of Justice thereupon requested that an arbitrator be appointed anew (Appendix 10). In this case, the SCC did not hesitate to grant this request notwithstanding that the arbitral tribunal had already been seated. The SCC granted RoK an enhanced extension of time, until 6 March 2006, to appoint an arbitrator (Appendix 11), to which RoK responded by letter dated 21 February 2006. The SCC sent a letter on that same day to Professor Zykin, in which they apologised for revoking his appointment. (Appendix 12).

(56)     In the case, the SCC thus granted RoK an opportunity to appoint an arbitrator notwithstanding that the arbitral tribunal had already been seated. There is no explanation as to why the SCC did so in this case but failed to do the same thing in the case which was initiated by Stati. The SCC even explained its decision to the

17

claimant, who had complained that RoK was afforded an opportunity to appoint an arbitrator, as follows (<u>Appendix 13</u>):

> *"With reference to your letter of 29 March 2006 please be informed in the following.*
>
> *The party's right to appoint an arbitrator*
>
> *Each party to an arbitral proceeding shall be afforded a right to appoint an arbitrator. <u>This is a fundamental prerequisite of any international arbitration.</u> Where a party explicitly denies or neglects such right, the appointment shall be made by an auxiliary jurisdiction (an arbitral institution or a court in ad hoc proceedings.*
>
> *The SCC rules empower the SCC Institute to make an appointment <u>only where a party explicitly fails to make an appointment. The exercise of this power in excess</u>, i.e. for the SCC Institute to appoint an arbitrator itself, <u>could jeopardise the proceedings and may constitute a ground for a future challenge of the award</u>. This power shall neither be used as a sanction against the party who failed to pay its advance on costs.*
>
> *<u>Again, this is a universally accepted principle."</u>*
> *(emphasis added)*

(57)    On the other hand, the two other cases to which Stati refers in this regard are irrelevant.

(58)    *Eisenberg Export Company Ltd and Asia House Ltd v. Republic of Kazakhstan* is from 1993; in other words it is over 20 years old. The arbitration proceedings were determined by a sole arbitrator.[30] In accordance with section 5 (2) of the 1980 rules[31] which were applicable at that time, the arbitrator was appointed by the SCC. Accordingly, this case cannot provide any guidance in the instant case.

(59)    The case of *MTR Metals Ltd. v. Republic of Kazakhstan* also does not provide any guidance. In this case, the arbitration had been preceded by almost 3 years of litigation in France before the French courts ultimately referred the case to arbitration.[32] The request for arbitration was filed on 24 September 1999 and it was not until 9 November 2000 that the SCC referred the case to an arbitral tribunal.[33] It must be noted that the case challenging the arbitral award in that case was filed in the Svea Court of Appeal. At that time, RoK was represented by Advokatfirman Lindahl

---

[30] See RH 2003:61

[31] SCC Arbitration Rules 1988 in Albert Jan van den Berg (ed), Yearbook Commercial Arbitration 1989 - Volume XIV, Volume XIV, p. 251 – 262.

[32] Jarvin/Magnusson, *International Arbitration Court Decisions*, p. 904-908.

[33] *Ibid.*

which, surprisingly, did not prevent Advokatfirman Lindahl from now representing Stati against RoK.

(60)    The cases referred to above, particularly *CCL Oil v. Republic of Kazakhstan* and *Sudima et al v. Republic of Kazakhstan*, clearly show the SCC's previous practice and interpretation of its own rules. They also show RoK's willingness to participate in arbitration. In the instant case, the SCC thus deviated from its own practice, which ultimately resulted in RoK being denied the right to appoint its own arbitrator.

(61)    In summary, the SCC's errors are as follows:

- the SCC has failed in its *prima facie* assessment of Stati's request for arbitration and thereupon failed to ensure that the necessary conditions for jurisdiction, based on article 26 of the ECT were met (see section 3.1.2 below);

- the SCC erroneously assumed that RoK should have appointed an arbitrator in its reply (see section 3.1.3 below);

- the SCC failed to observe due process by ordering deadlines which were entirely too short and by issuing unclear orders (see sections 3.1.4 and 3.1.6 below);

- the SCC failed to inform RoK that it was to appoint an arbitrator (see section 3.1.5 below);

- the SCC failed to ask RoK before appointing Professor Lebedev;

- the SCC failed to ask RoK before appointing Professor Böckstiegal as chairperson (see section 3.1.7 below); and

- the SCC failed to rectify its errors by granting RoK an opportunity to appoint a new arbitrator (see section 3.1.8 below).

### 3.1.2   **The SCC has failed in its *prima facie* assessment in relation to the ECT**

(62)    Under the ECT, the SCC is designated one of the two alternative institutions for arbitration proceedings. The other is the International Centre for Settlement of Investment Disputes ("**ICSID**") in Washington. An additional alternative is an *ad hoc* proceeding under UNCITRAL *Arbitration Rules*. Given the special role which the SCC is assured to conduct investment disputes under the ECT, the SCC has a particular responsibility to ensure that arbitration under the ECT is requested and conducted in a procedurally correct manner and to ensure that the risk of challenges being made is minimised.

(63)    As regards the SCC's *prima facie* assessment pursuant to section 10 of the SCC rules, the purpose of this adjudication is to determine whether the SCC has jurisdiction over the dispute. This adjudication need not be complicated in simple cases, where the crucial factor is whether the SCC has been designated in the parties' arbitration agreement. Jurisdiction for an arbitral tribunal or an institution is governed by the parties' agreement and, thereupon, consent to arbitration. Thus, where an arbitration agreement exists, it is easier for the SCC to presume that it has jurisdiction.

(64)    However, ordinary arbitration proceedings (resulting from an arbitration agreement) differ from arbitration proceedings which derive from an investment treaty, in which the state has granted its conditional consent to arbitration. This consent is governed by an offer/acceptance model whereby the investment treaty instead states the conditions under which a state consents to arbitration being conducted pursuant to the relevant investment treaty. Accordingly, the question is whether the party requesting arbitration has fulfilled the procedural requirements specified in the investment treaty for an arbitration agreement to exist at all. In light of this, the binding nature of arbitration must automatically be called into question.[34]

(65)    Contrary to Stati's assertions,[35] a *prima facie* assessment by the SCC does not require a party to invoke the assessment pursuant to Rule 10 of the SCC, and the wording of the provision does not support such a proposition (*cf.* section 2 above). The SCC is under an obligation to ensure, and also take all reasonable measures to ensure, that arbitration awards awarded are enforceable.[36] Within the scope of this obligation, the SCC should, *sua sponte*, adjudicate the issue of whether there is a valid arbitration agreement, even where the adjudication usually takes place at the objection of a party. A *sua sponte* adjudication should become relevant if special cause exists, *inter alia* in cases where the defendant does not give testimony.[37]

(66)    As one of the three alternative arbitration regimes within the scope of the ECT, the SCC has a particular responsibility to be well-versed in the rules of the ECT, including the prerequisites under which an arbitration may be commenced. Notwithstanding the manner in which Stati attempts, after the fact, to qualify the procedural conditions set forth in article 26 (2) of the ECT, both the SCC and its secretariat must have been well aware of the three-month cooling off period for first-stage negotiations in article 26(2) of the ECT and the problems which result from the requesting party failing to observe this fundamental procedural requirement. Regardless of Stati's assertions that negotiations have been conducted between the parties, the SCC was under an obligation to conduct a *prima facie* review of whether the information and

---

[34] *Cf.* Paulsson, J., *Arbitration Without Privity*, 10 ICSID Review – Foreign Investment Law Journal 2, Fall 1995, p. 232 et. seq.

[35] See Statement of Defence, para.55.

[36] See Article 47 of the SCC rules.

[37] Öhrström, *Stockholms Handelskammares skiljedomsinstitut – en handbok och regelkommentar för skiljeförfaranden [The Arbitration Institute of the Stockholm Chamber of Commerce – a handbook and commentary on the arbitration rules]*, 2009, p. 139.

documentation offered by Stati fulfilled the requirements stated in article 26 of the ECT. If there were any uncertainties, the SCC should have asked additional questions to essentially make sure that it had jurisdiction over the dispute. This obligation appears to be even more important if the state in question was not afforded a necessary opportunity to respond to the request for arbitration.[38]

(67)     Upon comparison with ICSID proceedings (the other eligible institution under article 26 of the ECT), the SCC's shortcomings become clearer.[39] Article 36(3) of the ICSID Convention contains exactly the same tasks for the ICSID as for the SCC, namely to investigate whether the institution "*manifestly lacks jurisdiction over the dispute*"[40]. ICSID carries out its evaluations on its own initiative and does so very carefully. As an example, RoK is currently a party to an ICSID proceeding. In this arbitration the ICSID sent, slightly more than a week after having received and reviewed the request for arbitration, a three-page letter containing a detailed questionnaire for the claimant to clarify issues concerning the ICSID's jurisdiction. In this context, the ICSID requested, for example, a detailed explanation of conformity to the definitions of "investment dispute", "foreign investor" and "foreign investments" in Article 1 of the Law of the Republic of Kazakhstan on Foreign Investments (which provisions, *inter alia*, were invoked by the claimants).

(68)     In the instant case, the SCC failed to conduct the necessary *prima facie* determination. This is clear merely by the fact that the SCC forwarded the request for arbitration, which comprised 40 pages and 42 appendices, within two days of its receipt. Had the SCC conducted a correct *prima facie* determination it would have, *inter alia*, discovered that: (i) the letters with the alleged attempt at amicable settlement invoked by Stati were drafted more than a year prior to the commencement of the arbitration; (ii) that these letters did not contain any reference to ECT; (iii) that these letters were not written on behalf of all of the claimants; and (iv) that these letters only refer to parts of the potential dispute. (See section 3.2.4 below).

### 3.1.3     The SCC erroneously assumed that RoK should have appointed an arbitrator in its response

(69)     When RoK received the request for arbitration, there was no decision from the SCC regarding the number of arbitrators. It was not even certain that RoK was to appoint an arbitrator; *cf*. "*if applicable*" in section 5(1)(v) of the SCC rules.

---

[38] Cf Lindell's expert legal opinion, Appendix 1, p. 13-14: "*in each case, high standards for formal compliance in conjunction with commencement of the arbitration [should] be imposed, and this includes deadlines and the wording of orders to the parties.*

[39] Cf Lindell's expert legal opinion, Appendix 1, p. 17: "*Among the deadlines set for investment disputes, ICSID's appear to be well-weighted and considered, which is because efficiency and speed are not the primary goals when a conflict has arisen.*"

[40] Article 36(3) of the ICSID Convention; (...) "*The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.*"

(70)     The SCC's request that RoK provide its opinion on Stati's proposal that the chairperson be appointed from the arbitrators appointed by the parties also cannot be deemed to constitute a decision regarding the number of arbitrators. Such a request does not make clear that RoK was to appoint an arbitrator but, instead, indicates that RoK was to provide its opinion on the proposed method of appointing the arbitral tribunal. It is more the case that such specific instructions give the impression only that the separate order will be followed, not that there are tasks to perform beyond those which are specified.

(71)     Stati further alleges that RoK should have contacted the SCC in the event of any genuine ambiguity in this respect.[41] However, there were no ambiguities. Neither the SCC rules nor the SCC's letters contained any request to appoint an arbitrator.

(72)     Stati's allegations in respect of the Russian language – that ambiguities in the Russian version of the SCC rules are irrelevant because the English version is clear[42] – is similarly wrong. It should be noted that even if the English version of the rules states that the English rules take precedence, the Russian version contains no such notice.[43]

### 3.1.4     The SCC acted in contravention of the rules regarding due process and equal treatment by ordering deadlines which were entirely too short, giving unclear instructions, and committing other serious mistakes

(73)     The SCC acted in contravention of the rules regarding due process and the principle of equal treatment. By means of, *inter alia*, ordering deadlines which were too short and by issuing unclear orders, which led to the appointment of Professor Lebedev on RoK's behalf, the SCC breached the principle which had previously been proclaimed, namely that an arbitrator would only be appointed on behalf of a party "where a party explicitly fails to make an appointment."[44]

### (i)     *The prescribed deadlines were too short*

(74)     RoK refers to its Statement of Claim where it has explained in detail how RoK's fundamental procedural rights were violated by the SCC by virtue of the latter's prescription of an insufficient deadline by which to appoint an arbitrator.[45] RoK wishes to comment on certain issues raised by Stati in its Statement of Defence.[46]

(75)     Stati erroneously asserts that RoK had a deadline of more than 40 days to appoint an arbitrator and therefore implies that there was, to the contrary, ample time in relation to the deadline under the old Arbitrators' Act (1929), i.e. 14 days. The older Act is, of

---

[41] Statement of Defence, para. 69.

[42] Statement of Defence, para. 94.

[43] Statement of Claim, para. 99-100.

[44] Letter from the SCC dated 30 March 2006, Appendix 13 (emphasis added).

[45] Statement of Claim, para. 87-88.

[46] See further Lindell's expert legal opinion, Appendix1, section 3.1.

course, entirely irrelevant in this case, not in the least because it was not drafted to handle large international disputes but was instead drafted for smaller domestic disputes. The preliminary works to the SAA state that the earlier deadline was "*quite short, even for domestic disputes*".[47]

(76)   The deadline under the SCC's rules is triggered from the date on which the recipient is *presumed* to have received the documents. Under section 8 of the SCC rules, the recipient is deemed to have received the documents which were sent within the time which is the normal delivery time using the selected means of conveyance.[48] Given the time it takes for a courier to arrive in Kazakhstan and to reach the correct addressee, the SCC must also have had reason to assume that the request for arbitration would reach RoK at the earliest on 11 August 2010, from which date the deadline should be calculated.

(77)   In point of fact, RoK was thus given an effective deadline of 15 days and, subsequently, an additional nine days to submit a response, but not to appoint an arbitrator since no such order was ever issued. Even if the two deadlines are aggregated, there were only 30 days from the date on which the first letter was received until the second deadline expired.

(78)   The provisions of section 5(1) of the SCC rules are clear in that they provide flexibility, and thus freedom of action, for the board of directors and the secretariat when the board of directors has delegated this task.[49] This also applies to section 7 of the SCC rules in respect of extension of deadlines. By reaching an agreement regarding arbitration under the SCC's rules, the parties have not subjected themselves to arbitrary decisions on the part of the institution. It is more the case that the SCC's freedom of action is limited by the parties' fundamental procedural rights. Such rights include the right to appoint an arbitrator. The SCC must therefore take into consideration all available information when setting deadlines. In the instant case, this means such information as set forth in the request for arbitration and the conditions which follow from the ECT.[50]

(79)   Stati's reference to the so-called Blagovest letter as evidence of RoK's alleged awareness of an arbitration is both erroneous and irrelevant. This letter was written by an independent company (a third party) and does not prove that the relevant department in Kazakhstan was aware, or should have been aware, of an impending arbitration against Stati. It is also refuted that individuals within Kazakh public authorities conducted discussions regarding an alleged nationalisation plan.[51] In any

---

[47] Government Bill. 1998/99:35, p. 92

[48] Öhrström, *Stockholms Handelskammares skiljedomsinstitut – en handbok och regelkommentar för skiljeförfaranden [The Arbitration Institute of the Stockholm Chamber of Commerce – a handbook and commentary on the arbitration rules]*, 2009, p. 134.

[49] *Cf.* Statement of Claim, para. 87.

[50] See also Lindell's expert legal opinion, Appendix 1, p. 25.

[51] Statement of Defence, para. 77.

event, this letter was neither mentioned in, nor appended to, Stati's request for arbitration. Consequently, the Blagovest letter cannot have been relevant to the SCC in conjunction with its decision regarding a suitable deadline.[52]

(80)     Stati's counterargument[53] to the fact that English is not spoken to any great extent is misdirected. The documents which were appended to the request for arbitration should have made clear to the SCC that the parties have always communicated in Russian. The Soviet legacy entails that Russian is generally spoken in Moldavia, and particularly by Anatolie Stati and his employees, almost all of whom testified in Russian in the arbitration. Moreover, the ratification of the ECT does not constitute consent to resolve disputes in English. This is best illustrated by Article 46 of the ECT, which sets forth an equally great number of authentic languages for the ECT, including Russian. Moreover, nothing to the contrary follows from the ECT's reference to arbitration under the SCC. Section 21 of the SCC rules does not state that English takes precedence as a language, but rather stipulates that the arbitral tribunal is to decide in light of the circumstances in each individual case. In this case, it could thus more likely be expected that Russian would be selected as the language for the arbitration. Accordingly, it should have been clear to the SCC that if it communicates with a foreign state, it is likely that the decision-makers within that state will need a translation of the document before they can partake of the content and take suitable measures.[54]

> (ii)      The PCA rules do not support Stati's action

(81)     Stati's reference to the PCA rules do not support Stati's action.[55] There are almost no international investment treaties which contain an application of the PCA rules. These rules thus cannot constitute any standard for investment disputes. Moreover, RoK has not acceded to the conventions for peaceful settlement of disputes of 1899 or 1907, which conventions form the basis for the PCA.[56] In other words, RoK has never agreed to, or undertaken to comply with, the PCA rules.

> (iii)     The ICSID rules work better as a relevant benchmark

(82)     Stati should have instead referred to the more well-known and more frequently used ICSID Convention, to which RoK has acceded. As RoK explained in the Statement of Claim, the ICSID Convention is a particularly good indicator of what should be

---

[52] This also applies to the letter dated 28 September 2009 from MEMR to the Kazakhstan Ministry for Trade and Industry, to which Stati refers in fn. 8 of the Statement of Defence.

[53] Statement of Defence, para. 92.

[54] Although it has little relevance, Stati is quite wrong when it questions the truth of the claim that English is not widely spoken within the Ministry of Justice. When the department received the request for arbitration, there was only one person in the department who could speak English, namely Marat Beketayev, and he was not present at that time.

[55] Statement of Defence, paras. 85-86.

[56] Cf http://www.pca-cpa.org/showpage.asp?pag_id=1038.

regarded as the generally accepted procedure when states are parties. According to Article 38 of the ICSID Convention, a deadline of not less than 90 days is granted from the date on which notice of receipt of registration of the request for arbitration has been sent until an arbitrator can be appointed for a party.[57] As of 30 June 2014, the ICSID had registered 473 cases under the ICSID Convention or its Additional Facility Rules.[58] In comparison, the PCA rules have very negligible significance.

(83)    Stati's only counterargument in respect of the ICSID convention is that RoK, through article 26 of the ECT, offers investors a choice between the ICSID rules and the SCC rules.[59] Stati ignores that the SCC rules do not prescribe any specific time frames but instead leaves this to the SCC's discretion. The signatories to the ECT must have been able to assume that this discretion would be exercised with care and in a manner which is comparable with the ICSID Convention, not that the SCC would treat arbitration between states and investors as if they were domestic arbitrations.

(84)    In point of fact, the SCC rules confer flexibility and provide the SCC with the opportunity to act based on the specific circumstances in the dispute. Reference to a 30-day deadline under other rules disregards the fact that even such a 30-day deadline is unrealistic in cases in which states are involved.[60] George Kahale, a well-known and experienced arbitration lawyer, has expressed this as follows:

> "*These rules are totally unrealistic and inappropriate for investor-state arbitration, where states are the respondents. Anyone with even the slightest experience in representing states knows that it could take much more than 30 days for a request for arbitration to come to the attention of the right person or department in a government, and that is just the beginning of the process. From there a series of decisions normally have to be made in order to assign responsibilities within the government and engage counsel. In turn, engaging counsel often requires a bidding process, which could take weeks if not months. Even if a bidding process is not required, there may be formal budgetary requirements that must be met before expenditures on the defense can be made. What all this means is that the natural disadvantage of any respondent is magnified when it comes to investor-state arbitration, as states and their counsel have little if any time to consider carefully the first critical decision in any arbitration, the appointment of arbitrator, and little if any time*

---

[57] Cf Statement of Claim, para. 105-106.

[58] Cf *The ICSID Caseload – Statistics (Issue 2014-2)*, available at https://icsid.worldbank.org/ICSID/FrontServlet?requestType=ICSIDDocRH&actionVal=ShowDocument&CaseLoadStatistics=True&language=English52>.

[59] Statement of Defence, para. 89.

[60] See also Lindell's expert legal opinion, Appendix 1, p. 16 et. seq.

> *to prepare for the first session, at which certain basic issues, such as the structure and timing of the proceeding, are presented.*"[61]

  (iv)  *The SCC failed to order RoK to appoint an arbitrator*

(85) The SCC's short deadlines are exacerbated by the fact that the SCC never issued an order for appointment of an arbitrator before it appointed an arbitrator on RoK's behalf.

(86) As stated below (see section 3.1.6), the communication obligation ensures that the principle that no party may remain unheard is observed. With respect to initial measures taken by an arbitration institution, proceedings are completely of a summary nature and are conducted only through the exchange of correspondence. Thus, it is particularly important to clarify what a party is required to do in the initial proceedings. Therefore, stringent requirements must be placed on written communications and orders. This means that if the SCC erroneously assumed that RoK was to appoint an arbitrator, this should have been made clear to RoK.

(87) However, the SCC requested that RoK submit (in accordance with section 5 of the SCC rules) a response to the SCC, which was only to contain comments on the location and the claimant's proposal that the chairperson be appointed by the arbitrators appointed by the parties and, if appropriate, that RoK also submit a power of attorney for its counsel. These points appear to constitute an exhaustive list, while in fact the SCC also erroneously expected that RoK would appoint an arbitrator.

(88) In the event a certain consequence is linked to a failure to respond, this must also be clearly stated in the SCC's communications.[62] Fundamental requirements of due process are not fulfilled where parties are required to guess what measures an arbitration institution or a court will take in the event they fail to respond. Thus, the only relevant factor is the time period to which some kind of consequence is linked. The time period can only start if and when the document contains a clear reference to a consequence of insufficient compliance.[63]

(89) In the case at hand, the SCC informed RoK in the SCC's second letter that a failure to respond would not constitute an impediment to the continuation of the arbitration. Once again, the SCC did not state the import of this. Under no circumstances, could this be understood as a notice that an arbitrator would be appointed on RoK's behalf

---

[61] Kahale, *Is Investor-State Arbitration Broken?*, TDM 7, 2012, p. 11. *Cf.* Lindell's expert legal opinion, Appendix 1, p. 16 et. seq.

[62] See, *inter alia*, Lindell's expert legal opinion, Appendix 1, p. 19. *"In respect of a right as fundamental as a party's right to appoint an arbitrator, due process requires the order to be clear and unambiguous. The point of departure is thus that the order must be understood from its plain language and be worded as narrowly as possible. For due process reasons this is, as a whole, the only acceptable interpretation alternative for an incomplete or ambiguous order, which thus must be interpreted restrictively in light of the serious loss of rights which are connected thereto, in this case the right to appoint one's arbitrator."*

[63] See also Lindell's expert legal opinion, Appendix 1, p. 20.

within a few days and without warning, particularly taking into consideration the SCC's actions in previous cases to which RoK had been a party.

> (v)   *The SCC's failure to order RoK to appoint an arbitrator also breached the SCC rules*

(90)   Stati disregards the relevant issue when it alleges that equal treatment entails that RoK could not be treated more advantageously than Stati and that RoK thus should not have been given a longer time period for appointed an arbitrator. Section 13 of the SCC's rules governs the appointment of arbitrators on a party's behalf, where subsection (3) provides that if the arbitral tribunal comprises more than one arbitrator, each party must appoint an equal number of arbitrators and the chairman must be appointed by the board. If either of the parties fails to appoint an arbitrator within the prescribed time, the board must appoint the arbitrator. It should be noted already in this context that it is unclear what is meant by the "prescribed time". Such uncertainty must (particularly when the party requesting arbitration and the responding party are foreign) be ascribed to the SCC (see further section 3.1.9 below).

(91)   Under section 6 of the SCC's rules, the board may request that a party supplement its claim, whereupon the SCC should request significant information, such as details of the arbitrator appointed by the party.[64] Furthermore, in cases where the SCC is to appoint an arbitrator on a party's behalf pursuant to section 13, the secretariat is required to request outstanding information if there are no details available regarding the appointed arbitrator. The SCC itself has written the following in its commentary on the SCC rules:

> "*The secretariat <u>will ask</u> for additional information if such appointment statements are missing in the parties' briefs*"[65] (emphasis added)

(92)   The fact that a party is not allowed to be heard does not (as Stati has asserted) prevent the continuation of the proceedings. However, it follows from the SCC's rules that a reminder that a party must appoint an arbitrator must be issued:

> "*If the respondent does not appoint an arbitrator, <u>despite being reminded by the Secretariat to do so</u>, that does not constitute an impediment to further processing of the proceedings. The Board then appoints an arbitrator on behalf of the respondent.*"[66] (emphasis added)

---

[64] Öhrström, *Commentary to the SCC rules*, p. 823; "If decisive information is missing in any of the parties' submissions, the Secretariat may request further details. [...] Should the registration fee, the arbitration agreement or – if applicable – <u>details of the appointed arbitrator be missing</u>, then the SCC serves the respondent with the request for arbitration first after receiving such completion." (emphasis added)

[65] Öhrström, *Commentary to the SCC rules*, p. 828. Öhrström also refers in this sentence to section 6, which states that the SCC may request that a party supplement its case if significant information is missing.

[66] Öhrström, *Commentary to the SCC rules*, p. 828.

(93)   Based on the SCC guidelines and practice it is clear that it is not possible to opt out of the SCC rules when the SCC is tasked with appointing an arbitrator on a party's behalf. The SCC must specifically order a party to submit a response when there are no details as to which arbitrator has been appointed.[67]

(94)   In summary, it follows both from the SCC's rules and from its custom and practice that parties are regularly to be ordered to submit a response or supplement their claim with respect to significant information (*cf.* the SCC's comments on "*decisive information*" in the commentary on section 6 of the SCC rules).

*(vi)    RoK is not requesting that it be treated more advantageously*

(95)   Equal treatment does not mean that one party's special situation is to be ignored. It is more the case that the SCC should ensure that both parties can exercise their rights equally, particularly in respect of appointing an arbitrator.

(96)   The SCC rules give the SCC's secretariat the necessary flexibility to prescribe deadlines based on the specific case. The SCC should have noted that the case involved a state as a party, which generally entails that longer deadlines, as compared with those for a commercial party, are necessary.[68]

*(vii)    The SCC's method of sending documents was unsuitable*

(97)   Stati also misses the point when it argues that because the SCC merely used the means of communication identified in section 8 of the SCC rules, it acted correctly.[69] RoK has never argued that the means of communication were not, in principle, acceptable under the SCC rules. Instead, RoK's argument was that in respect of Stati's request that an arbitrator be appointed on RoK's behalf, the means of communication selected by the SCC entailed that RoK was not heard on the matter of the request. The selection of means of communication contributed to the failure to take RoK's procedural rights into consideration. Although section 8 of the SCC rules contains a number of means of communication, it does not state that the SCC can randomly change the means of communication at any time whatsoever; this may affect a party's procedural rights. Communicating (as in this case) by sending certain letters by courier and other letters by ordinary post was inappropriate and had a negative impact on RoK's opportunity to preserve its rights.

---

[67] See further Lindell's expert legal opinion, Appendix 1, section 3.3.

[68] *Cf.* Lindell's expert legal opinion, Appendix 1, p. 16. *"The fact that it can take a longer time for a matter to find its rightful home in a state since it may need to be filtered through a multitude of bureaucratic layers before anything happens is probably infamous."*

[69] Statement of Defence, para. 91.

3.1.5 **The SCC did not give RoK the right to be heard when an arbitrator was appointed on RoK's behalf**

(98)   Instead of RoK being heard on the appointment of Professor Lebedev, RoK received Stati's request that an arbitrator be appointed on RoK's behalf three days after the appointment had already been made.[70]

(99)   Stati seems to assert that the parties' agreement regarding the SCC rules entailed that the parties waived their right under the SAA to be heard before an order was issued regarding one party's application for an arbitrator to be appointed on behalf of the other party.[71] However, to the extent that the agreed rules for arbitration do not govern a specific issue, the SAA functions as *lex arbitri* even in relation to the arbitration. In this case, the provisions of *lex arbitri* must be applied by analogy to the arbitration proceeding which is governed by the SCC rules.

(100)  The SCC's board fills the same role and functions as a court under the SAA.[72] Under the SAA, a party has a right to be heard by the court before an arbitrator is appointed on its behalf.[73] By selecting the SCC rules, the parties have not waived the legal right to be heard regarding one party's application that an arbitrator be appointed on behalf of the other party.

(101)  Stati seems to suggest that such waiver would be implicit since the SCC rules do not expressly prescribe that parties be heard in conjunction with such an application, but this argument presumes that the SCC rules replace the SAA in its entirety. This is not the case, since the SAA fills in the blanks in all situations where the SCC rules are silent.

3.1.6 **The SCC has failed to reach the standard which the law imposes on the court when it acts as an elector**

(102)  The SCC's insufficient administration also becomes clear upon a comparison with the role which a court undertakes when it acts as an elector. As an arbitration institution, the SCC has taken over the role of elector, which a court would usually have in arbitration proceedings under the SAA (*ad hoc*). Section 13(3) of the SCC rules corresponds fully with the provisions of section 15 of the SAA, except that the SCC is the elector rather than the court, and the SAA prescribes that the two arbitrators appointed by the parties must appoint the third arbitrator (see section 13 of the SAA) and the arbitral tribunal must appoint the chairman (see section 20 of the SAA).[74] In light of the assertions above, it is also evident that the handling of a case by the SCC

---

[70] Statement of Claim, para. 123.

[71] Statement of Defence, para. 72.

[72] Statement of Claim, para. 125.

[73] Statement of Claim, para. 124, with reference to Heuman, *Skiljemannarätt [Arbitration Law]*, 1999, p. 236

[74] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 1210.

is largely the same as the handling of a case by a court in terms of appointing an arbitrator on behalf of the defendant in *ad hoc* proceedings.

(103)    In order to ensure that an arbitral tribunal is constituted and maintained correctly so as to allow it to have jurisdiction, the SAA contains a number of provisions providing that a party can instruct the court to ensure that the specified purpose is reached. Thus, the court must assist in appointing an arbitral tribunal if the parties have so decided and one of the parties applies for the court's assistance. In addition, pursuant to section 14, third paragraph of the SAA, the court must appoint an arbitrator if a party fails to do so.[75]

(104)    The court's handling of issues relating to appointed and disqualification of an arbitrator is governed by the Handling of Court Matters Act (SFS 1996:242) (the "**Court Matters Act**"),[76] pursuant to which the other party must be afforded the opportunity to submit a response. The Court Matters Act provides that if a party fails to be heard, this does not prevent a final decision being made on the matter[77] (*cf.* the SCC's comments that a failure by the defendant to submit a response does not constitute an impediment to further processing of the arbitration proceedings[78]). A party cannot opt out of the provisions of the SAA stating that the other party must be afforded the opportunity to submit a response regarding the appointment of an arbitrator, as is the case for the SCC's rules.[79]

(105)    Judicial proceedings pursuant to the Court Matters Act, similarly to proceedings before the SCC, are purely in written form, which means that issues regarding the exchange of correspondence have greater significance than is the case in matters subject to general court proceedings.[80] An important principle for all activities in courts is that no party shall be judged without being heard. In court matters, it is primarily through the exchange of correspondence that this principle is upheld and the court has sufficient documentation as a basis for its decision.[81]

(106)    The reason the court is subject to a communication obligation is that the defendant must be afforded the opportunity to give detailed reasons as to why the application should be dismissed, for example where the arbitration agreement does not relate to the issue about which an arbitration award has been requested.[82] It may be assumed

---

[75] *Id., p.* 395

[76] *Ibid,* see also Heuman, *Skiljemannarätt [Arbitration Law],* 1999, p. 236.

[77] Under section 15 of the Court Matters Act and section 44, paragraph 1, third sentence of the SAA, the other party must be afforded the opportunity to submit a response. See also Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary],* 2nd ed., 2012, p. 395.

[78] See, *inter alia,* section 5(3) of the SCC rules.

[79] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 1050

[80] Commentary on section 15 of the Court Matters Act.

[81] Commentary on section 15 of the Court Matters Act.

[82] Heuman, *Skiljemannarätt [Arbitration Law],* 1999,  p. 236

that a defendant's argument that a valid arbitration agreement does not exist would also be relevant in this context.

(107)    The import of the provision is that the court must expressly explain to the other party that it has an opportunity to submit a response. Thus, it is not sufficient (as one might believe from the term "communication" based on linguistic grounds) for the court to dispatch the initial correspondence and then wait a while before making a decision on the matter.[83]

(108)    If the court is in any doubt as to the question of whether the parties have put forward everything they wish, the court can effectuate an order which is equivalent to a final order under the Code of Judicial Procedure by explaining to the parties that the matter has been fully investigated and that it plans to render a decision on the matter at a specific date in the future.[84]

(109)    A procedural error can in purely general terms be characterised as an error made by the court, entailing the violation, or incorrect interpretation, of a procedural rule. A failure to issue a final order before a matter has been decided (by, for example, appointing an arbitrator on a party's behalf) should be regarded as a serious procedural error pursuant to Chapter 58, section 1 of the Code of Judicial Procedure, i.e. a miscarriage of justice.[85]

(110)    It should also be emphasised that in cases where the procedural error has involved violating a significant guarantee of due process, according to case law there is a presumption that the error was significant to the outcome of the case.[86]

(111)    There are no rules in the SAA corresponding to those in the Code of Judicial Procedure regarding new trials (Chapter 58 of the Code of Judicial Procedure) and miscarriages of justice (Chapter 59 of the Code of Judicial Procedure). Instead, the purpose is that the parties to the arbitration must obtain the requisite legal protection by means of the provisions set forth in sections 33 and 34 of the SAA. These provisions also largely cover that which in respect of a judgment by a court is covered by the provisions regarding new trials and miscarriages of justice.[87] In other words, a serious procedural error which should be regarded as a miscarriage of justice, or grounds for declaring an arbitral award invalid or, in any event, setting aside an arbitral award. In this context, it should be pointed out that if an arbitral tribunal (or in this case, the SCC) fails to observe the contradictory principle or the communication principle, the award can be set aside pursuant to the rules governing challenges in

---

[83] Commentary on section 15 of the Court Matters Act.

[84] Commentary on section 17 of the Court Matters Act.

[85] The case reported on page 441 in NJA 1981.

[86] Lars Welamson, *Rättegång [Legal Proceedings] VI*, 3rd ed., p. 124.

[87] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 834

section 34, first paragraph, subsection 6. In the case of serious infringements, there may be a breach of the *ordre public.*[88]

(112)   Thus, the following can be stated. If the same procedural error which the SCC committed in this case had been committed in *ad hoc* proceedings, the arbitral award would have been impaired by a serious procedural error, i.e. a miscarriage of justice. Thus, in light of what is stated above, there is reason to declare the arbitral award invalid or, in any event, to set aside the arbitral award (see further section 3.1.9). There must be an expectation that, in its role as elector, the SCC applies the same degree of care as a court as regards the fundamental rights of the parties. In addition, the SCC's rules, which are of a mandatory nature, are largely equivalent to the rules governing the appointment of arbitrators under the SAA.

(113)   In addition, cultural differences which exist in an international arbitration must be taken into account. Thus, there is no scope for an institution like the SCC to require that parties to arbitration interpret the institution's rules in the manner the institution wants the rules to be interpreted. The fact is that it is the institution's responsibility to draft and apply its rules in a clear and unambiguous manner.[89] Thus, on this ground alone, the SCC should have informed RoK that it risked forfeiting its right to appoint its own arbitrator if it failed to submit a response. RoK must reasonably have been able to presume (based on the SCC's rules, its clarifying commentary on the rules and its earlier practice) that the SCC would specifically inform RoK that an arbitrator would be appointed on its behalf unless RoK submitted a response on this issue within a certain period of time.

(114)   In summary, the efforts by the SCC to achieve proceedings that were as efficient as possible has overshadowed the fundamental right of the parties to appoint their own arbitrators. The procedural error by the SCC has also resulted in consequences for the entire proceedings. There is therefore a presumption within Swedish procedural law that a procedural error has had an impact on the outcome of the case.

### 3.1.7   The SCC did not give RoK the right to be heard when the chairperson of the arbitral tribunal was appointed

(115)   The SCC also failed to give RoK the right to be heard when it appointed the chairperson of the arbitral tribunal. Stati once again argues that there is, quite simply, no such obligation under the SCC rules, and that the appointment was therefore correct.[90] This is a flawed argument since it does not take sufficient consideration of the SCC's obligation to ensure the parties' fundamental procedural rights. Moreover, it disregards the specific facts in this case, whereby Stati specifically stated in the

---

[88] Heuman, *Skiljemannarätt [Arbitration Law]*, 2012, p. 603.

[89] *Cf.* Lindell's expert legal opinion, Appendix 1, p. 25: *"A high degree of flexibility entails […] a great risk for a lack of predictability and consistency, and that SCC is complicating matters for itself by virtue of the fact that ambiguities arise. The parties cannot bear the burden of such ambiguity.*

[90] Statement of Defence, para. 73.

request for arbitration that it wanted the chairperson to be appointed by the arbitrators appointed by the parties, rather than by the SCC's board.

(116)    Stati's argumentation in this context also demonstrates its selective use of argumentation. It refers to the PCA rules as support for its allegation that the deadlines prescribed by the SCC are correct. However, they fail to mention that Article 9(3), together with Article 8(2), of the PCA's Arbitration Rules provide, for example, that a chairperson may be appointed in such a manner that the parties play a crucial role in conjunction with the appointment.

### 3.1.8    The SCC failed to rectify its mistake by failing to give RoK an opportunity for a new appointment

(117)    After having notified RoK that its right to appoint an arbitrator had been waived, the SCC failed to allow RoK to make a new appointment of an arbitrator. The SCC thus deviated from its earlier practice, i.e. the *Sudima v. RoK* case, in which the SCC gave RoK an opportunity to make such a new appointment. In that case, the arbitral tribunal had also been seated. Moreover, when RoK raised this issue, the arbitral tribunal had not yet taken any actions, no meetings had been held, and no administrative orders had been issued. Without a perceptible reason, the SCC rejected RoK's objection and failed to take into consideration the express request to make a new appointment. This was done notwithstanding that the SCC had previously shown that there is no obstacle to replacing an arbitrator who has already been appointed.

### 3.1.9    Summary of the SCC's infringement of RoK's fundamental procedural rights

(118)    By taking the SCC's handling of the appointment of Professor Lebedev as a whole, including ambiguous orders, short deadlines, and previous practice at the SCC compared with normal administrative routines, one can observe that this was a serious error which infringed RoK's fundamental rights. In light of all the circumstances, the SCC's handling has entailed that the arbitral tribunal was not constituted in the right manner and that an imbalance between the parties thus arose.[91]

(119)    Above all, in light of serious forfeiture of rights which may be linked to the SCC's orders, the orders must be complete and clear. In its Statement of Defence, Stati has attempted to minimise the importance of the SCC's orders, and stated that "*[i]f there had been any genuine ambiguity in this respect, Kazakhstan would, of course, have contacted the SCC and sought clarification*"[92]; this is an erroneous conclusion. Upon on an objective assessment, it is impossible to glean from the SCC's orders that RoK had been ordered to appoint an arbitrator.[93] Contrary to what Stati suggests, this involves issues of due process at the highest level; if the SCC's orders are ambiguous they must be interpreted restrictively, i.e. there can be no consequences, or very

---

[91] *Id.*, s. 28.

[92] Statement of Defence, para. 69.

[93] See Lindell's expert legal opinion, Appendix 1, p. 28.

limited consequences, of a failure to comply with the order. This is very important for maintaining confidence in arbitration as a procedure which affords due process.[94]

(120)   The SCC's handling has, above all, entailed infringement of the fundamental right to appoint one's own arbitrator, which has created the risk that the arbitration failed to comply with fundamental due process principles.[95] In light of the content of the orders alone, one can find it highly offensive that the SCC appointed an arbitrator on RoK's behalf based on these orders. Taken as a whole, the SCC's manner of proceeding in conjunction with the appointment of Professor Lebedev may be regarded as clearly incompatible with the bases for the Swedish legal system.[96] The administration has thus violated procedural *ordre public*.

(121)   Under any circumstances, the SCC's administration in conjunction with the appointment of an arbitrator on RoK's behalf has entailed erroneous administration of the SCC rules which, moreover, involves a fundamental right. Accordingly, the appointment of Professor Lebedev was not lawful. The arbitral award has thus been issued by three arbitrators of whom one (in any event) was not duly appointed, and thus the arbitral award may be set aside in accordance with section 34, first paragraph, subsection 4 of the SAA.[97] One can hardly view the SCC's failure to order RoK to appoint an arbitrator as an omission or mistake.[98]

(122)   If the SCC's actions are to be deemed a procedural error, it must be presumed that the error has had an impact on the outcome of the case, since it involves such a serious error. Stati's allegation that this infringement worked to RoK's advantage since Professor Lebedev had a dissenting opinion regarding jurisdiction[99] is irrelevant. As was set forth in the Statement of Claim, Professor Lebedev took a very passive role during the proceedings and could not, or did not want to, perform the role of a party-appointed arbitrator, for example by ensuring that the arbitral tribunal correctly understood RoK's presentation of its case. Stati's argument, that Professor Lebedev is probably the arbitrator who has been most appointed by parties domiciled in the former Soviet Union, and therefore one cannot assume that he would neglect to take into consideration such parties' allegations, is also insignificant.[100] The crucial issue is that RoK was erroneously deprived of the right to appoint an arbitrator.

(123)   The imbalance which arose in the arbitration by virtue of the fact that RoK was deprived of the right to appoint its own arbitrator means that RoK's case was not administered and understood by the arbitral tribunal as was necessary. Professor

---

[94] *Id.*, p. 24.

[95] *Cf.* Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 906.

[96] See Lindell's expert legal opinion, Appendix 1, p. 26.

[97] *Id.*, section 4.2.

[98] *Id.*, s. 28; "*And if it is a mistake, it is undeniably a serious mistake.*"

[99] Statement of Defence, para. 97.

[100] Statement of Defence, para.96.

Lebedev's lack of interest and other passivity led to RoK's position, evidence, and argumentation in the arbitration not being taken into consideration to a sufficient extent, which led to the exceeding of the mandate and procedural errors which RoK discusses in sections 3.5-3.8 below.

3.2     **The arbitral award is not covered by an arbitration agreement which is binding on the parties since Stati failed to satisfy the requirement for first-stage negotiations as prescribed in article 26 of the ECT.**

3.2.1   **Introduction**

(124)   One of the basic issues in dispute in this case is whether the undisputed requirement for first stage negotiations in article 26 of the ECT is to be regarded as a question of jurisdiction or a procedural agreement. However, a question of key importance to the assessment of this question is whether there was even an arbitration agreement that was binding on the parties. If a binding arbitration agreement has not been entered into, the issue regarding the categorisation of the first stage negotiations is irrelevant.

(125)   The ECT is an intergovernmental treaty to which investors are not party. The starting point when interpreting the ECT is the same as when interpreting ordinary contracts, namely the common intention of the parties. However, the difference is that the intention of the investor should not be taken into consideration since the investor is not a party to the ECT. Consequently, no joint will of the parties can be taken into consideration when an international treaty is to be interpreted; the treaty must instead be interpreted on a strictly objective basis, based on the wording of the relevant provisions.

(126)   It is relevant that the ECT expressly states that international law is the applicable substantive law under article 26(6) of the ECT:

> "*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"

(127)   In this respect, courts in the United Kingdom have held that the interpretation of a bilateral investment treaty ("**BIT**") should be an independent interpretation of the treaty, without being affected by the particular characteristics of the specific legal system in an acceding state.

(128)   In *Czech Republic v. European Media Ventures SA*, the Czech Republic moved an English court to vacate an Award on Jurisdiction under Section 67 of the English Arbitration Act (1996) on the grounds that the arbitral tribunal lacked substantive jurisdiction. The arbitral award in respect of jurisdiction was issued within the scope of an arbitration situated in London pursuant to UNCITRAL Arbitration Rules, but which was initiated against the Czech Republic pursuant to a bilateral investment treaty between the Czech Republic and the Belgo-Luxembourg Economic Union. In its decision to uphold the arbitral award in respect of jurisdiction, Justice Simon stated that: "[a] Treaty is governed by international law, which includes the rules of interpretation" under the Vienna Convention on the Law of Treaties (the "**Vienna**

**Convention**"), i.e. Articles 31 and 32 of the Vienna Convention.[101] Justice Simon further stated that: "a treaty must be given independent derivable from the sources mentioned in articles 31 and 32 [of the Vienna Convention on the Law of Treaties] and without taking colour from distinctive features of the legal system of any individual contracting state. In principle therefore there can only be one true interpretation of a treaty."[102]

(129)   The following can be noted in respect of Stati's allegation that article 26(2) of the ECT must be interpreted in accordance with Swedish law.

(130)   Under the Swedish legal system, each international treaty which Sweden has signed immediately becomes part of Swedish law. Since Sweden has acceded to the Vienna Convention, it follows that the principles regarding interpretation of treaties under the Vienna Convention automatically constitute part of Swedish law.

(131)   In addition to the plain wording of the provisions, a crucial factor is the intention of the contracting states in conjunction with their accession to the ECT. A fundamental prerequisite for an arbitration agreement to be deemed binding is that the parties have consented to settle disputes through arbitration.[103] A state can justifiably have reason to make its consent to arbitration in relation to the potential investors wishing to settle disputes against the state in arbitration conditional on a treaty or a bilateral investment protection agreement.[104] An example of such a condition can be found in the rule regarding first stage negotiations in article 26 of the ECT.

(132)   What is striking about Stati's arguments is that Stati entirely avoids this key issue. Stati's arguments are based quite simply on the fact that the parties were already bound by an arbitration agreement and it is the provisions of this arbitration agreement that must be interpreted. This argument is made without explaining how this arbitration agreement would have been entered into between the parties according to the fundamental offer-acceptance principle under Swedish law. Thus, Stati's arguments are based on the wrong grounds, which means that Stati's arguments in this respect

---

[101] *Cf.* the Netherlands' Supreme Court decision dated 26 September 2014 in *Republic of Ecuador v. Chevron Corporation (2) Texaco Petroleum Company.* In this case, the Dutch courts addressed the US-Ecuador BIT and noted that the definition of the term "investment" in this BIT was very broad and exceeded general usage. The decision is available only in Dutch.

http://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:HR:2014:2837

[102] *Czech Republic v. European Media Ventures SA* [2007] EWHC 2851 (Comm), [2007] All ER (D) 75 (Dec), paras. 33-37

[103] See, among others, Roe & Happold, *Settlement of Investment Disputes under the Energy Charter Treaty,* 2011, p. 137-138. – "*Consent of the respondent host state is the most important condition for the vesting of adjudicative power in the Tribunal. That consent is simply not given unless the dispute is one which 'cannot be settled according to the provisions of paragraph (1) [i.e. amicably] within a period of three months from the date on which either party to the dispute requested amicable settlement'*" (emphasis added).

[104] See Justice Sotomayor's opinion concurring in part in case *BG Group PLC v. Republic of Argentina,* p. 2 – "*a nation-state might reasonably wish to condition its consent to arbitrate with a previously unspecified investor counterparty on the investor's compliance with a requirement that might be deemed 'purely procedural' in an ordinary commercial context*".

are largely irrelevant and of no importance to the determination by the Court of Appeal.

### 3.2.2 There is no arbitration agreement binding on the parties

(133) It should be common ground in the case that the provisions of article 26 of the ECT do not *per se* constitute an arbitration agreement. This is evident, *inter alia*, from the fact that no investor is a party to the convention. Rather, article 26 of the ECT constitutes a standing offer by the state, in this case RoK, to enter into an arbitration agreement on the terms and conditions stated in the article. A binding arbitration agreement arises between the parties only when the investor requests arbitration in accordance with the provisions of article 26 of the ECT.[105]

(134) Another way of expressing this is that the state's consent to the arbitration, which is fundamental to a binding arbitration agreement[106], is conditional on the provisions of article 26 of the ECT being accepted in full by the investor. Article 26(3) provides as follows: "*(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]*" (emphasis added).

(135) Party autonomy in arbitration proceedings gives the parties not only the freedom to agree on the manner in which the arbitration should be carried out, but also the manner in which the arbitration is to be initiated. Section 19 of the Swedish Arbitration Act provides as follows: "*Unless the parties have determined otherwise, the arbitration shall commence when a party receives a request for arbitration pursuant to the second paragraph*" (emphasis added). Consequently, an agreement which, for example, provides that arbitration must be preceded by settlement negotiations for a limited period, must be upheld and respected in full.[107]

(136) The importance of satisfying all formal requirements is significantly greater in investment disputes than in ordinary commercial disputes. This is because of the limits on the state's sovereignty by virtue of its consent to arbitration.[108] In other words, the investor is not free to choose to comply with certain elements of article 26 of the ECT when requesting arbitration.

---

[105] See further Lindell's expert legal opinion, Appendix 1, section 2, where he states, on page 5, that: *"[i]t is clear and unambiguous from article 26(2) that one condition for a party being able to request arbitration is that the three-month time period has been observed."*

[106] Hobér, *Investment Arbitration and the Energy Charter Treaty*, Journal of International Dispute Settlement, Vol. 1 (2010) p. 55´; Heumann, *Arbitration Law of Sweden*, 2003, p. 27.

[107] Andersson et al., *Arbitration in Sweden*, 2011, p. 68. See also the case reported on page 853 in NJA 1982 in which all three instances held that a provision regarding the requirement of pre-procedural measures before arbitration could be requested was binding, and thus a bar to litigation. See also the arbitral award in SCC 21/1999 in SAR 2000:2 p. 59.

[108] Chief Justice Robert's dissenting opinion in case *BG Group PLC v. Republic of Argentina*, p. 9 – "*It is not a trifling matter for a sovereign nation to subject itself to suit by private parties; we do not presume that any country […] takes that step lightly*".

(137)    Article 26 of the ECT provides that arbitration must be preceded by a period of three months in which to settle the dispute.[109] Thus, the state's consent to arbitration and the offer in itself is wholly conditional on the observance of this cooling off period.

(138)    *Advokat* Kaj Hobér, a professor of international investment and commercial law at Uppsala University, and probably Sweden's foremost expert on investment disputes in general and disputes under the ECT in particular, has expressed this as follows:

> "*In accordance with the first paragraph of article 26, investment disputes (as defined above) must, if possible, be settled amicably. <u>The investor may not submit a dispute for resolution in accordance with article 26 until three months have elapsed from the date on which either party to the dispute requested amicable settlement</u>. However, if a dispute cannot be settled amicably within three months, the dispute shall be resolved in a forum elected by the investor, as set forth in article 26.*"[110] (emphasis added)

(139)    The three-month period prescribed in article 26 of the ECT involves initiation of arbitration under the rules of the treaty and the question of whether a binding arbitration agreement has been entered into pursuant to these rules.

(140)    In the highly notable case of *BG Group PLC v. Republic of Argentina*[111], the minority, comprising, among others, United States Supreme Court Chief Justice Roberts, stated that the investor, BG Group PLC, could not be deemed to have bound Argentina to an arbitration agreement where the investor failed to comply with the rule regarding "domestic legal remedies" which were stated in the bilateral investment protection agreement between the United Kingdom and Argentina. Justice Sotomayor, who generally shared the majority opinion, stated in an opinion concurring in part that a party's consent to arbitration is fundamental to the validity of the arbitration agreement; "*a party plainly cannot be bound by an arbitration clause to which it does not consent*".[112] However, the question of whether such consent was given did not need to be examined in that case, since the bilateral investment protection agreement between the United Kingdom and Argentina did not contain any provisions on consent (unlike article 26(3) of the ECT).[113] If the bilateral investment protection agreement had contained rules regarding consent which were equivalent to those in article 26 of the ECT, the outcome of the case would probably have been different.[114]

---

[109] Note the word "*shall*" in article 26(1) of the ECT.

[110] Hobér, *Investment Arbitration and the Energy Charter Treaty*, Journal of International Dispute Settlement, Vol. 1 (2010) p. 162.

[111] Supreme Court opinion of 5 March 2014 in *BG Group PLC v. Republic of Argentina*

[112] See Justice Sotomayor's opinion concurring in part in *BG Group PLC v. Republic of Argentina,* p. 2.

[113] US Supreme Court opinion of 5 March 2014 in *BG Group PLC v. Republic of Argentina*, p. 12 –"*We leave for another day the question of interpreting treaties that refer to conditions of consent explicitly*".

[114] See Justice Sotomayor's opinion concurring in part in *BG Group PLC v. Republic of Argentina,* p. 2. – In addition, Justice Sotomayor stated that "*[C]onsent is especially salient in the context of a bilateral investment treaty, where the*

(141)   It is clear from the facts in this dispute that Stati failed to comply with the procedure for requesting arbitration as stated in article 26 of the ECT. By failing to observe the prescribed cooling off period, Stati accepted RoK's arbitration offer subject to qualifications. RoK never accepted this qualified acceptance from Stati. Therefore, an arbitration agreement that was binding on the parties never arose.[115]

(142)   It is important in this respect to differentiate between the formal requirements applicable to the validity of a clause, on the one hand, and the interpretation of a provision in an arbitration agreement that has already been entered into, on the other hand.[116] In the latter case, in certain cases it would be possible to make a more pragmatic assessment, while this cannot be deemed acceptable in the former case. Stati's reference to Lindskog's comments[117] is thus irrelevant to the issue, since Lindskog proceeds on the basis of the fact that the provisions regarding first stage negotiations are included in an arbitration agreement which is binding on the parties.

(143)   Furthermore, a more detailed review of Lindskog's reasoning presents a different picture of Lindskog's opinion on the issue than that stated by Stati. Lindskog's reasoning is as follows.

> "*As a consequence of the above, the provisions of an arbitration clause providing that arbitration may not be requested until settlement negotiations have been carried out (a so-called two-tier arbitration clause) should not prevent (where a party requests arbitration) the other party being obliged to appoint an arbitrator based on the provisions of section 14, paragraph 1.*"[118] (emphasis added)

(144)   Lindskog, who proceeds on the basis that the first stage negotiation provisions are part of an arbitration agreement which is binding on the parties (which is not the case here) is thus not of the opinion, as Stati argues, that an arbitral tribunal is unimpeded from "*hearing a dispute referred to it*" even where a party has failed to comply with first stage negotiation provisions.[119] What Lindskog is saying is that, despite first stage negotiations not having been held, the other party is obliged to appoint his arbitrator. Lindskog's reasoning continues as follows.

---

*treaty is not an already agreed-upon arbitration provision between known parties, but rather a nation state's standing offer to arbitrate with an amorphous class of private investors.*" (opinion concurring in part p. 2)

[115] See Lindell's expert legal opinion, Appendix 1, p. 29.

[116] *Cf.*, for example, the requirement that a contract to purchase a property must be in writing. This requirement for a written contract is an absolute requirement and it would be unheard of under Swedish law to accept (in the absence of a written contract) a binding contract between the parties for reasons of judicial economy or practical reasons.

[117] *Cf.* Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 54 et seq. and the Statement of Defence, para.104.

[118] *Id.*, p. 55.

[119] Statement of Defence, para.104.

> "*However, with respect to multi-stage dispute resolution mechanisms, it cannot be ruled out that a failure to assist in the initial stage (such as mediation) entitles the other party to terminate the arbitration agreement.*[120]

(145) **Thus, the conclusion drawn by Lindskog is that failure to assist in first stage negotiations** in accordance with a provision of an arbitration agreement which is binding on the parties might constitute a material breach of contract entitling the other party to terminate the arbitration agreement. Applying this reasoning to this case, it is difficult to see that, through a material breach of contract, Stati would be deemed to have entered into a binding arbitration agreement with RoK pursuant to article 26 of the ECT.

(146) Stati also does not take into consideration that its own expert, Professor Bayno, has stated with regard to the <u>specific wording</u> of article 26 of the ECT that if there has been no attempt to settle the dispute amicably within the prescribed three-month period, there is no valid offer on the part of the state to resolve the dispute through arbitration.[121]

(147) In light of the above, the discussion as to whether the first stage negotiation issue should be deemed a jurisdictional issue or merely a procedural agreement, becomes academic in nature.

### 3.2.3   The provision regarding first stage negotiations is a jurisdictional issue

(148) There is no uniformity in international case law on the issue of the categorisation of prescribed first stage negotiations in arbitration. There are primarily two lines of argument. One line of argument is based on international law and the principles of interpreting treaties, in which substantial weight is attached to the stated purpose of the treaty and the wording of the provisions in the treaty. In this case, the provisions regarding first stage negotiations are to be considered a jurisdictional issue.[122] The second line of argument is sprawling, but can be summarised as follows: in their interpretation, arbitral tribunals give weight to considerations of judicial economy, the purpose of the arbitration (instead of the purposes of the treaty), practical considerations, and the facts of the particular case.[123] In the case at hand, the conclusion would be that the first stage negotiation provisions constitute merely a procedural agreement, not a jurisdictional issue.

---

[120] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 488 et seq.

[121]  Statement of Claim, para. 150.

[122] *Cf. Enron v. Argentina*, as invoked in the Statement of Claim, para.152. It should be noted that the arbitral tribunal in this case was unanimous in its conclusion that "*[S]uch requirement is in the view of the Tribunal <u>very much a jurisdictional one</u>. A failure to comply with that requirement would result in a determination of lack of jurisdiction*" (emphasis added). *Cf.* Stati's inaccurate claim in the Statement of Defence, para.117, that this would be a minority opinion.

[123] See Lindell's expert legal opinion, Appendix 1, p. 9 et. seq.

(149)   It is difficult to find any legally tenable grounds for the latter line of argument. In legal treatises, it has therefore been pointed out that:

> "…*the better view, at least so far as article 26 of the ECT is concerned, is that <u>it does indeed present a jurisdictional hurdle</u>. This follows from the plain wording, which unambiguously makes the right to elect for formal dispute settlement conditional on the dispute being one which cannot be settled within three months. This wording cannot simply be brushed aside.*"[124] (emphasis added)

(150)   As stated above, it is clearly evident from the wording of article 26 of the ECT that first stage negotiations are an absolute requirement.[125] It has been considered to be extremely desirable for several reasons that, in disputes under the ECT, an initial attempt is made to reach a settlement before the dispute is referred to an arbitral tribunal.

(151)   A negotiations period serves several functions. This was clarified by the ICJ *Case Concerning Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Georgia v. Russian Federation)* under the heading "*compromissory provisions*":

> "*[I]t is not unusual in compromissory clauses conferring jurisdiction on the Court and other international jurisdictions to refer to resort to negotiations. Such resort fulfills three distinct functions. In the first place, it gives notice to the respondent State that a dispute exists and delimits the scope of the dispute and its subject-matter… In the second place, it encourages the Parties to attempt to settle their dispute by mutual agreement, thus avoiding recourse to binding third-party adjudication. In the third place, prior resort to negotiations or other methods of peaceful dispute settlement performs an important function in indicating the limit of consent given by States.*"[126]

(152)   It must be added that the first function includes the possibility to conduct a review of facts, carry out legal research, contact witnesses and experts, and appoint an arbitrator.[127] As was expressed by the arbitral tribunal in *Merril & Ring Forestry v. Canada*, a cooling off period is also intended to enable the defendant to formulate a genuine defense:

> "*The arbitral tribunal has no doubt about the importance of the safeguards noted and finds that they cannot be regarded as merely procedural niceties. They perform a substantial function which, if not complied with, would*

---

[124] Roe & Happold, *Settlement of Investment Disputes under the Energy Charter Treaty*, 2011, p. 137.

[125] See Lindell's expert legal opinion, Appendix 1, *inter alia* p. 29.

[126] ICJ, Case Concerning Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Georgia v. Russian Federation), Decision on Preliminary Objections, Judgment, ICJ reports 2011.

[127] *Cf.* Kahale, *Is Investor-State Arbitration Broken?*, TDM Vol. 9, issue 7, December 2012, p.10 and fn 19.

*deprive the Respondent of the right to be informed beforehand of the grievances against its measures and from pursuing any attempt to defuse the claim announced. This would be hardly compatible with the requirements of good faith under international law and might even have an adverse effect on the right of the Respondent to a proper defence.*"[128]

(153)    Since first stage negotiations are a prerequisite for the state consenting to arbitration and, consequently, to the validity of the arbitration agreement, a formalistic view must be established when interpreting article 26 of the ECT. This is particularly important for reasons of due process. The arbitral tribunal in the case of *Tulip v Turkey* proceeded on the basis of the three functions which had been indicated for first stage negotiations in *Georgia v Russian Federation* and added a fourth function, namely that "*such a requirement also fulfils the policy function of conferring upon the State Party an opportunity to address a potential claimant's complaint before it becomes a respondent in an international investment dispute.*"[129] (emphasis added). Any other procedure, i.e. where the arbitral tribunal is afforded scope to make an arbitrary interpretation based on reasons of judicial economy or practical circumstances, would undermine due process and predictability, and in practice result in the ECT's clear terms and conditions becoming an illusion.[130]

(154)    Stati's assertion that Madsen has questioned whether a provision regarding first stage negotiations can constitute a bar to commencing arbitration is misleading.[131] What Madsen says is that "*[T]here is no authoritative factor which is determinative for Swedish law*".[132] Without drawing his own conclusion on this issue, Madsen refers to a number of decisions and comments in literature and articles, all of which on the whole result in the conclusion that a provision regarding first stage negotiations is to be deemed to constitute a bar to litigation.[133]

(155)    In SCC case no. 21/1999[134], which, *inter alia*, related to the issue of the first stage before arbitration (in that case referring a dispute to a designated "*Adjudicator*" before arbitration could be requested), the arbitral tribunal stated the following.

---

[128] *Merrill & Ring Forestry L. P. v. Government of Canada*, UNCITRAL, ICSID Administered, Decision on a Motion to Add a New Party, 31 January 2008, para. 29.

[129] *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Bifurcated Jurisdictional Issue, 5 March 2013, para. 62 (emphasis added).

[130] See *Generation Ukraine, Inc. v. Ukraine*, ICSID Case Nr. ARB/00/9, arbitral award of 16 September 2003, p. 45, para.14.3 – "*Some authorities consider the requirement to consult and negotiate before proceeding to arbitration as "procedural" rather than a condition precedent for the vesting of jurisdiction. This Tribunal would be hesitant to interpret a clear provision of the BIT in such a way so as to render it superfluous, as would be the case if a "procedural" characterisation of the requirement effectively empowered the investor to ignore it at its discretion.*" (emphasis added)

[131] *Cf.* Statement of Defence, para.104.

[132] Madsen, *Skiljeförfarande i Sverige [Arbitration in Sweden]*, 2nd ed., 2009, p. 185.

[133] Madsen, *Skiljeförfarande i Sverige [Arbitration in Sweden]*, 2nd ed., 2009, p. 185, fn 551. Essentially, it is only in one article by Peter Westberg that the binding character of a first stage negotiation provision has been called into question.

[134] The case is published in the Stockholm Arbitration Report (SAR) 2000:2, p. 59.

"*Construction contracts have come to include […] provisions for multistage dispute resolution procedures. Under the contracts, disputes are to be resolved through procedures to be activated in a specified sequential order. In determining whether the agreed procedure has been followed in this case, the arbitral tribunal applies normal methods of contract interpretation when comparing the agreed procedure with the actual events as demonstrated by the parties. Deriving its powers from the agreement of the parties, the arbitral tribunal is required to respect and implement the Contracts in respect of dispute resolution procedures no less than other contractual areas. The Parties have chosen to provide that claims must be prepared and structured in a certain way in order to reach any arbitral tribunal.*"[135] (emphasis added)

"*In reaching its conclusions, the arbitral tribunal has been deeply cognizant of its obligations to the parties and in particular of its obligation to constitute a helpful element in the resolution of disputes under the agreed dispute resolution procedure. Not only has the arbitral tribunal found that as a legal matter it is prevented from reviewing the decisions of Mr N as Adjudicator, but the parties would also, as a business matter, suffer for several years from any wrongful assumption by the arbitral tribunal of jurisdiction over matters not properly referred to it.*"[136] (emphasis added)

(156)   In light of the above, the Arbitral Tribunal held that it had no authority (jurisdiction) to determine the dispute, and dismissed the claim; "*The Arbitral Tribunal dismisses the Claimants' Request for Arbitration, without prejudice to the Claimants' right to bring a new action before an arbitral tribunal or otherwise, in accordance with the dispute resolution procedures contained in the Contracts, or otherwise.*"[137]

(157)   Stati's assertions (a) that agreements regarding first stage negotiations are not adjudged to have the effect of operating as a bar to litigation under Swedish law[138], and (b) that procedural agreements are invalid unless there is statutory support to the contrary[139] are, in light of the submissions above, misleading and incorrect.

(158)   Firstly, both of these claims assume that there is an arbitration agreement containing a first stage negotiation provision which is *de facto* binding on the parties. This is not so in this case. Article 26 of the ECT is a standing offer to enter into an arbitration agreement on certain given terms. It is thus not a question of the interpretation, or categorisation, of a first stage negotiation provision in an existing arbitration agreement, but rather a question of whether a valid arbitration agreement can be deemed to have been entered into between the parties at all.

---

[135] Jarvin/Magnusson, *SCC Arbitral Awards 1999-2003*, 2006, p. 231.

[136] Jarvin/Magnusson, *SCC Arbitral Awards 1999-2003*, 2006, p. 235.

[137] Jarvin/Magnusson, *SCC Arbitral Awards 1999-2003*, 2006, p. 236, ruling, p. 2]

[138] Statement of Defence, para.102.

[139] Statement of Defence, para.103.

(159)   <u>Secondly,</u> the assertions assume that first stage negotiations should be categorised as a procedural agreement and not as a jurisdictional issue. Thus, Stati's arguments skip the key issue of the categorisation of the first stage negotiation provision in itself, which means that the argument ends up in a blind alley without getting any closer to resolving the issue.

(160)   <u>Thirdly,</u> the principle of the invalidity of procedural agreements is only relevant in cases where the parties have, in an agreement, *entirely* waved the right to having disputes determined by a court or in a dispute resolution forum equivalent to a court, such as arbitration.[140] This is not so in this case. Furthermore, the principle is based on the absence of (or, in any event, the restrictions on) party autonomy in Swedish judicial proceedings. However, unlike judicial proceedings, the respect for party autonomy is one of the most important elements of arbitration.

(161)   <u>Fourthly,</u> the assertion that a procedural agreement (in the event this relates to a procedural agreement) would be invalid if there is no statutory support to the contrary, does not lend support to Stati's line of argumentation, since the ECT, being a multilateral treaty, has the status Stati's line of argumentation is seeking (see paragraphs 162-165 below). In other words, the first stage negotiation prescribed in article 26 of the ECT is just the kind of bar to litigation which must lawfully be upheld and respected under Swedish law.

(162)   The ECT is a multilateral treaty which has been approved by a large number of states, including Sweden.[141] The treaty constitutes an international agreement which is binding on Sweden. Sweden, as a state, is obliged under international law to comply with the ECT's rules, and Swedish laws must be applied in a manner which is in accordance with the ECT.[142] Swedish courts and administrative public authorities which, in their activities are assumed to be aware of an international agreement such as the ECT, are required to interpret the ECT as a treaty, i.e. ensure that national rules are in accordance with the ECT and interpret the national rules based on these anticipated norms.[143]

(163)   The ECT was negotiated at the initiative of the EU and aims to unify, from a pan-European perspective, the long-term cooperation interests within the energy sector of the countries.[144] The ECT entered into force in Sweden in April 1998 and was published in the publication *Sveriges internationella överenskommelser*, SÖ 1997:57. No specific legislative measures were required further to Sweden's ratification of the ECT; rather, it was assumed that no legislative changes were necessary for Swedish

---

[140] Allowing such an agreement would also be in violation of article 6 of the European Convention regarding the right to such a trial.

[141] Government Bill 1995/96:68 p. 2

[142] http://www.regeringen.se/sb/d/3305

[143] Bring, *Sverige och folkrätten [Sweden and International Law]*, 4th ed., 2011, p. 44

[144] Government Bill 1995/96:68 p. 12

law.[145] However, the ECT was deemed to be of such importance that the treaty had to be approved by the Parliament pursuant to Chapter 10, section 2 of the Constitution.[146] Following the Parliament's approval of the treaty, it entered into force on 16 April 1998.

(164)    Even if the first stage negotiation provision in article 26 of the treaty was only to be categorised as a procedural agreement (which is disputed), this would be valid under Swedish law and the court would be compelled to uphold and respect it.[147]

(165)    In light of the above, Stati's reference to litigation proceedings in employment disputes [148] (which in itself are irrelevant to this case) lend support to the argument that the first stage negotiation provision must be categorised as a jurisdictional issue, which is wholly in accordance with RoK's opinion.

(166)    Stati is also trying to make a point that, in conjunction with the introduction of the Mediation in Certain Civil Law Disputes Act (SFS 2011:860) (the "**Mediation Act**"), a mediation agreement would not constitute a bar to litigation or bar to arbitration.[149] The reason the legislature chose this solution as regards mediation was that there was deemed to be a fundamental right under the Swedish legal system for a party to have its case tried in a court or through arbitration.[150] Adhering to the first stage negotiation provision in article 26 of the ECT differs from the Mediation Act insofar as (a) in the Mediation Act the issue concerns a mediation agreement which is binding on the parties (not a requirement that a contract be deemed to have been entered into), and (b) that the first stage negotiations prescribed in article 26 of the ECT in part are for purposes other than mediation, including giving the state reasonable time for consideration.[151] Even more important is the fact that the first stage negotiation provision in article 26 of the ECT, like the Mediation Act, does not prevent investors from having their case tried in arbitration proceedings; the provision merely provides that investors be required to observe a limited cooling off period before such arbitration can be requested.[152]

(167)    Stati's assertion that "the vast majority of arbitral tribunals" have found that a first stage negotiation provision does not constitute a condition to a substantive

---

[145] Government Bill 1995/96:68 p. 14

[146] Government Bill 1995/96:68, p.2.

[147] *Cf.* Statement of Defence, para.103.

[148] Statement of Defence, para.107.

[149] Statement of Defence, para.105.

[150] Government Bill 2010/11:128, p. 29.

[151] See Statement of Claim, para.148.

[152] Govt. Bill 2010/1:128, p. 31; Cf also Lindell's expert legal opinion, Appendix 1, p.7: *"It must be said in this context that the defendant's argument regarding the position taken in Swedish law on mediation clauses constituting an impediment to litigation has no significance, since the initiation of arbitration is governed by the rules of the treaty and international law.*

adjudication is clearly misleading.[153] This assertion may have a certain bearing on cases where the first stage negotiation provision was part of an arbitration agreement binding on the parties, i.e. ordinary commercial disputes.[154] In these cases, the arbitral tribunals have reasoned in terms of judicial economy and it was believed to be unimportant to compel the parties to a stay in *already initiated arbitration proceedings* in order to satisfy the provision regarding first stage negotiations.[155] Even in these cases, the standard practice is, however, far from standardised.

(168)   In its attempt to describe the majority position, Stati has referred to five cases, *Lauder v. Czech Republic*, *Wena Hotels v. Egypt*, *SGS v. Pakistan*, *Bayindir v. Pakistan* and *Paushok v. Mongolia*, none of which are cases under the umbrella of the ECT.

(169)   *Lauder v. Czech Republic* is of little relevance since the arbitral tribunal essentially assumed that the six-month time period had nothing to do with jurisdiction since there was no evidence that the Czech Republic would have accepted entering into negotiations with the claimant and since the Czech Republic had not reacted at all to a letter requesting a meeting to find an amicable resolution to the dispute.[156] As early as at this point this case differs from the instant case, since in the instant case Stati commenced arbitration immediately after the termination of the subsoil use contracts without making any request for amicable settlement. Accordingly, there was no indication that negotiations would be futile.

(170)   In *Wena Hotels v. Egypt*, the arbitral tribunal did not even address the issue of whether a three-month time period was a procedural issue or a jurisdictional issue, since Egypt waived this objection.[157]

(171)   In the section of *SGS v. Pakistan* which Stati cites, the arbitral tribunal referred to only one case in support of its determination that arbitral tribunals generally tend to treat cooling off periods as routine and procedural rather than jurisdictional in nature[158]; little weight can be afforded to this groundless statement.

---

[153] In the majority of cases to which Stati refers, some form of settlement negotiations have been conducted *de facto* by the parties before arbitration was requested. However, the Arbitral Tribunals (incorrectly and following an assessment of reasonableness) found that these negotiations, even where they were deficient or did not comply with the three month period, should not constitute a bar to the subsequent arbitration; see, for example, *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, *Wena v. Egypt*, ICSID case number ARB/98/4, Decision on Jurisdiction, 29 June 1999, *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, *Paushok v. Mongolia*, *Paushok v. Mongolia*, UNCITRAL Award on Jurisdiction and Liability, 28 April 2011, para. 218 – "*Claimants did not fail to abide by the six-month negotiating period*".

[154] See, however, *inter alia*, SCC 21/1999, *Cf.* the case reported on page 853 in NJA 1982. See also Justice Sotomayor's opinion concurring in part in case *BG Group PLC v. Republic of Argentina*, p. 2 (see footnote 112 above).

[155] See, e.g. para. 177 below and cases referred to therein.

[156] *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, para. 188.

[157] *Wena Hotels Ltd. v. Egypt*, ICSID case number ARB/98/4, decision on jurisdiction, 29 June 1999, section VII, 41 I.L.M. 881, 891 (2002).

[158] *SGS Societe Generale de Surveilliance S.A. v. Pakistan*, ICSID's case number ARB/01/13, decision on jurisdiction, 6 August 2003, para. 184.

(172)   In its conclusion in *Bayindir v. Pakistan* the arbitral tribunal also referred to the Lauder case in respect of the cooling off period. This case is also different in that the claimant had actually sent notice of the dispute; it had just failed to comply with the six-month time period and, based on Pakistan's failure to respond to the message, the arbitral tribunal drew the conclusion that Pakistan was not willing to commence negotiations.[159] Moreover, in its conclusion, the arbitral tribunal did not make a general statement but instead stated that "*in the circumstances of this case*" the six-month time period would not prevent the arbitral tribunal from accepting jurisdiction.[160] Furthermore, Pakistan itself had admitted that there can be occasions when the requirement for the cooling off period is not of a jurisdictional nature.[161] Accordingly, the decision was motivated more by Pakistan's consent than meticulous legal reasoning.

(173)   Stati's reference to *Paushok v. Mongolia* has little relevance, since the arbitral tribunal in that case reached the conclusion that the claimant had complied with the six-month period required under the bilateral investment treaty between Russia and Mongolia. The arbitral tribunal therefore only addressed the question of whether this requirement was jurisdictional on an *arguendo* basis.[162]

(174)   In this context, it should be noted that Stati incorrectly states that RoK relied on a "minority opinion" in three cases[163], namely *Murphy Oil v. Ecuador*, *Enron v. Argentina* and *Burlington v. Ecuador*. In all of these cases, the arbitral tribunals were unanimous, or in the majority, in their opinion regarding a lack of jurisdiction.

(175)   In *Burlington v. Ecuador* the arbitral tribunal held, in respect of the requirement of a six-month period under the applicable BIT, that:

> "*The purpose of this right is to grant the host State an opportunity to redress the problem before the investor submits the dispute to arbitration. In this case, Claimant has deprived the host State of that opportunity. That suffices to defeat jurisdiction.*"[164]

(176)   The arbitral tribunal in T*ulip Real Estate v. Turkey* decided similarly:

> "*The explicit requirements to give notice of the dispute as arising under the BIT and to seek consultations and negotiations until one year has elapsed*

---

[159]  *Bayindir Insaat Turizm Ticaret Ve Sanayi (Scedil) v. Pakistan*, ICSID case number ARB/03/29, Decision on Jurisdiction, 14 November 2005, para. 102.

[160]  *Ibid.*

[161]  *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, November 2005, para. 99.

[162]  *Cf. Paushok v. Mongolia*, UNCITRAL Award on Jurisdiction and Liability, 28 April 2011, para. 220.

[163]  See Statement of Claim, paras.151-152 and 162.

[164]  *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, para. 315.

> *from the date of notification of the dispute is not to be watered down to a mere statement of aspiration. The arbitral tribunal finds compliance is an essential element of Turkey's prospective consent to qualify its sovereignty to permit unknown future investors of the other contracting State to claim relief under the terms of the BIT against it in an international forum. The arbitral tribunal finds that the fulfillment of the requirements in Article 8(2) is a pre-condition to the jurisdiction of this arbitral tribunal."[165]*

(177)   Other decisions in respect of jurisdiction where arbitral tribunals have treated attempts to reach an amicable settlement of the agreement within the prescribed time pursuant to the applicable BIT include *Azurix v. Argentina*[166], *Noble Energy v. Ecuador,*[167] *Pan American Energy v. Argentina,*[168] *El Paso v. Argentina,*[169] *Micula v. Romania,*[170] *Bogdanov v.* Moldova,[171] *MTD v. Chile*[172] and *AES v. Hungary.*[173] These arbitral tribunals held that the jurisdictional requirement was only met when the relevant prescribed negotiation attempts had taken place within the prescribed time.

(178)   In order to illustrate that the requirement for first stage negotiations is also gaining ground within the scope of purely contractual relationships, we would like to refer to a recent decision of the English Commercial Court, *Emirates Trading Agency LLC v Prime Mineral Exports Private Ltd*[174], where the court held that a provision in a contract regarding first stage negotiations was obligatory and, thus, had to be fulfilled before a dispute could be referred to arbitration. Thus, the first stage negotiations were deemed to be a jurisdictional issue ("*condition precedent*"). By reference to previous case law,[175] the court established certain specific criteria for provisions regarding first stage negotiations to have obligatory effect, namely:

---

[165] *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Bifurcated Jurisdictional Issue, 5 March 2013, para. 72.

[166] *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award on Jurisdiction, 8 December 2003, para. 54.

[167] Noble Energy Inc. and MachalaPower Cía. Ltd. v. Republic of Ecuador and Consejo Nacional de Electricidad, ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008, para. 212.

[168] *Pan American Energy LLC and BP Argentina Exploration Company v. Argentine Republic*, ICSID Case No. ARB/03/13, Decision on Preliminary Objections, 27 July 2006, para. 39.

[169] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Jurisdiction, 27 April 2006, para. 36.

[170] *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Decision on Jurisdiction and Admissibility, 24 September 2008, para. 136.

[171] *Iurii Bogdanov, Agurdino-Invest Ltd. and Agurdino-Chimia JSC v. Republic of Moldova*, Arbitral Award, 22 September 2005, para. 1.5.1 et.seq.

[172] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, para. 96.

[173] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, paras. 6.5.1-6.5.2.

[174] *Emirates Trading Agency LLC v Prime Mineral Exports Private Ltd*174 *[2014] EWHC 2104 (comm)*

[175] *Cable & Wireless v. IBM [2002]*; EWHC 2059 and *Wah v. Grant Thornton [2013]* 1 Lloyd's Law Reports II.

(i)  a sufficiently determined and unequivocal undertaking to commence first stage proceedings;

(ii)  through which it was possible to distinguish which stages the parties were obliged to take to enable the proceedings to take place, and which was

(iii)  sufficiently and clearly defined to enable the court to assess, an objective grounds

    a.  what the parties' minimum commitments were during the proceedings with respect to their participation therein; and

    b.  when and how the proceedings were to be considered exhausted or possible to conclude without being in breach of the provision.

(179)   The court held that the provision regarding settlement negotiations ("friendly negotiations") for a four-week period was sufficiently determined and limited to uphold the obligatory nature of the provision.[176] The court also held that there were clear benefits of judicial economy in having a provision regarding first stage negotiations to avoid costly and drawn-out arbitration proceedings.

(180)   Again, it is important to distinguish cases in which the first stage negotiation provision is a necessary prerequisite to the state consenting to arbitration and, thus, the validity of the arbitration agreement, from cases where such provision is part of an arbitration agreement which is already binding on the parties. In the former case, one of the reasons for having to comply with a provision regarding first stage negotiations is judicial economy.[177] This is largely in the interests of the parties and, in any event, the state.[178]

(181)   Stati's assertion that the case law in respect of provisions regarding domestic legal remedies to which RoK refers is distinguishable from this case in that those cases did not involve any stay of proceedings is misleading.[179] Stati ignores the issue of the categorisation of the provision as a jurisdictional issue. If a binding arbitration agreement cannot be deemed to have been entered into by the parties, the later stay of proceedings is irrelevant since this cannot cure the deficiencies which existed at the time arbitration was requested (see further section 3.2.5 below).

---

[176] See also Söderlund, *Multimodala tvistlösningsklausuler [Multimodal Dispute Resolution Clauses]*, Juridisk Tidsskrift 2005-06, Nr. 1, p. 188, in which Söderlund establishes a corresponding requirement for clarity in first stage clauses. According to Söderlund, first stage clauses constitute "*provided they are stated with a sufficient degree of precision […], a suspensive bar to litigation or arbitration*". *Cf.* Lindskog, *Skiljeförfarande i Sverige [Arbitration in Sweden]*, 2nd ed., 2012, p. 306.

[177] See Statement of Claim, paras.146 och 147.

[178] *Cf.* Statement of Defence, para.110.

[179] *Cf.* Statement of Defence, para.117.

(182)   The practical and political purposes to which Stati refers in respect of rules regarding "domestic legal remedies"[180] are largely applicable in this case as well. As was stated in the Statement of Claim, para 148, it is of particular importance that the defendant state's bureaucratic apparatus is taken into account, not least to ensure that the parties are afforded equal opportunities to present their claim.[181]

(183)   In any event, there is no relevant difference in the purpose of these clauses. The requirement that domestic legal remedies be exhausted is intended to provide for a period of time during which a dispute can be resolved without international arbitration. Moreover, the requirement of exhaustion of domestic legal remedies compels the state to prepare the case for the local courts, which automatically entails that the case is also prepared for an international arbitration. Consequently, the purpose of the requirement of exhaustion of domestic legal remedies is exactly the same as requirements for a cooling off period.

(184)   Stati's reference to the *ICS v. Argentina*[182] case is misplaced.  While it is true that the arbitral tribunal cited *Wintershall* for the proposition to which Stati referred, it is clear that Stati has taken this citation entirely out of context. In *Wintershall,* the arbitral tribunal referred to the construction of the specific dispute resolution mechanism in the bilateral investment treaty between Argentina and Germany. Articles 10(1) and (2) of this BIT stipulate that disputes must be amicably settled, to the extent possible, within a period of six months. Article 10(3) thereafter states that before arbitration can be requested, the dispute must be referred to a local court for a period of 18 months. It is clear that the ECT does not prescribe two different time periods prior to arbitration, but rather only a period of time for negotiations. Moreover, it is equally clear that it was the specific construction of article 10 of the Argentina-Germany BIT and the differences in the wording of the two periods of time which caused the arbitral tribunal in *Wintershall* to reach the conclusion that the time periods function differently. This reasoning can therefore not be applied to the requirement of a cooling off period under the ECT.

(185)   Stati's assertion that article 26 of the ECT gives an investor the opportunity to unilaterally ignore the rules regarding first stage negotiations if, as may be the case of course, the investor considers it pointless to conduct settlement negotiations is contrary to the purpose and purport of the ECT, in particular article 26.[183] If this position were to be accepted, the fundamental principle regarding the formation of a contract through an offer-acceptance procedure would be rendered obsolete. Thus, it would be up to the recipient of an offer to unilaterally ignore the terms of the offer which the recipient considers are "pointless" and still bind the offeror to a contract

---

[180] Statement of Defence, para. 119.

[181] *Cf. Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Bifurcated Jurisdictional Issue, 5 March 2013.

[182] Statement of Defence, para. 119.

[183] *Cf.* Statement of Defence, para.121.

through this qualified acceptance. The consequences of this would jeopardise the entire set-up of the ECT.[184]

(186)    As was explicitly noted by the arbitral tribunal in *Guaracachi America v. Bolivia*, a claimant must take the offer to arbitrate as it is; it cannot avoid any such prescribed cooling off period:

> "*It is irrelevant for the issue at hand whether it could be anticipated—by Rurelec or even by this arbitral tribunal—that nothing would happen during said six-month period and that the Respondent would not react to the notification and take advantage of the chance to negotiation a resolution. The "cooling off period" clause imposes an obligation of means and not an obligation of result. All clauses of the BIT must be given equal effect and, if the Contracting Parties gave their consent subject to those conditions, Rurelec could only accept the offer of arbitration as it was presented and not as it would have liked to receive it.*"[185]

(187)    Stati chooses here to misinterpret the words "*if possible*" in article 26(1) of the ECT; "*[D]isputes […] shall, if possible, be settled amicably*". It is clear that the provisions of article 26(1) are mandatory because of the word "*shall*".[186] The subordinate wording "*if possible*" merely reflects the obvious fact that the parties may be compelled to negotiate, but, of course, not to come to an agreement.[187] This also follows from the provisions of article 26(2) of the ECT, which are relevant in this case, namely that arbitration may only be requested "*[I]f such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months […]*". Thus, the words "*if possible*" do not relieve the parties from complying with the mandatory three-month period in article 26(2) of the ECT in the manner Stati is claiming, i.e. that the three-month period only needs to be complied with if the investor believes that it is possible to reach an agreement in settlement negotiations. Such a procedure, which would give an investor the right to make its own assessment and choose whether or not to comply with the three-month period, is contrary to article 26 of the ECT. Instead, an investor is afforded the opportunity to have the dispute referred to arbitration after three months if the settlement discussions fail to result in an agreement, i.e. when it can be said that it was not possible to reach an agreement.

---

[184] *Cf. Generation Ukraine, Inc. v. Ukraine*, ICSID Case Nr. ARB/00/9 (footnote 203 above).

[185] *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, 31 January 2014, para. 392.

[186] See Lindell's expert opinion, Appendix 1, p. 5: *"There is thus no requirement that the parties must negotiate; instead the purpose is to give the parties time to reflect, to cool off, and to gather themselves, so that the conditions are created for the parties to commence discussions and – if possible – to reach a solution based on mutual understanding."*

[187] See*, inter alia, Murphy Oil v. Ecuador (*ICSID Case No. ARB/08/4, Award on Jurisdiction, 15 December 2010) – Murphy Oil stated, *inter alia*, that settlement negotiations would have been pointless. However, the arbitral tribunal found that "*the obligation to negotiate is an obligation of means, not of results. There is no obligation to reach, but rather to try to reach, an agreement.*" Since Murphy Oil had failed to comply with the six-month period prescribed in BIT between the United States and Ecuador, the arbitral tribunal (the majority) consequently stated that it had no authority (jurisdiction) to determine the dispute.

3.2.4 **Stati has failed to comply with the condition regarding first stage negotiations pursuant to article 26 of the ECT**

(188)     In this respect, RoK refers to its submissions in the Statement of Claim, paras 157-164. Stati's rebuttal of this in the Statement of Defence, paras 135-164, appears to amount to the argument that the investor's request for settlement negotiations can be very informal and non-specific and nonetheless fulfil the requirement for such a request. Stati seeks support for its position in the Labour Disputes Act and the case law of the Swedish Labour Court, which is irrelevant in accordance with the argument advanced under section 2 above (see further under paragraph 203 below).

(189)     However, Stati's view on this issue ignores the obvious in that an investor's request for settlement negotiations must be specified with sufficient clarity for the state to have any opportunity at all to understand what is being alleged.[188]

(190)     Stati refers to two letters in the spring of 2009 and a meeting which, according to information received, amounted to a request for amicable settlement. In order to justify this position, they allege that a non-formalistic approach should be taken.

(191)     In the complicated relationship which existed between Stati and RoK, there were several agreements with separate dispute resolution mechanisms. These agreements had not been terminated at the time of Stati's letters in the spring of 2009. In the letters, no reference was made to any breach of the ECT. On the contrary, an objective interpretation of these letters reveals that they relate to matters in the development agreements entered into between the investors and RoK, and the threat of arbitration was a reference to the arbitration clause contained in these agreements.

(192)     RoK will first address the relevant legal rules and then address the specific alleged attempts to reach an amicable settlement.

          *(i)     Legal requirements for reaching an amicable settlement*

(193)     Stati argues for a non-formalistic approach when interpreting the "*requested amicable settlement*" in article 26(2) of the ECT, which should not require reference to the ECT or any other specific wording. They claim, erroneously, that this is the prevailing view.

(194)     The arbitral tribunal in *Maffezini* observed that the dispute: "*must relate to clearly identified issues between the parties and must not be merely academic […]. The*

---

[188] See, *inter alia, Murphy Oil v. Ecuador* (ICSID Case No. ARB/08/4, Award on Jurisdiction, 15 December 2010, para.104 – "*The Tribunal sides with Claimant in that Article VI [of the BIT] does not impose a formal notice requirement. However, without the prior allegation of a Treaty breach, it is not possible for a dispute to arise which could then be submitted to arbitration under Article VI of the BIT*" and *Burlington v. Ecuador*, (ICSID Case No. ARB/08/5), Decision on Jurisdiction of June 2, 2010, para. 335 – "*… as long as no allegation of Treaty breach is made, no dispute will have arisen giving access to arbitration under Article VI [of the BIT].*"

*dispute must go beyond general grievances and must be susceptible of being stated in terms of a concrete claim.*"[189]

(195)     By the same token, the ICJ noted in *Georgia v. Russian Federation*[190,] that: "*the exchanges must refer to the subject matter of the treaty with sufficient clarity to enable the State against which a claim is made to identify that there is, or may be, a dispute with regard to that subject-matter.*"

(196)     Stati is wrong when it alleges that RoK's argument is excessively formalistic. RoK does not advocate unnecessarily complicated or formalistic requirements for a request for amicable settlement. The only thing Stati needed to do was to expressly state that they believed that a breach of the ECT was at hand and that they thereupon requested amicable settlement in accordance with the provisions regarding first-tier negotiation in article 26 of the ECT. No such request was made, which means that RoK was never informed of the threat of an ECT proceeding.[191]

(197)     It must be emphasised that the wording of such a request could have been very simple. The documentation in the arbitration shows that King & Spalding had been retained long before the arbitration was commenced. Hence, one could expect that Stati, which received professional advice, would take necessary measures before they initiated an arbitration instead of relying on a few letters which cannot in any way be understood to constitute a request for amicable settlement.

(198)     The requirements in article 26 are simple and clear. As the arbitral tribunal in *Guaracachi v. Bolivia* observed:

>     "*Moreover, the notification of the dispute and the "cooling off period" were requirements that could easily have been met by Rurelec, since there exists no obligation to reach an amicable agreement. Thus, Rurelec cannot bemoan the fact that it is inefficient and costly to submit a new request for arbitration concerning those claims; it was in their control to act differently and in accordance with the BIT's conditions concerning the New Claims.*"[192]

(199)     In any event, the purpose of the cooling off period (informing the state of the imminent arbitration and giving it time to prepare) requires that reference be made to the ECT. It should be added that even cases to which Stati itself refers confirm that at least where

---

[189] *Maffezini v. Kingdom of Spain* (ICSID Case No. ARB/97/7), Decision on Jurisdiction, 25 January 2000, para. 94.

[190] *Georgia v. Russian Federation*, Preliminary Objections, Judgment, 1 April 2011, para. 30.

[191] See Lindell's expert legal opinion, Appendix 1, p. 11; "*The content of a request must also be such that the opposing party understands that it involves a request as referred to in the treaty.*"

[192] *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, 31 January 2014, para. 394.

arbitration pursuant to an agreement is also a possibility, the party bringing the claim must make clear on which dispute resolution mechanism it intends to rely.[193]

(200)    Stati has not taken into consideration the reasoning of the arbitral tribunal in *Burlington v. Ecuador*, where the arbitral tribunal unambiguously stated that a specific reference to a breach of a relevant treaty is necessary. RoK maintains that such reference should also be necessary under article 26 of the ECT.

(201)    Stati refers, quite correctly, to articles 31 and 32 of the Vienna Convention, but misinterprets the wording of article 26 of the ECT. Article 26 (1) ECT describes disputes as a dispute "*between a Contracting Party and an Investor of another Contracting Party relating to an Investment (…) which concern an alleged breach of an obligation of the former under Part III*." Thus an ECT dispute is one which involves an alleged breach of an obligation under the ECT. Disputes must also be understood this way in conjunction with application of article 26(2) of the ECT, since it refers to "*such disputes*", i.e. disputes as defined in the first paragraph. For such disputes, article 26 of the ECT stipulates that one must first attempt to settle such disputes, and only if such attempts prove fruitless during a three-month period commencing the request for amicable settlement, can arbitration be initiated.

(202)    Accordingly, a breach of the ECT must be alleged in conjunction with the request for amicable settlement of a dispute. Such an interpretation is consistent not only with the arbitral tribunal's decision in *Burlington v. Ecuador* – even the arbitral tribunal in *Lauder v. Czech Republic,* on which Stati has otherwise chosen to rely, stated that the period of time for negotiation only begins to run as from the date on which the investor alleges a breach of the relevant treaty.[194]

(203)    Stati instead relies on Swedish labour law in order to argue that no formalities are applicable in respect of requests for amicable settlement and that subsequent events are also covered by a prior request for amicable settlement.[195] However, Stati's reference to the Labour Disputes Act in this respect is both far-fetched and misleading. Certainly, Stati admits quite rightly that the Labour Disputes Act and the case law of the Swedish Labour Court relates to the dispute resolution mechanism in collective agreements. This case law has developed over a long period of time and the parties to these collective agreements are well versed in the labour law process. The fact that the Swedish Labour Court has applied a non-formalistic approach to these negotiations can, in other words, not be used as justification for an equivalent approach being applied to a complex investment dispute based on the rules under the ECT. The requirements for an amicable settlement under article 26(2) of the ECT are determined exclusively by the ECT.

---

[193] *Cf. Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, para. 91, referred to in the Statement of Defence, para. 114.[194] *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, para.184 et. seq.

[194] *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, para.184 et. seq.

[195] Statement of Defence, paras. 149-150.

(204)    The citation of the ICJ's decision in *Nicaragua v. US* is similarly entirely inapposite, particularly since Stati chose to omit certain important parts of the ICJ's reasoning for its decision.

(205)    In point of fact, the ICJ stated as follows:

> "*In the view of the Court, it does not necessarily follow that, because a State has not expressly referred in negotiations with another State to a particular treaty as having been violated by conduct of that other State, it is debarred from invoking a compromissory clause in that treaty. <u>The United States was well aware that Nicaragua alleged that its conduct was a breach of international obligations before the present case was instituted</u>; and it is now aware that specific articles of the 1956 Treaty are alleged to have been violated.*" (emphasis added)

(206)    This quote highlights the important difference between the Nicaragua case and the instant case. The Nicaragua case was a proceeding between two states in which it was clear that the claimant was invoking provisions of international law. The instant case, however, involved a state and a private party who had entered into a contract that contained its own dispute resolution mechanism. Thus, it was far from clear that Stati was invoking RoK's international obligations. It was in fact much more logical to expect the invocation of the contractual dispute mechanism. Thus, a reference to the ECT would have been necessary for RoK to have the opportunity for the dispute; the cooling off period seeks to secure this requirement. Obviously, the legal issues in an investment treaty case are different from those in a customary contractual dispute, which means, *inter alia*, that different legal counsel is required and other arbitrators may be selected.

(207)    Stati's reference to *Paushok v. Mongolia*, the only investor-state dispute they have cited in support of their opinion, is of little relevance. Firstly, it is impossible to discern from the award the types of statements which the claimant in the case made to the authorities which could be regarded as attempts to reach amicable settlement.

(208)    Secondly, and even more importantly, the Russia - Mongolia BIT which was applicable in the Paushok case differs from the ECT in that its article 6 does not explicitly require a request for amicable settlement. This entails that the formal requirements imposed on a claimant are lower under this BIT than under the ECT. Consequently, any findings made by the arbitral tribunal in the cited case are inapposite to the instant case, since they are clearly distinguishable.

*(ii)      Stati's alleged attempts to resolve the dispute amicably*

(209)    Upon a correct application of article 26 of the ECT, neither the two letters nor the alleged discussions meet the requirements for a request for amicable settlement.[196]

(210)    Stati's letter of 18 March 2009 did not contain any reference to the ECT, was only written in TNG's and Terra Rafs' names, and was written almost a year and a half before Stati's subsoil use contract was terminated.[197] Accordingly, it cannot address the majority of the disputed issues which were raised in Stati's request for arbitration. Neither Ascom, which in its capacity as KPM's owner was responsible for some of the primary complaints (*inter alia* the criminal litigation) nor Gabriel Stati even sent this letter. Instead, the letter addressed only one question, namely the revocation of approval by the Ministry of Energy and Mineral Resources ("**MEMR**") for transfer of the TNG shares from Gheso to Terra Raf.

(211)    Stati further refers to a meeting which was to taken place on 19 March 2009.[198] Is unclear how this meeting could constitute a "request for amicable settlement". The accuracy of the minutes of the meeting were disputed, and thus cannot serve as evidence. Moreover, the minutes do not mention a request under the ECT or any other statement which could be understood as a request for amicable settlement.

(212)    The only counterargument proffered by Stati in respect of the letter dated 7 May 2009 is the allegation that it was clear that Stati intended to reach an amicable settlement with this letter. However, the letter contained nothing other than accusations, an "appeal to the common sense of the officers" and a request that the president intervene. It is difficult to see how such a plea could have constituted a request for amicable settlement under article 26 of the ECT. The letter can be seen as a complaint, but not as a request for amicable settlement. As was previously observed, no breach of the treaty has been claimed, and the reference to arbitration can only have been understood as arbitration in respect of the relevant subsoil use contracts.

(213)    It must also be pointed out that even the requirements for which Stati itself propagates were not met by Stati's alleged request for amicable settlement. According to Stati, the crucial factor in the request for settlement is that the investor gives the state a reason to understand that the investor will try to bring about <u>an amicable settlement</u> without taking recourse to formal dispute resolution mechanisms. Stati's alleged attempt is, in fact, proof of the opposite. The letter was, if anything, confrontational in nature and demanded payment of extremely high amounts.

(214)    Stati also does not succeed in disposing of the fact that several important events included in the request for arbitration did not occur until after these letters had been

---

[196] See Lindell's expert legal opinion, Appendix 1, p. 11.

[197] Appendix 9 to the Statement of Claim.

[198] Statement of Defence, para. 139.

sent.[199] As noted above, the requirement of a cooling off period also gives the state the opportunity to prepare for the prospective arbitration. Accordingly, the circumstances to which the request for settlement pertains must be clear. It is obvious that circumstances which did not occur until a year or more after the alleged request for amicable settlement are not included within such a request. This is particularly the case since Stati states that the first negotiations about which they complain occurred in October 2008, the letters were written in March and May 2009, and the last event which is included in the arbitration occurred in July 2010. This means that at the time that Terra Raf and TNG wrote the first letter, only five of the 22 months during which the alleged harassment occurred had passed, and only seven months had passed since Ascom wrote a letter in May 2009.

(215)   Stati's allegation that since the Arbitral Tribunal stated that there was a harassment campaign the request for amicable settlement also automatically covered future instances of alleged harassment[200] does not merit comment.

(216)   Firstly, RoK denies that the state directed any harassment campaign whatsoever against Stati. In its assessment, the Court of Appeal cannot rely on the Arbitral Tribunal's finding that there was a harassment campaign.

(217)   Secondly, the Arbitral Tribunal based its finding of a harassment campaign on a review of the facts during the period from October 2008 through July 2010. It would be pure speculation to say that the Arbitral Tribunal would also have reached the same conclusion had it only looked at the events up until the dates on which the letters were sent. The fact that the Arbitral Tribunal assumed, after the fact, that there had been a harassment campaign thus cannot mean that the letters from March and May 2009 covered all future events until July 2010.

(218)   As has already been noted, Stati also cannot refer to the so-called Blagovest letter to in support of its allegation that RoK was aware of the imminent risk that Stati would commence arbitration.[201] The Blagovest letter was written by a third party. It was unclear why Blagovest was writing to the state and state officials who received the letter had no reason to pay any particular attention to it.

(219)   Stati wrongly invokes the arbitral tribunal's reasoning in *Amto v. Ukraine* to support its claim that Stati's letters of March and May 2009 sufficiently addressed the later events. In order to fit the case to suit their argument, Stati omits the following from their citation to the *Amto* award:

> "*The purpose of a request for amicable settlement is to discuss the dispute, over its causes, the interests involved, clarifying factual uncertainties and possible misunderstandings, and identifying possible solutions within the*

---

[199] Statement of Defence, paras. 154-161.

[200] Statement of Defence, para. 155.

[201] Statement of Defence, para. 154.

*framework of the promotion of long term cooperation in the energy field based on complementarities and mutual benefits.*"[202]

(220)   *Amto v. Ukraine* thus clearly states that a request for amicable settlement must give the parties the opportunity to discuss the dispute and, above all, its causes. However, how could two parties discuss the causes of a dispute if major elements of the relevant events have not even occurred at the time of the alleged request?

(221)   Stati's reliance on *Generation Ukraine*[203] to support the assertion that the absence of certain facts in the request for amicable settlement was irrelevant is misplaced. In that case, the difference between the request for amicable settlement and the later request for arbitration stemmed from the way in which this claim was presented under the applicable BIT. Specifically, the respondent in the case complained the request for amicable settlement had not included any allegation of expropriation.[204]   The *Generation Ukraine* tribunal rejected this argument. Of course the ways in which a single claim is presented need not be identical, and RoK has never alleged this to be the case. Rather, RoK is arguing that the alleged requests for settlement did not address major elements of the later dispute, i.e. the underlying facts irrespective of their legal characterisation. The *Generation Ukraine* arbitral tribunal never addressed this issue. When more than one-year's worth of additional circumstances are invoked by an investor, it is important that an additional request for amicable settlement must be made - both to inform the state of the potential arbitration and to enable new settlement discussions. A state's inclination towards settlement may, naturally, change in view of later events which occurred.

(222)   Stati has also failed to explain away the fact that the alleged attempts at amicable settlement were not made in the name of all claimants.[205]   Stati relies on the word "either" in Article 26 of the ECT to claim that it is sufficient if one of several parties to a dispute has previously requested amicable settlement. However, the word "either" is used in Article 26(2) of the ECT because the provision is clearly based on the assumption that only one investor brings a claim. Hence, the wording provides no guidance as to how to administer a case involving several investors as claimants.

(223)   The purpose of the cooling-off requirement is decisive here as well. Logically, the purpose gives the state time to prepare for the investment dispute and the state is also informed of all the opposing parties it will face. This also follows from the purpose behind ordering a cooling-off period for amicable settlement. A state needs clear information regarding the persons who will bring a claim and who should therefore be included in settlement talks. In addition, a state cannot properly enter into settlement discussions if it does not have sufficient information to evaluate the opposing party's

---

[202] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, para. 57.

[203] *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003

[204] *Id.* at para. 6.8(h).

[205] Statement of Defence, paras. 162 – 164.

prospects for success. However, due to the definition of investor in the ECT and provisions such as the Denial of Benefits clause in Article 17 of the ECT, the assessment of a claim depends, to a large extent, on who it is who brings the claim. Consequently, proper settlement discussions can only be conducted where the identity of the party bringing the claim is clear in the request for amicable settlement.

(224)   In that context, Stati asserts that a state must expect that a claim will be brought by all investors with ownership interests, which presumably includes indirect ownership interests, but this argument is also without merit. This argument disregards the fact that that some owners are not eligible to bring claims under the ECT because they do not qualify as "investors". Thus, the state cannot automatically expect that each and every indirect owner will bring a claim. Moreover, a state cannot be expected to pre-emptively check whether all potential indirect owners also qualify as investors where only one owner makes a settlement request. This would be inappropriate and entail an undue burden on the state. It would be significantly easier for the owners, at the outset, to identify to the state which investors are bringing claims, rather than compelling the state to speculate as to who will bring a claim.

(225)   Furthermore, Stati provides no authority in support of the proposition that, in practice, all direct and indirect owners bring claims. Even the case which Stati relies on, *Amto v Ukraine*,[206] instead supports RoK's position. The arbitral tribunal in the *Amto* case relied on the fact that a representative of the claimant had been involved in settlement discussions.[207] In the instant case, Anatolie Stati was somewhat involved since he signed the letters invoked by Stati. However, it is clear that Gabriel Stati was not involved in any negotiation attempts. Hence, applying the reasoning of the *Amto* arbitral tribunal, Gabriel Stati cannot be deemed to be covered by any of the alleged requests for amicable settlement. Therefore, even if one were to view the letters referred to by Stati as requests for amicable settlement (which they clearly are not), the cooling-off period would not have been satisfied in respect of Gabriel Stati.

### 3.2.5   The stay of proceedings in the case has not cured the lack of jurisdiction in connection with the request for arbitration

(226)   Since observance of the cooling off period is a prerequisite for a valid arbitration agreement according to the ECT and a prerequisite for the authority (jurisdiction) of the Arbitral Tribunal, it is not possible to cure deficiencies in this respect after the fact as a procedural issue.[208]

---

[206] Statement of Defence, para. 34.

[207] *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008, para. 51.

[208] *Cf.* Lindell's expert legal opinion, Appendix 1, p. 13. *"In some way, the fundamental issue of contractual obligation disappears. It goes up in smoke and is mystically dissipated in the understanding that a cooling-off requirement is only a procedural issue."*

(227)   Under Swedish procedural law, a distinction is drawn between bars to litigation which are capable of remedy and those that are not.[209] It is correct, as Stati says, that this classification has been called into question.[210] For example, Ekelöf states that *lis pendens*, which is deemed to be a bar to litigation capable of remedy[211], can actually be cured by means of the case on which the bar to litigation is founded being dismissed. Similarly, *res judicata* may potentially be cured by means of a new trial in the previous case.[212] However, in Ekelöf's example, it is not a question of whether a compulsory bar to litigation can, through an order of the court, be cured, but rather that the bar to litigation disappears due to circumstances over which a party has no control.

(228)   The question is academic because in this case the question is whether or not there is an arbitration agreement which is binding on the parties. It is wholly evident that the absence of a valid arbitration agreement between the parties constitutes a bar to litigation that is not capable of remedy, if one disregards the possibility that the parties are of course free to enter into a "new" binding arbitration agreement before arbitration is requested.

(229)   Thus, Stati's submissions in the Statement of Defence, paragraphs 123-124, present a misleading impression of the legal position. Above all, it is clear that Stati is avoiding the issue of whether a failure to observe the cooling off period is a bar to litigation which is capable of remedy at all.

(230)   As previously discussed (see, *inter alia,* section 2 above), domestic procedural rules are not applicable to international arbitrations. Nevertheless, if one takes this into consideration *arguendo* as alleged by Stati, it would support RoK's argument. Under the Code of Judicial Procedure, a case cannot be decided until all questions regarding bars to litigation have been dealt with. Noting that the court should not enter into any consideration of the case at all until it is clear that there are no bars to litigation, it follows from Chapter 34, section 1, first paragraph of the Code of Judicial Procedure that an issue regarding a bar to litigation must be addressed as soon as it arises. In other words, the court must, at each and every stage of the trial, ensure that there are no bars to litigation, and, if such a bar does exist, dismiss the case.[213] Thus, contrary to Stati's assertions, it follows from the provisions of the Code of Judicial Procedure that the trial must <u>not</u> continue, unless the court has found that the bar to litigation has been eliminated. In addition, the court must take any bar to litigation into account on

---

[209] Mention is made in the reasoning to the category of curable bars to litigation, for example that a Statement of Claim is so deficient that it cannot serve as grounds for litigation.

[210] Statement of Defence, para.123.

[211] See 1949 commentary, p. 467

[212] See Fitger et al., Commentary on Chapter 34 of the Code of Judicial Procedure.

[213] *Ibid.*

its own initiative.[214] This does not *per se* rule out either of the parties themselves objecting to the bar in question.

(231)    In general, it is not stated in legislation what constitutes a bar to admitting a case but, rather, the conditions which apply to admitting the case on objective grounds, i.e. procedural requirements. If a procedural requirement has not been met, there is a corresponding bar to litigation.[215] In the event the arbitral tribunal finds that there are deficiencies in its authority, this is due to the nature of the deficiency which has to do with the arbitral tribunal. If the deficiency can be cured by a party taking a measure, the arbitral tribunal should give that party the opportunity to take such measure. If the deficiency cannot be cured or no measures are taken to cure the deficiency, the arbitral tribunal should ordinarily conclude the arbitration.[216]

(232)    In the case at hand, as stated above the issue has not been whether or not the parties to the arbitration have entered into a procedural agreement. Rather, the rule regarding first stage negotiations in article 26(2) of the ECT constitutes a procedural requirement which follows from an international treaty.[217] Thus, the fact that the Arbitral Tribunal failed to observe the cooling off period under article 26(2) of the ECT constitutes a bar to litigation which is incapable of remedy[218], entailing that the Arbitral Tribunal was obliged to dismiss the action.[219] Even if the parties were theoretically afforded the opportunity to cure the relevant deficiency, it is difficult to see a practical situation where it would be meaningful to afford the parties the opportunity to cure a deficiency in authority.[220]

(233)    Thus, Stati's request for arbitration under the ECT took place without there having been any procedural requirements. Therefore, no arbitration agreement has arisen which is binding on the parties. If a similar deficiency exists where a party requests arbitration, the consequence will be that the arbitral tribunal cannot be deemed to be properly constituted and there would therefore be a lack of authority as well with respect to the arbitral tribunal.[221]

(234)    It can therefore be stated that the Arbitral Tribunal was obliged to dismiss the case on the grounds of an absence of a valid arbitration agreement. Furthermore, this deficiency was not capable of remedy unless the parties entered into a new arbitration

---

[214] *Cf.* Chapter 34, section 1, paragraph 2 of the Code of Judicial Procedure.

[215] Per Henrik Lindblom, *Processhinder* [*Bars to litigation*], 1974, p. 21.

[216] Lindskog p. 273.

[217] *Cf.* Chapter 4, section 7 of the Labour Disputes (Arbitration) Act.

[218] *Cf.* Lindell's expert legal opinion, Appendix 1, p. 29: *"In light of the wording and purpose of article 26 of the ECT, for due process reasons a party must also be entitled to assume that the obligation to arbitrate will not later be construed based on criteria other than those which are set forth in the actual provision."*

[219] *Cf.* the case reported on page 441 in NJA II 1943.

[220] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 275.

[221] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 268; see also p. 271.

agreement in accordance with article 26(2) of the ECT, including the procedural requirements stated therein.

### 3.2.6   RoK has never waived its jurisdictional objection

(235)   Contrary to Stati's allegations, RoK has never waived its jurisdictional objection. Stati has not actually responded to RoK's allegations in its Statement of Claim. RoK highlighted therein the fact that RoK's letter of 18 January 2011 explicitly stated that RoK did not waive its jurisdictional objection. The letter still notes that the three-month window for settlement was offered "notwithstanding the fact that this jurisdictional defect could result in dismissal after full briefing and hearing on the merits."[222] Stati has not responded to this. It has not even attempted to explain how this sentence should otherwise be understood.

(236)   It should be noted that RoK's statement was made at the very outset of the correspondence regarding the stay. It was thus clear from the outset that RoK did not intend to waive its jurisdictional objection.

(237)   The presentation of the alleged "acts in bad faith" which, according to Stati, "speak for themselves" excludes crucial correspondence which disproves the alleged chain of events.  Stati alleges that in a letter dated 24 January 2011 they made a counteroffer for an agreement on a cooling-off period, which included RoK waving its jurisdictional objection relating to the cooling-off period. Apparently, Stati assumes that RoK somehow accepted this counteroffer.[223] However, in their description of the relevant facts, they ignore the email written by RoK on 28 January 2011 which was sent in response to Stati's letter of 24 January 2011, in which RoK explicitly rejected any waiver of the jurisdictional objection. The email stated:

> "*I write in response to your letter of January 24. There is no need to debate with you at this time the merits of the jurisdictional objection that we set forth in our letter of last week. Suffice it to say that we do not agree that your clients "were under no obligation" to respect the three-month period set forth in Article 26 of the Energy Charter Treaty. On the contrary, their failure to do so constitutes a jurisdictional defect justifying dismissal of their claims.*"[224]

(238)   To make RoK's position even clearer, the email concluded with the following remark:

> "*The Republic reserves its rights to assert all defences and applicable jurisdictional objections at the appropriate time in this case, including claimants' failure to comply with the requirements of the Energy Charter Treaty.*"

---

[222] Appendix 11 to the Statement of Claim.

[223] Statement of Defence, para. 134.

[224] Email from Curtis Mallet-Prevost, Colt & Mosle to opposing party's counsel, the Arbitral Tribunal, and the SCC dated 28 January 2011 (Appendix 14).

(239)   King & Spalding responded to this email with a letter which did not repeat a demand that RoK waive its jurisdictional objection in respect of the cooling-off period.[225] A review of this letter (which Stati has submitted as Appendix 7 to the Statement of Defence) shows that while Stati maintained its opinion that the cooling-off period is not a jurisdictional requirement, they also admitted that RoK had another opinion and that the parties agreed to disagree on this point.

(240)   It is disingenuous for Stati to ignore RoK's email of 28 January 2011 and, instead, to describe RoK's letter of 6 February 2011 – in which RoK did not object to Stati's position that RoK had waived its jurisdictional objection – as a response to Stati's letter. On 6 February 2011, there was no need to again repeat this issue since it had been resolved.[226]

(241)   A waiver cannot be interpreted in any other way either. During the arbitration, the jurisdictional issues and the substantive issues were not bifurcated, notwithstanding RoK's request in this respect. Had the case been bifurcated, the parties need only have argued on the merits of the case if and when the arbitral tribunal had decided, in a separate arbitral award, that it had jurisdiction. In the absence of such bifurcation, a defendant has no possibility other than participating in the arbitration in good faith and arguing on the merits while simultaneously maintaining its jurisdictional objection. The continued participation under protest does not, however, mean that RoK can be deemed to have waived its right to challenge the arbitration pursuant to section 34, second paragraph of the SAA.

### 3.2.7   The Arbitral Tribunal failed to correctly decide the issue

(242)   As is probably clear from the foregoing and the description provided in the Statement of Claim, the Arbitral Tribunal failed to correctly decide the issue of its jurisdiction. The mistakes by the Arbitral Tribunal and the SCC in this respect cut to the heart of the arbitration, which gives the Court of Appeal no choice other than to notify or vacate the arbitral award.

---

[225] Statement of Defence, para. 131.

[226] *Cf.* Lindell's expert legal opinion, Appendix 1, p. 12 "*RoK has … expressly stated that under no circumstances would RoK waive the jurisdictional objection. Nor did RoK need to repeat this protest after the case was resumed following the stay.*" See also Lindskog, *Skiljeförfarande – en kommentar, [Arbitration proceedings – a commentary]*, 2nd ed., 2012, p. 983.

3.3 **The arbitral award is not covered by a valid arbitration agreement between RoK and Terra Raf**

(243) RoK maintains its position as stated in the Statement of Claim. Stati's reasoning in this respect is inapposite. It refers to the arbitral tribunal's decision as "simplified" and then present its own proposal as to how the Arbitral Tribunal should have reasoned. The allegation that the issue regarding Terra Raf is immaterial to the arbitral award in terms of amount is irrelevant. Since the Arbitral Tribunal had no jurisdiction in respect of Terra Raf, it did not have the jurisdiction to resolve the dispute in this regard. Notwithstanding the outcome of the arbitral award, the arbitral award must thus be vacated in accordance with section 34, first paragraph, subsection 1 of the SAA.

3.3.1 **Pursuant to article 40(2) of the ECT, the ECT does not apply to Gibraltar**

(244) Stati claims that when the United Kingdom ratified the ECT in 1996 in respect of the United Kingdom, Jersey, and the Isle of Man – but not Gibraltar – this should have meant that the ECT became binding on Gibraltar. This is erroneous. At the time of signing, Great Britain explained that the provisional application would include Gibraltar.[227] The United Kingdom did not elucidate at all by saying that it automatically wished future ratification also to include Gibraltar.

(245) The wording of article 40(2) of the ECT entails that a party which has made a provisional declaration in respect of the ECT may, in conjunction with its ratification of the ECT, expand its scope to include territories not included in the declaration ("*[…] to other territory specified in the declaration*" (emphasis added)). Contrary to the allegation made by Stati, the wording of article 40(2) is inapplicable when the ratification entails a restriction as compared with the earlier declaration. It follows from the United Kingdom's ratification of the ECT, that Gibraltar was deliberately excluded.

(246) Stati's allegation also contradicts its own expert, Professor Bayno, who explained the fact that the United Kingdom had ratified the ECT only in respect of the United Kingdom, Jersey, and the Isle of Man by saying: "*[it] equally follows that the ECT is not yet 'in force' for Gibraltar.*"[228]

(247) Stati's additional allegations on this issue also appear to be contradictory. They appear to allege that the ECT is both currently binding on, and provisionally applicable to, Gibraltar. Provisional applicability and applicability due to ratification are, however, mutually exclusive, which Stati has also admitted.[229]

---

[227] See Appendix 9 to the Statement of Defence

[228] Professor Adnan Amkhan Bayno's expert witness statement, para. 247.

[229] Statement of Defence, para. 181.

### 3.3.2 The ECT is not provisionally applicable to Gibraltar

(248)  Stati's argument in respect of provisional application of the ECT to Gibraltar is also incorrect. We incorporate by reference the description given in RoK's Statement of Claim.

(249)  Stati's argument in respect of the *note verbale* is misleading. Stati would have it appear that this *note verbale* stated that Gibraltar prepared legislation for the purpose of acceding to the ECT as early as the date of the United Kingdom's ratification. However, this *note verbale* shows that Gibraltar did not want to accede to the ECT at the time of the United Kingdom's ratification. This is the reason why the United Kingdom did not include Gibraltar in the ratification. It was not until later that Gibraltar decided that it actually wanted to accede to the ECT and therefore began to prepare legislation. However, at this time the provisional application of the ECT had terminated and an entirely new ratification was necessary.

(250)  Provisional application was introduced into the ECT in order to fill gaps in the regulatory scheme governing the field of energy in the newly independent states of the former Soviet Union. As Professor Tietje explained in his expert witness statement in the arbitration, the reason for provisional application is either an urgent situation or a need to prevent gaps in the legislation.[230] In the case of Gibraltar, there is neither urgency nor are there gaps in the legislation.

(251)  Moreover, the ECT is not provisionally applicable to Gibraltar through the EU's ratification of the ECT. The accession of the Kingdom of Denmark, Ireland, the Kingdom of Norway, and the United Kingdom, which comprise a part of the treaty between the old EC and the new members of the EEC, expressly prescribed that Gibraltar does not participate in the Common Commercial Policy ("**CCP**"). This was confirmed by the European Court of Justice in 2003.[231] The EU did not have authority to ratify the ECT on behalf of Gibraltar since accession to the ECT was decided within the scope of the CCP.

(252)  Stati's allegation that the United Kingdom had informed Gibraltar that it believed that the ECT had the same status as a Community Treaty and that the ECT applied to Gibraltar by virtue of the United Kingdom's accession to the EU is misleading. This is only a legal analysis made by the United Kingdom and is not in any way binding in this respect.

(253)  Moreover, Appendix 12, to which Stati refers, states that the United Kingdom later revised its advice and informed Gibraltar that the Trade Amendments to the ECT only apply to the United Kingdom and not to Gibraltar, since Gibraltar is excluded from the Customs Territory and the CCP through the European Communities Act (1972).

---

[230] Professor Tietje's expert witness statement, para.34.

[231] Statement of Defence, para. 195.

(254)   The United Kingdom actually applied the same reasoning advanced by RoK (and RoK's expert, Professor Tietje) in the arbitration and the Statement of Claim. In other words, the United Kingdom accepted that a Community Treaty quite simply cannot apply to Gibraltar through the United Kingdom's accession to the EC.

(255)   Since the CCP, through article 207 (1) of the TFEU, applies to trade and foreign direct investments, there can be no doubt that the ECT, which primarily pertains to trade and investment protection in the energy sector, was signed within the scope of the CCP.

(256)   Even if it is assumed, *arguendo*, that the ECT applied to Gibraltar in principle due to the EU's ratification, the ECT could not have applied to Terra Raf. The EU's area must be the same as that of its Member States. The specific EU law is applicable to the Member States either directly or through transposition into national law. In this context, Terra Raf could only obtain protection from the ECT through the EU's ratification if it was transposed under a specific EU law, as a *Societas Europaea (SE)*, which it is not. Otherwise, it would not have made any difference whether the ECT applied through the EU's or through Gibraltar's ratification.

(257)   Stati's allegation that it would be of no import if the arbitral award was vacated in respect of Terra Raf, since Terra Raf is owned by Anatolie and Gabriel Stati[232] is irrelevant. Section 34, first paragraph, subsection 1 of the SAA provides that impact on the outcome is not a necessary condition. In the absence of a valid arbitration agreement between the parties, the Arbitral Tribunal lacked jurisdiction and the arbitral award must be vacated in its entirety.

(258)   Moreover, partial vacation of the arbitral award only with regard to Terra Raf would be inappropriate and difficult to achieve. This is so because the arbitration did not involve a separate case against Terra Raf which can easily be severed from the arbitral award. In fact, Terra Raf's case is linked together with the case brought by the other claimants. This is illustrated by the fact that at the outset, Stati included Terra Raf as a claimant party, which they would not have done had Terra Raf been regarded as irrelevant.

---

[232] Statement of Defence, para. 167.

3.4     **The Arbitral Tribunal exceeded its mandate and committed several procedural errors by failing to take into consideration facts, objections, crucial evidence and relevant law**

3.4.1   **Introduction**

(259)   The following sections, 3.5 – 3.8, address a number of situations in which the Arbitral Tribunal exceeded its mandate and committed procedural errors which should lead to vacation of the arbitral award.

(260)   Throughout its Statement of Defence, Stati attempted to characterise RoK's case as an expression of dissatisfaction with the Arbitral Tribunal's weighing of the evidence, i.e. as a substantive issue not subject to challenge. However, this is not the case.

(261)   Instead, RoK alleges that the Arbitral Tribunal's failure to take into consideration evidence and/or claims (as is set forth under each section) firstly entails the Arbitral Tribunal exceeding its mandate under section 34, first paragraph, subsection 2 of the SAA and, in the alternative, a procedural error which had an impact on the outcome of the case under section 34, first paragraph subsection 6 of the SAA.[233] Had an express reference to section 34, first paragraph subsection 2 of the SAA been omitted from the Statement of Claim or this brief, it would be of no significance; it should be undisputed between the parties that abstract legal facts need not be invoked. Moreover, there is no requirement that the exceeding of the mandate have an impact on the outcome of the case in order for the arbitral award to be vacated.

(262)   In light of that which is set forth under section 3.1 above in respect of the SCC's appointment of Professor Lebedev as arbitrator on RoK's behalf and his passive role during the arbitration, it must be assumed that this, too, had an impact on the errors which are discussed in sections 3.5 – 3.8 below. A party-appointed arbitrator's task is to ensure that the case and arguments of the appointing party have been correctly understood and taken into consideration by all arbitrators. It is clear from the discussion below that Professor Lebedev cannot have performed this task.

3.4.2   **The Arbitral Tribunal based the arbitral award on facts which were not invoked or ignored facts and crucial evidence which RoK invoked**

(263)   In its Statement of Defence, Stati returns to the question of the difference between legal facts and evidentiary facts. The somewhat simplified view which Stati presents in its Statement of Defence[234] is not *per se* disputed. On the other hand, the purpose of explaining what constitutes a concrete legal fact is unclear. It is assumed that it is undisputed between the parties that a legal fact is a fact which, in concert with other legal facts, form a cause of action.[235] However, it is clear that Stati is attempting to

---

[233] Hobér, *International Commercial Arbitration in Sweden*, p. 313 et.seq, particularly at paragraph 8.78 on p. 314-315

[234] Statement of Defence, para. 291.

[235] Lindell, *Civilprocessen [Civil Procedure]*, p. 106.

shoehorn a very complex legal discussion into a shorter section of the Statement of Defence.

(264)   The application of the principle which is described in Chapter 17, section 3 of the Code of Judicial Procedure is complicated, since it is difficult to discern whether a fact has immediate relevance to a cause of action of (i.e. a concrete legal fact) or whether it has long-term relevance (i.e. an evidentiary fact). In *Rättegång II*[236] (*Litigation II*) Ekelöf discusses the difficulties of the classification and questions whether a statement during a hearing in respect of the state of an object is to be regarded as evidence (indicium) for the content of a provision, i.e. an evidentiary fact, or a legal fact which is of significance in respect of the consequences of the agreement. Ekelöf does not offer any answer. In other words, the distinction between these two legal concepts cannot be determined as easily as Stati alleges.

(265)   However, in order for an arbitral tribunal to take a concrete legal fact into consideration, it must be expressly and unambiguously invoked. An arbitral tribunal is strictly bound by the principle that the parties delimit the scope of the proceedings, which means that the Arbitral Tribunal cannot take into consideration any facts other than those which were expressly invoked. In order for a concrete legal fact to be deemed invoked, it is necessary that it clearly formed the basis for a claimed cause of action and that this has been understood by the other party.[237]

(266)   Notwithstanding the complexity of the underlying arbitration, where details were crucial for the ultimate outcome, Stati argues that everything on which RoK's current challenge action is based must be classified as an evidentiary fact instead of a legal fact. As support for its allegation, Stati refers to the case reported at NJA 1970 p. 740; a much-discussed case, which involves the issue of the scope of an arbitral tribunal's judicial management. Firstly, it must be pointed out that the case reported at NJA 1970 p. 740 has little relevance to international arbitrations. Secondly, it is questioned whether this case addresses the issue of sufficiency of the evidence at all.[238] On the other hand, this case does not stand for the proposition that due to the way in which the claimant worded its challenge action, the arbitrators are not bound by the parties' claims. The claimant in the aforementioned case did not even allege that the arbitral tribunal had based the arbitral award on facts which had not been invoked. However, it was established that the arbitral tribunal in the case had exceeded its mandate and that the arbitral award should therefore be vacated.[239] Arbitral tribunals, like courts, must follow established procedural principles such as an arbitral award may not be based on facts which have not been invoked.[240] This is of particular importance in

---

[236] Ekelöf, *Rättegång II [Litigation II]*, 8th ed., p. 126-127.

[237] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, p. 721 et. seq.

[238] Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, 34 – 5.1.2, fn. 115.

[239] Schöldström, Festskrift till Jan Hellner (II), p. 217-218 and JT 1999-00, No. 11, p. 945. See also Lindskog, *Skiljeförfarande – en kommentar [Arbitration – a commentary]*, 2nd ed., 2012, 34 – 5.2.7, fn. 213.

[240] Schöldström, Festskrift till Jan Hellner (II), p. 222.

international arbitrations, where neither the parties nor the arbitrators are familiar with what can be regarded as "national peculiarities" in Swedish procedural law (see above, section 2).

(267)   An error equally serious to an arbitral tribunal basing its arbitral award on facts which have not been invoked is the Arbitral Tribunal utterly disregarding invoked facts and evidence. In this regard, RoK alleges that this was the case in respect of several crucial issues in the arbitration, which are discussed in detail below.

(268)   Stati's attempt in the Statement of Defence (at paragraph 215) - in the form of reference to the sheer number of witnesses and experts in the arbitration proceeding - to minimise the fact that the Arbitral Tribunal ignored crucial evidence is completely irrelevant. It is true that the arbitration included a great quantity of evidence. It is also true that the arbitral award was 414 pages long, which at first blush may seem impressive. However, a closer review shows that the Arbitral Tribunal's reasoning is only approximately 22 pages long. The balance consists of procedural background, summarising the parties' briefs and guidelines, which has essentially been gleaned from Stati's briefs. As discussed in the Statement of Claim, the Arbitral Tribunal's reasoning on several crucial issues lacks reference to <u>central pieces</u> of the evidence. RoK's challenge action does not involve any minor pieces of the evidence; instead it involves crucial facts which are some of such significance that a specific issue cannot be the subject of a thoughtful adjudication and decision without taking them into consideration.

(269)   RoK does not question the Supreme Court's conclusions in the case reported at NJA 2009 p. 128 (the "**Soyak case**"). However, these conclusions need a closer review and analysis. The Supreme Court's first and primary observation in this case was that sufficient reasoning for the decision is a guarantee of due process. However, the case does not offer any clarification regarding the content of the reasoning for the decision. In its reasoning, the Supreme Court refers to Chapter 17, section 7 of the Code of Judicial Procedure, which stipulates that a court need not discuss the grounds on which it believes that something has been proven. Even if this follows from the wording of the provision, the prevailing opinion among legal commentators is that this is insufficient. A court must be able to discuss why it found a legal fact to be proven or not proven.[241] This must also apply to an arbitral award. By virtue of such a procedure, the arbitrators are compelled to evaluate their own thought processes and the parties are given the opportunity to fully evaluate the arbitral award.[242]

(270)   In order to illuminate the importance of this issue, we refer to a 1985 case from the German Supreme Court, where it was found that an arbitral tribunal's reasoning may not be padded with empty phrases (*inhaltsleere Wendungen*), but must instead take

---

[241] Ekelöf, *Rättegång V [Litigation V]*, 7th ed., p. 236-237.

[242] Lindell, *Civilprocessen [Civil Procedure]*, p. 340.

the parties' main arguments and objections into consideration in its reasoning.[243] *Hanseatische Oberlandesgericht* in Hamburg further noted in 1989 that in the reasoning for its decision, an arbitral tribunal must reflect upon and specify the arbitral tribunal's opinion of the parties' primary arguments. Simply repeating the parties' arguments in the reasoning for the decision is not sufficient.[244] The same fundamental opinion has been expressed by the English judge Humphrey Lloyd, QC, who imposed the requirement that international arbitral awards be persuasive. The reasoning for the decision must be provide an exhaustive explanation by taking into consideration all of the parties' arguments and explaining whether they are sustainable. Simply stating in the reasoning that one parties' argument is preferable if not satisfactory and does not meet the requirements of a considered arbitral award. Such phrases do not facilitate the understanding of the arbitral tribunal's reasoning and considerations.

(271)   Consequently, an international arbitral award must contain an account of the parties' arguments and the arbitral tribunal's weighing of the evidence. This view probably does not contradict the Supreme Court's conclusions in the *Soyak* case. In light of the "national peculiarities" discussion above (see section 2) where the only connection to Swedish procedural law is that the SCC decided that the arbitration would be heard in Stockholm, the arbitral award must also comply with international norms.

(272)   RoK does not *per se* challenge the way in which the arbitral award was worded (with the exception of the allegations advanced in section 3.6.6 below). It is undisputed between the parties that the Supreme Court has imposed a high threshold for challenges on this ground. RoK's grounds for challenge are of another nature, namely that the Arbitral Tribunal ignored and failed to take into consideration certain evidence. It is generally accepted that an arbitral award may be vacated through challenge if an arbitral tribunal completely disregards invoked evidence.[245] In these cases, the arbitral award itself is the primary proof of the Arbitral Tribunal's procedural error. The fact that crucial evidence is not mentioned in the arbitral award is proof of, or at least creates a strong presumption for, the proposition that the Arbitral Tribunal disregarded the evidence. This fact cannot be explained away by reference to the fact that RoK primarily challenges insufficient reasoning for the decision.

(273)   The Court of Appeal should bear in mind that the points invoked by RoK below pertain to the separate issues which the Arbitral Tribunal found constituted a "string of measures of coordinated harassment"[246]. If the lion's share of these factors are removed, the Arbitral Tribunal's theory no longer holds and thus the grounds for the entire arbitral award fail. Consequently, the Arbitral Tribunal's erroneous administration affected the outcome of the case. The arbitral award must therefore be vacated.

---

[243] The case reported at NJW 1986, 1436 at p. 1437.

[244] Case No. 9 U 36/98 on 15 December 1998, DIS Datenbank, p. 2 n.

[245] Öhrström, *Institutional Arbitration*; http://www.sccinstitute.com/filearchive/4/45731/Öhrström%20(2).pdf, p.. 849.

[246] Arbitral award, paras. 1086 and 1095.

3.5     **The Arbitral Tribunal failed to take into consideration crucial testimony in respect of the value of the LPG Plant**

(274)    The Arbitral Tribunal based its decision to award Stati USD 199,000,000 for the LPG Plant on an allegation that RoK had continued to build LPG facilities after Stati's agreement regarding the subsoil rights had been terminated. There is no basis for Stati's allegation that the Arbitral Tribunal took the evidence into consideration and found that the evidentiary value of Khalelov's written testimony and oral testimony was such that it had more weight than Stati's evidence, namely FTI's expert witness opinion. There is no indication in the arbitral award that the Arbitral Tribunal took the Khalelov evidence into consideration in any way. Contrary to Stati's assertion, RoK's challenge action does not pertain to how certain evidence was valued, but instead how the Arbitral Tribunal failed to take any consideration whatsoever of the most crucial pieces  of the evidence in respect of the value of the LPG Plant.

(275)    After Khalelov had testified to the contrary, not even Stati maintained its claim regarding RoK's alleged continued construction of the LPG facility. Stati invoked this – for the first time – in its *Reply on Quantum* and RoK refuted it with Khalelov's written witness statement in its subsequent submission, *Rejoinder on Quantum.* At this hearing, Khalelov also testified on the quantum of damages. Stati did not attack Khalelov's information in any manner. Instead, they attempted to adapt their position based on the information which Khalelov provided and did not question his evidence during cross-examination. Although the purpose of *First Post-Hearing Briefs* was not to argue on every issue, these submissions were extensive. Since Stati had advanced this argument at a late stage it needed to be supported, or at least mentioned, in this submission. Stati's *First Post-Hearing Brief* was 267 pages long, with 9 of these pages devoted to Stati's allegation regarding the value which should be ascribed to the LPG facility; not once was it mentioned that this should be done on the grounds that RoK had allegedly continued the construction.

(276)    It must also be pointed out that RoK reminded Stati of this in its First Post-Hearing Brief, and emphasised that "Claimants did not even question Mr. Khalelov on his written and oral witness statement that ever since Claimants abandoned the construction site, no further works had been conducted and that there were no plans to do so."[247] Nevertheless, Stati did not address this issue in its *Second Post-Hearing Brief*.

*(i)      The Arbitral Tribunal failed to consider crucial testimony*

(277)    Stati's argumentation (paragraph 195) is largely irrelevant. Moreover, Stati's allegation that gas delivered by third parties should have been available to the LPG Plant is also

---

[247] RoK's *First Post-Hearing Brief*, para. 820.

immaterial. RoK did not allege that Stati formally revoked its allegation that RoK completed the incomplete LPG Plant but, rather, Stati did not maintain the argument and did not respond or otherwise question RoK's evidence in rebuttal.[248] The crucial matter is that the Arbitral Tribunal based its dispute solely on the allegation that RoK had performed work to complete the LPG Plant and the Arbitral Tribunal thereupon failed to consider that RoK had submitted crucial evidence in rebuttal.

(278)   Stati speculates that the reason that Khalelov is not even mentioned in the arbitral award was typographical error. However, there is nothing which indicates that such typographical error occurred. Stati's allegation that Khalelov was the only witness who was named on page 2 is wrong. In the transcripts, which were approved by both parties and submitted to the Arbitral Tribunal, Khalelov is named on page 3 of that day's transcript, on the same page as Broscaru, Cojin, Stati and Rahimgaliev, all of whom – with the exception of Khalelov, are named in the arbitral award.

(279)   Stati refers to two paragraphs in the arbitral award where Khalelov's name appears and argues that this proves that the Arbitral Tribunal took him into consideration. However, these two paragraphs are the only places in the arbitral award where Khalelov's name appears. Moreover, paragraph 125 of the arbitral award only states that the English translation of Khalelov's testimony was submitted. The other paragraph (paragraph 632) offers even less support to Stati's argument; notwithstanding that Khalelov's name appears, there is no reference to his written witness statement or testimony, but rather only to Stati's *Second Post-Hearing Brief*, which shows that this information was only copied from Stati's briefs.[249] Moreover, this section entirely lacks any connection to the LPG Plant, since it only addressed a question regarding taxation.

(280)   Stati further alleges that the Arbitral Tribunal did not ascribe evidentiary value to Khalelov's written statement and testimony. This is pure speculation. There is nothing in the arbitral award which shows that the Arbitral Tribunal believed that Khalelov's evidence had limited evidentiary value. In other contexts, the Arbitral Tribunal noted that there was a certain evidence with limited evidentiary value, but did not do so here.[250] The fact that it made such a comment in other contexts but not in respect of Khalelov proves that the Arbitral Tribunal did not find that Khalelov's evidence had limited evidentiary value. It is more likely that the Arbitral Tribunal completely ignored this evidence.

---

[248] Statement of Claim, para.209.

[249] This is also clear from the fact that the Arbitral Tribunal adopted Stati's interpretation of Khalelov's testimony, namely that he had testified that up to and including January 2013, no attempt had been made to collect outstanding tax from TNG and KPM when he had, in fact, testified that he did not know whether this had taken place. Had the Arbitral Tribunal looked at the transcript of Khalelov's testimony instead of merely looking at Stati's brief, it would have noticed this.

[250] Arbitral award, para.1746 regarding KNOC and Total.

*(ii)*      *By virtue of its error, the Arbitral Tribunal exceeded its mandate or committed a procedural error which had an impact on the outcome of the case*

(281)   Stati alleges that Khalelov's written witness statement and testimony were not credible. This is, however, immaterial in this case; the weighing of the evidence falls to the Arbitral Tribunal. However, since the Arbitral Tribunal failed to consider the evidence, it exceeded its mandate and/or committed a procedural error which affected the outcome of the case.

(282)   Since the Arbitral Tribunal based its decision to ascribe a value to the LPG Plant based solely on the allegation that RoK was prepared to open the LPG Plant, and entirely disregarded Khalelov's evidence, it is clear that had Khalelov's witness statement and testimony been taken into consideration, they are likely to have successfully rebutted such allegation. Accordingly, the Arbitral Tribunal's mistake affected the outcome of the case.

(283)   Moreover, the July 2013 press conference to which Stati refers [251] lacks relevance in this case. As Stati states, only a <u>resumption</u> of the construction was mentioned, not a continuation of the construction, which *per se* proves that no construction took place during that time. In addition, Stati twists the import of this press conference. It was noted that the LPG Plant was not a complete object and, taking into consideration the limited authority of the administrator under the terms and conditions of the subcontractor contracts, and Kazakh legislature, it was not possible for KMT to complete the construction and bring it online. Moreover, a press conference during 2013 cannot in any way prove that continued construction was under consideration as of the relevant valuation date. Finally, this has no relevance because the Arbitral Tribunal could not have based its reasoning on the statements made at that press conference, since Stati did not even invoke it during the arbitration. Stati could not even have invoked it at all, since the press conference was not held until July 2013, i.e. after the parties' statements of costs had already been exchanged.

---

[251] Statement of Defence, para. 212

3.6     **The Arbitral Tribunal failed to consider expert testimony and other evidence invoked by RoK regarding many important and disputed issues in the case**

(284)   The following discussion describes several situations where the Arbitral Tribunal failed to consider facts and evidence invoked by RoK. The Arbitral Tribunal's errors in this respect constitute the Arbitral Tribunal exceeding its mandate or committing a procedural error which affected the outcome of the case. The arbitral award must therefore be vacated in whole or in part.

3.6.1   **The Arbitral Tribunal adjudicated the issue of the classification of pipelines under Kazakh law without considering Kazakh law and related expert witness testimony**

(285)   In its brief, Stasi alleges that the dispositive question was whether RoK violated international law, not whether pipelines had been correctly classified under national law.[252] However, it would be hard to find a breach of the ECT in cases where national law was correctly applied. This would only be the case if the national law itself was a breach of the ECT, which was not the Arbitral Tribunal's conclusion. Even Stati confirms – a few paragraphs later[253] – that the issue of fair and equitable treatment involves issues regarding classification of pipelines under Kazakh law.

(286)   Stati's description in the Statement of Defence (paragraphs 220-226) is essentially a summary of its position in the arbitration. RoK refutes the accuracy of this description but since it essentially lacks a connection with the grounds for RoK's challenge action, RoK currently refrains from discussing this issue in detail. The critical issue in the challenge action is that the Arbitral Tribunal decided on an issue regarding Kazakh law without taking into consideration Kazakh law and expert testimony and witnesses who were invoked on this issue.

(287)   Stati argues that the Arbitral Tribunal did not need to comment on the lawfulness of RoK's pipelines, since it found that the breach of the provision regarding fair and equitable treatment was a result of the disregard of transparency, reasonableness, and due process.[254] The Arbitral Tribunal based its finding of a violation of the provision regarding fair and equitable treatment on an alleged harassment campaign, namely "a string of measures of coordinated harassment".[255]

(288)   The Arbitral Tribunal stated that such a campaign had been proven. However, the Arbitral Tribunal reached this conclusion only by failing to consider crucial evidence invoked by RoK. "Harassment or compulsion" belongs to a different subcategory of fair and equitable treatment then "transparency, reasonableness, and due process", as

---

[252] Statement of Defence, para. 218.

[253] Statement of Defence, para.227.

[254] Statement of Defence, para.228.

[255] Arbitral Award paras. 1086 and 1095.

has been established by, e.g., the arbitral tribunal in *Bayindir v. Pakistan*[256] – an arbitral tribunal on whose decision Stati otherwise relies.

(289)   Stati further alleges that the Arbitral Tribunal found that a breach of the treaty had taken place at but that it "*did not stop there, declaring instead that it was also proven that the relevant pipelines were field pipelines*". However, it is more the case that the arbitral award shows that the Arbitral Tribunal – without considering RoK's evidence – decided that KPM and TNG were not operating *trunk pipelines* and drew the conclusion that RoK had breached the ECT. There are no grounds for Stati's allegation, that the Arbitral Tribunal's conclusion that these *pipelines* were not *trunk* lines was based on balancing Kazakh law and actual facts.

(290)   Stati's only support for this argument is that the Arbitral Tribunal used the word "arbitrary", which is alleged to have required an evaluation of the actions. However, the word "arbitrary" does not at all presuppose the grounds on which the assessment was made. The Arbitral Tribunal did not provide any reasoning in respect of RoK's evidence, i.e. above all two expert witness statements and the testimony of one witness. The Arbitral Tribunal failed to consider evidence which RoK invoked. The Arbitral Tribunal's only reason, including the contradictory statements regarding the need to determine the category of pipelines, reinforces this assessment. The reasoning regarding this central issue could not be more superficial and cannot be understood as anything other than showing that the Arbitral Tribunal failed to consider the evidence. There is nothing which indicates (as argued by Stati) that the Arbitral Tribunal found that RoK's evidence lacked credibility.[257] Since – at the Arbitral Tribunal's request – the experts did not testify, there was no latitude for the Arbitral Tribunal to base its decision in this respect on the credibility of these experts.

(291)   RoK has pointed out that the relevant evidence was not only entirely omitted in the section where the Arbitral Tribunal "explained" its conclusion regarding a breach of the provision for fair and equitable treatment, but other evidence, for example Latifov's opinion and Professor Didenko's first two opinions, was not mentioned at all in the arbitral award.

(292)   In summary, the parties agreed that the issue of whether or not the relevant *pipelines* were *trunks* must be resolved under Kazakh law. Accordingly, the Arbitral Tribunal's task was to apply Kazakh law. However, the Arbitral Tribunal did not discuss any deliberation on the interpretation of the law, which proves that the Arbitral Tribunal decided the issue without taking Kazakh law into consideration. The Arbitral Tribunal has thereupon exceeded its mandate and/or committed a procedural error which has had an impact on the outcome of the case.

---

[256] *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, para. 178.

[257] Statement of Defence, para. 233.

3.6.2    **The Arbitral Tribunal decided issues regarding Kazakh civil law without considering crucial expert evidence regarding Kazakh civil law**

(293)    It appears to be uncontested between the parties that Professor Ilyassova's expert opinion is not mentioned in the arbitral award, with the exception of two identical paragraphs, paragraphs 993 and 1368. These do not support the claim that the Arbitral Tribunal considered Kazakh civil law in the arbitral award since they do not address Kazakh civil law. Instead, the paragraphs relate to an uncontested fact, namely the content of the message from MEMR to TNG.

(294)    Nor has Stati been able to explain the fact that the Arbitral Tribunal treated RoK's revocation of its authorisation of the transfer as invalid without ever questioning or discussing whether this action was lawful. This can only be explained by the fact that the Arbitral Tribunal failed to take into consideration RoK's evidence, particularly Professor Ilyassova's expert opinion which proved that this action was, in point of fact, lawful.

(295)    Stati's claim that the Arbitral Tribunal would not have arrived at a different conclusion if it had taken into consideration Professor Ilyassova's expert opinion since her expert opinion supported their position is erroneous.

(296)    Firstly, the Arbitral Tribunal did not in any way indicate that it believed that the expert opinion supported Stati's position. Instead, as previously stated, the Arbitral Tribunal did not at all take into consideration Professor Ilyassova's evidence regarding Kazakhstan law. Secondly, the statement is also incorrect since Professor Ilyassova instead gave the impression that her opinion was that the transfer from Gheso to Terra Raf was invalid since the requisite approval under article 53 of the *Petroleum Law* had not been obtained at that point in time; consequently a transfer could not have been carried out in 2003.

3.6.3    **The Arbitral Tribunal decided issues regarding Kazakhstan tax law without taking into consideration expert witness evidence regarding Kazakhstan tax law**

(297)    Stati 's claim that the Arbitral Tribunal considered all of the evidence offered by RoK, including Professor Balco's expert opinions and Rahimgaliev's testimony but "*did not find the evidence persuasive*"[258] is incorrect. Nothing in the Arbitral Tribunal's decision indicates any support for this conclusion.

(298)    Stati mentions stabilization agreements as if RoK had breached such agreements.[259] However, it was uncontested in the arbitration proceedings that RoK always applied the version of the tax legislation to which the parties agreed in the agreements

---

[258] Statement of Defence, sections 243 and 249.

[259] Statement of Defence, section 245.

regarding extraction rights. The issue in question involved whether RoK had changed its underlined interpretation of the tax legislation.[260]

(299)   Stati also implies that the state had accepted Stati's deduction practices for years. This statement is misleading.[261] The first time the tax authorities needed to take a decision regarding the deduction rights for the costs was 2008/2009 since this was the first time in years that the tax authorities audited tax returns where such deductions had been made and these audits are retrospective in nature.

(300)   Neither Professor Balco's name nor his views are mentioned in any part where the Arbitral Tribunal states its conclusion. The only example which Stati offers in order to support its claim that the Arbitral Tribunal did not fail to consider Professor Balco's or Professor Rahimgaliev's evidence is the reference to the fact that the Arbitral Tribunal held that the Kazakhstan Supreme Court's decision deviated from the court's earlier case law. The Arbitral Tribunal made this statement in the paragraph of the arbitral award dealing with the quantum of damages, i.e. after it had already decided (without stating any reference to Kazakhstan law or Professor Balco who had addressed this issue[262] ) that a part of the harassment has consisted of the tax audit.

(301)   In addition, when the Arbitral Tribunal expressly states that the decision of the Kazakhstan Supreme Court was not sufficient to fulfill RoK 's (very dubious) burden of proof, it treats this decision as if it were the only evidence offered by RoK [263], which once again demonstrates that it failed to take into consideration Professor Balco's opinion.

(302)   It is also incorrect that Professor Balco agreed with Stati that article 20 of *the Kazakh Tax Code* should have been applied. Professor Balco made it clear, both in his opinion and in his testimony, that article 23 of the *Kazakh Tax Code* should have been applied. It should be emphasised that Stati had not previously claimed, for example particularly not in its *Post-Hearing Briefs*, that Professor Balco had conceded that article 20 of *the Kazakh Tax Code* should be applied.

(303)   In the reasoning of the tribunal, the Arbitral Tribunal held that the residual tax assessment was unlawful, without taking into consideration the law of Kazakhstan. In the tax-related section in the portion regarding the quantum of damages, the Arbitral Tribunal only states that it believes that the Kazakhstan Supreme Court ruled directly contrary to earlier decisions. This had been contested by Professor Balco. Consequently, the Arbitral Tribunal treated this issue as an uncontested one; an issue which it appears to have considered to be decisive by itself.

---

[260] See, e.g. Stati's *First Post-Hearing Brief*, para. 242 *et. seq.*, where no breach of the stabilisation clauses is alleged.

[261] Statement of Defence, para. 245.

[262] Professor Balco's second expert opinion, p. 30 *et. seq.*

[263] *Cf.* Statement of Claim, para. 275.

(304)   With respect to Stati's claim that Rahimgaliev's testimony was irrelevant since it dealt with changes in the tax legislation which were introduced in 2009, a quick review of Rahimgaliev's testimony demonstrates that Stati's description is incorrect. The testimony addressed various questions and, in particular, over several pages, both the tax audits and the Kazakhstan tax authorities' tax decision from February 2009, including the reasons that article 23 of the *Kazakh Tax Code* is to be applied.[264]

(305)   Stati has not contested the fact that the parties were in agreement that the imposition of residual tax must be assessed in accordance with Kazakhstan law and that it was therefore the task of the Arbitral Tribunal to apply Kazakhstan law. By ignoring Kazakhstan law and/or related evidence, the Arbitral Tribunal exceeded its mandate and/or committed a procedural error which influenced the outcome of the case.

### 3.6.4   The Arbitral Tribunal has decided the question of causality without taking into consideration RoK's economic experts

(306)   It is obvious that the Arbitral Tribunal, in its assessment of causality, failed to take into consideration RoK's evidence regarding the financial situation of Stati's company. This demonstrated that Stati's company was in grave financial difficulties as early as the time of, and before, Stati's valuation date and consequently even before the valuation date chosen by the Arbitral Tribunal[265].

(307)   Stati's claim that paragraph 1456 of the arbitral award proves that the Arbitral Tribunal considered Deloitte GmbH's analysis of the financial situation lacks any support. When the Arbitral Tribunal concluded that Gruhn had not made any direct analysis of KPM's and TNG's possibilities of paying their debts and, instead, refers to balance sheet liquidity calculated by FTI, there can only be one explanation: namely, that the Arbitral Tribunal did not review the evidence.

(308)   RoK is claiming that the Arbitral Tribunal misunderstood the evidence offered. Deloitte GmbH's third expert opinion, paragraphs 242-260, set forth a clear direct analysis of KPM's and TNG's possibilities of paying their debts.

(309)   Stati is attempting, through semantic reasoning, to explain that Deloitte GmbH did not carry out any direct analysis since they reviewed Tristan's consolidated balance sheet rather than those specific to KPM and TNG.[266] Stati's argument appears to be that FTI analyzed the situation at KPM and TNG independently of each other while Deloitte GmbH did not make any distinction between KPM and TNG. Even if this is correct, this does not mean that FTI's analysis was "direct" and Deloitte GmbH's analysis was "indirect".

---

[264] Rahimgaliev's first witness statement, parts 5 and 6.

[265] The Arbitral Award, para. 1456.

[266] The Statement of Defence, para. 259.

(310)   By using the word "directly", the Arbitral Tribunal excluded Deloitte GmbH's analysis of KPM's and TNG's financial situation based on the price of the Tristan bonds, which was found in Deloitte GmbH's second expert opinion.[267] It can be argued that this was an indirect financial analysis since it was not based on a review of the balance sheets, but rather on a review of the price of the Tristan bonds. That by the term "*direct financial analysis*" the Arbitral Tribunal intended the very type of analysis which Deloitte GmbH carried out is also confirmed in connection with paragraph 1456 of the arbitral award. The Arbitral Tribunal refers here to FTI's conclusions regarding balance sheet liquidity. Obviously, the Arbitral Tribunal found that such a balance sheet liquidity analysis was a "*direct financial analysis*". However, Deloitte GmbH's analysis also included an analysis of the balance sheet liquidity.[268] This proves that the Arbitral Tribunal ignored Deloitte GmbH's work.

(311)   Stati's claim regarding paragraph 1443 of the arbitral award is irrelevant. As set forth in paragraph 1456 of the arbitral award, the Arbitral Tribunal did not consider Deloitte GmbH's analysis anyway.

### 3.6.5   The Arbitral Tribunal decided a question regarding international law and EU law without taking into consideration RoK's expert evidence regarding these legal areas

(312)   For the purpose of rebutting the argument that the Arbitral Tribunal ignored Professor Tietje's testimony, Stati refers to what it stated previously in the Statement of Defence, where they explained their position on the question of jurisdiction. This lacks significance in this context. The question of how the jurisdiction objection regarding Terra Raf is to be determined differs from the procedural question of whether the Arbitral Tribunal ignored expert evidence.

(313)   With respect to Professor Tietje's statement, his name is mentioned twice in the arbitral award; once in the summary of RoK's motion for costs[269] – where nothing more than his name and the cost for his opinion are mentioned – and once in a summary of Stati's arguments [270] where Stati replies to a statement by Professor Tietje. These references do not demonstrate in any way that the Arbitral Tribunal actually considered Professor Tietje's opinion.

### 3.6.6   The Arbitral Tribunal relied on Stati's geological experts without stating the reasons for this and therefore entirely failed to consider RoK's geological experts' opinions and testimony

(314)   With respect to the geological experts, RoK argues that the Arbitral Tribunal committed two procedural errors. It failed to consider the expert opinions and

---

[267] Deloitte GmbH's second expert opinion, paras. 192-193.

[268] Deloitte GmbH's third expert opinion, paras. 246-248.

[269] Arbitral Award, para. 1872.

[270] Arbitral Award, para. 720.

testimony from RoK's geological experts, Gaffney Cline, and it failed to give any reasons for its decision to rely on Stati's geological experts, Ryder Scott.

(315)    Stati claims that the Arbitral Tribunal found that Gaffney Cline's evidence lacked credibility.[271] However, there is a clear statement in the arbitral award which points in the opposite direction. The Arbitral Tribunal concluded that it had not carried out an analysis of the credibility of any of the parties' geological experts.[272]

(316)    The fact that the Arbitral Tribunal cited certain information from Gaffney Cline in its summary of RoK's claim is of no significance. There is no reference to the actual opinions prepared by Gaffney Cline, not even in its summaries; these are references to RoK's *Post-Hearing Briefs*, which mention Gaffney Cline's evidence. Consequently, this is only a reference to a secondary source and does not mean *per se* that this evidence was taken into consideration.

(317)    As has already been explained in the statement of claim, this evidence was not in any way of secondary significance. Stati's claim amounted to approximately USD 3 billion, excluding interest. The actual grounds for this claim were stated by Stati's geological experts when they provided reserve calculations on which grounds Stati's financial experts calculated the claimed value. Even small variations in the reserve calculations would have led to differences of two, or even three, figure million dollar amounts. In such circumstances, an Arbitral Tribunal must be obligated to raise the level of its review, both in conjunction with the Arbitral Tribunal's considerations as well as when the Arbitral Tribunal reports its reasoning. A question worth USD 100 million or more cannot be decided through a single sentence.[273]

(318)    However, the Arbitral Tribunal decided in one sentence to follow Stati's geological experts and thus not only tossed aside the reserve calculations which Gaffney Cline made, but also their criticism of Ryder Scott's evidence. With respect to Stati's reference to the *Soyak* case[274], the sentence which concludes that expert evidence is followed because it is deemed "*convincing in their approach and results*" does not constitute a reason at all. The question, and therefore the reasons which must be given for this are: why was the evidence convincing in its approach and results?

(319)    In international arbitration proceedings, there is a *de minimis* requirement which each party in an arbitration proceeding must be able to expect. This is not contradicted by the conclusions in the *Soyak* case. As concluded above, 414 pages is admittedly an extensive arbitral award, and this number of pages might impress a reader at first glance. Upon a more detailed review, these 414 pages, however, cannot hide the fact

---

[271] Statement of Defence, paras. 266, 270 and 273.

[272] Arbitral Award, para. 1839.

[273] See the case reported at NJA 2011, p. 589 where the Supreme Court granted a new trial in a case that involved complicated facts on the basis that the Court of Appeal's reasoning was insufficient to judge the correctness of the holding. This decision also illustrates that there must be sufficient reasoning regarding all parts of the dispute.

[274] Statement of Defence, para. 272.

that fundamental issues were decided without consideration of the relevant evidence and without stating any reasons whatsoever.

3.7 **The Arbitral Tribunal failed to take into consideration RoK's objections that certain deductions must be made from any damages awarded**

(320) RoK maintains that the Arbitral Tribunal neither considered RoK's objections regarding the necessary deduction of income after the valuation date nor the fact that Stati could only be awarded half the value ascribed to the LPG plant.

3.7.1 **The Arbitral Tribunal did not take a decision regarding RoK's arguments that all revenues accruing to Stati between the valuation date and the date of the termination of the agreement should be deducted from any damages**

(321) Stati is incorrectly claiming that the Arbitral Tribunal took into consideration, and took a position regarding, RoK's argument that all revenues which accrued to Stati between the valuation date and day of the termination of their agreement should be deducted from any damages.

(322) Firstly, it must be emphasised that Stati attempted to reduce this question to covering payment of the dividend in an amount of USD 71.9 million. RoK's challenge action in this respect also applies to a postponement of the due date and the nonpayment of claims ultimately totaling USD 143.4 million and other possible outflows.

(323) Secondly, Stati is also wrong regarding the facts. Particularly in their *Second Post-Hearing Brief*, RoK explained in detail, with reference to Deloitte GmbH's *Second Supplemental Report*, why Stati's arguments, which were presented in their *First Post-Hearing Brief* and which Stati is now reformulating are incorrect. Whether TNG and KPM had USD 221.5 million net in combined operating capital[275] in September 2008 is hardly relevant since Stati's experts, FTI, in any event calculated future cash flow on the assumption that a particular initial operating capital (including unpaid revenues) existed at the time of appraisal.

(324) In order to prove that capital which was diverted after the valuation date did not weaken the future liquidity on which the value was calculated in a DCF calculation, Stati would have needed to prove that such assets were "*additional assets*", i.e. income and cash flow which had not been included in the discounted cash flow appraisal of the assets. They did not present any such evidence. Not even Stati's experts, FTI, gave them *carte blanche* when they concluded that, on the basis of the absence of financial reports for the year 2010, they did not have any opinion regarding the profit which had been created during the 2010 financial year which would need to be deducted.[276]

---

[275] Stati's only evidence is unaudited financial reports.

[276] FTI's *Post-Hearing Report*, para. 7.35.

(325)  With respect to what Stati pointed out in the Statement of Defence, paragraph 279, it should be obvious that this only involves a typographical error. What RoK intended to state was that Stati had confirmed that <u>RoK</u> had produced such a summary. This was intended to prove that it had expressly been a matter of discussion between the parties and that the Arbitral Tribunal nonetheless failed to take any decision in this respect.

(326)  In any event, the crucial question for this challenge ground is that the Arbitral Tribunal entirely failed to take into consideration RoK's request that a requisite deduction must be made. Stati is erroneously claiming that the Arbitral Tribunal treated the question of a deduction as a question regarding the correct time of valuation, and that it was therefore sufficient that the Arbitral Tribunal cited RoK's position in conjunction with this.

(327)  RoK ultimately presented two arguments: firstly, that Stati's valuation date was erroneous and secondly that if the Arbitral Tribunal were to use a valuation date before July 2010, deductions must be made since Stati had continued to conduct the operations after the valuation date. Logically, the Arbitral Tribunal could not decide these two questions at the same time since the second question presupposes a valuation date before July 2010. Instead, the Arbitral Tribunal, after having taken such a decision, would have been compelled to take into consideration RoK's second argument. However, the Arbitral Tribunal failed to do so.

(328)  In addition, the Arbitral Tribunal did not consider at all the question of a deduction in its reasoning regarding the valuation date. Merely citing a few assertions without reporting the objections in this context cannot be deemed sufficient, particularly when one party states that a deduction must occur with respect to the damages claimed. This is particularly the case when these objections are not insignificant but involve sums of over USD 200 million, i.e. 2/5 of the amount awarded.

(329)  The Arbitral Tribunal specifically stated that the chosen valuation date differs from the valuation date which Stati presented and that it was therefore necessary to consider whether the parties' appraisals regarding Stati's valuation date could be used by the Arbitral Tribunal in its own appraisal regarding another valuation date.[277] The Arbitral Tribunal went on to conclude that it would take into consideration the difference in the valuation dates when it reviewed Stati's various claims for damages.[278] This clearly indicates that the Arbitral Tribunal did not decide the question of deductions when it addressed the valuation date but rather saved this decision for later portions of the arbitral award. However, no such analysis is carried out in any later part of the arbitral award and, quite specifically, consideration is not given to the fact that a deduction due to a later valuation date must be made. The reasoning in the arbitral award thus demonstrates that the Arbitral Tribunal failed to address the question.

---

[277] The Arbitral Award, para. 1500.

[278] The Arbitral Award, para. 1501.

(330)   Even if Stati is arguing that RoK's claims for deductions do not constitute a counterclaim or a set-off claim, one cannot escape the fact that the objection regarding a deduction is comparable, in all respects, to a set-off claim and functions as such; it involves facts other than what Stati is presenting and entails a reduction of the damages which RoK is to pay. There is therefore no cause to limit the setting aside of the arbitral award to those cases in which the Arbitral Tribunal failed to take into consideration a set-off defense or a counterclaim and to exclude other types of deductions within the scope of a challenge proceeding.

(331)   In any event, it is immaterial whether RoK presented a counterclaim or a set-off defense. The fact that the Arbitral Tribunal failed to take into consideration RoK's request means that the Arbitral Tribunal carried out an incomplete assessment of the damages.[279] In this respect, Heuman has stated the following:

> "*One could assume that there is an excess of mandate to the extent the defendant's claim or defence  means that the arbitral tribunal was not at liberty to limit its adjudication solely to the claimant's claims and grounds: the tribunal was charged with adjudicating the entire dispute.*"[280] (emphasis added)

(332)   The Arbitral Tribunal's obligation to adjudicate the entire dispute is clearly linked to the principle of disposition; it is the parties' respective dispositions which set the framework for the Arbitral Tribunal's assessment. In the same way, in international contexts, the German Supreme Court has concluded that an arbitral tribunal must illuminate, in its reasoning, the significant objections a party has presented as its defence.[281] Since the disposition principle constitutes a cornerstone of arbitration law and the Arbitral Tribunal is strictly bound by this, the Arbitral Tribunal's failure to take into consideration RoK's arguments in this respect constitutes excess of mandate.

(333)   It is apparent from the above that the Arbitral Tribunal also committed a procedural error. Stati is claiming that even if it had committed an error, it did not affect the outcome of the case since RoK's "objections obviously are in contravention of the facts in the case and lack any credibility". As reported above, however, RoK's objections do not in any way contravene the facts, nor do they lack credibility.

3.7.2   **The Arbitral Tribunal did not take into consideration, or take a decision regarding, RoK's objection that an arbitral award for the LPG plant can only cover half of the assumed value**

(334)   Stati's sole rebuttal argument is that the Arbitral Tribunal is claimed to have considered RoK's objection in the respect cited by Stati, which relates to obligations vis-à-vis Vitol. What Stati forgets to mention is that it has cited a part of the arbitral

---

[279] See Heuman, *Skiljemannarätt [Arbitration Law]*, p. 612-13.

[280] See Heuman, p. 612. See also Hobér, *International Commercial Arbitration in Sweden*, p. 257.

[281] NJW 1986, 1436 at p.1437.

award in which the Arbitral Tribunal addresses the handling of liabilities, i.e. the question of whether a particular liability which Stati's company incurred should be deducted from any damages awarded. This does not have any connection to the question of whether it should be taken into consideration in an appraisal of the LPG plant that Stati was only entitled to the 2% of the plant's generated profits.

(335)   As RoK has explained in its *Second Post-Hearing Brief*[282], there were two questions which are not to be confused: Vitol COMSA and the profit-sharing agreement between Vitol and Ascom regarding the LPG plant.

(336)   KPM and TNG sold, via closely-associated intermediaries, their oil and their condensate to Vitol which took place through a so-called COMSA. As Stati's witness Artur Lungu explained in the proceedings regarding the quantum of damages, COMSA agreements allow certain prepayments and, according to the prepayment mechanism, Stati's company had the right to request prepayments so that they functioned as a "revolving" credit facility.[283] Artur Lungu further stated that this was primarily used in order to allow Vitol to contribute with its loan share to the construction of the LPG plant since Vitol and Ascom were building the LPG plant together. RoK argued that, based on Stati's own experts (FTI) as per 13 February 2010, TNG had a debt of USD 53.6 million according to the COMSA agreement's prepayment mechanism.[284]

(337)   Consequently, COMSA is related to existing liabilities while the agreement regarding profit-sharing between Vitol and Ascom entails that the (hypothetical) cash flow was to have been shared if the LPG plant had been placed into operation and that Stati therefore, in particular based on the joint agreement concerning a discounted cash flow method, could only be entitled to one half of the estimated value of the LPG plant since they both only received half of the cash flow. This was an entirely different claim.

(338)   Stati provides an erroneous impression of the Arbitral Tribunal's statements when it claims that it took a position regarding the relevant question, namely whether the agreement regarding profit sharing entails that Stati could only be awarded one half of the assumed value of the LPG plant. The Arbitral Tribunal refers only to obligations vis-à-vis Vitol in the part regarding deduction, and the future agreements regarding profit-sharing quite clearly do not involve a question of liabilities.

(339)   There is no support for the claim that the Arbitral Tribunal, admittedly in the wrong place, took the argument into consideration. The Arbitral Tribunal described RoK's position in the following way:

> "*Regarding the KPM and TNG COMSA prepayment arrangements, the envisioned sharing of cash-flows from the envisioned joint venture capital*

---

[282] RoK's *Second Post-Hearing Brief*, para. 959; FTI Consulting's Supplemental Report, section 3.5.

[283] Artur Lungu's testimony, hearing regarding quantum of damages, day 1, p. 188.

[284] RoK's *First Post-Hearing Brief*, paras. 1064 and FTI Consulting's Supplemental Report, section 3.5.

> *company needs to be deducted from a claim for the LPG Plant. The COMSAs, however, refer to an existing date as of the valuation date. Claimants do not contest that the COMSA debt existed as of 21 July 2010 and they do not explain why it would not need to be deducted from their claims. Claimants, therefore, admit that this debt needs to be deducted. (RPHB 2, paragraphs 959 – 960).*"[285]

(340)    The Arbitral Tribunal is obviously referring to paragraphs 959-960 in that part of RoK's *Second Post-Hearing Brief*, where RoK explains its position regarding the deduction of liabilities under TNG COMSA, and not to paragraphs 714-730, i.e. more than 60 pages earlier and under an entirely different heading, where RoK explains why, in any event according to the agreements regarding profit sharing, only one half of the assumed value of the LPG plant could be ascribed to Stati.

(341)    In addition, in that part of the award's reasoning where the question of the deduction of liabilities is addressed, which is cited by Stati, the Arbitral Tribunal does not take into consideration this argument either. Here, the Arbitral Tribunal speaks about "*obligations to VITOL under the COMSA prepayment terms and LPG financing arrangements*" but RoK's argument did not refer to any financing agreement; it referred to the agreements regarding future profit-sharing. Stati has cited this paragraph incompletely. In its entirety, it reads as follows:

> "*Regarding the obligations to VITOL under the COMSA prepayment terms and LPG financing arrangements, the arbitral tribunal does not agree with Respondent that these must be deducted from the damages awarded. As testified by Mr. Lungu (Tr. Hearing January 2013, day 1 p. 185/186), VITOL never owned part of the LPG Plant. As explained by Claimants (CPHB 1 ¶ 643), the prepayment arrangements guaranteed by KPM and TNG were not a separate debt but regarded VITOL's portion of the debt financing for construction of the LPG Plant. The Joint Operating Agreement with VITOL for the LPG Plant project (First FTI Scope of Review No.44) expressly provides that, in the event that the Government seeks any rights of pre-emption, VITOL is still entitled to payment from ASCOM of the fair value price and that ASCOM shall seek to recover such amounts from the Government.*"

(342)    The Arbitral Tribunal speaks of obligations according to the terms and conditions for prepayment under COMSA and the financing agreements for LPG, i.e. as Stati's own witness, Lungu, explained the agreement, that COMSA was used for Vitol's share of the financing of the LPG plant. This becomes even more obvious when the Arbitral Tribunal explains that this was not a separate liability but instead related to Vitol's share of the financing. The obligations to which the Arbitral Tribunal referred were thus the obligations vis-à-vis Vitol for the financial contributions which were made to the

---

[285] Arbitral Award, para. 1524.

construction of the LPG Plant, not the fact that TNG was only to have received 50% of the (hypothetical) profit of the plant.

(343)   It should be added that, in the relevant portion of RoK's *Second Post-Hearing Brief*, i.e. that part in which RoK explained why Stati would only receive 50% of the assumed value of the LPG plant, RoK explained that the "*Claimants are wrong to allege that this was a question of obligations towards Vitol.*"[286] Had the Arbitral Tribunal nonetheless intended to treat the assessment of the agreements regarding profit-sharing in the section regarding liabilities, namely as an obligation vis-à-vis Vitol, RoK could have had cause to expect that the Arbitral Tribunal took into consideration the fact that RoK expressly opposed such a classification.

(344)   Consequently, the Arbitral Tribunal exceeded its mandate and committed a procedural error which has affected the outcome of the case. As has been reported above, this argument functioned as a set-off claim. There is therefore no cause to address this question differently.

---

[286] RoK's *Second Post-Hearing Brief*, para. 724.

3.8      **The Arbitral Tribunal has gone beyond the parties' arguments and failed to consider the parties' arguments and the applicable law**

(345)    Several issues in dispute were dependent upon a consideration of Kazakhstan law. RoK offered the testimony of several experts on these questions. However, the Arbitral Tribunal ignored these and adjudicated the questions without any consideration of the content of Kazakhstan law and the expert opinion evidence regarding this offered by RoK. The error committed by the Arbitral Tribunal in this respect constitutes excess of mandate or a procedural error which affected the outcome of the case. The arbitral award must therefore be set aside, in whole or in part.

3.8.1    **The Arbitral Tribunal incorrectly handled the question of KazAzot as a liability question despite the fact that it was argued by both parties only in relation to the pricing of gas; as a consequence, the Arbitral Tribunal relied on circumstances never argued by any of the parties and failed to apply the correct legislation**

(346)    It should initially be noted that in its "*grounds in summary*", Stati states that it argued in the arbitration proceedings that international rules regarding the liability of states must be applied to the question of whether KazAzot's actions can be ascribed to RoK. However, this statement is erroneous and Stati does not make any reference to this claim and does not even repeat this claim in its actual arguments.

(347)    RoK maintains what was previously stated regarding how the question of KazAzot was treated. As previously stated, this question covers three separate parts;

(i)       the Arbitral Tribunal relied on facts not argued by the parties;

(ii)      the Arbitral Tribunal relied on the KazAzot question for liability and causality even if both sides only touched upon the question in connection with the issue of the pricing of gas; and

(iii)     the Arbitral Tribunal failed to apply the correct legislation regarding the establishment of the state's liability for KazAzot's actions.

(348)    The Arbitral Tribunal has largely based its assessment of liability on the fact that KazAzot never signed the Tripartite Agreement. This was crucial for the Arbitral Tribunal when it concluded that a breach of the ECT's requirements for fair and equitable treatment existed. In its assessment of the reason that KazAzot never signed the Tripartite Agreement, the Arbitral Tribunal concluded that the state had applied pressure. [287] In light of what is stated above (see section 3.4.2), the conclusion can thus be drawn that these facts were of immediate significance for the legal consequences and must therefore be classified as concrete facts. Such facts

---

[287] Statement of Claim, paras. 334-336.

must be expressly argued by Stati in order for the Arbitral Tribunal to be able to rely on them.

(349)   In addition, it is a fundamental principle that a party must not be surprised by the fact that Arbitral Tribunal has taken into consideration a fact in a particular context. It is not questioned *per se* that an evidentiary fact need not be argued in the same way as a concrete legal fact. However, even if a circumstance in another context may have evidentiary value, the Arbitral Tribunal may not base its decision on this unless such an evidentiary fact supports an expressly argued concrete legal fact.[288] In the arbitration proceedings, the Arbitral Tribunal relied on the KazAzot question regarding the question of liability and causality, despite the fact that the question had been argued by both parties only regarding the pricing of gas. Consequently, even if this is to be classified as an evidentiary fact, the Arbitral Tribunal committed procedural error when it relied on this in another context where these facts were never expressly argued.[289]

(i)   The Arbitral Tribunal relied on facts never argued by the parties

(350)   Stati has not presented any evidence which proves how and when they claimed that Timur Kulibayev controlled KazAzot and thereby that KazAzot's failure to sign the three party agreement was a consequence of the state's pressure, which was later presumed by the Arbitral Tribunal.

(351)   It speaks volumes about Stati's attempt in this respect that it is citing RoK's *First Post-Hearing Brief* instead of citing any of its own pleadings which contained a claim that Kulibayev controlled KazAzot. Stati's reference to RoK's *First Post-Hearing Brief* is also misleading; Stati chose to intentionally exclude the footnote to the statement cited by Stati. This footnote explains that RoK was not referring to any pleading by Stati but to the testimony given by Anatolie Stati. Consequently, RoK has not in any way confirmed this statement as Stati's legal position in the arbitral proceedings, but only touched upon the testimony. The only reason that RoK presented the statement as one of the "*Claimant's*" in the arbitration proceedings was that Anatolie Stati was one of four claimants in the arbitration proceedings. RoK expected that Stati would offer Anatolie Stati's testimony. Stati's *First* and *Second Post Hearing Briefs*, which immediately followed Anatolie Stati's testimony, demonstrated that Stati did not do this and did not repeat a word of Anatolie Stati's claims. Possibly due to the fact that Anatolie Stati's testimony had been rebutted by Minister Mynbaev's testimony,[290] Stati did not even attempt to make this argument. Consequently, it cannot be claimed that Stati argued that Kulibayev controlled KazAzot.

---

[288] Lindskog, *Skiljeförfarande – en kommentar, [Arbitration Proceedings – a commentary],* 2nd ed., 2012, p. 722.

[289] See also *Systembolaget AB v. V&S Vin & Sprit Aktiebolag* in the Svea Court of Appeal's judgment of 1 December 2009, case no. T 4548-08.

[290] See the paragraph after the paragraph Stati cites, namely paragraph 397 of RoK's *First Post-Hearing Brief.*

(352)    Stati's second argument is equally without foundation. What it is claiming is not entirely clear, but it appears to be that since they claimed that Timur Kulibayev was behind the alleged harassment campaign, they ought to be presumed to have claimed that Timur Kulibayev controlled KazAzot. These charges are irrelevant since they are far broader than the specific charge which is relevant in this context. The specific charge was never presented by Stati in its pleadings and it cannot be claimed that, since sweeping accusations were made, Timur Kulibayev can be blamed for each and every negative event which Stati suffered. Stati never claimed in the arbitration proceedings that Kulibayev exerted any pressure on KazAzot in order to prevent KazAzot from signing the Tripartite Agreement.

(ii)    *The Arbitral Tribunal relied on the KazAzot question for liability and causality despite the fact that both sides only touched upon the question in conjunction with the question of the pricing of gas*

(353)    Stati states that the question regarding KazAzot was argued in conjunction with the question concerning liability since it was touched upon by the witnesses in the *Hearing on Jurisdiction and Liability*. However, this lacks relevance. At the proceedings held on October 2012, which were officially designated as the "*Hearing on Jurisdiction and Liability*", a number of questions regarding the quantum of damages were addressed. None of the parties felt it was limited to questions regarding jurisdiction and liability at these proceedings. This is best illustrated by the fact that, during these proceedings, Stati called RoK's witness, Suleimenov, and posed several questions which only dealt with the quantum of damages. The fact that KazAzot was discussed at proceedings in October 2012 thus does not mean that KazAzot was a part of the questions regarding jurisdiction and liability. What is crucial in this regard is in which respect the parties addressed the question in their written pleadings. If one looks at these, it is clear that KazAzot was only discussed in conjunction with the quantum of damages and Stati has not been able to prove anything different.

(354)    Stati's further claim that questions regarding KazAzot were treated as liability questions in subsequent pleadings is not correct. KazAzot is not mentioned anywhere in the parties' pleadings in conjunction with liability. It should be particularly emphasised that, in the paragraphs in Stati's *First Post-Hearing Brief* which are cited by Stati[291] KazAzot is not mentioned nor anything with the slightest connection to KazAzot. If Stati actually meant to refer to RoK's *First Post-Hearing Brief*, it is obvious that, merely on the basis that RoK referred to a statement by Anatolie Stati from the proceedings, RoK was not arguing in any way regarding KazAzot in any liability-related question.

(iii)    *The Arbitral Tribunal failed to apply the correct legislation when it imposed liability on the state for KazAzot's actions*

---

[291] Statement of Defence, para. 302.

(355)   Stati argues that the Arbitral Tribunal applied international law regarding the state's liability. This does not mean that Stati denies that international rules regarding the state's liability are to be applied to the question of liability for KazAzot's actions. However, Stati does not explain how or where the Arbitral Tribunal applied international law. Stati does not even contest the argument that the reasons which the Arbitral Tribunal stated do not reflect an application of international law.

(356)   In addition to this, the Arbitral Tribunal mentioned the *ILC Draft Articles* in other parts of the arbitral award, namely when it reported the elements for establishing causality between a breach and loss[292] and regarding the concept of loss of opportunity in the calculation of damages.[293] This proves that the Arbitral Tribunal expressly stated when it applied the *ILC Draft Articles*, which means that it did not do so regarding KazAzot *[sic]*.

### 3.8.2   In its decision regarding the press release from INTERFAX, the Arbitral Tribunal, by emphasising that RoK did not contest the fact, relied on a fact not argued by any of the parties

(357)   With respect to the question of the press release from INTERFAX, Stati's objection is entirely irrelevant. RoK has stated that the Arbitral Tribunal relied on facts which were never argued and erroneously assumed that RoK had made an admission when it found that it was "*obvious and not disputed by Respondent, that it was <u>Respondent's actions starting in October 2008</u> that caused the publication.*"[294] The Arbitral Tribunal thus relied on facts which neither of the parties argued and thereby also did not admit. This is the case since the press release from Interfax only applied to a specific event, namely that the approval of the share transfer from Gheso to Terra Raf was revoked, which took place on 18 December 2008, and not any previous event. It was contested between the parties whether the press release from INTERFAX had been caused by a leak within the government but it was never claimed or discussed that any events other than the revocation of the approval of the share transfer in TNG was the subject of, and therefore "caused", the publication.

(358)   Stati's only reply is that they regarded the press release in a larger context of an alleged harassment campaign. However, there is a difference between portraying the press release as part of a harassment campaign and claiming that RoK's actions beginning in October 2008 caused the publication. The publication only applies to the revocation of the approval of the share transfer and nothing else. None of RoK's actions before 18 December 2008 are mentioned. In addition, RoK denied that there was a harassment campaign. Consequently, even if the Arbitral Tribunal's statement can be read as argued by Stati, the Arbitral Tribunal still erroneously presumed that there was an admission.

---

[292] Arbitral Award, paras. 1331 *et. seq.*, 1452.

[293] Arbitral Award, para. 1688.

[294] Arbitral Award, para. 994 (emphasis added).

### 3.8.3   In its decision regarding the financial police, the Arbitral Tribunal relied on facts never argued by any of the parties and on an alleged admission by RoK which was never made

(359)   Stati's claim that it had argued that the financial police had established that TNG and KPM operated *trunk pipelines* is not entirely correct. In its *Second Post-Hearing Brief*, Stati relied on the same evidence to claim that on 10 December 2008 the "*Financial Police admit to the Deputy Prime Minister of Kazakhstan that no authority has determined that KPM's and TNG's pipelines are "main" pipelines.*"[295] With respect to the alleged admission, even Stati confirms in paragraph 314 of its Statement of Defence that RoK never made such a confirmation. It is therefore uncontested that the Arbitral Tribunal erroneously accepted, and relied on, an admission when it stated that it approved the "*Respondent's earlier statement.*"

(360)   Stati goes on to claim that the Arbitral Tribunal "dismissed [...]Kazakhstan's forced interpretation of the letter", but this is incorrect. The Arbitral Tribunal ultimately concluded that it believed that "*Respondent's earlier statement acknowledging that the Financial Police had, indeed, concluded that KPM and TNG were operating trunk pipelines*", with reference to paragraphs 473-474, and placed this in juxtaposition to RoK's opposing statement in paragraph 197 in its *First Post-Hearing Brief*. However, it was in the cited paragraph 474 in RoK's *Rejoinder* that RoK expressly stated that the financial police have not yet received any definitive conclusion regarding whether TNG and KPM operated *trunk pipelines.*

(361)   Stati's claims in paragraph 314 regarding the Arbitral Tribunal's consideration of written evidence in appendix C-448 sheds light on what RoK states in this respect. Irrespective of what the Arbitral Tribunal felt to be proven by appendix C-448 in the arbitration proceedings, this had a low evidentiary value when, as mentioned above, Stati had not argued a concrete legal fact which could be supported by the above-stated evidence. As reported above (see section 3.4.2), the invocation of a concrete legal fact (in order to constitute the basis for a claimed legal consequence) must be so clear and expressed that it must have been understood by the opposing party. This fundamental requirement guarantees the opposing party's (in this case RoK's) due process interests.[296] In the absence of an express and unambiguous invocation of a legal fact, evidentiary facts lack significance.

### 3.8.4   With respect to the issue of a lowering of the liability, the Arbitral Tribunal erroneously held that a certain legal agreement had been conceded by RoK and the Arbitral Tribunal thus failed to take into consideration legal arguments made by RoK

(362)   Stati appears to misinterpret what RoK is arguing when it assumes that RoK has claimed that Stati never argued that Terra Raf and Ascom were obligated to report any

---

[295] Stati's *Second Post-Hearing Brief*, para. 61 (emphasis added).

[296] Lindskog, *Skiljeförfarande – en kommentar, [Arbitration Proceedings – a Commentary]*, 2nd ed., 2012, p. 722.

compensation awarded for the value of KPM and TNG to Tristan's bondholders.[297] RoK never stated this. On the contrary, in paragraph 372 of RoK's Statement of Claim, RoK stated expressly that Stati claimed that they were liable for payments vis-à-vis Tristan's bondholders.

(363)     With respect to Stati's reference to Chapter 35, section 3 of the Code of Judicial Procedure, the decision regarding the difference between the company value and the value of shareholders equity, which was the question, was entirely based on legal grounds. All relevant facts are uncontested. The evidentiary value can only play a role in relation to contested facts, not in relation to a decision on a purely legal issue. In addition, Stati's reference to Chapter 35, section 3 of the Code of Judicial Procedure is misguided when the issue involves international arbitration proceedings. The SCC rules contain a specific provision in article 26 governing evidence and the Arbitral Tribunal also decided, in accordance with *Procedural Order No. 1*, that the parties and the Arbitral Tribunal could use the *IBA Guidelines on the Taking of Evidence* as guidance. Thus, there was no scope for the application of the provisions set forth in the Code of Judicial Procedure in this respect.

(364)     In addition, Stati has not succeeded in rebutting the notion that the Arbitral Tribunal's conclusion that RoK 's statements in the proceedings in May 2013 "*may perhaps be understood as changing its position*" constitutes clear evidence of the fact that the Arbitral Tribunal failed to take into consideration what RoK had argued in this respect. What RoK had argued was clear and unambiguously different than what the Arbitral Tribunal read into the alleged admission. Stati has thus not brought attention to what is relevant, namely that the Arbitral Tribunal failed entirely to take into consideration RoK's arguments regarding why Stati's debts should be deducted from any damages, even if the Arbitral Tribunal believed that Ascom and Terra Raf were still liable for payments vis-à-vis the bondholders.

3.8.5     **With respect to the valuation of Borankol and Tolkyn, the Arbitral Tribunal erroneously assumed that RoK has stipulated to a certain valuation result when, in reality, RoK had clearly and unambiguously stated that the valuation result was erroneous and inflated**

(365)     The Arbitral Tribunal erroneously assumed that RoK's statements regarding the valuation of the Borankol and Tolkyn fields entailed a stipulation of the valuation results and thereby exceeded its mandate and committed a procedural error which affected the outcome of the case.

(366)     Stati claims that RoK presented a claimed "alternative calculation model" as appropriate in the event its own valuation time were not approved, and that the Arbitral Tribunal considered this alternative calculation model and, without feeling it was bound by it, relied on this alternative calculation model. Stati's claim can quite simply be rebutted by the wording of RoK's pleadings and the arbitral award.

---

[297] Statement of Defence, para. 317.

(367)    As has already been reported in the Statement of Claim, RoK and its experts, Deloitte GmbH, neither presented the comparable company/transaction analyses as an alternative calculation model which could be applied alone, nor described the valuation calculated through this as appropriate or even entirely correct.

(368)    As noted by the Arbitral Tribunal, the parties were in agreement that the DCF method should be applied in order to establish the value of the assets and both parties' experts did so. Stati's experts (FTI), however, introduced the comparable company and transaction analyses in an attempt to prove that the results which they calculated using the DCF method were reasonable. They described this with the following words:

> "*To assess the reasonability of the range of values estimated by the income approach for Borankol field and Tolkyn field operations, we reviewed comparable transactions and comparable companies under the Market Approach. We check the reasonability of the valuation derived from the Income Approach by reviewing publicly available data (…).*"[298]

(369)    Stati described this as "*reality checks*" on the value.[299] In other words, Stati did not even treat these methods as primary sources to indicate value, but only to check the results of the DCF valuation. Deloitte GmbH considered these "*reality checks*" by carrying out its own comparable company and transaction analyses based on Ryder Scott's reserves estimates and came to the conclusion that FTI's calculations were deficient in terms of methodology and exaggerated and thus did not take into consideration FTI's DCF results.[300]

(370)    The values which Deloitte GmbH calculated on the basis of Ryder Scott's estimates of reserves were presented solely in order to prove that FTI's DCF valuation was not reliable since it did not have any support in the comparable company and transaction calculations, i.e. these "*reality checks*" had failed. In addition, as has already been stated, Deloitte GmbH also expressly stated that the values they calculated were still exaggerated since Tolkyn's and Borankol's share of gas was considerably greater than that which the companies used in the comparison analyses and they were therefore of less value.

(371)    There can therefore not have been any doubt that the value of USD 277.8 million for Tolkyn and Borankol, which was calculated by Deloitte GmbH based on the comparable transaction analysis, was never "conceded" as the correct value for the valuation date of 14 October 2008, in the event the Arbitral Tribunal were to reject RoK's valuation date. It was neither conceded nor presented as reasonable.[301]

---

[298] The first FTI report, section 14.1.

[299] Stati's *First Post-Hearing Brief*, para. 519.

[300] See RoK's *First Post-Hearing Brief*, paras. 1027 - 1028.

[301] Directly contrary to Stati's claims in para. 328 of the Statement of Defence.

(372)   Despite this, the Arbitral Tribunal treated the value as "conceded". Contrary to what Stati claims, the Arbitral Tribunal held it was also bound by such a "concession" without for that sake stating any explanation as to why it believed the amount, which was calculated according to the comparable transaction analysis (USD 277.8 million) was conceded instead of the significantly lower amount which had been calculated with the comparable company analysis (USD 169.6 million).

(373)   The way in which the Arbitral Tribunal used the word "conceded" proves that the Arbitral Tribunal believed that it need not burden itself with the task of further assessing the value since it believed that RoK had conceded a value of USD 277.8 million for Stati's valuation date. What Stati is arguing, that the Arbitral Tribunal did not believe it was technically bound since it otherwise would not have evaluated RoK's calculation[302], is incorrect since the Arbitral Tribunal did not in any way consider RoK's calculation. The Arbitral Tribunal addressed this question, the award of USD 277.8 million, in one sentence:

> "*On the other hand, since in fact damages have been caused, the Tribunal considers that their calculation can be based on the alternative damage calculations conceded by Respondent, if its own valuation date is not accepted, for the valuation date of 14 October 2008 (RPHB 1 §§ 1027 et seq.) by referring to Deloitte's comparable transactions analysis, also based on the Ryder Scott Reports, leading to a combined asset value of USD 277.8 million.*"[303]

(374)   There is no trace of a valuation of evidence in this sentence. This is in stark contrast to other parts of the Arbitral Tribunal's reasoning in the award, for example the Arbitral Tribunal's reliance on Ryder Scott's work. It is stated expressly there that the Arbitral Tribunal believes that Ryder Scott's reports were "*convincing in their approach and results*".[304] The conclusion that can be drawn from this is that the Arbitral Tribunal felt it was bound by a concession of a specific amount and thus was satisfied that it did not need to look beyond this alleged "concession".

(375)   It should be added that, even if the Arbitral Tribunal did not feel it was bound by any concession, it failed to consider RoK's objection that the comparable fields had a higher *oil-to-gas ratio*

## 4       REGARDING STATI'S MOTION FOR REMAND TO THE ARBITRAL TRIBUNAL

(376)   According to section 35 of the Arbitration Act, the Court of Appeal is empowered, upon motion by a party, to stay the case in order to provide the Arbitral Tribunal with an opportunity to take up the arbitration proceedings again and take such other measures

---

[302] Statement of Defence, para. 326.

[303] Arbitral Award, para. 1625.

[304] Arbitral Award, para. 1625.

which, in the opinion of the Court of Appeal, remove the grounds for invalidity or setting aside the award. However, the main rule is that the Court of Appeal may only remand a dispute if it has been established that the grounds exist for declaring the award invalid or setting it aside.[305] In the instant case, where only Stati has moved for a remand, the Court of Appeal can only grant the motion where it finds that the challenge action has been proven.[306]

(377)    Section 35 of the Arbitration Act is drafted on the basis of, and inspired by, Article 34(4) of UNCITRAL's model act and was introduced in order to promote efficiency and the finality of arbitration proceedings. The purpose of the provision is to provide the arbitrators with the possibility to correct procedural errors which otherwise might have led to the arbitration award being set aside or declared invalid. This would save time and money since the parties, if the arbitral award were set aside or declared invalid, would need to commence new arbitration proceedings.[307]

(378)    According to the legislative history underlying section 35 of the Arbitration Act, the provision is intended primarily to "cure" minor defects as an alternative to declaring the award invalid or setting it aside, such as a correction of a missing signature by one of the arbitrators in the arbitral award. Such an arbitral award need not be declared invalid. However, section 35 of the Arbitration Act may not be used to go through the "back door" and carry out a re-adjudication of the arbitral award on substantive grounds.[308] Nor may a more lenient evidentiary requirement be established in conjunction with remand as opposed to cases where the entire arbitral award is set aside. It is important that one adheres to the principle that an arbitral award is to be final and that the Court of Appeal not compromise this principle and remand the dispute to the arbitrators where their handling of the matter appears curious or ineffective, without any invalidity or challenge rule being applicable for that sake.[309]

(379)    There are situations when the arbitrators may correct the defect without difficulty, for example where an arbitrator's signature is missing from the arbitral award. In such cases, the arbitral award should be supplemented with the missing signature. Procedural errors can thus be "cured" without the need to set the arbitral award aside. Section 35 of the Arbitration Act constitutes a supplement to the provision set forth in section 32 of the Arbitration Act which permits the arbitrators to correct, supplement or interpret the arbitral award within a certain period of time after the award has been issued.[310] However, the provision is not intended to create the authority for the arbitrators to review the content of the arbitral award or to carry out a general review

---

[305] Heuman, *Arbitration Law of Sweden, Practice and Procedure*, 2003, p. 646.

[306] Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 345.

[307] *Id.*, p. 346.

[308] Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 152

[309] Heuman, *Arbitration Law of Sweden, Practice and Procedure*, 2003, p. 646

[310] Madsen, *Commercial Arbitration in Sweden – A commentary on the Arbitration Act (1999:166) and the rules of the Arbitration Institute of the Stockholm Chamber of Commerce*, 3rd ed., 2007, p. 295

of the decisions contained in the arbitral award.[311] The arbitrators may not review the arbitral award substantively or carry out any general overview of their decisions.[312]

(380)   In addition, a change in the arbitral award requires that the procedural error is of such a nature that it can be corrected. If, for example, one of the arbitrators was not impartial, there is little benefit in remanding the case to the Arbitral Tribunal where the arbitrator is serving.[313] Remand must not lead to further adjudication of the substantive issue in the case which, for example, if the defect in question consisted of one of the parties not being permitted to examine a witness and that the arbitrators must consider the impact the testimony may have.[314] A condition for remand is therefore that the arbitrators can remedy the alleged defect. If the defect cannot possibly be remedied by the arbitrators, the dispute should not be remanded, for example if there is not a valid arbitration agreement or the dispute cannot be resolved through arbitration.[315] In such cases, the Court of Appeal must decide the case.[316]

(381)   RoK's grounds, which are set forth in sections 5.5-5.7 of the Statement of Claim, related to the fact that the Arbitral Tribunal exceeded its mandate and committed several procedural errors by (i) failing to take into consideration expert evidence submitted and other evidence regarding almost all important issues in dispute in the case; (ii) failing to take into consideration RoK's objections that certain deductions be made from any damages awarded; and (iii) on several occasions going beyond the parties' arguments and failing to consider the parties' arguments and applicable law. All of these instances of excess of mandate or procedural error constituted material errors which affected the outcome of the case and therefore a "cure" is not possible as an alternative to declaring the award invalid or setting it aside. In the instant case, there is a risk that a remand of the dispute to the Arbitral Tribunal may lead to further substantive review of the case, yet another reason not to grant the motion for remand.

(382)   In summary, remand is a measure rarely applied by the Court of Appeal, if ever. In this case, it is not appropriate for any of the grounds argued for setting aside or declaring the award invalid. We therefore assume that the Court of Appeal will not consider this motion since it is neither relevant nor applicable.


# 5       CITED CASE LAW

(383)   RoK will shortly compile and submit the case law cited in the Statement of Claim and in this pleading.

---

[311] *Id.*, p. 296

[312] *Id.*, p. 297

[313] Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 346

[314] *Id.*, p. 347

[315] Government Bill 1998/99:35, p. 237 and Olsson, Kvart, *Lagen om Skiljeförfarande: En kommentar*, (The Arbitration Act – A Commentary) 2000, p. 152.

[316] Government Bill 1998/99:35 p. 237.

_____

Stockholm, as above

_____        _____

Hans Bagner                          Pontus Ewerlöf

**APPENDICES**

Bilaga 1          Legal opinion from Professor Bengt Lindell, 26 November 2014

Bilaga 2          Letter from SCC to RoK, 21 December 2001

Bilaga 3          Letter from SCC to RoK, 22 January 2002

Bilaga 4          Letter from SCC to RoK, 21 February 2002

Bilaga 5          Letter from SCC to RoK, 5 October 2005

Bilaga 6          Letter from SCC to RoK, 17 November 2005

Bilaga 7          Letter from SCC to RoK, 18 November 2005

Bilaga 8          Letter from SCC to RoK, 16 December 2005

Bilaga 9          Letter from SCC to RoK, 12 January 2006

Bilaga 10         Letter from SCC to RoK, 8 February 2006

Bilaga 11         Letter from SCC to RoK, 13 February 2006

Bilaga 12         Letter from SCC to Professor Ivan S Zykin, 21 February 2006

Bilaga 13         Letter from SCC to Sudima Time Ltd and Kazakhstan Development Corporation
                  Limited, 30 March 2006

Bilaga 14         e-mail from Curtis Mallet-Prevost, Colt & Mosle to counsel for the opposing party,
                  the Arbitral Tribunal and SCC, 28 January 2011

Bilaga 15         chronology of events which led to Professor Lebedev being appointed an
                  arbitrator on behalf of RoK

Bilaga 16