# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD., <br><br> Petitioners, <br><br> v. <br><br> REPUBLIC OF KAZAKHSTAN, <br><br> Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 1:14-cv-1638-ABJ |

## RESPONDENT REPUBLIC OF KAZAKHSTAN'S SUR-REPLY IN SUPPORT OF OPPOSITION TO PETITION TO CONFIRM ARBITRAL AWARD

Matthew H. Kirtland (D.C. Bar No. 456006)
matthew.kirtland@nortonrosefulbright.com
Kara L. Petteway (D.C. Bar No. 975541)
kara.petteway@nortonrosefulbright.com
Benjamin Hayes (D.C. Bar application pending)
benjamin.hayes@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
Tel:  202-662-0200
Fax:  202-662-4643

*Attorneys for Respondent Republic of Kazakhstan*

## TABLE OF CONTENTS

Table of Contents ........................................................................................................................ i

Introduction…………………………………………………………………………..…1

I.   Petitioners' Violation of the ECT's Cooling-Off Period ................................................... 2

A.   The ECT Provides That The Cooling-Off Period Is a Condition of
Kazakhstan's Agreement to Arbitrate .................................................................. 2

B.   Petitioners' Violation of Article 26(2) Renders the Award Unenforceable ................... 3

C.   Compliance with the Cooling-Off Period is Jurisdictional ............................................ 5

D.   Under Any Standard of Review, the Cooling-Off Period Was Not Satisfied ................ 6

E.   Kazakhstan Did Not "Waive" Its Objection to the Cooling-Off Period ......................... 7

F.   Kazakhstan was Substantially Prejudiced by Petitioners' Violation of the
Cooling-Off Period ................................................................................................... 10

II.   The SCC Violated Its Arbitration Rules When It Appointed Professor Lebedev ............ 11

A.   The SCC Secretariat's August 2010 Letters Did Not Notify Kazakhstan That
It Should Appoint an Arbitrator .............................................................................. 12

1.   Articles 5 and 12 Did Not Provide Kazakhstan with Notice That There
Necessarily Would Be Three Arbitrators or the Manner of the Chair's
Appointment ................................................................................................. 12

2.   The Board Failed to Set a Timeline, Even Though It Was Required To Do
So Pursuant to Article 13 ............................................................................. 14

B.   Kazakhstan Did Not Receive Notice of Petitioners' Request That The SCC
Appoint Kazakhstan's Arbitrator Until Too Late ....................................................... 17

C.   Kazakhstan's Objections to the SCC's Appointment of Professor Lebedev
Were Not Untimely .................................................................................................. 19

D.   Petitioners Would Have the Court Improperly Ignore the Special
Circumstances of This Case That Determine What Process Was Due ......................... 19

E.   The SCC Should Have Vacated Professor Lebedev's Appointment ............................. 23

F.   Kazakhstan was Substantially Prejudiced by Professor Lebedev's
Appointment ............................................................................................................. 23

Conclusion ................................................................................................................... 25

## INTRODUCTION

Pursuant to the Court's May 6, 2015 Order, Respondent Republic of Kazakhstan ("Respondent" or "Kazakhstan") respectfully submits this response to the reply brief (the "Reply") filed by Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. (collectively, "Petitioners").  Attached hereto as Exhibit A is a Second Report from Kazakhstan's expert, Professor Horacio A. Grigera Naón.[1]

Nothing in the Reply changes the two dispositive facts in this case:  (1) Petitioners initiated the underlying arbitration against Kazakhstan in violation of the three month cooling-off period required by the Energy Charter Treaty ("ECT"); and (2) the Stockholm Chamber of Commerce (the "SCC") denied Kazakhstan its paramount right to appoint its own arbitrator, in violation of both the SCC Rules of Arbitration and due process.  As set forth in Kazakhstan's Opposition, these two facts, measured against the provisions of the New York Convention and other applicable law, require denial of the Petition to Confirm because:  (1) compliance with the three month cooling-off period was a condition of Kazakhstan's consent to arbitrate under the ECT, and in the absence of such consent there was no valid arbitration agreement between Kazakhstan and Petitioners (Article V(1)(a)); (2) Kazakhstan was not given proper notice of the appointment of its arbitrator by the SCC (Article V(1)(b)); (3) the composition of the arbitral authority and the arbitral procedure were not in accordance with the parties' purported agreement to arbitrate (Article V(1)(d)); and the Award resulted from procedures contrary to public policy (Article V(2)(b)).

---

[1] Petitioners' expert repeatedly notes in his report that Professor Naón did not opine on whether the Award is enforceable under the New York Convention.  This is correct but it is not, as Petitioners' expert would have it, a result of any reticence by Professor Naón.  Rather, it comes from his correct recognition that this is not a proper question for expert opinion but rather a matter to be resolved through application of the law to the existing factual record, i.e., one for argument from counsel and a decision by the Court.  In any event, Professor Naón confirms in his Second Report that he disagrees with Petitioners' expert, and agrees with Kazakhstan that the Award should not be enforced under the New York Convention.  *See* Naón Second Op. ¶ 34, and reasons stated therefore.

## I.      PETITIONERS' VIOLATION OF THE ECT'S COOLING-OFF PERIOD

Petitioners attempt to minimize the importance the ECT's required three month cooling-off period by arguing that it was not a condition to Kazakhstan's agreement to arbitrate, it was a procedural rather than jurisdictional requirement, Kazakhstan waived its right to challenge the Award on this basis, and in any event the Tribunal held that this requirement was satisfied when the parties voluntarily agreed to a three month stay in February 2011.  These arguments ignore the express text of the ECT, overstate the scope of the Supreme Court's ruling in *BG Group*, and misrepresent the parties' correspondence and the Tribunal's holdings.

### A.      The ECT Provides That The Cooling-Off Period Is a Condition of Kazakhstan's Agreement to Arbitrate

According to Petitioners' argument, Kazakhstan, by signing the ECT, unconditionally consented to arbitration with Petitioners, whether or not Petitioners complied with the ECT's three month cooling-off period.  *See* Reply at 5-7.  This is illogical, and would have the Court ignore clear provisions of the ECT, and in particular render ECT Article 26 a nullity.

The law is clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).  ECT Article 26(3) provides in pertinent part that each sovereign state ("Contracting Party") joining the ECT "hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation ***in accordance with the provisions of this Article.***" (emphasis added).  In turn, ECT Article 26(1) requires amicable settlement of all disputes and, to implement this, Article 26(2) further requires that before private parties such as Petitioners may initiate an arbitration they must (1) request amicable settlement from a Contracting Party and (2) wait three months thereafter before filing. By definition, a party that submits a dispute for arbitration without complying with this cooling-

off period has not submitted the dispute "in accordance with the provisions" of Article 26, and a Contracting Party therefore has not consented under the ECT to arbitrate that dispute.

According to Petitioners, however, the provisions of Article 26(3) are irrelevant and a sovereign state can be compelled to arbitrate under the ECT ***whether or not*** the submission to arbitration in fact occurred "in accordance with the provisions of" Article 26.  The premise of this argument is the assertion that the wording, "in accordance with the provision of this Article" in Article 26(3) is only aimed at arbitration and/or mediation *per se* (i.e. that such proceedings should follow the provisions of Article 26) and that the exceptions from consent only relate to the two exceptions specified in Article 26(3).  This makes no sense given (1) the reference in Article 26(3) to "this Article" is, by definition, to the entirety of Article, not just sub-paragraph (3) of the Article; and (2) this ignores that Article 26(1) and 26(2) are mandatory "gateway" provisions.  It is only if these gateway provisions are satisfied that an arbitration "may" be initiated under the ECT, and the consent provisions of Article 26(3) then come into effect.  The contrary reading of Article 26(3) advocated by Petitioners would render Articles 26(1) and (2) a nullity, and Petitioners have no valid answer for this obviously incorrect result.   *Compare* Opp. at 29-30 *with* Reply at 5-7.[2]

### B.       Petitioners' Violation of Article 26(2) Renders the Award Unenforceable

While Petitioners argue that ***arbitral tribunals*** have permitted "the *ex post facto* curing" of alleged noncompliance with a cooling-off period by imposing a stay of the arbitral proceedings at their ***outset***, *see* Reply at 12, United States federal courts have held awards are

---

[2]  The authority cited by Petitioners, *Chevron v. Rep. of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013), *see* Reply at 6-7, is inapplicable.  That case addresses the Bilateral Investment Treaty ("BIT") between the United States and Ecuador, not the ECT.  Unlike the ECT, the U.S.-Ecuador BIT's provision concerning consent to arbitration ***does not*** incorporate that Treaty's cooling-off period.  *See* Ex. B hereto, U.S.-Ecuador BIT, Article VI(2), VI(4).

unenforceable when "the arbitral procedure was not in accordance with the agreement of the parties[.]" New York Convention, Art. V(1)(d). That is precisely what occurred here.

As a preliminary point, contrary to the cases cited by Petitioners, the stay in the underlying arbitration here was ***not*** entered at the outset of the proceedings. Specifically, the SCC upon receipt of Petitioners' Request for Arbitration in July 2010 ***did not***, but easily could have, stayed the arbitral proceedings for three months. The SCC did not do this. Instead, it proceeded and then, to make matters far worse, appointed Kazakhstan's arbitrator at the request of Petitioners without proper notice and in violation of the SCC Rules. These actions – first by Petitioners in violating the cooling-off provision and then as compounded by the SCC – permanently deprived Kazakhstan of one of the chief advantage of the cooling-off period, i.e., three months advance notice of the precise claims being submitted to arbitration, ***and*** the opportunity to settle such claims, before the arbitral proceedings are initiated. The subsequent stay of proceedings agreed to by the parties and the Tribunal nearly seven months later – after the arbitral proceedings were in full swing and the SCC already had appointed Kazakhstan's arbitrator – did nothing to remedy the deprivation of this right. *See* Award ¶¶ 6, 830.

Furthermore, as Petitioners acknowledge, the Second Circuit in *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005), refused to confirm an Award where "the co-arbitrators had not followed the specific steps set forth in the agreement to arbitrate." Reply at 12 n.10. Specifically, the Second Circuit concluded that the tribunal's failure to abide by the temporal order established in the arbitral agreement meant that the award was invalid, ***and specifically held that a stay imposed by the Tribunal "had no remedial effect."*** 403 F.3d at 91 (emphasis added); *see also id.* ("'the Tribunal's premature appointment of Decker irremediably spoiled the arbitration process.'") (citation omitted).

Indeed, even though there is a strong public policy in favor of international arbitration, the Second Circuit noted that it has "never held that courts must overlook agreed-upon arbitral procedures in deference to that policy." *Id.* Likewise here, the mandatory cooling-off requirements of Article 26(2) were not satisfied, and the after-the-fact stay of proceedings could not, and did not, remedy this defect.

Similarly, in *Polimaster Ltd. v. RAE Systems, Inc.*, 623 F.3d 832 (9th Cir. 2010), the Ninth Circuit refused to confirm an award where the procedures used were contrary to the parties' agreement. Citing a publication of Petitioners' own expert, Professor Born, the court noted that "[t]he New York Convention 'recognizes the central role of the parties in fashioning the arbitration procedure, *and provides sanctions for failure to adhere to the agreed procedures*.'" *Id.* at 841 (emphasis added) (citation omitted). Accordingly, the court held that the arbitrator could not "override the parties' express agreement" regarding where claims were to be filed, and refused to confirm the Award. *Id.*

The same result follows here. Petitioners assert that *Encyclopaedia* and *Polimaster* are inapposite because they "involve decisions by arbitral tribunals that contradict express language in the arbitration agreement," whereas here, "there is no contradiction with the language of ECT Article 26." Reply at 12 n.10. This has no merit. As set forth above, the ECT unequivocally requires that private parties comply with the three month cooling-off period *before* they "may" initiate arbitral proceedings against sovereign states such as Kazakhstan that have signed the ECT. This condition was not satisfied by Petitioners. The "sanction for failure to adhere to [this] agreed procedure" is denial of enforcement under New York Convention Article V(1)(a).

### C.       Compliance with the Cooling-Off Period is Jurisdictional

The Reply misstates the scope of the Supreme Court's holding in *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014), in arguing that compliance with the cooling-off

period is a procedural rather than jurisdictional requirement.  Petitioners fail to acknowledge that in *BG Group*, the Court expressly declined to decide whether a "condition on consent" to enter into an arbitration agreement is procedural or jurisdictional.  *See BG Grp.*, 134 S. Ct. at 1208-10. While the Court noted that "the word 'consent' could be attached to a highly procedural precondition to arbitration, such as a waiting period of several months," the Court "le[ft] the matter open for future argument," because the treaty at issue in *BG Group* did not state that the local litigation requirement in that case was a condition of consent to arbitration.  *Id.* at 1209 ("We leave for another day the question of interpreting treaties that refer to 'conditions of consent' explicitly.").  The language in ECT Article 26(3), however, *is* a "condition on consent" because it explicitly references what a party is unconditionally consenting to: "the submission of the dispute to international arbitration … in accordance with the provisions of [Article 26]."  The cases and secondary authorities cited by Petitioners, none of which interpret the ECT's "condition on consent," are thus irrelevant.[3]  *Cf.* Reply at 7-11.

**D.    Under Any Standard of Review, the Cooling-Off Period Was Not Satisfied**

Regardless of whether compliance with the cooling-off period is deemed a procedural rather than jurisdictional requirement, and thus whether the Tribunal's ruling on this issue is given a deferential rather than de novo standard of review, the Tribunal's ruling cannot be accepted.

Petitioners miss the point when they argue that the following three communications satisfied the cooling-off period:  (1) a March 18, 2009 letter from Anatoli Stati to the Kazakh Ministry of Energy and Mineral Resources ("MEMR") (Reply Ex. A); (2) a March 19, 2009 meeting between executives of Terra Raf, Ascom and executives of the MEMR (Reply Ex. B);

---

[3]  Moreover, the Court in *BG Group* did not purport to lay down an all-inclusive rule that all cooling-off periods (or similar provisions) are procedural.  Indeed, it could not have because, as the Court noted, arbitration is a matter of contract and a contract's interpretation is dependent on the parties' intent.  134 S. Ct. at 1208.

and (3) a May 7, 2009 letter from Anatolie Stati to Kazakhstan President Nazarbayev (Reply Ex. C).  *See* Reply at 13.  Petitioners made exactly this same argument to the Tribunal, *see* Award ¶ 818, but it was not accepted.  *See* Award ¶¶ 828-830; *compare* Opp. at 31 *with* Reply at 13-14. Instead, the Tribunal only found (incorrectly) that the three month stay agreed to by the parties in February 2011 (seven months after the arbitration was initiated) satisfied the required pre-arbitration cooling-off period.  *Id.* ¶ 830.  In the absence of a Tribunal ruling on Petitioners' argument regarding the three 2009 communications, there is nothing to which the Court can apply any standard of review – whether deferential or de novo.  Thus, the three communications referenced by Petitioners are irrelevant.[4]

The only proper question for the Court is whether the Tribunal's actual ruling was correct.  For the reasons set forth in Kazakhstan's Opposition, this cannot be the case because under *BG Group*, *supra,* regardless of whether reviewed under a highly deferential or de novo standard, the Tribunal's ruling that the ECT's pre-arbitration cooling-off period was "excused" by an after-the-fact stay of proceedings cannot be correct.  *See* Opp. at 27-30.

### E.    Kazakhstan Did Not "Waive" Its Objection to the Cooling-Off Period

Likewise incorrect are Petitioners' arguments that Kazakhstan "waived" its challenge to Petitioners' violation of the cooling-off period, and that Kazakhstan purportedly stated that the February 2011 stay would "cure" this jurisdictional defect.  *Cf.* Reply at 3 & 5 n.1.  Nothing could be further from the truth.

---

[4] The Tribunal likely did not accept Petitioners' argument because the three communications they rely upon did not, on their face, satisfy the ECT's cooling-off provision.  None of these communications requested "amicable settlement" under the ECT as required by ECT, Article 26(2).  Their generic references to "international arbitration" meant nothing given that the underlying contracts between the parties provided an independent right to submit a dispute to international arbitration, *i.e.*, arbitration outside of the ECT.  *Compare* Opp. at 31-22 *with* Reply at 13-14. Nor could any of these three communications – all in 2009 – have provided Kazakhstan with notice of the specific claims which Petitioners submitted to arbitration more than one year later given that the submitted claims were based on Kazakhstan's termination of Petitioners' contracts on July 21, 2010, just five days before the arbitration was filed, and more than a year after the communications upon which Petitioners attempted to rely.  *See* Opp. at 31 (citing Award, ¶ 823); *see also* Opp. Ex. 26 (1-18-2011 letter) at 1-2.

First, Petitioners point to Kazakhstan's January 18, 2011 letter, where it proposed a mid-arbitration stay "in satisfaction of [the] jurisdictional requirement" as a "practical solution." Reply at 4 (quoting Opp. Ex. 26 at 3). However, the Reply omits the language from the same sentence in which Kazakhstan expressly reserved its right to challenge jurisdiction: "We offer this as a practical solution that best serves the interests of the parties ***notwithstanding the fact that this jurisdictional defect could result in dismissal after full briefing and hearing on the merits***." Opp. 26 at 3 (emphasis added). Petitioners further ignore (and do not disclose to the Court) that Kazakhstan again expressly reserved its right to challenge the violation of the cooling-off period in a subsequent January 28, 2011 email. Ex. C hereto ("The Republic reserves its rights to assert all defenses and applicable jurisdictional objections at the appropriate time in this case, including claimants' failure to comply with the requirements of the Energy Charter Treaty.").

Moreover, the January 18, 2011 letter cited by Petitioners was only the first of several pieces of correspondence exchanged between the parties concerning the terms of the proposed three month stay. The January 18, 2011 letter was not a final "offer" and its terms were not "accepted" by Petitioners. To the contrary, on January 24, 2011, Petitioners rejected the proposals made in Kazakhstan's January 18, 2011 letter, and made a counter-offer.[5] *See* Opp. Ex. 24 at 2 ("[O]ur clients are not willing to accept the proposal set forth in your letter for a three-month suspension of the arbitration."). As a term of their counter-offer, Petitioners proposed that "Kazakhstan formally withdraw[] and waive[] its objection regarding the notice period … ." Opp. Ex. 24 at 2. But this was expressly rejected by Kazakhstan. *See* Opp. Ex. 25 at 1 ("We also refer to our letter of January 24, 2010 [*sic*], in which our clients made a proposal

---

[5]  In a typographical error, Petitioners' January 24, 2011 letter is misdated January 24, 2010. *See* Opp. Ex. 24 (letter dated January 24, 2010, responding to "your letter of January 18, 2011").

on this issue that was rejected by Kazakhstan.").  In response to this rejection, Petitioners responded by letter dated February 2, 2011, and dropped their request that Kazakhstan agree to waive its jurisdictional objections.  *See generally id*.  This correspondence makes clear that Kazakhstan did not waive, and in fact expressly reserved, its right to challenge the Award because of Petitioners' failure to comply with the cooling-off period.

Second, in support of its "waiver" argument, Petitioners rely on a phrase ostensibly excerpted from Kazakhstan's February 6, 2011 letter.  *See* Reply at 5 ("the ROK reserved its right to raise 'other' unrelated jurisdictional objections").  *Cf.* Opp. Ex. 27.  Again, this is a material misrepresentation of the correspondence.  What the February 6, 2011 letter specifically states is that if the parties were ***not*** able to reach an agreement regarding a stay of the proceedings ***then*** Kazakhstan would agree that the Tribunal should determine its "jurisdictional objection under Article 26 of the ECT on a bifurcated basis, with briefing and argument on that sole question … ."  *Id.* at 3.  It was only under this hypothetical scenario that Kazakhstan went on to state:  "This is without prejudice to the Republic's right to assert ***other*** jurisdictional objections and substantive defenses at the appropriate time, ***all of which are expressly reserved***."  *Id.* (emphasis added).  Thus, Kazakhstan's reference to raising "other jurisdictional objections" did not in any way imply that Kazakhstan had waived its jurisdictional challenge based on Petitioners' failure to comply with the cooling-off period – quite the opposite.

Finally, contrary to Petitioners' argument, *see* Reply at 4, Kazakhstan expressly raised Petitioners' failure to comply with the cooling-off period with the Tribunal.  *See, e.g.,* Award ¶ 820 (arguments by Kazakhstan, "Claimants have not fulfilled the waiting period prior to initiating arbitral proceedings, and this is fatal to Claimants' case."); ¶ 830 ("According to [Kazakhstan], … the settlement period proposed by the Republic was without prejudice to the

9

jurisdictional issues that this defect could later cause."); ¶¶ 820-27 (noting Kazakhstan's jurisdictional objection based on Petitioners' non-compliance with the cooling-off period).  For these reasons, the waiver cases cited by Petitioners are inapposite.  *Cf. Dean v. Sullivan*, 118 F.3d 1170 (7th Cir. 1997) (challenge to arbitral award based on argument not asserted during underlying arbitration); *Hawkins v. Hooters of Am., Inc.*, 2011 WL 2648602 (D.D.C. July 6, 2011) (party who submitted a dispute to arbitration could not subsequently contest the arbitrability of the dispute).[6]

### F. Kazakhstan was Substantially Prejudiced by Petitioners' Violation of the Cooling-Off Period

Petitioners claim that Kazakhstan cannot demonstrate substantial prejudice from their failure to comply with the cooling-off period because Kazakhstan "proposed the stay as a 'practical solution' … ."  Reply at 28.  This is a non-sequitur.  That Kazakhstan, ***after*** the arbitration proceedings were improperly commenced, proposed a three month stay of proceedings to see if a settlement could be reached, while reserving its rights, does not in any way eliminate the substantial prejudice caused by Petitioners' deliberate failure to comply with the ECT's cooling-off period before instituting the arbitral proceedings.

Likewise irrelevant is that "the parties met in person during this three month period and attempted settlement in good faith."  Reply at 28.  Parties can hold settlement discussions any time during an international arbitration (or civil or criminal proceeding), and if they so choose agree to a stay of the proceedings to advance this purpose.  Articles 26(1) and (2) of the ECT, however, require that investors such as Petitioners, before they "may" submit a dispute to arbitration, "shall" first issue a request for amicable settlement and then observe the three month

---

[6]  The Reply also fails to acknowledge that Petitioners made the same "waiver" argument to the Tribunal (*see* Award ¶¶ 814, 828-830), and it too was not accepted.

cooling-off period.  No amount of settlement discussions or procedural stays *after* the

proceedings are commenced and ongoing can give Kazakhstan back the three months *advance*

notice of the arbitration to which it was legally entitled and, in this case, deprived.  This

substantially prejudiced Kazakhstan by depriving it of the three months it would have had,

before the arbitration was initiated, to investigate Petitioners' allegations, retain counsel and

evaluate potential nominees for its arbitrator – all of which could have mitigated the SCC's

rushed and illegal constitution of the Tribunal.[7]

## II.   THE SCC VIOLATED ITS ARBITRATION RULES WHEN IT APPOINTED PROFESSOR LEBEDEV

Kazakhstan agreed in the ECT to arbitrate disputes before the SCC under the SCC Rules.

Kazakhstan did not agree that the SCC could violate its own arbitration rules in administering an

arbitration, and certainly did not agree that the SCC could in so doing deprive Kazakhstan of one

of its most critical rights – the right to appoint its own arbitrator.

The Reply does not dispute that in international arbitration a party's right to appoint its

own arbitrator is paramount.  *Cf.* Opp. at 2.  That right is so important that it gives rise to two

bases for non-recognition of an award – Articles V(1)(b) and V(1)(d) of the New York

Convention.  Petitioners, however, argue that the SCC's appointment of Professor Lebedev

"resulted from the ROK's inaction, was consistent with the SCC Rules, and was thus consistent

with the parties' agreement."  Reply at 26-27.  All of these assertions are contradicted by the

undisputed facts and plain language of the SCC Rules.

---

[7] Further, while the settlement talks were held, Petitioners' deadline for the Statement of Claim was running. The deadline had been moved from March 1, 2011 to May 16, 2011, *see* Award ¶ 29, but as a suspension of the proceedings was only agreed in February 2011, this meant that while engaging in settlement talks, Petitioners at the same time had to prepare their Statement of Claim, which was accompanied by several witness statements and by expert reports.  This clearly is not conducive to reaching an amicable settlement.

### A. The SCC Secretariat's August 2010 Letters Did Not Notify Kazakhstan That It Should Appoint an Arbitrator

Petitioners do not dispute that the August 2010 letters from the SCC Secretariat to Kazakhstan requesting the submission of an Answer did not expressly request that Kazakhstan appoint an arbitrator. *See* Opp. Ex. 2, 4. Nor could they, given that the SCC's August 5, 2010 letter expressly asked Kazakhstan to comment on the "proposition of [Petitioners] that the Chairperson be selected by the party-appointed arbitrators," and nothing else. *See* Opp. Ex. 2 at 1. Likewise, the SCC's August 27, 2010 letter made no mention of Kazakhstan appointing an arbitrator. *See* Opp. Ex. 4. These were the only two communications from the SCC that Kazakhstan received before the SCC unilaterally deprived Kazakhstan of its right to appoint its arbitrator.

In the absence of any express notice from the SCC that Kazakhstan should appoint an arbitrator, Petitioners are left with an argument that Kazakhstan should have inferred that it was supposed to appoint its arbitrator based on the provisions of two Articles of the SCC Rules – Articles 5 ("Answer") and 12 ("Number of Arbitrators"). These arguments ignore that the appointment of arbitrators is plainly governed by Article 13 ("Appointment of Arbitrators").

#### 1. Articles 5 and 12 Did Not Provide Kazakhstan with Notice That There Necessarily Would Be Three Arbitrators or the Manner of the Chair's Appointment

Petitioners incorrectly argue that having received the August 5 and August 27, 2010 letters from the SCC Secretariat, Kazakhstan should have inferred that it was required to appoint an arbitrator because Petitioners had themselves requested that the Tribunal be composed of three members. This ignores two points. First, Petitioners confirmed that the number of arbitrators was not yet fixed when they *proposed* in their Request for Arbitration that the Tribunal consist of three members and that, in deviation from SCC Article 13(3), the

Chairperson be appointed by the two party-nominated arbitrators rather than the SCC Board.  If, as Petitioners now would have it, the arbitral tribunal had been fixed at three persons instead of one at the time the Request for Arbitration was submitted, no ***proposal*** would have been required; rather, Petitioners simply would have named their arbitrator for the agreed three-person tribunal.

Second, it is precisely because the parties had not previously agreed on the number of arbitrators that it was for the SCC Board to first determine under Article 12 the number of arbitrators, and how the Chairperson would be appointed, before Kazakhstan was required to appoint an arbitrator.  Until the SCC Board confirmed the number of arbitrators ***and*** how the Chairperson was to be appointed – which was never done – it would have been illogical for Kazakhstan to "infer" that there necessarily would have been a three-person arbitral tribunal or that it had to nominate an arbitrator.[8]  *Cf*. Reply at 14-17; Born Op. ¶ 91(a).  Indeed, not until the SCC Board confirmed how the Chairperson was to be appointed, could Kazakhstan properly have selected an arbitrator.  This is because it is one thing, as an arbitrator, to simply decide a case.  It requires quite different skills and qualities to also participate, in conjunction/negotiation with the adverse party's nominee, in the selection of the Tribunal Chair.  And, given the significance of the Chairperson in a three-person Tribunal, it is thus critical for a party to know whether its arbitrator will be selecting the Chair before it can select the proper nominee.

In the absence of confirmation from the SCC as to the number of arbitrators, and how the Chair would be appointed, Petitioners' argument that Article 5(1)(v) required Kazakhstan to appoint an arbitrator in its response to the Request fails.  This is because, as expressly stated in the SCC Rules, Article 5(1)(v) only is triggered "if applicable."  A party's obligation to nominate

---

[8]  Certainly, it would have been illogical to infer from the Request for Arbitration and two August 2010 letters from the SCC Secretariat that the SCC was going to proceed to appoint Kazakhstan's arbitrator without further notice.

an arbitrator only becomes "applicable" when the number of arbitrators is fixed, as well as the manner of each of their appointments.  Here, both were in flux as of August-September 2010, as confirmed by Petitioners' proposal on the number of arbitrators and manner of appointment of the Chairperson.  This was confirmed by the SCC Secretariat's August 2010 correspondence to Kazakhstan requesting that it comment in its Response on Petitioner's proposal that the Chairperson be selected in deviation from the SCC Rules, with *no mention* made of appointing an arbitrator.[9]  Certainly the Request for Arbitration combined with the communications from the SCC Secretariat did not, as Petitioners' expert now says (Born Op. ¶ 96), make it "perfectly clear" that Kazakhstan was required to appoint its arbitrator in its Answer.

### 2.     *The Board Failed to Set a Timeline, Even Though It Was Required To Do So Pursuant to Article 13*

While Article 5 governs the submission of a respondent's answer, and Article 12 governs the number of arbitrators, it is Article 13 that governs the appointment of arbitrators.  Petitioners conceded this point in their September 13, 2010 letter to the SCC, when they requested the appointment of an arbitrator on Kazakhstan's behalf "[p]ursuant to Article 13(3) of the Arbitration Rules[.]"  Opp. Ex. 6.  Even in their Reply, Petitioners insist that the "SCC Board plainly possessed the authority to appoint the ROK's arbitrator under Article 13(3) of the SCC Rules."  Reply at 18.

Article 13(3) addresses the procedure to be used where the tribunal is to consist of more than one arbitrator, and it provides that it is only if a party fails to appoint an arbitrator within the

---

[9]  Petitioners fault Kazakhstan for not seeking clarification or an extension from the SCC Secretariat as to whether it was required to appoint its arbitrator.  *See* Reply at 18-19, 23 n.20.  Kazakhstan, however, was under no obligation to seek clarification or an extension from the SCC Secretariat when the communications of Petitioners and the SCC Secretariat made clear that the requirements of Article 5(1)(v) had not yet become applicable, and certainly there had been no communication that the SCC Board had set the deadline required by SCC Articles 13(1) and (3) for Kazakhstan to appoint an arbitrator.  Given these circumstances, combined with the SCC's express communications in the prior Sudima Arbitration, Kazakhstan could not reasonably have inferred that the SCC would appoint an arbitrator for Kazakhstan without further notice.

"stipulated" time period for doing so that the SCC Board is empowered to make the appointment. As confirmed by Article 13(1), this "stipulated" time period can be either the time period agreed by the parties or, absent that, the time period set by the SCC Board.  Here, it is undisputed that the parties did not agree on the time period for appointing arbitrators, either in the ECT or otherwise, and that the SCC Board never set a time period for appointing arbitrators.  The time period for each party to appoint their arbitrator therefore was never "stipulated," and the SCC Board thus had no authority under the SCC Rules to appoint an arbitrator for Kazakhstan under Article 13(3).  The SCC's appointment of Professor Lebedev therefore violated the SCC Arbitration Rules, and this violation deprived Kazakhstan of its fundamental right to select its own arbitrator, as well as proper notice of the same.

Petitioners incorrectly argue that Article 13(1) was not applicable in this matter, and the SCC Board was not required to designate a time period within which Kazakhstan was required to appoint its arbitrator.  *See* Reply at 16 n.15.  The basis of this argument is the assertion that the first sentence in Article 13(1) ("The parties may agree on a different procedure for appointment of the Arbitral Tribunal than as provided under this Article."), limits the application of the second sentence of this provision ("In such cases, if the Arbitral Tribunal has not been appointed within the time period agreed by the parties or, where the parties have not agreed on a time period, within the time period set by the Board, the appointment shall be made pursuant to paragraphs (2)-(6)."). *Id.*  According to Petitioners, Article 13(1) thus only applies when the parties have "agree[d] on a different procedure for appointment of the Arbitral Tribunal."  This argument fails on the facts and the plain terms of the SCC Rules.

First, Petitioners have ignored that they themselves triggered the application of Article 13(1) in this case by proposing in their Request for Arbitration that the parties agree "on a

different procedure for appointment of the Arbitral Tribunal than as provided under" Article 13. Specifically, Petitioners proposed that the Tribunal Chairperson be appointed by the two arbitrators nominated by the parties instead of by the SCC Board, as provided by Article 13(3). It was in reliance on this proposal that the SCC Secretariat requested in its August 5, 2010 letter that Kazakhstan comment on Petitioners' proposed deviation from Article 13(3).  Having deliberately invoked the authority granted under Article 13(1) for the parties to agree on a "different procedure" for appointing the Tribunal, Petitioners cannot now properly come back and claim that the provisions of Article 13(1) did not apply to constitution of the Tribunal.

Second, even if Article 13(1) had not been triggered by Petitioners, Article 13(3) only empowers the SCC Board to appoint an arbitrator where a party fails to appoint an arbitrator within the "stipulated time period."  As set forth above, this "stipulated time period" refers back to Article 13(1), which provides for the two scenarios in which a time period can be "stipulated": (1) where there is a "time period agreed by the parties"; *or* (2) "where the parties have not agreed on a time period, within the time period set by the Board."  The disjunctive "or" in this sentence makes clear that it applies in all cases, i.e., both "in such cases" where the parties have agreed on a "different procedure" for appointment of the Tribunal *or* "where the parties have not agreed on a time period," as here, in which case it is "the time period set by the Board."  If Article 13(1) has no application, as Petitioners now assert, the language "within the stipulated time period" in Article 13(3) would have no meaning.  Indeed, if, as Petitioners now contend, the "stipulated time period" in Article 13(3) for when the Board could appoint a party's arbitrator necessarily corresponded with the deadline for submitting an Answer unless otherwise agreed by the parties,

Article 13(1)'s requirement that the Board set a timeline would be superfluous.[10]  This

fundamental error in Petitioners' logic dooms their argument.

    For all of these reasons, Petitioners are incorrect that the August 27, 2010 letter from the

SCC somehow resolved whether Kazakhstan was required to appoint an arbitrator.  *See* Born Op.

¶ 122 (arguing that the letter's quotation of Article 5(3) "dispelled" any notion that "RoK

retained rights in relation to  . . . appointment of an arbitrator").  While it is true that "failure to

submit an answer does not prevent the arbitration from proceeding," *see id.* ¶ 122 (citing SCC

Art. 5(3)), this fact does not change the mandate of SCC Article 13(1) and 13(3) that the ***SCC***

***Board*** first must establish the time period within which Kazakhstan was to appoint its arbitrator

***before*** the SCC Board is empowered to appoint Kazakhstan's arbitrator.  Because the SCC

Board (and even the Secretariat) never did this, the SCC's appointment of Professor Lebedev

was not done with "proper notice" and was "not in accordance with the agreement of the

parties."  *See* New York Convention Art. V(1)(b) and V(1)(d).

### B.    Kazakhstan Did Not Receive Notice of Petitioners' Request That The SCC Appoint Kazakhstan's Arbitrator Until Too Late

    It is undisputed that Kazakhstan did not receive notice of Petitioners' September 13, 2010

request that the SCC appoint an arbitrator on Kazakhstan's behalf until after the SCC already had

acted on this request.  This alone deprived Kazakhstan of due process because it had no

opportunity to respond to Petitioners' request, and certainly no opportunity to oppose it.

---

[10]  The only way that Petitioners' interpretation of Article 13(1) and (3) could make any sense would be to read
Article 13(1)'s reference to the "time period set by the Board" to apply only where the parties have reached a
"different agreement" as to the procedure for appointing the arbitrators ***except*** as to the time period for appointing
the arbitrators.  Such a strained interpretation of Article 13 underscores why Petitioners' argument cannot be
accepted.  There is no reason why the SCC would specifically craft a rule to address such a unique situation; nor do
Petitioners offer an explanation.  Indeed, the lack of such an explanation is perhaps the reason why Petitioners'
expert did not address this point, despite it clearly being raised in Kazakhstan's Opposition.  *See* Opp. at 49-52.  *Cf.*
Born Op. ¶ 91(c) (stating only that "it is obvious that Article 5(1)(v) will be 'applicable' whenever there is a three-
person Tribunal" without considering Kazakhstan's Article 13(1) argument).

Notice of a request must be received by a party before it is acted on by an adjudicative body -- whether court or arbitral tribunal – in order to provide notice "in a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Here, the SCC acted on Petitioner's September 13, 2010 request, without providing any notice of this request to Kazakhstan *or* any opportunity to respond, much less meaningful notice and opportunity. This complete violation by the SCC of proper notice requirements, and its needlessly rushed appointment of Kazakhstan's arbitrator,[11] constitutes the "significant, material" violation of due process that even Petitioners' expert concedes "will permit non-recognition under Article V(1)(b)." Born Op. ¶ 83; *see also Parsons & Whittmore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969, 975 (2d Cir. 1974) (Article V(1)(b) incorporates the forum state's standards of due process); Born Op. ¶ 80 (same).

In international arbitration, the right to receive "proper notice of the appointment of the arbitrator or of the arbitral proceeding" requires that a party be notified "of *any* request for the appointment of an arbitrator[.]" *See* Maxi Scherer, *The New York Convention on Recognition and Enforcement of Foreign Arbitral Awards, A Commentary* 292 (C.H. Beck München & Hart Publishing, Oxford, 2012) (emphasis added). This right, which is necessary to the right to receive notice of the appointment of the arbitrator, exists for the same reason; namely, to ensure that a party is not wrongly deprived of its paramount right to appoint its own arbitrator. *See, e.g.*, *Stef Shipping Corp. v. Norris Grain*, 209 F. Supp. 249, 253 (S.D.N.Y. 1962) ("The right to appoint one's arbitrator . . . is [] the essence of tripartite arbitration[.]"). The Reply and Professor Born completely miss the point of this argument, instead arguing that Kazakhstan

---

[11] Petitioners did not submit their Statement of Claim (equivalent to their Complaint) until May 2011, almost a year after the arbitration was initiated, and more than eight (8) months after the SCC unilaterally appointed Professor Lebedev as Kazakhstan's arbitrator. This timeline demonstrates that it cannot credibly be argued that the SCC providing Kazakhstan with meaningful notice of Petitioners' September 13, 2011 request, and adequate time to respond, would have in any way unduly delayed the arbitral proceedings.

being given notice of Lebedev's appointment *after-the-fact* satisfies the notice requirements of due process. *Compare* Opp. at 37-38, 41 *with* Reply at 18 *and* Born Op. ¶¶ 104-08. This cannot be correct and, for the reasons stated above and in Kazakhstan's opening brief, the lack of proper notice of Petitioners' September 13, 2010 request that the SCC appoint Kazakhstan's arbitrator alone compels non-recognition of the Award.

### C. Kazakhstan's Objections to the SCC's Appointment of Professor Lebedev Were Not Untimely

Petitioners incorrectly argue that Kazakhstan's objections to Professor Lebedev were untimely. *See* Reply at 20-21; Born Op. ¶¶ 172-82. The flawed premise of this argument is that SCC Article 15 – and its fifteen-day deadline – applies to Kazakhstan's challenge to Professor Lebedev's appointment. In fact, Article 15 applies only to challenges based on an arbitrator's lack of "impartiality or independence." This is confirmed in its text, which provides as follows:

> *A party may challenge any arbitrator if circumstances exist which give rise to justifiable doubts as to the arbitrator's impartiality or independence or if he/she does not possess qualifications agreed by the parties. A party may challenge an arbitrator whom it has appointed or in whose appointment it has participated, only for reasons of which it becomes aware after the appointment was made.*

SCC Article 15(1).

Here, Kazakhstan's challenge to Professor Lebedev *was not* based on doubts as to his impartiality or independence but rather on the manner in which the SCC appointed him, i.e., that it was done both in violation of the SCC Rules of Arbitration and without any notice of Petitioners' request that an arbitrator be appointed for Kazakhstan. These are not Article 15 challenges and therefore the fifteen-day deadline set out in Article 15 is inapplicable.[12]

### D. Petitioners Would Have the Court Improperly Ignore the Special Circumstances of This Case That Determine What Process Was Due

---

[12] Notably, Petitioners, when requested by the SCC to comment on Kazakhstan's challenge to Professor Lebedev's appointment, *see* Opp. Ex. 15-16, did not assert that Kazakhstan's objections were untimely. *See* Opp. Ex. 17. Nor did the SCC make any such assertion in denying Kazakhstan's challenge. *See* Opp. Ex. 18.

Petitioners argue that the SCC's representations to Kazakhstan in the prior arbitration are irrelevant to New York Convention Article V(1)(b) because "the SCC Board followed the plain language of the rules when appointing Professor Lebedev." *See* Reply at 20 n.18. This argument misses the point. Not only did the SCC Board violate the plain language of the rules in appointing Professor Lebedev, the SCC's express representations to Kazakhstan in the prior Sudima Arbitration are relevant to a due process analysis because the difference between (1) those representations and the SCC's conduct in that prior case, and (2) the SCC's actions in this case, demonstrate that the SCC acted in an arbitrary manner in depriving Kazakhstan of its right to appoint an arbitrator. Because New York Convention Article V(1)(b) subjects the SCC's conduct to review under the forum's standards of due process, the SCC's actions in the prior arbitration are highly relevant. *See Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 142-46 (2d Cir. 1992) (reversing arbitral award on due process grounds where tribunal reneged on a prior representation to a parties' detriment).[13]

Here, it was wholly arbitrary for the SCC to represent to Kazakhstan in the prior arbitration that it would only find waiver of the right to appoint an arbitrator where such waiver is "explicit," *see* Opp. Ex. 31 at 1, but then to proceed in the present arbitration on the basis of some purportedly implied waiver where the SCC did not either (1) set a time period for appointing the arbitrators pursuant to Article 13, *or* (2) provide any notice of Petitioners' request that an arbitrator be appointed for Kazakhstan before unilaterally acting on that request.

---

[13] Petitioners attempt to distinguish *Iran Aircraft* on immaterial grounds. In that case a party relied on an arbitral tribunal's representation and was prejudiced when the tribunal later changed its position. 980 F.2d 143-46. It makes no difference for purposes of due process that the change of position here was by the SCC Board – not the arbitral tribunal. What matters is that the SCC made a representation to Kazakhstan in the prior arbitration on the precise point now at issue – waiver of a right to appoint an arbitrator – and then reversed course in this arbitration without any prior notice. Importantly, the SCC's prior representation was in no way limited to that particular dispute. *See* Opp. Ex. 31 at 1 ("The SCC Rules empower the SCC Institute to make an appointment *only* where a party explicitly fails to make an appointment."); *see also* Opp. at 42-44 (discussing SCC's prior representation in the *Sudima Time* arbitration).

In this respect, Petitioners' expert draws exactly the wrong conclusion when he posits the following:

> *123.     I understand that the RoK has been party to at least one other SCC Arbitration. The  RoK has also been party to other ECT arbitrations, under the ICSID Rules. The RoK is therefore experienced in ECT proceedings, including proceedings conducted under the SCC Rules, and more generally, in responding to requests for arbitration in investor-State proceedings.*
>
> *124.     Therefore, in the circumstances, the RoK must have known, or be presumed to have known, what was expected of it under the SCC Rules, and known the consequences of failing to submit an Answer within the stipulated time period.*

Born Op. ¶ 124.  In fact, it is precisely because this identical issue had arisen in a prior arbitration, and the SCC had expressly confirmed to Kazakhstan that only an "explicit" waiver of a party's right to appoint its own arbitrator would constitute waiver, that Kazakhstan could not have inferred from the SCC's August 2010 correspondence that the SCC would appoint Kazakhstan's arbitrator without further, express notice.

Petitioners' argument that Kazakhstan's status as a sovereign state is irrelevant fails for the same reason.  *See* Reply at 23.  It is not the SCC Rules, but rather the requirements of due process – applicable to the SCC's actions via New York Convention Article V(1)(b) – that dictate that sufficient notice will depend on the context of each situation.  *See*, *e.g.*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (sufficient notice must be "reasonably calculated, ***under all the circumstances***, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections") (emphasis added).  Petitioners' own expert, Professor Born, concedes this point when he emphasizes that due process must take into consideration "the practicalities and peculiarities of the case."  *See* Born Op. ¶ 82 (quoting *Mullane*, 339 U.S. at 314).

While recognizing the contextual nature of due process, Petitioners and their expert refuse to apply that principle to the actions of the SCC.  *See* Born Op. ¶¶ 100, 129-32.  As noted by Professor Naón, the process and considerations attendant to selecting an arbitrator are particularly sensitive (and therefore time consuming) for a sovereign state as compared to a private actor.  *See* Naón First Op., ¶ 31(b).  This is one of the very important reasons the ECT requires a three month cooling-off period *before* arbitral proceedings may be instituted.  *See generally* Naón Second Op. ¶¶ 18-33.  Given the contextual differences between private parties on the one hand, and a sovereign state on the other, "same" treatment may, in fact, not be *equal* treatment.  In other words, a timeline completely "fair" as applied to a private party may not be so for a sovereign state.  *Id.*  Recognizing such contextual differences does not amount to "special treatment," *cf.* Born Op. ¶¶ 143-48, but rather is a recognition of the important differences that the SCC should have taken into account – and was required to under due process standards – in order to ensure that Kazakhstan received a truly equal opportunity to exercise its fundamental right to appoint its own arbitrator.  *See* Naón Second Op. ¶¶18-33.

Lastly, Petitioners argue that Kazakhstan should not be permitted to challenge the actions of the SCC because "[t]he ROK agreed to arbitrate under the SCC Rules," "those rules . . . govern the arbitration" and Kazakhstan is bound by the SCC's application of these rules.  *See* Reply at 22; Born Op. ¶¶ 69-74.  This entirely circular argument misses the point.  Nowhere in the SCC Rules is the SCC Board or Secretariat given the authority to violate the SCC Rules of Arbitration, and certainly not with respect to depriving a party of proper notice concerning its paramount right to appoint its own arbitrator.  *See* SCC Art. 5, 7.[14]  Such a violation, *per se*, renders an award unenforceable under Articles V(1)(b) and V(1)(d) of the New York

---

[14]  For the same reasons that the SCC's conduct violated fundamental principles of due process, its conduct conflicts with basic notions of United States public policy.  *See* New York Convention, Art. V( 2)(b); Opp. at 57-58.

Convention, which expressly police whether there is "proper notice" of an arbitrator's appointment and the arbitral procedure was in "accordance with the agreement of the parties." *See also* Born Op. ¶ 86 (conceding that these articles "both deal with alleged procedural defects). This point, and the incorrect view provided by Petitioner's expert that the SCC may violate the SCC Rules of Arbitration with impunity, is addressed at length in the Second Expert Report of Professor Naón. *See* Naón Second Op. (Ex. A hereto) at ¶¶ 2-17.

### E.     The SCC Should Have Vacated Professor Lebedev's Appointment

Petitioners also incorrectly claim that the SCC did not have the authority to vacate Professor Lebedev's appointment because the "ROK did not challenge Professor Lebedev on any of the grounds specified in Article 15 of the SCC Rules, which provides the exclusive grounds for challenging an arbitrator." *See* Reply at 19.  This is nonsensical.  If an arbitral institution has violated its own procedural rules in appointing an arbitrator it of course has the inherent authority to correct this violation.  That the SCC in particular has such authority was confirmed in the prior Sudima Arbitration when the SCC, on Kazakhstan's application, reversed its appointment of an arbitrator on Kazakhstan's behalf because Kazakhstan had not "explicitly" waived this right.  *See* Opp. Ex. 30; Opp. at 43.  The basis for the vacatur in the Sudima Arbitration, just as here, was not SCC Article 15 but rather the fundamental nature of a party's right to appoint its arbitrator, and the SCC's own position that it would only find waiver of this right if such waiver was "explicit."  *See* Opp. Ex. 31 at 1.  Petitioners have no meaningful response to this critical point.  *See* Reply at 20 n. 18.[15]

### F.     Kazakhstan was Substantially Prejudiced by Professor Lebedev's Appointment

---

[15]  Petitioners' argument would have the Court accept the untenable proposition that even with an undisputed violation of a party's right to appoint its own arbitrator (or any other violation by an arbitral institution of a fundamental right under the applicable rules), the arbitral institution is powerless to correct this violation.

Kazakhstan was substantially prejudiced by Professor Lebedev's invalid appointment because the SCC's actions wrongly deprived Kazakhstan of its ability to appoint the arbitrator of its choice, which is "the essence of tripartite arbitration[.]"  *Stef Shipping*, 209 F. Supp. at 253.  It makes no difference how Professor Lebedev ruled on any particular issue.  *See* Reply at 27 (noting that Professor Lebedev ruled in favor of Kazakhstan's jurisdictional arguments).  Petitioners do not point to any authority that requires a party asserting substantial prejudice to demonstrate a "but for" causal connection between the agreement's violation and subsequent, prejudicial errors, nor does any such authority exist.

Further, as noted in Kazakhstan's Opposition, *see* Opp. at 53-57, the Tribunal here did commit numerous procedural errors,[16] which occurred without a "judge of [Kazakhstan's] choice to listen to its case."[17]  Alan Redfern & Martin Hunter, *Law and Practice of International Commercial Arbitration* 250 (5th ed. 2009).[18]

---

[16]  Kazakhstan is not asking this Court to re-weigh the evidence since the record strongly suggests that the Tribunal never considered the testimony of Mr. Khalelov.  *Cf.* Reply at 29.  Petitioners incorrectly argue that the Tribunal considered Mr. Khalelov's testimony and allege that he was mentioned "in multiple places."  However, Petitioners only refer to two sections of the Award, both of which are irrelevant.  The first citation (Award ¶ 125) simply notes that Kazakhstan "submitted the English version of Mr. Khalelov's witness statement to the Tribunal."  This says nothing about whether the Tribunal actually considered that testimony.  Petitioners' second citation (Award ¶ 632) does not address the LPG Plant at all.  The point is that the Tribunal should have, but did not, consider Mr. Khalelov's testimony and if it had, it could not reasonably have relied solely on two links to webpages to assume that Kazakhstan had been willing to invest further in the LPG Plant, *see* Award ¶ 1745.  *See* Opp. at 55.

Petitioners are also wrong to argue that Kazakhstan's argument was a red herring because the Tribunal allegedly ultimately relied on different evidence, namely contemporaneous bids.  *Cf.* Reply at 30.  Instead, the Tribunal clearly treated separately, as a preliminary question, whether it considered Kazakhstan's argument that the LPG Plant could only be valued as scrap to be correct. In this assessment, it did not look at the contemporaneous bids at all; it only looked at the two webpages and the alleged further investments, arguing that Kazakhstan's argument must be wrong as otherwise, it would not have been willing to invest further in the LPG Plant. *See* Award ¶ 1745. Only once it had thereby satisfied itself that some value should be attributed to the LPG Plant, did the Tribunal decide a precise value.. *See* Award ¶ 1746.  In sum, the Tribunal failed to consider Kazakhstan's only evidence regarding the allegation of further investments into the LPG Plant, and Kazakhstan was thereby prejudiced.  *See Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985) (arbitrator's "refusal to ascribe any weight" to relevant testimony warranted setting aside the award).

[17]  For these same reasons, Kazakhstan suffered substantial prejudice under New York Convention Article V(2)(b) because the SCC's due process violations deprived Kazakhstan of its ability to appoint the arbitrator of its choice.

[18]  Petitioners' arguments with respect to the exercise of jurisdiction over Terra Raf were anticipated and addressed in the Opposition.  *See* Opp. at 58-60.

Petitioners also would incorrectly limit substantial prejudice to only those instances in which an arbitrator demonstrates a lack of independence or impartiality – the grounds listed in SCC Article 15 for challenging an arbitrator.  *Cf.* Reply at 27.  However, Petitioners do not point to a single authority that indicates that "substantial prejudice" under New York Convention Article V(1)(d) can only result from a basis identified in the governing arbitration rules for challenging an arbitrator.  Moreover, Petitioners' argument would lead to absurd results.  Just as the SCC confirmed to Kazakhstan in the prior Sudima Arbitration that it is authorized to reverse the appointment of arbitrator for reasons other than "impartiality or independence," so too does the prejudice that results from that invalid appointment support refusing enforcement under New York Convention Article V(1)(d).

## **CONCLUSION**

For these reasons, and those set forth in its Opposition, Kazakhstan respectfully requests that this Court deny the Petition to Confirm.

Dated:  May 26, 2015

Respectfully submitted,

/s/ Matthew H. Kirtland

Matthew H. Kirtland (D.C. Bar No. 456006)
matthew.kirtland@nortonrosefulbright.com
Kara L. Petteway (D.C. Bar No.  975541)
kara.petteway@nortonrosefulbright.com
Benjamin Hayes (D.C. Bar application pending)
benjamin.hayes@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
Tel:  202-662-0200
Fax:  202-662-4643

*Attorneys for Respondent Republic of Kazakhstan*