IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD., <br><br> Petitioners, <br><br> v. <br><br> REPUBLIC OF KAZAKHSTAN, <br><br> Respondent. | Civil Action No. 1:14-cv-1638-ABJ |

**RESPONDENT REPUBLIC OF KAZAKHSTAN'S
MOTION FOR RECONSIDERATION OF MAY 11, 2016 ORDER**

The Court's May 11, 2016 Order (Dkt. 36) ("Order") is based on a fundamental misunderstanding of fact and an error of law. Because of this, and because the Order also did not address the alternate basis presented by Respondent Republic of Kazakhstan ("Kazakhstan") for granting its Motion for Leave (Dkt. 32),[1] Kazakhstan respectfully requests reconsideration.

First, the Court denied the Motion for Leave based on the conclusion that evidence of the Stati Parties' fraud "would not be germane to the petition to confirm" because "the arbitrators did not rely upon" the fraud. This is factually incorrect. The $199 million valuation relied upon by the Tribunal to award damages to the Stati Parties was equally the product of the fraud perpetrated by the Stati Parties,[2] as set forth below.[3] Second, the Order is contrary to the case

---

[1] Motion for Leave to Submit Additional Grounds in Support of Opposition to Petition to Confirm Arbitral Award (Dkt. 32).

[2] Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. (collectively, the "Petitioners" or the "Stati Parties").

[3] Kazakhstan's prior papers did not provide the details set out herein regarding its fraud allegations because such details go directly to the merits and therefore were to be addressed in Kazakhstan's supplemental filing. Confirming this, the Court's Minute Order expressly stated that the briefing "should

1

law that makes clear that, in order to invoke the public policy defense under Article V(2)(b) of the New York Convention, *the alleged fraud need not be relied upon by the arbitral tribunal*. Third, the Order did not address Kazakhstan's argument that the fraud provides an independent basis to set aside the award under Article V(1)(b) of the New York Convention.

## ARGUMENT

Reconsideration of an interlocutory decision is available "as justice requires." *Bryant v. Cent. Intelligence Agency*, 818 F. Supp. 2d 153, 156 (D.D.C. 2011). This standard is satisfied where a court has "patently misunderstood the parties" or "made an error not of reasoning but of apprehension." *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quotations marks and alterations omitted). Courts in this district have reconsidered orders rooted in incomplete (or incorrect) understanding of the facts. *See, e.g.*, *Powell v. Castaneda*, 247 F.R.D. 179, 182-83 (D.D.C. 2007) (granting motion to reconsider dismissal of certain claims where the factual basis on which "the court's ruling was predicated" "did not take into account" certain evidence that required reinstatement of the claims); *DAG Enters. v. Exxon Mobile Corp.*, No. 00-cv-0182, 2005 WL 475274, at *1-2, *4 (D.D.C. Feb. 25, 2005) (granting motion for reconsideration where "the foundation of the Court's" prior order was "now in doubt"). Courts also have held that "[e]rror[s] of apprehension may include a Court's failure to consider controlling decisions or data that might reasonably be expected to alter the conclusion reached by the court." *Singh*, 383 F. Supp. 2d at 101 (quotation marks omitted). In order to obtain reconsideration, the party seeking reconsideration "must demonstrate that some harm, legal or at least tangible, would flow from a denial of reconsideration." *Loumiet v. United States*, 65 F. Supp. 3d 19, 24 (D.D.C. 2014) (quotation marks omitted).

---

be limited to the issue of whether respondent should be granted leave to file a supplemental memorandum." *See* Minute Order (4/15/2016).

**I.      The Order is Based on a Mistake of Fact:  The Tribunal's $199 Million Award for the LPG Plant was the Product of the Stati Parties' Fraud**

In denying the Motion for Leave, the Court incorrectly assumed that the "allegedly fraudulent evidence" to be presented by Kazakhstan did not relate to the $199 million award given by the Tribunal for the LPG Plant.  Order at 3.  In so doing, the Court accepted the Stati Parties' merits argument that the arbitrators declined to credit both parties' experts, and instead valued the LPG Plant based on a third-party bidding process, specifically the $199 million offer for the LPG Plant made by KazMunaiGas Exploration Production JSC ("KMG").  *See* Order at 3-4 (quoting Award ¶¶ 1746-48).  Because "the arbitrators themselves expressly disavowed any reliance on the allegedly fraudulent material" (*i.e.*, the experts' testimony and reports), the Court reasoned that it would "not be in the interest of justice to conduct a mini-trial on the issue of fraud here."  Order at 4.

The Court's assumption (and the Stati Parties' argument) is incorrect.  The evidence of fraud to be submitted by Kazakhstan ***does not*** solely relate to the expert testimony and reports that were "disavowed" by the arbitrators.  As explained below, the Stati Parties' fraud predated the submissions in the arbitration and equally infected KMG's $199 million bid.  It is precisely because this bid ***was the evidence relied upon by the arbitrators***[4] that Kazakhstan stated in its Motion and Reply that the $199 million Award resulted from the Stati Parties' fraud.  Motion for Leave at 6-7; Reply at 2.

The fraud is comprised of at least four phases.  First, the Stati Parties created falsified financial statements by using one of their related companies – "Perkwood Investments" – to materially inflate the LPG Plant construction costs.  Second, the Stati Parties failed to represent

---

[4]  *See* Order at 3 (the "'best source for the valuation [of the LPG Plant] … are the contemporaneous bids that were made for the LPG Plant by third parties … .'") (quoting SCC Award ¶ 1746).

3

to their auditors (KPMG) that Perkwood was a Stati-related party.  In so doing, the Stati Parties avoided audit scrutiny of their related-party dealings and had their falsified financial statements blessed by a major accounting firm.  Third, in 2008, the Stati Parties presented these falsified financial statements to the investment bank, Renaissance Capital, retained to manage the sale of the Stati Parties' Kazakh assets, including the LPG Plant.  On the basis of these falsified financial statements, Renaissance Capital prepared a prospectus inaccurately describing the Stati Parties' Kazakh assets (the "Information Memorandum"). This Information Memorandum was distributed among the potential bidders, including KMG.  In turn, KMG, when making the $199 million offer for the LPG Plant, expressly relied on the accuracy of the financial information provided through the Information Memorandum, which in turn relied on the falsified Stati Parties' financial statements.  Fourth, the Stati Parties relied on the falsified financial statements in the SCC Arbitration.

        **1.**        **Stati Parties Create Falsified Financial Statements**

At the heart of the Stati Parties' fraud is a company called Perkwood Investments Ltd. ("Perkwood").  Through this company, the Stati Parties created falsified financial statements that materially overstated the construction costs of the LPG Plant.  Kazakhstan now knows that Perkwood is a dormant, shell company owned and controlled by the Stati Parties.[5]

One of the documents that Kazakhstan has discovered is a February 17, 2006 contract (the "Perkwood Agreement") in which the Stati Parties had Perkwood "sell" certain of the LPG Plant equipment to Tolkynneftegas LLP ("TNG"), the Stati company that constructed the LPG

---

[5] *See* Ex. 4 hereto, ¶42 (discussed *infra*); *see also* Witness Stmt. of Artur Lungu, attached hereto as Ex. 1, ¶ 61 ("First, TNG engaged an Ascom affiliate, Perkwood Investments, to manage the acquisition of most of the equipment and Services for the LPG Plant Project."). Mr. Lungu is the Executive Vice President of Petitioner Ascom Group S.A., the leading Stati company.  His witness statement (Ex. 1) was discovered by Kazakhstan in the materials from the other LPG Plant-related arbitrations to which Kazakhstan was not a party.

Plant.[6]  The total amount shown as being "paid" from TNG to Perkwood under this contract is $191 million.  However, Kazakhstan has also now discovered that a number of the "costs" stated in this document are fictitious and/or materially overstated.  For example:

- The tranche of equipment referenced in Annex 2 of the Perkwood Agreement was "sold" by Perkwood to TNG for $93 million.  Kazakhstan now has evidence from the company that actually supplied this equipment to the Stati Parties – Tractebel Gas Engineering GmbH ("Tractebel")[7] – that the true cost of this equipment to the Stati Parties was only $34.5 million.[8]  This resulted in an overstatement of circa $58.5 million.

- The Stati Parties then double-charged another $30.9 million for this same tranche of equipment by changing its description in Annex 14 to the Perkwood Agreement, and at a time when the equipment was not even needed.[9]

In addition to the foregoing, an even simpler component of the fraud was the creation of a fictitious management fee.  In short, the Stati Parties included in the Perkwood Agreement's $191 million total price a non-existent $43 million "management fee."  The nature and existence

---

[6] The Perkwood Agreement was not disclosed by the Stati Parties during the SCC arbitration.  A true and correct copy of the English translation of the Perkwood Agreement is attached hereto as Ex. 2.

[7] http://www.tractebel-engie.com/.

[8] *See* Statement of Franjo Zaja ¶¶ 10(1), a true and correct copy of which is attached hereto as Ex. 3.  Mr. Zaja was Tractebel's senior site electrical and instrumentation engineer and was "personally involved" in the performance of the contract between Tractebel and the Stati Parties. *Id.* ¶ 3.  Under this contract, Tractebel "was the main supplier of equipment for the LPG Plant, and the components delivered by [Tractebel] constitute the core and most cost-intensive components of the LPG Plant." *Id.* ¶ 5.  The total price of the Tractebel contract, which included this LPG Plant equipment and associated services, was approximately EUR 28.38 million (equal to approximately $34.4 million). *Id.* ¶ 6.  As Mr. Zaja explains, the contract price was never varied, and Tractebel fully completed delivery by October 2008. *Id.* ¶¶ 6-7.  Mr. Zaja further explains that Tractebel "interacted with all major suppliers of the LPG Plant at an operational level" and that he never encountered Perkwood. *Id.* ¶ 9.

[9] *See* Ex. 3 (F. Zaja Statement) ¶ 10(2).

of this fee were not disclosed to Kazakhstan in the SCC Arbitration.  Rather, the fee only came to light when Kazakhstan reviewed the newly discovered materials from the LPG Plant-related arbitrations (to which Kazakhstan *was not* a party) and discovered that the Stati Parties had testified that this $43 million "management fee" consisted of intra-Stati company "mark-ups" that should be deducted to accurately determine the Stati Parties' actual investment costs in the LPG Plant:

> *Perkwood charged TNG for the equipment and services under an agreement that included Perkwood's management fee. … Those fees … must be deducted from TNG's total capital expenses reflected in its financial systems and statements, total USD 43,852,108.*

Ex. 1(Lungu Statement) ¶¶ 60-62.  Ultimately, Perkwood's "management fee" had no basis in fact, as Perkwood was a dormant, shell company at all relevant times.  This has been confirmed in a judgment by the English High Court (Justice Cooke) in proceedings arising from these other arbitrations to which Kazakhstan was not a party:

> *Ascom has asserted that it paid a management fee of over $33 million to an English company called Perkwood. An agreement has been disclosed which makes no mention of any management fee nor of any formula for calculating it. It appears from other evidence that there was a mark up on prices for equipment supplied to the LPG Plant. It appears therefore that this "fee" was simply paid at will.*

High Court Judgment ¶ 39, attached hereto at Ex. 4.[10]  Further, the English High Court went on to conclude that Perkwood's finances were fictitious and deliberately misleading:

> *The financial records of the following companies are inaccurate and misleading:*
>
> *(i) Although Perkwood was said to have charged a management [fee] of over $43 million, it filed dormant company accounts throughout the relevant period.*
> *…*
> *(iii) TNG's audited accounts for the years 2007-2009 do not disclose the fact that Perkwood was a related party.*

---

[10] This decision was only obtained by Kazakhstan after it had obtained the newly discovered materials.

6

> *(iv) No mention of the Perkwood management fee is to be found in the ECT Award [i.e., the SCC Award].*

*Id.* ¶ 42.

All of the foregoing resulted in a massive overstatement of the LPG Plant construction costs in the Stati Parties' financial records.

### 2. Stati Parties Deceive Their Auditors Regarding Perkwood's Status

The next step in the Stati Parties' fraud was to cover-up the material overstatement of LPG Plant costs by having their financial statements audited and approved. The Stati Parties accomplished this by deceiving their auditors (KPMG) regarding the fact that Perkwood *was* a Stati-related party. For example, the TNG 2007 Audited Statements identify all related parties with whom TNG is stated as having entered into transactions. Perkwood was not included on this list. This same deception was repeated in the Stati Party financial statements for 2008 and 2009. KPMG then relied on the accuracy of the Stati Parties' representations, as is confirmed in the audited financials themselves.[11] Had the Stati Parties truthfully identified Perkwood as a "related party" to their auditors, as international accounting standards require, numerous transactions between Perkwood and the Stati Parties would have been subject to strict scrutiny and the fraud, in all likelihood, could not have continued.

### 3. Stati Parties Use the Falsified Financial Statements to Generate Bids for the LPG Plant

The next step in the fraud was the Stati Parties' use of their falsified financial statements in the bidding process that generated the $199 million KMG offer. Specifically, in the summer of 2008, the Stati Parties attempted to sell some of their Kazakh assets, including the LPG Plant.

---

[11] The Stati Parties' financials are voluminous and will be provided in Kazakhstan's proposed full submission. That these statements *did not* disclose the fact that Perkwood was a related party is also confirmed in the above-quoted excerpt from the High Court Judgment. Ex. 4, ¶ 42(iii) ("*TNG's audited accounts for the years 2007-2009 do not disclose the fact that Perkwood was a related party*").

7

To organize this sale, the Stati Parties contracted with Renaissance Capital, who contacted 129 potential buyers. Eight responses were received, including one from KMG. To enable prospective buyers to price their offers, Renaissance Capital prepared an "Information Memorandum" that included key information regarding the various assets offered for sale, including the LPG Plant.[12] But as the Information Memorandum discloses, the financial information it contained—including the alleged LPG Plant investments—was derived from the financial statements of Stati companies Kazpolmunay LLP ("KPM"), TNG and Tristan Oil:

> The financial information presented in this Information Memorandum is derived from the unaudited interim combined balance sheets and statements of income, cash flows and changes in shareholders' equity of KPM, TNG and Tristan Oil, as of and for the six months ended 30 June 2007 and 2008, and the audited combined balance sheets and statements of income, cash flows and changes in shareholders' equity of KPM, TNG and, with effect from its incorporation on 24 October 2006 and Tristan Oil, as of 31 December 2005, 2006 and 2007. In addition, financial information presented in this Information Memorandum is derived from the individual interim unaudited balance sheets and statements of income, cash flows and changes in shareholders' equity of KPM, TNG and, Tristan Oil, as of and for the six months ended 30 June 2007 and 2008, and the audited individual balance sheets and statements of income, cash flows and changes in shareholders' equity of KPM [and] TNG….

Ex. 5 (Information Memo.) at 4. The Information Memorandum further stated that the financial statements prepared by management could be relied upon by potential interested parties, like KMG, because they had been audited or reviewed by reputable auditors applying International Financial Report Standards.[13]

---

[12] A true and correct copy of the relevant excerpts of the Information Memorandum is attached hereto as Ex. 5.

[13] *See* Ex. 5 (Information Memo.) at 59 ("The Companies' and Tristan Oil's financial statements have been prepared in accordance with International Financial Reporting Standards ('IFRS'). Prior to 01 January 2007, the combined and individual financial statements of Tristan Oil, KPM and TNG were audited by Deloitte. Following the best practice to change auditors periodically, the Companies and Tristan Oil changed to KPMG as auditor for the year ended 31 December 2007 and thereafter.").

It was only in reliance upon the falsified information in the Information Memorandum, including in particular the falsified LPG Plant construction costs, that KMG issued its September 25, 2008 indicative offer in the amount of $199 million (the "Indicative Offer"[14]). *See* Ex. 6 (Indicative Offer), Section F ("In formulating our Indicative Offer, we have relied upon the information contained in the Information Memorandum and certain other publicly available information. Our valuation depends upon this information and assumptions being substantiated in the next round through due diligence materials and meetings.").[15]

### 4. The Stati Parties Rely Upon the Fraud During the SCC Arbitration

Finally, the Stati Parties relied upon their fraud during the SCC Arbitration by claiming, through their expert witnesses, that the LPG Plant could be valued by reference to the KMG Indicative Offer.[16] This offer, as the Stati Parties well knew, was only made by KMG in reliance upon the falsified information provided to prospective bidders such as KMG. In addition, the Stati Parties relied upon their falsified financial statements to claim that, "[a]t minimum, Claimants' recoverable investment value for the LPG Plant is USD 245 million." SCC Award ¶¶ 1694, 1699. This $245 million number also includes the Stati Parties' falsified LPG Plant costs.

### 5. Reconsideration is Warranted

In sum, the Stati Parties utilized Perkwood to engage in transactions which resulted in falsified financial statements that materially overstated the construction costs of the LPG Plant.

---

[14] A true and correct copy of the Indicative Offer is attached hereto as Ex. 6.

[15] *See also id.*, Section C (stating that the offer "relied upon the information contained in the Information Memorandum ….").

[16] *See* Expert Suppl. Rpt. of FTI Consulting, Inc. (SCC Arbitration) (May 28, 2012) ¶ 7.5 ("Offers made by interested buyers in 2008 for buying Claimants' assets as summarized on page 106 of our previous report, valued the LPG Plant at $150 million on average. The offer made by state-owned KazMunaiGaz at that time was $199 million for the LPG Plant. Hence it is clear that the value of the LPG Plant at the 2008 Valuation Date was well in excess of its salvage value."). The FTI report is voluminous and a true and correct copy will be submitted to the Court in Kazakhstan's proposed full submissions.

9

In order to avoid the scrutiny of its auditors and to conceal this fraud, the Stati Parties misrepresented Perkwood's related-party status to their auditors. The Stati Parties then injected these falsified financial statements into the bidding process for the LPG Plant, which KMG then relied on in calculating its $199 million offer. And, KMG's $199 million valuation was expressly relied upon by the Tribunal to award the Stati Parties $199 million for the LPG Plant.

Thus, the Court's conclusion that evidence of the Stati Parties' fraud "would not be germane to the petition to confirm" because "the arbitrators did not rely upon" the fraud, *see* Order at 3, was incorrect. The Court should therefore reconsider the Order and grant Kazakhstan leave to submit the full evidence of the Stati Parties' fraud. *See, e.g.*, *Powell v. Castaneda*, 247 F.R.D. 179, 182-83 (D.D.C. 2007) (granting motion to reconsider dismissal of certain claims where the factual basis on which "the court's ruling was predicated" "did not take into account" certain evidence that required reinstatement of the claims); *DAG Enters. v. Exxon Mobile Corp.*, No. 00-cv-0182, 2005 WL 475274, at *1-2, *4 (D.D.C. Feb. 25, 2005) (granting motion for reconsideration where "the foundation of the Court's" prior order was "now in doubt").

## II. The Order is Based on a Mistake of Law: Fraud Need Not Be Outcome-Determinative Under Article V(2)(b) of the New York Convention

The Court's conclusion that evidence of the Stati Parties' fraud "would not be germane to the petition to confirm" because (in the Court's mistaken view) "the arbitrators did not rely upon" the fraud, s*ee* Order at 3, is also legally incorrect. Federal courts of appeals have held that, to deny enforcement of an arbitral award under the New York Convention on the basis of fraud, ***"[i]t is not necessary to establish that the result of the arbitration would have been different if the fraud had not occurred."*** See *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306-07 (5th Cir. 2004) (emphasis added); *see also Morgan Keegan & Co. v. Garrett,* 495 F. App'x 443, 447 (5th Cir. 2012) (quoting *Karaha*

*Bodas*, 364 F.3d at 306-07); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (holding that the fraud must materially relate to an issue in the arbitration, but this "element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred"). *Cf. ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 929 (N.D. Ill. 2012) (cited by the Stati Parties) (examining whether evidence was "central" to the arbitrators' ruling).

Thus, contrary to the Court's conclusion, the evidence of the Stati Parties' fraud is "germane to the petition to confirm," whether or not the arbitral tribunal relied on the fraud. As such, the Court's legal reason for denying the Motion to Leave was erroneous. This error is even more acute here since (as explained above) the Tribunal's $199 million valuation of the LPG Plant *was* the product of the Stati Parties' fraud. The Court should therefore grant Kazakhstan's motion for reconsideration. *See Singh*, 383 F. Supp. 2d at 101 (reconsideration warranted when "Courts fail[] to consider controlling decisions or data that might reasonably be expected to alter the conclusion reached by the court") (quotation marks omitted).

### III. The Order Did Not Address Kazakhstan's Alternate Argument: The Fraud Provides an Independent Defense Under Article V(1)(b) of the New York Convention

As set forth in Kazakhstan's Motion and Reply, the Stati Parties' fraudulent evidence gives rise to two additional grounds for non-confirmation of the SCC Award. First, the SCC Award is contrary to the public policy of the United States on account of fraud in the underlying arbitration proceedings. N.Y. Convention, Art. V(2)(b); *see also* Mot. for Leave at 4, 6–7. Second, Kazakhstan was denied the opportunity to present its case. N.Y. Convention, Art. V(1)(b); *see* Mot. for Leave at 5. While Kazakhstan was "afforded the opportunity to, and did, present its case concerning the value of the LPG Plant," Stati Opp. at 9, Kazakhstan's case over

the duration of the arbitration was, by definition, a response to *fraudulent evidence*. *Cf. Karaha Bodas*, 364 F.3d at 306 ("an arbitration award is not fraudulently obtained when the protesting party had an opportunity to rebut his opponent's claims at the hearing"). Had the Stati Parties not engaged in their fraud, and instead made truthful representations regarding the construction costs of the LPG Plant as well as other material facts, Kazakhstan's defense would have materially changed. Instead of boxing shadows for five years, Kazakhstan would have been able to present its case on the true facts. The Stati Parties' fraud denied Kazakhstan this opportunity, and resulted in a $199 million award for the Stati Parties.

Both of these defenses are directly relevant to the arbitrators' award of $199 million for the LPG plant, which represents more than 40 percent of the total award. The Court's Order, however, did not address Kazakhstan's Art. V(1)(b) basis for seeking leave to submit evidence of the Stati Parties' fraud. This too provides grounds for reconsideration.

\* \* \* \* \* \*

In light of all the above, it is clear that the reconsideration criteria are satisfied: the Order is expressly grounded on a rationale which is factually incorrect and legally incorrect. The Order also considered only one of the defenses Kazakhstan intended to use the evidence to support. Kazakhstan will unquestionably be harmed if it is not afforded the opportunity to prove additional grounds for non-confirmation of the SCC Award, and a $500 million fraudulently obtained award is enforced against it.

It also would be fundamentally unfair for the Court to deny Kazakhstan the ability to brief additional grounds for non-confirmation of the SCC Award based on the newly acquired

evidence of the Stati Parties' fraud.[17] Kazakhstan must be permitted an opportunity to set forth, in detail, the merits of its position—which the prior briefing regarding leave to file was not intended to address. *Cf.* Minute Order (4/15/2016). A "mini-trial," Order at 4, will not be required to adjudicate Kazakhstan's additional grounds. The Stati Parties' fraud will be evident on the written evidence that Kazakhstan will submit to the Court. However, even if in-person proceedings other than oral argument were required, the Court can narrowly tailor any such proceedings to avoid any prejudice to any party. In any event, the *possibility* that in-person proceedings other than oral argument are required, would not be grounds to deny a sovereign state from presenting all grounds available to it under U.S. law to defend against enforcement of a nearly $500 million dollar international arbitral award.[18]

---

[17] *Accord Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 384-85 (3d Cir. 1996) (affirming district court Rule 60(b)(3) order granting new trial based on evidence, discovered after trial, proving "patent inconsistenc[ies] between [party's] trial testimony and arbitration" where the misrepresentation was "crucial" to the case); *Canady v. Erbe Elektrmedizin GmbH*, 99 F. Supp. 2d 37, 44-49 (D.D.C. 2000) (Urbina, J.) (granting Rule 60(b) motion where defendant withheld non-privileged documents that were clearly responsive to discovery requests and might have enabled the plaintiff to survive summary judgment). *See also Bonar*, 835 F.2d at 1383 n.8 ("The standard for determining whether a party should be relieved of a final judgment under 60(b)(3) is nearly identical to the standard for determining whether an award should be vacated for fraud under § 10(a).").

[18] *Accord Middle Atl. Utils. Co. v. S.M.W. Devel. Corp.*, 392 F.2d 380, 386 (2d Cir. 1968) (reversing denial of leave to amend: "The burden of further discovery and motions is not a satisfactory basis to deny the motion to amend" since they can "be regulated and controlled by the trial court").

## **CONCLUSION**

For the foregoing reasons, Kazakhstan respectfully requests that this Motion be granted and that, as previously requested, it be granted leave to file its supplemental brief on or before June 10, 2016. A proposed order is attached.

Dated: May 18, 2016                  Respectfully submitted,

/s/ Matthew H. Kirtland

---

Matthew H. Kirtland (D.C. Bar No. 456006)
matthew.kirtland@nortonrosefulbright.com
Kara L. Petteway (D.C. Bar No. 975541)
kara.petteway@nortonrosefulbright.com
Benjamin Hayes (D.C. Bar No. 1030143)
benjamin.hayes@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
799 9th Street, NW
Washington, D.C. 20001
Tel: 202-662-0200
Fax: 202-662-4643

*Attorneys for Respondent Republic of Kazakhstan*