**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI;  ) | |
| ASCOM GROUP, S.A.; TERRA RAF TRANS ) | |
| TRAIDING LTD.,                                       ) | |
|                                                               ) | |
|                 Petitioners,                           ) | |
|                                                               ) | |
|         v.                                                  ) | Civil Action No. 1:14-cv-1638-ABJ |
|                                                               ) | |
| REPUBLIC OF KAZAKHSTAN,              ) | |
|                                                               ) | |
|                 Respondent.                           ) | |
|                                                               ) | |

**RESPONDENT REPUBLIC OF KAZAKHSTAN'S**
**MOTION FOR RECONSIDERATION OF MAY 11, 2016 ORDER**

# EXHIBIT 1

UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

IN THE MATTER OF

**ASCOM GRUP S.A.**

**Claimant**

v

**VITOL FSU B.V.**

**Respondent**

---

### WITNESS STATEMENT OF ARTUR LUNGU

---

1.  My name is Artur Victor Lungu.  I am the Executive Vice President of Ascom Grup S.A. ("Ascom"), the Claimant.

**Background**

2.  Ascom and its affiliate Terra Raf Trans Traiding Ltd ("Terra Raf") were the 100% owners of two Kazakh oil and gas companies, Kazpolmunay LLP ("KPM") and Tolkyneftegaz LLP ("TNG") until the expropriation of those companies and their assets by the Government of Kazakhstan in July 2010.  Among those assets, KPM and TNG held hydrocarbon licences with respect to the Borankol and Tolkyn oil and gas fields, and Tabyl exploration block in Kazakhstan.

3.  I joined Ascom in 2005, starting out in a junior role as a financial analyst.  In that capacity, I worked on different projects.  My role with respect to the LPG Plant Project which is the subject of these proceedings was initially fairly limited and other members of the Ascom team, including Mr Stati, Mr Bastovoi (Ascom's former Vice President) and Mr Maniakov (Ascom's former Marketing Director) took the lead role from Ascom's side in devising and setting up the project. However, my role grew over time, and by early 2008, I had substantial involvement in Ascom's relationship with

025

the Respondent, Vitol FSU BV ("Vitol FSU") and the commercial aspects of the LPG Plant Project.

**The Early Stages of the LPG Plant Project**

4.    TNG operated the Tolkyn field, which primarily produced natural gas and condensate. KPM operated the Borankol field, which primarily produced oil but also produced some associated natural gas.  Additionally, TNG held an exploration license for several structures neighbouring the Tolkyn field (Tabyl, Munaibay, and Bhayt), which had potential for significant oil and/or natural gas discoveries.

5.    TNG's gas production was historically sold locally in the Kazakhstan market at a heavily discounted price.  TNG's ability to export gas through international pipelines was highly restricted due to certain policies of the Kazakh government.  Among the options for acquiring a higher and more attractive price for the gas was to extract liquefied petroleum gas products from the gas stream, which could be exported by railcar and sold at higher international market prices.  Therefore, beginning around 2003, Ascom and its affiliates conceived of a project to construct and develop a liquefied petroleum gas processing facility to extract LPG products (propane, butane and pentane plus) from the gas stream.

6.    In 2004, Ascom and its affiliates entered into discussions with Vitol FSU and its affiliates with a view to forming a strategic alliance with a particular focus on Ascom's activities in Kazakhstan.  The alliance was to include the sale by Ascom to Vitol of TNG's and KPM's oil and condensate production via two off-take agreements (the TNG COMSA and the KPM COMSA, respectively) as well as a joint venture to construct and operate a liquefied petroleum gas processing plant in Kazakhstan (i.e. the LPG Plant Project).  The LPG Plant was to be fed principally from TNG's Tolkyn field operations in Western Kazakhstan, but also would have had the capacity to process gas from the Borankol field and TNG's exploration blocks, as well as gas from third parties who operated other fields in the region.

7.    As set out above, my involvement in the initial discussions regarding the project was limited and, in particular, I did not attend the parties' meetings in Gleneagles and Val

026

D'Isere in 2004 and 2005, respectively, at which the Project was first conceived. However, I attended a meeting on 20 September 2005 in Chisinau at which the parties agreed on a financing structure for the LPG Plant. I was aware in general terms of what had been discussed between the parties at the earlier meetings.

8.  As the minutes of the September 2005 meeting record,[1] the parties' participation in the real cost of the LPG Plant was to be on a 50:50 basis. That split was not the subject of negotiation or debate between the parties at the meeting in September 2005, as it had already been discussed and agreed at prior meetings. Instead, the focus of the September 2005 meeting was the means by which Vitol FSU would advance its 50% share of the cost of the Project and secure that investment. For a number of reasons, Vitol could not take direct security in the Plant itself and a classic joint venture model, as initially envisaged by the parties, was therefore not possible. Those reasons included Kazakh tax regulation, which would have made the Project un-economic if we used a classic joint venture model, as well as the terms of Ascom's existing Kazakh financing with KKB.[2] These difficulties are mentioned in the proposed structure for the Project which Ascom prepared for the parties' September 2005 meeting.[3]

9.  The solution reached at the September 2005 meeting was for the parties to adopt a "virtual" or "unincorporated" joint venture. TNG would own the LPG Plant, but the parties would participate equally in the costs and profits of the Project through a joint operating agreement (the "JOA"), under the terms of which a joint management committee with oversight over the Project would be put in place. The parties agreed that they would each make an initial equity contribution to the project of USD 20 million and they would advance the balance of their respective 50% cost commitments via debt.

10. In Vitol FSU's case, its required debt investment would be advanced by means of prepayments by its affiliate Vitol SA under the TNG COMSA, an agreement which was

---

[1]    C-9.
[2]    As discussed and defined in the SOC at ¶34.
[3]    C-149.

also under discussion at the time. Under that structure, Vitol SA would pay in advance for future deliveries of oil and condensate by TNG, and its prepayments would be secured against future deliveries. That concept was intended to give Vitol security in the event that Ascom or its affiliates breached their obligations under the JOA, for example by encumbering the LPG Plant without Vitol's consent, since Vitol could not own the plant or take a security interest in the plant for the reasons mentioned above. The parties agreed at the September 2005 meeting that they would ultimately recoup their respective investments in the LPG Plant from their respective 50% shares in the profits of the plant, with those profits being applied first to pay off the parties' respective debt contributions.

11. The parties' discussions in this regard resulted in the TNG COMSA, which was executed in January 2006,[4] and the JOA, which was executed in June 2006.[5] Both of those agreements were drafted by the international law firm, Salans. To the best of my recollection, Salans did not enter a formal engagement to advise Ascom at the time, either in its capacity as an independent entity or as a member of the proposed virtual joint venture. Further, Ascom did not make payment to Salans for any services rendered during this period (nor were such charges assumed as part of the LPG Project costs). I therefore consider that Salans represented Vitol's interests during the negotiation of the TNG COMSA and the JOA.

12. Once the JOA was executed, Ascom and Vitol FSU each made their respective equity contributions to the LPG Plant Project of USD 20 million. The parties then proceeded to provide the balance of their 50% share of the costs of the Project by means of debt financing. In Ascom's case, its obligations were fulfilled initially via financing from its KKB loans and subsequently (from 2007 onwards) from funds raised on the market by the issuance of notes by its affiliate Tristan Oil. In Vitol FSU's case, as discussed above, it fulfilled its obligations by sums advanced by Vitol SA under the TNG COMSA.

13. In practice, this meant that Vitol FSU had to ensure that the prepayment level under the TNG COMSA was kept at a level equal to the difference between its 50% share of

---

[4]     C-12.
[5]     C-15.

the LPG Plant costs and its initial USD 20 million contribution.  Therefore, as the investment costs increased, Vitol FSU had to ensure that the outstanding prepayment amount under the TNG COMSA was increased in line with its 50% share.  The Vitol Group's internal policies required that Vitol entities limit their exposure under any one trading agreement; thus, the various increases in Vitol's prepayment limit under the TNG COMSA required internal approvals from Vitol.  The prepayment amount under the TNG COMSA was initially capped at USD 20 million.  Over time, and as the costs of the LPG Plant Project were incurred, Vitol SA executed amendments to the maximum prepayment limit so that Vitol FSU could fulfill its financing obligations under the JOA. Thus, reflecting the progress of the Project and its cost, by the Summer of 2009 the maximum pre-payment limit under the TNG COMSA had been raised to USD 80 million.

**The Parties' Relationship in 2008**

14.    In early 2008, Mr Stati wrote to Mr Taylor, the CEO of the Vitol Group, with respect to an increase in the costs of the Project.[6]  It was around the time of this letter that I became more involved in the commercial aspects of Ascom's relationship with Vitol. Although I never formally became a member of the JMC which operated pursuant to the JOA, shortly after Mr Stati's letter, I travelled to London in February 2008 to attend a JMC meeting which was called as a result of that letter.[7]

15.    Mr Stati's letter had advised Vitol of an increase in the costs of the Project compared to the parties' original estimates.  So far as I am aware, the JMC did not devise a detailed or sophisticated budget for the Project at the outset, and the early estimates for the costs of the Project were fairly basic.  It was therefore not so much a question of the costs of the Project increasing over time as of the true costs of the Project becoming apparent with time.  In 2007, the JMC had become aware of the likely customs/VAT charges applicable to equipment imports into Kazakhstan, which had resulted in an increase to the initial estimated Project costs.  The costs under discussion at the meeting in early 2008 related to the conclusion of contracts for

---

[6]    C-28.
[7]    C-29.

- 5 -

029

works and services with Project sub-contractors. These costs were greater than the parties had anticipated for various reasons, including high services and equipment costs and high interest rates which had resulted from the market upturn in 2007.

16. I recall that the atmosphere at the JMC meeting in early 2008 was pleasant. Although neither party was happy that the costs of the Project were greater than anticipated, we took the Vitol members of the JMC through the relevant contracts, and they were satisfied with the reasons why the costs were higher than anticipated.

17. Ascom also asked Vitol to make further equity contributions to the Project at the JMC meeting in February 2008.[8] Ascom was concerned that the TNG COMSA would be unsuitable in the long term as Vitol's means of financing the LPG Plant Project. The TNG COMSA was unsuitable in particular because of the need for amendments to the prepayment limit under the TNG COMSA each time greater investment under the JOA was required, and the time it took for Vitol's internal approval of each amendment. In addition, TNG was carrying the burden of the shortfall which existed at the time between Vitol's contribution to the Project and its 50% of the overall Project cost. However, Vitol wanted to continue to advance its 50% share of the LPG Plant investment by way of debt because it did not have a direct interest in the Plant and therefore wanted an alternative means of security. Ultimately, it was agreed at that meeting that Vitol would come back to Ascom with a proposal as to how it would fund the shortfall in its 50% investment share.

18. Mr Taylor wrote to Mr Stati later the same month.[9] The letter refers to a misunderstanding which, to the best of my recollection, arose from Mr Stati's frustration with Vitol's reluctance to advance its required investment in the LPG Plant in the form of equity and its insistence on continuing to use the TNG COMSA as the mechanism for its share of its debt investment. In his letter, Mr Taylor in any event confirmed Vitol's full commitment to the Project and to maintaining its required equal contribution to the overall financing of the Project.

---

[8]   C-29.
[9]   C-31.

19. Vitol became more actively involved in technical aspects of the Project during spring and summer of 2008 and its JMC members attended meetings in Kazakhstan and conducted site visits to the LPG Plant on a number of occasions throughout that period.[10]

20. Vitol continued to provide its required share of the financing for the LPG Plant Project via the TNG COMSA mechanism despite Ascom's reservations about that mechanism and its cumbersome nature.  In this regard, Vitol FSU wrote to Ascom in June 2008 providing assurance that if the TNG COMSA mechanism became unsustainable (in particular due to a fall in the price for Brent to which the maximum prepayments were by that stage to be pegged) and the prepayments became insufficient to meet the costs of the Project, it agreed to *"satisfy its financing obligations under the JOA by allocating amounts from other revenue streams or resources"*.[11]  Thus, Vitol FSU acknowledged that while the TNG COMSA was its preferred mechanism for funding its share of the construction costs, its obligation to fund half of the costs of the Project through the TNG COMSA or some other mechanism was unconditional.

21. Also during this period, Ascom made the decision to explore a sale of its and its affiliates' Kazakh assets.  Ascom had by that time acquired other oil and gas interests, in particular in Kurdistan, which it wanted to pursue.  In addition, oil prices were very high in the summer of 2008, so it was a good time to sell the Kazakh assets.  We therefore took the commercial decision to seek to liquidate Ascom's Kazakh assets to free up funds for purposes of other projects.  The sale was to be facilitated by Renaissance Capital, which issued a teaser to a number of potential purchasers in July 2008.[12]  Ascom received a number of indicative offers for its Kazakh assets as a result of this process in late September 2008, including from the Kazakh State oil company KazMunaiGas, though none of the indicative offers met with our approval.[13]  Moreover, the sharp decline in oil prices that began in July 2008 amid the emerging global recession made it a less attractive time to sell the Kazakh assets by the time we

---

[10]   C-102 to C-104; C-106; C-108 and C-114.
[11]   C-35.
[12]   C-105; C-107 and C-150.
[13]   C-57 and C-110 to C-112.

received the indicative offers. For this reason, we did not at the time proceed with an intended second phase of the sale process, which would have involved the opening of a data room and a binding bid phase, although the idea of selling the Kazakh assets remained a live one.

22.    By October 2008, the rapid decline in oil and gas prices heightened Ascom's concern about the unsuitability of the TNG COMSA as a financing vehicle for Vitol's 50% share of the LPG Plant Project costs, because the prepayment limit in that COMSA was tied to the price of oil. Despite Vitol's assurance in June 2008 that it would meet its financing obligation through another mechanism if the TNG COMSA proved inadequate, Vitol's unwillingness to propose a viable alternative for the fulfilment of its obligations under the JOA led Ascom to question Vitol's commitment to the Project and the parties' relationship.

23.    In October 2008, the 4-month average of dated Brent fell below US$85 per barrel. The then prepayment limit of US$ 70 million under the TNG COMSA was subject to that average remaining above US$85 and a further amendment under the TNG COMSA mechanism was therefore necessary for Vitol FSU's 50% contribution to the LPG Plant Project to be maintained.

24.    For these reasons, Ascom decided to seek legal support and retained Bulboaca (a Romanian firm) and Lovells.[14] Members of both law firms attended the next key meeting I attended with Vitol in London in October 2008.[15] Vitol was represented by Salans at the meeting. The tone of the meeting was more careful and formal than past meetings had been and I think Vitol's team were surprised that we had elected to bring lawyers.

25.    Our main aim at the October meeting was to gain clarity regarding the timing and means of Vitol FSU's financing of its share of the LPG Project under the JOA. As oil prices continued to drop, Vitol FSU's use of the TNG COMSA through Vitol SA as its

---

[14]    For the avoidance of doubt, by making reference to Ascom's retention of these lawyers I do not waive privilege over advice given by them to Ascom. Instead, I refer to Ascom's instructing lawyers as it was an indication at the time that the parties' relationship had become quite strained.
[15]    C-38.

investment vehicle was becoming more problematic.  Historically, when oil prices were high and the global economic situation was good, although cumbersome the mechanism did not pose a serious problem, as we had substantial cash assets from which we could cover any shortfall in Vitol's 50% share of the costs until an amendment could be issued.  However, we were now in a position where our liquidity was decreasing, and we needed certainty from Vitol FSU that it would both respect its 50% investment obligation and ensure that its investment contribution was provided in a timely manner.  We did not want to wind up in the position (as ultimately happened) of having to revert to Vitol SA every month or so for a further amendment to the TNG COMSA with respect to finance that Vitol FSU was obliged to invest under the JOA in any event.  However, as I have mentioned, our financial situation was becoming difficult.  This meant that the scope for us to be aggressive and refuse Vitol's proposals and conditions regarding its financing contributions was limited.  The reality was that Vitol possessed the vast majority of the commercial leverage and it deployed this leverage throughout our discussions.

26.   We tabled a number of discussion points at the October meeting, which included hypothetical scenarios based on the proposed sale of Ascom's Kazakh assets and what was known as the Ridley transaction.  The latter was a proposal which had existed at the outset of the Project when the parties had contemplated a more traditional joint venture model and contemplated using a company called Ridley for that purpose.  Ultimately the meeting resulted in Vitol SA agreeing to execute a 3-month waiver under the TNG COMSA and Vitol FSU agreeing to review its position and revert to Ascom with proposals as to how it could provide its share of the Project finance other than via that mechanism.  This was not what we wanted but given Ascom's financial position, we had little choice.

27.   Despite agreeing to do so, Vitol did not revert to us with a proposal following the October meeting.  Our concern about the position with them and the differences

between the parties continued to grow as a consequence. This is reflected in Mr Stati's and Mr Taylor's letters of December 2008.[16]

### Kazakhstan's Harassment Campaign

28.   The difficulties with Vitol were particularly worrying because around the same time (beginning in October 2008) Kazakhstan commenced its concerted campaign of harassment and coercion against TNG and KPM, which ultimately led to the outright expropriation of those companies and their assets. Between October 2008 and July 2010, that campaign included:

   a.   numerous false accusations of wrongful conduct, including a leak to the financial press in 2008 accusing Terra Raf of fraud in the acquisition of TNG, and claiming that the Kazakhstan government therefore had a pre-emptive right to acquire TNG;

   b.   unfounded criminal charges;

   c.   a lengthy criminal prosecution and the ultimate jailing of KPM's General Director (who was first interrogated in December 2008, subsequently arrested in April 2009 and ultimately jailed in September 2009 on the basis of spurious allegations that KPM was operating a "main" pipeline without a licence);

   d.   a monetarily debilitating criminal fine against KPM (of USD 145 million, again in connection with the alleged un-licenced operation of a "main" pipeline);

   e.   a similar investigation of TNG for allegedly operating a "main" pipeline without a license, and a threat to bring similar charges and impose comparable fines against TNG;

   f.   seizure of KPM's and TNG's assets and bank accounts; freezing of both companies' equity interests (from April 2009);

---

[16]   C-43 and C-151.

g.    intrusive and unwarranted tax and State-agency audits (which continued off
       and on from November 2008 until July 2010);

h.    the imposition of exorbitant and illegal taxes and fees; and

i.     the arbitrary reversal of decisions previously taken by State agencies with
       respect to the companies' exploration rights and licences.

29.    I believe these actions by Kazakhstan beginning in October 2008 were undertaken to
       prevent us from selling TNG and KPM to a non-Kazakh third party and to gain ultimate
       control over the LPG Plant and the licences and other assets of TNG and KPM.
       KazMunaiGas had been contacted as a potential buyer in the preliminary sale process
       we engaged in earlier the same year and had tendered an indicative offer (of $754
       million). The Kazakh Government therefore knew of our intention potentially to sell
       these assets. Our belief is that Kazakhstan was intentionally trying to undermine the
       marketability and value of the assets by saddling TNG and KPM with monetary
       liabilities and other problems – a strategy frequently employed by the Kazakh state
       against foreign investors in recent years. These matters are the subject of a separate
       arbitration against the Kazakh Government. In any event, these problems, coupled
       with the worsening financial outlook in the energy sector, meant that we needed
       Vitol to behave like the committed long-term partner that it had agreed to be, in
       keeping with its commitments under the JOA, at precisely the point when it started to
       give us cause for doubt about whether it would meet its obligations.

**Developments in early 2009**

30.    Kazakhstan's harassment campaign and the market downturn put pressure on Ascom
       and its affiliates' Kazakh businesses in late 2008 and early 2009. In late 2008, we
       conducted detailed negotiations with Credit Suisse for a bridge loan to provide
       additional working capital in connection with our decision to put the Kazakh assets on
       the market. On 5 December 2008, Credit Suisse sent us a term sheet for a US$150-
       175 million facility, giving us every indication that they were ready to close the loan.
       Then on 18 December 2008, Credit Suisse sent me a press release from the Kazakh
       Ministry of Energy and Mineral Resources ("MEMR") which referred to Kazakhstan's

- 11 -

arbitrary decision to reverse a prior decision waiving pre-emptive rights it held for purposes of an intra-group transfer of TNG (from an Ascom subsidiary to Terra Raf) and spuriously accusing TNG of fraud and forgery. We had follow-up discussions with Credit Suisse, who informed us that they would not provide the bridge loan until we resolved our disputes with the Kazakh Government.

31. The actions of the Government of Kazakhstan were therefore already having a significant impact on Ascom's financial position in early 2009. This was further worsened by steps taken by Kazakhstan to choke off TNG's access to gas markets such that TNG was forced to reduce gas production by 26% in March 2009.

32. We kept Vitol aware of all these difficulties and developments and, in fact, made a proposal to Vitol in January 2009 for Vitol to provide us with the bridge financing we needed.[17] Vitol did not agree to provide the financing. Our only clear option was to sell our Kazakh assets. Therefore, in January 2009, we decided to re-visit the sale process and proceed to the second binding bid phase which we had not pursued the previous autumn. Renaissance Capital contacted a number of the parties who had previously been interested in purchasing the Kazakh assets and in mid-February 2009 those companies were given access to an electronic data room containing documents relating to TNG's and KPM's geological and operational data. The interested companies included international oil majors such as Total and KNOC and initially the signs were promising that we would identify a purchaser.

33. Ultimately, all of the bidders that were of interest to us withdrew from the process, in our view because the Kazakh authorities discouraged the purchasers in question from pursuing a bid (either directly, or indirectly through the harassment campaign that made the companies appear highly troubled). This belief was further heightened when KazMunaiGas, the Kazakh State oil company, to whom we had opened the data room asserted in June 2009 and again in November 2009 that our equity in the Kazakh assets had a market value of zero and made offers respectively of USD 50 million and USD 20 million for them. Bearing in mind that we had received indicative offers in excess of USD 1 billion less than a year previously (including an indicative

---

[17]     C-115.

offer from KazMunaiGas of $754 million), KazMunaiGas's "firesale price" offers of mid and late 2009 were incredible.

34. Ascom was therefore in a very challenging position in the first half of 2009. The Kazakh Government's intention ultimately to seize TNG and KPM was abundantly clear. We knew that the sudden onslaught of inspections, accusations, tax audits, and criminal charges were a page out of Kazakhstan's "playbook" for expropriation or a forced sale to the state at firesale prices. Moreover, regardless of the Kazakh Government's ultimate intention, its assertion of a pre-emptive right over TNG, its assessment of massive back tax liability and penalties against TNG, and its threat of criminal prosecution and a massive fine against TNG for operating a main pipeline, put all of TNG's assets (including the LPG Plant) at substantial risk of attachment and seizure. Therefore, by March 2009, we had no choice but to halt construction of the LPG Plant. Continuing to invest in a plant that the Kazakh Government was evidently targeting for seizure, and that Ascom was actively trying to sell in order to escape the hostility of Kazakhstan, would have been irresponsible.

35. I note that Mr Taylor wrote to Mr Stati complaining about this decision in March 2009.[18] He alleged that the decision to halt construction was a breach of the JOA and complained that it should have been referred to the JMC. For a number of reasons, I do not agree with that allegation. First and foremost, as I have already explained, Ascom's and TNG's situation was by then impossible, and they could not have been reasonably expected to continue with the construction of the Plant in such circumstances. Secondly, Vitol was fully aware of our difficulties. Kazakhstan's actions were very public and Vitol was in any event well-connected with the Government. Moreover, by taking the position that it had with respect to the TNG COMSA mechanism, Vitol exacerbated our difficulties. At a time when we needed a strong partner, Vitol abandoned the parties' original goal and took a self-serving approach of protecting its own interests at all costs.

36. In any event, Vitol did not pursue the allegation that Ascom had breached the JOA by enacting its JMC deadlock provisions or seeking termination of the agreement.

---

[18]   C-44.

Instead, Mr Stati responded to Mr Taylor by requesting an urgent meeting of the parties in London and Mr Taylor agreed to such a meeting.[19] We circulated an agenda to Vitol shortly before the meeting, which included the approval by the JMC of the decision to suspend work on the LPG Plant.[20]

37. At the time of the meeting in London in April 2009, a number of issues were forefront in our minds. First, a sale of the Kazakh assets to Total or another purchaser remained an option. Secondly, forthcoming financial commitments were starting to press on us. A payment of USD 32 million in Kazakh "excess profits" tax (which was a legitimately-imposed tax, but was nonetheless a hardship in light of the recession and our inability to obtain bridge financing after the MEMR's leak to the financial press in December 2009) was due from TNG to the Kazakh authorities at the end of April 2009. In addition, a payment of USD 22 million to the Tristan Oil note-holders was due at the end of June 2009. The imbalance in the commercial leverage that had been present at previous meetings was therefore even greater. As described below, Vitol recognised this and adopted a hedge approach in the sense that it sought both to decrease its financial exposure in the Plant (hedging against an expropriation) but at the same time encouraging us with respect to a sale (hoping for a 50% return on any sale). At the meeting in London in April 2009, consistent with its hedge both ways approach Vitol seemed supportive of the sale process and offered to assist with it. We agreed that work on the LPG Plant would be suspended, but that a certain minimum of payments would be made to Project contractors to ensure that construction on the Plant (which, by this stage, was substantially complete) could be resumed relatively easily. Vitol clearly had no real intention of terminating the JOA. Instead Vitol wanted to see if it could get its 50% share through a sale, but at the same time reduce its financial exposure so that if there was no sale and there was an expropriation, it would be in the best possible position.

38. On this latter point, as we had feared for some time, using its overwhelming commercial leverage and the TNG COMSA waiver mechanism, Vitol began to dictate terms to us with respect to financing obligations. This manifested itself following the

---

[19]   C-45 and C-120.
[20]   C-121.

April 2009 meeting when Vitol SA executed a waiver which meant that the prepayments were maintained at the limit required of Vitol FSU under the JOA (*i.e.* USD 80 million, which, together with Vitol's equity contribution of USD 20 million, amounted to 50% of the Plant cost). However, this waiver was only for three months and the implicit threat that Vitol FSU would renege on its JOA commitments (thus recouping its investment in the Plant illegitimately) and allow the waivers to lapse was by now clear. We remained very unhappy about the situation and viewed the approach of a 3-month waiver as a breach of the JOA because Vitol FSU's obligation was an unconditional obligation to invest 50%, not temporary or limited by time obligation that would elapse within 3 months.

39.   In June 2009, we in part resolved our immediate liquidity issues by obtaining bridge financing from Renaissance Capital in the form of the "Laren" loan facility. The terms of the Laren facility were not good and included an interest rate of 35%, but it was all we could acquire at the time because of the substantial risks posed by Kazakhstan's harassment campaign, which by that time included (as mentioned already) Kazakhstan's reversal of its pre-emptive rights decision, its freezing of Terra Raf's and Ascom's equity interests in TNG and KPM, criminal proceedings against KPM, criminal allegations against TNG, and the imposition of alleged corporate back taxes and the choking off of our access to gas markets.

40.   Several things came to a head in June 2009:

a.   although TNG had continued to deliver condensate to Vitol under the TNG COMSA throughout May and June, Vitol SA had stopped making payment for those deliveries, which meant that the prepayment amount had substantially reduced. We regarded this to be a direct breach by Vitol FSU of its investment obligations.

b.   the Laren facility sums were paid to us and we applied them to the back-tax payments due to the Kazakh authorities;

039

    c.    however, part of the Laren facility sums was swallowed by our overdraft facility which our Latvian bank then cancelled so we had a shortfall on the amount we needed to meet the coupon payment to the Tristan noteholders.

41.    We therefore reverted to Vitol asking that they make payment for the May and June condensate deliveries as well as a part advance payment against the July deliveries. Vitol complained about the "dilutive effect" of the additional finance we had obtained.[21]  This was a point with which we did not agree and which we did not entirely understand.  However we were in dire straits.  In exchange for making the requested payments, Vitol insisted we sign a protocol.[22]  As can readily be seen, this document was entirely one-sided and we vehemently disagreed with it at the time. In particular, point 2 suggested that Vitol SA was entitled to draw down the prepayment level under the TNG COMSA without putting Vitol FSU in breach of the JOA. In addition, point 5 sought to impose a wide range of onerous obligations on us. For that reason, I sought to amend these two points by deleting the obligations in points 5 and by specifying in point 2 that the draw-down of payments under the TNG COMSA would result in a commensurate buying back of Vitol's 50% share in the LPG Plant.[23]  These changes were refused by Vitol.  Given the duress that we were under and the fact that we did not regard this protocol to be a legally binding amendment or variation to the JOA, we had no choice but to accept Vitol's position.  In particular, not accepting Vitol's position would have meant defaulting on the payment to the Tristan Oil note-holders (which would have put the very survival of the Ascom Group in peril).

**Developments in the second half of 2009**

42.    Mr Stati wrote to Mr Taylor in August 2009 to voice some of our long-held complaints against Vitol.[24]  By this stage, we had paid the Tristan Oil note-holders and therefore some of the pressure on us was off and we felt able to voice our disagreement with Vitol's position.  Mr Stati referred in his letter to the imposition of the June 2009

---

[21]    C-125 to C-127.
[22]    C-47.
[23]    C-128.
[24]    C-48.

protocol. He also referred to an offer Mr Taylor had made for the Ascom Group's Kazakh assets in or around July 2009. This was a very low offer made during a dinner between the two company principals. Although relationships between the two parties had been strained for some time now, it was this offer which first caused Mr Stati and the Ascom Group to consider that beyond hedging its position as described above, Vitol was going a step further and actually seeking to profit (beyond a 50% interest in the Plant) from our difficulties with the Government of Kazakhstan.

43. In addition, Mr Stati's letter referred to a leak of confidential information. This arose because of a very strange meeting I had with a representative of a potential buyer for our Kazakh assets named Starleigh. At the meeting, the representative claimed to have been given information by Vitol in relation to our assets. He knew the status of the joint venture balance sheet under the JOA and also knew about Vitol's use of the COMSA prepayments to fund its required investment share under the JOA. We later learned that Starleigh was owned and controlled by the head of KazMunaiGas and son-in-law of the President of Kazakhstan, Timur Kulibayev, who essentially controlled Kazakhstan's energy sector.

44. Mr Stati's letter also included a threat to cease delivery of condensate under the TNG and KPM COMSAs. Although our preference was to continue to deliver to Vitol given that the alternative was to sell on the domestic market at much lower prices, we meant this threat. We considered the Vitol to be in breach of its JOA obligations and to have taken advantage of our difficulties and we wanted to prompt a commercial debate on these issues.

45. Vitol responded to Mr Stati's letter the same day.[25] For the first time, the reply did not come from Mr Taylor, but instead from two Vitol Managers. The letter was legal in tone and accused us of being in material breach of both COMSA agreements. Notably, no mention was made of the JOA and the parties' obligations under that agreement. Vitol acted as if it was entirely within its rights unilaterally to reduce the TNG COMSA prepayments (which following July deliveries had dropped to USD 67 million) without replenishing the JOA investment requirements by some other means.

---

[25]     C-49.

46. Mr Stati directed his reply of 10 August 2009 to Mr Taylor asking that the discussion be kept on a commercial and not a legal footing and suggesting a prompt meeting of the parties.[26] I note that Mr Stati emphasised the key element of our complaint against Vitol: *"The LPG project was and still remains to be a joint project and none of us withdrew from. Therefore it must be finance 50%/50%. In this context we shall remind you that according to the last estimates as of August 10, 2009 the Vitol share in LPG investment financed via debt should have been approximately $80.0 mil. In reality it stood at approximately $65.0 mil. representing a shortage of $15.0 mil. Further to the above our position is that Vitol should honor its contractual obligations as they are provided for in the COMSA KPM and the Joint Operating Agreement (JOA). If Vitol wants to terminate its participation in the LPG project, then it has to do it in accordance with the provisions of the JOA and not through the provisions of the COMSA TNG which has always been a vehicle to finance Vitol shares of debt financing for the LPG project."*

47. This was very much the message that we delivered to Vitol at our subsequent meeting in London on 13 August 2009.[27] We were not interested in legal proceedings with Vitol and wanted to find a commercial solution to our problems. A sale of the Kazakh assets to KNOC was still believed to be possible at the time. However, a further coupon payment to the Tristan Oil bond-holders was to fall due in December and repayments under the Laren facility would start to fall due in September, so we wanted to be sure of our cash-flow position in the event the sale process dragged on. At the meeting Mr Stati insisted on Vitol's obligations under the JOA and that Vitol's investment level, whether through the TNG COMSA or some other mechanism, had to be maintained. Mr Taylor did not deny this obligation. Instead, he seemed more focused on the risks in Kazakhstan and the degree of Vitol's exposure there. This illustrated the true source of Vitol's reluctance to abide by its JOA commitments and highlighted the hedge approach that had been adopted by Vitol over the previous months.

---

[26] C-50.
[27] C-51.

48.  Despite the relatively amicable tone of the parties' meeting on 13 August 2009, the relationship deteriorated again over the course of the following month.  We were forced to reduce condensate production temporarily for a period because of a seasonal lack of consumer demand for natural gas combined with the Kazakh government's interference with our efforts to sell to industrial or export users.

49.  This caused both parties to revert to their hard line positions.  In Vitol's case, they insisted that we should deliver condensate and that they had no obligation to make further payment.  In our case, we reiterated our position that Vitol was obliged to maintain its level of investment in the Plant under the JOA.  This is reflected in Mr Stati's email to Mr Taylor of 15 September 2009 in which he again stated that by drawing down the prepayment levels under the TNG COMSA, Vitol was effectively selling back its share of the LPG Plant to Ascom.[28]

50.  In his response, Mr Taylor insisted that Vitol was entitled to draw down the prepayment level without in any way impacting its share of the LPG Plant.[29]  He stated that he had asserted this many times and we had accepted this. I do not agree with this at all. I do not recall Vitol taking that position prior to this occasion, and we had certainly never agreed to such a position. To my recollection, this email was the first time that Vitol clearly stated that they thought they were entitled to reduce the TNG COMSA prepayment level without there being any repercussions in relation to their rights or obligations under the JOA.

51.  We did not agree with Vitol's position.  We regarded Vitol FSU's overriding obligation to make a 50% contribution to be paramount and not something that could be vitiated by the technicalities of the TNG COMSA.[30]  However, our practical  options were very limited.  We still had serious liquidity issues, and a further substantial payment to the bondholders was looming.  We were required under the terms of the

---

[28]  C-129.

[29]  C-130.

[30]  The issues relating to the interpretation of the TNG COMSA have been now determined by an arbitration Tribunal in favour of Vitol SA. Although I respect the Tribunal's decision in that matter as a non-lawyer I remain of the view that it does not reflect the parties' actual commercial agreement. Further the Tribunal did not make any determination regarding Vitol FSU's obligation to invest under the JOA and whether Vitol SA's actions under the TNG COMSA were a breach of those obligations.

TNG COMSA to deliver condensate to Vitol, and we knew by this time that they would sue us if we delivered to a third party instead. We could have sued Vitol ourselves to enforce our rights under the JOA, but given everything that was still going on in Kazakhstan, another legal dispute was the last thing we needed. Our preferred course was to try to resolve matters commercially and our focus remained on selling the Kazakh assets. In mid-October 2009, I put together a proposal for Vitol with respect to the reduction in the TNG COMSA pre-payment level. We wanted to re-situate the discussion to the context of the JOA and Vitol's obligations under that agreement.[31] The proposal was for Vitol to incorporate a Kazakh subsidiary which would acquire 50% title in the LPG Plant. The subsidiary would pay the shortfall between Vitol's investment level via the TNG COMSA prepayments and the LPG Plant costs at the time. It would also acquire the TNG COMSA prepayment debt from Montvale.

52. I sent this proposal to Vitol later in October 2009[32] and we made it clear that we were keen to meet with them to discuss it.[33] We subsequently met with Vitol in early November. The meeting went well and the parties agreed the broad terms of my proposal in principle. This can be seen from point 4 of the draft letter agreement Vitol sent to us a few days later.[34] After exchanging comments on the letter,[35] the parties signed a version of this letter in January 2010.[36]

**Agreement for the sale of the Kazakh Assets**

53. In November 2009, we signed an MOU for the sale of our Kazakh assets to a company connected to the Assaubayev family, a wealthy and politically well-connected Kazakh family that owned the mining company KazakhGold, and had recently sold a majority stake in that company.

---

[31]  C-52.
[32]  C-131.
[33]  C-132.
[34]  C-133.
[35]  C-134 and C-135.
[36]  C-138.

54. This was followed, on 13 February 2010, by Ascom signing a share purchase agreement with Cliffson Company SA, an Assaubayev special purpose vehicle, for the sale of 100% of the shares and participatory interests in KPM and TNG.[37] The total value of the agreement, including the assumption of the companies' debts, was in excess of USD 920 million.

55. In March 2010, Mr Stati wrote to Mr Taylor formally notifying him of the sale to Cliffson and that we were dealing with matters prior to completing that sale. Mr Stati enclosed a balance sheet for the LPG Plant Project and asked for Vitol's deficit to be settled.[38] The parties signed a further letter agreement along the same lines as that of January 2010 as a result of this correspondence.[39]

56. In April of 2010, we submitted applications for approval of the sale to the Kazakh Ministry of Oil and Gas (the "MOG", the successor to the MEMR). The MOG responded seeking detailed information with regard to the transaction which, over the course of May and June 2010, we endeavoured to provide. We also signed an escrow agreement with Cliffson for the transfer of the sale price to an escrow account the same month.

57. In the meantime, in May 2010, we arranged for Mr Taylor to meet with Mr Aidar Assaubayev so that Vitol could establish if and to what extent it wanted to continue to contract with TNG and KPM under their intended new ownership.[40]

58. After submitting detailed information to the MOG in late June 2010, things went quiet and we heard nothing from either of the MOG or the Assaubayevs. A month later, in July 2010, Kazakhstan seized KPM, TNG and the companies' assets including the LPG Plant.[41]

---

[37]  C-139.
[38]  C-140.
[39]  C-141.
[40]  C-143.
[41]  C-54.

045

59. Following the expropriation of the Ascom Group's Kazakh assets, the relationship with the Vitol Group broke down completely and the parties have been in dispute with one another since then.

**Quantum**

60. The starting point for assessing Ascom's losses arising from Vitol's breaches of the JOA is the cost of the LPG Plant project. As reflected in the 2009 financial statements of TNG, which were audited contemporaneously by the major international accounting firm KPMG, TNG invested USD 248,084,113 in the construction of the LPG Plant as of December 31, 2009. Apart from some small transactions that occurred in 2010 (after construction on the plant had ceased), those financial statements accurately reflected TNG's total costs incurred on the LPG Plant project. Because of the special mechanisms through which the LPG Plant Project was financed and managed, however, several adjustments must be applied to TNG's actual costs to arrive at the amount that Vitol agreed to fund equally.

61. First, TNG engaged an Ascom affiliate, Perkwood Investments, to manage the acquisition of most of the equipment and services for the LPG Plant Project. Perkwood charged TNG for the equipment and services under an agreement that included Perkwood's management fee. Ascom and Vitol agreed, however, that the shared investment amount and profit distribution formula would be based on the original cost of the services and equipment, excluding any management fees. Accordingly, for purposes of calculating the shared investment amount, TNG's total expenses must be reduced by the amount of management fees charged by Perkwood. Those fees, which are not part of Ascom's claim and must be deducted from TNG's total capital expenses reflected in its financial systems and statements, total USD 43,852,108.

62. Secondly, because the Perkwood management fees were included as mark-ups on equipment delivered to TNG, TNG incurred customs charges attributable to those fees that are not included in the shared investment amount. Applying the average rate of customs charges actually incurred in the Perkwood purchases (4.09%) to the

- 22 -

046

management fee component, the amount of customs charges included in the shared investment amount should be reduced by USD 1,793,551.

63.   Thirdly, VAT incurred in connection with capitalised construction costs are included in the shared investment amount.  Although VAT was potentially recoverable from the Kazakhstan government, there was a delay between when the VAT expense was incurred and when it could be recovered by refund.  The parties agreed to include VAT in the shared investment amount, and then credit any refunds on a 50/50 basis when obtained.  Due to the expropriation of the project, however, VAT never was recovered from the State of Kazakhstan.  The total amount of VAT incurred on the project was USD 24,509,784 (which included VAT attributable to the Perkwood management fees of USD 6,001,082), resulting in total VAT in the shared investment amount of USD 18,508,702.

64.   Fourthly, the parties agreed to include TNG's operating expenses attributable to the LPG project, which totalled USD 2,255,526, in the shared investment amount.

65.   Finally, TNG paid a substantially higher interest rate on the funds that it borrowed from KKB (and later Tristan) to fund its debt investment in the Project than the rate that applied to Vitol's debt investment under the TNG COMSA.  Accordingly, the parties agreed to equalise the interest rates for purposes of calculating the shared investment amount.  Accordingly, for purposes of calculating the shared investment amount, TNG's capitalised interest expense on the KKB and Tristan debt attributable to the project must be equalised to the amount of interest on the TNG COMSA prepayments attributable to the project.  This also is reflected in Clause 8.1 of the JOA, which provides that *"interest on any debt financing shall incorporate adjustments in respect of real plant cost, financing from KKB and difference between KKB rate (via the KKB loan) and Vitol rate (via the TNG COMSA) according to the rules agreed for the dedicated accounting vehicle."*  The total amount of interest paid to Vitol under the TNG COMSA during the LPG project (from 15 February 2006 to 31 December 2009) was USD 11,921,778.

66. From time to time, Ascom provided Project Balance spread-sheets to Vitol that reflected the shared investment amount, and the Parties' respective funding obligations to meet those agreed expenses. An illustrative example of these spread-sheets is the following LPG Total Balance report that Ascom provided to Vitol in December 2008:

| | A | B | | C | D | E |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | **LPG Total Balance, USD** | | | | |
| 3 | | | | | | |
| 4 | | | | till 31.12.2008 | Jan'09 Plan | TOTAL |
| 5 | | CAPEX | $ | 158,864,432 | $ 8,085,041 | $ 166,949,472 |
| 6 | | OPEX | $ | 5,524,676 | $ 271,819 | $ 5,796,495 |
| 7 | | Interest COMSA | $ | 10,244,795 | $ 400,000 | $ 10,644,795 |
| 8 | | Interest KKB | $ | 10,244,795 | $ 400,000 | $ 10,644,795 |
| 9 | | TOTAL | $ | 184,878,697 | $ 9,156,860 | $ 194,035,557 |
| 10 | | | | | | |
| 11 | | *FUNDING SOURCES* | | TOTAL | | |
| 12 | | | | | | |
| 13 | | Debt capital | $ | 150,035,557 | | |
| 14 | | ASCOM | $ | 75,017,778 | | |
| 15 | | VITOL | $ | 75,017,778 | | |
| 16 | | | | | | |
| 17 | | Equity capital | $ | 44,000,000 | | |
| 18 | | VITOL ($R $4mln included) | $ | 24,000,000 | | |
| 19 | | ASCOM | $ | 20,000,000 | | |
| 20 | | | | | | |
| 21 | | TNG COMSA Outstanding Status (31/12/2008) | | 75,621,242 | | |
| 22 | | Lack of financing (VITOL) | -$ | 603,464 | | |

67. These balance reports formed the basis of the parties' periodic discussions regarding the amount spent on the Project, and the shortfall in Vitol's funding of its share of the total agreed investment amount. At no time did Vitol object that the Project Balance Reports inaccurately reflected the total investment amount to be shared between the parties.

68. Additionally, Vitol at all times had full access to the original project documents, such as contracts, invoices, payment records, etc. From time to time, Vitol had its personnel verify the Project Balance Reports provided by Ascom against the original contract documents. For example, in March 2008, a Vitol accountant, Mikhail Dvorak, conducted a thorough review of the project cost documents over a two-day period.[42] As Mr. Dvorak noted in his report to Vitol management, his analysis included *"checking the documents they provide on capital expenses (contracts, invoices, acts,*

---

[42]    C-101.

payment documents, etc.) and verifying it against the capital expenses spreadsheet which they provide." According to Dvorak's report, with the exception of one item that required additional follow-up, "[a]ll docs were promptly provided and question answered" by Ascom.

69.   Based on these agreed accounting procedures, Ascom calculates the amount of the total investment obligation that Vitol agreed to share equally to be USD 194,118,690, meaning that Vitol's 50% shared investment obligation was USD 97,059,345. Notably, this amount is very close to the amount of the shared investment amount that Vitol acknowledged it owed as of March 31, 2009. At that time, Vitol had funded $20 million through its equity contribution and an additional $80 million through the prepayment facility in the TNG COMSA, for a total investment of $100 million. In the course of discussions regarding the cessation of construction of the LPG Plant, Ian Taylor of Vitol stated in a letter to Mr. Stati that the TNG COMSA was "*overfunding our requirements by approximately $6 million.*" This equates to an agreed funding requirement by Vitol of USD 94 million when construction ceased, which is close to Ascom's calculation of the total shared investment amount of approximately USD 97 million.

70.   Vitol reduced its investment in the LPG Plant project by drawing down the balance under the TNG COMSA to USD 48,687,472.88 by the time of the expropriation in July 2010. Vitol did not replace that required investment through some other funding mechanism. Accordingly, Vitol's total final investment in the LPG Plant project (including its USD 20 million equity investment and a USD 4 million contribution through the "SR Loan," but before the COMSA Arbitration) was USD 72,687,472.88. Therefore, Ascom's losses from Vitol's withdrawal of its investment (prior to the COMSA Arbitration) are the difference between the agreed investment amount of USD 97,059,345 and its actual investment amount of USD 72,687,472.88, which equals USD 24,371,872.12.

71.   Following the expropriation in 2010, Vitol FSU successfully sued Ascom's affiliate, Montvale, under the TNG COMSA for the return of the outstanding prepayment amounts. It maintained that this was a simple debt claim and denied that Vitol FSU's

- 25 -

**049**

obligations under the JOA were relevant to that claim.  The Tribunal in the COMSA Arbitration ordered Montvale to pay the amount of principal and accrued interest outstanding under the TNG COMSA of $48,687,472.88, plus Vitol's costs of £288,734.67 and the tribunal's costs of €349,987.42.  Furthermore, Ascom incurred costs and expenses of $412,457.95 defending Montvale in the COMSA Arbitration.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true.

Signed ..................................

ARTUR LUNGU

Dated ..... 11/10/13

050