**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD.,<br><br>    Petitioners,<br><br>v.<br><br>REPUBLIC OF KAZAKHSTAN,<br><br>    Respondent. | Civil Action No. 1:14-cv-1638-ABJ |

**RESPONDENT REPUBLIC OF KAZAKHSTAN'S
<u>MOTION FOR RECONSIDERATION OF MAY 11, 2016 ORDER</u>**

# EXHIBIT 4



Neutral Citation Number: Double-click to add NC number

Case No: 2014 FOLIO 506

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 29/08/2014

Before :

MR JUSTICE COOKE

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **VITOL FSU BV** | Claimant |
| - and - | |
| **ASCOM GRUP SA** | Defendant |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Robert Thomas QC and Christopher Jay (instructed by Clyde & Co) for the claimant
Thomas Sprange (Solicitor Advocate) and Ruth Byrne (Solicitor Advocate) (instructed by King & Spalding) for the defendant

Hearing dates: 27th and 28th August 2014
- - - - - - - - - - - - - - - - - - - - -

# Reasons for Judgment
# (subject to editorial corrections)

46

**Mr Justice Cooke:**

*Introduction*

1. On 12th June 2014 Burton J granted a worldwide freezing injunction in respect of assets of the defendant (Ascom) up to the value of US$105 million in support of arbitration proceedings (the Fourth Reference). The order was made without notice to Ascom. On the return date on 27th June 2014, Field J continued the freezing order with a timetable for evidence to be filed in relation to Ascom's challenge to the order. A large body of evidence was served and the matter came before the court again in the vacation on 27th and 28th August. At the end of the hearing I ordered that the injunction should continue.

2. The brief reasons for my decision follow. Whilst there was extensive argument and evidence before me, it does not seem to me necessary or helpful to descend into great detail when setting out the basis of my decision.

*The Gateway argument – section 44(3)-(5) of the Arbitration Act 1996*

3. The Fourth Reference was commenced in late 2012, following three earlier references between the claimants (Vitol) and Ascom related parties. The Fourth Reference is subject to the UNCITRAL Rules 1976. By article 26 of those Rules, "the arbitral tribunal may take any interim measures it deems necessary in respect of the subject matter of the dispute, including measures for the conservation of goods forming the subject matter in dispute, such as ordering a deposit with a third person or the sale or perishable goods".

4. Vitol did not accept that this gave the arbitral tribunal power to make a worldwide freezing order, submitting that the words were not apt to cover an order restraining a party from disclosing or otherwise dealing with assets that did not form the subject matter of the dispute as such but might nonetheless be a target for enforcement measures at a later stage. Reliance was placed upon section 4(2) of the Torts (Interference with Goods) Act 1977 and the words "Goods which are or may become the subject matter of subsequent proceedings in the court" which appear in that section. Attention was also drawn to the 2010 version of the UNCITRAL Rules which expressly provide in article 26(2)(c) that the tribunal has the power "of preserving assets out of which a subsequent award may be satisfied".

5. I do not accept this argument. Article 26 of the 1976 Rules makes specific reference to "measures for the conservation of the goods forming the subject matter in dispute" as one of the powers included in the wider power to "take any interim measures it deems necessary in respect of the subject matter of the dispute." A distinction is thus drawn between "the subject matter of the dispute" and "goods forming the subject matter in dispute".

6. In the same way that section 4(2)(c) has been widely interpreted by this Court and the Court of Appeal so as to encompass freezing orders of the type sought by Vitol here, so also the UNCITRAL Rules should be widely interpreted, particularly in the light of the distinction drawn in the wording to which I have referred. Most commentators appear to agree.

47

7. It was contended by Ascom that, in these circumstances, any application for a worldwide freezing order should be made to the tribunal which had long since been constituted and would have been able to make any order it thought appropriate without any great delay. Ascom submitted that the case was not one of urgency within section 44(3) and that the provisions of section 44(5) were inapplicable because the arbitral tribunal was able to make the order in question.

8. I reject these submissions.

   i) The urgency of the application is closely connected with the risk of dissipation and the need for an order to restrain such potential dissipation. I set out my reasons for considering the case to be one of urgency below.

   ii) It was an express term of the Terms of Appointment of the arbitral tribunal that "there shall be no ex parte communication between any party and any arbitrator regarding matters covered by these proceedings". There was therefore no possibility of Vitol making an application to the arbitrators for an order without notice to Ascom and giving notice would defeat the very purpose of seeking a worldwide freezing order.

   iii) Any order made by the tribunal would not bind third parties nor be buttressed by sanctions of the kind that the court is able to employ in relation to its freezing order. The penal notice on a court order refers to the court's power to fine or imprison directors, officers and employees of the party restrained, for participating in a breach of the order.

9. In my judgment therefore the court is entitled to act "to the extent that the arbitral tribunal is unable for the time being to act effectively", within the meaning of section 44(5). The tribunal could not have heard an application by Vitol without notice being given to Ascom. The Tribunal could not have made an order which would bind third parties nor would it have had sufficient sanctions to fortify its order. In *Pacific Maritime (Asia) Ltd v Hollystone Overseas Ltd* [2008] 1 Lloyd's Rep 371 at page 381, Christopher Clarke J (as he then was) exercised the court's jurisdiction in circumstances where the arbitrators could make a similar order to that made by the court save that any such order would not bind third parties and would not be buttressed by sufficient sanctions. He thus held that the tribunal lacked the power in the circumstances of the case to act effectively in relation to the order sought. The same reasoning applies here.

10. There is here no usurpation of the powers of the arbitrators. The court is acting, in accordance with the DAC Report and the opinions of many commentators, in aid of the arbitration process, with a view to preventing a successful party in arbitration being deprived of the fruits of any Award in its favour.

11. There was discussion before me as to whether or not, if the court did continue the order, it should be an order which ceased to have effect on the order of the tribunal in the Fourth Reference. Under section 44(6), the court has power so to provide in its order and it was urged upon me that this would be the appropriate course to adopt if I was against Ascom on its submissions that the order should not be continued at all. If it had only been the "ex parte" issue which had prevented the tribunal from acting effectively, I can see that there would be some merit in providing for the arbitrators to

48

decide on an inter partes basis but in circumstances where it is the inadequacy of sanctions which means that the tribunal has no power to act effectively, and in circumstances where issues involving third parties and potential variations of the order in the light of their interests could arise, it makes no sense for the court to hand the matter over to the arbitrators for any further decision. Moreover, having heard argument for over a day on the question whether or not the order should be continued, it would be wasteful of the parties' time and expense if I were to fail to make a decision and depute the arbitrators to do so instead. When regard is had to the size of the bills of costs incurred in relation to the hearing before me, this point is reinforced.

*Delay in making the application*

12. Ascom submitted that Vitol had delayed in bringing its application and that the court should not exercise its jurisdiction to make a freezing order in these circumstances. Reference was made to the decision of the Deputy Judge in *Cherney & ors v Newman & ors* [2009] EWHC 1743 (Ch) and to my own decision in *Antonio Gramsci Shipping Corporation v Recoletos Ltd & ors* [2011] EWHC 2242 (QB). Delay is a factor to be taken into account in more than one respect. Delay in bringing an application can affect the risk of dissipation of assets by a defendant. Delay can cast doubt on the belief of the claimant in such a risk but can also provide an opportunity for the defendant to dissipate the assets in advance so that, by the time the order is made, the horse has already bolted. It can also feature in the overall discretion of the court as in any application for an injunction, even without any effect on the risk of dissipation. If there is prejudice caused to the defendant, that is itself a factor but otherwise, delay may go simply to the question whether it is just and convenient to grant an order.

13. In the present case, I do not see how delay militates against the granting of an order at all. Whilst it was submitted by Ascom that Vitol was attempting to stymie Ascom's legitimate claims in the Fourth Reference and to deprive it of the opportunity to enforce an arbitration award against the state of Kazakhstan for a sum in excess of $500 million, it did not seem to me that delay was a relevant feature in this submission. The position would have been much the same whenever the application had been made after the events giving rise to Vitol's counterclaim.

14. The counterclaim in question, in support of which the freezing order was sought, came into existence only by virtue of a letter of termination sent by Vitol in January of this year. The effect was that, allowing for the period of notice, actual termination occurred on or about 20th March 2014. On Vitol's case, that triggered an obligation for Ascom to acquire Vitol's rights under the Joint Operating Agreement for "fair value" within one month, with payment to be made within 3 months of any demand by Vitol. The cause of action could not therefore be said to accrue before 23rd April 2014.

15. Ascom contended however that this was a claim which could have been brought much earlier, since all the events giving rise to the right to terminate occurred in 2012 or before. Moreover, Vitol had an existing counterclaim which could have formed the basis of an application for a freezing order. Neither of these points carry any weight.

16. The existing counterclaim in the Fourth Reference, prior to the termination counterclaim, referred to the potential future recovery from the State of Kazakhstan by Ascom in the ECT arbitration. Vitol claimed that, insofar as the sums recovered

49

represented the value of the LPG Plant then part of any sums recovered were due and owing to Vitol "as money had and received and/or as sums by which Ascom has been unjustly enriched and/or Ascom is obliged to account in respect of the same". There was thus no quantification of the claim and all that could have been sought was a declaration of entitlement on the basis put forward. An application for a freezing order on this basis would not have made any headway. Equally, it does not seem to me that any valid criticism can be made of a party for not pursuing a particular claim at an earlier stage and then seeking a freezing order in support of that claim. Any relevant issues which arise from delay relate to the injunction itself, not to the claim, whether or not that claim could have been brought earlier or was only thought of at a late stage. As it is accepted that Vitol has a good arguable case in respect of this claim, delay in bringing it, followed by the application for an injunction once the cause of action had accrued, is neither here nor there.

17. As I pointed out in *Antonio Gramsci*, if a party delays in bringing an application injunction, it bears the risk that the horse may already have bolted but it is entitled nonetheless to see if it can freeze any miniature pony that may be left in the field. Delay may or may not, on the facts of any case, cast doubt upon the belief of the claimant in risk of dissipation of assets, but it is ultimately the objective risk with which the court is concerned, to which I refer later.

*The law*

18. Apart from the above matters in relation to section 44 and delay, there was no relevant dispute about the law to be applied in the context of freezing orders. For current purposes, I need do no more than say that I have had authorities such as the *Niedersachsen* [1983] 2 Lloyd's Rep 600 well in mind.

*Urgency*

19. The question of urgency is likewise linked with the risk of dissipation. If there is a real risk of dissipation then, unless the defendant's assets are all so illiquid that they cannot be disposed of in a short period of time, there will be urgency in any application for a freezing order. The same factors which justify the need for an ex parte application apply to the need for urgency for the purposes of section 44(3) of the Arbitration Act. Mr Kraljevic's first affidavit made it plain that he knew relatively little about Ascom's assets because there was limited available public information and little information that had been disclosed in the course of the Fourth Reference. Vitol had instructed a firm of accountants to conduct a review of publicly available information about Ascom the previous year but its financial statements were not publicly available and little appears to have been established beyond the ownership by Ascom of an insurance company called Garantie, said to be worth approximately €848,000 as at 21st May 2013.

20. Reference was made to the application for security for costs made by Vitol against Ascom in the Fourth Reference in June 2013 which was refused by the tribunal without giving reasons, albeit giving liberty to apply. The witness statement of Mr Lungu, the Executive Vice President of Ascom was adduced by Ascom in order to resist the application. In it, he said that between 2009 and 2011, Ascom and some of its affiliated companies experienced difficulties with cash flow but that "as of 2012, these difficulties were resolved and Ascom is an operational company with assets in

50

multiple jurisdictions including the Republic of Moldova, South Sudan and Iraq. To the best of my knowledge and belief there is no basis for the concerns Vitol has raised with respect to Ascom's financial capacity to meet the costs, if required."

21. However by written submissions on 20th March 2014, Ascom applied to the tribunal seeking an immediate stay of the Fourth Reference for six months and the deferral of the hearing on the merits which was scheduled for late April 2014. The basis of the application was that Ascom was said to be facing temporary but "serious difficulties with cash flows" and that it was "not able to meet the costs of the proceedings including the hearing, at the present time". Three factors were relied on by Ascom as contributing to its cash flow difficulties: the illegal expropriation by Kazakhstan of the overwhelming majority of the Ascom Group's assets; the fact that the principal business activities of Ascom since that expropriation which were focussed on oil and gas exploration and production in Kurdistan and South Sudan were "cost intensive": the allegation that Vitol's conduct of the Fourth Reference had been abusive and had operated to bleed Ascom dry. It was also said that Ascom was due "in the next 3 to 6 months, to receive a substantial in-flow of cash, in connection with its business activities".

22. At paragraph 166 of his first affidavit, Mr Kraljevic referred to the Award which Ascom had secured against the State of Kazakhstan in the ECT Arbitration. He also referred to the Sharing Agreement which had been disclosed in redacted form by Ascom in January which provided for 70% of the Award to be paid to the Tristan Note holder whilst Ascom and the other ECT claimants were specifically given liberty to assign 20% of their rights under that Award. Vitol inferred that such an assignment might be imminent, a conclusion which was borne out by comments by Ascom's counsel in court on 27th June 2014 and the subsequent evidence of Mr Fleuriet at paragraph 16.4 of his second affidavit. It appears that, but for the freezing injunction, Ascom and/or the other ECT Claimants might have assigned or provided a security interest in the ECT Award to other parties because they were in active negotiations to do so. As put by Vitol in its skeleton, it "acted in the nick of time".

23. If therefore there was a real risk of dissipation which would justify the application without notice, the requirement of urgency in section 44(4) of the Arbitration Act was met.

*Risk of dissipation of assets*

24. As already indicated, the two triggers for the application to the court were the accrual of Vitol's termination claim and the application by Ascom for a stay of the Fourth Reference on the grounds of cash flow difficulties, combined with the ascertainment of potential assignments of the ECT Award. Whilst Vitol's understanding of the Sharing Agreement in relation to the ECT Award may have been restricted and some of its suspicions unjustified, the fact remains that no Pledge Agreements have been disclosed which are said to set out Ascom's prior liability on the Tristan Notes. Whilst Vitol may be wrong in saying Ascom undertook additional liabilities on the notes by the Sharing Agreement and may also be wrong in thinking that benefit did not inure to Ascom and the ECT Claimants from the agreement, the position as it has since emerged on the evidence reveals such a degree of inconsistency in Ascom's position about its own assets that I am unable to accept its evidence about this without clear supporting documentation.

51

25. I have already referred to Mr Lungu's witness statement in which he referred to Ascom itself as an operational company with assets in multiple jurisdictions including Moldova, South Sudan and Iraq and to Ascom's financial capacity to meet the costs of the Fourth Reference, in the context of Vitol's application for security for costs in that Reference. In its application, Vitol had asserted Ascom's weak financial position and lack of assets in June 2013 against which to enforce any costs order that might be made and Mr Stati's willingness to allow Montvale and TNG to default on payment obligations arising in arbitration, to remove value from companies under his beneficial ownership and control and to shift assets and liabilities in the Group. Reference was made to the existence of severe financial difficulties across his "corporate empire", with several pages of submissions on the point. In response, relying upon Mr Lungu's evidence, Ascom said that its financial position was strong, that it had substantial assets and could meet any award of costs that might be made, even though it no longer held the asset that was the subject matter of the current dispute. It will be recalled that Mr Lungu stated that cash flow difficulties in 2009-2011 were resolved in 2012. The effect of what was being said was that Ascom was a thriving company with operations in many jurisdictions including the three named and had no financial problems, whether temporary, cash flow or otherwise.

26. By March 2014 however, when applying for a stay of the proceedings, Ascom was relying on cash flow difficulties without suggesting any diminution in its strong assets position. In Kraljevik 1, at paragraph 134, Vitol expressed its continuing assumption that Ascom continued to hold the assets referred to by Mr Lungu in Iraq, South Sudan and Moldova, whatever those assets might be.

27. When Mr Stati came to swear his first affidavit of disclosure, following the granting of the freezing order, no such interests were revealed. The number of assets worth more than $30,000 was extremely limited. The only assets with values running into millions were constituted by a figure of $15 million in respect of a loan to Novitas, a blocked deposit of $25 million with Victoriabank and the ECT Award of $497 million. Mr Fleuriet's first affidavit referred to Ascom's financial position and denied that it had dramatically transformed. He said it remained relatively asset rich but was experiencing temporary cash flow difficulties because of the cost of enforcing the ECT Award, because of its business activities in South Sudan which were hindered by ongoing conflict and the costs of the Fourth Reference. He referred to Ascom as "an operational oil and gas company with interests in Southern Sudan".

28. Furthermore, in its letter seeking a stay, Ascom had said in terms that its principal business activities since expropriation of its Kazakh assets had focussed on oil and gas exploration and production in Kurdistan and South Sudan. Although those businesses were cost intensive, they were lucrative and Ascom was due in the next 3-6 months to receive a substantial inflow of cash in connection with its business activities.

29. Mr Stati's affidavit however revealed an altogether different picture from that which had been put forward by Ascom in 2013 in the context of the security for costs application and in 2014 in the context of the application for a stay. Mr Fleuriet's first affidavit confirmed that Ascom had no assets in Iraq/Kurdistan but that the Ascom Group had an interest there held by an entity other than Ascom with a separate ownership structure which did not fall within the terms of the freezing order. No

52

details of this were provided. Mr Fleuriet said that Ascom held the same assets that it had held for years.

30. Similarly, with regard to Ascom's operation in South Sudan, although it had previously told the tribunal in March 2014 and the court on 26th and 27th June 2014 that Ascom was an operational company with operations in southern Sudan, as confirmed by paragraph 30 of Mr Fleuriet's first affidavit, it has emerged that a subsidiary Ascom Sudd was in fact the operating company in South Sudan where operations ceased in December 2013/January 2014.

31. As the position has now emerged, it is said that Ascom has no interest in Iraq and no current operations, even through a subsidiary in South Sudan. Its shareholding in Ascom Sudd, despite investment of approximately $611 million, is said to be worth less than $30,000. Moreover, nothing further has emerged from Ascom about its expected "substantial inflow of cash" in connection with its business activities in the six months following March 2014. The picture which is now put forward by Ascom is of a company with limited assets apart from the ECT Award in which it now asserts it has only a 12.5% interest.

32. It is clear on the evidence that Montvale, an Ascom related company, failed to pay a Partial Award in favour of Vitol and Arkham in the sum of $45.896 million and costs of approximately £120,000. Montvale is in liquidation in consequence, at Vitol's instigation. What appears clearly from the comments of the liquidator is that Mr Stati, the president of Ascom and the ultimate owner of the Ascom group, failed to co-operate with the liquidator in his attempts to ascertain the true assets of Montvale and to realise them. They appear to have included an outstanding debt from another Ascom related company Hayden Intervest Ltd of $158 million approximately and an advance to another Ascom related entity of $3 million. Vitol justifiably contends that Mr Stati has done what he could to avoid payment of Montvale's liabilities under the Partial Award and to conceal company assets.

33. Furthermore Montvale had continued to fund its own costs in the arbitration following the Partial Award whilst refusing to make the advance payment to the arbitrators directed by them. It is clear therefore that Mr Stati, who directed the operations of Montvale, Ascom and other group companies, was happy to ignore arbitrators' orders for payments of money whilst using monies available to pursue the group aims as he saw them to be. Despite claiming that the freezing order had the effect of stifling Ascom's claim in the Fourth Reference and enforcement of the ECT Award, it is noteworthy that some £500,000 worth of costs have been incurred by Ascom in the context of the current application. I was told that none of these costs have however been paid in circumstances where the order itself requires Ascom to inform Vitol from whence any such costs would be paid. It is hard to imagine that any firm of lawyers would allow such a large bill to be incurred without some assurance of payment, from whatever source the assurance may have been given and from whatever source that payment might thereafter be made. Given this and the evidence of the way in which costs have been funded in the past, I am sceptical about any suggestion that the order will impede Ascom's future conduct of the Fourth Reference or enforcement of the ECT Award.

34. A fundamental point relied on by Vitol in the context of risk of dissipation of assets is Mr Stati's ability, power and propensity to move assets around the Ascom group

53

and/or the Stati group at will, without respecting the separate corporate personalities of, or properly differentiating between, the various individual companies. It is said that he is prepared to allow companies in the Stati group such as Montvale to go into liquidation rather than ensuring that its debts are paid and that, not only has proved unwilling to assist or co-operate with the Montvale liquidator but has actually obstructed the latter's investigations and attempts to ascertain Montvale's assets. There is even an attempt by another of his companies to claim sums due on the $3 million loan made by Montvale.

35. At paragraph 160 of Mr Kraljevic's affidavit, he refers to combined financial statements showing that Mr Stati is both the ultimate controlling party and ultimate owner of Ascom, Terra Raf, KPM, TNG and Tristan Oil. Mr Stati was the only person making important decisions relating to the LPG project. Whilst it is said by Ascom that senior personnel at Vitol knew the way in which Mr Stati conducted business operations through the various companies which he controlled, that is nothing to the point in the context of risk of dissipation. The question is not whether Vitol was conscious that Mr Stati used companies he controlled in order to benefit the group as a whole but whether the arrangements that he adopted give rise to the risk of dissipation of Ascom's assets making enforcement of an award more difficult or impossible. The points raised by Vitol in this connection were essentially unanswered save by assertion by Mr Fleuriet, a lawyer engaged by Ascom and not an officer of Ascom itself that everything done in the Ascom group was part of "ordinary business activity".

36. Despite the fact that Ascom and other companies in Mr Stati's control were facing severe financial difficulties in 2008-2009 and the fact that construction of the LPG Plant had stopped, Mr Stati paid himself, from Tristan Oil, bonuses totalling $8.3 million.

37. Montvale received $713.673 million from Vitol between July 2007 and March 2011 in respect of oil purchases. Montvale paid $324.934 million to General Affinity, $311.54 to Hayden Intervest and $246.164 million to Stadoil, all of which were companies under Mr Stati's control. Terra Raf had framework contracts with General Affinity and Stadoil which it novated to Montvale. Additionally there was a loan agreement dated May 1st 2007 between Montvale and Hayden. The loan agreement provided for Ancillary Agreements which would set out the instalments of the loan and the terms of repayment, with a final fall back repayment date of 30th April 2017. No ancillary agreements exist. The framework sales and purchase contracts provided for Delivery Lot Addenda setting out quantity, price, quality and delivery details. No such addenda existed either. Without such supplementary agreements, the loan, sales and purchases cannot be considered proper bona fide arms-length transactions. On the basis of the report of Mr Stern, the forensic accountant engaged by Vitol, there is no evidence of any payment by Montvale of sums for construction costs of the LPG Plant; and there is no evidence of the collateral on Hayden loan. The $158 million outstanding from Hayden to Montvale is unsecured and the statement of affairs produced to the official receiver failed to disclose that asset, it being Mr Stati's position that Montvale had no asset except its claim against Vitol.

38. The Group's combined financial statements for 2009 indicate that payment terms between members of the group can be amended at will by Mr Stati. Note 30 to those statement also illustrates how assets and liabilities are moved around the Group.

54

39. Ascom has asserted that it paid a management fee of over $33 million to an English company called Perkwood. An agreement has been disclosed which makes no mention of any management fee nor of any formula for calculating it. It appears from other evidence that there was a mark up on prices for equipment supplied to the LPG Plant. It appears therefore that this "fee" was simply paid at will.

40. Payment of legal or arbitrators' costs appears to have been made from any convenient source. Hayden Intervest paid €50,000 by way of an advance on costs for Montvale in the First Reference. Ascom asserts in the Fourth Reference that it incurred costs and expenditure of over $412,000 in defending Montvale in the First Reference. Those costs were however claimed by Montvale in the Reference and were in fact paid by Terra Raf. As appears below, entirely inconsistent statements have been made on behalf of Ascom as to payment of the costs in the ECT arbitration.

41. In the context of the Fourth Reference, Ascom claimed to have paid nearly $18 million in costs to obtain the ECT Award. In his second witness statement, Mr Lungu confirmed this. In Mr Fleuriet's first affidavit it was said that Ascom did not fund the entire costs of the ECT proceedings but that they were shared amongst the claimants. In his second affidavit he stated that Ascom did not fund any of the costs of the ECT arbitration but that "three other entities in the Ascom group" did so. As, of the ECT claimants, only Ascom and Terra Raf were entities within the Ascom group, that cannot be correct. The inconsistency in the position advanced is remarkable. It is noteworthy also that, in the context of the decision to stop building the LPG Plant, different explanations have been given. The first was that TNG faced financial difficulties; the second that it was intended to sell the plant; the third was that it was feared that the Kazakh state might seize it.

42. The financial records of the following companies are inaccurate and misleading:

   i) Although Perkwood was said to have charged a management of over $43 million, it filed dormant company accounts throughout the relevant period.

   ii) Although Stadoil and General Affinity received substantial payments from Montvale as set out earlier, their financial statements are inconsistent with this. They are presented as "small companies" with a turnover below £6.5 million.

   iii) TNG's audited accounts for the years 2007-2009 do not disclose the fact that Perkwood was a related party.

   iv) No mention of the Perkwood management fee is to be found in the ECT Award.

43. I am satisfied on the basis of all the material put before me that Mr Stati not only has a propensity to move assets around his group companies as he thinks fit but he and Ascom has a propensity to give information to the tribunal or the court about its assets according to what he or it thinks suits its interests at the time. Mr Fleuriet is a lawyer who has sworn affidavits on the basis of instructions given to him. His evidence is most unsatisfactory, particularly where it contradicts that given by Mr Lungu or Mr Stati who could be taken to have first hand knowledge of the group assets position and the way in which the group operated. Mr Stati's own evidence is also unsatisfactory. He exhibited Ascom's unaudited accounts for the past 3 years and

stated that it did not prepare management accounts at all. It is not apparently a requirement of Moldovan that accounts be audited. Neither Ascom's shareholding in Ascom Sudd nor its shareholding in Garantie is said to be worth more than £30,000. It is accepted in Mr Fleuriet's second affidavit that the Garantie shareholding is valued at $579,000 and it is inconceivable that Ascom Sudd's plant and equipment does not give rise to the value of the shareholding in Ascom Sudd exceeding $30,000 when $611 million approximately has been spent in exploration costs. On its own website Ascom refers to its wide range of capabilities to drill new wells and perform well recoveries by using "its own rigs F-320, F-200 and F-100."

44. In these circumstances, Vitol's fears about Ascom's financial position, as expressed in its application for security for costs and its fears of dissipation in the context of the current application are well founded. Exactly what Ascom's asset position is remains unclear but the inconsistent information that has been given, when combined with the way in which Mr Stati conducts his business through his companies establishes, in my judgment, a real risk that an award against Ascom could go unsatisfied by reason of unjustifiable disposals of assets or that assets could be dealt with in such a way as to make enforcement more difficult. I cannot accept Mr Fleuriet's assertions that nothing has been done by Ascom save in the ordinary course of business. In Ascom's Reply Submissions in the Fourth Reference, in response to a complaint that sums paid under the TNG COMSA were not used for the construction of the LPG Plant, Ascom said that "dollars within the Ascom group were fungible" which is merely another way of saying that assets are moved around the group as Mr Stati saw fit. Given his approach to Montvale's liabilities in the First Reference, the risk of movement of assets rendering an award against Ascom unenforceable is all too clear.

*The ancillary orders*

45. I can see no objection in principle to the form of the ancillary orders as set out in paragraph 6 of the freezing order. These orders prevented Ascom, without first obtaining the permission of the court, from agreeing to any amendment to the Sharing Agreement, the Security and Collateral Assignment Agreement or the Security Agent Agreement or any assignment of rights under the Sharing Agreement. Ascom was also prevented from giving instructions to Mr Stati in his capacity as the ECT Claimants' Representative for the purpose of the Security Agent Agreement. The object of these provisions was to prevent dissipation by Ascom of the asset it held in the shape of rights under the ECT Award. Ascom submits that the effect of this is to stop it monetising those rights and enabling it to pursue enforcement of the Award against the State of Kazakhstan which is refusing to pay and taking steps in the seat of the arbitration to set aside the Award. No application has been made to this court for a release from these orders on the basis that such monetisation is actually necessary for funding enforcement and thus inuring to the benefit of the company as a whole in circumstances where there are no other funds available for this purpose. For any such application to have any prospect of success, Ascom would have to present the full picture of its assets and liabilities to this court, documented and audited in such a way as to satisfy the court of the true position in order to make out a case that it was necessary for an assignment of rights or a change in the arrangements to take place in order to pursue enforcement. The Court would have to be satisfied that any funds obtained were to be used for proper commercial purposes for the benefit of the company and that there were no other funds available to the ECT Claimants for this

purpose. Given the unreliability of the evidence produced thus far, it would face an uphill struggle in seeking to persuade the Court that an *Angel Bell* variation was required.

*Conclusion*

46.   I have therefore dismissed Ascom's application to discharge or vary the order. It will continue until further order of this Court and costs must follow the event.

57