## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                     )
ANATOLIE STATI; GABRIEL STATI;              )
ASCOM GROUP, S.A.; TERRA RAF               )
TRANS TRAIDING LTD.,                            )
                                                     )
                         Petitioners,              )
                                                     )
        v.                                          )          Civil Action No. 14-1638 (ABJ)
                                                     )
REPUBLIC OF KAZAKHSTAN,                     )
                                                     )
                         Respondent.              )
_____)

### MEMORANDUM OPINION & ORDER

        The petitioners in this action are Anatolie Stati and Gabriel Stati ("Stati"); Ascom Group,

S.A. ("Ascom"), a company incorporated in Moldova and owned by Anatolie Stati; and Terra Raf

Trans Traiding Ltd. ("Terra Raf"), a company incorporated in Gibraltar, and owned in equal shares

by Anatolie and Gabriel Stati.  They have filed a petition to confirm a December 19, 2013

arbitration award against respondent, the Republic of Kazakhstan ("Kazakhstan"), related to

Kazakhstan's alleged violation of the Energy Charter Treaty, an international agreement signed by

the respondent.  Pet. to Confirm Arbitral Award ("Pet.") [Dkt. # 1] ¶¶ 11, 34, 36.  Petitioner seeks

to confirm the award pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 _et seq._,

which codifies the United Nations Convention on the Recognition and Enforcement of Foreign

Arbitral Awards[1], June 10, 1958, 330 U.N.T.S. 38.  Pet. ¶ 1.  The Court finds as a preliminary

matter that it has jurisdiction under both the FAA and the Foreign Sovereign Immunities Act.  But

given the pendency of a proceeding to set aside the arbitral award and the status of that proceeding,

---

1       The treaty is more commonly known as the "New York Convention," and this opinion will
refer to it as such.

the Court believes that it is prudent to stay the instant action pending resolution of that challenge. Therefore, this matter will be stayed, and the parties will be ordered to file a status report advising the Court of the status of the currently pending petition in the Svea Court of Appeal within seven days of any decision by that court.

## FACTUAL BACKGROUND[2]

Petitioners have been engaged in the oil and gas business in Kazakhstan for approximately 17 years.  In 1999, petitioner Ascom, Anatolie Stati's company, purchased a 62% share in KPM, a company that owned the subsoil use rights to the Borankol oil field in Kazakhstan.  Pet. ¶ 29.  In 2000, petitioners acquired a 75% interest in TNG, a company that owned the subsoil use rights to the Tolkyn gas field and the Tabyl exploration block ("Tabyl Block").  *Id.* ¶ 30.  Ascom ultimately acquired 100% of KPM, and Terra Raf allegedly came to own 100% of TNG.[3]  *Id.* ¶ 31.  In 2000, KPM and TNG obtained approval from Kazakhstan to explore and develop various oil and gas fields located in Kazakhstan.  Arb. Award [Dkt. # 2-1, 2-2, 2-3, 2-4] ("Award") ¶ 229.  A year later, in 2001, petitioners, through KPM and TNG, invested more than one billion dollars in the development of the Borankol and Tolkyn fields, and the Tabyl Block.  Pet. ¶ 32.

In 2008, the President of Moldova contacted the President of Kazakhstan and accused Anatolie Stati of illegally concealing profits in offshore territories and illegally using the proceeds from his Kazakhstan operations to invest in states subject to sanctions by the United Nations. Award ¶ 291.  Kazakhstan subsequently began a government investigation of Stati and his

---

2      Because the Court must satisfy itself that it has jurisdiction before it turns to the merits of the petition to confirm the arbitration award, this opinion will focus only on the facts relevant to the jurisdictional questions.

3      Kazakhstan disputes the validity of the transfer of TNG to Terra Raf.  Resp't's Opp. to Pet. [Dkt. # 20] ("Resp't's Opp.") at 12 n.6.

companies.  *Id.* ¶¶ 296, 301.  Petitioners and respondent disagree on what followed.  According to petitioners, the government of Kazakhstan began to intimidate and harass petitioners into selling their investments to the state-owned KazMunaiGas at a substantial discount.   Pet. ¶ 33.  Specifically, petitioners claim that Kazakhstan "baselessly" accused petitioners of fraud and forgery, levied more than $70 million dollars in back taxes, arrested KPM's general manager for "illegal entrepreneurial activity," and ultimately seized all of KPM and TNG's assets.  *Id.*  And, in July of 2010, Kazakhstan terminated petitioners' subsoil use contracts.  Award ¶ 611.

Petitioners assert that in 2009 they contacted respondent in response to the alleged harassment.  On March 18, 2009, Stati wrote to Kazakhstan's Ministry of Energy and Mineral Resources, and requested an amicable resolution to the Ministry's rescission of its prior approval of Terra Raf's acquisition of its Kazakh subsidiary.  Award ¶ 412.  The next day, March 19, 2009, the executives from Terra Raf and Ascom met with the Ministry's executive secretary to discuss resolution of that issue and other alleged harassment.  *Id.* ¶ 414.  Just under two months later, on May 7, 2009, Stati wrote a letter to the president of Kazakhstan that set forth petitioners' intention to bring arbitration claims against Kazakhstan for the diminution of the value of their investments.  Award ¶ 444.

Kazakhstan's version of events is that the Kazakh Tax and Customs Committee properly assessed $62 million dollars in taxes to petitioners, and that a lawful criminal investigation by the Kazakh authorities led to in the arrest and imprisonment of KPM's General Director.  Award ¶¶ 394, 430, 440, 492.  Respondent maintains that it was the investigation that led to the termination of KPM and TNG's subsoil use contracts on July 21, 2010, and it disputes the claim that Kazakhstan expropriated petitioners' assets.  *Id.* ¶¶ 591–611.  Instead, respondent takes the

position that the Kazakh state oil company and its subsidiary placed petitioners' oil and gas fields into trust management on a temporary basis only.  *Id.* ¶ 611.

On July 26, 2010, petitioners filed a request for arbitration.  Req. for Arb., Ex. C. to Decl. of Charlene C. Sun [Dkt. # 2–6] ("Req. for Arb.").  The request states:

> Over the past two years, Kazakhstan has engaged in a campaign of harassment and illegal acts against [petitioners] that culminated on July 21, 2010 with the State's notice of unilateral termination of the companies' Subsoil Use Contracts, the illegal expropriation of [petitioners'] Kazakh investments, and the subsequent commandeering of [petitioners'] offices by personnel of State-owned KazMunaiGas and the Kazakh Ministry of Oil and Gas.

*Id.* ¶ 4.  The request invoked the Energy Charter Treaty and asserted that Kazakhstan's harassment "clearly had expropriation as its ultimate goal, and it had the effect in the process of destroying both the market value and alienability of [petitioners'] investments."  *Id.* ¶¶ 4, 8.

The parties arbitrated the dispute before the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC").  On December 19, 2013 the Tribunal determined that Kazakhstan breached its obligation to provide fair and equitable treatment under article 10(1) of the ECT.  Award ¶¶ 1085–95.  The Tribunal awarded petitioners $497,685,101.  This total included $277.8 million for the Borankol and Tolkyn oil and gas fields, $31.3 million for the subsoil use contracts, $199 million for an unfinished plant, and $8,975,496.40 in legal costs.  *Id.* ¶¶ 1085-95, 1856-61, 1885.

On September 30, 2014, petitioners commenced this proceeding to confirm the arbitration award under the New York Convention and the FAA.  Pet.  Respondent opposed the motion, Resp't's Opp., petitioners filed a reply, Pet'rs' Reply, and the Court granted respondent leave to file a sur-reply, Resp't's Sur-Reply in Supp. of Resp't's Opp. [Dkt. # 28] ("Resp't's Sur-Reply").  On October 21, 2015, the Court ordered the parties to brief the question of subject matter jurisdiction under both the FAA and the Foreign Sovereign Immunities Act.  Min. Order (Oct. 21,

2015).  Both parties responded to the Court's Order.  *See* Pet'rs' Mem. of Law re Court's Order [Dkt. # 30] ("Pet'rs' Juris. Mem."); Resp't's Mem. on Subject Matter Jurisdiction [Dkt. # 31] ("Resp't's Juris. Mem.").

## LEGAL BACKGROUND

Before the Court may turn to the merits of petitioners' argument that the arbitral award in this case should not be confirmed in the United States under the New York Convention, it must first ensure that it has jurisdiction to hear this case.

> Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.  It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). In addition, "'[i]t is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue *sua sponte*.'"  *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), quoting *Athens Cmty. Hosp., Inc. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982).  Indeed, a federal court must raise the issue because it is "forbidden – as a court of limited jurisdiction – from acting beyond [its] authority."  *Id.*, citing *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

Under Federal Rule of Civil Procedure 12(b)(1), petitioner bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye*, 339 F.3d at 971, quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

To determine whether a district court has subject matter jurisdiction over the type of case presented here – an action to enforce a foreign arbitral award against a foreign sovereign – two requirements must be satisfied. "First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, [the foreign state] must not enjoy sovereign immunity from such an enforcement action." *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). For the reasons that follow, the Court finds that the New York Convention provides a basis for the Court to enforce the award, and that Kazakhstan does not enjoy sovereign immunity in this instance.

## ANALYSIS

### I. The Court has subject matter jurisdiction under the Federal Arbitration Act.

The Federal Arbitration Act is the statute that codifies the New York Convention into U.S. law. 9 U.S.C. § 201 *et seq.* Section 202 of the FAA specifies that: "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the [New York] Convention." 9 U.S.C. § 202. The "district courts of the United States . . . shall have original jurisdiction over [an action or proceeding falling under the Convention], regardless of the amount in controversy." 9 U.S.C. § 203.

As the Second Circuit has explained, a court will have subject matter jurisdiction under the FAA when: "(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001).

### A. Kazakhstan agreed to arbitrate for purposes of the FAA.

Kazakhstan argues that it did not consent to the arbitration, and thus no agreement to arbitrate exists under the FAA. Resp't's Opp. at 29–30. The arbitration award in this case arises

out of the Energy Charter Treaty.  *See* Pet. ¶ 27.  Kazakhstan's argument is based on Article 26 of

that treaty, which outlines how disputes that arise under the treaty will be handled:

(1)     Disputes between a Contracting Party and an Investor of another Contracting Party[4] . . . shall, if possible, be settled amicably.

(2)     If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

    (a)     to the courts or administrative tribunals of the Contracting Party party to the dispute;

    (b)     in accordance with any applicable, previously agreed dispute settlement procedure; or

    (c)     in accordance with the following paragraphs of this Article.

(3)     (a)     Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

    (b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

      (ii)  For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

    (c)     A Contracting Party listed in Annex IA does not give such unconditional consent with regard to a dispute arising under the last sentence of Article 10(1).

Energy Charter Treaty, art. 26 (1)–(3), 34 I.L.M. 360, 399–400 (1995) ("ECT").

---

4     A "Contracting Party" under the ECT is a state that has ratified the treaty.  *See* ECT, art. 1(2),  34 I.L.M. 360, 383 (1995).  An "Investor" is a person or entity who resides in one of those states.  *Id.*, art. 1(7).

The treaty provides that "[t]he consent given in paragraph (3) [of article 26] together with the written consent of the Investor . . . shall be considered to satisfy the requirement for . . . an "agreement in writing" for the purposes of article II of the [New York Convention].  ECT, art. 26(5)(a)(ii).  It is undisputed that petitioners are Investors under the ECT, and that they consented to arbitrate.  Pet. ¶¶ 14–20.

Kazakhstan contends, though, that it never consented to arbitrate.  It argues:  1) that Article 26(1) of the ECT requires that disputes be settled amicably, if possible; 2) that Article 26(2) accords the parties three months to settle a dispute among themselves before the Investor Party may submit it for resolution, and 3) that Article 26(3)(a) states that the Contracting Party gives consent to international arbitration "in accordance with the provisions of this Article."  Resp't's Opp. at 29.  Thus, Kazakhstan concludes that it did not consent, and no agreement existed because petitioners failed to await the expiration of the three-month settlement period, and that failure was not "in accordance with the provisions of this Article."  *Id.*; *see* ECT, art. 26(1)–(3).

While it does appear that the contractual requirement to attempt to come to a negotiated resolution is mandatory, that provision does not serve as a condition precedent to the contracting parties' consent to international arbitration.  Article 26(3)(a) of the ECT specifies:  "[s]ubject *only* to subparagraphs (b) and (c), each Contracting Party hereby gives its *unconditional* consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article."  *Id.* at 29–30, art. 26(3)(a) (emphasis added).  Although respondent is correct that article 26(3) requires arbitration to proceed in accordance with article 26's provisions, including the three-month settlement period, the international arbitration provision does not act as a condition precedent to a party's consent, which is "[s]ubject *only* to subparagraphs (b) and (c)."  *Id.*

Interpreting the ECT to mean that the three-month settlement period is a prerequisite to consent, as respondent suggests, would be an obscure way to include a third major exception to otherwise unconditional consent. *See, e.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468–69 (2014) ("[I]t is generally presumed that statutes do not contain surplusage"), quoting *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 299 n.1 (2006). Kazakhstan therefore consented to the arbitration under the ECT, because the only exceptions to consent under subparagraphs (b) and (c) of article 26(2) are not at issue here, and therefore the treaty provides for Kazakhstan's "unconditional consent" to international arbitration. *See* ECT, art. 26(3)(a).[5]

### B.     The ECT provides for arbitration in Sweden, and the dispute is not entirely domestic in scope.

To assert jurisdiction under the FAA, the Court must also find that the ECT provides for arbitration in the territory of a signatory of the New York Convention, and that the subject matter of the dispute is not entirely domestic in scope. *U.S. Titan,* 241 F.3d at 146. Neither of these elements are in dispute.

The arbitration occurred in a territory of a signatory to the New York Convention, Pet. ¶ 43; *see also TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 299, 305 (D.C. Cir. 2005) (upholding an award from arbitration held in Sweden under the New York Convention). And, the subject matter of the dispute is not entirely domestic in scope because it involves a dispute originating in Kazakhstan, and none of the parties are citizens of the United States. *See* Pet. ¶¶ 28–39; *see* 9 U.S.C. § 202 ("An agreement or award arising out of [a commercial relationship] which

---

5       And in any event, the arbitration should have come as no surprise to Kazakhstan. The matter was submitted to arbitration more than a year after petitioners informed the President of Kazakhstan on May 7, 2009, that, in light of the alleged harassment, they "intended to bring arbitration claims against Kazakhstan for the diminution of value" of certain of petitioners' investments. Award ¶ 444.

is entirely between citizens of the United States shall not be deemed to fall under the Convention . . . .").

### C.   The subject matter of the arbitration is commercial.

The Energy Charter Treaty expressly provides in Article 26 that "[c]laims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of [the New York] Convention." ECT, art. 26(5)(b). Thus, respondent Kazakhstan, a party to the ECT, has plainly agreed that the relationship between it and the petitioners is commercial under the New York Convention and the FAA. *Id.*; 9 U.S.C. § 202.

Moreover, the case law in this Circuit supports that finding. As the D.C. Circuit recently recognized, the term "commercial" as used in the New York Convention, though it does not have a specific statutory definition, refers to "matters or relationships, whether commercial or not, that arise out of or in connection with commerce." *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 103–04 (D.C. Cir. 2015), quoting Restatement (Third) of U.S. Law of Int'l Comm. Arb. § 1-1 (2012); Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987) (explaining that "the fact that an agreement to arbitrate is in the contract between a government and a private person may confirm its commercial character"). The *Belize* court added that "the full scope of 'commerce' and 'foreign commerce' as those terms have been broadly interpreted, is available for arbitral agreements and awards." 794 F.3d at 104, quoting *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973); *see also Diag-Human, S.E. v. Czech Republic – Ministry of Health*, No. 14-7142, 2016 WL 3064507, at *4 (D.C. Cir. May 31, 2016).

In the transactions underlying this case, respondent Kazakhstan granted and revoked petitioners' rights to develop oil and gas fields within its borders, so the relationship between the parties clearly "arise[s] out of or in connection with commerce." *See Belize*, 794 F.3d at 104.

Because the Court finds that each of the four factors of the *U.S. Titan* test have been met, it finds that it has jurisdiction under the FAA.  The Court next considers whether Kazakhstan nonetheless enjoys foreign sovereign immunity in this enforcement action under the Foreign Sovereign Immunities Act.  *See Creighton*, 181 F.3d at 121.

## II. The Court has subject matter jurisdiction because this case falls within the implied waiver and arbitration exceptions to the Foreign Sovereign Immunities Act.

The Foreign Sovereign Immunities Act is the "sole basis for obtaining jurisdiction over a foreign state in the courts of [the United States]."  *Belize*, 794 F.3d at 101, quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  Under the FSIA, 28 U.S.C. § 1602 *et seq.*, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions . . . [a]t the threshold of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the exceptions applies."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983); *see also Belize*, 794 F.3d at 101 (describing the FSIA's terms as "absolute").

It is undisputed that respondent Kazakhstan is a foreign state that is covered by the FSIA.  Petitioners assert that the Court may exercise subject matter jurisdiction in this case under two different exceptions to foreign sovereign immunity: the implied waiver provision, 28 U.S.C. § 1605(a)(1), and the arbitration exception, 28 U.S.C. § 1605(a)(6).  Pet'rs' Juris. Mem. at 4–10.  The Court is satisfied that those exceptions apply and that it therefore has the power to hear the matter.

**A.    Kazakhstan has implicitly waived its sovereign immunity under Section 1605(a)(1) of the FSIA.**

Section 1605(a)(1) of the FSIA, the implied waiver provision, states that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has waived its immunity . . . by implication." 28 U.S.C. § 1605(a)(1).  The Court of Appeals has found implied waivers of foreign sovereign immunity in three circumstances: when "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990), citing S. Rep. No. 94-1310, at 18 (1976); H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617. The first and third options are applicable here.

**1.    Kazakhstan's agreement to arbitrate in Sweden operates as an implied waiver of immunity to suit in the United States.**

**a.    Kazakhstan has "agreed to arbitration."**

The question of whether Kazakhstan agreed to arbitrate is central to the parties' dispute in this case.  The D.C. Circuit has recently explained that the FSIA does not require a district court to make a *de novo* determination of arbitrability.  *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 205 (D.C. Cir. 2015).  All that is required is that the petitioner make a "prima facie showing that there was an arbitration agreement by producing the [treaty] and the notice of arbitration."  *Id.* Once petitioner makes this showing, the burden shifts to the respondent "to demonstrate by a preponderance of the evidence that the [treaty] and the notice to arbitrate did not constitute a valid arbitration agreement between the parties." *Id.*, citing *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008).

Petitioners here have provided prima facie evidence of an arbitration agreement – they have

a provided the Energy Charter Treaty, *see* Ex. B. to Sun Decl. [Dkt. # 2-5], and the notice of

arbitration.  Req. for Arb.  Thus, the Court must determine "whether [respondent] has sufficiently

rebutted the presumption that the [treaty] and [petitioner's] notice of arbitration constituted an

agreement to arbitrate."  *Chevron*, 795 F.3d at 205.

The ECT provides that if a dispute cannot be solved "within a period of three months from

the date on which either party to the dispute requested amicable settlement, the Investor party to

the dispute may choose to submit it for resolution" before an international arbitration.  ECT, art.

26(2)–(3)(a).  Respondent, as it argued under the FAA, attempts to rebut the presumption by

arguing that it never agreed to arbitrate because petitioners failed to satisfy the three month

"cooling off" period that was required under the Energy Charter Treaty.  Resp't's Juris. Mem. at

5–13.

Respondent's argument is undermined by the recent Supreme Court decision in *BG Group,*

*PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014).  *BG Group* involved a dispute-resolution

provision in an investment treaty between the United Kingdom and Argentina.  *Id.* at 1203.  The

provision provided for arbitration if the local court had not reached a final decision within eighteen

months of the time the aggrieved party submitted a dispute.  *Id.*  Argentina alleged that the

arbitrators did not have jurisdiction because BG Group initiated arbitration without waiting the

requisite eighteen months.  *Id.* at 1204.  The Supreme Court concluded that the eighteen-month

provision was procedural, not jurisdictional, because it governed when the duty to arbitrate arose,

rather than whether the duty existed at all.  *Id.* at 1207.  As a result, the Supreme Court held that

satisfaction of the condition was for the arbitrators to decide, not the courts, because parties

"normally expect a forum-based decision-maker to decide forum-specific *procedural* gateway matters." *Id.*, quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 86 (2002).

That principle applies here as well.  As the Court has discussed, the three-month settlement period is not a condition precedent to the consent to arbitrate because Kazakhstan gave its *unconditional* consent to arbitration in the ECT subject only to two exceptions that do not relate to the settlement period.  *See* ECT, art. 26(3)(a); *see also Chevron*, 795 F.3d at 206.  As in *BG Group*, the settlement period is a procedural provision that determines when the parties may begin arbitration, and such procedural prerequisites are for the tribunal, not the Court, to interpret and apply.  *See* 134 S. Ct. at 1207.  In this case, the tribunal determined that a three-month suspension of the proceedings would satisfy the ECT's three-month settlement requirement.  Award ¶ 830.  Because the arbitrators found the procedural hurdle to arbitration to have been satisfied, respondent has failed to rebut the presumption of an agreement to arbitrate under the FSIA.

### b.        Respondent agreed to arbitrate in another country.

Petitioners next submit that Kazakhstan implicitly waived its sovereign immunity because it agreed to arbitrate in Stockholm.  *See* Pet'rs' Juris. Mem. at 7–8.  As the D.C. Circuit has explained, when a foreign state agrees to arbitrate in a country that has signed the New York Convention, it waives its sovereign immunity in all of the signatory countries, because "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states." *Creighton*, 181 F.3d at 123, quoting *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 578 (2d Cir. 1993).  Kazakhstan, Sweden, and the United States are all signatories of the New York Convention.  *See* "Contracting States," *New York Arb. Convention*, http://www.newyork convention.org/countries.

Therefore, because respondent agreed to arbitrate in Sweden, the implied waiver doctrine applies, and Kazakhstan cannot assert its foreign sovereign immunity in the United States as a bar to this Court's jurisdiction over the petition to confirm the arbitration award.

> **2.     Kazakhstan's failure to raise the sovereign immunity defense in its first responsive pleading is a second implied waiver of sovereign immunity.**

There would be additional grounds to find that Kazakhstan has waived its sovereign immunity if it filed a responsive pleading without raising a sovereign immunity defense. *Foremost-McKesson*, 905 F.2d at 444 (holding that a sovereign has impliedly waived its immunity when it makes a "conscious decision to take part in the litigation and [fails] to raise sovereign immunity despite the opportunity to do so").  After petitioner filed this action, respondent filed two substantive responsive pleadings – an opposition to the petition, and a sur-reply in support of its opposition,  Resp't's Opp.; Resp't's Sur-Reply – and it did not object to this Court's jurisdiction on sovereign immunity grounds.  Indeed, the parties were silent with respect to any foreign sovereign immunity questions until the Court solicited briefing on the issue.  *See* Min. Order (Oct. 21, 2015).  Because respondent made a "conscious decision" to file responsive pleadings in this Court, it can be found to have waived sovereign immunity under the FSIA for this reason as well. *Foremost-McKesson*, 905 F.2d at 444.

> **B.     Kazakhstan waived its sovereign immunity under Section 1605(a)(6), the arbitration exception to the FSIA.**

The  Court  can  also  assert  its  jurisdiction  through  another  one  of  the  FSIA's exceptions – the arbitration exception.  Under that exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or  to confirm

15

> an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . .

28 U.S.C. § 1605(a)(6).  As the D.C. Circuit explained in *Chevron*, this statute requires that a district court must make three findings to satisfy itself that it has jurisdiction under the arbitration exception:  (1) a foreign state has agreed to arbitrate; (2) there is an award based on that agreement; and (3) the award is or may be governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards.  795 F.3d at 204 (citing a party's argument and indicating that the party "has identified the relevant jurisdictional facts").

As the Court has already found, Kazakhstan agreed to arbitrate for purposes of the FSIA. *See id.* at 205.  And the Court finds – and the parties do not appear to dispute – that the arbitral award that petitioners are seeking to enforce in this action was made pursuant to that agreement. *See id.* at 204 (finding that "the existence of an award is a factual question that the District Court must resolve in order to maintain jurisdiction").

Finally, the arbitral award "is or may be governed" by the New York Convention.  The New York Convention is a multilateral treaty providing for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention, art. I.1.  The FAA, which codifies the New York Convention into U.S. law, declares, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  9 U.S.C. § 203.  Since all that is required for jurisdiction under the FSIA is a "non-frivolous" argument that the controversy is covered by the Convention, *see Chevron*, 795

F.3d at 204; *Agudas-Chasidei Chabad*, 528 F.3d at 941, the Court finds that petitioners have satisfied this factor as well.

Because Kazakhstan has waived its sovereign immunity by implication in the two ways discussed above, and because this dispute falls under the arbitration exception to the FSIA, the Court may exercise its subject matter jurisdiction over this dispute under the FSIA. *See* 28 U.S.C. § 1605(a)(1), (a)(6).

**III.   This matter will be stayed in light of the pending set-aside proceeding in Sweden.**

The Court must consider, then, whether the petition to confirm the arbitral award should be granted.  On April 5, 2016, Kazakhstan moved for leave to file additional grounds in support of its opposition to the petition to confirm the arbitration award.  Resp't's Mot. for Leave to Submit Additional Grounds in Supp. of Opp. to Pet. [Dkt. # 32].  In its motion, respondent argued that petitioners procured the award by fraud, and noted that "[i]n March 2014, Kazakhstan initiated proceedings before the Svea Court of Appeal in Stockholm, Sweden . . . to set aside the SCC Award under the Swedish Arbitration Act." *Id.* at 2–4, 6–7.  The Court reviewed the arbitration award and denied the motion, reasoning that "it [would] not be in the interest of justice to conduct a mini-trial on the issue of fraud here when the arbitrators expressly disavowed any reliance on the allegedly fraudulent material." Order (May 11, 2016) [Dkt. # 36] at 4.

Kazakhstan then moved for reconsideration, Resp't's Mot. for Recons. of May 11, 2016 Order [Dkt. # 37] ("Resp't's Mot."), and petitioners opposed the motion.  Pet'rs' Mem. of P. & A. in Opp. to Resp't's Mot.  [Dkt. # 38] ("Pet'rs' Opp.").  Petitioners pointed out that Kazakhstan "has the opportunity to litigate the very same fraud allegations in the courts of Sweden, which is the seat of the arbitration and primary jurisdiction in this case." *Id.* at 5.  In respondent's reply, it confirmed that the parties are litigating the fraud issue in Sweden, but it argued that the Sweden

17

proceeding should not affect the Court's review of the petition to confirm, or the motion for reconsideration.  *See* Reply in Supp. of Mot. for Recons. [Dkt. # 39].

The Court then ordered the parties to address whether a stay pending the resolution of the set-aside proceedings in Sweden would be prudent.  Min. Order (June 10, 2016).  Kazakhstan indicated that it "has not requested a stay of these proceedings," and "that its position has not changed and Kazakhstan is not now requesting a stay."  Resp't's Mem. on Stay of Proceedings [Dkt. # 40] at 1.  But Kazakhstan also recognized "the strong likelihood that a stay in favor of the Swedish Proceedings would serve the interests of judicial economy."  *Id.* at 2.  For that reason, it stated that it did "not object to a stay if the Court is inclined to order one," because "[i]n the event Kazakhstan's petition to set aside the Award is granted by the Svea Court of Appeal, the Award will be virtually unenforceable in the United States and the Petition to Confirm would thus be subject to summary denial."  *Id.* at ¶¶ 2, 4.  Kazakhstan noted that the "Swedish Proceedings are scheduled for final hearing during twelve (12) non-consecutive days in the immediate future – from September 8 to October 6, 2016 – with a decision expected from the Svea Court of Appeals before the end of 2016."  *Id.* ¶ 7.

Petitioners oppose a stay, and they maintain that if the Court were inclined to grant a stay, Kazakhstan should be forced to post security for the amount of the arbitration award.  Pet'rs' Mem. of P. & A. Concerning Stay of Proceedings [Dkt. # 41] ("Pet'rs' Stay Mem.").  Petitioners do not contest that a hearing is scheduled to occur in the coming months, but they protest that even if the decision of the Swedish court is issued at the end of 2016, an appeal could follow, and that appeal

could take another year to conclude.  *Id.* at 3.[6]  Kazakhstan responded to petitioners' filing to oppose the posting of security, and argued that the request was procedurally deficient.  Resp't's Resp. to June 24, 2016 Mem. [Dkt. # 42].

The New York Convention provides that the Court "may, if it considers it proper, adjourn the decision on the enforcement of the award" where "an application for the setting aside or suspension of the award has been made to a competent authority" in the country in which the award was issued.  New York Convention, art. VI.  Although the D.C. Circuit has not addressed the scope of the Court's discretion under Article VI, other circuits have stressed that in exercising this discretion, the Court should "balance the Convention's policy favoring confirmation of arbitral awards against the principle of international comity embraced by the Convention."  *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 (11th Cir. 2004), citing *Europcar Italia, S.p.A v. Maiellano Tours*, 156 F.3d 310, 317 (2d Cir. 1998).  And the Second Circuit has articulated a non-exhaustive list of six factors that a district court should consider in conducting the required balancing:

> (1)    [T]he general objectives of arbitration – the expeditious resolution of disputes and the avoidance of protected and expensive litigation;
>
> (2)    the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3)    whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4)    if the characteristics of the foreign proceeding including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying

---

[6]    Petitioners admit, however, that "[w]hile decisions rendered by the Swedish Court in set aside cases generally are not appealable, the Swedish Court may grant leave to appeal if it considers the matter to be of importance as a matter of precedent that the appeal be considered by the Supreme Court."  Decl. of Ginta Ahrel [Dkt. # 41-1] ¶ 16.

enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5)     a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country; and

(6)     any other circumstances that could tend to shift the balance in favor or against adjournment.

*Europcar*, 156 F.3d at 317–18.

These factors weigh in favor of a stay.  As to the first factor, while the Court recognizes that a stay will not promote the expeditious resolution of this matter, a decision by the Svea Court of Appeal may limit or eliminate the need for continued and expensive litigation.  And in terms of the timing of the Swedish proceeding, the parties anticipate that it will be resolved in short order. The record does not reflect the standards under which the Svea Court of Appeal will consider the set-aside petition, but given the summary nature of confirmation proceedings under the New York Convention, *see Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (noting that district courts have "little discretion in refusing or deferring enforcement of foreign arbitral awards"), the Court finds that the third factor is at least neutral if it does not favor the stay. The fourth factor appears to point in more than one direction:  the foreign proceeding was brought to set an award aside, which the Second Circuit suggests (without explanation) would weigh against a stay, but it was initiated before the instant matter was filed, which would indicate that a stay would be consistent with international comity.  And while petitioners have articulated some financial pressures that will not be remedied by a stay, the Court is mindful that if respondent is successful in the set-aside proceeding, confirmation of the award will be unlikely, and so the fifth factor favors a stay.  *See* New York Convention, art. V(1)(e); *see also In re Arb. of Certain*

*Controversies Between Getma Int'l & Republic of Guinea*, No. 14–1616 (RBW), 2016 WL 3211808 (D.D.C. June 9, 2016) (declining to enforce foreign arbitration award where it had been set aside by a court of competent authority).  There are no other relevant considerations that the parties have identified.[7]

Given the fact that a decision by the Swedish court is expected in the coming months, and the possibility that the pending set-aside proceeding could have a dramatic impact on the petition to confirm the arbitration award, the Court will, in an exercise of its discretion, stay this confirmation proceeding.

---

7    Petitioners have requested that "any stay be conditioned upon [Kazakhstan's] posting of security in the full amount of the award, including interest, within a reasonable period of time." Pet'rs' Stay Mem. at 5; *see* New York Convention, art. VI (indicating that the Court "may, if it considers it proper . . . order the other party to give suitable security").  Given the fact that the stay is likely to be of reasonably short duration, the Court, in an exercise of its discretion, will not require Kazakhstan to post security.  However, the Court may revisit the matter if the Swedish court's decision is appealed.

**CONCLUSION**

For all of the reasons that the Court has explained, the Court finds that it has jurisdiction over this dispute.  However, the Court will stay the consideration of the merits of the dispute until the Svea Court of Appeal reaches a decision on respondent's petition to set aside the arbitral award. Within seven days of a decision in the set-aside proceedings, the parties shall file a joint report attaching the decision of the Swedish court, indicating whether any appeals are anticipated, and requesting that the Court lift the stay and resume the  proceedings, if necessary.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 5, 2016