IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD.,<br><br>Petitioners,<br><br>v.<br><br>REPUBLIC OF KAZAKHSTAN,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:14-cv-1638-ABJ<br>)<br>)<br>)<br>)<br>)<br>) |

**NOTICE OF SUPPLEMENTAL AUTHORITY**
**REGARDING MOTION FOR RECONSIDERATION**

Respondent Republic of Kazakhstan ("Kazakhstan") hereby provides notice of supplemental authority relevant to its pending Motion for Reconsideration (ECF 37).

**INTRODUCTION**

First, on June 6, 2017, in the related proceedings before the High Court of Justice, Queen's Bench Division, Commercial Court, in London, England (the "London Proceedings"), the High Court of Justice (the "London Court") issued a ruling on the precise question before this Court on Kazakhstan's Motion for Reconsideration, *i.e.*, whether Kazakhstan should be permitted to amend its case to permit introduction of evidence that the Stati Parties obtained the SCC arbitral award ("SCC Award") through fraud. The London Court, after receiving extensive evidence—including thousands of pages of documentary evidence – and holding a two-day hearing, held that Kazakhstan has demonstrated a *prima facie* case that the Stati Parties obtained the SCC Award by fraud, and granted Kazakhstan's motion for leave.[1] Further, in making this ruling, the London Court rejected the exact same argument which the Stati Parties presented to

---
[1] The decision is attached hereto as Exhibit 1.

1

this Court in opposition to Kazakhstan's Motion for Leave (ECF 32), on which the Court relied to deny Kazakhstan's motion (ECF 36), and which is now the subject of Kazakhstan's Motion for Reconsideration (ECF 37), *i.e.*, the argument that the alleged fraud even if accepted as true did not affect the Tribunal's ruling in the SCC Award. Kazakhstan respectfully submits that the reasoning and findings of the London Court should be considered by this Court if it decides to lift the stay and rule on Kazakhstan's Motion for Reconsideration.

Second, a recent decision from the D.C. Circuit confirms the proposition that fraud not discovered in an underlying arbitral proceeding is a basis for non-recognition of an award under the New York Convention, and a recent decision from the Second Circuit confirms that allegations of fraud in a motion to dismiss context must be accepted as true.

I.  **THE LONDON COURT'S JUNE 6, 2017 DECISION**

   A.  **Procedural History**

As this Court is aware, the Stati Parties sought to enforce the SCC Award against Kazakhstan both in this Court and in the courts of England. In both this Court and the London Proceedings, Kazakhstan sought to introduce newly-discovery evidence of the Stati Parties' fraud as an additional ground to deny enforcement of the arbitral award. *See* Mot. for Leave to Submit Additional Grounds in Support of Opp. to Petition to Confirm Arbitral Award ("Mot. for Leave") (ECF 32) & Mot. for Reconsideration (ECF 37). Specifically, Kazakhstan asserted that the Stati Parties engaged in a fraudulent scheme to *inter alia* artificially inflate the construction costs of the LPG Plant, and then used these artificially inflated costs to obtain a $199 million bid for the LPG Plant from KazMunaiGas ("KMG"), the state-owned oil and gas company of Kazakhstan (the "KMG Indicative Bid"). *See* Mot. for Reconsideration (ECF 37), at 9-10. During the SCC arbitration, the Stati Parties then asserted that the fraudulently obtained KMG Indicative Bid was a valid basis for awarding damages, and the Tribunal relied upon this

assertion to award the Stati Parties $199 million in compensation for the LPG Plant.  As a result, the key piece of evidence relied upon by the SCC Tribunal to award damages to the Stati Parties—the KMG Indicative Bid—was a product of the Stati Parties' alleged fraud.  *See id.*

Kazakhstan asserted that this fraud gives rise to two additional grounds under the New York Convention for non-recognition of the SCC Award:  (1) that the SCC Award is contrary to U.S. public policy (and, in the London Proceedings, contrary to English public policy) in that it was obtained by fraud; and (2) that such fraud denied Kazakhstan of the opportunity to present its case to the SCC Tribunal.  *See* Mot. for Leave (ECF 32) at 5; *see also* Mot. for Reconsideration (ECF 37), at 11-12.  Therefore, Kazakhstan sought leave to make the evidentiary showing of the Stati Parties' fraud that is required to challenge the enforcement of a foreign arbitral award.  ECF 32; *see* N.Y. Convention, art. 5(1) ("[r]ecognition and enforcement of the award may be refused, … only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof" of the ground for non-recognition); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 264, 306 (5th Cir. 2004) (a movant must "establish the fraud by clear and convincing evidence").

As the Court is aware, the Stati Parties opposed Kazakhstan's Motion for Leave, arguing that any alleged fraud did not "adversely affect[] the outcome of the arbitration."  *See* Opp. to Mot. for Leave (ECF 34), at 1.  Specifically, the Stati Parties represented that the arbitral tribunal "did not credit either party's testimony concerning the valuation of the LPG Plant" and Kazakhstan had an "opportunity to, and did, challenge the veracity of Petitioners' valuation expert."  *Id.* at 1-2.  Kazakhstan rebutted this argument in its opening brief and reply brief, explaining that the KMG Indicative Offer was a direct result of the alleged fraud of the Stati Parties.  *See* Mot. for Leave (ECF 32), at 6 ("Kazakhstan presently understands that the $199

3

million awarded to Petitioners for the LPG Plant in the SCC Arbitration was a direct result of the fraud."); Reply in Support of Mot. for Leave (ECF 35), at 3 ("[T]he Stati Parties' fraud infected the $199 million number relied upon by the Tribunal to award compensation to the Stati Parties for the LPG Plant.").[2]

On May 11, 2016, this Court denied Kazakhstan's Motion for Leave and relied on the Stati Parties' representations in finding that: (i) "it is clear that the arbitrators did not rely upon the allegedly fraudulent evidence in reaching their decision" and (ii) "the issue [the alleged fraud] has already been presented to the Swedish authorities." ECF 36 at 3-4. On August 18, 2016, Kazakhstan filed a Motion for Reconsideration on May 18, 2016. ECF 37. Therein, Kazakhstan argued in part that the Court's conclusion (based on the Stati Parties' representation) that the arbitrators did not rely on the alleged fraudulent evidence in reaching their decision was factually incorrect—the arbitrators relied upon the KMG Indicative Bid, which Kazakhstan alleged was procured by fraud—and thus reconsideration was warranted because the Order was based on an incomplete (or incorrect) understanding of the facts. *Id.* at 2-9. Further, Kazakhstan argued that the Court applied the incorrect legal standard. *See id.* at 10-11. On August 5, 2016, the Court stayed these proceedings. ECF 43. Kazakhstan's Motion for Reconsideration remains pending.

In January 2017, in the London Proceedings, Kazakhstan submitted extensive evidence supporting its fraud allegations. This evidence (described in more detail below) was summarized in Kazakhstan's Response to the Stati Parties' Motion to Lift the Stay in this case. *See* ECF 47 at 9-10 (describing the 2,200 pages of evidence submitted in the London Proceedings).

---

[2] Kazakhstan repeated this point in its motion for reconsideration briefing. *See* Mot. for Reconsideration (ECF 37), at 1 ("The $199 million valuation relied upon by the Tribunal to award damages to the Stati Parties was equally the product of the fraud perpetrated by the Stati Parties … ."); Reply in Support of Mot. for Reconsideration (ECF 39), at 2 ("KMG's $199 million bid for the LPG Plant was the product of the Stati Parties' fraud. The Tribunal, in turn, relied on KMG's fraud-infected $199 million bid when issuing the SCC Award.").

On June 6, 2017, the London Court, after review of the voluminous record and a two-day hearing, the London Court granted Kazakhstan's request to amend its case to allow it to proceed with its contention that the SCC Award was unenforceable under the New York Convention because it was obtained by reason of the Stati Parties' fraud. In coming to this conclusion, the London Court rejected the same false argument by which the Stati Parties convinced this Court to deny Kazakhstan's Motion for Leave and which now is the subject of Kazakhstan's motion for reconsideration, *i.e.*, the argument that the Stati Parties' alleged fraud even if accepted as true had no impact on the award of damages for the LPG Plant because the Tribunal relied on the KMG Indicative Offer when valuing the LPG Plant.

## A.   The June 6, 2017 Decision in the London Proceedings

### *1.   Background and Procedural History*

The procedure to enforce a foreign arbitral award is somewhat different in England than in the United States. Under English procedure, a party seeking to enforce an award files an *ex parte* application for enforcement and the court ordinarily grants such application. The court's order then is served on the opposing party and, if defenses are presented, enforcement of the order granting the original *ex parte* application is stayed pending the court's resolution of such defenses.

Pursuant to this procedure, the Stati Parties filed their "without notice" application to enforce the SCC Award and in February 2014, the London Court granted this application. Ex. 1 ¶ 3. Kazakhstan timely filed an initial application to set aside the permission to enforce the award, and presented its then-known New York Convention defenses. *Id.* ¶ 5. Subsequently, after Kazakhstan discovered evidence of the Stati Parties' fraud as a result of a subpoena issued in a 28 U.S.C. § 1782 proceeding it filed in the United States District Court for the Southern District of New York, *In re Ex Parte Application of Petitioner Republic of Kazakhstan for an*

*Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. § 1782*, No. 1:15-mc-0081-P1 (S.D.N.Y.) (the "Section 1782 Proceeding"), Kazakhstan applied to the London Court to amend its pleadings to add the contention that enforcement of the award would contravene English public policy by reason of fraud by the Stati Parties.[3]  *Id.* ¶ 6.  The London Court the issued a stay pending the outcome of the set-aside before the Svea Court of Appeal, which dismissed Kazakhstan's application on December 9, 2016. *Id.* ¶¶ 7, 8.  Thereafter, in January 2017, Kazakhstan submitted extensive witness evidence, documents and legal submissions to the London Court in support of its application to amend its pleading to add its fraud contentions.  A hearing was held on this application on February 6-7, 2017.

### 2. *Relevant Issues Decided*

The London Court decided the central issue presented in Kazakhstan's pending motion for reconsideration in this Court:  whether the Stati Parties' alleged fraud affected the SCC Tribunal's Award.

### 3. *Evidence Before the London Court*

The London Court had before it an extensive record, including full written submissions from the parties, documentary evidence and witness statements from international accountants, construction engineers, Kazakhstan's counsel in the SCC Arbitration, and Kazakhstan's counsel in the Swedish Proceedings.  Kazakhstan's witness evidence and documents totaled over 2,200 pages, and included:

**1.    Expert Report from Deloitte.**  Deloitte GmbH Wirtschaftsprüfungsgesellschaft ("Deloitte"), a member firm of international accounting firm Deloitte Touche Tohmatsu Limited,

---

[3] In the Section 1782 Proceeding, Kazakhstan sought documents from other arbitrations involving the Stati Parties where the value of the LPG Plant was at issue.  The Stati Parties intervened in those proceedings to attempt to prevent those documents from being produced.  In June 2015, the court in the Section 1782 Proceeding issued an Order rejecting the Stati Parties' arguments and allowing production of documents to Kazakhstan to proceed.  Thereafter, Kazakhstan began receiving documents that began to unravel the Stati Parties' fraud.

was retained by Kazakhstan to render an independent expert opinion. Thomas Gruhn and Gabriel Andras of Deloitte submitted an expert report that was 15 pages long and attached 765 pages of appendices and exhibits that addressed the impact of Tolkynneftegaz LLP's ("TNG's")[4] transactions with Perkwood on the amount of KMG's Indicative Bid for the LPG Plant and the significance of the Stati Parties' failure to disclose to its auditors that TNG and Perkwood were related parties. The exhibits included, *inter alia*, Tristan's[5] annual reports; Tristan, KPM and TNG's financial statements;[6] internal documentation demonstrating the basis of the amount of the Indicative Bid; and the expert reports that Deloitte prepared in the Swedish Proceedings.

2.      **Expert Report from Ernst Kallweit.** Mr. Ernst Kallweit is a Senior Project Engineer for Tractebel Gas Engineering GmbH ("TGE"), the primary supplier of the equipment used to construct the LPG Plant. Mr. Kallweit was retained by Kazakhstan to render an independent expert opinion. Mr. Kallweit submitted an expert report that was 40 pages long and attached 17 exhibits, totaling 327 pages, providing a detailed analysis of the Perkwood Contract, including a comparison of the equipment purchased pursuant to the Perkwood Contract and the TGE Contract.[7] The exhibits to Mr. Kallweit's report included, *inter alia*, the TGE Contract[8]; diagrams and/or drawings of the LPG Plant; and spreadsheets analyzing the equipment supplied by TGE pursuant to the TGE Contract.

---

[4] TNG is a Stati-related entity that is owned by Terra Raf, which in turn is owned by Anatolie and Gabriel Stati.

[5] Tristan Oil Ltd. is wholly owned by Anatolie Stati.

[6] Tristan's annual reports for calendar years 2006-2009 attach the audited combined and individual financial statements of KPM, TNG and Tristan and include representations regarding related-party transactions entered into by each corporate entity.

[7] The "Perkwood Contract" refers to the purported contract between Perkwood and TNG dated February 17, 2006. The Perkwood Contract is 45 pages, with 16 annexes. It is one of the principal vehicles through which the Stati Parties effected their fraudulent scheme. Kazakhstan has referred to this document as the "Perkwood Agreement" in prior filings with this Court. *See* ECF 37 at 4.

[8] "TGE Contract" refers to the January 31, 2006 contract between Azalia Ltd., Ascom and TGE. The TGE Contract is a 208-page contract for the supply of equipment and consultancy services for the "Borankol LPG Recovery Unit."

3.     **Witness Statement of Franjo Zaja.**  Mr. Zaja worked onsite at the LPG Plant for TGE as the senior site electrical and instrumental engineer, from October 2008 to February 2009 and February to March 2010.  Mr. Zaja submitted a witness statement that addressed the fact that he had no interactions with Perkwood during his work onsite at the LPG Plant, the status of the construction of the LPG Plant at the time it was abandoned by the Stati Parties, and his observations regarding the remaining equipment onsite at the LPG Plant during the same time period.  His witness statement was seven pages long and attached multiple photographs.

4.     **Witness Statement of Dr. Patricia Nacimiento.**  Dr. Nacimiento is a partner in the Frankfurt office of Herbert Smith Freehills Germany LLP and was lead counsel for Kazakhstan in the SCC Arbitration.  Dr. Nacimiento submitted a witness statement that was 23 pages long and attached 977 pages of exhibits which set forth the factual basis for Kazakhstan's contention that the SCC Award was obtained by fraud.  The exhibits to Dr. Nacimiento's witness statement included, *inter alia*, powers of attorney granted by Perkwood's directors to Anatolie and Gabriel Stati, dated 2005-2009; Perkwood's bank account statement for the years 2006-2009; and various briefing and testimony submitted in the SCC Arbitration.

5.     **Witness Statement of Alexander Foerster.**  Mr. Foerster is a partner at the Swedish law firm Manneheimer Swartling and is lead counsel for Kazakhstan in the Swedish Proceedings.  Mr. Foerster submitted a witness statement that was 13 pages long and attached 95 pages of exhibits.  His witness statement summarized the evidence and argument advanced by Kazakhstan regarding the Stati Parties' fraud in the Swedish Proceedings.  The exhibits to Mr. Foerster's witness statement included, *inter alia*, an English translation of the Svea Court of Appeal's judgment.

**6.     Expert Report of Dr. Patrick Schöldström.**  Dr. Patrick Schöldström is the Director for the Stockholm Centre for Commercial Law and Associate Professor in Procedural Law at the Stockholm University Faculty of Law.  Dr. Schöldström was retained by Kazakhstan to render an independent expert opinion.  Dr. Schöldström submitted a 10-page expert report that explained the standard for invalidating an arbitral award on the basis of public policy under Swedish law and the application of that standard by the Svea Court of Appeal in the Swedish Decision.

### *4.  Findings/Conclusions by the London Court*

(a)   <u>Kazakhstan Presented *Prima Facie* Evidence of Fraud that Affected the $199 Million KMG Indicative Bid that in Turn Affected the SCC Award</u>

On the basis of the evidence, and submissions of both parties, the Court determined that Kazakhstan had presented *prima facie* evidence that the SCC Award was obtained by reason of the fraud of the Stati Parties.  Ex. 1 ¶ 37.  This *prima facie* evidence included that:

- the Stati Parties conceded in the Swedish Proceedings that Perkwood was a Stati-related company, which was not the Stati Parties' position in the SCC Arbitration (*id.* ¶ 26);

- related-party transactions between Perkwood and TNG artificially inflated the costs of the LPG plant (*see id.* ¶¶ 27, 28, 30, 31, 32);

- the Stati Parties were required to disclose in the SCC Arbitration documents specifying the cost of construction of the LPG Plant yet did not disclose the Perkwood Contract (*id.* ¶ 29); and

- the Stati Parties concealed the true costs from TNG's auditors, KMG, Kazakhstan, and the SCC Tribunal (*id.* ¶ 34).

The Court went on to conclude that if the Stati Parties dishonestly stated the costs of the LPG Plant in their financial statements, then the amount of KMG's Indicative Bid would have been a product of those false representations. *Id.* ¶¶ 38-49. In coming to this conclusion, the Court explicitly rejected the Stati Parties' arguments that there was no evidence that the KMG Indicative Bid relied on the Stati Parties' allegedly false financial representations. *Id.* ¶ 39. This is because the KMG Indicative Bid itself states on its face that its estimated value of the LPG Plant is based on information contained in the Information Memorandum (*id.* ¶ 40), and the Information Memorandum was "expressly based" on the information in KPM and TNG's financial statements. *Id.* ¶ 42. As held by the London Court, that these financial statements make no reference to Perkwood being a related party "gives rise to the strongest suggestion that even the auditors of TNG did not know, with one consequence being that audit or review scrutiny of related-party dealings was avoided." *Id.* ¶ 71. Thus: "If construction costs were not US$245 million because that figure was fraudulently inflated by the [Stati Parties] . . . then, because the KMG Indicative Bid valued the LPG Plant using a calculation that brought costs of US$193 million into an arithmetical average there is the clearest argument that the KMG Indicative Bid would have been lower." *Id.* ¶ 43.

Further, the Court found, the SCC Tribunal relied on the KMG Indicative Bid in issuing its award. *Id.* ¶¶ 45-49. Indeed, the Stati Parties themselves "invited the Tribunal to have regard to the KMG Indicative Bid." *Id.* ¶ 45. They argued that "little more [wa]s needed" to demonstrate the value of the LPG Plant. *See id.* In the SCC Award, the Tribunal referred to the KMG Indicative Bid as having "particular relevance" within "the relatively best source of information" for the valuation of the LPG Plant. *Id.* ¶ 47 (quoting SCC Award ¶¶ 1746, 1747); *see also id.* ¶ 20 (In the SCC Tribunal's view, "'the relatively best source for the valuation' [of

10

the LPG Plant] were contemporaneous bids by third parties, and within those, the KMG Indicative Bid specifically."). Importantly, the SCC Tribunal was unaware of the Perkwood Contract, which the Stati Parties failed to disclose to Kazakhstan in the arbitration. As the London Court noted, "[t]he Perkwood Contract was not produced in the [SCC] Arbitration, and I am not satisfied the [Stati Parties] have properly explained why. It fell within the description of documents that the Tribunal required to be produced by the [Stati Parties] where in their possession custody or control. It was a very significant document, as the [Stati Parties] will have known." *Id.* ¶ 75. The London Court thus rejected the Stati Parties' contention that "It is absurd to suggest that the alleged fraud was a fraud on the Tribunal . . ., or would have made a difference to the Tribunal." *Id.* ¶ 48. Rather, the London Court found that "there is the necessary strength of *prima facie* case that the alleged fraud would have made a difference to the Tribunal. And that, in asking the Tribunal to rely on the Indicative Bid in circumstances (concealed from the Tribunal, as from the bidder) of the alleged fraud, there was a fraud on the Tribunal." *Id.* In summary, the Court concluded that the alleged fraudulent "conduct itself, and the concealment of what had been done, had later consequences including for the audited or reviewed financial statements and the KMG Indicative Bid, and in turn the Award." *Id.* ¶ 49.

Based on the foregoing, the Court concluded that "there is a sufficient prima facie case that the [SCC] Award was obtained by fraud," and that the interests of justice require that Kazakhstan's fraud allegations be "examined at trial and decided on their merits" in the London Proceedings. *Id.* ¶¶ 92, 93.[9]

---

[9] Of note, the Stati Parties improperly attempted to use this Court's May 11, 2016 Order denying Kazakhstan's motion for leave to leave to estop Kazakhstan from introducing evidence of the Stati Parties' fraud in the London Proceedings. *See id.* ¶¶ 50, 51. The London Court properly rejected this attempt on the basis of the fact that this Court did not rule on the merits of the Stati Parties' alleged fraud when it issued its May 11, 2016 Order. *Id.* ¶¶ 80, 82, 92.

## II. SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR RECONSIDERATION

After the briefing on Kazakhstan's Motion for Reconsideration was completed, two federal courts of appeal issued decisions that are relevant to the issue presented therein.

### A. *Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria,* 844 F.3d 281 (D.C. Cir. 2016)

In *Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria*, 844 F.3d 281, 287 (D.C. Cir. 2016) (attached as Exhibit 2 hereto), the D.C. Circuit held that a party may raise a valid public policy defense to the enforcement of a foreign arbitral award where enforcement would result in the court being made a party to fraud or other criminal acts.

In *Enron Nigeria*, the award-debtor, Nigeria, argued that the contract that gave rise to the underlying arbitration (its contract with an Enron special purpose vehicle) was "tainted by fraud," and, as a result, enforcement of the arbitral award was contrary to U.S. public policy. *See id*. The D.C. Circuit held that Nigeria's allegations, if demonstrated, could give rise to a valid public policy defense to enforcement of the award. *Id.* The D.C. Circuit observed that "'most if not all States … ha[ve] long recognized the fundamental equitable principle that no one shall be permitted to profit by his own fraud.'" *Id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*, 502 U.S. 105 (1991)). Likewise, the court noted, "'a party to an illegal contract cannot ask a court of law to help him carry out his illegal object.'" *Id.* (quoting *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E. 2d 571 (1948)). Thus, the D.C. Circuit concluded, the "'fundamental equitable principle' preventing courts from being made parties to fraud or other criminal acts'" is a well-defined U.S. public policy for purposes of determining whether a foreign arbitral award may be enforced under the New York Convention. *Id.* (quoting *Simon & Schuster*, 502 U.S. at 119).

Nigeria's fraud claim was rejected on the merits because it had presented its claims of fraud to the arbitral tribunal, which had rejected them. *Id.* at 290.  The D.C. Circuit emphasized that the question before the court enforcing a foreign arbitral award is limited, and "significant" weight is afforded to a tribunal's factual findings.  *Id.* at 289, 291.  Because the tribunal considered and rejected Nigeria's fraud allegations, the D.C. Circuit held that enforcement of the award was not contrary to U.S. public policy.[10]  *Id.*

This case is directly relevant to Kazakhstan's Motion for Reconsideration because it affirms the principal that enforcement of a fraudulently procured arbitral award is contrary to U.S. public policy, and therefore provides a valid defense under the New York Convention.  Here, Kazakhstan's allegations give rise to a valid public policy defense in that it alleges that the SCC Award was procured by fraud.  *Cf. Enron Nigeria Power Holding,* 844 F.3d at 287.  Accordingly, Kazakhstan must be permitted to present this defense and supporting evidence to the Court.

Furthermore, unlike Nigeria, Kazakhstan did not have knowledge of the Stati Parties' fraud during the underlying arbitration, and thus did not present evidence of the fraud to the arbitral tribunal.  *See* Mot. for Leave (ECF 32), at 3-4.  Kazakhstan only learned of this fraud well after the SCC Arbitration concluded.  Thus, unlike in *Enron Nigeria*, the SCC Tribunal did not hear, let alone reject, Kazakhstan's evidence of fraud, because it was kept concealed by the Stati Parties until Kazakhstan started to discover it through documents that began to be produced in June 2015 (as referenced above).

---

[10]  *See also BCB Holdings Ltd. v. Gov't of Belize*, 650 Fed. Appx. 17, 19 (D.C. Cir. 2016) (unpublished) (rejecting public policy defense to enforcement of foreign arbitral award where arbitral tribunal was presented with corruption allegations); *Inversiones Y Procesadora Tropical Inprotsa, S.A. v. Del Monte Int'l GMBH*, No. 16-24275, 2017 WL 1737648, at *5 (S.D. Fla. May 2, 2017) (rejecting public policy defense to enforcement of foreign arbitral award where arbitral panel ruled on merits of fraud allegations).

B.  *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2d Cir. 2017)

In *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2d Cir. 2017) (attached as Exhibit 3 hereto), the Second Circuit provided guidance on the standard to be applied to allegations of fraud in foreign arbitral proceedings.  There, the plaintiffs sought to enforce a foreign arbitral award under the New York Convention and asserted state law fraud claims against the award-debtor and corporate entities that it alleged were the award debtor's alter egos.  *Id.* at 61-62.

In the underlying arbitration, the plaintiffs requested that the award-debtor's alter egos be held liable for any award rendered by the tribunal, on the basis that the award-debtor had fraudulently transferred assets to the alter egos.  *Id.* at 64-66.  Although the tribunal ultimately entered an award in favor of the plaintiffs, it rejected the plaintiffs' request to hold the alter egos liable.  *Id.* at 67.  In the U.S. proceedings, the plaintiffs alleged that this ruling was obtained on the basis of false evidence presented to the tribunal by the award-debtor.  *See id.*

The Second Circuit ruled that the tribunal's holding regarding the alter egos was not preclusive as to the plaintiffs' state law fraud claims because the plaintiffs' allegations were required to be accepted as true on a motion to dismiss and the plaintiffs alleged that they were denied a full and fair opportunity to litigate the merits of their fraud allegations before the tribunal.  *See id.* at 77-78.  Separately, the issue of whether the award cold be enforced against the alter egos was remanded to the district court.  *See id.* at 76.

This case is relevant to Kazakhstan's Motion for Reconsideration because Kazakhstan plausibly alleged in its motion for leave that the Stati Parties obtained the SCC Award as a result of their "fraud and misconduct" before the tribunal.  *See id.*  In ruling on Kazakhstan's motion for leave, the Court stated that it would apply a motion to dismiss standard.  *See* ECF 36 at 3-4

(applying Fed. R. Civ. P. 15).  Accordingly, if Kazakhstan's fraud allegations were accepted as true, its motion for leave should have been granted and it should have been afforded the opportunity to present its additional defenses.  *See CBF Indústria de Gusa*, 850 F.3d at 77-78.

DATED:  June 15, 2017                         Respectfully submitted,

                                               */s/ Matthew H. Kirtland*
                                               _____
                                               Matthew H. Kirtland (D.C. Bar No. 456006)
                                               matthew.kirtland@nortonrosefulbright.com
                                               Kara P. Wheatley (D.C. Bar No. 975541)
                                               kara.wheatley@nortonrosefulbright.com
                                               NORTON ROSE FULBRIGHT US LLP
                                               799 9th Street N.W., Suite 1000
                                               Washington, D.C. 20001
                                               Tel:  202-662-0200
                                               Fax:  202-662-4643

                                               *Attorneys for Respondent Republic of Kazakhstan*