# Exhibit A

The Arbitration Institute of the Stockholm Chamber of Commerce

19/12/2013

Arbitration no. V 2010/116
Doc. no. 2010/116-130

**SCC Arbitration V (116/2010)**
1. **Anatolie Stati**
2. **Gabriel Stati**
3. **Ascom Group S.A.**
4. **Terra Raf Trans Traiding Ltd.**
**versus**
**The Republic of Kazakhstan**

# AWARD

### Date of Award: 19 December 2013

**The Arbitral Tribunal:**

**David R. Haigh QC (Co-Arbitrator)**
**Prof. Sergei N. Lebedev (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel (Chairman)**

Ms. Katherine Simpson (Secretary to the Tribunal)

| | |
|---|---|
| **Claimants:** | Anatolie Stati<br>Gabriel Stati<br>Ascom Group S.A.<br>Terra Raf Trans Traiding Ltd. |
| **Claimants' counsel:** | Reginald R. Smith<br>Héloise Hervé<br>Kenneth Fleuriet<br>King & Spalding<br>Bulboaca Asociatii |
| **Respondent:** | Republic of Kazakhstan |
| **Respondent's counsel:** | Dr. Patricia Nacimiento<br>Matthew Buckle<br>Norton Rose Fulbright LLP<br><br>Joseph Tiredo<br>Winston & Strawn London<br><br>Professor I. Zenkin<br>Moscow Regional Collegium<br>of Advocates |

**ARBITRATION INSTITUTE OF**

**THE STOCKHOLM CHAMBER OF COMMERCE**

Certified true copy of original

Natalia Petrik, Legal Counsel
Date 28 January 2014

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# Table of Contents

| | | | |
|---|---|---|---|
| **Abbreviations** | | | 6 |
| **A.** | **The Parties and Their Counsel** | | 8 |
| **B.** | **The Arbitral Tribunal** | | 9 |
| **C.** | **Short Identification of the Case** | | 10 |
| | **C.I.** | **The Claimants' Perspective** | 10 |
| | **C.II.** | **The Respondent's Perspective** | 13 |
| **D.** | **Procedural History** | | 18 |
| **E.** | **Relief Sought by the Parties** | | 79 |
| | **E.I.** | **Relief Sought by Claimants** | 79 |
| | **E.II.** | **Relief Sought by the Respondent** | 80 |
| **F.** | **Factual Background** | | 80 |
| | **F.I.** | **General Background Information** | 80 |
| | **F.II.** | **Timeline of Events** | 82 |
| | **F.III.** | **Respondent's Alleged "*Playbook*" / Campaign of Harassment and Interference** | 128 |
| | | 1. **Arguments by Claimants** | 128 |
| | | 2. **Arguments by Respondent** | 135 |
| **G.** | **Short Summary of Contentions** | | 142 |
| | **G.I.** | **Summary of Contentions by Claimants** | 142 |
| | **G.II.** | **Summary of Contentions by Respondent** | 146 |
| **H.** | **Preliminary Considerations and Conclusions of the Tribunal** | | 151 |
| | **H.I.** | **Jurisdiction** | 151 |
| | | 1. The Parties' Consent to Arbitration before the SCC | 151 |
| | |    a. Arguments by Claimants | 151 |
| | |    b. Arguments by Respondent | 152 |
| | |    c. The Tribunal | 153 |
| | | 2. Jurisdiction Ratione Personae | 154 |
| | |    a. Arguments by Claimants | 154 |
| | |    b. Arguments by Respondent | 157 |
| | |    c. The Tribunal | 161 |
| | | 3. Jurisdiction Ratione Materiae – Existence of Investment | 162 |
| | |    a. Arguments by Claimants | 162 |
| | |    b. Arguments by Respondent | 169 |
| | |    c. The Tribunal | 176 |
| | | 4. Jurisdiction – Compliance with Three-Month Waiting Period | 178 |
| | |    a. Arguments by Claimants | 178 |
| | |    b. Arguments by Respondent | 180 |
| | |    c. The Tribunal | 182 |
| | | 5. Admissibility of Claimants' Claims Pursuant to ECT | 183 |
| | |    a. Arguments by Claimants | 183 |
| | |    b. Arguments by Respondent | 184 |
| | |    c. The Tribunal | 185 |
| | **H.II.** | **Applicable Law** | 185 |
| | | 1. Arguments by Claimants | 185 |
| | | 2. Arguments by Respondent | 187 |
| | | 3. The Tribunal | 188 |


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

| H.III. | | **Considerations Regarding Arbitration Procedure** | 189 |
|---|---|---|---|
| | 1. | **Arguments by Claimants** | 189 |
| | 2. | **Arguments by Respondent** | 190 |
| | 3. | **The Tribunal** | 194 |
| **J.** | **Liability** | | 195 |
| J.I. | | Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT | 195 |
| | 1. | **Arguments by Claimants** | 195 |
| | 2. | **Arguments by Respondent** | 202 |
| | 3. | **The Tribunal** | 209 |
| J.II. | | Whether Claimants' Interests were Expropriated (Art. 13 ECT) | 231 |
| | 1. | **Arguments by Claimants** | 231 |
| | | a. **Law on Expropriation** | 231 |
| | | b. **Exhaustion of Remedies** | 233 |
| | | c. **Indirect Expropriation** | 234 |
| | |    i. General Principles and Jurisprudence Regarding Indirect Expropriation | 234 |
| | |    ii. **Right to Regulate** | 235 |
| | |    iii. Acts Allegedly Amounting to An Indirect Expropriation | 236 |
| | | d. **Direct Expropriation** | 240 |
| | |    i. **Transfer of Title** | 240 |
| | |    ii. **Exercise of Regulatory Powers** | 242 |
| | 2. | **Arguments by Respondent** | 244 |
| | | a. **Law on Expropriation** | 245 |
| | | b. **Exhaustion of Remedies** | 245 |
| | | c. **Indirect Expropriation** | 248 |
| | |    i. General Principles and Jurisprudence Regarding Indirect Expropriation | 248 |
| | |    ii. **Right to Regulate** | 249 |
| | |    iii. Acts Allegedly Amounting to An Indirect Expropriation | 250 |
| | | d. **Direct Expropriation** | 255 |
| | |    i. **Transfer of Title** | 255 |
| | |    ii. **Exercise of Regulatory Powers** | 256 |
| | 3. | **The Tribunal** | 258 |
| J.III. | | Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT) | 259 |
| | 1. | **Arguments by Claimants** | 259 |
| | 2. | **Arguments by Respondent** | 260 |
| | 3. | **The Tribunal** | 264 |
| J.IV. | | Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1) ECT) | 264 |
| | 1. | **Arguments by Claimants** | 264 |
| | 2. | **Arguments by Respondent** | 268 |
| | 3. | **The Tribunal** | 270 |
| J.V. | | Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim) | 271 |



|   |   | 1. **Arguments by Claimants** | 271 |
|   |   | 2. **Arguments by Respondent** | 274 |
|   |   | 3. **The Tribunal** | 280 |
|   | J.VI. | Respondent's Observance of Obligations It Entered Into with Respect to Claimants' Investments (Umbrella Clause in Art.10(1) ECT)) | 280 |
|   |   | 1. **Arguments by Claimants** | 280 |
|   |   | 2. **Arguments by Respondent** | 283 |
|   |   | 3. **The Tribunal** | 287 |
|   | J.VII. | Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice (Art. 11 ECT) | 287 |
|   |   | 1. **Arguments by Claimants** | 287 |
|   |   | 2. **Arguments by Respondent** | 288 |
|   |   | 3. **The Tribunal** | 289 |
| K. | Causation |   | 289 |
|   | K.I. | **Law on Causation** | 289 |
|   |   | 1. **Arguments by Claimants** | 289 |
|   |   | 2. **Arguments by Respondent** | 290 |
|   |   | 3. **The Tribunal** | 290 |
|   | K.II. | Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages | 291 |
|   |   | 1. **Arguments by Claimants** | 291 |
|   |   | 2. **Arguments by Respondent** | 294 |
|   |   | 3. **The Tribunal** | 295 |
|   | K.III. | Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause) | 307 |
|   |   | 1. **Arguments by Claimants** | 307 |
|   |   | 2. **Arguments by Respondent** | 310 |
|   |   | 3. **The Tribunal** | 312 |
| L. | Quantum |   | 314 |
|   | L.I. | **Preliminary Considerations** | 314 |
|   | L.II. | **Valuation Date** | 314 |
|   |   | 1. **Arguments by Claimants** | 314 |
|   |   | 2. **Arguments by Respondent** | 319 |
|   |   | 3. **The Tribunal** | 322 |
|   | L.III. | Arguments Regarding the Treatment of Debt: Enterprise vs. Equity Value | 324 |
|   |   | 1. **Arguments by Claimants** | 324 |
|   |   | 2. **Arguments by Respondent** | 326 |
|   |   | 3. **The Tribunal** | 329 |
|   | L.IV. | Quantum Related to Borankol Field and Tolkyn Field | 331 |
|   |   | 1. **Arguments by Claimants** | 331 |
|   |   | 2. **Arguments by Respondent** | 342 |
|   |   | 3. **The Tribunal** | 351 |
|   | L.V. | **Quantum Related to Contract 302 Properties** | 353 |
|   |   | 1. **Arguments by Claimants** | 353 |
|   |   | 2. **Arguments by Respondent** | 358 |
|   |   | 3. **The Tribunal** | 367 |
|   | L.VI. | **Quantum Related to LPG Plant** | 368 |
|   |   | 1. **Arguments by Claimants** | 368 |


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

|  |  |  | 2. | **Arguments by Respondent** | 373 |
|  |  |  | 3. | **The Tribunal** | 381 |
|  | **L.VII.** |  | **The Parties' Arguments Concerning the Tristan Notes** | | 382 |
|  |  |  | 1. | **Arguments by Claimants** | 382 |
|  |  |  | 2. | **Arguments by Respondent** | 385 |
|  |  |  | 3. | **The Tribunal** | 387 |
|  | **L.VIII.** |  | **Moral Damages** | | 387 |
|  |  |  | 1. | **Arguments by Claimants** | 387 |
|  |  |  | 2. | **Arguments by Respondent** | 389 |
|  |  |  | 3. | **The Tribunal** | 390 |
|  | **L.IX.** |  | **Tax Claims** | | 390 |
|  |  |  | 1. | **Arguments by Claimants** | 390 |
|  |  |  | 2. | **Arguments by Respondent** | 391 |
|  |  |  | 3. | **The Tribunal** | 392 |
|  | **L.X.** |  | **Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV)** | | 393 |
|  |  |  | 1. | **Arguments by Claimants** | 393 |
|  |  |  | 2. | **Arguments by Respondent** | 394 |
|  |  |  | 3. | **The Tribunal** | 398 |
|  | **L.XI.** |  | **Credibility of the Parties Experts** | | 398 |
|  |  |  | 1. | **Arguments by Claimants** | 398 |
|  |  |  | 2. | **Arguments by Respondent** | 399 |
|  |  |  | 3. | **The Tribunal** | 402 |
|  | **L.XII.** |  | **Interest** | | 402 |
|  |  |  | 1. | **Arguments by Claimants** | 402 |
|  |  |  | 2. | **Arguments by Respondent** | 403 |
|  |  |  | 3. | **The Tribunal** | 405 |
|  | **L.XIII.** |  | **Summary of Tribunal's Conclusions Regarding Quantum** | | 406 |
| **M.** | **Arbitration Costs** | | | | 407 |
|  | **M.I.** |  | **Arguments by Claimants** | | 407 |
|  | **M.II.** |  | **Arguments by Respondent** | | 409 |
|  | **M.III.** |  | **The Tribunal** | | 412 |
| **N.** | **Decisions** | | | | 414 |



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ   Document 2-13   Filed 09/30/14   Page 7 of 225
Case 1:14-cv-01638-ABJ   Document 2-13   Filed 09/30/14   Page 109 of 225

Page **6** of **414**

# **Abbreviations**

| | |
|---|---|
| ¶ / ¶¶ | Paragraph / Paragraphs |
| § / §§ | Section or Clause / Sections or Clauses |
| ARNM | Agency for Regulation of Natural Monopolies |
| Ascom | Ascom Group S.A. |
| Art. | Article / Articles |
| $Bcm^3$ | Billion cubic meters |
| BIT | Bilateral Investment Treaty |
| BOE | Barrels of Oil Equivalent |
| C | Claimants' Exhibit |
| C-0 | Claimants' Request for Arbitration |
| C-I | Claimants' Statement of Claim (18 May 2011) |
| C-II | Claimants' Reply Memorial on Jurisdiction and Liability (7 May 2012) |
| C-III | Claimants' Reply Memorial on Quantum (28 May 2012) |
| CAC Pipeline | Center Asia Center Pipeline |
| CAPEX | Capital Expenditure |
| CC RF | Criminal Code of the Russian Federation |
| CC RK | Civil Code of the Republic of Kazakhstan |
| CPC | Criminal Procedure Code of the Republic of Kazakhstan |
| CPHB 1 | Claimants' First Post-Hearing Brief (8 April 2013) |
| CPHB 2 | Claimants' Second Post-Hearing Brief (3 June 2013) |
| C Costs | Claimants' Request for Costs (1 July 2013) |
| C Costs Reply | Claimants' Reply on Costs (8 July 2013) |
| DCF | Discounted Cash Flow |
| ECOS | Economic Chance of Success |
| ECT | The Energy Charter Treaty |
| ECtHR | European Court of Human Rights |
| EPT | Excess Profits Tax |
| FDP | Field Development Plan |
| FET | Fair and Equitable Treatment |
| FMV | Fair Market Value |
| FTI | FTI Consulting |
| GCA | Gaffney, Cline, & Associates |
| GCOS | Geological Chance of Success |
| GPO | General Prosecutor's Office (Kazakhstan) |
| ICC | International Chamber of Commerce |
| ICSID | International Centre for Settlement of Investment Disputes |
| IPO | Initial Public Offering |



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

| JSC | Joint Stock Company |
|-----|---------------------|
| KMG | KazMunaiGas / KazMunaiGaz |
| KMG EP | KazMunaiGaz Exploration Production |
| KMG NC | KazMunaiGaz National Company |
| KMT | KazMunaiTeniz JSC |
| KNOC | Korea National Oil Company |
| KPM | Kazpolmunay LLP |
| Law on Oil | Law of the Republic of Kazakhstan of 28 June 1995, No. 2350 "*On Petroleum*" (as amended in 2003) |
| LLP | Limited Liability Partnership |
| LPG | Liquefied Petroleum Gas |
| ltr. | Letter |
| MBbls /MMBbl | Million barrels |
| MEMR | State of Kazakhstan Ministry of Energy and Mineral Resources |
| MES | Ministry of Emergency Situations |
| Mln | Million |
| MOG | Kazakh Ministry of Oil and Gas |
| NPV | Net Present Value |
| OJSC | Open Joint Stock Company |
| OTP | Oil Treatment Plant |
| p. / pp. | Page / Pages |
| PO | Procedural Order |
| R | Respondent's Exhibit |
| R-I | Respondent's Statement of Defence (21 November 2011) |
| R-II | Respondent's Rejoinder on Jurisdiction and Liability (13 August 2012) |
| R-III | Respondent's Rejoinder Memorial on Quantum (1 December 2012) |
| RPHB 1 | Respondent's First Post-Hearing Brief (8 April 2013) |
| RPHB 2 | Respondent's Second Post-Hearing Brief (3 June 2013) |
| R Costs | Respondent's Submission on Costs (1 July 2013) |
| R Costs Reply | Respondent's Comments on Claimants' Costs Submission (8 July 2013) |
| SCC | Stockholm Chamber of Commerce |
| SM Law | Law of the Republic of Kazakhstan of 5 March 1997 , No. 77-1 On the Securities Market |
| Subsoil Law | Law of the Republic of Kazakhstan "*On Subsoil and Subsurface Use*" |
| TNG | Tolkynneftegaz LLP |
| TOO | Limited Liability Partnership |
| USD | United States Dollar(s) |
| VCLT | 1969 Vienna Convention on the Law of Treaties |
| WS | Witness Statement |



# A.    The Parties and their Counsel

**The Claimants**

*Represented by*

Anatolie Stati
Gabriel Stati
Ascom Group S.A.
Terra Raf Trans Traiding Ltd.

Héloise Hervé
Kenneth Fleuriet
King & Spalding
1100 Louisiana, Suite 4000
Houston, Texas 77002
**USA**

King & Spalding
12, cours Albert 1er
75008 Paris
**FRANCE**

Bulboaca & Asociatii
UTI Business Center, 9th Floor
31 Vasile Lascar Street, District 2
020492 Bucharest
**ROMANIA**

**The Respondent**

*Represented by*

Republic of Kazakhstan

Dr. Patricia Nacimiento
Norton Rose Fulbright LLP
Stephanstrasse 15
60313 Frankfurt
**GERMANY**

Matthew Buckle
Norton Rose Fulbright LLP
3 More London Riverside
London SE1 2AQ
**UNITED KINGDOM**

Joseph Tiredo
Winston & Strawn London
CityPoint
1 Ropemaker Street
London EC2Y 9HU
**UNITED KINGDOM**

Professor I. Zenkin
Moscow Regional Collegium of Advocates
Aviazionnaya Street, 79-1-37
123182 Moscow
**RUSSIA**



# B.    The Arbitral Tribunal

Appointed as Chairman by SCC Letter dated 28 September 2010:

Professor Dr. Karl-Heinz Böckstiegel, Chairman
Parkstrasse 38
D-51427 Bergisch-Gladbach
**GERMANY**

Nominated by Claimants in their Request for Arbitration filed on 26 July 2010:

David Haigh, QC
Burnett, Duckworth & Palmer LLP
2400, 525 – 8 Avenue S.W.
Calgary, Alberta T2P 1G1
**CANADA**

Appointed by the SCC on behalf of Respondent by letter dated 23 September 2010
and confirmed on 15 December 2010:

Prof. Sergei N. Lebedev
Staroalexeevskaya Str., 16/49
129626 Moscow
**RUSSIA**



## C.    Short Identification of the Case

1.    The short identification below is without prejudice to the Parties' full presentation of the factual and legal details of this case, and the Tribunal's considerations and conclusions.

### C.I.    The Claimants' Perspective

2.    Claimants summarize the main aspects of the dispute at C-I ¶¶ 2 – 24 and C-II ¶¶ 1 - 31, partially quoted and summarized below; CPHB 1 ¶¶ 2 – 42, CPHB 2 ¶¶ 1 – 8:

> *2.    [...] In reliance on Kazakhstan's solemn commitments under international law, Claimants invested more than US\$ 1 billion breathing new life into previously-neglected oil and gas fields, and constructing a state-of-the art LPG Plant that Kazakhstan itself described as having "great regional and industrial importance for development of the region." But just as those investments matured and began to generate returns, Kazakhstan launched a targeted campaign of intimidation and harassment designed to pressure Claimants into selling their investments to the state-owned oil company at a firesale price. Kazakhstan went so far as to imprison a senior KPM employee on patently bogus criminal charges, and to threaten other employees with the same fate, in furtherance of its strong arm tactics. When its plan failed — because Claimants defiantly refused to give in to Kazakhstan's pressure — the government simply seized the investments, deciding to take its chances in arbitration.*

> *3.    Perhaps most shocking, this plan originated from the highest level of the Kazakhstan government, namely, President Nazarbayev himself. That fact would sound far-fetched if it were not admitted, but Kazakhstan concedes that President Nazarbayev personally issued the order that led to the expropriation of Claimants' investments.*

> *4.    [...] Kazakhstan attempts to shroud its violations of international law in a cloak of legitimacy by focusing on each minute detail in isolation rather than the totality of its conduct as a whole. It argues that its extraordinary campaign of inspections was perfectly normal, and that its subsequent actions were appropriate responses to the information it discovered under arcane, Delphic, and often-misstated provisions of its own domestic law. These arguments, however, crumble under the weight of the evidence. Kazakhstan did not discover any wrongdoing by Claimants' companies, much less violations that would justify the extraordinary actions that followed. Viewing Kazakhstan's conduct in its entirety, it is evident that Kazakhstan's objective from the start was to devalue Claimants' investments by making it virtually impossible for Claimants to operate or sell the businesses, so that Claimants would sell to Kazakhstan at a firesale price. Moreover, Kazakhstan also anticipated this arbitration from the beginning, and cloaked its actions under mystifying interpretations of domestic laws and regulations in order to create an appearance of normalcy and legitimacy.*



5.    Furthermore, Kazakhstan has continued its blatant disregard for its
      obligations under international law in its conduct of this arbitration.
      Kazakhstan consistently attempts to obstruct this Tribunal's consideration
      of Claimants' claims by raising utterly baseless arguments, flatly
      misstating facts and law, and engaging in procedural misconduct of the
      worst kind. [Kazakhstan hopes that through the sophistry of focusing on
      each small fact individually, the Tribunal will lose sight of the fact that
      Kazakhstan launched the investigations for the precise purpose of
      acquiring Claimants' investments for less than fair value.] (C-II ¶¶ 2 – 5,
      7). [...]

15.   Moreover, while Kazakhstan publicly maintained that it would honor its
      earlier contracts, its practice has been quite to the contrary.   [...]
      Kazakhstan has become adept at pressuring foreign investors to sell equity
      stakes to KazMunaiGaz through a combination of Financial Police
      investigations, baseless criminal allegations, fines, and tax threats.
      Kazakhstan makes it essentially impossible to continue normal operations,
      and then makes it known that the sale of a substantial equity stake to
      KazMunaiGaz would resolve the company's various legal difficulties.
      Kazakhstan has run this "playbook" on foreign investors — and
      especially, investors in 100% foreign-owned projects — time and again.
      [That is precisely what happened here. And when Claimants' refused
      Kazakhstan's below-average bid for Claimants' investments, Kazakhstan
      turned up the pressure. After six months of government harassment, they
      offered USD 150 million less.  This is the Kazakhstan playbook to the
      letter.] (C-II ¶¶ 15 - 16). [...]

17.   Moreover, when Claimants rejected KazMunaiGaz's lowball offer in June
      2009, Kazakhstan simply turned up the pressure. It interfered in the trial
      of Mr. Cornegruta to ensure a guilty verdict, then sentenced him to four
      years in Kazakhstan's notoriously dangerous prison system as punishment.
      It continued to threaten the same fate for KPM and TNG's other directors.
      It engineered a massive fine against KPM (which was not even a party to
      the criminal trial) that was large enough to bankrupt the company and
      provide a ground for seizing its assets. And it continued to interfere with
      the day-to-day operations of the businesses, including more inspections
      and audits, asset seizures, and apparent interference with TNG's access to
      gas markets that choked the company's cash flows. Then, in November
      2009, KazMunaiGaz made another bid to buy the companies, this time
      attempting to circumvent the Claimants by negotiating with the
      companies' note-holders, and then offering even less to the Claimants than
      it had offered in June 2009.

18.   Despite all this, Claimants continued to resist Kazakhstan's coercion, and
      ultimately found a Kazakhstan-based buyer for the companies.    In
      February 2010, Claimants signed an agreement to sell their Kazakhstan
      investments to the Cliffson company for more than US$ 920 million —
      which was nearly 70% higher than KazMunaiGaz's lowball offer in June
      2009. And that presented a dilemma for Kazakhstan. Cliffson was owned
      by the wealthy and politically connected Assaubayev family. In the course
      of those negotiations, it became clear to all involved (and no doubt to



> Kazakhstan as well) that Claimants intended to bring arbitration claims
> against Kazakhstan once the sale closed for the diminution in the sale
> price caused by Kazakhstan's harassment campaign. Thus, Kazakhstan
> faced the prospect of either allowing the companies to slip out of its hands
> or exercising its pre-emptive rights (which would have required it to match
> Cliffson's offer), while still facing arbitration claims for the diminution in
> value. Kazakhstan delayed approval of the transaction for several months
> with requests for additional details and documentation, but Claimants
> submitted everything the Government requested in June 2010. Within a
> week, on June 29, 2010, Kazakhstan launched the final inspection blitz
> that led to the outright seizure of the companies on July 21, 2010.
> Kazakhstan apparently concluded that if it was going to face arbitration
> claims anyway, it might as well take the assets for free and posture a
> termination basis for the coming arbitration fight. (C-II ¶ 18).

> 19.   This tale of conspiracy coordinated at the highest levels of government
> might seem contrived if it were not both a familiar pattern of behavior in
> Kazakhstan and admitted in this case that President Nazarbayev was
> personally involved. But viewed in the context of all the facts, this is a far
> more plausible explanation than Kazakhstan's suggestion that this was
> just the normal operation of law in Kazakhstan. Only Kazakhstan knows
> precisely why it chose this path: a favor to a regional ally, punishment for
> a 100% foreign-owned company that had refused purchase overtures in
> the past, an old-fashioned money grab, or some combination of all three.
> But it is beyond serious dispute that it occurred. [And, Kazakhstan's own
> documents and admissions in this proceeding confirm that it did. (C-II ¶¶
> 19 – 20)]. [...]

> 30.   [In these proceedings, Kazakhstan's] conduct goes beyond zealous
> advocacy in a contentious arbitration.     [Kazakhstan has delayed
> proceedings, unfairly and obstructionistically submitted evidence, and has
> made meritless jurisdictional objections.] Kazakhstan seeks to obscure the
> truth from this Tribunal and make it as costly, time-consuming, and
> difficult as possible for Claimants to obtain justice, in furtherance of its
> strategy of harassment and intimidation. Indeed, if Kazakhstan can bully
> or mislead this Tribunal into an award favoring Kazakhstan — or even an
> award for Claimants that undervalues damages — then Kazakhstan will
> have accomplished its objective of seizing Claimants investments for less
> than fair value, and also can discourage other foreign investors from
> resisting its coercion in the future based on hope of obtaining redress in
> arbitration. (C-II ¶¶ 22 – 30).

3.   Prior to the Hearing on Quantum, Claimants summarized the main aspects of the
dispute at C-III ¶¶ 1-7, partially quoted and summarized below:

> 1.   [...] Kazakhstan's harassment campaign had as its principal objective a
> devaluation of Claimants' investments in an effort to acquire them for far
> less than their fair market value. Kazakhstan saddled KPM and TNG with
> unfounded liabilities, interfered with the companies' cash flows, and
> obstructed the sale of the companies, all as part of its strategy to force
> Claimants to sell to KazMunaiGas at a firesale price. When that strategy



      *failed, Kazakhstan seized the investments, deciding to take its chances in arbitration.*

2.    *Respondent has continued that strategy in this arbitration, making a series of disingenuous arguments about the value of Claimants' investments in an effort to enlist the Tribunal in accomplishing the objective Respondent could not accomplish in negotiations with Claimants — namely, acquiring Claimants' investments for far less than their actual worth. In summary, Kazakhstan argues that the value of Claimants' investments as of October 14, 2008 (the valuation date used by Claimants) was significantly less than Claimants calculate; that Claimants' investments were of de minimis value by the time of their final seizure in July 2010; and that, between October 2008 and July 2010, "there are other possible causes of a reduction in the value of the Claimants' investments that cannot possibly be attributable to the Republic and may even be attributable to the Claimants."*

4.    *Respondent purportedly arrives at a range for the total market value of Claimants' investments, as of its chosen July 21, 2010 valuation date, of US $161 to US $237 million on an enterprise value basis (i.e., without considering debt). To arrive at this exceedingly low value, Respondent fabricates capital costs, overstates operating costs, ignores existing reserves, fabricates artificially low gas prices, attributes no value at all to five of the six resource areas at issue in the Contract 302 Properties, relegates the LPG Plant to scrap value, and ignores entirely any attributes of the investments that would be of uniquely enhanced value to the State itself.*

## C.II.     The Respondent's Perspective

4.    Respondent summarizes the main aspects of the dispute at R-I ¶¶ 2 *et seq.*, and R-II ¶¶ 1 – 9, RPHB 2 ¶¶ 1 – 3, 59 partially quoted and summarized below:

1.    *[...] A claimant raising claims must state and prove his case. Stating one's case means that the claimant must present to a tribunal a complete, plausible and logical factual story without contradictions. Proving one's case means that the investor must prove that the tribunal has jurisdiction to hear the case and that the applicable treaty was breached by the state. The claiming investor must further prove causation, [...][i.e.] that he incurred damages as a result of such breach. And finally the claiming investor must prove and specify the precise amount of the damages he requests the tribunal to award based on a certain valuation date which also needs to be correctly determined by the claiming investor. [...]*

3.    *[...] [The]need for the claimant to fulfil its procedural duties cannot be replaced by mere reference to an alleged discretion of a tribunal. A claimant may not simply anchor the highest possible value and the earliest valuation date he could think of and leave it to the tribunal to award a portion of this maximum threshold established by a claimant. Rather, any claimant must submit a specified request for damages based on specific and proven facts. A claimant must further establish a causal link between the alleged breach by a respondent and the requested damages. And this*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *must be linked to a specific date for the valuation of the damages requested. Once the claimant has done so, he is bound by the choices he made as to facts, causation, amount requested and valuation date. Equally, the tribunal is bound by those choices and bound to verify whether the claimant has discharged its various procedural duties. Where this is not the case, the tribunal cannot put its own discretion to cover up for claimant's failure. Rather, if a claimant fails in any of the mandatory steps required of a claiming party, his claim must also fail. [...]*

59. *Claimants have in many instances failed to coherently state their case. Where they did present a coherent set of factual allegations, they generally failed to provide proof of their contentions: Their witnesses are non-credible, many of their documents are tainted with procedural misconduct, and their experts lack independence as well as the competence necessary to provide useful opinions on valuation issues. The latter is evidenced not least by Claimants' ever changing prayers for relief. Ultimately, all of this does not matter, as Claimants have not presented a valuation corresponding to the facts of this case and the timing of the alleged breaches of the law. In summary, Claimants' claims must be dismissed (RPHB 2 ¶¶ 1 -3, 59).*

1. *Anatolie Stati is a Moldovan businessman [who] [...] claims to have acquired two relativley minor oil and gas companies in Kazakhstan, KPM and TNG. The mechanism of the supposed acquisition and holding of these companies is opaque, involving multiple intermediate entities outside Kazakhstan, some disclosed others not.*

2. *The rationale for this complex holding structure is unknown, but liabilities seemed to gravitate to KPM and TNG from their owners and their owner's afiliates, whilst cash flowed out to a number of afiliated companies outside Kazakhstan.*

3. *Tristan Oil, a BVI registered entity has no disclosed stake in KPM or TNG, but since the end of 2006, it has issued over half a billion dollars in debt, ostensibly for the purpose of funding KPM and TNG. Whilst KPM and TNG are apprently guarantors of this debt, it is by no means clear that they benefited from all of the funds this brought into Tristan Oil. As a BVI registered entity Tristan Oil does not benefit from the protection of the ECT.*

4. *In late 2008, when at a domestic level the Republic began to become aware of problems with KPM and TNG, it seems that KPM and TNG's precarious debt laden ownership structure was pushed to the brink by the financial crisis, resulting in yet more funds being stripped from the companies.*

5. *In late 2008 little of the above was known to the agencies of the Republic that regulated the performance of KPM and TNG. At that time their principal concern was a littany of breaches by KPM and TNG of their contractual and other legal obligations. There were also wider social consequences for the area in which the companies operated, caused by what, at the time, seemed an inexplicable decline in the companies' performance and indiference of their management.*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

6          *The Republic was ultimately driven to terminate KPM and TNG's contract contracts and place their subsoil use assets into trust management to preserve them from decay. That was not the outcome that anyone wanted, least of all the Republic, which generates much of its income from active subsoil users. However, KPM and TNG's apparent disinterest in remedying their desructive poor performance made it unavoidable.*

7          *Since this Arbitration was commenced, the Republic has learned rather more about KPM and TNG and Mr Stati, though perhaps not enough fully to explain the decline of KPM and TNG. However, what it has learned has re-inforced its view that fundamentally the Claimants are seeking to use international arbitration to shield them from the consequences of their wrongdoing in Kazakhstan and perhaps from matters outside Kazakhstan as well.*

8          *In the Republic's respectful submission, the Tribunal should not allow its power to be abused either to protect the Claimants from the Republic's legitimate reaction to KPM and TNG's illegal conduct or from the apparent wider troubles of Mr Stati's buiness empire in which the Republic plays no part.*

9          *In dealing with this case, the Tribunal should keep four basic points in mind:*

     (a)        *First, the Claimants' illegal and bad faith conduct already excludes any protection under the ECT and any jurisdiction of the Tribunal. A foreigner breaching the laws of a state cannot expect protection under international law. Conversely, a state making promises in the expectation of (i) lawful investor conduct, (ii) mutual cooperation and (iii) mutual profiting of both the state and the investor from the investment cannot be held to such promises when the investor acts illegally and contrary to the purposes of admission of foreign investment.*

     (b)        *Second, Claimants claims are in any event completely without merit. Claimants suggest that they fell victim to a "harassment campaign" initiated by the President of the Republic for the purpose of expropriating the Claimants' assets and that this "harassment campaign" was based on a "Kazakhstan playbook". These are mere pretty words with which Claimants try to turn the case on its head. Claimants, as foreign subsoil use contractors in Kazakhstan, were not respecting the laws that Kazakhstan had enacted in order to safeguard its interests and ensure its subsoil use policies. The Republic's audits, inspections and investigations were the lawful reaction to Claimants' illegal conduct. This is not harassment but the legitimate measures any state in the position of the Republic would have taken.*

     (c)        *Third, Claimants are trying to blame the Republic for the demise of their companies, when it was in fact the Claimants' own conduct,*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *as well as external circumstances, which made the Claimants'*
> *project companies KPM and TNG fail in the end. Claimants*
> *overburdened KPM and TNG with debt. This approach backfired*
> *when the global financial crisis hit the markets in 2008, energy*
> *prices took a dive and important local customers of KPM and TNG*
> *could no longer fulfil their contracts with Claimants. Yet, in this*
> *severe situation, instead of supporting the companies, Claimants*
> *decided to strip them of cash even more. The ultimate failure of the*
> *companies can come as no surprise against this background.*

> *(d)    Fourth, Claimants also largely overstate the importance of their*
> *alleged investment within the Republic. Claimants' activities were*
> *of a rather minor scale compared to many other exploration and*
> *production projects in the Republic. This has two consequences:*
> *For one, this further undermines Claimants' spurious allegation of*
> *a "harassment campaign" initiated by the President of the*
> *Republic. Apart from all other reasons excluding this argument,*
> *Claimants' assets were simply not valuable enough to merit such*
> *action in the first place. Moreover, this also shows that Claimants'*
> *claim for compensation is artificially inflated. In fact, Claimants*
> *claim for compensation runs into billions, a sum which no*
> *interested third party ever offered to pay for KPM and TNG.*

5.    Prior to the Hearing on Quantum, Respondent summarized the main aspects of the
dispute at R-III ¶¶ 1 – 12, partially quoted and summarized below (citations
omitted):

> *3      [T]he billions of USD claimed by Claimants in this arbitration, are*
> *reached by a blatant breach of universally accepted valuation standards.*
> *Moreover, they are reached by simply disregarding a whole range of*
> *inconvenient facts and substituting reality by wishful thinking. [...]*

> *5      The largest part of Claimants' damages claim is taken up by the claim*
> *relating to Contract No. 302. Claimants demand a whopping USD 1.58*
> *billion in compensation for the "loss of opportunity" to develop the*
> *Contract 302 Properties. However, as even Claimants' expert confirms,*
> *the chances of success were minimal and this must be reflected in the*
> *valuation. [Claimants disregard risk in their valuation.] [...]*

> *10     The central element of Claimants' wishful thinking approach is Claimants'*
> *improperly early valuation date. Claimants set their valuation date to 14*
> *October 2008, a date on which no state action had any actual effect on*
> *KPM and TNG and, moreover, a date which is months or even more than a*
> *year prior to many of the state measures Claimants complain of. By*
> *choosing 14 October 2008 as their valuation date, Claimants find a way to*
> *disregard many developments after that date[,] which drive down the value*
> *of their assets. In particular, Claimants ignore the sharp drop in oil prices,*
> *the sharp drop in demand for TNG's gas[,] and the failure to conclude the*
> *so-called tri-partite agreement with KazAzot. Taking into account these*
> *developments, as international law requires, Claimants' claims shrink*
> *decisively.*



*11*      *There are also other instances throughout Claimants' case on damages in which Claimants completely disregard the existing facts or the legal framework surrounding KPM and TNG. For example, Claimants ignore that KPM and TNG were never able to export gas because they could not secure a contract for export. Claimants simply apply export prices – even though their own reserves reports from 2008 and 2009 reveal that at the time of events, they did not actually expect that they would be able to achieve export prices.*

*12*      *In a final attempt at inflating their damage claims, Claimants demand the compensation of moral damages in the amount of "at least" 10% of compensatory damages awarded. Since Claimants inflated damage claim comprises approximately USD 2.7 billion, their moral damages claim thus amounts to at least USD 270 million. This further inflation of Claimants' claim borders on the ridiculous as is reflected by the fact that the highest amount of moral damages ever awarded by an investment tribunal was USD 1 million. (R-III ¶¶ 1 – 12, partially quoted).*



## D. Procedural History

6.   On **26 July 2010** Claimants filed of their **Request for Arbitration** (C-0) and appointed Mr. David R. Haigh, QC of Canada as arbitrator. (C-0 ¶ 112).

7.   On **23 September 2010**, Arbitration Institute of the SCC appointed Prof. Sergei Lebedev as an arbitrator.

8.   On **28 September 2010**, Prof. Karl-Heinz Böckstiegel accepted his appointment as Chairman of the Tribunal.

9.   On **10 November 2010**, the Chairman, on behalf of the Tribunal, issued his first email to the Parties and the Tribunal members, inviting the Parties to prepare for an in-person procedural meeting and to inform the Tribunal as to when and where to hold that meeting.

10.  Respondent's then-counsel, Curtis, Mallet-Prevost, Colt & Mosle LLP, advised that it had been retained on 8 November 2010 but had only received the file on 12 November.

11.  On **22 November 2010**, the Chairman, on behalf of the Tribunal, sent the Parties an **Annotated Preliminary Agenda of Issues Regarding the Further Procedure** in preparation for the First Procedural Meeting with the Parties in Stockholm, scheduled for 15 December 2010.

12.  On **2 December 2010**, Respondent challenged the 23 September 2010 appointment of Prof. Sergei Lebedev as arbitrator. Respondent argued that, especially in light of the necessary translation issues and the fact that the arbitration involves a State as Respondent, the 21 and even 35-day time limits within which Respondent was to have filed its Answer were exceptionally short – even shorter than would have been demanded in a commercial arbitration. Respondent also noted that a member of the SCC Board is a Consultant in the King & Spalding firm, which is representing Claimants in this case, and indicated that this fact raises concerns about the undue haste. Respondent indicated that it has been prejudiced and that procedural fairness has been impaired by the hasty appointment.

13.  On **15 December 2010** and after considering comments from the Parties, the Arbitration Institute of the SCC dismissed Respondent's challenge of Prof. Lebedev, having found no ground for disqualification.

14.  On **20 December 2010**, the Chairman circulated the draft Procedural Order 1 (PO-1), which resulted from the First Meeting in Stockholm, to the Parties for their comment by 3 January 2011.

15.  On **27 December 2010**, Respondent wrote to the Secretary General of the Arbitration Institute of the SCC, expressing disappointment with the Decision of 15 December and noting that no explanation had been provided for the decision. Neither the SCC nor Claimants' comments addressed whether Ms. Margrete Stevens of King & Spalding participated in any way in the consultations regarding the selection or appointment of Prof. Lebedev. Respondent again protested Prof.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Lebedev's appointment and argued that "*the SCC's own rules do not prescribe a specific time period for filing an Answer and appointing an arbitrator, and the short time given by the SCC was unreasonable and constitutes clear procedural unfairness.*" Respondent maintained that the necessities of governmental procedures required due consideration in the setting of time limits. Respondent maintained its objections and indicated that it participates in these proceedings in good faith and with full reservation of all of its rights, defenses, and objections.

16. The Arbitration Institute of the SCC responded by letter dated **29 December 2010** and stated that Ms. Margrete Stevens, a member of the SCC Board, did not take part in the decisions made by the SCC Board on this case.

17. On **3 January 2011,** Claimants wrote to the Tribunal, indicating that they had no comments to the draft procedural order. They made two comments related to potential jurisdictional objections by Respondent and requested that the Tribunal "*clarify that, in the event Kazakhstan elects to make a jurisdictional objection, 1) it must do so in its Counter-Memorial, and 2) if Kazakhstan submits a reply on its jurisdictional objection in its Rejoinder, Claimants will be entitled to submit a brief rejoinder, on jurisdictional issues only, on 10 May 2012 (i.e., 30 days after receipt of Kazakhstan's Rejoinder).*"

18. On **3 January 2011,** Respondent submitted comments to the draft procedural order, objecting to calling the second week of the hearing an "*extension.*" In response to Claimants' email of 3 January 2011, Respondent objected to any limitations on its right to assert jurisdictional objections. Respondent also objected to Claimants' request for an additional round of briefing on jurisdictional issues, explaining that Claimants had "*opposed bifurcation and agreed to the briefing schedule discussed at the December 15 meeting, fully aware that Respondent contemplated asserting jurisdictional objections. There is no reason to alter that arrangement.*"

19. In a second email on **3 January 2011,** Claimants stated that they are merely seeking to ensure that both Parties have an equal opportunity to address jurisdictional objections and indicated that the issue of bifurcation had not been entirely decided at the meeting. Claimants then stated that, since the Tribunal had indicated that there would be no bifurcation, it would be appropriate to address the schedule for jurisdictional submissions.

20. On **12 January 2011,** the Tribunal issued **Procedural Order No. 1** (PO-1) The operative text is provided below for convenience:

*Procedural Order (PO) No.1*
*Regarding the further procedure*

*1. Procedural Meeting Stockholm 15 December 2010*

*The Procedural Meeting was attended by:*

*For Claimants:*      *Mr. Ken Fleuriet, Esq. (King & Spalding)*



| *For Respondent:* | *Ms. Miriam K. Harwood, Esq. (Curtis, Mallet-Prevost, Colt & Mosle LLP)* |
|---|---|
| | *Ms. Aizhan Galimovna Irgaliyeva (Deputy Director, Legal Service Department, Ministry of Oil and Gas, Republic of Kazakhstan)* |
| *The Tribunal:* | *David R. Haigh QC*<br>*Prof. Sergei Lebedev*<br>*Prof. Karl-Heinz Böckstiegel (Chairman)* |

## 2.   *Results of Meeting*

2.1.   *This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

2.2.   *At the beginning of the Meeting Respondent declared that it maintained its objections raised in its letter of 2 December 2010 regarding the appointment of Prof. Lebedev.*

## 3.   *Communications*

3.1.   *The Tribunal shall address communications to by e-mail to all Counsel of the Parties. In so far as such communications are confirmed by courier, such courier mail will be addressed to the lead counsel indicated by each Party.*

3.2.   *Counsel of the Parties shall address communications directly to each member of the Tribunal (with a copy to counsel for the other Party and to the SCC)*

   *   *by e-mail, to allow direct access during travel,*

   *   *and in addition, longer letters and substantial submissions as well as memorials shall be confirmed either by courier or by fax ( but fax communications shall not exceed 10 pages).*

3.3.   *Deadlines for submissions shall be considered as complied with if the submission is received by the Tribunal and the other Party in electronic form or by courier on the respective date.*

3.4.   *Longer submissions and memorials shall be preceded by a Table of Contents.*

3.5.   *To facilitate word-processing and citations in the deliberations and later decisions of the Tribunal, the e-mail transmission of*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

*memorials and substantial or longer submissions shall be in Windows Word, or in a PDF document that can be word-searched and from which text can be copied and pasted into Windows Word.*

3.6.    *To facilitate that parts can be taken out and copies can be made, submissions of all documents including statements of witnesses and experts shall be submitted separated from Memorials, **unbound in A5 size binders** and preceded by a list of such documents, consecutively numbered with consecutive numbering in later submissions (C-1, C-2 etc. for Claimant; R-1, R-2 etc. for Respondents) and with dividers between the documents. In addition, documents shall also be submitted in electronic form on a CD or USB-device (preferably in Windows Word to facilitate word processing and citations).*

### 4.    Particulars Regarding the Procedure

4.1.    *The Procedure shall be in accordance with the SCC Rules of Arbitration in force as from 2010.*

4.2.    *As decided by the SCC Board according to SCC letter of 23 September 2010, the seat of arbitration for this case is Stockholm.*

4.3.    *The language of the arbitral procedure shall be English.*

4.4.    *In view of Art. 37 SCC Rules and in order to avoid the considerable delay caused by bifurcation, the procedure will not be bifurcated. It will deal with any jurisdictional objections, liability and quantum in one procedural phase.*

### 5.    Timetable

5.1.    ***By 1 March 2011**, the Claimant shall submit its Statement of Claim according to Art. 24 SCC Rules together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.2.    ***By 1 September 2011**, the Respondent shall file its Statement of Defence according to Art. 24 SCC Rules, including objections to jurisdiction if any, together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.3.    ***By 9 September 2011**, the Parties may request disclosure of documents from the other Party (with a copy to Tribunal).*

5.4.    ***By 23 September 2011**, the receiving Party either produces the requested documents or replies by a reasoned objection to the other Party (with a copy to Tribunal).*



5.5. *By 30 September 2011, the Parties try to agree regarding the documents to which objections have been made.*

5.6. *By 10 October 2011, insofar as they cannot agree, the Parties may submit reasoned applications in the form of Redfern Schedules to the Tribunal to order production of documents.*

5.7. *By 21 October 2011, the Tribunal decides on such applications.*

5.8. *By 4 November 2011, the Parties produce documents as ordered by the Tribunal.*

5.9. *By 16 January 2012, the Claimant files its Reply Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production above.*

5.10. *By 10 April 2012, the Respondent files its Rejoinder Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimant's Reply memorial or regarding new evidence from the procedure for document production above.*

5.11. *Should Respondent's submission according to section 5.10. contain further arguments regarding objections to jurisdiction, Claimant may submit a brief Rejoinder on Jurisdiction, but only in rebuttal to these further arguments by Respondent, by 23 April 2012.*

5.12. *Thereafter, no new evidence may be submitted, unless agreed between the Parties or expressly authorized by the Tribunal.*

5.13. *By 30 April 2012, the Parties submit*

*\*notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing including any information which witness or expert cannot testify in English,*

*\* and an updated list of all exhibits with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

5.14. *By 7 May 2012, a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*



5.15.     *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

5.16.     **Within 3 weeks later***, at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

5.17.     *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing.*

5.18.     **Hearing from 23 (afternoon) to 27 July 2012***, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* **30 July to 3 August 2012.**

5.19.     *Towards the end of the Hearing, the Tribunal will consult with the Parties whether the Parties shall submit Post-Hearing Briefs and further details of such briefs.*

## 6.     Evidence

*The Parties and the Tribunal may use, as an additional guideline, the 2010 version of the "IBA Rules on the Taking of Evidence in International Arbitration", always subject to the SCC Rules and changes considered appropriate in this case by the Tribunal.*

## 7.     Documentary Evidence

7.1.     *All documents ( including texts and translations into English of all substantive law provisions, cases and authorities) considered relevant by the Parties shall be submitted with their Briefs, as established in the Timetable.*

7.2.     *All documents shall be submitted in the form established above in the section on communications.*

7.3.     *New factual allegations or evidence shall not be any more permitted after the respective dates for the Rebuttal Briefs indicated in the above Timetable unless agreed between the Parties or expressly authorized by the Tribunal.*

7.4.     *Documents in a language other than English shall be accompanied by a translation into English.*

## 8.     Witness Evidence

8.1.     *Written Witness Statements of all witnesses shall be submitted together with the Briefs mentioned above by the time limits established in the Timetable.*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

8.2.   *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as such witnesses are invited by the presenting Party or asked to attend the hearing at the request of the other Party, the available hearing time should mostly be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

## 9.   **Expert Evidence**

*Should the Parties wish to present expert testimony, the same procedure would apply as for witnesses.*

## 10.   **Hearing**

*Subject to changes in view of the further procedure up to the Hearing:*

10.1.   *The dates of the hearing shall be as given in the Timetable above.*

10.2.   *The hearing shall be held in Paris. (See Art. 20(2) SCC Rules) The chairman of the Tribunal will proceed with making appropriate reservations and then inform the Parties regarding further details and steps to be taken.*

10.3.   *The Parties may present short opening statements of not more than two hours, unless decided otherwise by the Tribunal after receiving an application in that respect from a Party.*

10.4.   *No new documents may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.*

10.5.   *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest **by 25 April 2012.***

10.6.   *A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. **23 May 2012.***

10.7.   *Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of*



*double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.*

### 11. Extensions of Deadlines and Other Procedural Decisions

*11.1. Short extensions may be agreed between the Parties as long as they do not affect later dates in the Timetable and the Tribunal is informed before the original date due.*

*11.2. Extensions of deadlines shall only be granted by the Tribunal on exceptional grounds and provided that a request is submitted immediately after an event has occurred which prevents a Party from complying with the deadline.*

*11.3. The Tribunal indicated to the Parties, and the Parties took note thereof, that in view of travels and other commitments of the Arbitrators, it might sometimes take a certain period for the Tribunal to respond to submissions of the Parties and decide on them.*

*11.4. Procedural decisions will be issued by the chairman of the Tribunal after consultation with his co-arbitrators or, in cases of urgency or if a co- arbitrator cannot be reached, by him alone.*

*11.5. In view of the expected volume and complexity of the file in this procedure, the Tribunal may appoint an Administrative Secretary. The Tribunal will inform the Parties of such an appointment and of the fees of the Secretary. The costs for the Secretary shall be treated as expenses of the arbitration.*

### 12. Other Issues

*At the Meeting, Claimants notified the Respondents and the Tribunal that they may in the future seek interim measures in the event that the Government of Kazakhstan seeks to dispose of some or all of the assets that it has seized and are subject to these proceedings.*

21. On **18 January 2011**, Respondent requested that the Tribunal "*order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three—month period in satisfaction of that jurisdictional requirement.*" Respondent argued that the Art. 26 ECT requirement that parties refrain from submitting a dispute to international arbitration unless and until three months have elapsed from the date on which a party requested amicable settlement of the dispute had not been met. Claimants asserted that Respondent breached its obligations on 21 July 2010 – five days before Claimants filed their Request for Arbitration. In addition, Claimants never gave notice that they intended to assert treaty claims under the ECT and this is in



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

violation of the requirements of the ECT. Claimants' reliance on two letters from 2009 was misplaced and did not satisfy the ECT requirements.

22. On **24 January 2010**, Claimants replied that they have observed the three-month notice period set forth in Art. 26(2) ECT. Claimants reject Respondent's arguments that there was insufficient notice of the dispute, and offered instances where, between 2008 and mid-2010, the Parties attempted to resolve their dispute. Claimants rejected Respondent's reliance on a recent decision, *Murphy Exploration and Production Co. Int'l. v. Republic of Ecuador*, calling it an aberration in terms of the weight of investment treaty case law on this subject. Alternatively, Claimants indicated that, although they would be willing to suspend the arbitration in order to attempt to achieve settlement, they are not willing to delay the merits hearing. Claimants would allow for a sixty-day extension of the proceedings if Respondent were to (1) agree to waive its objections to the notice period and (2) apportion the suspension time equally between the parties, and (3) make a settlement proposal or propose a settlement meeting, in a neutral location, within one week of the letter.

23. On **28 January 2011**, Respondent answered Claimants' letter.

24. The Tribunal responded to the Parties on **1 February 2011**. The Tribunal encouraged the Parties to make a good faith effort to agree on a solution, hopefully maintaining the agreed hearing dates. The Tribunal also indicated its willingness to select a new, later hearing date in October 2012.

25. On **2 February 2011**, Claimants responded to the Tribunal's letter of 1 February, and to Respondent's letters of 18 and 28 January 2011. Maintaining its objections to Respondent's points, Claimants proposed a 90-day suspension of the arbitration and proposed some changes to the submissions schedule, while maintaining the hearing date. Claimants indicated their agreement to this would be subject to Respondent's agreement that it will not use the suspension period to aggravate the dispute and requested a response by 4 February 2011 at 17:00 CET.

26. Respondent replied to Claimants' letter on **6 February 2011**, rejecting Claimants' arguments that there had been notice and that such notice had been sufficient under the ECT. Respondent proposed an alternative time table that would allow for a suspension of the hearing.

27. On **8 February 2011**, Claimants requested that that Tribunal advise the Parties as to its availability for a 2-week hearing in October 2012.

28. On **14 February 2011**, the Arbitration Institute of the SCC wrote to the Tribunal, stating that "*the final award in the above arbitration shall be rendered on 26 April 2011*" and that the Tribunal must request an extension of time for rendering the final award.

29. On **22 February 2011**, the Tribunal, in consultation with the Parties, created a revised time table for the dates in Section 5 of PO-1.

| *Procedural Order* | *Event* | *Current Schedule* | *Revised Schedule* |
|---|---|---|---|



Case 1:14-cv-01638-ABJ Document 73-3 Filed 09/30/14 Page 28 of 225
Case 1:14-cv-01638-ABJ Document 23-1 Filed 02/23/12 Page 28 of 225

Page **27** of **414**

| 5.1 | *Statement of Claim* | *March 1, 2011* | *May 16, 2011* |
|---|---|---|---|
| 5.2 | *Statement of Defense* | *September 1, 2011* | *November 16, 2011* |
| 5.3 | *Document Requests* | *September 9, 2011* | *November 28, 2011* |
| 5.4 | *Responses/Objections to Document Requests* | *September 23, 2011* | *December 9, 2011* |
| 5.5 | *Agreement on Documents* | *September 30, 2011* | *December 20, 2011* |
| 5.6 | *Redfern Schedule on Document Objections* | *October 10, 2011* | *December 30, 2011* |
| 5.7 | *Decision on Document Objections* | *October 21, 2011* | *January 10, 2012* |
| 5.8 | *Produce Remaining Documents (if any)* | *November 4, 2011* | *January 23, 2012* |
| 5.9 | *Claimants' Reply* | *January 16, 2012* | *April 2, 2012* |
| 5.10 | *Respondent's Rejoinder* | *April 10, 2012* | *June 26, 2012* |
| 5.11 | *Rejoinder on Jurisdiction (if any)* | *April 23, 2012* | *July 9, 2012* |
| 5.13 | *Pre-Hearing Witness Notifications and Exhibit Lists* | *April 30, 2012* | *July 16, 2012* |
| 5.14 | *Amended Pre-Hearing Witness Notifications* | *May 7, 2012* | *July 23, 2012* |
| 5.16 | *Pre-Hearing Telephone Conference (if necessary)* | *By May 28, 2012* | *By August 13, 2012* |
| 5.18 | *Hearing* | *July 23-27, 2012 July 30-August 3, 2012* | *October 1-5, 8-12, 2012* |

30. In its **Statement of Defence** (R-I), Respondent characterized this as the Tribunal having awarded a stay of proceedings with the intention of providing a window for settlement on 22 February 2011. (R-I ¶ 7.2; C-II ¶ 72).

31. On **4 March 2011**, the Arbitration Institute of the SCC granted the Tribunal an extension until 31 July 2013 render an Award.

32. The Parties met on **10 March 2011** in London for a settlement negotiation. (C-I ¶ 40).

33. On **18 May 2011**, Claimants submitted their **Statement of Claim** (C-I) to the Tribunal.



34.    On **16 June 2011**, Respondent retained the law firm Norton Rose to represent it in this dispute, in place of the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP. The SCC reacted on 20 June 2011, sending a "*Power of Attorney*" for Respondent's new counsel.

35.    On **29 June 2011**, Respondent returned the completed Power of Attorney forms to the SCC and informed the Tribunal and Claimants that the interests of the Republic of Kazakhstan will be represented by the Norton Rose law firm and by Prof. I. Zenkin, Attorney of Moscow Regional Collegium of Attorneys.

36.    On **21 November 2011**, Respondent submitted its **Statement of Defence** to the Tribunal.

37.    In a separate writing on **21 November 2011**, Respondent proposed trifurcation of the proceedings.  Respondent argued that the Tribunal's reasons for refusing bifurcation were not compelling and that trifurcation would be necessary to re-balance the time table, especially in light of the size and complexity of the case.

38.    On **8 December 2011**, Respondent submitted its **Request for Disclosure of Documents and the Explanatory Note thereto** to the Tribunal.

39.    On **8 December 2011**, Claimants submitted their **Request for Production of Documents**.  Claimants also requested production of the documents referred to and relied upon in the expert reports, which were not submitted with those reports. Claimants indicated that they would seek an order striking the so-called "*sleeper exhibits*" (witness statements disguised as exhibits) from the record.

40.    Claimants produced 30 documents on **15 December 2011** and 14 documents on **22 December 2011**.

41.    On **5 January 2012**, Claimants submitted their **Request for Production of Documents** and a cover letter detailing the request and responses to Respondent's production objections to the Tribunal.  Claimants objected to Respondent's provision of so-called "*sleeper*" witness statements.

42.    On **5 January 2012**, Respondent submitted its **Redfern Schedule** to the Tribunal.

43.    On **5 January 2012**, Claimants submitted their **Redfern Schedule** to the Tribunal, along with lengthy arguments refuting Respondent's position.

44.    On **16 January 2012**, Respondent submitted its WORD version of the **Redfern Schedule** to the Tribunal.

45.    On **26 January 2012**, the Tribunal proposed the appointment of Katherine Simpson as Administrative Secretary to the Parties and requested their comment by 2 February 2012.

46.    On **2 February 2012**, the Tribunal, after consultation with the Parties, appointed Ms. Simpson as Administrative Secretary.



47. The Tribunal issued **Procedural Order No. 2 on Production of Documents** (PO-2) on **3 February 2012**. The operative parts of that PO, but not the attached completed **Redfern Schedules**, is provided below:

*Procedural Order (PO) No. 2*
*On Production of Documents*

**1.** **Introduction**

*1.1.* *The Tribunal has taken note of the submissions of the Parties regarding document production.*

*1.2.* *The Tribunal recalls **Art. 26 SCC Rules** regarding evidence.*

*1.3.* *The Tribunal further recalls **section 5.6. of PO-1 providing for the submission of Redfern Schedules,** and that, by the Chairman's mails of 5 and 12 January 2012, the Tribunal had asked Respondent to submit its Redfern schedule in WORD format so that the Tribunal can insert its decisions. The Tribunal notes that, only on 16 January 2012, Respondent provided such a submission. Due to this delay, the Tribunal could only issue the present decision today.*

*1.4.* *According to section 6 of PO-1, the **"IBA Rules on the Taking of Evidence in International Arbitration"** can be used as a guideline giving indications regarding the relevant criteria for what documents may be requested and ordered to be produced. The Tribunal will use the IBA Rules (as re-issued 29 May 2010), taking into account the relevant practice of their application in international arbitration. In this context, the Tribunal has taken note of the Parties' submissions regarding the applicable criteria and will take them into account insofar as they are not in conflict to the IBA Rules.*

*1.5.* *The Tribunal recognizes that, on the one hand, ordering the production of documents can be helpful for a party to present its case and in the Tribunal's task of establishing the facts of the case relevant for the issues to be decided. On the other hand, the process of disclosure may be time-consuming, excessively burdensome, and even oppressive. Unless carefully limited, the burden may be disproportionate to the value of the result. Further, the Parties may have a legitimate interest in confidentiality.*

*1.6.* *Further, the Tribunal notes that, insofar as a Party has the **burden of proof,** it is sufficient for the other Party to deny what the respective Party has alleged and then respond to and rebut the evidence provided by that respective Party to comply with its burden of proof.*

**2.** **Documents to be produced**

*All documents identified in requests to be "admitted" **in the Annexes I and II attached** to this Order shall be produced **by 17 February 2012** to the other Party in this procedure, but not yet to the Tribunal, subject to the further qualifications and limitations in this Order. The receiving Party may then decide the extent to which it wishes to rely on such documents in*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*its further submissions to the Tribunal and may submit the respective documents with its next Memorial.*

**3.      Qualifications and Limitations of Document Production**

3.1.    *All documents produced under this Order may be utilized by the other Parties only in direct connection with the present arbitration procedure.*

3.2.    *Of the documents ordered by the Tribunal, the following documents or categories of documents **need not be produced, but the reason for the non-production must be identified.** If they:*

> *do not exist or do not yet exist,*
>
> *or are not in the possession, custody or control of a Party,*
>
> *or have already been sent or copied to the requesting Party,*
>
> *or contain commercially sensitive information,*
>
> *or include information regarding third parties for which the ordered Party has an obligation of confidentiality,*
>
> *or are subject to attorney-client privilege under the legal or ethical rules by which Counsel of the Parties are bound in their respective jurisdictions,*
>
> *or which reflect the seeking or rendering of a legal opinion by internal or external counsel.*

3.3.    *If a document or category of documents ordered by the Tribunal only contains some information or sections which do not have to be produced according to Section 3.3 above, the respective document **may be redacted** in such a way that those sections are excluded from the production. **But the reason** for non-production or redaction and the extent of such redaction **must be indicated** in a separate note or in the document.*

3.4.    *"Documents" should be understood to include permanent records in any form, including on paper and electronic.*

**4.      Adverse Inference**

*Insofar as documents ordered are not produced or are not produced as ruled in this Order, the Tribunal may take this into account in its evaluation of the respective factual allegations and evidence and may draw an inference against the Party refusing production.*

**5.      Tribunal's Decisions in attached Redfern Schedules**

*According to Section 2 above, as Annexes I and II, the following Redfern Schedules submitted by the Parties are attached in which the respective decisions of the Tribunal are added in the last column:*



       *Claimants' Redfern Schedule dated 5 January 2012,*

       *Respondent's Redfern Schedule dated 5 January 2012, but submitted in WORD format on 16 January 2012.*

**6.**     **Claimants' application dated 5 January 2012 regarding "Sleeper Expert reports and Witness Statements"**

6.1.    *The Tribunal has taken note of Claimants' earlier letter of 8 December 2011 and Claimant's applications in its letter of 5 January 2012, to which Respondent has not yet replied.*

6.2.    *The Tribunal invites both Claimants and Respondent, after having taken note of the Tribunal's decisions on their Redfern schedules, to submit any further comments in this regard **by 17 February 2012**.*

48.    The Chairman's email of **3 February 2012** is also provided for convenience:

       *Dear colleagues,*

       **1. Production of Documents**

       *Attached please find Procedural Order No.2 (PO-2) together with its two Annexes containing the Tribunal's decisions on the Parties' Redfern Schedules.*

       *Since, due to the delayed submission of the WORD version of Respondent's Redfern schedule, PO-2 could not be issued in time, as you see, the production is now ordered to be **by 17 February** which is the period of two weeks after the Tribunal's decisions originally provided in the agreed revised timetable confirmed by my mail of 2 December 2011.*

       **2. New date for Claimant's Reply Memorial**

       *In view of the above mentioned delay, the date by which Claimant is to submit its Reply Memorial is now set two weeks later, i.e. **16 April 2012**. As, thereafter, Respondent's Rejoinder is only due by 26 June 2012, the remainder of the agreed timetable up to the hearing is maintained without prejudice to the further exchange under section 3 hereafter.*

       **3. Respondent's Procedural Applications dated 21 November 2011**

       *After the decisions on document disclosure have now been issued, **Claimants** are hereby invited to comment **by 17 February 2012** on Respondent's procedural applications submitted by letter of 21 November 2011.*

       **4. Communications to Tribunal's Administrative Secretary**

       *In follow-up to my mail of 26 January 2012, the Parties are from now on invited to send copies of all electronic and hard copy communications, in*



*addition to each member of the Tribunal, also to the Administrative Secretary:*

*Katherine Simpson*
*Graeffstr. 1*
*Zi. 1908*
*50823 Köln*
*Germany*
*Ksimpson.llm@hotmail.com*

### 5. **Correct Address of Prof. Lebedev**

*As communications to Co-Arbitrator Prof. Lebedev have been sent to different addresses, the Parties are invited to submit further communications only to his following address:*

*Moscow 129626, Staroalexeevskaya 16/49.*

49. On **7 February 2012**, the SCC confirmed the appointment of Ms. Simpson.

50. On **16 February 2012**, Claimants wrote to Respondent, requesting the production of the documents and data referred to and relied upon by its party-appointed experts, Deloitte and GCA.

51. On **17 February 2012**, Claimants wrote to Respondent in response to PO-2. Claimants would provide Respondent's counsel 285 documents, in addition to those produced on 15 and 22 December 2011. Claimants indicated reasons for non-production of some of the requested documents.

52. On **17 February 2012**, Claimants requested that the Tribunal:

- *Order Kazakhstan to produce immediately all materials upon which Deloitte and GCA relied when preparing their expert reports;*

- *Clarify its decision with respect to Kazakhstan's "sleeper" expert reports and witness statements to the extent necessary;*

- *Order Kazakhstan to identify immediately all of the individuals who authored the twenty "sleeper" expert reports and witness statements;*

- *Reject Kazakhstan's application to trifurcate this proceeding;*

- *Reject Kazakhstan's request to "rebalance" the procedural calendar; and*

- *Reject Kazakhstan's request to extend the currently-scheduled 10 day hearing to 22 days in length.*

53. On **21 February 2012**, Claimants requested that the Tribunal instruct Respondent to comply with its document production obligations, or suffer the consequences of its failure to comply with the Tribunal's document production decision.



54.  On **22 February 2012**, the Tribunal invited the Parties to submit any comments to the other's submissions of 16 and 17 February by 12 March 2012.

55.  On **12 March 2012**, Claimants wrote in response to the Tribunal's 22 February 2012 request for additional comments, reiterating its earlier arguments and urging the Tribunal not to allow Respondent to benefit from its obstructionism, while protecting Claimants' right to a fair hearing.

56.  On **24 March 2012**, the Tribunal issued Procedural Order No. 3 (PO-3). The entire text of PO-3 is set out below:

### *Procedural Order (PO) No. 3*

#### *1.  Introduction*

*1.1.  The Tribunal has taken note of the recent submissions of the Parties regarding document production and regarding the further procedure. Since the Parties had the opportunity to file two rounds of submissions and since the arguments put forward in these submissions are well known to the Parties, the Tribunal sees no need to repeat the many arguments of the Parties.*

*1.2.  Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

#### *2.  Document Production*

*2.1.  The earlier rulings of the Tribunal, particularly in PO-2, its Annexes, and the Chairman's letter of 3 February 2012, are maintained and are hereby confirmed.*

*2.2.  Due to a clerical error, Claimant's Request no. 48 in Annex 1 of PO-2 was not decided. It is now decided as follows:*

*"Admitted in so far as documents are referenced or relied upon in Exhibit R-118."*

*2.3.  Regarding supporting documents to the reports by Deloitte, GCA, and Neftegazconsult, as well as to other reports submitted by Claimants and Respondent, it is confirmed that these have to be produced now, in so far as they have not yet been produced. If a Party chooses not to produce them, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*

*2.4.  Regarding what the Claimants refer to as "Sleeper" reports and statements, the Tribunal has already admitted the respective requests by Claimants in Annex 1 to PO-2, as explained in the last paragraph on the title page of Annex 1 to PO-2. It is clarified that the required disclosure includes the identification of the authors of such documents. And, it is confirmed that, if Respondent chooses not to produce, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

2.5.   *Insofar as the Parties in view of PO-2, in view of their further submissions thereafter regarding their own or the othe rParty's production up to now, and in view of the above clarifications in this PO, choose to still produce documents, they shall do so by 2 **April 2012** in order to provide for the next procedural step according to the agreed timetable, i.e. to enable Claimant to take such documents into account in its Reply Memorial now due by 16 April 2012 according to my letter of 3 February 2012. Otherwise it will be assumed that the Party has chosen not to produce with the consequences mentioned above.*

2.6.   *Finally, the Tribunal confirms that it is left to each Party whether or not it will produce documents. However the Tribunal stresses, that both the Parties and the Tribunal have an interest that all relevant evidence is available for an orderly discussion and for decisions by the Tribunal and also an interest that neither non-production leads to adverse inferences nor that submitted evidence may be considered of little or even no evidentiary value due to non-production of supporting documents or information.*

**3.   Further Procedure**

3.1.   *Regarding the **further procedure**, the Tribunal recalls Section 2.1 of PO-1:*

  *2.1.   This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

3.2.   *The Tribunal notes that Respondent is well acquainted with international arbitration procedures from other earlier cases and was represented at the Stockholm meeting by counsel also regularly active in this field.*

3.3.   *It is further recalled that, in February 2011, the Parties submitted a joint proposal for a new timetable, which the Tribunal accepted by the Chairman's letter of 22 February 2011.*

3.4.   *The Tribunal considers that changing the agreed and so far implemented procedure at the present stage would considerably disrupt the procedure and would only be acceptable for mandatory and urgent reasons. The Tribunal does not see any such reasons in the present case.*

3.5.   *Therefore, the procedure shall proceed as established in PO-1 and later rulings of the Tribunal slightly adapting the timetable.*

3.6.   *According to the agreement recorded in Sections 4.3 and 7.4 of PO-1, English will remain the **language of this procedure**. However, while accordingly, the hearing shall also be conducted in English, the Parties may make arrangements at the hearing for simultaneous interpretation to Russian. Anyhow, if witnesses or experts are examined at the hearing who do not testify in English, such arrangement will have to be made by the*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Parties in accordance with Section 10.7 of PO-1. Therefore, it is suggested that the Parties when they contact the ICC Hearing Centre in accordance with the Chairman's mail of 4 April 2011 regarding the logistics of the hearing (it is suggested that they do so soon), they also request to use the logistics for simultaneous interpretation which are available at the Centre.

3.7.    Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in section 6.18 o fPo-1 which, taking into account the dates of the jointly proposed and accepted new timetable provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 12 October 2012.

3.8.    Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:

Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

3.9.    To clarify the intention of the Tribunal regarding the conduct of the hearing, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings, which have proved to be efficient and acceptable to the parties in similar cases:

A.      In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions      may      be admitted by the Tribunal. Therefore, insofar as, at the Hearing, such witnesses or experts are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness or expert for up to 10 minutes and add direct examination on issues, if any, which have occurred after the last written statement or report of the witness or expert has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.

B.      The following Agenda is intended to be established for the Hearing:

1.      Introduction by the Chairman of the Tribunal.

2.      Opening Statements of not more than total of two hours for each Party

        First on jurisdiction



        *a)      Respondent up to 30 minutes*

        *b)      Claimants up to 30 minutes*

        *Second on all other issues including the Merits*

        *a)      Claimants up to 90 minutes*

        *b)      Respondent up to 30 minutes*

3.     *Unless otherwise agreed by the Parties: Examination of Claimants' fact witnesses:*

        *a)      Affirmation of witness to tell the truth.*

        *b)      Short introduction by Claimants*

        *c)      Cross-examination by Respondent.*

        *d)      Re-direct examination by Claimants, but only on issues raised in cross-examination.*

        *e)      Re-cross examination by Respondent but only on issues raised in re-direct examination.*

        *f)      Remaining questions by members of the Tribunal, but they may raise questions at any time.*

4.     *Examination of Respondent's fact witnesses. For each: vice versa as under 3.a) to f) above.*

5.     *Examination of experts as under 3.a) to f) above.*

6.     *Any witness or expert may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness and expert during the time of the Hearing.*

7.     *Oral closing arguments of up to 2 hours (or longer if authorized by the Tribunal after consultation with the Parties during the hearing) each for the*

        *a)      Claimants,*

        *b)      Respondent.*

8.     *Remaining questions by the members of the Tribunal, if any.*

9.     *Discussion regarding the timing and details of post-hearing submissions and other procedural issues.*

3.10.   *Taking into account the above rulings and intended conduct of the hearing, and also taking into account, from the submissions already received, the*



> *volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the period blocked for the hearing in accordance with the agreed timetable is sufficient.*
>
> 4. *Beyond the above observations and rulings, the Tribunal does not consider any action necessary from its side.*

57. On **2 April 2012**, Respondent confirmed that it had sent Claimants approximately 32,000 pages of requested documents. Respondent also contacted the ICC Hearing Center. Finally, Respondent stated that the time period for the oral hearing on jurisdictional matters is not sufficient and proposed devoting the period from 1 – 5 October to jurisdictional matters.

58. On **4 April 2012**, Claimants requested an extension of six weeks for the preparation of their Reply, since that amount of time would be necessary to translate and read the 32,000 pages of documents sent by Respondent – sent 14 days prior to Claimants' deadline to submit the Reply.

59. On **10 April 2012**, the Tribunal wrote to the Arbitration Institute of the SCC. In light of changes in the case, it became necessary for the Tribunal to ask that its fees and the Security for Expenses be doubled.

60. On **11 April 2012**, Respondent wrote to the Tribunal, objecting to Claimants' requests for extensions of time unless the same time period would be granted for Respondent's Rejoinder.

61. On **21 April 2012**, the Tribunal circulated a draft of Procedural Order No. 4 (PO-4) to the Parties for their review and comment by 30 April 2012.

62. On **23 April 2012**, the Arbitration Institute of the SCC forwarded the Parties the Tribunal's letter of 10 April 2012 and requested their response by 30 April 2012.

63. On **24 April 2012**, Claimants provided their comments to draft PO-4. Claimants objected to moving the hearing date and proposed alternatives.

64. On **4 May 2012**, the Tribunal issued **Procedural Order No. 4** to the Parties. The entire text is provided below, for ease of reference:

### *Procedural Order (PO) No.4*

*A draft of this PO was sent to the Parties for comments by 30 April 2012. Taking into account the comments received from the Parties, the Tribunal now issues the PO in its final form.*

#### *1.     Introduction*

> *1.1.   The Tribunal has taken note of Claimants' Application of 4 April and letter of 24 April 2012 and of Respondent's comments of 11 April and letters of 30 April 2012, both with attachments and proposals for a new timetable. Since the arguments put forward in*



*these submissions are well-known to the Parties, the Tribunal sees no need to repeat them here.*

1.2.    *Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

## 2.    Relevant aspects of the procedure up to now

2.1.    *The Tribunal recalls **Procedural Order No.3 (PO-3)**, particularly its Section 3. The respective rulings are confirmed, subject to changes hereafter in this PO.*

2.2.    *The Tribunal notes that both Parties now agree that the timetable as confirmed by PO-3 should be changed. But they disagree in which way it should be changed.*

2.3.    *The Tribunal recalls the second introductory paragraph of Annex I to PO-2 dated 3 February 2012:*

*Further, the Tribunal clarifies that, in so far as Respondent has submitted exhibits, in particular statements and reports (which Claimants refer to as "Sleeper" Reports and Statements), the Tribunal has admitted Claimants' requests that documents on which such exhibits rely, etc., shall be produced. However, if Respondent chooses not to produce such documents, this will be taken into account by the Tribunal regarding the evidentiary value of such exhibits. The same may apply, if persons who have produced such exhibits and who are called for cross-examination by Claimants, do not appear at the hearing for cross examination.*

2.4.    *In their submissions dated 17 and 21 February 2012, Claimants identified and listed a number of such documents alleging that they had not been produced by Respondent and requested (pages 11 and 12 of the letter of 17 February 2012) that the Tribunal order Respondent to produce them "immediately."*

2.5.    *The Tribunal understands that, rather than relying on the Tribunal's reaction concerning ordered but not produced documents identified in the paragraph quoted above from Annex I, Claimants considered the disclosure of these documents so essential for their Reply Memorial that they insisted on their production.*

2.6.    *Taking into account Claimants' submissions and Respondent's further submissions, in Section 2 of PO-3, the Tribunal provided further clarifications and a further opportunity to the Parties to produce further documents by the new deadline of 2 April 2012.*

2.7.    *By that date of 2 April 2012, Respondent submitted its letter of that date announcing the disclosure of a great number of documents which seem to include all those requested by Claimants.*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

2.8. By letter of 4 April 2012, Claimants submitted that they could not address this volume of documents now disclosed by Respondent by the deadline of 16 April set for their Reply Memorial. Therefore, they proposed a new timetable.

2.9. By letter of 11 April 2012, Respondent submitted comments on Claimants' letter. Particularly, Respondent listed a number of documents which it alleged Claimants should have disclosed according to PO-3 and proposed a new timetable different from that proposed by Claimants.

2.10. By letter of 24 April 2012, Claimants submitted comments on the draft PO and, particularly, declared themselves ready to submit their Reply Memorial on Jurisdiction and Liability by 7 May and their Reply Memorial on Quantum by 28 May 2012. On that basis, Claimants suggested new alternative timetables.

2.11. By letters of 30 April 2012, Respondent submitted letters and appended comments on the draft PO-4 and on Claimants' letter of 24 April 2012.

### 3. The Tribunal's Conclusions

3.1. The Tribunal understands that the Parties prefer to have as many relevant documents as possible available for their final Memorials before the hearing on the merits.

3.2. The Tribunal also feels that every effort should be made to have all relevant documentation on file in order to fully evaluate the Parties' submissions and evidence.

3.3. The Tribunal agrees with the Parties that, therefore, the timetable should be changed. The Tribunal recalls that, in its draft PO-4, it already asked for the Parties' views regarding a bifurcation with an early hearing on jurisdiction. The Tribunal notes that both the Claimants (in their Alternative 2) and the Respondent now accept bifurcation, though they do not agree on its scope.

3.4. Since the great majority of the large volume of documents which Respondent should have produced by 17 February 2012 according to the second introductory paragraph of Annex I to PO-2, but were produced only by 2 April 2012, concerns the quantum of the claims, the Tribunal finds that bifurcating the procedure into a first phase on jurisdiction and liability and a second phase on quantum, is the relatively best solution in order to avoid undue delay for the entire procedure under the present circumstances.

3.5. In this context, the Tribunal finds it helpful that Claimants now accept 7 May 2012 as an earlier deadline for their Reply Memorial on jurisdiction and liability, and still the originally suggested



deadline of 28 May 2012 for their Reply Memorial on quantum, and also foregoes its Rejoinder on Jurisdiction. Insofar as, from the list of allegedly missing documents according to Respondent's letter of 11 April 2012, Claimants are ready to submit such documents, they should at the latest be submitted with these Memorials.

3.6.   While the Tribunal agreed with Respondent that the deadline originally suggested by Claimants for Respondent's Rejoinder Memorial, i.e. 6 August 2012, was not sufficient, bifurcation would allow different deadlines for Respondent's two Rejoinder Memorials in the two phases. Since Claimants' Reply Memorial on Jurisdiction and Liability can now be submitted by **7 May 2012**, the Tribunal considers that Respondent can now be expected to submit its Rejoinder Memorial restricted to jurisdiction and liability **by 26 July 2012**.

3.7.   Thereafter, as Claimants have forgone their right to submit a Rejoinder on Jurisdiction, there will be sufficient time for the further procedural steps up to a hearing starting at the originally agreed date of 1 October 2012, but restricted to jurisdiction and liability.

3.8.   Regarding the procedure on quantum, a separate timetable could, thus, be set up leading to a shorter hearing on quantum only at a later time.

### 4.   New Timetable

4.1.   Taking into account its above conclusions, the Tribunal hereby sets the following new **Timetable** for the further procedure using and adapting the originally agreed procedural steps in Sections 5.9 to 5.19 of PO-1.

4.2.   **By 7 May 2012**, the Claimants file their Reply Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.3.   **By 28 May 2012**, the Claimants file their Reply Memorial on quantum with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.4.   **By 26 July 2012**, the Respondent files its Rejoinder Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimants' Reply Memorial or regarding new evidence from the procedure for document production.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

4.5.    *Thereafter, no new evidence may be submitted regarding jurisdiction and liability, unless agreed between the Parties or expressly authorized by the Tribunal.*

4.6.    **By 3 August 2012**, *the Parties submit*

*        *notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing on jurisdiction and liability including any information which witness or expert cannot testify in English,*

*        *and an updated list of all exhibits regarding jurisdiction and liability with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.*

4.7.    **By 10 August 2012**, *a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.*

4.8.    *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

4.9.    **Within 3 weeks later**, *at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

4.10.   *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing on jurisdiction and liability.*

4.11.   **Hearing from 1 to 5 October 2012**, *and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* **8 to 9 October 2012**.

4.12.   *Towards the end of the Hearing, the Tribunal will consult with the Parties regarding the further procedure up to the hearing on quantum.*

4.13.   *Subject to any changes resulting from the discussion at the above hearing in October,* **by 21 November 2012**, *Respondent's Rejoinder on quantum.*

4.14.   *Dates for a period of up to 4 days for the* **hearing on quantum** *will be determined after further exchanges between the Tribunal and the Parties as soon as possible.*

**5.    <u>Logistics at the Hearing</u>**



> *5.1.* *The Tribunal recalls regarding the logistics at the Hearing:*
>
> \* *Section 10.6 of PO-1 (transcript)*
> \* *Section 10.7 of PO-1 (interpretation)*
> \* *the Chairman's mail of 4 April to the ICC Hearing Centre in Paris, which was copied to the Parties (arrangements and billing at the Centre).*
>
> *5.2.* *The Parties are invited to jointly make the necessary arrangements and inform the Tribunal accordingly by 26 July 2012.*

65. On **7 May 2012**, Claimants notified the Tribunal that it required an extension until 14:00 CET on 8 May in order to make its submission, due to the size of the submission, as well as lingering issues of obtaining signatures and translations across various jurisdictions.

66. On **8 May 2012**, Claimants submitted **Claimants' Reply Memorial on Jurisdiction and Liability** (C-II), together with 7 witness statements and 5 expert reports, to the Tribunal.

67. On **9 May 2012**, the Arbitration Institute of the SCC decided that additional advances, in the amount of EUR 422 000 shall be paid by Respondent by 23 May 2013 and so notified the Parties.

68. On **24 May 2012**, the Arbitration Institute of the SCC wrote to the Parties, reminding Respondent to pay the outstanding advance of EUR 422 000 and extending the deadline to 1 June 2012.

69. On **28 May 2012**, Claimants submitted **Claimants' Reply Memorial on Quantum** (C-III) to the Tribunal.

70. On **30 May 2012**, Respondent advised the Tribunal that Respondent appointed Dr. Patricia Nacimiento of Norton Rose LLP as counsel.

71. On **30 May 2012**, Respondent applied for an extension of the deadline to submit **Respondent's Rejoinder on Jurisdiction and Liability** (R-II).

72. On **31 May 2012**, the Tribunal confirmed receipt of Respondent's two letters of 30 May 2012 and invited Claimants to submit any comments thereto by 4 June 2012.

73. On **4 June 2012**, Claimants responded that they do not object to Respondent being provided a brief extension of one week or less for its Rejoinder, and left the matter to the Tribunal's discretion.

74. On **5 June 2012**, Respondent urged the Tribunal to grant the requested extension and arguing that an extension was necessary in order that Respondent adequately reply to Claimants' new evidence.

75. On **5 June 2012**, Claimants urged the Tribunal to grant a shorter extension that would leave the bulk of August and September available to prepare for the October hearing.



76. On **6 June 2012**, the Tribunal sent the following email to the Parties.

> *[T]he Tribunal has taken note of the Parties' recent communications. Since they are well known to all concerned, there is no need to repeat or summarize them again.*
>
> *1. Regarding Respondent's 1ˢᵗ letter of 30 May 2012.*
>
> *In this regard, I as Chairman disclose the following.*
>
> *Dr. Patricia Nacimiento, who is announced as a new additional counsel, is one of my two co-editors of the book "Arbitration in Germany" published some years ago and planned for a 2ⁿᵈ edition in the future. I have not ever had and still do not have any other professional contact with her. I do not consider that her appointment raises any professional conflict either for her or for my involvement in this arbitration. However, as a precaution, I inform the parties of the above (which anyhow can be seen from the book having been on the market for some years). I add that the other members of the Tribunal also do not see any conflict. Unless we receive an objection from one of the Parties within one week of this letter, we consider this matter as closed.*
>
> *2. Regarding Respondent's 2ⁿᵈ letter of 30 May 2012.*
>
> *After an examination of the Respondent's extension application and the comments received from the Parties, mainly for the reasons mentioned in the Respondent's letter of 30 May, the Tribunal concludes that the requested extension shall be granted as follows:*
>
> *The dates in PO-4 are changed as hereafter:*
> ☐ ***Section 4.4. to 13 August 2012***
> ☐ ***Section 4.6. to 20 August 2012***
> ☐ ***Section 4.7. to 27 August 2012***
> ☐ ***with the later sections and, of course, the hearing dates remaining unchanged.***
>
> *3. Hearing on Quantum.*
>
> *Pursuant to 4.14 of PO-4, the Tribunal has had an exchange on possible dates for the Hearing on Quantum. It has turned out that, after the Respondent's Rejoinder due by 21 November 2012, the only period prior to April 2012 at which all three members of the Tribunal are available for the 4 day hearing, is **28 to 31 January 2013.***
>
> *Therefore, the Tribunal sets the hearing for these dates and requests the Parties to block that period for a hearing in Paris. Further details will be determined later.*

77. On **12 June 2012**, the Arbitration Institute of the SCC advised that Respondent still has not made the required EUR 422 000 payment. Claimants were, therefore, invited to make the payment by 19 June 2012.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

78. On **20 June 2012**, the Arbitration Institute of the SCC advised that Claimants provided the additional advance of EUR 422 000, as ordered.

79. On **24 June 2012**, the Tribunal provided the Parties the ICC Centre's revised reservation confirmation for the shortened hearing in October 2012 and the ICC Centre's Quotation for the 2nd hearing to take place in January 2013. The Tribunal invited the Parties to confirm the reservation to the ICC Centre by 9 July 2012 and to inform the Tribunal by the same date.

80. On **4 July 2012**, Claimants announced the confirmation of the reservations with the ICC Centre for the October 2012 and the January 2013 hearings and also announced the relocation of its counsel's Paris office.

81. On **1 August 2012**, the Tribunal requested that the Parties submit Microsoft WORD versions of each of the Memorials to the Tribunal. The Parties complied on **3 August 2012**.

82. On **13 August 2012**, Respondent filed its **Rejoinder on Jurisdiction and Liability**, and the accompanying witness statements and export reports, with the Tribunal.

83. On **20 August 2012**, the Parties submitted their respective notifications of witnesses and experts for examination at the hearing, pursuant to PO-4 as amended on 6 June 2012, to the Tribunal.

84. On **23 August 2012**, the Chairman distributed the **Tribunal's draft for a Procedural Order No. 5 regarding the details of the hearing in October** to the Parties. The Tribunal requested responses by 7 September.

85. On **27 August 2012**, Respondent emailed the Tribunal. Respondent confirmed receipt of draft PO-5 and requested that the Tribunal confirm that, by the attached draft, the deadline initially established for 27 August 2012 for the Parties' comments to the respective letters of 20 August 2012 is superseded and that the next relevant deadline is 7 September 2012.

86. On **27 August 2012**, the Tribunal confirmed the 27 August deadline.

87. On **27 August 2012**, the Parties, in separate emails, confirmed their 20 August 2012 notifications of witnesses and experts for examination at the hearing and indicated that neither wished to make any changes to those lists.

88. On **7 September 2012**, Claimants and Respondent, in separate letters, submitted their comments to draft PO-5 to the Tribunal.

89. On **8 September 2012**, Respondent wrote in response to Claimants' letter of 7 September 2012, indicating that the contents of Claimants' letter deviated in part from the Parties' discussions. In particular, Respondent strongly objected to using the January hearing for any purpose other than quantum.



90. On **11 September 2012**, the Tribunal thanked the Parties for their cooperation on logistics and arrangements with the ICC Hearing Centre and invited them to a telephone conference at 15:00 Paris time on 15 September.

91. On **13 September 2012**, Claimants confirmed their attendance for the October hearing. While Claimants would prefer to hear expert testimony at the hearing, they are mindful that the Tribunal considers that oral testimony from the experts may be unnecessary. Instead, Claimants stated that they will not insist on presenting experts or on cross-examining Respondent's experts at the October hearing unless Respondent calls an expert. Finally, Claimants stated that they did not consider a pre-hearing telephone conference with the Tribunal to be necessary.

92. On **14 September 2012**, Respondent wrote to the Tribunal with comments on PO-5. Respondent suggested that the order of witnesses should be notified by 26 September, at the latest. Respondent also requested that witnesses Messrs. Smagulov, Aubakirov, and Aldashev be heard by video-conferencing. Respondent asked that the deadline for Post-Hearing Briefs be set after the January 2013 hearing.

93. On **14 September 2012** the Chairman replied, stating that Respondent would need to make witnesses Smagulov, Aubakirov, and Aldashev available for oral testimony at the hearing or, alternatively, could withdraw their witness statements, per section 3.6 of draft PO-5.

94. On **14 September 2012**, Claimants requested the Tribunal's permission to submit a limited number of documents into evidence in advance of the October hearing, pursuant to points 7.3 and 10.4 of PO-1.

95. On **16 September 2012**, Respondent urged dismissal of the request.

96. On **16 September 2012**, Claimants replied to Respondent's email, explaining that the evidence sought to be admitted is pertinent and responsive to new arguments made by Respondent.

97. On **18 September 2012**, the Tribunal issued **Procedural Order (PO) No. 5 Regarding further details of the Hearing on Jurisdiction and Liability** (PO-5). The entire text is provided below for ease of reference:

*Procedural Order (PO) No.5*
*Regarding further details of the Hearing on Jurisdiction and Liability*

*A draft of this PO was sent to the Parties for comments by 7 September 2012.*

*Thereafter, taking into account:*

- *the comments on the draft and further submissions received from the Parties,*
- *the Tribunal's letter to the Parties dated 11 September 2012*
- *and the submissions received from the Parties thereafter,*

*the Tribunal now issues the PO in its final form.*



## 1. Earlier Agreements and Rulings

1.1. In order to have all rulings relevant for the hearing available in one document, this Order recalls the **earlier agreements and rulings** of the Tribunal and confirms them, to the extent that they are not amended in this PO, in bracketed text or elsewhere. The Tribunal particularly takes into account the recent submissions and letters of the Parties.

1.2. In particular, with reference to section 2.1 of PO-4, the **following sections of PO-3** are recalled and again confirmed:

3.7. Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in Section 6.18 of PO-1 which, taking into account the dates of the jointly proposed and accepted new timetable, provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 9 October 2012. [In this regard, section 4.11 of PO-4 decided on the bifurcation of the proceedings and ruled that extension days would include only 8 to 9 October.].

3.8. Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:

Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish **equal maximum time periods** both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

3.9. To clarify the **intention of the Tribunal regarding the conduct of the hearing**, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings which have proved to be efficient and acceptable to the parties in similar cases:

[The later provisions of § 3.9 of PO-3 are not recalled, but are later included in this PO-5 in their amended form as now valid for the hearing.]

3.10. Taking into account the above rulings and intended conduct of the hearing and also taking into account, from the submissions already received, the volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the **period blocked for the hearing in accordance with the agreed timetable is sufficient.**

1.3 Further, the Tribunal recalls from **PO-1 the following sections:**

10.4. **No new documents** may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the



credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.

10.5. Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

10.6. A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.

10.7. Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.

1.4 Further, the Tribunal recalls from **the Tribunal's letter dated 11 September 2012** the following sections:

### 1. Logistics of the Hearing

1.1. The Tribunal thanks the Parties for their arrangements with the ICC Hearing Centre.

1.2. The Parties' selection of Mr. McGowan as **court reporter** is an excellent one. It should be pointed out to him that very few interruptions of the hearing will be possible so that he can bring a colleague in case he considers that necessary.

1.3. For the same reasons, the **interpreters** should be notified and it may be necessary for them to bring a second team to allow un-interrupted simultaneous interpretation.

1.4. In order to make sure that all the **logistics are ready** _before_ **the beginning of the hearing Monday 1 October 2012 at 9:30**, it should be assured early enough (either on Sunday or very early Monday morning) that the hearing room is set up, including in particular that:

\*    All files of the Parties are set up,
\*    There is sufficient room for the members of the Tribunal to spread their files on their desks,
\*    The hearing binders for the Tribunal on separate carts  behind        every member of the Tribunal,



\*     *Microphones for all speaking connected to loud speakers,*
\*     *All of the equipment of the court reporter is set up,*
\*     *All of the equipment for the simultaneous interpretation is set up, and*
\*     *There are sufficient plugs available for the individual laptops of the Parties, of the members of the Tribunal, and of the Tribunal Secretary, in addition to the live laptops of the court reporter.*

*The Parties are invited to inform the Tribunal in advance at which time this preparation will be done so that the Tribunal Secretary can join them at an appropriate time.*

*1.6.    Subject to the provisions below, for the case that Mr. Seong-Hoon Kim is to be examined orally, the Parties should make all arrangements for a **video examination** from Korea for an appropriate time during the hearing agreed between the Parties and notified to the Tribunal.*

## 2.    Fact Witnesses

*2.1.    The Tribunal thanks the Parties for reducing the number of fact witnesses to be heard at the hearing.*

*2.2.    As agreed between the Parties, they are invited to notify the other Party and the Tribunal as early as possible and at the latest by the beginning of the hearing regarding the order in which the fact witnesses should be heard.*

## 3.    Experts

*3.1    The Tribunal thanks the Parties for their efforts and suggestions regarding the examination of experts.*

*3.2.    The Tribunal recalls from the chairman's letter of 23 August 2012 the indication that, in view of the extensive reports of most experts, the Tribunal considers that oral examination of most experts may not be necessary.*

*3.3.    Having reviewed the various considerations and suggestions of the Parties in their recent communications in this regard, the Tribunal rules as follows:*

> *3.3.1.   With their 1[st] round of Post-Hearing Briefs after the October hearing, the Parties may submit comments of their experts, but only regarding any new developments or issues which they have not addressed in their earlier reports, if considered necessary.*

> *3.3.2.   With their 2[nd] round of Post-Hearing Briefs after the October hearing, the Parties may submit reply comments of their experts to the comments of the experts of the other Party submitted in the 1[st] round, if considered necessary.*



3.3.2. *[sic] If, in spite of the above opportunity for written additional comments by the experts, a Party insists that oral examination should take place at the hearing, the examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

3.3.3. *In so far as a Party insists on oral examination of an expert according to section 3.3.2. above, it shall notify the Tribunal by noon (Paris time) Friday 14 September 2012*

- *of the respective expert who should be examined,*
- *the respective expert from the other side who should join the conferencing, and*
- *the issues on which the conferencing examination should focus.*

3.3.4. *In so far as a notification is made according to section 3.3.3. above, the Parties shall make the respective experts available at the hearing.*

3.3.5. *In preparation of the hearing, the notified experts regarding the same issues, in so far as they will attend the hearing, are invited to try to agree on a note, or otherwise send separate notes, listing major points of agreement and disagreement, and the **Parties** shall submit such notes to the Tribunal by 24 September 2012.*

## 4.     **Further procedure**

4.1. *As the Parties must have sufficient time to prepare the hearing and assure attendance (including getting visas etc) of the witnesses and experts required at the hearing, the Tribunal intends to issue **PO-5** as soon as possible after 14 September 2012 and any possible notifications received by that time. The Parties are invited to start their preparations for the hearing already now on the basis of the provisions in the draft PO-5 they received in so far as these are not affected by the rulings in this letter of the Tribunal.*

4.2. *At the present time and in view of the above rulings, the Tribunal does not consider it necessary to, additionally, hold a telephone conference for which an option is provided in section 4.9 of PO-4," if considered necessary by the Tribunal".*



4.3.    In view of other commitments of the members of the Tribunal, the only possible date on which Mr. Haigh and the chairman would be available for a telephone conference on any further details would be Saturday 15 September. But Prof. Lebedev, who is travelling, is not sure he could join in.

4.4.    If the Parties agree that a telephone conference is still necessary and if they are available on that day, they are invited to arrange a telephone conference for that day which, in view of the time differences involved, should start at **15:00 hours Paris time on 15 September**.

4.5.    If it turns out that the Parties are not available on that date, the Tribunal will issue PO-5 taking into account any notifications and comments received from the Parties.

4.6.    At the end of the January hearing, the Tribunal will consult with the Parties whether a one day hearing should be set for final pleadings in April 2013.

## 2.    **Procedural Steps before the Hearing**

2.1.    Claimants are authorized to submit, **by 21 September 2012**, the new documents mentioned in its letter dated 14 September 2012. If Respondent wishes to submit any new documents in rebuttal to these documents, it may do so **by 27 September 2012**.

2.2.    In view of the great number of exhibits submitted by the Parties and in order to facilitate references and using these exhibits at the Hearing and to avoid that each member of the Tribunal has to bring all of them to the Hearing, the **Parties** are invited to bring to the Hearing:

- for the other Party and for **each** member of the Tribunal **Hearing Binders in A5 format** of those exhibits or parts thereof on which they intend to rely in their oral presentations at the hearing, together with a separate consolidated Table of Contents of the Hearing Binders of each Party.
- a **USB-Device** with the contents of the Hearing Binders for the other Party, for each member of the Tribunal, and for the Tribunal Secretary.
- for the use of the Tribunal, in **A5 format one full set of all exhibits** the Parties have submitted in this procedure, together with a separate consolidated Table of Contents of these exhibits.

## 3.    **Further Details regarding the Hearing**

3.1.    As ruled in section 4.11 of PO-4, the Hearing shall be held at the **ICC Hearing Centre in Paris from 1 to 5 October 2012**, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from **8 to 9 October 2012.**

3.2.    No extension of the hearing will be possible due to other commitments of members of the Tribunal.



3.3. *To give sufficient time to the Parties and the Arbitrators to prepare for and evaluate each part of the Hearings, the daily sessions shall not go beyond the period between 9:30 a.m. and 5:30 p.m. However, the Tribunal, in consultation with the Parties, may change the timing during the course of the Hearings.*

3.4. *In accordance with section 10.5 of PO-1, the Tribunal establishes the following maximum time periods which the Parties shall have available for their presentations and examination and cross-examination of all witnesses and experts. Taking into account the Calculation of Hearing Time attached to this Order, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

> *15.5 hours for Claimants*
> *15.5 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items above, as long as the total time period allotted to them is maintained.*

3.5. *The Parties shall prepare their presentations and examinations at the Hearing on the basis of the time limits established.*

3.6. *If a witness whose statement has been submitted by a Party and whose examination at the Hearing has been requested by the other Party, does not appear at the Hearing, his or her statement will not be taken into account by the Tribunal. A Party may apply with reasons for an exception from that rule.*

### 4. Conduct of the Hearing

4.1. *In addition to the above cited provisions of PO-1, PO-3, and the Tribunal's letter dated 11 September 2012, the following shall apply:*

4.2. *The following **Agenda** is established for the Hearing:*

> *1. Introduction by the Chairman of the Tribunal.*

2. *Opening Statements of not more than a total of two hours for each Party:*

*First on jurisdiction*
> *a) Respondent up to 30 minutes*
> *b) Claimants up to 30 minutes*

*Second on all other issues including the merits*
> *a) Claimants up to 90 minutes,*
> *b) Respondent up to 90 minutes.*

### 3. Fact Witnesses:

3.1. *In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar*



*as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness for up to 5 minutes and add a short direct examination on issues, if any, which have occurred after the last written statement or report of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

*3.2.    Unless otherwise agreed by the Parties: Examination of **Claimant's fact witnesses** in the order set by Claimant:*

*a)    Affirmation of witness to tell the truth.*
*b)    Short introduction by Claimants*
*c)    Cross-examination by Respondent.*
*d)    Re-direct examination by Claimants, but only on issues raised in cross-examination*
*e)    Re-cross examination by Respondent but only on issues raised in re-direct examination*
*f)    Remaining questions by members of the Tribunal, but they may raise questions at any time.*

*3.3.    Examination of **Respondent's fact witnesses** in the order set by Respondent:*

*For each:*
*vice versa as under 3.a) to f) above.*

### 4.    **Examination of experts**:

*No experts will be examined orally at the hearing. But attention is drawn to the respective rulings in the Tribunal's letter dated 11 September 2012, quoted above.*

*5.    Any witness may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness during the time of the Hearing.*

*6.    Remaining questions by the members of the Tribunal, if any.*

*7.    Discussion regarding the timing and details of post-hearing submissions and other procedural issues, including the question whether Post-hearing Briefs shall be submitted soon after the October Hearing or only after the January Hearing.*

*4.3.    Unless otherwise agreed between the Parties or ruled by the Tribunal, witnesses may be present in the Hearing room during the testimony of other witnesses.*



## 5.    *Other Matters*

5.1    *The Tribunal may change any of the rulings in this Order, after consultation with the Parties, if considered appropriate under the circumstances.*

5.2    *The Parties are invited to submit, **by 19 October 2012**, a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration costs to the SCC, and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.*

*Attachment to Procedural Order No. 5:*

*Calculation of Hearing Time*

| | Hours |
|---|---|
| *Time available* | |
| *Hours* | |
| | *56* |
| *7 days of 8 hours* | *56* |
| | |
| ***Time needed*** | |
| | |
| *Lunch breaks: 7 x 1 hour* | *7* |
| *Various breaks (procedural and coffee)* | *7* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *6.5* |
| | |
| *Total time for other purposes* | *25.0* |
| | |
| *Total time available to Parties* | *31* |
| | |
| ***Time available to each Party (including their opening statements and closing arguments, if any)*** | *15.5* |

98.    On **20 September 2012**, Claimants sent exhibits C-700 – C-717 to the Tribunal and to Respondent.

99.    On **21 September 2012**, Respondent stated that it had not received any documents from Claimants prior to the deadline and requested that the Tribunal exclude the documents.

100.    On **22 September 2012**, Claimants sent Respondent the allegedly outstanding exhibits, via email.

101.    On **22 September 2012**, Respondent requested that the Tribunal exclude Claimants' new and allegedly late exhibits from the arbitration.

102.    On **22 September 2012**, Claimants sent the Tribunal the FedEx tracking report, demonstrating that Claimants had met the Tribunal's deadline.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 56 of 225
Case 1:14-cv-01638-ABJ Document 73-3 Filed 09/30/14 Page 56 of 225

Page **54** of **414**

103. On **23 September 2012**, Claimants wrote in response to Respondent's request to exclude certain exhibits submitted on 21 September, explaining that Respondent's complaints are without merit and should be rejected.

104. On **24 September 2012**, Respondent again objected to Claimants' exhibits.

105. On **27 September 2012**, the Chairman invited the Parties to submit a final list of all persons attending the hearing, and their respective sides identifying their function, at the start of the hearing.

106. On **27 September 2012**, Respondent submitted new exhibits in reply to Claimants' new documents submitted on 21 September 2012. Respondent requested that the Tribunal order the Claimants to indicate specific parts of the documents they intend to rely upon.

107. On **28 September 2012**, the Tribunal wrote to the Parties in reference to Respondent's applications of 24 and 27 September. The Tribunal indicated that the application to exclude documents would be decided after the Tribunal has had an opportunity to discuss it at the beginning of the hearing. The Tribunal invited Claimants to indicate, at the beginning of the hearing, the specific parts of the exhibits submitted on 21 September 2012 upon which they intend to rely. The Tribunal also allowed Respondent to extend its direct examinations beyond 5 minutes, so far as the new exhibits would concern matters not previously addressed in the witness statements.

108. On **28 September 2012**, Claimants stated that they would not object to Respondent's new witness statements and agreed to withdraw the documents not accompanied by English translations. Claimants requested leave under PO-1 ¶ 5.12 to submit two additional documents.

109. On **1 October 2012**, Respondent had no objection to Claimants' withdrawal of its documents submitted on 21 September 2012. Respondent stated, however, that its preparation for the hearing would be prejudiced by the late submission of additional material. Respondent offered to allow the admission of new documents in exchange for Mr. Rakhimov being allowed to submit a third witness statement on the matter.

110. The **Hearing on Jurisdiction and Liability** was held at the ICC Hearing Centre in Paris from **1 – 8 October 2012**. A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Joseph Tirado, Simon Ramsden, Zhanibek Saurbek, Max Stein, and Sven Lange of Norton Rose LLP and Prof. Igor V. Zenkin of the Moscow Regional Collegium of Advocates appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding and Mihail Popovici of the Ascom Group SA. Also appearing for Respondent were Anastasia Maltseva and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Alan Tlenchiev, Head of the Division on the Supervision over Compliance with Environmental



Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO Office, Aman Sagatov, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Chief Expert of the Department of Protection of State Property Rights of the Ministry of Justice, and Prof. Martha Brill Olcott, Carnegie Endowment for International Peace. Anatolie Stati, Artur Lungu, Grigore Pisica, and Alexandru Condorachi were also present.

111. On **1 October 2012**, the Tribunal heard the Parties' respective opening statements on jurisdiction / merits and heard testimony from Artur Lungu.

112. On **2 October 2012**, the Tribunal heard testimony from Mr. Anatolie Stati, Mr. Grigore Pisica, Mr. Victor Romanosov, and Mr. Alexandru Condorachi.

113. On **3 October 2012**, the Tribunal heard testimony from Alexandru Condorachi, Mr. Alexandru Cojin, Mr. Veaceslav Stejar, Mr. Eduard Calancea, and Minister Sauat Mukhametbayevich Mynbayev.

114. On **4 October 2012**, the Tribunal heard testimony from Mr. Herve Chagnoux, Mr. Andrey Kravchenko, and Mr. Medet Suleymenov.

115. On **5 October 2012**, the Tribunal heard testimony from Mr. Arman Testemirovich Rakhimov and Mr. Daniyar Mukanovich Turganbayev.

116. On **6 October 2012**, Respondent notified the Tribunal of its intention to call Mr. Akhmetov for direct examination.

117. On **8 October 2012**, the Tribunal heard testimony from Dr. Seong Hoon Kim, Mr. Serik Dosymovich Rakhimov, Mr. Rustam Nurlanovich Akhmetov, Mr. Mirbulat Zarifovich Ongarbaev, and Mr. Salamat Sartevich Baymaganbetov. At the close of the hearing, the Chairman asked the Parties if they had any objections to the procedure, as conducted to date. The Parties each answered that they had no objections.

118. On **15 October 2012**, the Tribunal issued **Procedural Order No. 6** (PO-6):

*Procedural Order (PO) No. 6*
*Regarding the further procedure after*
*the Hearing on Jurisdiction and Liability*

*1.*    *Timetable*

*Resulting from the discussion between the Parties and the Tribunal at the end of the Hearing on Jurisdiction and Liability in Paris, the following timetable is set for the further procedure:*

*1.1.*    *By 19 October 2012, as ruled in § 5.1 of PO-5, the Parties are invited to submit a short statement to the Tribunal regarding which Party made which payments up to the October Hearing for deposits on arbitration*



costs to the SCC and for the expenses related to the reservation of the ICC Hearing Centre, the transcript, and the interpretation at the Hearing.

1.2. *By **21 November 2012**, as ruled in § 4.13 of PO-4, Respondent is invited to submit Respondent's Rejoinder on Quantum.*

*No new evidence on quantum may be submitted after this date unless the Tribunal has authorized such submission in reply to a reasoned request by a Party.*

1.3. *By **3 December 2012**, the Parties are invited to notify which witnesses and experts on quantum presented by themselves or the other side they wish to examine at the January Hearing.*

1.4. *By **10 December 2012**, the Parties are invited to notify whether they wish to change their notifications of 3 December in view of the notification received from the other side.*

1.5. *In preparation of a possible expert conferencing at the hearing, **experts** that have been notified for examination at the January hearing are invited to contact, either directly or with the help of the Parties, the expert from the other side addressing the same issues and try to agree on a short note identifying the major sub-issues on which they agree and disagree.*

1.6. *By **11 January 2013**, the Parties are invited to submit*

  - *either the notes agreed by the experts according to section 1.5 above or separate notes of each expert in so far as they cannot agree on a joint note,*

  - *lists of the persons which intend to participate in the hearing from their respective sides.*

1.7. ***28 to 31 January 2013**, starting at 9:30, **Hearing on Quantum** at the ICC Hearing Centre, 112 Avenue Klebèr, Paris. The Parties are invited to make the necessary logistical arrangements as they did for the October hearing. The Tribunal intends to issue a Procedural Order closer to the time of the hearing regarding further details, in a similar fashion as it did for the October hearing.*

1.8. *By **8 March 2013**, simultaneous submission of 1st Round Post Hearing Briefs by the Parties regarding all issues addressed in the October and January hearings. As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, the submissions may include comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports. Further details regarding the Post Hearing Briefs may be determined in a discussion with the Parties at the end of the January hearing.*



1.9.    **By 29 March 2013**, *simultaneous submission of 2ⁿᵈ Round Post Hearing Briefs, but only addressing issues in rebuttal of the 1ˢᵗ Round Post Hearing Brief of the other side.*

1.10.   **By 19 April 2013**, *simultaneous submission of Cost Statements will be made by the Parties.*

1.11.   **By 26 April 2013**, *simultaneous submission of comments, if any, regarding the Cost Statement of the other side.*

## 2.    Other rulings

*The Tribunal may change or amend the above rulings if considered appropriate after consultation with the Parties.*

119. On **17 October 2012**, Respondent requested a two-week extension on its deadline to make its submission on quantum, to 5 December 2012.

120. On **18 October 2012**, the Tribunal granted the extension until 1 December 2012, so long as both Parties could agree and confirm that they could maintain the procedural steps in the timetable in PO-6.

121. On **18 and 19 October 2012**, respectively, Claimants and Respondent confirmed that they could maintain the procedural timetable and consented to the extension.

122. On **19 October 2012**, Claimants submitted a costs summary to the Tribunal, detailing Claimants payment of the SCC costs to date, amounting to € 1,034,000.00.

123. On **19 October 2012**, Respondent stated that it will pay its share of the costs upon receipt of the invoices.

124. On **1 December 2012**, Respondent filed its **Rejoinder on Quantum,** together with supplementary evidence, to the Tribunal.

125. On **3 December 2012**, Respondent submitted the English version of Mr. Khalelov's witness statement to the Tribunal.

126. On **3 December 2012**, Claimants and Respondent each submitted their respective notifications of witnesses and experts to the Tribunal.

127. On **7 December 2012**, Claimants wrote to Respondent, renewing requests that Respondent produce the four referenced enclosures to R-41.1.

128. On **10 December 2012**, Claimants and Respondent each submitted their updated notifications of witnesses and experts to the Tribunal. Each commented on the other's notifications. Claimants moved to exclude newly submitted evidence and renewed arguments to exclude other evidence.

129. On **13 December 2012**, Respondent answered Claimants' arguments from their 10 December 2012 letter.



130. On **17 December 2012**, the Tribunal issued **Procedural Order No. 7** (PO-7):

### *Procedural Order (PO) No.7*
#### *Regarding the Preparation and Conduct of the Hearing on Quantum*

#### *1. Introduction*

*In view of the recent submissions of the Parties, the Tribunal considers that it should already now issue its Procedural Order provided for in section 1.7 of **PO-6**.*

#### *2. Preparation of the Hearing*

2.1. *The Tribunal also confirms its earlier rulings on the form and contents and on the timetable for the Parties' submissions including those on the still outstanding procedural steps according to PO-6.*

2.2. *The Tribunal considers that, at this stage, it should not exclude any evidence provided by the Parties. But this is without prejudice to later decisions during or after the hearing in view of the following.*

2.3. *As is clear from the earlier rulings of the Tribunal, the hearing in January is strictly limited to matters of QUANTUM.*

2.4. *The Parties are invited to prepare their presentations and examination of witnesses and experts at the hearing accordingly. Any parts of submissions or any evidence going beyond that limit will not be considered by the Tribunal. In so far as the Parties disagree in this regard, they may explain their positions at the hearing and the Tribunal will take that into account.*

2.5. *The Parties may, in direct contact, try to reach agreement on the final list of witnesses and experts to be examined at the hearing and on the order of examination, and inform the Tribunal in this regard **by 11 January 2013**.*

#### *3. Conduct of the Hearing*

3.1. *The hearing shall take place at the ICC Hearing Centre from 28 to 31 January 2013.*

3.2. *Subject to PO-6 and to the following provisions, the rulings on the conduct of the October Hearing in **PO-5** apply, mutatis mutandis, also to the January Hearing.*

3.3. *Particular attention is drawn to the following provisions of PO-5:*

3.3.1. *§ 2.2. on **Hearing Binders***

3.3.2. *§ 3.4. on **time slots** attributed to the Parties.*



*In this context, according to the adapted calculation of hearing time as annexed to this PO, the total maximum time available for the Parties (including their opening statements and closing arguments, if any) shall be as follows:*

> *8 hours for Claimants*
> *8 hours for Respondent*

*It is left to the Parties how much of their allotted total time they want to spend on their various Agenda items, as long as the total time period allotted to them is maintained.*

*At the beginning of the hearing, the Parties are invited to nominate one member of their teams who will coordinate the time keeping with the Tribunal Secretary.*

3.3.3. *§ 4.2. on the **Agenda of the Hearing***

3.3.4. *After the preparation according to sections 1.5 and 1.6 of PO 6, § 1.4.3. of PO-5 provided on **expert conferencing**:*

> *(T)he examination of experts will be conducted by expert conferencing of the experts from both sides on the respective issues as follows:*

- *Short introduction up to 5 minutes of each expert by the Party which presented that expert,*
- *Questions by the Parties to the experts, but only regarding any new developments or issues which the experts have not yet addressed in their earlier reports,*
- *Additional questions by the Tribunal, if any, and*
- *Follow-up questions by the Parties on the questions raised by the Tribunal, if any.*

**Attachment to Procedural Order No. 7:**

**Calculation of Hearing Time**

| Time available | Hours |
|---|---|
| *4 days of 8 hours* | *32* |

**Time needed**

| | |
|---|---|
| *Lunch breaks: 4 x 1 hour* | *4* |
| *Various breaks (procedural and coffee)* | *4* |
| *Procedural discussions (estimated total)* | *4* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by Members of Tribunal* | *3.5* |



| | |
|---|---|
| *Total time for other purposes* | *16.0* |
| *Total time available to Parties* | *16* |

***Time available to each Party (including their opening statements and closing arguments, if any)***   **8**

131. On **18 December 2012**, Suvi Lappalainen of the SCC wrote to the Parties. In reference to the correspondence between the Tribunal and the Parties about appointing an Administrative Secretary, the SCC decided that additional advances in the amount of EUR 60 000 shall be paid in equal shares and will cover the fee of the secretary. The Parties were requested to make payment by 2 January 2013.

132. On **18 December 2012**, Claimants requested that Respondent provide the documentation or data relied upon in the expert reports submitted on 1 December 2012, pursuant to Art. 5(2)(e) IBA Rules. Claimants pointed out that Respondent had already failed to provide such information earlier in the procedure, requiring a procedural order to be issued. Claimants argued that they are highly prejudiced by Respondent's failure to provide this documentation, since it hinders their trial preparation.

133. On **31 December 2012**, Claimants informed Respondent and the Tribunal that, on 17 December 2012, Claimants entered into a Sharing Agreement with the holders of the majority of the notes issued by Tristan Oil Limited.

134. On **2 January 2013,** Claimants sought instruction from the Tribunal that Respondent is not excused from bringing Mr. Mynbayev and Mr. Suleymenov to the Quantum Hearing.

135. On **2 January 2013**, Claimants submitted **Claimants' Application to Compel Production** to the Tribunal. Therein, Claimants requested the production of four documents that the Tribunal ordered produced in PO-2. Claimants requested that the Tribunal draw specific adverse inferences against Respondent, should Respondent fail to produce these documents.

136. On **3 January 2013**, the Arbitration Institute of the SCC notified the Tribunal and the Parties that payment of 30 000 Euro had been made by Claimants, and that 30 000 from Respondent was still outstanding. Later that day, Respondent confirmed that payment had been made.

137. On **4 January 2013**, Respondent submitted **Respondent's Application for Postponement of the Hearing on Quantum**. Respondent also requested that the Tribunal grant it leave to reply to Claimants' "Application to Compel Production" and to submit a response to the Sharing Agreement and to dismiss Claimants' Application to Compel Production.

138. On **7 January 2013**, Claimants submitted their **Opposition to Respondent's Application for Postponement of Hearing on Quantum**.



139. On **9 January 2013**, Respondent argued that postponement of the Hearing and the dismissal of Claimants' "Application to Compel Production" is the only way to safeguard procedural justice and to restore procedural equality.

140. On **10 January 2013**, the Tribunal issued **Procedural Order (PO) No. 8 Regarding several Applications of the Parties**, provided below:

### *Procedural Order (PO) No.8*
### *Regarding several Applications of the Parties*

#### *1.    Introduction*

*The Parties have submitted several Applications before the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these Applications or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these Applications decided without any delay, to avoid longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in dealing with the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions on the Applications.*

#### *2.    Claimants' Application dated 2 January 2013 for Document Production*

*The procedure to compel document production has been concluded at a much earlier stage of the proceedings in this case. Insofar as a Party has not produced as ordered by the Tribunal, the consequences of such have already been identified in section 4 of PO-2. Issuing a further order on document production is not provided in the timetables of POs 6 and 7 and would seriously disturb the preparation of the Hearing both for the Parties and the Tribunal.*

*Therefore, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.*

#### *3.    Claimants' Application dated 2 January 2013 to instruct Respondent that it is not excused from bringing Mr. Mynbaev and Mr. Suleimenov to the Hearing on Quantum*

*The timetable of PO 6 provided that the last changes to the Parties' requests to have witnesses of the other side attending had to be submitted by 10 December 2012. On 20 December 2012, Claimants submitted a further change regarding the above mentioned witnesses. Claimants point out that Respondent has not articulated any prejudice by this late request. However, in view of the clear timetable set by PO 6, the Tribunal concludes that it is not appropriate to order the attendance of the two witnesses.*



> *Therefore, this Application is dismissed. However, Respondent is free to bring these witnesses to the Hearing and Parties are free to submit any arguments in this regard at the Hearing or in their Post-Hearing Briefs.*

4. *Claimants' submission on 31 December 2012 of the Sharing Agreement with Tristan Noteholders, and Respondent's request for leave to submit a written statement thereto*

> *The Sharing Agreement is a new development with relevance for the Hearing on Quantum and the submission could not be filed earlier in the procedure. Indeed, not filing it would have been inappropriate.*

> *Therefore, the Tribunal accepts this submission. The Parties are free to argue in this regard at the Hearing and in their Post-Hearing Briefs.*

5. *Respondent's Application to Postpone the Hearing on Quantum*

> *In view of the dismissal of Claimants' Applications in sections 2 and 3, above, the major reasons for this Application of Respondent are moot. The Tribunal is not persuaded by Respondent's arguments that, even in case of such dismissals, it would be prejudiced in its preparation of the Hearing. As provided above, the Parties are free to submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs. For the same reason, the late submission of the Sharing Agreement does not justify a postponement of the Hearing. After the bifurcated and very long procedure in this case, a postponement of the hearing (which would probably delay the procedure for at least several months in order to find a new hearing period at which all concerned would be available) could only be justified for absolutely compelling reasons. In view of the above considerations and conclusions, such reasons do not exist.*

> *Therefore, this Application is dismissed. However, again, the Parties may submit further arguments in this regard at the Hearing and in their Post-Hearing Briefs.*

141. On **11 January 2013**, Respondent made a Procedural Objection regarding the Tribunal's decision to dismiss Respondent's Application for Postponement of the Hearing on Quantum.

142. On **11 January 2013**, Claimants and Respondent provided the Tribunal information regarding the Hearing on Quantum, pursuant to PO-6 and PO-7.

143. On **18 January 2013**, the SCC informed the Tribunal that the additional advance on costs has been paid as ordered.

144. On **18 January 2013**, Claimants requested authorization from the Tribunal to submit documents into evidence in advance of the Quantum Hearing.

145. On **19 January 2013**, the Tribunal invited Respondent to submit comments on Claimants' Applications of 18 January 2013 by 22 January 2013.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

146. On **22 January 2013**, Respondent (1) requested that the Tribunal deny Claimants' request for leave to submit new documents, (2) proposed the order of witness and expert examination, (3) requested the Tribunal's guidance on whether the presence of Mr. Sachsalber would be necessary at the Hearing, (4) requested that Ms. Hardin appear at the Hearing, and (5) remarked on proposed corrections to the valuation experts' testimony.

147. On **23 January 2013**, the Tribunal issued **Procedural Order (PO) No. 9 Regarding further Applications of the Parties and further Details of the Hearing (PO-9)**, provided below:

***Procedural Order (PO) No.9***
***Regarding further Applications of the Parties***
***and further Details of the Hearing***

*1. Introduction*

*By letters dated 11, 18, and 22 January 2013, the Parties have submitted several further Applications and some information and suggestions regarding the conduct of the Hearing scheduled from 28 to 31 January 2013. As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions or the arguments put forward by the Parties. And, as it is in the interest of the Parties to have these matters decided without any delay, to avoid the need of longer deliberation exchanges between members of the Tribunal, this PO will not go into any details of the Tribunal's reasoning in considering the arguments presented by the Parties. Rather, in this PO, the Tribunal will immediately turn to its conclusions and decisions.*

*2. Claimants' Application dated 18 January 2013 for leave to submit certain documents*

*The submission of a considerable number of further documents just a few days before the hearing would seriously disturb the preparation of the Hearing, both for the Parties and the Tribunal, and would not provide Respondent sufficient time to evaluate the documents, formulate replies, and try to find any rebuttal evidence. The Sharing Agreement has already been accepted by section 4 of PO-8 and, as mentioned in section 1 of Respondent's letter of 22 January 2013, has been available to Respondent since 31 December 2012.*

***Therefore, with the exception of the admission of the Sharing Agreement, this Application is dismissed. However, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.***

*3. Respondent's Application to submit a two-page note correcting minor errors in Deloitte's valuation report of 30 November 2012.*

***Since such a note would be more convenient for all concerned than oral corrections at the beginning of the examination of the expert, the submission is admitted.***

*4. Agenda of the Hearing*


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*Taking into account the submissions from the Parties, and subject to any final changes agreed at the beginning of the Hearing, the Tribunal intends to follow the following Agenda:*

1.     **Introduction** *by the Chairman of the Tribunal.*

2.     **Opening Statements** *of a length determined by each Party*

3.     **Examination of Fact Witnesses**

   3.1.   *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination, though exceptions may be admitted by the Tribunal. Therefore, insofar as, at the Hearing, witnesses are invited by the presenting Party or asked to attend at the request of the other Party, the* **presenting Party may introduce the witness for up to 5 minutes, and add a short direct examination** *on issues, if any, which have occurred after the last written statement of the witness has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

   3.2.   *Unless otherwise agreed by the Parties: first, there will be the Examination of* **Claimants' fact witnesses** *in the order set by Claimants:*

   *For each witness, the examination will be conducted as follows:*

   a)   *Affirmation of witness to tell the truth*
   b)   *Short introduction by Claimants*
   c)   *Cross-examination by Respondent.*
   d)   *Re-direct examination by Claimants, but only on issues raised in cross-examination*
   e)   *Re-cross examination by Respondent but only on issues raised in re-direct examination*
   f)   *Remaining questions by members of the Tribunal, but they may raise questions at any time.*

   3.3.   *Examination of* **Respondent's fact witnesses** *in the order set by Respondent:*

   *For each: the examination will be conducted in the same pattern vice versa as mentioned for Claimants' witnesses.*

4.     **Examination of Experts**



4.1 By letters of 11 January 2013, the Parties have communicated an agreement, and the Tribunal agrees, on the following order of examination:

    a)     Claimants' experts

    \*     Direct examination of Claimants' expert by Claimants
    \*     Cross-examination by Respondent
    \*     Re-direct examination by Claimants, but only on issues raised in cross- examination
    \*     Re-cross examination by Respondent but only on issues raised in re-direct examination

    b)     Respondent's experts

    The same order vice versa as for Claimants' expert shall apply

    c).     Experts conferencing by the Tribunal
    d)     Follow-up questions by the Parties on the questions raised by the Tribunal, if any

5. Any witness or expert may only be **recalled** for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness during the time allotted to the Parties at the Hearing.

6. Remaining **questions by the members of the Tribunal**, if any.

7. **Discussion of the further procedure**, taking into account the timetable already established by PO-6, and any new developments and submissions after that PO.

## 5. Certain Further Details of the Conduct of the Hearing

5.1. The Tribunal has taken note of the Parties' communications regarding the attendance of witnesses and experts.

5.2. Unless, in reply to Respondent's letter of 22 January 2013, Claimants notify Respondent no later than **12 noon Friday 25 January 2013 Paris time**, that they insist on orally examining **Mr. Sachsalber, Mr. Powell and Mr. Rhodes**, these persons do not have to attend the hearing.

5.3. In view of the explanation in Respondent's letter of 22 January 2013, the Tribunal accepts that **Mr. Seitinger**, who is situated in Pakistan, will be examined at the hearing in the morning of the last day of the hearing, i.e. 31 January 2013.



5.4.    *If, as notified by Claimants' letter of 11 January 2013, **Ms. Hardin** will not be available for examination at the hearing, the Parties are free to argue at the hearing and in their Post-Hearing Briefs in this regard.*

**6.    Respondent's Application to Extend the Time limits for Submission of the Post-Hearing Briefs and Cost Submissions**

*This matter will be discussed with the Parties at the end of the Hearing on Quantum in order to find an agreement between and with the Parties, and otherwise will be decided by the Tribunal.*

148. On **23 January 2013**, Respondent submitted its "*Additional Note to the Expert Report dated 30 November 2012*" to the Tribunal.

149. On **24 January 2013**, Claimants requested leave to submit an explanatory note from FTI to correct errors that FTI discovered in reviewing the Deloitte GmbH expert report and preparing for the expert conferences.

150. On **25 January 2013** the Tribunal admitted FTI's 6 page correction note.

151. On **25 January 2013**, Respondent submitted the joint issue list of Claimants' expert Ryder Scott and Respondent's expert GCA.

152. On **25 January 2013**, Claimants submitted (1) the Sharing Agreement (C-721), (2) the Explanatory Note of FTI, and (3) a revised translation of Catalin Broscaru's witness statement, to the Tribunal. Claimants also gave notice that they intend to call Mr. Romanosov for direct examination.

153. On **26 January 2013**, Respondent wrote to the Tribunal with regard to Claimants' submission of the "*FTI Amendments to Expert Report*" and the Direct Examination of Mr. Romanosov and other witnesses.

154. On **27 January 2013**, Claimants submitted the revised schedules and supporting documents requested by Respondent on 26 January 2013.

155. The Hearing on Quantum was held at the ICC Hearing Centre in Paris from **28 – 31 January 2013**. A transcript was made. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, James Toher, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachkova, and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Max Stein, and Sven Lange of Norton Rose, LLP and Joseph Tirado of Winston & Strawn appeared on behalf of Respondent. Also appearing for Claimants were Zhennia Silverman and Vicki Mason of King & Spalding, and Mihail Popovici of Ascom Group, SA. Also appearing for Respondent were Zhanibek Saurbek, Anastasia Maltseva, and Natalia Nikiforova of Norton Rose, Marat Beketayev, Secretary of the Ministry of Justice and Deputy Minister of Justice, Yerlan Tuyakbayev, Director of the Department of Legal Support and International Cooperation of the Financial Police, Aman Sagatove, Senior Prosecutor of the Division on the Supervision over Compliance with Environmental Legislation of the Department of Supervision over Compliance with Legislation in the socio-economic sphere of the GPO, Gani Bitenov, Director of the Department of Protection of the States Property Rights, Ministry of Justice, and



Done Tulegen, Deputy Director of the Legal Services Department, and the Ministry of Oil and Gas.

156. On **28 January 2013**, the Tribunal heard opening statements on Quantum from Claimants and from Respondent. The Tribunal also heard testimony from Mr. Artur Lungu. Counsel for Claimants and counsel for the Respondent also indicated that they had agreed to request "*an additional hour or two*" per side, to present their case. The Tribunal indicated that the hearing could not go beyond Thursday evening, but stated that it may be possible to add time at the end.

157. On **29 January 2013**, the Tribunal heard testimony from Mr. Victor Romanosov, Mr. Catalin Broscaru, Mr. Alexandru Cojin, Mr. Anatolie Stati, and Mr. Nurlan Rahimgaliev.

158. On **30 January 2013**, the Tribunal heard testimony from Prof. Martha Brill Olcott, Prof. Tomas Balco, Mr. Michael Nowicki, and James Latham of Ryder Scott, and Dr. Stephen Wright, Mr. Tony Goodearl, and Mr. Michael Wood of GCA. The Tribunal, after considering arguments from both Parties, decided to give each Party an additional hour to present its case, over Dr. Nacimiento's objection.

159. On **31 January 2013**, the Tribunal heard testimony from Mr. Michael Nowicki, Jr. James Latham, Dr. Stephan Wright, Mr. Michael Wood, and Mr. Tony Goodearl via witness conferencing. The Tribunal also heard testimony from Mr. Howard Rosen of FTI and Mr. Tomas Gruhn of Deloitte GmbH, separately, before taking testimony from both via witness conferencing. The Tribunal also heard testimony from Mr. Peter Seitinger. Finally, the Tribunal discussed the further procedure with the Parties. At the close of the hearing, the Chairman asked the Parties if they had any objections to the way the Tribunal has conducted the procedure up until that point. Dr. Nacimiento, on behalf of the Respondent, answered "*we have filed objections and, with all due respect, we uphold our objections.*" Mr. Smith for Claimants answered that there were no objections on behalf of Claimants.

160. On **4 February 2013**, Claimants provided Respondent and the Tribunal access to the 3D seismic data, via a secured website and a CD/DVD.

161. On **6 February 2013**, the Tribunal sent its draft of PO-10 to the Parties and requested comments thereto by 13 February 2013.

162. On **13 February 2013**, Respondent submitted its response to draft PO-10, together with a reiteration of Respondent's objections and 5 Annexes.

163. On **13 February 2013**, Claimants stated that they have no comments to PO-10.

164. On **14 February 2013**, the Chairman, on behalf of the Tribunal, invited Claimants to submit any comments it may have to Respondent's submission, no later than Saturday, 16 February 2013.

165. On **16 February 2013**, Claimants responded to Respondent's submission of 13 February 2013 by letter supported by three annexes.



166. On **17 February 2013,** Respondent responded to Claimants' letter of 16 February 2013.

167. On **20 February 2013**, the Tribunal issued **Procedural Order (PO) No. 10 Regarding the Further Procedure**:

### *Procedural Order (PO) No. 10*
### *Regarding the Further Procedure*

*1.*      *Introduction*

*1.1*      *This PO contains rulings resulting from the discussion between the Parties and the Tribunal at the January Hearing. On 6 February 2013, a draft of this PO was circulated to the Parties for comments within one week. Taking into account the discussion at the hearing and the comments received from the Parties, this PO is now issued in its final form.*

*1.2*      *The Tribunal records that, at the end of the hearing, Claimants agreed to provide, by Monday 4 February 2013, the 3D Seismic data discussed at the hearing and the related documentation to Respondent.*

*2.*      *Respondent's Applications dated 13 February 2013.*

*2.1.*      *In reply to the Tribunal's invitation to comment on the Tribunal's draft of PO-10, on 13 February 2013, Respondent filed a submission which included the following Applications:*

     *(a)*      *Allow for an opportunity to submit an expert report on the new subject matter introduced by Claimants within a period of three months as of submission of the full data information and documents as specified below;*

     *(b)*      *Provide for a hearing with the opportunity to address the new subject matter introduced by Claimants, in particular through examination of the parties' experts and witnesses;*

     *(c)*      *Order Claimants to submit data, information and documents as specified below;*

     *(d)*      *Allow Respondent to submit further witness and/or expert testimony relating to the new subject matter introduced by Claimants as specified below;*

     *(e)*      *The proposed periods for the two rounds of post-hearing briefs and the oral closing submissions shall be maintained and shall commence after the hearing on the new subject matter introduced by Claimants*

     *91*      *In addition, Respondent seeks clarification as to the scope of the first round of Post Hearing Briefs as specified in the second bullet point of section 2.1 and the admissibility of new documents as specified in the last bullet point of section 2.1.*


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

2.2.    On 14 February 2013, the Tribunal invited Claimants to submit any comments they may have. On 16 February 2013, Claimants filed a submission which included the following request:

> Claimants firmly oppose the bulk of the relief requested in Respondent's Submission. Claimants do acknowledge that the Munaibay 3D information has only recently been analyzed by Ryder Scott and GCA, and Claimants do not object to cross-examination of the quantum experts regarding, and limited to, the Munaibay 3D information – if that examination is scheduled in a manner that does not delay the procedural calendar.

2.3.    Thereafter, the Parties filed further submissions providing further arguments and maintaining their above requests.

2.4.    As they are well-known to all concerned, the Tribunal will not repeat or summarize these submissions of the Parties or the arguments put forward by the Parties. Indeed, many of the arguments presented in the most recent submissions by Respondent and, in reply, by Claimants, were already presented during the January hearing and taken into account in the Tribunal's deliberations after that hearing and in the draft PO-10 resulting from these deliberations which was sent to the Parties for comments. While all arguments of the Parties have been considered by the Tribunal, in this PO the Tribunal will thus focus on the arguments it considers determinative for its conclusions and decisions.

2.5.    It is recalled that, according to Art. 19 SCC Rules, the Tribunal **may** conduct the arbitration in such a manner as it considers appropriate (19.1), but **shall** conduct the procedure in an expeditious manner (19.2). It is further recalled that, for the same purpose, Art. 37 SCC Rules provides a time limit of 6 months for the final award, and that this time limit has already been extended considerably in the present case.

2.6.    The Tribunal's duty to conduct the procedure in an impartial manner (Art. 19.2) includes an obligation to take into account the interests of both Claimants and Respondent. In that context, obviously, due process does not mean that every application of a party must be accepted. In particular, it is the Tribunal's authority and duty to decide on the most efficient consideration of evidence in a given phase of the procedure as long as both sides have an opportunity to present their case.

2.7.    In the present case, there have been long and many opportunities for the Parties to submit evidence and two hearings to orally examine witnesses and experts presented by the Parties.

2.8.    In the judgment of the Tribunal, any new information and evidence that became available to the Parties before and at the hearing on quantum, can be commented by the Parties in a following written procedure without the need for another evidentiary hearing. Therefore, the Tribunal had suggested, in its draft for this PO



Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/30/14   Page 71 of 225
Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/30/14   Page 196 of 105

Page **70** of **414**

* *a first round of Post-Hearing Briefs within a period of more than two months after the hearing,*

* *a hearing for oral closing arguments three weeks later,*

* *a final round of Post-Hearing Briefs within a period of one further month after that hearing.*

2.9.    *Nevertheless, the Tribunal considers that the hearing scheduled for 2 May 2013 could also be used for an oral examination of the technical experts of both sides on the update of the Munaibay 3D information. The Tribunal considers that these further three rounds provide the Parties more than ample opportunities to evaluate, comment, and rebut whatever they consider new information and evidence that became available before, at, and immediately after the hearing on quantum.*

2.10.    *Taking all these considerations into account, Respondent's Applications are therefore dismissed in so far as they are not covered by the timetable set hereafter.*

### 3.     **New Timetable**

*The **timetable originally set in PO-6** is changed and amended as follows:*

3.1.    **By 8 April 2013,** *the Parties shall simultaneously submit their respective **1st round Post Hearing Briefs** to the Tribunal:*

* *Regarding all issues addressed in the October 2012 and January 2013 hearings,*

* *Regarding any submissions and documents admitted by the Tribunal and filed by the other side after the October 2012 hearing.*

* *The Tribunal recalls that, according to section 4.5 of PO-4 and section 1.2 of PO-6, no new evidence may be submitted unless authorized by the Tribunal. However, the Parties may attach to the Post Hearing Briefs the following:*

    * *As provided in § 3.3.1 of the Chairman's letter of 11 September 2012, comments of their experts on issues of jurisdiction and liability, but only regarding any new developments or issues which these have not addressed in their earlier reports,*

    * *updates of the Reports of Claimants' and Respondent's technical experts and quantum experts heard at the hearing on quantum,*



    \*       *new documents, but only in rebuttal to submissions and documents filed by the other side filed after the October hearing and admitted by the Tribunal.*

*As a precaution, the Tribunal notifies the Parties that it does not intend to grant any extensions of the above deadline for submissions, since the following period until the Final Hearing on 2 May 2013 is required for the preparation of all concerned, and a postponement of that hearing would lead to unacceptable further delays in the procedure.*

3.2.    ***On 2 and 3 May 2013, a two day Final Hearing** will be held at the ICC Hearing Centre in Paris. The Tribunal has made a provisional reservation of rooms for this hearing at the Centre. The Parties are invited to confirm this reservation with the Centre in the same manner as they did for the two earlier hearings. Details of the conduct of this Hearing will be set by the Tribunal after consultation with the Parties closer to the time of the hearing.*

*In the morning of 2 May, the Parties' technical experts, Ryder Scott and GCA, will be examined, but exclusively limited to the update of the Munaibay 3D information. Unless the Parties agree otherwise, this examination will be conducted by conferencing similar to the manner used at the January hearing.*

*Starting in the afternoon of 2 May, the Parties may present a first round of final oral arguments.*

*In the morning of 3 May 2013, the Parties may present a second round of final oral arguments.*

*Further details of the hearing will be set by the Tribunal after the Parties' submissions have been received by 8 April 2013.*

3.3.    ***By 3 June 2013**, the Parties shall simultaneously submit their respective 2nd **Round Post Hearing Briefs**, but only addressing issues in rebuttal to the other side's 1st Round Post Hearing Brief and regarding issues addressed in the hearing of 2 and 3 May 2013.*

*As earlier listings partly overlapped or were incomplete since focusing on one hearing only, with these 2nd round submissions, the Parties shall file:*

- *Final complete lists of all witness statements and expert reports including their updates and attachments if any,*

- *Final complete lists of all documents submitted or handed out at the hearings with their exhibit numbers,*

- *Hyperlinked versions of the above lists on two new master USB devices, one from Claimants and one from Respondent, enabling easy access to all statements, reports, and documents listed.*



  *3.4.*   ***By 1 July 2013**, simultaneous submission of Cost Statements by the Parties.*

  *3.5.*   ***By 8 July 2013**, simultaneous submission of comments, if any, regarding the Cost Statement of the other side.*

#### *4.   Questions*

*At any time during or after the above timetable, the Tribunal may address the Parties inviting comments on specific questions on which the Tribunal feels further clarifications may be helpful.*

168. On **21 February 2013**, the Parties attempted to resolve issues with the 2D data.

169. On **22 February 2013**, Respondent sent Respondent's opening Presentation for the Hearing on Quantum in PDF format, to the Tribunal.

170. On **6 March 2013**, Respondent filed a Procedural Objection with the Tribunal.

171. By email of **7 March 2013**, the Chairman, on behalf of the Tribunal, invited Claimants to respond to this objection, by 22 March 2013.

172. On **14 March 2013**, Respondent submitted the Squire Sanders Legal Due Diligence Report, the PwC Financial and Tax Due Diligence Report, the KMG EP Presentation on Asset Assessment as at September 2008, and the RBS Presentation on Asset Assessment as at 31 July 2009, as listed in Exhibit R 41.1 and as requested by Claimants, to Claimants and to the Tribunal.

173. Claimants submitted their response to Respondent's procedural objection on **22 March 2013**.

174. On **8 April 2013**, the Parties simultaneously submitted their respective first Post Hearing Briefs and related Expert Reports to the Tribunal.

175. On **12 April 2013**, the Tribunal issued PO-11, provided below:

#### *Procedural Order (PO) No.11*
#### *Regarding Further Details of the Hearing*

#### *1.   Earlier Rulings*

*The Tribunal recalls its earlier rulings in section 3.2 of PO-10:*

***On 2 and 3 May 2013, a two day Final Hearing** will be held at the ICC Hearing Centre in Paris. The Tribunal has made a provisional reservation of rooms for this hearing at the Centre. The Parties are invited to confirm this reservation with the Centre in the same manner as they did for the two earlier hearings. Details of the conduct of this Hearing will be set by the Tribunal after consultation with the Parties closer to the time of the hearing.*



In the morning of 2 May, the Parties' technical experts, Ryder Scott and GCA, will be examined, but exclusively limited to the update of the Munaibay 3D information. Unless the Parties agree otherwise, this examination will be conducted by conferencing similar to the manner used at the January hearing.

Starting in the afternoon of 2 May, the Parties may present a first round of final oral arguments.

In the morning of 3 May 2013, the Parties may present a second round of final oral arguments.

Further details of the hearing will be set by the Tribunal after the Parties' submissions have been received by 8 April 2013.

### 2.     **Procedural Steps before the Hearing**

2.1.     A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly by **25 April 2013**.

2.2.     By **25 April 2013**, the Parties shall inform the Tribunal which persons in which functions will attend the hearing from their respective sides.

2.3.     In view of the great number of exhibits submitted by the Parties and in order to facilitate references and using these exhibits at the Hearing and to avoid that each member of the Tribunal has to bring all of them to the Hearing, the Parties are invited to **bring to the Hearing:**

- for the other Party and for each member of the Tribunal **Hearing Binders** in A5 format of those exhibits or parts thereof on which they intend to rely **in their expert examination** at this hearing,
- together with a separate consolidated **Table of Contents** of the Hearing Binders of each Party,
- a **USB-Device** with the contents of the Hearing Binders for the other Party, for each member of the Tribunal, and for the Tribunal Secretary.

### 3.     **Further Details Regarding the Hearing**

3.1.     **No new documents** may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of an expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.

3.2.     The Hearing shall be held at the **ICC Hearing Centre in Paris** on 2 May and in the morning of 3 May 2013. No extension of the hearing will be possible due to other commitments of members of the Tribunal.

3.3.     The Tribunal sets the following **Agenda:**



1.   Short **Introduction** by the Chairman of the Tribunal.

2.   **Opening Statements** of up to 10 minutes by each Party

3.   **Examination of the Parties' technical experts**, Ryder Scott and GCA, **but exclusively limited to the update of the Munaibay 3D information.** In view of the limited time available, **each Party has a total of one hour** for all of its following examinations:

   a)   Claimants' experts
       * Direct examination by Claimants
       * Cross-examination by Respondent
       * Re-Direct, if any
       * Re-Cross, if any

   b)   Respondent's experts
       * Direct examination by Respondent
       * Cross-examination by Claimants
       * Re-Direct, if any
       * Re-Cross, if any

   c)   Experts conferencing by questions of the Tribunal only

   d)   Follow-up questions by the Parties on the questions raised by the Tribunal, if any.

   e)   Remaining questions by the members of the Tribunal, if any.

   The above examination shall be finished by 13:00 hours, before the lunch break.

4.   Starting at 14:00 hours: *1ˢᵗ* **Round Closing Statements by the Parties**

   a)   Claimants up to 90 minutes

       Coffee Break

   b)   Respondents up to 90 minutes

5.   Starting at 9:30 on 3 May: *2ⁿᵈ* **Round Closing Statements by the Parties**, but only in rebuttal of the other side's *1ˢᵗ* Round Statement:

   b)   Claimants up to one hour

       Coffee Break

   c)   Respondent up to one hour



*6. Final Questions of the Tribunal, if any.*

*7. Discussion of any remaining procedural issues, if any.*

*3.4. The Hearing shall end no later than 13:00 hours. An extension is not possible.*

176. On **16 April 2013**, the Tribunal wrote to the Parties to confirm that the hearing on 2 May would begin at 9:30 a.m., as usual.

177. On **17 April 2013**, Respondent wrote to the Tribunal in reference to the May hearing.

178. On **18 April 2013**, the Tribunal responded with the following email

*As the hearing is fast approaching, the Tribunal replies without delay to Respondent's letter dated 17 April 2013.*

*Point 1 of the letter regarding the 2nd Round PostHBs can be discussed at the Hearing.*

*Point 2: The Tribunal encourages the Parties to make an effort similar to, mutatis mutandis, sections 1.5 and 1.6 of PO-6:*

*In preparation of the examination of the experts at the 2 May Hearing, the **experts** are invited to contact, either directly or with the help of the Parties, the expert from the other side and try to agree on a short note identifying the major sub-issues on which they agree and disagree.*

*The Tribunal would be grateful if, **by 29 April 2013**, the Parties could submit either the notes agreed by the experts according to section 1.5 above or separate notes of each expert in so far as they cannot agree on a joint note.*

179. On **22 April 2012**, Claimants and Respondent each wrote to the Tribunal in reference to the Hearing and explained procedural objections against the other. Respondent also submitted an updated translation of R-360.

180. On **24 April 2013**, Respondent wrote in response to Claimants' letter of 22 April 2013. In a separate email, Respondent informed the Tribunal that it had made grids prepared by GCA for its 3D seismic analysis available to Claimants through an FTP server and provided the Tribunal that data.

181. On **24 April 2013**, Claimants responded to Respondent's letter of the same date.

182. On **25 April 2013**, Respondent replied to Claimants' letter of 24 April 2013.

183. On **25 April 2013**, Claimants and Respondent provided the Tribunal a list of hearing attendees.

184. On **29 April 2013**, Respondent wrote to the Tribunal and objected to Claimants' amendments to the transcript.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

185. On **29 April 2013**, Respondent sent the Joint Issue List of Ryder Scott and GCA for the testimony at the hearing to the Tribunal.

186. On **1 May 2013**, Claimants wrote in response to Respondent's letter concerning the issue of corrections to the hearing transcripts.

187. A hearing was held in Paris from **2 – 3 May 2013**. Reginald Smith, Kenneth Fleuriet, Kevin Mohr, James Toher, Heloise Herve, Amy Roebuck Frey, Alexandra Kotlyachova and Valerya Subocheva of King & Spalding appeared on behalf of Claimants. Dr. Patricia Nacimiento, Max Stein and Sven Lange of Norton Rose LLP and Joseph Tirado of Winston & Strawn LLP appeared on behalf of Respondent. A transcript was made.

188. At the end of his introduction at the start of the hearing, the Chairman informed the Parties of the following rulings from the Tribunal's deliberations prior to the hearing (quoted from the manuscript read by the Chairman, Tr. May 2013 pp. 4 – 5):

*By their recent letters, the Parties addressed the following issues in particular:*

*1.*     *Regarding the Testimony of Mr. Wood (Respondent's expert from GCA):*

     *Taking into account [...]*

- *section 3.2 of PO-10,*

- *and the arguments submitted by the Parties,*

- *and the **Experts' Joint List of Issues** submitted by Respondent by its mail of 30 April 2013,*

     *the Tribunal has concluded that*

- *Mr. Wood **can** be examined at this hearing*

- *But that the 2nd Round of Post-Hearing Briefs provides an opportunity for the Parties and their experts to submit further comments on the issues addressed.*

*2.*     *Regarding Comments on expert reports and Claimant's objection to the 2nd Deloitte report:*

     *The Tribunal has taken note that, at the end of their letters of 24 April, the **Parties agree** that, with their 2nd Round Post-Hearing briefs, the Parties may submit further comments*

- *Both by Ryder Scott and GCA*

- *And by FTI and Deloitte.*

     *In fact, taking into account also the Tribunal's letter of 11 September 2012 admitting such comments as well for the experts at the Hearing on*



*Jurisdiction and Liability, this means that comments by **all** the experts may be submitted with the Parties' 2nd Round Post-Hearing Briefs, **but only in rebuttal** to the previous reports by the respective experts from the other side.*

*And from all these rulings it is obvious and confirmed by the Tribunal that these 2nd Round submissions are the final round of submissions, and that **NO further comments** may be submitted thereafter either by the Parties or by their experts.*

*However, in case it turns out that the **Tribunal has further questions** to the Parties, the Tribunal may address the Parties during the time of its deliberations.*

3. **Regarding Transcript Corrections**

*The Tribunal points out that corrections are only necessary in so far as the transcript is incorrect **with relevance to substantial issues**.*

*Regarding the **first two** hearings, the Parties had ample time to examine the transcripts while drafting their 1st Round Post-Hearing Briefs. Regarding the very short **final hearing**, such examination can easily be done while drafting their 2nd Round Post-Hearing Briefs which are due by 3 June 2013.*

*The Tribunal **encourages the Parties** to agree on a timely procedure for joint corrections. If that cannot be achieved, each Party may submit suggested corrections to the other side **by 15 May 2013**.*

*If or in so far as the Parties cannot agree on joint proposals, each Party may submit, together with its 2nd Round Post-Hearing Briefs, its suggested corrections and comments on the suggestions of the other side. The Tribunal will examine such suggestions and take them into account in so far as they are relevant for its conclusions.*

*In view of the above, **an extension of the date set for the Post-Hearing Briefs is NOT necessary** in the view of the Tribunal, but also not possible as the planning of the Tribunal for its deliberations shortly after the deadline for the 2nd Round Post-Hearing Briefs would otherwise be delayed considerably.*

4. **If the Parties feel** that any **other** procedural issue has to be addressed at the beginning of this Hearing, this can be done in the short Opening Statements which follow now.

189. After brief opening statements by Mr. Smith and Dr. Nacimiento, respectively, the Tribunal heard testimony from Mr. Michael Nowicki, Dr. Stephen Wright, and Mr. Mike Wood. The three experts also testified through witness conferencing.

190. As recorded in the transcript (page 100), at the end of the Hearing the Chairman of the Tribunal raised the following question:



*The Tribunal has, of course, taken note of the procedural objections that were put on record at an earlier stage, and we take it that these will be maintained. So my usual question at the end of a hearing only is: are there any further procedural objections at this stage regarding the way the Tribunal has conducted this procedure?*

191. The Parties replied as follows:

> *For Claimant MR SMITH: None from the Claimants.*
>
> *For Respondent DR NACIMIENTO: And none from Respondent.*

192. On **29 May 2013**, the Chairman, on behalf of the Tribunal, sent a letter to the Arbitration Institute of the SCC, suggesting that the SCC extend the deadline for the issuance of the Award to 31 December 2013.

193. On **3 June 2013**, Respondent sent its **Second Round Post-Hearing Brief** (RPHB 2) to the Tribunal. Respondent also submitted Deloitte GmbH 2nd Supplemental Expert Report, GCA Fourth Expert Report, the Second Expert Report of Tomas Balco, the Third Expert Report of Prof. Didenko, and the Third Expert Report of Prof. Ilyassova to the Tribunal.

194. On **3 June 2013**, Claimants submitted their **Second Round Post-Hearing Brief** (CPHB 2) to the Tribunal. Claimants also submitted the Third Maggs Report, the Third Suleymenov Report, The Second Malinovsky Opinion, the Corrected Final Hearing Transcripts, the Fourth Expert Report of Howard Rosen (FTI), the Fourth Expert Report of the Ryder Scott Company, and a photo array of all witnesses.

195. By letter of **10 June 2013**, the Arbitration Institute of the SCC decided that the Final Award shall be rendered by 2 January 2014.

196. On **1 July 2013**, Claimants and Respondent each submitted their respective Statements on Costs to the Tribunal.

197. On **8 July 2013**, Claimants and Respondent each submitted their responses to the Costs Submissions submitted by the other side.

198. On **12 December 2013**, the Arbitration Institute of the SCC issued its decision on costs, recorded later in this Award.



# E.    **Relief Sought by the Parties**

## E.I.    **Relief Sought by the Claimants**

199. Claimants' most current Request for Relief is found at ¶ 396 of their Second Post-Hearing Brief of 3 June 2013.  This Request for Relief replaces those found at ¶ 664 of **Claimants' First Post-Hearing Brief** of **8 April 2013**, ¶ 626 of **Claimants' Reply Memorial on Jurisdiction and Liability** of **7 May 2011**, ¶ 99 of **Claimants' Reply Memorial on Quantum**, dated **28 May 2012** at ¶¶ 116 and 117 of **Claimants' Request for Arbitration** submitted on **26 July 2010,** and ¶ 470 of **Claimants' Statement of Claim** submitted on **18 May 2011**.

### VI.    *REQUEST FOR RELIEF*

*396.    For the reasons set forth herein, Claimants respectfully request an award granting them the following relief:*

- *A declaration that Kazakhstan has violated the ECT and international law with respect to Claimants' investments;*

- *Compensation to Claimants for all damages they have suffered, as set forth in Claimants' Statement of Claim and Reply on Quantum and as further updated at the January 2013 Hearing and in Claimants' First Post-Hearing Brief, corresponding to the following amounts:*

| *Tolkyn* | *US $478,927,000* |
|---|---|
| *Borankol* | *US $197,013,000* |
| *Munaibay Oil* | *US $96,808,000* |
| *LPG Plant* | *US $245,000,000 cost plus discretionary portion of US $84,077,000* |
| *Contract 302 (other than Munaibay Oil)* | *US $31,330,000 cost plus discretionary portion of US $1,498,017,000* |

- *All costs of this proceeding, including Claimants' attorneys' fees and expenses as well as fees and expenses of the Tribunal and the SCC;*

- *Pre-award compound interest at a rate of 10.5% from October 14, 2008 to the date of the Award;*

- *An award of compound interest at a rate of 10.5% until the date of Kazakhstan's final satisfaction of the Award; and*

- *Any other relief the Tribunal may deem just and proper.*



## E.II. Relief Sought by the Respondent

200. Respondent's most recent Request for Relief is found at Part VI of its Second Post-Hearing Brief of 3 June 2013. This replaces the Requests for Relief found in **Part IV of its First Post-Hearing Brief** of **8 April 2013**, Section F of **Respondent's Rejoinder on Jurisdiction and Liability**, dated **13 August 2012**, and at ¶ 58 of **Respondent's Statement of Defence**, dated **21 November 2011**.

> *1069. The Republic requests the Arbitral Tribunal to issue:*
>
> > *(a)    an order dismissing Claimants' claims in their entirety;*
> >
> > *(b)    an order that Claimans [sic] must bear all costs of this arbitration and must reimburse Respondent all costs which Respondent incurred and will incur in this arbitration, including inter alia fees and expenses of the SCC, the Arbitral Tribunal, experts, consultants, witnesses and legal counsel plus interest. Respondent hereby reserves the right to detail and document its claim for such foregoing costs, which by their very nature are continuing, at the appropriate future time as directed by the Arbitral Tribunal*

## F.    Factual Background

201. The Tribunal has considered all of the facts presented by the Parties, even if not explicitly stated below. This section summarizes the facts and events leading to the current dispute, as presented by the Parties in their submissions and testimony and without prejudice to the relevance the Tribunal may give to facts and issues. More comprehensive coverage of the facts can be found in C-0 ¶¶ 5 *et seq.*, C-I ¶¶ 2 - 238, C-II ¶¶ 16 - 42 and 210 – 422, CPHB 2 ¶¶ 37 – 196; R-I ¶¶ 4,17 – 31, R-II ¶¶ 241 – 832, RPHB 1 ¶¶ 15 – 413; and RPHB 2 ¶¶ 15 – 382.

### F.I.    General Background Information

202. Natural hydrocarbon resources are one of the principal assets of the Republic. Within the next ten years, Kazakhstan will be among the top five oil producers, holding 30 billion barrels of proven oil and 85 trillion cubic feet of gas reserves. KPM and TNG were important to the economic framework of and have played a strategic role in the Mangystau region's economy, providing 80% of the fuel needed for the local power plant and employing a considerable number of people. (R-I ¶¶ 4.1, 31.52; R-II ¶ 322).

203. The Borankol and Tolkyn fields are approximately 50 km apart in the Mangystau region. Aktau, the capital of the Mangystau region, is approximately 400 and 500 km from the Borankol and the Tolkyn fields, respectively. The closest town to the Borankol field is Opornaya, which is approximately 15 km away. (C-I ¶ 52).

204. The Respondent is the government of the Republic of Kazakhstan, which is the sovereign body responsible for managing the investment in and exploitation of Kazakhstan's natural resources. (R-I ¶ 4.4).



205. Claimant Anatolie Stati is a natural citizen of Moldova and Romania who has invested in Turkmenistan since 1995. Based on his testimony and the testimony of Prof. Olcott at the Hearing on Jurisdiction and Liability, Respondent argues that Anatolie Stati was a "*novice*" in the oil and gas industry when he entered Kazakhstan. Respondent presents a history of the Stati family's involvement in Moldova's politics, as well as in the politics and businesses of other states. Claimants and Respondent agree that Anatolie Stati is not a political opponent of President Nazarbayev. (C-0 ¶ 10; C-II ¶ 79; R-II ¶¶ 24 – 33, 38 – 39, 267; RPHB 1 ¶¶ 21, 118).

206. Claimant Gabriel Stati is a natural citizen of Moldova and Romania and is the son of Anatolie Stati. (C-0 ¶ 11; C-II ¶¶ 79 - 80).

207. Claimant Ascom Group S.A. is a joint stock company incorporated under the laws of Moldova, with headquarters in Moldova. Ascom's operational subsidiaries were located in Kazakhstan. The Parties dispute whether Anatolie Stati owned 100% of Ascom, which owned 100% of KPM or that Ascom has substantial business activities in or is controlled from Moldova. Respondent argued that Anatolie Stati is Ascom's 100% shareholder. (C-0 ¶ 12; C-II ¶¶ 85, 86, 95, 128; R-II ¶¶ 51 – 54; RPHB 1 ¶ 124).

208. Claimant Terra Raf Trans Traiding Ltd. is a limited liability company incorporated under the laws of Gibraltar. (C-0 ¶ 13; C-II ¶ 96, 129; R-I ¶ 9.81, 14.9).

209. Respondent states that Tristan Oil Ltd. ("*Tristan*") is an affiliate of KPM and TNG and is 100 % owned by Anatolie Stati. Tristan was created as a special purpose vehicle with the purpose of issuing notes. (R-II ¶ 728).

210. Mr. Lungu is the Executive Vice President and CFO of Tristan and the Commercial Vice President of Ascom. (RPHB 1 ¶ 138).

211. TNG is a Kazakh company that owned the subsoil use rights to the Tolkyn field and the Tabyl Block pursuant to Contracts 210 and 302 on Exploration and Extraction of Hydrocarbons at the "*Tolkyn*" deposit and the Tabyl Block (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and TNG, and dated 12 August and 31 July 1998, respectively. Contract Nos. 210 and 302 were issued pursuant to the Licenses for the right to explore and/or exploit the hydrocarbons, Series MG No. 242-D (oil) and MG No. 243-D (oil), both dated 4 December 1997 and issued by the Government. (C-0 ¶ 18, partially quoted, citations omitted; C-I ¶¶ 3, 47; R-I ¶ 13.55).

212. KPM owned the subsoil use rights to the Borankol field pursuant to Contract 305 on Exploration and Extraction of Hydrocarbons at the "*Borankol*" deposit (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and KPM, and dated 30 March 1999. Contract 305 was issued pursuant to the license for the right to use subsoil, Series MG No. 309-D (oil) dated 23 May 1997, issued by the Government to KPM. (C-0 ¶ 16, quoted, citations omitted; C-I ¶¶ 3, 42; R-I ¶ 13.2).



213. Over 90% of KPM's and TNG's work force was comprised of local Kazakh citizens, nearly 1,000 of which were employed on a permanent basis. (CPHB 1 ¶ 123).

214. Respondent considers KMG to be two separate, distinct entities: KazMunaiGaz Exploration Production (KMG EP) and KazMunaiGaz National Company (KMG NC). Respondent explains that KMG EP is not a state entity, but is a commercial entity listed on the London Stock Exchange and the Kazakhstan Stock Exchange. KMG NC is a state entity that considers the social and economic implications of an acquisition to the Republic as a whole. (R-II ¶ 350 – 351; RPHB 2 ¶ 10).

215. Mr. Timur Kulibayev is President Nazarbayev's son-in-law and the Chairman of KMG NC, but not of KMG EP. (C-I ¶ 189, R-II ¶ 352).

## F.II.    Timeline of Events

216. As will be seen later in this Award, in the present dispute the timeline of events is of particular importance to the considerations and conclusions by the Tribunal. It is, therefore, provided in much greater detail than would normally be necessary. The following timeline records events mentioned by the Parties in their submissions, without prejudice to the relevance the Tribunal may attach to each item.

217. The Borankol structure was discovered in 1959, with test drilling finalized in 1973. The Tolkyn field structure was discovered in 1992 (C-I ¶¶ 42, 46).

218. KPM was established as a closed JSC joint venture / non-commercial organization on 24 March 1997. The companies Polmak Sondazh Sanaii A.Şh. (from the Republic of Turkey) and CJSC Joint Kazakh-Estonian-Irish Company Aksai were the founders and equal 50% owners of the company. (R-I ¶¶ 13.1 – 13.3).

219. On 27 January 1999, Promtorgbank JSC Industrial and Trade Bank transferred 800 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

220. On 29 March 1999, Shagyrly-Shomyshty LLP transferred 1000 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

221. Claimants began investigating investment opportunities in Kazakhstan in 1999. (C-I ¶ 42).

222. On 18/19 November 1999, KPM submitted a request to the Agency of the Republic of Kazakhstan on Investment for consent to Ascom Group's acquisition of a 62% share of KPM. (C-I ¶ 45; C-II ¶¶ 169, 165; RPHB 2 ¶ 275).

223. On 9 December 1999, Ascom purchased the 62% share in KPM. Respondent disputes the legality of this purchase. (R-II ¶ 117).



224. On 13 December 1999, KPM was reorganized from a non-commercial to a commercial organization. Claimants dispute this and state that KPM was always a commercial entity. They suggest that the change could have been to remedy a registration error by the Republic. (R-I ¶ 13.12; C-II ¶ 155).

225. On 24 January 2000, KPM obtained a national identification number with respect to the initial issuance of its shares. (C-II ¶ 149).

226. Claimants' interest in TNG and the TNG Subsoil Use Contracts began with Ascom's acquisition of a 75% interest on 17 May 2000. Claimants requested and received consent for the transfer. The State believed its pre-emptive rights were inapplicable to the transfer. (C-0 ¶ 19).

227. Respondent acknowledges that, in relation to the TNG shares, Claimants have produced evidence of certain payments being made by Ascom to Kaihar TOO in the amounts of USD 421,000 and USD 1,137,000 at the time of the acquisition on 30 May 2000, but notes that this investment was made by Ascom and not Terra Raf. Respondent states that the formal shares themselves were purchased for USD 189,185 on 16 January 2009. Respondent states that this discrepancy has not been explained by Claimants. (R-I ¶ 14.3 (stating that the amount was USD 190,000); R-II ¶ 118).

228. On 30 May 2000, Kainar LTD transferred 3050 TNG shares to Ascom S.A. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

229. As of July 2000, Claimants were the operators for both the Borankol and Tolkyn fields. (C-I ¶ 49).

230. The MEMR was created on 13 December 2000. (C-II ¶ 167).

231. KazRosGas LLP was created in 2001 pursuant to an agreement between the governments of Kazakhstan and Russia. It was designated as the single operator to buy, sell, and market Kazakhstan's export gas. Gazprom owns 50% of KasRosGas. Domestic producers that wish to export gas must contract with Gazprom. (R-I ¶ 49.13; R-III ¶¶ 253 - 262).

232. In 2001, NIPI Neftegaz issued the Borankol Raw Materials Base Project, a design of KPM's gathering and treatment facility as a single technological process. (CPHB 2 ¶ 74; RPHB 2 ¶ 204).

233. On 25 April 2001, State Expert Review of Projects approved construction of KPM's pipelines, including the 18 km pipeline that is at issue. (CPHB 2 ¶ 74).

234. On 4 March 2002, the State Inspection for Emergency Situations, the Fire Safety Supervising Agency, the State Sanitary Surveillance Department, the Ministry of Environmental Protection for the Mangystau Region, the State Inspection for Architecture and Construction, and NIPI Neftegaz approved the commissioning of KPM's 18-kilometer pipeline. No mention was ever made of that pipeline being a trunk pipeline. (C-II ¶ 272; CPHB 2 ¶ 74; RPHB 2 ¶ 214).



235. On 13 March 2002, Ascom transferred its 75% interest in TNG to its subsidiary, Gheso S.A. ("*Gheso*"). (C-0 ¶ 19; C-I ¶¶ 50, 140 et seq.) Claimants did not obtain consent from either the Government or MEMR for this transfer. (R-I ¶ 13.28; R-II ¶ 158; RPHB 2 ¶ 273).

236. On 30 April 2002, Kainar LTD transferred 950 shares of TNG to Gheso. Claimants state that they received consent, and provide the Tribunal with Exhibit C-134, which Claimants say TNG received from the MEMR, granting permission for the share transfer. (C-II ¶ 168). In response, Respondent states that consent should never have been granted without a waiver of the Republic's pre-emptive right and that Exhibit C-134 cannot be deemed as consent by the appropriate body, as Claimants allege. (R-I ¶ 13.28, RPHB ¶ 273).

237. On 3 May 2002, Production-Commercial Firm Bobro and Anavi respectively transferred 100 and 200 TNG shares to Gheso, resulting in Gheso becoming the 100% owner of TNG. Respondent states that Claimants did not obtain consent from either the Government or MEMR for these transfers. (R-I ¶ 13.28).

238. In September 2002, KPM and TNG applied to the MEMR for licenses covering its new gathering system. On 26 September 2002, MEMR issued the requisite licenses to KPM and TNG for their production, treatment, and transportation activities. (C-I ¶ 83; C-II ¶ 274; CPHB 2 ¶ 74).

239. On 12 May 2003, Gheso transferred its 100% interest in TNG to Terra Raf. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that Claimants did not obtain consent for this transfer. (R-I ¶¶ 13.28 – 13.29).

240. Claimants state that the transfer was complete on 28 May 2003 when TNG's share registrar, Zerde, registered the Gheso-Terra Raf share transfer. (CPHB 2 ¶ 117). Respondent disagrees – a transfer cannot be validly registered under Kazakh law without consent being obtained under Art. 53(1). (RPHB 2 ¶ 273).

241. Starting in 2004, Claimants conducted the initial seismic work on the Contract 302 properties. (C-I ¶ 66).

242. In 2004, Claimants had discussion with GazImpex, a gas-exporting company which Claimants allege is controlled by Mr. Kulibayev, about the sale of a 35% stake in TNG. The parties were never able to reach agreement because Claimants valued TNG at USD 567 million, while GazImpex valued it at USD 27.8 – 32.9 million. (C-II ¶ 375). Respondent states that Claimants have failed to prove that Mr. Kulibayev owned or controlled GazImpex and argue that these negotiations are irrelevant to this arbitration. (R-II ¶¶ 341 – 344).

243. Respondent states that Claimants have produced a document identified as C-514, dated 15 September 2004, which expressly refers to Ascom being the owner of TNG as of that date. Claimants provide no explanation of how this could be the case, given that by this point, Terra Raf had acquired TNG from Gheso. Respondent states that, according to Claimants at C-I ¶ 50, the last time Ascom owned TNG was in 2002. (R-II ¶ 173).



244. In November 2004, Ascom acquired the remaining 38% interest in KPM. Respondent acknowledges that Claimants have provided evidence of USD 9 million having been provided by Ascom and Terra Raf for this purchase. (C-I ¶ 45; C-II ¶ 184; R-II ¶ 117).

245. On 1 December 2004, Kazakhstan passed a law giving the State a pre-emptive right over certain transfers of subsoil users. (CPHB 2 ¶ 117).

246. The 8 December 2004 enactment of Law No. 2-III, which amended Art. 71 of the 1996 Subsoil Use Law, gave Kazakhstan a pre-emptive right to acquire shares in subsoil users. (C-II ¶ 184).

247. In May 2005, KPM was reorganized from an OJSC to a LLP. Claimants state that the Government approved of this change by letter. (C-I ¶¶ 45, 51).

248. On 16 May 2005, Terra Raf reorganized TNG from an OJSC to a LLP. Claimants notified MEMR of this reorganization, and the change from TNG OJSC to TNG LLP was memorialized in the State-executed 2006 Supplements to the TNG Subsoil Use Contracts. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that when TNG was reorganized from an OJSC to a LLP in 2005, there was an error: Terra Raf never was a lawful shareholder of TNG and could not carry out its reorganization from an OJSC to a LLP. (R-I ¶¶ 13.32; 13.45).

249. After the alleged reorganizations, KPM and TNG applied to re-license their pipelines. MEMR re-issued licenses on 5 August 2005. (C-I ¶ 82; C-II ¶ 274; CPHB 2 ¶ 74).

250. In 2006, TNG contracted with Vitol to construct and operate the LPG Plant. The Parties dispute the amounts invested. (C-I ¶¶ 62, 64; R-II ¶ 123).

251. In May 2006, Claimants halted construction on the LPG Plant for financial reasons. (C-I ¶ 64).

252. On 31 July 2006, the exploration period for Contract 302 was extended. Flooding in the Caspian Sea basin, however, suspended exploration work for two years and eight months. The MEMR extended the exploration period until 30 March 2009, without counting this *force majeure* against the two permissible contractual extensions. (C-I ¶ 47; R-I ¶ 14.20).

253. On 19 October 2006, the State asked TNG whether Ascom had transferred any of its interest in TNG during the period of 1 December 2004 to 19 October 2006. TNG replied that Terra Raf was the sole interest holder in TNG since May 2003. (C-0 ¶ 21; C-I ¶ 143; CPHB 2 ¶ 117).

254. In 2006, Claimants began the "*Bonds Project*", under which Tristan Oil (a company under the control of Claimants), issued 3 tranches of bonds with maturity of 1 January 2012, for a total amount of USD 531 million. The bonds were issued at the EURO MTF Market of the Luxembourg Stock Exchange and were guaranteed by KPM and TNG. The charter capital of each company at the date of issuance of guarantees amounted to USD 50,000, *i.e.* 0.018% of the par bond issue. (R-I ¶¶ 9.59 – 9.62).



255. The first tranche of the Bonds Project was issued on 20 December 2006. (R-I ¶ 9.59).

256. On 11 January 2007, Kazakhstan adopted a new Law on Licensing, pursuant to which the MEMR would remain the licensing authority for production activities and operation of pipelines other than "*main*" or "*trunk*" pipelines. (C-II ¶ 275; CPHB 2 ¶ 74). Since the Parties have used the terms "*main*" and "*trunk*" pipelines interchangeably, so too shall this Award.

257. In early 2007, Kazakhstan approached Claimants with a proposal for the provision of gas to KazAzot as part of a project of national priority to allow the Republic to develop an Ammonia-Carbamide project, which required a secure gas supply. (C-I ¶ 58; R-I ¶ 15.5 et seq.). Claimants state that they agreed to provide specific volumes of gas to KazAzot, provided that Claimants would be allowed to export specific volumes of gas at international market prices. (C-I ¶ 58).

258. On 13 February 2007, Respondent notified Claimants that they had failed to obtain consent for the 2003 transfer of Gheso's 100% interest in TNG to Terra Raf and that Claimants had not notified the Republic that Ascom's shares had been transferred to Gheso. Respondent notified Claimants that they had failed to give the Republic the opportunity to exercise its pre-emptive right to purchase TNG. (R-I ¶ 13.47; RPHB 2 ¶ 277). Respondent requested that TNG apply for retroactive permission for the 2003 transfer and TNG complied. (C-I ¶ 143; CPHB 2 ¶ 117). Claimants state that MEMR also notified Claimants that the transfer had been proper and the pre-emptive right was not applicable. (CPHB 2 ¶ 117).

259. On 19 February 2007, TNG informed the MEMR that the Republic's pre-emptive right did not apply in February 2007. (RPHB 2 ¶ 277).

260. On 21 February 2007, Terra Raf noted KazRosGas's interest in acquiring a stake in TNG, and asked KazRosGas to send a written offer. (C-II ¶ 376). Respondent states that this is irrelevant to this arbitration, and there is no link to the Republic. Likewise, Claimants have not proven that Mr. Kulibayev controls this company. (R-II ¶¶ 341, 345).

261. On 7 May 2007, Claimants, the MEMR, the Governor of the Mangystau Region, the operator of the main gas pipeline KazTransGas (a subsidiary of the national oil company KMG), and the owner KazAzot agreed to enter into gas supply and transport arrangements and signed a Memorandum of Understanding. Pursuant to these arrangements, Claimants would sell certain volumes of gas at a price substantially above the discounted prices to KazAzot (first at near-market prices, then at the international market price after two years), and TNG, through KazTransGas, would be allowed to export certain volumes of gas at international market prices.    Over the following year, Claimants conducted extensive negotiations to conclude the prices, volumes, and conditions of the agreement. (C-I ¶ 59). Respondent disputes that there was any reference to the ability to sell oil in the Memorandum of Understanding. (R-I ¶ 15.7).

262. On 14 June 2007, the second tranche in the Bonds Project was issued for USD 120 million. (R-I ¶ 9.59).



263. On 19 June 2007, President Nazarbayev issued a Presidential decree that transferred authority for licensing the operation of trunk pipelines from the MEMR to the ARNM – the regulator and controller of activities of natural monopolies and regulated markets. (R-II ¶ 589). Claimants state that the MEMR (later called the Ministry of Oil and Gas or "*MOG*") remained the licensing authority for activities related to production and to operation of pipelines other than trunk pipelines. (C-II ¶ 275). Respondent, however, states that the ARNM has the power of issuing licenses to operate transfer gas pipelines, oil pipelines, trunk pipelines, and oil product pipelines. It neither polices who owns trunk pipelines nor does it classify whether a pipeline was trunk. (R-I ¶ 25.2; R-II ¶¶ 544, 589; CPHB 2 ¶ 74). The Parties have acknowledged that, since 2007, competency to issue licenses in relation to trunk pipelines lies with the ARNM. The Parties are aware that anyone wishing to operate a trunk pipeline needs to apply for a license. (CPHB 1 ¶ 155, R-I ¶ 26.9; R-II ¶¶ 464 – 465, CPHB 2 ¶ 61; RPHB 1 ¶¶ 198 – 202).

264. On 6 December 2007, KPM and TNG each applied to the MEMR for permits to allow the transfer of their ownership interests to Tristan Oil for the purpose of conducting an IPO on the London Stock Exchange. (C-0 ¶ 22; C-I ¶ 144; R-I ¶ 9.70).

265. On 26 December 2007, the Kazakh Inter-institutional Committee recommended that the MEMR (1) grant permission for the transfer and (2) waive the State's pre-emptive rights to purchase 100% of KPM and TNG. (C-I ¶ 144; CPHB 2 ¶ 117).

266. By letters to KPM and TNG dated 29 December 2007, the MEMR granted permission for the transfers and expressly waived its pre-emptive rights. According to Claimants, the State indicated that it was interested in purchasing the assets within the IPO. (C-0 ¶¶ 22, 79; C-I ¶ 144; CPHB 2 ¶ 119).

267. Production in the Tolkyn Field declined from 2005 – 2007, until there was a jump in production from 2007 – 2008. This sudden increase in gas production led to an associated increase in water production ("*water cut*"), which led to a significant and sustained reduction in gas production, a situation that continues to date. In relation to the Borankol field, liquid production declined beginning in 2005 and gas production declined beginning in 2004. (R-I ¶¶ 15.2, 16.1, 46.13).

268. In April 2008, Claimants received the Miller & Lents reserves report, which showed that their estimates for production from Borankol had been overstated by 300%. (RPHB 2 ¶ 61).

269. On 8 April 2008, Kazakhstan amended its 2005 laws regarding the payment of export taxes. Pursuant to the 2008 amendments, a USD 109.91/ton duty was imposed on exported crude oil. The 2008 amendments contained specific provisions, pursuant to which no export tax would be applied to exported crude oil that had been extracted under Subsoil Use Contracts containing specific exemptions from the Crude Oil Export Tax. (C-I ¶ 162).

270. On 28 April 2008, the MEMR, TNG, KazAzot, and KazTransGas entered into a first agreement setting out their understanding, entitled "*Agreement for the Implementation of the Memorandum of Understanding of 7 May 2007.*" (C-I ¶ 60).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

271. On 5 May 2008, Mr. Cornegruta of KPM wrote to the MEMR for the re-issue of KPM's license for the performance of certain activities. The operation of trunk pipelines was not mentioned, but the exploitation and storage of gas were. Respondent states that, objectively, the letter specifically and deliberately requested a license for the operation of trunk pipelines. (RPHB 2 ¶ 162)

272. On 16 May 2008, the Prime Minister of Kazakhstan, the MEMR, KMG, KazTransGas, KazAzot, and TNG agreed that the parties should enter into tri-partite agreements to resolve the outstanding issues. (C-I ¶ 60).

273. On 26 May 2008, the MEMR wrote to KPM, directing KPM to apply to the ARNM for other licenses it may need, pursuant to the change of law and ARNM's new authority. (C-II ¶ 313, CPHB 2 ¶ 74; RPHB 1 ¶ 204).

274. On 29 May 2008, the MEMR re-issued KPM and TNG their licenses for various operations, including "*oil, gas, and oil products production*", pursuant to the 2007 Law on Licensing. (C-II ¶ 275; CPHB 2 ¶ 74).

275. On 13 June 2008, Mr. Cornegruta wrote to ARNM, requesting permission to carry out activities. The Parties dispute whether this letter was an admission that KPM operated a trunk pipeline. This is later referred to as the "*confession*" letter and was relied on by the Republic as the admission of certain facts. (C-II ¶¶ 313 – 317, R-I ¶¶ 9.83; 21.9, 25.11, 27.55 - 27.56; R-II ¶ 633, RPHB 1 ¶¶ 205 – 208). Respondent explains that the letter was clearly an incomplete application for a license and that it was only one piece of evidence of much more showing that the KPM Pipeline was trunk. (RPHB 1 ¶¶ 205, 209; RPHB 2 ¶ 215). Claimants state that KPM wrote to ARNM inquiring as to whether it needed to have its license re-issued by the ARNM in light of the changes in the new Law on Licensing. (CPHB 2 ¶ 74).

276. KPM's 13 June 2008 application was rejected in July 2008 because the submitted package of documents did not meet the requirements of the legislation. The ARNM suggested that KPM submit the documents in accordance with the legislation. KPM did not submit any documents after that. (R-I ¶¶ 21.9, 25.12; RPHB 1 ¶ 202; RPHB 2 ¶ 218).

277. On 3 July 2008, after KPM had notified the Customs Committee of its contractual exemption from specific export taxes, the Customs Committee notified KPM that "*Contract no. 305 contains no regulations as to the exemption from export tax and, thus, export tax shall be applicable to the crude oil exported under the foregoing contract.*" Pursuant to this notice from the Customs Committee, KPM was prohibited from exporting 22,000 tons of crude oil for August 2008 without payment of the Crude Oil Export Tax. KPM conditionally paid these export taxes and concurrently commenced a legal action challenging imposition of the tax. (C-0 ¶¶ 69 – 70; C-I ¶ 19).

278. In summer 2008, Claimants made an "*independent business decision*" to explore a sale of KPM, TNG, and the LPG Plant, excepting the Contract 302 properties (the so-called Tabyl Block). This was nicknamed "*Project Zenith*" and Claimants retained Renaissance Capital to facilitate the sale process. (C-I ¶¶ 69, 184, C-II ¶ 397; R-I ¶ 9.67).



279. On 14 July 2008, the ARNM responded to Mr. Cornegruta's letter of 13 June 2008, and stated that further documentation needed to be submitted. Both Parties accept that none was ever received. (RPHB 1 ¶¶ 210 – 211). Claimants state that the ARNM responded by informing KPM that the type of activities listed in KPM's 2005 license to not require separate licensing from the ARNM. (CPHB 2 ¶ 74).

280. On 18 July 2008, Renaissance Capital sent a "*teaser*" offer to 129 potential purchasers, including KMG. (C-I ¶ 69; R-II ¶ 775, RPHB 1 ¶ 82).

281. On 20 July 2008, TNG discovered gas and condensate deposits in the East Munaibay structure of the Tabyl Block. Productivity testing demonstrated a commercial flow of 120,000 cm/day and 150,000 cm/day of rich gas in the Asselian and Artinskian strata, respectively, without any treatment for productivity enhancement, and 3D seismic interpretation of the structure is commensurate with a substantial find. (C-0 ¶¶ 23, 57; C-I ¶ 13).

282. By letter dated 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay No. 1 well in Contract 302. (C-I ¶ 67 CPHB 1 ¶ 129; CPHB 2 ¶ 151).

283. Later in the summer of 2008, a tri-partite agreement between TNG, KazAzot, and KazTransGas containing the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export was created ("*KazAzot Tripartite Agreement*"). Subsequently, Kazakhstan replaced KazTransGas with its parent company, KMG. (C-I ¶ 60).

284. On 11 August 2008, TNG filed an application for the evaluation/appraisal phase for Munaibay No. 1. (C-I ¶ 67; CPHB 2 ¶ 151).

285. In mid-August 2008, Renaissance Capital distributed the Information Memorandum to 41 parties that had expressed an interest in the properties and signed a confidentiality agreement, including KMG. (C-I ¶ 70; RPHB 1 ¶ 82).

286. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith. (C-I ¶ 69).

287. On 25 September 2008, based on information provided by Claimants and upon invitation by Claimants, KMG EP tendered an indicative offer of USD 754 million in Project Zenith. Respondent states that, prior to Claimants' invitation, KMG EP was not interested in investing. Claimants state that this was among the lowest of the bids received, amounting to less than half the highest indicative offer (KNOC's offer of USD 1.55 billion), and more than 25% below the average of all eight indicative offers (USD 1.05 billion). Respondent alleges that Renaissance Capital "*tweaked*" the numbers by conditioning access to the data room on higher offers. (C-I ¶¶ 12, 16, 71; C-II ¶ 378; R-II ¶¶ 356 – 357, 781).

288. On 26 September 2008, KNOC submitted an indicative bid, based on the assumption that higher export prices could be achieved as a result of the KazAzot Tripartite Agreement. (RPHB 1 ¶ 95)



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

289. Based on Tristan's financial statements, on 30 September 2008, the cash on hand and cash equivalents of the Tristan group (KPM, TNG, and Tristan) were USD 9.7 million, despite the issuance of notes in mid-2006 for USD 300 million and at the beginning of 2007 for USD 120 million. (RPHB 1 ¶ 47)

290. By 1 October 2008, Claimants had received 8 non-binding indicative offers in Project Zenith. (C-I ¶ 12, 71; R-I ¶ 16.9; R-II ¶ 775).

291. On 6 October 2008, then-President of Moldova, Vladimir Voronin, wrote a letter to President Nazarbayev of Kazakhstan, stating that Mr. Anatolie Stati was using proceeds from Kazakhstan's mineral resources to invest in areas subject to UN sanctions, in particular, in South Sudan. At the time, Claimants did not view the letter as particularly problematic, since Anatolie Stati had frequently sparred with President Voronin over Moldova's democratic transformation. Claimants state that letter contained false and defamatory personal accusations against Anatolie Stati. Claimants state that Anatolie Stati is not funding terrorist groups in South Sudan. Claimants admit that Anatolie Stati has normal, commercial investments in the oil and gas industry in South Sudan and has contributed enormously to the well-being of the population of South Sudan by making substantial investments in oil and gas exploration and by building schools, a hospital, medical clinics, and means of transportation in the region where his investments are located. Claimants maintain that Anatolie Stati's investments in South Sudan have never been a secret and have never violated UN sanctions. Respondent states that there is no evidence that Stati's investments contribute to the well-being of the population of South Sudan. Respondent states that Claimants' insinuation that President Nazarbayev asked President Voronin to write the letter is ludicrous. (C-0 ¶ 25; C-I ¶ 74; C-II ¶ 194, 211; R-I ¶¶ 9.56, 19.21; R-II ¶¶ 43 – 44; RPHB 1 ¶¶ 188, 374 – 376; RPHB 2 ¶ 156).

292. On 7 October 2008, the MEMR acknowledged TNG's August 2008 application for evaluation of the discovery on the Contract 302 property. (C-I ¶¶ 13, 67).

293. On 10 October 2008, Claimants withdrew their statement of intention filed on 11 August 2008 because they felt it was still too early in the exploration stage to commence evaluation. (C-0 ¶ 57). In its Post-Hearing Brief, Claimants explained that TNG informed Kazakhstan that it was withdrawing its August 2008 application to move to the appraisal phase for Munaibay because it intended to fully and thoroughly explore the contractual territory because the Munaibay 1 well suggested "*a high probability of additional discovery of more deep-lying raw hydrocarbon reservoirs on Munaibay area.*" (CPHB 1 ¶¶ 129, 234; CPHB 2 ¶ 151).

294. On 14 October 2008, Claimants applied to MEMR to extend the exploration period in the Tabyl Block by two years. (C-II ¶ 175, CPHB 1 ¶ 129, CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416). In October 2008, Claimants commenced an exploratory well in the Tabyl Block's Bahyt structure, which had shown evidence of gas in the lower Triassic stratus. Through October 2008, Claimants had invested USD 43 million in exploration work in the Contract 302 properties. (C-0 ¶ 57, C-I ¶¶ 66 – 68).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

295. As of 14 October 2008, the yield to maturity of the Tristan notes stood at 26.319%, meaning that the Tristan note course stood at USD 65.125 for a nominal value of USD 100. (RPHB 1 ¶¶ 48, 77)

296. On 14/16 October 2008, President Nazarbayev issued a document (Exhibit C-8), which contains both the dates of 14 and 16 October 2008 in the Russian original and in the English translation. (The Tribunal decided not to address these two different dates as the difference has no impact on the present dispute. Both dates are used in the Parties' submissions and in various parts of this Award.) In the document, the President instructed Kazakh Deputy Prime Minister, Umirzak Shukeyev, and the head of the Financial Police, Sarybai Kalmurzayev, to "*thoroughly investigate*" / "*thoroughly check[]*" all of Claimants' business activities in Kazakhstan. (C-0 ¶ 25; C-I ¶ 75; C-II ¶ 16 CPHB 2 ¶¶ 38, 61, 115, 117, 128; RPHB 1 ¶¶ 188, 377; RPHB 2 ¶ 10). Respondent disputes the translation of this order, and states that Claimants' ability to obtain this internal government document, points to serious corruption on behalf of Claimants. (R-I ¶¶ 19.22 – 19.23; R-II ¶ 214). Respondent nonetheless explains that the note is nothing more than a pro-forma document by which a complaint from one head of state is forwarded to the competent authorities, as is the etiquette of dealings between CIS leaders. As explained at the hearing, the letter received no special treatment from the Financial Police by virtue of the fact that it came from the President. Respondent stated that the fact that President Nazarbayev does not have any specific interest in Claimants' operations in Kazakhstan was confirmed by Minister Mynbayev during cross-examination. (RPHB 1 ¶¶ 377 – 383; RPHB 2 ¶¶ 42 – 44).

297. On 16 October 2008, the Deputy Prime Minister issued order No. 6497, pursuant to which the Financial Police, under the supervision of that office, ordered the MEMR and the Tax and Customs Committees to conduct comprehensive or complex audits of KPM and TNG, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Claimants report that the (1) MEMR, (2) Tax Committee, (3) Customs Committee, (4) National Bank of Kazakhstan, (5) Geology Committee, (6) Ecology Committee, and (7) MES were ordered to conduct audits and investigations of KPM and TNG. (C-0 ¶ 25, C-I ¶ 76; CPHB 2 ¶¶ 38, 128). Respondent states that Claimants have exaggerated the nature of the audits and that there has been no evidence that audits by the Customs Committee, the Ecology Committee, or the MES occurred. (R-I ¶¶ 20.3 – 20.6).

298. On 18 October 2008, the Financial Police instructed the Customs Committee to audit KPM's and TNG's compliance with export tax laws. (C-I ¶¶ 161 – 163, CPHB 2 fn. 209).

299. On 18 October 2008, the Financial Police wrote to the Customs Committee regarding Anatolie Stati's travel through Kazakhstan. (CPHB 2 ¶ 38, C-11).

300. On 19 or 20 October 2008, after deciding not to proceed to the firm bidding phase of Project Zenith, Mr. A. Stati learned of President Nazarbayev's 14 October 2008 Order. (Stati 2nd p. 4).

301. On 20 October 2008, the Financial Police wrote to the MEMR and an official in Moldova requesting information on Anatolie Stati, KPM, and TNG. (CPHB 2 ¶ 38).



302. On 24 October 2008, the Chief Inspector of the Financial Police, Mr. Turganbayev, reported that "*with respect to the companies controlled by A. Stati,[...] inspections regarding the completeness of payment of taxes, compliance with labor legislation, environmental protection legislation, as well as legislation in the sphere of subsoil use and industrial safety have been [initiated]*." He requested that the Deputy Head of the Department for Investigations of the Financial Police extend the inspection term two months to 16 December 2008. (C-430; C-II ¶ 213; CPHB 2 ¶¶ 38, 128).

303. On 24 October 2008, the Financial Police ordered comprehensive tax inspections of KPM and TNG. (CPHB 2 ¶¶ 38, 128).

304. On 24 October the MEMR responded to the Financial Police request for KPM's and TNG's corporate documents showing their shareholdings. (CPHB 2 ¶ 117).

305. By letter of 27 October 2008, Gazprom refused to accept KazTransGaz as the exporter. (RPHB 2 ¶ 499).

306. On 28 October 2008, the Financial Police ordered the Geology Committee, the Ecology Committee, the National Bank of Kazakhstan, the Tax Committee, and the MES to carry out inspections of KPM and TNG and insisted that Financial Police be permitted to participate. (C-0 ¶ 36, CPHB 2 ¶¶ 38, 61, 128).

307. On 30 October 2008, the Financial Police issued a finding that Anatolie Stati is not a registered businessman in Kazakhstan, but that he carries out his business through Ascom. They found that "*ASCOM SA owns 100% of the participation share in KPM.*" (C-II ¶ 86; CPHB 2 ¶ 38).

308. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities and noted specific items to inspect, but found that KPM and TNG were compliant with their investment obligations. (CPHB 2 ¶ 38).

309. In the fall of 2008, TNG's largest non-local customer, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382, partially quoted; R-II ¶¶ 751 - 752). Respondent notes that Kemikal is a commercial entity that cannot be attributed to the state. Likewise, KazRosGas is a joint venture under equal participation of Gazprom and KMG and the Republic is not responsible for its actions. Kemikal stopped payments toward the end of 2008 because of "*liquidity and insolvency*" issues, per the PwC Due Diligence Report. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124).

310. In November 2008, Renaissance Capital asked KNOC to revise their bid. (RPHB 1 ¶ 95).



311. By 1 November 2008, Financial Police informed the Deputy Prime Minister of Kazakhstan that it had discovered that Anatolie Stati left Kazakhstan in 2007. (C-II ¶ 212).

312. On 1 November 2008, Financial Police reported to Deputy Prime Minister, confirming the ownership of KPM and TNG and informing him that inspections were being carried out. (CPHB 2 ¶ 38).

313. On 4 November 2008, the Committee of Geology and Subsoil Resources Use of the MEMR commenced an audit of KPM and TNG regarding compliance on legislation on industrial safety. This inspection was organized and attended by the Financial Police and was scheduled to last until 15 November 2008. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 157).

314. On 7 November 2008, the Tax Committee initiated a targeted audit of KPM and TNG at the request of the Financial Police regarding transfer pricing ("*Transfer Price Audit*"). (C-I ¶ 172; CPHB 2 ¶¶ 38, 128). Respondent does not admit that the audit was instructed by the Financial Police. (R-I ¶ 30.62).

315. On 7 November 2008, Anatolie Stati wrote to President Nazarbayev, assuring him that there were no reasons to investigate KPM and TNG. (CPHB 2 ¶¶ 38, 142).

316. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (CPHB 2 ¶¶ 38, 128).

317. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. (C-0 ¶ 60; C-I ¶ 156; CPHB 2 ¶¶ 38, 128).

318. On 11 November 2008, the MEMR's Geology Committee concluded its audit (4 days ahead of schedule) and found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61). Respondent reports that an inspection was carried out to assess whether KPM and TNG were acting in compliance with their licenses. Reports were written after the inspection and were signed by Mr. Cornegruta (KPM) and Mr. Cojin (TNG). (RPHB 1 ¶ 192). The Financial Police attended this meeting, but the ARNM did not. (R-I ¶ 26.8; R-II ¶ 455). The Financial Police found that KPM did not have a trunk pipeline license. (C-II ¶¶ 16, 380). .

319. On 12 November 2008, following the site visit, the Financial Police asked ARNM whether KPM, TNG, and another Stati company called "*Kok Mai*" held a license for a trunk pipeline. (CPHB 1 ¶ 155; CPHB 2 ¶ 61; R-I ¶ 26.9; R-II ¶¶ 464 – 465; RPHB 1 ¶¶ 198 – 202).

320. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (CPHB 2 ¶ 38).



Case 1:14-cv-01638-ABJ   Document 2-13   Filed 09/30/14   Page 95 of 225
Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/23/19   Page 95 of 105

Page **94** of **414**

321. On 13 November 2008, the Tax Committee noted that including the Financial Police in inspections would be illegal and proposed that a working group be established instead to review inspection results. (CPHB 2 ¶¶ 38, 128).

322. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (CPHB 2 ¶ 38).

323. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for – but neither held - licenses to operate main pipelines, and that operation of a trunk pipeline requires such a license. (C-I ¶ 90, CPHB 2 ¶ 61; R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164).

324. Claimants allege that, on 14 November 2008, Financial Police insisted that Mr. Cojin and Mr. Cornegruta sign inspection reports "*admitting*" that KPM and TNG do not hold licenses to operate "*main*" pipelines. (CPHB 2 ¶ 61). Respondent contests this allegation and states that it is only supported by the incredible testimony of Mr. Cojin. (RPHB 2 ¶¶ 158 – 160).

325. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. (R-I ¶ 38.22; RPHB 2 ¶¶ 165 – 172). Claimants refer to this as the "*reclassification*" and Respondent calls it a "*discovery*." (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542).

326. On 17 November 2008, the Financial Police ordered a new audit of KPM and TNG to determine the income from its trunk pipeline operations, as well as KPM's entire revenue for onward sales of oil. (C-0 ¶ 42; C-I ¶ 92; CPHB 2 ¶¶ 38, 61, 81; R-II ¶ 469; RPHB 2 ¶¶ 172 – 173). .

327. A 17 November 2008 agreement memorialized the TNG, KazAzot, and KazTransGas (later replaced with its parent company KMG) tri-partite terms on price, volumes, and conditions. TNG and KMG signed the agreement and it was hand-delivered to KazAzot for signature, but KazAzot never signed the agreement. (C-I ¶ 60; CPHB 1 ¶ 130).

328. On 18 November 2008, the Financial Police issued a resolution for the inspection of unpaid customs taxes by TNG. (CPHB 2 ¶¶ 38, 128).

329. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198).

330. KPM and TNG first made contact with the MES, the state authority responsible for the supervision and control of industrial safety of in-field and main pipelines, on 19 November 2008. (R-I ¶ 28.10).

331. On 19 November 2008, the Tax Committee, at the request of the Financial Police, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM, and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (C-0 ¶ 42; C-I ¶ 92 (stating 2 December 2008); C-II ¶ 330; CPHB 1 ¶ 160; CPHB 2 ¶¶ 61,



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

81). Claimants state that these were crude calculations that amounted to all of KPM's and TNG's oil and gas production revenues from the Borankol and Tolkyn fields for the audited period 2005-2007. (C-0 ¶ 42). Claimants provide the Tribunal with a detailed explanation as to how the Tax Committee erred in its calculation at C-II ¶¶ 330 – 331, which Respondent contests at R-II ¶ 620. Respondent states that these calculations were based on TNG's own tax filings and were based on the underlying materials of KPM. (R-I ¶ 26.19).

332. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favor in response to KPM's challenge of export duties. The Court ruled that the imposition on KPM of the Crude Oil Export Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743; C-I ¶ 164).

333. On 19 November 2008, KPM and TNG obtained written confirmation from the MES that "*all pipelines operated by your enterprise, from the place of extraction to the point of transferring the hydrocarbons to the oil and gas main pipelines are not main pipelines. We would also like to communicate that the extraction of oil (crude oil, gas condensate, and natural gas) to the surface, treatment and transportation of oil to the place of transfer into a main pipeline and (or) another means of transport form a single technological process of oil production.*" (C-II ¶ 283, partially quoted, emphasis maintained; CPHB 1 ¶ 172; CPHB 2 ¶¶ 38, 61, 98).

334. Respondent clarifies that the 19 November 2008 letter from the MES states that only some of Claimants' pipelines are not trunk pipelines. In any event, the letters were beyond the competence of the MES. (R-I ¶¶ 28.11 - 28.13).

335. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72). They ordered an economics expert from the Ministry of Justice to confirm Tax Committee calculations and instructed that the calculation include transport fees received from TNG's and KPM's revenues from sales of oil. (CPHB 2 ¶ 81).

336. On 21 November 2008, Financial Police ordered the MES to withdraw its statements confirming that KPM's and TNG's pipelines are not "*main*" on the basis that the MES is not competent to provide that conclusion. (CPHB 2 ¶¶ 38, 61, 98; R-I ¶ 26.12).

337. On 25 November 2008, Financial Police wrote to Ministry of Finance inquiring into why the Customs Committee "*exonerated*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (CPHB 2 ¶¶ 38, 128).

338. In late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas, which KazAzot allegedly wanted reconsidered. KazAzot indicated that it would sign the 17 November 2008 agreement within six months, subject to the audit. (C-I ¶ 61).

339. On 28 November 2008, the Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (CPHB 2 ¶ 81).



340. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008 by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

341. On 2 December 2008, Financial Police sent an internal report confirming that KPM operated a "*main*" pipeline without a license and had gained illegal income of over 41 billion Tenge. (CPHB 2 ¶¶ 38, 61).

342. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5 December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381).

343. On 10 December 2008, Mr. Turganbayev (Financial Police) reported to the Prime Minister that KPM and TNG were operating trunk oil and gas pipelines, but further inquiries were necessary since the Financial Police are not competent to classify pipelines. (C-II ¶ 220, CPHB 2 ¶¶ 38, 61; R-II ¶ 473).

344. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407).

345. On 15 December 2008, the Financial Police opened a criminal investigation against KPM based on suspicions that KPM was operating a truck pipeline without a license, due to the following findings: (1) on 13 June 2008, KPM applied to the ARNM for re-issuance of a license, indicating that it believed it was operating a trunk pipeline, (2) on 14 July 2008 ARNM informed KPM that it needed to submit documents for the license to operate a trunk pipeline, (3) a 4 December 2008 MEMR report confirming that neither KPM nor TNG had been issued licenses for the operation of trunk pipelines, (4) confirmation that KPM had been operating the pipeline at least since 2005, (5) an expert report stating that TNG's pipeline was a trunk pipeline, and that this one was similar to KPM's, and (6) a 28 November 2008 report stating that KPM's income from operating the pipeline without a license amounted to 41,166,014,544 Tenge. (R-II ¶¶ 294; 475; RPHB 1 ¶ 222, RPHB 2 ¶¶ 177 – 179; CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61). Respondent concedes that the investigation phase started in December 2008 without a conclusive finding that the pipeline was trunk. (RPHB 2 ¶ 178).

346. On 18 December 2008, the yield to maturity on the Tristan notes increased from 26.319% to 45.666%. (RPHB 1 ¶¶ 77, 78).

347. On 18 December 2008, notified TNG of irregularities in the 2003 Gheso transfer and the corresponding potential violation of the State's pre-emptive right. The MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership



within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (C-0 ¶ 27; C-I ¶¶ 19, 145, 276; C-II ¶¶ 16, 189, 228, 380, 402, CPHB 1 ¶ 214; RPHB 2 ¶ 281).

348. On 18 December 2008, INTERFAX issued a report accusing Claimants of having altered documents in order to defraud the State of its pre-emptive right to purchase the companies. The Parties dispute whether the Tribunal should view this as a MEMR press release (Claimants) or whether this was an independent press item that cannot be attributed to Respondent (Respondent). Respondent states that INTERFAX received the information from unofficial sources. (C-II ¶¶ 400, 402; CPHB 1 ¶¶ 137, 215, 347 – 348, 350; CPHB 2 ¶¶ 38; 117; R-II ¶¶ 171, 747 – 749, 796; RPHB 2 ¶¶ 7, 97).

349. On 18 December 2008, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with the Kazakhstan government. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211). Respondent states that Claimants have not provided any proof that the news agency piece caused Credit Suisse to step back from providing the bridge loan. (R-II ¶¶ 747 – 749; RPHB 2 ¶¶ 95 – 99).

350. On 20 December 2008, the Financial Police began interrogation of KPM and TNG employees. (CPHB 2 ¶ 38).

351. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117).

352. On 23 December 2008, the Board of Appeal of the Mangystau Regional Court accepted an appeal by the Aktau territorial customs body of the 19 November 2008 court ruling in favour of KPM. Subsequent appeals of the Mangystau Regional Court's decision were dismissed. (C-0 ¶ 72; C-I ¶ 165, CPHB 2 ¶ 128).

353. Claimants received a letter dated 24 December 2008 from the Financial Police, but disagree as to the legal content of the letter. The letter requested information regarding (a) the level of protection of the company, and (b) sales made by KPM to agents, individuals, and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38). Claimants state the letter notified KPM that it was the subject of a criminal investigation for operating a main pipeline without a license. (C-0 ¶ 43; C-I ¶ 94). Respondent reports that this was not a notice of criminal investigation. (R-I ¶ 26.20).

354. On 24 December 2008, the Financial Police issued a summons for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (CPHB 2 ¶ 38).

355. On 24 December 2008, the State issued a decision that the Crude Oil Export Tax would not be applicable to crude oil exports subject to the Rent Tax, starting on 1 January 2009. (C-0 ¶ 73; C-I ¶ 166).

356. On 25 December 2008, Mr. Rakhimov of the Financial Police summoned and questioned KPM's General Manager, Mr. Cornegruta. Mr. Cornegruta was



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

considered a witness at the time. (C-I ¶ 95; R-I ¶¶ 26.21, 27.38). Claimants state that he was not allowed to be accompanied by counsel. (C-I ¶ 95). Respondent denies this and states that he was entitled to be accompanied by counsel. (R-I ¶ 27.39).

357. On 26 December 2008, Mr. Rakhimov summoned and questioned the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar. (C-I ¶ 95; R-I ¶ 26.21).

358. On 26 December 2008, Financial Police ordered the seizure of TNG documents regarding contracts with third parties and the construction of pipelines. (CPHB 2 ¶ 38).

359. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-I ¶ 147; CPHB 2 ¶ 117).

360. On 30 December 2008, KPM submitted a declaration for the quantities of crude oil to be exported by it in January 2009 (c.a. 21,000 tons) to the Aktau territorial customs body. KPM did not pay the Crude Oil Export Tax for these January 2009 exports and instead paid the newly applicable Rent Tax for Export. (C-0 ¶ 74; C-I ¶ 167).

361. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95; CPHB 2 ¶ 38). Respondent says that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (R-II ¶ 481).

362. Oil and gas prices were severely depressed in December 2008 and January 2009. (R-II ¶ 738). Respondent states that Tristan Oil's Annual Report for the Financial Year 2009 revealed a decrease in sales of 65.4%. (R-II ¶ 740).

363. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG cannot deduct 100% of drilling expenses the year they are incurred for corporate income tax purposes. (CPHB 2 ¶ 128).

364. The EPT for the year ending 31 December 2008 was USD 11.2 million for KPM and USD 20.8 million for TNG. Claimants have not contested the imposition of these tax payments. (R-II ¶¶ 761 – 762).

365. In January 2009, the second phase of Project Zenith began. Potential bidders, including KMG EP, were given access to the data room. (R-I ¶ 16.10; R-II ¶ 358).

366. On 5 January 2009, Mr. Rakhimov asked the MEMR to ascertain whether KPM's 17.9 km pipeline was a main pipeline. (CPHB 1 ¶ 171, CPHB 2 ¶ 61).

367. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines are not main pipelines. (CPHB 1 ¶ 173; CPHB 2 ¶¶ 61, 98).



368. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines. (CPHB 1 ¶ 172, CPHB 2 ¶¶ 61, 98).

369. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines are not "*main.*" (CPHB 2 ¶¶ 61, 98).

370. On 14 January 2009, the Fitch ratings agency issued a rating watch for Tristan's long-term default rate, due to the cloud on TNG's title and the criminal investigation of KPM. (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117).

371. On 14 January 2009, the Financial Police issued a resolution to appoint three investigators to the criminal investigation. (CPHB 2 ¶ 38).

372. On 15 January 2009, Moody's reported a downgrade review, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).

373. The 16 January 2009 JSC Registrar Zerde for TNG shows 8 share transfers involving TNG. (RPHB 2 ¶ 273).

374. On 19 January 2009, KPM and TNG submitted complaints against the actions being taken by the Financial Police with the GPO, the Ministry of Justice of the Republic of Kazakhstan, the Financial Police itself, the MEMR, and the Western Regional Transport Prosecutor. They nevertheless complied with the request for documents. (C-I ¶¶ 96, 332; CPHB 2 ¶¶ 38, 117, 142).

375. On 20 January 2009, KPM and TNG submitted complaints to the Transport Prosecutor for Mangystau region, describing the illegal actions of the Financial Police and the fact that their pipelines are not "*main*" pipelines. (CPHB 2 ¶ 142).

376. On 20 January 2009, TNG complied with the MEMR's 29 December 2008 requested for notarized documents evidencing the change in ownership of TNG. (C-I ¶ 147).

377. On 21 January 2009, the Transport Prosecutor of the Mangystau Region forwarded KPM's and TNG's complaints to prosecutor for the Western Region. (CPHB 2 ¶ 142).

378. On 22 January 2009, Financial Police requested corporate documents from KPM. (CPHB 2 ¶ 38).

379. On 23 January 2009, Financial Police requested corporate documents from TNG. (CPHB 2 ¶ 38).

380. On 22 – 23 January 2009, the GPO forwarded KPM's and TNG's complaints to the Regional Prosecutor. (CPHB 2 ¶ 142).

381. On 26 January 2009, the GPO sent KPM, through Mr. Cornegruta, a letter (C-629). (CPHB 2 ¶ 38).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

382. On 27 January 2009, the Transport Prosecutor forwarded KPM's and TNG's complaints to the prosecutor for the Western Region. (CPHB 2 ¶ 142).

383. On 29 January 2009, KPM and TNG sent complaints to the Financial Police regarding seizure orders and requested a copy of the order that was serving as the basis for the criminal investigation. (CPHB 2 ¶ 142).

384. On 30 January 2009, the Deputy Transport Prosecutor for the Western Region informed KPM and TNG that the complaints are under investigation pending responses from the Financial Police. (CPHB 2 ¶ 142).

385. On 2 February 2009, the Financial Police notified Claimants that their complaints were rejected and that TNG was the subject of a criminal investigation on the same basis, which led to criminal charges against the in-country manager of TNG from 2002 to 2009. The charges were later suspended. The Financial Police rejected the request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142). Respondent accuses Claimants of submitting a misleading translation of C-98. (RPHB 1 ¶ 1065).

386. On 4 February 2009, KPM and TNG wrote to the ARNM and asked to be included in the analysis for the classification of the pipelines. (CPHB 2 ¶ 142).

387. On 4 February 2009, the GPO forwarded complaints from KPM and TNG to the Transport Prosecutor of the Mangystau Region. (CPHB 2 ¶ 142).

388. On 4 February 2009, Financial Police interviewed Mr. Cojin (General Manager of TNG) to determine whether he or Mr. Cornegruta would be the appropriate defendant in any criminal proceedings. (R-II ¶ 480).

389. On 4 February 2009, the MEMR wrote to the Financial Police that the KPM pipeline "*belongs to pipelines working as a gathering manifold and is not a main pipeline.*" (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98). Respondent states that this MEMR letter was withdrawn on the MEMR's own accord on the basis that it had not been reviewed by the legal department. (RPHB 1 ¶¶ 229 – 230; RPHB 2 ¶ 183). The 4 February 2009 letter is an internal government document which was not included in Mr. Cornegruta's criminal file. In this regard, Respondent reiterated its concerns about Claimants' access to internal documents. (RPHB 2 ¶ 186).

390. On 5 February 2009, KPM and TNG wrote to the MEMR asking to be included in the analysis regarding the classification of the pipelines. (CPHB 2 ¶ 142).

391. On 5 February 2009, the Transport Prosecutor of Mangystau Region forwarded complaints of KPM and TNG to First Deputy Transport Prosecutor of the Western Region. (CPHB 2 ¶ 142).

392. On 9 February 2009, the Financial Police ordered the College of Experts of the MOJ to produce an expert report to classify the KPM pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61). Respondent states that the cover letter to the 9 February 2009 Order explained that the Financial Police were under time



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

pressure and required determination of the issue. Mr. Baymaganbetov stated that these resolutions were received frequently by the department in respect of investigations of companies. (R-II ¶ 553).

393. On 10 February 2009, Mr. Baymaganbetov met Mr. Turganbayev, who had previously been in charge of the inspection and of procuring a preliminary report on the classification of pipelines. (R-II ¶ 554). The two men set out the four documents that had been given to Mr. Baymaganbetov. (CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 195). Mr. Baymaganbetov was entitled to seek out as much further information as he needed. Respondent states that the four other so-called "*expert*" opinions procured by Claimants were not shown to Mr. Baymaganbetov because they could have unfairly tainted his opinion. (RPHB 2 ¶¶ 195 – 196).

394. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. (C-0 ¶ 61). On that date, the State sent notices/Acts of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (C-0 ¶ 61 and 53 partially quoted, cites 69 million; C-I ¶¶ 19, 159; C-II ¶¶ 16,223, 380; CPHB 1 ¶¶ 139, 243; CPHB 2 ¶¶ 38, 128).

395. On 11 February 2009, the letter prepared on 4 February was replaced by a letter dated 11 February, in which the MEMR wrote to KPM and TNG stating that it was not competent to resolve their complaints. (RPHB 1 ¶ 229).

396. On 13 February 2009, MEMR wrote to KPM and TNG stating that it is not competent to resolve their complaints regarding the criminal prosecution and suggested that they write to the GPO. (CPHB 2 ¶ 142).

397. On 13 February 2009, the MEMR wrote to the Financial Police and provided them information on how the definition of "*trunk pipeline*" in Art. 1 of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines. (RPHB 2 ¶ 183).

398. On 13 February 2009, Mr. Baymaganbetov issued the expert decision that KPM's pipelines were trunk pipelines. He based this decision only on the documents received from Mr. Turganbayev. Respondent states that Mr. Baymaganbetov came to his decision quickly because the matter at hand was not unduly complex and he had time to devote to the issue, which fitted with the Financial Police's need for a prompt opinion. In any event, Mr. Baymaganbetov required at least three times as long to issue his opinion than did Claimants' purported expert, Mr. Idrisov. (R-II ¶¶ 554 – 555; CPHB 2 ¶¶ 38, 61, 98; RPHB 2 ¶¶ 188, 193).

399. On 16 February 2009, TNG provided the 12 May 2003 SPA between Gheso and Terra Raf to the MEMR. (CPHB 2 ¶ 117).

400. On 18 February 2009, Moody's downgraded the Tristan debt due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).



401. In mid-February 2009, Turkish Petroleum Corporation and PSA Energy Holding SPC were granted access to the Project Zenith data room containing over 2,000 reports, agreements, surveys, maps, and other documents relating to KPM's and TNG's geological data, operations, and financial, tax, and legal matters. The geological data contained in the data room included 3D seismic data, interpreted seismic horizons, faults (cuts and boundaries), and well tops and coordinates. These companies later withdrew from the bid process. (C-I ¶ 186; R-II ¶ 763).

402. On 24 February 2009, Financial Police seized KPM's corporate documents. (CPHB 2 ¶ 38).

403. On 24 February 2009, TNG complained to MEMR regarding the negative effects of the December 2008 publication on its business and reputation. (CPHB 2 ¶ 117).

404. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for the consent to the transfer and waiver of the State's pre-emptive purchase right and that failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117). This was the last action from the MEMR with regard to the pre-emptive rights claim. (CPHB 2 ¶ 117).

405. On 27 February 2009 and 2 March 2009, respectively, KPM and TNG filed separate complaints before the Tax Committee requesting cancellation of the 10 February 2009 notices. The Tax Committee refused to consider the complaints and Claimants spent the next 1.5 years litigating the matter before Kazakh courts. (C-0 ¶ 63; C-I ¶ 159; CPHB 2 ¶¶ 128, 142).

406. Claimants report that, in February 2009, Claimants made a management presentation for TOTAL. After examining the data room and the management presentation, TOTAL stated that they were going to speak with the Kazakh authorities about the properties before they would be willing to move ahead with a binding proposal. Claimants state that TOTAL spoke with the Kazakh authorities in late February or early March 2009, and withdrew from the bid process, allegedly for technical reasons relating to the properties, but likely because Kazakh authorities discouraged them. (C-I ¶ 187). Respondent states that Claimants have not provided substantiation of their claim that Kazakh authorities spoke to TOTAL. (R-II ¶ 799).

407. On 3 March 2009, NIPI Neftegaz and the Kazakh Research and Design Institute of KMG confirmed to TNG that drilling wells amounts to construction and, thus, drilling expense can be deducted 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

408. On 3 and 4 March, 2009, Financial Police seized KPM's and TNG's corporate documents. (CPHB 2 ¶ 38).

409. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38).



410. On 9 March 2009, Claimants re-filed their notice of discovery in the East Munaibay structure and filed a notice of discovery in the Bahyt structure with the MEMR. Claimants also re-notified the MEMR of their intention to exercise their contractual right to extend the exploration period in the Tabyl Block by two years. (C-0 ¶ 58, partially quoted; C-1 ¶ 176). Because there had been no response to the extension request, Claimants declared their intention to appraise those discoveries. (CPHB 2 ¶ 151).

411. On 11 March 2009, the MEMR confirmed to KPM that the drilling of wells amounts to construction and that, thus, drilling expenses can be deduced 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

412. On 18 March 2009, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit was denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-1 ¶¶ 38, 149; CPHB 2 ¶ 117). Respondent cites this letter as an attempt to provoke the Republic. (R-I ¶ 9.76).

413. On 18 March 2009, KPM and TNG filed a complaint against initiation of criminal cases undertaken by the Financial Police, with the GPO. (C-1 ¶¶ 96, 332; CPHB 2 ¶¶ 38, 142).

414. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A. B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. All of the State's actions against Claimants since President Nazarbayev's 14 October 2008 investigative directive were discussed. Claimants state that Mr. Batalov assured Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG simply submitted a new application for its transfer to Terra Raf and permitted the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Claimants state that the MEMR assured them that the pre-emptive right claim would be resolved in their favour. (C-0 ¶¶ 30 – 31, 82; CPHB 2 ¶¶ 38, 117, 151). Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, Claimants state that the MEMR also indicated that the Financial Police ought to rely on opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-1 ¶¶ 106, 150, 152, 177). Respondent agrees with the above, but states that "*it is simply not the case*" that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in Claimants' favour, or that there was any "*reclassification*" of pipelines. (R-I ¶¶ 13.47(e)(v), 21.1).



415. On 24 March 2009, TNG applied for permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332).

416. On 24 March 2009, TNG applied to MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for 2 years into the agenda of the next meeting of the Expert Commission. (R-I ¶ 31.69).

417. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142).

418. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332).

419. On 27 March 2009, Financial Police order KPM and TNG to submit originals of their corporate documents. (CPHB 2 ¶ 38).

420. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested copies of the criminal investigation order. The Financial Police ordered TNG to submit additional original company documents. (CPHB 2 ¶ 38).

421. On 30 March 2009, the Transport Prosecutor for the Western Region wrote to KPM and TNG stating that complaints were under investigation and noted that it had received nothing from the Financial Police in response to inquiries. (CPHB 2 ¶ 142).

422. On 30 March 2009, Contract 302 expired. (R-II ¶ 411).

423. In April 2009, KMG received access to the complete Project Zenith data room. (C-I ¶ 191; C-II ¶ 383).

424. Claimants removed CASCo, a Stati-owned service company that was doing the service work in the fields, from the field in 2009. (C-II ¶ 409; R-I ¶ 9.70; R-II ¶ 791). Respondent notes that Anatolie Stati's testimony regarding ownership of CASCo was inconsistent with and, indeed, was contradicted by other witnesses, his previous statements, and Claimants' own due diligence of 29 August 2008. (RPHB 1 ¶¶ 117 – 136).

425. Respondent reports that, in April 2009, Gabriel Stati was arrested following elections in Moldova, amid allegations that he was involved in the organization and financing of civil unrest and attempting to overthrow the Moldovan government. Moldovan authorities extradited him from the Ukraine. (R-II ¶ 35).

426. On 2 April 2009, the Expert Commission passed the Decision, recommending the extension of Contract 302 for 2 years. (R-I ¶ 31.70; CPHB 1 ¶ 236, CPHB 2 ¶ 151).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

427. On 6 April 2009, Financial Police requested information on TNG's costs for oil and condensate in relation to the criminal case against KPM. (CPHB 2 ¶ 38).

428. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which Claimants state that they requested on 9 March 2009, and which Respondent states was requested on 24 March 2009. Claimants state that MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. (C-0 ¶ 58; C-I ¶¶ 22, 178; C-II ¶ 241, CPHB 1 ¶ 224, CPHB 2 ¶ 151; R-I ¶ 31.71). Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension. (R-I ¶¶ 31.72 - 31.73; R-II ¶ 414). Respondent states that the true translation of the decision highlights that actual prolongation of the contract remains to be undertaken. (R-II ¶¶ 413, 419 – 424). Since TNG did not apply for a renewal license No. 243-D in conjunction with the application for the extension, the competent authority had no right to extend the term of the Contract 302. (R-I ¶ 31.79; R-II ¶ 436). To add context, Respondent states that, in 2008, the competent authority received 152 applications for extension of exploration periods. Of these, 31 were refused. In 2009, the competent authority received 139 applications, of which 38 were refused. (R-I ¶ 31.81).

429. On 13 April 2009, five experts from the Russian Science and Research Institute for the Construction and Operation of Pipelines and Energy Facilities issued expert opinions affirming that the pipelines in question were not trunk pipelines. (C-I ¶ 101; C-II ¶ 289; CPHB 2 ¶¶ 61, 98).

430. On 20 April 2009, Mr Rakhimov decided to detain KMG's general manager, Mr. Cornegruta, and opened criminal proceedings against him for the crime of illegal entrepreneurial activity under Art. 190(2)(b) of the Criminal Code of the Republic. At that time, Mr. Cornegruta was named as a potential defendant. (R-II ¶ 487; RPHB 1 ¶ 230, RPHB 2 ¶ 189).

431. On 22 April 2009, the Financial Police ordered additional documents from KPM. (CPHB 2 ¶ 38).

432. On 25 April 2009, the Financial Police arrested Mr. Cornegruta and took him in for interrogation. (CPHB 2 ¶¶ 38, 61).

433. On 26 April 2009, Claimants filed complaints against the Financial Police, including its head investigator, Mr. Rakhimov. The same day, 900 employees of KPM, TNG, and CASCo that were on shift addressed and signed a letter to the Governor of the Mangystau Region expressing their concerns. (C-I ¶¶ 109).

434. On 27 April 2009, Mr. Batalov was fired as Executive Secretary of MEMR. (C-I ¶¶ 106, 332).

435. On 27 April 2009, the court of Aktau considered and rejected a petition against Mr. Cornegruta's arrest. (RPHB 1 ¶ 244).

436. On 28 April 2009, KazAzot explained that it did not sign the 17 November 2008 Tri-Partite Agreement because, among other things, an audit that it had carried out,



particularly in light of the impact that the global financial crisis had had on the mineral fertilizers market, had demonstrated the unfeasibility of the project. (R-I ¶ 15.7).

437. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. (R-I ¶ 29.2). Claimants report that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline, and the companies' other property. Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; C-II ¶ 335; CPHB 1 ¶ 140; CPHB 2 ¶¶ 38, 61).

438. On 30 April 2009 and on 4 May 2009, TNG submitted Addendum No. 9 of TNG's Tabyl Block Subsoil Use Contract to the MEMR for execution. TNG never received the MEMR's signature to the addendum extending TNG's exploration rights. (C-0 ¶ 58; C-I ¶¶ 22, 178; CPHB 2 ¶ 151).

439. On 30 April 2009, the Deputy Minister of the MES wrote to Claimants and asked them to withdraw his previous letters of 19 November 2008, as their issuance was beyond his competence. (R-I ¶ 28.13).

440. On 1 May 2009, the decision to detain Mr. Cornegruta was confirmed on appeal. (R-II ¶ 487; RPHB 1 ¶ 244).

441. Claimants and Respondent report that construction of the LPG Plant was halted in May 2009 due, at least in part, to "*cash constraints*." (C-I ¶ 64; R-I ¶ 19.24).

442. On 4 May 2009, Mr. Rakhimov of the Financial Police ordered an unscheduled inspection to determine the amount of income KPM had obtained by operating a trunk pipeline without a license. (RPHB 2 ¶ 190).

443. On 6 – 7 May 2009, pursuant to a search warrant dated 30 April 2009, the Financial Police conducted an overnight search of KPM's and TNG's offices for the other General Managers of KPM, Messrs. Salagor and Spasov, and the General Manager of TNG, Mr. Cojin, as well as information on their whereabouts. (C-I ¶ 111, CPHB 2 ¶ 38; R-I ¶ 27.47; R-II ¶ 486; RPHB 1 ¶ 233). The three in-country managers had been charged with the same offense as Mr. Cornegruta. The initial phase of the search started at 4:20 p.m. on May 6 and ended at 4:15 a.m. on May 7, 2007. (C-I ¶ 111). The search was carried out in the presence of Deputy Director General for Economic and Financial Affairs of TNG, Mr. Stejar. (R-I ¶ 27.47). Respondent states that the Financial Police procured human resources and financial records from KPM and TNG. (R-II ¶ 483). Respondent states that it became clear during the course of the investigation that most senior managers had left Kazakhstan. (R-II ¶ 486). The Parties dispute the level of inconvenience caused by the search. (C-I ¶ 111; R-II ¶¶ 301 *et seq*.). Claimants state that the Financial Police seized other documents not listed in the warrant and searched Mr. Cornegruta's flat. (C-I ¶ 112). Respondent makes no admission as to C-I ¶ 112, but notes that no complaints were made at the time. (R-I ¶ 27.48).



444. On 7 May 2009, Mr. Anatolie Stati, on behalf of Claimants, wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. (C-I ¶¶ 39, 113, 332, C-43; CPHB 2 ¶¶ 38, 142). Anatolie Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol. (CPHB 2 ¶ 38). Claimants also state that this letter made clear that Claimants intended to bring arbitration claims against Kazakhstan for the diminution of value of their investments once the sale to Cliffson closed. (C-II ¶ 392). While Respondent makes no admission as to whether any letter was written or sent to or received by President Nazarbayev, Respondent confirms the existence of the letters. (R-I ¶ 27.49; R-II ¶ 226). Respondent also notes that the Cliffson transaction, at earliest could have started in February 2010. (RPHB 2 ¶ 7).

445. On 13 May 2009, the Mangystau Regional department of the MES withdrew its letters about whether the pipelines were trunk pipelines. Respondent states that this was in response to the 30 April 2009 letter from the Deputy Minister of the MES and not to the letter from the Financial Police, dated 21 November 2009, as asserted by Claimants at C-I ¶ 91. (R-I ¶ 28.14).

446. On 15 May 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts and requested additional documents from KPM. (R-I ¶ 29.2; CPHB 2 ¶ 38).

447. On 15 May 2009, the Financial Police notified KPM and TNG that it had seized Claimants' equity interests in KPM and TNG two days before, on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). While Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009, Respondent states that such a seizure would seem entirely appropriate in the circumstances, and if the Financial Police moved to gain interim measures of security over KPM and TNG pending the resolution of a *bona fide* underlying dispute, this would not be surprising. (R-I ¶ 26.26).

448. On 18 May 2009, the College of Experts of the Ministry of Justice calculated KPM's purported "*illegal profits*" from oil and gas transportation services at 5.9 million Tenge (approximately USD 48,300) for the period from 2002 through 2008. (C-I ¶ 92). This calculation also showed "*illegal profits*" of approximately 1,935,547 Tenge (approximately USD 15,000) for March 2007 – May 2008. (C-I ¶ 119). Respondent denies this and states that that expert considered that the value of income from illegally operating the trunk pipeline amounted to 65,479,414,197 Tenge for the period from April 2002 – 2008, and that its income during the relevant period in 2007 and 2008 was 21,673,919,031 Tenge. (R-I ¶¶ 26.23; 26.26; R-II ¶ 484; RPHB 2 ¶ 190). Respondent states that this calculation was necessary to determine whether the crime of illegal entrepreneurship had been triggered. (R-II ¶ 484). Respondent admits that the Court relied on this document when determining the amount of fine to be imposed on KPM. All of Claimants' other assertions concerning this report are denied. (R-I ¶ 27.60).

449. On 18 May 2009, the Financial Police issued an order on the refusal to initiate a criminal case. According to this, the Financial Police declined to initiate a criminal



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

case against Mr. Cornegruta based on the checks carried out by the MES, the Ministry of Environmental Protection, the Customs Control Committee of the Ministry of Finances, or the MEMR. (RPHB 2 ¶ 191).

450.  On 18 May 2009, Mr. Rakhimov issued application to exclude Claimants' expert opinions about the classification of the pipelines. (R-II ¶¶ 631 - 632). The expert reports included a report dated 5 January 2009 from the Kazakh Scientific, Research, and Design Institute of Oil and Gas (a division of KMG) that found the pipelines owned by KPM and TNG "*do **not** belong to the category of **main** pipelines and are designated to ensure the process of hydrocarbons production*." (C-I ¶ 98, emphasis maintained). The expert reports also included a report that the Scientific, Research, and Design Institute of Oil and Gas Industry of NIPI Neftegaz concluded on 9 January 2009 that the pipelines owned by KPM and TNG were correctly "*classified as **in-field** pipelines*." (C-I ¶ 99, emphasis maintained). The court later deemed the Claimants' expert opinions to be inadmissible. (R-II ¶¶ 631 - 632). These so-called "*expert*" opinions did not evidence KPM and TNG's requests for those opinions, making it impossible to divine the scope of the request. There was no indication that the bodies were independent of Claimants, and some of the experts whose reports were excluded had a role in the construction of the pipelines and in the legal amendments regarding their status. In any event, they were not qualified to issue such opinions and had not been appointed pursuant to Art. 243 of the CPC. (RPHB 2 ¶¶ 203 – 207).

451.  On 18 May 2009, the Kazakh Financial Police expressly determined that Anatolie Stati could "*not be held liable for performance of illegal business activities*" with respect to his companies in Kazakhstan. (C-II ¶ 213).

452.  On 19 May 2009, the Financial Police ordered KPM and TNG to provide a valuation of all the property that it had seized. (C-II ¶ 335; CPHB 2 ¶ 38).

453.  On 19 May 2009, Mr. Rakhimov announced the completion of the investigation and allowed Mr. Cornegruta and his lawyer to study the files of the criminal case. (R-II ¶ 488).

454.  On 20 May 2009, Mr. Cornegruta's lawyers submitted a complaint to the Regional Prosecutor's office regarding his illegal arrest. (CPHB 2 ¶ 142).

455.  Beginning on 25 May 2009, Mr. Cornegruta had access to lawyers who reviewed the file with Mr. Cornegruta. A defendant is entitled to an unlimited amount of time to consider the evidence put against him, as explained by Mr. Kravchenko at the Hearing on Jurisdiction and Liability. Mr. Cornegruta and his attorneys had access to the file until 30 July 2009. (RPHB 1 ¶ 245).

456.  In May 2009, the Financial Police declared the reports from the KMG institute, the MES research center, NIPI Neftegas, and the Russian institute inadmissible in the criminal proceeding. Without making her own independent assessment, the judge also declared them inadmissible. (CPHB 2 ¶ 98).

457.  At least by 5 June 2009, the Prime Minister, the MEMR, the Ministry of Justice, the Ministry of Finance, and Samruk-Kazyna contemplated a "*buyout*" of KPM and TNG and/or a termination of their Subsoil Use Contracts. (CPHB 2 ¶ 38).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Respondent notes that C-293, upon which this allegation is based, was obtained in violation of the law, and it is unclear what reliability it could have. (RPHB 1 ¶¶ 1120 – 1138).

458. On 12 June 2009, Terra Raf and Ascom filed petitions to lift the seizures. (C-0 ¶ 45; C-I ¶ 122).

459. On 15 June 2009, Mr. Cornegruta submitted a petition to stop the criminal proceedings against him. (CPHB ¶ 142).

460. On 15 June 2009, the Financial Police investigation team presented the indictment dated 15 June 2009 to the prosecution department of the Ministry of Justice. (R-II ¶¶ 446, 490).

461. Claimants state that they were only able to weather the liquidity storm in the summer of 2009 by obtaining emergency bridge financing from a group of venture capitalists (the "*Laren Facility*") on 16 June 2009. The Parties agree that the terms of the Laren Facility were terrible for Claimants (35% interest on a USD 60 million note, plus the issuance of USD 111 million of new Tristan notes). (C-II ¶ 384, CPHB 2 ¶ 117 (stating 11 June), R-II ¶¶ 765 – 766; R-268; RPHB 1 ¶¶ 58 – 61).

462. On 16 June 2009, TOTAL E&P's geologist Philippe Mallard sent Radu Constantin of Ascom an email containing TOTAL E&P's findings and concerns about chances of development, based on the 3D and 2D seismic data received. He requested additional information, but Claimants never provided it. The email ends with a recommendation to abandon the Project Zenith. (RPHB 1 ¶¶ 99 – 103).

463. On 17 June 2009, the Financial Police publically announced that the investigative phase had concluded and that the four former and current managers of KPM and TNG would be prosecuted for having realized an "*illegal profit*" of 147 billion Tenge (approximately USD 980 million as of June 2009). (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38 (calling the 147 billion the potential fine); R-I ¶ 26.24).

464. On 19 June 2009, the third tranche of the 2006 Bonds Project was issued, for USD 111.11 million. (R-I ¶ 9.59).

465. On 23 June 2009, the Financial Police submitted the case to the Public Prosecutor of the Western Regional Transport for consideration. (R-I ¶ 26.24).

466. On 23 June 2009, KPM and TNG separately filed cases against the Tax Committee in the Astana Economic Court seeking cancellation of the 10 February 2009 notices. (C-0 ¶ 64).

467. On 27 June 2009, the Terra Raf and Ascom petitions to lift the seizures were denied. (C-0 ¶ 45; C-I ¶ 122).

468. On 27 June 2009, Mr. Cornegruta was indicted and the Regional Prosecutor's Office wrote to Ascom and Terra Raf noting that an international search was underway for Mr. Cojin. (CPHB 2 ¶ 38; RPHB 2 ¶ 191).



469. On 30 June 2009, Squire Sanders confirmed that the 2003 transfer to Terra Raf was valid, but in light of the MEMR's claim of violation, recommended that waiver of the State's pre-emptive right regarding the 2003 transfer be a condition precedent to a sale. (CPHB 2 ¶ 117). Respondent states that this is misleading. Squire Sanders considered it unlikely that MEMR would terminate Contracts 210 and 302 because of the issue, but stated that Claimants had breached Art. 71 of the Subsoil Law because TNG did not apply for the necessary pre-emptive rights waiver. (RPHB 2 ¶ 279).

470. On 30 June 2009, Mr. Cornegruta moved to stop the criminal proceedings. This motion was rejected the following day. (CPHB 2 ¶ 142).

471. By 30 June 2008, the current ratio for KPM and TNG had decreased from 5.74 at the year end 2007 to 3.06 and their quick ratios had decreased from 5.33 at the year end 2007 to 2.91. The cash ratio had decreased from 0.51 to 0.13 for the same period. (RPHB 2 ¶ 67).

472. On 2 July 2009, the self-imposed deadline to extend Contract 302 expired, without an extension of that contract. (CPHB 2 ¶¶ 38, 151).

473. On 2 July 2009, Prof. Suleymenov, author of Kazakhstan's Law on Oil, issued an expert legal opinion that KPM's pipelines are not "*main*." (CPHB 2 ¶¶ 61, 98).

474. On 10 July 2009, a Fitch Ratings Press Release indicated that market observers were concerned about "*weak corporate governance standards at Tristan*." (RPHB 2 ¶ 61).

475. The trial involving Mr. Cornegruta and KPM lasted from 30 July until 18 September 2009. (CPHB 2 ¶ 98 (trial until 14 September, verdict on 18 September). At the trial, the State introduced a letter Mr. Cornegruta had written on 13 June 2008 to the ARNM as its principal evidence that Mr. Cornegruta had "*confessed*" that KPM operated a trunk pipeline. (C-0 ¶ 47; C-I ¶¶ 115 – 116; CPHB 2 ¶ 38; R-I ¶ 27.5). In his defense at trial, Mr. Cornegruta's counsel argued that Mr. Cornegruta is not an entrepreneur, that he is an employee of KPM, that he does not own KPM, that his June 13, 2008 letter was not a "*confession*," and that the KPM gathering system pipelines are not "*trunk*" pipelines.

476. Respondent states that KMG EP withdrew from Project Zenith in July 2009 after deciding that it was not commercially sensible to purchase the assets due to the amount of debt involved. (R-II ¶¶ 359, 790).

477. Claimants state that, in July 2009, KNOC re-entered the bid process. Claimants state that KNOC examined the Project Zenith data room, Claimants conducted a management presentation for them in July, and that representatives of KNOC also went for a site visit of the properties in August of 2009. KNOC was only willing to proceed with a binding bid after it had spoken with the Kazakh authorities about the properties. Claimants later learned that KNOC had spoken with the Kazakh authorities in late August or early September 2009. After that conversation, Claimants never heard from KNOC again. (C-I ¶ 188; C-II ¶¶ 402 *et seq*.). Respondent disputes the above and submits that Claimants have not provided any proof of these contentions and argue that KNOC was not even involved in Phase II



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

of Project Zenith. (R-II ¶ 798). After the Hearing on Quantum, Respondent accepted that KNOC had visited Claimants in Bucharest for a meeting and presentation on KPM and TNG. During examination, Dr. Kim of KNOC stated KNOC had not re-entered negotiations. (RPHB 1 ¶ 95).

478. On 24 July 2009, TOTAL E&P informed Renaissance Capital that it had left Project Zenith. (RPHB 1 ¶ 104).

479. On 31 July 2009, RBS reported that it valued KPM and TNG (without Contract 302) at between USD 855 million and 1 billion, as of 1 October 2009. (CPHB 1 ¶ 38).

480. On 30 and 31 July 2009, Mr. Zlupacarov of the Financial Police had chased Mr. Cornegruta's attorneys and his wife, while driving after and filming them from his car. (CPHB 1 ¶ 203).

481. In August 2009, Starleigh, a Kazakh-owned company that Claimants believe to be owned and controlled by Mr. Kulibayev, contacted Claimants. Starleigh was represented by a middle man, Mr. Arvind Tiku, whom Claimants understand to be one of Mr. Kulibayev's business partners. Starleigh examined the Project Zenith data room. (C-I ¶¶ 189 - 190). Respondent states that Claimants have provided no evidence that Mr. Kulibayev is linked to Starleigh or that Starleigh is in any way linked to the Kazakh government. (R-II ¶¶ 341, 346 – 347).

482. On 6 August 2009, the second day of Mr. Cornegruta's trial, Mr. Cornegruta's defense counsel requested that the judge order Financial Police officer Zlupacarov, who was present, dismissed from the courtroom and the proceeding. (CPHB 1 ¶ 203; RPHB 2 ¶ 241). Although the hearing was public and Mr. Zlupacarov was permitted to attend, Mr. Cornegruta's request was considered and immediately granted. (RPHB 2 ¶ 241).

483. In a supplementary expert opinion on 25 August 2009, the Russian Science and Research Institute for the Construction and Operation of Pipelines and Energy Facilities confirmed that KPM's pipeline was a "*field pipeline*" and that the unfounded report of the Kazakh Ministry of Justice "*cannot serve as a ground to consider [KPM's pipeline] as a main pipeline.*" (C-II ¶ 289).

484. On 25 August 2009, the Russian Joint Stock company VNIIST concluded that KPM's pipeline is not "*main.*" (CPHB 2 ¶¶ 61, 98).

485. On 26 August 2009, Mr. Cornegruta's defense counsel moved for postponement of less than one week so that the judge and counsel could question the authors of the expert reports that contradicted the conclusions of Mr. Baymaganbetov. The motion was denied, without explanation. (CPHB 1 ¶ 201).

486. In August 2009, Kazakhstan, the Governor of the Mangystau Region, KazAzot, and Mitsubishi confirmed their intention to go forward with the ammonia-carbamide complex. (C-I ¶ 61).

487. Claimants report that, on 26 August 2009, the Governor of the Mangystau Region asked Prime Minister Massimov to accelerate the State's cancellation of TNG's



and KPM's Subsoil Use Contracts and to transfer TNG's assets to KazAzot. The Governor referred to instructions dated 5 June 2009 given by the Kazakh Prime Minister to the MEMR, the Minister of Finance, the Ministry of Justice, and the multi-billion sovereign wealth fund of Kazakhstan, Samruk-Kazyna. Claimants state that the Prime Minister instructed these Kazakh authorities to orchestrate the termination of Claimants' Subsoil Use Contracts. (C-I ¶ 61; CPHB 1 ¶ 316). Respondent states that the letter in question is a complaint concerning the failure by the MEMR to provide the necessary information concerning its investigations of KPM and TNG. The letter calls for action in light of the deteriorating condition of TNG and KPM. (R-I ¶ 19.25). Respondent challenges Claimants' characterization of this letter and says that Governor Kusherbayev was aiming at a regular purchase of the companies because of the problems that were surrounding them. (R-II ¶ 326). It in no way proposes an expropriation. (RPHB 1 ¶¶ 398 – 403). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-293, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

488. Respondent states that the 27 August 2009 meeting referenced in exhibit C-294 is not an indication of a planned government taking. Claimants have confirmed that the state of TNG and KPM was dire in the summer of 2009, so it should be no surprise that the government was concerned about the companies and the potential social consequences. Claimants have produced no evidence for their contention that the meeting was a working group to discuss ways to "*finish off the planned taking.*" (RPHB 2 ¶ 381).

489. On 29 August 2009, Mr. Baymaganbetov was cross-examined. (RPHB 2 ¶ 240).

490. On 8 and 9 September 2009, the Astana Economic Court ruled against KPM and TNG's 23 June 2009 filing and found that the tax assessments were proper. KPM and TNG appealed the ruling. (C-0 ¶ 64; R-I ¶ 19.24; CPHB 2 ¶ 128).

491. On 17 September 2009, TNG wrote to MEMR regarding the promised Contract 302 extension and requested execution of Addendum No. 9. (CPHB 2 ¶ 151).

492. On 18 September 2009, the Aktau City Court of the Mangystau Oblast rendered a guilty verdict against Mr. Cornegruta for illegally engaging in entrepreneurial activities by operating KPM trunk pipelines without a license. (C-I ¶ 118, CPHB 2 ¶¶ 38, 61, 74, 98; R-I ¶ 27.58; R-II ¶¶ 446, 645; RPHB 2 ¶ 266). In accordance with the Court Decision, KPM was ordered to pay the illegal revenue in the amount of 21,675,854,578.00 Tenge (approximately, USD 145,475,534.08) to the Kazakhstan state budget. (C-0 ¶ 50; C-I ¶ 119, C-II ¶ 318, CPHB 2 ¶¶ 38, 81, R-II ¶¶ 615, 645; RPHB 2 ¶¶ 246 -261). Mr. Cornegruta was sentenced to 4 years imprisonment, and Respondent reports that he escaped from prison. (C-0 ¶ 49; C-I ¶ 118; R-I ¶ 9.79; RPHB 1 ¶ 303).

493. On 21 September 2009, President Nazarbayev's Head of Administration issued an order regarding the "*free of charge transfer of [Claimants'] assets.*" (CPHB 2 ¶ 38). Respondent notes that C-294, upon which this allegation is based, was obtained in violation of the law, and it is unclear what reliability it could have. (RPHB 1 ¶¶ 401, 1120 – 1138).



494. On 22 September 2009, Claimants requested an official copy of the verdict. (C-0 ¶ 51; CPHB 1 ¶ 208; CPHB 2 ¶ 98; RPHB 2 ¶ 269). The request was signed by "*Acting General Director of KPM Oskolkov V.V.*", and Claimants have provided no evidence that Mr. Oskolkov was properly appointed or was authorized to make the application. There is no evidence that the request was ever received by the court. (RPHB 2 ¶ 269).

495. A 28 September 2009 letter from MEMR to the Ministry of Industry and Trade noted the risk of arbitration as one of the reasons why it would be better to obtain KPM and TNG through an acquisition rather than a premature termination of the Subsoil Use Contracts. (C-II ¶ 392; CPHB 1 ¶ 321). Respondent explains that the MEMR was responding to the concern at the decline of the businesses of TNG and KPM and the resultant social problems, caused by Claimants' decision to wind down operations. The solution under consideration was the transfer of KPM and TNG into state control. (R-I ¶¶ 19.20, 19.26; RPHB 2 ¶ 381). Respondent states that the notion of a gratuitous transfer of assets was rejected by MEMR. (R-II ¶ 327). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-294, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

496. On 30 September 2009, the Financial Police ordered the Aktau territorial customs body to conduct a new audit of KPM based on its failure to pay the Crude Oil Export Tax for its January 2009 exports. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

497. On 1 October 2009, Mr. Cornegruta appealed the criminal judgment of the Aktau City Court. (CPHB 2 ¶ 98).

498. In October 2009, Starleigh presented an initial bid of USD 450 million for Claimants' properties. (C-I ¶ 190).

499. 4 October 2009 was the last day that an appeal could be filed in the case against KPM and Mr. Cornegruta. KPM did not appeal the sentence of 18 September 2009 within the 15 days allowed. (R-II ¶ 636; RPHB 1 ¶ 304, RPHB 2 ¶ 268).

500. On 22 October 2009, the Financial Police interviewed Mr. Condorachi, the General Counsel of KPM and Deputy General Counsel of TNG, regarding KPM's alleged obligation to pay 2008 export taxes. (C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

501. On 28 October 2009, the Civil Collegium of Astana Court reversed the Astana Economic Court's ruling of 10 February 2009 and remanded it for a new hearing at the Specialized Interdistrict Economic Court. (C-0 ¶ 64; CPHB 2 ¶ 128).

502. In November 2009, Starleigh dropped its offer from USD 450 million to USD 350 million, due to concerns about the USD 145 million fine that had been imposed on KPM in connection with criminal action brought by the State. (C-I ¶ 190).

503. Respondent states that KMG NC did not express an interest in purchasing TNG and KPM until November 2009, and explains that it took an interest in the assets in order to play a "*white knight*" role. (R-II ¶ 360).



504. In November 2009, Claimants were invited to attend a meeting with KMG in Amsterdam. When Anatolie Stati and Mr. Lungu arrived, they saw principals of Claimants' main noteholders leaving the meeting room. The noteholders told them that KMG had just offered 25 cents on the dollar to purchase their interests, which the noteholders refused. Anatolie Stati and Mr. Lungu then met with representatives of KMG, who presented them with an offer of USD 20 million for their equity interests, which they refused. (C-0 ¶ 84 (stating September 2009); C-I ¶ 192; C-II ¶ 386).

505. Claimants report that, in November 2009 (or in early 2010), they received an offer from Starleigh for USD 50 million and a buyout of the noteholders, which Claimants refused. (C-I ¶ 190; C-II ¶¶ 387, 415).

506. Claimants report that, on 3 November 2009, in an effort to pressure KPM into paying the Crude Oil Export Tax, the Financial Police interrogated and intimidated Mr. Cornegruta (in jail) and other employees of KPM. The interrogation of Mr. Cornegruta regarded KPM's alleged obligation to pay 2008 export taxes. The Aktau territorial customs body also informed KPM that it was required to pay the Crude Oil Export Tax for its January 2009 exports, amounting to USD 4 million. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

507. Mr. Cornegruta appealed his verdict with the Mangystau Regional Court. On 12 November 2009, the Regional Court upheld the Aktau City Court's verdicts against both Mr. Cornegruta and KPM. (C-0 ¶ 52; C-I ¶ 120, CPHB 2 ¶¶ 38, 98; R-I ¶ 27.60; R-II ¶ 446, 586, 646; RPHB 2 ¶ 266). Judge Ryskalieva's decision was scrutinized by three judges, all of whom agreed with her. (R-II ¶ 586). Respondent admits that KPM was not a named party in either the initial trial or the subsequent appeal. However, it is denied that KPM was not represented in either hearing. (R-I ¶ 27.60). Neither KPM (which was able to) nor Mr. Cornegruta appealed to the Supreme Court. (RPHB 2 ¶ 266).

508. Grand Petroleum offered to purchase KPM and TNG for USD 1.15 billion. (CPHB 2 ¶ 38).

509. In an instruction of the President of the Republic of Kazakhstan dated 19 November 2009, the President highlighted the inadmissibility of a production shutdown at the enterprises TNG, KPM, Borankol Gas Treatment Plant, TOO "*KASKO*" and the company "*Caspian Gas Corporation*" in connection with the conducted inspections. (R-I ¶ 18.7; CPHB 2 ¶ 38). The President instructed responsible authorities to revisit these issues in view of anti-crisis measures of the Government. (R-II ¶ 332).

510. The President issued a further instruction on 23 November 2009, which expressed the President's concern that the investigations of KPM and TNG might be interfering with the operation of those companies. (R-I ¶ 19.24).

511. On 23 November 2009, Mr. Cornegruta was transferred from a temporary detention facility in Aktau to the prison in Atyrau. (C-I ¶ 120).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

512. On 23 December 2009, the 19 November 2008 decision of the Specialized Interdistrict Court of Mangystau Region was cancelled on procedural grounds by the Board of Appeal of the Mangystau Regional Court. (R-I ¶ 30.56).

513. On 25 December 2009, Astana Economic Court issued a new decision against KPM regarding the comprehensive tax audits notice issued 10 February 2009. (C-I ¶ 159).

514. On 25 December 2009, the Specialized Interdistrict Economic Court issued a consolidation decision, rejecting KPM's and TNG's challenges to corporate back taxes. (CPHB 2 ¶ 128).

515. On 28 December 2009, TNG wrote to MEMR again requesting execution of Addendum No. 9 to Contract 302. (CPHB 2 ¶ 151).

516. Prior to 29 December 2009, Claimants negotiated a major new gas supply and purchase agreement with MAEK SPA and two major new gas supply and purchase agreements with AktauGasServise SPA. (R-II ¶ 409).

517. On 29 December 2009, the Aktau City Court issued a writ of execution against KPM, in execution of the verdict of the Mangystau Regional Court of 12 November 2009. (C-I ¶ 123, CPHB 2 ¶¶ 81, 98; R-I ¶¶ 29.7; R-II ¶ 648). Claimants appealed this. (R-II ¶ 649).

518. Claimants state that the Tax Committee Transfer Price Audit lasted 13 months, ending in 29 December 2009. (C-0 ¶ 78; C-I ¶¶ 19, 173). Respondent states that it lasted only 30 working days. The audit commenced on 12 November 2008 and was suspended on 12 December 2008, recommenced, and was concluded on 29 December 2009. This audit did not involve more than 5 members of the Tax Committee at any one time. (R-II ¶¶ 368, 369, 407, 410).

519. In the Transfer Price Audit, all of the sales invoices of KPM and TNG from 1 January 2004 to 31 December 2007 were disclosed to the State and audited in the process. The State assessed approximately USD 5 million in back transfer price taxes and penalties. KPM's and TNG's appeals of this remained pending on 22 July 2010. (C-0 ¶ 78; C-I ¶¶ 19, 173; CPHB 2 ¶ 38). Respondent presents that the audit showed that KPM and TNG had underreported their taxable income for the period 1 January 2005 – 31 December 2007. Respondent states that the audit revealed, in relation to KPM, underpayments of 191,391,320 Tenge, to which a late payment charge of 196,254,044 was added. In relation to TNG, the audit revealed underpayments of 172,766,494, to which a late payment of 154,900,840 was added. Respondent presents that KPM owed additional corporate Income tax of 2,255,019,100 Tenge and a penalty of 1,002,105,500 Tenge. TNG owed an additional 4,007,519,000 Tenge and a penalty of 1,898,215,500 and a "*reduction in loss*" of 1,558,600,300 Tenge. (R-II ¶ 373). For KPM, the amount was USD 2,607,070.00, and for TNG USD 2,203,694.00. (R-II ¶ 402; CPHB 2 ¶ 128). Neither company, however, paid the taxes. (R-II ¶ 404).

520. On 31 December 2009, KPM declared a dividend of USD 52.9 million. (R-II ¶ 142). The audit also revealed that, for the year ending 31 December 2009, Mr.



Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 10 of 104
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/30/14   Page 120 of 225

Page **116** of **414**

Anatolie Stati received a bonus of USD 3,863,000, down from USD 4,435,000 that he received in 2008. (R-II ¶ 143).

521. In January 2010, KPM commenced a legal action concerning the illegal imposition of the Crude Oil Export Tax on its January 2009 exports. (C-0 ¶ 75; C-I ¶ 169).

522. In January 2010, KPM commenced new legal proceedings challenging the Financial Police's claim that it owed 2008 export taxes on oil exports. (CPHB 2 ¶ 128).

523. On approximately 5 January 2010, the Aktau Division of the Enforcement Officers of the Mangystau Oblast issued the Decree on Initiating of the Enforcement Proceedings against KPM on Recovery of the Revenue, for USD 145 million. (C-II ¶ 337; R-II ¶ 648; CPHB 2 ¶ 81). The relevant Claimants appealed. (R-II ¶ 649). Enforcement measures were taken from January – June 2000. (CPHB 2 ¶ 81).

524. On 6 January 2010, TNG and KPM successfully appealed the 25 December 2009 ruling by the Astana Economic Court. (C-0 ¶¶ 64 – 66).

525. On 10 January 2010, the Chief of the Aktau Territorial Department of Judicial Executors issued a court order attaching several of KPM's "*second-tier*" bank accounts. (C-I ¶ 125, CPHB 1 ¶ 212, CPHB 2 ¶ 38; R-I ¶ 29.7). The seized accounts included two settlement accounts with Kazkommertsbank in Bostandykskyi District, forty-one settlement accounts with Kazkommertsbank in Aktau City, and nine settlement accounts with Halyk Bank of Kazakhstan in Aktau City. The order included instructions to those banks to inform the judicial executor whenever it received any funds from KPM. The order also included a warning to KPM's General Manager and Chief Accountant that criminal responsibility could result from failing to comply. (C-I ¶ 125; CPHB 2 ¶ 38).

526. On 14 January 2010, KPM requested and received an official copy of the 19 September 2009 verdict. (C-0 ¶ 51; CPHB 2 ¶ 98).

527. On 14 January 2010, the MEMR invited KPM and TNG to a working group meeting to take place on 21 January 2010 to discuss agreements and terms of additional projects, as well as negotiations. (CPHB 2 ¶ 151).

528. On 21 January 2010, KPM challenged the court decisions dismissing its complaints against enforcement. (CPHB 2 ¶ 98).

529. On 21 January 2010, KPM and TNG were informed upon their arrival at the MEMR's office that the working group meeting had been cancelled due to the need to conduct an unscheduled inspection of their operations. (CPHB 2 ¶ 151).

530. On 22 January 2010, KPM submitted a new complaint against enforcement orders. (CPHB 2 ¶ 98).

531. On 22 January 2010, the Chief of the Aktau Territorial Department issued an order finding that KPM had "*not paid the debt to the state and [had] not fulfilled the requirements of the judicial executor in due time.*" As a result, the order attached



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 22-3 Filed 09/30/14 Page 118 of 225
Case 1:14-cv-01638-ABJ Document 72-3 Filed 09/30/14 Page 19 of 104

Page 117 of 414

eighteen different motor vehicles belonging to KPM. It also instructed the Road Police Department to take notice of the vehicles' registrations and to seize and impound them in order to make a formal inventory of their value. KPM received a copy of this order on 1 February 2010. (C-I ¶ 126; R-I ¶ 29.7).

532. On 22 January 2010, Mr. Mynbayev ordered an unscheduled inspection. (CPHB 1 ¶ 273). Claimants provided the MEMR documents evidencing compliance with the working programs on this date. (C-I ¶ 209).

533. On 25 January 2010, the MEMR notified KPM and TNG that it would perform a week-long audit / inventory of KPM's assets, beginning 26 January 2010. The resulting inventory listed 2,186 different assets, including 63 oil drilling wells and 10 gas drilling wells. (C-I ¶¶ 127, 128, 196, C-II ¶ 244; R-I ¶ 29.7; C-171).

534. On 25 January 2010, the Committee on Judicial Administration - a division of the Supreme Court of Kazakhstan - wrote to Mr. Stejar of KPM to inform him that the judicial acts pertaining to the Writ of Execution for 21.6 billion Tenge remained unexecuted. Further, the Deputy Administrator of Mangystau Oblast courts, Mr. Tursynbayev, instructed the Chief of Aktau Territorial Department to execute enforcement procedures by 30 January 2010. The instructions included: (i) to visit the Borankol Village to confirm whether KPM was operating, and if so, to make an inventory of and attach its property; (ii) to demand all documentation from KPM; and (iii) to make note of and inventory any motor vehicles discovered that were previously attached. (C-I ¶ 127; C-124).

535. On 25 January 2010, KPM filed a request with the Aktau City Court to reinstate the missed time for the appeal of the verdict of 18 September 2009 and filed an independent appeal of that verdict with the Board of Appeals of the Mangystau Regional Court. (C-0 ¶ 53, CPHB 2 ¶ 98; R-II ¶ 647).

536. From 25 January – 5 February, the MEMR noted that it was still considering the draft Addendum No. 9 to Contract 302. (CPHB 2 ¶ 151).

537. From 25 January – 6 February 2010, the MEMR inspection team noted that Kazakhstan had delayed providing necessary protocols to KPM and TNG because of its failure to execute the extension. (CPHB 2 ¶ 151).

538. From 25 January 2010 – 6 February 2010, the Department for Direct Investments in Subsoil Exploitation, the Department for Development of Oil Industry, and the Inspection Department for Geology and Subsoil Exploitation of the MEMR conducted an unscheduled comprehensive audit of KPM and TNG regarding their historical compliance with the subsoil use contracts and Kazakh law. (C-0 ¶ 55; C-II ¶ 290; CPHB 2 ¶¶ 38, 61).

539. On 26 January 2010, the Ministry of Finance commenced bankruptcy proceedings against KPM. (CPHB 2 ¶¶ 38, 128).

540. On 29 January 2010, the Aktau City Court denied KPM's right to appeal the 18 September 2009 decision as untimely. Respondent explained that KPM's failure to appeal in time could not be attributed to failures by the Republic and that everyone



Case 1:14-cv-01638-ABJ    Document 22-3   Filed 09/30/14   Page 10 of 104
Case 1:14-cv-01638-ABJ    Document 72-3   Filed 09/30/14   Page 10 of 225

Page **118** of **414**

had knowledge of the appeals deadline. (C-0 ¶ 53; R-II ¶¶ 636, 647; RPHB 1 ¶ 305).

541. On 3 February 2010, the Ministry of Finance notified KPM that it was monitored for bankruptcy on 26 January 2010 for 3.8 billion Tenge, including interest. The back taxes and penalties regarding the corporate income tax represented 85% of the amount notified by the Ministry of Finance, or 3.2 billion Tenge (approximately USD 40 million). (C-0 ¶ 65; C-I ¶ 160, CPHB 2 ¶ 38; R-I ¶ 29.3). Respondent states that the bankruptcy proceedings were unsuccessful. (R-II ¶ 377).

542. The unscheduled inspection ended on 6 February 2010. MEMR concluded that KPM and TNG were in compliance with the Kazakh law, including with respect to the pipelines. (C-0 ¶ 55; C-I ¶ 18; C-II ¶ 290; CPHB 2 ¶¶ 38, 61). The MEMR report clearly states that the pipelines are part of a "*single technological process*" and are, therefore, not main pipelines. (CPHB 2 ¶¶ 61, 74). According to the 6 February 2010 Report of the MEMR on Unscheduled Inspection for KPM, and the 5 February 2010 MEMR Report on Unscheduled Inspection for TNG, Claimants invested more than USD 1.1 billion (USD 772 after deduction of taxes and administrative expenses). (C-II ¶ 121).

543. On 8 February 2010, KPM challenged the appeal court's refusal to reinstate the time period for appeal. The letter also challenged the court's refusal to provide a copy of the 18 September 2009 judgment. (CPHB 2 ¶ 98; RPHB 2 ¶ 269).

544. On 13 February 2010, Claimants negotiated the sale of 100% of the shares and participatory interests in KPM and TNG to Cliffson Company S.A. (C-0 ¶ 85 (stating 2 February); C-II ¶¶ 393 – 395). The total value of the agreement, including the buy-out of the companies' noteholders and payment for Claimants' equity interests and the assumption of liabilities, exceeded USD 920 million. (C-I ¶ 193 (stating USD 930 million); C-II ¶¶ 388; CPHB 2 ¶ 371 and 418; R-II ¶ 814). Claimants state that this was a reduced value taking the criminal judgment and its enforcement against KPM into account. (CPHB 2 ¶ 38). USD 267 million represented the equity interests in TNG, KPM, and Tristan. (C-II ¶ 418). One condition of this sale was that MOG would grant permission for the sale and waive the State's alleged pre-emptive right to purchase KPM and TNG. (C-I ¶ 194; R-II ¶ 815). MOG conditioned permission for the sale on removal of the attachment orders and on its receipt of information about the financial solvency of Cliffson Company and about its technical and managerial capabilities, and on the receipt of other additional materials. (C-I ¶ 194). Respondent states that it cooperated fully with Claimants, but that Claimants delayed their waiver application by 2 months and ultimately failed to provide the information necessary for an approval and a waiver. (R-II ¶¶ 816 – 817).

545. On 16 February 2010, KPM submitted a claim to suspend the enforcement measures. (CPHB 2 ¶ 98).

546. On 17 February 2010, the President of the Blagovest fund wrote to Minister Mynbayev to make a suggestion to "*resolve the question of nationalization of the assets posed in 2008.*" (CPHB 2 ¶ 38).



547. On 19 February 2010, the Chief of the Aktau Territorial Department issued a writ of execution, noting that prior collection orders had gone unfulfilled. This order formally attached the 2,186 assets listed in the 26 January 2010 inventory and it specifically warned KPM's General Manager, Mr. Stejar, that he could face criminal responsibility for embezzlement or alienation of that property. KPM received this order on 1 March 2010. (C-I ¶ 129; R-I ¶ 29.7).

548. On 23 February 2010, the Chief of Aktau Territorial Department issued an order prohibiting KPM from executing import and export formalities regarding the transportation of oil. It meant that KPM could not deliver oil from its gathering system to the main pipeline operated by KazTransOil. (C-I ¶ 130; R-I ¶ 29.7).

549. On 23 February 2010, in response to the Akim (Governor) of the Mangystau Region's proposal for TNG to borrow funds from State agencies to complete the LPG Plant (CPHB 2 ¶ 219). Anatolie Stati wrote to the Akim to seek his assistance in resolving the companies' legal problems. (CPHB 2 ¶ 142).

550. On 24 February 2010, the Regional Customs Committee notified KPM and TNG that the companies were liable for Crude Oil Export Tax on their January 2009 exports. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56).

551. Akim Kusherbayev wrote to Prime Minister Massimov on 24 February 2010, in an effort to broker a compromise by submitting a proposal made by Mr. Stati to the Prime Minister. Under Anatolie Stati's proposal, Claimants were to complete construction of the LPG Plant if claims against KPM and TNG were dropped. (R-II ¶¶ 324 – 325; CPHB 2 ¶ 221). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-665, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

552. On 25 February 2010, KPM appealed the decision dismissing its claim to suspend enforcement measures. (CPHB 2 ¶ 98).

553. On 25 February 2010, Anatolie Stati sent a second letter to the Akim of the Mangystau Region, seeking his assistance. (CPHB 2 ¶ 142).

554. On 26 February 2010, the Chief of Aktau Territorial Department dismissed KPM's challenge to the writ of enforcement and issued an order to "*attach the oil pipeline from [the] OTP to Opornaya CRMB [Commodities and Raw Material Base of Opornaya Station] of 18 kilometers long*" and KPM's accumulator oil tanks, in order to fulfill the previous execution orders. This order also prohibited KPM from transferring oil to the main pipeline operated by KazTransOil once its accumulator tanks reached capacity. (C-I ¶ 131, CPHB 2 ¶ 98; R-I ¶ 29.7).

555. On 3 March 2010, the Interdistrict Economic Court of Mangystau Region dismissed KPM's action of January 2010. (C-0 ¶ 75; C-I ¶ 169).

556. On 4 March 2010, the Chief of the Aktau Territorial Department appealed to the President of the Second Aktau City Court for a change in the method and order of execution. He noted that, despite attaching fifty-two settlement accounts and numerous assets, "*monetary resources by collection orders do not arrive to the deposit account.*" Claimants state that, as a result, he requested that the



enforcement procedure be changed to an in-kind transfer of land lots, including the three previously-attached plots of real property, the 18 kilometer pipeline, KPM's Contract 305 over the Borankol field, and KPM's subsoil use license No. 309. (C-I ¶ 133).

557. On 5 March 2010, KPM appealed the decision dismissing its challenge to the writ of enforcement. On the same date, KPM submitted a complaint regarding the enforcement measures. (CPHB 2 ¶ 98).

558. On 15 March 2010, the Chief of the Aktau Territorial Department issued orders for the valuation of KPM's assets, including three lots of property, eighteen motor vehicles, the 18 kilometer pipeline, the field camp, and the Borankol field that were attached in previous orders. (C-I ¶ 134; R-I ¶ 29.7).

559. On 16 March 2010, KPM moved to alter execution procedures so that production on the Borankol field could continue. (C-I ¶ 135).

560. On 17 March 2010, the Acting Head of Aktau Territorial Department of Judicial Executors complied with KPM's request and issued two orders that suspended execution of the orders of 23 and 26 February 2010, respectively. Both confirmed that suspension was necessary "*to avoid the suspension of production activity of 'Kazpolmunai' LLP*" / to ensure that KPM and TNG's business was not unduly affected by the execution orders. (C-I ¶ 137; R-I ¶ 29.7).

561. On 20 March 2010, the Acting Chief of Aktau Territorial Department of Judicial Executors proposed that the Prosecutor initiate a criminal case against Mr. Stejar, then-General Manager of KPM, for failing to enforce the 29 December 2009 writ of execution against KPM. (C-I ¶ 138).

562. On 26 March 2010, KPM appealed the criminal judgment to the Cassation Court. (CPHB 2 ¶ 98).

563. On 31 March 2010, the Central Customs Committee cancelled the 24 February 2010 notifications to KPM and TNG and stated that, pursuant to their Subsoil Use Contracts, KPM and TNG were not liable for export taxes from October 2008 onward. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56; R-II ¶ 386). Respondent states that, in total, KPM paid USD 700,000 in respect of customs duties, and this payment was returned following the withdrawal of charges. (R-I ¶ 30.57). Respondent denies Claimants' positions that they paid USD 10 million or that they paid USD 12.77 million, USD 2.6 million of which was refunded. (C-0 ¶ 74; C-I ¶ 164; C-II ¶¶ 234 – 235; CPHB 2 ¶¶ 38, 128; R-II ¶¶ 387 – 391).

564. On 3 April 2010, Anatolie Stati's company, Komet, sent a notice of dispute to the Regional Government of Kurdistan to initiate arbitral proceedings. This notice was signed by Reginald Smith of King & Spalding. (RPHB 1 ¶ 137).

565. On 9 April 2010, KPM submitted a new complaint regarding enforcement measures. (CPHB 2 ¶ 98).

566. On 10 April 2010, Ascom and Cliffson conferred regarding the Cliffson SPA, specifically, the allocation among the four companies (TNG, KPM, CASCo,



Tristan) in the sale for purposes of completing government applications. (CPHB 2 ¶ 374).

567. On 12 April 2010, Claimants submitted applications for approval of the Cliffson sale and waiver of Kazakhstan's pre-emptive rights to the MOG and Ministry of Industry and Technology, respectively. (C-II ¶ 389; R-II ¶ 817).

568. On 23 April 2010, the Astana appellate court reversed the 25 December 2009 decision against KPM and TNG by the Astana Economic Court and found that KPM and TNG properly deducted drilling expenses. The Tax Committee's appeal was dismissed. (C-0 ¶ 66; CPHB 2 ¶ 128).

569. In connection with the bankruptcy proceeding, the State filed a request with the Specialized Interdistrict Economic Court of Mangystau Region for external management of KPM (appointment of a bankruptcy administrator) on 26 April 2010. (C-0 ¶ 65; C-I ¶ 160). This request was dismissed by the Interdistrict Economic Court on procedural grounds, and a subsequent replacement request was withdrawn by the State. (C-0 ¶ 66).

570. On 30 April 2010, the MOG responded to Claimants' 12 April 2010 request by: (1) requesting additional information regarding the terms of the transaction and the financial and technical abilities of Cliffson, (2) noting that based on Kazakhstan's seizures of the companies' assets, transfers of the shares of KPM and TNG were forbidden, and (3) concluding that the transaction would only be approved if KPM and TNG satisfied the requirements necessary to release the attachment of their shares. (C-II ¶ 389, CPHB 2 ¶ 38; R-II ¶ 818). Respondent states that Claimants failed to respond to this letter. (R-II ¶ 820).

571. On 6 May 2010, Cliffson executed an amendment to the SPA extending the time for the transaction. (CPHB 2 ¶ 374).

572. On 6 May 2010, Respondent sent a notice of breach, stating that TNG had failed to comply with the annual working program in respect of Contract 302 and requested response by 20 May 2010. (R-I ¶ 31.137; CPHB 2 ¶ 151). TNG received this on 7 May 2010. (C-I ¶ 197).

573. On 7 May 2010, the MOG notified TNG of inadequate fulfillment of license and contract provisions for 2009 and requested that TNG "*remove delays*" in its 2009 Contract 302 work program and present to the Ministry a draft appendix for the 2010 work program within one month. (C-I ¶ 197; CPHB 2 ¶ 151).

574. On 11 May 2010, KPM appealed the decision regarding enforcement to the Cassation Court. (CPHB 2 ¶ 98).

575. On 18 May 2010, there was an order not to prosecute Anatolie Stati, since there were no grounds on which to prosecute him, personally. (CPHB 1 ¶ 312).

576. On 27 May 2010, TNG wrote to the MOG, explaining that it had submitted an application for a two-year extension of the exploration period in its Contract 302 properties and the corresponding work program, in October 2008. TNG explained that MOG had agreed to the extension by letter dated 9 April 2009, that TNG



submitted the addendum for execution dated 30 April 2009, and that TNG never received an executed extension from MOG. TNG explained that it, therefore, suspended its exploration operations in the Contract 302 properties. TNG argued that it had fulfilled all of its contractual obligations. (C-I ¶ 198).

577. On 1 June 2010, the MOG sent an additional request to KPM and TNG for information regarding the Cliffson transaction. (C-II ¶ 389; R-II ¶ 821).

578. On 9 June 2010, the Court Execution Body of the Mangystau Region - the Acting Chief of Aktau Territorial Department of Judicial Executors - ordered the sale of KPM's assets as a single lot, so as to avoid any suspension of activities. (C-0 ¶ 87; C-I ¶ 139; CPHB 2 ¶ 98; R-I ¶ 29.7).

579. On 15 June 2010, Claimants wrote to Cliffson regarding Cliffson's "*backing out*" of the so-called Cliffson transaction. (CPHB 2 ¶ 375).

580. On 15 June 2010, the Acting Chief of Aktau Territorial Department issued a "*repeated warning*" to Mr. Stejar of KPM, claiming that KPM operated and carried out oil and gas extraction, sold the products, and gained income, but did not voluntarily make any payments as ordered by the court decision. The notice instructed KPM to execute the court order by paying 21.6 billion Tenge in full or by transferring assets corresponding to the amount owed, within two weeks' time. (C-I ¶ 139; R-I ¶ 29.7).

581. On 18 June 2010, KPM challenged the valuation of its property and the actions of state executors. (CPHB 2 ¶ 98).

582. On 22 June 2010, the Kazakh Court of Cassation dismissed the Tax Committee's claims that KPM and TNG owed USD 62 million in corporate back taxes for allegedly improperly deducting drilling expenses. The Court affirmed the appellate court decision in favor of KPM and TNG. (CPHB 2 ¶¶ 38, 128).

583. On 23 June 2010, Claimants replied to the MOG requests of 30 April and 1 June 2010 regarding the proposed Cliffson transaction. (C-II ¶ 390). The Parties dispute whether Claimants provided all of the necessary information. (C-II ¶ 390; R-II ¶ 822). Claimants state that they received no reply from Kazakhstan. (C-II ¶ 390).

584. On 24 June 2010, a change in the Subsoil Use Law was approved, which allowed Kazakhstan to terminate contracts when a contractor failed to cure 2 or more contract violations. (CPHB 1 ¶ 278).

585. After receiving no reply from the MOG, Cliffson wrote to MOG, stating that it refused to purchase the interests in TNG and KPM. (C-I ¶¶ 193 – 195).

586. On 25 June 2010, KPM submitted its complaint to the 9 June 2010 enforcement order. (CPHB 2 ¶ 98).

587. From 25 – 29 June 2010, there were unscheduled inspections of KPM and TNG from at least 7 agencies, on the order of the Prime Minister and with the involvement of the Financial Police and the GPO. (CPHB 2 ¶ 38).



588. On 28 June 2010, the GPO received a complaint from Messrs. Sadyrbaev, Makashev, Esenov, and Sagindikov about KPM and TNG related to non-payment of salaries, mass dismissal of employees, and failure to comply with environmental legislation and legislation on subsoil use. The complaint requested that the GPO take measures to prevent the loss of deposits and to establish a stable social environment. According to the petition, the individuals who submitted it were residents of the Beyneu District of Mangystau Province, where the Tolkyn and Borankol oil deposits as well as the KPM & TNG oil exploitation infrastructure were situated. (R-II ¶¶ 305, 676; CPHB 1 ¶ 265; CPHB 2 ¶ 178 (referring to alleged receipt)).

589. On 28 June 2010, Claimants provided documents related to its working program to the MEMR. (C-I ¶ 209).

590. Claimants and Respondent dispute aspects of the June – July 2010 inspections. Claimants state that a dozen Government agencies sent notices that unscheduled inspections of KPM and TNG would commence. (C-I ¶ 200). Respondent states that only 5 ministries requested further inspections. (R-I ¶ 31.98; R-II ¶ 306). Contrary to Claimants' assertion, Respondent does not admit that the MOG covered the same issues 6 months previously. (R-I ¶ 31.98). Respondent admits that TNG's compliance with Contract 302 was investigated as part of the July 2010 investigations. (R-I ¶ 31.138). Respondent states that the inspections initiated with the GPO and had nothing to do with the Financial Police. (RPHB 2 ¶ 45).

591. On 29 June 2010, the Ministry of Industry and New Technologies' Geology and Subsoil Use Committee ordered a two-week inspection of KPM and TNG to determine whether the companies were in compliance with subsoil use legislation. The Chief State Ecological Inspector of Mangystau Oblast notified KPM and TNG that an unscheduled inspection regarding compliance with environmental protection legislation would take place beginning 30 June 2010. The State Labor Inspector sent notices to KPM and TNG that unscheduled inspections would take place. The Immigration Police sent notifications of inspections that were to take place from 1 – 29 July 2010, in order to ensure that neither KPM nor TNG was in violation of Kazakhstan's immigration legislation. (C-I ¶¶ 199 - 201). Finally, Kazakhstan ordered its second round of unscheduled inspections of KPM and TNG, to take place in the same time period, to assess compliance with their subsoil use contract obligations. (C-II ¶ 343; CPHB 2 ¶ 178).

592. On 30 June 2010, the Ecology Committee began its unscheduled inspection of KPM and TNG. (CPHB 2 ¶ 178).

593. From June – July 2010, the Department for Emergency Situation carried out unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

594. From 30 June – 15 July 2010, MOG carried out its unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

595. From 30 June – 16 July 2010, the Geology and Subsoil Use Committee of the Ministry of Industry and New Technology carried out its unscheduled inspection of KPM and TNG. (CPHB 2 ¶ 178).



596. From 30 June – 29 July 2010, the Labor Department carried out its unscheduled inspections of KPM and TNG.

597. By July 2010, the LPG Plant was over 90% complete. (C-I ¶ 64).

598. By July 2010, KPM and TNG were both in breach of the Minimum Work Programs. (R-II ¶¶ 657, 659, 660).

599. From 1 July – 29 July 2010 the Immigration Police carried out their unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

600. On 3 July 2010, the Ecology Department issued an act of inspection for its environmental audit of KPM and TNG. (CPHB 2 ¶ 178).

601. Claimants state that, on 4 July 2010, the Financial Police arrived on KMG / TNG premises to conduct their investigation. The Financial Police requested access to the Human Resources Department. Claimants state that they feared that a search through personnel files would lead to another arrest and ordered the middle-management of KPM and TNG to evacuate Kazakhstan. (C-I ¶ 203; CPHB 1 ¶ 270). Respondent puts Claimants to proof that this investigation occurred and that it caused Anatolie Stati to instruct the evacuation of middle management from KPM. (R-I ¶ 31.98).

602. Claimants state that, on 9 July 2010, a representative from Mangystau Oblast's Entrepreneurship and Industry Department, a division of the Regional Authority of Mangystau, called TNG to inform it that Kazakh Prime Minister K.K. Massimov planned to visit the LPG Plant during a working trip to the region. He instructed TNG to prepare and/or construct: (i) landing pads in the vicinity of the LPG Plant to support the arrival of three helicopters; (ii) a presentation of the LPG Plant project, including photographs, technological specifications, and remaining financing required; and (iii) a platform on which discussion of the project could take place. (C-I ¶ 204; CPHB 2 ¶¶ 38, 178).

603. According to Claimants, on 9 July 2010, Financial Police officer S. Rakhimov reported to the Chief of Financial Police referencing ongoing inspections. (CPHB 2 ¶ 178). Respondent states that, at the Hearing on Jurisdiction, Mr. S. Rakhimov denied writing the report. (RPHB 2 ¶ 46).

604. On 9 July 2010 and on 12 July 2010, KPM and TNG, respectively, challenged the 29 December 2010 transfer price tax assessment. (R-I ¶ 30.65).

605. Claimants state that, on 12 July 2010, the Governor's office again contacted TNG to request that it make its land cruiser (which had been seized earlier that year), other automobiles, and drivers available for the entire delegation. The members of the Government delegation would include the Prime Minister, the Minister of Oil and Gas, the regional Governor, and several other high-level officials. (C-I ¶ 205; CPHB 2 ¶ 178).

606. On 14 July 2010, the MOG sent notices to KPM and TNG that the companies were in violation of their Subsoil Use Contracts 210 and 305. (R-I ¶ 31.19; C-II ¶ 346, CPHB 1 ¶ 296, CPHB 2 ¶¶ 74, 178; RPHB 1 ¶ 360; RPHB 2 ¶ 354). The notices



from the MOG were dated 14 July 2010, but were not received by KPM and TNG until 16 July 2010. (R-I ¶ 31.54). The notices set out (1) the contract to which the notice related, (2) the contractual breaches by KPM and TNG, (3) a deadline within which to respond, and (4) the consequences for failing to respond to the notice. (R-I ¶ 31.107). The notices gave KPM and TNG until 19 July 2010 to *"submit explanations on reasons of non-execution of contract terms and all necessary documents, ascertaining removal of the above-mentioned violations, as well as to inform [the MOG] on measures taken in order to avoid violation of contract terms."* Respondent reports that the violations in the notices included *"admissions"* by KPM and TNG that they had operated trunk oil and gas pipelines without a license and 13 additional alleged violations for which Claimants state that the State had provided no prior notice to KPM or TNG. (R-I ¶¶ 31.103 *et seq.*). Claimants report that the notices listed 16 alleged violations. The notice further provided that *"[i]n case of failure to comply with the request set forth in this Notice within the established time limit, the Competent Body is entitled to terminate the Contract[s]."* (C-0 ¶ 88; C-I ¶¶ 20, 206 – 208, 332). Respondent states that the violations contained in the notice of 14 July 2010 were detected by the competent authority as a result of permanent monitoring of the compliance by the subsurface users of their contractual obligations. (R-I ¶ 31.42). The audits proved that production activities at KPM and TNG had virtually stopped; there was little chance of employee salaries being paid. (R-II ¶ 692). The Parties state that, by this time, the majority of TNG and KPM senior and middle management had left Kazakhstan. (R-II ¶ 698; C-1 ¶ 218).

607. On 14 July 2010, the MOG sent a notice of contract violations, which treated Contract 302 as still in force. (CPHB 2 ¶ 151).

608. Claimants allege that the inspections may have never been officially concluded. (C-II ¶ 346).

609. On 19 July 2010, Claimants submitted written answers and explanations concerning each violation alleged in the 14 July 2010 notice. (C-0 ¶ 89, CPHB 2 ¶ 178; RPHB 1 ¶ 361, RPHB 2 ¶ 354).

610. On 20 July 2010, the Ministry of Industry and New Technologies issued its acts of inspections for the unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

611. On 21 July 2010, the State delivered to KPM and TNG two written notices terminating KPM Subsoil Use Contract 305 covering the Borankol field, and terminating TNG Subsoil Use Contract 210 covering the Tolkyn field. (R-I ¶ 31.129; CPHB 2 ¶ 178). The State did not deliver a specific written notice terminating TNG Subsoil Use Contract 302 covering the Tabyl Block, which the State says expired on 30 March 2009. (C-0 ¶¶ 59, 89; C-1 ¶¶ 21, 217). On the same date, pursuant to the legislation, the MOG and KMG agreed to two trust management agreements over the subsoil areas for the Tolkyn and Borankol. (CPHB 2 ¶¶ 38, 178). Respondent stressed that these agreements transferred the property into temporary possession of KMG NC as a result of the termination of the contracts until a new subsoil user is found. (R-I ¶ 31.151; R-II ¶ 701). While terminating the contracts, the State made no claim that KPM and TNG owed outstanding corporate income taxes, transfer pricing taxes or export duties. (CPHB 2 ¶ 128).



612. Nine hundred employees of KPM and TNG resigned effective 21 July 2010. Many were rehired by KMG in the same positions they had held previously. (C-I ¶ 220; C-II ¶ 356). Respondent also does not dispute that many KPM and TNG employees joined KMG NC on their own volition. (R-II ¶ 713).

613. On 21 July 2010, the Kazakh Prime Minister, the MOG, and the Aktau Regional Governor, visited Claimants' LPG plant to personally carry out the transfer of ownership. (C-I ¶ 218). Claimants characterize this as the expropriation where they were told that they could either (1) sign an agreement to transfer operations, (2) become subcontractors, or (3) KMG would obtain a court order and obtain the business "*the hard way*." (C-0 ¶¶ 90- 91). Respondent states that the LPG Plant, which Claimants abandoned in May 2009, was never part of the property that was transferred to KMG trust management. It still remains the property of TNG. (R-I ¶ 31.152).

614. There was a phone call on 22 July 2010 between Mr. Calancea of TNG, Mr. Ongarbaev of MOG, and Mr. Utilgaliev of KMG in which all issues of the termination of the contracts and the management of the assets going forward were discussed. (R-I ¶ 31.155 *et seq*.; R-II ¶ 705; CPHB 2 ¶ 178).

615. Claimants state that the termination notices faxed to KPM and TNG on 22 July 2010 informed both that the territories involved in Contracts 210 and 305 were to be transferred to the Republic of Kazakhstan and into the temporary possession and use by KMG. (C-I ¶ 222; C-II ¶ 354; CPHB 2 ¶¶ 74, 117). KPM continued to exist as a legal entity that could have asserted its legal rights, notwithstanding the transfer of assets. (R-II ¶ 378, R-I ¶ 31.150).

616. On 22 July 2010, the MOG sent TNG a notice of termination of Contract 302, alleging that Contract 302 had expired in March 2009. (CPHB 2 ¶ 178).

617. KMG forwarded Claimants contracts providing for the transfer of infrastructure, operations, and economic benefits to KMG and the State — contracts that KMG has already executed. (C-0 ¶ 91; C-I ¶¶ 225 – 230). Respondent states that the terms of the contracts proposed to KPM and TNG in order to transfer the territories to KMG NC to hold in trust management mirrored the terms of the main trust agreements signed the day before and provided that the transfer was temporary until a new subsoil user was found. (R-II ¶ 706). Claimants state that they never signed a transfer agreement with KMG. (C-II ¶ 230).

618. On 22 July 2010, all revenues generated from oil and gas production were put into a separate escrow account held by KMG. (C-I ¶ 231; R-I ¶ 31.164).

619. The MOG issued its notification of termination of Contract 302 on 22 July 2010. (RPHB 1 ¶ 347).

620. On 23 July 2010, KPM and TNG received letters from the MOG stating that, due to the unilateral termination of the contract from 00 hrs. 00 min. of 22 July 2010 all products produced on the enterprise had been transferred to the ownership of the Republic of Kazakhstan. (C-I ¶ 232).



621. On 24 July 2010, Claimants notified the State that it viewed the actions of KMG and the State as illegal takings of Claimants' rights and assets, and protested the revocations and seizures. (C-0 ¶ 91). Respondent confirms this conversation and points out that there was no one from Claimants left in Kazakhstan to run the companies. (R-I ¶ 31.156).

622. On 28 July 2010, Respondent employed the attorney provisions set out in Article 72(10) of the Subsoil Law and to arrange for an agreement to be entered into for the transfer of property to KMG. (R-I ¶ 31.160). The transfer of assets was finalized in Claimants' absence. (R-II ¶ 712).

623. Since being taken into trust management, KMG has delegated all immediate functions for the subsoil area trust management to the Aktau branch of its 100% affiliate KMT. (R-I ¶ 31.162).

624. On 26 August 2010, KPM and TNG wrote to the MOG to inquire about the status of their assets after the cancellation of the three contracts. (C-I ¶ 236).

625. A summons was issued for Mr. Stejar to appear at the transport prosecutor's office in or around September 2010. (C-I ¶ 138).

626. On 16 September 2010, the 29 December 2009 transfer price tax assessment decisions were upheld. (C-I ¶ 174; R-I ¶ 30.65).

627. On 3 November 2010, the Kazakh Supreme Court overturned the decisions of the appellate court and the Court of Cassation, thereby reinstating the trial court's findings that the corporate income tax assessment was proper. Claimants were unaware of this review until it was mentioned in the Statement of Defense filed in this arbitration. (CPHB 1 ¶¶ 255, 258; CPHB 2 ¶ 128; RPHB 2 ¶ 976).

628. On 24 January 2011, there was a TV interview of the former President of the Republic of Moldova. (C-78, minute 1:10:59). Claimants believe that this interview is an admission that former President Voronin composed the 6 October 2008 letter at the request of President Nazarbayev. (C-I ¶ 75). Respondent rejects this translation of the interview. (R-I ¶ 19.21).

629. On 29 April 2011, KMT obtained a license to operate main pipelines, including KPM's 18 km pipeline. (CPHB 2 ¶ 74).

630. In August 2011, former Ascom Vice President, Andrei Bastovoi, and his son were charged with misappropriating USD 185,000 of Ascom funds. Respondent states that Mr. Bastovoi defended himself by arguing that he was under orders to divert this funding from Sudan to another African country (Uganda) for corporate purposes. Respondent states that Mr. Bastovoi was rearrested in October 2011 for plotting the murder of members of the Stati family. (R-II ¶ 45).

631. On 17 December 2012, Claimants set up a so-called "*Sharing Agreement*" between them and the noteholders. The Sharing Agreement foresees that proceeds from an award be shared between Claimants and noteholders on a 30/70 basis. (RPHB 1 ¶ 1056).



632. As of January 2013, KMT trust manager Mr. Khalelov confirmed that no attempts have been made to recover allegedly outstanding taxes from KPM or TNG. (CPHB 2 ¶ 128).

633. Claimants state that, on 14 February 2013, the Sharing Agreement was accepted by 99.8% of the noteholders, effectively amending the notes and related security arrangements for all noteholders. The Sharing Agreement did not create or materially alter Claimant's obligations regarding the Tristan Debt. Instead, it was a renegotiation of Claimants' existing obligations and not a voluntary assumption of new liability. (CPHB 1 ¶¶ 626 – 630, 632; CPHB 2 ¶¶ 325 - 327).

## F.III.   Respondent's Alleged *"Playbook"* / Campaign of Harassment and Interference

634. The Tribunal has considered all of the facts presented by the Parties, even if not explicitly stated herein. This section introduces the facts and events related to what Claimants call Kazakhstan's *"Playbook."* This section is without prejudice to the Parties' further submissions and arguments.

### 1.   Arguments by Claimants

635. Claimants argue that Respondent runs a *"playbook"* of harassment to coerce investors and to enrich powerful Kazakhs. The playbook typically commences with an executive-mandated investigative onslaught and ends with a firesale of assets to the State or an outright seizure. Groundless tax claims are an important element of the playbook. Respondent used these harassing and intimidating tactics to coerce Claimants into selling their investments to KMG at a firesale price and, when that failed, seized the investments under the appearance of legitimacy. (C-II ¶ 363; CPHB 2 ¶¶ 40, 128 – 139).

636. Claimants urge the Tribunal to view Respondent's conduct for what it was: *"a concerted attempt to coerce Claimants to sell their successful investments to KMG (or some other company owned by Timur Kulibayev) at a firesale price."* (C-II ¶ 373). Kazakhstan has a long-standing goal of *"claw[ing] back some of the value it had negotiated away to foreign investors in earlier deals."* (C-II ¶ 365). It accomplishes that by *"attempting to renegotiate contracts with foreign investors, and by acquiring interests in foreign-owned companies through KMG at a discount to fair market value. If foreign investors did not go along voluntarily, Kazakhstan brought pressure in the form of harassing inspections, outrageous tax assessments, criminal prosecutions, fines, etc."* (C-II ¶ 365). Claimants describe the *"playbook"* as follows:

> *[T]ax authorities and other regulators [in Kazakhstan] have been tasked to approach investors very aggressively in an effort to address the perceived unfairness of the deals struck with foreign investors in the republic's early years. The Financial Police have apparently been tasked a key role in implementing government policies designed to reverse these past "errors." Using methods similar to those often employed in neighboring Russia, the Kazakh government has become adept at harassing foreign companies with a barrage of fines, criminal allegations, and tax threats until it is able to extract from them whatever concessions it desires. Sometimes the tactics*



> *employed are designed to achieve a material modification of the economic essence of the transaction. On other occasions their intention seems rather more confiscatory, geared to driving the foreign investor away and seizing its investment. (C-II ¶ 365, CPHB 2 ¶ 129).*

637. This "*playbook*" typically involves three elements. First, there are the Financial Police. The Financial Police have powers to "*preempt, investigate, and prosecute economic, financial and corruption crimes and violations.*" The Financial Police are closely controlled by President Nazarbayev and act as the "*President's instrument to coordinate multi-agency investigations and to ensure that other more independent agencies reach the desired conclusions.*" (C-II ¶ 367). Second, there is the involvement of the judiciary. While the involvement of the judiciary may lend the appearance of normalcy and legitimacy to Kazakhstan's actions, it actually is just another tool through which the executive branch ensures a predetermined outcome. Kazakhstan has a weak and partial judiciary. Further, the use of criminal allegations and prosecutions puts tremendous pressure on investors and greatly enhances the bargaining position of the State: (C-II ¶¶ 367 – 369).

> *[...] First, it allows for dramatic pressure against individuals, who recognize that they may be held for protracted periods in investigative detention and subjected to aggressive interrogation in a country with a reputation for jailhouse torture and abuse and for ill-explained deaths in detention, which has no independent judiciary, and in which a conviction is a foregone conclusion in any case taken to trial. Second, it ratchets up pressure on those arrested to turn on their employer and provide information that may lead to the "discovery" of crimes or regulatory infractions, even when none were legitimately detected before. Criminal investigators offer immunity for employees who turn on an employer in this fashion. Third, the disruption produced by the criminal case can paralyze a business and bring it grinding to a halt. This can occur by distracting senior management from performing their jobs, through the seizure of business records which make the continuation of work all but impossible, through raids and searches of business premises which demoralize employees and stop work at critical junctures. The prosecution of a criminal case can thus destroy a business, even if no conviction results. (C-II ¶ 369).*

638. Third, Kazakhstan invariably makes it clear that the renegotiation of a contract or the sale of a substantial equity stake to KMG (or another Kazakhstan-owned entity) will make all these problems go away. This tactic has been used against at least four other investors in the oil and gas sector to date: (1) Tengizchevroil LLC (charged with "*illegal entrepreneurship*" for "*unauthorized overproduction*" of oil), (2) Agip KCO (publically accused of fraud), (3) Karachaganak Petroleum Operating BV (accused, among other things, of "*illegal entrepreneurship*" for "*profiting from oil output that was not approved by the state*", and (4) Caratube International Oil Company (repeated raids). (C-II ¶ 370).

639. Claimants state that observers have dubbed Kazakhstan's political system as an "*advanced kleptocracy or a 21st-century dictatorship*" and identify 2 motives for this. First, President Nazarbayev uses his tactics to enhance personal wealth and power of himself and his allies. His son-in-law, Timur Kulibayev, who has amassed a fortune of over USD 1 billion and holds the Chairmanship of KMG and



other positions, is one clear beneficiary of this. He controls an estimated 90% of the Kazakhstan economy. Second, Kazakhstan uses this "*playbook*" to weaken political opponents of President Nazarbayev by eliminating their sources of income. This motivation seems unlikely here, although Claimants were made vulnerable by the fact that Anatolie Stati was an adversary of Moldovan President Voronin. This was a vulnerability because it meant that no Moldovan diplomats would come to Anatolie Stati's rescue. (C-II ¶¶ 371 – 373).

640. Claimants argue that Respondent used its "*playbook*" to force Claimants to sell at a firesale price. Claimants have been refusing offers from companies controlled by Timur Kulibayev to purchase all or some of their Kazakhstan investments since at least 2004. In 2004, GazImpex – a company controlled by Mr. Kulibayev – attempted to purchase TNG. At the time, Claimants valued TNG at USD 567 million, but GazImpex valued TNG at USD 27.8 – 32.9 million. This was likely Mr. Kulibayev's first attempt to acquire Claimants' investments at a bargain price. In 2007, Claimants discussed the sale of TNG to another company controlled by Mr. Kulibayev – KazRosGas – a joint venture between KMG and Gazprom. KazRosGas wanted to purchase a 50% interest in TNG. But, when Terra Raf determined that selling a share in TNG of that size could trigger Kazakhstan's pre-emptive right to acquire the interest, it decided not to sell the partial stake to anyone. The message was that Claimants did not want to be in business with the Kazakhstan government (i.e., KMG). (C-II ¶¶ 373 – 376).

641. In summer 2008, Claimants marketed the 100% sale of their investments through Project Zenith. They included KMG in the potential purchaser targets, since they would not be in business with the buyer thereafter. Renaissance Capital sent KMG the Information Memorandum and the Due Diligence presentation, both of which contained substantial details about the companies and their assets. On 25 September 2008, KPM submitted an offer of USD 754 million, for KPM and TNG (minus the Contract 302 properties). This was the third lowest offer. Less than three weeks later, however, President Nazarbayev issued his order to investigate Claimants' companies, resulting in a "*barrage of investigations, false accusations, exorbitant tax assessments, and criminal prosecutions.*" Claimants argue that the "*timing alone supports a strong inference that President Nazarbayev issued his order to help tip the scales in KazMunaiGaz's favor in the Project Zenith. The events that unfolded over the next 20 months make that inference extremely clear.*" (C-II ¶ 376 – 380). In particular, Claimants highlight the following events:

- *On November 11, 2008, the Financial Police's issuance of a finding that KPM did not have a main pipeline license, paving the way for the criminal trial and US$ 145 million fine on KPM;*

- *On December 18, 2008, the MEMR's reversal of its pre-emptive rights waiver as to TNG, and issuance of a press release alleging forgery and fraud in connection with the registration of TNG;*

- *On February 10, 2009, the assessment of US$ 62 million in back taxes, disregarding stabilization guarantees in its Subsoil Use Contracts; and*

- *On April 29, 2009, the arrest of KPM's general director. (C-II ¶ 380).*



642. This harassment campaign caused a liquidity crisis within Claimants' companies that, combined with falling energy prices, forced Claimants to obtain a bridge loan for additional working capital. Claimants had already finalized the details of a loan from Credit Suisse on 5 December 2008, but Credit Suisse – after seeing the 18 December 2008 press release and accusations – refused to provide the capital until Claimants resolved their disputes with Respondent. (C-II ¶ 381). Claimants' description of its additional liquidity problems are best taken from their own words:

> 382. *Without that additional working capital, KPM and TNG's cash position became very tight in early 2009. Moreover, Kazakhstan exacerbated that liquidity problem by choking off TNG's access to gas markets. In the fall of 2008, TNG's largest non-local customer — Kemikal, a company controlled by Mr. Kulibayev — inexplicably failed to post bank guarantees that were part of its required payment terms. Because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). When local demand declined in the spring of 2009, however, the absence of the Kemikal contract left TNG with a shortage of demand. TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. TNG had previously sold gas for export through KazRosGas and GasImpex (both companies that were controlled by Mr. Kulibayev), and those companies had made a substantial profit on those contracts. Thus, the decision of KazRosGas not to export TNG's gas in the spring of 2009 seems suspiciously like a conscious attempt to choke off TNG's revenues at a critical time.*

> 383. *This liquidity crisis reached its peak in June 2009, when KPM and TNG owed significant tax payments as well as loan repayments to Tristan needed to fund Tristan's coupon payments to noteholders. Not coincidently, KazMunaiGaz returned at exactly that time to make another lowball offer for the companies. KazMunaiGaz knew the predicament that KPM and TNG were in. As a result of the "re-evaluation" of TNG that the MEMR ordered in March, KazMunaiGaz received access to the complete Project Zenith data room — including KPM and TNG financials — in April 2009. Then, in June 2009, KazMunaiGaz offered only US$ 50 million for Claimants' equity interests and indicated that it would "deal separately" with the companies' debts, without providing any further detail. Even assuming that KazMunaiGaz intended to pay face value for the US$ 550 million in outstanding debt (which seems unlikely, based on KazMunaiGaz's offer of 25 cents on the dollar to the Tristan noteholders in November 2009), the total value of [KMG's] "offer" had decreased to at most US$ 600 million — which was at least US$ 150 million less than its indicative offer from September 2008. It is no coincidence that KazMunaiGaz showed up with this opportunistic offer at just the right time. This is the Kazakhstan harassment playbook at work.*

> 384. *Claimants were only able to weather the liquidity storm in the summer of 2009 by obtaining emergency bridge financing from a group of venture capitalists (the "Laren Facility"). The terms of the Laren Facility were*



Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 28 of 104
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/30/14   Page 28 of 104 of 225

Page **132** of **414**

> *terrible for Claimants (35% interest on a $60 million note, plus the issuance of $111 million of new Tristan notes). Because of the substantial risks to lenders created by Kazakhstan's harassment campaign, those were the best terms that Claimants could obtain. They had no choice but to accept those terms while they continued to try to sell the companies to Total and KNOC in the summer of 2009. (C-II ¶¶ 382 – 384).*

643. As time continued, Respondent simply turned up the pressure. Kazakhstan interfered in the trial of Mr. Cornegruta to ensure a guilty verdict and then sentenced him to four years' incarceration in a notoriously dangerous prison system. Kazakhstan then threatened to do the same to KPM and TNG's other directors. Kazakhstan levied a massive fine against KPM that was large enough to bankrupt the company and provide a ground for seizing the assets. Through the continued inspections, audits, and seizures, Kazakhstan continued to interfere with the day-to-day operations of the business. Then, in November 2009, KMG made another, even lower bid to buy the companies. (C-II ¶¶ 385 – 386).

644. At around the same time, Mr. Kulibayev clandestinely made another attempt to purchase the companies, through a different company: the Starleigh Group. (C-II ¶ 387).

645. On 7 February 2010, the President of the Blagovest Fund, Mr. Zakharov, wrote a letter to the MEMR. (C-I ¶¶ 15, 181-2, CPHB 1 ¶ 335, CPHB 2 ¶ 38). Accompanying this Blagovest letter was a 19 November 2009 personal instruction from President Nazarbayev, which Claimants state indicates that he had wanted to strip the companies of their assets while maintaining the assets operational. This letter and the attached government instruction indicates that Kazakhstan planned a take over as early as 2008. (C-I ¶ 182; CPHB 1 ¶¶ 335 – 341).

646. Despite the campaign of harassment, Claimants were able to find a buyer for KPM and TNG in February 2010 – the Cliffson Company. The total value of this offer exceeded USD 920 million. On 12 April 2010, Claimants submitted applications for approval of the Cliffson sale and a waiver of Kazakhstan's pre-emptive rights. On 30 April 2010 and 1 June 2010, the MOG requested additional information about the transaction and Claimants provided all of the reasonably requested information on 23 June 2010. Rather than respond, however, Kazakhstan initiated the final inspection blitz that led to the ultimate expropriation of Claimants' assets on 22 July 2010. (C-II ¶¶ 388 – 391, partially quoted).

647. Claimants state that, by this time, they had made it clear that they intended to bring arbitration claims against Kazakhstan for the diminution in value of their investments once the Cliffson sale closed. This had been an issue of concern throughout the harassment campaign. Even the MEMR's 28 September 2009 letter to the Ministry of Industry and Trade noted that the risk of arbitration was one of the reasons why it would be better to obtain KPM and TNG through acquisition rather than premature termination of the Subsoil Use Contracts. (C-II ¶¶ 392 - 394, partially quoted).

648. In addition to completely interfering with Claimants' ability to use, manage, and enjoy their investments, Kazakhstan's conduct made it impossible for Claimants to sell their companies, as they had planned to do starting in mid-2008. Claimants do not contend that Kazakhstan's actions motivated their initial decision to sell. What



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

is important, however, is that none of the interested bidders was willing to follow through with the sale after Kazakhstan commenced its targeted harassment of KPM and TNG in October 2008. (C-II ¶¶ 396 - 397).

649. In response to Kazakhstan's argument that "*the majority of potential bidders decided not to make a bid for reasons unrelated to governmental harassment or interference, such as the global economic crisis, perceived lack of transport links, and other reasons outlined in a presentation by Renaissance Capital to Claimants*", Claimants point out that all of these factors existed in September 2008, well before the campaign of harassment began. Despite all of these factors, eight bidders showed serious interest in Claimants' investments. (C-II ¶ 398).

650. In response to Kazakhstan's argument that Claimants provided bidders inaccurate or incomplete information masking the illegalities of their purchase of KPM and TNG, Claimants state that there were no such facts to disclose. Claimants' acquisition and reorganization of KPM and TNG were legal, and the companies had valid licenses for all the activities they conducted. It was not until Kazakhstan retroactively reversed its waiver of pre-emptive rights and publicized allegations of fraud in December 2008 (as part of this harassment campaign) that there was ever any question about the legal status of Claimants' investments.

651. With respect to the five bidders who chose not to go forward, Claimants state that some change in circumstances having nothing to do with the data room (which they did not see), must have caused them to lose interest in the investments. The two events that occurred between the bidding and their decision not to participate were (1) Kazakhstan's retroactive reversal of its waiver of pre-emptive rights with respect to Terra Raf's purchase of TNG and (2) Kazakhstan's assessment of USD 62 million in alleged back taxes and penalties, in blatant disregard of the stabilization guarantees in the Subsoil Use Contracts. With respect to the two bidders who chose not to continue after seeing the data room, their exit does not cast any doubt on the accuracy of information provided to bidders in the first phase of Project Zenith or on the reliability of those indicative offers. Instead, Claimants state that "*it is possible that these two potential bidders withdrew from Project Zenith after learning of Kazakhstan's allegations of such illegalities, which Kazakhstan publicized in a press release on 18 December 2008. But since those allegations were wholly unfounded and a part of Kazakhstan's targeted harassment campaign, this possibility only supports Claimants' position that the harassment campaign had its intended effect of deterring potential bidders for Claimants' investments.*" (C-II ¶¶ 401 – 402).

652. The final two bidders, Total and KNOC, withdrew only after speaking with Kazakh authorities. These companies likely knew about the ongoing harassment and its effect on KPM and TNG. Total has been understandably quiet and diplomatic about its real reasons not to pursue acquisition of KPM and TNG, as it is already involved in long-standing joint activities with KMG in Kazakhstan. This ownership and management structure insulates Total from the kind of harassment that Claimants have experienced, harassment which Total as a 100% disfavored foreign owner could also experience. KNOC would not proceed without speaking to Kazakh authorities. Respondent has not presented any witnesses to dispute that its personnel met with representatives of Total and KNOC and persuaded them not to acquire TNG and KPM. The letters that have been provided should be



disregarded unless their authors are presented for cross-examination. The authenticity of these letters is in question, as they were plainly solicited by Kazakhstan for this arbitration. In addition, the four companies that purportedly wrote the letters (R-41, 41.2, 41.4) continue to have significant investments in Kazakhstan  (C-II ¶¶ 403 - 407).

653. Claimants state that the letter from KMG demonstrates how Kazakhstan's harassment campaign undermined the alienability of Claimants' investments. Of the six factors it states it discovered in the data room in March 2009, two were inaccurate and four were the direct result of Respondent's harassment campaign – and none were from any declines in KPM's and TNG's intrinsic worth. (C-II ¶¶ 407 – 410).

    *409.   [...] As described above, the US$ 60 million Laren loan (issue 2), and the issuance of US$ 111.1 million in additional Tristan notes in connection with that loan (issue 4), were only necessary because of Kazakhstan's harassment campaign.  Moreover, the third issue referenced by KazMunaiGaz — the "other risks related to claims from Kazakhstan's government authorities" — refers presumably to the tax, duty, and criminal fine liabilities imposed wrongly on KPM and TNG as part of Respondent's harassment campaign.  Additionally, the final factor mentioned by KazMunaiGaz — Claimants' removal of Casco from the field in 2009 — resulted directly from Kazakhstan's harassment campaign. Because of the cash flow shortfall discussed above, and the increasingly hostile investment environment, Claimants prudently reduced their drilling and workover activities in Kazakhstan and removed Casco personnel from the country. (C-II ¶ 409).*

654. Turning to Respondent's dismissal of the effect that its actions had on KNOC, Total, and other Phase 2 Project Zenith companies, Claimants remind the Tribunal that, prior to the Aktau City Court's issuance of the USD 145 fine on 18 September 2009, Kazakhstan had (1) retroactively reversed its waiver of pre-emptive rights with respect to Terra Raf's acquisition of TNG and publicly accused Claimants of fraud and forgery; (2) assessed millions of dollars in back taxes, blatantly disregarding its contractual stabilization guarantees; and (3) jailed KPM's general director on charges that could be leveled against most oil and gas producers in Kazakhstan. Each of these events was significant enough to deter foreign investors, making the timing of the bidder's withdrawals (prior to the fine assessment) less relevant. (C-II ¶¶ 412 – 414).

655. The KMG and Starleigh offers were significantly below FMV – not only because they valued equity at USD 50 million and because they promised to "*deal separately*" with the companies' debts – but because they were attempting to take advantage of Claimants' weakened position caused by Kazakhstan's harassment campaign. In light of the harassment, and with the knowledge that, because of it, Claimants were desperate to sell and that Kazakhstan could obtain the investments for KMG through expropriation, neither KMG nor Starleigh had any incentive to offer FMV for Claimants' investments. (C-II ¶¶ 415 – 417).

656. The Cliffson offer, which was for USD 267 million for all equity interests in TNG, KPM, and Tristan and for assumption of all of those companies' liabilities, was valued at USD 920 million. This offer was below the FMV because of the pressure



to sell, caused by Respondent's harassment campaign. Cliffson even indicated during negotiations that it was the only company that Kazakhstan would permit to purchase TNG and KPM. (C-II ¶¶ 418 - 422).

## 2. **Arguments by Respondent**

657. In its Post Hearing Briefs, Respondent explained:

*(a)    that there was nothing improper about President Nazarbayev's instructions based upon President Voronin's letter; [Indeed, to not investigate would have been an affront from a foreign policy perspective. (RPHB 2 ¶ 375)]*

*(b)    that no motive for harassment – be it political or financial – existed; and*

*(c)    that the Blagovest letter about which Claimants try to create a lot of confusion does not support their theories in any way;*

*(d)    that no "Playbook" exists and that the Financial Police and other authorities as well as the Kazakh courts acted independently and not as the extended arm of the executive. (RPHB 1 ¶¶ 371 – 373, partially quoted; RPHB 2 ¶ 375 et seq.).*

658. Respondent's arguments with respect to Claimants' "*Playbook*" theory are best taken from their own words:

*244.    Claimants' account of the "Kazakhstan Playbook" is nothing more than a fairytale. There is no "Kazakhstan Playbook" and certainly no campaign to expropriate Claimants' investments by using these so-called "Playbook" tactics. [...] Claimants' Reply Memorial on Jurisdiction and Liability provides no evidence of a planned nor a concerted harassment of Claimants' business by the Republic or any person or entity associated with the Republic. Instead, the Republic legitimately investigated Claimants, uncovering substantial legal and contractual violations, ultimately leading to a rightful and lawful termination of the Contracts. Any conspiracy theory which Claimants concoct cannot circumvent these facts.*

*245.    Claimants' "Playbook" theory is completely unsubstantiated and wholly dependent on defamatory opinions of the Republic's oil and gas industry. Claimants fail to provide any factual evidence to support the existence or operation of a "Playbook". Notwithstanding this, Claimants still draw the most inconceivable conclusions to fabricate their conspiracy. The expert report they largely rely on from Scott Horton does not assist them in this regard. Notwithstanding this, Claimants still deem it appropriate to make ludicrous comments about the Republic, including describing its political system as an "advanced kleptocracy or a 21st-century dictatorship". These statements are not only irrelevant and inappropriate but also fundamentally incorrect.*



Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 32 of 204
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/30/14   Page 32 of 225

Page **136** of **414**

246.    The "Playbook" theory itself hinges on a misguided belief that the
        Republic harasses foreign investors by "inspections, outrageous tax
        assessments, criminal prosecutions, fines, etc" using the Financial Police
        and the Kazakh courts and through coercing the investors to renegotiate
        their contracts, to "make all these problems go away". Claimants state
        that the motives for the Republic's "conduct" are to enhance President
        Nazarbaev's "personal wealth and power of himself and his allies"
        including Timur Kulibayev and to "weaken political opponents of
        President Nazarbayev by eliminating their sources of income". For the
        reasons set out below, each of these alleged tactics of harassment
        employed and motives for doing so are completely unfounded.
        Furthermore, the farcical manner in which Claimants seek to associate
        this theory with the very legitimate action taken by the Republic against
        them is completely misleading. Although Claimants' various legal and
        contractual violations will be addressed in other parts of this Rejoinder
        Memorial on Jurisdiction and Liability, the Tribunal should not, in any
        event, be persuaded that this "Kazakhstan Playbook" that Claimants have
        concocted exists. (R-II ¶¶ 244 – 246; RPHB 1 ¶¶ 409 – 413).

659.  Claimants completely mischaracterize the purpose and role of the Financial Police.
      The Financial Police are obliged by law to investigate and prosecute financial
      crimes.   This includes carrying out investigations of subsoil users having
      potentially committed such offenses.  They do not set out to harass foreign
      investors. The Financial Police has become an accountable agency. It is headed by
      professional security officials and is independent from the executive.  Claimants
      have provided no evidence for their contention that the Financial Police act as
      President Nazarbayev's instrument. (R-II ¶¶ 247 - 249).

660.  Closer examination reveals that Claimants were not subject to a barrage of
      seemingly random inspections, but rather were subject to two principle phases of
      inspection, each initiated for unconnected reasons by different organizations for
      different purposes. In each case, the outcome was different. The first phase of
      inspections took place from October – November 2008 in response to the concerns
      of President Nazarbayev in light of the letter from President Voronin of Moldova.
      The purpose of these investigations was to determine whether there was any truth
      in President Voronin's allegations. The result of this first phase of inspections was
      the criminal prosecution of Mr. Cornegruta for illegal entrepreneurial activity and a
      number of assessments of taxes and duties.  The inspections that took place
      between November 2008 and July 2010 were principally a continuation of
      processes set in motion in October and November 2008 and share the justification
      and objective of those initial inspections.  The second phase of inspections was
      initiated by the GPO in June and July 2010 in response to complaints that KPM
      and TNG were not fulfilling their obligations to employees and were failing to
      comply with legislation and their Subsoil Use Contracts.  This second phase
      discovered a string of infringements that ultimately led the MEMR to terminate
      KPM and TNG's Subsoil Use Contracts, prior to transferring the companies'
      subsoil assets into trust management. (R-II ¶¶ 247, 280 – 285; RPHB 2 ¶¶ 375 –
      382).

661.  Subsoil users are always subject to a high level of scrutiny, which is simply a
      feature of the subsoil industry. Claimants were aware of this high level of scrutiny.
      It was expressly disclosed in their contracts and licenses, which contain ongoing



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

disclosure and record maintenance obligations and even reference legislative rights of inspection and audit contained in law. KPM and TNG were not subject to any greater degree of scrutiny than were any other subsoil users. To the contrary, from 2001 to 2010, KPM was inspected 88 times, TNG was inspected 100 times while other companies were inspected more: Karazhanbasmunai was inspected 246 times, Mangistaumunaigaz 298 times, Uzenmunaygaz 390 times, and Emir Oil 76 times. Considering the statistics for subsoil users in Mangystau Province, such as KPM and TNG, for the period of 2001 – 2010, KPM and TNG were the second and third least audited companies, with the state company Uzemunaigaz being the most audited. (R-I ¶¶ 20.29 – 20.31; R-II ¶¶ 286 - 291).

662. The criminal inspections of KPM and TNG were, of course, outside of the scope of the routine inspections, but were nonetheless justified and lawful. These inspections were motivated by allegations of criminal behavior. The results of these inspections were reviewed by a separate department of the Financial Police – independent from the individuals who had undertaken the inspections – before any decision was taken as to whether to proceed. Review confirmed that there was sufficient evidence that a crime had been committed in some respects, but that there was insufficient evidence to pursue criminal investigation of other findings. Those investigations were terminated. (R-II ¶¶ 292 – 297).

663. The continuation into 2009 of the initial inspection was a structured attempt to gather evidence to develop the case – it was not "*an unguided capricious exercise of power*." These investigations were far from sinister or threatening. Employees at KPM and TNG's premises were helpful. The Financial Police conducted the searches while unarmed (KPM and TNG's security forces were armed) and while outnumbered by KPM and TNG's security forces. Respondent describes steps undertaken to help KPM and TNG employees feel at ease throughout the search, especially since by that time they knew that Mr. Cornegruta had been arrested. Claimants' descriptions to the contrary are wildly exaggerated. (R-II ¶¶ 298 – 302).

664. The second round of inspections (June/July 2010) was initiated by the GPO in response to complaints that KPM and TNG had infringed the rights of their employees and had breached a number of contractual and legislative obligations. The complaints included allegations related to non-payment of salaries, mass dismissal of employees, failure to comply with environmental legislation, and failure to comply with subsoil use legislation. The investigation had nothing to do with the introduction of new subsoil legislation. Each agency that participated in this complex/comprehensive audit was specifically instructed based on its particular expertise. A complex audit was found to be more appropriate and less intrusive than a "*drip, drip*" of inspections to address the issues raised in the complaint. These inspections were led by the GPO and revealed a number of infringements by KPM and TNG. The Ministry of Environment Protection, the MOG, the Ministry of Industry and New Technologies, the Ministry of Labor and Social Protection, the MES, and the Sanitary and Epidemiological Inspection authorities found extensive violations. No contemporaneous complaint was received in relation to the conduct of the complex investigation. Claimants' statements that this was a "*final inspection blitz*" or that this was somehow the culmination of a campaign of harassment by the Republic are unfounded. (R-II ¶¶ 305 – 310, 317 - 320).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

665. The results of the GPO inspections were not required to be recorded in an Act of Inspection. In response to Claimants' complaint that the Acts of Inspection were received too late to avoid termination of the contracts, Respondent notes the following:

    *(a)*    *The issue of operating a main pipeline without a license, referred to in the MEMR's letters of 14 July 2010, had been known to the companies since at least 18 September 2009 when Mr Cornegruta was convicted of the offence of illegal entrepreneurial activity. Therefore ample time had been available to respond to the allegation;*

    *(b)*    *The issue of non payment of taxes, also referred to in the MEMR's letters, had been known about since at least 8 and 9 September 2009 when the Astana City Court ruled against their challenge to the Tax Committee's assessment of corporate back taxes;*

    *(c)*    *Claimants admit that they received the MEMR's Act of Acceptance several days prior to the 19 July 2010 deadline set by the MEMR to reply to its notices of breach and sufficiently in advance for Mr Calancea to conclude that "Kazakhstan's allegations were essentially groundless" and for KPM and TNG to each provide 5 to 6 page responses to the MEMR's notices. (R-II ¶¶ 311 – 312; see also RPHB 2 ¶¶ 339 - 374).*

666. Given the nature of the infringements discovered, it was proper for the MEMR to address the breaches to the Subsoil Use Contracts.

667. Claimants' allegation that Kazakh courts are dominated by the executive is quite simply wrong, though western observers have not sufficiently noted the major steps that have been undertaken in recent years to reform the judiciary. Kazakhstan's constitution expressly refers to the independence of the judiciary and to the separation of powers between the executive legislature and the judiciary. Claimants have provided no evidence that the executive in any way controlled or influenced the courts as part of the alleged harassment of KPM and TNG. The Republic's position is that there is nothing incorrect or improper about the Aktau Court's decision to prosecute Mr. Cornegruta for illegal entrepreneurship. The decision was valid, correct, and was confirmed on appeal. (R-II ¶¶ 250 – 254, 495 – 627).

668. As the backdrop to the "*playbook*" argument, Claimants argue that the Republic made it clear that "*renegotiation of a contract or the sale of a substantial equity stake to KMG (or another Kazakhstan-owned entity) will make these problems go away.*" First, there is nothing untoward with the Republic legitimately re-negotiating Subsoil Use Contracts and/or national companies acquiring interests in companies that had rights to exploit its subsoil. It certainly cannot be seen as part of some "*Playbook*" conspiracy against foreign investors. Instead, Respondent shows that the examples provided by Claimants involved companies that had very serious problems and had violated the terms of their contracts and Kazakh law, making contractual renegotiation and/or state assistance necessary. Second, there was likewise nothing untoward about the bids for TNG and/or KPM made by companies supposedly associated with the Republic or with Mr. Kulibayev. None of these bids confirm any alleged "*playbook.*" Third, even if the Republic were to try to renegotiate contracts made in the 1990s which it believed to be too generous,



there is nothing untoward about such action and it certainly is not part of any conspiracy against foreign investors. (R-II ¶¶ 255 – 260, 270 – 271).

669. Claimants' arguments that the Republic and Mr. Kulibayev wrongfully tried to acquire KPM and TNG is nothing more than a fanciful attempt to frame what was a rightful termination of the contracts and transfer of contractual territories into trust management as some sort of fictional conspiracy theory against them. With respect to Claimants' arguments that GazImpex, KazRosGas, and Starleigh have attempted to purchase KPM and TNG, Claimants have failed to prove that Mr. Kulibayev owned or controlled any of these companies. (R-II ¶¶ 338 – 342; RPHB 2 ¶ 375).

670. The 2004 GazImpex offer for TNG is irrelevant to this arbitration. Those negotiations fell apart when GazImpex did not value the company as highly as Claimants did. The 2007 offer by KazRosGaz is also irrelevant, and there were no official proposals or negotiations. There is no connection to the Republic and there is nothing coercive about one company bidding for another. (R-II ¶¶ 343 – 345).

671. The Starleigh offer is also irrelevant, as Claimants have not proven that Mr. Kulibayev is linked to the company or, even if he is, if Starleigh is linked to the Kazakh government or if Starleigh was involved in any conspiracy against Claimants. Claimants' argument also makes little sense. Respondent hypothesizes "*if Starleigh genuinely believed it could somehow obtain KPM and TNG for no money at all, it surely would not have made the very substantial bid it did at the time, which included dealing with the debt Claimants had amassed, which amounted to more than US$500m.*" (R-II ¶¶ 346 – 349, partially quoted).

672. With respect to the bids made by KMG EP and KMG NC, Respondent explains that these two distinct companies, which Claimants refer to misleadingly as KMG, made very different bids for KPM and TNG at very different stages. Claimants have provided no evidence that Mr. Kulibayev was the Chairman of KMG EP. Mr. Kulibayev was only the Chairman of KMG NC – a state entity that considers the social and economic implications of an acquisition. Mr. Kulibayev had no control over KMG EP and Claimants have provided no evidence that he had any role in KMG EP or KMG NC's bids for KPM and TNG, or that he was in any way influencing the Republic to coerce Claimants into selling KPM and TNG to KMG NC. Furthermore, a sale to KMG NC would not lead to a change in Mr. Kulibayev's wealth, as KMG NC is a state owned company. Finally, it is clear from the facts that neither KMG EP nor KMG NC were part of any alleged attempt by the Republic to force Claimants to sell KPM and TNG to entities allegedly owned or controlled by Mr. Kulibayev. In fact, KMG EP only bid on Claimants' companies after being invited to do so by Claimants themselves. Thereafter, Claimants invited KMG EP to participate in the second phase of Project Zenith – again, undermining the argument that the Republic was coercing it to sell to KMG EP. The bid was made based on information made available by Claimants – the bid was certainly not a form of harassment. KMG EP withdrew in July 2009 after deciding that it was not commercially reasonable to purchase the assets. KMG NC, on the other hand, only expressed an interest in purchasing TNG and KPM in November 2009, in order to play a "*white knight*" role in resolving the issues that Claimants had caused to its assets. (R-II ¶¶ 350 – 361, partially quoted).



673. Respondent explains that the motives that Claimants describe for the Republic to use a "*Playbook*" are entirely fictional. Turning first to the alleged motive of enhancing Timur Kulibayev's power and wealth, Respondent explains that Mr. Kulibayev is far from the omnipotent figure in the Kazakh regime that Claimants describe. Prof. Olcott explained that he had recently been dismissed from his position at Samruk-Kazyna. His role as a state servant in KMG NC is different and distinct from his separate business interests. In any event, Claimants have provided nothing beyond conjecture to support their argument that the Republic was trying to coerce them into selling to entities owned or controlled by Mr. Kulibayev. (R-II ¶¶ 261 – 264; RPHB 1 ¶¶ 384 – 385, 389 - 391; RPHB 2 ¶ 375).

674. Claimants have also failed to demonstrate that Mr. Kulibayev or any of the companies controlled by him was interested in acquiring KPM and TNG. With respect to KazRosGas, that is a Russian-Kazakh joint venture that is only 50% controlled by Kazakhstan. Accordingly, it is impossible that Mr. Kulibayev controls the company. Regarding GazImpex and Kemikal, Prof. Olcott was unable to find any proof that Mr. Kulibayev owned the companies. Claimants also lack evidence regarding Starleigh, and did not even mention it in the hearings in October 2012 or January 2013, making it likely that they have abandoned those contentions. Claimants' first allegation that KazAzot was controlled by Mr. Kulibayev was made at the Hearing on Jurisdiction and Liability. That allegation was denied by Minister Mynbayev. (RPHB 1 ¶¶ 392 – 397; RPHB 2 ¶ 375).

675. Kemikal did not "*inexplicably*" stop payment – Kemikal's "*liquidity and insolvency*" issues were the reason that Kemikal stopped making payments. The loss of Kemikal as a customer is not attributable to Respondent. (RPHB 2 ¶ 124).

676. With respect to governmental motives, Claimants rely on internal government correspondence, which they deliberately misinterpret. The correspondence confirms that government officials were worried about the social situation in the region. In particular, the letter from the Mangystau Governor Kusherbayev of August 2009 in no way proposes an expropriation. Instead, the idea of purchasing the assets was only considered as one method to address the problems surrounding the companies. (RPHB 1 ¶¶ 398 – 403).

677. Turning to the alleged political motives, Respondent states that Claimants have failed to provide any evidence to support their bold assertion that "*Kazakhstan frequently uses this harassment playbook to weaken political opponents of President Nazarbayev by eliminating their sources of income.*" Claimants' own admission that Anatolie Stati is not a political opponent of President Nazarbayev, however, makes their attempts to twist the political dynamic to make it applicable to him is, at best, fanciful. That President Voronin of Moldova saw Anatolie Stati as an adversary is wholly irrelevant. The letter from President Voronin did not attempt to paint Anatolie Stati as an irresistible target, but was instead simply the kind of letter that required some sort of follow up.

678. To the extent that Claimants argue that the letter from President Voronin is proof of a campaign against Claimants, their argument fails for several reasons. First, the letter is a pro-forma document with which a complaint by one head of state is forwarded to competent authorities. Second, this letter received special attention because it was from another CIS head of state. Third, given post-soviet alliances, it



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

would be likely that President Nazarbayev would take the side of Anatolie Stati, rather than the side of President Voronin, due to their political connections prior to independence. Fourth, the letter accused Anatolie Stati of concealing profits from the states where those profits were being made, meaning potentially that taxes were being withheld from the Republic. Against this background, it would have been careless for President Nazarbayev not to inspect. The authorities indeed inspected the tax payments, and given the grave charges made by President Voronin, there was no reason to limit the inspections to taxes. The inspections turned up violations and the Financial Police were free to rely on other aspects proven by the inspections to open criminal investigations. Claimants are, therefore, incorrect when they argue that the accusations in President Voronin's letter were not investigated – they were, including the accusations of concealing profits from state authorities. Claimants attempt to use this "*playbook*" argument to district the Tribunal from this fact. (R-II ¶¶ 265 – 279; RPHB 1 ¶¶ 377 – 382; RPHB 2 ¶ 381).

679. Regarding Claimants' allegations of financial or strategic motives, Respondent also states the KPM and TNG were uninteresting targets with an equity value of 0 and an enterprise value of USD 186 as of 21 July 2010. (RPHB 1 ¶¶ 387).

680. Regarding the so-called Blagovest letter, that letter was from a private organization written on its own initiative. Claimants state that the Blagovest letter was written by Mr. Zakharov on the initiative of Mr. Andreyev, then-general director of KPM. The obscure circumstances surrounding this letter stem from the obscure action of KPM's general director at the time. There is no proof of any connection between the Republic and Mr. Zakharov, President of the Blagovest Fund. Testimony at the Hearing also demonstrated that Mr. Zakharov was "*far removed from the facts of real life*." Allegations of a plan to expropriate cannot be based on his letter. (RPHB 1 ¶¶ 404 – 408; RPHB 2 ¶ 372, 381, 382).

681. Respondent explains that the Blagovest Fund is a non-commercial and non-governmental organization in Kazakhstan. It is a social foundation (i.e. a private entity that serves a specific public interest). (R-I ¶ 19.27; R-II ¶ 335). The Blagovest Foundation applied to the MEMR to assist in solving problematic issues connected with KPM and TNG. (R-I ¶ 19.27). The director of Blagovest was a former director of KPM. (R-I ¶ 19.32). Mr. Zakharov, who had been approached by then-general director of KPM, believed himself able to mediate the dispute, in part because of the similar religious missions of the Blagovest Fund – a Cossack charitable fund – and the Stati family. Mr. Zakharov, however, refused to appear to be examined at the Hearings. (R-II ¶ 336; RPHB 2 ¶ 375, 381). Respondent confirms that an internal government instruction, which was not supposed to be seen by or disclosed to the public, was attached to the Blagovest letter. Respondent states that it is very likely that KPM obtained this document through bribery or otherwise by corrupting Kazakh officials. (R-II ¶ 213).

682. Claimants' argument that all Kazakh authorities – except the MEMR, which tried to defend Claimants – conspired against Claimants contradicts its previous allegations that the MEMR fabricated the pre-emptive rights waiver issue in December 2008 to harass TNG. Claimants' construction of Minister Mynbayev's testimony that MEMR defended KPM and TNG "*against the other Kazakh authorities involved, in an effort to protect from a unilateral takeover*" is simply not in the transcript. Nor is the alleged statement that President Nazarbayev's



instruction of November 2009 was a starting point for the MEMR's alleged "*work*" to terminate KPM and TNG's Subsoil Use Contracts. (RPHB 2 ¶ 377, 380). Claimants have also failed to respond to the Republic's arguments that no motive for the alleged harassment exists. (RPHB 2 ¶¶ 377 – 378).

# G.    Short Summary of Contentions

## G.I.    Summary of Contentions by Claimants

683.  Claimants' contentions are taken from their own words, without prejudice to their further arguments:

> 6.    *Kazakhstan does not have — and never did have — any credible jurisdictional objections. Claimants are indisputably "Investors" who made qualifying "Investments" protected by the ECT.*

> 7.    *[...] According to Kazakhstan's own figures, between 2000 and 2009, Claimants invested US $473 million in KPM and US $693 million in TNG, a total in excess of US $1.1 billion [and] paid over US $350 million in tax revenues to the Kazakh State. KPM and TNG permanently employed nearly 1,000 Kazakh workers, and TNG employed some 3,000 additional contract workers to construct the LPG Plant.*

> 8.    *Claimants' substantial investments transformed the previously fallow Borankol and Tolkyn fields into significant producers of oil, gas, and condensate. By 2010, Claimants had over 70 operational wells in the Borankol field and a total of 40 wells in the Tolkyn field and Contract 302 area. As of 2008, Claimants had produced 12 million barrels of oil and condensate ("MBbls") and 22 billion cubic feet ("bcf") of gas from the Borankol field, and 11 MBbls oil and condensate and 246 bcf of gas from the Tolkyn field. As a result of Claimants' investments, TNG became the fourth largest gas producer in Kazakhstan.*

> 9.    *Claimants also invested more than US $240 million in construction of an LPG Plant, which was substantially complete before construction was halted as a result of the State's misconduct. Kazakhstan viewed the LPG Plant as a "strategic asset" for the Mangystau region. Claimants also conducted extensive exploration and production work on TNG's Contract 302 Properties, including drilling the "Munaibay 1" well, shooting 3D seismic, and acquiring a deep drilling rig to explore the considerable "Interoil Reef" prospect.*

> 10.    *[...] [P]rior to President Nazarbayev's directive of October 14, 2008, Claimants and their companies had enjoyed eight years of positive, productive relations with the Kazakh Government. That changed abruptly in the weeks following President Nazarbayev's personal instruction to "thoroughly check" KPM and TNG. During the previous eight years, however, Kazakh agencies had routinely inspected and audited the*



companies' operations and accounts and had consistently given them "clean bills of health."

11.    Notably, there had never been any allegation that KPM's or TNG's field pipelines were "main" pipelines, because they obviously were not. And Kazakhstan had taken express positions on other issues that it would directly contradict after October 2008 (and in this case). A simple review of Kazakhstan's change of position before and after October 14, 2008, demonstrates that President Nazarbayev's order caused the harm Claimants suffered in this case.

12.    [...]The documentary record clearly indicat[s] that State agencies, led by the executive's Financial Police, had pursued KPM and TNG (and their personnel) on multiple fronts, including trumped-up [and contrived] charges of criminal wrongdoing, which caused immediate harm to Claimants' investments. [...]

17.    The campaign against Claimants' investments in KPM and TNG that Kazakhstan commenced in the final quarter of 2008 breached the ECT and international law in multiple respects. It clearly entailed indirect expropriation, because it materially interfered with Claimants' ability to manage, use, and dispose of their investments. The measures Kazakhstan adopted — interference with contractual rights, wrongful exercises of administrative and judicial authority, sequestration of the companies' assets and Claimants' shares, assessment of spurious tax penalties, and harassment and persecution of key personnel — all fall squarely within the bounds of indirect expropriation as understood in international law and treaty practice.

18.    Kazakhstan's campaign was equally a violation of the ECT's fair and equitable treatment and impairment provisions, as well as its "most constant protection and security" clause. Kazakhstan subjected Claimants' investments in KPM and TNG to severe harassment and coercion as well as inconsistent and contradictory conduct, and it created an environment that was thoroughly unstable and unpredictable (if not treacherous). Kazakhstan also flagrantly violated due process and committed "denial of justice" in relation to KPM and its general director. At the same time, Kazakhstan's state apparatus, led by the Financial Police, utterly failed to provide legal (and in some cases physical) protection and security to Claimants' investments and personnel, much less the "most constant protection and security" required by the ECT.

19.    Kazakhstan also breached key provisions of Claimants' Subsoil Use Contracts. For example, Kazakhstan imposed groundless and extra-contractual tax assessments on KPM and TNG, and perhaps most notably, it terminated those contracts in violation of their termination provisions. Those acts were breaches of the ECT's "umbrella clause."

20.    In July 2010, Kazakhstan directly expropriated Claimants' investments by terminating KPM's and TNG's Subsoil Use Contracts and seizing their assets outright. Like the campaign that preceded it, Kazakhstan's ultimate



*expropriation was thoroughly groundless and illegal. By that point, however, Claimants' investments had already suffered 20 months of indirect expropriation and other mistreatment that clearly violated the standards of protection afforded by the ECT and international law.*

*[October 14, 2008 is the correct valutation date because (1) Kazakhstan's campaign against Claimants' investments in KPM and TNG commenced immediately after the directive, in breach of the ECT and international law, (2) the 2008 campaign harmed Claimatns' investments almost immediately and the injuries continued thereafter, and (3) due to the vicious downward spiral caused and fueled by the State's campaign, October 14, 2008 is the last date on which the Tribunal could assign a value to the investments that was not diminished by the consequences of Kazakhstan's illegal conduct.]*

35.  *Claimants' valuations of their investments are fundamentally sound and credible, as demonstrated by the fact that they are supported by multiple contemporaneous valuations performed by sophisticated third parties. Furthermore, they have been "reality-checked" by Claimants' experts — all of whose work is backed up with underlying data and modeling — against other independent indicators of value. The 89-page RBS Asset Valuation of mid-2009, performed with full access to Claimants' data room, clearly supports the main planks of Claimants' valuation. So too do the numerous indicative offers received from sophisticated energy companies during Project Zenith, as well as the arms-length Cliffson transaction of early 2010. FTI has also analyzed the trading prices of comparable companies, the terms of comparable transactions, and the trading value of the Tristan debt — all of which likewise support Claimants' valuation. [...]*

37.  *The "enterprise value" of Claimants' "Investments," KPM and TNG, is the appropriate measure of damages in this case, as it is in most treaty arbitrations involving "investments" in wholly-owned companies established in the host state. "Enterprise value" means the value of the companies' assets without deducting the companies' debts.*

38.  *Kazakhstan's argument that the Tribunal should award "equity value" — i.e., that it should deduct the debts of KPM and TNG — is wrong as a matter of fact and of law. Fundamentally, Kazakhstan's "equity value" argument is wrong because Kazakhstan seized all the assets of KPM and TNG, without assuming or extinguishing their debts. By seizing their assets, Kazakhstan left KPM and TNG unable to satisfy their debts, and Claimants remain responsible for doing so from the proceeds of any award in this case.*

39.  *The clear terms of the ECT as well as established treaty practice indicate that compensation should include the debts of KPM and TNG, especially in cases such as the present in which Claimants remain responsible for the debts. Indeed, Kazakhstan has conceded that if Claimants remain responsible for the debts of KPM and TNG — which they clearly do — an award of "enterprise value" would be appropriate. An award of*



*"enterprise value" is also necessary to prevent the unjust enrichment of Kazakhstan.*

40.    *Claimants have firmly established that Kazakhstan agreed to extend Contract 302 until March 30, 2011, but wrongfully failed to execute the required addendum to the exploration contract. Claimants have also conclusively demonstrated that they were actively in the process of exploring and drilling in the Contract 302 areas in late 2008 and early 2009 — until the State's refusal to execute the addendum and other misconduct stymied their exploration activities — and that they had the intent and the means to continue exploration through March 2011. Claimants were particularly active in relation to the substantial Interoil Reef prospect, in respect of which they had shot and interpreted 3D seismic and acquired a specialized deep drilling rig that was being prepared for transport to Kazakhstan.*

41.    *As a direct result of Kazakhstan's refusal to execute the addendum and its campaign against KPM and TNG, Claimants were prevented from advancing their exploration activities and drilling the wells necessary to determine if hydrocarbons were present in the Contract 302 areas, at what depths, and in what quantities and qualities. The only exception was Munaibay Oil, where sufficient drilling had been completed to confirm a significant discovery. For the other Contract 302 properties, however — including the Interoil Reef — the State's illegal conduct halted exploration prior to the point at which Claimants had obtained all the data necessary for their experts in this case to establish a fair market value. Claimants therefore had no choice but to submit a prospective valuation for the Contract 302 properties (except for Munaibay Oil).*

42.    *The Tribunal should nevertheless exercise its discretion to award a significant portion of the Contract 302 prospective valuation to Claimants under the "loss of opportunity" doctrine. That doctrine exists precisely for situations such as this in which claimants have been unable to demonstrate their losses with greater certainty as a direct result of the host state's illegal conduct. A number of treaty tribunals have relied on the doctrine in circumstances such as the present, and this Tribunal should do the same. Indeed, a failure to do so would reward Kazakhstan for its misconduct. (CPHB 1 ¶¶ 6 –42).*

684. Claimants make the following contentions regarding compensation (CPHB 2 ¶ 396):

| Tolkyn | US $478,927,000 |
|---|---|
| Borankol | US $197,013,000 |
| Munaibay Oil | US $96,808,000 |
| LPG Plant | US $245,000,000 cost plus discretionary portion of US $84,077,000 |



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

| **Contract 302 (other than Munaibay Oil)** | **US \$31,330,000 cost plus discretionary portion of US \$1,498,017,000** |
|---|---|

685. Claimants contend that they are entitled to (1) compound interest at an appropriate rate, (2) recovery of principal, interest, and penalties on the Tristan notes, (3) moral damages in the amount of 10% of the total compensatory damages awarded to Claimants, and (4) a full award on costs.

## G.II. Summary of Contentions by Respondent

686. Respondent's contentions are taken from its own words, without prejudice to their further arguments:

*11. The Republic is only prepared to offer the right to arbitrate to a certain pool of investors. The parameters of entitlement are framed by the provisions of the arbitration agreement in article 26 of the ECT, the rules of the Stockholm Chamber of Commerce, international law and the relevant rules of applicable law. The Republic has not consented to resolve any dispute with any of the Claimants under the ECT through arbitration.*

*12. The Republic's responses can be summarised as follows:*

*(a) The ECT should be interpreted in accordance with international law which includes the requirement to act in good faith in accordance with the general principle of pact sunt servanda.*

*(b) Anatolie Stati and Gabriel Stati, who allegedly own and/or control Ascom, Terra Raf, KPM and TNG, are not true investors and none of the Claimants is entitled to benefit from the ECT for the following reasons:*

*• Anatolie Stati is a political creature whose political connections, previous expertise and other international dealings strongly suggest that any investments he has made in Kazakhstan are not made as a commercial investor in energy resources with which the ECT are concerned. The same is true of Gabriel Stati who is more a playboy than a businessman.*

*• The benefits of the ECT are denied to Ascom under article 17 of the ECT.*

*• Gibraltar is not a party to the ECT and therefore Terra Raf cannot seek protection from the Treaty.*

*(c) No investments have in fact been made*

*• There is an inherent meaning of "investment" which has to include international law and national law. As such the inherent meaning includes (1) Salini characteristics (which are relevant if not exhaustive), and (2) compliance with the laws of the host State and good faith.*



▪       *There was no investment on the facts.*

⌐       *There is insufficient evidence of investments being made.*

⌐       *Claimants have not demonstrated that it has acted in good faith.*

⌐       *Moreover, the investments allegedly made by the KPM and TNG were in violation of Kazakh law.*

(d)     *In any event, even if (any of) the Claimants were entitled to benefit from the ECT (and can demonstrate to the relevant standard that investments had been made), Claimants did not comply with the cooling off period and therefore no jurisdiction vests in the tribunal.*

13.     *Lastly, Claimants have not discharged their burden of proof. Casting Claimants' arguments in the most flattering light, the case they now present is at best ambiguous and unclear. As set out in the recent award of ICS Inspection and Control Services Limited (United Kingdom) v. Argentine Republic, PCA Case No. 2010-9, Award on Jurisdiction, 10 February 2012, "a State's consent to arbitration shall not be presumed in the face of ambiguity." Where such consent is uncertain, no jurisdiction should be found, and the case against the Republic falls at the first hurdle. More likely, their assertions that their claims are entitled to any further consideration by the tribunal are simply unevidenced and unfounded. (R-II ¶¶ 11 – 14).*

1053.   *In their Reply Memorial on Jurisdiction and Liability, Claimants allege that the umbrella clause embodied in the last sentence of Article 10(1) of the ECT covers not only contractual but also statutory and regulatory obligations, that the Subsoil Use Contracts and Contract No. 302 are relevant under the umbrella clause and that the Republic has violated the umbrella clause. However, these arguments have no merit. (R-II ¶ 1053).*

1108.   *The guarantee under Article 10(12) of the ECT refers to the legislative obligation to provide a fair and efficient system of justice and does not encompass isolated failures of the judicial system in individual cases. Yet, the Claimants misconceive the meaning of the duty arising from Article 10(12) of the ECT. Instead of addressing the adequacy of domestic legislation, the Claimants focus on the judicial proceedings in one individual case. In fact, the Claimants have not even contended, let alone proven that the Republic has enacted legislation which does not provide a fair and efficient system of justice.*

864.    *Claimants allege that "in July 2010" the Republic directly expropriated Claimants' investment after already having indirectly expropriated it "over the October 2008-July 2010 period". Claimants go as far as claiming that in this period, the Republic took several measures and "any*



> *number of them individually constitute an act of indirect expropriation". In making these assertions, Claimants effectively defeat their own argument. Simple logic prescribes that something that has been taken once cannot be taken again unless it has been returned. However, Claimants were not expropriated once, twice or even several times – they were not expropriated at all. (R-II ¶ 864).*

890. *The Republic has explained that neither of these actions constitutes a direct expropriation due to a lack of a transfer of title. Claimants sole ground of opposition to the Republic's argument is that the fact that no transfer of title took place was "immaterial as a matter of international law". They have thus conceded that no transfer of title to the Republic took place. Since, as explained above, there is no basis for Claimants' contention that transfer of title is not required for direct expropriation to occur, the only available conclusion is that the Republic did not directly expropriate Claimants investments. (R-II ¶ 890).*

993. *To reiterate the Republic's position, the standard of fair and equitable treatment needs to be considered against all the factual circumstances. In a situation where the state action that the injured party claims of is one which the aggrieved party has been granted a right to resolve at a local level, there can be no conclusion that the state has acted unfairly and inequitably if the aggrieved party has not actually pursued those rights. In other words, a state (acting fairly and equitably) may provide an opportunity (through the provision of contractual protection or through the court system) for the claimant to seek redress of actions taken by the state that may have been incorrect. This might apply to a decision of a first instance court or the actions of an administrative official. This is a fundamental part of providing a fair and equitable as well as stable and predicable environment for the investment. As set out in Helnan v Egypt, a treaty claim for the breach of fair and equitable treatment is likely to be less successful where the claimant has not been able to show that the system of investment protection in the host state has been unfair and inequitable vis-a-vis the aggrieved party.*

982. *[The] duty of most constant protection and security requires a host state to diligently implement reasonable mechanisms of protection. Claimants have not challenged that the Republic disposes of the necessary legal framework to provide protection to foreign investors and investments from physical damage or violence. Yet, it is Claimants who need to prove the absence of reasonable measures. Since they have failed to establish such absence, their claim fails on this ground alone.*

983. *Apart from this, the legal and administrative system of the Republic is indeed sufficiently developed and refined to the extent which can be expected from a vigilant state exercising due diligence. The Republic has enacted sufficient laws to protect nationals and foreign investors alike from any physical harm.*

984. *Even if the scope of Article 10(1) of the ECT was not restricted to the duty to implement reasonable measures for protection - which, as explained*



*above, it is - Claimants still fail to establish that prerequisites of this provision have not been met in this case. In their Reply Memorial on Jurisdiction and Liability Claimants contend that the Republic violated the guarantee by not providing the necessary physical security of Claimants' assets. This reasoning is flawed. (R-II ¶¶ 982 – 984).*

1009. *[...] Claimants [...] begin their section by listing five cases in which the tribunals found the respective host state to have violated [the duty to refrain from unreasonable or discriminatory measures impairing the investments pursuant to Art. 10(1) ECT.] However, [...] the Republic has adhered to its obligations under Article 10(1) of the ECT at all times. Its measures were neither unreasonable nor discriminatory, nor was the management, maintenance, use, enjoyment or disposal of Claimants' investments impaired in any way. (R-II ¶ 1009).*

1145. *[...]Claimants allege that the Republic has failed to permit them to employ key persons of their choice contrary to their obligation pursuant to Article 11(2) of the ECT. However, Claimants content themselves with drawing the conclusion that the Republic violated this provision and do not bother subsuming any facts under Article 11(2) of the ECT. Such conclusion has no merit. [...] [The criminal proceedings and interrogations of KPM's and TNG's employees have not hindered Claimants from employing key personnel of their choice.] (R-II 1145, 1159, partially quoted).*

687. Respondent's contentions regarding causation are summarized in RPHB 2 ¶ 61:

   (a) *Claimants mismanaged their assets on numerous occasions, for example by putting alarmingly incompetent personnel in charge of important tasks and by promising sales to business partners that they could have never made.62 The mismanagement went so far that market observers were concerned about "weak corporate governance standards at Tristan".63 The overall level of mismanagement comes as no surprise given that Claimants had no prior experience in oil and gas production and in the Kazakh or international markets.*

   (b) *KPM's and TNG's business was very risky from the start, as was set out clearly in the Tristan note prospectus.*

   (c) *KPM's and TNG's financing structure, which aimed at removing capital from the companies, made them vulnerable to situations of crisis.*

   (d) *Claimants took business decisions aimed only at short-term profit. In particular the ramping up of production at the end of 2007 was short sighted, as it led to a loss of available gas production for the LPG Plant and the allegedly expected possibility of gas export (which the Republic denies).*

   (e) *In April of 2008, Claimants found out that their estimates for production from Borankol had been overstated by 300%. At the time, Claimants received the new Miller&Lents reserves report68 which set out 2P reserves of 24.6 MMboe. The earlier report by Ryder Scott had provided for 2P*



*reserves of 72.4 MMboe. 69 The effect of this loss was particular[ly] significant because Borankol is a predominantly oil producing field and oil production is much more valuable than gas production.*

    *(f)    KPM and TNG were already in severe financial difficulties as of Claimants' valuation date, as is evidenced by the development of the Tristan notes price.*

    *(g)    Severe drops in energy prices and in demand, in particular due to the loss of Kemikal as a customer, led to a very restricted cash position for KPM and TNG. At the same time, the need for capital expenditure increased markedly, putting further pressure on the companies.*

    *(h)    Against this background, when uncontestedly legal tax demands were raised by the state in the summer of 2009, Claimants had to take out the horrendous Laren loan and issue new notes in the amount of USD 111.1 million in connection thereto.*

    *(i)    Thereafter, Claimants deliberately chose to withdraw cash from KPM and TNG, all while not fulfilling the annual work programs. This was effectively the deliberate abandonment of the companies.*

688.  Respondent's contentions in the case of quantum can be summarized as follows:

    *13    [...] Claimants' claims fail for a lack of damage. In the following, the Republic will establish through serious and thorough experts that*

        *(a)    the asset value of Contract No. 302 is **zero**;*

        *(b)    the LPG Plant may at best have **salvage value** which Claimants failed to determine;*

        *(c)    the asset value of the Borankol field is **USD 62.8 million**;*

        *(d)    the asset value of the Tolkyn field is **USD 123.2 million***

        *(e)    debt under the Tristan notes in the amount of **USD 531.1 million** as well as other debt must be **deducted** from any asset value assigned to the assets in question.*

        *(f)    the final result after proper valuation and deductions is **zero**. (R-III ¶ 13, emphasis added).*

689.  Respondent contends that (1) Claimants grossly inflated their damage claim, (2) 21 July 2010 is the proper valuation date, (3) the Cliffson SPA and the offers made in Project Zenith are irrelevant to damages, (4) Claimants are not entitled to moral damages, (5) the appropriate interest rate for compensation would not apply to Claimants' "*loss of opportunity*" claim, and (6) that the Respondent is entitled to a full award on costs.



Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 40 of 52
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/30/14   Page 40 of 204 of 225

Page **151** of **414**

# H. Preliminary Considerations and Conclusions of the Tribunal

690. The Tribunal has considered the extensive factual and legal arguments presented by the Parties in their written and oral submissions. The Tribunal's use of one Party's terms as opposed to another's is not a reflection of the Tribunal's legal interpretation of an issue – rather, effort has been made to use consistent terminology through this Award in order to facilitate understanding. Below, the Tribunal discusses the arguments of the Parties most relevant for its decisions. The Tribunal's reasons, without repeating all the arguments advanced by the Parties, address what the Tribunal considers to be the determinative factors required to decide upon the issues arising to decide on the relief sought by the Parties. The Tribunal considers, however, that brief repetition of certain aspects of its conclusions in the context of particular issues is necessary, or at least appropriate, in order to avoid misunderstanding.

## H.I. Jurisdiction

### 1. The Parties' Consent to Arbitration before the SCC

#### a. Arguments by Claimants

691. The Tribunal's jurisdiction over this dispute arises from Art. 26 ECT, the language of which clearly points to the SCC as the proper forum for this dispute. The ECT entered into force for Kazakhstan on 16 April 1998. (C-0 ¶¶ 92 – 95; C-1 ¶¶ 26 – 28; C-II ¶¶ 23 – 33; CPHB 1 ¶ 43; CPHB 2 ¶ 9).

692. After the Hearing on Quantum, Claimants argued that Respondent seemed to abandon its linguistic contentions regarding the ECT. (CPHB 1 ¶¶ 43 – 46).

693. Claimants reject Respondent's linguistic analysis of Art. 26. (C-II ¶¶ 43 – 48). There is no support for Respondent's argument that the capital "*A*" in "*Arbitration institute*" refers to the International Court of Arbitration of the ICC, and support to the contrary is found on the official Russian language website of the ECT. (C-II ¶ 44). Likewise, there is no support for Respondent's argument the use of the word "*international*" is determinative in meaning. (C-II ¶ 45). Claimants also state that the words "*in Stockholm*" do not denote a seat and point out that references to arbitral seats are notably absent in the other arbitration options in Art. 26(4) ECT. (C-II ¶ 46). As Respondent admits, all other authentic versions of the ECT clearly refer to the Arbitration Institute of the SCC as the forum. The Russian-speaking Contracting Parties to the ECT understood this. This is sufficient for the Tribunal to find that the SCC is the proper forum. (C-II ¶¶ 34 – 35). In addition, the publications of the ECT Secretariat consistently refer to Art. 26 ECT as providing for SCC, and not ICC, arbitration – to no state's objection. (C-II ¶ 51).

694. Even if Respondent's translation arguments are correct, the Russian ECT must be interpreted in conformity with the five others. (C-II ¶¶ 40 – 42). Claimants state that under the rule of treaty unity – a core principle of interpretation of plurilingual treaties enshrined in Art. 33(3) VCLT – treaty terms are presumed to have the same



meaning in each authentic text. Although the ECT is plurilingual in expression, it is one single treaty with a single set of terms. Indeed, even Art. 33(4) VCLT directs the Tribunal, to adopt the meaning that best reconciles the texts. Therefore, the Tribunal should make every effort to find a common meaning among the ECT texts, before preferring one to another. (C-II ¶¶ 38 – 39).

695. Other Kazakh documents, including a BIT between Kazakhstan, Belgium, and Luxemburg and the Law of Kazakhstan on Foreign Investment use the language "*in Stockholm*" as a reference to the SCC and not to an arbitral seat. (C-II ¶ 46 – 48).

696. Claimants state that tribunals have accepted jurisdiction in all SCC arbitrations involving Russian-speaking states brought under the ECT to date. None of the respondent states have raised any doubt as to whether Art. 26(4)(c) ECT referred to the SCC. (C-II ¶¶ 50 – 52). The commercial arbitration cases relied on by Respondent do not compel a different conclusion.

## b. Arguments by Respondent

697. Respondent argues that it is not bound to arbitration under the ECT because the offer to arbitrate contained in Art. 26(4) ECT is ambiguous and, thus, pathological. (R-II ¶ 241). The text in the Russian language refers to the Arbitration Institute of the ICC, while the equally authentic texts in other authentic languages (English, Spanish, Italian, German and French) refer to the Arbitration Institute of the SCC. Pursuant to Art. 50 ECT, consistent with Art. 33 VCLT, the Russian ECT is authentic, regardless of these differences. (R-I ¶¶ 6.5 – 6.8; 6.31 – 6.32). As a result, the offer contains indications for two different arbitration institutions. The ambiguity of the offer stems from the irremovable discrepancy between the Russian and other authentic texts of Art. 26 ECT. (R-II ¶ 242). Since the acceptance of an ambiguous offer cannot result in the conclusion of a valid arbitration agreement, the alleged arbitration agreement between the Republic of Kazakhstan and Claimants concerning dispute examination in the Arbitration Institute of the SCC does not exist. (R-II ¶ 243). Accordingly, the Tribunal should decline jurisdiction. (R-I ¶ 6.2).

698. Kazakhstan and Moldova assumed obligations under the ECT on the basis of the Russian language text. (R-I ¶¶ 6.33 – 6.36). Turning to Art. 26(4)(c) ECT, the Russian text permits an investor to submit the dispute "*to an arbitral proceeding under the Arbitration institute of the international chamber of commerce in Stockholm.*" Respondent argues that each word in the ECT must be given due consideration and submits that the key expressions for the Tribunal's consideration and analysis are "*under the Arbitration institute*" and "*in Stockholm.*" (R-I ¶¶ 6.11, 6.24).

699. Regarding the term "*under the Arbitration institute*", Respondent submits that the term means that a dispute should be considered by an arbitral tribunal acting under the framework of a permanent arbitration centre – one with an institutional framework for the administration of proceedings, a list of arbitrators, and rules for proceedings. (R-I ¶¶ 6.12 – 6.22). One such institution would be the International Court of Arbitration of the ICC, and the use of the capitalized "*A*" lends credibility to the argument that that particular institute was intended. (R-I ¶¶ 6.21 – 6.23).



700. Regarding the language "*in Stockholm*", Respondent submits that the only correct interpretation of the Russian text is that "*disputes may be submitted for proceedings in Stockholm, and shall be considered by an arbitral tribunal constituted under the rules of the ICC.*" (R-I ¶¶ 6.24 – 6.30). Respondent highlights international arbitration cases that have considered similarly ambiguous arbitration agreements and where the tribunal or court also found that the city reference was merely to the place where arbitration was to occur, and not the institution. (R-I ¶ 6.28).

701. Respondent concedes that the clause may be simply ambiguous, lending itself to several alternative meanings, including that it refers disputes to the "*International Court of Arbitration of the International Chamber of Commerce in Stockholm*" (in which case, the words "*Arbitration Institute*" would be interpreted to mean "*International Court of Arbitration*") or the "*Arbitration Institute of the Stockholm Chamber of Commerce*" (and the words "*international*" should be replaced with "*Stockholm*"). (R-I ¶¶ 6.9 – 6.10). The first of these alternatives is, however, most plausible. (R-I ¶ 6.10).

702. Respondent presents that arbitration is based on consent. Here, the investor must accept the Art. 26(4)(c) ECT offer to arbitrate by submitting a request for arbitration to the relevant institution. (R-I ¶¶ 6.39 – 6.44). Here, the agreement to arbitration is void for uncertainty, the Moscow Commercial Arbitrazh Court (R-95) and the Federal Supreme Court of Germany (R-96) have come to similar conclusions in similar circumstances. (R-I ¶¶ 6.44 – 6.47).

703. Respondent argues that Art. 26(4)(c) ECT violates the *jus cogens* norm of the sovereign equality of states and is, therefore, void. (R-I ¶ 6.49 – 6.61). All of the ECT texts, except the Russian version, allow an investor to commence arbitration proceedings in the SCC. (R-I ¶ 6.58). The consequence of this is that a Swedish investor could commence proceedings with a Swedish arbitration institute (the SCC) against a foreign state and potentially receive a ruling against that foreign state, as has already occurred. (R-I ¶ 6.59). This is a violation of the principle of sovereign equality, because it gives Swedish investors an inequitable right to commence proceedings in a (home) Swedish arbitration institute, which has a right that other investors do not have – i.e., a Kazakh investor cannot commence proceedings in a (home) Kazakh arbitration institute against Sweden. (R-I ¶¶ 6.58 – 6.61).

704. Based on the foregoing, Respondent argues that the Tribunal is under a duty to decline jurisdiction. (R-I ¶ 6.48).

### c.    The Tribunal

705. While Claimants have stated that the consent to arbitrate pursuant to Art. 26 ECT is no longer at issue (CPHB 2 fn 2), Respondent continues to incorporate its arguments relating to Art. 26 through the second post hearing brief. (RPHB 2 fn 714).

706. There is no dispute between the Parties that Art. 26 ECT is the provision ruling on jurisdiction. The ECT entered into force for Kazakhstan on 16 April 1998.



707. However, Respondent maintains its argument that the Russian text of the ECT does not provide for arbitration under the rules of the SCC. The Tribunal is not persuaded by Respondent's linguistic analysis. All other authentic versions of the ECT clearly refer to the Arbitration Institute of the SCC as the forum of jurisdiction. In addition, the publications of the ECT Secretariat consistently refer to Art. 26 ECT as providing for SCC, and not ICC, arbitration – to no state's objection.

708. As Respondent concedes (R-I ¶¶ 6.9 – 6.10), the clause may be simply ambiguous, lending itself to several alternative meanings, including that it refers disputes to the "*International Court of Arbitration of the International Chamber of Commerce in Stockholm*" (in which case, the words "*Arbitration Institute*" would be interpreted to mean "*International Court of Arbitration*") or the "*Arbitration Institute of the Stockholm Chamber of Commerce*" (and the words "*international*" should be replaced with "*Stockholm*"). However, Respondent argues that the first of these alternatives is most plausible. (R-I ¶ 6.10). The Tribunal disagrees. First, the Tribunal is not persuaded by Respondent's linguistic analysis of the Russian text of the provision, as the states ratifying the ECT were aware of the texts in the other languages referring to the SCC and not objecting thereto or to the respective publications of the ECT Secretariat. But, second, even if Respondent's translation arguments were correct, the Russian ECT must be interpreted in conformity with the five others under the rule of treaty unity, which is the core principle of interpretation of plurilingual treaties contained in Art. 33(3) VCLT: treaty terms are presumed to have the same meaning in each authentic text. Although the ECT is plurilingual, it is one single treaty with a single set of terms which should be interpreted as having one meaning. Respondent has not provided any evidence that the Russian text was intended to provide a different meaning regarding the jurisdiction.

709. Therefore, the Tribunal concludes that it has jurisdiction under Art. 26 ECT and under the Rules of the SCC.

## 2. Jurisdiction Ratione Personae

### a. Arguments by Claimants

710. The Tribunal's jurisdiction is governed by the express terms of the ECT. Each of the four Claimants qualifies as an investor under Art. 1(7) ECT. (C-I ¶¶ 29 – 32; C-II ¶¶ 76 – 78; CPHB 1 ¶¶ 47 – 49).

711. Under Art. 1(7) ECT, "*Investor means… (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law.*" Anatolie Stati and Gabriel Stati each hold the nationality of Moldova and Romania, which are Contracting Parties to the ECT. They are, therefore, qualified as "*investors*" under the ECT. That is the end of the inquiry. Their residence does not matter. Claimants have provided the Tribunal with *prima facie* proof of nationality for each, including identification cards and passports (C-II ¶¶ 79 – 80, CPHB 1 ¶¶ 47 – 49; CPHB 2 ¶ 10).

712. Respondent's arguments that neither Anatolie Stati nor Gabriel Stati is an "*investor*" are either wrong or irrelevant. Additionally, they are also contrary to



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Kazakhstan's own internal documentation, which identifies Anatolie Stati as an investor. (C-II ¶ 81). Claimants explain as follows:

> 82. Second, to the extent that Kazakhstan's jurisdictional objections relating to Anatolie Stati and Gabriel Stati pertain to the legality of their investments, they are misplaced. The legality of an investment has no bearing on whether an individual qualifies as an "investor" under Article 1(7) of the ECT. [...]
>
> 83. Third, Kazakhstan's contention that because "Ascom is not an investor, Anatolie Stati also cannot be considered as an indirect investor in the meaning of the ECT" is a non sequitur, and of no relevance to the definition of "investor" under the ECT. Ascom qualifies as an "investor" under the ECT on its own, as demonstrated below. Even if it did not, the ECT protects indirect investments, and does not require that any intermediary company qualify as an "investor" for an indirect owner to be an "investor."
>
> 84. Fourth and finally, Kazakhstan's argument that "Anatolie Stati does not have the capacity to act as an investor in the Republic of Kazakhstan" is also beside the point. Nothing in the definition of "investor" under Article 1(7) of the ECT requires that the individual qualify as an "investor" within the meaning of the national law of the host state. Kazakhstan's attempt to add its own self-serving requirement to the definition of "investor" under the ECT is unavailing. (C-II ¶¶ 81 – 84, emphasis in original, citations omitted).

713. The accusations that have been made against Mr. Anatolie Stati by the President of Moldova are absolutely meritless. Claimants explain that "Mr. Anatolie Stati's investments in South Sudan are normal, commercial investments in the oil and gas industry. He has contributed enormously to the well-being of the population of South Sudan by making substantial investments in oil and gas exploration and by building schools, a hospital, medical clinics, and means of transportation in the region where his investments are located." (C-II ¶¶ 194 – 195).

714. No legal authority exists that would allow Respondent to add additional requirements into Art. 1(7) ECT. Respondent's personal attacks on Claimants "smack of desperation by a party with a losing case." (CPHB 1 ¶¶ 47 – 48).

715. Turning to Ascom, Claimants produced the Certificate of Incorporation of Ascom in Moldova as an exhibit to their Request for Arbitration and to their Statement of Claim, and Kazakhstan does not contest the authenticity of that document. Kazakhstan's arguments concerning whether Ascom is a 100% owner of KPM – a fact which has been recognized by the Financial Police – are irrelevant to establishing whether Ascom meets the definition of investor under Art. 1(7) ECT. (C-II ¶¶ 85 – 86).

716. Respondent seeks to improperly and retroactively deny ECT benefits to Ascom on the basis of the so-called "[denial] of benefits" provision of Art. 17 ECT. Respondent contends that because Ascom is incorporated in Moldova and controlled by a Romanian national, Mr. Anatolie Stati, Ascom falls within the



denial of benefits provision in Art. 17 ECT. Kazakhstan's reliance on Art. 17 ECT is misplaced. Article 17 ECT only applies to Part III of the ECT, leaving unaffected the dispute resolution provision in Art. 26 ECT. Article 17 ECT concerns only the merits and not jurisdiction, and this view has been relied on by the tribunal in *Plama v. Bulgaria*, and was adopted by the *Yukos* tribunal. Regardless, however, Art. 17 ECT only applies if a state invoked that provision to deny benefits to an investor before a dispute otherwise arose. Since Kazakhstan did not exercise this right, Art. 17 ECT is completely irrelevant to this case. (C-II ¶¶ 87 – 90; CPHB 1 ¶¶ 50 – 52; CPHB 2 ¶ 13).

717. Article 17 ECT has only a prospective effect and, even if this Tribunal were to find that exercise of the "*denial of benefits*" could be retroactive, Art. 17(1) would still be inapplicable because the two elements of that article are not met, namely: i) that a legal entity be owned or controlled by citizens or nationals of a third state and (ii) that that entity has no substantial business activities in the Area of the Contracting Party in which it is organized. First, as is clear from the text of the ECT, a "*third state*" under the ECT is a state that is not a party to the ECT. Second, the second element is also missing, as Ascom's board of directors and management direct and control Ascom from its headquarters in Chisinau, Moldova. Even if Art. 17 could be applicable, Anatolie Stati is the sole shareholder and has dual Romanian and Moldovan citizenship. Both countries are parties to the ECT. Accordingly, neither of the cumulative requirements of Art. 17 ECT would be satisfied. (C-II ¶¶ 91 – 95; CPHB 1 ¶¶ 50 – 52; CPHB 2 ¶ 12).

718. Claimants state that Terra Raf was incorporated on 1 March 1999 by Southbridge Services Limited and Cresmount Services Limited. On 27 January 2000, Messrs. Stati acquired Terra Raf's two sole shares and replaced the former directors as Terra Raf's new directors. In September 2004, Messrs. Stati increased their shares to a thousand each, with each receiving an additional 999 shares. Claimants state that Terra Raf's certificate of incorporation clearly name Messrs. Stati as directors and sole shareholders, directly owning and controlling 50% of it and of TNG and its assets. (C-0 ¶ 13; C-II ¶ 96, 129).

719. In response to Kazakhstan's contention that this Tribunal does not have jurisdiction over Terra Raf because the ECT does not apply to Gibraltar, Claimants explain that, as the *Petrobart v. Kyrgyzstan* tribunal held, the ECT applies to Gibraltar by way of Art. 45(1) ECT, which addresses provisional application of the Treaty. (C-II ¶¶ 96 – 98; CPHB 1 ¶¶ 53 – 54; CPHB 2 ¶ 11). Kazakhstan argues that "*[p]rovisional application of the ECT will cease: (a) by virtue of the Treaty coming into force pursuant to Article 45(1); or (b) by virtue of a written notification pursuant to Article 45(3)(a)*" and that "*the provisional application was de facto terminated on that date in respect of the United Kingdom and all sovereign territories of the UK, including Gibraltar.*" (C-II ¶¶ 99 – 100, partially quoted). This argument ignores ECT's provisions which do not provide for *de facto* termination. Instead, Art. 45(3)(a) ECT requires that provisional application be terminated by written notification. This view was endorsed by the *Petrobart v. Kyrgyzstan* tribunal and this view was upheld when the Svea Court of Appeal declined to annul the award and found that the tribunal had correctly addressed the jurisdiction issue. This is the only tribunal to date that has considered the applicability of the ECT to Gibraltar. To date, no written notification has been made with respect to Gibraltar.



720. Kazakhstan's attempts to distinguish *Petrobart* are misplaced. First, with respect to the timing of the investment, that was not a consideration in the *Petrobart* tribunal's reasoning. That tribunal's reasoning solely concerned the analysis of Art. 45 ECT and the regime to terminate provisional application under that article, i.e., a notification under Art. 45(3) ECT. The text of Art. 45 ECT does not indicate that the timing of an investment should be of any relevance to termination of provisional application. The question turns solely on whether the United Kingdom or Gibraltar has made a declaration to terminate provisional application of the ECT to Gibraltar. Neither has done so. (C-II ¶ 103). Second, Kazakhstan's contention that "*the terms of the UK's ratification document were clear notice that the UK intended to end the application of the ECT to Gibraltar*" is wrong. The UK ratification document simply does not refer to Gibraltar at all. Furthermore, the notification and the note verbale indicate Gibraltar's intention to ratify the ECT later. Both indicate that ratification by the United Kingdom and by Gibraltar will be dissociated in time, thereby leaving intact the provisional application of the ECT in the meantime. (C-II ¶ 104). This interpretation is supported by Art. 40(2) ECT on the application of the treaty to overseas territories, which clearly anticipates the possibility of a dissociation between the date of entry into force for a state and an overseas territory, and which provides that "*[a]ny Contracting Party may at a later date [i.e., later than at the time of signature, ratification, acceptance, approval or accession], by a declaration deposited with the Depository, bind itself under this Treaty with respect to other territory specified in the declaration.*" (C-II ¶ 105). Finally, termination of provisional application of the ECT has not been noted on the Members' page of the Energy Charter Secretariat, though it has notes on the end date of Russia's provisional application. (C-II ¶ 106). With regard to Dr. Tietje's allegation that the treaty practice of the United Kingdom since 1967 is not to make a declaration regarding inclusion of an overseas territory at the time of signature since such would usually have to be reconfirmed a the time of ratification, it is clear that the United Kingdom did confirm that the ECT provisionally applied to Gibraltar. (CPHB 1 ¶¶ 53 – 56).

721. Alternatively, should the Tribunal find that the ECT ceased to apply provisionally to Gibraltar, the ECT nevertheless applies to Gibraltar on the basis that Gibraltar is a part of the European Community, which is itself party to the ECT. (C-II ¶ 108; CPHB 2 ¶ 11). Gibraltar's parliamentary reports indicate that the ECT applies to it on that basis. Pursuant to Art. 52 TEU and Art. 355 of the Treaty on the Functioning of the European Union, Gibraltar is a European territory. (C-II ¶¶ 108 – 110, CPHB 1 ¶ 56).

722. Finally, while there should be no doubt that Terra Raf is a qualified "*investor*" under the ECT, the issue is of little ultimate relevance, because Terra Raf is owned and controlled by Messrs. Anatolie and Gabriel Stati. The ECT protects their indirect investments in Kazakhstan. (C-II ¶ 112).

### b. Arguments by Respondent

723. Respondent agrees that the definition of "*investor*" is set out in Art. 1(7) ECT. If Claimants can provide evidence to discharge their burden of proof to the Tribunal, namely that Claimants Anatolie and Gabriel Stati are citizens, nationals or permanent residents of a contracting party, it is not for the Respondent to dispute it. (R-I ¶¶ 8.1 – 8.6, 8.62; R-II ¶ 19).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

724. Nevertheless, the inquiry does not end there. Rather, when assessing jurisdiction, the question of nationality is one which the Tribunal, may examine from the standpoint of international law. Such an analysis, which mirrors the analysis to be undertaken with respect to whether an investment has been made, considers the overall nature of the Claimants and their general conduct. (R-II ¶¶ 20 – 23; RPHB 1 ¶¶ 420 – 422).

725. Turning first to Anatolie Stati, Respondent states that he cannot be seen as an investor under the ECT because (1) he has not made any direct investments in Kazakhstan, (2) his so-called investments are invalid under the laws of Kazakhstan, and (3) he is not an indirect investor in any firm, since he does not hold the legal capacity to act as an investor. (R-I ¶¶ 8.56 – 8.61).

726. Respondent argues that Anatolie Stati is a highly skilled political animal who is adept at converting long term assets into the short term aims of "advancing political goals." Anatolie Stati's background is in the corrupt construction sector in the former USSR. While his method of entry into the oil and gas industry is not clear from Claimants' submissions, it is clear that Anatolie Stati has established himself in a position of power by playing in the political field in Moldova. Anatolie Stati operates among a web of political figures who are engaged in corrupt practices and terrorism – and that these actors have direct interests in Anatolie Stati's investments in Kazakhstan. Indeed, it appears that Anatolie Stati pays politicians in return for political power, business connections, and opportunities. Equally, politicians pay him to act as a front for their business endeavours, as evidenced by Anatolie Stati's investments in Turkmenistan, where Anatolie Stati was involved in a document smuggling operation, for which his political ties helped him in avoid prosecution. (R-II ¶¶ 24 – 33; 38 – 39; RPHB 1 ¶¶ 420 – 427).

727. Claimants' activities in Sudan (1) have been regarded as non-beneficial to the local population, (2) have been questioned for a lack of transparency and (3) shed serious concerns as to whether Claimants are entitled to protection under the ECT. The statements made by both President Voronin and Mr. Andreyev in relation to Mr. Anatolie Stati's financing of illegal militant groups in Sudan in circumvention of UN sanctions are not "defamatory." There is nothing to suggest that both President Voronin (as a political adversary) and Mr. Andreyev (as a former employee) would not have had actual knowledge of Claimants' businesses in Sudan, given their respective relationships with Claimants. Their stories are consistent, even though they have not interacted with one another. Moreover, since the assets in Sudan are non-producing, it is likely that Claimants used money received from Kazakhstan to finance the illegal activities there. (R-I ¶ 9.57; R-II ¶¶ 40 – 46; RPHB 1 ¶¶ 430 – 431).

728. Gabriel Stati – the pampered son of Anatolie Stati – is more a playboy than a businessman. No stranger to controversy, he was arrested following the April 2009 elections in Moldova amid allegations that he was involved in the organization and financing of civil unrest and attempting to overthrow the Moldovan government. The Moldovan authorities attempted to extradite Gabriel Stati from the Ukraine. There is little to suggest that he has had any active involvement in Claimants' alleged investments in Kazakhstan. (R-I ¶ 8.62; R-II ¶¶ 34 – 36; RPHB 1 ¶¶ 428 – 429).



729. Respondent disputes legality of Ascom's 9 December 1999 purchase of the 62% interest in KPM. Claimants made no payments in relation to this initial purchase, but instead likely paid monies to a company called Telwin under a brokerage agreement. Respondent alleges that, pursuant to this brokerage Agreement, Telwin was obliged to find the owner of the rights in the exploration of the Borankol field and to assist in the acquisition of those rights for Ascom. Telwin, however, held 85% of the shares of Aksai at the time and, therefore, received USD 1.5 million in consideration for locating the owner of the rights, which it must have known that Aksai owned all along. Respondent also states that payment of the purchase price has not been proven. (R-II ¶ 117).

730. The benefits of the ECT to Ascom should be denied under Art. 17(1) ECT, pursuant to which a state can deny the benefits under the ECT if citizens or nationals of a third state own or control the investor and if the investor has no substantial business activity in the state in which it is organised. Presently, Ascom fulfils both parts of this test. First, Ascom is controlled by citizens of a third state. It is organized under the laws of Moldova, but is not controlled by citizens of Moldova (since "*third state*" means any state other than the state of incorporation). Thus, since Claimants state that Anatolie Stati and Gabriel Stati are controlling Ascom, the Tribunal would have to find that Anatolie and Gabriel Stati, as citizens of Romania, are citizens of a third state for the purposes of Art. 17(1) ECT. Although Claimants attempt to avoid this conclusion by arguing that "*third state*" in Art. 17(1) ECT means "*states other than contracting states of the ECT*," this argument is contradicted by the ECT's use of the term "*third state*" in other provisions, such as Art. 7(10)(a)(i) ECT. As a result, third state can mean contracting and non-contracting states. Accordingly, Romania is to be treated as a third state, thereby fulfilling the first part of the text. (R-I ¶¶ 8.9 – 8.10; R-II ¶¶ 47 – 52; RPHB 1 ¶¶ 432 – 434).

731. Second, Claimants have only made the unsupported contention that Ascom's Board of Directors and management direct and control Ascom from Moldova. Claimants have not met their burden of proving that Ascom has substantial business activities in Moldova, leaving the second part of the test fulfilled. (R-I ¶ 8.10; R-II ¶¶ 53 – 54).

732. Since Ascom does not meet the requirements of Art. 17(1) ECT, Respondent can deny it benefits under the ECT. Contrary to Claimants' contention, the Republic can do this retrospectively and Claimants did not challenge this in the Hearings. The mere existence of Art. 17(1) ECT is a clear warning for a putative investor that protection can be denied if the prerequisites of the provision are fulfilled. The tribunals in the *Plama* and *Yukos* decisions erred when they based their findings on the argument that a retrospective application would undermine an investor's legitimate expectations regarding the existence of protection under the ECT. The *Plama* and *Yukos* decisions render Art. 17(1) inapplicable. These decisions are also in clear neglect of investment practice. Foreign investors often times do not even have to inform host states of their investment in the first place and investment is made "*under the radar*" of the host states. Under such conditions, an effective application of the denial of benefits clause would not be possible. Yet, tribunals have frequently held that the effective interpretation of treaty provisions is important. Thus, the tribunals in *Ulysseas Inc. V. Ecuador* and in *Pac Rim Cayman*



*v. El Salvador* were correct when they held that a denial of benefits clause could have retrospective effect. (R-II ¶¶ 55 – 61).

733. With respect to Terra Raf, Respondent does not admit that Terra Raf is validly incorporated in Gibraltar. Even if it were, however, Terra Raf would not be entitled to protection under the ECT because the ECT does not apply provisionally to Gibraltar, nor is Gibraltar a party to the ECT based on the EU's signature to the ECT. (R-I ¶ 8.11; RPHB 1 ¶ 440).

734. Regarding the provisional applicability, although the Parties agree that the ECT applied provisionally to Gibraltar prior to the United Kingdom's ratification thereof on 13 December 1996, the ECT no longer applies to Gibraltar on a provisional basis. Provisional application of the ECT is regulated by Art. 45 ECT, which provides for two methods of termination of the provisional application. Under the *de facto* method of Art. 45(1) ECT, the entry into force of the ECT automatically brings provisional application of the ECT to an end. The ECT entered into force in the United Kingdom on 16 April 1998, and provisional application was *de facto* terminated on that date in respect of the United Kingdom and all sovereign territories of the UK, including Gibraltar. Alternatively, under the notice method set out in Art. 45(3)(a) ECT, the entry into force of the ECT constituted notice of the United Kingdom's intention that Gibraltar would not be part of the ratification of the ECT, and that its provisional application would also terminate. The United Kingdom's practice since 1967 has been to expressly declare the specific territories to which a treaty shall extend, and Gibraltar was not included in the United Kingdom's declaration. Thus, to the extent that the ECT ever could have provisionally applied, that terminated with the United Kingdom's ratification of the ECT on 13 December 1996. (R-I ¶¶ 8.12 – 8.41; R-II ¶¶ 62 – 69; RPHB 1 ¶¶ 443 – 444).

735. The United Kingdom was within its rights to refuse to apply the ECT to Gibraltar, even without consulting it. Further, the United Kingdom's intention not to apply the ECT to Gibraltar is confirmed by a *note verbale* dated 27 July 2004, which made it clear that Gibraltar did not want the United Kingdom to ratify the ECT on its behalf. (R-I ¶¶ 8.27 – 8.30).

736. Respondent states that Claimants have seemed to drop their assertion that the ECT applied to Gibraltar *via* the EU's signature on the ECT and seemed only to maintain their position that the ECT applies provisionally. Nevertheless, Claimants' EU arguments rest on the incorrect assumption that the EU is a contracting party of the ECT. Respondent reminds the Tribunal that the EU is not a contracting party to the ECT. The United Kingdom signed the ECT as an EU Member State in a "*mixed agreement*." This means that, the Member State signed in respect of those matters where Member States align their policies with the EU. There is a strong presumption that mixed agreements are concluded in territorial areas which fall within the regulatory scope of the application of EU law. Respondent states that Gibraltar is a disputed territory as between the United Kingdom and Spain and, as a result, important aspects of EU policy do not apply to Gibraltar. (R-II ¶¶ 70 – 72; RPHB 1 ¶¶ 440 – 442).

737. Respondent denies that the case *Petrobart v. Kyrgyzstan* is a binding precedent or that it may even serve as guidance to this Tribunal, since it was decided on the



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

basis of facts different to those of this case. Notwithstanding the absence of precedent in international arbitration, the Tribunal in *Petrobart* considered the application of the ECT to Gibraltar in the context of investments made during the period of provisional application of the ECT, but prior to its entry into force following ratification. The present case, however, involves alleged investments made several years after ratification of the ECT, by which time the ECT had ceased to have any effect in Gibraltar. It is also noteworthy that the Respondent in that case raised its objection to the ECT extending to Gibraltar at a very late stage in the proceedings. Further, the *Petrobart* decision has been criticized on the basis that the correct analysis should have been that Parties have to "*opt in*" on ratification, rather than "*opt out*." (R-I ¶¶ 8.11, 8.42 – 55).

738. Accordingly, Terra Raf is not an "*investor*", as defined in the ECT. Any Art. 1(6) ECT "*investments*" otherwise owned or controlled by it (100% of TNG, its assets and the LPG Plant) have no protection under the ECT. (R-II ¶ 72).

739. Respondent contests Messrs. Stati's ownership of Terra Raf. Respondent states that Claimants' evidence at C-32 does not contain any information about Messrs. Stati each owning 50% of the company and states that C-33 lists two British companies as the founders of Terra Raf Traiding Ltd. Respondent states that Claimants have not produced a single document that demonstrates their relationship to Terra Raf. Respondent states that it appears that Terra Raf is a shell company, existing only to hold shares of TNG. (R-I ¶ 9.81, 14.9). To the extent that Claimants seek to recover losses suffered by TNG, its assets and the LPG Plant, clearly no double recovery for the same loss should be available (if it is found that Terra Raf is an "*investor*" within the definition). (R-II ¶ 72).

### c. The Tribunal

740. As is not contested between the Parties, the Tribunal's jurisdiction is governed by the express terms of the ECT and particularly the definition of "*investor*" in Art. 1(7) ECT. As is also undisputed, Claimants have the burden of proof that each one of them qualifies as an investor under this definition.

741. The Tribunal will, therefore, address this issue for each of the four Claimants.

742. Regarding **Messrs. Anatolie and Gabriel Stati**, as natural persons, Art. 1(7) ECT provides: "*Investor means [...] (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law.*"

743. Claimants have provided the Tribunal with *prima facie* proof of nationality for Messrs. Anatolie and Gabriel Stati, including identification cards and passports. (C-II ¶¶ 79 – 80, CPHB 1 ¶¶ 47 – 49; CPHB 2 ¶ 10). These show that each holds the nationality of Moldova and Romania, which are Contracting Parties to the ECT. Messrs. Anatolie and Gabriel Stati are, therefore, qualified "*investors*" under the ECT. Their residence would only matter, as is clear from the wording of the definition in Art. 1(7) ECT by the second alternative after the word "*or*", if they would not have the nationality of a Contracting State.



744. Regarding the third and fourth Claimants, Ascom and Terra Raf, the definition in Art. 1(7)(ii) ECT, according to which "*Investor means [...] a company or other organization in accordance with the law applicable in that Contracting Party*" applies.

745. To prove the Tribunal's jurisdiction over **Ascom**, Claimants have produced the Certificate of Incorporation of Ascom in Moldova (as an exhibit to their Request for Arbitration and to their Statement of Claim), and Respondent does not contest the authenticity of that document. Respondent's argument that Ascom falls within the denial of benefits provision in Art. 17 ECT is not relevant in the present context. Article 17 ECT, as clearly indicated by its introductory words "*of this part*", only applies to Part III of the ECT, leaving unaffected the dispute resolution provision in Part V with Art. 26 ECT (see tribunal in *Plama v. Bulgaria*). And further, Art. 17 ECT would only apply if a state invoked that provision to deny benefits to an investor before a dispute arose and Respondent did not exercise this right.

746. Turning to the fourth Claimant, Claimants state that **Terra Raf** was incorporated under the laws of Gibraltar on 1 March 1999 and that Terra Raf's certificate of incorporation name Messrs. Stati as directors and sole shareholders, directly owning and controlling 50% of it and of TNG and its assets. (C-0 ¶ 13; C-II ¶ 96, 129). Respondent argues that this Tribunal does not have jurisdiction over Terra Raf because the ECT does not apply to Gibraltar. In that regard, the Tribunal considers that it does not have to decide whether the ECT applies to Gibraltar by way of Art. 45(1) ECT, which addresses provisional application of the ECT. (C-II ¶¶ 96 – 98; CPHB 1 ¶¶ 53 – 54; CPHB 2 ¶ 11). In addition, the Tribunal need not consider whether, as Respondent argues, that provisional application of the ECT has ceased or whether the decision of the the *Petrobart v. Kyrgyzstan* tribunal provides guidance in this respect. For, in any case, the ECT applies to Gibraltar on the basis that Gibraltar is a part of the European Community, which is itself party to the ECT. According to Art. 52 of the Treaty on the European Union and Art. 355 of the Treaty on the Functioning of the European Union, Gibraltar is included in its territory.

747. For the above reasons, therefore, the Tribunal concludes that all four Claimants qualify as investors under the ECT.

### 3. Jurisdiction Ratione Materiae – Existence of Investment

#### a. Arguments by Claimants

748. All of the acts complained of occurred after the ECT entered into force for Moldova, Romania, and Kazakhstan on 16 April 1998. Claimants' investments fall clearly within the definition of "*Investment*" in Art. 1(6) ECT, which Claimants note is broader than the definition in many other investment treaties. This definition includes every kind of asset, owned or controlled by an investor, "*including tangible and intangible assets, a company or business enterprise, shares, equity participation, debt, claims to money or performance, returns, and any rights conferred by law or contract*." (C-I ¶¶ 33 – 35; C-II ¶¶ 119, 123 – 124; CPHB 1 ¶ 59; CPHB 2 ¶ 14).



749. To take from Claimants' words:

>    *120.   KPM and TNG are energy companies that held Subsoil Use Contracts and Subsoil Use Licenses from Kazakhstan for the exploration and production of hydrocarbons. Claimants' tangible and intangible holdings in Kazakhstan included ownership of oil and gas wells, drilling equipment, gathering pipelines, treatment and storage facilities, vehicles, offices, an LPG plant, equity interests in KPM and TNG, and contractual rights conferred by Kazakhstan to KPM and TNG under the Subsoil Use Contracts and Licenses for the Borankol field, the Tolkyn field, and the Contract 302 Properties. These are "any investment associated with an economic activity in the energy sector" for the purpose of Article 1(6), and they are encompassed by subcategories (a), (b), (c), (e), and (f) of Article 1(6). (C-II ¶ 120, citations omitted; see also C-I ¶ 34).*

750. Claimants argue that the double-barreled *Salini* test, which requires establishing an investment under both the applicable investment treaty and the ICSID Convention, is not applicable here, as it only applies in ICSID cases. After the Hearing on Quantum, Claimants reminded the Tribunal that the controversial *Salini* test is applied in ICSID arbitrations because, unlike the ECT, ICSID does not define "*investment*." Furthermore, at best, ICSID applies the *Salini* test as a flexible guideline, rather than as a strict jurisdictional requirement. (CPHB 1 ¶¶ 60 – 62). The *Salini* test – and likewise all cases that rely on it – is irrelevant to this arbitration, and Respondent has not provided any ECT cases that apply the *Salini* criteria. Although Claimants' investments would clearly satisfy the *Salini* test, there is no basis for the Tribunal to apply criteria outside of the ECT to establish whether Claimants made a valid investment. The only relevant definition of investment is that found in Art. 1(6) ECT. (C-II ¶¶ 114 – 116, 118, 122; CPHB 2 ¶ 15).

751. Characterizing Respondent's contributions arguments as "*irrelevant*", Claimants explain that their investments resulted from substantial financial contributions, including the over USD 12 million purchase price for KPM's and TNG's shares, as well as investments in accordance with the working programs (which the MEMR recognized that Claimants exceeded, both in terms of investment values and financial obligations. Respondent has not contested that the amounts exceeded the companies' working program obligations by USD 400 million for KPM and USD 475 million for TNG. From 2000 until the end of 2009, Claimants invested more that USD 1.1 billion in KPM and TNG. (C-II ¶ 121; CPHB 1 ¶¶ 63 – 67; CPHB 2 ¶ 16).

752. After Hearings on Jurisdiction and Liability and on Quantum, Claimants explained that they initially funded the operations of KPM and TNG through shareholder loans, which are investments under Article 1(6) ECT. Furthermore, substantial contributions to KPM and TNG were made through the reinvestment of profits. By the end of 2008, KPM and TNG had nearly USD 400 million in retained earnings on their balance sheets. This is disregarded by Respondent. Reinvesting profits is an investment, as Art. 14(1) ECT guarantees Claimants the right to take the profits or "*Returns*" of KPM and TNG and to distribute them as dividends or to spend or invest them as they saw fit. (CPHB 1 ¶ 68 – 72; CPHB 2 ¶ 16).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

753. Respondent's argument that the Tristan Loan financial structure deprives the Tribunal of jurisdiction because it shielded Claimants from risk in relation to the investments in KPM and TNG is factually and legally meritless. The Tristan note offering was a normal public debt offering in which sophisticated investors examined the business and financial status of KPM and TNG and found them creditworthy. The third party financing for KPM and TNG from Kazcommerzbank was approximately USD 145 million at the end of 2006. In 2006, the debt portion of the capital structure was refinanced through the Tristan note offering, in order to increase the available credit line and to obtain better credit terms. The notes were issued by Tristan and were secured entirely by the assets of KPM and TNG and pledges of Claimants' equity interests in KPM and TNG. Claimants' investments remained at risk at all times, since Terra Raf and Ascom pledged their entire equity interests in KPM and TNG to the Tristan noteholders as security. The pledge agreements provided that in the event of default, Ascom and Terra Raf would be required to provide any payments of any kind to the Tristan noteholders, including payments received as a result of this arbitration. This pledge is in and of itself an investment under Art. 1(6) ECT, which broadly defines investment as including pledges. The pledges also satisfy the inapplicable *Salini* requirements of substantial contribution, risk, duration, and benefit to the host State: "*They are substantial contributions to KPM and TNG in the form of legal obligations that enabled KPM and TNG to raise hundreds of millions of dollars from the Tristan noteholders. Those contributions entailed substantial risk, namely, Claimants' risk of losing their entire equity stakes in KPM and TNG and any payment received through arbitration. Those contributions had a lengthy duration; Claimants entered into the Pledge Agreements in 2006, and they remain in force today. And the contribution benefited Kazakhstan, because it enabled KPM and TNG to raise hundreds of millions of dollars to finance operations that provided jobs to hundreds of Kazakh citizens and significant tax revenues to the Kazakh treasury.*" This is analogous to the case *Enron v. Argentina*, where the tribunal observed that a guaranty could be treated as part of the investment. (CPHB 1 ¶ 72 – 80; CPHB 2 ¶ 17).

754. Claimants state that there is no "*origin of capital*" language in the ECT's broad definition of "*investment*." Thus, Respondent's contention that the "*real*" investor in KPM and TNG is Tristan Oil, and not Claimants, has no legal basis. Moreover, as is plain from the text of Art. 1(6) ECT, which refers expressly to "*every kind of asset, owned or controlled directly or indirectly by an Investor*" the ECT protects investments that are not only directly owned, but also investments that are indirectly owned or controlled. Claimants have demonstrated that Anatolie Stati indirectly owned and controlled KPM and its assets, and that he and Gabriel Stati each indirectly owned and controlled 50% of TNG and its assets. (C-II ¶¶ 125 – 129; CPHB 1 ¶ 67).

755. Regarding the benefit that Claimants' investments had for Kazakhstan, Claimants point out that Kazakhstan has even recognized the "*strategic role*" that Claimants' investment and development of the oil and gas fields has had for the Mangystau Region and for Kazakhstan. This disproves Respondent's allegations to the contrary. In addition, from 2000 – 2009, Claimants KPM and TNG paid USD 163 and 187 million in taxes and administrative expenses, respectively. They employed over 900 Kazakh citizens as permanent workforce and employed nearly 3,000 on a contract basis. (CPHB 1 ¶¶ 81 – 85; CPHB 2 ¶ 18).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

756. Even though Claimants' investments were made in good faith and in accordance with Kazakh law, the ECT contains no such requirement that they be so made. Indeed, if the contracting states had intended there to be such a requirement, they could have written it into the text of the Treaty, as explained in the ICSID case of *Saba Fakes v. Turkey*. Neither the ECT nor customary international law requires that an investment comply with the minutiae of domestic and administrative legal requirements in order to qualify for protection. Furthermore, tribunals under other treaty regimes have only excluded an investment from protection in instances of calculated misconduct amounting to fraud. (C-II ¶¶ 130 – 131; CPHB 1 ¶¶ 86 – 87).

757. Regardless, even where a treaty requires that an investment be made in accordance with domestic law, it does not follow that any violation will preclude jurisdiction. Indeed, tribunals that have rejected jurisdiction based on illegality – like the *Phoenix* and the *Plama* tribunals - have done so when an investment amounted to fraud. At issue here, however, are allegations of technical, minute – and meritless – violations of formalities of Kazakh corporate law, coming nowhere close to fraud. Hyper-technical, formalistic allegations of "*illegality*" precluding jurisdiction have been uniformly rejected in treaty cases, including *Tokios Tokeles* and *Saluka*, and this Tribunal should likewise do the same. (C-II ¶¶ 132 – 137).

758. Respondent's allegations of illegal corporate formation are contrived and meritless. Despite benefitting from, inspecting, and monitoring the corporate structures for years, Respondent failed to allege that anything was illegal or improper prior to this arbitration. This suffices for the Tribunal to reject Respondent's formalistic claims of illegality in this case. Claimants argue that Respondent created these illegalities as part of its campaign of indirect expropriation, initiated in October 2008. (C-II ¶¶ 135 – 141; CPHB 2 ¶¶ 20 – 22).

759. Turning to the issue of KPM's formation and share issuance, even if KPM failed to submit appropriate documents, such failure does not result in a *per se* illegal formation. Rather, such a failure would merely give Kazakh officials the right to challenge the legality of KPM's formation before a Kazakh court, pursuant to Art. 16 of the SM Law. Kazakhstan never did so and, by the time of the transfer of KPM's shares to Claimants, the registration requirement had been abolished. Claimants concede that the previous shareholders of KPM failed to register KPM's initial share issuance as required by law. Kazakhstan and investment tribunals, such as *Saluka*, accept that there is a distinction to be made between former shareholders and failings by claimants in an arbitration. The alleged technical illegalities by former shareholders of KPM cannot taint Claimants' title to shares. Claimants state that Respondent is trying to create an issue where none. (C-II ¶ 142 – 143; CPHB 1 ¶¶ 88 – 91).

760. Further, Kazakh law does not recognize a concept of a transaction that was *void ab initio*. Rather, pursuant to Art. 157(1) CC RK, all transactions remain valid until voided by a court. Not only have there been no claims brought by Kazakhstan to challenge KPM's formation, but the 3-year statute of limitations for such claims, which runs from the date when the person knew or should have known about the violation, expired on 24 June 2000. (C-II ¶¶ 144 – 145).



Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/30/14   Page 62 of 104
Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/30/14   Page 62 of 225

Page **166** of **414**

761. Despite Respondent's arguments to the contrary, Ascom's acquisitions of KPM shares in 1999 and 2004 were lawful, despite not being registered, because JSCs were exempted from an obligation to register their initial issuance of shares in 1998 – before the transactions at issue here. Further, as part of the amendments to the law, the issuance of shares not subject to state registration required a national identification number. After completing its review, the National Securities Commission could either assign a national identification number, or refuse to do so if its review of the submitted documents revealed any violation of law by the issuer. KPM obtained a national identification number with respect to the initial issuance of its shares on 24 January 2000. If there had been any irregularities, the National Securities Commission was under a duty to notify KPM of these, rather than assigning a number. Therefore, KPM's initial issuance of shares duly complied with Kazakh law from at least that moment forward. Claimants cured any alleged defect in registration upon their acquisition of 62% of KPM's shares in 1999. (C-II ¶¶ 146 – 149; CPHB 1 ¶¶ 88 – 91; CPHB 2 ¶ 23).

762. Claimants also state that KPM has always been a commercial company – the so-called "*re-registration*" as a commercial entity was nothing more than Kazakhstan's correction of its own clerical error. This is plain from a review of KPM's Foundation Agreement, which explicitly calls KPM a commercial organization. KPM's Charter contains no provisions related to the non-profit goals of the company. Further, opposite of the goals of a non-profit, the explicit main goal stated in KPM's Foundation Agreement is that KPM is to obtain a profit. Finally, KPM has engaged in commercial activity since its establishment and its acquisition of a Subsoil Use License in May 1997 – 2 years before the alleged re-registration. This Subsoil License even explicitly states that KPM's main area of business is commercial activities. The same commercial orientation is noted in Contract 305. Indeed, if the registration authorities had correctly performed their obligations, they would have registered KPM as a commercial organization from the outset. Claimants state that they have no knowledge of the December 1999 re-registration or of the documents Respondent has submitted. (C-II ¶¶ 150 – 155; CPHB 1 ¶ 90 – 93).

763. Claimants present a history of Claimants' acquisitions of KPM and TNG and their development of these investments, and this is also contained in this Award in the Timeline, above. Importantly, Contracts 305, 302, and 210 each contained stabilization clauses stating that "*[c]hanges and additions to the legislation made after the signature of the Contract that deteriorate the position of the Contractor shall not be applicable to this Contract.*" (C-I ¶¶ 42 – 73). Claimants explain that all of their acquisitions in KPM and TNG occurred after the elimination of the licensing regime and authority. Moreover, Kazakh law required consent of the Competent Authority only for transfers of subsoil use rights from one user to another, not transfers of shares in a subsoil user. KPM's and TNG's subsoil use rights were valid, and TNG and KPM violated no provisions of Kazakh law when making amendments to their Subsoil Use Contracts without amending the respective subsoil use licenses. Claimants explain that the 1995 Law on Licensing did not apply to the issuance and emending of KPM's and TNG's subsoil licenses. The subsoil licenses were issued in 1997, and are subject to the Subsoil Use Law, enacted on 27 January 1996. This law and Government Resolution No. 1017 (16 August 1996) contained the licensing procedures for subsoil users. In August 1999, Kazakhstan abolished the dual licensing and contracting system with respect



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 63 of 104
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/26/14   Page 69 of 225

Page **167** of **414**

to subsoil use, moving directly to a contract-only system. Amendments to Subsoil Use Licenses were effectively replaced by amendments to the subsoil use agreements after the 1999 Amendments Law. (C-II ¶¶ 173 – 182; CPHB 1 ¶¶ 93 *et seq.*). The specific arguments are best taken from Claimants' words:

158.    *In August 1999, Kazakhstan abolished its dual licensing and contracting system with respect to subsoil use and moved to a contract-only system of subsoil use ("1999 Amendments Law"). Pre-existing subsoil use licenses remained in force and their "suspension, revocation, termination, and invalidation" were still governed by the 1996 Subsoil Use Law in force prior to the 1999 Amendments Law. The 1999 Amendments Law effectively "froze" the licenses, which could only be suspended or withdrawn—but not amended—by the state authorities. Thus, only the subsoil use contracts could reflect amendments to the terms of a subsoil user's rights and obligations.*

159.    *The 1999 Amendments Law also resulted in a number of sweeping changes to various legislative acts that largely eliminated references to a Licensing Authority and its powers. In particular, those amendments deleted Article 7 of the 1996 Subsoil Law (Transfer of Subsoil Use Rights), which had empowered the Government of Kazakhstan to issue and amend licenses for subsoil use. Additionally, Article 8(1) of the 1996 Subsoil Law, which previously stated that the Competent Authority "submits to the Licensing Authority proposals for revocation of a License or making amendments thereto," was amended to provide that the "[Competent Authority] issues consents for transfer of Subsoil Use Rights." Likewise, the amendments substituted the Competent Authority for the Licensing Authority in Article 14 of the 1996 Subsoil Law, which thereafter provided:*

> *The transfer of Subsoil Use Rights by the subsoil user to another party, made either against payment or for free, including by contributing to the charter capital of a new legal entity, except for the transfer of the subsoil use right as collateral, shall be permitted only with the consent of the Competent Authority [authorized government body]. (C-II ¶¶ 156 – 159):*

764.    Claimants even sought clarification on the relationship between the licenses and subsoil use agreements in December 1999. The Agency on Investment – the then-competent authority – informed KPM by letter dated 18 January 2000 that, pursuant to the amendments to the Law on Subsoil Use (11 August 1999), that licenses for subsoil use shall no longer be issued, nor shall changes or amendments be introduced into earlier-issued licenses. This was confirmed by the Government of Kazakhstan on 14 May 2002 and by the MEMR in December 2008. (C-II ¶¶ 178 – 181; CPHB 1 ¶¶ 95 – 104).

765.    Turning to Respondent's argument under Art. 53 of the 1995 Law on Oil, while that statute technically existed, it did not apply as a result of Kazakh laws governing the hierarchy of statutory acts, pursuant to which in the event of contradictory statutory provisions, the latter enacted Act shall prevail. Here, the later amended 1999 Amendments were applicable. These required consent only for the transfer of a subsoil use contract and not for the transfer of shares in a subsoil user. (C-II ¶¶ 161 – 163; CPHB 95 – 96).



**ARBITRATION INSTITUTE** OF THE STOCKHOLM CHAMBER OF COMMERCE

766. In spite of this, however, KPM and TNG twice sought consent for the transfers – and they either received it or were informed that consent was not required. (C-II ¶¶ 156, 164). Only after Kazakhstan commenced its expropriation campaign in October 2008 did Kazakhstan contend that those share transfers lacked the required consents. (C-II ¶ 156; CPHB 1 ¶ 96). It is simply not true that Claimants applied to the wrong authority. On Respondent's own evidence, the Competent Authority on 26 April 1999 was the Agency on Investment, and the MEMR did not even exist until 13 December 2000. (C-II ¶ 166). It is also worth noting that on 20 February 2007, when the Appraisal Commission (responsible for deciding requests for alienations of subsoil use agreements) allowed for the transfer of TNG shares from Gheso to Terra Raf, and also expressly found that there was no deadline within which TNG had to seek approval for the transfer of shares from Gheso to Terra Raf. (C-II ¶ 167). Claimants state that exhibit C-134, which TNG received from MEMR because it was the document granting permission for the share transfer, shows that the appropriate governmental body consented to the transfer. Finally, Claimants state that Respondent has conceded that it had approved the transfer, stating that as part of its indirect expropriation campaign, it "*annulled the earlier issued permit.*" (C-II ¶ 168).

767. Respondent's argument that the reorganizations of KPM and TNG from JSCs to LLPs in 2005 were unlawful because Claimants were not the lawful shareholders, is meritless. Ascom and Terra Raf were the lawful shareholders of KPM and TNG (respectively) when the reorganization occurred. (C-II ¶¶ 169, 170). Registration is deemed complete upon state registration, occurring here at the latest in May 2005, when the Kazakh Ministry of Justice approved and registered KPM's transformation from a closed JSC into a LLP. Respondent did not question these reorganizations until filing its Statement of Defense. (CPHB 1 ¶ 92).

768. Nonetheless, even if the reorganizations were invalid, there is no "*domino theory*" to chain transactions in Kazakhstan – a court's finding that one transaction in the chain was invalid will not serve to invalidate all later transaction. Rather, every transaction remains valid until voided by a court. (C-II ¶¶ 170 - 172).

769. Turning to Respondent's arguments that Claimants failed to apply for necessary waivers of the Republic's rights to purchase KPM and TNG, Claimants state that Respondent had no pre-emptive rights at the time that any of the transactions occurred – the last of which being Ascom's acquisition of the remaining 38% shareholding in KPM in November 2004. The state's pre-emptive right did not arise until 8 December 2004, with the amendments to Art. 71 of the 1996 Subsoil Use Law. It applied only prospectively. Further, any attempts to cure defects in the transfers after December 2004 would not trigger the Republic's ability to exercise a preemptive right. (C-II ¶¶ 183 – 186; CPHB 1 ¶ 106).

770. It is not disputed that Claimants twice obtained waivers of pre-emptive rights from Kazakhstan – once in 2007 in preparation of an IPO on the London Stock Exchange and again in February 2007 when TNG applied for permission for the 2003 transfer of TNG ownership to Terra Raf (which TNG did not believe was required at the time). Claimants state that it was not until 18 December 2008 that Respondent attempted to revoke the waiver of pre-emptive rights, baselessly accusing Claimants of fraud and forgery in connection with that waiver. Respondent never provided any evidence of fraud or forgery, and never acted on



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 22-3 Filed 09/30/14 Page 69 of 104
Case 1:14-cv-01638-ABJ Document 72-3 Filed 09/24/18 Page 69 of 225

Page **169** of **414**

the allegations. Respondent's only objective in that retroactive revocation must have been to cast a cloud on Claimants' title to TNG, making it impossible for Claimants to sell the business. (C-II ¶¶ 187 – 190, 228, CPHB 1 ¶ 105).

771. It was a surprise when Kazakhstan requested that TNG apply for retroactive consent for the 2003 transfer of TNG shares from Gheso to Terra Raf. Respondent had no pre-emptive right request to any acquisition or share transfer in TNG, since such prospective rights first arose on 8 December 2004 through the amendment to Art. 71 of the 1996 Law on Subsoil Use. Respondent's argument that the transfer was not "*completed*" until 16 May 2005 and that that is why consent was required has neither factual nor legal basis. Kazakhstan's witness, Mr. Ongarbaev confirmed that the transfer was completed at the latest on 28 May 2003. The only reason that the 16 May 2005 date is relevant is because that was when TNG was reorganized from an open JSC to an LLP, and that re-organization was re-registered with State authorities and had nothing to do with pre-emptive rights. Finally, Respondent only made this objection during proceedings and not even KMG's international counsel, Squire Sanders, raised any concerns about TNG's registration, even after analyzing the pre-emptive rights topic. Rather, and contrary to Respondent's selective quoting and mischaracterization of that report, international legal counsel to KPM E&P, Squire Sanders, considered that Terra Raf's ownership of TNG was proper and legal and issued an opinion to that effect in a due diligence report, which Respondent withheld from the Tribunal. (CPHB 1 ¶¶ 93 – 94, 106 – 110; CPHB 2 ¶¶ 25 – 26).

772. Each of Respondent's bad faith arguments – *i.e.* that (i) proceeds from those investments were used to fund terrorist activities in South Sudan; (ii) KPM and TNG guaranteed bonds issued by Tristan Oil, which "*diverted*" money from Kazakhstan; and (iii) Claimants tried to illegally sell an investment they did not legally own in the "*Project Zenith*" process – are frivolous and irrelevant. These complaints are supported by unsubstantiated statements made by a disgruntled former-employee in the context of a wrongful termination lawsuit, a defamatory letter from a political opponent of Anatolie Stati, former President Voronin of Moldova, and Respondent's own misstatements. First, it has never been shown that Anatolie Stati funded terrorist groups in South Sudan. Rather, Anatolie Stati's normal, commercial investments in the oil and gas industry have contributed enormously to the well-being of the population of South Sudan by building schools, a hospital, medical clinics, and means of transportation in the region. Second, President Voronin's letter merely demonstrates that he and President Nazarbayev teamed up to undermine Anatolie Stati's investments in one country and his pro-democracy movement in the other. Third, in relation to Respondent's puzzling claims with respect to KPM and TNG guaranteeing bonds for Tristan Oil, the bonds show no evidence of bad faith and the issue is irrelevant for whether KPM and TNG are valid investments under the ECT. Finally, turning to the bad faith allegations with respect to Project Zenith, Claimants state that they were completely within their rights to offer these companies for sale – Kazakhstan acted in bad faith and in breach of the ECT by interfering with Project Zenith and in making the sale of KPM and TNG impossible. (C-II ¶¶ 192 – 197).

## b.    Arguments by Respondent



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

773. In order to receive protection under the ECT, the investments must meet the definition of investment as articulated in Art. 1(6) ECT. The term "*investment*" has a meaning in and of itself, and simply meeting one of the categories listed under Art. 1(6) ECT is not sufficient. Instead, there are gaps in the Art. 1(6) ECT definition of "*investment*", and there is evidence to suggest that the Treaty parties intended the term to mean more than "*any right property or interest in money or money's worth*." (R-I ¶¶ 9.11 - 9.15, R-II ¶¶ 73 – 85, 83; RPHB 1 ¶ 446; RPHB 2 ¶¶ 384 – 385).

774. The first step this analysis is Art. 31(1) VCLT, which establishes the need to interpret a treaty in good faith. (R-I ¶ 9.40; R-II ¶ 79; RPHB 2 ¶ 385). International law is applicable by virtue of Art. 26(6) ECT, which allows the Tribunal to apply applicable general principles of international law. (R-II ¶ 77). Cases, such as *Salini* and *Phoenix*, are also relevant, since they amount to an expression of international law. (R-II ¶ 79).

775. The Tribunal – like the tribunals in *Romak*, *Alps Finance and Trade AG v. Slovak Republic*, and *Compagnie International de Maintenance (CIM) v. Ethiopia* – should consider the term's ordinary meaning, in light of other ECT provisions and the ECT's object and purpose, and should also consider the use of the term in international law, as applied by other tribunals. (R-II ¶¶ 84 – 87). Accordingly, Respondent asks the Tribunal to consider a broader meaning of "*investment*." (R-II ¶¶ 80 – 82).

776. Contrary to Claimants' argument, the definition of "*investment*" is not institution-specific – indeed, to make it so would (1) encourage forum shopping within the ECT (where investors have a choice of commencing arbitration under three different institutions) and (2) would violate the principle endorsed in *CIM v. Ethiopia* that Parties should search for a consistent meaning across investment treaties. (R-II ¶¶ 97 – 100; RPHB 1 ¶ ¶ 448).

777. The test for an investment available in ICSID arbitrations is one that should and could equally apply in ECT arbitrations. This is because the ICSID and ECT treaties are each predicated on general principles of international law, which allows for a wider definition of "*investment*" than that set out in the text. Thus, it is entirely appropriate for this Tribunal to employ tests like the ICSID-originating *Salini* test, which has been employed in cases where Tribunals have had to construe the word "*investment*" in accordance with its inherent meaning. (R-I ¶ 9.5; R-II ¶¶ 95, 96, 99).

778. Pursuant to the *Salini* and *Phoenix* awards, an investment must have the following six characteristics: (a) a contribution of money or other assets; (b) a certain duration; (c) an element of risk; (d) a contribution to the host state's development that is made (e) in accordance with the laws of the host state and (f) in good faith in accordance with general principles of international law. It is Claimants' burden to demonstrate that these characteristics have been exhibited in this case. (RPHB 2 ¶ 389). (R-I ¶¶ 9.4 – 9.5, 9.10, 9.36 – 9.41, 9.45 – 9.47; R-II ¶¶ 100 – 108; RPHB 1 ¶¶ 449 – 450).

779. Regarding the financial contribution requirement (a), Respondent notes that, although some tribunals have adopted the approach that an investment need not be



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

substantial, the low purchase prices for the assets, placed in context of the arbitration, raises doubts as to whether Claimants made was a true economic contribution when making the investment. Claimants initially invested in the businesses by way of share purchases and work programs. While Respondent acknowledges that Ascom and Terra Raf provided USD 9 million for the purchase of 38% of shares in KPM, it notes the Ascom - and not Terra Raf - purchased the TNG shares for only USD 189,185. Claimants have not provided a share purchase agreement for the purchase of the other 62% of shares in KPM. Instead, they have only provided a brokerage agreement between Ascom and Telwin. For TNG, while excerpts of the share purchase agreements were provided, the parts providing the purchase price were withheld. All that was provided was Mr. Pisica's allegation that a total of USD 617,333 was paid for 100% of the TNG shares, which Respondent notes is ridiculous when compared with Claimants' claim of the alleged value. No additional specification was ever given for Claimants' assertion that, between 1999 and 2004, Claimants invested over USD 12 million to acquire KPM and TNG. (R-I ¶¶ 9.27, 9.29 – 9.30; R-II ¶¶ 109 – 110, 116 – 118, 127; RPHB 1 ¶¶ 450 – 456; RPHB 2 ¶¶ 391 – 393).

780. Respondent also notes that it appears that Tristan Oil was contributing to and getting value from the assets. Tristan Oil was the main financier of KPM and TNG, and that this is not disputed by Claimants, who state that the ECT contains no "*origin of capital*" requirement. (R-II ¶¶ 120 – 131).

781. Further, Respondent points out discrepancies in figures for amounts that Claimants state were invested in the LPG Plant, the Contract 302 properties, or Claimants' alleged own operating plant, as well as a huge disparity between the investment purportedly made and the amounts claimed in damages. (R-I ¶ 9.31; R-II ¶¶ 123 – 126).

782. Respondent has not submitted arguments with respect to the element (b) duration. Regarding the risk element (c), Respondent states that Claimants' description of their payments demonstrates that Anatolie Stati took on the least amount of risk possible and that there was a lack of risk undertaken by other Claimants. Claimants protected themselves from the companies' liability by creating the Tristan Oil structure and overexposing KPM and TNG to debt. This lack of risk devalues Claimants' arguments that they made investments in accordance with the inherent meaning of the word. (R-II ¶¶ 119, 128 – 132; RPHB 2 ¶ 394).

783. Respondent argues that financial gain may not have been the primary motivator for Claimants. (R-II ¶¶ 128 – 132).

784. Respondent states that there was a lack of contribution to the economy of Kazakhstan (d). First, Respondent notes that Claimants imported foreign labor into Kazakhstan, rather than using local resources. Claimants failed in their obligation to train Kazak specialists. Claimants' evidence is incomplete and that Respondent cannot assess whether USD 14,166,558 was in fact provided. Second, while Claimants contend that they can do what they wish with their profits, Respondent states that the entire structure of Claimants' investment was aimed at taking any money created by the investments off shore and not to making a contribution to the host state, resulting from the investment. In 2008 and 2009, money and profits were diverted from KPM and TNG into Montvale Invest – a Stati-owned BVI



company. Ascom responded to the financial crisis by stripping TNG and KPM of their assets – by declaring dividends and paying a large bonus to Anatolie Stati. At the same time, KPM and TNG paid little of the taxes due to the Republic. USD 62 million in corporate back taxes remain outstanding. The service agreements with Ascom were typical of contracts that are used to transfer money between two related companies without any actual services being performed. (R-II ¶¶ 122, 133 – 145; RPHB 1 ¶¶ 459 – 462; RPHB 2 ¶ 395).

785. Respondent states that there was an undue exploitation of Kazakhstan's assets and that this harmed the Kazakh economy. Claimants' increase of production in the Tolkyn gas field was inconsistent with the strategy of maintaining the long-term usefulness of the asset and resulted in falling reservoir pressure. Respondent alleges that this action could indicate the "*deliberate action of the shareholder, which could be the result of irreversible loss of much of recoverable hydrocarbons and growth capital expenditures of drilling new wells (each worth USD 15 million).*" Confirmation of the diminished value of the assets are confirmed by Claimants' attempted sale in "*Project Zenith*" where no interested buyer could be found once buyers discovered the value of the assets. At the Hearing on Jurisdiction and Liability, Mr. Ongarbaev described the treatment of the field as "*barbaric.*" (R-I ¶¶ 9.69 – 9.70; R-II ¶¶ 133 – 145).

786. Regarding the legality of the investment (e), investments must be made in accordance with the law of the host state. This is supported by both the *Plama* and the *Yallisoletana SL v. Republic of El Salvador* decisions. The *Phoenix* and *Plama* tribunals have agreed that national law forms part of the international legal principles to be applied. Further, providing protection for investments that contravene the laws of the host state undermines a broader compliance with international law. Claimants' investment was not made in accordance with Kazakh law. Claimants have admitted that they breached Kazakh law and this admission is enough to demonstrate that Claimants are not entitled to protection under the ECT. Their breaches were not of "*mere formalities*" – they were substantial. (R-I ¶¶ 9.5 – 9.10, 9.25 – 9.16, 9.74, 9.87, 10.3, 25.10 – 25.14; R-II ¶¶ 78, 100 – 108, 147 – 204, 209; RPHB 1 ¶ 465 – 466; RPHB 2 ¶¶ 396 – 398).

787. Article 53 of the 1995 Law on Oil states that consent is required from both the Licensing Authority and Competent Authority when there is a transfer of shares in a company with subsoil use rights. As Claimants admit, the 1995 Law on Oil was in existence when the share transfers occurred, and even when the law was amended in 1999, the requirement for obtaining consent under Art. 53 was maintained. In response to Claimants' argument that it only needed to comply with Art. 14(1) of the 1996 Subsoil law, as explained by Prof. Ilyassova, pursuant to both Art. 14(1) of the 1996 Subsoil Law and Art. 2 of the 1995 Law on Oil, the 1995 Law on Oil actually took precedence over the 1996 Subsoil Law in the event of any inconsistency. Accordingly, Art. 53 of the 1995 Law on Oil applied to the transfers. Claimants are wrong that the 1996 Subsoil Law would have been exclusively applicable – the laws had distinct scopes, one concerning oil and one concerning subsoil use. A company would need to comply with both. (R-II ¶¶ 152 – 157, 168; RPHB 1 ¶ 469, 470; RPHB 2 ¶¶ 399 – 403).

788. Claimants failed to obtain consent from the Licensing Authority and Competent Authority in relation to any of the eight transfers that involved TNG. Although



Case 1:14-cv-01638-ABJ Document 22-3 Filed 09/30/14 Page 69 of 164
Case 1:14-cv-01638-ABJ Document 72-3 Filed 09/23/18 Page 174 of 225

Page **173** of **414**

Claimants received one authorization 4 years after the last share transfer in TNG (from Gheso to Terra Raf), that consent does not "*heal*" the prior failures to obtain consent for the three preceding transfers in TNG. Each of those prior transfers was invalid under Art. 14 of the 1996 Subsoil Law. Further, the consent given was legally invalid – Claimants failed to provide pertinent information, and the Republic never granted a waiver of its pre-emptive right. There can be no doubt that Terra Raf's investment in TNG was not in accordance with Kazakh law – the necessary and late-obtained consent for Terra Raf's investment in TNG was validly revoked as a result of Claimants' provision of false and misleading information. (R-II ¶¶ 148 – 149; 150 – 167; RPHB 1 ¶ 468 – 471).

789. Even when making their application for retro-active consent to the transfer of TNG from Gheso to Terra Raf in February 2007, Claimants expressly conceded that Art. 53 of the 1995 Law on Oil was in force. Accordingly, Respondent had a right, under Art. 71 of the 1996 Law on Subsoil Use as amended on 8 December 2004, to purchase TNG. This made the purported transfer invalid if the Republic would not waive its rights. (RPHB 2 ¶ 404 - 407).

790. In 2008, when the MEMR realized that it had been misled by Claimants regarding the necessity of the waiver, the MEMR was obliged to revoke the waiver, pursuant to Art. 15(2) of the 1996 Subsoil Law. Respondent denies that the revocation had anything to do with alleged "*harassment*" and deny that there was an official MEMR press release regarding this. Respondent states that KPM and TNG were given the opportunity to dispute the charges, as evidenced through the correspondence and meetings held. Nevertheless, it is evident that the problems arising out of the transfer of TNG from Gheso to Terra Raf were caused by Claimants themselves, likely in an effort to avoid having to obtain a waiver of the Republic's pre-emptive right. (R-II ¶¶ 170 – 176).

791. Claimants have provided no evidence for their argument that they were led to believe that no consent was required for the transfer of TNG from Gheso to Terra Raf because they were affiliated companies, and they did not make this argument at the hearings. Mr. Pisica is not qualified to opine on Kazakh law. Further, any alleged "*affiliation*" did not prevent TNG from belatedly requesting consent to the transfer. Respondent argues that Claimants always believed that they needed consent but simply chose not to obtain it. (R-II ¶ 162 -163; RPHB 1 ¶ 472, 473).

792. In response to Claimants' statements during the Hearing on Jurisdiction and Liability, Respondent reminds the Tribunal that it was correct in questioning the transfer from Gheso to Terra Raf. Respondent notes that there have been additional irregularities in the many transfers involving TNG. Claimants have produced a document which refers to Ascom owning TNG as of 15 September 2004, and at the same time argue that the last time Ascom owned TNG was in 2002. Further, Respondent it never conceded that Terra Raf's acquisition of TNG took place in 2003 and was registered at that time. (R-II ¶ 173; RPHB 1 ¶¶ 474 – 475).

793. The waivers obtained in 2007 in relation to the transfer of TNG and KPM to Tristan Oil bear no relation to the TNG-Gheso-Terra Raf transfer. Nevertheless, the Republic would not have waived its right in regard to the proposed transfer to



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Tristan Oil had it known that Claimants should have requested a waiver at the time of the TNG-Gheso-Terra Raf transfer. (R-II ¶¶ 178 – 180).

794. Since the start of this arbitration, Respondent has discovered other serious breaches of Kazakh law in relation to Claimants' investment, which were concealed from Respondent. Since Respondent was not aware of these, they were not grounds for termination of the subsoil contracts. These violations include:

    *(a)    Violations of Kazakh law in relation to the issuing of shares in KPM;*

    *(b)    KPM was transformed from a "non-commercial" entity into a commercial entity in breach of Kazakh law;*

    *(c)    The transfer of KPM's shares to Ascom was illegal due to the failure to obtain consent from the Licensing and Competent Authorities;*

    *(d)    The reorganisation of KPM and TNG into LLPs was illegal; and*

    *(e)    KPM and TNG failed to amend their licenses when amending their contracts. (R-II ¶¶ 181 – 182, citations omitted, see also R-II ¶ 148 – 149; RPHB 1 ¶ 477).*

795. Respondent argues that KPM's share issue was *void ab initio* – a concept that exists in Kazakh law. Claimants admit that KPM failed to submit the relevant documents to obtain state registration, meaning that it did not have a national identification number. It is unacceptable to describe this as a mere "*technical*" error. Instead, under Art. 15 of the SM Law, the documents needed to be submitted as part of the share issue – absent these, the share issue cannot be registered pursuant to Art. 17(1) SM Law and, therefore, shall be deemed invalid under Art. 17(2) SM Law. The Republic was not, as Claimants allege, required to pursue this issue in court to challenge the validity of the registration. Likewise, the matter is not time barred. Accordingly, being that the initial share issue in KPM was invalid and Claimants nonetheless purchased the company, they cannot be regarded as investing in accordance with host state law, as required under international legal principles. At the Hearing on Jurisdiction and Liability, Claimants addressed this issue and admitted that the shares were not registered pursuant to Art. 16 of the SM Law. Claimants continued to rely on Prof. Maggs's report. Prof. Ilyassova explained, however, that under Kazakh law, transactions can be considered invalid, without a court order. Likewise, the late registration of KPM's shares did not cure any defect with their registration. (R-II ¶¶ 183 – 188; RPHB 1 ¶ 478; RPHB 2 ¶¶ 408 – 411).

796. Regarding KPM's illegal transformation into a commercial company on 13 December 1999, Claimants have not provided any evidence that this was a mere correction of a prior error or that Claimants were unaware of the change. Accordingly, Respondent states, Claimants willingly invested in KPM as a non-commercial entity, knowing it was carrying out commercial activities in breach of Kazakh law. (R-II ¶¶ 189 – 192).

797. Regarding the unlawful transfer of KPM's shares to Ascom, Respondent states that this transfer required State consent under the 1995 Law on Oil. All that Claimants have presented to demonstrate their consent is a letter from the State showing that



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

further action needed to be taken to obtain consent. As it cannot be said that Ascom obtained consent to the transfer, Ascom acted in breach of Kazakh law by making its investment in KPM. (R-II ¶ 195).

798. Regarding the reorganization of KPM and TNG into LLPs, Respondent argues that, since neither Ascom nor Terra Raf were legal shareholders in KPM and TNG, the attempted reorganization of those companies into LLPs was ineffective and a further breach of Kazakh law. The change was void *ab initio* – therefore, Claimants' point regarding there being no "*domino theory*" under Kazakh law is misplaced. Further, Claimants cannot employ the statute of limitations to argue that it did not breach Kazakh law as a matter of fact. Respondent states "*[a]s to the alleged three year limitation period which now supposedly bars the Republic's claim, the Republic has already explained above that the majority of the illegalities came to light only after the commencement of this arbitration, by which point any scope for bringing a claim would have been useless (since Claimants had abandoned KPM and TNG).*" (R-II ¶¶ 196, 199).

799. Claimants failed to amend the licenses in accordance with the amendments to the contracts. Claimants' interpretation of Kazakh law that they did not need to amend the licenses is simply wrong. Under Art. 26 and 29 of the 1995 Law on Oil, they needed to extend their licenses as well as their contracts, just as other companies did. (R-II ¶¶ 200 – 204).

800. Respondent states that Claimants do not deny breaching fundamental aspects of Kazakh law throughout their investment, including:

    (a)    *Unlawfully investing in the Republic and illegally engaging in activity involving the Republic's subsoil resources;*

    (b)    *Illegally operating a trunk pipeline without a licence in order to exploit the subsoil area KPM and TNG operated in;*

    (c)    *Failing to pay legally imposed taxes as well as penalties it incurred; and*

    (d)    *Repeated violation of the Contracts resulting in their valid termination. (R-II ¶ 207).*

801. The *Salini* requirements (e) and (f) apply, even though not expressly mentioned, because it would be absurd to suggest that such fundamental principles of national and international law would be inapplicable. Good faith has been recognized as relevant for the ECT. Respondent's arguments concerning "*good faith*" are best taken from its own words:

    *9.43*    *An analysis of general principles of international legal practice and the doctrine suggests that an investor's behaviour is not considered to be in good faith if it:*

        (a)    *does not comply with local laws and contracts concluded by the Investor (specifically the local law and the concluded contracts upon which the legitimate expectations of the Investor are based, subject to the protection of international law);*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

> (b)     *does not correspond to social and moral requirements (for
>         example if in violation of public order and justice); or*
>
> (c)     *does not respect the rights of counterparties and other participants
>         in civil commerce (the equal status of the parties). (R-I ¶ 9.43,
>         citations omitted).*

802. Claimants' attempt to counter the above has been limited to attempts to discredit Prof. Olcott, who Claimants nevertheless quote when criticizing the quality of the rule of law in Kazakhstan. This selective use of Prof. Olcott's work suggests that Claimants' criticism of Prof. Olcott is superficial. (RPHB 2 ¶ 413).

803. Regarding (f) whether Claimants have made a *bona fide* investment, Respondent highlights that there is no evidence that Claimants have made their investment in good faith. Rather, Respondent presents that it is difficult to believe that Claimants Anatolie and Gabriel Stati have behaved as normal, commercial investors and instead accuses them of corruption and engagement in criminal and terrorist activities and/or civil unrest groups. As evidence of their corruption, Respondent points to Claimants' possession of confidential, internal government documents in this case. At the Hearing on Jurisdiction and Liability, Claimants admitted to their involvement in obtaining stolen documents. This is further evidence of Claimants' corruption. (RPHB 1 ¶ 481). Their illegal activities also include those regarding the unlawful transfers, described above. (R-I ¶ 9.51 – 9.59; R-II ¶¶ 210 – 214; RPHB 2 ¶ 412).

804. Allowing a claim for damages based on the Tristan Notes to go forward would enable the Claimants to circumvent the jurisdictional and substantive requirements of investment arbitration. In particular, the noteholders would not need to demonstrate either nationality or investment to bring the claim under the Kazakh BIT. By claiming "*enterprise value*", which represents the net present value of the operating cashflow of an entity and includes the cash flows to creditors, Claimants are claiming their own alleged damage and the damage of the Tristan noteholders. Thus, this is a claim by one party on behalf of a third party, the Tristan noteholders and this is impermissible. (RPHB 1 ¶¶ 415 – 419).

### c.     The Tribunal

805. The ECT provides the following definition of "*Investment*" in Art. 1(6):

*"Investment" means every kind of asset, owned or controlled directly or indirectly
by an Investor and includes:*

> (a)     *tangible and intangible, and movable and immovable, property,
>         and any property rights such as leases, mortgages, liens, and
>         pledges;*
>
> (b)      *a company or business enterprise, or shares, stock, or other forms
>         of equity participation in a company or business enterprise, and
>         bonds and other debt of a company or business enterprise;*
>
> (c)     *claims to money and claims to performance pursuant to contract
>         having an economic value and associated with an Investment;*



(d)     *Intellectual Property;*

(e)     *Returns;*

(f)     *any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*

*A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.*

*"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.*

806. By this extremely broad definition, particularly extended by its section (f) quoted above, it stands in contrast to the ICSID Convention which contains no definition of "*investment*" and thus needs further interpretation as regularly done by ICSID tribunals. Guidelines and tests of criteria developed in this jurisprudence on the ICSID Convention and similar treaties, therefore, cannot be used as long as any right or activity is clearly covered by the wording of the above definition in ECT cases. Therefore, the so-called *Salini* test, controversial and much discussed both by the Parties in this case and otherwise in ICSID and similar arbitrations, even if applied as a flexible guideline rather than as a strict jurisdictional requirement, cannot be used for the definition of investment under the ECT or, likewise, in the present case. The Tribunal, thus, sees no need to examine the various criteria discussed for the *Salini* test.

807. Further, the VCLT expressly provides in its Art. 31.1 that a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to its terms. Article 32 VCLT provides that supplementary means of interpretation may only be used in order to confirm the meaning from the terms of the treaty or, if the Art. 31.1 interpretation leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable. These latter conditions for recourse to supplementary means of interpretation are clearly not fulfilled by the wide and highly detailed above definition of "*investment*" in the ECT.

808. KPM and TNG are energy companies that held Subsoil Use Contracts and subsoil use licenses from Kazakhstan for the exploration and production of hydrocarbons. Claimants' tangible and intangible holdings in Kazakhstan included ownership of oil and gas wells, drilling equipment, gathering pipelines, treatment and storage facilities, vehicles, offices, an LPG Plant, equity interests in KPM and TNG, and contractual rights conferred by Kazakhstan to KPM and TNG under the Subsoil Use Contracts and Licenses for the Borankol field, the Tolkyn field, and the Contract 302 properties. These are encompassed by the subcategories (a), (b), (c), (e), and (f) of Art. 1(6) ECT and, further, by the language "*any investment*



*associated with an economic activity in the energy sector*" for the purpose of Art. 1(6).

809. Claimants' explanations as well as the evidence show that Claimants initially funded the operations of KPM and TNG through shareholder loans, which are investments under Art. 1(6) ECT, and that, later, substantial contributions to KPM and TNG were made through the reinvestment of profits. Reinvesting profits is also an investment, as Art. 14(1) ECT allowed Claimants to take the "*Returns*" of KPM and TNG and to distribute them as dividends or to spend or invest them as they saw fit.

810. The Tribunal is not persuaded by Respondent's argument that the Tristan Loan financial structure deprives the Tribunal of jurisdiction because it shielded Claimants from risk in relation to the investments in KPM and TNG. The Tristan note offering was a public debt offering in which investors examined the business and financial status of KPM and TNG and found them creditworthy. The Tribunal cannot see why this would prevent the investment from being covered by the definitions in the ECT.

811. Further, the Tribunal is not persuaded by Respondent's contention that the "*real*" investor in KPM and TNG is Tristan Oil, and not Claimants. It is clear from the text of Art. 1(6) ECT referring expressly to "*every kind of asset, owned or controlled directly or indirectly by an Investor*" that the ECT protects investments that are not only directly owned, but also investments that are indirectly owned or controlled. Claimants have demonstrated that Anatolie Stati indirectly owned and controlled KPM and its assets, and that he and Gabriel Stati each indirectly owned and controlled 50% of TNG and its assets. (C-II ¶¶ 125 – 129; CPHB 1 ¶ 67).

812. Respondent has also argued that Claimants' investments were either illegal from the beginning or became so at a later stage. First, the Tribunal notes that the ECT contains no requirement in this regard. Indeed, if the contracting states had intended there to be such a requirement, they could have written it into the text of the Treaty, as explained in the ICSID case of *Saba Fakes v. Turkey*. This consideration is even more valid in view of the extremely detailed definition of investment and other details regulated in the ECT. At least with regard to jurisdiction, the Tribunal does not see where such a requirement could come from. Whether that aspect is also relevant for the merits of the case, will have to be examined later in this Award. In addition the Tribunal notes that, as the timeline above demonstrates, while inspecting and monitoring Claimants' investments and their corporate structures for years, Respondent failed to allege that anything was illegal or improper prior to October 2008.

813. For the above reasons, the Tribunal concludes that it has jurisdiction over the investments made by Claimants.

## 4. Jurisdiction – Compliance with Three-Month Waiting Period

### a. Arguments by Claimants



814. After the Hearing on Quantum, Claimants asserted that, after the Hearing on Jurisdiction and Liability, it appeared that Respondent had abandoned its "*cooling off*" period arguments. In any event, Claimants satisfied any alleged duties during the three month stay of proceedings. (CPHB 1 ¶ 44, CPHB 2 ¶ 27).

815. While Claimants argue that they have complied with the three month waiting period under Art. 26(2) ECT, they also argue that this is not a jurisdictional requirement, but rather is a procedural hurdle. The procedural nature of the waiting period has been confirmed by the vast majority of arbitral tribunals called upon to decide upon the jurisdictional objections related to a claimant's alleged failure to comply with such a period. This solution is dictated by procedural economy, since denying jurisdiction would simply force a claimant to re-start proceedings a few months later – a solution that is in no party's interest. (C-II ¶¶ 53 – 57).

816. Claimants present cases where the tribunal has concluded that the waiting period is procedural and not jurisdictional. In the *Lauder* case, the tribunal found that the claimant had failed to comply with a six-month waiting-period under the applicable BIT by filing its Request for Arbitration 17 days after the notice letter, but did not consider that to be a bar to jurisdiction. Likewise, in *Wena v. Egypt*, in accepting the respondent's offer to withdraw its objection to jurisdiction based on Wena's alleged failure to comply with the three-month waiting period under the applicable BIT, the tribunal viewed the requirement as procedural. The tribunal in *SGS v. Pakistan* also chose to treat consultation periods as procedural rather than jurisdictional. In *Bayindir v. Pakistan*, the tribunal held that the claimant's failure to comply with a waiting period under the applicable BIT did not affect its jurisdiction. In *Occidental v. Ecuador*, the tribunal noted Ecuador's own acknowledgment at the hearing that "*this is not an objection to jurisdiction that has fared extremely well in many cases*," as well as Claimants' argument that the waiting-period requirement need not be respected if attempts at a negotiated solution have proven futile. The tribunal found that "*attempts at reaching a negotiated solution were indeed futile in the circumstances*," and as a result, it rejected Ecuador's objection. Most recently and with reference to the *SGS v. Pakistan* and *Lauder v. Czech Republic* decisions, the tribunal in the *Paushok* case held that "*[a]rguendo, even if they had failed to abide by the negotiating period, this would not go to jurisdiction, as that delay has long expired.*" Respondent has presented no reason for this Tribunal to stray from such a consistent line of case authority. (C-II ¶¶ 58 – 63, partially quoted).

817. Claimants two additional responses to Respondent's arguments are best taken from their own words:

> 64. *Should the Tribunal consider that the requirement to observe a "waiting period" is not a procedural requirement, the most appropriate alternative characterization would be to regard the requirement as one of admissibility, not of jurisdiction. In the Western NIS case relied on by Kazakhstan in its correspondence with Claimants, the tribunal found that the claimant had not given notice to the respondent as required under the applicable BIT. The tribunal however concluded that this defect could be cured by a suspension of the proceeding for the duration of the "waiting*



*period." In doing so, the tribunal effectively treated the requirement as one of admissibility, not jurisdiction*

65. *Kazakhstan disregards the well-established line of case law on this issue and relies on a distinctly minority view espoused in two cases, Murphy Oil v. Ecuador and Burlington v. Ecuador. Those cases are distinguishable from the present case on the facts, notably insofar as they did not involve a stay of the arbitration for the parties to conduct settlement negotiations. (C-II ¶¶ 64 – 65).*

818. In any event, Claimants maintain that they had complied with the "*waiting period*" by the time they filed the Request for Arbitration on 26 July 2010. The waiting period runs from the date Kazakhstan became aware of the dispute, which Claimants (in an exercise of futility) raised on numerous occasions, starting at least in March 2009. (C-0 ¶¶ 109 – 110; C-I ¶¶ 38 – 39; C-II ¶¶ 66 – 68). This is similar to the *Paushok* case. In any event, Tribunals – such as the recent *Abaclat* tribunal which considered a similarly worded treaty, have emphasized that compliance with a waiting period is not required where it would be futile. (C-II ¶¶ 69 – 70).

819. Claimants agreed to stay proceedings in February 2011 in order to give Kazakhstan an additional three month period. If any doubt remains, Claimants have indisputably satisfied the "*waiting period*" requirement through their agreement to a suspension of the arbitration for three months in 2011. During that time, there were attempted settlement negotiations, which resulted in one meeting in London on 10 March 2011. Respondent even concedes that the procedural requirements of Art. 26(2) ECT have been met. (C-I ¶ 40; C-II ¶¶ 71 – 72). Claimants state: "*[h]aving demanded and agreed to the suspension of the arbitration for the express purposes of complying with the 'waiting period' in Article 26 of the ECT, it is preposterous for Kazakhstan now to contend that the Tribunal has no jurisdiction over the dispute because Claimants failed to comply with the 'waiting period' in Article 26.*" (C-II ¶ 73). Respondent's own statements confirm that the suspension would ensure even jurisdictional compliance with Art. 26 ECT. (C-II ¶ 74).

### b. Arguments by Respondent

820. Claimants have not fulfilled the waiting period prior to initiating arbitral proceedings, and this is fatal to Claimants' case. The waiting period is a jurisdictional requirement under Art. 26(1) and (2) ECT. This was recognized as a safeguard in the case *Murphy v. Ecuador*. (R-I ¶¶ 7.11 – 7.14; R. ltr. of 18 January 2011; RPHB 1 ¶¶ 482 – 483).

821. Respondent presents arguments applying Art. 31(1) VCLT (on giving words in a treaty their ordinary and natural meaning in light of the Treaty's object and purpose) to Art. 26(1) and (2) ECT.

219. *Article 26(1) provides that disputes "shall, if possible, be settled amicably." The types of dispute that are to be settled amicably in compliance with Article 26(1) include alleged breaches of the obligations owed by a State under Part III of the ECT. Article 26(2) states that one of the dispute resolution mechanisms thereunder can be invoked if disputes arising under Part III "can not be settled...within a period of three months*



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

*from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution…".*

220.  *Therefore, the primary goal of the dispute resolution mechanism is settlement (disputes "shall…be settled amicably"). The word "shall" is not permissive, but mandatory and obligatory. This is clarified by the caveat ("shall, if possible"), which assumes that settlement may not always be forthcoming. In this case, where one party has requested amicable settlement and this has not been settled within three months of such notification, the Investor may submit the dispute for resolution in accordance with the terms of the remainder of the article. As to the nature of those settlement discussions, it is settled under international legal principles that they must be conducted in good faith. (R-II ¶¶ 219 – 220).*

822. The importance and mandatory nature of the three-month period, as well as the obligation to use that time to attempt settlement in good faith rather than simply "*wait it out*", is clear from the words of the ECT and this was noted by the tribunal in *Amto v. Ukraine*. (R-II ¶¶ 221 – 223).

823. Prior to the 26 July 2010 **Request for Arbitration**, the Republic had no notice (express or otherwise) of the imminent arbitration proceedings to be launched against it, nor of the dispute (as set out in Article 26(1) ECT) to be referred to arbitration. The events at issue occurred on 22 July 2010 – not five days before. Even if the cooling off period were to begin to run from the date on which Kazakhstan "*became aware of the dispute*", as Claimants contend, this was not prior to the Request for Arbitration. Finally, neither the letter dated 18 March 2009 nor the letter dated 7 May 2009 fulfilled the requirements of Art. 26(2) ECT. First, both letters predate the majority of events which Claimants state gave rise to this arbitration. Second, neither letter mentioned the ECT or contained an offer to arbitrate. Third, even if these constituted effective notice, they could not have constituted effective notices in respect of KPM, Gabriel Stati or Anatolie Stati, as they were sent by TNG and Ascom. (R-I ¶¶ 7.8 – 7.9; R-II ¶¶ 224 – 228; R ltr. of 18 January 2011).

824. Claimants cite decisions of other tribunals to support their contention that the cooling off period is procedural, rather than jurisdictional. These cases are irrelevant – not only because arbitration knows no precedent, but because these cases bear little resemblance to Art. 26(2) ECT. The *Lauder* case, for example, considered treaty provisions that were less strict and less specific than the ECT. In *Wena*, the tribunal considered a treaty provision that required neither notice, nor amicable settlement – and the respondent abandoned its jurisdictional objection in any event. *Western NIS* concerned a BIT that did not explicitly provide for notice (contrary to Claimants' assertions) and found that notice was not a jurisdictional requirement. It should be noted, however, that the tribunal in *Burlington* considered similar wording and came to a different conclusion. What is most important is that none of these cases concerned breaches of the ECT and are, therefore, wholly irrelevant to the interpretation of Art. 26(2) ECT. Unlike the definition of "*investment*" under Art. 1(6) ECT, this is not an instance where general principles of international law demand a wider meaning; the words are specific and sufficient. (R-I ¶ 7.15; R-II ¶¶ 229 – 236).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

825. If, however, the Tribunal is to consider comparisons with other investment treaties as instructive, Art. 26(2) ECT is similar to provisions in the BIT between Belgium and Burundi. Cases concerning that BIT have held that jurisdiction was not established where the cooling off period was not satisfied. (R-II ¶¶ 234 – 236).

826. Finally, the stay of arbitral proceedings cannot be conflated with a "*cooling-off*" period.

> *237. The timing of any settlement discussions between the parties is key to establishing whether or not the "cooling-off" period is satisfied. In this case, the settlement discussions occurred after the Request for Arbitration was submitted and therefore cannot be considered to fulfill the requirement for the "cooling-off" period.*

> *238. Claimants missed the "cooling off" period and no notice was given to trigger access to the dispute resolution mechanism in Article 26(2). Such failures cannot be cured retrospectively. The investor has all the time in the world to bring the claim. The waiting period is also supposed to allow the State to properly react and to properly prepare its defence. If the waiting period is ignored, there is an imbalance. This imbalance cannot be remedied by staying the proceedings at a later point in time. The defence needs to be strong from the start. If it is not, it might be too late. (R-II ¶¶ 237 – 238; see also R-I ¶ 7.5).*

827. The Republic has been willing to settle, and Claimants have not denied this. The Tribunal awarded by consent on 22 February 2011 a stay of proceedings with the intention of providing a window for settlement. In this order, the Tribunal acknowledged that the cooling off period was not satisfied. (R-I ¶ 7.10). While procedurally, the provisions of Art. 26(2) ECT have been met, the settlement period proposed by the Republic was without prejudice to the jurisdictional issues that this defect could later cause. (R-I ¶¶ 7.1 – 7.4, 7.16 – 7.18; R-II ¶ 239). Accordingly, the Tribunal does not have jurisdiction over this matter.

## c.     The Tribunal

828. Art. 26(1) ECT provides for a primary stage to settle a dispute amicably. And Art. 26(2) ECT provides for a three month waiting period for such settlement discussions, before the dispute may be submitted to arbitration.

829. By the express reference in subparagraphs (1) and (2), it is clear that the intention of Art. 26 ECT is to provide an opportunity of three months to the Parties to settle the dispute. In view of this obvious intention, the Tribunal considers that to be a procedural requirement rather than one of jurisdiction, at least as long as the Parties have indeed had such a three months opportunity.

830. The Respondent concedes that the Tribunal awarded on 22 February 2011, by consent with both Parties, a stay of proceedings with the intention of providing a window for settlement. (R-I ¶ 7.10). During that time, there were attempted settlement negotiations, which resulted in one meeting in London on 10 March 2011, but did not reach a settlement. According to Respondent, while procedurally, the provisions of Art. 26(2) ECT have been met, the settlement period proposed by the Republic was without prejudice to the jurisdictional issues that this defect could



later cause. (R-I ¶¶ 7.1 – 7.4, 7.16 – 7.18; R-II ¶ 239). The Tribunal does not agree. In view of the clear intention of Art. 26(1) and (2) ECT as indicated above, after the failed discussions during the granted three month period, there is no prejudice to either Party and there is no reason to deny jurisdiction.

## 5.    Admissibility of Claimants' Claims Pursuant to ECT

### a.    Arguments by Claimants

831. Claimants' arguments that there is no merit to Kazakhstan's objection under Article 18(2) ECT are best taken from their own words:

> 200. *Kazakhstan alleges that it is clear from Article 18(2) that the provisions of the ECT – including the dispute resolution clause – do not apply to issues related to a State's rules governing the system of property ownership of energy resources. Respondent contends that, pursuant to Article 18(3) and 18(4), "facilitating access to energy resources through, inter alia, licenses and contracts forms part of the system of property ownership." Therefore, according to Kazakhstan, the Tribunal has no jurisdiction to hear claims relating to Kazakhstan's right to audit KPM and TNG, the operation of trunk pipelines, the tax proceedings, the enforcement proceedings, the refusal to extend the period of the Contract 302 Properties, and direct expropriation. These assertions are ludicrous.*

> 201. *Kazakhstan's contention that Article 18 limits Contracting Parties' obligations under Part III of the ECT has no merit, and Kazakhstan does not cite a single legal authority or case in which its interpretation of Article 18(2) has been accepted.*

> 202. *First, the plain text of Article 18 (Sovereignty over Energy Resources) does not limit in any way the obligation of Contracting Parties under Part III. It merely re-states the well established principle of sovereignty over natural resources.*

> 203. *Second, Kazakhstan fails to mention Declaration No. V (appended to the ECT) [which states in relevant part "The representatives declared that Article 18(2) shall not be construed to allow the circumvention of the application of the other provisions of the Treaty."] and the Chairman of the ECT Conference's Statement at the Adoption Session for the ECT on 17 December 1994:*

>> *Finally, I note that the representatives of Norway supported by the representatives of ... Kazakhstan, Moldova... have declared that the Treaty shall be applied and interpreted in accordance with generally recognized rules and principles of observance, application and interpretation of treaties as reflected in Part III of the Vienna Convention on the Law of Treaties of 25 May 1969. **In particular in the context of Article 18(2) they recalled that a party may not invoke the provisions of its internal law as justification for its failure to perform a treaty**. The Treaty shall be interpreted*



> *in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose. (C-II ¶¶ 198 – 209, partially quoted, emphasis maintained).*

832. Claimants point out that Declaration V is the only Declaration made by all ECT signatories. It was made to preclude the very argument put forward by Respondent, namely that Art. 18(2) permits a state to evade its obligations under Part III of the ECT. This conclusion is supported by recourse to supplementary means of interpretation, like the *travaux préparatoire*. (C-II ¶¶ 206 – 209).

### b.    Arguments by Respondent

833. Respondent presents that the rights of the investor must be balanced against those rights of the host State. As recognized in Art. 18 ECT, the State has the right to regulate natural resources. (R-I ¶¶ 4.9 – 4.12). Respondent presents that *"the failures of the Claimants to provide any meaningful return to the Republic for their alleged investments (in particular in relation to the payment of taxes and the failure to contribute to the technological information exchange key to development) not only attracted legal consequences in the Republic, but importantly casts doubts on the Claimants' suitability to benefit from investment protection at the international level."* (R-I ¶ 4.12).

834. Respondent argues that the Tribunal's ability to hear Claimants' claims is limited by Art. 18(2) ECT, which states that the ECT *"shall in no way prejudice the rules in Contracting Parties governing the system of property ownership of energy resources."* This applies to all articles of the ECT, including Art. 26 which concerns the dispute resolution procedure. (R-I ¶ 11.1).

835. The Russian language text of the ECT is more restrictive than the English one. Whereas the English text says that the ECT *"shall in no way prejudice"*, the Russian text says *"shall in no way affect"* or *"shall in no way concern."* Although the texts are equally authentic pursuant to Art. 50 ECT, Art. 33(2) VCLT commands the Tribunal to apply the meaning that best reconciles the tests, having regard to the object and purpose of the Treaty. Accordingly, the Russian text shall apply in the present case, as it is narrower and reconciles both texts that, *"the ECT shall not apply to the provisions of national legislation governing the system of property ownership of energy resources."* Likewise, Art. 26 ECT shall not extend to issues related to the state's rules governing the system of ownership for energy resources, making also claims under Art. 10 and 13 ECT are inadmissible. (R-I ¶¶ 11.5 – 11.15)

836. The majority to Claimants' allegations fall within the Republic's right to govern the system of property ownership for its energy resources and, therefore, pursuant to Art. 18(2), the Tribunal lacks jurisdiction over these claims. These claims include (1) The Republic's right to audit KPM and TNG, (2) the claims regarding the operation of trunk pipelines, (3) tax proceedings, (4) execution proceedings, (5) the extension of the period for exploration under the Contract 302 fields, and (6) the direct expropriation. (R-I ¶ 11.16 – 11.28, 11:30, 13.48 – 13.63). Accordingly, the Tribunal should decline jurisdiction.



### c. The Tribunal

837. Art. 18(2) ECT provides:

> *Without affecting the objectives of promoting access to energy resources,*
> *and exploration and development thereof on a commercial basis, the*
> *Treaty shall in no way prejudice the rules in Contracting Parties*
> *governing the system of property ownership of energy resources.*

838. In addition, as Claimants have correctly submitted in this context, this provision
must be interpreted together with Declaration No. V, which is appended to the ECT
and which states in relevant part:

> *The representatives declared that Article 18(2) shall not be construed to*
> *allow the circumvention of the application of the other provisions of the*
> *Treaty.*

839. In addition, the Chairman of the ECT Conference's Statement at the Adoption
Session for the ECT on 17 December 1994 is also relevant:

> *Finally, I note that the representatives of Norway supported by the*
> *representatives of [...] Kazakhstan, Moldova [...] have declared that the*
> *Treaty shall be applied and interpreted in accordance with generally*
> *recognized rules and principles of observance, application and*
> *interpretation of treaties as reflected in Part III of the Vienna Convention*
> *on the Law of Treaties of 25 May 1969. **In particular in the context of***
> ***Article 18(2) they recalled that a party may not invoke the provisions of***
> ***its internal law as justification for its failure to perform a treaty.** The*
> *Treaty shall be interpreted in good faith in accordance with the ordinary*
> *meaning to be given to the terms of the treaty in their context and in the*
> *light of its object and purpose. (emphasis added).*

840. Declaration V is the only Declaration made by all ECT signatories. From this
exceptional step, it is clear that it was adopted to preclude that Art. 18(2) would
permit a state to evade its obligations under Part III of the ECT. Therefore,
Respondent's argument that the Russian language text of the ECT is more
restrictive than the English one cannot change this interpretation.

841. In view of these considerations, Art. 18(2) ECT does not prevent or limit this
Tribunal's jurisdiction. Whether any of Respondent's arguments, particularly
referring to the licensing and contracting structure within Kazakhstan (R-I ¶ 11.16
– 11.28; 13.48 – 13.63), are relevant regarding the merits of this case will have to
examined later in this Award.

### H.II.   Applicable Law

#### 1.   Arguments by Claimants

842. Pursuant to Art. 22(1) SCC Rules, this Tribunal shall decide the merits of the
dispute based on the rules of law agreed upon by the Parties. Accordingly, since
the Parties consented to arbitrate under the ECT and Art. 26(6) ECT contains an



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

express choice of law provision providing that the Tribunal "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law,*" the Tribunal's task is to determine whether Kazakhstan violated the ECT and international law. (C-I ¶¶ 239 – 242; C-II ¶¶ 423 – 437).

843. A state may not invoke its domestic law to justify or avoid liability for a violation of its international obligations. This is incontestable. This is also true for investment law cases. Kazakhstan is not permitted to evade its international obligations to Claimants by contending that its subsoil use laws, its corporate laws, or any other domestic legal rule excused its conduct. If the Tribunal determines that Kazakhstan violated any of the substantive protections in the ECT or any applicable rule of international law, that is the end of the inquiry. At most, Kazakh law is relevant as a factual matter. No provision of Kazakh law alters that conclusion. (C-I ¶¶ 239 – 242; C-II ¶¶ 423 – 437, partially quoted).

844. Claimants' argument with respect to the Tribunal's approach with respect to the choice-of-law clauses in the Subsoil Use Contracts is best taken from its own words:

> 438. [...*Even*] *if the Tribunal were to consider the articles on applicable law of Contracts No. 305, 210, and 302 – which it should not – those articles would require the application of the ECT and international law:*
>
> *For the Contract as well as for other agreements signed on the basis of the Contract, the law of the State shall be applied, <u>unless otherwise stated by international treaties to which the State is a party</u>. (C-II ¶ 438).*

845. Claimants also argue that Kazakhstan cannot justify its past conduct through "*new*" arguments under Kazakh law. Even though Kazakh law is irrelevant as far as governing law is concerned, Kazakhstan is making arguments that it never raised contemporaneously. New arguments include (1) claims regarding the alleged illegality of Claimants' investments in Kazakhstan, (2) Kazakhstan's assessment of export duties, (3) the reclassification of TNG's and KPM's filed pipelines as trunk pipelines, and (4) new termination grounds for the Subsoil Use Contracts. Even if Kazakhstan could rely on domestic law to evade its ECT obligations, Kazakhstan would not be permitted to excuse its prior unlawful conduct by retroactively conjuring up new legal arguments that allegedly might have justified its prior conduct, but did not actually motivate its conduct at the relevant time. Indeed, this is the same conclusion reached in *Wena Hotels Ltd. v. Egypt*, where the Respondent attempted to retroactively excuse its seizures by arguing that Wena had failed to comply with the leases. The same was true in *Siag v. Egypt*, where the Tribunal rejected Egypt's novel attempts to retroactively justify its expropriation of Mr. Siag's investments under Egyptian law. Indeed, in *Siag*, the tribunal rejected each of Egypt's *ex post facto* arguments and found that "*an illegal expropriation was carried out by Egypt, which may not be remedied by reference to Egyptian municipal law.*" (C-II ¶¶ 440 – 447). Claimants' final point is best taken from its own words:

> 448. *Kazakhstan's new theories similarly ask the Tribunal to imagine that Kazakhstan had chosen to rely upon legal grounds that allegedly would have made its conduct legal under Kazakh domestic law, rather than adopt the outrageous and unlawful course of action that it actually employed.*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *Beyond the fact that Kazakh domestic law cannot be used to excuse a Treaty breach, Kazakhstan's revisionist history is highly speculative and dubious. Kazakhstan has cited no principle of international law (and Claimants are aware of none) by which a State's blatantly unlawful conduct can be excused retroactively on the basis that the State supposedly could have accomplished the same end lawfully (but did not). The present Tribunal should refuse to entertain Kazakhstan's attempts to retroactively excuse its conduct. Whatever theories it now espouses, Kazakhstan cannot undo the fact that it blatantly violated the ECT and international law in its treatment of Claimants' investments. (C-II ¶ 448).*

## 2. Arguments by Respondent

846. Respondent's arguments related to applicable law are best taken from its own words:

> *834. As Claimants agree, pursuant to Articles 22(1) of the SCC Rules and 26(6) of the ECT, the arbitral tribunal shall decide the merits of a dispute in accordance with the ECT and applicable rules and principles of international law. However, many aspects of a complex investment arbitration case are not covered precisely enough by the ECT and international law. These lacunae need to be filled in by the host state's domestic law. [...]*

> *837. In investment treaty arbitrations, the body of law best suited for filling in the gaps of international law is the host state's domestic law because foreign investment always requires compliance with the domestic law of the host state. Private and public international law aspects are intrinsically linked:*

>> *"Investment disputes are about investments, investments are about property, and property is about specific rights over things cognisable by the municipal law of the host state."*

> *838. Since international law and domestic law are intertwined with respect to foreign investments, the host state's domestic law is highly relevant for determining any dispute. [...]*

> *841. The host state's domestic law is highly relevant to a number of issues. In particular, it is relevant to the question of whether an investment exists. Furthermore, as noted by Newcombe and Paradell, it is relevant to:*

>> *"whether the investment is held in the territory of the host State, its validity, the nature and scope of the fights making up the investment and whether they vest on a protected investor, the conditions imposed or assurances granted by national law for the operation of investment, as well as the government measures allegedly in breach of the investment treaty." (R-II ¶¶ 834 – 843).*



847. Respondent explains that the Subsoil Use Contracts explicitly provide that both Kazakh law and international law are applicable in relation to the relationship between Claimants and the Republic. Kazakh law is essential for assessing (1) whether an investment exists, (2) the legitimacy of the audits, inspections, criminal proceedings, (3) the termination of the Subsoil Use Contracts, and (4) the classification of Claimants' pipelines. (R-II ¶¶ 844 – 847). Respondent states that Claimants have admitted that Kazakh law is highly relevant, even alleging violations of the Kazakh constitution and Kazakh statutes in their memorials. (R-II ¶ 848).

848. In response to Claimants' irrelevant allegation that Respondent is relying "*on domestic legal arguments that it never made contemporaneously*", Respondent states that this is irrelevant for the determination of applicable law and, indeed, Claimants have failed to explain why this should have any impact on the applicable law pursuant to Art. 22(1) SCC Rules and Art. 26(6) ECT. New legal arguments for prior conduct do not change anything about the high relevance of the host state's domestic law in investment treaty arbitrations and the decisive significance of Kazakh law with respect to claims in the dispute at present. (R-II ¶¶ 849 – 850, partially quoted).

849. Likewise, since Respondent only became aware of many breaches after commencement of these proceedings, it is wholly logical that arguments about that past conduct could not have been made contemporaneously. (R-II ¶¶ 853 – 857).

850. With respect to the use of international law, Respondent encourages the Tribunal to recognize, as have other tribunals like the *S.D. Myers v. Canada* tribunal, that the determination on whether a state has acted unfairly or inequitably "*must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders.*" (R-II ¶ 860). There is no breach of international law if the state court's decisions are reasonably tenable and made in good faith. Accordingly, when addressing the conduct of the Republic from an international law perspective, the Tribunal should consider the policy reasons that generally guide the Republic in the regulation of subsoil use. The Republic has a reasonable expectation that foreign investors make and manage their investments in a lawful manner and in a manner which furthers the wealth of the Kazakh people. Through its laws and through the authorities applying its laws, the Republic implements a policy that aims to ensure that these expectations are being met by foreign investors. (R-II ¶¶ 858 – 863, partially quoted).

### 3. The Tribunal

851. The Tribunal agrees with the Parties that pursuant to Art. 22 (1) SCC Rules and Art. 26(6) ECT, the Tribunal shall decide the merits of the dispute in accordance with the ECT and applicable rules and principles of international law.

852. The question of in which way and to which extent the domestic law of Kazakhstan becomes relevant will be discussed later in this Award in the context of the breaches of the ECT alleged by Claimants.



## H.III. Considerations Regarding the Arbitral Procedure

### 1. Arguments by Claimants

853. Claimants argue that Respondent has obstructed these proceedings from the outset. It has attempted to *"railroad the Tribunal"* by (1) successfully requesting a 3-month extension in order to satisfy Art. 26 ECT, after which Respondent continued to argue that the same 3-month waiting period had not been met and that this deprived the Tribunal of jurisdiction, (2) raising five objections to jurisdiction, including the ludicrous one that the ECT is void because of an incomprehensible interpretation of the Russian text, (3) submitting *"sleeper"* witness statements, disguised as exhibits, that did not meet the requirements of Art. 4(5) IBA Rules on the Taking of Evidence in International Arbitration (IBA Rules), (4) withholding 30,000 pages of mostly Russian-language documents relied upon by sleeper witnesses, which was in contravention of Art. 5(2)(e) IBA Rules and the Tribunal's orders, until the Tribunal threatened evidentiary sanctions, and (5) accusing Claimants' counsel of withholding documents. In addition, Respondent has made exaggerations and misstatements of law that go beyond zealous advocacy. (C-II ¶¶ 21 – 31; CPHB 1 ¶ 4; CPHB 2 ¶ 28).

854. Claimants reject Respondent's allegations that they intentionally submitted misleading translations, illegally obtained documents, and obtained not genuine documents. The errors to which Respondent points in the translations, in particular the *"investigate"* and *"thoroughly check"*, among others, are distinctions without difference – the expressions have the same meaning and Kazakhstan has not explained the difference that these words could have in this case. In contrast, however, Respondent has made numerous errors and omissions in its translations, in particular with regard to Mr. Ongarbaev's witness statement, where entire paragraphs were deleted and sentences were added. (CPHB 1 ¶¶ 111 – 114; CPHB 2 ¶ 28).

855. Respondent has provided no support for its allegation that C-520 was altered, and the incorrect registration number on that document is likely a clerical error. Nevertheless, Respondent bears the burden of proving that the error was intentional. (CPHB 1 ¶¶ 115).

856. Regarding the allegations of corruption in that Claimants presented internal government documents, Kazakhstan has not established that the documents were confidential or that they were obtained improperly. Their authenticity has never been questioned. (CPHB 1 ¶ 116; CPHB 2 ¶ 28).

857. Exhibit C-704 came from the Court and Claimants produced it exactly as they received it. It was a draft transcript that was prepared prior to the judge's amendments. As explained at the hearing, it is completely unremarkable that Claimants obtained a copy of the Blagovest letter, produced as Exhibit C-23. (CPHB 1 ¶¶ 117 – 118).

858. Respondent has provided no explanation for why Claimants would forge the Report from Mr. Rakhimov to the Chief of the Financial Police, produced as



Exhibit C-711. Mr. Rakhimov has also confirmed that such reports were created. (CPHB 1 ¶¶ 119).

859. Respondent has exacerbated the volume and complexity of this case by, in addition to the above, submitting an entirely new case on quantum shortly before the January 2013 Hearing on Quantum. This has led to the unprecedented situation that Claimants had to address an entirely new case in a post-hearing brief. (CPHB 1 ¶ 3).

## 2.   Arguments by Respondent

860. Respondent argues that it has acted properly throughout this arbitration procedure. Every example provided by Claimants is flawed.

861. Respondent's request for a stay of proceedings in order to attempt amicable resolution of the dispute was proper, and was agreed to by Claimants. Respondent's goal was to end the proceedings with a settlement agreement. Claimants' attempt to intertwine this stay with their failure to comply with Art. 26 ECT is, however, incorrect.   The Republic proposed the settlement period, *expressis verbis*, without prejudice to the jurisdictional issues that this defect could later cause. (R-II ¶¶ 1160 – 1163).

862. Respondent's jurisdictional claims are meritorious and are made in good faith. Claimants ignore the fact that lack of jurisdiction is a very common and decisive issue in investment treaty arbitrations. In many prominent investor-state disputes under the ECT tribunals have held a preliminary hearing on jurisdiction. This is not obstructionism:   this is perfectly common and rightful behavior in an investment treaty arbitration. (R-II ¶ 1164).

863. With respect to the so-called "*sleeper*" reports, Claimants allege that the fact witness statements do not meet Art. 4(5) IBA Rules. The IBA Rules, per PO-6, are only guidelines. They are, therefore, not mandatory in this proceeding. The SCC Rules, which Respondent is following, do not set such narrow limits to the submission of witness statements. Thus, the allegation that the documents do not meet the IBA Rules is irrelevant. Moreover, PO-2 Annex I already outlined the next steps that the Republic needed to take with regard to the documents on which the "*sleeper*" reports rely. (R-II ¶¶ 1165 – 1169).

864. Respondent states that "[c]*onsidering this detailed roadmap on the production of documents on which the "Sleeper" reports rely and the adverse procedural consequences looming in case of disregard, the arbitration proceedings have not at all been obstructed. Quite the contrary, the Republic is committed to procedural transparency and has been advancing the proceedings by complying with its procedural duties in general and the aforementioned request of the Tribunal to produce the documents in particular. This is acknowledged by Claimants in their Reply Memorial on Jurisdiction and Liability, where they admit that the backup documents have been disclosed by the Republic on 2 April 2012.*" (R-II ¶ 1170).

865. As for Claimants' argument that the documents on which the "*sleeper*" reports rely were withheld, in violation of Art. 5(2)(e) IBA Rules, those rules do not apply and are only guidelines. Claimants' argument is irrelevant. (R-II ¶ 1171).



866. Claimants' complaints regarding the April 2012 document production are unfounded. The timely submitted documents were technical documents that were known to Claimants. Despite the large volume of documents, Claimants opposed extending the deadline. (RPHB 2 ¶ 1033). As for the withholding of documents, counsel explained in an email to the Tribunal on 11 April 2012 that, due to the pre-requisite coordination with public authorities to obtain documents, it was not feasible to produce those prior to 2 April 2012. Crucially, Respondent provided them before the expiration of the deadline set out in PO-3. This was not, as Claimants contend, a meticulous plan to force Claimants to seek extensions. Respondent met the deadline – Claimants only have themselves to blame for the extension. Furthermore, Claimants' counsel was ineffective in analysing the documents – documents which were largely already in Claimants' possession at that time. (R-II ¶¶ 1172 – 1175).

867. As another demonstration of Claimants' bad faith, Respondent argues that Claimants brought this present arbitration in an effort to avoid criminal liability in the US as a result of their bond issuances and their unwillingness to pay interest or to repay the amounts received. Respondent also accuses Claimants of submitting false information with the Statement of Claim. (R-I ¶¶ 9.71 – 9.72).

868. Respondent also presents that the procedural timetable in this matter has been unduly short for the issues at hand, and has been inherently biased in favor of Claimants. (R-I ¶ 3).

869. In Respondent's First Post Hearing Brief, Respondent accused Claimants and Claimants' counsel of procedural misconduct and encouraged the Tribunal to draw its own conclusions about the credibility of witnesses based thereon. First, Respondent alleged that some documents submitted by Claimants were obtained in violation of Kazakh law, notably exhibits C-293 and C-294, C-704, and also those listed in Respondent's opening presentation at slide 29 and that this has been conceded by Claimants and it remains unclear how these documents were obtained and what reliability they may have. In this regard, Claimants' C-704 is quite questionable. While it purports to be the hearing minutes of Mr. Cornegruta's Trial, it contains no stamps and no signatures – it is neither a draft nor a copy. In any event, it was not obtained lawfully. (RPHB 1 ¶¶ 1120 – 1138). Second, Respondent accuses Claimants of submitting forged documents, including C-495, C-520, C-702, C-704, and C-711.1. For the transcript of Mr. Cornegruta's trial (C-704), when compared to Respondent's official version (R-315.1 and R-315.2) contain differences. Claimants' transcript does not reflect a motion filed by Mr. Cornegruta. Testimony was also changed. Third, Claimants have submitted intentionally misleading translations in this arbitration, and the Republic has raised this issue previously, especially in regard to C-8, C-98, and the fact that Claimants have relied on these incorrect translations to create their claim. The correct English translations are essential in this arbitration. (RPHB 1 ¶¶ 1139 – 1175; RPHB 2 ¶¶ 39 – 49).

870. Further complaints relate to Deloitte GmbH and the allegedly new case on quantum. Claimants' FTI Report was severely flawed and then Claimants silently failed to produce Ms. Hardin, the main author of FTI 1 and FTI 2, for cross-examination. The Supplemental Expert Report of Deloitte does not exceed the



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

scope indicated by the Tribunal on 24 April 2013, and Claimants never requested to cross examine Mr. Gruhn again. (RPHB 2 ¶¶ 1034 – 1037, 1054, 1059).

871. The Republic was not authorized to disclose various due diligence reports prepared for KMG EP in 2009. KMG EP is not the state, but later consented to disclosure after the Hearing on Quantum. The content of these reports is excellent proof of the lack of procedural misconduct by the Republic. They contradict Claimants' allegations and support the Republic's position. There was no reason, beyond confidentiality, to withhold them. (RPHB 2 ¶ 1038 – 1039).

872. Claimants' argument that they were excluded from submitting further evidence or from cross-examining witnesses, like Mr. Suleymenov and Mr. Mynbayev is without merit – they never asked to do so and they did not hesitate to provide new evidence during the Hearing on Quantum. (RPHB 2 ¶ 1040).

873. Claimants' continuous changes of their requests and the underlying facts put Respondent at a considerable disadvantage. Claimants' inability to produce the main author or of the FTI Reports, Ms. Hardin, is one such example. It was obvious that Mr. Rosen was not familiar with the first and second FTI Reports. At the same time, he attempted to disregard the fact that Ms. Hardin had ever worked on the documents. The Tribunal should exclude the FTI Reports in their entirety. (RPHB 2 ¶¶ 1041 – 1048). In addition, to the extent that Claimants continue to move for exclusion of the Deloitte Reports, Respondent requests the exclusion of the FTI Reports. (RPHB 2 ¶¶ 1052 – 1053).

874. In addition, Claimants were disruptive prior to each of the three hearings in this case, thereby shortening and disrupting Respondent's preparation time. In the lead up to the Hearing on Jurisdiction and Liability on 1 October 2012, this included (1) the 14 September 2012 request to submit new documents, (2) the 20 September 2012 request to submit different new documents, the 28 September 2012 request to withdraw documents. In the time leading to the hearing on Quantum starting 28 January 2013, Claimants (1) made a midnight submission of the "*Sharing Agreement*", on 31 December 2012, (2) submitted a "*Request to compel production*" containing new arguments and statements on 2 January 2013, (3) submitted a further request regarding witnesses to the Tribunal on 2 January 2013, (4) moved to submit new documents, including 3D seismic data, on 18 January 2013, (5) submitted a revised calculation of FTI on 25 January 2013, (6) submitted the supporting materials for the revised FTI calculation and 27 January 2013. Then, on the third day of the Quantum Hearing and in violation of the Tribunal's order, Claimants submitted the new evidence relating to 3D data, anyway. Next, immediately prior to the First Post-Hearing Briefs and the Closing Hearing, Claimants opposed Respondent's request for an adequate, three-month, opportunity to digest the newly submitted materials. To date, Claimants have failed to explain their belated and clandestine submission of supporting documents to the Ryder Scott Third Report. Then, one week before the Closing Hearing, Claimants objected to the testimony of Mike Wood of GCA, since FTI's Mr. Rosen would not be present. (RPHB 2 ¶¶ 1050 - 1051).

875. Claimants often unfairly attempted to limit the Republic's defenses. (RPHB 2 ¶¶ 1054 – 1056). They delayed filing their May 2012 submission, as well, without excuse. (RPHB 2 ¶ 1057).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

876. Claimants' experts were complicit in supporting Claimants' unfair procedural strategy, and helped Claimants to have a procedural and substantive advantage in having more time for the analysis of the 3D seismic data. (RPHB 2 ¶ 1058).

877. Respondent upholds its procedural objections and consideration must be made not only to the number of submissions, but also to whether sufficient time for preparation was granted. Respondent upholds its objection of 11 January 2013 and made orally on Day 1 of the Hearing on Quantum (objecting to the late submission of the Sharing Agreement and reserving the right to address it in writing, to submit expert opinions on it, and to request an additional hearing). Respondent also upholds its objection of 6 March 2013, which was also raised on Day 3 of the Hearing on Quantum (objecting to the revised report). Claimants' experts' testimony confirm that this objection is fully justified. Ryder Scott had been complicit with Claimants in misleading the Tribunal though the Joint Issue List and in submitting new and relevant evidence by surprise. These actions gave Ryder Scott significantly more time to review the 3D seismic data, thereby giving Claimants a procedural advantage over the Republic. Respondent's experts (GCA) confirmed that the time constraints had limited the scope of their work. While they knew that the work existed previously, they had not reviewed it. (RPHB 2 ¶¶ 31 – 37, 1160 – 1067).

878. The Final Hearing also made Ryder Scott's partiality apparent. Upon questioning by the Tribunal about Ryder Scott's role, Mr. Nowicki agreed that they had been engaged by the client and might have that role (as opposed to having the role of independently assisting the Tribunal). Repeatedly, Ryder Scott presented Claimants' counsels findings as its own. (RPHB 2 ¶¶ 35 - 37

879. Claimants have changed and amended their case on quantum, in the amount of USD 841 million (RPHB 2 ¶ 52):

|  | Statement of Claim (million USD) | Δ | Reply on Quantum (million USD) | Δ | Hearing on Quantum (million USD) | Δ | 1st PHB (million USD) |
|---|---|---|---|---|---|---|---|
| Borankol Field | 193 | + 38.5 | 231.5 | - 33.49 | 197.01 | | 197.013 |
| Tolkyn Field | 561 | - 52.6 | 508.4 | - 29.47 | 478.93 | | 478.927 |
| LPG Plant (cost) | 208.5 | + 36.5 | 245 | | 245 | | 245 |
| Contract 302 (prospective) | 1,766 | - 186 | 1,580 | - 132 | | 1,448 + 188.9 | 1,636.9 |
| LPG Plant (prospective) | 344 | + 64.3 | 408.3 | - 79.2 | 329.1 | | 329.1 |



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

880. Claimants are not entitled to update their requests without the Republic being heard on those requests or to simply leave it to the Tribunal to decide for them. (RPHB 2 ¶¶ 50 – 55).

881. Claimants have alleged that the Republic has not produced certain government instructions in these proceedings, but that allegation is misleading since Claimants have not requested such production, outside of in their first post-hearing submission. (RPHB 2 ¶ 381).

## 3.    The Tribunal

882. Throughout this procedure, the Parties have raised numerous objections to the procedural conduct of the other side. The Tribunal has addressed these by a great number of rulings in letters and procedural orders, all reflected in the summary of the Procedural History provided earlier in this Award.

883. As recorded in  the transcript (page 100), at the end of the last Hearing on 3 May 2013, the Chairman of the Tribunal raised the following question:

> *The Tribunal has, of course, taken note of the procedural objections that were put on record at an earlier stage, and we take it that these will be maintained. So my usual question at the end of a hearing only is: are there any further procedural objections at this stage regarding the way the Tribunal has conducted this procedure?*

884. The Parties replied as follows:

> *For Claimant MR SMITH: None from the Claimants.*

> *For Respondent DR NACIMIENTO: And none from Respondent*

885. After the hearing, at the end of this procedure, the Tribunal notes that Claimants have not raised any further objections against the way the Tribunal conducted this procedure.

886. At the end of this procedure, in its 2nd Post-Hearing Brief, Respondent upheld its earlier procedural objections.

887. The Tribunal does not see any need to reiterate its many rulings recorded in the summary of the Procedural History provided earlier in this Award, all of which were made in an effort to grant the Parties the opportunity to present its case and to comment on the other side's submissions and keep up a high standard of due process.

888. The final hearing in May 2013 provided the Parties not only an opportunity for a further examination of the technical experts, but also two rounds of oral closing arguments.

889. Thereafter, as provided in PO-10, the Parties had and used the opportunity to submit 2nd Round Post-Hearing Briefs (without any page limit) by 3 June, cost claims 1 July, and comments thereon by 8 July 2013.



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

890. Taking all these procedural steps together, the Tribunal concludes that the Parties have had ample opportunities to present their case and comment on the other side's submissions and every aspect of the case.

## J.    Liability

### J.I.    Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT

#### 1.    Arguments by Claimants

891. Article 10(1) ECT obliges Respondent to treat Claimants' investments fairly and equitably. As the term "*fair and equitable treatment*" (FET) is not defined in the ECT, the term must be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of the object and purpose of the treaty. Given the breadth of the terms "*fair*" and "*equitable*," their context in the ECT and the object and purpose of the ECT, the FET standard in the ECT prohibits a wide array of governmental misconduct and omissions. Thus, the Tribunal "*will have to decide whether in all the circumstances the conduct in issue is fair and equitable or unfair and inequitable*." (C-I ¶¶ 337 – 339).

892. With respect to the ordinary meaning of the terms "*fair*" and "*equitable*", Claimants explain that the ICSID tribunal in *MTD v. Chile* concluded that the "*ordinary meaning*" of "*fair and equitable*" is "*just, even-handed, unbiased, legitimate*." (C-I ¶ 340, partially quoted).

893. With respect to the context and the object and purpose of the ECT, the *Saluka* tribunal explained that the other provisions of the treaty, including the Preamble, are relevant. Claimants explain that, pursuant to the Preamble and Art. 2 and 10(1) ECT, the ECT was created to boost investor confidence and to increase investment flows. (C-I ¶¶ 341 – 343).

894. Claimants also state that the Tribunal should consider the manner in which the FET standard has been interpreted and applied under international law by the many international investment tribunals that have considered the standard in recent years. There is a considerable body of case law that has added specific meaning and content to the standard, making it clear that specific types of host state misconduct are prohibited. (C-I 344 – 348, C-II ¶ 501). The prohibited conduct includes:

- *Actions that violate an investor's legitimate expectations in relation to the investment;*

- *Conduct that creates an unstable or unpredictable legal framework or business environment for the investment;*

- *Conduct that violates due process or results in a "denial of justice," including (but not limited to) improper judicial or administrative proceedings as well as governmental interference in such proceedings;*



- *Interference with a contractual relationship;*

- *Actions that treat an investor or an investment inconsistently, ambiguously, or with a lack of transparency;*

- *Failure to sufficiently notify an investor in advance of impending acts that will impact the investment;*

- *Actions that are discriminatory;*

- *Harassment or coercive conduct; and*

- *Conduct that is in bad faith. (C-I ¶ 345).*

895. Investment case law, including *Waste Management v. Mexico*, confirms that the above list is an accurate representation of prohibited conduct. The *Tecmed v. Mexico* decision presents the most frequently quoted articulation of the FET standard, cited and applied by other Tribunals, including *CMS, Azurix, MTD, Occidental, LG&E, BG*, and *Suez*. (C-I ¶¶ 346 – 348). That description is as follows:

*[The FET standard] requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment. The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and to comply with such regulations... The foreign investor also expects the host State to act consistently, i.e. without arbitrarily revoking any preexisting decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities. The foreign investor also expects the State to use the legal instruments that govern the actions of the investor or the investment in conformity with the function usually assigned to such instruments, and not to deprive the investor of its investment without the required compensation. (C-I ¶ 347).*

896. There is no exhaustion of local remedies requirement in applying the FET standard. The *Helnan* Annulment Committee expressly annulled the part of the arbitral decision that had taken the view Kazakhstan wants this Tribunal to adopt. There, that Committee stated, "*claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention. But that is a very different matter to imposing a requirement on the claimant to pursue local remedies before there can be said to have been a failure to provide fair and equitable treatment.*" Thus, pursuance of domestic remedies is a factor in determining whether the State's treatment was fair, but it is not a pre-requisite. In any event, such a requirement – even if it were to exist – would not be applied if



pursuance of remedies would have been futile. (C-II ¶¶ 498 - 500, partially quoted, emphasis maintained).

897. From October 2008 – July 2010, Kazakhstan violated nearly every aspect of the FET standard that has been articulated to date, and Claimants refer the Tribunal to their arguments concerning Kazakhstan's excessive campaign of harassment and interference with Claimants and their investments, and to the outright seizure of the investment in July 2010. Claimants present 6 categories of actions which they state violated the FET standard, summarized and partially quoted below. (C-I ¶¶ 349 – 351).

898. First, Respondent "*fabricat[ed] the grounds for criminal actions against Mr. Cornegruta, KPM, and TNG*" and that that was in violation of the FET standard. This was based on the unfair, arbitrary, and false re-classification of KPM and TNG's pipelines into trunk pipelines. This reclassification was administered unfairly, with even the Judicial Executor admitting that the segment at issue was a mere "*field*" – and not "*trunk*" pipeline. The Financial Police were not a competent authority to determine whether the pipelines in question were field or trunk pipelines. There was no change in the pipelines that led to the re-classification. Kazakhstan's own officials approved the design and construction of the pipelines. Respondent's allegation that none of KPM's or TNG's previous licenses were sufficient for the type of pipeline is preposterous. Further, "*key personnel were targeted as criminally responsible for the funds that corresponded to the dates of their respective tenures as General Directors.*" The reclassifications were discriminatory – KPM and TNG were the only companies singled out for reclassifications, "*despite similar gathering systems being owned and operated by other oil and gas companies in the immediate vicinity and throughout Kazakhstan.*" Finally, these criminal actions violated Claimants' legitimate expectations toward proper and fair governmental conduct. (C-I ¶ 351, partially quoted; C-II ¶¶ 504 – 506; CPHB 1 ¶¶ 150 – 213 *et seq.*; CPHB 2 ¶¶ 71 – 79, 87, 97, 99 – 100).

899. According to Claimants, the segments of Claimants' pipes that are at issue extend from the principal joint where the KPM wellhead pipes converge to KPM's processing facility, and from the processing facility to TNG's storage tanks, where services are also provided to KPM. For the TNG gathering system, the segment extends from the principal joint where the TNG wellhead pipes converge to TNG's processing facility; from the processing facility directly to the CAC Pipeline for gas; and from the processing facility to TNG's storage tanks for condensate. Claimants state that identical gathering systems are owned and operated by other oil and gas companies in the immediate vicinity – and indeed throughout Kazakhstan – none of which are classified as trunk pipelines requiring licensure. Very few companies hold licenses for the operation of trunk pipelines. (C-0 ¶¶ 36, 39 – 40, partially quoted).

900. In any event, Claimants dispute that the pipelines are trunk pipelines. The segments of oil and condensate pipelines that are at issue carried oil and condensate to storage tanks, which are hardly another means of transport, processing, or consumption. Claimants also state that the pipelines are not trunk pipelines, because they are operated by contractors, and contractor's pipelines are not trunk pipelines as a matter of law. (C-II ¶¶ 258, 260).



Case 1:14-cv-01638-ABJ   Document 72-3   Filed 09/30/14   Page 94 of 104
Case 1:14-cv-01638-ABJ   Document 22-3   Filed 09/26/14   Page 94 of 104 of 225

Page **198** of **414**

901. The criminal allegation of "*illegal entrepreneurial activity in an especially large amount*" under Art. 190(2)(b) of the Kazakh Criminal Code was malicious and contrived. Respondent contrived the operation of the main pipeline to satisfy the "*illegal entrepreneurial activity*" element of the crime. The second element, "*in an especially large amount*" was manufactured by manipulating instructions to the Tax Committee and calculating the "*illegal profits*" by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. Kazakhstan assessed "*illegal profits*" from operating the trunk pipeline – and this fine amounted to more than 65 billion Tenge for KPM and more than 82 billion Tenge for TNG – reflecting all of the revenue that both companies had generate for oil, gas, and condensate production from 2002 – 2008. These calculations were unfair, did not consider expenses or costs, and did not correspond to the transportation fees that would have applied if the pipeline segment was truly a trunk pipeline. Importantly, the fine was contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The proper calculation would have yielded USD 12,000 – 13,000 in illegal profits – below the USD 17,000 threshold for the crime. (CPHB 2 ¶¶ 80 – 84, 87)

902. Under *Vivendi II*, which provides guidance on the types of measures that give rise to international liability for disproportionate measures, the USD 145 fine against KPM for a failure to get an USD 80 license is disproportionate. Likewise, *Occidential v. Ecuador* found that the loss of an investment worth hundreds of millions of dollars was disproportionate to the state goal of deterrence. (CPHB 2 ¶¶ 92 – 93).

903. The pipeline was not indispensible to KPM's ability to sell oil, as Kazakhstan alleges. Even if the calculation were correct, which Claimants deny, the USD 145 million fine was grossly disproportionate, especially compared to the USD 80 fee to obtain a main pipeline license or the USD 12,000 – 13,000 in actual profits earned from operating the pipeline. It was higher than the total profits earned by KazTransOil during 2007 and 2008. This fine would be in violation of international law as being disproportionate to the wrong that the state is trying to address. Here, no harm resulted from KPM's operation of the pipeline and there was no risk beyond those presented by other parts of KPM's extensive gathering system. The USD 80 license is not material, and was only issued to KMT in 2011, a year after it took over KPM's operations. (CPHB 2 ¶¶ 81, 85, 89, 91, 95).

904. Whether the opaque regulations were a violation of the FET standard is an alternative case that the Tribunal may not even need to consider, since the evidence that neither KPM nor TNG operated a main oil and gas pipeline is overwhelming. Kazakhstan has essentially defended the wrongful and unwarranted "*main pipeline*" conclusions of its Financial Police, Mr. Baymaganbetov, and the Aktau City Court by arguing that its regulatory regime in relation to main pipeline licensing was so lacking in transparency that only the country's prosecutor could provide the correct answer. Even if Kazakhstan's argument were credible — which it is obviously not — it would do Kazakhstan no good in terms of escaping liability under the ECT. The ECT's FET standard requires a consistent, transparent regulatory framework every bit as much as it precludes arbitrary prosecutions and denials of justice. (CPHB 2 ¶¶ 75 – 79).


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

905. Claimants state that "[i]t is simply no defense to Claimants' fair and equitable treatment claim for Kazakhstan to argue that its own laws were so confusing and unclear that multiple Kazakh officials applied them incorrectly for nearly a decade."

> 507. Kazakhstan is in a conundrum. Either it unlawfully and unfairly reclassified KPM's and TNG's field pipelines as trunk pipelines as a pretext for taking over Claimants' investments — as the evidence overwhelmingly demonstrates — or Kazakhstan's laws and its application of those laws were so confusing and non-transparent that they amounted to unfair and inequitable treatment. Either way, Kazakhstan violated the ECT's fair and equitable treatment standard. (C-II ¶ 507).

906. Second, Claimants allege that Respondent's prosecution "and conviction of Mr. Cornegruta in a sham trial that also delivered a verdict against the non-party KPM" was a violation of the FET standard. (C-I ¶ 351, partially quoted). They were "factually incorrect, politically motivated, and riddled with due process violations. KPM was convicted in that proceeding, when it was not even named as a party and could not be named a party under Kazakh law. KPM was not officially notified of the proceeding, nor was it represented by counsel or allowed to appeal." Mr. Cornegruta does not own KPM and that he was not an entrepreneur under Kazakh law. Rather, he was an employee of KPM. (C-0 ¶ 44, partially quoted; C-I ¶ 108; CPHB 1 ¶ 139). In addition, Kazakhstan "failed to provide Mr. Cornegruta access to the allegations and supporting evidence against him, and the court summarily rejected the evidence demonstrating his innocence." (C-II ¶ 509). This was an improper proceeding in the sense of Petrobart. Claimants' expert witnesses were compelled to withdraw their expert opinions, and "Kazakhstan's interference in the criminal proceeding and the conviction of non-party KPM ensured that Claimants would not have 'a real possibility to present [their] position' on Mr. Cornegruta's and KPM's behalf, which the Rumeli and Tecmed tribunals deemed contrary to due process and a breach of the fair and equitable treatment standard." KPM was never named or made a party to the criminal action for allegedly operating a trunk pipeline without a license, and KPM was consequently not represented by counsel during the criminal trial against Mr. Cornegruta. (C-0 ¶ 46; C-I ¶ 108). This proceeding also amounted to a denial of justice under international law. (C-I ¶ 351, partially quoted; C-II ¶¶ 508 – 511; CPHB 1 ¶¶ 188 et seq.; CPHB 2 ¶¶ 97 - 114).

907. Claimants argue that this judgment violated not only international norms and standards of due process, but also violated Kazakh law and due process. The Judge was not bound by the 18 May 2009 decision that the expert opinions were inadmissible (a decision that Mr. Cornegruta only learned of after conviction). Instead, the judge could evaluate their value on her own. Claimants state that defense counsel introduced seven expert opinions explaining that the KPM gathering system pipelines are not trunk pipelines (two of which were subsequently withdrawn after the experts who rendered them received threatening letters from the Financial Police). (C-I ¶ 117; C-II ¶¶ 300 – 305).

908. Kazakh law only permits recovery based on the extent of enrichment of the guilty person. Only income unjustly earned by Mr. Cornegruta (the guilty person) could be recovered. The damages calculation failed in numerous respects, not the least of which that the judge refused to hear testimony from Claimants' expert Mr.



Suleymenov (who drafted the Law on Oil) and ignored the obvious fact that the *"illegal profits"* allegedly earned by Mr. Cornegruta were not profits (they were revenues), were not earned by him (they were earned by KPM), and did not correspond to sums earned through operation of a pipeline (they were simply total revenues earned by KPM, over 99% of which corresponded to onward sales of oil). There could be no recovery from KPM and Kazakhstan identifies no provision of Kazakh law supporting its notion that Mr. Cornegruta's purported unjust enrichment amounted to all of KPM's revenues. There is also no theory of *"quasi-criminal"* liability in Kazakh law. (CPHB 2 ¶¶ 86, 97 – 109).

909. The threats against KPM and TNG's employees that they would face similar trials to Mr. Cornegruta if they did not cooperate and the Financial Police's efforts to follow and intimidate Mr. Cornegruta's wife and lawyers outside of court violate the FET standard. (CPHB 2 ¶¶ 49 – 51).

910. Third, *"Kazakhstan's refusal to approve TNG's contractual rights to continue exploration in the 302 Contract Properties comprises two distinct breaches of the [FET] provision."* First, by simply ignoring TNG's request for an extension for six months, Kazakhstan violated Claimants' right to be notified of acts or omissions that would impact its investment. Second, Claimants' legitimate expectations were frustrated when Kazakhstan failed to extend the contract, despite having assured TNG that it would do so. This *"wrongful refusal to execute the addendum extending TNG's exploration rights in the Contract 302 Properties prevented Claimants from proving the Contract 302 Properties' reserves, which in turn prevented them from establishing the market value of their Kazakh investments."* At best, this is gross negligence. It is more likely, however, that this *"[bad faith] conduct represents deliberate interference with Claimants' rights over their investments, including KPM's and TNG's contract rights, because Kazakhstan never communicated any change in its position to them and gave them no justification for its refusal."* The termination also frustrated Claimants' legitimate expectations because they breached the contractually-mandated 90 day notice period before termination would be effective. (C-I ¶ 351, partially quoted; C-II ¶¶ 514, 516; CPHB 2 ¶¶ 149 – 176).

911. Fourth, Claimants allege that Kazakhstan *"saddl[ed] KPM and TNG with ownership and title concerns that destroyed Claimants' ability to dispose of their investments at market value"* and that this was a violation of the FET standard. Kazakhstan acted inconsistently and without transparency by *"continually changing its position on KPM's and TNG's transfer prices, corporate taxes, export tax exemptions, amortization rates, the extension of TNG's exploration period, and the State's pre-emptive rights. The imposition of clearly improper tax rates is tantamount to extortion."* In particular, Kazakhstan incorrectly assessed USD 6 million in back transfer price taxes and penalties against the companies. In effect, and in the sense of *CME v. Czech Republic* ruling, this eviscerated the arrangements that induced the Claimants to invest, and upon which Claimants relied. Furthermore, in violation of specific contractual and legal provisions that exempted KPM from paying export taxes, KPM was prohibited from exporting 22,000 tonnes of crude oil without paying the tax. KPM paid, under protest, and has legally challenged these actions. Claimants' characterization of the tax issues are best taken from their own words:



*The State then introduced a new tax provision that replaced crude oil export taxes with a Rent Tax for Export. When a court decision exempted KPM from paying the Crude Oil Export Tax for its January 2009 exports, but instead obliged KPM to pay the newly applicable Rent Tax for Export, the Financial Police intervened. The Aktau territorial customs body subsequently informed KPM that it was required to pay the Crude Oil Export Tax, amounting to USD 4 million, which led to KPM filing additional legal challenges. The Financial Police's interference in KPM's and TNG's contractual relationship with the Ministry amounts to a violation of Kazakhstan's duty to treat Claimants' investments fairly and equitably. The changes of opinion with respect to export taxes also frustrated Claimants' legitimate expectations that that they would benefit from a contractually agreed tax exemption. (C-I ¶ 351).*

912. In addition, "*Kazakhstan also refused to refund US$ 10 million that KPM and TNG paid under protest, after those taxes were found to have been improper.*" (C-II ¶ 514). The three tax claims – the USD 10 million for export duties, the USD 62 million for corporate income taxes, and the USD 5 million in transfer pricing taxes were structured in such that they were, in *RosInvest's* words, "*linked to the strategic objective of returning petroleum assets to the control of the [State] and in an effort to suppress the [an investor].*" The Tribunal should conclude that Respondent's actions have breached the FET standard. (CPHB 2 ¶¶ 127 – 139).

913. Inconsistently and non-transparently, Kazakhstan raised questions as to the true ownership of TNG and clouded Terra Raf's title when, on 18 December 2008, it retroactively revoked its prior, express consent for the transfer of TNG's ownership from Gheso to Terra Raf and its prior waiver of pre-emptive rights. It is now common ground that Kazakhstan did not have a pre-emptive right in 2003, when Gheso transferred TNG to Terra Raf. Even throughout this arbitration, Respondent has shifted its arguments. When Kazakhstan argued that the Gheso-Terra Raf transfer was not valid until it was registered, Claimants proved that it was registered in May 2003 and was, therefore, complete. When Kazakhstan then argued that the 2003 transfer was not complete until the relevant Kazakh authorities consented to it, Claimants showed that Kazakh law did not require consent to be complete in 2003 and that Respondent consented to the transfer in 2007. The manner in which Respondent protested the transfer and then made false public claims of fraud and forgery, which immediately clouded title to TNG, violated the FET standard. (CPHB 2 ¶¶ 115 – 126).

914. All of these measures furthered the State's goal, expressed in 2008, to take over Claimants' investments, as these measures prevented Claimants from selling their investments. (C-I ¶ 351, C-II ¶ 513).Claimants state that Kazakhstan does not dispute that harassment and coercion of an investor constitutes a breach of the FET provision. Kazakhstan initiated a campaign of harassment and coercion that endured for 21 months. This campaign was carried out in bad faith, for the purpose of acquiring Claimants' investments at firesale prices. (C-II ¶¶ 512 – 513, partially quoted).

915. Fifth, Respondent "*fabricat[ed] the grounds for the direct seizures of Claimants' investments in July 2010*" and that this was a violation of the FET standard. Taken from Claimants' own words:



*[...] The eleventh-hour allegations of breach were utterly without merit. For example, the Ministry of Oil and Gas raised its tired claim that TNG operated a main pipeline without a license as a ground for claiming breach of TNG's Contract No. 302, even though that contract for exploration in the area surrounding the Tabyl Block had nothing at all to do with KPM's or TNG's gathering systems. The Ministry later admitted that the violations it had alleged only days before were not the reasons for terminating Contract No. 302. (C-I ¶ 351):*

916. Even if Respondent's allegations had been meritorious, they still violated the FET provision because Claimants were not given a meaningful opportunity to dispute or correct the alleged violations. The burdensome taxes and criminal prosecution described above, as well as the multiple inspections, raids, and interrogations of Claimants' personnel, "*destroyed the ability of KPM and TNG to operate normally*" and that was a violation of the FET standard. The asset seizures following the conviction forced KPM and TNG to spend valuable time and resources challenging the orders and protecting their business. Finally, the bad faith seizure, culminating "*the State's months-long, self-serving scheme to gain control and nationalize those investments [...] included the takeover of all of Claimants' investments in Kazakhstan. In no way can the seizure of Claimants' investments be in accord with Kazakhstan's duty to treat Claimants' investments fairly and equitably.*" (C-I ¶ 351).

917. Sixth, Claimants filed dozens of complaints to various Kazakh authorities about the mistreatment they were suffering. Every plea fell upon deaf ears. The Tribunal could consider this bureaucratic blame shuffling and ultimate non-reaction to be a violation of the FET standard, as the Tribunal in *Wena Hotels v. Egypt* found when it considered that Egypt's failure to take any action to prevent illegal action by state authorities constituted just such a violation. (CPHB 2 ¶¶ 140 – 148).

918. Regarding the content of the Cliffson deal, Claimants present that during negotiations they made it clear that they intended to bring an arbitration against Kazakhstan for the diminution in value of the investment once the sale closed. They explain that they only agreed to drop the arbitration amendment in exchange for "*the family's*" use of their influence to obtain the release of Mr. Cornegruta from prison. (C-II ¶¶ 392 – 395).

919. Each action describe above violates every element of the UNCTAD's description of abusive conduct that violates the FET standard. (CPHB 2 ¶ 58).

### 2. Arguments by Respondent

920. Throughout its dealings with KPM and TNG, Respondent has acted in a manner that was consistent with the expectations of investors and consistent with any legitimate expectations that KPM and TNG could reasonably have had. Claimants' attempt to argue that Respondent's adherence to due process is part of a so-called "*strategy of obstructionism*" is a figment of Claimants' imagination. (R-II ¶¶ 990 – 991). Regardless, Respondent has treated Claimants and their investments fairly and equitably. As far as the typical elements of FET, Respondent agrees with the facts that Claimants' list at C-I ¶ 345 (protection against actions in bad faith, the protection of legitimate expectations, the reliance on a stable and predictable business environment, the expectation of due process and the protection against interference with contractual relationships, harassment or coercive conduct).



Respondent reminds the Tribunal, that it must assess each allegation on a case-by-case basis, and none of the above factors, alone, is sufficient for a finding that of a breach of the FET standard. (R-I ¶¶ 37.32 – 37.34). Respondent's position is best taken from its own words:

> 993. *[The FET standard] needs to be considered against all the factual circumstances. In a situation where the state action that the injured party claims of is one which the aggrieved party has been granted a right to resolve at a local level, there can be no conclusion that the state has acted unfairly and inequitably if the aggrieved party has not actually pursued those rights. In other words, a state (acting fairly and equitably) may provide an opportunity (through the provision of contractual protection or through the court system) for the claimant to seek redress of actions taken by the state that may have been incorrect. This might apply to a decision of a first instance court or the actions of an administrative official. This is a fundamental part of providing a fair and equitable as well as stable and predictable environment for the investment. As set out in Helnan v Egypt, a treaty claim for the breach of fair and equitable treatment is likely to be less successful where the claimant has not been able to show that the system of investment protection in the host state has been unfair and inequitable vis-a-vis the aggrieved party.*
>
> 994. *Claimants say that Helnan v Egypt does not support this contention. This is incorrect. The basic principle in international law is that the parties should exhaust local law remedies first prior to pursing rights through diplomatic protection. In investor-state arbitration <u>as a matter of jurisdiction</u>, the exhaustion of local remedies is often not required since the parties agree in advance to resolve their disputes through arbitration. Therefore, this rule is dispensed with unless the parties agree otherwise.*
>
> 995. *However, the Republic's argument here is not (as Claimants seem to suggest) a question of jurisdiction, nor that the "exhaustion of local remedies" as such is required. Rather, this situation concerns circumstances where the claimant alleges that certain domestic laws have been breached, and that accordingly, the standard of fair and equitable treatment has been not been met. The Republic's contention is that the claimants have not established that a breach of the standard of fair and equitable treatment (judged at an international level) has occurred simply by alleging that there have been breaches of law at a domestic level. This is all the more the case when there are available to the claimant, avenues of recourse which have not in fact been pursued. [...] this is precisely the case here. (R-II ¶¶ 993 – 996, citations omitted, emphasis maintained).*

921. Claimants have not pursued remedies against the Republic, and this bars their claims. Instead, Claimants "*dismiss [...] this issue as if it were a minor technical hitch and quickly go on to simply reiterate their grievances against the Republic.*" There is no legal basis recovery. In cases where there is an available remedy – via domestic law or through a contractual forum selection clause – the investor has a right to resolve a dispute. The granting of such a mechanism, if it works properly, must be considered as an action of the host state that is favorable to the investor and is aimed at ensuring a FET. If an investor fails to pursue such remedy, this counter-acts the allegation that the host state acted unfairly or inequitably. As a



host state cannot always guarantee that its officials will always act in accordance with the laws, the remedies available to rectify low level breaches are important. The analysis of FET must take the entire legal system of the host state and likewise, whether it was tested by the investor, into account. (R-I ¶¶ 37.3 – 37.12; R-II ¶ 997 – 999).

922. Other tribunals, such as *Parkerings v. Lithuania*, *MCI v. Ecuador*, and *Waste Management*, have held that, in cases of a sufficient domestic system of redress stemming from either domestic law or from the contractual forum selection clause, failure to pursue available remedies excludes the possibility of a breach of the FET standard. (R-I ¶¶ 37.12 – 37.17).

923. Furthermore, despite asserting that "*dozens of treaty tribunals*" have found violations in cases of "*less severe*" treatment, they have left unchallenged the Republic's observation that finding a breach of the FET standard is actually a very high bar. There is a high measure of deference that international law extends to the right of domestic authorities to regulate matters within their own borders. Only cases of blatant misconduct will support a finding of unfair and inequitable treatment. A mere breach of a host State's domestic law is not sufficient. The ECT, interpreted with due regard for its purpose, supports a restrictive understanding of FET, as an overly "*investor-friendly*" interpretation would prevent host states from admitting investors. This is a highly fact-specific analysis – it is simply not sufficient to "*trot out*" examples of whether other tribunals may have come to a finding that helps Claimants' arguments. (R-I ¶¶ 37.24 – 37.31; R-II ¶¶ 997 – 1000).

924. Initially, Claimants cited the following nine instances where they alleged Respondent breached the FET standard:

   *(a)* *The determination that KPM was operating trunk pipelines;*

   *(b)* *the trial and conviction of Mr. Cornegruta and the verdict against KPM;*

   *(c)* *the decision of the Republic's authorities not to prolong the exploration rights under Contract No. 302;*

   *(d)* *the imposing of corporate back taxes, export duties and rent taxes as well as the subsequent withdrawing of some tax charges;*

   *(e)* *the alleged revocation of the Republic's purported consent to the transfer of TNG to Terra Raf;*

   *(f)* *the series of inspections and audits in 2008 and 2010;*

   *(g)* *the seizure of KPM's assets based on the verdict against KPM;*

   *(h)* *the termination of KPM's and TNG's contracts, allegedly without giving enough time to respond and without keeping the contractually agreed notice period;*



(i)     the taking into trust management of KPM's and TNG's assets after the termination of the contracts. (R-I ¶ 37.19).

925. The actions listed under (c), (d), and (h) arise out of the Subsoil Use Contracts and Contract 302. The contractual remedy in respect of those allegations has not been pursued, and Claimants are therefore barred from invoking these allegations. The remaining allegations fail because Claimants have not pursued available domestic remedies for them to their full extent. (R-I ¶¶ 37.20 – 37.21).

926. Over 100 enterprises hold licenses to operate trunk pipelines. (R-I ¶ 21.12). The term "*trunk pipeline*" is defined in Art. 14 of the Law on Oil, pursuant to which pipelines are classified according to how they operate. A trunk or main pipeline is an engineering structure intended for transportation of commercial oil (prepared in accordance with the requirements of technical regulations) from the points of intake (from Contractor's pipeline) to the places of: (a) transshipment to a different means of transport; (b) processing; (c) consumption; or (d) storage. (R-I ¶ 21.7). The length of a pipeline is irrelevant for the classification. The KPM Pipeline is not a gathering main mode pipeline (which would be excluded from the definition of "*trunk pipeline*"). Further, the KPM Pipeline shares oil with other contractors. Respondent states that the 1 km piece of pipeline at issue is located outside of the Contract Area, making it a trunk pipeline. (R-I ¶¶ 23 – 24; R-II ¶¶ 519 – 541). With respect to Claimants' comparisons between the KPM and the KazTurkMunai pipelines, Respondent finds this futile, since Claimants have not proven any like features between the two. Further, they have not established that the KazTurkMunai has a license for a trunk pipeline. (R-II ¶ 545).

927. Each of the four instances upon which Claimants now focus (rather than the six initially alleged) fails for two reasons: "*Firstly, each is a case where Claimants could have and should have pursued the issue further using the official systems put in place by the Republic. Secondly, Claimants misconstrue the facts to create a distorted and fictional picture in their favour.*" (R-II ¶ 1001). Respondent's arguments are best taken from its own words:

> 1002.   Claimants allege that the "reclassification" of the KPM Pipeline breached fair and equitable standards. [...] Claimants have misconstrued the events that comprised the Financial Police's inspection and investigation of the pipeline issue, suggesting, wrongly that the Republic had premeditated the outcome that resulted in the prosecution of Mr. Cornegruta on behalf of KPM. In any case, there was no "reclassification" and therefore it is not possible that this activity was unfair or inequitable. The pipeline was always a trunk pipeline.
>
> [The conclusion that the at-issue pipelines were indeed trunk pipelines is both legally and factually correct. The Parties' witnesses agreed on the legal definition of a trunk pipeline, which is provided in the Law on Oil. (RPHB 2 ¶¶ 219 – 236).]
>
> 1003.   The Financial Police's inspection and investigation was carried out in accordance with due process and the laws prevailing at the time. The classification of pipelines is a legal question and one that in the case of a dispute should be resolved by reference to the judicial authorities. As such, classification decisions are not finally determined by industry specialists,



*technical court experts in pipeline design, the MEMR, ARNM, or, for that matter, TNG or KPM. Moreover, the Financial Police is not a competent authority for the classification of pipelines, nor as it ever held itself out to be such. This is why the Financial Police spent a number of months in late 2008 and early 2009 collating the necessary evidence regarding the pipeline and its operation by KPM. [see also R-II ¶ 457]*

1004. *Claimants suggest that the Republic admits that its laws are confusing, citing reference to the Judicial Executor's decision. This misconstrues the Republic's assertion which was simply that the way in which the Judicial Executor referred to the pipeline did not make it clear whether the pipeline was trunk or field: there was no statement by the Judicial Executor that the law was confusing. On the facts of this case, it is accepted that there were different views as to the correct classification of the pipeline. Since the application of the law always depends on the facts, it is not uncommon for there to be disagreement as to whether or not a particular law does or not apply, or how it applies. However, this does not lead to the inevitable conclusion that the law is unclear. More importantly, it does not absolve KPM and Mr. Cornegruta from the consequences of their illegal operation of the KPM Pipeline. [Further, Respondent denies that the Judicial Executor made any admission that the pipe in question was a field pipeline. As for the argument that their licenses gave them a legitimate expectation – the licenses only informed them of what type of pipeline they could operate. The license did not tell them what pipes they were actually operating. None of the licenses have ever been sufficient for the pipelines Claimants were actually operating. (R-I ¶¶ 37.36 – 37.41)]*

1005. *Claimants continue to contend that Mr. Cornegruta's conviction and the recovery of income from KPM was contrary to fair and equitable treatment standards. For the reasons set out in Section C.VI to C.VIII, this is not the case. In any event, Mr. Cornegruta could have appealed any decision against him to the Supreme Court. Similarly, KPM had an opportunity to challenge the recovery order and failed to do this within the correct time limits. Since he did not, Claimants are not now entitled to complain that the Republic's treatment of him was unfair. [Further, nothing in this proceeding constituted a "denial of justice", as alleged by Claimants. There was nothing shocking to judicial propriety. The decision was consistent with domestic law and accorded with international standards. Further, the calculation of illegal profit was correct and in accordance with the law (although even if it were incorrect, more than incorrectness is required to bring that into a treaty violation. (R-I ¶¶ 37.38; 37.42 – 37.50); RPHB 2 ¶¶ 151 – 218, 265 - 271)]*

1006. *In relation to the "harassment and coercion campaign" there simply was no such campaign against KPM or Claimants. [...] In any case, Claimants' case is contradictory. On the one hand, they say that there was a "Playbook" employed by the Republic and wheeled out against systemically every foreign investor. At the same time, they argue that the campaign was unfair. At the very least, it must be recognised that if there was such a "Playbook" that was employed by the Republic (which is*



*denied), its employment cannot, by definition, be "unfair" or "inequitable".*

1007. *Finally, with regard to the non-extension of Contract 302, Claimants' allegations equally amount to zero. It is not correct that the Republic ever agreed to an extension of the contract or that Claimants could rely on such an extension being granted. That is because the process for an agreement had simply not been gone through. The document that Claimants rely on as "proof" of a promise to extend the contract was a mere intermediate step in the process of reaching an agreement. It could not cause any reliance on the part of Claimants. Rather, the simple fact that no extension was agreed and signed created all the legal security that Claimants could expect, though to a different effect as they may have hoped for. [see also RPHB 2 ¶¶ 282 – 305]*

1008. *Claimants' further arguments with regard to the termination of Contract 302 are downright confusing. Claimants seem to allege that the MOG's notice of infringement of obligations prior to the contract termination somehow created reliance on the side of Claimants that the contract would be extended. It should be self-explanatory that a statement noting contract infringements cannot create any expectation of contract extension. (R-II ¶¶ 1002 – 1008, partially quoted; see also R-I ¶¶ 37.35 – 37.52).*

928. Regarding the criminal proceedings, Respondent states that the Aktau court was asked to rule on whether Mr. Cornegruta, on behalf of KPM, was guilty under Art. 190(2)(b) of the Criminal Code of the Republic. (R-II ¶ 498). Respondent states that Mr. Cornegruta was the General Manager of KPM and, as such the most senior executive of that company. Given Mr Cornegruta's position within KPM, it was trite that he would in theory carry responsibility under law for any criminal activity of KPM. (R-II ¶ 510). Respondent rejects Claimants' characterization that this was a trial of Mr. Cornegruta. Strictly, it was the trial of KPM, at which Mr. Cornegruta was its representative. (R-I ¶¶ 27.50, 27.54, 27.57). Respondent explained that the necessity of arresting Mr. Cornegruta arose because other potentially liable individuals, including Mr. Cojin, Mr. Spasov, and Mr. Salagar, had already left the country. (RPHB 1 ¶ 230).

929. Respondent denies Claimants' contention that KPM was not criminally indicted. It is admitted that no civil action had been brought against KPM. It is admitted that KPM was ordered to pay 21,675,854,578 Tenge, based on the assessment of the income received by KPM as a result of its illegal entrepreneurial activity dated 18 May 2009. It is not admitted that the sum constitutes all of KPM's oil and gas production revenues from March 2007 – May 2008. It is not admitted whether KPM had already paid taxes on such income. However, to the extent that taxes had been paid on that income, it is apparent that KPM neglected to provide evidence of this to the court. It is not admitted whether the above sum bears any relationship to transportation fees earned by a trunk pipeline operator or whether such fees represent the sole income of such an operator. However, the relevance of these assertions to the computation of the sums KPM was obliged to pay is denied. (R-I ¶ 27.59). Claimants' criticism that the recovery was disproportionate misses the mark: the goal is to address and negate the unjust enrichment that results from the crime, not to punish the crime. The unjust enrichment is not limited to the hypothetical income for providing crude oil transportation services. Squire



Sanders assessed the amount subject to recovery to be reasonably over USD 80,000,000. (RPHB 2 ¶¶ 262 – 264).

930. [Respondent's prosecution of Mr. Cornegruta on behalf of KPM and the subsequent appeal were conducted in a lawful manner that adhered to Kazakh and international standards of due process. Mr. Cornegruta examined evidence, requested further evidence, and had the advice of qualified counsel. While some of his motions were not granted, others were. He had the opportunity to ask questions of witnesses and only those experts whose evidence was admitted pursuant to Art. 243 CPC were heard. With respect to the refusal to allow Claimants' so-called experts to testify, since their testimony was outside of Art. 243, it would not have attracted evidentiary weight in any event. (RPHB 2 ¶¶ 237 – 242).] Respondent denies that the Financial Police threatened any of KPM's experts and states that there were 5, not 7, experts. (R-I ¶¶ 27.52, 27.57). The State introduced a single expert opinion containing a statement that the KPM gathering system pipelines trunk pipelines. Respondent admits that the prosecutor relied on a single expert opinion, dated 13 February 2009. (R-I ¶ 27.57). Respondent states that the Judge considered evidence presented by KPM, but found it to be unpersuasive. (R-I ¶ 27.57).

931. Respondent maintains that the executive branch did not interfere with the trial. Claimants have produced little more than conjecture to support this contention. While it is true that the initial inspection was connected with the President's instructions, instructions did not lead to the conviction of Mr. Cornegruta. A proper review of the chronology of events reveals that the process, if anything, was bottom up, starting with the inspection of KPM and TNG's pipelines and ending in the prosecution, following due process. The rejection of the Mr. Cornegruta's expert opinions – first by the Financial Police, and then separately by the Judge in Aktau, was also according to due process. Mr. Baymaganbetov's expert report and the Court's use of Mr. Cornegruta's "*confession*" letter were proper. (R-II ¶¶ 628 – 634; R-I ¶ 27).

932. Claimants never exhausted the appeals system within the Republic, which stood open to Claimants. KPM missed the deadline to appeal. It was the Court's view that KPM had notice of the decision against it, since its senior management was present at the hearing. (R-II ¶ 635 – 638).

933. The termination of the contracts and the seizure of KPM and TNG's assets were in accordance with due process. The terminations were based on breaches of those contracts, including non-fulfillment of work programs. Claimants had the opportunity to dispute or correct the Republic's arguments. Claimants were involved in the inspection process, they were aware of the breaches, they provided inadequate responses to the Notices of Breach, and they never requested additional time to prepare fuller responses. Regardless, even if there was no due process, this would not change the fact that the Republic could validly terminate the contracts and that Claimants, thus, stood to lose their contractual rights. It was Respondent's substantive right to terminate the contract in light of Claimants' misbehavior and that caused Claimants' losses. The seizure was legal under Kazakh law and was necessary for the continued gas production of the region. (R-I ¶¶ 37.59 – 37.64; RPHB 2 ¶¶ 339 – 374).



934. Respondent states, in response to paragraph 11 of Mr. Calancea's Witness Statement, that the Republic would never have been in a position to compensate Claimants for the transfer. (R-II ¶ 708). The transfer did not involve a transfer in title. (R-I ¶ 31.162). Accordingly, KMG NC's role was clearly as trust manager and therefore it had no business in taking on the debts and liabilities, which remained with KPM and TNG. (R-II ¶ 711).

935. Claimants' allegations regarding the tax assessments fail in their entirety, as they were also in compliance with domestic law. Claimants could not legitimately expect anything except a lawful tax assessment, or that there would not be back assessments in the event of an incorrect tax declaration. (R-I ¶¶ 37.53 – 37.55).

936. As for the transfer from TNG to Terra Raf, the alleged reversal does not harm Claimants' legitimate expectations, as the application for the alleged approval was based on a flawed and inaccurate application. (R-I ¶¶37.56 – 37.57; RPHB 2 ¶¶ 272 – 281).

937. Respondent's investigations were at all times lawful. Thus, the argument cannot stand that these investigations and proceedings – brought on by Claimants' own illegal behavior – can be the basis for a claim of unfair and inequitable treatment. Claimants always had a duty to apply for the appropriate licenses for their work, and even upon being notified that their application was incomplete, they chose not to. (R-I ¶ 37.58; RPHB 2 ¶¶ 151 – 218).

938. Claimants' argument that Respondent forced Mr. Cojin and Mr. Cornegruta to sign inspection protocols after the MEMR's 4 – 11 November 2008 inspection is only supported by the incredible testimony of Mr. Cojin. After the hearing, Respondent explained that, while initially Mr. Cojin had stated that he accompanied the Financial Police on behalf of TNG, he admitted in cross-examination that he did not actually attend the inspection. Respondent argues that, since Mr. Cojin has testified dishonestly, there is no proof that he was forced to sign the inspection protocols. Not even the minutes of the meeting signed by Mr. Cojin or Mr. Cornegruta reflect this event. (RPHB 1 ¶¶ 194 – 196; RPHB 2 ¶¶ 157 - 161). ,

939. At the Hearing on Quantum, Claimants alleged that the gas market in Kazakhstan amounts to a violation of the FET standard. Respondent states that Claimants are seeking not fair, but rather preferential treatment, something that is not guaranteed. Claimants received the same treatment as other investors and when they did not receive special treatment, they felt persecuted. The Republic was under no obligation to create or find a market for Claimants' oil and gas. The Republic reserves the right to submit further submission on this point. (RPHB 1 ¶¶ 612 – 618, 698 – 700).

940. Respondent states that Claimants' statements about the contract negotiations with Cliffson, especially those related to the investment arbitration clauses, are beyond Respondent's knowledge. (R-II ¶ 827).

## 3.    The Tribunal

941. To a large extent, the Parties seem to be in agreement regarding the abstract definition of what fair and equitable treatment (FET) is and intends to protect. In



Case 1:14-cv-01638-ABJ-ZMF   Document 23-3   Filed 09/30/13   Page 206 of 225
Case 1:14-cv-01638-ABJ-ZMF   Document 23-3   Filed 09/30/13   Page 211 of 225

Page **210** of **414**

particular, they agree that the host state has to act in a manner that is consistent with the legitimate expectations of investors.

942. In view of the breadth of the terms "*fair*" and "*equitable*," their context in the ECT, and the object and purpose of the ECT, the Tribunal has to interpret the FET standard in the ECT. The two terms as such provide little guidance. The VCLT, however, provides such guidance:

- *Art. 31.1 requires an interpretation of a treaty provision in their context and in the light of its object and purpose,*

- *Art. 31.2 requires an interpretation of the purpose of a treaty including its preamble and annexes, and*

- *Art. 32 allows recourse to supplementary means of interpretation.*

943. In the latter context, the Tribunal may take into account that the FET standard has been interpreted and applied under international law by many international investment tribunals, thereby creating a considerable body of case law that has added specific meaning and content to the standard.

944. But the Parties also seem to agree, and the Tribunal agrees as well, that the FET standard needs to be considered against all of the factual circumstances. Indeed, the application of the FET standard can only be case specific, taking into account:

- *the specific factual circumstances of the present case, and*

- *that these have to be evaluated in the present case in the legal context of the ECT.*

945. In view of this approach, the Tribunal will now first consider the factual circumstances by summarizing the Respondent's conduct *vis-à-vis* Claimants' investment insofar as it is considered relevant. In doing so, the Tribunal considers that, at least in the present case, as the term "*treatment*" already indicates, not one particular action by the host state has to be considered, but rather Respondent's "*treatment*" of Claimants' investment over a longer period allows its legal evaluation. In view of that, above in this Award, the Tribunal has included a detailed timetable of all relevant actions of the Parties.

946. Regarding the events and steps of the Parties from the beginning of contacts in 1997 to 6 October 2008, the Tribunal refers to the timetable recorded above in a separate section of this Award. It needs not to be summarized or repeated here and shows what the Tribunal considers, with some exceptions described below, to be a normal sequence of contacts and cooperation between the Claimants and Respondent regarding the investments made. It provides no indication that Respondent considered major aspects of the investment or the conduct of the investors as illegal or that it intended to bring the investment to an end.

947. Hereafter, the Tribunal describes in detail the treatment after the above date, which in its view is relevant for the alleged breach of FET standard.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

948. On 6 October 2008, Mr. Vladimir Voronin ("Voronin"), then-President of Moldova, wrote to Mr. Nursultan Nazarbayev, the President of Kazakhstan ("President Nazarbayev"). There is some indirect evidence (based on an unverified 24 January 2011 Moldovan television interview transcript) that President Nazarbayev may have requested that Voronin, at a meeting of CSI, provide him information about Anatolie Stati. (C-78). Respondent denies every allegation that President Nazarbayev asked Voronin for the letter as a pretext to any investigation, and disputes the translation of the interview – an interview where the name "Stati" was not even mentioned. (R-I ¶¶ 18, 19.21; RPHB 1 ¶ 375). The Tribunal, however, need not decide whether the content or translations of the interview, as presented by either side, are accurate in order to reach the conclusions, below.

949. The 6 October 2008 Voronin letter (C-77), in the interest of "*strengthen[ing] trust [and] develop[ing] relations free of any suspicious businessmen*," informed President Nazarbayev that Anatolie Stati conceals profits from the states where he has earned them and even "*use[s] of his profits from the deposits in Kazakhstan for investments in areas, for example, in Southern Sudan, that are subject to sanctions by international organizations, in particular the U.N.*" The letter warns that this activity is damaging to the reputations of both Kazakhstan (as the state where Anatolie Stati earns his income) and Moldova (as "*the state of origin of the businessman*"). The letter also accuses Anatolie Stati of "*interfere[ing] with the development of the external and personnel policy of Moldova, creating a corrupt lobby of supporters of the trade agreements concluded with states subject to the U.N. sanctions.*" (C-77, R-II ¶ 277).

950. What is undisputed is that, expressly based on the letter from President Voronin, President Nazarbayev issued an Order dated 14/16 October 2008 to the Kazakh Deputy Prime Minister, U. Sukeev, and the head of the Agency of the Republic of Kazakhstan for Fighting Economic and Corruption Crimes (the "Financial Police"), S. Kalmurzaev ("the Order"). (C-8). The Order used the terms "*[a]t the request of the Moldovan party*," to "*thoroughly check company's work and to take decision on its further work in the best interests of the country.*" (C-II ¶ 213; R-II ¶ 283; RPHB 1 ¶ 1162; C-8 (partially quoted); Tr. Hr. 1 Day 1 Opening by Tirado (R) p. 35; Opening by Smith (C) pp. 94, 155; Mynbaev Day 3 p. 86).At approximately the same time as the Nazarbayev Order, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km...*" and "*large deeply submerged reef fields...*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251). Prior to filing, On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal



application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66).

951. Shortly after it was issued, President Nazarbayev's instruction came to the attention of Major A. Rakhimov of the Financial Police ("Major Rakhimov"). In his testimony, he acknowledged that he had never received a personal directive from the President of Kazakhstan previously. (Rakhimov Day 5 pp. 81 – 83).

952. On 16 October 2008, the Deputy Prime Minister issued Order No. 6497 and, shortly thereafter, the Financial Police ordered the commencement of numerous audits and investigations of Anatolie Stati, KPM, and TNG (R-II ¶ 283), summarized by reference to the following events:

953. On 18 October 2008, the Financial Police wrote to the Customs Committee to enquire about Anatolie Stati's travel through Kazakhstan. (C-11).

954. By correspondence dated 20 October 2008, the Financial Police requested the Kazakh State Ministry of Energy and Mineral Resources ("MEMR") to investigate Anatolie Stati and his companies and to provide "*[c]opies of contracts, working schedules, LKU reports as well as the set of documents for obtaining the license,*" as well as "*[i]nformation on the volume of extractions and investments at the closing date of the contracts*." (C-9). An internal request was also made for Mr. Turganbayev to provide information regarding Anatolie Stati's activities in Kazakhstan and off shore. (C-444).

955. On 24 October 2008, the Financial Police ordered the Tax Committee of the Ministry of Finance (the "*Tax Committee*") to conduct comprehensive or complex tax audits of KPM, TNG, and Kok Mai, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Members of the Financial Police were to be included in the Tax Committee. (C-10).

956. On 24 October 2008, Mr. Turganbayev requested a prolongation of the inspection until 16 December 2008. (WS Turganbayev 2 ¶ 4.8; C-430).

957. On 28 October 2008 the Financial Police ordered the Committee of Geology and Subsoil Resources Use of the MEMR to commence an audit of KPM's and TNG's compliance with their subsoil use licenses and to involve the Financial Police in the audit. (CPHB ¶ 38; WS Turganbayev 2 ¶¶ 4.1 – 4.2).

958. By Order dated 28 October 2008, the Financial Police directed the Committee for Ecology Regulation and Control for the Ministry for Environmental Protection (the "*Ecology Committee*") to organize the inspection of KPM's and TNG's compliance with "*rational*" subsoil exploitation and petroleum operations (including burning gas over allowed limits) and to include members of the Financial Police in the inspection committee. (C-13; R-I ¶ 26.8).

959. On 30 October 2008, the Financial Police reported that Anatolie Stati was not a registered businessman in Kazakhstan, but carried on business through Ascom which, in turn, owned KPM. (C-366).



960. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities, noting specific items to inspect, but finding that KPM and TNG were in compliance with all of their investment obligations. (C-438).

961. By correspondence dated 31 October 2008, the MES reported to the Financial Police on scheduling the examination of KPM's and TNG's compliance with industrial safety legislation for the years 2006 and 2007. (C-14).

962. Kemikal, which was TNG's largest non-local customer, which was under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev, through intervening entities he was said to control, namely, Gaz Impex and KazRosGas. Mr. Kulibayev was also the Chairman of KMG. In the Fall of 2008, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382; R-II ¶¶ 751 - 752).

963. On 1 November 2008, the Financial Police reported to the Deputy Prime Minister, confirming the ownership of KPM, TNG, and Kok Mai and informing him that inspections were being carried out. The letter also informed him that, based on the inspection, it had been ascertained that Anatolie Stati had left Kazakhstan on 29 March 2007. (CPHB 2 ¶ 38, C-600).

964. On 7 November 2008, the Tax Committee ordered a targeted audit of KPM and TNG regarding transfer pricing. Although the Respondent does not admit that the audit was instructed by the Financial Police, correspondence from the Tax Committee to the Financial Police, dated 11 November 2008 appears to acknowledge that such was the case. (C-38).

965. On 7 November 2008, Anatolie Stati sent a letter to President Nazarbayev assuring him that there was no reason to investigate KPM and TNG. (C-700). The President did not reply.

966. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (C-440).

967. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. Respondent does not admit that the audit was instructed by the Financial Police, although C-38 shows that the Tax Committee disclosed information relating to the audit at the request of the Financial Police. (R-I ¶¶ 30.48, 30.62; RPHB 1 ¶ 1062; C-38; C-149; C-150).

968. From 4 to 11 November 2008, pursuant to Art. 37 of the Law on Oil and Art. 51 of the Law on Subsoil Use, the Geology Committee of the MEMR, with the



involvement of the Financial Police, carried out an inspection of KPM and TNG regarding compliance with legislation on industrial safety and their licenses. (R-I ¶ 26.8; R-II ¶ 455; RPHB 1 ¶ 192, RPHB 2 ¶ 157; WS Turganbayev 2 ¶ 4.2; C-86; C-87; C-14; C-439). Claimants state that the MEMR found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89, CPHB 2 ¶¶ 38, 61; C-86; C-87).

969. On 12 November 2008, following the site visit, Mr. Turganbayev of the Financial Police asked the ARNM whether KPM, TNG, and Kok Mai held licenses for trunk pipelines. (R-I ¶ 26.9; R-II ¶¶ 464 – 465 (stating 14 November); RPHB 1 ¶¶ 198 – 202; WS Turganbayev 2 ¶ 5.1; C-441).

970. The Transfer Price Audit commenced on 12 November 2008. (R-II ¶ 407, WS Rahimgaliev ¶¶ 10.5, 10.6).

971. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (C-442).

972. On 13 November 2008, the Tax Committee noted that the inclusion of the Financial Police in inspections would be illegal and proposed that, instead, a working group be established to review inspection results. (C-38).

973. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for, but neither held licenses to operate main or trunk pipelines, and that the operation of a trunk pipeline required such a license. (R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164; WS Turganbayev ¶ 5.3).

974. On 14 November 2008, the Financial Police met with Messrs. Cojin and Cornegruta. The Parties dispute whether the Financial Police insisted that each sign inspection reports admitting that KPM and TNG did not hold licenses to operate main pipelines.

975. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (C-443).

976. KMG executed the 17 November 2008 Tripartite Agreement. The final signatory, KazAzot, however, never signed.

977. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. Claimants refer to this as the "*reclassification.*" (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542; RPHB 2 ¶¶ 165 – 172).

978. On 17 November 2008, Mr. Turganbayev of the Financial Police ordered the Tax Committee to conduct a new audit to calculate the profit that KPM and TNG received from operating a main pipeline without a license and to determine KPM's revenue for onward sales of oil. (R-II ¶ 469; RPHB 2 ¶¶ 172 – 173; C-89; WS Turganbayev 2 ¶ 5.4).

979. On 18 November 2008, the Financial Police issued a resolution for an audit of any unpaid customs taxes by TNG. (C-446).



980. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198; C-88).

981. On 19 November 2008, the Tax Committee, at the request of the Financial Police and based on accounting information provided by TNG, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (R-I ¶ 26.19, C-202; C-450);

982. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favour in response to KPM's challenge of export duties. The Court ruled that the imposition of KPM on the Crude Oil Expert Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743). Despite this ruling in KPM's favour, the Financial Police and the Customs Committee challenged the ruling, resulting in further litigation. New claims were raised against KPM and TNG. On 31 March 2010, the Customs Committee conceded that neither KPM nor TNG was obliged to pay export duties. (C-161).

983. On 19 November 2008, KPM and TNG contacted the MES for a second opinion regarding the pipelines. (R-I ¶ 28.10). The MES confirmed that KPM's and TNG's pipelines were not main pipelines, but "*form a single technological process of all production.*" (C-90; C-91). Respondent admits that this was the MES response, but states that the opinion only stated that some of the pipelines were not trunk and, in any event, the statement was outside of their competency. (R-I ¶¶ 26.12, 28.11 – 28.13; R-189).

984. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72).

985. On 21 November 2008, the Financial Police requested that the MES withdraw its statements confirming that KPM's and TNG's pipelines were not main pipelines, on the basis that the MES was not competent to provide that conclusion. (R-I ¶ 26.12; C-92; R-189).

986. On 25 November 2008, the Financial Police wrote to the Ministry of Finance inquiring into why the Customs Committee "*exonerate[d]*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (C-162). The Customs Committee had, in fact, found that KPM was not contractually obliged to pay the export duty.

987. On 28 November 2008, a Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (R-I ¶ 26.23, CPHB 2 ¶ 81; C-452).

988. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008, by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that, although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions



regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

989. On 2 December 2008, the Financial Police circulated an internal report confirming that KPM operated a main pipeline without a license and had gained illegal income of over 41 billion Tenge. (C-85).

990. On 10 December 2008, the Financial Police reported to the Deputy Prime Minister that the Financial Police had determined that KPM and TNG were operating trunk oil and gas pipelines without licenses. They stated that the Financial Police, however, were not competent to make that decision, and reported that they had asked the ARNM to determine what type of pipelines KPM and TNG operated, taking their functions into account. Without a conclusion by the competent authority "*it is impossible to make a lawful procedural decision in respect of this case.*" (C-II ¶ 220; C-448, partially quoted). Although Respondent states that "*no decision had been reached as to whether or not the pipelines were trunk at this point*" (RPHB 1 ¶ 197), this statement is belied by C-448. The Tribunal believes Respondent's earlier statement acknowledging that the Financial Police had, indeed, concluded that KPM and TNG were operating trunk pipelines, even though they were not legally competent to make that classification. (R-II ¶¶ 473 – 474).

991. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407; WS Rahimgaliev Exhibit 12).

992. On 15 December 2008, the Financial Police formally opened a criminal investigation against KPM for allegedly operating a main pipeline without a license. (CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61; R-II ¶ 294, 475, RPHB 1 ¶¶ 219 – 221; RPHB 2 ¶¶ 177 – 180; C-632; Rakhimov Day 5 p. 20 – 21, 24-25; WS Rakhimov 2 ¶¶ 3.5 – 3.8, 4.1, 4.3, 4.4). While Respondent has argued that this investigation was opened, but not in respect to a particular person, the Tribunal notes that KPM is expressly named in the order, which instructs "*[t]o initiate the criminal case under Article 190 Part 2 item "b" CC RK involving the illegal entrepreneurial activity carried out by Kazpolmunai LLP and to accept it for examination.*" (RPHB 1 ¶ 222, C-632; Rakhimov Day 5 p. 25).

993. On 18 December 2008, the MEMR informed TNG that it was cancelling the State's decision of 20 February 2007 that had further allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice further required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Ilyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

994. The Parties are in agreement that an 18 December 2008 INTERFAX press release alleged that the State's pre-emptive rights had been violated and indicated illegal conduct by Terra Raf. They also agree that, on the same date, Credit Suisse sent Mr. Lungu of Ascom a copy of the INTERFAX press release and requested an explanation. (C-141). The Parties disagree as to where INTERFAX received its



information and whether that report is attributable to the Respondent. Respondent argues that the accusation that the INTERFAX report was somehow attributable to Respondent was not made contemporaneously. (R-II ¶ 171, *see e.g.* C-619; RPHB 2 ¶¶ 7). Indeed, while Mr. Lungu initially told Credit Suisse that "*there are a lot of errors in [the INTERFAX press release] which make us believe that this info is not from official sources*," (C-625, partially quoted), Claimants now argue that the INTERFAX press release is attributable to Respondent, "*given the level of detail in the in the information that the INTERFAX article sources to the MEMR*." (C-II ¶¶ 400; CPHB 1 ¶¶ 137, 215 – 216, 347 – 348, fn. 497 (partially quoted), 350; CPHB 2 ¶¶ 38, 117). Respondent dismissed Claimants' argument as speculative. (R-II ¶ 749). It provided evidence that the information did not originate in the Republic, including a 21 June 2012 letter from INTERFAX indicating that an inofficial source was used (R-264) and a 21 June 2012 letter from the MEMR that it did not provide the information (R-265). (RPHB 2 ¶¶ 7, 95 – 99). Respondent denies that the report was from official sources and Mr. Ongarbayev denied knowledge and stated that there was no official press release. (C-720, WS Ongarbaev (1 December 2012)). In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

995. On 20 December 2008, the Financial Police began conducting repeated interrogations of TNG and KPM employees. (CPHB 2 ¶ 38; R-I ¶ 26.22; C-46; C-96; C-620; C-621; C-622; C-623; C-624; C-626; C-627).

996. On 22 December 2008, TNG refused to submit the required application to the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

997. On 24 December 2008, the Financial Police requested information from KPM and TNG on their gas and condensate outputs. In particular, the letter requested information regarding (a) the level of production of the company and (b) sales made by KPM to agents, individuals and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38; C-94).

998. On 24 December 2008, the Financial Police issued summonses for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (C-654).

999. On 25 December 2008, Major Rakhimov of the Financial Police summoned and interviewed KPM's General Manager, Mr. Cornegruta. (R-I ¶ 26.21, 27.38; C-I ¶ 95). Mr. Cornegruta was considered a witness (R-II ¶ 480) and was, accordingly, not allowed to be accompanied by counsel (C-I ¶ 95). Respondent denies that Mr. Cornegruta was not permitted to have legal counsel in attendance for the interview. He was allowed to under Art. 82.3 CPC. (R-35). After the interview, Mr. Cornegruta was released and permitted to go about his business. (R-I ¶ 27.40).

1000. On 26 December 2008, Major Rakhimov summoned and interviewed the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar; (C-I ¶ 95, R-I ¶ 26.21).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ   Document 23-3   Filed 09/30/14   Page 10 of 225
Case 1:14-cv-01638-ABJ   Document 23-3   Filed 09/30/14   Page 10 of 104

Page **218** of **414**

1001. On 26 December 2008, the Financial Police ordered the seizure of TNG documents regarding contracts with third parties and construction of pipelines. (C-605, C-606).

1002. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-144).

1003. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95). The Respondent alleges that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (C-95). Mr. Turganbayev attended this inspection and confirms that it involved visiting KPM's pipeline. (R-I ¶¶ 13.47(e), 26.22; R-II ¶¶ 285, 481; WS Turganbayev 2 ¶ 6.3).

1004. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG could not deduct 100% of drilling expenses in the year they were incurred for corporate income tax purposes. (Maggs 2 Exhibit 2; CPHB 2 ¶ 128);

1005. On 5 January 2009, Major Rakhimov asked the MEMR to ascertain whether KPM's 17.9 kilometer pipeline was a main pipeline. (C-718, Rakhimov 3 ¶¶ 3.1 – 3.2; Rakhimov, Day 5 pp. 46 – 47).

1006. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines were not main pipelines (C-99, C-100);

1007. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines (C-101; C-104);

1008. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines were not main pipelines (C-101, C-102);

1009. On 14 January 2009, the Financial Police issued a resolution appointing three investigators to the criminal investigations of KPM and TNG. (C-453).

1010. In January-February 2009, KPM and TNG submitted various complaints regarding the illegality of the Financial Police's searches and seizures of documents and forwarded reports confirming that their pipelines were not main pipelines. (R-I ¶ 26.25; C-46, C-96, C-620, C-621, C-622, C-623, C-624, C-626, C-627, C-628, C-629, C-630).

1011. On 22 January 2009, the Financial Police requested corporate documents from KPM. (C-607).

1012. On 23 January 2009, the Financial Police requested corporate documents from TNG. (C-608).

1013. On 2 February 2009, the Financial Police informed TNG that, on 20 January 2009, they had formally opened a criminal investigation against TNG for the alleged



operation of main pipelines without a license. The Financial Police notified Claimants that TNG was the subject of a criminal investigation. The charges were later suspended. The Financial Police rejected a request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142; C-98 (translation disputed by Respondent); C-630; Condorachi ¶ 11).

1014. On 4 February 2009, the Financial Police interviewed Mr. Cojin, General Manager of TNG, to determine whether he or Mr. Cornegruta would be an appropriate defendant in any criminal proceeding; (R-II ¶¶ 298, 480; Rakhimov 2 ¶ 4.5).

1015. On 4 February 2009, MEMR wrote a letter to the Financial Police confirming that KPM's pipeline was part of its gathering system, and thus, was not a main pipeline. The Respondent alleges that this letter was later withdrawn as it was not reviewed by the legal department and/or because the MEMR has no authority to provide a classification regarding pipelines. (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98; RPHB 1 ¶ 229; RPHB 2 ¶¶ 183 – 186; C-719; Rakhimov 3 ¶¶ 3, Rakhimov Tr. Day 5 pp. 47 – 49).

1016. On 9 February 2009, the Financial Police ordered the College of Experts of the Ministry of Justice ("MOJ") to appoint an expert to classify KPM's pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61; R-II ¶¶ 549, RPHB 1 ¶ 226; C-109; R-245; R-362).

1017. On 10 February 2009, Mr. Turganbayev met with the MOJ expert, Mr. Baymaganbetov, and provided him with four documents on which to base his report. (R-II ¶ 554; Baymaganbetov. ¶¶ 3.2, 6.2; R-246).

1018. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. On that date, the State sent notices of an Act of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (Exhibits 3, 4, 5, and 6 to Maggs 2; C-155). The corporate tax dispute embroiled KPM and TNG in litigation until 22 June 2010, when the Kazakh Court of Cassation dismissed the claim. (Exhibit 11 to Second Maggs Report; C-155). In the course of this arbitration, Claimants first learned that Respondent had appealed the Court of Cassation's decision. They were, therefore, unable to participate in the process that led to the 3 November 2010 decision of the Kazakh Supreme Court, which overturned the decisions at the lower instances and found that the corporate income tax assessment was proper. (CPHB 1 ¶ 258; Rahimgaliev Exhibit 6).

1019. On 11 February 2009, the MEMR withdrew the letter prepared on 4 February 2009, allegedly on the basis that it had not been reviewed by the legal department of the MEMR. (Rakhimov 3 ¶ 3.5). A replacement letter was issued on 11 February 2009. (RPHB 1 ¶ 229).

1020. On 13 February 2009, three days after receiving the file and without having reviewed any other documents or visited KPM's pipeline, Mr. Baymaganbetov



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

issued his report. (R-II ¶¶ 549 – 568; RPHB 2 ¶ 188; C-110; Baymaganbetov ¶¶ 3, 4.1, 4.2, 6).

1021. On 13 February 2009, the MEMR wrote to the Financial Police to provide them with information on how the definition of trunk pipeline in Article I of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines in question. (Rakhimov 3 Exhibit 4; RPHB 2 ¶ 183).

1022. On 13 February 2009, the MEMR wrote to KPM and TNG and informed them that it was not competent to resolve their complaints. The MEMR suggested that they write to the GPO, instead. (C-629, C-630).

1023. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1024. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for its consent to the transfer and a waiver of the State's pre-emptive purchase right Failure to do so would result in termination of TNG's Subsoil Use Contracts. (CPHB 2 ¶ 117; C-146).

1025. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1026. On 18 March 2009, KPM and TNG complained to the GPO regarding the criminal investigations. (C-41; C-154; Condorachi ¶ 13).

1027. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A.B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. The Claimants say the MEMR assured them that the pre-emptive right claim would be resolved in their favour. The Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, the Claimants assert that the MEMR also indicated that the Financial Police ought to rely on the opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. The Respondent denies that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in the Claimants' favour, or that there was any



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 23-3 Filed 09/30/14 Page 19 of 204
Case 1:14-cv-01638-ABJ Document 73-3 Filed 09/23/18 Page 222 of 225

Page **221** of **414**

*"reclassification"* of pipelines. (C-I ¶¶ 106, 150, 152, 177; R-I ¶ 13.47(e)(v), 21.1); C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 - 37, 43).

1028. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1029. On 24 March 2009, TNG applied to the MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for two years into the agenda of the next meeting of the Expert Commission. (R-I ¶ 31.69; R-162).

1030. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1031. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1032. On 27 March 2009, the Financial Police ordered TNG to submit originals of their corporate documents with reference to the criminal case against KPM. Claimants also allege that the same request was made of KPM. (C-614; C-615);

1033. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1034. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested a copy of the criminal investigation order. (C-615).

1035. On 31 March 2009, the Financial Police ordered TNG to submit additional original company documents. (C-616).

1036. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-I ¶ 31.70; R-163.2).

1037. On 6 April 2009, the Financial Police requested information on TNG's costs for oil and condensate in relation to the criminal case against KPM. (CPHB 2 ¶ 38; C-618).

1038. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension. (C-0 ¶ 58; C-I ¶¶ 22, 178; R-I ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68; RPHB 1 ¶ 323 – 325). Respondent states that the Parties agree that



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Respondent was under no obligation to extend prior to the 9 April 2009 letter, at least. (Compare RPHB 2 fn 526 with C-II ¶ 242; see also CPHB 1 ¶ 224 (Parties experts' debate on obligation to extend contract after 9 April)).

1039. On 20 April 2009, Major Rakhimov decided to detain KMG's general manager, Mr. Cornegruta, and opened criminal proceedings against him for the crime of illegal entrepreneurial activity under Article 190(2)(b) of the Criminal Code of Kazakhstan. At that time, Mr. Cornegruta was named as a potential defendant. (R-II ¶ 487; RPHB 2 ¶ 189; R-243, Rakhimov 2 ¶ 7.1 - 7.5). On 22 April 2009, the Financial Police ordered additional company documents from KPM. (CPHB 2 ¶ 38; C-617).

1040. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2). Respondent admits that Mr. Cornegruta was denied bail, pursuant to Kazakh law. (R-I ¶ 27.45, R-35).

1041. On 26 April 2009, the Claimants filed complaints against the Financial Police, including its head investigator, Major Rakhimov. The same day, 900 employees of KMG, TNG, and CASCo that were on shift addressed and signed a letter to the Governor of the Mangystau Region expressing their concerns, particularly in relation to Mr. Cornegruta's welfare. (C-I ¶ 109; C-113; Condorachi ¶ 16, 19; Pisica ¶ 41; Romanosov ¶ 31; Stati ¶ 26).

1042. On 27 April 2009, Mr. Batalov was fired as Executive Secretary of the MEMR. (C-I ¶¶ 106, 332; Pisica ¶ 43).

1043. On 27 April 2009, a petition against Mr. Cornegruta's arrest was considered and rejected by the Court of Aktau. (RPHB 1 ¶ 244; Kravchenko ¶ 13.14; Exhibit 6 Kravchenko).

1044. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1045. The Claimants say that, on 30 April 2009 and on 4 May 2009, TNG submitted Addendum No. 9 of TNG's Tabyl Block Subsoil Use Contract to the MEMR for execution. TNG never received the MEMR's signature to the addendum extending TNG's exploration rights. (C-168).

1046. On 30 April 2009, the Deputy Minister of the MES wrote to the Claimants and asked them to withdraw his previous letters of 19 November 2008 (confirming that KPM's and TNG's pipelines were not main pipelines), as their issuance was beyond his competence. (R-189).



Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/30/14   Page 19 of 104
Case 1:14-cv-01638-ABJ   Document 23-3   Filed 09/30/14   Page 224 of 225

Page **223** of **414**

1047. On 1 May 2009, the decision to detain Mr. Cornegruta was confirmed on appeal. (R-II ¶ 487; RPHB 1 ¶ 244; Kravchenko 2 ¶ 13.15).

1048. On 4 May 2009, Major Rakhimov of the Financial Police ordered an unscheduled inspection to determine the amount of income KPM had obtained from operating a trunk pipeline without a license. (RPHB 2 ¶ 190; C-184).

1049. Pursuant to a search warrant dated 30 April 2009, on 6 and 7 May 2009, the Financial Police conducted an overnight search of KPM's and TNG's offices for the other General Managers of KPM, Messrs. Salgor and Spasov, and the General Manager of TNG, Mr. Cojin, as well as information on their whereabouts. The three in-country managers had by then been charged with the same offence as Mr. Cornegruta. The initial phase of the search started at 4:20 p.m. on 6 May 2009 and ended at 4:15 a.m. on 7 May 2009. The search was carried out in the presence of Deputy General for Economic and Financial Affairs of TNG, Mr. Stejar. The Respondent states that the Financial Police procured human resources and financial records from KPM and TNG and that it became clear during the course of the investigation that most senior managers had left Kazakhstan. The Parties dispute the level of inconvenience caused by the search. (R-I ¶ 27.47; R-II ¶ 301, 483, R-III ¶ 504 – 507, 511; RPHB 1 ¶ 170, 175 – 176, 233 – 238; C-114; Rakhimov 2 ¶¶ 4.09 – 4.20; Stejar ¶ 20; Pisica Day 2 p. 71; Rakhimov Day 5 pp. 1 - 6; Stejar Day 3 p. 35).

1050. On 7 May 2009, Anatolie Stati, allegedly on behalf of the Claimants, wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol. The Claimants also allege that this letter made clear that the Claimants intended to bring arbitration claims against Kazakhstan for the diminution in the value of their investments once the sale to Cliffson closed. Respondent admits that the letter was sent by Ascom and denies Claimants' allegations regarding notice. (R-II ¶ 226. The Respondent also notes that the Cliffson transaction, at earliest, could have started in February 2010. (C-43; Stati ¶ 28)

1051. On 13 May 2009, the Mangystau Regional Department of the MES withdrew its letters about whether the pipelines were trunk pipelines. (R-I ¶ 28.14; RPHB 2 ¶ 198; C-90; C-93).

1052. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).



Case 1:14-cv-01638-ABJ   Document 23-3   Filed 09/30/14   Page 10 of 204
Case 1:14-cv-01638-ABJ   Document 73-3   Filed 09/30/14   Page 225 of 225

Page **224** of **414**

1053. On 18 May 2009, the College of Experts of the Ministry of Justice calculated KPM's purported illegal profits from oil and gas transportation services at 5.9 million Tenge (approximately USD 48,300) for the period from 2002 through 2008. This calculation also showed "*illegal profits*" of approximately 1,935,547 Tenge (approximately USD 15,000) from March 2007 to May 2008. (C-I ¶ 92, C-184). The Respondent denies this and states that that expert considered that the value of income from illegally operating the trunk pipeline amounted to 65,479,414,197 Tenge for the period from April 2002 to 2008, and that its income during the relevant period in 2007 and 2008 was 21,673,919,031 Tenge. (R-I ¶ 27.59(c), (h); C-117, C-184). The Respondent states that this calculation was necessary to determine whether the crime of illegal entrepreneurship had been triggered. (R-II ¶ 484; C-184). The Respondent admits that the Court relied on this document when determining the amount of the fine to be imposed on KPM. In all other respects, the Claimants' assertions concerning this report are denied. (R-I ¶ 27.60).

1054. On 18 May 2009, Major Rakhimov issued an application to exclude Claimants' expert opinions about the classification of the pipelines. (R-II ¶¶ 632; RPHB 2 ¶ 206; Kravchenko 2 ¶¶ 11.13, 11.14, 11.22; Kravchenko 2 Exhibit 2). The expert reports included a report dated 5 January 2009 from the Kazakh Scientific, Research and Design Institute of Oil and Gas (a division of KMG) that found the pipelines owned by KPM and TNG "*do **not** belong to the category of **main** pipelines and are designated to ensure the process of hydrocarbons production.*" (C-I ¶ 98, emphasis maintained; C-99; C-100).The expert reports also included a report that the Scientific, Research, and Design Institute of Oil and Gas Industry of NIPI Neftegaz concluded on 9 January 2009 that the pipelines owned by KPM and TNG were correctly "*classified as in-field pipelines.*" The Court later deemed the Claimants' expert opinions to be inadmissible on the grounds that these so-called expert opinions did not evidence KPM and TNG's requests for such opinions, making it impossible for the court to divine the scope of the request. There was no indication that the bodies were independent of the Claimants, and some of the experts whose reports were excluded had a role in the construction of the pipelines and in the legal amendments regarding their status. In any event, they were not qualified to issue such opinions and had not been appointed pursuant to Article 243 of the CPC. (RPHB 2 ¶ 203 – 207; Kravchenko 2 Exhibit 2).

1055. On 19 May 2009, the Financial Police requested the valuation of sequestered property from KPM. (C-500).

1056. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1057. On 17 June 2009, the Financial Police issued a press release that announced that the investigative phase had concluded. The media reported on the ongoing criminal investigations and reported that KPM and TNG had obtained illegal profits of 147 billion Tenge and that the companies' assets had been sequestered. (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38; R-I ¶ 26.24; C-118).

1058. On 27 June 2009, the Regional Prosecutor's Office corresponded with Ascom and Terra Raf noting the international search underway for Mr. Cojin. (C-183).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE