1059. On 2 July 2009, the MEMR failed to execute the extension of the exploration period of Contract 302. (C-27; R-163.1);

1060. Mr. Cornegruta's trial was held between 30 July and 14 September 2009. (C-704; R-315.1 (in Russian); R-315.2 (in Russian); R-316; R-317; R-318; R-319).

1061. On 18 September 2009, Aktau City Court found Mr. Cornegruta guilty of "*illegal entrepreneurial activity in an especially large amount*" for operating a main pipeline without a license and ordered recovery of USD 145 million from KPM. (C-117) Respondent admits that KPM was not a party to the criminal proceeding against Mr. Cornegruta and explains that the Court was asked to rule on whether Mr. Cornegruta, on behalf of KPM, was guilty of the crime. Respondent denies that KPM was not represented in either the hearing or the appeal. (R-I ¶ 27.60; R-II ¶¶ 615, 645; RPHB 2 ¶¶ 246 – 261; C-117).

1062. On 21 September 2009, President Nazarbayev's Head of Administration issued an order regarding "*free of charge transfer of [Claimants'] assets*." (RPHB 1 ¶¶ 401; C-294; Mynbaev Day 3 pp. 159 – 167).

1063. On 30 September 2009, the Financial Police ordered a new audit of KPM regarding alleged failure to pay export taxes. (Condorachi WS ¶ 34).

1064. On 22 October 2009, the Financial Police questioned Mr. Condorachi regarding KPM's alleged obligation to pay export taxes. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128; Condorachi WS ¶ 35).

1065. On 3 November 2009, the Financial Police interviewed Mr. Cornegruta in jail regarding KPM's alleged obligation to pay export taxes. (Condorachi WS ¶ 36).

1066. On 12 November 2009, the Appeal Court upheld the criminal judgment of Aktau City Court finding Mr. Cornegruta guilty of illegal entrepreneurial activity in an especially large amount and ordering recovery of USD 145 million from KPM. (C-565).

1067. On 19 November 2009, President Nazarbayev issued an instruction to the Prime Minister, Minister Mynbayev, and Timur Kulibayev to look into and resolve the issue with respect to KPM and TNG. (R-II ¶ 332; C-23).

1068. On 29 December 2009, a Writ of Enforcement was issued against KPM for USD 145 million. (C-119).

1069. On 29 December 2009, the Tax Committee concluded an audit of transfer pricing and claimed that KPM and TNG owed approximately 700 million Tenge (US $5 million) in unpaid transfer prices and penalties. (R-I ¶ 30.63; C-137 and C-138).

1070. KPM and TNG commenced legal action challenging the transfer pricing claim (R-II ¶ 649). This was still pending as of the State's 21-22 July 2010 take-over. (CPHB 2 ¶ 128).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 18 of 104

1071. On 10 January 2010, Kazakhstan froze the bank accounts of KPM to satisfy the USD 145 million judgment against it. (C-I ¶ 125; CPHB 1 ¶ 212; CPHB 2 ¶ 38; R-I ¶ 29.7; C-119; C-121).

1072. From 25 January to 6 February 2010, MEMR carried out unscheduled inspections of KPM and TNG regarding historical compliance with Subsoil Use Contracts and Kazakh law. (C-0 ¶ 55; C-II ¶ 290; CPHB 2 ¶¶ 38, 61; C-171, C-385, C-386, and C-599). Respondent states that the purpose was to ensure compliance with contractual obligations and legislation, not to assess legality from 1997 to present. (R-I ¶ 31.96; C-171; C-174). While Respondent states that the purpose was to ensure compliance with contractual obligations and legislation and not to assess legality from 1997 to present, this stands in contradiction to C-174, which Respondent has also cited.

1073. From January to June 2010, Kazakh enforcement officers took repeated measures to recover funds from KPM to satisfy the court's criminal judgment. (C-79; C-122; C-123; C-124; C-125; C-199; C-201; C-298; C-501; C-502; C-503; C-504; C-505; C-506; C-507).

1074. On 26 January 2010, the Ministry of Finance began bankruptcy proceedings against KPM. (CPHB 2 ¶¶ 38, 128; C-157).

1075. On 17 February 2010, the President of Kazakh social fund "*Blagovest*" wrote to Minister Mynbaev to make a suggestion to "*resolve the question of nationalization of the assets posed in 2008*". (CPHB 2 ¶ 38; RPHB 1 ¶ 404 (saying 7 February); C-23).

1076. On 24 February 2010, the Customs Committee informed both KPM and TNG that they were liable for unpaid export taxes. (C-44; C-479). One month later, on 31 March 2010, the Customs Committee retracted this claim and conceded that the Subsoil Use Contracts exempted KPM and TNG from export taxes. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56; C-130).

1077. By mid-March 2010, Kazakhstan's court administrators had seized nearly every asset of KPM, including key oil production equipment, and had prevented KPM from importing equipment and exporting oil. Nevertheless, the Claimants continued to pay the salaries of KPM's workers through TNG's accounts. While Respondent disputes that salaries were paid, Respondent, despite having access to information that would suggest otherwise, has not provided any. (CPHB 2 ¶ 194; RPHB 2 ¶ 349).

1078. On 30 April 2010, MOG informed KPM and TNG that a sale to Cliffson was not possible because the companies' shares were sequestered / arrested. (C-528; C-529). It would only be approved if KPM and TNG satisfied the requirements to release the attachment of their shares. (R-II ¶ 818).

1079. From 25 to 29 June 2010, on the order of the Prime Minister and with the involvement of the Financial Police, the GPO ordered unscheduled inspections of KPM and TNG from no fewer than seven different Kazakh agencies. (CPHB 2 ¶ 38; C-174; C-175; C-177; C-178; C-180; C-181; C-182; C-185; C-315; C-647; C-648; C-649; C-650; C-651; C-687; C-688; C-689; C-711).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1080. On 9 July 2010, while inspections were underway, TNG was notified that the Prime Minister had planned to visit the field facilities and the LPG Plant. TNG was instructed to make preparations for his 20 – 21/23 July visit. (C-186; C-299).

1081. On 14 July 2010, the MOG sent notices to KPM and TNG that the companies were in violation of Subsoil Use Contracts 210 and 305. (R-I ¶ 31.19; C-II ¶ 346, CPHB 1 ¶ 296, CPHB 2 ¶¶ 74, 178; RPHB 1 ¶ 360; RPHB 2 ¶ 354). The notices from the MOG were dated 14 July 2010, but were not received by KPM and TNG until 16 July 2010. (R-I ¶ 31.54). The notices set out (1) the contract to which the notice related, (2) the contractual breaches by KPM and TNG, (3) a deadline within which to respond, and (4) the consequences for failing to respond to the notice. (R-I ¶ 31.107). The notices gave KPM and TNG until 19 July 2010 to "submit explanations on reasons of non-execution of contract terms and all necessary documents, ascertaining removal of the above-mentioned violations, as well as to inform [the MOG] on measures taken in order to avoid violation of contract terms." Respondent reports that the violations in the notices included "admissions" by KPM and TNG that they had operated trunk oil and gas pipelines without a license and 13 additional alleged violations for which Claimants state that the State had provided no prior notice to KPM or TNG. (R-I ¶¶ 31.103 et seq.). Claimants report that the notices listed 16 alleged violations. The notice further provided that "[i]n case of failure to comply with the request set forth in this Notice within the established time limit, the Competent Body is entitled to terminate the Contract[s]." (C-0 ¶ 88; C-I ¶¶ 20, 206 – 208, 332). Respondent states that the violations contained in the notice of 14 July 2010 were detected by the competent authority as a result of permanent monitoring of the compliance by the subsurface users of their contractual obligations. (R-I ¶ 31.42). The audits proved that production activities at KPM and TNG had virtually stopped; there was little chance of employee salaries being paid. (R-II ¶ 692). The Parties state that, by this time, the majority of TNG and KPM senior and middle management had left Kazakhstan. (R-II ¶ 698; C-I ¶ 218).

1082. On 19 July 2010, Claimants submitted written answers and explanations concerning each violation alleged in the 14 July 2010 notice. (C-0 ¶ 89, CPHB 2 ¶ 178; RPHB 1 ¶ 361, RPHB 2 ¶ 354). Claimants had, previously, on 22 January and on 28 June 2010, provided evidence of their compliance with the work program requirements. (C-I ¶ 209). In July 2010, they provided all that they had. KPM explained that it failed to pay costs costs amounting to US 114,809, because KPM this figure was a direct result of the Financial Police seizing KPM's assets in May 2009 and the judicial executor seizing bank accounts in January 2010. These seizures were a result of the state-initiated criminal investigation, which in and of themselves constituted a force majeure under the contract. KPM explained that it was unable to pay the USD 10,000 owed to the liquidation fund and various taxes because of the financial constraints caused by the criminal investigations. KPM also stressed that its pipeline was never a trunk or main pipeline. KPM responded to the allegation regarding its obligation to purchase goods, works, and services, by simply referring the Ministry to its previously submitted "*notes and objections*" explaining how this issue too, like all of the other claims, was groundless. TNG replied similarly, and submitted documentation showing that none of the Ministry's claims were proper. With respect to Contract 302, TNG documented its work and training programs, the purchase of goods, works, and services, and demonstrated that the re-classified pipeline was not trunk. (C-I ¶¶ 211 – 216). Respondent states


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 20 of 104

that Claimants' responses were inadequate and failed to address the violations. (R-154). For example, in response to the notice of KPM's and TNG's failure to instruct and train a Kazakh specialist, KPM and TNG referred to funding allocated for the training of all employees. In response to the notice of KPM's failure to pay costs according to the Additional Agreement of 13 June 2008, KPM simply denied liability based on "force majeure." KPM and TNG also argued force majeure to excuse their failure to contribute to the liquidation funds, as required by Contracts 305 and 210, and KPM used that argument to excuse its non-payment of taxes. Both tried to re-open the discussion on whether the pipelines were trunk. Importantly, Claimants refused to "*remove the violations of their obligations THI*" (R-I ¶ 31.121; RPHB 2 ¶ 354). R-I ¶ 31.122; R-154).

1083. Respondent, in any event, disputes that these responses were received on time and argues that they were received by the MOG after 21 July 2010. (R-I ¶ 31.54; RPHB 1 ¶ 362).

1084. Between 21 and 22 July 2010, the Prime Minister and the Minister of Oil and Gas publicly declared the takeover and abrogation of the Claimants' Subsoil Use Contracts, seized the assets of KPM and TNG, and caused them, in due course, to be transferred to KMG, which later appointed its subsidiary KazMunaiTeniz as "trust manager" for the companies. (R-I ¶¶ 31.129, 31.150 et seq.; R-II ¶ 701; C-3, C-4, C-5, C-189, C-190; C-194; C-195; R-152; R-153, R-200; R-257).

1085. Having considered all of the Parties submissions, even where not expressly stated herein, the Tribunal draws the following conclusions:

1086. The Tribunal considers that it need not find that there was a "playbook", as alleged by Claimants and as recorded above in this Award, to find that the conduct presented in the above timeline constitutes a violation of the FET. Indeed, for the Tribunal, the evaluation of the objective timetable is sufficient. While Respondent's explanations and justifications regarding some specific actions it has taken affecting Claimants' investments may perhaps at least be arguable, even if not convincing to the Tribunal, (1) the picture of them seen cumulatively in context to each other and (2) the difference of treatment of Claimants' investments before and after the Order of the President of the Republic on 14/16 October 2008, permit only the conclusion that Respondent's conduct after the President's Order was a string of measures of coordinated harassment by various institutions of Respondent and has to be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

1087. The Parties are in agreement, and the Tribunal agrees as well, that prior to November 2008, Respondent's authorities regularly inspected KPM's and TNG's pipelines. The Parties are in agreement, and the Tribunal agrees as well, that there was no change in the pipeline from the date that Kazakh authorities approved the design and construction of the pipelines until the 18 November 2008 inspection where the Financial Police – who Respondent agrees are not the competent authority to classify a pipeline – declared that the pipelines at issue were a "*trunk*" rather than field pipelines. (R-II ¶ 451). The Tribunal, however, is not persuaded by Respondent's argument that the Financial Police, in pursuit of their lawful obligations, simply made this discovery during an inspection – a discovery that was not made during any of the prior routine inspections that were made by agencies

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 21 of 104

who were competent to classify pipelines. Rather, it is far more likely that this alleged "*discovery*", as well as the events leading to it and those stemming from it, constitute violations of the FET and, in particular Claimants' legitimate expectations toward proper and fair governmental conduct.

1088. The Tribunal need not opine on whether the pipeline was a field or trunk pipeline in order to find that the procedure surrounding the discovery was in violation of the FET standard. The Parties have presented that Claimants operated a pipeline system that was approved by Kazakh authorities. During routine inspections from 2002 – until November 2008, there was no indication that anyone believed that the pipelines were trunk pipelines and Respondent has provided no indication that the proper authorities were in any way prevented from having made the same discovery sooner. Instead, the evidence demonstrates that, it was not until immediately prior to the "*discovery*", namely on 12 November 2008, that the Financial Police began to seek information on whether KPM and TNG held licenses to operate trunk pipelines. On Friday, 14 November 2008, the Financial Police received confirmation that neither company held such licenses. Immediately thereafter, on the following Monday, 17 November 2008, the Financial Police "*discovered*" that KPM and TNG operated a trunk pipeline and ordered the Tax Committee to calculate profit earned from operating that pipeline.

1089. Following the "discovery", Claimants received confirmation from numerous Kazakh authorities that the pipeline at issue was a field, rather than a trunk pipeline. Often, however, the Financial Police compelled these authorities, in particular the MES and the MEMR, to withdraw their statements. The evidence also indicates that even the Judicial Executor admitted that the segment at issue was a mere "*field*" – and not "*trunk*" pipeline.

1090. Accordingly, the Tribunal is persuaded by Claimants' argument which demonstrates that this was not a mere "*discovery*" but that, rather, this was a re-classification. As indicated, there were no changes to the pipelines prior to their change in designation. The segments of Claimants' pipes that are at issue extend from the principal joint where the KPM wellhead pipes converge to KPM's processing facility, and from the processing facility to TNG's storage tanks, where services are also provided to KPM. For the TNG gathering system, the segment extends from the principal joint where the TNG wellhead pipes converge to TNG's processing facility; from the processing facility directly to the CAC Pipeline for gas; and from the processing facility to TNG's storage tanks for condensate. Claimants state that identical gathering systems are owned and operated by other oil and gas companies in the immediate vicinity – and indeed throughout Kazakhstan – none of which are classified as trunk pipelines requiring licensure. (C-0 ¶¶ 39 – 40, partially quoted). The Tribunal is persuaded that the at-issue pipelines, likewise, were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by Respondent. That the City Court of Aktau found that the pipes were trunk does not bind this Tribunal.

1091. The re-classification, viewed in light of President Nazarbayev's 23 November 2009 confidential instruction that was attached to the 7 February 2010 Blagovest letter (C-23), appears to have been an important step for the State to have obtained the assets of KPM and TNG, without sacrificing their working ability.

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1092. While the Parties dispute many aspects of the June – July 2010 inspections, the Tribunal is satisfied that these sudden inspections, which involved no fewer than seven Kazakh agencies, unduly harassed Claimants. It appears from the evidence presented that these numerous agencies, each reacting to the same orders of the Prime Minister, the GPO, and the Financial Police, conducted inspections which, in some aspects, may have been duplicative of one another. In particular, the Tribunal notes that multiple agencies were tasked with reviewing KPM's and TNG's compliance with their Subsoil Use Contracts. These sudden inspections forced KPM and TNG to spend their time and resources addressing the inspections, rather than operating normally. Importantly, throughout this barrage of inspections, no remedies were available to Claimants. Despite filing complaints with relevant authorities, no help was forthcoming. Respondent's conduct and treatment of Claimants, therefore, violated the FET standard.

1093. The Tribunal is, finally, not convinced that Claimants violated Kazakh law. Even without determining whether the pipeline was trunk, the evidence indicates that the charge of "*illegal entrepreneurial activity in an especially large amount*" under Art. 190(2)(b) of the Kazakh Criminal Code did not comply with Kazakh law. Instead, the threshold calculation for "*illegal profits*" was only met by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. Kazakhstan assessed "*illegal profits*" from operating the trunk pipeline – and this fine amounted to more than 65 billion Tenge for KPM and more than 82 billion Tenge for TNG – reflecting all of the revenue that both companies had generated for oil, gas, and condensate production from 2002 – 2008. These calculations were unfair, did not consider expenses or costs, and did not correspond to the transportation fees that would have applied if the pipeline segment was truly a trunk pipeline. Importantly, the fine was contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The Tribunal is persuaded by Claimants' argument that the proper calculation could have yielded USD 12,000 – 13,000 in illegal profits – an amount below the USD 17,000 threshold for the crime.

1094. Respondent disputes whether Kemikal's actions are attributable to the state and argue that, per the PwC Due Diligence Report, Kemikal stopped making payments due to "*liquidity and insolvency*" issues. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124). Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State were the cause of the various difficulties they encountered in endeavouring to secure their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal finds that it is more probable than not that there was State influence at play with respect to the failure by KazAzot to sign the Tri-Partite Agreement. Similarly, the Tribunal finds that the relationship between Kemikal and Timur Kulibayev is established on the basis of Professor Olcott's evidence that Kemikal was managed by Samruk-Kazyna, which is the Kazakh state welfare fund and is 100% owned and controlled by Kazakhstan. Mr. Kulibayev was, as the Claimants

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 23 of 104

have submitted, close to Samruk-Kazyna, having served at one time as deputy manager of its holding company shortly after its launch in 2006 until 2007, later returning in 2008 as deputy CEO when Samruk's responsibilities increased. Considering these facts in the context of the familial ties between President Nazarbayev and Mr. Kulibayev, the Tribunal concludes that it is more probable than not that Kemikal's failure to provide the requisite bank guarantees to TNG in late 2008 was caused by Kazakhstan. While this evaluation of the evidence regarding non-implementation of the Agreement is by no means the sole reason for the Tribunal's conclusion, it does contribute to and confirm that it was part of and due to the Respondent's conduct found to be in breach of the ECT.

1095. Taking into account the above considerations, the Tribunal concludes that Respondent's measures, seen cumulatively in context to each other and compared with the treatment of Claimants' investments before the Order of the President of the Republic on 14/16 October 2008, constituted a string of measures of coordinated harassment by various institutions of Respondent. These measures must be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

## J.II. Whether Claimants' Interests were Expropriated (Art 13 ECT)

### 1. Arguments by Claimants

#### a. Law on Expropriation

1096. Article 13 ECT prohibits direct and indirect expropriation, to the extent that expropriatory measures are not carried out in accordance with the requirements of Art. 13 ECT. (C-I ¶¶ 243 – 244). Under international law, as described in *Compañia del Desarrollo de Santa Elena, S.A. v. Costa Rica*, "*an expropriation occurs where the state takes measures which deprive the owner of title, possession or access to the benefit and economic use of his property. 'A deprivation or taking of property may occur under international law through interference by a state in the use of that property or with the enjoyment of its benefits, even where legal title to the property is not affected.*'" (C-I ¶ 246). Under Art. 13(3) ECT, expropriation may be of assets of a company that an investor owns, even as a shareholder. (C-I ¶¶ 246 – 247). Article 13 ECT expressly prohibits any measure of expropriation (direct or indirect) by Kazakhstan that does not cumulatively satisfy four distinct requirements: the expropriation must be "*(a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.*" Respondent's actions have met none of these requirements. (C-I ¶¶ 286 – 288, partially quoted).

1097. The minimum requirement for an expropriation to be lawful under Art. 13 ECT is that it be carried out in the public interest / for a bona fide public purpose. As the Tribunal in *ADC v. Hungary* found, a mere reference to "*public interest*" will not satisfy this requirement. Nevertheless, Respondent has never alleged that the taking was for the public interest, not that it in any event could satisfy that requirement. Instead, Respondent's many actions served an entirely different purpose, namely



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 24 of 104

the diminution of value in Claimants' investments, until the state seized them outright. Accordingly, since none of the actions of either indirect or direct expropriation were for a purpose that was in the public interest, the Tribunal should conclude that Kazakhstan's expropriation of Claimants' investments was unlawful under Art. 13 ECT and international law. (C-I ¶ 289 – 296).

1098. "*Due process*" encompasses procedural and substantive fairness, and this has been recognized by international tribunals. Claimants explain:

> *300. The failures of due process at issue in this case are markedly more numerous and severe than those at issue in ADC and Kardassopoulos. The Tribunal in both of those cases found that the host States had not given the investors a reasonable opportunity to be heard following an expropriation. In the present case, Claimants were given no chance at all to be heard or to object to the direct expropriation that occurred in July 2010. Furthermore, despite their many efforts to contest Kazakhstan's various measures of indirect expropriation during the October 2008 – July 2010 period, all of Claimants' objections, explanations, and appeals for assistance fell on deaf ears. Claimants vigorously contested the various audits, inspections, findings, criminal charges, fines, and seizures levied during that period, but all of their complaints fell upon deaf ears. (C-I ¶ 300).*

1099. Respondent's actions of indirect and direct expropriation were not carried out under due process of law, as required by Art. 13 ECT. The most blatant due process violations occurred in relation to the prosecution, trial, and conviction of Mr. Cornegruta and the conviction of non-party KPM. Claimants allege that the criminal charges and the substantive evidence were entirely fabricated and the court was obviously partial. Not only that, but KPM – a non-party to the criminal proceedings, an entity that could not even be prosecuted under Kazakh law – was convicted and ordered to pay a fine of more than USD 145 million. Among other things, this sum bore no relation to the charges and constituted all of KPM's oil and gas revenues for March 2007 – May 2008. The court made no effort to deliver the verdict to KPM or to provide KPM notice of its content. It was only after enforcement that KPM finally received a copy. Appeals were unsuccessful – KPM's appeal, filed after it finally received a copy of the verdict on 25 January 2010 – nine days after receiving a copy, was refused as untimely. (C-I ¶¶ 297, 301 – 306; CPHB 1 ¶¶ 188 – 213; CPHB 2 ¶¶ 97 – 114).

1100. The incessant criminal investigations against KPM and TNG starting in 2008 were baseless, unfair, politically motivated, and pursued without regard to due process. KPM and TNG's complaints to the relevant authorities regarding these were either ignored or served only to prompt more investigations. (C-I ¶¶ 307 – 309).

1101. Respondent also committed due process violations with regard to Claimants' rights to extend the exploration period for the Contract 302 properties and to confirm ownership of TNG to Terra Raf. Requests for action and assistance were ignored. Finally, Claimants were promised an extension, and then the Republic failed to issue it. (C-I ¶¶ 310 – 311) At the hearing, Respondent's witness Mr. Ongarbaev, formerly of MEMR, confirmed that the MEMR had decided to allow the extension. Documents that Claimants withheld, including the PwC Due Diligence Report, also confirmed the extension. (CPHB 1 ¶¶ 221 – 230, 237).



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 25 of 104

1102. The total take over to KPM and TNG in July 2010 was accomplished without reference to due process. KPM and TNG were given only 3 days to respond to and explain the multiple allegations of violation of the Subsoil Use Contracts before the contracts were repudiated. This lack of reasonable time alone is sufficient for a finding of violation of due process. In any event, the responses were wholly ignored and Kazakhstan unilaterally repudiated the contracts and physically took over KPM and TNG. (C-I ¶¶ 311 – 313).

1103. Claimants also allege that Respondent's expropriatory measures were discriminatory, and incorporate by reference its arguments regarding the ECT's FET standard and the ECT's impairment clause. (C-I ¶ 317, C-I ¶¶ 337 *et seq.*, ¶¶ 352 *et seq.*).

1104. Respondent has also failed in its obligation to pay prompt, adequate, and effective compensation, as required by Art. 13 ECT and as firmly grounded in international law. To date, no compensation has been paid. (C-I ¶¶ 314 – 316).

### b. Exhaustion of Remedies

1105. Respondent's arguments that Claimants are precluded from bringing a claim of illegal expropriation under the ECT because they have failed to exhaust dispute resolution mechanisms or to exhaust domestic remedies available to them is simply wrong. Claimants' first argument in this respect is taken from their own words:

> *452. There is a fundamental distinction between Kazakhstan's obligations to Claimants as qualified "Investors" under the Treaty, including the duty not to expropriate Claimants' investments unlawfully, and Kazakhstan's obligations to KPM and TNG under the contracts, including the duty not to terminate those contracts in violation of the contracts' termination provisions or applicable law. The respective parties and causes of action are different in the two situations. In short, "[a] treaty cause of action is not the same as a contractual cause of action." There would have been nothing preventing KPM and TNG, at least in a theoretical sense, from raising breach-of-contract claims against Kazakhstan while the Claimants commenced separate Treaty claims against Kazakhstan. In fact, KPM and TNG have not lost the right to pursue their contract claims against Kazakhstan, and whether they did so at the time or do so in the future has no bearing on either Claimants' right to bring an expropriation claim under the Treaty or whether Kazakhstan's unlawful termination of the Subsoil Use Contracts and takeover of KPM and TNG amounted to a direct expropriation of Claimants' investments. Kazakhstan is mistakenly conflating two different types of legal claims, only one of which (Claimants' claims for Kazakhstan's breaches of the ECT) is before this Tribunal. (C-II ¶ 452).*

1106. The ECT does not contain a requirement for exhaustion remedies, and investment case law affirms that no such requirement exists. The tribunal in *Helnan v. Egypt* (which Respondent cites elsewhere) rejected any requirement to pursue available remedies as an element of showing a treaty breach, since doing so "*would empty the development of investment arbitration of much of its force and effect, if, despite a clear intention of States parties not to require the pursuit of local remedies as a*



*pre-condition to arbitration, such a requirement were to be read back in as part of the substantive cause of action.*" (C-II ¶ 453, partially quoted).

1107. The ECT contains a "*fork-in-the-road*" clause, under which Kazakhstan only consents to submit disputes under the ECT to international arbitration where an investor has not already submitted the dispute for resolution before local courts or tribunals or in accordance with other previously agreed upon dispute resolution procedures. Thus, if Claimants (as opposed to KPM or TNG) had chosen to challenge the expropriation before Kazakhstan's courts, they might have been precluded from bringing the present action. This makes it clear that no requirement of exhausting domestic remedies can exist in this case. (C-II ¶¶ 454 – 455).

1108. Moreover, the Subsoil Use Contracts precluded recourse to local courts and instead obliged parties to arbitrate disputes before the SCC. The logical extension of Respondent's argument would lead to the absurd result of requiring KPM and TNG to file one SCC claim before a new tribunal and then for Claimants to file a separate action before the SCC. (C-II ¶ 456).

1109. In any event, resort to local remedies would have been futile. This is not a matter concerning a single act of low level maladministration, but rather these cases stem from treaty violations perpetrated at the highest level of the Kazakh government. No Kazakh court would overturn an expropriation ordered at the highest levels of Kazakhstan's government. (C-II ¶¶ 457 – 458).

1110. In its Post-Hearing submission, Claimants argued that there is direct evidence that the executive mandated the takings at issue. This is true despite Minister Mynbayev's testimony that the MEMR was actually attempting to protect KPM and TNG against the Kazakh authorities. In his position having direct authority over KPM's and TNG's operations, he had in depth knowledge that the companies would need protection from higher authorities. The evidence and testimony before the Tribunal strongly suggests the direct involvement of Kazakhstan's political elite. (CPHB 1 ¶¶ 309 – 339).

### c. Indirect Expropriation

#### i. General Principles and Jurisprudence Regarding Indirect Expropriation

1111. "*Indirect expropriation*" is widely understood as interference with an investment that "*leaves the investor's title untouched but deprives him of the possibility to utilize the investment in a meaningful way*", i.e. depriving the investor of its rights or attributes of ownership, without physically seizing the property. (C-I ¶¶ 259 – 269; C-II ¶ 469). The present case does not concern a "*creeping*" expropriation where numerous small events cumulatively amounted to an indirect expropriation. Rather, the measures were extreme and any number of them individually constitutes an act of indirect expropriation under international law. Cumulatively, the conclusion that Kazakhstan indirectly expropriated Claimants' investments is inescapable. (C-I ¶ 285; CPHB 2 ¶ 36).



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 27 of 104

1112. Respondent substantially deprived Claimants of the rights of ownership of their investments. There is a generous amount of jurisprudence describing the kinds of acts that can amount to indirect expropriation, which is often defined as a substantial deprivation of the rights or attributes of ownership of an investment. The deprivations and impacts that resulted from Kazakhstan's mistreatment of KPM and TNG over from October 2008 – July 2010 resemble those summarized by the tribunal in *PSEG v. Turkey*, when it summarized these constitutive aspects of an indirect expropriation:

> *[T]here must be some form of deprivation of the investor in the control of the investment, the management of day-to-day operations of the company, interfering in the administration, impeding the distribution of dividends, interfering in the appointment of officials and managers, or depriving the company of its property or control in total or in part. (C-II ¶¶ 474 – 476, partially quoted).*

1113. Investment tribunals have routinely found that substantial interference with an investor's ability to manage its investment entails indirect expropriation. Contrary to Respondent's argument, Claimants were not at fault for the start of these investigations. Respondent never alleged that KPM or TNG had violated the law before that date. Rather, the investigations were a pretext for Kazakhstan to prosecute Claimants' companies and ultimately gain control over them. Kazakhstan invented those grounds as early as November 2008, when the Financial Police reclassified the pipelines and ordered calculation of KPM's "*illegal*" profits (i.e., all of its revenues over the previous several years). The Court ignored and declared inadmissible evidence in Mr. Cornegruta's favor, and ignored the obvious fact that the "*illegal profits*" calculated as the penalty were actually not profits at all but were revenues, and were not even earned by Mr. Cornegruta. There should be no question that Kazakhstan's actions, which were carried out in bad faith, amount to indirect expropriation under the ECT and international law (C-II ¶¶ 479 – 480, partially quoted; CPHB 2 ¶¶ 97 – 100).

### ii. Right to Regulate

1114. Respondent's arguments that its actions from October 2008 – July 2010 were a proper exercise of its regulatory powers fail for the simple reason that its actions were not regulatory in nature. In this regard, Claimants state as follows:

> *470. [...] Kazakhstan's actions amounting to an indirect expropriation [...] did not stem from enactment of new laws or regulations or the legitimate enforcement of existing regulations, and they were not designed to maintain "public order, health, or morality." Instead, they consisted of an egregious campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG. The campaign involved a multitude of ministries led by the Financial Police, and it culminated in extraordinary denials of justice suffered by Mr. Cornegruta and KPM in the Kazakh courts. The campaign was carried out under an order from President Nazarbayev to investigate Mr. Stati. Far from being necessary to protect or promote a legitimate State interest, the Government's campaign intentionally interfered with Claimants' ability to manage, control, and dispose of their investments and*



*was designed to force Claimants to sell KPM and TNG (or parts of the companies) to the State at bargain-basement prices. [...]*

472. *Moreover, even if Kazakhstan could show a legitimate purpose for its so-called "regulatory" conduct, and that its conduct was necessary and proportional to achieving that purpose, Kazakhstan would still be required to pay compensation to Claimants for its expropriatory measures. [...]*

473. *Thus, even if Kazakhstan's measures could be said to fall within the scope of normal, regulatory actions — which is vehemently denied — their devastating impact on Claimants' investments was to such a degree as to require compensation from Kazakhstan. Kazakhstan's failure to compensate Claimants alone establishes the unlawful nature of its indirect expropriation. (C-II ¶¶ 471 – 473, partially quoted).*

1115. The case law cited by Respondent is inapplicable here, as those cases concern states that actually took regulatory measures that tribunals found to be tied to a legitimate state interest.

471. *[...] In Tecmed, Mexico refused to renew the claimants' landfill permit on environmental protection grounds, which the tribunal found to fall within the state's regulatory powers (but which the Tribunal nevertheless found to amount to expropriation). Further, the Glamis Gold case involved application of the U.S.'s environmental protection laws, which were designed to promote public health and safety and therefore were proper regulatory measures; the Methanex case dealt with a ban on the MTBE additive in gasoline, which was a necessary regulatory measure to maintain public health and safety; and the LG&E tribunal found that a measure that has a social or general welfare purpose may be accepted when it proportionally addresses an established need. Kazakhstan has not even articulated what public purpose was served by its complete devastation of Claimants' investments through its harassment campaign and denials of justice, much less demonstrated that its measures were necessary and proportional to achieve such a purpose. (C-II ¶ 471).*

1116. The Tribunal does not need to abandon common sense. All of the legal and regulatory problems faced by KPM and TNG arise in the context of President Nazarbayev's October 2008 order and had never been experienced previously. (CPHB 2 ¶ 40). The events following President Nazarbayev's 14 October 2008 Order were not a coincidence. To argue so is to state that none of Kazakhstan's regulatory bodies had successfully carried out their functions for nearly a decade, by missing all of these serious infractions. The Tribunal should recognize that the acts described below were designed to (and successfully did) discourage third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies. (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57).

### iii. Acts Allegedly Amounting to An Indirect Expropriation

1117. Kazakhstan's measures from October 2008 to July 2010 interfered with Claimants' use and control of their investments and caused significant damage to the



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 29 of 104

alienability and economic potential of those investments. (C-I ¶ 270; CPHB 2 ¶ 38, 40).

> 271. *Kazakhstan's campaign of indirect expropriation commenced on October 14, 2008, when President Nazarbayev personally ordered the Kazakh Financial Police and a variety of other Governmental agencies to "fully investigate" Claimants' business activities in Kazakhstan. The Financial Police and seven other ministries and agencies started their harassment campaign in earnest on the heels of President Nazarbayev's directive. Kazakhstan's harassment campaign – which included a groundless criminal prosecution and conviction of KPM's in-country manager (and a similarly groundless criminal verdict against KPM), freezing KPM's assets, multiple assessments of improper taxes, reversal of prior State approvals and waiver of the State's pre-emptive rights, and refusal to execute the agreed exploration period extension – entail "indirect" expropriation under Article 13 of the ECT and international law.* (C-I ¶ 271; CPHB 1 ¶ 112, stating that the difference between "*thoroughly check*", as Respondent translates, and "*thoroughly investigate*" is a difference without distinction. Claimants later use "*thoroughly check*" in their memorial at CPHB 2 ¶ 115).

1118. The events following President Nazarbayev's 14 October 2008 Order were not a coincidence. The measures described below discouraged third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57):

> 273. *[The first measure taken against Claimants was Kazakhstan's refusal to extend the exploration for the Contract 302 properties. This wrongful refusal to execute prevented Claimants from proving the Contract 302 Properties' reserves and thereby affected the market value of that asset. This occurred after Claimants had begun to accept bids for the sale of KPM and TNG. To the extent that Kazakhstan argues that Contract 302 terminated on its own accord, Claimants state that it only terminated because of the State's refusal to extend, which was not in accordance with the contractual termination provisions. (see also CPHB 2 ¶¶ 149 – 176)]*
>
> *[[T]he Financial Police effectively commandeered KPM's and TNG's offices for months, from late October 2008 until March 2009, while they oversaw numerous inspections, intimidated employees, seized company documents, and prevented KPM's and TNG's personnel from carrying out their normal daily activities. Those inspections substantially interfered with the day-to-day management and operations of the companies. (C-II ¶ 476)]*
>
> 274. *[In] November 2008, [...] the Tax Committee initiated an audit of KPM and TNG and assessed approximately USD 6 million in back "transfer" price taxes and penalties. KPM and TNG spent the following months contesting this assessment in Kazakhstan's courts, legal actions that remained pending at the time Kazakhstan abrogated KPM's and TNG's Subsoil Use Contracts and directly expropriated Claimants' investments in July 2010.*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> 275. *[...] The February 10, 2009, refusal by Kazakhstan to apply amortization rates as contractually agreed in the KPM and TNG Subsoil Use Contracts raised additional concerns about the companies' financial health. The State wrongfully assessed against the companies approximately USD 69 million in back taxes on corporate income and associated penalties. In early 2010, the State pursued bankruptcy proceedings against KPM, further disrupting KPM's ability to operate and driving down the value of Claimants' investments.*
>
> 276. *On December 18, 2008, the State reversed its earlier position and cancelled its prior approval of the 2003 transfer of TNG to Terra Raf, as well as its prior waiver of pre-emptive rights to purchase 100% of KPM and TNG, all amidst threats of termination of the Subsoil Use Contracts. Despite the Government's verbal assurances, it never granted the permit to "re-allow" the transfer of TNG's ownership to Terra Raf. From December 2008 onward, the lingering transfer and pre-emptive rights issues consumed an extraordinary amount of time, attention, and resources, and severely affected the marketability of TNG and KPM. [Kazakhstan's arbitrary reversal of its pre-emptive rights waiver, as well as its false announcements of "irregularities" at the companies and its later seizures of KPM's and TNG's assets, deprived Claimants of their ability to dispose of their investments.]*
>
> 277. *[...] On September 30, 2009, the State revived a dispute with KPM regarding payment of the explicitly inapplicable Crude Oil Export Tax for KPM's January 2009 exports, resulting in a purported financial penalty of over USD 10 million. (C-I ¶¶ 273 – 277, partially quoted; C-II ¶¶ 476 – 478, partially quoted; CPHB 2 ¶¶ 115 – 139).*

1119. The measures described above pale in comparison to the criminal proceedings that Kazakhstan waged against KPM, TNG, and their personnel. Claimants' employees were harassed and intimidated. They were coerced into signing inspection reports. Their families were intimidated. This harassment was in violation of the ECT. The baseless reclassification of KPM's and TNG's pipelines into trunk pipelines was the basis for Kazakhstan's prosecution of Mr. Cornegruta, and for Kazakhstan's "*conviction*" of KPM. Numerous expert reports were generated that confirmed by common sense that these pipelines had been wrongfully reclassified, and these were all rejected by the court. (C-I ¶¶ 279 – 280; CPHB 2 ¶¶ 48 - 51).

1120. The harassment and coercion constituted an illegal indirect expropriation by depriving Claimants of their incidents of ownership of KPM and TNG. (CPHB 2 ¶ 59). The constant investigations and then the conviction of Mr. Cornegruta and KPM seriously impaired the value of Claimants' investments, in a manner similar to those considered in the *Biloune* case, though more severe. The criminal proceeding cost Claimants considerably and severely impaired Claimants' right and ability to manage their investments, in particular in light of the hours and resources spent preparing Mr. Cornegruta's defense, as well as his and KPM's appeals. Kazakhstan callously argues that the imprisonment of Mr. Cornegruta had no impact on the Claimants' ability to operate their companies. Despite the fact that the Kazakh court specifically found (as if such a fact were in doubt) that while Mr. Cornegruta was in jail he "*could not fulfill any obligations related to the*



*management of [KPM and TNG],*" his arrest and imprisonment also caused other high-level KPM and TNG managers and personnel to flee the country, forcing Claimants to manage KPM and TNG remotely. There is, therefore, no question that Kazakhstan substantially interfered with Claimants' ability to manage KPM and TNG. (C-I ¶¶ 282 – 284; C-II ¶ 477; CPHB 2 ¶¶ 52 – 56).

> *281. In conjunction with this case, the Financial Police issued seizure orders against (i) KPM's Subsoil Use Contract, oilfield pipelines, and vehicles; (ii) TNG's Subsoil Use Contracts, and oilfield gas and condensate pipelines; and (iii) Claimants' participatory interests in KPM and TNG. These seizures were designed to prevent KPM and TNG from selling or transferring their assets during the course of the criminal proceedings, thereby preventing Claimants from disposing of their investments in Kazakhstan. Needless to say, those seizures and the criminal case massively interfered with Claimants' ability to enjoy or dispose of their investments, and they further diminished their market value. (C-I ¶ 281, partially quoted).*

1121. Kazakhstan's attempts to enforce its "*fabricated*" USD 145 million fine against KPM also resulted in the inalienability of Claimants' investments. The seizure of Claimants' operations interfered with rights under the Subsoil Use Contracts, measures that the *CME* and *Alpha* Tribunals deemed to be expropriatory. Those execution measures also led to the flight of more key personnel and further paralyzed Claimants' operations in Kazakhstan. (C-I ¶ 284).

1122. Respondent's actions, described above, placed a "*cloud*" over Claimants' title to TNG. With KPM facing a pre-ordained conviction, a baseless USD 62 million back tax assessment, and this cloud hanging over TNG, no investor could be expected to purchase the companies. Claimants also argue that Respondent maliciously defamed Claimants by disclosing information to INTERFAX. These public allegations of forgery and fraud exacerbated the above mentioned injuries, and made it difficult for Claimants to obtaining financing for their projects at reasonable rates. (CPHB 1 ¶¶ 138 – 145, 214 – 220, 346 – 357).

1123. Three baseless tax disputes — concerning assessments of back corporate income taxes, transfer pricing, and oil export duties — formed part of Kazakhstan's onslaught of harassment that commenced immediately after October 14, 2008. The "*comprehensive tax audit*" that the Financial Police ordered in October 2008 gave rise to no valid complaint regarding the companies' tax payments or filings. So at the urging of the Financial Police, the Tax and Customs Committees simply created baseless claims. First, in November 2008, the Customs Committee claimed that a previous, disputed assessment of oil export duties, in an amount exceeding USD 10 million, should be paid, despite both an initial court ruling and a previous concession from the Customs Committee that the companies were contractually exempt from such duties. Second, in February 2009, the Tax Committee claimed that KPM and TNG owed USD 62 million in corporate back taxes for failing to properly deduct drilling expenses. Third, in December 2009, it claimed that KPM and TNG owed USD 5 million in back transfer pricing taxes. None of these three claims had any merit, but were instead spurious assessment whose only purpose was to harass Claimants and to pressure them to sell KPM and TNG to the state at firesale prices. (CPHB 2 ¶¶ 127 – 134, 137).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1124. As of 21 July 2010, the Kazakh courts resolved the corporate back tax dispute and ruled that KPM and TNG owed no such taxes. Thus, Kazakhstan's assertion in its First Post-Hearing Brief that this claim continued to increase "until the valuation date of 21 July 2010" is patently wrong. To the contrary, as of July 21, 2010, KPM's and TNG's corporate back tax liability was zero (CPHB 2 ¶ 135). Kazakhstan revived the matter after July 2010 in bad faith, thereby ensuring that Claimants would have no ability to defend their position before the Kazakh Supreme Court (whose decision, in any event, was substantively incorrect). (CPHB 2 ¶ 136).

1125. Despite the Supreme Court ordering taxes due from KPM's and TNG's purported trust manager in November 2010, no collection efforts have been undertaken. Thus, it is likely that these tax actions were simply part of Kazakhstan's coordinated attack on Claimants' investments. Along with Kazakhstan's other acts of harassment and coercion, the tax assessments were measures that, in the words of the *RosInvest* tribunal, were "*linked to the strategic objective of returning petroleum assets to the control of the [State] and to an effort to suppress [an investor]*." Because that tribunal found that the State's measures were "*structured in such a way to remove [the investment company's] assets from the control of [the investors]*," it concluded that the State had committed an illegal, indirect expropriation. The Tribunal should not hesitate to reach the same conclusion here. (CPHB 2 ¶¶ 137 – 138).

1126. In order for the Tribunal to find that Kazakhstan breached the ECT and owes compensation to Claimants, the Tribunal need only be satisfied that the Kazakhstan's actions were unlawful and harmed Claimants' investments. While Kazakhstan's actions clearly demonstrated an intention to devalue, impair, and harm Claimants' investments from October 2008 onward, Respondent's intention is relevant for determining the valuation date. (CPHB 2 ¶¶ 44 – 45). The wrongful verdict against KPM and its assets was a measure of "*indirect expropriation*", since the enforcement destroyed what little remained of Claimants' "*incidents of ownership*" over KPM by that time. (CPHB 2 ¶¶ 97 – 114).

### d. Direct Expropriation

#### i. Transfer of Title

1127. "*Direct*" expropriation refers to the overt seizure of a foreign investor's property or the title to such property by the host state. Respondent's argument that a formal transfer of title to the state or to a third party nominated by the state is "*the decisive element*" for the Tribunal in finding a direct, rather than an indirect, expropriation occurred is wrong as a matter of law. (C-I ¶¶ 249 – 252; C-II ¶ 459). Claimants' arguments are best taken from their own words:

> *460. The Santa Elena case, on which Claimants rely for this (undisputed) principle of international law, was cited with approval by the Telnor v. Hungary tribunal. It quoted the Santa Elena finding that "[t]here is ample authority for the proposition that a property has been expropriated when the effect of measures taken by the state has been to deprive the owner of title, possession, or access to the benefit and economic use of his property." The Metalclad tribunal similarly found that expropriation*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 33 of 104

*includes "open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favor of the host State." Likewise, the Tecmed tribunal explained, "[u]nder international law, [direct expropriation occurs] where the use or enjoyment of benefits related thereto is exacted or interfered with . . . even where legal ownership over the assets in question is not affected. . . . " Thus, there is no requirement that Kazakhstan must have received title to Claimants' investments in order for this Tribunal to find that a direct expropriation occurred.*

*461. Kazakhstan admits that Claimants' legal ownership of KPM and TNG and their assets were substantially affected and transferred to State control. It explains that "[u]pon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist" and "the assets then had to be transferred to [State-owned KazMunaiGaz] so that they would be taken into trust management." That alone is sufficient to establish expropriation. By Kazakhstan's own case, Claimants lost their contracts and all the assets of KPM and TNG. That is precisely the kind of taking the Sempra tribunal, on which Kazakhstan relies, had in mind when it held that a direct expropriation requires that "at least some essential component of the property right has been transferred to a different beneficiary." (C-II ¶¶ 460 – 461).*

1128. It is beyond dispute that Kazakhstan directly expropriated Claimants' investments on 21-22 July 2010 by seizing Claimants' rights under the Subsoil Use Contracts and by seizing legal and physical control of the assets held by Claimants through KPM and TNG. The act of transferring Claimants' KPM and TNG Subsoil Use Contracts to KMG, as well as the subsoil area subject to those contracts was a compulsory transfer of title to property to the State. (C-I ¶¶ 253 – 254, CPHB 2 ¶ 196). As Respondent has confirmed, from the moment of termination, Claimants' contractual rights to ownership over the produced oil, gas, and condensate was terminated. Further, the MOG's and KMG's occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. Claimants' description of the transfer of legal title is as follows:

*256. Those seizures of legal title were personally instructed and overseen by the Kazakh Prime Minister, along with the Minister of Oil and Gas and the regional Governor, during their visit to Claimants' LPG plant to announce the seizures. The following day, Kazakhstan seized physical control of Claimants' investments. On July 22, 2010, Kazakhstan seized Claimants' offices, equipment, production, revenue, and other investments and operations, when a group of thirteen high-ranking officials from the MOG and KazMunaiGas arrived at Claimants' offices in Aktau, Kazakhstan. KazMunaiGas explained that government escrow accounts were being opened the same day, and "everything that has been extracted since [July] 22nd, extracted oil and payment for oil, gas and condensate - such income shall be deposited in the special account." The MOG's and KazMunaiGas' occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. (C-I ¶ 256).*



1129. Indeed, such an outright seizure of physical assets, contractual rights, and legal title are textbook examples of "*direct*" expropriation. Hence, it is indisputable that Kazakhstan directly expropriated Claimants' investments under Art. 13 ECT and international law in July 2010. (C-I ¶¶ 255 – 257; CPHB 2 ¶¶ 178 – 179).

### ii. Exercise of Regulatory Powers

1130. Respondent's argument that the unilateral termination of the Subsoil Use Contracts and its takeover of the companies was merely a normal exercise of its regulatory powers is fanciful, at best. (C-II ¶ 462).

> *464. Unilaterally terminating contracts and seizing rights and property are not the types of exercise of regulatory powers that normally exculpate a state from responsibility for harming investments protected by a treaty. Prima facie state measures comprising a lawful exercise of regulatory powers include taxation, trade restrictions, and/or measures of devaluation. But the outright taking of rights and property from an investor and transferring it to a State company — even if on a "trust management" basis until a third subsoil user can be found — is altogether different from regulating an interest of the state.*
>
> *463. Kazakhstan claims that its expropriatory acts were regulatory because they were in accordance with its Subsoil Law of 2010, the purpose of which was "to balance the host State's legitimate interest in furthering the wealth and well-being of its population and the investors' legitimate interest in making a return on its investment." Further, Kazakhstan contends that its regulatory powers under that Law require it to ensure that "investors [do not] take over the gas and oil production on a certain field forever but that production rights are tied to contracts which expire and have to be renegotiated regularly." (C-II ¶¶ 463 – 464).*

1131. Furthermore, the takeover was at odds with the interests allegedly expressed in the Subsoil Use Law. The takeover did not provide balance – like what may have been prior to 2008, when Claimants earned a return on their investments and paid taxes according to the Subsoil Use Contracts. After October 2008, there was no balance, as Respondent gradually took everything and left Claimants with nothing. The expropriation was aimed solely at expropriating the benefits of Claimants' production rights after Claimants had invested all the necessary time and money to make the fields productive. The July 2010 expropriation was largely a formality, formalizing Respondent's campaign of indirect expropriation. (C-II ¶¶ 465 – 468).

1132. In any event, Respondent cannot merely point to its domestic law to legalize its expropriation by way of the regulatory powers doctrine because Respondent would still be required to compensate Claimants for the taking. The Parties do not dispute that Respondent has paid no compensation to Claimants. (C-II ¶ 466).

1133. Respondent has been unable to point to any contemporaneously made allegation that would have supported its position. Instead, the justifications for the expropriation are based on snippets of witness testimony, which are contradicted by the contemporaneous evidence. (CPHB 2 ¶¶ 179 – 180).



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 35 of 104

1134. First, Minister Mynbayev's testimony at the October 2012 Hearing confirmed that the public policy grounds alleged do not justify the termination. He admitted that the inspections concluded that Claimants were in compliance with their subsoil use contract obligations. The reports also confirmed that Claimants exceeded their minimum work program for 1999 – 2009 by 6.6 times. For 2010, the MEMR noted that TNG had exceeded its contractual obligations by 3.4 times. (CPHB 2 ¶¶ 178 – 184). In any event, the alleged "*violations*" did not merit termination of the contracts. Three of the seven alleged violations against KPM were that it failed to satisfy financial obligations toward Kazakhstan. At the hearing, Claimants corrected the Respondent that KPM was accused of owing USD 114 thousand to Kazakhstan – not USD 114 million. KPM was accused of owing USD 10,000 for the liquidation and a vague amount in taxes, which KPM disputed and would not have been able to pay since the accounts were frozen. The other four grounds were completely baseless. These included that (a) KPM failed to train Kazakh specialists (at the hearing, Minister Mynbayev could not explain why this would be a valid ground for termination), (b) that KPM failed to provide information about compliance with the work program, (c) that it had breached obligations regarding the acquisition of goods, works, and services, and (d) that it operated a main pipeline without a license. The six allegations against TNG for Contract 210 were likewise meritless:

> *288. […] Like KPM, TNG explained that information regarding fulfillment of its work programs had been sent to Kazakhstan on multiple previous occasions. Kazakhstan also accused TNG of failing to provide annexes regarding the training of employees. TNG explained that those had been provided, along with its annual reports, and TNG provided them again in its July 19, 2010 response. TNG also explained that, like KPM, it had written to the Ministry of Oil and Gas to determine where to send its excess funds for training Kazakh specialists, which the Ministry ignored. In response to the claim that TNG owed some US $84,000 in historic costs, TNG explained and demonstrated that it properly paid its historic costs on a quarterly basis and that it had no arrears. TNG also explained, just as KPM had done, that it did not operate a main pipeline and that it had not breached any obligations for the acquisition of goods, works, or services.*
>
> *289. Amazingly, Kazakhstan also issued a notice of alleged violations with respect to TNG's Contract No. 302. Kazakhstan claimed that TNG had violated Contract No. 302 on five grounds: (i) the same alleged failure to provide information regarding its work program; (ii) the same supposed failure to provide annexes regarding employee training; (iii) the same contention that TNG had not trained Kazakh specialists; (iv) the false criminal allegation that TNG operated a main pipeline without a license; and (v) the same vague obligation that TNG had breached its obligations regarding the acquisition of goods, works, and services. (CPHB 1 ¶¶ 273 – 289, partially quoted).*

1135. Respondent's allegation that the Table 1-p in the English version of the MEMR inspection report, which was not provided due to a cut-off in printing, showed underperformance and mismanagement of the business is incorrect. The Russian version was provided and the missing English section does not provide any



evidence of non-compliance with contract obligations or Kazakh law. (CPHB 2 ¶¶ 184 – 185).

1136. Respondent's selective reliance on the PwC due diligence report is also unavailing. That report indicated that TNG had fallen behind on its 2008 and 2009 aspirational work programs. The MEMR also recognized that the company's aspirational working program was not the same as their minimum work obligations. Mr. Lungu admitted to no breach of the minimum work programmes, but was instead referring to the companies' own more aggressive annual work program. And this is consistent with Claimants' historic over-fulfillment of their minimum work requirements. (CPHB 2 ¶¶ 187 – 188).

1137. By summer 2009, TNG had reduced gas production in Tolkyn and this was noted by the MEMR – who did not find that the reduction amounted to a violation of contract or law. The reason for the reduction in production was due to the loss of Kemikal as a contractual partner (due to Respondent's harassment campaign) and the fact that the LPG Plant was not completed. In any event, the production slump was temporary and the production and sale of gas increased during winter 2009. (CPHB 2 ¶¶ 189 – 190).

1138. Even if there had been non-compliance with the minimum work obligations in 2009, it would be immaterial, since (i) MEMR expressly stated that there were no problems in the field as of February 2010 and that "*any falldown [or non-compliance] for certain years is compensated by the significant exceedings registered in the next or previous years*;" (ii) any failure to meet minimum work obligations would have been solely as a result of Kazakhstan's harassment and interference with Claimants' normal business operations; and (iii) any minimal "*falldown*" that may have existed was not sufficient to terminate the contracts, because it was not a reason the MOG gave for contract termination in July 2010. (CPHB 2 ¶¶ 191 – 193).

1139. Kazakhstan has provided no contemporaneous evidence that mass employee dismissals were a serious concern or that there was a risk of social tension. The opposite was confirmed in Mr. Calancea's, Mr. Condorachi's, and Mr. Ongarbayev's testimony. Payment was even made when the accounts were frozen. Upon the government's take over, 900 workers went to work for the state. (CPHB 2 ¶ 194).

1140. Kazakhstan's claims that Claimants were unwilling to cooperate with the State to cure contract breaches are misleading, given that Claimants had a mere 3 days to cure the alleged breaches and, as indicated above, by the time of the expropriation, Claimants had been appealing to multiple Government agencies since late 2008. Further attempts would have been futile. (CPHB 2 ¶ 195).

1141. Importantly, in Minister Mynbayev's testimony, it was revealed the allegations for breach of Contract 302 actually reveal that Kazakhstan considered that it had been extended, because otherwise it would have expired in March 2009. Furthermore, since it was an exploration contract, Claimants did not own or operate any transport pipelines. (CPHB 1 ¶¶ 290 – 292).

### 2. Arguments by Respondent



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 37 of 104

### a. Law on Expropriation

1142. Respondent agrees that expropriation is governed by Art. 13 ECT. (R-I ¶ 33.4).

1143. Respondent also highlights that expropriation needs to be differentiated from valid government activity. Respondent implies that, since no expropriation occurred, the four factors presented in Art. 13 ECT are irrelevant. Quoting *Marvin Feldman v. Mexico*, Respondent states that "*the essential determination is whether the actions of the Mexican government constitute an expropriation or nationalization, or are valid governmental activity. If there is no expropriatory action, factors a-d [i.e. (a) for a public purpose; (b) on a non-discriminatory basis; (c) in accordance with due process of law and article 1105(1); and (d) on payment of compensation] are of limited relevance, except to the extent that they have helped to differentiate between governmental acts that are expropriation and those that are not (...).*" (R-II ¶ 892).

1144. Respondent committed no due process violations with respect to the non-extension of Contract 302 and the 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. Claimants are incorrect to allege that Messrs. Mynbayev and Ongarbaev supported Claimants' interpretation of the 9 April 2009 letter. Mr. Ongarbaev never testified that MEMR had decided to extend Contract 302, but rather than the decision to recommend extension was made. (RPHB 2 ¶¶ 296 – 305). Minister Mynbayev's testimony was mistranslated:

> *304. When Minister Mynbaev explained that the decision of the Export Commission had only recommendatory character, he was translated to have said that it gave recommendations as to whether the subsoil user may count on the extension or not. However, the Russian verb **«paccgHTbIBaTb Ha»** translated into English as "count on" was used by the witness in the ordinary meaning of **«HageATbcA Ha»**, or English "hope for". And certainly, a decision of recommendatory nature may raise hopes but it cannot give rise to legitimate expectations. (RPHB 2 ¶ 304, emphasis in original).*

1145. Claimants created the irregularities in the title to TNG when they wrongly asserted that Respondent's pre-emptive rights did not apply to the Gheso – Terra Raf transfer. There were 8 transfers involving a majority interest in TNG, and the consequence of failure to obtain consent in any of those transfers is that none of the transfers involving Claimants' companies were completed. The belated consent to one transfer does not cure all previous failures to obtain consent. (RPHB 2 ¶¶ 272 – 281).

### b. Exhaustion of Remedies

1146. Respondent argues that Claimants' expropriation arguments are precluded by Claimants' failure to pursue available remedies in pursuance of their contractual claims or domestic legal claims. After every alleged action, KPM and TNG could have turned to the contractually agreed upon arbitral tribunals or to the Republic's domestic courts, and they chose not to do so. (R-I ¶ 33.6; R-II ¶ 865).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 38 of 104

1147. Turning first to Claimants' contractual claims and citing *Waste Management and Parkerings v. Lithuania*, Respondent presents that an expropriation of contractual rights is not perfected until available remedies to address the alleged contractual breach have been pursued. (R-I ¶¶ 33.7 – 33.10; R-II ¶¶ 865 - 866).

1148. Claimants' claims for actions making up the direct expropriation and many claims regarding the indirect expropriation are contractual in nature. These actions include (1) the refusal to prolong Contract 302, (2) the termination of Contract 302, (3) the Republic's alleged refusal to apply contractually agreed amortization rates leading to an assessment of back taxes and penalties of USD 69 million, (4) the alleged non-application of a contractually agreed exemption to the Crude Oil Export Tax, and (5) the alleged revocation of the Republic's purported approval of the transfer of TNG to Terra Raf. These claims each fail for the simple reason that in each and every case, the Claimants – alone or through TNG and KPM – could and should have pursued these claims by way of arbitration, as agreed in the Subsoil Use Contracts and Contract 302. To be clear: the present arbitration does not satisfy the contractual requirements. (R-I ¶ 33.17 – 33.22; R-I ¶ 33.22 represents that KPM and TNG would be suing).

1149. In respect of domestic law, so long as the state provides effective remedies for breaches of domestic law, an expropriation cannot occur so long as the investor's attempts at pursuing those remedies have not failed. Respondent cites *Generation Ukraine v. Ukraine* and *EnCana v. Ecuador* in support of this position and summarizes that there have been several reasons that lead tribunals consider that a failure to pursue available remedies is fatal to an expropriation claim:

*(a)* *Non-performance of a contract - and thus also termination of a contract - does not amount to an expropriation of the rights stemming from the contract as long as the loss of the right is not final, i.e. ultimately determined by the appropriate forum.*

*(b)* *An act of maladministration at the lowest level cannot amount to an expropriation. Otherwise, investors could invoke any minor mistake at the local level and bring investment arbitration claims.*

*(c)* *Tribunals generally are less knowledgeable about domestic law than domestic courts. Thus, in the absence of a valid reason for a failure to bring the claim to the appropriate forum, such failure puts into doubt that a right was actually taken from the investor. (R-I ¶¶ 33.10 – 33.15; quoting ¶ 33.15).*

1150. Claimants' other indirect expropriation claims could have and should have been addressed in domestic courts, which were open to Claimants. Claimants never pursued all available appeals against lower-instance decisions. (R-I ¶¶ 33.23 – 33.26; RPHB 2 ¶¶ 265 – 271). With regard to the prosecution of KPM, Claimants never exhausted the appeals system within the Republic, which stood open to Claimants. KPM missed the deadline to appeal. It was the Court's view that KPM had notice of the decision against it, since its senior management was present at the hearing. (R-II ¶ 635 – 638). This excludes the notion of expropriation. (R-I ¶ 34.9).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1151. Claimants' position that the contracts precluded them from submitting breaches of contract to domestic courts is untenable. Claimants base their allegation that Contracts 210 and 302 provided for arbitration before the SCC was based on an alleged footnote in Maiden Suleymenov's chapter in "*Oil and Gas Law in Kazakhstan*." Suleymenov, however, states the opposite of what Claimants allege. (R-II ¶¶ 870 – 873).

> *874. Article 28 (2) of Contract No. 305 does indeed refer the parties, i.e. KPM and the Republic, to the SCC. However, the requirement for KPM to refer disputes to the SCC does not mean that "KPM and TNG would first have to commence arbitration proceedings at the Stockholm Chamber of Commerce for another international tribunal to determine whether Kazakhstan's actions amount to a breach of contract under Kazakh law". Firstly, only KPM is a party to Contract No. 305. Secondly, Claimants seem to suggest that the tribunal in the SCC proceedings would need to render a declaratory award in favor of KPM and on that basis, Claimants could then pursue their claim under the ECT. This is clearly not the case. Instead, there would only be two proceedings if KPM were unsuccessful in the SCC arbitration and Claimants then decided to pursue their claim under the ECT nonetheless. This is not at all "absurd". (R-II ¶ 874, emphasis maintained).*

1152. Respondent states that, having shown that remedies were available, it is for Claimants to prove their assertion that resort to local remedies would have been futile. Claimants have not even alleged that recourse to arbitration for the acts that they consider to be "*indirect*" expropriation would have been futile. The Republic refutes Claimants' contention that arbitration as a remedy against termination of the contracts would have been futile from the outset. Furthermore, Claimants have not explained why a tribunal constituted pursuant to the Subsoil Use Contracts would not have addressed their complaints. Finally, regarding Claimants' final futility argument regarding maladministration, Claimants cannot base any argument on their allegation that the termination notices were a result of a notification by the President of the Republic, which they were not. (R-II ¶¶ 875 – 878).

1153. Claimants misrepresent the contents of the decision taken in the *Helnan* annulment. *Helnan* was not an easy, one-way decision, but it was a quite nuanced ruling, striking a balance between an investor's interest in pursuing treaty arbitration and a state's interest in not being held liable for decisions of low-ranking officials. In pertinent part, that Tribunal stated "*Of course, a claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention.*" (R-II ¶¶ 866 – 867).

1154. Claimants allege that the Republic has failed to differentiate between treaty claims and contract claims. In response, Respondent state that, "*[o]bviously, a claim under a treaty is something quite different to a claim under a contract. However, this in no way precludes the fact that available remedies have to be pursued.*" (R-II ¶ 869).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1155. In response to Claimants' fork-in-the-road argument, Respondent explains that TNG and KPM – as distinct parties from Claimants in this arbitration, needed to have pursued their own contractual remedies, prior to Claimants' initiation of proceedings. This would not have triggered the fork-in-the-road clause for Claimants, as was explicitly held in *CMS v. Argentina.*

### c. Indirect Expropriation

#### i. General Principles and Jurisprudence Regarding Indirect Expropriation

1156. Indirect expropriation describes the rare situation in which no transfer of title occurs but the host State's measures nonetheless are "*tantamount*" to expropriation or have an equivalent effect. (R-I ¶ 35.2). The main criterion for a finding of an indirect expropriation is the effect that a governmental measure has on the rights of the investor. As stated by the tribunal in *Tecmed v. Mexico*:

> *[...][M]easures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are* ***irreversible and permanent*** *and if the assets or rights subject to such measure have been affected in such a way that "...**any form of exploitation thereof...**" **has disappeared**; i.e.* ***the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed.*** *" (R-I ¶ 35.3, citing Tecmed v. Mexico, emphasis in original).*

1157. In order to succeed in their allegation that the inspections from October 2008 – March 2009 amounted to an expropriation, Claimants must demonstrate that the interference was in fact equivalent to an expropriation. Respondent argues that it did not interfere with the day-to-day management of KPM and TNG. Rather, the inspecting agencies made every effort to not disrupt the business of KPM and TNG, and Claimants have not proven that their day-to-day business was seriously disrupted, despite requests that they meet this burden of proof. Occasional and legitimate inspections and audits, clearly, do not prevent investors from directing the day-to-day operations of the investments, and Claimants have not proven otherwise. (R-I ¶¶ 35.21 – 35.23; R-II ¶¶ 907 - 910).

1158. In addition, at the Hearing on Jurisdiction and Liability, then-General Director of TNG, Mr. Cojin, stressed that the Financial Police "*could not disturb us too often because we were very busy with production [...].*" (RPHB 2 ¶ 23).

1159. It is noteworthy that the Claimants have not complained – and indeed cannot complain – that the laws in and of themselves were expropriatory. If the laws themselves are not expropriatory, only there misapplication can be. Hence, a showing of lawfulness under domestic law will preclude a notion of expropriation. (R-I ¶¶ 35.9 – 35.10, partially quoted).

1160. Finally, other tribunals have formulated further requirements for the State's right to regulate, including due process of law and non-discrimination. Respondent also cites *Azurix v. Argentina*, where the Tribunal held that no indirect expropriation had occurred because the impact on the investment due to the State's measures

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 41 of 104

was, in the aggregate, not attributable for the loss to the claimant, which still had control over the investment. Likewise, in *LG&E v. Argentina*, the tribunal found that there was no expropriation because the investor had not lost control over the investment. (R-II ¶¶ 901 – 903).

1161. Finally, the Republic's alleged reversal of its pre-emptive rights waiver (which Respondent denies) and its supposedly false announcement of irregularities did not deprive Claimants of their ability to dispose of their investment. (R-II ¶ 918). Respondent lawfully revoked its authorisation of the transfer from Gheso to Terra Raf. None of the alleged problems with Claimants' disposal of their assets were Respondent's doing. (R-II ¶ 919; RPHB 2 ¶ 272 – 281).

### ii. Right to Regulate

1162. Prominent scholars in international law, including Ian Brownlie, Prof. Sornarajah, and Prof. Böckstiegel also agree that legitimate regulatory actions do not constitute a compensable expropriation. Extensive practice in international investment arbitration has also shown that valid state regulation is non-compensable. (R-II ¶¶ 950 – 956).

1163. A determination of whether there has been an indirect expropriation, even in cases similar to *Tecmed*, is limited by a state's police powers. Losses incurred by the investor which are "*incidental to the normal operation of laws of the State*" may be non-compensable. (R-I ¶¶ 35.5 – 35.6).

1164. The sovereignty of the state over its natural resources includes the right to regulate, and this has been confirmed in the Preamble to the 1991 European Energy Charter, the 1975 Helsinki Declaration, as well as other treaties. The laws of the host state are highly relevant, and the investor is entitled to compensation only for those damages, actions, or omissions by state bodies or officials that are contrary to the host state's legislation. (R-II ¶¶ 922 – 926).

1165. Respondent explains that a regulatory action does not constitute compensable expropriation. The definition of expropriation as provided in the Convention that establishes the Multilateral Investment Guarantee Agency, to which 176 states are party, defines expropriation in general terms, excluding "*non-discriminatory measures of general application which the governments normally take for the purpose of regulating economic activities in their territories*." (R-I ¶¶ 927 – 932).

1166. This is confirmed by Art. 1 of the Protocol 1 to the European Convention of Human Rights (1952), which states that the "*enforcement of laws, necessary to control the use of property in accordance with the general interest cannot constitute a compensable taking*."

1167. The approach taken by the ECtHR should be of guidance to this Tribunal. Respondent presents cases under the ECtHR where compulsory alienation of property, the imposition of a duty, or the withdrawal of a license, tax sanctions for violations of tax legislation, was found to be non-expropriatory. (R-I ¶¶ 933 – 940). The case practice of the ECtHR is relevant here, as that Court hears investment claims and its cases demonstrate that a deprivation of property in the form of fines, taxes, etc., does not constitute an expropriation and does not require



compensation. States are given a wide margin of discretion in determining the public interest and the measures required in the pursuance of these interests. The ECtHR first considers whether the measures were lawful under the laws of the host state and evaluates whether the law was sufficiently available, specified, and predictable. The ECtHR emphasizes throughout that its competence for assessment of the lawfulness of state authorities' actions is limited. Second, the ECtHR assesses measures in respect of their proportionality, taking into account the wrongfulness of the applicant's conduct, the interests of the host state and the investor, the requirements of public interests, and the requirements of protection of fundamental freedoms. (R-II ¶¶ 940 – 949).

1168. All of the measures at issue concerned the lawful enforcement of laws that are necessary to regulate the hazardous and strategically important exploration and extraction of oil and gas. (R-II ¶¶ 904 – 905). Contrary to Claimants' assertion, there was no "*campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG.*" Rather, the measures at issue were legitimate and the state was entitled to regulate. (R-I ¶¶ 35.15, 35.20; R-II ¶ 906).

### iii.    Acts Allegedly Amounting to An Indirect Expropriation

1169. Claimants incredibly and wildly assert that various alleged treaty breaches, slowly and quickly, individually and/or in combination, breached the ECT. Respondent explains that Claimants have argued that the following actions individually and cumulatively amount to an indirect expropriation of Claimants' rights in KPM and TNG: (1) the Republic's refusal to prolong the exploration rights under Contract 302, (2) the assessment of back transfer price taxes and back taxes on corporate income, (3) the alleged revocation of the purported approval of the transfer of TNG's shares to Terra Raf, (4) the dispute about the application of the Crude Oil Export Tax, (5) the classification of KPM's and TNG's pipelines as trunk pipelines, (6) the ensuing trial and conviction of Mr. Cornegruta and the verdict against KPM, and (7) the seizure orders against KPM and TNG. (R-I ¶ 35.11). The assertions have changed so frequently that they are not credible. (RPHB 2 ¶¶ 419 – 423).

1170. Respondent also notes that "*Claimants have clandestinely dropped all relevant tax measures from the list of alleged expropriations and only mention them in a footnote in this section in which they claim that they had been deprived of their ability to dispose of the investment. Apparently, Claimants have come to the conclusion that the tax measures cannot constitute an expropriation and quite rightly so. The taxation measures do not fall within the jurisdiction of the Tribunal. In any event, the tax measures do not constitute expropriations under Article 13 ECT.*" Further as has been demonstrated, the Tax Committee's assessment of corporate back taxes was legitimate, the 2008 crude oil export duties were lawful and were not paid by TNG, and the 2009 duties were withdrawn before either KPM or TNG made any payment. Respondent further states that "*the taxation measures were not expropriatory because neither was an 'acquired right' taken from Claimants nor could the tax measures be said to 'frustrate the complete operation of [Claimants'] activities in [Kazakhstan].*'" (R-II ¶ 920 - 921).



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 43 of 104

1171. Respondent's arguments and points on indirect expropriation are best taken from its own words:

> *899. The Republic did not indirectly expropriate Claimants. Even Claimants do not seem to be certain which measure is supposed to have indirectly expropriated them when they refer to "expropriatory conduct over the October 2008-July 2010 period". They later enumerate four allegedly expropriatory measures taken by the Republic but remain very elusive as to whether each of these measures is supposed to have constituted an expropriation or whether they collectively expropriated Claimants: Firstly, the Republic allegedly interfered with the day-to-day management of KPM and TNG when the Financial Police "commandeered" their offices from October 2008 - March 2009, secondly, the Republic allegedly deprived Claimants of their ability to manage their companies by arresting KPM's General Director in April 2009 and "hunting" other KPM and TNG senior officials, thirdly, the cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 supposedly deprived Claimants of their ability to prove their reserves and finally, the Republic's alleged reversal of its pre-emptive rights waiver and its supposedly false announcement of irregularities are said to have deprived Claimants of their ability to dispose of their investment.*
>
> *900. Claimants mischaracterise the Republic's actions in each of the above cases. Ironically, in the first two cases, the Republic's actions related to the need to investigate and later to punish the Claimants own misdeed or that of KPM and TNG and their employees. In each case, all measures taken by the Republic were legitimate and a legal applications of Kazakh law which were not expropriatory in nature. In any event, none of the measures even came close to the effect of a taking. (R-II ¶¶ 899 – 900; see also R-I ¶¶ 35.11 – 35.12 listing Claimants' claims).*

1172. Claimants operated trunk pipelines without a license, at least since 2002. Mr. Cornegruta wrote to the MEMR in May 2008 to apply for a trunk pipeline, but the application was incomplete. The investigation that led to this conclusion demonstrates clearly that nothing about the criminal charges against Mr. Cornegruta was premeditated – the relevant agencies (MEMR and the Financial Police) operated independently of one another and, on 15 December 2008, the Financial Police opened a criminal investigation based on reasonable suspicions that KPM was operating a trunk pipeline without a license. This investigation was based on the following evidence: (1) letters from KPM and TNG to the MEMR requesting the re-issue of a licence, (2) a letter from KPM to ARNM requesting the re-issue of a licence, (3) a geological committee report, (4) a letter from ARNM confirming that KPM and TNG held no licenses for trunk pipelines, (5) an expert review based on a similar pipeline, and (6) the design documentation for the pipelines. Witnesses were interviewed and there was a physical examination of the pipeline. Mr. Rakhimov of the Financial Police finally obtained an expert opinion from Mr. Baymaganbetov on 13 February 2009 about whether the pipelines were, indeed, trunk. Mr. Baymaganbetov reviewed four reports provided to him by the Financial Police and, although he was free to seek out other opinions, he did not. Claimants' four expert opinions were not shown to him because their independence could not be verified and they risked compromising his independence. Claimants' reliance on 5 opinions from other governmental agencies fared just as well, since



Claimants filed to provide the scope of the request for the issuance of those opinions, the agencies may have been involved in the design or other aspects of the pipeline and, most importantly, none of them were appointed in accordance with Art. 243 CPC. (RPHB 2 ¶¶ 151 – 207).

1173. To repeat from above, the conclusion that the at-issue pipelines were indeed trunk pipelines is both legally and factually correct. The Parties' witnesses agreed on the legal definition of a trunk pipeline, which is provided in the Law on Oil. Importantly, the Parties have agreed that the relevant section of pipeline extends beyond the Contract Area, for which KPM never had a license. Claimants' allegation that they had all of the licenses that they needed can only be true if they demonstrate that they have only field pipelines – a type of pipeline that cannot go beyond the Contract Area. Contrary to Prof. Suleymenov's opinion, the classification of a pipeline is not a matter of industry analysis or the visual size of the pipeline. The Parties' experts agree that it is a question of law. Since "*(i) the KPM Pipeline extends beyond the Contract Area (i.e. it is not a field / contractors pipeline), (ii) third party oil as well as commercial oil is carried by the pipeline, (iii) that the oil is commercial, and (iv) that the oil is transported to places of transshipment, transport, processing or consumption*", the pipeline is a trunk pipeline. Claimants' new assertion that the Law on Oil excludes pipelines that are involved in the single technological process of oil and gas production from the classification as "*main pipelines*" is incorrect and is based on a mishearing of Mr. Romanosov's testimony. (RPHB 2 ¶¶ 219 – 236).

1174. It is to be noted that Claimants always had the duty to obtain a license for operation of a trunk pipelines before operating one. Claimants knew of the licensing laws and it would have been easy for them to seek clarification if needed. Their most recent application was incomplete and Claimants chose not to procure a license. (RPHB 2 ¶¶ 208 – 218).

1175. Penal measures following the violation of a criminal statute cannot give rise to a compensatory taking. Mr. Cornegruta was prosecuted and convicted in accordance with due process and Kazakh law. His conviction cannot constitute an indirect expropriation, and Claimants have not demonstrated how his absence affected the "*promoting, financing, and managing*" of the investment. In this regard, the *Biloune* case, cited by Claimants, is easily distinguishable from this matter. There, the claimant (Biloune, the investor) had a central role in promoting, financing, and managing the investment, and was expulsed from the host state. Here, however, Claimants have not even attempted to show to what extent Mr. Cornegruta had a central role, or how his absence made it impossible to pursue KPM's investment activity. Claimants have only made the less forceful assertion, that he was only an employee. This case is, thus, clearly distinguishable from *Biloune*. Respondent rejects Claimants' assertion that it was "*hunting*" KPM and TNG senior officials. (R-I ¶¶ 35.17 – 35.18; R-II ¶¶ 911 – 913).

1176. Kazakh law uncontestedly provides for the recovery of income obtained by means of illegal activity. Such recovery is necessary to address unjust enrichment obtained by criminal means. As KPM earned income from its general manager's criminal behaviour, namely the illegal operation of a main pipeline without a license, it was the natural consequence that the court ordered the recovery of this income. Kazakh law foresees recovery of illegal income from a company, even

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

where the company is not named as a party in the criminal case, and there is no requirement that the Republic bring a civil claim in order to recover this unlawful income. The amount of illegal income received in the course of illegal entrepreneurial activity is unjust enrichment. (RPHB 2 ¶¶ 243 – 261).

1177. Claimants' criticism that the recovery was disproportionate misses the mark: the goal is to address and negate the unjust enrichment that results from the crime, not to punish the crime. The unjust enrichment is not limited to the hypothetical income for providing crude oil transportation services. Squire Sanders assessed the amount subject to recover to be reasonably over USD 80,000,000. (RPHB 2 ¶¶ 262 – 264).

1178. In response to cases cited by Claimants, Respondent states as follows:

> *914. In Benvenuti & Bonfant v. Congo the Tribunal held that the investor had been expropriated because the army had seized the premises of a bottling factory. The only relevance of the fact that the manager had fled the country due to the risk of criminal proceedings was that this was one of the arguments to refute Congo's allegation that the investor could return anytime to take repossession of his property.*
>
> *915. Likewise, the facts in Biwater Gauff (Tanzania) Ltd. v. Tanzania bear no resemblance to the case at hand. In this case, the investor's senior management was forcibly deported from Tanzania while simultaneously the premises of the investor were seized. This does not compare to the lawful prosecution and conviction of Mr. Cornegruta. (R-II ¶¶ 914 – 915).*

1179. In response to Claimants' allegation that they were deprived of the ability to prove reserves, Respondent states as follows:

> *916. The cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 did not deprive Claimants of the ability to prove reserves.*
>
> *917. The Republic has demonstrated that no such harassment campaign existed. The non-extension of Contract 302 cannot constitute an indirect expropriation. It is telling that Claimants' consider the non-extension to be both a direct and an indirect expropriation when in fact it does not constitute a taking at all. Contract 302 expired on 30 March 2009. Vain hope to prolong a contract cannot constitute a taking and as demonstrated above, Claimants did not obtain a right to prolong the contract. (R-II ¶¶ 916 – 917).*

1180. The 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. In any event, TNG's successful application for a renewal of its license would have been a pre-requisite to such an extension. The subsoil use contract and the license for subsoil use are different documents with different natures. The fact that the MEMR is both the Competent Authority and the Licensing Authority did not abolish the need to amend existing licenses, nor did it change the procedure for such amendments. Mr. Suleymenov's last minute expert submission provides no support for Claimants' unfounded allegation that the MEMR agreed to extend Contract 302 and to execute an extension. As explained



by Prof. Ilyassova, the decision of the Expert Commission to recommend extension is part of the Competent Authority's internal process and cannot be equated with a decision to actually extend, nor can the letter of 9 April 2009, since it was not ordered by the Minister. (RPHB 2 ¶¶ 292 – 305).

1181. In addition, Claimants would not have been able to prove reserves, as they allege. Even if the Contract 302 had been extended, TNG would have been bound by the working program of 14 October 2008 and the draft addendum of 30 April 2009, which only contained exploratory work on Munaibay and Bahyt. Neither contained a reference to the Interoil Reef. Claimants' allegation that TNG would not have been bound by these working programmes is contrary to the testimony of their own witnesses and their opening statement. These were not "*minimum*" working programs, but were working programs. Addendum 5 to contract 302, Art. 3.3 does not contain the word "*minimum*" – the relevant Law on Oil and the Subsoil Law in force from October 2008 to March 2011 and the terms of Contract 302 would have required changes to the work programme if the subsoil user intended to go beyond the agreed working program. (RPHB 2 ¶¶ 319 – 328).

1182. The non-extension of Contract 302 made no interference with Claimants' ability to use and dispose of their investments. The subsoil belongs to the State and, as of 30 March 2009, Claimants lost all right to that area because they failed to declare a commercial discovery. (RPHB 2 ¶¶ 329 – 330).

1183. The tribunal in *LG&E* respected the State's power to adopt measures having social or general welfare purposes. That tribunal stated that, such a measure must be accepted without the imposition of liability, except where such a measure was obviously disproportionate. The tribunal in *Tecmed* considered the issue of proportionality:

> *[T]he Arbitral Tribunal will consider, in order to determine if they are to be characterized as expropriatory,* ***whether such actions or measures are proportional*** *to the public interest presumably protected thereby and to the protection legally granted to investments, taking into account that the significance of such impact has a key role upon deciding the proportionality. Although the analysis starts at the* ***due deference*** *owing to the State when defining the issues that affect its public policy or the interests of society as a whole, as well as the actions that will be implemented to protect such values, such situation does not prevent the Arbitral Tribunal, without thereby questioning such due deference, from examining the actions of the State in light of [the expropriation provision of the BIT] to determine whether such measures are reasonable with respect to their goals, the deprivation of economic rights and the legitimate expectations of who suffered such deprivation.* ***There must be a reasonable relationship of proportionality between the charge or weight imposed to the foreign investor and the aim sought to be realized by any expropriatory measure.*** *(R-I ¶¶ 35.7 – 35.8, partially quoted, emphasis maintained).*

1184. Respondent reminds the Tribunal that KPM and TNG repeatedly broke Kazakh law by making incorrect tax assessments and operating a trunk pipeline without a license. The audit requests were reasonable given the strong suspicions of wrongdoing. Respondent states that it was Claimants' own fault that the authorities started investigations. (R-I ¶ 35.14).



## d. Direct Expropriation

### i. Transfer of Title

1185. A direct expropriation requires a transfer of title. Here, Claimants have conceded that no transfer of title took place. Since there was no transfer of title, no direct expropriation occurred. (R-I ¶¶ 34.2 – 34.3; R-II ¶¶ 879 – 881, 888 – 890).

1186. Respondent at no point in time expropriated Claimants' assets. Given the numerous violations of the Subsoil Use Contracts, Respondent had no choice but to terminate the contracts and to transfer the contractual territory of KPM and TNG into trust management. Proceeds from the operation of the fields are held in an escrow account. (RPHB 2 ¶¶ 415 – 417).

1187. Respondent explains how the transfer of KPM and TNG to state custody did not constitute a transfer of title and, therefore, was not an expropriation:

> *34.5 [...] Upon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist. Under Article 72(10) of the Subsoil Law (Exhibit R-152) and due to the circumstances set out in detail above, the assets then had to be transferred to KMG so that they would be taken into trust management.*
>
> *34.6 As explained above, and unlike in certain common law national jurisdictions, this does not entail any transfer of the title of the assets, although, under the provisions of the law, the trust manager is entitled to possess and use the facilities and equipment. This arrangement is set up so as to enable continuing production.*
>
> *34.7 Therefore, there is no transfer of title envisaged under article 72(10) of the Subsoil Law. Moreover, the subsoil user has the opportunity to have its contract reinstate. Where this is not possible or desired, the contract can be transferred to a new subsoil user with the assets. At this point, the payment of the subsoil users' costs and its property must be provided for in the new agreement.*
>
> *34.8 This does not amount to an expropriation. Rather, an inherent limitation in the rights held by KPM and TNG came to bear. Moreover, there are opportunities for compensation within provided for within the mechanism. (R-I ¶¶ 34.5 – 34.8).*

1188. Respondent presents that Claimants have mis-cited *Telnor v. Hungary*, which considered not a direct expropriation, but a creeping expropriation. Likewise, Claimants' citation of *Metalclad* is also misleading, as that tribunal did not differentiate between direct and indirect expropriation. Instead, the tribunal in *Metalclad* enumerated several actions that could amount to an expropriation – direct and indirect. It, therefore, cannot be relied upon to identify the requirements for a direct expropriation.

1189. Respondent argues that *Tecmed* concerns indirect *de facto* expropriation and accuses Claimants of inserting the quote "*direct expropriation*" in brackets

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

throughout their quotation of that text, and states that they, instead, should have inserted the phrase "*indirect expropriation*" to correctly quote the tribunal in that case. (R-II ¶¶ 882 – 887). Finally, the *Santa Elena* tribunal merely explained the general principles of expropriation and – without differentiating between direct and indirect expropriation – affirmed that in some cases (indirect expropriation cases), expropriation can occur without a formal transfer of title. (R-I ¶ 34.4).

1190. With respect to the LPG Plant, it is even more obvious that there was no expropriation since TNG still owns the plant and the plant was not transferred into trust management. (RPHB 2 ¶ 418).

### ii. Exercise of Regulatory Power

1191. International law recognizes that, even in cases involving a transfer of title, there is not always an "*expropriation.*" States, in an exercise of their sovereignty, can take measures without being obliged to compensate investors, as explained by the *S.D. Myers* tribunal. Expropriatory acts must be differentiated from valid governmental activity. Here, the termination of the Subsoil Use Contracts, the non-extension of Contract 302, and the transfer to trust management of KPM's and TNG's assets were dictated by and consistent with Kazakh law and, thus, were a legitimate exertion of the Republic's regulatory power. (R-I ¶¶ 34.10 – 34.13; R-II ¶¶ 891 – 892). The assets have been protected and the monies held in escrow, where they will remain until a new subsoil user is found. (RPHB 2 ¶ 373).

1192. First, the non-extension of Contract 302 cannot constitute an expropriation, as it did not take anything from the investor. Second, the termination of the Subsoil Use Contracts cannot be a direct expropriation, as it was mandated by Kazakh law. The same is true for the transfer of the contractual territory into trust management – an action that was a legal consequence of KPM's and TNG's misconduct. (R-II ¶¶ 893 – 895; RPHB 2 ¶¶ 329 – 330).

1193. Claimants explain that an action that is legal under local law cannot constitute a treaty breach unless that law itself breaches the treaty. Claimants have not argued otherwise and, thus, concede that the relevant Kazakh laws are in accordance with international law. This is true, despite Claimants' arguments that the Republic cannot rely on domestic law to legalize the taking because the Republic must still provide compensation. As explained, neither the Republic nor any other state entity ever owned the contractual territories. Any compensation will be in the contract entered into with the new subsoil user that would compensate KPM and TNG. (R-II ¶¶ 896 – 897).

1194. Finally, Respondent states that any claim for expropriation must fail, because Claimants' own actions and external events were relevant in the demise of the companies. (R-II ¶ 898).

1195. Claimants were in continuing and serious breach of Contracts 210 and 305 as a result of their operation of a trunk pipeline without a license, their breaches of tax laws, their failure to comply with KPM's and TNG's minimum working programs, among others. Claimants have not disputed that KPM and TNG were in violation of labor laws in early 2010. In addition, Claimants' treatment of the fields can accurately be described as "*barbaric.*" The actual work promised under the



working programs – like the drilling of wells - was not carried out, despite alleged financial investment in KPM and TNG (investment which, nevertheless, was insufficient from 2007 – 2009). Claimants' arguments that KPM and TNG were given "*a clean bill of health*" are without merit. Minister Mynbayev's testimony expressly confirmed that prior to the June 2010 inspections, Claimants were in breach. He also stated that, by July 2010, the situation was no longer tolerable. (RPHB 2 ¶¶ 339 – 349).

1196. The Republic, due to the breaches of environmental law, reports of Claimants' failure to pay salaries and reports of mass employee dismissals, and the poor conditions in the field, was obliged if not entitled to carry out inspections of KPM and TNG in June and July 2010. These inspections revealed additional serious violations of Contracts 210 and 305 by KPM and TNG. (RPHB 2 ¶¶ 350 – 352).

1197. The severity of the breaches of Contracts 210 and 305 left the Republic with no option but to act and serve notices of breach. Although they had previously been given opportunities to cure, their responses to the 14 July 2010 notice for breach on 19 July 2010 was inadequate and focused only on procedural reasons to challenge termination. For example, Claimants claimed "*force majeur*" for their failure to make payments related to KPM and TNG's historical costs, KPM's contributions to the Kazakh liquidation fund, and KPM's tax obligations due to the fact that KPM's accounts were frozen as a result of the execution of the recovery order for the operation of a pipeline without a license. The execution orders were not *force majeur* and, allegedly, they did not (as Claimants state) prevent Claimants from paying employees. Importantly – Squire Sanders also raised the issue of payment of historical costs by KPM and TNG, as well as other failures to meet obligations regarding the acquisition of goods, works, and services, in its June 2009 report. (RPHB 2 ¶¶ 353 – 358).

1198. In addition, Claimants neglected and mistreated the investment, having effectively abandoned it. There were reports of salaries not being paid, complaints about KPM and TNG's treatment of the fields, and reports that production had stopped. Claimants provide not support for their argument that these were "*post hoc*" justification for termination. There were quite clearly social problems and issues that were being experienced in June and July 2010, due to KPM and TNG's failure to pay wages. Claimants have misquoted Mr. Ongarbaev that there was no risk of unemployment, since employees would just be re-hired under trust management. Claimants quote GCA for support of the statement that the fields were in good condition, but this is inaccurate – GCA only referred to the facilities being "*adequate for the region.*" (RPHB 2 ¶¶ 359 – 366).

1199. The Republic terminated Contracts 210 and 305 in accordance with the law. The Republic fully complied with Section 38 of the Law of Private Business when conducting inspections and Claimants always had the right to appeal the inspections reports. They failed to appeal within the permitted three days. Claimants' attempts to contest the very different Notices of Breach served under Subsoil Law 2010 cannot be said to be an appeal of the Acts of Inspection pursuant to the Law of Private Business. In any event, contrary to Claimants' position, a breach of the Law of Private Business would not result in a breach of Art. 72 of the Subsoil Law 2010, pursuant to which the Contracts were terminated. The two laws are different and there were grounds for termination arising from the monitoring of

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

KPM and TNG as well as for the inspections in June and July 2010. (RPHB 2 ¶¶ 367 – 368).

1200. Claimants' arguments, based on Mr. Suleymenov's testimony that there was a conspiracy behind the timing of the termination and the date the Subsoil Law 2010 was passed have not been proven. The law was heavily debated and took almost two years to pass. Mr. Suleymenov's opinion is irrelevant in this arbitration. (RPHB 2 ¶ 369).

1201. Claimants were given enough time to respond to the Notices of Breach and were aware of the many breaches set out therein. They participated in the July 2010 audit and were regularly involved in findings. The limited period for response was also justified by the breaches of monetary obligations and the requirement to provide information. Since production had nearly stopped, there was little chance of employees being paid, as senior managers left the country. Delay was not an option for the Republic. Claimants, however, made no attempt to seek an extension to the deadline and responded – insufficiently – within the period. (RPHB 2 ¶¶ 371 – 372).

### 3. The Tribunal

1202. It is the Tribunal's task to decide on the relief sought by Claimants, as recorded above in a separate chapter of this Award:

- *A declaration that Kazakhstan has violated the ECT and international law with respect to Claimants' investments;*

- *Compensation to Claimants for all damages they have suffered, as set forth in Claimants' Statement of Claim and Reply on Quantum and as further updated at the January 2013 Hearing and in Claimants' First Post-Hearing Brief, corresponding to the following amounts:*

1203. Regarding the first relief sought and repeated above, a declaration that Respondent has violated the ECT is possible already after a breach of the FET obligation has been found by the Tribunal.

1204. Regarding the second relief sought repeated above, if such damages are granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1205. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 13 by expropriation, if there are any further damages sought by Claimants not covered by the FET breach.

1206. As will be seen later in the chapters of this Award on Causation and Quantum, the FET breach has caused a taking of Claimants' investment, resulting in respective damages.



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 51 of 104

1207. In view of this, there is no need to examine whether the same results also from a breach of Art. 13 ECT.

1208. However, as will be seen and addressed in the chapter of this Award on Quantum, Art. 13 ECT provides some guidance regarding the calculation of damages.

## J.III. Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT)

### 1. Arguments by Claimants

1209. Article 10(12) ECT obliges each Contracting Party to "*ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.*" This obligation is distinct from customary international law, and is distinct but similar to the concept of denial of justice. Article 10(12) ECT was designed "*to prevent the travesties of justice that occurred in this case, by ensuring that an investor has an effective means to enforce its legal rights. Claimants had no ability to enforce their legal rights, and Kazakhstan is indisputably liable under the ECT for denying them the ability to do so.*" (C-I ¶¶ 373 – 374, 379, partially quoted).

1210. The Tribunal in the *Chevron v. Ecuador* case stated that "*a failure of domestic courts to enforce rights 'effectively' will constitute a violation*" of the guarantee to provide effective means to assert claims and enforce rights. (C-I ¶¶ 373 – 374; C-II ¶ 548, partially quoted)

1211. The tribunal in *Chevron* also interpreted the "*effective means*" obligation as allowing the tribunal to examine the state's conduct, in addition to the system of laws and institutions in place. Claimants state that, in this way, the Tribunal is obliged to reassess the criminal case against Mr. Cornegruta. (C-I ¶¶ 375 – 376). Claimants explain as follows:

> *377. In the present case, the Tribunal need not assess the criminal case against Mr. Cornegruta and KPM de novo to determine that the Kazakh court issued decisions against Claimants that a "fair and impartial" Kazakh judge would never have reached. A fair and impartial judge would not have convicted KPM, which was not even named as a party in the criminal proceeding and could not have been, since criminal charges may not be brought against a company under Kazakh law. It would not have convicted KPM and Mr. Cornegruta when KPM had never operated a "main" pipeline, as acknowledged by the State itself in MEMR reports, and when Mr. Cornegruta was not an "entrepreneur" under Kazakh law but merely an employee of KPM. Additionally, a fair and impartial judge would have considered all the evidence before it. The Kazakh judge disregarded multiple expert reports from Claimants and based his decision solely on an unfounded and conclusory opinion from a Ministry of Justice employee.*
>
> *378. Further, a fair and impartial judge would have given KPM the opportunity to defend itself. It would not have confirmed the convictions on appeal and*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*effectively prevented KPM from exercising its right to appeal. (C-I ¶¶ 377 - 378).*

*551. Finally, Kazakhstan's assertion that "it was legally correct and not to KPM's disadvantage that it was not a party to the [criminal] proceedings" is breathtaking. Claimants do not deny that "a measure of deference" is to be "afforded to the domestic justice system." However, Kazakhstan has far exceeded whatever "measure of deference" may exist under international law, as evidenced, inter alia, by its attempts to justify the findings of its courts ex post facto in the present arbitration. [...].* (C-II ¶ 551).

1212. Kazakhstan's misconduct makes it liable to Claimants under the ECT and international law as Respondent has violated nearly every protection afforded foreign investors under the ECT and international law. (C-I ¶¶ 380 – 383).

1213. Claimants state that Respondent is mistaken in its contention that Claimants cannot invoke Art. 10(12) ECT with regard to the Subsoil Use Contracts because they largely did not turn to courts or contractually agreed arbitral tribunals. First, a foreign investor faced with a plethora of wrongful measures by a host state has the right to choose the forum with the more comprehensive jurisdiction. Using the umbrella clause, international arbitration under the ECT is the appropriate choice since it covers both disputes relating to investments and contractual claims. Moreover, the forum selection clauses in the Subsoil Use Contracts refer to the Arbitration Institute of the SCC. Second, Claimants have made a *bona fide* attempt to resolve their dispute before Kazakh courts, and this has been acknowledged by Respondent. As to appeals, Claimants were either denied the possibility of appeal or were precluded from pursuing their pending law suits, at the latest by the July 2010 seizure of their investments. Thus, Claimants utilized the means made available to them. (C-II ¶¶ 548 – 550).

1214. At the Hearing on Liability, Mr. Condorachi explained Claimants' attempts to complain about the investigation, prosecution, and conviction of Mr. Cornegruta and KPM. Respondent's witnesses also confirmed that there were at least 8 complaints from KPM and TNG, and one more from Terra Raf and Ascom. Respondent's argument that KPM could have appealed, but failed to, is disingenuous since KPM was not a party and, therefore, could not appeal and, second, the Aktau City Court refused to provide KPM a certified copy of the judgment to enable them to appeal. The evidence even shows that KPM challenged the court's refusal to send KPM this copy. (CPHB 1 ¶¶ 205 – 210). Kazakhstan's conduct in relation to the trial and the appeal violate its obligations under the ECT to provide effective means to assert claims and enforce rights. (CPHB 2 ¶¶ 97 – 114).

1215. During the hearing, the judge refused to entertain Mr. Cornegruta's defense counsel's motion for a postponement in order to examine Mr. Baymaganbetov's evidence. The trial transcripts also establish that the Financial Police were involved in the prosecution and influenced the trial process. (CPHB 1 ¶¶ 201 – 204).

### 2. Arguments by Respondent



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 53 of 104

1216. The text of Art. 10(12) ECT unambiguously establishes a legislative obligation to provide a fair and efficient system of justice, and does not encompass isolated failures of the judicial system in individual cases. (R-II ¶¶ 1108 – 1114, partially quoted).

1217. The availability of remedies hinders any claim if these remedies have not been pursued. Claimants, therefore, cannot bring a claim under Art. 10(12) ECT because they have failed to pursue remedies or exhaust appeals. As confirmed by other investment tribunals, the duty to exhaust remedies needs to be interpreted more strictly because of its specific meaning, which creates a legislative obligation to provide a fair and efficient system of justice. A high likelihood of success of these remedies is not required in order to expect a claimant to attempt them. (R-I ¶¶ 43.2 – 43.4, R-II ¶¶ 1125 – 1129, partially quoted; RPHB 2).

1218. Claimants conceded that they have not exhausted all remedies or appeals made available to them by Kazakh law. They have offered no evidence that pursuing such would have been ineffective or futile. With respect to their contract claims, they have not explained why they did not resort to the international arbitration proceedings as required in the Subsoil Use Contracts and in Contract 302. Contrary to their allegation, they did not have the right to choose the forum with the more comprehensive jurisdiction. The contract between the investor and the host state is the *lex specialis*, compared with the treaty between the two host states. Foreign investors must comply with exclusive forum selection clauses before they may rely on investment treaty guarantees. (R-I ¶¶ 40.1 – 40.4; R-II ¶¶ 1130 – 1134; RPHB 2 ¶ 374).

1219. Claimants did not appeal the Acts of Inspection of 15 July within the 3 days allowed as they could have under the Law of Private Business 2009. They, thus, have no basis to allege that they were denied the right to appeal the inspection reports. Claimants' contesting of the Notices of Breach served under the Subsoil Law 2010 are not appeals of the very different Acts of Inspection. In any event, Claimants were given enough time to respond to the Notices of Breach, and in any event, such allegations had been raised before. Claimants made no attempt to see an extension of either deadline. (RPHB 2 ¶¶ 368 – 372).

1220. Turning to Claimants' *Chevron* arguments, Respondent states that Claimants base their contention that *Chevron* is even applicable in this case on the allegation that case involved a similarly worded provision. Respondent compares these texts as follows (R-II ¶¶ 1110 – 1112, partially quoted, emphasis maintained):

> *1111. The relevant provision in the BIT between the USA and Ecuador, Article II(7), reads:*
>
> *Each Party **shall provide effective means** of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations. (emphasis added)*
>
> *1112. In contrast, Article 10(12) of the ECT stipulates explicitly:*
>
> *Each Contracting Party **shall ensure that its domestic law provides effective means** for the assertion of claims and the enforcement of rights*



*with respect to Investments, investment agreements, and investment authorizations.*

1221. That these provisions involve different requirements was confirmed by the *Amto v. Ukraine* tribunal, which clarified that the prerequisites of Art. 10(12) ECT are fulfilled if the foreign investor contends and proves legislative failures by the host state to provide a fair and efficient system of justice. (R-II ¶ 1115). This meaning of Art. 10(12) ECT is in accordance with the decision of the *Chevron* tribunal. Further still, even where tribunals have applied *Chevron* and considered Article II(7) of the BIT between the USA and Ecuador, tribunals have paid special attention to the legislative failures of a host state to provide a fair and efficient system of justice. (R-II ¶¶ 1116 – 1118).

1222. Claimants have neither contended nor proven that there was a legislative failure to provide a fair and efficient justice system, which is Claimants' responsibility under the *onus probandi* rule. With respect to the prerequisites carved out by the tribunal in *Amto v. Ukraine*, Claimants are required to contend and prove in particular that there was no legislation for the recognition and enforcement of property and contractual rights or that this legislation was not made in accordance with the constitution or was not publicly available or that there were no secondary rules of procedure so that the principles and objectives of the legislation could not be translated by Claimants into effective action in the domestic tribunals. (R-II ¶ 1119).

1223. Indeed, even if Art. 10(12) ECT extended to individual failures of the judicial system, Claimants would be required to prove procedural irregularity and interference, which they have not. With respect to the criminal proceedings against Mr. Cornegruta on behalf of KPM, Claimants' objection is that the proceedings were wrong in law. The Tribunal, however, is not a court of appeal for decisions of Kazakh courts. (R-II ¶¶ 1119 – 1123, 1135).

*1135. A tribunal's review of the host State's legislation is limited. This follows a fortiori from the fact, that even in cases which do not involve Article 10(12) of the ECT tribunals have concluded that their review of the decisions by local courts is limited. In Chevron v. Ecuador, for example, the tribunal stated that a measure of deference needs to be afforded to the domestic justice system and that the tribunal was not empowered to act as a court of appeal reviewing every alleged failure of the local judicial system de novo. (R-II ¶ 1135).*

1224. Claimants' argument that the *Chevron* decision allows the Tribunal to step into the shoes of the domestic courts and decide the merits of the case as would a fair and impartial judge relies on a statement that has been taken out of context. The *Chevron* tribunal did not assume the position of a host state judge in finding whether the assertion of claims clause had been breached. This Tribunal is not an appellate court. (R-I ¶¶ 40.6 – 40.7, 43.6 – 43.7).

1225. A tribunal's finding of a violation of 10(12) ECT is rare. The only published case in that respect is *Petrobart v. The Kyrgyz Republic*, which in any event is not convincing, since the Tribunal provided no reasons for its disregard of the express reference to domestic law in Art. 10(12) ECT. That case also involved a high degree of interference, which has not been alleged here. Cases where violations of

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

similar provisions have been found related to undue delays. In *Chevron*, there was an "*undue delay of judicial proceedings*" because Chevron's cases had been pending for 13 – 15 years. In *White Industries v. India*, a delay in jurisdictional proceedings of nine years and the Supreme Court's inability to hear a jurisdictional appeal for over five years amounted to undue delay. (R-II ¶¶ 1136 – 1141).

1226. Here, Claimants have neither contended nor proven that the criminal proceedings against Mr. Cornegruta on behalf of KPM suffered from undue delay. None of Claimants' allegations about the trial in any way being unfair or impartial is true – and the fact that the decision came out against Claimants does not automatically mean that they were unfair. While Respondent admits that certain evidence was excluded from trial, this was due to a number of reasons including the lack of attendance of witnesses at trial and non-compliance with procedures for appointing witnesses. None of the expert reports complied with Art. 243 CPC, which requires that experts be drawn from a limited pool of expertise. Claimants provided no evidence of KPM and TNG's requests for these opinions, making it impossible to divine the scope of their requests, and there was no guarantee that any of the bodies issuing opinions – some of which were involved in the design and construction of the pipelines – were independent from Claimants. (R-I ¶ 28; R-II ¶¶ 1140 – 1144; RPHB 2 ¶¶ 203 – 207).

1227. At the Hearing on Jurisdiction and Liability, Prof. Olcott demonstrated that the principles of justice in the Kazakh legal system are in place and are complied with sufficiently to prevent violations of due process. Prof. Olcott – who demonstrated her credibility by also criticizing some aspects of the Kazakh legal system – explained the training that judges receive as well as the transparency of decisions. That the Kazakh legal system complies with the legal principle of due process is also confirmed by the Global Integrity 2008 report. Although Claimants allege that the Kazakh judiciary does not meet Western standards, the Republic has the elementary principles of justice in place to prevent violations of due process. (RPHB 1 ¶ 486 – 495).

1228. Also at that Hearing, Claimants made the flawed contention that the trial against Mr. Cornegruta amounted to a denial of justice. While Respondent concedes that it is acknowledged that the FET standard includes the obligation not to deny justice in criminal proceedings, such a claim "*requires a manifest and gross failure to comply with the elementary principles of justice*" that "*offend[s] a sense of judicial propriety.*" Tribunals such as *Loewen v. U.S.* and *Thunderbird v. Mexico* confirm that his is a very high threshold, in absolute and in relative terms. For criminal proceedings, as elaborated in *Tokios Tokelés v Ukraine*, "*the sense of judicial propriety must be shocked by a manifest and gross failure to comply with elementary principles of justice.*" While this stands in stark contrast to the sophisticated legal framework in the Western world, this minimum standard has not been breached in the present case. With respect to the witnesses that "*were struck off*", Art. 311 CPC requires a witness to attend trial and to be examined in order that their evidence is accepted. None of the reports submitted complied with Kazakh law. Regarding the complaint that the criminal fine was assessed against KPM, this is consistent with Kazakh law and general principles of procedural fairness. KPM was always represented during the trial and had every opportunity to appeal. Regarding Claimants' allegation that the amount recovered was disproportionate to KPM's profits, this is not relevant in the denial of justice

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

analysis, which requires a manifest and gross violation of the elementary principles of justice. Finally, with respect to Claimants' contradictory complaint about the enforcement of the criminal fine, enforcement is a characteristic feature of the elementary principles of justice, not a failure to comply with those principles. (RPHB 1 ¶¶ 256 – 260; 496 – 520).

1229. Claimants could have appealed the 18 September 2009 decision against Mr. Cornegruta to the Supreme Court in Kazakhstan, but chose not to. KPM did not challenge the decision to not provide a copy of the hearing transcript or decision to KPM and its failure to appeal the decision – a decision that it always had access to – is not the fault of Respondent. (RPHB 2 ¶¶ 265 – 271).

### .3. The Tribunal

1230. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1231. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 10(12) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1232. Claimants' allegation of a breach of Art. 10(12) leads to no further relief sought than that resulting from the FET breach.

## J.IV. Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1))

### 1. Arguments by Claimants

1233. The ECT offers a more robust level of protection than most BITs and Claimants' investment is entitled to such protection:

> *318. Article 10(1) of the ECT provides that investments "shall enjoy the most constant protection and security." This provision is similar to – but notably stronger than - the more commonly-used language in investment treaties that obligates host States to provide "full protection and security" to investments. [...]. (C-I ¶ 318).*

1234. Earlier cases, like *AAPL v. Sri Lanka*, stated that the only "*due diligence*" required to be undertaken by the host state in order to provide "*most constant protection and security*" was to have reasonable measures of prevention in place. This was confirmed in *AMT v. Zaire*, which added that the host state, Zaire, also needed to comply with its own national laws. These cases have since been expanded upon, such as in the case *CME v. Czech Republic*, which expanded the definition so as to include full protection of licensing rights, among others. (C-I ¶¶ 320 – 325).



1235. Claimants state that, while the "*most constant protection and security*" standard was at one time invoked for failure to provide physical protection to an investment, the standard today clearly encompasses legal security. This has been demonstrated by consideration of the standard by several investment treaty tribunals, including *Biwarter Gauff v. Tanzania*, *Siemens v. Argentina*, *Vivendi II*, and *National Grid v. Argentina*. These tribunals found that the standard was wider than mere physical protection – especially in cases involving intangible assets. (C-I ¶¶ 319, 326 - 328; C-II ¶¶ 482 - 484).

1236. In addition to failing to provide legal security, Respondent failed to provide physical security, as demonstrated by "*Kazakhstan's callous arrest of Mr. Cornegruta, its attempts to arrest the other senior in-country managers of KPM and TNG, and its harassment of company staff during its investigations[,] [which] clearly undermined the physical security of Claimants' investments and rendered them an unsafe place to work. Kazakhstan's outright physical seizure of KPM and TNG in July 2010 amounts to a breach of its duty to provide both physical and legal protection and security.*" (C-II ¶ 485).

1237. Respondent cites no authority for its proposition that including "*legal security*" in "*most constant protection and security*" would make the standard identical to FET. Other tribunals have recognized the obligations to be separate. In any event, the fact that two protections rely on the same facts does not obviate the need for the Tribunal to consider each protection. (C-II ¶ 486).

1238. Claimants contend that Respondent has conflated the "*most constant protection and security*" standard with the obligation to provide effective means to assert claims and enforce rights under Art. 10(12) ECT. In making this argument, Respondent overlooks that it was the instigator and perpetrator of the violations. (C-II ¶ 488).

> *489. Kazakhstan cites three cases to support its argument that the obligation to ensure the most constant protection and security is one of mere diligence or vigilance of the host State. However, the issue arose in those three cases because the respective tribunals needed to determine whether the acts in question were attributable to the host state and whether the state could have protected claimants. In the present case, Kazakhstan does not — and cannot — dispute that the misconduct complained of was perpetrated by Kazakhstan. There is no issue of state attribution in this case. As the Tribunal in Wena v. Egypt concluded, where the host State is itself the instigator or a participant in the violations, there is "no question" that the obligation was breached. As it is Kazakhstan itself that instigated and carried out the breach of the ECT's most constant protection and security standard, it is not relevant that the standard might also import a due diligence standard in respect of the conduct of others. (C-II ¶ 489).*

1239. Claimants provide examples of Respondent's deliberate conduct and argue that Respondent's failures to respond to Claimants' requests for assistance make these violations even more severe. (C-I ¶¶ 332 – 333):

- *On January 19, 2009, Claimants filed complaints with the Western Regional Transport Prosecutor, the General Prosecutor's Office, the*



*Ministry of Justice, and the MEMR against the Financial Police in respect to its illegal actions and to obtain the dismissal of the criminal case against KPM. The only answer Claimants received was a notice from the Financial Police that their complaints were dismissed and that a criminal case also being initiated against TNG.*

- *On March 18, 2009, Claimants submitted a new complaint with the General Prosecutor's Office regarding the illegal initiation of criminal cases against KPM and TNG. Claimants never received an answer to this complaint.*

- *In the period from October 2008-March 2009, Claimants wrote to the MEMR to obtain the extension of the exploration period for Contract No. 302 prior to its expiration on March 30, 2009. The extension was never granted, in violation of the Government's commitments.*

- *As per the request of the MEMR, on April 30, 2009, Claimants submitted addendum No. 9 to Contract No. 302 for the extension of the exploration period for execution by the MEMR. Claimants never received an answer to this request for an extension.*

- *On March 24 and 25, 2009, Claimants requested that Kazakhstan confirm that Terra Raf was the legitimate owner of TNG and confirm its prior waiver of its pre-emptive rights. Claimants never received an answer to this request.*

- *On April 26-27, 2009, Claimants filed complaints with the Regional Prosecutor's Office and the Western Regional Transport Prosecutor regarding the arrest of Mr. Cornegruta. Claimants never received an answer to their complaints.*

- *On May 7, 2009, Claimants appealed directly to President Nazarbayev to obtain the release of Mr. Cornegruta, protect the former and current management of KPM and TNG, and end the dispute. President Nazarbayev ignored the request and never responded.*

- *After Mr. Cornegruta was sentenced to four years in prison, his wife and Claimants obtained an undertaking from Moldova to request the transfer of Mr. Cornegruta to serve his sentence in his home country, closer to his family. However, the Kazakh Prosecutor General, at the request of the Financial Police, always requested further assurances from Moldova that he would indeed serve his sentence. In the end, Kazakhstan refused to extradite him.*

- *Kazakhstan improperly assessed alleged corporate back taxes and penalties against KPM and TNG in the amount of approximately USD 62 million. While KPM's and TNG's court challenges to those assessments were pending, Kazakhstan issued a bankruptcy notice on February 3, 2010.*



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 59 of 104

- *On July 16, 2010, despite being only given three days to respond to the accusations of alleged violations of the Subsoil Use Contracts, KPM and TNG provided detailed explanations refuting the State's accusations. Claimants' timely responses were ignored, and Kazakhstan unilaterally repudiated the Subsoil Use Contracts. (C-I ¶ 332).*

1240. Kazakhstan failed to respond to Claimants' complaints, despite having the ability to do so, as it did upon receiving a hand-written complaint from four unknown residents of the Mangystau Region in July 2010. This conduct violates the most constant protection and security standard, as elaborated in *Siag v. Egypt* and *Wena Hotels v. Egypt*. (CPHB 2 ¶¶ 140 – 148).

1241. Kazakhstan's abrupt reversal of its 2007 commitment that it consented to the Gheso – Terra Raf transfer of TNG obliterated "*the agreed and approved security and protection*" of Terra Raf's ownership of TNG. This was in violation of Kazakhstan's duties to provide "*the most constant protection and security*" to Claimants' investments. In addition, Claimants have endeavored to have the MEMR withdraw its notices for breach of Contracts 210 and 302 for failure to honor the State's pre-emptive right, but Respondent took no action, effectively hanging an indefinite cloud over Claimants' reputation and title to TNG. (CPHB 2 ¶¶ 115 – 126).

1242. With regard to Kazakhstan's contention that "*Claimants have not attempted to show that Kazakhstan has failed to provide reasonable mechanisms of protection and that the facts put forward by Claimants are 'completely disconnected from Claimants' own legal understanding of the guarantee*", Claimants state that Respondent's assertion is contradicted by the facts. Claimants explain that "*[this] scheme was orchestrated by the President of Kazakhstan, other senior Government officials, and the Financial Police was carried out by officials, judges, and law enforcement and other agencies who, in violation of their duties and contrary to Kazakh and international law, conducted a campaign of harassment and coercion against Claimants from October 2008 until July 2010.*" Claimants' further arguments that Kazakhstan's conduct violated the most constant protection and security standard of the ECT are best taken from their own words: (C-II ¶ 491 – 492)

> *492. [...] the pretext for Kazakhstan's conduct was a letter from President Voronin to President Nazarbayev that provided the justification for Kazakhstan's actions. President Nazarbayev seized upon the opportunity and ordered Kazakhstan's State organs to effectively destroy Claimants' investments in Kazakhstan.*
>
> *493. In terms of physical security, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. The court decisions that sentenced Mr. Cornegruta to four years in jail and fined KPM in excess of US$ 145 million were entirely unfounded and unlawful because the provisions of Kazakh law relied on by the Kazakh courts did not, and could not, justify the reclassification of KPM's 18-km pipeline as a main pipeline. The ridiculous calculation of KPM's allegedly enormous "profits," and the sentencing of KPM — a non-party to the criminal trial – were further travesties of justice. Kazakhstan relied on the same frivolous legal grounds to initiate criminal*

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 60 of 104

*actions against four other general managers of KPM and TNG and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations. Respondent also conducted searches and raids of KPM's and TNG's offices, all in clear violation of the most constant protection and security standard.*

*494. Furthermore, the Kazakh courts, the Prosecutor's Office, the Financial Police, and numerous Government officials rejected Claimants' repeated protests, requests for assistance, lawsuits, and appeals filed by Claimants, KPM, TNG, and Mr. Cornegruta. From the President of Kazakhstan to the Financial Police, from the Governor of the Mangystau Region to the MEMR (and its successor, the MOG), Kazakhstan colluded to deprive Claimants of their investments.*

*495. Those State organs, including the courts, the central Government, and local authorities, acting in blatant violation of Kazakh law and international law, also harassed and coerced Claimants by requesting payment of debilitating taxes and custom duties that were never due, by refusing to extend the exploration period of the Contract 302 Properties, and by reversing the State's prior waiver of its pre-emptive right for the transfer of TNG to Terra Raf. (C-II ¶¶ 492 – 495).*

1243. The intimidation, coercion, and threats by Kazakhstan, described in detail above, violate the standards of full protection and security. Other tribunals, like *Pope & Talbot v. Canada*, which found that the government's threat to refuse to grant future export quotas if the investor failed to cooperate with an audit, have found much less intense and less threatening conduct sufficient to constitute a violation of this standard. (CPHB 2 ¶¶ 49 – 51, 59).

## 2. Arguments by Respondent

1244. Contrary to Claimants' assertion, Article 10(1) ECT extends only to physical security and not to legal security. In addition, the prevailing view of tribunals in investment treaty arbitrations is that the standard encompasses solely physical protection and security. (R-II ¶¶ 957 – 960, 969 – 970).

1245. There are manifold reasons that tribunals have restricted the scope of the duty to provide full protection and security to only physical damage and violence. Some tribunals compare this duty with the customary international law duty relating to aliens to provide full protection and security of foreign nationals. Under customary international law, foreign nationals can expect to be protected from physical damage, but not from legal instability. This is because customary international law of aliens only establishes a minimum standard of protection. There is no reason to expect that "*legal security*" is included in the treaty, absent a statement to that effect. (R-I ¶¶ 36.3, 36.8 – 36.9; R-II ¶¶ 961 – 964).

1246. Respondent also contends that the standards FET and "*full protection and security*" have different substantive meanings. While the FET standard obliges the host state to abstain from a certain course of action, the full protection and security standard obliges the host state to actively create a framework which grants security.



Blurring these distinctions creates legal uncertainty. (R-I ¶ 36.11; R-II ¶¶ 965 – 967). A further argument is best taken from Respondent's words:

> *964. Another reason for the need to restrict the scope of the provision of full protection and security to physical damage and violence is the fact that this guarantee must have a meaning beyond, and distinct from, the standard of fair and equitable treatment. Legal protection in terms of an investor's legitimate expectation and its interest in a stable and predictable business environment is already encompassed by the provision on fair and equitable treatment. Claimants' assumption that both provisions can be read as comprising legal protection although they are stipulated separately from each other violates the principle of systematic interpretation, whereby a legal system is self-consistent and therefore no provision can be contrary to another. Furthermore, Claimants' assumption violates the principle of effective interpretation, requiring a purpose and object oriented interpretation, because the separate stipulation of two provisions aims at establishing two distinct guarantees. (R-II ¶ 964).*

1247. *Siemens v. Argentina*, cited by Claimants in support of their contention that the standard of most constant protection and security includes legal security, is inapplicable here. That case concerned the Argentina-Germany BIT which contained the term "*legal security*" in the relevant provision on full protection and security. The ECT does not expressly refer to legal security, and these facts have been ignored by Claimants. As Respondent states, "*by argumentum e contrario, Claimants' conveniently partial quotation of Siemens v. Argentina illustrates once more that the guarantee of most constant protection and security does not encompass legal security unless the investment treaty explicitly states otherwise. Rather, it requires the host state solely to provide protection from physical damage and violence.*" (R-II ¶¶ 971 – 972).

1248. The duty of ensuring most constant protection and security requires a host state to diligently implement reasonable measures of protection, and the Republic has provided such measures. The broad consensus, as reflected in the *Noble v. Romania*, *AAPL v. Sri Lanka*, and *AMT v. Zaire* cases, is that reasonable measures are all that is required. Claimants even acknowledge that these cases confirm this argument. The facts in the present case do not alter the general principle that the duty of full protection and security is restricted by a concept of reasonableness. (R-I ¶¶ 36.4 – 36.5; R-II ¶¶ 973 – 978).

1249. Respondent's response to Claimants' comparison between Art. 10(1) ECT and Art. 10(12) ECT is best taken from its own words:

> *981. Whilst Article 10 (12) of the ECT requires the host state to implement reasonable measures of assertion of claims and enforcement of rights, Article 10(1) of the ECT requires the host state to implement reasonable measures of protection and security. In particular, the guarantee under Article 10(12) of the ECT refers to the legislative obligation of a host State to provide a fair and efficient system of justice. This illustrates the systematic coherence of the individual provisions within the ECT, not their conflation. By drawing the comparison between Article 10(1) of the ECT and Article 10(12) of the ECT, Claimants thus reinforce the fact that the*



*implementation of reasonable measures is sufficient in terms of Article 10(1) of the ECT. (R-II ¶ 981).*

1250. Further still, an obligation to provide "*legal security*" would run contrary to the purpose of the ECT. It would be vague and host states would be unable to determine whether their legal framework was adequate for future tribunals to rule in its favor. Such a standard, as expressed by the *Saluka* tribunal, would dissuade host states from admitting foreign investments, thereby undermining the purpose of the Treaty. (R-I ¶ 36.10).

1251. Claimants have not challenged that the Republic possesses the necessary legal framework to provide protection from physical damage and violence to foreign investors and investments. In order to prevail, however, Claimants must prove the absence of reasonable measures. They have not met this burden. (R-I ¶ 36.12; R-II ¶ 982 – 984). Respondent explains:

> *985. It is undisputed that Claimants and their assets have not been physically harmed and that not a single one of their representatives has been hurt. In particular, Mr. Cornegruta and the other senior in-country managers of KPM and TNG were not injured. As explained above, Mr. Cornegruta received a fair trial and the verdict was upheld upon appeal. The alleged harassment of company staff during the investigations did not result in any physical harm of the employees either. Although Claimants contend that the investigations rendered KPM and TNG an unsafe place to work, they have not offered any proof thereof because, again, not a single employee has been injured during these inspections and investigations. Apart from that, as has been established above, company staff have never been harassed but have rather experienced ordinary concomitants of lawful investigations. (R-II ¶ 985).*

1252. Further, Claimants' assets were not taken by use of force. Claimants' investments have not been taken, but rather have been held in trust management ever since they were abandoned by Claimants. To the extent that Claimants argue that their investments were taken by use of force, however, under the ruling in *SAUR International SA v. Republic of Argentina*, a take-over using police force does not violate the guarantee of full protection and security. (R-I ¶ 36.13; R-II ¶ 986).

1253. Finally, the facts pleaded by Claimants do not relate to the guarantee of most constant protection and security. Claimants have not proven that the alleged losses and injuries would have been prevented but for the alleged insufficiency of reasonable measures. As this has not been addressed by Claimants at all, Claimants have failed to establish a breach of the Art. 10(1) ECT guarantee of full protection and security. (R-I ¶¶ 36.2, 36.12 – 36.15; R-II ¶¶ 988 – 989).

### 3. The Tribunal

1254. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.



1255. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation to provide most constant protection and security to Claimants' investment according to Art. 10(1) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1256. Claimants' allegation of this further breach leads to no further relief than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1257. There is, therefore, no need to examine whether such a further breach has been shown.

## J.V. Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim)

### 1. Arguments by Claimants

1258. Article 10(1) ECT provides that "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures*" the "*management, maintenance, use, enjoyment or disposal*" of an investment. To prevail in their argument under Article 10(1) ECT, it is sufficient for Claimants that Respondent's actions were either "*unreasonable*" or "*discriminatory*." Claimants present that Respondent's actions were both. (C-I ¶¶ 352 – 353).

1259. Claimants present that, "*over the past several years, the Tribunals in BG Group v. Argentina; Siemens v. Argentina; ADC v. Hungary; Azurix v. Argentina; and Saluka v. Czech Republic have all determined that conduct of a host State violated an impairment clause, thereby breaching the relevant treaty*." (C-II ¶ 517). While Respondent does not dispute that measures need only to be arbitrary to violate the ECT, Respondent nevertheless considers that this is a high threshold. Respondent's reliance on *ELSI* for the position that it is a high threshold is misguided. The definition of arbitrariness used in *ELSI* has faced criticism, since it does not accord with the ordinary meaning of the term as required by Art. 31(1) VCLT. None of the cases cited by Respondent have eschewed the ordinary meaning of the term or limited the notion of "*arbitrary*" treatment to Kazakhstan's narrow articulation of the standard. (C-II ¶¶ 518 – 520).

1260. The term "*reasonable*" - interpreted according to its ordinary meaning as required by the VCLT - means "*based on or using good judgment and therefore fair and practical*." In *Saluka v. Czech Republic*, the tribunal stated that "*reasonableness*" requires a state's conduct to bear "*a reasonable relationship to some rational policy*." Likewise, the tribunal in *CME* found the state's actions to be unreasonable because they were unjustified and improper. (C-I ¶¶ 355 – 357). Likewise, "*unreasonable*" has been found to refer to a wider scope of acts that are intentional, shocking or improper. (C-II ¶ 523). As the *EDF v. Romania* tribunal found, such unreasonable measures could include:

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 64 of 104

a. *a measure that inflicts damage on the investor without serving any apparent legitimate purpose;*

b. *a measure that is not based on legal standards but on discretion, prejudice or personal preference;*

c. *a measure taken for reasons that are different from those put forward by the decision maker;*

d. *a measure taken in willful disregard of due process and proper procedure. (C-II ¶ 523).*

1261. In this regard, Claimants present seven examples of Respondent's conduct and argue why these were actions that were arbitrary, shocking, and in willful disregard to the due process of law. (C-II ¶ 524; CPHB ¶¶ 60 – 70, 97 - 114).

- *Kazakhstan's "reclassification" of KPM's and TNG's pipelines as "main" pipelines, despite there being no "main" pipeline as acknowledged by numerous State authorities and agencies;*

- *Kazakhstan's arrest, conviction, and incarceration of Mr. Cornegruta, which did not serve any legitimate purpose, were not based on legal standards, and were carried out in willful disregard of due process and proper procedure;*

- *Kazakhstan's criminal verdict against the non-party KPM, freezing of KPM's assets, and barring of KPM from lodging an appeal against its conviction, which inflicted considerable damage on Claimants without serving any legitimate purpose and violated applicable legal standards, due process and proper procedure;*

- *Kazakhstan's retroactive reversal of its approval of the transfer of TNG to Terra Raf and waiver of its pre-emptive rights, which did not serve any legitimate purpose, had no legal basis, and violated due process; [see also CPHB 2 ¶¶ 115 – 126).*

- *Kazakhstan's refusal to extend TNG's exploration period in the Contract 302 Properties, notwithstanding its express approval of the extension (CPHB 2 ¶¶ 149 – 176);*

- *Kazakhstan's imposition of the Crude Oil Export Tax on KPM, which violated exemption and legal stabilization clauses in the Subsoil Use Contract and inflicted damage on Claimants without serving any legitimate purpose; and [see also CPHB 2 ¶¶ 127 – 139]*

- *Kazakhstan's wrongful and unilateral repudiation of KPM's and TNG's Subsoil Use Contracts without any justifiable basis and without providing the companies any opportunity to cure the alleged deficiencies. (C-II ¶ 524).*

1262. Regarding the retro-active reversal, Respondent did not have a pre-emptive right to TNG in 2003 and, in any event, Respondent consented to the transfer in 2007. The



retroactive refusal of consent clouded Claimants' title to TNG and its reputation and prevented Claimants from selling. (CPHB 2 ¶¶ 115 – 126).

1263. The main pipeline charges were, in any event, reverse-engineered fabrications. The Financial Police first alleged that KPM and TNG did not have main pipeline licenses. They then confirmed that they could impose a devastating penalty. Then they sought out an authority to opine that the companies were operating trunk pipelines. At the time, Kazakhstan knew that it could potentially recover 41 billion Tenge (approx. USD 350 million) if the pipelines could be considered "*main*." (CPHB 2 ¶¶ 61 – 68).

1264. A reverse-engineered criminal conviction would meet every definition of an unreasonable measure provided in *EDF v. Romania*. (CPHB 2 ¶ 69). The same is true for every act of indirect expropriation. (CPHB 2 ¶¶ 69 – 70).

1265. The criminal allegation of "*illegal entrepreneurial activity in an especially large amount*" under 190(2)(b) of the Kazakh Criminal Code was malicious and contrived. They contrived the operation of the main pipeline to satisfy the "*illegal entrepreneurial activity*" element of the crime. The second element, "*in an especially large amount*" was manufactured by manipulating instructions to the Tax Committee and calculating the "*illegal profits*" by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. This is contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The proper calculation would have yielded 12,000 – 13,000 in illegal profits. The threshold for such a crime was USD 17,000. (CPHB 2 ¶¶ 80 – 84, 87).

1266. The term "*discrimination*", means "*differential treatment; especially, a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.*" It entails two elements: "*first, the measures directed against a particular party must be for reasons unrelated to the substance of the matter .... Second, discrimination entails like persons being treated in an inequivalent manner.*" (C-I ¶¶ 358 – 359, partially quoted). Claimants present that Respondent agrees with Claimants' and the *Saluka* tribunal's definition of discrimination that "*State conduct is discriminatory, if (i) similar cases are (ii) treated differently (iii) and without reasonable justification.*" (C-II ¶ 525).

1267. Claimants argue that they have met their burden of proof regarding the similarity of cases to establish discriminatory treatment. The extraordinary campaign of harassment and coercion between October 2008 and July 2010, and the outright seizure in July 2010 was discriminatory because these actions singled out KPM and TNG. Respondent's actions were also discriminatory because they singled out Claimants for different treatment from other investors in Kazakhstan's oil and gas industry. Claimants present that no other investor's in-field gathering systems were reclassified as trunk pipelines, and that no other investors were subjected to criminal prosecution based on that charge. Neighboring companies, including KTM, operate similar pipelines as part of their in-field gathering system. Furthermore, "*if Kazakhstan's contention that a contractor's pipeline extending outside the Contract Area is a [trunk] pipeline were correct, hundreds of oil and gas companies in Kazakhstan would operate [trunk] pipelines, but only Claimants' companies have faced that charge.*" All of the information available to the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Tribunal suggests that the companies are comparable. Accordingly, as the tribunals in *Feldman v. Mexico* and *Nykomb* held, once *prima facie* evidence of *de facto* discrimination had been presented by the claimant, the burden of proof shifts to the respondent to rebut the presumption of discrimination. Respondent has not rebutted this presumption. (C-I ¶ 354 – 362; C-II ¶¶ 525 – 528).

1268. Respondent's violations of the ECT's impairment clause are beyond serious dispute. The *Saluka* tribunal defined "*impairment*" according to its ordinary meaning as required by Art. 31 VCLT as "*any negative impact or effect caused by measures taken by the host state.*" While Respondent disputes that its conduct "*impaired*" Claimants' management, maintenance, use, enjoyment, and disposal of their investments, this is belied by the facts. By the time of Respondent's outright seizure of Claimants' investments in July 2010, Claimants' investments in KPM and TNG had already been impaired for twenty months. The intrusive audits following President Nazarbayev's 14 October 2008 order had just such a negative impact. Likewise, the 18 December 2008 repudiation of the unequivocal approval of the 2003 transfer of TNG to Terra Raf and the accompanying press release that accused Claimants of forgery damaged Claimants' ability to dispose of their assets. In addition, Respondent cannot deny the financial burden that the audits and inspections led by the Kazakh Financial Police had on Claimants. These audits resulted in the improper assessment of USD 62 million of alleged corporate back taxes in February 2009, the imposition of illegal export duties against KPM in December 2008, and an intrusive 13-month audit of KPM and TNG with respect to transfer pricing that began in November 2008. Respondent's refusal to execute the agreed upon extension of TNG's exploration period for Contract 302 prohibited Claimants from establishing the full market value of those properties. Finally, "*Kazakhstan's reclassification of the KPM and TNG gathering systems as [trunk] pipelines, which resulted in criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta, clearly impaired Claimants' ability to manage their investments. Top personnel left the country and the conviction itself was used to ultimately take over the companies. Similarly, Kazakhstan froze KPM's assets in an effort to execute the US$ 145 million judgment against KPM, thereby directly impairing Claimants' management, use, and enjoyment of KPM.*" (C-II ¶¶ 529 – 535; CPHB 1 ¶ 207; CPHB 2 ¶¶ 149 – 176).

1269. The Subsoil Use Law changed on 24 June 2010 and permitted Kazakhstan to terminate contracts when a contractor failed to cure two or more violations. Respondent's failure to offer Claimants an opportunity to cure the alleged contract violations was not in good faith. As explained above, these minor violations did not merit termination of the contracts, making the termination unreasonable. As explained at the hearing, KPM and TNG received notices of alleged infringements on 16 July 2010 and were required to cure by 19 July 2010. This was confirmed in Mr. Pisica's testimony. Even if the claims had been valid – and they were not – it would have been impossible for Claimants to cure within the time given. (CPHB 1 ¶¶ 278 – 293).

### 2. Arguments by Respondent

1270. Respondent explains that is has adhered to its obligations under Article 10(1) ECT at all times. Its measures were neither unreasonable nor discriminatory. The



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 67 of 104

management, maintenance, use, enjoyment, or disposal of Claimants' investments was not impaired in any way. (R-II ¶ 1009).

1271. Using Art. 31 VCLT, which requires that a treaty term shall be interpreted in accordance with the ordinary meaning of the term, Respondent states that the ordinary meaning of "*unreasonable*" is "*irrational; foolish; unwise; absurd; silly; preposterous; senseless; stupid.*" Respondent submits that the Parties agree that the term "*unreasonable*" is interchangeable with the term "*arbitrary.*" For this reason, the *ESLI* court's definition of the term "*arbitrary*" can be transferred onto the term "*unreasonable*" in the sense of Art. 10(1) ECT. (R-II ¶¶ 1011 – 1013). The *ELSI* court's definition was as follows:

*[B]y itself, and without more, unlawfulness cannot be said to amount to arbitrariness. [...] To identify arbitrariness with mere unlawfulness would be to deprive it of any useful meaning in its own right. [...] Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law. [...] It is a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety. (R-II ¶ 1012).*

1272. While Claimants have noted the similarities between the definition of "*unreasonable*" and "*arbitrary*", they overlook the conclusion that, given the similarities of both definitions, customary international law and the *ELSI* case both establish a high threshold for measures to be considered "*unreasonable.*" (R-II ¶¶ 1013 – 1016). This is confirmed by scholars as well as by anecdotal evidence that, "*while 30 percent of arbitral tribunals find that certain state measures amount to unreasonable or arbitrary conduct over all, only 22 per cent of those applied the ELSI or a similarly high standard [...]. It is because of this high threshold established in the ELSI case that findings of unreasonableness or arbitrariness are rare.*" In three of the cases cited by Claimants, the tribunals did not find that the respective measures of the host state reached the allegedly low threshold of unreasonableness. These cases were *LG&E*, *National Grid PLC*, and *EDF v. Romania*. (R-II ¶¶ 1016 – 1018).

1273. It is untrue that the *ELSI* standard for arbitrary treatment has been "*the target of much criticism.*" Rather, the overwhelming majority of scholars and tribunals have applauded the reasoning in the *ELSI* case. The tribunal in *Siemens v. Argentina* even adopted it as "*the most authoritative interpretation of international law.*" (1019 – 1021).

1274. Respondent also presents an additional argument that "*unreasonableness*" is a high standard:

> *1022. The adoption of a lower threshold would result in classifying all governmental regulations adversely affecting foreign investors as inherently suspect, thereby shifting the burden of proof from the foreign investor to the host state. Forcing host states to demonstrate that their measures were not unreasonable because there were no less restrictive alternatives available would clearly contradict the onus probandi rule. For this reason the ELSI standard is widely deemed to be the most authoritative interpretation of the term "unreasonable". Furthermore, in view of the vagueness of all definitions of "unreasonable", the legal assessment of whether a certain measure is unreasonable or not remains a*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *subjective process prone to unequal treatment and misjudgement. This forms another reason why a high threshold is justified. (R-II ¶ 1022).*

1275. Respondent summarizes some case law on this point and presents how other tribunals have used the *ELSI* test. In *Genin v. Estonia* the test was further developed and refined, and the tribunal added the requirement "*willful disregard of due process of law.*" The tribunal in *CME v. The Czech Republic* added a subjective element, that "*the host state's intention to deprive the investor of its investment as a pretext of a decision based on law.*" Other tribunals, like *Enron v. Argentina* and *Sempra v. Argentina* considered the elements of arbitrariness, finding that "*regardless of intent, arbitrariness requires that some important measure of impropriety be manifest.*" Finally, the tribunal in *Nobel v. Romania* found that an action would not be unreasonable if the proceedings of the kind in question are provided in all legal systems for much of the same reasons. By *argumentum e contrario*, only a measure which falls short of even such minimum standard will be unreasonable. (R-II ¶¶ 1023 – 1027).

1276. The Republic's measures did not reach the threshold of unreasonableness incorporated by the ordinary meaning of the term, let alone the one stipulated by the ICJ in *ELSI*. Respondent's actions and inactions were lawful and were not irrational or senseless or "*unreasonable*." The measures were not shocking to sense the judicial propriety in terms of the *ELSI* standard. This is confirmed by the fact that the Republic had no intention of depriving Claimants of their investments (unlike the respondent in the *CME* case), and the measures undertaken are provided for in all legal systems for much of the same reasons, just like Romania's measures in *Noble v. Romania*. (R-II ¶¶ 1028, 1037). Respondent's arguments related to each action alleged by Claimants are best taken from its own words:

> *1029. First, Claimants allege that the Republic's classification of KPM's and TNG's pipelines as trunk pipelines was unreasonable. However, Claimants had operated trunk pipelines without a licence. This was confirmed by the Republic's independent courts, warranting criminal proceedings and the levy of a fine. The due amount of this fine was equally assessed by an independent court. Also, the Republic only took enforcement measures and froze KPM's assets upon non-payment of the fine. In conclusion, the Republic applied the law correctly and its classification of KPM's and TNG's pipelines as trunk pipelines was not unreasonable. (see also RPHB 2 ¶¶ 151 – 218).*
>
> *1030. Claimants continue by suggesting it was unreasonable of the Republic to arrest, convict and incarcerate Mr. Cornegruta. As to arrest, Mr. Cornegruta had been identified by the Financial Police as the likely individual responsible on behalf of KPM for illegal entrepreneurship under Section 190(b) of the Criminal Code of Kazakhstan. The decision to arrest him was taken on valid ground by the court in accordance with the relevant provisions of the criminal code. As to the reasonableness of the decision to convict Mr. Cornegruta, [...] process was a key part of the way in which the decision and the later appeal of the decision against Mr. Cornegruta was taken. The actions of the various authorities were taken within the law.*



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 69 of 104

*1031. Subsequently, Claimants contend that the Republic's "criminal verdict against the non-party KPM" amounted to an unreasonable measure. However, as set out above, the recovery order was necessary in order to correct the unjust enrichment of KPM resulting from the criminal act of operating the main pipeline without a license. Importantly, contrary to Claimants' allegations, the recovery order was made in a perfectly proper procedure in which KPM was represented through its manager, Mr. Cornegruta. [see also RPHB 2 ¶¶ 243 – 264].*

*1032. Claimants also contend that it was unreasonable for the Republic to "retroactive[ly] revers[e] [its] approval of the transfer of TNG to Terra Raf and the waiver of its pre-emptive rights". However, Claimants actually failed to apply for the Republic's consent at the time of the transfer itself and they failed to prove that their belated request (after being prompted by the MEMR) was legitimate under Kazakh law. Furthermore, under Kazakh law, the Republic had the discretion to either approve or disapprove the transfer. Even if the Republic had approved of the transfer in the first place, a revocation of this approval was completely lawful because Claimants wrongly informed the Republic about the significant details of the transfer including the date when the transfer occurred, which impacted on whether a waiver to its pre-emptive right was required. Hence, the revocation of the alleged approval was not unreasonable. [see also RPHB 2 ¶¶ 272 – 281]*

*1033. Moreover, Claimants complain that the Republic's refusal to extend TNG's exploration period in the Contract 302 Properties was unreasonable. In fact, under Kazakh law, the Republic was not legally bound to extend or refuse to extend the exploration period in the Contract 302 Properties. Also, since the Republic had not signed the necessary addendum, Claimants could not rely on a prolongation of the exploration period. Thus, the refusal to extend TNG's exploration period in the Contract 302 Properties was not an unreasonable measure. [RPHB 2 ¶¶ 282 – 318]*

*1034. Claimants continue by alleging that the Republic's imposition of the Crude Oil Export Duties on KPM was another unreasonable measure. In reality, Claimants' invoked tax deductions which were provided for under Kazakh law or were withdrawn by the relevant authorities before any payment was made by KPM. This was confirmed by the independent Kazakh courts which found KPM to be liable for paying the Crude Oil Export Duties. Therefore, the Republic's assessment of Crude Oil Export Duties was lawful and not unreasonable.*

*1035. Finally, Claimants contend that it was unreasonable to repudiate KPM's and TNG's Subsoil Use Contracts. The Republic was entitled to terminate these contracts because of valid grounds for termination. Hence, the termination of KPM's and TNG's Subsoil Use Contracts cannot be deemed an unreasonable measure.*

*1036. In particular, as more specifically set out in the introduction to the section on direct expropriation, Claimants were in continuing and serious breach of the Contracts. In accordance with its rights to do so, the Republic*



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 70 of 104

> *terminated the Contracts and Claimants' assets were taken into a specific trust arrangement. Claimants could have resolved this issue amicably by invoking one of the mechanisms in the Contracts or, indeed, complying with the voluntary mechanism in the Subsoil Law at article 72(10) for handing over of assets to the trust and appealing the decision in accordance with Article 73 of the Subsoil Law. The opportunity to resolve this issue in accordance with the Contracts themselves and/or the Subsoil Law was sidestepped by Claimants by filing substantive proceedings only five days after the terminations. It is difficult to see how this behavior can be considered unreasonable under the relevant test. (R-II ¶¶ 1029 – 1036, partially quoted; see also R-I ¶¶ 41.9 – 41.17).*

1277. Respondent's measures were not discriminatory. As the Parties agree, a state's conduct is discriminatory if similar cases are treated differently without reasonable justification. Once the investor has demonstrated that its case and a reference case are similar, the burden shifts to the host state to demonstrate that there is a reasonable justification for the differential treatment. Here, Claimants have not proven the similarity between the cases of classification of pipelines and the conviction of Mr. Cornegruta and respective other cases. In particular, they have not established that the pipelines owned by KTM have features which would require their classification as trunk pipelines, nor have they demonstrated whether KTM holds a trunk pipeline license. Further, Claimants have not named a single case where authorities did not initiate criminal proceedings after they discovered the operation of a trunk pipeline without a license. Instead, they continue to make the baseless accusations that the Republic singled KPM and TNG out for some campaign of harassment. (R-I ¶¶ 41.14 – 41.24; R-II ¶¶ 1038 – 1043).

1278. Respondent's conduct has not impaired Claimants' investments. Contrary to the *onus probandi* rule, Claimants have failed to prove that the Republic's actions or omissions had any negative impact on the management, maintenance, use, enjoyment, or disposal of their investments, given Claimants' own mismanagement of KPM and TNG. (R-II ¶¶ 1044 – 1045). Claimants have neither shown nor even addressed whether the allegedly arbitrary measures caused their alleged loss. (R-II ¶ 1052). Respondent's arguments are best taken from their own words:

> *1046. First, [...] companies of KPM's and TNG's size operating in the subsoil sector must be prepared [...] [for] audits and inspections. [They] were not subject to any more audits or inspections than other subsoil users. Further, when companies fail to comply with the law, they must expect to be subject to audits and inspections. [...] Those audits were no more intrusive than those undertaken at other companies that did not comply with the law. Claimants have not proven that the audits and inspections impaired Claimants' management, use and enjoyment of their investments, [as they have not proven how their daily management activities were affected, whether there was a cut in dividends or why they could not sell KPM and TNG].*
>
> *1047. Claimants continue by suggesting that a press release, which notified potential buyers that the Republic would assert a pre-emptive right over TNG and accused Claimants of having forged documents in order to defraud Kazakhstan, impaired the disposal of their investments. The so-called press release Claimants refer to is in fact the INTERFAX-*



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 71 of 104

*KAZAKHSTAN news agency piece about the reversal of the pre-emptive rights waiver dated 18 December 2008. Claimants ignore that the reversal of the pre-emptive rights waiver was perfectly lawful. Moreover, they have not provided sufficient proof that it was this news agency piece that caused Credit Suisse to step back from providing the bridge loan. Finally, the news agency piece is not attributable to the Republic. For this reason the so-called press release did not impair Claimants' disposal of their investments.*

*1048. Furthermore, Claimants contend that the financial burden of corporate back taxes, export duties and the audit of KPM and TNG with respect to transfer pricing impaired Claimants' management, use and enjoyment of their investments. However, neither KPM nor TNG paid any of the corporate back taxes or transfer price taxes. Claimants have made no complaint and produce no evidence concerning payments of export duties by TNG. Furthermore, the evidence suggests that Claimants were not prevented from managing and enjoying their investments in the period in question. In any event, Claimants could not reasonably expect that no back taxes would be assessed and that the export duties would not be imposed because the Republic was entitled to the payment of these levies. Therefore, the financial burden resulting from these taxes did not impair Claimants' management, use and enjoyment of their investments.*

*1049. Subsequently, Claimants allege that the Republic's refusal to extend the exploration period for the Contract 302 Properties impaired the management, use and enjoyment of their investments because this prohibited Claimants from establishing the full market value of these properties. Claimants ignore that KPM and TNG could not reasonably expect the exploration period under Contract 302 to be extended because the Republic was free to decide whether to prolong the contract or not. Hence, the Republic's refusal to extend the exploration period for the Contract 302 Properties did not impair the management, use and enjoyment of their investments. [RPHB 2 ¶ 329 – 330]*

*1050. Also, Claimants complain that the "criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta" impaired the management, use and enjoyment of their investments because top personnel left the country and the Republic froze KPM's assets. Again, Claimants have failed to prove to the necessary standard how the criminal proceedings affected their daily management activities, whether there was a cut in dividends and how and why Claimants could no longer dispose of KPM and TNG. Therefore, it is not evident that the criminal proceedings really impaired Claimants' management, use and enjoyment of their investments. In particular, in respect of the repudiation of the alleged pre-emptive rights waiver, and the press release on the same day, Claimants have produced no evidence to suggest that the Republic was wrong in highlighting its concerns about the legality of Terra Raf's activities. As set out in the Statement of Defence at paragraphs 13.471(ii) and (iii) it was perfectly appropriate to air its concerns to INTERFAX, given the suspicions that Claimants had. It cannot be concluded from this that*



> *Claimants' investments were affected (or that if they were, that this was inappropriate). In respect of paragraph 534, Claimants have not produced any persuasive evidence that the top management left the country by reason of the Republic's investigations into Claimants' illegal activities or that this impaired their investments. (R-II ¶¶ 10–6 – 1050, summarized and partially quoted; see also R-I ¶¶ 41.25 – 41.30).*

1279. As recorded aboveRespondent also maintains that it terminated Contracts 210 and 305 in accordance with the law, and that Claimants failed to file a timely appeal or to request an extension, despite having ample time to do so. There was no conspiracy regarding the creation of the heavily debated Subsoil Law 2010, which took almost 2 years to pass. (RPHB 2 ¶¶ 367 – 372).

### 3. The Tribunal

1280. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1281. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 10(1) ECT not to impair by unreasonable or discriminatory measures Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1282. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1283. There is, therefore, no need to examine whether such a further breach has been shown.

## J.VI. Respondent's Observance of Obligations It Entered Into With Respect to Claimants' Investments (Umbrella Clause in Art. 10(1) ECT)

### 1. Arguments by Claimants

1284. Article 10(1) ECT contains a broadly worded "*umbrella clause.*" The purpose of this clause is to expand the reach of the ECT's protections to obligations that are not covered by the ECT's other substantive provisions. The plain language of the umbrella clause does not differentiate between contractual obligations and legislative/regulatory undertakings. Four language versions of the ECT clearly indicate that each Contracting Party shall observe any obligation that it has undertaken towards (or, in two ECT versions, has assumed with regard to) an investor or the investments of an investor of another Contracting Party. (C-I ¶¶ 363 – 370; C-II ¶ 537, 539, partially quoted).



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 73 of 104

1285. That the umbrella clause does not differentiate between contractual obligations and legislative undertakings has been confirmed by a number of investment treaty tribunals, such as the *Eureko v. Poland* and the *Enron v. Argentina* tribunals that have confirmed that the umbrella provision extends to obligations undertaken through law and regulation. Furthermore, in light of the other terms of the ECT, including the ECT's definition of investment, it is indisputable that Kazakhstan undertook a number of contractual, legislative, and regulatory obligations with regard to Claimants and their investments, which are protected under the umbrella clause. (C-I ¶¶ 363 – 370; C-II ¶¶ 537, 539).

1286. Neither case on which Respondent relies to support its argument that a restrictive reading of the umbrella clause is necessary actually stands for that contention. The tribunal in *Al-Bahloul v. Tajikistan* held that the ECT umbrella clause "*is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations*." Likewise, the *CMS* ad hoc committee held that an even broader reading was possible – looking toward the law of the host state and possibly international law. (C-II ¶ 538).

1287. Respondent's argument that the arbitration provisions in the Subsoil Use Contracts bar claims relating to those contracts under the umbrella clause is wrong, and it conflates contract claims with treaty claims. Here, Claimants assert that Kazakhstan breached its obligation to observe all obligations undertaken with respect to their investments, and that includes its contractual obligations. This is permissible under the ECT, which provides jurisdiction over disputes relating to an investment for contractual claims that may arise under the umbrella clause. Contractual forum-selection provisions, on the other hand, would naturally cover only contractual claims (those belonging to KPM and TNG, rather than to Claimants). Thus, the cases cited by Respondent – *SGS v. Philippines* and *Bureau Veritas* – are plainly inapplicable to the present cases. In those cases, the claimants were parties to the contracts at issue, making it not surprising that the tribunal found that they were bound by the contract. Here, Claimants are not parties to the contracts at issue. Further, the cases cited do not involve the types of government measures that were involved here – and the tribunals in *SGS v. Philippines* and *BIVAC v. Paraguay* were not asked to consider whether the breaches constituted international treaty violations. Finally, in the *BIVAC* case, the tribunal held that "*a forum selection clause should not be permitted to override the jurisdiction to hear Treaty claims of a tribunal constituted under that Treaty*." (C-II ¶¶ 540 – 542).

1288. Turning to Respondent's focus on the contractual forum selection clause, a cause of action under the ECT is not subject to the exclusive jurisdiction clauses contained in the underlying contracts, regardless of whether the treaty claims relate to contractual issues. Claimants state that Art. 26 ECT allows foreign investors to choose between a contractually agreed forum for international arbitration before ICSID, UNCITRAL, or the SCC. The claimant's choice is not constrained by the forum selected in the contract. (C-II ¶¶ 543 - 545).

1289. Article 26(3)(c) ECT permits Contracting Parties to exclude international arbitration for violation of the umbrella clause, but Kazakhstan has not exercised this option. (C-II ¶ 544).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1290. Each of the following measures constitutes a distinct violation of the umbrella clause:

[1] *Kazakhstan "reclassified" KPM's and TNG's pipelines as "main" pipelines, in violation of the approvals by its state authorities and agencies for the design, construction, and operation of the "reclassified" pipelines as in-field pipelines pursuant to Kazakhstan's Law on Oil and relevant regulations;*

[2] *Kazakhstan arrested, convicted, and incarcerated Mr. Cornegruta, in violation of general principles of due process and Articles 12 and 16 of the Kazakh Constitution recognizing each person's human rights and freedoms;*

[3] *Kazakhstan issued a criminal verdict against the non-party KPM, froze KPM's assets, and barred KPM from lodging an appeal against its conviction , in violation of general principles of due process and of Article 77(3) of the Kazakh Constitution;*

[4] *Kazakhstan approved the transfer of TNG to Terra Raf and waived its pre-emptive rights, and then later rescinded its express approval and waiver;*

[5] *Kazakhstan refused to extend TNG's exploration period in the Contract 302 Properties although it had expressly approved the extension;*

[6] *Kazakhstan imposed the Crude Oil Export Tax on KPM, in violation of exemption and legal stabilization clauses in the Subsoil Use Contract;*

[7] *Kazakhstan imposed amortization rates at higher than contractually-agreed rates, in violation of clear amortization and legal stabilization provisions in the Subsoil Use Contracts;*

[8] *Kazakhstan wrongfully and unilaterally repudiated KPM's and TNG's Subsoil Use Contracts, in violation of the contract terms; and*

[9] *Kazakhstan illegally seized Claimants' investments, in violation of general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property. (C-I ¶¶ 371 – 372; C-II ¶¶ 546 – 547, partially quoted; see generally CPHB 1 ¶¶ 122 – 422; CPHB 2 ¶¶ 97 - 114).*

1291. The 18 September 2009 judgment that sentenced Mr. Cornegruta to four years in prison and ordered the recovery of USD 145 million from non-party KPM constituted an egregious breach of Art. 10(1) ECT. Mr. Cornegruta was prevented from presenting evidence on his behalf and the judge relied only on information provided by the Financial Police. With regard to KPM, there is no theory of "*quasi-criminal*" liability in Kazakhstan – Kazakhstan has blatantly misconstrued clause 27 of the Regulatory Decree of the Supreme Court of June 20, 2005, "On hearing of a civil action in criminal proceedings" and Article 371, section 1(10) CPC to show otherwise. At most, Kazakhstan could have received compensation for "*property damage*" in cases where no civil action was filed – and this is totally inapposite to Mr. Cornegruta's case, where there is no issue of property damage.



In order to recover funds from a company for alleged criminal conduct, Kazakhstan would have had to have pursued a sanction under administrative law or file a civil suit. Simply imposing Mr. Cornegruta's fine on KPM was not an option. (CPHB 2 ¶¶ 97 – 114).

1292. Kazakhstan's 2007 commitments regarding Terra Raf's legal ownership of TNG (namely, that the State's pre-emptive right did not apply to the 2003 transfer) were breached in violation of the umbrella clause. (CPHB 2 ¶ 126).

1293. Respondent's "*spurious*" tax assessments violated the terms of the Subsoil Use Contracts and, likewise, were in violation of the ECT's umbrella clause. (CPHB 1 ¶ 261; CPHB 2 ¶ 139).

1294. When Kazakhstan failed to formalize the extension of Contract 302, which it expressed on 19 March 2009 and wrote on 9 April 2009, it breached the ECT's umbrella clause. The promise to extend the contract was an express "*obligation*", giving rise to a treaty obligation under the umbrella clause, as well as a legal obligation under Kazakh law to formalize the extension. Claimants legitimately expected the contract to be extended, as it had been in the past. TNG made a significant discovery in the Contract 302 properties at the Munaibay prospect, but retracted the application in October 2008 after determining that Contract 302 held greater reserves. It applied for an extension on 14 October 2008. The fact that Claimants retracted the declaration of the commercial discoveries – discoveries which would have given them the exclusive right to produce oil and gas from those fields – is a demonstration of their legitimate belief that the contract would be extended. Had the government been timely in addressing the application to extend, Claimants would have had the opportunity to undertake the appraisal work and declare commercial discoveries in the Contract area. Since the extension was promised, Claimants had no need to do further appraisal. (CPHB 1 ¶¶ 221 – 237, CPHB 2 ¶¶ 152 – 162, 176).

1295. This is not a pre-contractual dispute. Kazakhstan undertook to extend the contract, during the life of the contract. In the past, Kazakhstan granted an extension six months after the previous exploration had expired, with no consequence in the validity of the contract. Further, Kazakhstan treated the Contract 302 area as if the contract were still in force, ordering the sequestration of those assets on 30 April 2009 and remarking on the fulfillment of the work conditions of Contract 302 in 2010. Kazakhstan's actions demonstrate that it believed the contract to still be in force through 22 July 2010, when it formally terminated Contract 302. Respondent's failure to execute the addendum after expressly committing to is a violation of the umbrella clause. (CPHB 2 ¶¶ 163 – 171).

1296. Respondent's repudiation of the Subsoil Use Contracts was also in violation of the umbrella clause. There was no evidence that Claimants were in breach of any aspect of the Subsoil Use Contracts, the minimum work requirements or of Kazakh law, nor were they treating the fields badly. (CPHB 2 ¶ 191).

### 2. Arguments by Respondent

1297. Contrary to Claimants' assertion, the scope of the umbrella clause is limited to contractual obligations and does not extend to alleged breaches of the Republic's



domestic law. According to the VCLT, the wording of the umbrella clause must be interpreted such that its scope is limited to contractual obligations. The language "*to enter into*" or "*to undertake to bind oneself*", interpreted according to its plain meaning as required by Art. 31(1) VCLT, illustrates the consensual nature of the obligations in question. In addition, the use of the term "*with*" further indicates contractual obligations because statutes and regulations are not concluded *with* an individual party in one individual case. (R-II ¶¶ 1053 – 1058).

1298. Article 31(1) VCLT clarifies that the context of each term is crucial. Thus, when taking into consideration the ordinary meaning of "*to enter into*", the reference to "*any obligation a party enters into*" means "*any obligation a party has undertaken to bind itself to perform by an agreement*" and thus "*any contractual obligation.*" (R-II ¶ 1059).

1299. Regarding the different language across each equally authoritative version of the ECT, Claimants contend that four versions of the ECT refer to "*obligations assumed with regard to*" whereas 2 versions can be translated to mean "*to enter into.*" Since all versions of the ECT are equally authentic, the ordinary meaning of these terms is significant:

> *1063. The ordinary meaning of "to assume with regard to" in the context of Article 10(1) of the ECT is "to take upon oneself; undertake". When a party takes an obligation upon itself, the party commits voluntarily to performing the obligation. Therefore, both terms, "to enter into" and "to assume [with] regard to" contain an element of voluntary collaboration. This element of voluntary collaboration makes sense when referring to a contractual obligation because, self-evidently, both parties are free to enter into a contract. It makes no sense when referring to a statutory or regulatory obligation because these apply notwithstanding the intention of those involved. Furthermore, it is general linguistic usage to say that a party enters into a contract and assumes obligations with regard to a contract, but it is not commonly heard that a party enters into a statute or assumes obligations with regard to a regulation. (R-II ¶ 1063).*

1300. If four versions of the ECT limit the scope of the umbrella clause to contractual obligations, but two extend it to legislative, then there would be a difference in meaning between the texts. In such a situation, Article 33 VCLT demands that the Tribunal adopt the meaning which best reconciles the texts, having regard to the object and purpose of the Treaty. The "*contractual obligations only*" interpretation is, however, the common denominator of both meanings, best reconciling the texts. The Tribunal should adopt this meaning. (R-I ¶¶ 39.3 – 39.5; R-II ¶¶ 1064 – 1065).

1301. The interpretation of Art. 10(1) ECT as only encompassing contractual obligations is supported by the object and purpose of the ECT, which is to promote long-term cooperation between investors and host states. If the umbrella clause were to encompass regulatory or statutory obligations, every breach of a host state's domestic law would form a breach of the ECT. Had the contracting parties to the ECT really wished to commit themselves to such a large extent, they would have amended the wording of the umbrella clause accordingly. Construing the scope of the umbrella clause to encompass statutory and regulatory obligations would alienate the contracting parties to the ECT and might ultimately cause them to



withdraw from the treaty. This would run counter to the ECT's purpose of promoting long-term cooperation of investors and host states. (R-II ¶¶ 1066 – 1067).

1302. Renowned scholars and tribunals alike have agreed that the scope of the umbrella clause is limited to contractual obligations. The *CMS v. Argentina*, which Claimants cite in their favor, clearly referred to consensual obligations under the law of the host state or under international law. Statutes and regulations are not of a consensual nature – only contracts are. Hence, the reasoning in CMS *v. Argentina* demonstrates, contrary to Claimants' assertion, that tribunals agree that the scope of the umbrella clause is limited to contractual obligations. This view was confirmed by the tribunal in *Al-Bahloul v. Tajikistan*, which had to deliberate on the umbrella clause in Article 10(1) ECT. *Eureko v. Poland* can be read to mean that the tribunal regarded any contractual obligations with regard to investments as encompassed by the scope of the umbrella clause – that tribunal did not even deliberate on whether statutory or regulatory conduct toward an investor constituted a breach of the umbrella clause. Further still, in *SGS v. Philippines*, the issue under consideration arose from consensual obligations. As for *LG&E v. Argentina* and *Enron v. Argentina*, the tribunals found that Argentina's Gas Law and its regulations were encompassed under the umbrella clause – but they contrasted them from legal obligations of a general nature. Those cases concerned specific promises made by the state concerning the laws, and those promises transformed the laws and regulations into obligations within the meaning of the umbrella clause. Respondent, thus, presents that all of the cases cited by Claimants in support of their reasoning either does not support Claimants' proposition, or contradicts it. There is no reported investment law decision where the scope of the umbrella clause was unconditionally extended to domestic law. (R-I ¶¶ 39.6 – 39.8; R-II ¶¶ 1068 – 1080).

1303. The exclusive arbitration agreements in the Subsoil Use Contracts, as well as in Contract 302, bar claims relating to these contracts under the umbrella clause. Those contracts' arbitration clauses oblige both parties to resort exclusively to international commercial arbitration once a dispute arises with respect to those agreements. Claimants have never referred the disputes regarding the Subsoil Use Contracts or Contract 302 to international commercial arbitration. Foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause because this conforms to and enforces the maxim *pacta sunt servanda*. Therefore, the Subsoil Use Contracts and Contract 302 are utterly irrelevant in terms of the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1081 – 1086, 1097).

1304. Tribunals in investment treaty arbitrations have ruled that foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause. The tribunal in *SGS v. Philippines* clarified that a standard jurisdiction clause in an investment treaty between two states does not override the parties' binding selection of a forum to determine their contractual claims, because the contract between the parties needs to be regarded as *lex specialis* in relation to an investment treaty between two states. Respondent cites that this view has been confirmed by scholars and other tribunals, including *BIVAC v. Paraguay*, which added that contractual forum selection clauses needed to be regarded as a



"*voluntary waiver*" of resort to the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1087 – 1095).

1305. Even if the Tribunal considers that the umbrella clause covers statutory and regulatory obligations and that the Subsoil Use Contracts and Contract 302 were relevant under the umbrella clause – which Respondent denies – the Republic nevertheless complied with domestic law. Each of the actions alleged by Claimants was consistent with and/or mandated by Kazakh law. (R-I ¶ 39.13; R-II ¶¶ 1098 – 1099).

1306. The classification of KPM's and TNG's pipelines as trunk pipelines was lawful. It was found that KPM were operating a trunk pipeline without the relevant licence. As a consequence, Mr. Cornegruta, KPM's representative, was found guilty of illegal entrepreneurship under Section 190(2)(b) of the Criminal Code of Kazakhstan. This decision was confirmed on appeal on 12 November 2009 by the Regional Court of Mangystau. It was Claimants that were in breach of Kazakh law, not the Republic. Due process and Art. 77(3) of the Kazakh Constitution were strictly adhered to in the investigation of the crime, as well as in the arrest, conviction, and incarceration of Mr. Cornegruta on behalf of KPM. The procedure of the recovery order – i.e. the recovery of illegal income of a company resulting from the crime of its manager – was at all times in accordance with Kazakh law. Procedural participation was safeguarded at all times through the presence of Mr. Cornegruta. (R-II ¶¶ 1100 – 1103; RPHB 2 ¶¶ 243 – 264).

1307. KPM and TNG were in serious breach of the terms of the Subsoil Use Contracts. Claimants were aware of these breaches and had unsuccessfully contested them in Kazakh courts. After notifying the companies of their breaches, the Republic rightly terminated the Subsoil Use Contracts in accordance with Kazakh law and the terms of the contracts themselves. The Republic's termination of KPM's and TNG's Subsoil Use Contracts did not violate the respective contract terms. Rather, it was Claimants who breached the contractual terms, thus leading to a legitimate termination. (R-II ¶ 1104).

1308. There was no seizure of Claimants' investments. There was a legitimate transfer into trust management in accordance with the Subsoil Law 2010, which is the lawful consequence following the termination of the Subsoil Use Contracts. This transfer in any event only took place well after Claimants had abandoned their investment. Since the Republic did not illegally seize Claimants' investments, it follows that the Republic did not violate general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property. (R-II ¶ 1105, partially quoted; RPHB 2 ¶¶ 359 – 374).

1309. Regarding the transfer from Gheso to Terra Raf, there were 8 transfers that involved majority shares in TNG, the consequence being that none of the after-occurring transfers in TNG involving Claimants' companies was completed. Respondent's belated consent to one transfer does not cure all other previous failures. Thus, Respondent was fully justified in inquiring as to Claimants' position with respect to TNG. (RPHB 2 ¶¶ 272 – 281).

1310. At the Hearing on Quantum, Claimants alleged that the Republic's gas market breached the ECT's protections under the umbrella clause, as well as the FET and



impairment provisions of the ECT. This argument fails since the Republic never guaranteed an export market to Claimants. (RPHB 1 ¶¶ 698 – 700). This argument did not appear in Claimants' First Post-Hearing Brief and was not made in the final hearing. It appears that Claimants have dropped this claim. (RPHB 2 ¶¶ 423 – 424).

1311. The scope of the umbrella clause is limited to contractual obligations, as explained in *Siemens v. Argentina* to mean "*obligations [which] originate in a contract between the State party to the Treaty and the foreign investor*." (RPHB 2 ¶ 427).

1312. Claimants have attempted to argue that the non-extension of Contract 302 is a violation of the umbrella clause, but have failed to substantiate how such a claim could exist under investment law. Claimants have not demonstrated any reliance on the 9 April 2009 letter. In any event, Claimants have always accepted that Respondent was not under an obligation to extend Contract 302. Even if there had been no breach of the promise to extend the contract had not occurred, Claimants still would not have had a claim to develop the Contract 302 area because the contract would simply have terminated on 30 March 2009. Alternatively, even if the 9 April 2009 letter constituted a decision to agree to extend Contract 302 (which is denied), that was only a unilateral act, not a contract. Such unilateral acts are not covered by the umbrella clause. Additional steps, including an application for a new license, would have needed to be undertaken to perfect the extension. (RPHB 2 ¶¶ 292 – 305, 425 – 430).

### 3. The Tribunal

1313. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1314. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligations it entered into with respect to Claimants' investments by the Umbrella Clause in Art. 10(1) ECT), if there are any further damages sought by Claimants not covered by the FET breach.

1315. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1316. There is, therefore, no need to examine whether such a further breach has been shown.

## J.VII. Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice

### 1. Arguments by Claimants



1317. Claimants encourage the Tribunal to interpret Art. 11(2) ECT in good faith and under its ordinary meaning, pursuant to Art. 31(1) VCLT. (C-II ¶¶ 553 – 554). Claimants' argument is best taken from its own words, found at C-II ¶ 555:

> *555. According to the ordinary meaning of Article 11(2) of the ECT, Claimants were entitled to employ any key in-country personnel they wished. However, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. Moreover, Kazakhstan relied on the same spurious legal grounds to initiate criminal actions against four other general managers of Claimants and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations, so that Claimants had no choice but to recall all their key personnel from Kazakhstan. Therefore, Kazakhstan violated its obligation to permit Claimants to employ key personnel of their choice under Article 11(2) of the ECT. (C-II ¶ 555).*

1318. Mr. Condorachi's testimony confirmed that Claimants' management decided that it would be best if he and several other middle managers leave Kazakhstan, based on their previous dealings with the Financial Police and the imprisonment of Mr. Cornegruta. (CPHB 1 ¶ 270). In addition, as explained by Mr. Broscaru, after the 14 October 2008 order, construction on the LPG Plant slowed significantly because the non-Kazakh workers on the project were unable to renew their work permits. (CPHB 1 ¶ 358).

## 2. Arguments by Respondent

1319. Article 11(2) ECT permits foreign investors to employ key personnel of their choice, so long as such personnel have the required work and residence permits. It prevents a host State from enacting any domestic employment legislation or committing any forceful action that would prevent the foreign investor from hiring key personnel. As scholars agree, this provision is unambiguous and does not require interpretation. (R-II ¶¶ 1145 – 1147).

1320. In response to Claimants' argument that Art. 11(2) ECT needs to be interpreted using Art. 31(1) VCLT, Respondent disagrees that there is ambiguity in other terms, but agrees that the term "*key personnel*" could require interpretation, as it is not defined in the ECT or any other investment treaty. The ordinary meaning of "*key personnel*" refers to employees of the foreign investor which are indispensable to the running of the investment and/or are decisive to the success of the investment. The meaning of the term does not extend to other individuals. Claimants have not proven that Mr. Cornegruta or any of the other unnamed four general managers are part of such an exclusive group. It has not been alleged that these are essential personnel. (R-II ¶¶ 1151 – 1154).

1321. It is not true that the lawful interrogations and criminal proceedings against Mr. Cornegruta on behalf of KPM or against the other four managers forced Claimants to recall their key personnel from Kazakhstan. Respondent states, however, that it "*is notable that Claimants suggest that this should require the removal of their key personnel from the country. This suggests that Claimants are willing to assist their key personnel from facing the consequences of illegal behaviour. In turn this*



*suggests that the detention of Mr Cornegruta in April 2009 (on suspicion that he would flee the country) was well-founded.*" (R-II ¶¶ 1156 – 1159).

### 3. The Tribunal

1322. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1323. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 11(2) ECT to permit to employ key personnel according to Art. 11(2) ECT for Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1324. Claimants' allegation of this further breach leads to no further damages sought than those resulting from the FET breach. There is, therefore, no need to examine whether such a further breach has been shown.

# K. Causation

## K.I. Law on Causation

### 1. Arguments by Claimants

1325. Claimants agree that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation flows from the host state's conduct. Tribunals have broad discretion in evaluating causation. As the tribunal in *Lemire v. Ukraine* explained, the element of causation requires the aggrieved party to "*prove that an uninterrupted and proximate logical chain leads from the initial cause ... to the final effect.*" As the *Lemire* tribunal explained, the causal link need not be direct, but can be established through a chain of connected events. The primary limitation on the principle of transitive causation is that the chain of events must be "*neither too remote nor too aleatory.*" Classically, what is necessary is to prove that there is "*no [break] in the chain and [that] the loss can be clearly, unmistakably and definitely traced, link by link, to [the State's] act, [whereby] indirect losses are covered [so long as] in the legal contemplation, the [state's] action was the efficient and proximate cause and the source from which they flowed.*" The requirement of proximate cause is closely related to the foreseeability of injury – the wrongdoer could have foreseen that through successive links, the irregular act would finally lead to damage. (CPHB 2 ¶¶ 199 – 202).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1326. The state is also responsible for all harm that proximately flows from its wrongful actions, even if concurrent causes contributed to the harm. As the tribunal in *CME v. Czech Republic* explained, the only exception to this would be in cases of contributory fault.

1327. The burden then shifts to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged. As the tribunal in *CME v. Czech Republic* explained, however, unless the injury can be shown to be severable in causal terms from that attributed to the state, the latter is held responsible. Kazakhstan, therefore, can only escape liability for the injuries that naturally flowed from its conduct if it can prove that an intervening cause completely superseded the effects of its actions into a severable injury, and not merely that other concurrent events contributed to or amplified Claimants' injury. (CPHB 2 ¶¶ 200, 203).

1328. Finally, as the Tribunal in *Lemire* found, it is often not possible for a claimant to prove with certainty what would have happened "*but for*" the State's wrongful actions. Thus, it is sufficient for the Claimants to prove that it was probable that they would have had a different outcome, but for the State's actions. (CPHB 2 ¶ 204).

### 2. Arguments by Respondent

1329. Article 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. In investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss. Even in the *MDT v. Chile* case, cited favorably by Claimants in their "*full compensation*" arguments, the Tribunal reduced the damages otherwise due by 50 % to reflect the investors' negligent conduct. Here, there is a clear correlation in time between the companies' financial troubles and Claimants' conduct. (R-III ¶ 436 – 440).

### 3. The Tribunal

1330. The Parties agree, and so does the Tribunal, that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation is caused by the host State's conduct.

1331. The Tribunal further agrees with Respondent that Art. 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. Indeed, in investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss.

1332. And the Tribunal agrees with Claimants that the burden then may shift to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged, unless, as the tribunal in *CME v. Czech Republic* explained, the injury can be shown to be severable in causal terms from that attributed to the state.



## K.II.       Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages

### 1.       Arguments by Claimants

1333. The campaign of harassment and coercion that began in October 2008 and was publicized in December 2008 initiated a chain of events that irreparably harmed Claimants' investments and prevented Claimants from fully developing or alienating them from that moment forward.

1334. Claimants' search for bridge financing in November 2008 began on recommendation from Renaissance Capital. It was necessary in order to obtain a partial advance on the proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices. Further, although Kazakhstan sabotaged the Credit Suisse financing in December 2008, the liquidity position at KPM and TNG did not become problematic until the June 2009 Laren transaction. Respondent's argument about the "*going concern*" qualification issued by the auditors' is also disingenuous and expressly states that the "*going concern*" qualification was based on events after 31 March 2009. The reasons for this qualification were Kazakhstan's freezing of KPM and TNG's assets and Claimants' equity interests in KPM and TNG, the criminal investigations, and the USD 62 million back tax assessment. Finally, Claimants' financial position as of June 2009 was mainly due to Kazakhstan's conduct – it does not reduce the impact of Kazakhstan's interference on the Credit Suisse financing, but rather amplifies it. (CPHB 1 ¶¶ 405 – 408).

1335. Two events - the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's false accusations of forgery and violations of registration requirements, and the 15 December 2008 formal initiation of the criminal investigation against KPM – had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. Based on those events, on 14 January 2009, Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative. Fitch warned investors that the MEMR's cancellation of its pre-emptive rights waiver could result in the termination of TNG's Subsoil Use Contract. On 15 January 2009, Moody's placed Tristan's B2 rating on review for a possible downgrade, again based on both events. Accordingly, Kazakhstan's wrongful acts had a profound impact on the value of Claimants' investments not later than 14 January 2009. (CPHB 1 ¶¶ 346 – 357, 646 – 647; CPHB 2 ¶¶ 205 – 209).

1336. The INTERFAX article directly interfered with a specific financing transaction that Claimants were then negotiating with Credit Suisse. On 18 December 2008, Mr. Petrosius of Credit Suisse sent Mr. Lungu the INTERFAX article and requested his comments. After that, Credit Suisse refused to provide the bridge loan until Claimants resolved their disputes with the Kazakh government. Kazakhstan's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through is not persuasive. Moodys and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns to the companies' ability to service their existing debt. It would have been surprising if any lender would have gone forward with the new financing without resolution of the conflicts. (CPHB 2 ¶¶ 210 – 211).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 84 of 104

1337. The financial crisis did not prevent the Credit Suisse transaction. Credit Suisse stated on 5 December 2008 – after the crisis erupted in September 2008 – that it aimed to execute the term sheet the following week. (CPHB 2 ¶ 212).

1338. The inability to receiving financing forced Claimants to enter into the Laren transaction in June 2009. It was a necessary transaction that was on horrible terms, which caused Moody's and Fitch ratings agencies to further downgrade Tristan's debt to the C level. Respondent's illogical and speculative argument that Claimants would have turned to the Laren loan sharks in August 2009 to refinance the Credit Suisse loan ignores the State's actions, completely. If Claimants had needed to refinance, they would have been able to do so on ordinary commercial terms, possibly even with Credit Suisse, on the same or better terms, since oil prices and credit markets had improved dramatically by that time. Respondent's argument that the Credit Suisse loan would not have helped Claimants to avoid the Laren loan is speculative and nonsensical. (CPHB 2 ¶ 213 – 214).

1339. The evidence that Kazakhstan's conduct interfered with Claimants' ability to sell their investments in KPM and TNG is overwhelming. First, the MEMR leak to INTERFAX clouded Claimants' title and reputation. Second, Kazakhstan sequestered Claimants' shares in KPM and TNG and KPM's and TNG's Subsoil Use Contracts, pipelines, and vehicles on 30 April 2009. Claimants were thereafter legally prohibited from selling their investments, through sale of either shares or assets. (CPHB 2 ¶¶ 233 – 235).

1340. The clouded title resulting from the INTERFAX press release interfered with Claimants' ability to sell KPM and TNG as of 30 April 2009, when Kazakhstan froze the shares in the companies. Kazakhstan's actions also affected several potential buyers in the Project Zenith sale process, to which Mr. Suleymenov testified. This affected price, as the RBS Report confirms that RBS and KMG E&P deducted liabilities attributable to Kazakhstan from their valuation. In addition, the KMG E&P confirmed its valuation by examining the trading price of the Tristan debt, which was also negatively affected by Kazakhstan's actions. (CPHB 1 ¶¶ 384 – 389).

1341. Kazakhstan's actions interfered with TNG's sales. Claimants inferred that Kemikal's sudden and inexplicable refusal to post bank guarantees that were required by its credit terms was part of Respondent's aggressive and hostile campaign to put pressure on Claimants. At the time, Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev. As a result, Claimants did not renew the contract with Kemikal when it expired at the end of 2008. Respondent frustrated TNG's attempts to find replacement buyers in summer 2009 in two ways. First, Respondent prevented TNG from selling gas on export markets (which required access to the CAC Pipeline, which required Claimants to sell through a Kazakh government affiliate, either Kemikal or KazRosGaz). Second, the arrest of Mr. Cornegruta and the inspections and harassment caused the management of TNG to devote much of their time responding to the State's harassment, rather than the day-to-day management of the company. Many managers wisely fled the country. As a result of being compelled not to renew the Kemikal contract and of being unable to find a replacement, TNG had to shut down production by 30 – 50% from March – July 2009, and by 100% for two weeks in



August 2009. TNG produced 17 BCF of gas and 311,000 barrels of condensate fewer than its own targets. (CPHB 2 ¶¶ 223 – 227).

1342. Advisors to the State controlled oil company, KMG EP, confirmed that the State's actions were material impediments to any acquisition of KPM and TNG. Squire Sanders recommended that KMG EP make the return of the companies' documents and the termination of the criminal proceedings and attachment orders a condition on any transaction. Those accounts posed an insurmountable obstacle to the sale of KPM and TNG to buyers other than KPM EP, who may have had the clout to stop the criminal actions. (CPHB 2 ¶ 236).

1343. PwC identified financial and tax issues that were directly attributable to Kazakhstan's wrongful actions as impediments to the purchase by KMG EP or, at least, issues to be considered in valuing KPM and TNG. The RBS valuation included USD 243.5 million in contingent liabilities, most of which are attributable to Kazakhstan. RBS disregarded the potential exposure of up to USD 1 billion in criminal fines, but suggested that those could be dealt with in the SPA – something only perhaps no other purchaser but KMG EP could have accomplished. Mr. Suleymenov testified that KMG EP valued the companies' equity in the range of negative USD 50 – 100 million after deducting the Tristan debt and contingent liabilities. Importantly, however, the Tristan debt alone would have been USD 111 million less but for Kazakhstan's action. Thus, KMG EP's valuation would have been positive, but for KMG EP's action. (CPHB 2 ¶¶ 237 – 238).

1344. The market price of the Tristan debt was negatively affected by Kazakhstan's illegal actions. It was also misquoted by Mr. Suleymenov, when he stated that the market price of the Tristan notes was only 25 – 28 cents on the dollar, when it was nearly double that on the date of the RBS valuation. Mr. Suleymenov acknowledged that the trading price of the Tristan notes no doubt incorporate Kazakhstan's actions. (CPHB 2 ¶ 239).

1345. Finally, when Claimants submitted the Cliffson transaction to the MOG for approval in 2010, the MOG conditioned the sale on the satisfaction on all legal obligations imposed by the state and the release of the sequestration orders. The sale could not be concluded. Claimants have proven that Kazakhstan's actions were the primary reasons that KMG EP did not buy KPM and TNG. Other potential buyers, like Total lost interest when the State precluded Claimants from completing the exploration well. Dr. Kim of KNOC testified that the inability of TNG to export gas was the principle reason that KNOC lost interest. Mr. Seitinger testified that OMV decided against the purchase for market reasons, but those were also influenced by Kazakhstan. Even with the global financial crisis, it is beyond serious doubt that KPM and TNG became unattractive assets as a result of Kazakhstan's actions, and that Kazakhstan is responsible for all of the injury to which its actions contributed. (CPHB 2 ¶¶ 240 – 245).

1346. The final expropriation in July 2010 caused the direct and egregious injury to Claimants, who thereby lost their remaining ability to sell the assets, to use them productively, and to direct the cash flows from those assets to the creditors. The seizure was just the final step in a series of actions starting in late 2008 that impaired Claimants ability to profitably and successfully operate, manage, control, and dispose of their investments. (CPHB 2 ¶ 246).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE



## 2. Arguments by Respondent

1347. Initially, Claimants argued that the inspections and investigations initiated in October 2008 had a severe impact on the operations of KPM and TNG. Now, however, they have abandoned that claim. At the hearing, Mr. Cojin even testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production*." Instead, Claimants now focus on the lack of funding of KPM and TNG which they allege to have been caused by the Republic. (RPHB 2 ¶¶ 92 – 94, 126).

1348. Claimants now argue that the INTERFAX press item of 18 December 2008 caused an injury to Claimants' reputation and ability to get credit. It should be pointed out that in the first hearing, when asked about what caused the cashflow problems in 2009, Mr. Lungu made no mention of the pre-emptive rights waiver issue. Regardless, the INTERFAX item cannot be attributed to the Republic. It was not issued by the Republic. INTERFAX obtained the information from unofficial sources. Claimants have not shown that the Republic was in any way involved in the publication of the item. (RPHB 2 ¶¶ 95 – 97).

1349. Claimants' case that the pre-emptive rights waiver issue harmed their ability to secure financing boils down to the negotiations with Credit Suisse for a bridge loan (which could have collapsed for any number of reasons) and Mr. Lungu's non-credible and illogical testimony. Under Mr. Lungu's testimony, the Credit Suisse loan would have needed to be refinanced in August 2009 already – Claimants, thus, would have needed to turn to the Laren loan sharks in August 2009 instead of June 2009. To the extent that Claimants have argued that the INTERFAX item prevented them from getting financing on more commercial terms, Claimants have provided no evidence to support this, especially in light of the other problems relating to the drop in demand and the increase in need for capital expenditure. Finally, Respondent denies the unproven contention that Laren is not an affiliate of Anatolie Stati. (RPHB 2 ¶¶ 98 – 104).

1350. Respondent denies interfering with gas sales of KPM and TNG. The loss of Kemikal as a customer is not attributable to the Respondent since, as confirmed by PwC, that was due to Kemikal's own liquidity issues. Kemikal is a private company that was not acting in any kind of governmental capacity. It has not been managed by the State. (RPHB 2 ¶¶ 124 – 126).

1351. Claimants have not shown any legal authority in favor of lowering the standard of proof regarding the alleged interference with the sale of KPM and TNG. None of the causes complained of mentioned by Claimants played any role in the companies' decisions not to purchase KPM and TNG. Claimants' failure to sell the companies had nothing to do with the Republic's actions. Rather, it was caused by the lack of commercial activity of KPM and TNG. Any interest that may have existed on behalf of some market players vanished upon closer review of the companies. (RPHB 2 ¶¶ 135 – 137, 150).

1352. Anatolie Stati was dishonest in his testimony in both hearings. His testimony was inconsistent with that of other witnesses. In particular, he informed the Tribunal



that Kazakh authorities allegedly told Total EP and KNOC that it would not permit sale. The testimony of Mr. Chagnoux of Total EP and Dr. Kim of KNOC, however, confirmed that no such talks with Kazakh authorities had taken place. (RPHB 1 ¶¶ 112).

1353. Claimants' arguments regarding the involvement of KMG EP are confusing and fundamentally inconsistent. On the one hand, KMG EP was part of the alleged harassment campaign, and on the other, Claimants treat KMG EP as a purely commercial entity for the purpose of their alienability arguments. In any event, it was not State actions that led to the KMG EP decision not to go forward with the deal. "*As the RBS valuation showed, KMG EP assumed in the base case an enterprise value between USD 473 million and USD 751 million for KPM and TNG (taking into account potential synergy effects). At the same time, KPM and TNG were liable for USD 531.1 million in noteholder debt with an interest of 10.5%. In other words: There was a considerable likelihood that the equity value of KPM and TNG was negative even disregarding any other liability but the noteholder debt.*" Neither the pre-emptive rights waiver issue nor the sequestration of shares played any role. (RPHB 2 ¶¶ 146 – 149).

1354. Total E&P's ultimate lack of interest in purchasing KPM and TNG was that Total E&P was looking for situations in which they could add value or increase the reserves. In KPM and TNG, there was no such additional value. There is nothing incredible about this testimony and Claimants' attempts to discredit the witness, Mr. Chagnoux, are ridiculous. Mr. Chagnoux testified credibility and even discussed Total E&P's strategic decision to gain access to the data room by putting a value on the worthless LPG Plant. In any event, the Respondent did not hinder the sale by preventing Claimants from proving the resources in the Interoil Reef. TNG failed to prove these reserves, failed to drill deeply enough after the drill broke down, and failed to conduct a full and thorough 3D seismic analysis that covered the entire reef. Claimants, and not Respondent, are at fault. (RPHB 2 ¶¶ 138 – 142).

1355. In a fundamental reversal to Claimants' earlier positions, Claimants now agree that the lack of gas sales contracts caused KNOC to lose interest in KPM and TNG, despite testimony of their own witnesses, Anatolie Stati and Mr. Lungu, that the Kazakh authorities deterred KNOC. TNG's inability to secure gas contracts had nothing to do with the Republic. (RPHB 2 ¶¶ 143 – 145).

### 3. The Tribunal

1356. As indicated above in this Award, the Tribunal notes that the Parties' submissions indicate that the Claimants' investment proceeded in a more or less normal fashion before the Order of the President of the Republic on 14/16 October 2008.

1357. Prior to the 14/16 October 2008 order, Claimants were involved in three-way negotiations, at the behest of Kazakhstan, beginning in 2007. On 7 May 2007, the MEMR, the Governor of the Mangystau Region, KMG, KazAzot, Ascom, KPM, and TNG entered into a MOU that TNG would sell certain volumes of gas to KazAzot first at near market prices followed by the international market price after



two years and, further, that through KazTransGas, TNG would be allowed to export certain volumes of gas at international market prices. (C-300). It was argued that TNG was ideally suited to be considered as the primary supplier to the ammonia-carbamide project as it was the fourth largest producer of gas, it was locally situated, and it was a reliable provider of gas in large quantities. Over the following year, extensive negotiations took place among the parties regarding such issues as prices, volumes, and other conditions of the agreement.

1358. Beginning in 2007, TNG, in addition to its efforts to pursue what became the Tri-Partite Agreement, had also pursued gas sales opportunities with Kemikal. Claimants argue that this entity was believed to be under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev. Deliveries to Kemikal began in October 2007 and continued throughout 2008.

1359. On 28 April 2008, the MEMR, KMG, TNG, KazTransGas, and KazAzot made a first agreement among TNG, KazAzot, and KazTransGas. (C-301). A further Tri-Partite Agreement followed between TNG, KazTransGas, and KazAzot setting out the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export. (C-302).

1360. TNG's Contract 302 initially had a six year term. As a result of flooding from the Caspian Sea basin, the MEMR extended the exploration term for two years and eight months, until 30 March 2009. The MEMR did not count this *force majeure* against the two permissible contract extensions, which in any event required consent of the Republic. (R-I ¶¶ 14.20 – 14.25; R-165). On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66). Instead, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. On 14 October 2008, TNG submitted its formal application to extend the exploration period Contract 302 by two years. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km…*" and "*large deeply submerged reef fields…*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251).

1361. Following the direction of President Nazarbayev on 14/16 October 2008, the Deputy Prime Minister promptly issued Order No. 6497 on 16 October 2008, which ordered the MEMR and the Tax and Customs Committees to conduct comprehensive and complex audits of KPM, TNG, and Kok Mai. These audits began on 28 October, 10 November, and 18 November 2008, respectively.



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 89 of 104

1362. Under the direction and sometimes even the supervision of the Financial Police, KPM and TNG faced relentless inspections, including by:

- The Customs Committee (18 October 2008, C-11);
- The MEMR (20 October 2008, C-9);
- The Tax Committee (24 October 2008, C-10);
- The Geology Committee (28 October 2008, C-12);
- The Ecology Committee (28 October 2008, C-13);
- The MES (31 October 2008, C-14); and
- The National Bank of Kazakhstan (November 2008, C-15);

1363. KPM's former General Manager and subsequently Deputy General Manager of TNG, Alexandru Cojin, stated that these investigations and inspections were voluminous and harassing. He testified that the process began around November 2008 and continued for nearly two years. (WS Cojin ¶¶ 6 – 8). Similarly, KPM's and TNG's Technical Director, Victor Romanosov, testified that "*normal*" inspections in the field had previously occurred once yearly, but commencing in late 2008 and continuing thereafter, the frequency of these inspections increased to every quarter, such that, "*[a]s a result, [he] met with representatives from nearly a dozen agencies for weeks at a time every three months*." (WS Romanosov 1 ¶ 26). These investigations were unprecedented for KPM and TNG. Claimants provided evidence that these actions became an almost daily intrusion into the operations of KPM and TNG, so much so that many staff members were more occupied with responding to the inspections than with their normal everyday responsibilities.

1364. The following events are also of relevance:

1365. In fall 2008, Kemikal – TNG's largest non-local customer – failed to post the bank guarantees that were part of its required payment terms. These terms were required because Kemikal's payment history was erratic and large arrears accrued. Accordingly, TNG did not renew the contract with Kemikal at the end of that year. It required collection efforts until June 2009 for TNG to receive payment from Kemikal.

1366. A 17 November 2008 Tri-Partite Agreement between TNG, KMG (who had replaced KazTransGas), and KazAzot memorialized their agreement on price, volumes, and related conditions of sale and export. (R-393). TNG and KMG signed this Tri-Partite Agreement. It was hand-delivered to KazAzot for its signature, but KazAzot never signed. Instead, in late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas. KazAzot allegedly indicated at that time that it would sign the Tri-Partite Agreement within six months, subject to the outcome of this audit.

1367. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5



December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381). Respondent states that this shows that Claimants likely began looking for financing in November 2008. (R-II fn. 775).

1368. On 18 December 2008, the MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Illyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

1369. The Parties agree that, on 18 December 2008, INTERFAX issued a press release containing allegations that the Claimants had altered documents in order to defraud the State of its pre-emptive right to purchase the companies.

1370. Immediately after its publication, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. (C-625). After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with Kazakhstan. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211; WS Lungu 1 ¶ 7).

1371. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

1372. Anatolie Stati testified that, following the State's actions in relation to its revocation of its previous waiver of pre-emptive rights regarding the transfer to Terra Raf, beginning December 18, 2008, he concluded he should be careful regarding the Kazakhstan Government's intentions. (Tr. January 2013 Hearing Day 2, pp. 84, 114 – 115). Thus, although this rig was ready for transport in January 2009, the newly purchased heavier drilling rig was not brought into Kazakhstan. (CPHB 2 ¶¶ 228 – 232). Respondent argues that Claimants would have needed to remove old rig, move the new rig in, assemble the new rig, and drill to 6000m in 3 months. Even if they had a new rig, it is unrealistic that a discovery would have been made. Not even Claimants foresaw it would go so quickly, having submitted a working program on 14 October 2008 that foresaw 7 months to drill Munaibay-1 from 5200 – 6000m. RPHB ¶ 119; fn. 209).

1373. On 14 January 2009, the Fitch Ratings agency issued a Rating Watch Negative report for Tristan's long-term default rate. A Dow Jones release indicated that the Rating Watch Negative report reflected Fitch's concern of "*a potential negative impact relating to the latest actions of the Kazakh authorities on Tristan's financial standing and business prospects*." The Dow Jones report referenced KPM being "*subject to a criminal investigation*." (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117; C-590). Although Respondent has argued that the Tristan Notes were risky from the outset, the Tribunal considers that the evidence reflects that Respondent's actions worsened the market's treatment of these notes, and this was explicitly noted by the ratings agencies.



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 91 of 104

1374. On 15 January 2009, Moody's reported a downgrade review of Tristan, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117; C-744).

1375. On 18 February 2009, Moody's downgraded the Tristan debt from B2 to B3 due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claimed by the State against TNG. (C-744).

1376. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1377. On 24 February 2009, TNG complained to MEMR regarding the negative effects that the December 2008 publication of Respondent's actions had had on its business and reputation. (CPHB 2 ¶ 117; R-II ¶ 171; C-619).

1378. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State explained that TNG was, therefore, in breach of Contracts 210 and 302. The State demanded that TNG submit a new application for Kazakhstan's consent to the transfer and waiver of the State's pre-emptive purchase right. Failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117; C-146).

1379. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1380. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38; C-744).

1381. In a hand-delivered letter dated 18 March 2009, which Respondent states should be viewed as an attempt to provoke the Republic, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit were denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-I ¶¶ 38, 149; CPHB 2 ¶ 117; R-I ¶¶ 9.75 – 9.76; C-41, WS Pisica 1 ¶ 31, WS Lungu 2 ¶ 42).

1382. On 19 March 2009, the day after this correspondence from TNG to MEMR, a group of representatives from KPM, TNG, Terra Raf, and Ascom met with the MEMR Executive Secretary, Mr. A. B. Batalov, at the offices of the MEMR. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14/16 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 92 of 104

Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-I ¶¶ 106, 150, 152, 177; R-I ¶ 13.47(e)(v), 21.1; C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 – 37, 43).

1383. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1384. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1385. On 25 March 2009, TNG sent the State a separate request for another formal, written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1386. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1387. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-I ¶ 31.70; R-163.2).

1388. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension including, for example, that TNG needed to apply for a license renewal, as well. (C-0 ¶ 58; C-I ¶¶ 22, 178; R-I ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; RPHB 1 ¶ 323 – 325; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68).¶

1389. Despite these potentially promising developments of 2 and 9 April 2009, which indicated that an extension may be forthcoming, the MEMR never renewed Contract 302. This matter lingered over the following months, during which time, TNG occasionally followed up – on 30 April 2009 and on 4 May 2009 – and received hints that the renewal would be forthcoming. As a result of the State's inaction, however, following the expiration of Contract 302 on 30 March 2009, TNG was prevented from exercising its contractual rights under Contract 302 and, therefore, prevented from further exploration of the Tabyl Block. The East Munaibay discovery, first claimed by TNG in July 2008 and later further re-



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 93 of 104

notified to the MEMR on 9 March 2009, along with a further notice of discovery in the Bahyt structure, remained unfulfilled.

1390. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2).

1391. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline, and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1392. On 30 April 2009 and 4 May 2009, TNG followed up with the MEMR to inquire about the status of the Contract 302 extension.

1393. On 7 May 2009, Anatolie Stati wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol.

1394. On 15 May 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts and requested additional documents from KPM. (R-I ¶ 29.2; CPHB 2 ¶ 38).

1395. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).

1396. On 12 June 2009, Terra Raf and Ascom filed petitions to lift the seizures. (C-0 ¶ 45; C-I ¶ 122).

1397. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1398. By early summer of 2009, most of the senior management of KPM and TNG, in light of the case of Mr. Cornegruta, had fled Kazakhstan in order to avoid arrest. The assets of KPM and TNG were under seizure. Credit Suisse had refused to provide financing, and the companies urgently needed to renew financing



arrangements in order to meet their tax and interest obligations. It was against this setting that the Laren Loan Facility was negotiated. (CPHB 2 ¶ 213).

1399. On 16 June 2009, Claimants entered into the Laren Loan Facility, described in detail in the summaries of the Parties' positions, above.

1400. On 17 June 2009, the Financial Police publically announced that their investigative phase had concluded and that the four former and current managers of KPM and TNG would be prosecuted for having realized an "*illegal profit*" of 147 billion Tenge (approximately USD 980 million as of June 2009). (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38 (calling the 147 billion the potential fine); R-I ¶ 26.24; C-118).

1401. On 19 June 2009, the third tranche of the 2006 Bonds Project was issued, for USD 111.11 million. (R-I ¶ 9.59).

1402. On 27 June 2009, the Terra Raf and Ascom petitions to lift the seizures were denied. (C-0 ¶ 45; C-I ¶ 122).

1403. On 27 June 2009, the Regional Prosecutor's Office wrote to Ascom and Terra Raf noting that an international search was underway for Mr. Cojin. (CPHB 2 ¶ 38; RPHB 2 ¶ 191).

1404. On 2 July 2009, the MEMR's self-imposed deadline to extend Contract 302 expired, without an extension of that contract. (CPHB 2 ¶¶ 38, 151).

1405. On 10 July 2009, a Fitch Ratings press release indicated that market observers were concerned about "*weak corporate governance standards at Tristan.*" (RPHB 2 ¶ 61).

1406. In August 2009, Kazakhstan, the Governor of the Mangystau Region, KazAzot, and Mitsubishi confirmed their intention to go forward with the ammonia-carbamide complex. A few days after that announcement, on 26 August 2009, the Governor of the Mangystau Region asked Prime Minister Massimov to cancel TNG's and KPM's Subsoil Use Contracts. Claimants allege that this letter implicitly sought the transfer of TNG's assets to KazAzot. (C-I ¶ 61; C-293).

1407. Notwithstanding several attempts to obtain his release, Mr. Cornegruta remained incarcerated until the conclusion of "*his trial*" on 18 September 2009. Thereafter, following his conviction and sentence of four years, he remained in jail until he escaped.

1408. From the above chain of events, the Tribunal considers that Respondent's series of actions starting in October 2008, which are breaches of the FET standard of the ECT as found above in this Award and which were publicized beginning in December 2008, harmed Claimants' investments and prevented Claimants from proceeding with their investment from that moment, forward.

1409. This affected Claimants' search for bridge financing, which they began in November 2008 on recommendation from Renaissance Capital. Bridge financing, they state, was necessary at that time in order to obtain a partial advance on the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices.

1410. Thereafter, the 15 December 2008 formal initiation of the criminal investigation against KPM and the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's accusations of forgery and violations of registration requirements, had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. This impact is easily understandable and obvious to the Tribunal. It is confirmed by the fact that, on 14 January 2009, the Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative.

1411. In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic as it was not issued by the Republic and INTERFAX obtained the information from unofficial sources, does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

1412. As well, Respondent's argument that, at the Hearing, Mr. Cojin testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production*," does not change the negative impact of Respondent's chain of actions, as that impact is by no means limited to keeping the staff of Claimants from engaging in more work on their normal business.

1413. Further, the Tribunal is not persuaded by Respondent's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through. Moody's and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns about the companies' ability to service their existing debt. The Tribunal agrees with Claimants that it would have been surprising if any lender would have gone forward with the new financing without resolution of Claimants' conflicts with the government of Kazakhstan.

1414. It is apparent that, even before the trial of Mr. Cornegruta, the relentless onslaught of inspections and, eventually, charges against KPM's most senior officer had, when considered together with these pre-trial seizures of assets on 30 April 2009, seriously disabled Claimants' companies.

1415. The Parties agree, and the Tribunal also agrees, that Claimants were only able to weather the liquidity storm of summer 2009 by obtaining financing through the Laren Loan Facility. (RPHB 1 ¶ 58, CPHB 2 ¶ 257). The Parties agree, and the Tribunal also agrees, that the terms of the Laren Facility were terrible for Claimants. (CPHB 2 ¶ 213; RPHB 1 ¶ 60; RPHB 2 ¶ 69(e)). Likewise, the Parties agree, and the Tribunal also agrees, that had Claimants obtained financing from Credit Suisse in December 2008, they would not have needed to resort to other lenders in June 2009. (CPHB 1 ¶ 353; RPHB 2 ¶ 102; 961).

1416. What the Parties dispute is whether Respondent's actions caused Claimants to enter into the Laren Facility. The Tribunal finds that the Laren Facility, with its onerous terms, was arranged in June 2009 because it was necessary for KPM and TNG to



secure these funds and because Respondent's actions prevented them from doing so sooner. By June 2009, ordinary lenders would not lend to these companies on commercial terms. Although Claimants drove the best bargain they could, the cumulative effect of the barrage of inspections and the very public revelation in December 2008 of the alleged forgery and fraud said to have been committed in relation to the transfer to Terra Raf, as indicated above, led to the severe downgrades by Moody's and Fitch rating agencies. While the worldwide economic crisis was affecting these companies in late 2008 and early 2009, the State's aggressive and concerted actions, including the inspections, the criminal charges, and the asset seizures - even before Mr. Cornegruta's trial in August and September 2009 – forced Claimants to accept the "*horrendous*" Laren Facility.

1417. Furthermore, the Tribunal also notes that, despite TNG's apparent attempts to comply with Kazakhstan's requests, the State never responded to TNG's applications of 24 and 25 March 2009 – applications that the State requested. As a result, Kazakhstan's alleged pre-emptive rights claim lingered throughout the following two year period. It was, no doubt, a cloud on Terra Raf's ownership rights which created continuing difficulties for Claimants.

1418. The Claimants have also alleged that the inspections commencing in October 2008 interfered with their sales and marketing of gas. The Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State was the cause of the various difficulties they encountered in securing their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal notes Respondent's argument that the loss of Kemikal as a customer is not attributable to the Respondent since that was due to liquidity issues of its own, and that Kemikal is a private company that was not acting in any kind of governmental capacity. However, Kemikal's sudden refusal to post bank guarantees that were required by its credit terms was a change of its earlier business pattern for which the Tribunal sees no other convincing explanation than that it was part of Respondent's aggressive actions against the Claimants, irrespective of whether in that context the fact that Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev, played a role.

1419. The Tribunal notes in the present context the Parties' dispute whether the actions of the Kazakh State prevented the owners of KMP and TNG from selling their investments. The Claimants were persistent in their pursuit of selling KPM and TNG, with or without Contract 302. In order to consider any possible contribution to relevant causation, the following paragraphs highlight in a summary fashion the additional events which surround the Claimants' on-going efforts to sell KMP and TNG and the impact of the State's actions on those efforts.

1420. In the early summer 2008, Claimants decided that they wished to explore selling KPM, the LPG Plant, and TNG, excepting its Contract 302 properties (the Tabyl



Block). This activity was called Project Zenith. The Claimants engaged the services of Renaissance Capital to assist them.

1421. On 18 July 2008, Renaissance sent a preliminary "teaser" invitation to 129 potentially interested buyers, including KMG. In mid-August 2008, Renaissance distributed the Information Memorandum to 41 parties that had expressed interest in these companies and their properties and had signed confidentiality agreements. KMG was one of those companies.

1422. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith.

1423. By 1 October 2008, Claimants had received 8 non-binding indicative bids from various entities, including from KMG EP in the amount of USD 754 million and from KNOC in the amount of USD 1.55 billion. The average of the 8 indicative offers was USD 1.05 billion.

1424. On 30 April 2009, however, the Financial Police obtained a pre-trial order for the sequestration and arrest of all the shares of both KPM and TNG (C-486; C-487; C-488; and C-489). By their terms, these orders not only sequestered these shares, but also stated that all interested persons should be informed. The subsequent Minutes of 13 May 2009 stated, among other things, that 100% of the share ownership in the "statutory capital" of KPM and TNG had been sequestered and that, "*It is prohibited to carry out any actions related to the alienation or transfer of the sequestered property (100% share ownership in the statutory capital) to third parties*."

1425. In addition to these difficulties, the Claimants were faced with on-going taxation claims by the State, as well as the State's efforts to collect on the judgement made by the court against KPM. On 18 September 2009, in addition to a 4-year prison term for Mr. Cornegruta, the criminal court ordered KPM to pay 21,675,578.00 Tenge (approximately USD 145,475,534.08) to the Kazakhstan state budget. On 30 September 2009, the Financial Police ordered the Aktau territorial customs body to conduct a new audit of KPM based on its failure to pay the Crude Oil Export Tax for its January 2009 exports. By December 2009, following a number of court procedures, the Specialized Interdistrict Economic Court issued a consolidation decision, rejecting KPM's and TNG's challenges to corporate back taxes. At the same time, the Financial Police pursued interrogations of KPM employees with respect to a potential tax assessment in relation to 2008 export taxes. In early 2010, KPM commenced a new action to challenge the Financial Police's claim that it owed 2008 export taxes on oil exports. On 31 March 2010, after having paid significant sums in relation to export taxes, KPM and TNG were successful before the Central Customs Committee which notified them that pursuant to their subsoil use contracts, they were not liable for export taxes from October 2008.

1426. A myriad of enforcement actions ensued. On 29 December 2009, the Aktau City Court issued a writ of execution against KPM for the execution of the criminal courts' order to pay the fine of approximately USD 145 million. In early 2010, the Aktau Division of the Enforcement Officers of the Mangystau Oblast issued a Decree on Initiating of the Enforcement Proceedings against KPM for the Recovery of Revenue for the amount of USD 145 million. Enforcement measures



followed this decree from January to June 2010, including seizures of various bank accounts on 10 January 2010, seizure and impounding of motor vehicles on 22 January 2009, a further order on 25 January 2010 of the Mangystau Oblast court with respect to the outstanding Writ of Execution for the payment of 21.6 billion Tenge, together with various additional audits to determine the particulars of remaining assets. By 3 February 2010, the Ministry of Finance notified KPM that it was being monitored for bankruptcy (as of 26 January 2010) for the sum of 3.8 billion Tenge, including interest relating to alleged back taxes and penalties for corporate taxes. On 19 February 2010, the Chief of the Aktau Territorial Department issued a further writ of execution while noting that previous collection orders had gone unfulfilled. This particular order (actually received on 1 March 2010) attached some 2,186 assets previously listed in the detailed inventory. On 23 February this same official issued a further order prohibiting KPM from executing import and export formalities regarding the transportation of oil. On 26 February 2010, this same official dismissed KPM's challenge to the writ of enforcement and issued an order "*to attach the oil pipeline from [the] OTP to Opornaya CRMB [Commoditiies and Raw Material Base of Opornaya Station] of 18 kilometers*" and KPM's accumulator oil tanks. This order also prohibited KPM from transferring oil to the main pipeline operated by KazTransOil once its accumulator tanks reached their capacity. Later, on 4 March 2010, the Chief of the Aktau Territorial Department, despite attachment of numerous accounts and assets, complained that these efforts had not so far been successful and, accordingly, he wished to change course by seeking an enforcement procedure to in-kind transfers of land lots, the 18km pipeline, KPM's Contract 305 over the Borankol field and KPM's subsoil use license No. 309. By 17 March 2010, the Acting Head of the Aktau Territorial Department of Judicial Executors relented and agreed with KPM to suspend the effect of the previous orders made on 23 and 26 February 2010 in order to avoid the suspension of production activity by KPM.

1427. In the meantime, in October, 2009, Starleigh had presented an initial bid of USD 450 million for Claimants' properties in Kazakhstan. Later, in November 2009, Starleigh reduced this bid by USD 100 million, ostensibly in recognition of the USD 145 million fine that had been imposed on KPM by the criminal court. Around this same time, KMG NC began to pursue a possible purchase of the Claimants' assets. At a meeting in Amsterdam in November 2009, the Claimants received an offer from KMG NC of USD 20 million for their equity interests in their companies (immediately following a meeting between KMG NC and representatives of certain of the noteholders in which they were supposedly offered 25 cents on the dollar for their notes). Subsequently, Starleigh made a further offer of USD 50 million on the assumption they could buy out the noteholders. Grand Petroleum offered to purchase KPM and TNG for USD 1.15 billion.

1428. On 13 February 2010, the Claimants successfully negotiated the sale of 100% of their shares and participatory interests in KPM and TNG to Cliffson Company S.A. The total value of that agreement, including buying out the companies' noteholders (including the purchase of Tristam), payment for the Claimants' equity interests, and assumption of liabilities was in the order of USD 920 to 930 million. Claimants say this was a reduced value for their assets in view of the impact of the criminal judgement and its enforcement against KPM. One condition of this potential sale was that the MOG would grant permission for the sale and waive the State's alleged pre-emptive right to purchase KPM and TNG. The MOG conditions



for approval of this potential sale included removal of the attachment orders as well as assurances concerning the financial solvency and technical and managerial capabilities of the Cliffson Company. The Respondent says it co-operated with the Claimants on this matter while the Claimants say that Kazakhstan did not co-operate.

1429. On 30 April 2010, the MOG responded to the Claimant's application, dated 12 April 2010, for approval of the intended sale of their assets to Cliffson Company. The MOG requested additional information regarding the terms of the proposed transaction, but more importantly, noted Kazakhstan's previous seizures of the companies' assets and stated that transfers of the shares of KPM and TNG were forbidden. The MOG stated that, as a result, the transaction would only be approved if KPM and TNG satisfied the requirements necessary to release the attachment of their shares.

1430. On 6 May 2010, the Cliffson Company signed an amendment to the SPA to extend the time for completing the transaction. On 1 June 2010 the MOG renewed its request for further information in relation to the Cliffson Company transaction. By 9 June 2010, however, the Court Execution Body of the Mangystau Region – the Acting Chief of Aktau Territorial Department of Judicial Executors - ordered the sale of KPM's assets as a single lot, so as to avoid any suspension of activities.

1431. On 15 June 2010, the Claimants wrote to Cliffson Company to express their concern that it was "*backing out*" of the proposed transaction. Shortly after, on 23 June 2010, the Claimants wrote to MOG in reply to MOG's earlier requests, on 30 April and 1 June, for further information in relation to the Cliffson Company transaction. The Claimants subsequently learned that Cliffson Company had submitted a letter to the MOG stating that it refused to purchase the interests in TNG and KPM under their 13 February 2010 agreement.

1432. It is the mandate of the Tribunal to decide on the Relief Sought by the Parties, no less, but also no more. The Tribunal notes that Claimants, in their Relief Sought as cited above in this Award, do not request a separate amount allegedly caused by their prevention from selling the investment, but rather base their amounts requested on alleged violations related to the Borankol and Tolkyn Fields and Munaibay Oil, to the Contract 302 Properties, and to the LPG Plant. Therefore, the Tribunal hereafter will focus on these claims and considers that it does not have to decide whether Respondent's actions prevented Claimants from selling their investments, unless this issue may become relevant for one of the claims raised. This will be taken into account in the Tribunal's examination of the respective claims hereafter.

## K.III. Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause)

### 1. Arguments by Claimants



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 100 of 104

1433. When the State argues that injury resulted from acts of the victim or the market, rather than its own wrongful acts, the burden is on the State to prove such an intervening cause. Respondent has not met that burden. Respondent argues that the Tristan debt structure, the financial crisis, the drop in oil prices, and the "*constant withdrawal of cash from the companies*" led to "*a severe underfunding of KPM and TNG and subsequently, to the companies no longer complying with their obligations under the Subsoil Use Contracts and Kazakh law. The eventual termination of the contracts was a logical consequence.*" While KPM and TNG experienced a short-term liquidity shortage in the first half of 2009, that problem was magnified by Kazakhstan's actions and, in any event, did not lead to the failure of the companies. There never were any lawful grounds for terminating the Subsoil Use Contracts of KPM and TNG, or seizing their assets. Claimants never abandoned their investments. (CPHB 2 ¶¶ 247 – 248).

1434. There is no credible evidence to support Respondent's argument that KPM and TNG were overleveraged prior to state action, and that that doomed them to fail after oil prices dropped due to the financial crisis. This argument is belied by the facts. Prior to 14 October 2008, KPM and TNG were neither insolvent nor overleveraged. Prof. Olcott's statement that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations is not credible and she was not qualified to make the statement. Likewise, Mr. Gruhn of Deloitte failed to perform any direct analysis of KPM and TNG's abilities to service their debt. Deloitte's argument concerning the trading value of the Tristan notes indicated financial distress is rubbish. As Howard Rosen of FTI explained, prior to the Lehman bankruptcy, Tristan notes were trading close to their USD 100 face value (at USD 95). The day immediately following, the trading price was USD 84.50 and the value steadily declined to around USD 65 on 14 October 2008. At the time, the markets were not trading on fundamentals, and investors sold securities for a variety of reasons, including raising cash to meet investor calls, to reduce risk, or simply due to panic. FTI analysed the finances of KPM and TNG and concluded that they were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0. (CPHB 1 ¶¶ 399 – 404; CPHB 2 ¶¶ 249 – 253).

1435. Kazakhstan partly caused and greatly exacerbated the liquidity problem that KPM and TNG experienced in 2009. When Kazakhstan argues that KPM and TNG only had USD 9 million in cash on hand at the end of September 2008, they ignore that they also held USD 22 million in inventory and USD 296 in trade receivables at that time. In total, their net working capital was USD 222 million. That was a solid cushion, and they were a very long way from insolvent. That the primary assets were in receivables did not create a liquidity issue, since KPM and TNG could use the prepayment provisions of the Vitol COMSA agreement as a revolving line of credit to manage their cash flow requirements. (CPHB 2 ¶¶ 254 – 255).

1436. In the first half of 2009, a number of factors nonetheless combined to produce a liquidity crunch, including (1) low prices and slow payments by customers, (2) reduction in gas and condensate sales due to the non-renewal of the Kemikal contract, and (3) Vitol's decision to stop funding LPG Plant, and to reduce the credit line under the prepayment terms of the COMSA agreements from USD 120 million to USD 40 million effective at the end of June 2009. As a result, Claimants



sought the Credit Suisse Loan, in order to protect the company in the event that prices should continue to decline. The decision to see bridge financing was not a sign of financial distress. Nevertheless, the cash problem came to a head in June 2009 when 2 large payments became due – the USD 22 million payment on the Tristan notes and an EPT of USD 25 million. The failure to make either of these payments would have jeopardized KPM and TNG, and this forced Claimants to seek out the Laren loan facility. (CPHB 2 ¶¶ 255 – 257).

1437. The market causes not attributable to Kazakhstan were temporary. The low oil price environment was over by the fourth quarter of 2009. 2008 was an anomalous year because oil climbed to unprecedented highs and shocking lows. The companies average realized gas price declined only 14.2 percent from 2008 – 2009. The 52.1% decline in the companies' gas sale revenue was due to reduced sales volumes, attributable to Kazakhstan's conduct. The companies nonetheless survived the temporary cash flow crisis and even continued paying employees. Even with low oil prices, KPM and TNG did not record substantial losses – KPM recorded a net loss of USD 13 million and TNG recorded a net profit of USD 9.4 million, after paying interest in Tristan debt. The companies were not overleveraged. (CPHB 1 ¶¶ 409 – 415). But for the actions of Kazakhstan, they would have been well positioned to rebound as oil prices climbed back toward historic highs in the second half of 2010. (CPHB 2 ¶¶ 258 – 261).

1438. The evidence shows that Claimants did not abandon their investments. Kazakhstan's argument that Claimants' stripped KPM and TNG of cash in preparation to abandon them is unsupported and wrong. KPM paid dividends in 2009 and 2010 to avoid seizure of the funds – not to prepare for voluntary abandonment. It was apparent that any money flowing into KPM's bank accounts was at risk to satisfy the USD 145 penalty illegal imposed on KPM on 18 September 2009. Further, allowing Tristan to collect funds that would otherwise have been frozen in KPM's bank accounts was reasonable. Tristan noteholders did not place Tristan in default based on those payments, indicating that the noteholders were satisfied with the steps that Claimants took to enable that coupon payment. Tristan Oil's payment of a USD 3.86 million bonus to Anatolie Stati is a non-issue, as he has a right to receive the profits of his investment. The payment did not exacerbate any liquidity problems at the end of 2009, because there were none. (CPHB 1 ¶¶ 416 – 422; CPHB 2 ¶¶ 262 – 264).

1439. The declaration of dividends was a reasonable effort to mitigate harm caused by Kazakhstan's actions. The assignment of receivables allowed Tristan to collect funds that otherwise may have been frozen and allowed Tristan to make the USD 28 million coupon payment in full. It prevented Tristan's default on the notes. (CPHB 2 ¶ 264).

1440. Claimants dispute Respondent's assertion that KPM and TNG had not collected USD 170 million in receivables from Montvale, because it invested funds from Vitol in certain non-liquid assets. In any event, this does not show that KPM and TNG's failure to collect receivables was part of a preparation to abandon the companies. (CPHB 2 ¶ 265).

1441. The evidence demonstrates that Claimants went to great lengths to protect their investments. The assignment of receivables prevented a default on the Tristan



notes. Claimants went to great lengths to pay KPM's employees after its accounts were frozen in 2010 by having TNG pay those employees from its accounts. The Laren loan was secured by a personal guarantee from Anatolie Stati and a pledge from Ascom of its assets in Iraq, and was necessary to keep the companies alive. Thus, Claimants made every effort to protect their assets, right up to seizure in July 2010. (CPHB 2 ¶ 266).

## 2. Arguments by Respondent

1442. KPM and TNG's demise, which was unrelated to Respondent and was related to self-inflicted and external financial stress, ultimately led to the breaches of the Subsoil Use Contracts and to the termination of those contracts and the invocation of the trust regime. In particular:

(a) *Claimants mismanaged their assets on numerous occasions, for example by putting alarmingly incompetent personnel in charge of important tasks and by promising sales to business partners that they could have never made. The mismanagement went so far that market observers were concerned about "weak corporate governance standards at Tristan". The overall level of mismanagement comes as no surprise given that Claimants had no prior experience in oil and gas production and in the Kazakh or international markets.*

(b) *KPM's and TNG's business was very risky from the start, as was set out clearly in the Tristan note prospectus.*

(c) *KPM's and TNG's financing structure, which aimed at removing capital from the companies, made them vulnerable to situations of crisis*

(d) *Claimants took business decisions aimed only at short-term profit. In particular the ramping up of production at the end of 2007 was short sighted, as it led to a loss of available gas production for the LPG Plant and the allegedly expected possibility of gas export (which the Republic denies).*

(e) *In April of 2008, Claimants found out that their estimates for production from Borankol had been overstated by 300%. At the time, Claimants received the new Miller&Lents reserves report which set out 2P reserves of 24.6 MMboe. The earlier report by Ryder Scott had provided for 2P reserves of 72.4 MMboe. The effect of this loss was particular significant because Borankol is a predominantly oil producing field and oil production is much more valuable than gas production.*

(f) *KPM and TNG were already in severe financial difficulties as of Claimants' valuation date, as is evidenced by the development of the Tristan notes price.*

(g) *Severe drops in energy prices and in demand, in particular due to the loss of Kemikal as a customer, led to a very restricted cash position for KPM and TNG. At the same time, the need for capital expenditure increased markedly, putting further pressure on the companies.*



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 103 of 104

(h) *Against this background, when uncontestedly legal tax demands were raised by the state in the summer of 2009, Claimants had to take out the horrendous Laren loan and issue new notes in the amount of USD 111.1 million in connection thereto.*

(i) *Thereafter, Claimants deliberately chose to withdraw cash from KPM and TNG, all while not fulfilling the annual work programs. This was effectively the deliberate abandonment of the companies. (R-III ¶ 440; RPHB 2 ¶¶ 60 – 61).*

1443. KPM and TNG were in poor financial health prior to Claimants' valuation date. Importantly, the Tristan note trading price stood at USD 65.125 for a nominal value of USD 100, translating to a yield to maturity of 26.319%, indicating that the markets expected a default. While Claimants try to attribute this to the Lehman bankruptcy, that statement is misleading. At the same time, oil and gas prices strongly decreased, putting additional pressures on the companies' revenues and the market's risk perception made it difficult to obtain financing. Additional key financial figures indicate that KPM's and TNG's financial figures deteriorated prior to 14 October 2008, including their current ratios, (which decreased from 5.74 at year end 2007 to 3.06 on 30 June 2008), for example. (RPHB 2 ¶¶ 62 – 68).

1444. The PWC Due Diligence also confirmed that external circumstances were to blame for the demise of KPM and TNG. PwC found that the decline in condensate prices and the decline in oil prices were the key reasons for falling sales and profitability of TNG and KPM, respectively. The loss of Kemikal as a customer – which, contrary to Claimants' invention, was due to Kemikal's insolvency issues and not state action – also resulted in a drop in demand for Claimants' goods. Claimants' liquidity was further exacerbated by KPM and TNG's decision to have Montvale (the intermediary between KPM, TNG, and Vitol) invest USD 170 million from Vitol in non-liquid assets, rather than make payments on KPM and TNG's receivables. (RPHB 2 ¶ 69).

1445. These cash constraints caused KPM and TNG to stop their capital investment programs, putting them in breach of their annual work programs and causing them to stop the LPG Plant project. Thus, that work stoppage cannot be attributed to Respondent. An additional consequence of these cash constraints was the infamous Laren loan and the corresponding issuance of USD 11.1 million in new Tristan notes. (RPHB 2 ¶ 70).

1446. Regarding Claimants' criticisms of the PwC Due Diligence Report, Claimants could have objected to its introduction or have asked for an opportunity to produce counter evidence – they did not. PwC prepared a financial due diligence report that did not assess the legality of any state action, as that was beyond the scope of the report. PwC assessed all circumstances that could affect the financial situation, caused lawfully or unlawfully. (RPHB 2 ¶¶ 71 – 72).

1447. Claimants' contention that the auditor's going concern qualification in the Interim Report shows that the Republic's actions caused injury to Claimants is not true. Instead, the qualification demonstrates the severity of Claimants' situation due to the uncontestedly lawful tax claims (EPT which have never been objected to by



Case 1:14-cv-01638-ABJ Document 2-3 Filed 09/30/14 Page 104 of 104

KPM or TNG), the non-payment of which led to the freezing of KPM and TNG's accounts and the Montvale payment issue. (RPHB 2 ¶¶ 73 – 76)

1448. The oil price decline in 2008 and 2009 had a severe impact and was one of many factors affecting KPM and TNG. The drop in demand persisted through 2009, where Tolkyn was producing at 2005/2006 levels and then in 2010, when it produced at 2002 levels. At the same time, Claimants own evidence from Miller & Lents shows that Claimants needed an additional capital expenditure of USD 276.2 million to keep the estimated 2P production near the levels estimated in the 2008 Miller & Lents report. Thus, 2007 and 2009 are not comparable at all and 2009 was particularly volatile. Prices even dropped below USD 70/barrel in 2010. Claimants' argument that gas prices did not decline significantly is contradicted by Anatolie Stati's testimony. The objective evidence also shows that Anatolie Stati was lying when he stated that gas prices had been going up from summer 2008 to the beginning of 2009. (RPHB 2 ¶¶ 77 – 82).

1449. Claimants effectively abandoned the companies in 2009 and 2010, stripping as much cash from KPM and TNG as possible, issuing a USD 72 million dividend in 2009 and 2010 and transferring receivables to Ascom. These were paid in violation of the Tristan note indenture. As a result, KPM had no cash inflow. Claimants admit that they stripped the assets to avoid seizure by the State. Claimants have not proven that any of the USD 72 million was used to repay interest on the Tristan notes. Since the noteholders had not placed Tristan in default at that time, Claimants had not obligation to pay the interest. Claimants also suggested that the USD 72 million was used to repay Laren lenders and to keep paying KPM's employees, but this is also unproven. Finally, Claimants extension of the payment terms for Stadoil and General Affinities further stripped their assets. To date, Claimants have not clarified whether Stadoil or General Affinities ever made payments on the trade receivables. Accordingly, the evidence demonstrates that Claimants indeed abandoned KPM and TNG and only kept the companies on life support in order to force the Republic to terminate the contracts, so that Claimants could then advance these claims in arbitration. (RPHB 2 ¶¶ 83 – 90, 128).

1450. Claimants likely siphoned off more moneys by extending the due date on accounts receivables due from affiliated companies. Even the Tristan Oil Annual Report (2009) mentions that Claimants would cancel delivery for equipment to the LPG Plant, and then a third company, Perkwood Investments, would return the advance paid. Claimants have provided no trace of this money (USD 36,800,212) and likely pocketed it. Claimants would also divert cash to operating companies, such as by paying Anatolie Stati's CASCO double the market price to do work. There were also opaque service agreements with Ascom. Likely, there are other transactions, but Claimants' opaque financing structure makes it impossible to see those. FTI estimates that diverted monies could be as much as USD 226.6 million. (R-III ¶ 441; RPHB 1 ¶¶ 1038 – 1049; RPHB 2 ¶ 17).

1451. Assuming liability and causality, these financial difficulties have major implications for the calculation of damages and the selection of a valuation date.

### 3. The Tribunal



1452. As mentioned above, the Tribunal agrees with the Parties that

- as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation is caused by the host State's conduct,

- Article 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation,

- the burden may shift to the state to prove that a factor attributable to the victim or a third party caused the damage alleged, unless the injury can be shown to be severable in causal terms from that attributed to the State.

1453. The Tribunal has considered Respondent's arguments that KPM and TNG's demise was unrelated to Respondent and was caused by self-inflicted and external financial stress, ultimately leading to the breaches of the Subsoil Use Contracts and to the termination of those contracts and the invocation of the trust regime. Respondent adds a number of examples to prove that. In that regard, the Tribunal comes to the following conclusions.

1454. The evidence considered in the chapter above on the causation by Respondent's actions is so strong that, taking into account the above cited legal principles, the Tribunal concludes that the burden of proof has shifted to Respondent to show that, in spite of the causation by its own actions, Claimants caused or contributed in a relevant way to the damages that incurred to Claimants' investment. The Respondent has not been able to provide sufficient proof in this regard.

1455. As Claimants concede, KPM and TNG experienced a short-term liquidity shortage in the first half of 2009. But the Tribunal considers that this shortage was magnified by Kazakhstan's actions, and in any event did not lead to the failure of the companies. There is no convincing evidence to that KPM and TNG were over-leveraged prior to October 2008. The market causes not attributable to Kazakhstan were temporary. The low oil price environment was over by the fourth quarter of 2009. 2008 was an anomalous year because oil climbed to unprecedented highs and shocking lows. There is no convincing evidence that KPM and TNG would have become insolvent after oil prices dropped due to the financial crisis.

1456. Weighing the evidence submitted by the Parties, the Tribunal is not persuaded by the testimony of Prof. Olcott (who is not an economic expert) that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations. As Mr. Gruhn of Deloitte did not perform any direct analysis of KPM and TNG's abilities to service their debt, the Tribunal rather accepts FTI's testimony that the finances of KPM and TNG were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0.

1457. Respondent has also not provided sufficient evidence that Claimants abandoned their investments. Rather, Claimants' actions seem to have been caused by Respondent's measures. KPM paid dividends in 2009 and 2010 to avoid seizure of the funds by Respondent. It was apparent that any money flowing into KPM's bank accounts would be at risk of being taken to satisfy the USD 145 penalty imposed



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 2 of 102

on KPM on 18 September 2009. Further, allowing Tristan to collect funds is also understandable as these would otherwise have been been frozen in KPM's bank accounts. As well, the declaration of dividends, in the view of the Tribunal, seems to have been a reasonable effort to mitigate harm caused by Respondent's actions. The assignment of receivables allowed Tristan to collect funds that otherwise may have been frozen and allowed Tristan to make the USD 28 million coupon payment in full. It prevented Tristan's default on the notes.

1458. In view of these considerations, the Tribunal concludes that Respondent has not submitted sufficient evidence that Claimants' inexperience or own actions caused or contributed in a relevant way to the damages that occurred to Claimants' investment.

## L. Quantum

### L.I. Preliminary Considerations

1459. The Tribunal notes that Respondent has stated that its arguments made regarding damages are without prejudice to its position on jurisdiction and liability and to its position that no harassment campaign was ever started against Claimants. (R-III ¶ 15; R-I ¶¶ 34 *et seq.*, 35 *et seq.*, 47.2).

1460. Though the Tribunal found above that Respondent's primary breach of the ECT is that of Art. 10(1) to provide FET, since that breach resulted finally in a taking of Claimants' investment, some guidance can be provided by Art. 13 on expropriation regarding the date and measure for the calculation of damages. The second paragraph of Art. 13(1) ECT deals with "*compensation*" for a lawful expropriation and provides:

> "*Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment.*" (herein referred to as the "*Valuation Date*").

1461. From this provision, the Tribunal takes guidance to the effect that the damages to be awarded for what it has found above to be not a lawful expropriation, but rather a breach of the ECT, shall not be lower than what the ECT prescribes for a lawful expropriation.

### L.II. Valuation Date

#### 1. Arguments by Claimants

1462. The selection of the appropriate valuation date is critical for assessing damages and awarding Claimants the full reparation as set out by the PCIJ in *Chorzów* and as codified in Art. 31 of the International Law Commission Draft Articles on Responsibility of States for Internationally Wrongful Acts. (C-II ¶¶ 607 – 608).



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 3 of 102

1463. While the ECT provides that in cases of lawful expropriation, the State must pay "*prompt, adequate, and effective compensation*" amounting to the FMV of the investment at the time immediately prior to the expropriation, the ECT contains no rules for the standard of compensation for expropriations or other actions committed in violation of the ECT. Under customary international law on quantum, the Tribunal should award full reparation for the harm resulting from the state action. The FMV of the assets of KPM and TNG is the appropriate measure of damages for all of Claimants' claims, in light of the cumulative effect of Kazakhstan's numerous breaches of its obligations under the ECT. (CPHB 2 ¶¶ 268 – 273).

1464. In order to re-establish the situation that existed before the wrongful acts, Respondent must pay a sum that in the words of *Chorzów Factory*, would "*wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed*." Here, the act triggering or commencing the wrongful acts was the issuance of President Nazarbayev's 14 October 2008 order. The harassment campaign ensued immediately thereafter. There is a causal link between the campaign launched on 14 October 2008 and the seizure on 21 July 2010 that justifies setting the valuation date at the commencement of that campaign. Respondent has ignored the continuing injury to Claimants, including the active reduction in value of the properties and the impact that had on their efforts to sell the properties. (C-II ¶¶ 210 *et seq.*, 476 – 478, 580 – 583; 607 – 609; CPHB 2 ¶¶ 274 – 275).

1465. This principal of full compensation, with its corollary mandate for re-establishment of the situation that existed before a state's wrongful conduct, is equally at play in the adjudication of indirect expropriation cases. Where a state's conduct has involved two or more instances of identifiable expropriative measures, the selection of an early measure, even if less severe or direct than a later measure, will assure both equity and full compensation for the State's unlawful conduct. This principle was at play in *Sedco v. Iran*. The Tribunal in *Amoco International Finance Corp. v. Iran* also awarded the claimant compensation based on a date earlier than the liability date, using the date that the claimant lost control over the future management direction of the investments as the valuation date. The relevant element for a loss of control was not the appointment of outside managers, but the degree of interference by those managers with the owners' property rights or '*fundamental rights of ownership*.' While there were no temporary managers appointed in this case, the State's campaign deprived Claimants of their ability to freely alienate their investments and their ability to freely manage their capital expenditures for improvement of their investments. (C-II ¶¶ 610 - 613).

1466. Claimants' additional arguments are best taken form their own words:

> *615. Where, as in the present case, there is a campaign of unlawful, interfering measures by the State, with the commencement of that campaign being an unfair and inequitable order that implements a deliberate strategy of expropriation through conduct that indisputably violates multiple standards of treaty protection, and the conclusion of that campaign being direct expropriation, equity and full compensation fairly demand that the intentional commencement date of that campaign be chosen as the valuation date. Equity and full compensation are not served by choosing*

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 4 of 102

> *the date of final seizure for valuation, or by granting Kazakhstan a grace period between the date of its order to commence its expropriative campaign and some arguable date thereafter when that campaign ostensibly had its first measurable effects.*
>
> *616. The Tribunal should accordingly adopt October 14, 2008 as the proper valuation date, and assess the fair market value of Claimants' investments as of that date based upon the information then available to a willing buyer.*

1467. Professors Reisman and Sloane explain that, when considering an indirect expropriation, Tribunals should distinguish the "*moment of expropriation*" from the "*moment of valuation*." If, for example, the moment of expropriation were to be confused with the moment of valuation, a Tribunal would be unable to award full compensation and would allow the wrongdoing state to benefit from its unlawful conduct throughout the campaign of indirect expropriation. In effect, such a Tribunal would reward the unlawful conduct. (C-I ¶¶ 404 – 407). Claimants' arguments against using 21 July 2010 as the valuation date are best taken from their own words:

> *584. [...] Kazakhstan wants to pigeonhole Claimants' case into a classic claim of creeping expropriation under which alleged ownership-interfering actions by the State eventually "ripen" along a continuum into a taking. Misclassifying Claimants' case in this way provides Kazakhstan with an avenue to argue (unpersuasively) that no single action by the State during the course of its harassment campaign amounted to a State seizure — other than, of course, the State's ultimate seizure of Claimants' assets on July 21, 2010, which Kazakhstan then claims must be the valuation date if damages are to be awarded. Coupled with this argument is Kazakhstan's repeated and rote assertion that its harassment campaign was merely an appropriate exercise of State regulatory power, and that it was neither an intentional expropriative campaign nor executed in furtherance of a conspiracy to expropriate. Thus, under this argument, any diminution in the value or profitability of the assets to Claimants between October of 2008 and July of 2010 was not the fault of the State.*
>
> *585. By this argument, Kazakhstan is effectively contending that Claimants must itemize the loss caused by each discrete act in Kazakhstan's harassment campaign. [...] Claimants do not contend that each particular event in Kazakhstan's harassment campaign caused the entirety of Claimants' losses. Rather, the combined effect of Kazakhstan's conduct caused Claimants to lose control over their investments, deprived them of the rights of autonomous stewardship and free alienability associated with ownership, and violated Claimants' rights to have their investments treated fairly and equitably and in accordance with the other substantive standards of protection in the ECT. (C-II ¶¶ 584 – 585).*

1468. There is no mechanical formula for determining whether one or more State actions amount to an indirect expropriation or a treaty violation. Here however, the harassment campaign that was initiated on 14 October 2008 was designed to (i) prevent Claimants from selling their properties to a third party, (ii) make normal daily operations an effective impossibility, and (iii) create an extremely risky

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 5 of 102

investment environment to stop Claimants from continuing to make capital outlays for development of their investments. This harassment campaign met its intended purpose: to devalue and impair the investments. Professors Reisman and Sloane would agree: where the intent to expropriate can be proven, the State's intent to expropriate should be given significant weight in the assessment of the proper valuation date. The campaign was expropriatory and violated the ECT. (C-II ¶¶ 210 *et seq.*, 586 – 603, 614 – 616).

1469. The tribunals in *CMS v. Argentina* and *Vivendi v. Argentina* recognized that the task of putting claimants into the position they would have occupied but for the State's wrongful conduct necessarily involves uncertainty. The tribunal must consider how events far into the future may have developed but for the state's actions. As a result, and as confirmed by the annulment committee in *Rumeli v. Kazakhstan*, tribunals have broad discretion in establishing the appropriate quantum for compensation, and it is not a simple matter to be resolved on burden of proof. Once the tribunal is satisfied that the claimant has suffered some damage as a result of breach, the determination of damage is a matter of the tribunal's informed estimation. This is true for all of Kazakhstan's violations of the ECT, since they collectively led to the single injury of the impairment and taking of Claimants' investments. (CPHB 2 ¶¶ 270 – 272).

1470. As confirmed by Mr. Rosen's testimony at the Hearing on Quantum, the 14 October 2008 date is necessary to fully compensate Claimants for the injuries caused by Kazakhstan's violations of the ECT and international law. Respondent's valuation date does not account for any of the value-depressing effects of the State's actions, including the diminution in value caused by the allegations that the State made against KPM and TNG or the effect of actions taken against Claimants' reputation and ability to sell the investments free from state interference. 14 October 2008, or at least shortly thereafter, was the last day that Claimants had an opportunity to sell their investments in an open and unrestricted market. (CPHB 1 ¶¶ 426 – 430).

1471. Claimants note that Respondent has made no mention of other possible dates – like the 18 December 2008 reversal of the 20 February 2007 share transfer approval. In Respondent's effort to push the date forward all the way to 21 July 2010, Respondent only globally describes some aspects of its harassment campaign and summarily states that these could not have had any impact on operations or value of Claimants' assets. (C-II ¶ 594).

1472. In addition, on 14 October 2008, TNG notified MEMR of its intention to extend the exploration in the Contract 302 by two years. (C-I ¶ 175).

1473. The 14 October 2008 valuation date would not give Claimants double compensation, as asserted by Respondent. Claimants did not earn hundreds of millions of dollars between the valuation dates. Deloitte never stated that KPM and TNG earned anything at all between the valuation dates. Instead, Deloitte said that production was assumed by FTI have a value of USD 226.6 million (later USD 302.3 million). Deloitte purports to calculate the amount that KPM and TNG would have earned in between the valuation dates, but for the interference by Kazakhstan. The amount that KPM and TNG could have earned but for interference should not be deducted from the valuation because there was

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 6 of 102

interference. KPM and TNG did not produce as much oil and gas as they could have. Moreover, Kazakhstan impeded Claimants' efforts to sell the companies. Deducting this amount would improperly deny Claimants compensation for injuries that Kazakhstan caused during that time. (CPHB 1 ¶¶ 431 – 434).

1474. Regarding the distributions after 14 October 2008, KPM assigned USD 81.2 million in receivables to Tristan Oil and Ascom in the form of loan payments and dividends in 2009. Not only did Claimants reinvest more than this in the companies, those funds represented profits that KPM and TNG earned prior to 14 October 2008. At the end of September 2008, KPM and TNG combined had 221.5 million in net working capital and more than USD 367 in retained earnings on their balance sheets. (CPHB 1 ¶¶ 431, 435; CPHB 2 ¶ 288).

1475. Furthermore, an award based on 14 October 2008 would not overcompensate Claimants, since Claimants have not included working capital in their enterprise valuation. Claimants request damages in the amount of assets that Kazakhstan seized on the day it began its campaign to devalue and seize them. This is equivalent to a hypothetical asset sale – i.e., what Kazakhstan would have had to pay, had it purchased them on that date. Since Claimants have not included the working capital that KPM and TNG subsequently distributed to Claimants, there is no reason to reduce damages, since there is no double counting. (CPHB 1 ¶¶ 431, 436 - 437).

1476. It was never disputed or concealed that KPM paid USD 72 million in dividends in 2009 and 2010. After Kazakhstan imposed the unlawful USD 145 million criminal penalty in September 2009, Claimants prudently prevented cash from unnecessarily flowing into KPM and TNG. This was lawful under the ECT, which allows Claimants to retain profits. Claimants are not claiming damage in respect of these profits. The USD 72 million in receivables that KPM distributed as dividends, and the USD 143.4 million in uncollected receivables were generated prior to 14 October 2008. On 30 September 2008, KPM and TNG had a combined net working capital of USD 222.6 million. (CPHB 2 ¶ 290 – 294).

1477. There is no evidence to support Respondent's allegation that Claimants transferred hundreds of millions of dollars out of the Republic and did not subject it to Kazakh taxation. (CPHB 1 ¶ 438).

1478. Respondent's valuation date of 22 July 2010 fails to respond to Claimants' claims and fails to account for how the State's actions depressed the value of Claimants' investments, including the crippling diminution in value and alienability of KPM and TNG and the interference with normal business operations. Other tribunals have recognized that a state's wrongful actions can impair and depress an investor's assets long before the State actually acquires them. In *Santa Elena v. Costa Rica*, the tribunal adopted the date of the decree to expropriate that claimant's property, even though the date of actual expropriation was years later. The issue for the Tribunal is whether the State's conduct "*blights the possibility for the owner reasonably to exploit the economic potential of the property.*" The state's intent to expropriate is relevant to the determination of the valuation date, since after that date, the investor's ability to develop its investment is lost. In this regard, Respondent's argument that it did not express an intent to expropriate on 14 October 2008 is unpersuasive, as the evidence establishes an intent at the highest



levels of government to deprive Claimants of their investment in 2008. A reasonable investor in the position of Claimants would have understood it as such. (CPHB 2 ¶¶ 276 – 282).

1479. The *Kardassopoulos v. Georgia* award also supports Claimants' valuation date. That tribunal premised its valuation date on the decree that cast doubt on the validity of the investor's concession, rather than on the later expropriatory decree. This Tribunal should follow that approach and award damages in the amount of what Claimants should have been paid if the state had observed its international obligations. Scholarly opinion from Prof. Reisman and Sloane also support this approach. (CPHB 2 ¶¶ 283 – 287).

1480. It is common for tribunals, as demonstrated in *Gemplus and Talsud v. Mexico*, *Santa Elena v. Costa Rica*, *Tecmed v. Mexico*, *CMS v. Argentina*, *Siemens v. Argentina*, and *Azurix v. Argentina* not to adopt either of the parties' valuation dates or damages calculations outright, but to nonetheless award damage once injury is proven. (CPHB 2 ¶¶ 295 – 300). For the sake of argument, even if the Tribunal were to adopt Kazakhstan's valuation date, it would not be bound to use Kazakhstan's valuation. (CPHB 2 ¶ 303).

1481. The RBS Assessment for KMG EP on 31 July 2009 (valuation of October 2009) contains substantial evidence on which the Tribunal could base its assessment of damages. Based on this report, the Tribunal could select 18 December 2008 (date of MEMR's challenge to Claimants' ownership of TNG), 30 April 2009 (state sequestration of Claimants' KPM and TNG shares and assets) or 18 September 2009 (judgment against Mr. Cornegruta). The RBS valuation, however, post dates all of the non-governmental factors that Kazakhstan argues harm the FTI valuation, and the Cliffson transaction executed on 13 February 2010. (CPHB 1 ¶¶ 581 – 582).

## 2.    Arguments by Respondent

1482. Claimants' intention on setting an early valuation date should be readily apparent: an earlier valuation date helps inflate the claim by allowing the Tribunal to disregard negative developments that ultimately caused KPM and TNG to fail, including the drop in oil prices and demand. Moreover, the earlier the valuation date, the bigger the reserves in the Borankol and Tolkyn fields. Deloitte has calculated that 29.6% of Claimants' Borankol claim and 49.4% of Claimants' Tolkyn claim are based on cash flows occurring in the time in between the Parties' valuation dates. (RPHB 1 ¶¶ 1102 – 1104).

1483. Respondent states that "*the Tribunal can only rely on 14 October 2008 as the valuation date if it actually finds that there was a harassment campaign against Claimants. [...] there was no such harassment campaign.*" (R-III ¶ 37; RPHB 2 ¶¶ 375 – 382).

1484. Claimants' date of 14 October 2008 is far too early and should be rejected by the Tribunal. The Parties are in agreement: "*14 October 2008 is a date on which no state measures against KPM and TNG were executed. No contracts were cancelled on this day. No searches were conducted. No judgments were rendered. No promises were given or broken.*" The only event was President Nazarbayev



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 8 of 102

forwarded a letter from President Voronin to authorities, asking them to thoroughly investigate President Voronin's accusations. That is not proof of a campaign against Claimants, instead, it is a courtesy required between CIS Heads of State. It is unclear that Claimants even knew about the Order until a considerable time thereafter. In any event, Claimants' argument that the letter of 14 October 2008 constituted a violation of the ECT is absurd. (R-I ¶ 47.8; R-II ¶¶ 272 – 279; R-III ¶¶ 14 – 19; 36 – 37, 46; RPHB 1 ¶¶ 1105 – 1107).

1485. Under international law, as held in the cases of *International Technical Products v. Iran*, *Tippets*, *Philips Petroleum v. Iran*, and *Santa Elena v. Costa Rica*, the valuation date is to be determined in reference to the actual expropriatory effect. According to international practice for cases of indirect expropriation and as explained in the ICSID case *Santa Elena v. Costa Rica* and in *Azurix v. Argentina*, the valuation date must be the date at which the deprivation of property rights has turned out to be irreversible. Here, the only date at which Claimants possibly could have been deprived of their ownership rights in KPM and TNG was 21 July 2010. In the *Sedco v. NIOC*, on which Claimants rely, there was a much harsher interference than alleged in the present case. Claimants' selective citation of Professors Reisman and Sloan completely disregards their denunciation of improperly early valuation dates. Finally, Claimants' reliance on the full compensation principle as set out in the *Chorzów* case to support an improperly early valuation date is unacceptable. The *Chorzów* requirement to "*wip[e] out the effects of the expropriatory state action* <u>*presupposes*</u> *that there are measures with actual effect on the companies, not mere purported intentions of state bodies*." Under that principle, Claimants must rely on conduct, not on alleged intentions. (R-III ¶¶ 24 – 32, 37 – 44; RPHB 1 ¶¶ 1108 – 1111).

1486. An unduly early valuation date would have the consequence of providing double compensation. KPM and TNG were producing oil until the 21 July 2010 termination of the contracts (also undermining the earlier valuation date). An improperly early valuation leads to double counting this income. For 2009, KPM's financial statements demonstrate that KPM earned at least USD 81,235,291 from the sale of oil. (R-I ¶ 47.3, R-III ¶¶ 45, 442 – 446). In 2010, KPM distributed dividends in the amount of USD 71.9 million, paid by assigning trade receivables to Ascom. Claimants have provided no evidence that this amount originated in profits earned prior to 14 October 2008 or that Ascom reinvested any of the money received (which would be contrary to Claimants' admission that they tried to take out the money to protect that they could). The only money that may have been reinvested was a coupon payment made by Tristan in the amount of USD 28 million. KPM and TNG also extended the due date of accounts receivables due from Stadoil Ltd. and General Affinity in the amount of USD 143.4 – money which was never paid. Since Claimants did not prepare financial statements for 2010, one cannot evaluate whether other significant cash outflow may have also occurred. An advance in the amount of USD 36,800,212 related to the LPG Plant has, likewise, not been accounted for. In any event, while the Republic has never argued that Claimants made profits during the relevant time period, FTI assumed that TNG's and KPM's production from 14 October 2008 to 21 July 2010 would have amounted to USD 226.6, corrected to USD 302.3 in Deloitte's Additional note. (R-III ¶¶ 442 – 446; RPHB 2 ¶¶ 883 – 892).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 9 of 102

1487. Claimants need to prove that the payments made after 14 October 2008 were indeed paid from additional assets, earnings, and cash flows which would not have been included in the DCF cash flow analysis. They have failed to do so and only alleged that the dividends were paid out of pre-14 October 2008 funds, for the first time, in their First Post-Hearing Brief. They have only provided a conclusory statement that at the end of September 2008, KPM and TNG combined had USD 221.5 million in net working capital. The fact that the dividend distribution occurred on 31 December 2009 indicates that the receivables that were assigned (i.e. the dividend), accrued after 14 October 2008. Alternatively, had the receivables existed prior to 14 October 2008, obligations toward KPM and TNG would not have been fulfilled for 1 year 2 months. Thus, the receivables diverted from KPM to Ascom as dividends need to be deducted from the asset value and from an eventual award, if it were to be based on the FTI calculation. Likewise, the USD 143.4 million which appear to be due from two companies in the Stati Group – Stadoil Ltd. and General Affinity, would need to be deducted from an eventual award. It appears that money was transferred to these Stati subsidiaries to prevent these assets from being used to satisfy the recovery order. Claimants do not allege that these receivables were generated prior to 14 October 2008. These receivables need to be deducted from a damage calculation. (RPHB 2 ¶¶ 893 – 918).

1488. Claimants allege that the termination of Contracts 210 and 305 and the transfer of those assets into trust management on 21 July 2010 effected a direct expropriation. If one were to assume that a violation of the ECT had occurred, it is clear that 21 July 2010, under the international legal standard of compensation for expropriation, would be the valuation date of such an alleged direct or even indirect expropriation, since this is the date on which Claimants irreversibly lost rights in the dispute. Even in cases where the expropriation only came into effect later, the relevant date for valuation is the date of expropriation. (R-III ¶¶ 20 – 23; RPHB 1 ¶ 1114 – 1117; RPHB 2 ¶¶ 990 – 992).

1489. None of the four alleged actions – taken individually or collectively – which are to have occurred prior to 21 July 2010 can serve as the valuation date in this present case as they did not amount to an indirect expropriation because they did not cause Claimants to be deprived of their property rights. The only piece of evidence that Claimants used to attempt to show that they were deprived of their right to sell the companies was the Squire Sanders Due Diligence Report, which – contrary to Claimants' misinterpretation – made no mention that the Republic's assertion of its pre-emptive rights was improper. Instead, it recognized that the transfer in TNG from Gheso to Terra Raf was effected in breach of the government's first refusal right. Claimants have failed to prove that this would have actually deterred an interested buyer and, therefore, have failed to prove that they were irreversibly deprived of their rights prior to 21 July 2010. (R-III ¶¶ 33 – 35; RPHB 2 ¶¶ 993 – 1001).

1490. In their closing submissions, in particular in the discussion related to the Laren loan, Claimants also conceded that they were not deprived of their property rights prior to July 2010. They admitted to enjoying full property rights. (RPHB 2 ¶¶ 1003 – 1004).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1491. Even if the Tribunal relies on a valuation date prior to 21 July 2010, it should – in conformity with international practice – take external circumstances and Claimants' own actions up to 21 July 2010 into account. (R-III ¶¶ 425 – 426; RPHB 2 ¶¶ 1006 – 1009). Subsequent events may affect the extent of damage caused by illegal state actions. This was confirmed in *Amco Asia v. Indonesia* as well as in scholarly writings. Here, there is a clear correlation between the timing of the companies' financial troubles and external events. The impact of these external factors has been admitted by Claimants as well as by Respondent's independent valuation expert. These external factors led to a diminution of value – a diminution that Claimants would have suffered even in the absence of the alleged unlawful act. In particular, the Tribunal should consider:

> *(a)* *a sharp drop in oil and gas prices in 2008 and 2009;*
>
> *(b)* *a sharp drop in local demand in 2009;*
>
> *(c)* *the company's customers' conduct and the company's own business decisions;*
>
> *(d)* *the general undercapitalization of the companies and the constant withdrawal of cash from the companies;*
>
> *(e)* *the companies' failure to pay taxes on time as required by law;*
>
> *(f)* *and the consequential taking out of the so-called Laren loan which was extremely risky and required the payment of very high interest rates. (R-III ¶¶ 426 (quoted), 427 – 435, R-II ¶¶ 722 – 726).*

1492. Since Claimants have the burden of proof on the existence and extent, and since they have presented no other calculations other than those based on the improper 14 October 2008 valuation date, the damages claim must be dismissed in its entirety. The Tribunal cannot replace Claimants' failure to discharge their procedural duties by applying some form of discretion. The Tribunal may not unilaterally assist Claimants by determining a discretionary value at another valuation date. This is confirmed in *Rompetrol v. Romania*, which determined that no damages could be awarded when the claimant had presented only results from one valuation technique that the Tribunal had determined to be inappropriate. (RPHB 1 ¶¶ 1112 – 1113; RPHB 2 ¶¶ 56 – 58).

### 3. The Tribunal

1493. The Parties differ considerably regarding the valuation date. Claimants argue that the date of the President's Order 14 October 2008 is the date necessary to fully compensate Claimants for the injuries caused by Kazakhstan's violations of the ECT and international law. Respondent argues that, even if one were to assume that a violation of the ECT had occurred, it is clear that 21 July 2010, under the international legal standard of compensation for expropriation, would be the valuation date of such an alleged direct or even indirect expropriation, since this is the date on which Claimants irreversibly lost rights in the dispute.

1494. A preliminary question is whether the Tribunal can select any dates, other than those two, as the correct valuation date. Respondent argues that Claimants have



presented no calculations other than those based on the improper 14 October 2008 valuation date and the damages claim must be dismissed in its entirety if the Tribunal does not accept that valuation date. This is not correct, since Claimants have in fact addressed other valuation dates (CPHB 1 ¶¶ 581 – 582) and the quantum of damages to be calculated by such dates. Indeed, the RBS Assessment for KMG EP on 31 July 2009, though primarily relying on a valuation of October 2009, contains substantial evidence on which the Tribunal could base its assessment of damages either by 18 December 2008 (date of MEMR's challenge to Claimants' ownership of TNG), 30 April 2009 (state sequestration of Claimants' KPM and TNG shares and assets), or 18 September 2009 (judgment against Mr. Cornegruta).

1495. The Tribunal, therefore, is in a position to select another valuation date if it considers that appropriate. Separate therefrom, the Tribunal will have to examine later in the chapter on Quantum in this Award, which damages have been proved for the chosen valuation date.

1496. Turning to the question of which is the valuation date to be selected, the Tribunal considers that the date of 14 or 16 October 2008 suggested by Claimants cannot be accepted. Claimants have not shown that, already at that time, any damages were caused by Respondent's breaches of the ETC. Though the President's Order in October almost immediately caused various government actions against Claimants' investment, which were the beginning of a continuing breach of the FET-standard of the ECT, as seen above in the chapter on causation in this Award, the effects of these breaches damaging the investments only started in December 2008.

1497. The Tribunal considers that only by 30 April 2009, when the State sequestration of Claimants' KPM and TNG shares and assets occurred, actual, and permanent damages could be identified for the investments.

1498. Selecting a later date would be inappropriate, as the State sequestration made it impossible for Claimants to continue with their investments and the damages continued to occur from thereon. In particular, that implies that the damages had already occurred to a great extent before the valuation date in 2010 suggested by Respondent.

1499. Therefore, in its following considerations on the quantum of damages, the Tribunal will rely on 30 April 2009 as the determinative valuation date.

1500. Based on this valuation date, the Tribunal will have to hereafter proceed in all its calculation of damages. Since, contrary to that finding, the Parties have primarily relied on different valuation dates, i.e. Claimants on 14 October 2008, Respondent on 21 July 2010, for their calculations of damages, the Tribunal has to examine whether the Parties' arguments regarding the calculation of damages can still be applied to the valuation date found to be applicable by the Tribunal.

1501. This task is easier regarding Claimants' arguments, because the time difference between 14/16 October 2008 and 30 April 2009 is rather shorter and fewer relevant events have occurred during that period which might have changed the value of the investment and thus the calculation of damages. The Tribunal will take this



difference of the valuation dates relied upon into account when examining the various damage claims raised by Claimants.

1502. On the other hand, regarding Respondent's calculation, not only is the time difference between 30 April 2009 and 21 July 2010 considerably longer, but in particular the Respondent's conduct during that period, which the Tribunal found above in this Award to be a breach of the ECT and the cause of the damages, obviously had a a considerable influence on the value of the investment and, thus, the quantum of damages. It does not need any further explanation that this conduct caused the two companies affected to lose value due to the breaching treatment by Respondent and that Respondent cannot rely for the calculation of the damages on its own breaches and their effects.

1503. Respondent has argued regarding the calculation of damages on the basis of an earlier valuation date than the one it considers relevant, referring to the report of Deloitte GmbH, that KPM and TNG were already in severe financial difficulties even before October 2008 (RPHB 2 p. 17). The Tribunal will take this argument into account insofar as relevant when examining the various damage claims raised by Claimants.

## L.III.     Arguments Regarding the Treatment of Debt: Enterprise vs. Equity Value

### 1.     Arguments by Claimants

1504. Claimants seek an award based on the value of the assets that Kazakhstan impaired and seized, namely the operating "*enterprises*" of KPM and TNG. Thus, Claimants seek the enterprise value of their investments, meaning the value of the companies' assets without deducting their debt. Enterprise value is the appropriate measure of damages under the ECT and customary international law, and has been used in similar cases. The equity value position argued by Kazakhstan is incorrect as a matter of treaty law and is unwarranted by the facts. At a basic level, the equity value argument is incorrect because Respondent did not simply seize Claimants' equity – it seized all of the assets of KPM and TNG without assuming or extinguishing their debts and, at the same time, making KPM and TNG unable to satisfy their debts. Thus, the injury includes the assets that were seized and the debts that the companies are unable to repay as a result of the seizures. Neither the ECT, nor scholarly commentary, nor basic economics provide support for Respondent's argument that the Tribunal distinguish between assets and debts and award only equity, thereby limiting the damages to the value of the shareholdings in KPM and TNG. To do so would unjustly enrich Kazakhstan. Moreover, the expropriation section of the ECT provides that compensation shall amount to the FMV of the investment exploited, which is the assets of KPM and TNG, not their equity. This approach is supported in scholarly commentary, as well. (CPHB 1 ¶¶ 597 – 601, 606 – 610, 617 – 620; CPHB 2 ¶¶ 304, 314).

1505. Respondent has misframed this issue into whether the Tribunal should "*add*" debts to Claimants' damages. Instead, however, the issue is whether the Tribunal should deduct the value of debts from the assets impaired and taken. The full enterprise value is the appropriate measure of damages, pursuant to the *Chorzów* measure of full reparation, pursuant to which the correct measure of damages "*must as far as*



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 13 of 102

*possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed."* But for Kazakhstan's action, KPM and TNG would have continued to operate their business, generating cashflows to KPM and TNG, and Claimants would have been entitled to direct those flows to reinvest, pay dividends, and/or to pay off debts of KPM, TNG, and Tristan (under the KPM and TNG guarantees). Since the Tribunal cannot order restitution, however, the Tribunal's award should include all future cash flows of the assets taken, without deducting debts. This would mirror restitution as closely as possible and wipe out all consequences of Kazakhstan's actions. Deduction of debts would give no compensation for Claimants' loss of their right to direct cash flows to repay creditors before distributing dividends to themselves. (CPHB 2 ¶¶ 305 – 309).

1506. Enterprise value is the correct measure, regardless of whether Claimants are directly liable for the debts, as authorized under Art. 13 ECT, pursuant to which FMV is to be paid for a lawfully expropriated investment. It is well settled under customary international law that the "*full reparation*" standard should apply to unlawful expropriation. The ECT's broad definition of "*Investment*" as including assets that are directly and indirectly owned by the Investor, as also recognized in scholarly commentary, also supports this argument that the enterprise value should be compensated. (CPHB 2 ¶ 313 – 316).

1507. At the Hearing on Quantum, Kazakhstan equated FMV with equity value, which is incorrect as a matter of international practice. It is true that a potential buyer would have deducted the companies' debt from the enterprise value, if the buyer were acquiring only the equity and, thus, assuming all the liabilities. Here, Kazakhstan took the assets of KPM and TNG, but did not assume or extinguish the companies' liabilities. Thus, the FMV says nothing about whether that measure should be applied to Claimants' equity stake. (CPHB 1 ¶¶ 611 – 614; CPHB 2 ¶ 314).

1508. Importantly, Respondent is liable for the injuries suffered, irrespective of whether Claimants remain liable for the debts (but all the more so, since they remain liable). (CPHB 1 ¶¶ 602 – 606).

1509. Respondent cites *Impregilo v. Pakistan* and *PSEG v. Turkey*, which are inapposite. Here, unlike in *Impregilo*, Claimants are the 100% owners of KPM and TNG and are not asserting claims on behalf of any other parties. Likewise, when the *PSEG* tribunal refused compensation, it did so in a case that did not involve companies that were wholly owned by the claimant, as is the case, here. (CPHB 2 ¶¶ 317 – 318).

1510. In its Rejoinder on Quantum, Respondent expressly agreed that, insofar as Claimants remain responsible for the Tristan debt, enterprise value is the correct measure of damages. While Respondent attempted to retreat from this statement at the May 2013 hearing, it did not attempt to reconcile its prior statement. The argument that Ascom and Terra Raf are not liable to repay the noteholders is, in any event, incorrect. They are obliged to repay the noteholders, pursuant to Section 6 of the Pledge Agreement. (CPHB 2 ¶¶ 319 – 322).

1511. An award of the enterprise value would under-compensate Claimants and enable Respondent to take the assets, worth at least USD 186 million, for free.



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 14 of 162

Respondent would be unjustly enriched. As a result, *Chorzów Factory* observed that damages should not be reduced by the amount of obligations that claimants owe to third parties, even if that means that third parties may receive a portion of an arbitral award. The tribunal in *Occidental v. Ecuador* also applied that principle to reject Ecuador's efforts to reduce the award by deducting obligations that the claimant there owed to third parties. As in *Occidental*, the Claimants have demonstrated their commitment to honor their obligations to the noteholders. The notion that Claimants would be enriched by the Sharing Agreement that noteholders embraced is outweighed by the unjust enrichment that would accrue to Respondent if it were obliged to compensate only the equity value of the assets taken. (CPHB 1 ¶¶ 637 – 640; CPHB 2 ¶¶ 323 – 328).

1512. While the Tristan Debt is the largest at issue, Respondent also argues that the damages award must be reduced by other debts allegedly owed by KPM and TNG including, (1) amounts owed to Vitol under the COMSA prepayment terms and LPG financing arrangements; (2) outstanding debts under the Laren facility; and (3) the USD 62 million corporate back tax assessment. These debts should not be deducted from Claimants' damages for the same reasons that the Tristan debt should not be. (CPHB 2 ¶ 328; CPHB 1 ¶¶ 641 – 649).

## 2. Arguments by Respondent

1513. Claimants use the noteholder claim to "*gross up*" their damages claim by creating an enterprise value for KPM and TNG that simply ignores the debt of those companies, which must be considered in a compensation claim. By the date of the first Post-Hearing Brief, Claimants had still not provided a full breakdown of KPM's and TNG's debts, making a complete valuation impossible and making it, likewise, impossible to show Claimants' damage. The debt under the Tristan notes is, therefore, used to evaluate the debt, here. (RPHB 1 ¶ 1050 – 1054, 1063, 1071; RPHB 2 ¶¶ 956).

1514. As of 21 July 2010, the minimum amount of noteholder debt could have stood at USD 559 million (principal of USD 531.1 million + interest of 27.9 million that Tristan had failed to pay). KPM and TNG are liable for more than 81.2 million in taxes. The additional debt that KPM and TNG had as of 13 February 2010 was valued by FTI to be USD 119 million. (RPHB 1 ¶¶ 1057, 1063 – 1067; RPHB 2 ¶ 923). Deloitte has determined that the enterprise value of KPM and TNG cumulatively amounts to USD 186 million. As 21 July 2010, they were liable for at least USD 759.2 million in debt. Accordingly, they had an equity value of zero, and Claimants have suffered no damage whatsoever. This is consistent with how debt markets treated the Tristan debt as of 14 October 2008, when they were treated as close to zero, being traded at USD 65.125 for a nominal amount of USD 100. This is an indication that the markets considered default more likely than not, in such event noteholders would only be able to recover 65.125%. Accepting the enterprise value of USD 186 million but ignoring the USD 759.2 million in debt, Claimants would receive USD 65.4 million of that amount by operation of Section 4(b) of the Sharing Agreement after the deduction of expenses. With an enterprise value of USD 186 million, Claimants would not have suffered any damage in the first place, but would nonetheless receive compensation. (RPHB 1 ¶¶ 1080 – 1084, 1099 – 1101).



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 15 of 102

1515. There is, however, no risk of unjust enrichment if the award is based on equity value. Claimants would receive the precise value of their shareholding. The noteholders could bring their own claims under the applicable BITs and obtain their own award against the Republic. Insofar as their claims would fail for lack of jurisdiction *ratione personae*, this does not lead to unjust enrichment, but is rather a result of the BITs and the fact that the Republic has only agreed to arbitrate disputes with certain investors and not with others. (RPHB 2 ¶ 953 – 955).

1516. A debt gross-up is contrary to international law. Claimants' arguments that the investment definition in the ECT requires compensation according to enterprise value, and that Ripinsky and Williams stated so in their book, and that there is international practice supporting an award based on enterprise value, are incorrect. (RPHB 2 ¶¶ 925 – 928).

1517. Respondent explains that Claimants' argument is logically flawed because it ignores that KPM and TNG pledged for the entire Tristan debt with all of their assets and the entire business enterprise. "*Thus, even if one assumed that the investments are the assets and the business enterprise of KPM and TNG, the Tristan debt must be deducted from the value of those assets and this business enterprise. As Tristan had no operative business of its own, KPM and TNG were practically liable for the Tristan debt themselves, meaning that all of their assets were subject to potential enforcement measures by the noteholders. This directly undercuts the value of these assets. Thus, even assuming that Claimants' investments were the assets and the business enterprise of KPM and TNG, debt would still need to be deducted and equity value would still be the correct measure of damages.*" This argument has the unacceptable consequence that an investor could claim the enterprise value even if it had not remained liable for any of the investment vehicle's debt. This would allow for spectacular enrichment of an investor. Claimants' argument makes no differentiation between situations where an investor remained liable or not. Thus, it is no surprise that Ripinsky and Williams do not support Claimants' conclusions – they do not take any side of either enterprise or equity value. Claimants are citing authority where there is none. (RPHB 2 ¶¶ 929 – 931).

1518. There is no uncontroversial principle of international law that enterprise value can be claimed if the investor remained liable for the investment's debt. The opposite is true: the only international principle that has come into existence is the principle that debt must be deducted from the enterprise or asset value in question. As was explained in *Impregilo v. Pakistan* and *PSEG v. Turkey*, to hold otherwise would make it possible for an investor with standing to bring a claim on behalf of another who does not have standing. The fact that those cases involved investors who were not 100% shareholders in the local subsidiary makes no difference. *Impreglio* also observed that, like in this case, a tribunal has no means of compelling a successful claimant to pass on the appropriate share of damages to other shareholders or participants. The *Impreglio* tribunal, thus, contemplated the situation of shareholders as well as debtholders. (RPHB 2 ¶¶ 932 – 936).

1519. Claimants' reference to the *Enron* case is designed to confuse and to simulate the existence of authority where there is none. The paragraph referenced concerns the determination of the percentage of shares in a company that belonged to *Enron* and has no relevance here. *Occidential* also concerned a fundamentally different

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 16 of 102

question and not the value of the shareholding. Respondent does not understand why Claimants referenced *Azurix* in the Final Hearing. (RPHB 2 ¶¶ 937 – 938).

1520. Claimants' reference to *Chorzów* is misplaced. First, that case played out in a pre-BIT era where there was no possibility that debtholders were circumventing the requirements of their own claim – diplomatic protection did not foresee the bringing of claims by debtholders or by states on behalf of them. The *Chorzów* standard of restitution also misses the mark. The suggestion that Claimants must be put into a position in which they hold the cash flows created by KPM and TNG and in which they can direct these cash flows to Tristan noteholders is not supported by that decision. *Chorzów* does not provide for how the consequences of an illegal action should be wiped out. Factually, the repayment of the Tristan note debt was not to be conducted through the Claimants. Instead the repayment from Tristan to the noteholders was to be realized from the proceeds of loans that KPM and TNG had entered into with Tristan. It is not the case that Claimants were to forward KPM and TNG's cashflows to noteholders. An award that was grossed up for the Tristan debt "*would not recreate the hypothetical situation without the alleged breach if all hypothetical cash flows of KPM and TNG were directly awarded to the Claimants.*" (RPHB 2 ¶¶ 939 – 943).

1521. Respondent will not speculate on whether "*Claimants are actively acting on behalf of the Tristan noteholders and as a front for the actual noteholder claim.*" If successful, however, Claimants' claim has the practical consequence that Claimants serve for the noteholders to realize the noteholders' claim. It would have the same effect which was the salient point under *Impreglio* and *PSEG*, where the tribunals declined to compensate the claimants for the amounts they owed to creditors. (RPHB 2 ¶ 944).

1522. Ascom and Terra Raf are not liable toward the Tristan noteholders under Section 6 of the Terra Raf and Ascom Pledge Agreements. The limited scope of Section 6(b) clearly refers to "*dividends*" and "*distributions*." Hypothetical awards against Respondent are not covered. The Pledge Agreements must be interpreted under Kazakh law, pursuant to which only the activity of the LLP is subject to the pledges. Potential awards are not covered by the text of the pledges. The text of Section 6(b) also speaks against its argued purpose of covering payments from an award. In addition, the competent ICC tribunal has the authority to determine whether Claimants have liability to noteholders. Claimants' argument that Respondent needs to compensate Claimants before such liability has even been proven before an ICC tribunal is ludicrous. The only way that Respondent could theoretically even be liable for an enterprise value claim would be if Claimants did remain liable – but even then there are strong arguments under international law that only equity value could be awarded, and Respondent has never admitted the opposite. (RPHB 2 ¶¶ 945 – 952).

1523. Regarding additional debt, Claimants have not responded to Respondent's arguments that the debt under the Reachcom Facility Agreement, the Limozen Facility Agreement, and the Reachcom Receivables Purchase Agreement, need to be deducted. The Tribunal should consider this as a concession. (RPHB 2 ¶ 957).

1524. Regarding the KPM and TNG COMSA prepayment arrangements, the envisioned sharing of cash-flows from the envisioned joint venture capital company needs to



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 19 of 102

be deducted from a claim for the LPG Plant. The COMSAs, however, refer to an existing date as of the valuation date. Claimants do not contest that the COMSA debt existed as of 21 July 2010 and they do not explain why it would not need to be deducted from their claims. Claimants, therefore, admit that this debt needs to be deducted. (RPHB 2 ¶¶ 959 – 960).

1525. While Respondent disputes that it had any role in Claimants taking out the Laren loan, Claimants have not proven that their debt under the Laren loan has been repaid, beyond the incredible evidence of Mr. Lungu. It is also unproven that repayment caused any loss to Claimants. (RPHB 2 ¶ 961 – 962). Tax debt also needs to be deducted. (RPHB 2 ¶ 963).

1526. Contrary to the position advanced by FTI, the Tristan Note price is not an indicator of enterprise value and that valuation method is not commonly used, nor is the Morning Star Index. The Morning Star Index depicts the 5 year average of debt to total capital average of gearings (typical debt to typical capital ratio) for the oil and gas industry and stood at 19.5 % on 30 September 2008. Thus, FTI assumes that the market value of the Tristan notes (USD 273.5 million) represents 19.5% of the total enterprise value, making that value be USD 1.4 billion for KPM and TNG as of 14 October 2008. There is no typical debt to total capital ratio that applies to all companies in the oil and gas industry. There are wild variations, ranging from zero to 97%. Accordingly, the average is not a reliable method for valuation. As of both valuation dates, the markets expected Tristan to default on its notes, which means that the market value was close to the enterprise value of the companies at the time of the issue. This is because, in the event of default, the remaining relevant right of the noteholders is a primary claim to the enterprise value of the companies. As of 14 October 2008, the value of KPM and TNG as derived from the value of the Tristan notes was approximately USD 221.5 million – approximately one third of FTI's DCF calculations. As of the valuation date of 21 July 2010, the value was approximately USD 215.5 million, which is fairly close to Deloitte's DCF calculation of USD 186 million. (RPHB 1 ¶¶ 1031 – 1037).

### 3. The Tribunal

1527. The Parties disagree regarding the relevance of the *Chorzów* Award. The Tribunal considers that the starting point for the calculation of damages should indeed be the formula applied in the *Chorzów* Award, and often applied in investment arbitrations as well, i.e. that the damages awarded "*must as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed.*"

1528. For their respective arguments relating to the treatment of debts in this context, the Parties rely on several decisions of other tribunals, but disagree as to which of them are comparable to the situation in the present case and what their findings mean for the present dispute. The Tribunal finds that none of these earlier decisions exactly deal with a situation as exists in the present case. While taking into account the considerations in these earlier decisions, the Tribunal will turn to the specifics of the case at hand.

1529. The Parties disagree regarding the relevance of the **Sharing Agreement**. In that regard, this Tribunal considers that an approach similar to that taken by the tribunal

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

in the OPEC case *Occidental v. Ecuador* (R-355 §§ 654 *et seq.*) is the most appropriate: Such an agreement concluded long after the breach of the ECT in order to share the risk and proceeds of an award in the present case cannot be a factor reducing the damages owed by Respondent.

1530. In principle, Claimants are correct in their argument that, but for Kazakhstan's action, KPM and TNG would have continued to operate their business, generating cashflows to KPM and TNG, and Claimants would have been entitled to direct those flows to reinvest, pay dividends, and/or pay off debts of KPM, TNG, and Tristan (under the KPM and TNG guarantees).

1531. Since the Tribunal cannot order restitution and restitution is not a relief sought by Claimants, the Tribunal's award should include future cash flows of the assets taken.

1532. However, the Tribunal does not agree with Claimants that this approach would automatically mean that no debts of the seized companies can be deducted at all. Since Claimants, after the taking by Respondent, are no longer the owners of KPM and TNG, they should not be compensated for any debts for which they now are no longer liable and for which Respondent, or the new owner to which the assets were transferred, is now solely liable.

1533. As the Claimants have the burden of proof for all damages claimed, they must be considered to have the burden of proving that they remain liable for a debt after the taking by Respondent. On the other hand, Respondent must be considered to have the burden of proof for the exception that it, or the new owner to which it passed the assets, is solely liable for a debt.

1534. As recorded above in this Award, between 21 and 22 July 2010, the Prime Minister and the Minister of Oil and Gas publicly declared the takeover and abrogation of the Claimants' Subsoil Use Contracts, seizure of the assets of KPM and TNG and caused them, in due course, to be transferred to KMG, which later appointed its subsidiary KMT as "*trust manager*" for the companies. (C-3, C-4, C-5, C-189, and C-190).

1535. The Tribunal will, therefore, examine the debts which Respondent argues have to be deducted and will ascertain who is still liable for them at this time.

1536. Regarding the Tristan notes as the by far largest debt, Respondent expressly agreed in its Rejoinder on Quantum (R-III ¶ 383) that, insofar as Claimants remain responsible for the Tristan debt, enterprise value is the correct measure of damages. While Respondent's statement at the May 2013 Hearing may perhaps be understood as changing that position, it did not attempt to reconcile its prior statement and the Tribunal still agrees with Respondent's earlier position.

1537. Based on the information before it, the Tribunal concludes that Ascom and Terra Raf are still liable to repay the noteholders pursuant to Section 6 of the Pledge Agreement. That provision expressly includes in the payments to be made to the pledgeholder "*other payment or distribution of any kind.*" The Tribunal sees no reason why this general language should be restricted to payments of KPM and TNG alone as Respondent has argued at the May 2013 hearing (Tr. day 1, pp. 246



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 19 of 102

and 247). Quite to the contrary, if Claimants, in the present arbitration, would not claim the value of the Tristan debts, they might be held liable for not pursuing the interests of the pledgeholders.

1538. Beyond the Tristan issue, regarding additional debt, the Tribunal agrees with Respondent that Claimants have not sufficiently responded to Respondent's arguments that the debt under the Reachcom Facility Agreement, the Limozen Facility Agreement, and the Reachcom Receivables Purchase Agreement, need to be deducted. Even if the Tribunal does not consider this as a concession, it does consider that Claimants have not fulfilled their burden of proof in this regard and that, therefore, these debts have indeed to be subtracted from any damages.

1539. Regarding the **obligations to VITOL** under the COMSA prepayment terms and LPG financing arrangements, the Tribunal does not agree with Respondent that these must be deducted from the damages awarded. As testified by Mr. Lungu (Tr. Hearing January 2013, day 1 p. 185/186), VITOL never owned part of the LPG Plant. As explained by Claimants (CPHB 1 ¶ 643), the prepayment arrangements guaranteed by KPM and TNG were not a separate debt but regarded VITOL's portion of the debt financing for construction of the LPG Plant. The Joint Operating Agreement with VITOL for the LPG Plant project (First FTI Scope of Review No.44) expressly provides that, in the event that the Government seeks any rights of pre-emption, VITOL is still entitled to payment from ASCOM of the fair value price and that ASCOM shall seek to recover such amounts from the Government.

1540. The **Laren debt** was caused by the conduct of Respondent which this Tribunal now found to be a breach of the ECT. Furthermore, it has been repaid as testified by Mr. Lungu (Tr. Hearing January 2013, day 1 p.191). The Tribunal sees no reason why it should be deducted from the damages awarded.

1541. Finally, the alleged **back tax obligations** were created by Respondent's conduct which this Tribunal found above to be a breach of the ECT. Further, KPM and TNG prevailed in their court challenges of the tax assessments. The only appellate decision in favour of Respondent was issued after the seizure of the investment in a review process alleged by Claimants to have been conducted without their knowledge or participation. In any case, the Tribunal considers that Respondent has not fulfilled its burden of proof that the tax assessment would have been valid even without the conduct found to be a breach above in this Award.

1542. In view of the above, the **Tribunal concludes** that only the debts under the Reachcom Facility Agreement, the Limozen Facility Agreement, and the Reachcom Receivables Purchase Agreement are to be deducted from the damages to be awarded.

## L.IV. Quantum Related to Borankol Field and Tolkyn Field

### 1. Arguments by Claimants

1543. The hostile investment environment created by Respondent, combined with the liquidity shortage which was also caused by Respondent (i.e. the absence of Credit



Suisse loan), forced Claimants to reduce development efforts at Borankol and Tolkyn fields. This caused Claimants to decide not to drill or recomplete 13 wells at Borankol and Tolkyn in 2009 – 2010. This caused three injuries: (1) KPM and TNG lost revenue that they would have earned from their planned production; (2) the gap in the development efforts artificially depressed the production curve at Tolkyn and Borankol. The production that forms the basis for GCA's decline curve analysis is lower than it would have been had Claimants been able to develop the fields without Kazakhstan's influence. Claimants (3) were unable to promptly respond to the watering issues at the Tolkyn field. (CPHB 1 ¶¶ 365 – 368; CPHB 2 ¶ 222).

1544. After the Hearing on Quantum, Claimants stated that both Parties have valued the Tolkyn and Borankol fields using the DCF method, which is undisputedly the appropriate method for valuing these assets. Based on FTI's DCF valuation, which relies on the geological analysis of Ryder Scott, Claimants request the following damages (CPHB 1 ¶¶ 524 – 528):

| **Borankol** | **US $197,013,000** |
|---|---|
| **Tolkyn** | **US $478,927,000** |
| **Munaibay Oil** | **US $96,808,000** |

1545. Before the Hearing on Quantum, FTI's valuation of the Borankol field and the Tolkyn field as of 14 October 2008 was USD 231.5 million and USD 508.4 million, respectively. FTI arrived at these sums by assessing (1) distribution costs, (2) a mix of fixed versus variable costs in FTI's forecast of cost of goods sold, (3) recompletion CAPEX, (4) an estimate for liquidation expenses, and (5) depreciation. FTI has also adjusted its application of EPT to properly calculate EPT on income after corporate income taxes. (C-III ¶¶ 75 – 76).

1546. Claimants' right to export gas at international prices is relevant to TNG's and its prospective purchaser's reasonable expectations as of 14 October 2008. FTI assumed that a willing buyer, on 14 October 2008, would have been able to sell in export markets and acquire the prevailing international export prices for those sales. The CAC Pipeline – a direct export route – is proximate to the Tolkyn field. At the time, Respondent was forecasting both an expansion of total gas production from 33.7 Bcm$^3$ in 2008 to 61.5 Bcm$^3$ by 2015, with a concomitant export volume expansion from 6.2 Bcm$^3$ in 2008 to 12.9 Bcm$^3$ in 2015. Regarding pricing, in March 2008 there was every indication that companies from Turkmenistan, Kazakhstan, and Uzbekistan would export gas at European price levels, minus relevant transport and storage costs, by January 2009. In 2008, KMG even announced expectations that its own price could increase by 60 – 70% from January 2009, up to USD 306/mcm. (C-III ¶¶ 8 – 11).

> *10. That TNG's future receipt of international export prices was reasonably contemplated in 2008 is also clear from several of the indicative offers that Claimants received for TNG's Tolkyn field in the initial round of Project Zenith. A comparison of FTI's valuation of the Tolkyn field and the*



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 21 of 102

> *indicative offers demonstrates this. FTI has valued TNG's Tolkyn field as of October 14, 2008 at US $508.4 million, using a DCF methodology and incorporating as an important element the receipt of future gas export prices at a flat US $180 per 1000 cubic meters (a conservative estimate given the fact that export prices were set to be raised at the time to US $305 per 1000 cubic meters in January of 2009). By comparison, among the initial round of indicative offers received by Claimants, the Tolkyn field as a segregated component was valued by KNOC at US $1,067 million on an enterprise value basis, by OMV Exploration & Production GmbH at US $952 million on an enterprise value basis, and by Total at US $730 million on an equity basis using DCF methodology. The magnitude of these offers indicates that they certainly contemplated receipt of export prices for TNG's gas as a critical component. (C-III ¶ 10).*

1547. Deloitte makes the unreasonable assumption that all natural gas produced from the Borankol and Tolkyn fields would be sold on the domestic Kazakhstan market, even though a significant proportion of the gas production from these fields was sold on the export market. Deloitte's assumption is contrary to Claimants' right to export gas under the Subsoil Use Contracts (which Respondent has not contested), and is contrary to the negotiated (but not signed) Tripartite Agreement. Respondent does not address Claimants' explicit contractual right to export gas under its Subsoil Use Contract, the self-evident inclusion of export pricing assumptions in the initial round of Project Zenith offers, the proximity of the CAC Pipeline, or the State's own projections as of 2008 regarding increases in gas production, exports, and export prices. Instead, Respondent selectively focuses on deficiencies in the Tripartite Agreement. An examination of the negotiation documents, however, shows that the parties intended to enter into a long-term agreement for the supply of natural gas. The preliminary agreement signed by representatives of all three parties set out in careful detail the two explicit export pricing methodologies for deliveries of gas to KazAzot and KMG. That the Tripartite Agreement was not signed and that KazAzot decided against construction of the fertilizer plant is irrelevant for the establishment of TNG's and its prospective purchaser's reasonable expectations for two reasons. First, through August 2009, the Tripartite Agreement was a viable prospect and confirmatory reason for the belief that TNG would be able to export gas at international prices. Second, KMG executed the 17 November 2008 Agreement, giving its clear indication that gas exports and export prices could reasonable be presumed to be available to a prospective purchaser upon entry into negotiations with KMG, regardless of the KazAzot fertilizer project. This is an exception to the rule against consideration of events after the valuation date because it confirms management's expectations as of the valuation date. While KazAzot never signed the version that KMG executed, it had previously accepted a materially identical contract and one could reasonable assume that they would execute the agreement after the substitution of KMG as the exporter. Claimants explain that "*[i]t was, after all, KazMunaiGas through KazTransGas, not KazAzot, that was to take delivery of TNG's export gas and pay the specified export prices under the Tripartite Agreement. The export provisions in the Agreement were a separate component, providing for their own discrete gas stream from TNG for export, and providing their own pricing formula for the payment of international export prices. The fact that KazAzot might not need the portion of the gas allocated to it in the Tri-Partite Agreement means only that more of TNG's gas could be exported, not less.*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

*Respondent cannot now claim that an Agreement it effectively executed itself for TNG gas exports and export pricing is no evidence of the right, expectation, and ability to export gas at such pricing.*" (C-III ¶¶ 12 – 17, partially quoted; CPHB 1 ¶¶ 395 – 397, 492 – 494; CPHB 2 ¶¶ 346 – 352).

1548. Deloitte's new arguments demonstrate flaws in and the biased, outcome-driven nature of its work. Deloitte had every incentive to bias its secondary valuation analysis to make it appear to support the conclusions it had already published, and that is exactly what it did. In order to make the secondary analysis support its previous conclusions, Deloitte made unsupportable judgments and adjustments to the market data that biased the outcome downward. This is confirmed by the contemporaneous market analysis conclusions reached by KMG and RBS and the offers in Project Zenith. Analysis of those market actors, who had no reasons to bias their conclusions, corroborates FTI's market analysis. (CPHB 2 ¶¶ 340 – 345).

1549. Claimants respond to Respondent's argument that a price of USD 180 per 1000 $m^3$ is unreasonable and that an undocumented export price of USD 70 would have to be used, as follows:

> *19. [...] What Respondent is actually describing appears to be an export gas racket pursuant to which a State-controlled middle man pays a domestic producer of gas a reduced price (e.g., US $70), flips the gas at the border for the international export price (e.g., US $180), and retains the difference between the two prices. Respondent attempts to put a gloss on this racket by suggesting that the export prices received by domestic producers "were regulated by the State and were significantly lower than [international] export prices due to the lack of any direct entry to international markets." Respondent does not, however, cite any "regulation" supporting this contention, and Claimants invite Respondent to provide a regulatory basis for this State sponsored profit-skimming enterprise. And Respondent's reference to a "lack of any direct entry to international markets" is simply a euphemistic way of saying that a State-controlled middle man must be paid an illegitimate cut if a domestic producer wants to export gas. There exists, after all, an otherwise "direct entry to international markets" in the form of the Center-Asia-Center pipeline running adjacent to the TNG and KPM oil and gas fields, which TNG and KPM had a legal right to access at commercially reasonable rates under their Subsoil Use Contracts. (C-III ¶¶ 18 – 19).*

1550. Claimants were subject to the "*racket*" in the past. They were unsatisfied with these artificially reduced prices for KPM and TNG's gas exports and consistently negotiated to acquire reasonable export prices. The Tripartite Agreement set as an effective benchmark a legitimate export price, tied to the prevailing price at the border, along with a 20% fee to KMG. (C-III ¶¶ 20 – 21).

1551. Respondent also fails to take Kazakhstan's changing gas market of 2008 into account, when the demand for gas was breaking Russia's monopolistic stranglehold on the export of Kazakh gas. Deloitte cites to reports that support this, but nonetheless assume 3 scenarios that are premised on whether TNG would be able to export gas at all. The probability of each of the three scenarios changed during proceedings, but Deloitte never produced the MOG review upon which

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

those assumptions were allegedly based. Deloitte also ignored the gas pricing assumptions that were made in connection with the 2009 RBS Asset Assessment, which contains an 80% likelihood that all of TNG's gas would be sold on the export market, although it was cited in their report. RBS valuations of the Tolkyn field range from USD 527 million to USD 765 million, based on the different export prices that could be achieved, not on whether TNG would be able to export gas. This report is fatal to Deloitte's 5% probability of its "*export scenario*", which is why Respondent instructed Deloitte to remove all references to the RBS Assessment from its report. (CPHB 1 ¶¶ 491 – 500; CPHB 2 ¶¶ 346 – 352).

1552. The RBS valuation was based on (1) the 2009 reserve report prepared by Miller Lents; (2) detailed legal due diligence by Squire Sanders; (3) detailed financial, tax, and environmental due diligence by PWC; (4) discussions with management of KPM and TNG; and (5) "*valuation discussions with KMG EP*." It was created as an independent valuation for the purpose of a potential transaction, not litigation. It concluded that, on 1 October 2009, the combined enterprise value of Tolkyn, Borankol, and the LPG Plant was USD 612 million in the Default-Base scenario and USD 760 in the Special-Base scenario, which assumed higher gas prices. For Tolkyn and Borankol alone, RBS concluded that Tolkyn and Borankol had a combined enterprise value ranging from USD 546 million in the Default-Base scenario, up to USD 784 million assuming higher gas pricing in the Special-Base Scenario. The Tribunal should increase any amount derived from the RBS Valuation by USD 243.5 million to account for contingent liabilities attributable to Kazakhstan that RBS included in its model. Due to the untimely production of the RBS Valuation, any uncertainty over whether RBS deducted liabilities in its calculation must be resolved against Respondent. The RBS valuation represents an alternative valuation which should establish a minimum value for these assets, if the Tribunal rejects the 14 October 2008 valuation date. The Tribunal should, however, draw the inference that it understates the value of these assets. (CPHB 1 ¶¶ 583 – 585; CPHB 2 ¶¶ 360 – 370).

1553. Respondent selectively embraces parts of the RBS Valuation and ignores others to argue that the valuation should be adjusted downward. To the extent that adjustments to the RBS valuation are appropriate, it is that the RBS valuation of Borankol is mistakenly low. RBS used volume assumptions from the 2009 Miller & Lents report that were materially higher than GCA's volume assumptions. RBS's valuation as of 1 October 2009 is less than one-third of Deloitte's valuation as of July 2010, when oil prices were higher. For Tolkyn, differences in gas prices – not condensate volumes – account for the difference between the Deloitte and RBS valuations. (CPHB 2 ¶¶ 363 – 367).

1554. Deloitte also completely disregards the 2009 RBS Asset Assessment, which was a comprehensive review of KPM and TNG that RBS prepared for KMG E&P. The RBS Assessment corroborates FTI's valuation and undermines Deloitte GmbH's conclusions. It concludes that 80% of gas is expected to be exported, that the LPG Plant will be assumed to have gas from both the Borankol and Tolkyn fields and from third parties, and that the Contract 302 extension had been granted on 9 April 2009. The RBS report contains six scenarios for valuing KPM and TNG, without considering the Contract 302 properties, and these range from USD 272 to USD 1,094 million. Although these were significantly higher than the Deloitte GmbH valuation, it is clear that these erred on the low side. The enterprise values are



depressed through the incorrect deduction of contingent liabilities, many of which were attributable to Kazakhstan's illegal actions, such as the Laren debt and tax liabilities. Since Kazakhstan withheld this information until 14 March 2013, Claimants were unable to question Mr. Suleymenov, who supervised the valuation, about how these liabilities were deducted. The Tribunal should draw the inference that they were incorrectly deducted, raising the enterprise value in the RBS Assessment to USD 855.5 (default base scenario) to USD 1,003.5 million (Special base scenario). While Deloitte had access to the report, it does not explain the divergence between its conclusions and those of RBS. Instead, in the Hearing on Quantum, Mr. Gruhn attempted to distance himself from the RBS Assessment, saying he had not relied on it. (CPHB 1 ¶¶ 513 – 518; CPHB 2 ¶ 363 – 367).

1555. Regarding Respondent's arguments and the GCA production forecasts for the Tolkyn field, Claimants explain that the data GCA reviewed was incomplete. GCA's failure to include relevant reserve and production data in its analysis and its choice of analytic methodology affects the credibility of the report and all reports that rely on it, including the Deloitte economic analysis. Importantly, GCA did not include any of the significant "*behind-pipe*" reserves in the Tolkyn field, provided in the first Ryder Scott report. These reserves amounted to proven and probable (2P) reserves of 1,869 MBO and 43.7 BCF of gas as of 14 October 2008. (C-III ¶¶ 22 – 25; CPHB 2 ¶¶ 335 – 336).

1556. The GCA production forecasts for the Borankol field are also inaccurate. What the GCA characterizes as "*unexplained production increases in 2015 and 2016*" in the Ryder Scott report are actually fully explained forecasted production increases for that report. Future operations for the Borankol field included 58 well completions and 4 developed wells to be drilled. Each was supported by complete geologic analysis, geologic interpretations, log analysis, volumetric analysis, and the development schedule. (C-III ¶¶ 26 – 27).

> *28. These production increases represent full exploitation of the remaining reserves in the Borankol field, exploitation that any reasonable operator would be expected to pursue, and reserves that any reasonable prospective purchaser would be expected to value. Indeed, Ryder Scott's estimate of remaining crude oil and condensate in the Borankol field as of October 14, 2008 was 18.8 million barrels. This is 344% of GCA's estimate of 5.45 million barrels of remaining crude oil and condensate as of July 21, 2010. To put this in perspective, cumulative production between October of 2008 and July of 2010 in the Borankol field was approximately 2.3 million barrels of oil and condensate, which means that GCA's forecasted future production ignores 11.05 million barrels of recoverable crude oil and condensate. GCA does this by simply assuming "a limited work program" for the Borankol field. GCA does not, however, provide any explanation of why a limited work program should be assumed, or why otherwise recoverable reserves should be left in the ground. Simply ignoring without explanation a vast quantity of recoverable crude oil and condensate is not, to say the least, a credible method of calculating the fair market value of an oil and gas field, and calls into serious question the overall credibility of the reports submitted by GCA and Deloitte. (C-III ¶¶ 28).*

1557. GCA modeled the Borankol field as a homogenous reservoir to be drained by hypothetical, identical, and undisclosed type wells. GCA's "*type well*" analysis of



the behind pipe reserves likely consisted of GCA's creation of a hypothetical "*type well*" from undisclosed historical production data. The record contains no evidence that GCA actually conducted a type well analysis, at all. Ryder Scott's well-by-well analysis is more thorough because it considered the behind-pipe potential of each well, based on the characteristics that had not been completed. In regard to the Tolkyn field, "*Ryder Scott performed a volumetric and performance based analysis for all of the Borankol and Tolkyn reservoirs, and used the appropriate data and methodology to estimate the available reserves in the two fields*." There was no selective bias, as GCA alleges. Ryder Scotts' estimate of behind pipe and undeveloped reserves in Borankol and Tolkyn were based on volumetric analysis, as is appropriate wherer there is no production data. The estimates for producing reserves in Borankol and Tolkyn were based on well-by-well performance analysis. For the Tolkyn Artinskian Dolomite, the analysis was based on its material balance analysis as confirmed by performance data. GCA, however, "*inappropriately used a field wide oil cut versus cumulative production analysis for its Borankol producing estimates, and did not identify in any discernible way how it estimated either its Tolkyn behind pipe or producing reserves*." (CPHB 2 ¶¶ 335 – 336). Ryder Scott performed a well-by-well analysis, using isochore maps for each reservoir zone to identify well candidates for recompletion. Ryder Scott then created a grid summarizing the available and unavailable well bores, just as a prudent operator would to maximize recover from the lower J-VII reservoir. While Respondent criticized this at the hearing, Ryder Scott's assumption that recompletions would perform strongly was based on a thorough geological analysis of the reserves. There is nothing about the "*bump*" in Ryder Scott's production profile, since a prudent operator would exhaust production from existing completions in declining zones before moving to higher zones that have more remaining productivity. Since GCA incorrectly assumed that recompletions would not perform strongly and did not schedule individual wells for recompletion, GCA has created a production profile that reflects a fictional decline curve that no prudent operator could expect to see. (CPHB 1 ¶¶ 465 – 470).

1558. GCA failed to conduct any volumetric assessment or independent mapping or analysis of Borankol and Tolkyn, and admitted as much at the end of its Third Report. For its "*other performance-based studies*", presumably the field-wide decline-curve analysis and the type-well analysis addressed by Ryder Scott, GCA has not produced its assumptions underlying its type well. GCA's decline-curve analysis is "*a simplistic extrapolation from field-wide data that ignores State-caused reasons for low field performance and is an inappropriate method to estimate future production from behind-pipe reserves*." (CPHB 2 ¶¶ 332 – 333).

1559. Respondent's conduct prevented Claimants from promptly addressing water cut issues. Nonetheless, Respondent's arguments concerning water production in the Tolkyn field wells are confused, contradictory, and largely wrong. Ryder Scott accounted for water cut in its report and found it to be a localized formation problem and not a field-wide issue. Evidence Respondent provided to Claimants' on 2 April 2011 supports this finding. (C-III ¶¶ 29 – 32).

1560. Respondent argues that over-production in the Tolkyn field in 2007 and 2008 caused the increase in water production in 2009 and 2010, and that Claimants' recovery should be reduced based on this injury to the field. This is based on the Neftegazconsult "*expert*" report, attached as Exhibit R-173. The contentions in



this report are "*absurd*" and are contradicted by the FDPs and working programs under which TNG and KPM operated, as well as the history of Tolkyn field production. In 2007, TNG's actual gas production from the Tolkyn field was intentionally 726 mcm less than expected under the Development Plan because TNG did not have an additional sales contract in place to cover seasonal downturn during summer domestic demand. The 2008 Development Plan anticipated gas production of 2500 mcm – an increase of 516 over the expected gas production of 1984 mcm, and twice TNG's actual production of 1257.2 mcm. In 2008, TNG's actual production was 2352.2 mcm – 147 mcm les than expected. The increase in production created a marginally larger than historical water production, which did not become apparent until 2009. The Development Plan was reduced from 2500 mcm to 1800 mcm. In 2009, TNG produced 1317.1 mcm, 482.9 mcm less than permissible. As should be readily apparent, there was no "*incompliance*" on the part of TNG and no violation of the Development Plans by TNG. This should be viewed as another attempt for Respondent to excuse or justify seizure of the asset. (C-III ¶¶ 33 – 46).

1561. FTI has dealt with the errors in the CAPEX, OPEX, depreciation, liquidation, and calculations of inflation and exchange rates contained in the Deloitte and GCA expert reports. It is clear that in the Deloitte and the GCA Reports, Respondent has significantly increased the CAPEX and costs in order to decrease the value of the fields. One example is GCA's invention of an unnecessary USD 41 million cost to be included in the Tolkyn field for future compression. As of Respondent's valuation date, however, the vast majority of the Artinskian producing wells were flowing at a tube pressure or above 2000 psig – above the pipeline pressure of approximately 540 – 680 psig and above the inlet pressure for the Borankol Plant of 870 psig. Little, if any, compression would be required prior to the expiration of the Tolkyn Subsoil Use Contract. There is no industry support for increased pressure to be used to alleviate water production in the Tolkyn field. Further, it is unclear how Deloitte has applied GCA's USD 41 million capital expenditure forecasts in its DCF models, as there is a discrepancy of USD 10.5 million. The timing with which GCA and Deloitte apply this unnecessary expense also maximizes it impact and creates the greatest possible reduction in overall value. (C-III ¶ 47 – 50). An additional argument is best taken from Claimants' own words:

> *51. In addition to the unnecessary compression recommended by GCA, Respondent has also submitted in its Neftegazconsult report a recommendation that an extensive testing, workover, new drilling, and directional sidetrack drilling program be commenced in December of 2011 in the Tolkyn field to allegedly address the water issue. Neftegazconsult does not provide any estimates of the costs or CAPEX for this undoubtedly costly program of testing and drilling. Neither does Deloitte. Indeed, Deloitte's report does not reference (or even acknowledge) the Neftegazconsult report in any way. And in a further indication that GCA's alleged compression requirement is itself both unnecessary and a purely fabricated expenditure, Neftegazconsult does not mention GCA's alleged compression requirement anywhere in its report.*
>
> *52. Neither the compression program put forward by GCA, nor the testing, workover, and drilling program put forward by Neftegazconsult, would do anything more to address the water cut issue in the Tolkyn field than the*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *simple reduction in production that the State already incorporated into the 2009 Development Plan. And Respondent's inclusion of these two different, and enormously expensive, programs to allegedly address the water cut issue in the Tolkyn field, both intended to commence in 2011, begs a question: — It is now 2012; were either of these programs undertaken in 2011, or were they deemed unnecessary? Claimants have not been able to locate in the documents produced by Kazakhstan any indication that either program has been commenced, and if they have not, it is certainly logical to assume that Respondent simply invented them in order to impose the maximum possible negative impact on a discounted cash flow analysis and thereby suppress the value of the Tolkyn field. (C-III ¶¶ 51 – 52).*

1562. GCA's assumption that compression will be necessary in Tolkyn is based on the premise that wellhead pressure (varies from well to well), rather than the relevant bottomhole pressure (the natural force that drives production in the field), will decline. GCA's own data regarding bottomhole pressure (the most relevant to the possible need for future compression) shows that the need for compression should not be expected prior to 2018. On top of that, GCA manipulated the wellhead pressure data in Figure 3.1 by reporting only the low point from a range of pressure readings from each well. (CPHB 2 ¶ 337).

1563. Regarding the Tolkyn field, GCA's inclusion of a front-loaded capital expenditure for unnecessary compression drives down Deloitte's DCF valuation for the Tolkyn field. As conceded by GCA in testimony, no such compression was actually installed in 2011 and to date, none has been. No one would have expected compression to be needed in the Tolkyn field as of October 2008 or July 2010, even though the 2007 KazNIPIMunaiGas FDP contemplated the installation of compression at Tolkyn in 2012, but contrary to GCA's insinuation and as latter admitted by GCA, this was a freely amendable, non-mandatory plan. Further, the assumption about the installation of compression in the 2007 FDP was based on production rates that did not occur. GCA cherry picks with respect to this FDP, citing only that compression would be needed where it increases costs, but holding the projections for future production based on that plan. Ryder Scott's analysis analyzes the production profile and the need for compression as of 14 October 2008, rather than relying on the outdated 2007 FDP. In any event, that some compression will be required at some point in time is not a justification for a USD 40 million up front expense in the CAPEX calculation for 2011. At the Quantum Hearing, Mr. Goodearl conceded this point, explaining that a prudent operator would not install expensive compression to only marginally assist poorly producing wells. (CPHB 1 ¶¶ 471 – 477).

1564. After the Hearings, Claimants argued that the geological and valuation analyses of FTI and Ryder Scott are more accurate and more reliable than the corresponding work by Deloitte and GCA. GCA's valuation is not accompanied by any materials supporting the summary tables or conclusions in the GCA reports, and GCA representatives defended this failure to produce by citing commercial confidentiality. As a result, neither the Tribunal nor Claimants can scrutinize or verify GCA's summary assertions or conclusions beyond the wild variations and cherry picking that was done in their alarmingly lax analysis. The lack of transparency and failure to document its work (in violation of Art. 5(2)(I) IBA Rules) strongly suggests that GCA was engaged in an effort to arbitrarily maximize



cost estimates, minimize reserve and production estimates, and accelerate costs while denying revenues wherever possible. The reliance on "*commercial confidentiality*" for GCA's failure to follow the IBA Rules cannot be taken seriously. As Mr. Latham for Ryder Scott testified, if a document is confidential, an expert should not rely on it and should instead locate an alternate source of data. (CPHB 1 ¶¶ 439 – 444).

1565. Unlike Ryder Scott, GCA performed no independent petrophysical analysis, seismic analysis, well log analysis, mapping, material balance analysis, or work to assess the behind-pipe reserves or well recompletions. Without these, there can be no reliable estimate of the reserves and resources to create a FMV. Instead, GCA simply reviewed the work performed by Ryder Scott. This is no substitute for an independent and thorough analysis, like the one provided by Ryder Scott. (CPHB 1 ¶¶ 447 – 452).

1566. Deloitte relied entirely on GCA in its valuation. It is particularly unusual that Deloitte would rely on geologists and engineers of GCA for CAPEX and OPEX estimates, but Mr. Gruhn made it clear at the Hearing on Quantum that this was done. No effort was made to even compare those numbers to Claimants' historic costs. Importantly, all of the CAPEX, OPEX, and production forecast inputs for Deloitte's DCF valuations are based entirely on GCA's opaque, unsupported, and freely-fluctuating estimates, without verification. (CPHB 1 ¶¶ 445 – 446).

1567. Deloitte TCF's USD 16 million valuation for the Borankol field and Deloitte GmbH's USD 62.8 valuation were products of the summary reference estimates contained in GCA's reports, which estimated recoverable oil and condensate reserves to be only 5.45 million barrels (MBbls), and later 8.65 MBbls. Inexplicably, GCA cut off the forecast prior to the expiration of the contract. This forecast is absurd and is contradicted by Ryder Scott's estimate of 18.8 MBbls of remaining crude oil and condensate as of 14 October 2008 – 344% of GCA's initial estimate of 5.45 MBbls as of 21 July 2010. Production between those dates was only 2.3 MBbls. GCA initially reached its conclusion by assuming that an undefined "*limited work program*" would have applied to Borankol and in the second report purportedly based it on a review of a FDP (which FDP is unclear). GCA admitted that the FDP plan had its "*shortcomings*", but failed to note that KPM drilled 21 wells in Borankol after the FDP was prepared, making it severely outdated. Despite the addition of the behind-pipe recovery, GCA grossly underestimates the total recoverable reserves by 10.2 MBbls, likely based on its new methodology, which considers (1) a projected future production from existing wells based on "*oil cut vs. cumulative oil production*" and (2) projected production of behind-pipe reserves from 43 unidentified well recompletions based on a "*type well*" analysis. (CPHB 1 ¶¶ 453 – 458; CPHB 2 ¶ 334).

1568. The oil cut analysis is not reliable since it does not consider individual well production characteristics, geophysical characteristics of a reservoir, or volumetric analysis, all of which Ryder Scott considered. Here, there was a sharp decline in production form 2009 – 2010, and this was a product of the State's campaign against KPM and TNG and Claimants' decision to minimize exposure. GCA's analysis and estimates have a decline curve methodology that do not account for the production aberrations of 2009 or 2010, or for the enhanced production from a future re-commencement of completions. GCA ignores this – it acknowledges that



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 29 of 102

the 2007 FDP called for 45 new wells and 44 completions between 2007 and 2022, but concludes that the reduction in operations beginning in 2009 was the result of a reduction in actual recoverable reserves. GCA compounded this error in the selection of methodology with errors in the actual calculations of oil cuts, miscalculating the ratio of oil and water because it used a conversion based on fresh water, when the water in Borankol field is alt water and has a higher specific gravity than fresh water. As a result, GCA understates recoverable quantities of oil from existing wells by 15%. (CPHB 1 ¶¶ 459 – 464).

1569. Respondent's argument that FTI arbitrarily reduced its inflation assumption when it corrected its price forecasts from nominal to real in order to "*limit the impact of the correction*" is wrong for two reasons. First, the reduction was not arbitrary – while FTI had previously used a historical inflation rate, that rate was not appropriate for the adjustment of nominal price forecasts into real price forecasts. To make that adjustment, FTI used a forward-looking inflation rate, which was lower than the historical rate. To avoid selective bias, FTI incorporated a revised inflation assumption into its valuation, including in its discount rate determination, raising that from 13 to 14% and offsetting the allegedly arbitrary inflation rate reduction on future oil prices. This offset was ignored by Respondent and Deloitte. FTI rounded the discount rate to the nearest whole number avoid implying false precision in the estimation of WACC, which Deloitte acknowledges is appropriate. Deloitte GmbH merely disagrees with the degree of rounding, without support. Deloitte GmbH's criticisms of the FTI valuation of Munaibay Oil are mistaken and are discussed in FTI's response in the Fourth Report. (CPHB 2 ¶¶ 356 – 359).

1570. Contrary to industry practice, Deloitte GmbH failed to test its DCF valuations against another other indicators of value, including valuations performed by Deloitte TCF and RBS. FTI, on the other hand, considered six, including: (1) the Project Zenith indicative offers; (2) trading prices of comparable companies; (3) reported terms of comparable transaction; (4) trading value of the Tristan debt; (5) the Cliffson transaction; and (6) the RBS Report. In response to Mr. Gruhn's observation that not all of the "*comparable*" companies in FTI's analysis were truly comparable, there are few publically reported companies and transactions in Kazakhstan involving producers with similar gas resources. The 2008 KMG EP Report and the 2009 RBS Assessment used many of the same comparable companies that FTI examined. Claimants respond to Mr. Gruhn's questioning of FTI's analysis of implied enterprise value based on the market value of the Tristan debt guaranteed by KPM and TNG and his point that one cannot infer that a specific company has a capital structure that mirrors the industry average. Lenders constrain the ability of a borrower company to borrow beyond its capacity and markets will "*price-in*" risk of maintaining a capital structure that is not in line with the industry. Mr. Rosen confirmed that, although the Tristan notes were trading at 65% of face value at the end of September 2008, they were trading at close to face value prior to the Lehman bankruptcy. FTI's third report confirms that other oil and gas companies experienced similar declines. (CPHB 1 ¶¶ 501 - 521).

1571. Deloitte GmbH's valuation for Borankol, Tolkyn, and the LPG Plant assets is an outlier, containing unsupported assumptions and higher costs and lower revenues than other models, and should be disregarded (CPHB 1 ¶¶ 522 – 523).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 39 of 102

1572. In light of Mr. Kulibayev's or the state welfare fund's Samruk-Kazyna's control over Kemikal, Claimants accuse Respondent of interfering with gas sales in an effort to put pressure on Claimants. Kemikal failed to pay its invoices when due. (CPHB 1 ¶¶ 378 – 383).

1573. Mr. Chagnoux's testimony regarding the Borankol and Tolkyn fields was also not credible. (CPHB 1 ¶ 392).

## 2. Arguments by Respondent

1574. The value of the Borankol field as of 21 July 2010 amounted to **USD 62.8 million**, based on the GCA and Deloitte GmbH reports. As of 21 July 2010, the Tolkyn field has a value of **USD 123.2 million**, based on the DCF methodology applied by Deloitte. (R-III ¶¶ 212, 217, 222; RPHB 1 ¶¶ 929, 940; RPHB 2 ¶¶ 731, 766).

1575. For the Borankol field, GCA estimates that, as of 21 July 2010, gas in the amount of 94 MMm3 and oil condensate in the amount of 1,185.2 Mtonnes could have produced until 2022. This plan is based on mapping contained in the FDP and on the actual production of wells on the valuation date. GCA concluded that most reservoir units had already produced significant percentages of the estimated and approved ultimate recoverable reserves, under the FDP. This production was largely from wells located in the best parts of the reservoir. Recompletions - the redrilling of a well to a new, usually shallower producing zone when the current zone is depleted – which are used to access the so-called "*behind pipes reserves*" – will be located in poorer regions and will not perform as well. In addition, historical production figures and high water cut indicate that less reserves than initially planned in the FDP will be produced. The drilling of new wells is not to be expected. (R-III ¶ 215 – 216).

1576. Contrary to Claimants' allegations, GCA has provided supporting documentation, including two detailed spreadsheets concerning estimated oil and gas production. GCA made changes to its methodology – changes that were entirely in Claimants' favor – in its Supplemental Expert Report. GCA accounted for the 34 expected recompletions, the FDP, and the behind pipe potential. (RPHB 2 ¶¶ 749 – 751).

1577. Claimants allege that GCA has understated the available reserves by 10.2 MMBbl. This criticism is misleading and relates to the production that occurred in between the valuation dates. Claimants' failure to consider the oil and gas production in the period between the Parties' valuation dates leads to an inflation of the available reserves and, likewise, to an inflation of the value of the field. Further, Claimants and Ryder Scott assume that 4 new wells and 58 recompletions would be implemented by the end of 2022. Ryder Scott, however, ignores that recompletions will be made in poorer regions of the field and will perform worse than current non-completed wells. Ryder Scott also overestimates the potential for drilling new wells. (R-III ¶¶ 220 – 221; RPHB 2 ¶¶ 746 – 748).

1578. Contrary to Ryder Scott's assumption, GCA has pointed out that there is no potential for recompletions in the late life of the Borankol field. Instead, GCA estimates a gradual decline in production. Ryder Scott, however, implicitly assumes that the field developer would deliberately choose to develop a reservoir unit only very late in the field life – a highly atypical profile. Ryder Scott's



methodology is optimistic, is inconsistent with the data, and shows no consideration of actual field performance. (RPHB 1 ¶¶ 531, 931 – 934).

1579. The J-IA reservoir is the second largest in the Borankol field. Ryder Scott expected 4.17 MMBbl of its 18.6 MMBbl of recoverable reserves to be recovered there. Ryder Scott's analysis of the J-IA reservoir shows how Ryder Scott inflated the oil in place and the ultimate recovery rates. Ryder Scott also assumed deep oil-water contacts, meaning the elevation above which oil, rather than water, can be found in the pores of the rock. Since oil is always above the water (and gas is always above the oil), a deeper oil-water contact means that a reservoir contains more oil and less water. GCA showed that Ryder Scott's assumption of comparatively deep oil-water contacts was proven incorrect by data from key wells within the reservoir and was not supported by the FDP drafted under KPM's instructions and approved by the Central Commission. Ryder Scott has ignored this data, specifically for well 78 in the J-IA reservoir, where it placed the oil-water contact at the middle interval, even though it knew that the specific entire interval was 100% water saturated. The Tribunal should disregard the Ryder Scott Borankol production profile and the resulting inflated value. (RPHB 1 ¶¶ 532 – 533, 935 – 939; RPHB 2 ¶¶ 734 – 739).

1580. At the Hearing on Quantum, Mr. Goodearl of GCA unequivocally explained that water production is a risk that should have been considered in establishing the well rates. This information was ignored when Claimants ramped up their gas production for 2008 and thereby ran the risk of permanently damaging the wells and losing the opportunity to produce gas from the rock matrix in the lower levels of the reservoir. (RPHB 1 ¶¶ 941 – 944).

1581. Another key issue in the composition of the reservoir is the depth of the gas-oil contact. Deeper gas-oil contacts mean that the reservoir is filled with more gas and less oil. One hopes for a shallower gas-oil contact, since gas is less profitable than oil. At the J-IC reservoir, Ryder Scott ignored the available well data that the B13 well penetrating the J-IC reservoir produced for only seven months in 2005 and at a very high gas-oil ratio, to arrive at their desired, shallower, gas-oil contact. Any recompletion potential would be limited to less valuable gas. Ryder Scott was also quite optimistic with the J-IB reservoir. For the J-I reservoir, Ryder Scott estimates a recovery of 838 Mtonne of oil, ignoring that, until July 2010, that reservoir has only produced 110 Mtonne. The only conclusions one could draw from this is that KPM was incompetent and drilled too deeply, or that Ryder Scott's analysis is unreliable. There is no evidence to suggest that Ryder Scott has done anything beyond estimate in place volumes and then apply an unsubstantiated recovery rate to them. Ryder Scott's estimates cannot be considered fit for the purpose of estimating FMV. (RPHB 2 ¶¶ 739 – 745).

1582. Claimants' allegation that Ryder Scott's alleged well-by-well analysis was more thorough than the type well approach applied by GCA is untenable, as Ryder Scott's purported well-by-well analysis ignored available well data and is, therefore, insupportably optimistic. Claimants have not shown why the use of historical production data would be inappropriate and would not reflect the potential of the field. While Respondent disputes that there was a harassment campaign or that the State caused work reductions in 2009 and 2010, the reductions do not skew the analysis. There was no change in the decline rate after October

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 32 of 102

2008 for any of the reservoirs. As demonstrated in the Chart at RPHB 2 ¶ 759, it is incorrect that production dropped "*incredibly quickly*" after Claimants' valuation date. Production from the various Borankol reservoirs began to decline in 2003. (RPHB 2 ¶¶ 752 – 760). GCA confirmed that Ryder Scott's insinuation that well performance deteriorated after Claimants' effective date is baseless. (RPHB 2 ¶¶ 113 – 116).

1583. There would be a sharp decline in oil production beginning in 2009, brought about by the end of the contract with TNG's biggest customer, Kemikal. Kemikal stopped payments on Claimants' products because of liquidity and insolvency issues. (RPHB 2 ¶ 124). This information is also disregarded by Ryder Scott. (R-III ¶ 241 – 245).

1584. Claimants' criticism that GCA's type well calculation used an oil cut versus cumulative production methodology that applied the incorrect water density and thereby reduced recovery by 15%, is incorrect. GCA never used the oil cut versus cumulative production method in forecasting production for Borankol. The only oil cut calculation that Ryder Scott referred to was made as part of the overall assessment of the field. GCA even made a higher ultimate recovery estimate, 3.1 million tones, than what Ryder Scott thinks GCA's estimate should be corrected to. Claimants' and Ryder Scott's attacks on GCA are, therefore, unfounded. (RPHB 2 ¶¶ 761 – 765).

1585. Regarding the valuation of the Tolkyn field, Deloitte reaches its **USD 123.2** valuation by taking three essential factors into account: production profiles, realistic gas prices, and capital expenditure. Deloitte's assumptions are based on GCA's production profile, according to which gas production reached its peak in 2008 and decreased significantly in 2009. GCA estimates that, until 2018, 60.9 Mtonnes of oil, 574.4 Mtonnes of condensate, and 5.8131 Bcm$^3$ of gas may be produced. In light of Ryder Scott's comments, GCA increased the total gas sales by 0.13 Bcm$^3$. (R-III ¶¶ 222 – 233; RPHB 1 ¶¶ 940 and chart). Ryder Scott and GCA are not separated by much. As of 21 July 2010, Ryder Scott assumed recoverable volumes of 66.76 MMBoe. GCA estimate recoverable volumes of 50.3 MMBoe. Claimants exaggerate the difference. (RPHB 2 ¶ 485).

1586. Regarding the "*behind pipe*" reserves in the Tolkyn field, GCA notes that recovery of such reserves is dependent on the high performance of the wells in the field during the contract period. Ryder Scott ignores the indicators that suggest a low recovery rate of the wells, despite claiming to have conducted a well-by-well analysis for the Tolkyn field. The trend of falling wellhead pressure was apparent as of 14 October 2008. GCA takes these factors into account. (R-III ¶¶ 234 – 239; RPHB 1 ¶ 534).

1587. As confirmed by examination at the Hearing on Quantum, Deloitte GmbH independently created three different scenarios with different gas price assumptions: "*contracts*", "*transition*", and "*export*." The "*contracts*" scenario, estimated at a probability of 65%, would allow companies to sell gas to the domestic market at defined prices. The "*transition*" scenario, estimated at a probability of 30%, considers the MOG's not-yet-implemented plans to increase the regulated prices in the domestic market. Under the "*export*" scenario, estimated at a probability of 5%, TNG and KPM would export 80% of their



product at international prices and sell 20% in the domestic market. (R-III ¶¶ 247 – 252; RPHB 1 ¶¶ 685 – 687).

1588. The "*contracts*" 65% likelihood estimate is optimistic for Claimants, since subsoil users cannot simply export gas in Kazakhstan. Even where they are not contractually prohibited from exporting, they are required to find a purchaser who has the capacity to get the gas to market. For landlocked Kazakhstan, this is difficult. For subsoil users, absent an agreement with a Gazprom, gas producers are bound to deliver gas domestically. Claimants have not argued that KPM or TNG, at any point, exported gas to Gazprom. FTI, however, completely disregards domestic gas sales in their export assumption for Tolkyn's gas. (R-III ¶¶ 253 – 362).

1589. Anatolie Stati's statement regarding a protocol signed by Gazprom and others had contained a price of USD 160 at the border of Kazakhstan and Russia was incorrect and referred to a price at the Moldovan border, 2000 km away. Anatolie Stati frequently changed his position on whether Gazprom was supporting him or was creating problems in selling gas. (RPHB 1 ¶ 117).

1590. Claimants' valuations of Tolkyn and Borankol are inflated because they wrongly assume that a willing buyer would expect KPM and TNG to achieve international export prices. On the valuation date of 21 July 2010, TNG and KPM did not export gas and Claimants have not indicated any prospect of exporting gas at that point in time. TNG's contractual rights to export and its proximity to the CAC Pipeline do not give rise to any expectation that TNG would have been able to export gas. The extent to which indicative offers received by Claimants in Project Zenith for the Tolkyn field can be relied upon as an indicator for reasonable expectations regarding the possibility to export gas is questionable. If those bidders assumed that TNG would be exporting gas, it was because Claimants had told them in the Information Memo that TNG would be able to export gas. (R-III ¶¶ 267 – 268, 338 – 342; RPHB 2 ¶¶ 502 – 506).

1591. FTI only arrives at the conclusion that Claimants could export gas and achieve international prices by relying on the unsigned and undated 2008 Tripartite Agreement. Neither of the two Tripartite Agreements was signed and, therefore, neither can serve as a basis to assume export prices. The 17 November 2008 Agreement on which FTI relied cannot show the expected price as of 14 October 2008. Further, based on the events of the time, it could not be expected that KazAzot would have signed the 17 November 2008 Agreement. (R-I ¶ 15.7(b); R-III ¶ 275; RPHB 1 ¶¶ 619 – 650; RPHB 2 ¶ 499).

1592. FTI made numerous errors with regard to the unsigned Tripartite Agreement. FTI misnamed the parties – it was made between KazAzot, KazTransGas and TNG – not KazAzot, KMG, and Ascom. Claimants themselves have also misquoted the recipient of deliveries under this text – it would be KazAzot and KazTransGas and not KMG. FTI ignored, for example, that the Tripartite Agreement only concerned gas produced from Tolkyn – no room was made to apply the prices or volumes considered therein to Contract 302. (R-III ¶ 275 – 290, 292; RPHB 1 ¶¶ 651 – 656; RPHB 2 ¶ 499).



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 34 of 162

1593. The Undated 2008 Agreement could not have come into force because it could not be expected that KazTransGas would become the exclusive exporter of Kazakh gas, as anticipated in para 2.2. This would not have been acceptable to Gazprom, who wants its 50% affiliate KazRosGas to participate in the export of Kazakh gas. Gazprom refused to accept KazTransGas as the exporter by letter on 27 October 2008. Neither KazTransGas nor KMG became the exclusive exporter. Even if the Tripartite Agreement had been signed, it could not have come into force because of the role of Gazprom. (R-III ¶¶ 291 – 296; *see also* R-I ¶ 15.7(b); RPHB 2 ¶ 499).

1594. The Tripartite Agreement represented a bargain – if TNG were to deliver gas to a strategic project, TNG would have the opportunity to sell gas. The supply of gas and the export of gas were entirely interdependent. KazAzot wrote to KMG that, without the fertilizer plant, Claimants could not achieve export prices. In 2008, however, it could not be expected that KazAzot would have further pursued the building of the fertilizer plant under the given conditions, which would call for KazAzot to pay very high domestic prices (USD 100 per 1000 $m^3$). By fall 2008, it was clear that KazAzot would not be able to pay. Combined with the sharp drop in the prices for fertilizers, this made the enterprise not profitable for KazAzot. (R-III ¶¶ 297 – 319; RPHB 2 ¶ 499).

1595. It would have been impossible for TNG to fulfill its obligations under the Tripartite Agreement, bringing it to a likely termination in at least by early 2009. The total volume demanded under the Tripartite Agreement was 19.25 $Bcm^3$ – almost double the reserves of Tolkyn. For 2012, TNG would have been able to produce less than half (Ryder Scott) or, more correctly, a little more than one third (GCA) of the amount required. TNG's inability to deliver would have been to the detriment of KazAzot, which could have terminated the contract under Section 10.1 for failure to perform. Due to distribution priorities, TNG would not have been able to export. TNG would first have needed to deliver gas to KazAzot, and then to the domestic market before the remaining gas be able to be exported. Under the scenarios, TNG could not have even met its obligation to KazAzot. (R-III ¶¶ 320 – 337; RPHB 2 ¶ 499).

1596. Having received a report clearly setting out the available reserves in April 2008, Claimants must have known that they would be unable to fulfill the contract or to export when negotiating the Tripartite Agreement. The use of the 2 agreements in valuation is belied by Claimants' actions, which demonstrate that they never believed that the Tripartite Agreement would go into effect. Even when evaluating his own assets, Anatolie Stati instructed Miller Lents to estimate the net oil, condensate, gas, gas plant liquid reserves, and future net reserves based on prices that were far lower than envisioned in the Tripartite Agreement. During both hearings, Anatolie Stati made it clear that he did not believe in the viability of the KazAzot project. He agreed that a Tripartite Agreement that is only signed between 2 parties has no value. He stated: "*I'm sorry, it's not signed. It's not signed by anyone. Why should we look into it?*" (RPHB 2 ¶ 501; RPHB 1 ¶¶ 657 – 668).

1597. Regarding CAPEX, the cost of **USD 40 million** for the installation of compression on the Tolkyn field needs to be taken into account. Compression is necessary to alleviate water production and to remedy the declining pressure on many of the wells. Without compression, gas cannot enter the CAC pipeline. Furthermore, the



Third GCA Expert Report shows that compression would be necessary to avoid shutting wells in. At the Hearing on Quantum, Claimants wrongly alleged that no independent research by Deloitte had been done to prove that USD 40 million in compression installation would be required. Deloitte relied on the GCA expertise for that figure, and GCA has the expertise to conclude that compression would be necessary and to estimate its cost. GCA did not arrive at their opinion merely based on the FDP, which demonstrates that Claimants recognized that compression would be necessary as they were running the field. Mr. Goodearl's testimony at the Hearing on Quantum and the GCA Supplemental Expert Report expressed the need for compression as being required due to declining well head pressures. The Third GCA Expert Report also shows that compression would be necessary to avoid shutting the wells in. In addition, considering Claimants' instruction to Miller Lents, Claimants have also assumed that compression would be necessary and this was confirmed by testimony as the hearing. GCA predicted that compression would be necessary by 2011, the same as in the FDP, based on the actual pressure decline in the reservoir. The need for compression was foreseeable as at 14 October 2008, since wellhead pressure significantly declined starting in the second half of 2007. The PwC Due Diligence Report also identified the necessity of compression and estimated the costs at USD 55 million. The fact that KMT has not yet installed compression does not disprove the necessity of compression – the non-installation has led to a significant decrease in production. (R-III ¶ 263; RPHB 1 ¶¶ 946 – 972; RPHB 2 ¶¶ 766 – 770, 774 – 780).

1598. GCA never stated that there was a "*fall back*" that only some compression would be needed at some point in time. Rather, GCA has firmly stated that compression would need to be installed by 2011/2012. Unlike Ryder Scott, who completed a static analysis, GCA focused on the trends and rates of pressures. (RPHB 2 ¶¶ 771 – 773).

1599. Claimants themselves assumed that USD 65 million in infrastructure capital expenditure for Tolkyn from 2010 – 2012 when they were operating it. They have failed to provide any justification for why they now want to apply zero costs for infrastructure for Tolkyn. (RPHB 2 ¶¶ 781 – 782).

1600. Claimants' valuations of the Tolkyn and Borankol are inflated by FTI's unrealistic and unachievable price assumption of USD 180 per 1000 m3 of gas at the valuation date. The only company achieving such prices were KazRosGas – a company 50% owned by Gazprom. Claimants also misquote the government's statement that an increase in price could be possible – there are no set plans to raise prices to USD 306. Domestic prices are set by the ARNM. (R-III ¶¶ 343 – 353; R-I ¶ 49.13; RPHB 1 ¶ 945).

1601. Claimants' export price assumptions are incorrect and have no correlation to the prices actually paid for the export of gas. They are based on the Yenikeyeff Report, which Prof. Olcott demonstrated is unverifiable. FTI assumes more than twice what RBS assumes for the export price, USD 180 per 1000 cm rather than USD 85 per 1000 cm, respectively. RBS's price of USD 85 per 1000 cm is consistent with prices paid by Gazprom to KazRosGaz, which was USD 110 for 1000 cm in 2008. (RPHB 1 ¶¶ 688 – 697; RPHB 2 ¶¶ 507 – 508).RBS agreed with Prof. Olcott's assumptions for a valuation on a stand alone basis. (RPHB 2 ¶¶ 513 – 520).



1602. Anatolie Stati instructed Miller Lents to apply the prices of USD 49 per 1000 m3 for 2009, up to USD 115 for 2018. The price of approximately USD 70 per 1000 m3 is the export price that GasTradeInternational received. It is clear that Claimants never considered FTI's USD 180 per 1000 $m^3$ to be a reasonable price. (R-III ¶¶ 355 – 365).

1603. With respect to 14 October 2008, TNG did not even export gas at that time, but rather sold the majority of its gas to Kemikal. Kemikal stopped payments in 2008 due to liquidity and insolvency issues. (RPHB 2 ¶ 124). The Yenikeyeff Report also does not support Claimants' claim that export could be expected or that European prices could be obtained. As dissatisfying as the inability to export may have been, this is what Claimants bargained for when entering the Kazakh market. They were not treated less favorably than other market players. Although the contracts provided Claimants the "*right*" to export gas, that did not guarantee an export market or export prices. The Republic was not responsible for finding a buyer or for guaranteeing transit. Anatolie Stati's alleged belief that he was also guaranteed a market is not supported by the contracts. (R-III ¶ 354; RPHB 1 ¶¶ 597 – 612, 669 – 671).

1604. The RBS valuation report conducted as part of the KMG EP Due Diligence in September 2009 and which Claimants consider to have been prepared by "*world class experts*" is a draft report. It focuses on what the assets would be worth if added to KMG EP's portfolio, not if owned by Claimants. It contains no documentation or reasoning. It is based on a valuation date that does not correspond to the legal considerations of this case. It has numerous inconsistencies. The RBS Report may serve the Tribunal to verify Deloitte GmbH's work. (RPHB 2 ¶¶ 809 – 810).

1605. The RBS proves that Claimants' valuation of the LPG Plant, and other assets, are bogus. Liquids can be sold for considerably higher prices than gas. Miller Lents assumes a high potential for the production of liquids, The Parties experts agree, however, that these high liquids reserves estimates are unsupported by the data. The RBS valuation for Claimants' Borankol claim is disproportionate since it relied on gas, rather than oil prices. Since Borankol is an oil producing field, it is only worth approximately one tenth of the USD 197 million suggested by Claimants. The RBS valuation also proves that Claimants exaggerated their Tolkyn claim in that it arrives at a comparable value to that estimated by FTI, despite the fact that RBS applied more optimistic reserves estimates than either Ryder Scott or GCA presented. RBS reached this result not by applying the numbers from GCA or Ryder Scott (which would have resulted in a lower value), but instead by relying on the reserve estimates of Miller Lents as of 1 January 2009. (RPHB 1 ¶¶ 986 – 987, 991 – 995; RPHB 2 ¶¶ 823 – 824).

1606. The RBS valuation supports Deloitte GmbH's valuation of USD 123.2 million. The only asset that brings the RBS valuation anywhere near the FTI valuation is the RBS's valuation of the Tolkyn field. In the "*KMG EP Base Case Scenario*", RBS assumed a value of USD 327 million for the Tolkyn field, to which USD 200 were added as the 80% export sales. It is undisputed that RBS applied the production estimates from the Miller & Lents 2009 report to arrive at its asset value. That report assumes an aggregate oil and condensate production that dramatically exceeds both experts' assumptions, without providing sources or

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

reasoning. The overstated production projection accounts for a difference of USD 203 million. If RBS had applied the production estimates of GCA, they would have arrived at a value for the Tolkyn field below the USD 123.2 million, as calculated by Deloitte GmbH. Had RBS applied Ryder Scott's production estimates, the value would fall below FTI's Tolkyn value. (RPHB 2 ¶¶ 509 – 512; 782 – 797, 821 – 823).

1607. RBS added USD 200 million to the Tolkyn value for the assumption that 80% of the gas would be exported. RBS, however, has agreed with Respondent's arguments as to why TNG and KPM could not have been expected to be exporting gas at the valuation date or later. RBS, thus, only assumed the export portion based on the assumption that KPM EP would purchase the assets and would, thus, benefit from the synergy effects of a major oil and gas producer in Kazakhstan. On a stand-alone basis, KPM and TNG could only sell at domestic process. Thus, for evaluating the stand along value of Tolkyn, the export of gas cannot be assumed. (RPHB 2 ¶¶ 509 – 512; 798 – 802, 811 – 820).

1608. The RBS valuation did not include contingent liabilities in the working capital. Thus, there is no justification for Claimants'' addition of USD 243.5 million. RBS deducted USD 1 million from the aggregate asset value in the Best Case Scenario and USD 20 million in the Special Case Scenario to reflect changes in working capital. Claimants, however, simply allege that the RBS report incorrectly deducted contingent liabilities, and that this should be added back to arrive at the FMV. The items listed as contingent liabilities in the RBS Report would conventionally be considered working capital items. The deducted USD 1 million and 20 million are far below the level of contingent liabilities that Claimants' assume. RBS deducted the respective USD 1 and 20 million from the aggregated asset value because they assumed that over the lifetime of the assets, the required working capital would increase by USD 1 million (discounted). (RPHB 2 ¶¶ 839 – 852).

1609. Deloitte GmbH conducted a hypothetical case to test Claimants' allegations and found that, if true, RBS would have assumed that the working capital would decrease by USD 242.5 or USD 223.5 over the life of the assets. That was logically not possible, however, since the combined working capital of KPM and TNG as of 31 March 2009 only amounted to USD 157 million. (RPHB 2 ¶¶ 853 – 858).

1610. There was also no basis to assume that projected capital expenditure may contain contingent liabilities. Deloitte has checked the RBS report figures against the figures in the Miller & Lents 2009 report and the PwC Due Diligence Report on which RBS based its capital expenditure estimates. If RBS had factored any contingent liabilities into the capital expenditure, the RBS figures would be different from the Miller & Lents and PwC figures. They were not. Likewise, there is no basis for Claimants' assumption that operating expenses or tax expenses may contain contingent liabilities. The double counting of capital expenditure can be excluded, as there is no evidence that capital expenditure may have been deducted in both the DCF and the working capital. (RPHB 2 ¶¶ 859 – 864).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 38 of 102

1611. Deloitte's comparable companies and comparable transactions analyses corroborated Deloitte's valuation results in their DCF analysis. (RPHB 1 ¶¶ 1022 – 1023). Respondent explains the evaluation process as follows:

> *1024. A comparable companies analysis is conducted by first identifying a group of comparable companies whose shares are publicly traded. The more comparable the companies are, the more reliable the analysis will be. In the next step, the 2P reserves of these companies in barrels of oil equivalent (boe) are set in a relation to their enterprise value, with the enterprise value being determined based on the market price of shares and debt instruments of the companies as of the valuation date. The result are so-called "multiples". The 2P reserves of the asset in question, in this case the Borankol and Tolkyn fields, can then be multiplied with these multiples, leading to a value estimate. The basis of this method is the assumption that 2P reserves of liquids and gas are the main value driver in the oil and gas industry. (RPHB 1 ¶ 1024).*

1612. The comparable companies analysis based on GCA's 2P reserve estimates as of 21 July 2010 resulted in a combined asset value of the Borankol and Tolkyn fields of USD 96.6 million. The comparable transactions analysis based on the same resulted in a combined asset value of USD 216.1 million. These show that the FTI comparable companies and comparable transactions analyses for the Borankol and the Tolkyn fields for 14 October 2008 were overstated. Deloitte GmbH prepared their own companies and comparable transactions analyses based on Ryder Scott's reserves estimates and showed markedly lower values than the USD 675.9 million that FTI calculated in their DCF analysis. Deloitte GmbH's comparable companies analysis leads to a combined asset value of USD 169.6 million, or 25% of FTI's DCF calculated value and their comparable transactions analysis leads to a combined asset value of USD 277.8 million or 40% of FTI's DCF calculated value. FTI's calculations are massively overstated because (1) they use pre-financial crisis data without adjustment, (2) the used incomparable companies, and (3) they failed to find a company that was actually comparable. (RPHB 1 ¶¶ 588 – 590, 1026 – 1028).

1613. In the Second Post-Hearing Brief, Respondent demonstrated this by way of charts. Assuming the reserves as provided by Ryder Scott, the FTI valuation is the far outlier, and Deloitte GmbH's analysis was methodologically correct and within range. The FTI valuation based on the Cliffson transaction was widely outside of range. (RPHB 2 ¶ 874 – 880).

1614. Regarding Claimants' complaints regarding the multiples used for comparable companies ignores the inconsistencies in the multiples provided by RBS, numbers which even Renaissance Capital found to be inappropriate. If one applies the three transactions quoted by RBS that are the most relevant for Claimants' valuation date, one arrives at the average multiple of 2.17, which is less than one third of FTI's average comparable transaction multiple of 6.83. Applying the multiple of 2.17 to the 2P reserves assumed by Ryder Scott on 14 October 2008, one arrives at a value of USD 212 million for Borankol and Tolkyn, which is less than one third of the value alleged by FIT based on their DCF analysis. (RPHB 2 ¶¶ 881 – 882).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1615. FTI's calculations were flawed due to their use of an overstated multiple of about 6.98 for the comparable companies analysis, and 6.83 for the comparative transactions. This stands in stark contrast to the 2.3 multiple that Renaissance Capital used during Project Zenith on 27 September 2008, or the 2.99 that Renaissance Capital described on 31 October 2008 to represent the effects of the financial crisis. (RPHB 1 ¶ 1029).

### 3. The Tribunal

1616. As mentioned above in this Award, for each of its damage calculations, the Tribunal has to take into account that, above in this Award, it came to the conclusion that the correct valuation date for the calculation of damages in this case is 30 April 2009. Contrary to that finding, the Parties have primarily relied on a different valuation date for their respective calculations of damages, i.e. Claimants on 14 October 2008, Respondent on 21 July 2010. Therefore, first, the Tribunal has to examine whether the Parties' arguments regarding the calculation of damages can still be applied to the evaluation date found to be applicable by the Tribunal.

1617. The Parties agree that the DCF methodology is an appropriate method of calculation. The Tribunal agrees as well, as this method has been used in many comparable cases and decisions of other Tribunals. This Tribunal sees no reason not to apply it here. The Tribunal now turns to the issues of application of that method disputed between the Parties and their experts.

1618. After evaluation of the timeline of events summarized above in the chapter on causation, the Tribunal accepts Claimants' argument that Respondent's conduct, which was found above to be a breach of the ECT, including the liquidity shortage insofar as it was also caused by Respondent, forced Claimants to reduce development efforts at Borankol and Tolkyn fields and that, in particular, this caused Claimants to decide not to drill or recomplete 13 wells at Borankol and Tolkyn in 2009 – 2010.

1619. In this context, the Tribunal considers that Claimants have provided sufficient proof for three kinds of damages: (1) KPM and TNG lost revenue that they would have earned from their planned production; (2) the gap in the development efforts depressed the production curve at Tolkyn and Borankol more than it would have been, had Claimants been able to develop the fields without Respondent's breaching conduct, and (3) Claimants were unable to sufficiently respond to the watering issues at the Tolkyn field.

1620. Regarding valuation, as mentioned above, most of Respondent's arguments and their experts' calculations rely on the unacceptable valuation date 21 July 2010 and, therefore, cannot correctly be used for a calculation of the value of the investment at the correct valuation date before Respondent's breaching conduct had their impact on the value of the investment.

1621. Insofar as Respondent refers to an earlier valuation date, the Tribunal is not persuaded by Respondent's argument (RPHB 2 p.17) that relies on the report of its experts, Deloitte GmbH, that financial difficulties of KPM and TNG even before



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 49 of 162

October 2008 were causes. The Tribunal finds no convincing evidence that the above damages would have occurred absent Respondent's interference.

1622. In particular, before Respondent's interference, it could be expected that export of gas would be possible. The CAC Pipeline – a direct export route – is proximate to the Tolkyn field. At the time, Respondent was forecasting both an expansion of total gas production from 33.7 Bcm$^3$ in 2008 to 61.5 Bcm$^3$ by 2015, with a concomitant export volume expansion from 6.2 Bcm in 2008 to 12.9 Bcm$^3$ in 2015. Claimants' right to export gas is relevant to TNG's and its prospective purchaser's reasonable expectations as of 14 October 2008. The Tripartite Agreement confirms that TNG would be able to export gas. As Respondent itself rightly points out, the Tripartite Agreement represented a bargain – if TNG were to deliver gas to a strategic project, TNG would have the opportunity to sell gas. KMG executed the 17 November 2008 Agreement, giving its clear indication that gas exports could be presumed to be available to a prospective purchaser upon entry into negotiations with KMG, regardless of the KazAzot fertilizer project. The Tribunal is not persuaded by Respondent's argument that an Agreement it effectively executed itself for TNG gas exports and export pricing is no evidence of the right, expectation, and ability to export gas. The non-implemantation of the Agreement was part of and due to the Respondent's conduct found to be in breach of the ECT. The same is true for Respondent's argument that there would have been be a sharp decline in oil production beginning in 2009, brought about by the end of the contract with TNG's biggest customer, Kemikal. As suggested by Respondent itself, Kemikal stopped payments on Claimants' products because of liquidity and insolvency issues, but, as also discussed earlier in this Award, this discontinuance of payments was caused by Respondent's own breaching actions.

1623. Regarding the prices that could reasonably be expected, the Tribunal considers that Claimants have not fulfilled their burden of proof for the price of USD 180 they allege. Claimants instructed Miller Lents for the 2009 Report, which is closest to the valuation date accepted by this Tribunal, to apply a base price of USD 2.00 starting from the year 2009, which translates into about USD 70 per 1000m. (Miller Lents Report 2009 Attachment 1 Exhibit 349). This price of USD 70 is also the export price GasTradeInternational LLP received. (R-III ¶ 364). The Tribunal, therefore, considers that a price of USD 70 is appropriate for its calculation of damages.

1624. Regarding the resulting calculation of damages, the Parties have relied on the various expert reports provided to them and at various times. For the reasons given above, this Tribunal can only rely on those of these reports that use a valuation date of or close to 30 April 2009. In this context, the Tribunal considers that, rather than making an attempt to replace calculations of such expert reports by its own calculations, it is more appropriate to compare these reports and, if one is considered sufficiently convincing, to rely on that report. As Claimants have the burden of proof for the damages they allege, first the expert reports submitted from Claimants' side are considered.

1625. Of these, the Tribunal considers that the Ryder Scott reports on reserves estimates are convincing in their approach and results. However, based on these reserves estimates, the Tribunal finds that the FTI calculations provided by Claimants are less convincing and are considerably overstated for the reasons provided in more

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

detail by Respondent (RPHB 1 sections E to H, particularly H.II) and do not sufficiently fulfill Claimants' burden of proof. On the other hand, since in fact damages have been caused, the Tribunal considers that their calculation can be based on the alternative damage calculations conceded by Respondent, if its own valuation date is not accepted, for the valuation date of 14 October 2008 (RPHB 1 §§ 1027 *et seq.*) by referring to Deloitte's comparable transactions analysis, also based on the Ryder Scott Reports, leading to a combined asset value of USD 277.8 million.

1626. This is, therefore, the value that the Tribunal accepts as the correct damages.

## L.V.       Quantum Related to Contract 302 Properties

### 1.       Arguments by Claimants

1627. Kazakhstan interfered with the exploration of the Contract 302 area. When TNG informed MEMR on 10 October 2008 that it no longer wished to enter into the appraisal phase but instead wanted a two-year extension on the exploration contract, TNG explained that it based that decision on the belief that the Contract 302 area had significant potential in deep-lying raw reservoirs and that TNG desired to more fully explore it. Mr. Lungu confirmed at the Hearing on Quantum that this referred to the Interoil Reef. The 14 October 2008 extension request and proposed work program indicated this intent and showed a planned drilling depth of 6000m and a second ultra-deep well on the subsalt horizon. While TNG could have penetrated the Interoil Reef structure by deepening the Munaibay-1 well rather than drilling a second exploration well, the work program could have been amended later to include more wells, like the second ultra-deep well, the Munaibay No. 3. The 3D seismic data showed that the Munaibay-1 well was in a good position to explore the Interoil Reef, although it lay somewhat deeper than the originally planned depth (6750m per Ryder Scott, 6300m per GCA). TNG had the capacity to explore the Contract 302 area, including the Interoil Reef – it only stopped drilling at 4700m because it encountered pressures that required a heavier rig. Claimants acquired a rig with a depth capacity of 7000m in Georgia and it was ready for transport in January 2009. Claimants declined to move the rig to Kazakhstan after the State commenced its harassment campaign, opting instead to resolve disputes with the MEMR before prudently continuing investment in the Contract 302 area. Kazakhstan's harassment campaign and ultimate refusal to formally extend Contract 302 prevented further exploration work on the area. (CPHB 2 ¶¶ 228 – 232). Mr. Chagnoux's testimony demonstrated that Kazakhstan interfered with Claimants' sale efforts by preventing them from proving resources in the Interoil Reef structure. (CPHB ¶¶ 393 – 394).

1628. But for Kazakhstan's harassment campaign, TNG would have penetrated the Interoil Reef before Contract 302 was set to expire on 30 March 2009. As Mr. Romanosov testified, it would reasonably take six months to drill one well into the Interoil Reef structure. (CPHB 1 ¶¶ 369 – 377).

1629. In its First Post-Hearing Brief, Claimants valued the Contract 302 properties as follows (CPHB 1 ¶ 557):



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 42 of 102

| **Investment Cost (excluding Munaibay Oil)** | **US $31,330,000** |
|---|---|
| **Prospective Value** | **US $1,636,900,000** |
| **Munaibay Oil Prospective Value** | **(US $138,883,000)** |
| **Prospective Value (Other Than Munaibay Oil)** | **US $1,498,017,000** |

1630. Regarding the Munaibay Oil claim, Claimants seek an award of USD 96,808,000, based on the DCF calculations performed by FTI, which relied on the geological analysis of Ryder Scott. It is undisputed that the DCF method is appropriate for valuing this asset. (CPHB 1 ¶¶ 524 – 527).

1631. Claimants' claim for the undrilled Contract 302 properties (excluding Munaibay Oil) is based on (1) their out-of-pocket investment costs, plus (2) a portion of the prospective value they could have realized if Respondent had not denied them the opportunity to make a commercial success of the project. This is not a claim for lost profits. FTI conducted the appropriate DCF calculation, which included updates and adjustments to the crude oil and condensate sales mix and liquids prices, transportation expenses effecting its liquid price assumptions, and infrastructure CAPEX. This DCF calculation showed the unrisked prospective value of the Contract 302 properties as USD 1.58 (C-III ¶ 78 (stating LPG Plant rather than Contract 302); C-III ¶ 61).

1632. To assess the Munaibay Oil, Ryder Scott analyzed the available seismic data and performed a thorough independent analysis to project a total recovery of 53.285 MBbls of oil and a need for a total of 75 development wells and one exploration well. This stands in stark contrast to GCA's "*finger-in-the-wind*" methodology, which drastically changed between the first and second reports and resulted in a development plan that (1) needed more wells for less oil and (2) increased the project CAPEX to USD 828 million and total OPEX to USD 188.5 million, thereby summarily wiping out the USD 68 million that Deloitte TCF had originally attributed to Munaibay Oil based on GCA's first report. GCA does not specifically state its reasons for drastically changing its analysis. Additionally, GCA compounded its errors by baselessly front-loading the development costs while delaying the assumed production and revenues. (CPHB 1 ¶¶ 478 – 484).

1633. Respondent's *de minimis* USD 68 million is wholly inappropriate. It recognizes only the value in the Munaibay Main gas resources and ignores most of the Contract 302 properties, including the Munaibay North, Bahyt, and Interoil Reef resource areas. That these properties should have no value is belied by the fact that Respondent has entertained bids for the Contract 302 properties, among others, after seizing them. (C-III ¶¶ 61 – 62).

1634. Deloitte's calculations use the ECOS, GCOS, and Risked Capital values supplied by the GCA, which provided no explanation for how GCA derived the ECOS



factors. Nevertheless, FTI – using these same values – made its own calculation of the value of the Munaibay Main oil, and arrived at USD 153 million. (C-III ¶ 63).

1635. The GCOS is whether a well will produce a sustained flow of hydrocarbons. There can only be one GCOS for a project. The GCOS, according to GCA, is 10%. This is reasonable and not particularly low for a prospect of this size. GCA and Ryder Scott differ primarily in their estimations of the size of the reservoir. By examining the horizons around the Interoil Reef structure, Ryder Scott was able to provide an image of the reef with a high degree of confidence. GCA, on the other hand, had to force or "*ghost*" the analysis. (CPHB 2 ¶¶ 382 – 385).

1636. GCA assumes a protracted and unreasonable exploration schedule that could not be accomplished by the exploration deadline of March 2011. GCA also assumes that additional 3D seismic would be required to assess the prospect before drilling. Additional 3D seismic is, however, unnecessary. While additional 3D seismic may be helpful to determine whether there is a trap, that could be better tested by drilling, as a prudent operator would. As Ryder Scott concludes, assuming that TNG had been able to use the deep drilling rig that Claimants acquired in 2008, there were no safety or engineering obstacles to drilling an exploratory well in the Interoil Reef Structure. (CPHB 1 ¶¶ 485 – 486).

1637. Although Claimants spent USD 43 million exploring the Contract 302 property, this work was truncated by the State, making it difficult express the values with certainty. Nevertheless, and as Respondent is aware, prior to the seizure, "*Claimants had already successfully test drilled the Tabyl and Munaibay resource areas, conducted seismic work in the Tabyl West, Munaibay North, Bahyt, and Interoil Carboniferous Reef resource areas, and commenced a test well in the Bahyt resource area that has log data to approximately 3950 meters. Furthermore, the Tabyl West and Munaibay North resource areas are immediately proximate to the already successfully drilled Tabyl Main and Munaibay Main resource areas, which, as explained in the geology report (Exhibit 4) accompanying Ryder Scott's First Report, significantly increases their geological chance of success.*" (C-III ¶ 56).

1638. Although the valuation of the Contract 302 properties presents a greater challenge than the Tolkyn and Borankol fields, this is due to Respondent's wrongdoing. The benefit of the doubt belongs to Claimants as the victims and not to Respondent as the wrong-doer. Respondent continues to have full possession of the areas in question and "*should not be permitted to sit on these Contract 302 Properties without paying for them until the Tribunal renders an award that minimizes their value, and then prove by development the actual value of the bargain that it illegally acquired." (C-III ¶ 57).*

1639. Where it can be proven that the claimant has suffered a loss and the respondent has committed a legal wrong causing that loss, the respondent is not entitled to invoke burden of proof as to the amount of compensation for such loss to the extent that it would defeat the claimant's claim for compensation. Rather, in such a situation, the claimant need only provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss. (C-III ¶ 59). Respondent has conceded that there was at least a loss of USD 68 million in relation to the



Contract 302 properties. As a loss has been conceded, only the quantum of that loss remains to be determined. (C-III ¶ 60).

1640. Respondent's objection to the economic feasibility of the project is the potential for H2S contamination. GCA and Deloitte unreasonably assume a 100% chance of significant H2S contamination, despite having no knowledge of whether that gas is present. It is more reasonable to assume that the gas is not present, as the reason that TNG did not drill the exploration will that would have demonstrated the quality of the gas is Kazakhstan's illegal conduct. The infrastructure cost attributable to H2S contamination accounts for nearly half of GCA's estimated USD 2 billion CAPEX. This is problematic because there is no geological basis for GCA's opinion that H2S is present. GCA bases those assumptions on the Tengiz and Kashgan fields, which are 45 and 145 km away from the Interoil Reef, respectively. There is no reason to believe that H2S generating source rocks are present in the Interoil Reef structure. Second, the comparison to the Tengiz and Kashagan fields is inapposite, since those have very different fluid characteristics than the Interoil Reef. The Tolkyn field is likely the closest analog for estimating the composition of the Interoil Reef gas, which is what Ryder Scott used. (CPHB 1 ¶¶ 485 – 490, 556; CPHB 2 ¶ 385).

1641. Respondent has prevented Claimants from drilling the necessary exploration wells that would establish the extent of damages in the undrilled Contract 302 area. Thus, at the outset, Respondent should be precluded from arguing whether H2S contamination would be an issue, since Respondent prevented the drilling. Holding Claimants to a standard of reasonable certainty would be unfair, and international law gives the Tribunal to award damages that Claimants cannot establish with certainty. Claimants and FTI have never attempted to mislead the Tribunal about the certainty of their damages, and have clearly stated that their prospective valuation for the Contract 302 properties is an unrisked valuation, and Respondent's comments to the contrary are mere bluster. (CPHB 1 ¶¶ 528 – 533).

1642. Regarding Respondent's criticisms for well and infrastructure costs for the Contract 302 properties, FTI explained that it based its cost estimates for the Contract 302 properties on information provided by Claimants and discussed with Ryder Scott and confirmed against Claimants' historical experience. For the future, FTI forecasted well costs for deeper wells based on the same. (CPHB 2 ¶¶ 352 – 353).

1643. Finally, although Respondent made a number of misstatements and manipulations to support its argument that the RBS valuation corroborates Deloitte's valuation, the RBS valuation corroborates the FTI valuation. RBS did not value the Contract 302 properties – it did not, as Respondent argues, assign a zero value to the properties. KMG EP did not value the Contract 302 properties because, due to Respondent's wrongful action, Claimants could not provide any exploration data for Contract 302 to KMG EP. (CPHB 2 ¶ 362).

1644. Tribunals, most prominently the *Sapphire International v. NIOC* but also *AIG Capital Partners, Inc. and CJSC Tema Real Estate Co. v. Kazakhstan*, *SPP v. Egypt*, *Lemire v. Ukraine*, and *SOABI v. Senegal*, have awarded damages for the concept of loss of opportunity, even where damages cannot be proven with reasonable certainty. It has been recognized that it is exceptionally rare that lost



profits or opportunity can be precisely calculable. It is, therefore, appropriate to calculate these on the basis of a hypothetical maximum loss. Respondent's attempts to distinguish *Sapphire* are meaningless – that tribunal awarded out-of-pocket expenses, plus a portion of the amount that the investor could have earned based on the investor's estimate of best-case-scenario income. In *Sapphire*, unlike here, the claimant had performed no drilling or seismic work. This Tribunal could use *Sapphire* as a precedential guide and find that there is certainly enough evidence to determine the existence and extent of damage. In *AIG*, the tribunal awarded the 30% return that Claimants expected to earn on the full USD 16.3 million, less interest of 6% on the USD 12.74 million that those claimants never actually invested. The tribunals in *AIG* and *Gemplus* also rejected the DCF method, since the investment was an income generating activity. (C-I ¶¶ 424 – 429, C-III ¶ 50, CPHB 1 ¶¶ 534 – 536, 539 – 548).

1645. That the *Sapphire* decision was expressly decided according to the tribunal's *ex aequo et bono* powers simply means that it was a matter of discretion. The *Gemplus and Talsud v. Mexico* tribunal confirmed that arbitrators have the discretion to award damages for loss of opportunity, even without reference to *ex aequo et bono* powers. *Gemplus* also observed that the concept of damages for loss of chance/opportunity is recognized in many national legal systems (CPHB 1 ¶¶ 543 – 548).

1646. The only case that Kazakhstan cites for the rejection of the concept of damages for loss of opportunity is the inapposite *Chevron v. Ecuador*. There, the respondent argued that the award had to be reduced by the likelihood of the claimant prevailing on the court cases underlying the claim. Although that tribunal noted that the loss of opportunity doctrine does not have wide acceptance across legal systems, it observed that it exists in exceptional circumstances where such harm would be difficult to quantify, which was not the situation in that case. Indeed, the *Chevron v. Ecuador* and *Lemire v. Ukraine* cases show that the loss of opportunity doctrine exists for those situations where the claimant cannot show that its likelihood of success is greater than 50% - if it were greater than that, Claimants would be able to recover the full amount of lost profits without discounting for likelihood of success. Finally, even the scholar cited by Kazakhstan, Prof. Marboe, concludes that there are circumstances for which an award of damages for loss of opportunity is appropriate. (CPHB 1 ¶¶ 549 – 552).

1647. Applying the law on loss of opportunity to the Contract 302 prospect, there is ample evidence that the Contract 302 properties held substantial opportunity for large fields of commercially exploitable oil and gas. The only reason that Claimants cannot further prove this is because of Kazakhstan's unlawful actions. The *Sapphire*, *AIG Capital*, and *SPP* tribunals awarded their respective claimants their out-of-pocket expenses, plus an amount to compensate the potential upside of the opportunity. Here, Claimants invested USD 31,330,000 in exploring and analyzing the Contract 302 property, excluding the investment in the Munaibay-1 well. The amount USD 1,498,017,000 represents the middle case of the potential net income that would have been earned from those areas, absent Kazakhstan's actions. (CPHB 1 ¶¶ 553 – 555).

1648. Considering Respondent's criticism of the valuation of the Interoil Reef resource area, this area unsurprisingly holds the most potential of the Contract 302 resource



area, as well as higher risk. This area must, however, be considered valuable in a damages award, given Respondent's interest in gaining cost-free control over it by any nefarious means possible. Claimants urge the Tribunal to value the property at its full, unrisked, middle range, Best Estimate value. (C-III ¶ 64).

### 2. Arguments by Respondent

1649. Claimants have suffered no damage with respect to any of the other discoveries or prospects in the Contract 302 area. All have negative net present values, and Deloitte's findings remain unchallenged. GCA has, however, made a slight revision to its calculation on the Munaibay East Oil discovery, and arrived at a net present value of USD -223.7 million. (RPHB 1 ¶¶ 809 – 811). Anatolie Stati provided dishonest testimony that inflated the results of the seismic survey of the supposed Interoil Reef structure from 270 km2 to 380 km2. He was also dishonest when he stated that Claimants had firmly decided to drill deeply throughout the alleged reef structure. Even if it had been possible, Claimants were physically unable to drill beyond a depth of 4700m, due to pressure in 2008. (RPHB 1 ¶ 113 – 114).

1650. Applying the oft-cited *Chorzów* principle of damage compensation, Claimants' case unravels. Under *Chorzów*, the only damage that could be compensated would be reliance damages. There is no international law or doctrine pursuant to which the breach of a promise to conclude a contract would result in damages. Even if there had been no breach of the alleged promise to extend the contract, Claimants still would not have had a claim to develop the Contract 302 area because the contract would simply have terminated on 30 March 2009. Claimants have always accepted that Respondent was not under an obligation to extend Contract 302. Since Claimants complain of a "*bad faith refusal*" to extend the contract, under international law, Claimants' damages are limited to Claimants' expenditure made in reliance on MEMR's alleged April 2009 promise to extend Contract 302. Since Claimants have neither alleged nor demonstrated any damage based on reliance, their damage claim for Contract 302 is zero. (R-III ¶ 48, 52 – 53; RPHB 2 ¶¶ 521, 550 – 556).

1651. Even if the Republic had extended the contract period to 30 March 2011, it is unlikely that Claimants could have discovered the alleged Interoil Reef, even with the alleged Munaibay-3 well. In the 2008 Due Diligence, it was TNG's position that the capital expenditure set out therein correctly reflected TNG's future intentions. Thus, they cannot now claim that they intended to do more than stated in the program, especially since it was TNG's usual practice to abide by their programs. Ultra-deep drilling was not part of the exploration program that Claimants submitted to the MEMR in April 2009. Importantly, this program was submitted after the 3D seismic survey on the Munaibay area had been completed. It was, therefore, clear that they did not see the Interoil Reef as a viable prospect at the time. (RPHB 2 ¶¶ 120 – 122).

1652. Under Claimants' new theory that, but for the alleged harassment campaign, TNG would have penetrated the Interoil Reef with the Munaibay-1 well before 30 March 2009, Claimants could argue that they are entitled to more than reliance damage. Factually, however, the 4700m deep Munaibay-1 well never could have reached



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 49 of 102

the at least 6000m deep Interoil Reef and this is uncontested between the experts. (R-III ¶¶ 50, 105 – 201; RPHB 2 ¶¶ 557 – 558, 638 – 646).

1653. Claimants attempt to create a claim for damages where none exists, casting their claim as one for "*loss of opportunity*" to develop the Contract 302 area. This claim is based on the prospective value of USD 1.45 billion does not correspond with Claimants' case on liability regarding that area. Claimants did not add the claim of loss of opportunity or out-of-pocket expenses until the Hearing on Quantum. (RPHB 1 ¶¶ 702 – 707; RPHB 2 ¶ 521).

1654. International law does not recognize a principle of loss of opportunity. The cases cited by Claimants, including *Gemplus v. Mexico*, *SPP v. Egypt*, *Sapphire International v. NOIC*, *AIG Capital Partners v. Kazakhstan*, and *SOABI v. Senegal* do not support Claimants' claim. For example, *Gemplus* and *SPP v. Egypt* are factually distinguishable because, unlike in the present case, they each involved enterprises that had already proven themselves to be profitable. The tribunal in *Gemplus* stated that, under international law, claimants bear the burden of proving loss and "*if that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent.*" The *Sapphire* tribunal would have rejected Claimants' approach to its prospective damages, in that it awarded only 4.5% of the investor's total potential profit after taking all risks into account. This is in stark contrast to Claimants' claim for the unrisked prospective value of the Contract 302 property. The *Sapphire* tribunal also rejected the idea that all risks should be resolved against the Republic, as Claimants argue. *Sapphire* emphasized mutual reliance by investor and state on the probability of future profits, Respondent had not accumulated extensive documentation of the Contract 302 properties before it granted the exploration license to Claimants. Prior to this arbitration, neither the Republic nor KMG EP had valued the Contract 302 properties. In this regard, the minimum investment requirement under the working programme does not qualify as an indication of the Republic's reliance on the probability of discovering and commercially exploiting the Contract 302 properties, as each investor is required to undertake them. The *Sapphire* tribunal also had *ex aequo et bono* powers, which this Tribunal does not. In *AIG*, the Tribunal considered that "*the opportunity to make a commercial success*" qualified as an investment under the US/Kazakh BIT, without explanation. Lacking such explanation, it should not be used as a guide. This *SOABI* case is also in applicable, as it concerns the actual loss of an existing opportunity from an existing relationship, and not, as Claimants argue, with the non-granting of an opportunity to which Claimants were not entitled. Claimants' claim relates to what the *SOABI* tribunal would refer to as "*hypothetical damage, the occurrence of which is purely conjectural*" and cannot be awarded as compensation. (R-III ¶¶ 116 – 121; RPHB 2 ¶¶ 559 – 598).

1655. Under the international legal principle of *actori incumbit onus probandi*, the burden of proof lies with Claimants. They allege the entitlement to compensation and it is their burden to establish the existence and extent of that compensation, irrespective of whether the legal qualification of their claim is one for loss of opportunity or for loss of profits. This burden of proof is often why tribunals decline to award compensation for future profits in investment arbitration. (R-III ¶¶ 102 – 103; *see also* R-I ¶¶ 46.19 – 46.26).



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 48 of 102

1656. The investor must meet a high threshold to establish a claim for lost profits, especially due to the degree of economic, political, and social exposure of long-term investment projects. To meet this threshold, an investor must "*show that their project either has a track record of profitability rooted in a perennial history or operations, or has binding contractual revenue obligations in place which establish the expectation of profit at a certain level and over a given number of years.*" This is true even for projects in early stages. Claimants have neither alleged nor proven either element. (R-III ¶¶ 129 – 135; R-I ¶¶ 46.19 *et seq.*).

1657. One of the best-settled rules of the law of state responsibility, as confirmed in cases such as *Levitt v. Iran* and *Autopista Concesionada v. Venezuela*, is to deny reparation for speculative damages. Respondent rejects Claimants' speculative fall-back position on loss of profits. The testimony of Dr. Kim of KNOC established that exploration blocks cannot be valued due to their speculative character. (R-III ¶¶ 122 – 128; R-I ¶ 46.19 *et seq.*).

1658. Claimants' "*benefit of the doubt*" argument turns the facts on their head, and ignores the maximum 5% GCOS for the Interoil Reef and that, during the 11-year life of Contract 302, Claimants did not undertake to explore the Interoil Reef. Even if the Republic had extended Contract 302, Claimants had no plan to explore (and, hence, no reason to make a discovery in) the Interoil Reef Thus, even if the contract had expired in March 2011, no work would have been undertaken there. (R-I ¶¶ 52 *et seq.*; R-III ¶¶ 48, 54 – 138; RPHB 2 ¶ 521).

1659. Claimants are responsible for a substantial part of the uncertainty regarding the Interoil Reef. They also failed to take any action during the life of the contract to explore the reef. The 2D seismic was shot in 2000 and 2001. TNG did not even start drilling the Munaibay-1 well until February 2008. They would have needed 2.5 years to drill the exploration well. They introduced the information so late in the proceedings that a thorough analysis, which could have led to clearer results, was impossible. It was not until the Hearing on Quantum that Claimants suddenly remembered that they had conducted a 3D seismic study on Munaibay and that, accordingly, they (1) were ready to build an exploration well, (2) had acquired the deep drilling rig just for that purpose, and (3) were prepared to move everything to Kazakhstan in fall 2008. Even if these allegations were true, however, Claimants could never have declared a commercial discovery of the alleged Reef within the extended period to 30 March 2011. Claimants cannot disregard the working program that they submitted on 14 October 2008 which contained slower drilling times, nor should Claimants' inexperience in ultra-deep drilling be ignored. Claimants chose to drill before having acquired the 3D seismic. As was made clear at the final hearing, the Munaibay-1 well would not have reached the Interoil Reef. According to Mr. Nowicki, that well would have needed to be more than 6750m deep, whereas its target depth was only 6000m. Thus, it was never possible that Claimants could have penetrated the Interoil Reef with the Munaibay–1 well prior to the end of the contract term. They chose an inadequate drill that broke down at 4700m in the face of high, but predictable, pressure. Then, they commissioned a 3D seismic survey which did not even cover the complete reef. There is no evidence of the existence of the alleged Georgian replacement drill, the existence of which Respondent denies. There are holes in the story, such as the gap between why Claimants would wait until early 2009 to drill, why the alleged reef was not contained in the draft addendum to Contract 302 submitted at the end of April



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 49 of 102

2009, why the working program did not foresee further drilling of Munaibay-1 well, or why other Munaibay-2 drilling was only scheduled for 4700m. The speculations about the time necessary to drill such a well also ignore the challenges of drilling in an H2S rich environment, the necessary administrative procedures for such drilling, and their own inexperience. Claimants' contentions regarding interference with the exploration of Contract 302 properties are contradictory. In order to reach the Interoil Reef depth by the end of the contract term, Claimants would have needed to remove the old rig from the well, move the new rig to the well, assemble the new rig, and drill to the required depth – all in a period of three months. Without being able to prove that the alleged discovery was commercially exploitable, Claimants would not have been able to assert rights to it pursuant to Section 8 of Contract 302. Thus, they have only themselves to blame and cannot be granted the benefit of the doubt. (RPHB 1 ¶¶ 708 – 735; RPHB 2 ¶¶ 117 – 119, 123, 638 – 646).

1660. At the Hearing on Quantum, even Ascom's geologists demonstrated their disbelief that the Munaibay-1 well would have reached the Interoil Reef, even if drilled to 6000m. They believed that the top of the reef could start at 6500m and that the Munaibay-1 well would penetrate the structure between 6600m and 6700m. Ascom's geologists informed Claimants' counsel about this prior to the Hearing on Quantum, but they and Claimants' witnesses deliberately concealed the position of Ascom's geologists, thereby misleading the Tribunal and Respondent. But, GCA concurs with Ascom's geologists that the well would not have reached the structure, even if Claimants had overcome their technical challenges to resurrect the Munaibay-1 well that they were forced to abandon at 4700m. It is clear, however, that Claimants used inadequate equipment and got stuck 1300m prior to reaching what in all likelihood would have been a dry hole. (RPHB 1 ¶¶ 799 – 808).

1661. Mr. Cojin's testimony was often incorrect. He testified that Contract 302 expired in 2018, when everyone knew it expired in 2009. He described how TNG Drilled the Munaibay-2 well, but in truth, that well was never drilled. (RPHB 2 ¶¶ 24 – 25)

1662. Claimants' claim for out-of-pocket expenses has no legal basis in either Contract 302 or in international law. Since Claimants never declared a discovery, they were not entitled to reimbursement for exploration expenses under Section 8.9 of Contract 302 and they knew that they were not entitled to reimbursement prior to April. Additionally, contrary to Claimants' assertion, the *Gemplus* tribunal did not award any out-of-pocket expenses. While the *Sapphire* tribunal awarded out-of-pocket expenses, it provided no explanation for having done so, beyond that the expenses were incurred in performing the contract. Here, as indicated, no discovery was declared during the life of the contract, rendering *Sapphire* inapplicable. The *SPP v. Egypt* tribunal awarded out-of-pocket expenses since those could not be recouped with future profits, due to the breach. Here, however, even if the alleged breach had not occurred, Claimants would not have been able to recoup their out-of-pocket expenses. The *AIG v. Kazakhstan* tribunal, while awarding out-of-pocket expenses, failed to provide reasoning for that decision. (RPHB 2 ¶¶ 599 – 612).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 59 of 102

1663. Claimants used Mr. Nowicki of Ryder Scott to introduce new evidence of 3D seismic data on the "*Interoil Reef*." His statements were misleading because they insinuate that the 3D seismic data revealed slight modifications. Placing the 2D and 3D maps atop of one another, one sees that the 2D seismic data is at a different location than the 3D. It is apparent that the 3D data reveals an entirely new and different structure and was not a mere update. It also demonstrates that the old 2D data was of extremely poor quality, making any reliance on it suspect. The 3D data disproves the 2D based "*Reef*" interpretation in favor of the new 3D interpretation, , making the actual GCOS 0%. The 3D supersedes the 2D and replaces the earlier interpretation. Mr. Nowicki did not have sufficient time to do such an assessment, let alone to evaluate the 3D seismic data prior to testifying – he received the data less than one week before the Hearing. An assessment of 3D data requires months. Mr. Nowicki used the 3D data, presented in the "*Project Munaibay 3D Presentation*," which was prepared by Claimants, to arbitrarily increase the GCOS From 5% to 9%. It is clear that he simply presented the Claimants' assessment as his own, and this fundamentally undermines his credibility. In the new structure based on the 3D data, it is noted that the structure extends beyond the boundaries of the Contract 302 area and into the block of another subsoil user. This has substantial consequences for unitization, volumes, costs, and governmental approvals. Claimants' cost and development schedules need to be disregarded entirely. (RPHB 1 ¶¶ 521 – 529, 548; RPHB 2 ¶¶ 535 – 536, 544 – 548).

1664. Ryder Scott's interpretation of the "*Interoil Reef*" does not demonstrate closure, which is crucial to the assumption that there is a valid trap containing hydrocarbons. Without it, hydrocarbons could have migrated. Ryder Scott's reliance on a single 2D seismic line to suggest that there might be some indication of closure in the southwest of the structure is not credible. Ryder Scott testified that it never relied on the 2D line; GCA noted that the 2D line was poor and said nothing about the geological conditions of the surroundings. Mr. Nowicki's statement at the Hearing that "*in my mind, I know that there has to be more to that reef. It doesn't just end where the data ends*" is a demonstration of Ryder Scott's wishful thinking. Ryder Scott also attempted to avoid discussing faulting in the "*Interoil Reef*", which could make a trap invalid and enable hydrocarbons to migrate. GCA and Total E&P addressed the clearly visible and devastating faulting at the Interoil Reef interval. GCA has interpreted the data and found that the data does not show potential for further potential for hydrocarbons through a "*stratigraphic trap*". To the North and Southwest, the 3D seismic data is inconclusive. Total E&P reviewed the same 3D seismic data in 2009 and concluded that the roof does not close, meaning that there could not be a trap. (RPHB 1 ¶¶ 736 – 749; RPHB 2 ¶¶ 523 – 525, 532 – 533).

1665. Assuming for the sake of argument that there is a deep full scale closure and a large trap, Deloitte arrives at a negative net present value of USD – 89.4 million. This non-commerciality is the result of a comparatively high development costs and the length of development. The ECOS would remain unchanged for the model, but there is a change in the GCOS. The best ultimate recovery would amount to 58.5 $Bcm^3$, at a GCOS of 5%, due to the low probability of full closure and the likely lack of seal effectiveness. A full closure and a tight seal within the geological structure are important, because otherwise the oil could leak out, leaving a dry hole. There are several reasons to doubt the seal on the Interoil Reef, as there are several faults cut through the structure. This can destroy a seal and create

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 51 of 102

pathways along which hydrocarbons can migrate out of a trap, as they have in other parts of the alleged structure. Total E&P made the same observation when considering the property, and they observed seven faults above the reef structure. Where there is low seal effectiveness, Deloitte puts the unrisked net present value at USD -456 million. (RPHB 1 ¶¶ 780 – 798 R-III ¶¶ 86, 93 – 98 (net present value of -83.7 million)).

1666. In addition, the likely presence of H2S – which is confirmed by the Reef's location, Total E&P's analysis, and publications by Ryder Scott – greatly increases the necessary planning, drilling costs, drilling durations, and equipment costs and expenditures of the Interoil Reef. H2S is corrosive and toxic to humans and is associated with extended drill times. Mr. Romanosov's suggestion that treatment facilities for the Tolkyn field gas would be sufficient to handle the Interoil Reef is "*laughable*."(RPHB 1 ¶¶ 756 – 769).

1667. GCA evaluated the two "*Interoil Reef*" cases with different GCOS-es. GCA evaluated the "*Interoil Reef*" on the basis that 10% of the supposed gas stream will consist of H2S. Respondent's reliance on the Tengiz and Kashagan fields as analogs is appropriate because the Tengiz reservoirs and the "Interoil Reef" are roughly the same age. The Tolkyn field is millions of years younger. H2S is not a result of source rock contamination (necessary for Claimants' misinformed "*distance*" argument), but instead occurs at specific temperatures and pressures. Geographic vicinity plays only a marginal role – and in any event, the difference is only 11 km. (Tengiz is located 45 km away from the Interoil Reef, Tolkyn 34 km). Ryder Scott has admitted that there is a 50% chance of at least 1% H2S in the "*Interoil Reef*" gas and admits that that amount would require special treatment facilities. (RPHB 2 ¶¶ 614 – 621).

1668. Claimants argue that, if Tengiz and Kashagan are picked as analogs, then it is necessary to assume higher condensate yield. There is, however, no relationship between the presence of contaminates and the level of condensate yield. Condensate is created through a geological process, whereas contaminate levels depend on the reservoir itself. The thermochemical sulphate reduction is a chemical reaction that depends on reservoir temperature and not on source rock temperature. GCA has estimated that the depth of the reservoir and the geothermal gradient of that area indicates that a temperature of 160 – 180 C can be expected. This is the range at which thermochemical sulphate reduction occurs. Higher depths tend to mean less oil and condensate and more gas in a reservoir. In other evaluations, Ryder Scott has concluded that a contaminate level of 25% had to be expected in a gas stream from Type II prospects, like Tengiz and Kashagan. (RPHB 2 ¶¶ 622 – 631).

1669. The 3D seismic proves that the alleged Reef is non-commercial – the prospect is comparative small and has a high development cost and requires a long time for its development, due to the presence of significant quantities of H2S in the gas stream. In the best case scenario under GCA's interpretation, the ultimate recovery of gas amounts to 3.7 $Bcm^3$ and reaches a depth of 6150m. Compared to the Tolkyn field's peak performance of 2.37 $Bcm^3$, it is clear that the alleged reef does not provide for huge reserves of gas. (RPHB 1 ¶¶ 736 – 749). Ryder Scott's assumption about gas volumes, based on an unrealistic gas column of 2000m, is unrealistic. The largest gas column known to GCA is 1450m. It is apparent that



Ryder Scott's high case has never been observed and their low case has only been observed on 5% of all fields. Ryder Scott's maps also do not support the gas column estimates. (RPHB 2 ¶¶ 526 – 531).

1670. Claimants have ignored that the standard of sufficient probability would be applicable to a claim for lost opportunity. Applied here, Claimants would need to demonstrate a "*very strong chance*" that deposits of commercially workable oil exist in the concession area. Regarding the GCOS and ECOS, GCA estimates the GCOS of 10% of the Interoil Reef. This means that, in 90% of all cases, an operator will not find the structure as outlined. They estimate an ECOS of 50%, which is unchanged from the review of the 2D seismic data. These risks need to be accounted for, but even disregarding these, however, as Deloitte have calculated, the Interoil Reef has an unrisked net present value of USD – 249.3 million. (R-I ¶ 52; R-III ¶¶ 84 – 98; 113 – 115 (discussing 5% ECOS); RPHB 1 ¶¶ 777 – 779).

1671. FTI's drilling CAPEX estimates are so illogical that they have been empirically disproven by FTI. While FTI assumed responsibility for these flaws, they are not qualified to provide such estimates. At the Hearing, Mr. Rosen of FTI agreed that the deeper an operator drills, the higher the costs per meter will be. Claimants thereafter amended their well cost estimates to account for all instances of increasing costs per meter drilled, rather than decreasing costs per meter as previously stated and which Mr. Rosen had defended. The amendment shows that Claimants have admitted their mistake. Claimants' claim that an exploratory well to a depth of 4700m would cost USD 10 million is belied by FTI's own evidence, which calculated that the Munaibay-1 exploration well, which ultimately reached that same depth, cost USD 18 million. Regarding the non-drilling cost estimate and as confirmed at the hearing, FTI failed to provide any explanation for the infrastructure that they considered necessary for the development of the Contract 302 area. Mr. Rosen had no basic understanding of what was necessary to assess the costs of infrastructure. Instead, FTI simply adopted Claimants' assumptions in the cost estimates. At the Hearing on Quantum, Mr. Rosen of FTI conceded that FTI had applied incorrectly low administration costs for the Contract 302 area because FTI assumed that the Tolkyn and Contract 302 Area could operate jointly. In addition, FTI's valuation on gas pricing was based on the unsigned undated 2008 Agreement. FTI then applied this price to the Contract. 302 properties, even though §§ 2.3 and 3.1 of the Tripartite Agreement clearly state that it concerns only gas from Tolkyn. The new development schedule based on the 3D data can be criticized for the same reasons. (RPHB 1 ¶¶ 554 – 565, 581 – 587, 591 – 592; RPHB 2 ¶¶ 499 534; 537 - 543).

1672. FTI's update of their Contract 302 prospective valuation in the Third Report included an arbitrary rounding of the discount rate which inflated the valuation by USD 44 million. FTI understated the variable distribution costs by USD 9 million. And, by not incorporating an assumption for net working capital into the Contract 302 properties valuation, FTI inflated the valuation by USD 55 million. Accounting for the GCOS and ECOS as well, the value assumed by FTI would need to be reduced to USD 136. (RPHB 2 ¶¶ 459 – 460).

1673. FTI's costs for gas flowlines were understated by a factor of 20. They overlooked the need to construct an in-field facility to separate their gas and condensate from the Interoil Reef. They assumed that old, insufficient pipelines could be used and



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 53 of 102

thereby neglected to create data for a new pipeline. Costs for treatment facilities were also ignored, and it would be impossible for the resources from the Interoil Reef to be treated at the existing facility at Borankol. They also failed to provide facilities for the removal of H2S, and this would increase the cost by USD 200 million (assuming 1% H2S) or by USD 260 million (assuming 10% H2S). Finally it is unclear what is meant by FTI's term "*Changing the extraction system.*" (RPHB 2 ¶¶ 542 – 543). FTI made no allowance for costs for the necessary facilities in their evaluation and this increases the damages claim. GCA estimates an infrastructure CAPEX of USD 459 to interpret the Interoil Reef. The alternative 5900m Reef that is not supported by 3D data requires a CAPEX of USD 2.35 billion. (RPHB 1 ¶¶ 770 – 773).

1674. Turning to witness credibility, Respondent argues that "*Claimants' costs and development schedule are untenable as a matter of substance, they are also non-credible since they are opaque, illogical and were apparently largely prepared by Claimants themselves rather than by Claimants' experts who lack the necessary expertise in these matters.*" (RPHB 1 ¶ 547). In testimony, Ryder Scott was completely unaware of the regulatory requirements that were connected to the drilling schedules that formed the basis of the Ryder Scott valuation was outside of their expertise. Ryder Scott solved their knowledge problem by simply relying on Claimants' estimates and intentions, and then presenting them as Ryder Scott's own expert findings. In effect, Claimants have become their own experts. At the Hearing in May 2013, Claimants attempted to respond to Respondent's allegation. Ryder Scott does not claim authorship of Claimants' statement that "*25 wells are scheduled*" or that "*a two-rig schedule was implemented.*" This can only mean that they were provided by Claimants. No response was given for FTI having hidden that it had taken over infrastructure cost estimates from Claimants. By contrast, GCA has the necessary experience to prepare reliable development schedules and cost estimates. (RPHB 1 ¶¶ 546 – 552; RPHB 2 ¶¶ 466 – 469).

1675. At the Final Hearing, Claimants argued that the fact that well costs were provided by Claimants was apparent from a footnote in the First FTI Report. The footnote referenced, "*We have discussed with Ryder Scott what a reasonable estimate for capital costs for wells drilled in the different depths/structures would be based on a review of Company's historical capital expenditure costs for wells with adjustments made for varying depths,*" however, gives no such indication. It leads the reader to believe that a historical analysis was conducted. FTI did not even purport to do any analysis on whether the well costs provided by Claimants were reasonable. Their analysis has no credibility. (RPHB 2 ¶¶ 470 – 474).

1676. In response to Claimants' contention that GCA should have provided several different scenarios involving costs related to H2S, GCA explained that the mid-case assessment was sufficient. (RPHB 2 ¶ 634).

1677. FTI's calculations that are based on higher condensate yield are misleading. First, a production start in 2012 is not possible since additional research, including new 3D seismic, would need to be completed. The present research is very poor and do not enable the flanks of the Interoil Reef to be mapped with confidence. Even Ryder Scott agreed that the 3D survey was not sufficient to



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 54 of 102

define the structure. Additional seismic surveying would only add one year. GCA explains that assuming a production start prior to 2018 is improper. The prices that would be realizable in 2019 are not the same as would be realizable in 2012 – that ignores seven years of inflation. FTI also ignores increases in the costs of production, taxes, and ECOS and GCOS. Deloitte performed a proper analysis using FTI's assumed condensate yield and still come up with a negative value of the Interoil Reef. (RPHB 2 ¶¶ 632 – 637).

1678. GCA provided an outline FDP setting out the steps for the development of the Interoil Reef. According to this, and based on challenges outlined, production would begin in 2018. Claimants' experts, on the other hand, unrealistically assume that the first two production wells on the Interoil Reef would be drilled in 2009 and that production would start in 2010. This is even inconsistent with Claimants' production history. The wells in Tolkyn, for example, were drilled in 2001 but only started producing non-negligible volumes of gas in 2004. The assumption that they would have more success with a deeper well is nonsensical. (RPHB 1 ¶¶ 774 – 776).

1679. Claimants' Munaibay Oil claim is overstated by 63.8% (USD 37.7 million). While Claimants accuse GCA of manipulating its resource and capital expenditures estimates, this is incorrect and GCA has explained the reasons for changes to the estimates. Changes were based on a later analysis of the result of the drilling on age-equivalent reservoirs in Tolkyn field. As a result, there were even upward corrections on some wells. GCA provided Chrystal ball sheets, as well as cost estimates, showing the changes. The minor error in the phasing of capital expenditure on Munaibay was admitted by GCA and was corrected in GCA's Third Report. The value of the Munaibay discover remains negative, despite the change. (RPHB 2 ¶¶ 549, 647 – 651).

1680. The RBS valuation report conducted as part of the KMG EP Due Diligence in September 2009 contains no value for any of the Contract 302 properties and provides no support for their alleged USD 1.5 billion loss of opportunity. (RPHB 1 ¶¶ 986 – 989). In FTI's Additional Expert Report of 25 January 2013, Claimants grant the Tribunal the discretion to decide which part of the highly exaggerated prospective value of USD 1.448 billion to award as opportunity damage for the Contract 302 properties. (RPHB 1 ¶ 986).

1681. Respondent also explained that FTI improperly disregarded risk by virtue of its inappropriate "*prospective*" valuation method. Such a "*prospective*" value bears no relationship to what real investors in an open market would pay for an asset and should, therefore, play no role for valuation purposes. The Uniform Standards of Professional Appraisal Practice (USPAP) only uses the term "*prospective value*" when in reference to real property and personal property. There is no reason to apply it to an oil and gas development. Furthermore, as Deloitte have shown, the use of a prospective value does not support the complete disregard of risk, as suggested by FTI. (RPHB 1 ¶¶ 566 – 569).

1682. Other methodological flaws in FTI's analysis include that they incorrectly mixed the nominal and the real valuation approaches. As a result, they applied inflation twice, causing revenues to increase disproportionately and cash-flows to be overstated. When they conceded this error, it reduced the overall value estimate by



USD 379 million. When correcting this mistake, they applied a different inflation rate to their assumption – 1.61%, rather than 2.82%, which leads to lower nominal cost projections. While they based this change on an assumption that the new rate was "more appropriate", in reality, the change was untenable. The sole reason for the change was to limit the impact of the correction that was necessary. In addition, FTI's arbitrary rounding of their discount rate from 14.41% to 14% adds USD 49.3 million to Claimants' claim. (RPHB ¶¶ 570 – 577).

1683. One risk associated with investment projects in the early stage is the creditworthiness of the purchaser. Since Claimants have not named any purchaser who would take their gas from the Contract 302 properties, they have not, *a fortiori*, accounted for the risks associated with such a purchaser. Further, if the claimant cannot establish that there was a reasonable certainly of lost profits, it cannot determine with reasonable confidence what those lost profits would be. As a result, their claim must be dismissed. (R-III ¶¶ 136 – 138).

### 3. The Tribunal

1684. The timelines of events provided above in this Award show that TNG informed MEMR on 10 October 2008 that it no longer wished to enter into the appraisal phase but instead wanted a two-year extension on the exploration contract. The 14 October 2008 extension request and proposed work program indicated this intent and showed a planned drilling depth of 6000m and a second ultra-deep well on the subsalt horizon. From the evidence supplied, the Tribunal is satisfied that when TNG stopped drilling at 4700m because it encountered pressures that required a heavier rig, Claimants acquired a rig with a depth capacity of 7000m in Georgia and it was ready for transport in January 2009.

1685. Only after Respondent started its breaching and harassing conduct did Claimants decline to move the rig to Kazakhstan, opting instead to resolve disputes with the MEMR before prudently continuing investment in the Contract 302 area. Taking into account the Tribunal's considerations above in this Award regarding causation, the Tribunal accepts that Claimants could have reasonably expected the extension of the Contract under the usual professional relationship with the Respondent's institutions as it existed before 14 October 2008. Kazakhstan's refusal to formally extend Contract 302 prevented further exploration work on the area must be considered as part of, and caused by, the treatment which the Tribunal has found above to be in breach of the ECT.

1686. Regarding the damages caused, the Tribunal sees no difficulty in accepting that the Claimants' investment of out of pocket expenses of **USD 31,330,000** in exploring and analyzing the Contract 302 property, excluding the investment in the Munaibay-1 well, are indeed such damages due.

1687. As both Claimants and Respondent submit, the further damages claimed for lost profit or lost opportunity provide a much higher threshold for Claimants' burden of proof. This threshold is high both legally and factually. The Parties rely in some detail on the various earlier decisions of other tribunals dealing with this issue and take very different views on their interpretation and applicability for the case at hand.



1688. This Tribunal does not need to go into these legal issues because it considers that, in any event, Claimants have not been able to provide sufficient factual proof for the lost profits they claim. In this context, Respondent (R-III ¶¶ 129 *et seq.*) has rightly referred to the comments in Prof. Crawford's Commentaries on the ILC Articles on State Responsibility and to respective comments in earlier awards that the investor must meet a high standard of proof to establish a claim for lost profits, especially due to the degree of economic, political, and social exposure of long-term investment projects. To meet this standard, an investor must show that their project either has a track record of profitability rooted in a perennial history of operations, or has binding contractual revenue obligations in place that establish the expectation of profit at a certain level over a given number of years. This is true even for projects in early stages.

1689. In the view of this Tribunal, Claimants have not proven either element. The Tribunal does not agree with Claimants that, in this regard, the benefit of the doubt belongs to Claimants as the victims and not to Respondent as the wrong-doer. Rather, the burden of proof remains with Claimants. While it is true that no absolute certainty of proof can be required for such losses in the future, a high threshold of sufficient probability must be applied to a claim for lost opportunity.

1690. During the 11-year life of Contract 302, Claimants did not undertake to explore the Interoil Reef. The 2D seismic was shot in 2000 and 2001. TNG did not start drilling the Munaibay-1 well until February 2008. Claimants would have needed 2.5 years to drill the exploration well. Claimants have not proven that they could have declared a commercial discovery of the Interoil Reef within the extended period to 30 March 2011. The working program that Claimants submitted on 14 October 2008 contained slower drilling times. Claimants had no experience drilling ultra-deep wells. Claimants chose to drill before having acquired the 3D seismic and drilled a well that, admittedly, would not have been sufficient to reach the 6000m deep Interoil Reef. Ultra-deep drilling was not part of the exploration program that Claimants submitted to the MEMR in April 2009. They first chose an inadequate drill that broke down at 4700m in the face of high, but probably predictable, pressure and only then acquired the Georgian drill. As pointed out in some detail by Respondent (RPHB 1 ¶¶ 799 *et seq.*) and at the Hearing on Quantum, even Claimants' geologists were not sure that the Munaibay-1 well would have reached the Interoil Reef, even if drilled to 6000m.

1691. Assuming that Respondent had extended Contract 302, and that Contract 302 would have expired in March 2011, Claimants have not provided sufficient evidence that they would have realized the alleged lost profit or opportunity.

1692. Therefore, this Tribunal concludes that Claimants have not fulfilled their burden of proof in this regard.

## L.VI.    Quantum Related to LPG Plant

### 1.    Arguments by Claimants

1693. Shortly after President Nazarbayev issued the investigation order, construction on the LPG Plant slowed. Mr. Broscaru's unrebutted testimony is that this was because non-Kazakh workers were unable to renew their work permits.



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 59 of 102

Construction was paused indefinitely in 2009 because (1) TNG's liquidity position was deteriorating, due in no small part to Kazakhstan causing Claimants to lose the Credit Suisse loan facility and causing Vitol – another investor – to draw down its revolving line of credit, and (2) it became too risky to invest additional capital on construction of the LPG Plant. These delays increased the ultimate cost of completing the LPG Plant by approximately USD 50 million (per GCA). But for Kazakhstan's actions, however, these delays would not have occurred and the LPG Plant would have gone online in June 2009. Kazakhstan's actions changed the investment environment such that it was too risky to invest additional capital in an asset that Kazakhstan could seize. As President Nazarbayev acknowledged on 19 November 2009, construction on the LPG Plant had halted as a result of inspections by law enforcement. This was also acknowledged in the MEMR report on its January 2010 inspections. When the Akim of the Mangystau Region offered a proposal for TNG to borrow funds from State agencies to complete the facilities, Anatolie Stati explained that the delays in the LPG Plant resulted from the State's actions, which precluded Claimants from raising or investing additional funds. The Akim then reported to the Prime Minister Massimov that the construction had stopped due to the financial and legal problems of the company and urged the Prime Minister to dismiss the legal actions so that construction might resume. (CPHB 1 ¶¶ 358 – 364; CPHB 2 ¶¶ 215 - 222).

1694. Claimants seek to recover their investment costs of USD 245 million and the lost opportunity since, but for Kazakhstan's actions, Claimants would have developed the LPG Plant and would have even been able to develop the evidence needed to establish the FMV of the plant. As the tribunals in Sapphire and Gemplus also agreed, the Respondent should not benefit from the evidentiary uncertainty that results from its own misconduct. (CPHB 1 ¶¶ 558 – 559). Claimants request that the Tribunal award damages for the LPG Plant that are equal to Claimants' investment in the plant, plus some of the prospective value that Claimants could have realized from processing the Contract 302 gas in the LPG Plant (CPHB 1 ¶ 580):

| | |
|---|---|
| **Investment Cost** | **US $245,000,000** |
| **Prospective Value** | **US $329,077,000** |
| **Prospective Value Above Cost** | **US $84,077,000** |

1695. Respondent's market value of the LPG Plant of – USD 89.9 million is incorrect. It completely and baselessly disregards the possibility of processing third party gas at the LPG Plant – an assumption not even adopted by KMG EP. The FMV is not an appropriate measure of an asset that Claimants were prevented from turning into a commercial success. Instead, the investment value, as held by the tribunals in *Metalclad v. Mexico*, *Vivendi v. Argentina*, and *Wena Hotels v. Egypt*, is the appropriate measure of damages for an asset that was not yet a going concern at the time of the taking. Those tribunals recognize that when a state's actions deprive an investor of the opportunity to earn a profit, the investor is entitled to receive a portion of that potential profit as compensation for that lost opportunity. (CPHB 2 ¶¶ 386 – 389).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1696. FTI's prospective DCF valuation of **USD 408.3 million** for the LPG Plant is a reasonable estimate of the value of the LPG Plant to Kazakhstan. The Tribunal should not take seriously any argument that salvage value is an appropriate award for a seized LPG Plant that Kazakhstan is on the verge of putting into operation at full capacity:

> *66. As a preliminary matter, Deloitte's assumption of salvage value is intrinsically an inappropriate premise. As of the appropriate October 14, 2008 valuation date, Claimants fully intended to finish construction of the LPG plant and put it into operation, and in connection with all of Claimants' efforts to sell the LPG Plant both before and after October 14, 2008, Claimants offered the Plant, and prospective purchasers bid on the Plant, not as scrap but as prospectively operational. This fact is clearly reflected in the indicative offers made by interested buyers in 2008, which valued the LPG Plant at US $150 million on average. Indeed, the offer made for the LPG Plant by KazMunaiGas at that time was US $199 million. While Claimants did not accept these offers because at the time they deemed them too low and did not feel that they would lead to a sale, the Tribunal should note that State-owned KazMunaiGas itself offered almost US $200 million for the Plant, more than six times the highest value assigned to the LPG Plant by Deloitte of US $32 million. Little more is needed to demonstrate that Deloitte's salvage value assumptions and calculations are worthless.*
>
> *67. Furthermore, current publicly available information indicates that Kazakhstan is in fact gearing up to finally open the LPG Plant in 2012. In a document entitled "List of Investment projects of the Mangistauskoi Region, which are being supervised in 2011," there is a specific reference to the LPG Plant under "Regional Projects". The project is identified as having a cost of US $315 million (47 billion Tenge), and it is expected to start up in the first half of 2012 with a capacity of 7 mcm of gas per day. It is clear that, with an identified cost of US $315 million, Kazakhstan has been in the process of spending additional capital to complete the LPG Plant since its seizure, and that consequently Kazakhstan does not view the Plant as scrap. Furthermore, Kazakhstan is training specialists for operation of the LPG Plant, a clear indication that Kazakhstan is going to complete the Plant and put it into operation. [...] (C-III ¶¶ 66 – 69).*

1697. FTI made its prospective DCF valuation under the conservative and reasonable assumption that only gas supplies from Tolkyn, Borankol, and the Contract 302 properties would be processed in the LPG Plant. When Claimants commenced the LPG Plant project, they believed that the Tolkyn field alone would produce sufficient gas for the LPG Plant to produce 7 mcm per day for several years. There were also plans to produce gas from the Contract 302 properties as production from Tolkyn declined. While the LPG Plant had the capability to process gas from third party sources, TNG always expected to use the LPG Plant to process its own gas supplies. (C-III ¶¶ 70 – 71).

1698. Respondent's objection to the FTI's prospective DCF valuation, namely that there would not be enough gas from Claimants' properties or from third parties to make it profitable, is inconsistent with Respondent's current plans for the LPG Plant. The viability of the LPG Plant does not hinge on the availability of gas from the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Tolkyn field or the Contract 302 properties. FTI did, however, create an unrisked NPV of the plant that assumed full production from Contract 302, due to uncertainty regarding the terms of third-party gas sources. With these adjustments, the prospective value from the LPG Plant is USD 408.3 million. (C-III ¶ 73 - 75, 77; CPHB 1 ¶ 568).

1699. At minimum, Claimants' recoverable investment value for the LPG Plant is USD 245 million. This amount includes the USD 37 million expenditures through May 2009 that Claimants would not have incurred had Claimants been able to sell the LPG Plant in October 2008. (C-III fn. 179).

1700. FTI based its assessment of the investment value of the LPG Plant on the book value of the LPG Plant as of 14 October 2008 as contained in TNG's Third Quarter financial statements, which were not prepared for litigation and were reviewed by KPMG. The Tristan Oil Annual Report for 2009 was used to reflect investments after 14 October 2008. By contrast, Mr. Wood effectively admitted that his cost estimates are simply a "*black box*", based on his experience. (CPHB 2 ¶¶ 354 – 355).

1701. In early submissions, FTI applied the "*book value*" for the LPG Plant as a proxy for FMV, because "*the value of the LPG Plant, assuming only the use of the Borankol and Tolkyn field volumes, is less than the book value of the assets which is the total incurred capital expenditures of the LPG as at the Valuation Date*." This value, **USD 208.5 million**, was very conservative and did not provide a value for Claimants' lost opportunity from to earn profits from the LPG Plant upon completion. (C-I ¶¶ 419 – 420).

1702. Kazakhstan asserts that damages should be reduced by the debts owed by KPM and TNG to Vitol under the COMSA prepayment terms and the LPG financing arrangements. Respondent's arguments that Claimants' damages must be reduced because Vitol was a fifty-fifty joint partner in the LPG Plant, and because of the debt owed by Montvale to Vitol under the COMSA prepayment arrangement, are legally and factually incorrect. First, Vitol never owned an equitable interest in the LPG Plant but rather promised to provide (but never provided) half of the financing for the construction of the LPG Plant in exchange for the right to market the off-take of the Plant and to receive a portion of the LPG Plant's profits. The Joint Operating Agreement with Vitol for the LPG Plant project addressed the rights of the parties upon termination, including for the event that Kazakhstan asserted rights to the LPG Plant. In that agreement, contrary to Kazakhstan's contention, the parties contemplated that all of Vitol's rights would transfer to Ascom upon termination and that Ascom would seek compensation from the Government in the event that the Government asserted ownership rights over the plant. This is an illustration of the necessity of the *Chorzów* and *Occidental v. Ecuador* principle not to reduce the damages by the amounts owed to third Parties. Vitol never had any ownership interest in that Plant and was never an "Investor" for purposes of the ECT. To the extent that Claimants owe contractual obligations to Vitol under the Joint Operating Agreement, that issue is not before this Tribunal. Accordingly, the Tribunal should not consider any such obligations, which are disputed, in calculating the amount of compensation due to Claimants for the assets that Kazakhstan wrongfully seized. (CPHB 1 ¶¶ 641 – 645).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1703. Under the intended financial structure for the LPG Plant, Claimants and Vitol had originally planned to finance the LPG Plant with a combination of USD 20 million equity contribution from Vitol and Ascom, each financing from KazCommerzBank. This intended financial structure, which in any event is irrelevant for purposes of quantum, never came to pass. Instead, Claimants retired all KazCommerzBank debt in 2007 and Vitol drew down its debt financing to USD 46 million in addition to the USD 20 million contribution. As a result, TNG financed all of the construction of the LPG Plant, apart from the USD 66 million provided by Vitol. The LPG Plant was not a "*black hole*" with ever increasing costs – the cost increases corresponded with observed increases in inflation and LPG product prices. (CPHB 1 ¶¶ 573 – 576).

1704. At the Hearing on Quantum, Mr. Rosen (FTI) explained how the investment cost basis is an appropriate standard of valuation for the LPG Plant. FTI assumes that the LPG is a "*going concern*" since it would have been completed and would have operated, absent Respondent's interference. While one would typically consider the cashflow basis to evaluate the value of a going concern, that information was lacking. Accordingly, Mr. Rosen looked to the cost basis or investment basis to determine the LPG Plant's value. (CPHB 1 ¶¶ 560 – 561).

1705. Kazakhstan's cost assumption of USD 100 million is a massive, USD 50 million overstatement of the costs required to complete the LPG Plant, as confirmed in GCA's testimony at the Hearing on Quantum. But for Respondent's actions, construction would not have stopped and it would have only cost USD 50 million to complete. (CPHB 1 ¶ 562).

1706. Kazakhstan assumes – contrary to the evidence – that the LPG Plant would have gone online first in mid-2011. Accordingly, it fails to account for two full years of production that would have been achieved, but for Kazakhstan's violations. Evidence regarding third party gas was also ignored by Deloitte. As explained at the Hearing on Quantum, although TNG expected to load the LPG Plant from its own gas, the LPG Plant could also be used to process gas from other producers. The Joint Operating Agreement for the operation of the LPG Plant between Ascom, Terra Raf, TNG, and Vitol confirms that the processing of third party gas was anticipated. The 2009 RBS Assessment also assumed that the LPG Plant would be loaded with third-party gas, based on discussions with KMG E&P. (CPHB 1 ¶¶ 563 – 567, 570).

1707. Deloitte disregards the possibility that TNG could have sold the Plant to a third party that had its own gas run through the plant. KMG E&P, for example, made an indicative offer of USD 199 million for the LPG Plant in September 2008, based on a mixed comparative value and cost approach – not a DCF analysis. KMG E&P's use of the cost basis to value the LPG Plant contradicts Kazakhstan's argument that the cost basis is an improper valuation method. The 2009 RBS Assessment valued the LPG at USD 86 million (base case) to USD 146 million (high case) and the Tribunal should agree that these are the absolute minimum amounts that the Tribunal should award for the LPG Plant. (CPHB 1 ¶¶ 569 – 572).

1708. Claimants explain that Mr. Chagnoux was not a credible witness. His explanation that he was dishonest in his bid of USD 100 million for the LPG Plant may be

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

attributed to hurt feelings that Claimants did not initially consider his offer to be good enough to move to Phase 2 of the sale process. On cross, he admitted to not being present at a March 2009 meeting about which he provided testimony. It also appeared that he and Total were interested in currying favor with Kazakhstan. (CPHB 1 ¶¶ 390 – 391).

1709. Respondent's allegations about delays in the construction of the LPG Plant are based on a draft business plan that indicated a target start date of October 2007. The planned launch, however, was Q2 2009. Even if there were a delay, however, it would not shorten the usable life of the plant. (CPHB 1 ¶¶ 577 – 578).

1710. In response to Respondent's allegation that the LPG Plant was speculative from the beginning, Claimants explain that "*Using the valuation metrics that Mr. Broscaru described in his witness statement, Deloitte attempts to create a cash flows and a valuation model that it concludes had a value of US $108.2 million. Deloitte, however, makes a fundamental error in its calculation. Mr. Broscaru stated that TNG expected the LPG Plant to generate US $1 billion in revenue and US $500 million in profit over 10 years. Deloitte, however, spreads those cash flows over 20 years, effectively cutting them in half. FTI has corrected Deloitte's error, and concludes that an accurate 'simplified model' results in a positive NPV of US $92 million.*" (CPHB 1 ¶ 579, partially quoted).

1711. The RBS valuation was based on (1) the 2009 reserve report prepared by Miller Lents; (2) detailed legal due diligence by Squire Sanders; (3) detailed financial, tax, and environmental due diligence by PWC; (4) discussions with management of KPM and TNG; and (5) "*valuation discussions with KMG EP*." It was created as an independent valuation for the purpose of a potential transaction, not litigation. It concluded that, on 1 October 2009, the combined enterprise value of Tolkyn, Borankol, and the LPG Plant was USD 612 million in the Default-Base scenario, to USD 760 in the Special-Base scenario which assumed higher gas prices. This represents an alternative valuation which should establish a minimum value for these assets, if the Tribunal rejects the 14 October 2008 valuation date. The Tribunal should, however, draw the inference that it understates the value of these assets. (CPHB 1 ¶¶ 583 – 585).

## 2. Arguments by Respondent

1712. The LPG Plant is a failed project. Claimants have failed to prove either claim for USD 245 million or USD 408 million for the LPG Plant and they have failed to provide a salvage valuation for the LPG Plant. (R-III ¶¶ 163 – 164). Claimants initially intended to only invest USD 20 million into the project, but as alleged in its first post-hearing brief, expended USD 179 million – 800% of the anticipated amount. They expected it to be fully operational by the third quarter of 2007 but – almost two years after this projected operation date – the project remained unfinished, and Claimants abandoned it. Its value is zero. (R-III ¶¶ 139 – 140; R-I ¶ 53.3; RPHB 1 ¶¶ 812, 894; RPHB 2 ¶¶ 652, 657).

1713. It is unclear whether Claimants maintain their demand for lost opportunity to make a success of the LPG Plant. The termination of the construction of the LPG Plant, however, cannot be associated with any actions by the Republic. Mr. Broscaru received orders to stop construction due to TNG's cash constraints. Mr. Broscaru's



allegation that non-Kazakh workers were unable to renew their work permits in November/December 2008 (which is implausible and is denied) was first adopted in Claimants' First Post-Hearing Brief. Mr. Broscaru provided no substantiation of the claim that the work permits issue affected construction, nor was there a statement of what work could not be done since workers were unavailable. (RPHB 2 ¶¶ 688 – 697, 105 – 111).

1714. Claimants suggested that the Republic interfered by causing TNG's liquidity position to deteriorate, but this is incorrect – those developments related to the Credit Suisse loan and, as confirmed by the PwC Due Diligence Report, were outside of the Republic's influence. Similarly, since there was no harassment campaign, Claimants' assertion that the harassment campaigned made their decision to suspend construction be appropriate is empty. In testimony, it became obvious that either Anatolie Stati or Mr. Broscaru lied about the decision to "*postpone*" or to abandon the LPG Plant project. (RPHB 1 ¶ 115; RPBH 2 ¶¶ 108 - 109).

1715. At the Hearing on Quantum and in the Third Report, GCA explained the steps and costs that would be necessary to commission the LPG Plant, would amount to approximately USD 100 million, USD 32 million of which due to Claimants' "*mothballing*" the equipment. Claimants have not provided a credible cost estimate, and the Hearing on Quantum demonstrated that Ryder Scott had no expertise on capital expenditure. FTI, on the other hand, could not justify their assumption that USD 24.1 million would be necessary – FTI relied completely on information provided by TNG. In particular, FTI relied on the "*Tristan Oil Interim Financial Report For the Nine Months Ended September 30, 2008*", a document that was drafted in November 2008 but discusses the forward looking costs until June 2008. FTI errs in its costs assumptions:

> *921 FTI's approach becomes totally striking when looking at what happened to FTI's valuation in their second report. In their second report FTI applied a fair market value of the LPG Plant based on the allegation that TNG had not spent a total of USD 208.5 million as alleged in the first report but a total of USD 245 million. Applying the same logic that FTI had applied in their first report, they should have reassessed the costs for the completion of the plant and arrived at costs of USD 232.6 million as envisaged by TNG for the construction of the plant minus the USD 245 million actually spent to construct about 80-90% of the plant.*
>
> *922 Therefore, FTI in their second report should not have simply stuck to USD 24.1 million to finalise the construction as they did. Instead, FTI should have assumed that TNG would not need to pay USD 24.1 million to construct but rather TNG should be paid USD 12.4 million to construct the plant. This is obviously bogus, yet apparently good enough for FTI. (RPHB 1 ¶¶ 909 – 922, partially quoted; RPHB 2 ¶¶ 688 - 697).*

1716. Claimants sought to mislead potential investors, as well as the Tribunal, about the economic viability of the LPG Plant. Once Claimants' costs and recovery estimates were proven incorrect, Claimants sought to hide this information from the Tribunal and potential investors. At the Hearing, Mr. Lungu admitted to lying in ¶ 27 of his first witness statement. He also conceded that the construction of the LPG Plant had been a story of constant delay, exceeded budgets, and changing

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 63 of 102

assumptions about the availability of gas. This is obvious when considering the original business plan, which envisaged costs of USD 105 million – not USD 281 million. It assumed commission in the third quarter of 2007 – not in 2009, as written by Mr. Lungu. Mr. Lungu conceded these points in oral testimony. Claimants' statements that the document was a draft with no value were contradicted by the witness. The vendor due diligence report indicated that there had been no delays in construction of the LPG Plant and that it would be completed on time and within budget. In cross-examination, Mr. Lungu explained this to mean that there was no delay, so long as the plan was adjusted from time to time, so as to become the original plan. (RPHB 1 ¶¶ 813 – 846, 864 – 869; RPHB 2 ¶¶ 657 – 659). In the rebuttal, Claimants did not rebut any of the evidence regarding the failure of the LPG Plant. (RPHB 2 ¶¶ 653, 657 – 659).

1717. Claimants have withheld from the Tribunal that they actually assumed – in the PwC Due Diligence Report, that up to USD 60 million would be needed to complete the LPG Plant. In that Claimants have exceeded the projected costs for the LPG Plant by 250%, the estimate of USD 20 – 60 million could be adjusted to USD 40 - 150 million, which is in line with GCA's estimate. (RPHB 1 ¶¶ 925 – 928). Their assumption of costs of USD 60 million, the amount applied by RBS, given TNG's history of exceeding estimated costs, makes Respondent's assumption of USD 100 million more likely. Claimants have not provided proof or a position of costs for the completion of the LPG Plant. (RPHB 2 ¶ 688 – 692).

1718. Mr. Lungu tried to hide the LPG Plant cost explosion from the Tribunal and from its own auditors. FTI attempted to explain that the price increase for the LPG Plant could be explained by reference to Kazakh inflation, but this argument is seriously flawed. First, it is inconsistent with FTI's use of the 1.6% US inflation rate to forecast the costs of the LPG Plant construction. It disregards the initial USD 105 million estimate that was provide in the Ascom LPG Business Plan, allegedly prepared by Vitol. FTI disregards the ultimate of USD 281 provided in Mr. Broscaru's witness statement – oddly, because that estimate was provided to Mr. Broscaru by Mr. Lungu. In any event, the PwC Due Diligence Indicates that the USD 281 cost estimate was correct. As a result, FTI assumes a cost increase of 53.5% (from USD 151.5 million to USD 232.6 million) rather than in increase cannot be explained to the inflation development of 67.9% in 2007 and 2008 cited by FTI. (RPHB 2 ¶¶ 453 – 458).

1719. Deloitte has estimated that the unfinished LPG Plant has a negative enterprise value of **USD – 89.9 million**. They arrive at this using the DCF method, which RBS, Deloitte, and bidders in Project Zenith had no problem applying. Deloitte considered projections of future sales revenues and expenses, including the USD 100 million expenditure required to complete the LPG Plant. Deloitte derived the net cash flow over several years as the balance of revenues and expenses projected and arrived at a negative number. This indicates that alternate uses of the LPG Plant need to be considered. (R-III ¶¶ 145 – 147, 152; RPHB 1 ¶ 812; RPHB 2 ¶ 652, 672).

1720. Deloitte GmbH assumed a start-up date of 2011, which is consistent with the RBS valuation. Nevertheless, even taking account the processing of gas from June 2009 – June 2011, the value of the plant would still be negative. FTI's valuation of the



LPG Plant would only be 7% lower if gas production between 14 October 2008 and 21 July 2010 was disregarded. (RPHB 2 ¶¶ 698 – 699).

1721. Deloitte reaches this negative value because the LPG Plant could only be operated for four years, due to TNG's limited supply of gas. After four years, capacity utilization will fall below the minimum level required for technical operation and negative cash flows will be generated. Claimants were aware of this as of 2009 when, although the business plan was created under the assumption of the availability of 40.2 - 62.3 $Bcm^3$ to run the plan, the Miller Lents Report informed them that they only had 9.5 $Bcm^3$ – enough for 4 years. Claimants' valuation expert, Mr. Rosen, already conceded that the LPG Plant could not operate economically on the gas from Tolkyn and Borankol, alone. It would only be economically viable if Claimants' assumed gas volumes from the Contract 302 properties and gas from third parties would be available. No effort, however, was undertaken to test the viability of these assumptions or to see whether it would be possible to extract suitable gas from the CAC Pipeline. While KazTurkMunai was mentioned as a company that could deliver gas to the LPG Plant, no information about the amount of gas was provided. Ignoring the fact that the GCOS for Contract 302 was 5% and that they forwent exploring it, Claimants treated it as 100% for the purposes of assuming that it would supply gas to the LPG Plant. As for the so-called geographically proximate gas sources, Claimants and Mr. Broscaru failed to identify any specifically. All that Claimants have is the RBS Report that assumed gas from third parties could be processed in the Plant. (R-III ¶¶ 141 – 142, 146, 148, 165, 173; RPHB 1 ¶ 870 – 882; RPHB 2 ¶ 657, 700 – 705).

1722. Regarding gas from the Contract 302 property, even if Claimants had not foregone the opportunity to explore it, the Deloitte report confirms a maximum GCOS of 5% for the Interoil Reef, which combined with the ECOS, makes it commercially unexploitable. At the Hearing on Quantum, Claimants failed to show how the LPG Plant could be operated economically, but demonstrated why construction was a failure, in that it was supervised by incompetent personnel. Although he made several statements regarding the economic parameters of the project, in cross-examination, it became clear that Mr. Broscaru had no idea about the economics of an LPG Plant. He used numbers, like the alleged value of USD 450 million that he obtained from Mr. Lungu who, obviously, did not want to be scrutinized on these numbers and did not put them in his own statement. He was unable to support his other written statements during cross. He conceded that the Munaibay discovery could only support the plant for 6 months, and that the Tabyl discovery could only support it for three days and a few hours. It was obvious that the reference to Munaibay could not have included the Interoil Reef. Finally, the only possible conclusion that the Tribunal could draw from Mr. Broscaru's testimony that "*[his] action focused only on technical surveillance of the work and the facility*" is that the Tribunal should disregard every detail that does not only concern the technical details of the LPG Plant. Finally, the Tribunal should also note that Claimants' witness statements from Anatolie Stati and Mr. Broscaru regarding the LPG Plant are inconsistent. (RPHB 1 ¶¶ 847 – 863).

1723. The Claimants' witnesses, Mr. Lungu, Mr. Broscaru, and FTI provided incredible testimony regarding the LPG Plant. Mr. Lungu's testimony regarding the LPG Plant misrepresented all basic parameters of that project. Everyone except FTI agreed that Claimants should never have taken the decision to build the LPG Plant.



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 65 of 102



19 – 20. Mr. Broscaru, in cross examination, could not answer even basic questions about his witness statement entitled "*Design and economic rationale of the LPG Plant*" because he had received all of his information from Mr. Lungu and had simply written that into his statement. Apparently, Claimants sought to insulate Mr. Lungu from cross-examination regarding the financial aspects of the LPG Plant. FTI calculated that the assumed value of the LPG Plant of USD 450 million was overstated by up to USD 443 million. Corrected, and based on the assumptions set out in Mr. Broscaru's witness statement, FTI should have arrived at a negative value for the LPG Plant. (RPHB 2 ¶¶ 19 – 20, 26 – 28).

1724. With respect to the processing of gas volumes from the Borankol and Tolkyn fields, Claimants' valuation scenario concerning the LPG Plant is to determine the book value of the LPG Plant. Yet, Claimants instead apply a "*book value*" which is identical to the "*investment value*" – namely, the total capital invested in the LPG Plant. A hypothetical buyer will not be interested in how much cash was invested in the business, but only in the cash he or she would get out of the business in the future. Further, the "*investment value*" ignores developments after investment, such as inflation, deflation, and currency developments. Scholars have also confirmed that the investment value does not reflect its FMV, even for business valuation experts. Thus, it is not suitable as an indication for FMV in a treaty arbitration, either. (R-III ¶¶ 179 – 186). The investment value (USD 245) is irrelevant and, indeed, the investment value and the FMV are utterly disproportionate to each other. The investment itself was a black hole for Claimants' investments and, in the end, Claimants invested USD 245 million for the unfinished LPG Plant. The LPG Plant would have costs USD 269 – USD 345 million to finish – grossly higher than the USD 105 which they originally estimated. (R-III ¶¶ 174 – 178).

1725. The alleged USD 208.5 "*book value*" of the LPG Plant – defined as the investment value less accumulated depreciation – is, likewise, irrelevant. This method is not used for determining a FMV and scholars agree that it has no relationship to market values or to asset values. Rather, "*book value*" was created for accounting or tax evaluations. The vast majority of arbitral tribunals regard book value as an inappropriate basis for the calculation of compensation. (R-III ¶¶ 143 – 144, 187 – 195). In any event, Claimants failed to demonstrate that the necessary conditions – including a secured gas supply, an established market for LPG products, and a market for remaining dry gas – existed for the book value of the LPG Plant to be a valid proxy for FMV. (R-I ¶¶ 53.16 – 53.17).

1726. Claimants use the book value method because the FMV method leads to a lower compensation. (R-III ¶ 195). With adjustments like the "*impairment test*" or the "*mark-to-market process*", as required by international accounting standards, a book value can be made to reflect the actual FMV. FTI ignored the impairment of the LPG Plant mentioned in the Tristan Oil Annual Report for 2009, which would adjust the book value negatively. (R-III ¶¶ 196 – 199; RPHB 2 ¶ 706).

1727. The RBS valuation report conducted as part of the KMG EP Due Diligence in September 2009 and which Claimants consider to have been prepared by "*world class experts*" proves that Claimants' valuation of the LPG Plant, and other assets, are bogus. The RBS report estimates the value of the LPG Plant to be between USD 47 – 86 million, with a median of 67 million that is dependent on availability



of unsubstantiated third-party gas. This valuation disproves Claimants' exaggerated claims for the LPG Plant. The values that RBS attributed to the LPG Plant, even under the assumption that third party gas would be available, are nowhere near the costs that TNG incurred for constructing the plant, and are even further from FTI's "*prospective valuation*." (RPHB 1 ¶¶ 825 – 828, 986 – 987, 989).

1728. RBS, even when taking third party gas into account, only arrives at a value of negative USD 4 million to USD 67 million for the LPG Plant. This supports Respondent's view that Claimants' decision to build the LPG plant was fatally wrong. Applying RBS values, Claimants invested USD 245 million to create an asset that, in the best case scenario, had a value of only USD 67 million. They lose between USD 245 million and USD 178 million as a result of building the plant. (RPHB 2 ¶¶ 829 – 832).

1729. In the Hearing on Quantum, Mr. Rosen conceded that Claimants were seeking USD 87,077,000 in overcompensation for the FMV of the LPG Plant. Leaving aside his other errors, Mr. Rosen stated that FMV of the LPG Plant should be determined on a cost basis, and was, therefore, worth USD 245 million – not the USD 329 million that Claimants claim. Apparently, Claimants increase their FMV by adding an "*uplift*" for the processing of gas from the Contract No. 302 properties, which they assume will be available. This "*uplift*" factor is, in effect, double counted since it is already taken into consideration in the FMV. Respondent denies that an uplift would have occurred absent delays in construction. Due to the lack of demand for gas at the time, the Tolkyn production was severely curtailed and there would, as a result, have only been a very limited gas supply for the LPG Plant. (RPHB 1 ¶¶ 883 – 891; RPHB 2 ¶¶ 110).

1730. FTI's Mr. Rosen confirmed at the Hearing 2 that he determined the value of the LPG Plant on the cost basis because his assumption (based on Mr. Broscaru's witness statement and the assumption that Contract 302 and third party gas from the CAC Pipeline) that it was a going concern. The LPG Plant, however, was never a going concern – it would have been uncommercial to complete and operate the plant. All of Mr. Rosen's assumptions are unproven. There was no guarantee of gas from the Contract 302 properties. There was no guarantee of gas from the CAC Pipeline. Claimants, finally, have produced no evidence of their parties to supply gas to the LPG Plant. (RPHB 2 ¶¶ 678 – 687).

1731. Also, the cost basis is not an appropriate violation approach because prospective buyers consider the future income potential of an asset. The cost approach is not a suitable way to arrive at a FMV, even if the asset is not yet generating cash flows because it relies on the untenable assumption that the LPG Plant would be profitable. On top of that, the approach is illogical, awarding different damages based on the amount actually spent. Even the KMG EP, in Project Zenith, agreed that for the formation of a binding offer, the DCF method – and not a cost-based approach – would need to be applied. (RPHB 1 ¶¶ 897 – 906; RPHB 2 ¶¶ 672 - 677).

1732. Claimant's' "*prospective valuation*" of the LPG Plant has been tainted by their unrisked valuation of the Contract 302 properties. Thus, even Mr. Rosen's cost basis approach is based on a 2% chance that significant amounts of gas could be



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 69 of 102

economically produced from the supposed Interoil Reef. Any investor, however, would take the risks and the GCOS into account. (RPHB 1 ¶¶ 892 – 893).

1733. Mr. Broscaru makes the unsubstantiated assertion that the net present value of the LPG Plant would reach USD 450 million. FTI then used this number in their calculation to arrive on a value of USD 7 – 92 million, depending on the run time of the plant. Claimants instructed Mr. Broscaru to refuse to answer questions regarding these assumption. In any event, FTI admits that this is a gross miscalculation of at least USD 358 million, 38 pages later. In any event, even on their own assumptions, TNG should have arrived at a net present value of the LPG Plant of USD 51.2 million, even assuming a 20-year run-time. FTI made this error by understating the discount rate, disregarding administrative costs, and failing to consider tax – not to mention failing to consider the availability of third party gas. FTI desperately tries to assist Claimants by conveniently disregarding documents (Ascom LPG Business Plan) and by applying irrelevant US inflation (thereby driving capital expenditure down and increasing the prospective valuation) rather than Kazakh inflation. (RPHB 2 ¶¶ 661 – 671).

1734. Deloitte identified two additional methodological errors by FTI. These include that FTI used the same discount rate for the "*prospective*" valuation of the LPG Plant as for their other valuations, which was incorrect since FTI applied different tax rates to the LPG Plant. The applicable discount rate was, thus, understated by 1% and the prospective value of the LPG Plant was, therefore, overstated by USD 20.3 million. Costs were also underestimated and this resulted in an overstatement of value by USD 3.3 million. (RPHB 1 ¶ 580).

1735. Claimants' claim for a portion of the "*prospective value*" of the LPG Plant is bound to fail because it neglects even known certainties and risks (like the expiration of Contract. 302). While they based their initial prospective value on the assumption that gas from third parties and Contract 302 would be processed, they now provide the prospective value to compensation for the situation that the Interoil Reef may have been discovered and found to produce appropriate volumes of gas. FTI has adjusted their "*prospective value*" from USD 408 million, to USD 329 million, to USD 308.7. The absurdity of FTI's calculation is obvious when compared to the USD 67 million valuation that RBS arrived at – under the assumption that the LPG Plant would work at full capacity for 20 years. (RPHB 2 ¶¶ 707 – 713).

1736. Regarding the third party assessments of KPM and TNG's value, including the LPG Plant, the representative of KNOC, Total E&P, KMG EP and OMV have confirmed that their bids did not represent FMV. Instead, they were made to gain access to the data room and further investigation would be needed before arriving at FMV. As confirmed by Mr. Suleymenov's testimony at the Hearing on Quantum, their bids were made based on limited information and they were often made for strategic and not valuation driven reasons. (RPHB 1 ¶¶ 974 – 977). At Hearing on Quantum, Mr. Chagnoux explained that his bid on behalf of Total E&P was artificially high because Claimants' investment bank had conditioned access to the data room on higher bids. Mr. Chagnoux confirmed that he believed the LPG Plant to have a negative value. (RPHB 1 ¶¶ 200 – 202; 978 – 979).

1737. The Republic never had any intention of completing construction in the LPG Plant. Preservation work was initiated beginning in March 2009. Costs associated with



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 68 of 102

this preservation would need to be deducted from the USD 245 million allegedly spent until that time. As to the operation of the LPG Plant, since Claimants abandoned the plant, KMT (which subsequently assumed the trust management responsibilities of KMG NC) has been forced to employ guards to protect the Plant and re-employ minimal staff to avoid social tension. Claimants have given no explanation as to why the application at Exhibit C-583 in any way indicates that KMG is making plans for the future of the LPG Plant. (R-II ¶ 714; C-583 is undated). Turning to the "*List of Investment projects of the Mangistauskoi Region, which are being supervised in 2011…*", the content of that is not attributable to the Respondent as it did not arrange for such a document to be published. At best, it should be considered as mere promotional material. Contrary to Claimants' contention, the Republic is not training experts to run the LPG Plant. (R-III ¶¶ 203 – 207; RPHB 1 ¶¶ 895 – 896).

1738. Another relevant aspect, ignored by Claimants, is the Vitol Joint Venture Agreement. Under that Agreement, Claimants would not have kept 100% of the future profits allegedly arising from the operation of the unfinished LPG Plant. Respondent does not have the specifics of the Vitol Joint Venture, but many aspects were provided through Mr. Lungu's testimony. Respondent puts Claimants to proof that the proceeds they could have earned operating the LPG Plant under the Joint Venture Agreement are more than half of whichever asset value they are claiming. (R-III ¶¶ 208 – 211; RPHB 1 ¶¶ 907 – 908; RPHB 2 ¶ 729).

1739. The Republic denies Claimants' contentions regarding alleged decision by Vitol to retract its investment in the LPG Plant, which in any event would not be attributable to the Republic. (RPHB 2 ¶ 111).

1740. Vitol is also a factor in the costs analysis. Claimants have admitted that of the USD 245 million in damages for investment costs that they demand, at least USD 66 million were contributed by Vitol. TNG's alleged investment costs are, at best, therefore, USD 179 million. (RPHB 2 ¶¶ 279 – 270).

1741. At the most, the Tribunal could award not more than 50% of any of the assumed value to Claimants, if it were to assume liability and if it were to assume a positive value for the LPG Plant. Claimants, however, are not entitled to damages because the unfinished LPG Plant was never taken from Claimants – they abandoned it. The value of the LPG Plant is negative. What Claimants seek is compensation for the loss of the Plant. It is undisputed that Vitol, Ascom, TNG, and Terra Raf entered into a Joint Operating Agreement on 27 June 2006, pursuant to which the bulk of the profit of the LPG Plant would be generated by the Joint Venture Company – not TNG. Ascom would only own 50% of the shares in the company. If they now demand compensation for an alleged treaty breach, at most they can demand 50% of the asset value, since neither TNG nor Ascom would have received more than 50% of the profits of the LPG Plant. Accordingly, depending on how the Tribunal issues its award, whether based on the "*prospective value*", the "*cost basis valuation*", the RBS valuation, that amount would need to be halved. Anything more would be unjust enrichment. Claimants have failed to produce evidence of any "*obligations toward Vitol*" that would change this. (RPHB 2 ¶¶ 656, 714 – 728).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1742. Since the LPG Plant has a negative enterprise value, Claimants are, at best, entitled to the salvage value of its components. Prof. Marboe and the World Bank agree that it is recommended to use "*the salvage value for the valuation of companies which do not have a proven record of profitability*." Likewise, this measure has been used by arbitral tribunals if they consider the business to lack future prospects, due to an expropriation (*Eastman Kodak v. Iran*) or due to social and economic changes in wake of the Iranian Revolution (*Sola Tiles v. Iran*). The tribunal in *Sedco v. IMICO* used the salvage value to determine FMV in wake on an expropriation. *Tavakoli v. Iran* also considered valuation based on the liquidation value. Claimants' expert FTI even acknowledged that salvage value must be used when it stated "*we assume that the plant would not continue to operate under negative cash flow conditions and would be sold to another producer of natural gas*." (R-III ¶¶ 153 – 162; see also R-I ¶¶ 53.18 – 53.20).

### 3. The Tribunal

1743. First, in addition to an application of the Tribunal's considerations in the chapter on causation above in this Award, the Tribunal has no doubt that Respondent's actions found above to be in breach of the ECT, in particular were a cause for the delay and then discontinuance of Claimants' completion of the LPG Plant.

1744. In fact, President Nazarbayev himself confirmed this in his Instruction of 19 November 2009 (C-23, attached to Blagovest letter). And, this was further confirmed by MEMR in its Report on its inspections of January 2010 (C-599, Minutes of Inspection of TNG, January 25 – February 5, 2010, at 23).

1745. The Tribunal is not persuaded by Respondent's and their experts' conclusion that the LPG Plant is a failed project and must be considered to have a negative value and no damages at all can be claimed by Claimants. If that were so, Respondent would not have been ready to invest further expenses in the completion of the Plant, after Respondent had taken control of the Plant. However, there were obviously plans to complete it. Publicly available information indicates that Respondent was in fact preparing to open the LPG Plant in 2012. In a document entitled "*List of Investment projects of the Mangistauskoi Region, which are being supervised in 2011*," there is a specific reference to the LPG Plant under "*Regional Projects*" The project is identified as having a cost of USD 315 million (47 billion Tenge) and it was expected to start up in the first half of 2012 with a capacity of 7 mcm of gas per day (2nd FTI Report § 7.7 and fns. 138 and 139). Respondent's argument that it cannot be identified with this document is not persuasive. The LPG Plant was also listed on website of Kazakhstan's Embassy in Israel under the caption "*Large Investment Projects in Kazakhstan through 2012*" with the same project costs (FTI 2nd Report § 7.7 and fn140).

1746. Regarding the value of damages caused by Respondent's action, the Tribunal has taken note of the various extensive arguments submitted by the Parties relying on their respective experts' reports. However, the Tribunal considers that it does not have to evaluate these reports and the very different results they reach. In the view of the Tribunal, the relatively best source for the valuation in the period of the valuation date accepted by the Tribunal are the contemporaneous bids that were made for the LPG Plant by third parties after Claimants' efforts to sell the LPG Plant, both before and after October 14, 2008. Prospective purchasers bid on the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Plant, not as scrap but obviously as prospectively operational. This is reflected in the undisputed indicative offers made by interested buyers in 2008, which valued the LPG Plant at USD 150 million on average. In this context, the Tribunal is not persuaded by Respondent's argument that these offers did not reflect the anticipated price bidders were ready to pay, but were only strategic offers to gain access to the data room. In this context, the Tribunal attributes a limited evidentiary value to the testimony of Respondent's witnesses from KNOC and Total E&P, since these foreign companies remain active investors in Kazakhstan and, thus, for understandable reasons, have an interest to maintain a good relationship with the government of that country.

1747. On the other hand, the Tribunal considers it to be of particular relevance that an offer was made for the LPG Plant by state-owned KMG at that time for **USD 199 million**. The Tribunal considers that to be the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation for the LPG Plant during the relevant period of the valuation date accepted by the Tribunal, the Tribunal.

1748. Therefore, this is the amount of damages the Tribunal accepts in this context.

## L.VII. The Parties' Arguments Concerning the Tristan Notes

### 1. Arguments by Claimants

1749. Claimants explain the Tristan note structure:

> *571. The notes that were issued by Tristan Oil Ltd., [...] provided a portion of the capital for construction and operation of the KPM and TNG oil and gas assets [...] Tristan issued notes with a face value of US$ 531.1 million, which matured on January 1, 2012. While Tristan is the nominal principal obligor on those notes, Tristan is a special purpose entity that was created solely for the purpose of raising capital through the note issuance to fund KPM and TNG. It has no operating assets with which to repay the notes. The expectation of all parties involved, including the Tristan noteholders, was that KPM and TNG oil and gas operations would provide the funds to repay the principal and interest on the Tristan notes. Consequently, KPM and TNG guaranteed repayment of all obligations under the Tristan notes. (C-II ¶ 571).*

1750. Tristan has an integral relationship to Claimants, TNG, and KPM – and this relationship was recognized in Respondent's Statement of Defense. Any disposition of Claimants' interest in, or assets of, KPM and TNG requires arrangements to satisfy the Tristan note principal and interest held outside of, but guaranteed by, TNG and KPM. This was reflected in indicative offers received in Project Zenith. (C-III ¶¶ 91 – 92, partially quoted; *see also* C-II ¶¶ 572 - 575).

1751. That Claimants are allowed to claim for damages to the noteholders if Claimants are liable to the noteholders for such alleged damages is permissible was conceded by Respondent in its Rejoinder on Quantum. The only issue before the Tribunal is

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

whether there is a causal link between the State's illegal conduct and the companies' inability to satisfy their debts. (CPHB 1 ¶¶ 602 – 606).

1752. In large part, Respondent's arguments with regard to the Tristan debt rest on the assumption that the Tristan debt is true third-party debt for which Claimants have no liability. This is incorrect, as "*Claimants: (1) have always been obligated to repay the Tristan noteholders from the proceeds of any award; (2) further reinforced that obligation through the Sharing Agreement, and (3) have repeatedly, consistently, and unequivocally undertaken before this Tribunal (and for the avoidance of doubt, hereby commit and undertake yet again) to repay the Tristan noteholders from the proceeds of any award under the procedures set out in the Sharing Agreement*." Ascom and Terra Raf are also liable to repay the Noteholders, pursuant to Section 6 of the Pledge Agreement. (CPHB 1 ¶¶ 617 – 620, partially quoted; CPHB 2 ¶ 321).

1753. Claimants explain that they are responsible for the Tristan debt, which was issued with a fact value of USD 531.1 million and matured on 1 January 2012. Under the note structure, Tristan issued the notes. Tristan is an SPV with no assets that loaned the proceeds of those notes to KPM and TNG. The expectation was that KPM and TNG would repay the notes from their profits. KPM and TNG guaranteed repayment of all obligations under the notes. Ascom and Terra Raf also pledged 100% of their Participation Interests in KPM and TNG (all of their equity in the companies) and the money to be received with respect to those interests as security for the Tristan notes. Contrary to Respondent's reading of the Pledge Agreements, the claims would not be limited to the value of the shares pledged. Section 6(b) of the Pledge Agreements broadly applies to any and all dividend and other payment or distributions of any kind relating to the Participatory Interest, without restriction. This language is broad enough to include the benefit of payments Claimants receive as compensation for Kazakhstan's mistreatment of expropriation of the companies. (CPHB 1 ¶¶ 621 – 625).

1754. Claimants also point out that "*as Squire Sanders noted in its legal due diligence review for KMG E&P, transfer of the participation interests pursuant to the Pledge Agreements is subject to the State's preemptive right under Article 71 of the Subsoil Law. That raises the prospect that Ascom and Terra Raf may be unable to deliver their Participation Interests in KPM and TNG to the noteholders, and instead would receive compensation from Kazakhstan for those shares upon the State's exercise of its preemptive right. It thus stands to reason that a key purpose of the provision in Section 6(b) was to ensure that the noteholders received the benefit of any payments from Kazakhstan in respect of Ascom and Terra Raf's Participation Interests in KPM and TNG. That is exactly what an award in this arbitration would represent, albeit as the result of violations of the ECT rather than through the legitimate exercise of Kazakhstan's preemptive right.*" (CPHB 1 ¶ 625).

1755. Claimants reject Respondent's interpretation of the Pledge Agreement as it would require Claimants to press unreasonable, aggressive arguments in an effort to "stiff" creditors to mitigate losses and reduce damages that Respondent must pay. (CPHB 1 ¶ 626).

1756. The Sharing Agreement is only relevant insofar as it confirms Claimants' intention to perform their contractual obligations to the Tristan noteholders – it has no bearing



on the calculation of damages due as of the valuation date. The Pledge Agreements always obligated Ascom and Terra Raf to turn over any proceeds of this arbitration to the Tristan noteholders. The Sharing Agreement simply reorders the respective priorities of the Claimants and the Participating Noteholders so that Claimants will share in any proceeds of this arbitration. On 14 February 2013, the Sharing Agreement was accepted by 99.8% of the noteholders, effectively amending the notes and related security arrangements for all noteholders. The Sharing Agreement did not create or materially alter Claimants' obligations regarding the Tristan debt. Instead, it was a renegotiation of Claimants' existing obligations and not a voluntary assumption of new liability. The suggestion that Claimants voluntarily assume liability to share 70% of any award when they had no obligation to do so is absurd. The Sharing Agreement does not materially reduce Claimants' basic liability under the Tristan debt, either. It is a private matter between Claimants and the noteholders and has no bearing on Kazakhstan at all. (CPHB 1 ¶¶ 626 – 630, 632; CPHB 2 ¶¶ 325 - 327).

1757. The fundamental purpose and effect of the Sharing Agreement is to provide both sides with a clear set of agreed rights and obligations for the event that the award in this arbitration is less than requested by Claimants. In such event, Claimants will share in the award and, if noteholders have recovered at least 70% of the amount outstanding, will receive a total release in 2016. In exchange, the noteholders will ensure that Claimants are incentivized to pursue collection of any award (which may not be in Claimants' interest if Claimants are not to receive proceeds), and also to receive a right to approve any settlement. The Sharing Agreement changes the order of allocation of any award proceeds between Claimants and noteholders, until the noteholders are fully repaid. (CPHB 1 ¶¶ 631, 636).

1758. Claimants explain how, against the background of the Sharing Agreement, awarding equity would unjustly enrich Respondent at Claimants' expense.

> *[...] if the assets of KPM and TNG that Kazakhstan seized had a fair market value of US $1 billion and the outstanding Tristan debt were US $531 million, the value of Claimants' equity in KPM and TNG would be US $469 million. If the Tribunal awarded just the equity value (US $469 million in this example), that entire amount would go to satisfy Ascom and Terra Raf's liability to the Tristan noteholders under Section 6 of the Pledge Agreements (without considering the impact of the Sharing Agreement, which is discussed below). In other words, an award of equity value would in fact give Claimants less than the full value of their equity because some (and perhaps all) of the award would go to satisfy liabilities to third parties that, but for Kazakhstan's violations, would have been satisfied with the profits of KPM and TNG. In contrast, an award of the enterprise value (US $1 billion in this illustrative example) would satisfy Ascom and Terra Raf's liability to the Tristan noteholders, leaving Claimants with the value of their equity interest in KPM and TNG (US $469 million in the example), free and clear of all debts. Thus, an award of enterprise value is the proper measure of compensation to put Claimants in the position they would have occupied but for Kazakhstan's violations.*
>
> *[...] an award of equity value would unjustly enrich Kazakhstan by allowing it to obtain assets unencumbered by liabilities for a fraction of their value. In the same example, for instance, an award of equity value*

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 73 of 102

*would allow Kazakhstan to obtain assets worth US $1 billion while paying only US $469 million to Claimants. Claimants' subsequent payment to the noteholders under the Pledge Agreements would effectively eliminate any claims that the noteholders may have against the assets of KPM and TNG, or against Kazakhstan itself (to the extent that the noteholders have any claims directly against Kazakhstan, which to date they have never asserted). Thus, an award of equity value in this illustrative example would allow Kazakhstan to keep assets worth US $1 billion while paying only US $469 million, and without facing any further liabilities. In contrast, an award of the enterprise value (US $1 billion in this example) would require Kazakhstan to pay the full value of the assets its expropriated, and would not subject Kazakhstan to any further liability (because any claims of the noteholders would be extinguished by Claimants' performance of their obligations under the Pledge Agreements). (CPHB 1 ¶¶ 634 – 635).*

## 2. Arguments by Respondent

1759. The principal on the Tristan notes must be deducted from the asset values calculated by Claimants' expert since, due to the peculiarities of the securing mechanisms, Claimants can practically no longer be liable for and cannot claim the noteholders' alleged damage. Under Claimants' own case, due to the alleged breach of the ECT, Claimants are practically not liable to the noteholders. In any event, Claimants do not have standing to claim the noteholders' alleged damage. Further, the shares must be worthless, due to Respondent's allegedly illegal action. Thus, any claim by noteholders could not create a loss for Claimants. Assuming that there was a breach of the ECT, this would amount to a financial gain, advantageous to Claimants. Thus, it does not matter that Respondent did not assume or perform KPM's and TNG's guarantee obligations, as Claimants allege. (R-III ¶¶ 379 – 383, 389 – 390; RPHB 2 ¶¶ 923, 945).

1760. Even if Claimants were not freed from liability, their claim for recovery of the Tristan note principal would fail. Under the *Chorzów* principles, which the Parties agree apply here and according to which "*compensation must wipe out the effect of the allegedly expropriatory state action*" (looking to the situation that would have existed absent the alleged breach of international law), Respondent is not liable for the Tristan note principal. With or without breach, Tristan Oil would have been liable for the Tristan note principal and Claimants would have been acting as guarantors for the debt. There was no worsening of the situation through the Respondent's allegedly illegal actions. Claimants must have been aware of this, only including a claim for principal in passing in their Reply Memorial on Quantum. (R-III ¶¶ 392 – 393; RPHB 1 ¶ 1068; RPHB 2 ¶¶ 940 – 941).

1761. Under the *Chorzów* principles, compensation is to be achieved according to the FMV of an asset. The FMV takes the asset's debt into account. After all, a willing buyer would never simply pay the enterprise value, since debt infringes on the buyer's ability to realize profits from the purchase. The so-called Sharing Agreement entered into on 17 December 2012 foresees that proceeds from an award in this arbitration will be shared between Claimants and the noteholders in a roughly 30% / 70% split. Claimants effectively admit that the equity and not the enterprise value is the appropriate tool to value the assets when they base their claim on the idea that the Sharing Agreement acts as a security for the debt.

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 74 of 162

However, they essential argue that, if the debt is not added, the amount awarded would immediately go to the noteholders, leaving nothing for Claimants. Notably, Claimants did not try to gross up their claim by adding the debt that they continue to owe for taxes, which would also be deduced from an award. Investment practice strongly disfavors tax gross-ups, even when those are based the argument that an award in their favor would be subject to higher levels of taxation than the profits they would have been expected to make without interference. (RPHB 1 ¶¶ 1056, 1068 – 1074, 1097 – 1098).

1762. It should also be noted that Claimants do not allege that they are liable for noteholder debt no matter what. Instead, they state that that liability would only come into existence with an award. Then, they attempt to gross up the award by adding this debt to their damages. Claimants were never liable for the debt. It is not the case that Claimants had been supposed to hold the cash flows created by KPM and TNG and would then forward those to noteholders. Instead, repayment would go through Tristan, who is not a Claimant. (RPHB 1 ¶ 1078; RPHB 2 ¶¶ 941 – 942). Section 6 of the Terra Raf and Ascom Pledge Agreements create no liability for those Claimants toward noteholders. It only refers to dividends and distributions and, therefore, excludes payments from a hypothetical award. (RPHB 2 ¶¶ 945 – 948).

1763. The claim for recovery for interest and penalties must also fail. It has not been shown that any Tristan noteholder has brought a claim against Claimants for the note interest, penalties, or principal or that Claimants have paid anything to noteholders. Absent this proven damage, the claim must be dismissed. None of the Claimants remain liable for any of the noteholder debt, not even as a result of the Pledge Agreements. Under Section 6 of Ascom's and Terra Raf's Pledge Agreements, KPM and TNG only pledged to pay shareholders as part of a payout of equity. Payments by third parties (such as a payment of an award), are not dividends or distributions, meaning that, therefore, the noteholders are not entitled to them. (R-III ¶ 394; R-I ¶¶ 57.1 – 57.3; RPHB 1 ¶¶ 1075 - 1076).

1764. In any event, any liability based on the Sharing Agreement is Claimants and not Respondent's. Respondent cannot be held liable for Claimants' unilateral action. (RPHB 1 ¶¶ 1077, 1188).

1765. In response to Claimants' allegation that, if the Tribunal does not award the Tristan rate, it should include interest that has accrued on the Tristan notes since 14 October 2008, Respondent states that this allegation does not hold water. Even without a breach of international law, Tristan Oil would have been liable for the note principal, and for the interest payments. Further, Respondent cannot be liable for interest between 14 October 2008 and 1 July 2010, since Tristan only failed to make interest payments starting on 1 July 2010. Finally, since Claimants have never specified the amount of interest that accrued during the time period, Claimants' claims related to Tristan Note Interest should be rejected in their entirety. (RPHB 2 ¶¶ 1014 – 1018).

1766. Even if the Claimants had suffered damage, a debt gross up is contrary to international law and arbitral practice (as demonstrated in *Impregilo v. Pakistan* and Dr. Stern's dissent in the *Occidental* case, and *PSEG v. Turkey*) and would enable the noteholders to circumvent jurisdictional and substantive hurdles of their



own potential claims. There is no reason to assume that the Parties to the ECT intended that individuals could attach themselves onto another individual's claim to circumvent the ECT's requirements. Like in *Impregilo* where the investor was not permitted to present claims of his joint venture partner, here, too, the Claimants should not be permitted to present this claim on behalf of noteholders. Claimants attempt to vest this Tribunal with jurisdiction to decide on the interpretation of the pledge agreements, even though they have agreed in those pledges that an ICC tribunal will have jurisdiction. Respondent's general offer to arbitrate contained in the ECT does not entail an offer to have matters regarding the interpretation of private contracts be arbitrated as well. In addition, if Claimants are successful, it will have the practical consequence that Claimants serve for the noteholders to realize the noteholders' claim. (RPHB 1 ¶ 1085 – 87; RPHB 2 ¶¶ 934 – 939, 944, 950).

1767. Even if there were such a claim from a noteholder, the Claimants have failed to prove causation, namely that the alleged action of Respondent prevented timely payments to be made on the Tristan notes. Instead, any damages suffered could have been caused by a variety of reasons, including the economic crisis, falling oil prices, poor business decisions, or the Guarantors' debt overload. (R-III ¶¶ 395 – 396; R-II ¶ 723).

### 3. The Tribunal

1768. The Tribunal recalls its considerations above in this Award in the chapter on the treatment of debts. In particular, it recalls the following conclusions regarding the Tristan Notes:

1769. Regarding the Tristan Notes as the by far largest debt, Respondent expressly agreed in its Rejoinder on Quantum (R-III ¶ 383) that, insofar as Claimants remain responsible for the Tristan debt, enterprise value is the correct measure of damages. While Respondent's statement at the May 2013 hearing may perhaps be understood as changing that position, it did not attempt to reconcile its prior statement and the Tribunal still agrees with Respondent's earlier position.

1770. Based on the information before it, the Tribunal concludes that Ascom and Terra Raf are still liable to repay the noteholders pursuant to Section 6 of the Pledge Agreement. That provision expressly includes in the payments to be made to the pledgeholder "*other payment or distribution of any kind.*" The Tribunal sees no reason why this general language should be restricted to payments of KPM and TNG alone as Respondent has argued at the May 2013 hearing (Tr. day 1, pp. 246 and 247). Quite to the contrary, if Claimants, in the present arbitration, would not claim the value of the Tristan debts, they might be held liable for not pursuing the interests of the pledgeholders.

1771. Having again examined the Parties' specific arguments summarized above regarding the Tristan Notes, the Tribunal confirms that these conclusions need not be changed and that no reduction of any damages found is due to the Tristan Notes.

## L.VIII. Moral Damages

### 1. Arguments by Claimants

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1772. Respondent has conceded that "*moral damages are permissible*" and that they may be awarded in the following exceptional cases in investment treaty arbitrations, such as where:

– *the State's actions imply physical threat, illegal detention or other analogous situations in which the ill-treatment contravenes the norms according to which civilized nations are expected to act;*

– *the State's actions cause a deterioration of health, stress, anxiety, other mental suffering such as humiliation, shame and degradation, or loss of reputation, credit and social position; and*

– *both cause and effect are grave or substantial. (C-II ¶ 617, quoting from R-I ¶ 55.2).*

1773. The events here, including the prosecution and imprisonment of KPM's in-country manager, were exactly those which would warrant the Tribunal, in its discretion, to award moral damages, **in an amount of at least 10% of the total compensatory damages awarded to Claimants**. (C-III ¶¶ 95 - 97). While it is an exceptional remedy, this is a case where such an award is appropriate:

*96. There are only a modest number of investment treaty cases on record in which a state's mistreatment of an investor was so severe, intentional, and multi-faceted as Kazakhstan's treatment of Claimants in this dispute. There are even fewer cases on record in which that treatment was admittedly ordered by the Respondent's Head of State and carried out by dozens of state organs and instrumentalities over a period of years. Claimants have demonstrated that the mistreatment they suffered, while exceptional by investment treaty standards, was part of a "playbook" that Kazakhstan's rulers have employed in similar contexts. Claimants have also shown that awards of moral damages are becoming increasingly accepted in investment treaty practice, as demonstrated by the recent award in Desert Line v. Yemen. (C-III ¶ 96).*

1774. Respondent's idea that a moral damages awarded requires a precise repeat of the events at issue in *Desert Line* is nonsense. Rather, Respondent has identified a framework within which moral damages can be awarded, and Respondent's conduct fits that framework. Here, there was an actual, illegal imprisonment and a threat that all of Claimants' general managers would meet the same fate. By July 2010, Respondent had succeeded in driving Claimants' key personnel from Kazakhstan out of fear of imprisonment. It was the stress and anxiety to *Desert Line's* executives and the injury to *Desert Line's* credit, reputation, and prestige that caused that Tribunal to award moral damages. The parallels between that case and this one are striking. The fact that Mr. Cornegruta escaped from the false imprisonment does not absolve Respondent of liability. This Tribunal has discretion in awarding a figure that it finds most appropriate to compensate for the harm suffered by Claimants, and is not limited to the USD 1 million awarded in *Desert Line*. (C-II ¶¶ 619 – 623; C-I ¶¶ 453 – 464; CPHB 1 ¶ 659).

1775. Claimants remind the Tribunal that the claim for moral damage is a claim for Claimants' moral suffering. Claimants suffered through years of Kazakhstan's misconduct. Respondent has not disputed Mr. Cojin's testimony that KPM and



TNG's managers worked in Kazakhstan under threats and harassment, while being targeted, monitored, and followed by the Financial Police, before they were finally forced to flee the country. Kazakhstan has a responsibility to compensate Claimants for the stress, anxiety, mental anguish, and reputational harm that it imposed on them through its intimidation tactics, false criminal accusations, defamation, and the ultimate seizure of its assets. (CPHB 1 ¶¶ 658 – 663). The Tribunal should exercise its discretion to award substantial moral damages to Claimants. (CPHB 2 ¶ 395).

## 2. Arguments by Respondent

1776. Claimants' claim for moral damages is disingenuous, at best. First, that the Republic's actions with respect to Mr. Cornegruta and the search of KPM's and TNG's premises on 6 May 2009 were legal and proper. This bars any claim for moral damages. The allegation that it was an aggressive and intimidating raid is based only on Mr. Stejar's statements, which lacked credibility and contradicts the testimony of Mr. Rakhimov. Second, Claimants have not suffered any moral harm that would warrant an award for moral damages in the amount claimed. (R-III ¶¶ 499 – 501; RPHB 2 ¶¶ 1025 – 1031).

1777. While the Parties agree that moral damages may be awarded in exceptional circumstances, these do not exist in the present case. The *Lemire* requirements have not been fulfilled. Further, this case is distinguishable from the *Desert Line* case, where armed tribes attacked the investor's premises and the Yemeni military put the premises under siege. The 6 May 2009 search, as demonstrated in unchallenged witness testimony, was conducted by "*unarmed officers [who] took [the] utmost care to carry out the search without creating more disturbance than necessary*." Accordingly, it cannot serve as the basis for a claim of moral damages. (R-III ¶¶ 502 – 507; R-I ¶ 55.2).

1778. An award of moral damages would only benefit Anatolie and Gabriel Stati – neither of whom has suffered any more harm in the present case. The person who allegedly suffered moral harms, Mr. Cornegruta, is apparently not on speaking terms with Anatolie. Stati and has not been involved in this arbitration. Moral damages to Messrs. Stati, as a result of Mr. Cornegruta's imprisonment, have not been proven. (R-III ¶¶ 508 – 513, 1028).

1779. Claimants have since toned down their initial demands for compensation, the previous calculation of which was extraordinary and reminiscent of US-style punitive damages. Claimants are claimed moral damages of at least **USD 272.87 million** (10% of the claimed USD 2,728.2 million). Not only has no investment award for moral damages ever come close to such an amount, there is no case that points to moral damages being calculated as a percentage of the compensatory damages award. Indeed – there is no necessary connection between the tangible and moral harm allegedly suffered (i.e. "*there is no connection between the financial losses following from the assets being taken into trust management and the alleged stress and anxiety supposedly following from the May 2009 search or the imprisonment of Mr. Cornegruta.*"). (R-III ¶¶ 514 – 518; R-I ¶¶ 55.2 – 55.3, RPHB 2 ¶ 1031).



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 79 of 102

1780. Insofar as these damages are disguised punitive damages, there is no basis in international law for such an award, and tribunals have firmly rejected claims for punitive damages in the past. (R-III ¶ 518).

### 3. The Tribunal

1781. The Parties agree that a claim for moral damages can only be justified in investment treaty cases in very exceptional circumstances.

1782. Therefore, Claimants, having the burden of proof, must meet a very high threshold to show a liability for moral damages.

1783. Indeed, as Claimants concede, there are only a modest number of investment treaty cases on record in which a state's mistreatment of an investor was so severe, intentional, and multi-faceted as Kazakhstan's treatment of Claimants in this dispute. There are even fewer cases on record in which that treatment was admittedly ordered by the Respondent's Head of State and carried out by dozens of state organs and instrumentalities over a period of years.

1784. Obviously, the present case is distinguishable from the *Desert Line* case, where armed tribes attacked the investor's premises and the Yemeni military put the premises under siege. The Tribunal further agrees with Respondent that the *Lemire* requirements have not been fulfilled.

1785. While, above in this Award in the chapter on liability, the Tribunal has identified a timeline of conduct by Respondent that it considers must be viewed together and concluded to be a breach of its ECT obligation to provide FET, the Tribunal did not accept Claimants' characterization that this was a "*playbook*" by Respondent. And even if this were so, this would not by itself mean that moral damages are due.

1786. Without having to go into detail on the general question whether and under which exceptional circumstances awarding moral damages might be justified in investment treaty cases, the Tribunal concludes that Claimants have not fulfilled their burden of proof for facts that would make it necessary to examine that question any further.

## L.IX. Tax Claims

### 1. Arguments by Claimants

1787. Claimants do not address tax issues in their Reply Memorial on Quantum and state that tax assessments are not at issue in the Quantum Hearing. Claimants do not seek to recover any tax payments as damages. They protest the inclusion of the Balco expert report and argue that the tax assessments, which were part of the harassment campaign, were part of the liability phase. Neither the Deloitte report, the Balco report nor the Rahimgaliev witness statement relies on the validity of the tax assessments for valuation calculations. The report and the second Rahimgaliev witness statement are an improper backdoor attempt to get liability issues heard in this quantum hearing. (C. ltr. to Tribunal 10.12.12). Claimants' arguments concerning the validity of the tax assessments are found at C-II ¶¶ 233 – 236.



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 79 of 102

1788. Respondent's tax claim is part of Respondent's campaign to harass Claimants. Deducting it from amounts owed to Claimants would be contrary to international law. In any event, USD 62 million (USD 81.2 million in CPHB 2) is not the actual amount that Claimants would owe if Kazakhstan's legal argument were correct. Respondent has not presented evidence of the actual amount that the net tax debt would be, even if the legal argument were correct. (CPHB 1 ¶¶ 648 – 649; CPHB 2 ¶ 133).

1789. The USD 62 million tax claim was manufactured and, as Scott Horten and PwC confirm, is part of a well-recognized strategy that Kazakhstan uses to pursue investors who have fallen out of favor with the President. The claim is incorrect on the merits. Claimants were entitled to use the rate contained in Art. 20, and that contained in Art. 23 Tax Law contradicts the clear wording of the Subsoil Use Contracts. Even if Respondent were correct, however, the back taxes owed would be less than USD 62 million, as Prof. Balco agreed, since the issue would not be whether, but when, the drilling expenses could be deducted. Kazakh domestic courts resolved this issue in favor of Claimants, making this issue largely academic. (CPHB 1 ¶¶ 238 – 261).

1790. Procedurally, Respondent has raised this issue as a counterclaim. It has done this belatedly and solely to reduce the compensation owed to Claimants. If the Tribunal nevertheless decides to consider this claim, Kazakhstan bears the burden of proving that the position is correct (that taxes are lawfully owed), as well as the amount of taxes owed. Kazakhstan has proven neither. The corporate income tax dispute is a cash-flow issue that exclusively concerns the timing of deductions for drilling expenses – even if Kazakhstan's arguments were correct, Claimants would likely only owe a small fraction of the sum claimed because KPM and TNG could deduct all or nearly all of the drilling expenses, by today. (CPHB 2 ¶¶ 133 – 134).

## 2. Arguments by Respondent

1791. In part, Claimants' damages are based on an alleged improper assessment of taxes and duties against them. Tax issues have a significant impact on valuation. Respondent maintains that the assessments were made in accordance with the law and that Respondent is not liable for them. Respondent also applied the appropriate amortization rate. This is supported by Mr. Balco's expert report. (R-III ¶¶ 366 – 373).

1792. Any claim will need to be set off against the amount which Claimants owe Respondent due to their failure to correctly declare their taxable income. (R. ltr. to Tribunal 13.12.12). For KPM from the period 1 January 2005 to 31 December 2007, an additional 3,257,446.00 thousand Tenga was payable. For TNG for the same period, TNG is liable to pay an additional 5,906,027.2 thousand Tenga. (R-III ¶ 368).

1793. In its First Post Hearing Brief, Respondent calculated that KPM and TNG are liable for more than USD 81.2 million in tax debt, including penalties. Claimants admit that corporate back taxes were never paid by KPM or TNG. Claimants' dispute relates to the question of which amortization rate to apply to the companies' exploration expenses for 2005 – 2007. The tax committee applied the rate set out in Art. 23 of the applicable tax law (25%), but Claimants allege that the 100% rate

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

set out in Art. 20 should have been applied. Squire Sanders and PwC have confirmed that Respondent has applied the correct 25% rate. This was also confirmed in the expert report by Prof. Balco, which was not contested by Claimants. (RPHB 1 ¶¶ 1057 – 1061; RPHB 2 ¶¶ 963 – 965).

1794. Claimants wrongfully focused on the types of activities (own-account construction), rather than the purpose of the activities, which is the focus of the Kazakh Tax Code and the Subsoil Use Agreements. The Tax Code offers different depreciation rates on expenses relating to exploration and extraction, and those related to processing, including own-account construction and acquisition of equipment. This distinction is clear when viewing the grammatical interpretation in the Russian version of Art. 20 and 23 of the Tax Code. The language of the Tax Code and the Subsoil Use Agreements is consistent. None of Claimants' expenses referred to production (processing of new materials). Thus, Prof. Balco concluded that KPM's and TNG's expenditures were for exploration. The applicable tax depreciation rate for exploration under Art. 23 is 25%. (RPHB 2 ¶¶ 966 – 974).

1795. Respondent explained that the Tax Committee's February 2009 assessment did not constitute a reversal of a prior tax assessment, and this was confirmed by Mr. Rahimgaliev in the Hearing on Quantum, as well as in Claimants' own vendor due diligence of August 2008 which sets out the periods and types of taxes for which audits had been conducted. (RPHB 1 ¶¶ 1061 – 1062).

1796. Kazakh courts have confirmed the correctness of the Tax Committee's position. A clear look at the decision of the Supreme Court of 3 November 2010 overruling the decisions of the appellate and cassation courts demonstrates that Claimants' position was not vindicated, but rather was groundless. The Supreme Court's decision was reasoned and based on the proper construction of the relevant legislative position. The Court did not change a previous position, as alleged by Prof. Maggs. The decisions cited by Prof. Maggs (10 June 2008 and 11 February 2009) addressed only the point in time at which a taxpayer may claim an incentive. Neither case concerned whether the 100% depreciation rate could be applied to own-account construction expenditures. (RPHB 2 ¶¶ 975 – 982).

1797. Even if the relevant wells were fixed assets, KPM and TNG would have had to have applied different depreciation rates. Claimants failed to identify which wells were put into operation to either the Tax Committee or to the Kazakh courts. Claimants have also not provided a calculation for the impact of higher deductions in later years. They have the burden to prove these deductions. Accordingly, the amount of at least USD 81.32 million of tax debt, as calculated by PwC, is unchallenged. (RPHB 2 ¶¶ 983 – 987).

### 3. The Tribunal

1798. The Tribunal recalls its timeline, above in this Award in the chapter on liabilty of Respondent's conduct, through which it found Respondent to be a breach of its ECT obligation for FET. It further recalls its conclusions, above in this Award in the chapter on the relevance of debts, insofar as they deal with tax assessments.

1799. There is no doubt that an investor must pay taxes in the host country, as assessed by law. However, there is also no doubt that these tax assessments may be

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

abusively made in breach of the ECT. All of the alleged back tax obligations were created by and during Respondent's conduct after October 2008 which this Tribunal found above to be a string of measures in breach of the ECT. Indeed, the tax assessments were a major part of this string of measures. As the disputed tax assessments were all retro-active assessments for back taxes which had not been assessed during the earlier period before October 2008 when relations between Respondent and the Claimants were still normal, Respondent has the burden of proof that these disputed back tax assessments after October 2008 were not part of this breaching conduct.

1800. KPM and TNG prevailed in their court challenges of the tax assessments. The only appellate decision in favour of Respondent was issued after the seizure of the investment in a review process alleged by Claimants to have been conducted without their knowledge or participation. The decision of the Supreme Court of 3 November 2010 overruling the decisions of the appellate and cassation courts does not appear to the Tribunal to show a fair and independent assessment. Rather, the Tribunal tends to agree with Prof. Maggs that the Court changed a previous position compared to previous decisions cited by Prof. Maggs (10 June 2008 and 11 February 2009). This decision of the Supreme Court, in the judgment of the present Tribunal, is not sufficient to fulfill Respondent's burden of proof that the assessment would have been the same without Respondent's breaching conduct.

1801. Therefore, the Tribunal concludes that no deduction for Claimants' tax obligations are to be made from the damages found to be due for the ECT breaches.

## L.X. Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV)

### 1. Arguments by Claimants

1802. The best evidence of the value of Claimants' investments as of 21 July 2010 is the actual, then-pending Cliffson transaction – a deal that would have closed, but for Respondent's interference. Claimants ask the Tribunal to contrast the low values that Respondent has assigned to the assets with the terms of the arm's length Cliffson transaction, which was pending at the time of the seizure. Claimants and Cliffson executed a comprehensive SPA on 13 February 2010 for all of Claimants' equity interests in TNG, KPM, and Tristan to Cliffson for USD 267 million, and Cliffson agreed to assume all of those companies' liabilities, totaling more than USD 655 million. This places the entire value of the deal for Claimants' distressed assets at approximately **USD 924 million**. All that stood in the way of this deal was (1) Respondent's waiver of pre-emptive rights and (2) MOG approval. In response to Claimants' applications and document submissions, Respondent initiated a final inspection blitz that led to the expropriation of Claimants' assets on 22 July 2010. (C-III ¶¶ 5 – 7; CPHB 1 ¶¶ 586, 596; CPHB 2 ¶ 371).

1803. The Cliffson transaction remained pending until at least 7 June 2010 when Cliffson sent a letter to the MOG stating that it no longer wished to pursue the transaction. Cliffson did not inform Claimants of this letter, and Claimants only saw this letter when it was produced in this arbitration. (CPHB 1 ¶ 587).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

1804. Respondent has argued that Claimants' story regarding the Cliffson negotiations is not credible. Anatolie Stati never stated that the first time Claimants had discussions with the principals was in February 2010. The Cliffson transaction was an arm's length transaction. Discussions began in November 2009 with an Assaubayev company called Grand Petroleum, which had access to the Project Zenith data room. The only unusual aspect to the negotiations with the Assaubayevs was the preliminary MOU that the Aussabayevs executed in November 2009 that included a preliminary price commitment, which was later changed. The MOU shows that the Aussabayevs were insiders who knew the value of the assets that they were purchasing and that they knew that they were purchasing them at a distressed value. (CPHB 1 ¶¶ 588 – 592; CPHB 2 ¶¶ 371 – 373).

1805. The fact that the transaction did not close was a result of Respondent's action. Respondent's representation that Cliffson failed to take steps necessary to close the deal mischaracterizes the evidence. Anatolie Stati's letter of 9 March 2010 is no indication that Cliffson had backed away from its obligations. The letter focused on Cliffson's failure to perform its obligations in the Side Letter agreement to bring a halt to the governmental harassment of KPM and TNG. Cliffson repeatedly told Claimants that they were working on obtaining government approval. The fact that government approval never came is a good indication that the government's harassment campaign was very effective and that Cliffson was unsuccessful in ending it. It is not evidence that it had re-evaluated its decision to purchase. In any event, as FTI explained, absent a reason to believe that Cliffson's re-evaluation of value was the reason that the transaction did not close, the agreed price is a reliable indicator of the value of the non-consummated transaction. (CPHB 1 ¶¶ 593 – 596; CPHB 2 ¶ 373).

1806. Claimants' letter to Cliffson of 15 June 2010 reflects concern that Cliffson backed out of the transaction to because Kazakh authorities were planning to auction KPM's assets to satisfy the criminal penalty. (CPHB 2 ¶ 375).

1807. In previous submissions, Claimants have argued that the bids received in Project Zenith are a fair indication of the FMV of the properties, absent the State's harassment and indirect expropriation measures. (C-I ¶ 73). Regarding Project Zenith, Claimants only argue that the offers received there serve as evidence that the right to export / the future receipt of international export prices was reasonably contemplated in 2008. (C-III ¶ 10). Claimants maintain that Respondent has not shown that the bids received in that project were in any way inaccurate or incomplete. (C-II ¶ 399).

### 2. Arguments by Respondent

1808. Rather than provide a valuation for the correct date of 21 July 2010, Claimants instead refer to the Cliffson SPA of 13 February 2010 and allege that this SPA reflects a value of USD 924 million for KPM and TNG. (R-III ¶ 397). Respondent's summary is best taken from its own words.

(a) *The Cliffson SPA is no reflection of the fair market value. From its contents and from the little time the parties took to enter into it, the Cliffson SPA appears as a highly atypical agreement that raises doubts as*



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 83 of 102

*to whether there were serious negotiations regarding the value of the companies and as to whether a proper due diligence was conducted. It can hence not be described as an arm's length transaction.*

(b) *In fact, from documentary evidence and the statements made by Claimants' witnesses at the hearing, it appears that soon after the conclusion of the SPA, Cliffson itself realized that it had agreed to an inappropriately high purchase price. As a result, Cliffson tried to wiggle its way out of the SPA later on.*

(c) *In any event, the Cliffson SPA does not contain information sufficient in order to allow a proper assessment of its value. (R-III ¶ 398).*

1809. Regarding the argument that Cliffson had insufficient time to properly assess KPM's and TNG's value, the evidence shows that not more than 13 days of due diligence and negotiations were conducted before the SPA was concluded, and Cliffson was granted no guarantees or company-specific information. This is atypical for a contract valued at nearly USD 1 billion – in fact, Total E&P and KMG EP needed substantially more time - six months and four months, respectively - to come to their decision. The brevity and vagueness of the SPA also reveals a lack of proper due diligence. For example, major contracts and licenses, pending lawsuits, major debt, and other characteristics of the companies that could be important for their value are either not mentioned at all or are not set out in any detail. This lack of specificity is atypical of a proper M&A transaction. Thus, the Cliffson SPA was not likely an arm's length transaction. Even if the Cliffson deal was a fair market transaction at arm's length, however, the Cliffson SPA does not provide sufficient information for a proper valuation. Any calculation reached by FTI cannot be accepted as the actual value of the Cliffson SPA. (R-III ¶¶ 397 – 405, 412; RPHB 1 ¶¶ 997, 1003). In addition, at the Hearing on Quantum, Claimants introduced a new background to the Cliffson transaction, one that would have it date back to September 2009. This is not credible. (RPHB 2 ¶ 8).

1810. That the Cliffson transaction cannot be seen as an arm's length transaction, conducted on a reasonable information basis is supported by Mr. Lungu's testimony when he stated that Cliffson simply relied on information from the government and looked at KMG EP due diligence documents to assess the potential of the deal, without ever assessing Claimants' data room. The only part of that testimony that Mr. Lungu could know for sure was the proposition that the Assaubayev family did not assess the data room – everything else was speculation or invention. If the Assaubayev family had seen the KMG EP due diligence, they would not have made an offer based on a supposed enterprise value of USD 1.15 billion as alleged at the Hearing on Quantum, or USD 920 million as initially alleged. The Assaubayevs cannot have had access to the KMG EP valuation. (RPHB 1 ¶¶ 1116 – 1020; RPHB 2 ¶¶ 865 – 866).

1811. Cliffson also attempted to hinder the closing of the SPA, concluding that it had agreed to pay more than FMV. Under the SPA, two important closing conditions needed to occur: (1) the Republic had to waive its pre-emptive rights and (2) the MOG had to approve the transfer. Although Cliffson was responsible for making the necessary applications, Claimants made them – and then only 2 months after the SPA was concluded. Cliffson's lack of cooperation was apparent and recognized by Claimants. Cliffson did not provide the information required by the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

MOG for approval or by the Republic for the waiver, possibly in breach of section 4.2 of the SPA, as recognized by Anatolie Stati. Cliffson effectively hindered the deal from being closed. (R-III ¶¶ 406 – 411).

1812. Claimants continue to withhold details of the circumstances of the Cliffson deal. At the Hearing on Quantum, both Anatolie Stati and Mr. Lungu were caught in lies regarding when they had made contact with the family behind Cliffson. They revealed strange details about changes in the purchase price that, if true, should have been revealed at an earlier time because they would have supported a higher damages price, supported negative inferences with regard to KMG EP's valuation. The fact that these details were first elaborated in direct testimony shows that Claimants wished to avoid serious cross examination on those matters. Mr. Calancea was also evasive about questions. The story that has been given continues not to add up. In addition to Anatolie Stati and Mr. Lungu contradicting each other, Mr. Lungu's statement also contradicted prior documents on the record. His statement that Claimants were unaware of Cliffson's desire to "*back out*" is contradicted by the evidence and is inconsistent with Claimants' Opening Presentation at the Hearing on Quantum. (RPHB 1 ¶¶ 116, 998 – 1015; RPHB 2 ¶ 865 – 867).

1813. Claimants now argue that the Cliffson transaction actually began in November 2009 with a MOU between Grand Petroleum and Claimants. No documentation has been provided of this, despite the fact that Claimants would have been entitled to submit so much under PO-10. (RPHB 2 ¶ 869).

1814. Respondent has demonstrated that the Republic's authorities cooperated with Claimants in the process of obtaining state consent and the waiver of preemptive rights. Claimants, however, failed to provide sufficient documentation to the authorities – documents which remain outstanding to date. At the Hearing on Quantum, Mr. Lungu's testimony demonstrated Claimants' admission that it was ultimately Cliffson that backed out of the transaction, due to their own financial troubles. This makes their previous arguments about state impediments irrelevant. (RPHB 1 ¶¶ 998 – 1001; RPHB 2 ¶ 870).

1815. Claimants' arguments that are based on Anatolie Stati's letter of 9 March 2010 misstate that evidence. That letter shows that Claimants were accusing Cliffson of not taking the necessary steps for the implementation of the SPA, meaning that Cliffson was backing out of the transaction. It indicated a lack of progress on both the implementation of the SPA and the Side Letter. (RPHB 2 ¶ 871).

1816. Respondent denies that Cliffson was obliged to work back channels to obtain governmental approval for the sale. Not only would such an obligation be unenforceable, there is no documentation of such an obligation. (RPHB 2 ¶ 872).

1817. Finally, Respondent objects to Claimants' suggestion that the Tribunal should exercise its discretion to increase the amount of damages based on the Cliffson SPA. There is no basis in international law for a discretionary increase of damages. (RPHB 2 ¶ 873).

1818. Regarding basing a recovery on an alleged FMV, as Respondent reiterated in the Hearing, the non-binding offers made during the first phase of Project Zenith also



cannot serve as an indication of Claimants' properties' FMV as of October 2008. The representatives of KNOC, Total E&P, KMG EP, and OMV have confirmed that their bids did not represent FMV. Instead, as confirmed by Mr. Chagnoux's, Mr. Seitinger's, and Dr. Kim's testimony, they were made to gain access to the data room and were pushed up by Renaissance Capital. As confirmed by Mr. Suleymenov's testimony at the Hearing on Quantum, their bids were made based on limited information and they were often made for strategic and not valuation driven reasons. Dr. Kim of KNOC and Mr. Seitinger of OMV confirmed at the Hearing on Quantum that their bids were the result of optimistically high gas price assumptions, which were driven by the Renaissance Capital Information Memorandum and its reference to the KazAzot Tripartite Agreement. The Information Memorandum admittedly "*does not purport to be comprehensive*" and "*has not been independently verified*" and is based in part on unaudited financial statement. Thus, it is not a basis to produce a FMV. Even representatives of KNOC, Total E&P, and KMG EP testified that the information was not sufficient to make a FMV decision. In any event, bidders made bids for reasons that had nothing to do with FMV. As Claimants admitted at the Hearing on Quantum, bidders bid for strategic reasons, often after pressure from Renaissance Capital, in order to gain access to the data room. The only bids that somewhat matched the indicative value were those for Tolkyn, but those were inflated by unverified assumptions. In FTI's Additional Expert Report of 25 January 2013, Claimants claim an unrealistic FMV for USD 197 million for Borankol and USD 497 million for Tolkyn. (R-II ¶¶ 447 – 450; RPHB 1 ¶¶ 974 – 986; RPHB 2 ¶¶ 803 – 806).

1819. Indicative offers were also based on the reserves estimates in the 2008 Miller & Lents Report, which were massively overstated as compared to the estimates provided by Ryder Scott and GCA in this arbitration. "*The 2008 Miller & Lents Report provided for 2P reserves of 141.3 mmboe. Even Ryder Scott estimated 2P reserves of only 97.7 mmboe as of their valuation date. Assuming the highly overstated Ryder Scott estimates were correct, the indicative bids would thus still be based on a reserves report which overstated 2P reserves by further 40%. Importantly, the overstatement related primarily to the estimates for valuable liquids production from the Tolkyn field.*" (RPHB 2 ¶ 806).

1820. The offers made based on the Information Memorandum and the vendor due diligence ranged from USD 0.55 billion to USD 1.55 billion. Regarding the individual assets the ranges were as follows:

*(a) USD 90 mn and USD 248 mn for Borankol;*

*(b) USD 367 mn and USD 1.067 bn for Tolkyn; and*

*(c) USD 70 and USD 280 for the LPG Plant. (R-III ¶ 451).*

1821. These ranges show that they do not reflect a FMV. At most, the indicative offers could show that Claimants have overvalued their assets. Other circumstances include Claimants' ramping up of production in 2008, the 2008 spike in oil prices, and the non-conclusion of the Tripartite Agreement. (R-III ¶¶ 455 – 471; RPHB 1 ¶¶ 974 – 975). Claimants rely on favorable bids and ignore circumstances that show that these bids were above FMV, as well as lower bids. (R-III ¶¶ 452 – 454). The bids do not support Claimants' and FTI's valuation suggestions. This has not been addressed by Claimants. (RPHB 2 ¶¶ 807 – 808).



1822. Finally, even though these bids were exaggerated, Claimants' claims in this arbitration exceed what the bidders were offering. This is particularly true for the LPG Plant – the highest bid for that was USD 280 million, and Claimants have increased their estimate of the prospective value of that plant to USD 408.3 million. For the Borankol field, Claimants claim USD 231.5 million, even though the average of the indicative bids was USD 151.8. (R-III ¶¶ 472 – 475).

1823. At the Hearing on Quantum and as explained above, Claimants put forward arguments about alternative valuation methods, including the comparable transactions analysis, the comparable companies' analysis, and the "*implied value based on market value of debt*" methods. Each of these strongly supports Deloitte's and disproves FTI's findings. (RPHB 1 ¶ 1021).

### 3. The Tribunal

1824. The Tribunal has taken note of the extensive submissions by the Parties on their different views regarding the relevance of the Cliffson SPA and other factors in establishing FMV.

1825. However, the Tribunal's considerations in the Award, above, rely for the valuation of the damages due on factual and legal grounds that are independent from the above issues disputed between the Parties. Therefore, while the Tribunal understands why the Parties have been involved in that dispute, it need not enter into an examination of these issues for its decisions on the claims raised.

## L.XI.    Credibility of the Parties' Experts

### 1.    Arguments by Claimants

1826. GCA and Deloitte's work is utterly unreliable. GCA's work is largely a "*black box*" - it failed to produce the working papers underlying its conclusions because none exist. Instead, the documents and data that GCA produced were nearly all created by someone else – either Ryder Scott or State institutes. Only 20 megabytes of the 20,810 megabytes of data produced were GCA's own independent work product. The scant original work produced for Contract 302 – the Prospect Risk Assessment and the Crystal Ball documents – are deficient. Respondent's argument that they are more thorough and revealing than Ryder Scott's demonstrate a profound ignorance of the prospect evaluation process, which involves seismic research and interpretation. If GCA had provided the maps upon which they relied, one could give them credit for documentation of the work, but their supporting documentation consisted of a piece of paper with number and no explanation of their origin. (CPHB 2 ¶¶ 330 – 331, 338 – 339).

1827. Ryder Scott produced 6510 megabytes of original, independent work product. (CPHB 2 ¶ 331)

1828. The Deloitte TCF valuation was not tested by cross-examination, and Kazakhstan has explained that there was no reliance on it. Mr. Gruhn testified that the Deloitte GmbH report was completely independently prepared. There are, however, numerous differences between these two valuations, and Deloitte GmbH must explain the bases for these differences, which to date have not been explained.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 89 of 102

These include the gas price scenarios, the LPG Plant scrap value, and the value of the Contract 302 properties. Combined, these resulted in a reduction of the total calculation of the damages from USD 229 – 237 million to USD 186 million – a decrease of approximately 20%. Claimants provide the following chart to demonstrate the differences (CPHB 1 ¶¶ 505 – 512):

| Differences in NPV Between Deloitte DCF and Deloitte GmbH | | | |
|---|---|---|---|
| **Property** | **Deloitte TCF** | **Deloitte GmbH** | **Difference in Dollars** |
| Tolkyn | US $121 million | US $123.2 million | Increase US $2.2 million |
| Borankol | US $16 million | US $62.8 million | Increase US $46.8 million |
| LPG Plant | US $24 to $32 million | US $ (89.1 million) | Decrease US $113.1 to $121.1 million |
| Munaibay Oil | US $68 million | US $ (297.7 million) | Decrease US $365.7 million |
| **Total NPV** | **US $229 to $237 million** | **US $(200.8 million)** | **Decrease US $429.8 to $437.8 million** |
| **Total Deviation in NPV** | | | **US $527.8 to $535.8 million** |

## 2. Arguments by Respondent

1829. Claimants have attempted to argue that the RBS Report fully accounted for the impact of market factors, the effects of the global financial crisis, the effect of a year of additional production in KPM and TNG, the watering in the fields, the effects of additional compression costs according to GCA, and the effect of lower reserves in the Miller Lents report. This is not, however, the difference between the RBS and FTI values. Rather, those values differ in terms of asset value assumptions. None of the factors listed by Claimants' counsel depressed RBS's valuation. Claimants' depiction of the RBS values is devastating not for Respondent, but for Claimants and FTI. (RPHB 2 ¶¶ 825 – 838).

1830. Ryder Scott has proven to be a partisan instrument of Claimants, rather than independent experts. First, they were fully complicit in Claimants' procedural ambush at the Hearing on Quantum, where Claimants introduced a wholly new "*Interoil Reef*" case based on 3D seismic data introduced in Ryder Scott's direct testimony. Ryder Scott failed to put this data on the record for one and a half years

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 88 of 102

and the late introduction of this data hindered any meaningful cross examination of Ryder Scott. Ryder Scott was fully complicit in that they deliberately concealed their change in the GCOS estimate while the experts were preparing their joint issue list. They signed off on the statement that there was "*general agreement*" on the GCOS for the Contract 302 Area. Then, at the Hearing, they revealed that they had 3D data and then departed from their "*general agreement*" on the GCOS. This is not the behavior of an independent part-appointed expert, but rather proves that Ryder Scott was willing to engage in partisan maneuvers and not to act with the aim of assisting the Tribunal in finding the truth. Second, Ryder Scott demonstrated their willingness to uncritically adopt Claimants' findings as their own. At the hearing, they presented the findings in the "*Project Munaibay 3D*" presentation, prepared by Claimants, as their own findings. This was confirmed by Mr. Nowicki's testimony about drilling depths under cross-examination on 2 May 2013. It was apparent that Ryder Scott had not expected that there would be another expert report concerning the 3D interpretation or that they would be subject to cross-examination on that matter. (RPHB 2 ¶¶433 – 442).

1831. Mr. Nowicki of Ryder Scott was forced to admit to making further incorrect statements. While he stated in his CV that he had "*provided expert witness testimony for various arbitration hearings*", he admitted that the present arbitration was the first in which he gave testimony. He tried to mislead the Tribunal that the 3D structure was merely an update of the earlier 2D interpretation and not a complete disproval of the 2D structure. Ryder Scott also ignored issues that would hurt his clients' position, such as the H2S issue and the faulting in the crest of the "*Interoil Reef.*" His statements about the closure of the reef "*in my mind, I know that there has to be more to that reef. It doesn't just end where the data ends*" is contradicted by the documentation and is also telling. This proves his lack of forthrightness and independence. (RPHB 2 ¶¶ 445 – 448).

1832. Ryder Scott makes methodological errors including basing its Interoil Reef estimates on gas columns that are world record beating size, without demonstrating closure and does not take account of faulting. (RPHB 2 ¶ 449).

1833. FTI's analysis is severely flawed:

(a) *FTI incorrectly mixed the nominal and the real terms approach. FTI had to concede this severe and obvious methodological mistake and as a result, had to correct their overall value estimate by a stunning USD 379 million.*

(b) *FTI ignored known and quantified risks in their Contract No. 302 valuation, thus concealing valuable information from the Tribunal and violating good valuation practice. Deloitte GmbH have calculated that if GCoS and ECoS had been applied by FTI, the value of Contract No. 302 would be reduced in the order of 90%. FTI's "prospective valuation" is nothing but an attempt to "anchor" a high value with the Tribunal and it is not aimed at providing any useful expertise.*

(c) *FTI arbitrarily reduced its inflation rate assumptions from one report to another, with the clear intention to inflate asset values.*

(d) *FTI added almost USD 50 million to Claimants' claim by way of arbitrary rounding.*



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 89 of 102

(e) *FTI arbitrarily reduced its country risk premium, even though KPM's and TNG's financial statements explicitly mentioned country risk. FTI thus minimised their discount rate and overstated values.*

(f) *FTI created a 63.8% overstatement of their estimated market value for the Munaibay oil discovery through a series of severe calculation mistakes.*

(g) *FTI applied the same discount rate for their "prospective valuation" of the LPG Plant as for their other valuations. This is inconsistent as FTI applied different taxes to the LPG Plant.*

(h) *FTI admittedly assumed incorrect administration costs with regard to the Contract 302 Development.*

(i) *FTI underestimated the variable distribution costs for KPM, thus overstating Borankol's value by a further USD 3.3 million. The same mistake occurred in the EMV calculation for Munaibay Oil and in the "prospective valuation" of the Contract 302 Properties.*

(j) *FTI based its gas price assumptions on an unsigned draft contract which they interpreted against its wording. Thus, FTI applied prices that were never agreed upon to Contract No. 302 gas volumes that very likely do not exist.*

(k) *FTI made serious mistakes in their comparable companies and comparable transactions analysis, such as using transactions that closed prior to the financial crisis without adjusting for the effects thereof.*

(l) *FTI conducted an entirely unrecognised, illogical and empirically disproved valuation method for its "Implied Market Value of Debt" analysis. (RPHB 2 ¶ 451; see also ¶¶ 453 - 474).*

1834. Throughout these proceedings, FTI has made corrections in the amount of USD 841 to its value estimates. (RPHB 2 ¶¶ 463 – 464). This is small compared to the USD 530 million in changes that Claimants have stated make the Deloitte GmbH and the Deloitte TCF valuations "*completely unreliable*." (RPHB 2 ¶ 465).

| | Statement of Claim (million USD) | Δ | Reply on Quantum (million USD) | Δ | Hearing on Quantum (million USD) | Δ | 1st PHB (million USD) |
|---|---|---|---|---|---|---|---|
| Borankol Field | 193 | + 38.5 | 231.5 | - 33.49 | 197.01 | | 197.013 |
| Tolkyn Field | 561 | - 52.6 | 508.4 | - 29.47 | 478.93 | | 478.927 |
| LPG Plant (cost) | 208.5 | + 36.5 | 245 | | 245 | | 245 |
| Contract 302 (prospective) | 1,766 | - 186 | 1,580 | - 132 | 1,448 | + 188.9 | 1,636.9 |

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

| LPG Plant (prospective) | 344 | + 64.3 | 408.3 | - 79.2 | 329.1 | | 329.1 |
|---|---|---|---|---|---|---|---|

1835. Deloitte and GCA have provided solid work that remains intact and reliable and should be used by this Tribunal for the purposes of damage calculation. Claimants' and their experts' criticism completely ignore the explanations given and documents provided by GCA and Deloitte GmbH. Ryder Scott criticized GCA's reports, stating that they "*saw nothing in the GCA reports that led them to believe that GCA did independent geological, petrophysical or seismic analysis*" This criticism is undermined by GCA's provision of GCOS sheets, Crystal Ball Sheets, and other supporting documentation. Furthermore, there are no "*wild swings*" in the GCA reports. One need only to look at the appendices to the GCA reports to see that the amendments to the forecasts were minor, excepting the Munaibay Oil estimate. All changes were explained. GCA provides detailed cost estimates (which FTI hid from the Tribunal). Their approach in independently auditing the available data was sufficient for estimating a FMV. (RPHB 2 ¶ 443 – 444; 475 – 484).

1836. Deloitte GmbH's work was of far better quality and was more reliable than FTI's. FTI's criticisms were baseless and could often have been avoided if FTI had not ignored explanations given by Deloitte GmbH. (RPHB 2 ¶¶ 486 – 488).

1837. Regarding the differences between Deloitte GmbH and Deloitte TCF valuations, Deloitte GmbH has explained why they applied different gas pricing assumptions than did Deloitte TCF. As explained, the reason that Deloitte GmbH had not provided a scrap value was because they had not received the working files from Deloitte TCF. Claimants' criticisms regarding the valuation of Munaibay Oil are completely hypocritical. Respondent refuses any allegation of bad faith in submitting the Deloitte TCF valuation. (RPHB 2 ¶¶ 489 – 493).

### 3. The Tribunal

1838. The Tribunal has taken note of the submissions by the Parties on their different views regarding the professional methods and credibility of the experts who have submitted reports and testified in the hearings of this case.

1839. However, the Tribunal's considerations in the Award above rely, for the valuation of the damages due, on factual and legal grounds that are mostly independent from the conclusions of the Parties' experts. In those few instances where the Tribunal has relied on information or evaluation provided by the Parties' experts, the Tribunal has no hesitation to do so and such reliance is not impacted by the general doubts the Parties have expressed regarding the professional methods and credibility of the experts. Therefore, while the Tribunal understands why the Parties have raised concerns regarding the experts, the Tribunal need not enter into an examination of these issues for its decisions on the claims raised.

## L.XII. Interest

### 1. Arguments by Claimants



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 91 of 102

1840. An award of interest is appropriate to fully compensate Claimants for the injury caused by Kazakhstan. Claimants request that the Tribunal award pre-award and post-award interest, compounded annually, to the value of each of the separate elements of Claimants' damages claim from 14 October 2008 to the date that Respondent pays the Award in full. Awarding compound interest in investment treaty cases is the standard practice, since that is the norm in commercial financing transactions, making such necessary to fully compensate Claimants for the loss of opportunity to invest the funds. The rate that the Tribunal selects should accord with the general principle of "*full reparation*" for the injuries inflicted by Kazakhstan, as noted in the *LG&E v. Argentina* and the *Funnekotter v. Zimbabwe* decisions. The rate elected should be appropriate to compensate Claimants for the full period of time that they have been deprived of the value of their investments. (C-III ¶¶ 80 - 81, partially quoted; CPHB 1 ¶ 650, CPHB 2 ¶ 390).

1841. Claimants suggest applying, at minimum, a rate akin to Kazakhstan's sovereign debt or borrowing rate to the compensation owed. This would reflect the fact that, in effect, Respondent's taking has forced Claimants to loan Respondent the amount of compensation that Respondent would have paid. At maximum, the rate should be the cost for commercial loans for investments in the Kazakh market during the relevant time period (i.e., 10.5%, as exemplified in the rate for the Tristan notes during the relevant period). Setting such a range is a reasonable application of the *Chorzów* is also consistent with the approaches of other arbitral tribunals, including *Funnekotter*, *Wena Hotels*, and *Impregilo S.p.A.* (C-III ¶¶ 82, 86, 87).

1842. Respondent has conceded that interest may be appropriate and suggested the rate of 6%, based on US Treasury Bills. This approach is inappropriate because it does not reflect the rate that Claimants would have earned by investing the amount due. Claimants are not in the business of investing in US Treasury bills and instead invest in areas of the world, like Iraq and Southern Sudan, which have the potential for enormous returns. The interest should be tailored toward what an investor like Claimants could have earned by investing the funds. In *Sylvania v. Iran*, the Tribunal observed that it could be appropriate to derive an interest rate that would have been common in the investor's own country. Thus, looking to the U.S. Treasury Bill rate is inappropriate, and the rate from a commercial bank in Moldova is more appropriate. While there is a currency component to commercial interest rates, that is not a reason to apply the US Treasury Bill rate. Moldovan commercial banks accept USD, and can apply interest to those deposits, following the "*investment approach*." (CPHB 1 ¶ 655 – 657; CPHB 2 ¶ 394).

1843. Claimants would have maintained the debt and would have paid it off, but for Kazakhstan's conduct. Claimants also incurred debt that they would not have otherwise incurred, absent Kazakhstan's actions. The interest on the Laren loan was 35% until it was paid off in 2011. The Tristan note interest rate is 10.5%. 10.5%, thus, conservatively reflects Claimants' actual borrowing costs. To compensate Claimants' injury, the Tribunal should award interest at the rate of 10.5% on the entire award. Further, if the Tribunal does not award interest at least the 10.5% Tristan note rate, then it should include as a component of the award the interest that has accrued on those notes since 14 October 2008. (C-III ¶¶ 88 – 90; CPHB 1 ¶¶ 650 – 654; CPHB 2 ¶¶ 391 – 393).

### 2. Arguments by Respondent



1844. Respondent refutes Claimants' range of interest rates arguments, stating that these represent a contradiction to Claimants' reasoning for an award of interest and are contrary to arbitral practice. (R-III ¶¶ 476 – 478).

1845. Claimants have provided no evidence that the Tristan note rate would be an example of typical interest for a commercial loan in Kazakhstan at the time, which Respondent denies. Second, neither the commercial loan rate nor the sovereign debt rate plays any role in the determination of interest rates for an award. (R-III ¶¶ 479 – 480).

1846. Respondent disagrees with Claimants' contentions that the 10.5% interest rate on the Tristan notes is the borrowing cost attributable to Respondent's conduct. Claimants are not liable for any of the noteholder debt and, to the extent that they are based on the Sharing Agreement, the Republic cannot be liable for that unilateral action. There is, therefore, nothing that could justify the 10.5% interest rate. In addition, the interest rate owed pursuant to the Sharing Agreement is the rate that is set by the Tribunal in a potential Award. Thus, at least as of 1 January 2012, 10.5% is not a reflection of Claimants' borrowing costs – the Tribunal is free to determine those costs, freely. (RPHB 1 ¶¶ 1010 – 1013).

1847. The Parties agree that the claim for interest arises from the principle of "*full compensation.*" On this premise, the interest calculation must be based on what Claimants could have earned by investing the amounts due under the Award – what the Respondent did or could have done with the money in the meantime is irrelevant. (R-III ¶¶ 484 – 486). Applying the principles established in *Siemens v. Argentina*, *LG&E v. Argentina*, *Chevron v. Equator*, and *CSOB v. Slovak Republic*, Respondent states as follows:

(a) *Claimants have never stated that they wanted and less even that they would have been able to give out to anyone a loan at a rate typical "for commercial loans for investments in the Kazakh market during the relevant time period". Claimants are not a bank operating in Kazakhstan. They do not need to be "fully compensated" with regard to the interest a bank in Kazakhstan could have achieved with a commercial loan.*

(b) *Likewise, there is no reason to assume that Claimants would have invested any sum under a potential damages award into Kazakh state bonds. Given what Claimants themselves claim to have been their experience with the Kazakh government, this seems in fact very unlikely. (R-III ¶¶ 481 – 483, partially quoted).*

1848. Interest rates for typical conservative and risk-adverse investments should be applied. This is confirmed by arbitral practice and is in line with the purpose of "*full compensation.*" The use of risky investments as the baseline for a calculation is particularly inappropriate and would force the Tribunal to decrease the return rates of that investment with view to the increased risks. (R-III ¶¶ 487 – 489).

1849. Respondent submits that the low-risk re-investment rate that the Tribunal should use for guidance is the rate for 6 month US Treasury Bills. Since one of the most important factors in determining the interest rate for a debt is the currency of that debt, the rate of the national bank supervising that currency is relevant. Awarding based on typical USD interest rates for a risk-adverse investment would be in line

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

with other arbitral decisions whose only contact with the USA was that damages were awarded in USD. Further, US Treasury Bills do not yield compound interest. But, using the 6 months rate, it would be appropriate to compound interest semi-annually. The Republic clarified that it has never generally accepted the appropriateness of compound interest. Alternatively, an interbank offering rate based on various large banks would be an appropriate benchmark. The Tribunal should consider averages from multiple institutions or from countries and financial institutions with high credit standing, and should also consider the duration to maturity of the financial instrument. Using these factors, either the 6 month US Treasury Bill rate or the interbank offering rate (i.e. Libor, 6 months) would be appropriate. (R-III ¶¶ 490 – 494; RPHB 2 ¶¶ 1021 – 1024).

1850. Claimants' use of the interest rate offered by a specific Moldovan commercial bank, "*Victoriabank*" is not appropriate, as demonstrated by Deloitte. First, the interest rate offered by one specific commercial bank depends on the credit standing of that bank. Second, the circumstances of that bank have nothing to do with the situation of the present case. Third, FTI's alleged investment approach (A Moldovan Company to hold its money at one single Moldovan Bank) is doubtful, since prudent investors spread their assets. (RPHB 2 ¶¶ 1019 – 1020).

1851. No interest of any kind can be awarded for Claimants' loss of opportunity claim with respect to the Contract 302 properties. This follows from the principle that there may not be double compensation. (R-III ¶¶ 495 – 497). Respondent's argument is best taken from its own words:

> *497.    The awarding of damages for loss of opportunity – equal to the awarding of damages for lost profits – is based on the presumption that capital had been invested and that this investment would have created future profits. However, capital invested in a way to create future profits cannot create an additional amount of interest at the same time. Or in other words: the future profits claimed are already the "interest" on the investment. Additional interest is not possible have rejected the application of a commercial or a sovereign debt rate. (R-III ¶ 497).*

### 3.    The Tribunal

1852. The Parties agree that, on damages awarded, interest is due. The Tribunal agrees as well.

1853. As the Tribunal has found above that the correct date for the valuation of damages is 30 April 2009, this is also the date from which interest shall be calculated.

1854. Regarding the rate of interest, the Tribunal agrees with Respondent that according to arbitral practice in comparable cases, the rate of a conservative investment should be used. As Respondent rightly has pointed out (R-III ¶ 493) as the damages will be awarded in US-Dollars, as confirmed by previous arbitral practice, the Tribunal considers that the rates of 6 months US treasury bills over the relevant period are the appropriate rate.

1855. Regarding the question whether compound interest is due, Respondent's comments are not quite consistent. While, in its last submission (RPHB 2 ¶ 1024), Respondent denies that any compound interest should be awarded, the Tribunal



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 94 of 102

rather agrees with Respondent's comment in its Rejoinder (R-III ¶ 494) that Claimants could be expected to reinvest their interest gains every 6 months and that, therefore, interest has to be compounded semi-annually.

## L.XIII. Summary of Tribunal's Conclusions Regarding Quantum

1856. Based on the foregoing and as explained above, the Tribunal has accepted the following quantum of damages to be paid from Respondent to Claimants. First, the Tribunal has found in Claimants' favor for the following amounts:

| Section | Title | Amounts |
|---|---|---|
| L.IV. | Quantum Related to Borankol and Tolkyn Fields (Combined Asset Value) | **USD 277,800,000.00** |
| L.V. | Quantum Related to Contract 302 Properties (Claimants' Out of Pocket Investment Expenses) | **USD 31,330,000.00** |
| L.VI. | Quantum Related to the LPG Plant | **USD 199,000,000.00** |
| | **SUBTOTAL** | **USD 508,130,000.00** |

1857. The Tribunal has also found that certain debts need to be deducted from this amount:

| Section | Title | Amounts |
|---|---|---|
| L.III. | Treatment of Debt | |
| | Reachcom Facility Agreement | **USD 335,624.00** |
| | Limozen Facility Agreement | **USD 10,049,442.00** |
| | Reachcom Receivables Purchase Agreement | **USD 59,853.00** |
| | **SUBTOTAL** | **USD 10,444,899.00** |

1858. Since the only evidence that the Parties have provided regarding these debt amounts is the FTI Consulting Second Expert Report (28 May 2012), that is what the Tribunal uses to define the values of these debts.

1859. Subtracting the subtotal of debts (USD 10,444,899.00) from the subtotal of compensation due (USD 508,130,000.00), the Tribunal concludes that the net amount to be paid by Respondent to Claimants amounts to **USD 497,685,101.00**.

1860. This net amount is to be paid from Respondent to Claimants with interest, defined as the rate of 6 months US Treasury Bills from 30 April 2009 to the date of payment, compounded semi-annually.

1861. In addition to these amounts, the Tribunal decides on the arbitration costs, below.



Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 95 of 102

## M. Arbitration Costs

### M.I. Arguments by Claimants

1862. Claimants request that the Tribunal award them all costs and expenses associated with this arbitration, including attorneys' fees and expenses, experts' fees and expenses, and fees and expenses of the Tribunal and the SCC, pursuant to Art. 44 of the SCC Arbitration Rules. Article 44 embodies the "*loser pays*" rule, and, for the reasons already set out above, Claimants should prevail and Respondent should pay in this arbitration. (C-III ¶ 98; C Costs ¶¶ 2 – 3; C Costs Reply ¶¶ 2 – 3). Claimants request that the Tribunal award Claimants the entirety of their costs in this arbitration, **USD 17,950,992.87**, plus compound interest on the costs award at a reasonable rate until Respondent pays in full. Claimants further request that the Tribunal deny Respondent's request for costs. (C Costs ¶ 30; C Costs Reply ¶¶ 18 – 19).

1863. The severity of Respondent's misconduct in the events leading to this arbitration also weighs in favor of the Tribunal awarding Claimants the full costs incurred in pursuing an international legal remedy for the injuries suffered. (C Costs ¶¶ 4 – 7; C Costs Reply ¶ 3).

1864. Respondent's gross procedural misconduct greatly increased Claimants' legal fees and expenses and added nearly one year to the procedural calendar. Respondent's violation of PO-2 forced Claimants to prepare the bulk of their Reply submission without the aid of those documents. The late submission of 30,000 pages of materials resulted in significant delay and the quasi-bifurcation of the proceeding. Respondent's withholding of the four critical diligence and valuation reports for thirteen months, in violation of PO-2 and PO-3, exacerbated Claimants' expenses. Respondent held Claimants to prove and respond to positions that Respondent knew to be contradicted by crucial, contemporaneous evidence. In addition, Respondent increased costs by submitting lengthy, confusing, and contradictory written pleadings. Respondent's case materially changed throughout its submissions, requiring Claimants to submit new evidence to disprove it. Absent the untimely submission of the false contention regarding the Interoil Reef, the May 2013 Hearing would not have needed to include expert testimony on that subject. Respondent's misconduct is similar to and indeed worse than the respondent's misconduct in *ADC v. Hungary*, where the tribunal found an award of Claimants' legal expenses was justified. Here, Claimants should not be forced to bear the costs of Respondent's poor planning and its unwillingness/inability to follow the Tribunal's instructions. (C Costs ¶¶ 8 – 21; C Costs Reply ¶¶ 4 – 5).

1865. Claimants incurred **USD 17,950,992.87** in total costs, fees, and expenses in this arbitration. These costs were reasonable in light of the complexity of the case (involving 10 pleadings, 97 witness statements and expert reports, and over 1100 exhibits), its duration, and the harm that Respondent caused to Claimants' investments. The legal fees are in line with market rates and the fees of the experts are tailored to the scope and complexity of the issues addressed. The total costs comprise less than 2% of the quantum claimed. The table, found at C Costs ¶ 23, summarizes Claimants' costs. (C Costs ¶¶ 22 – 27).

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 98 of 102

| CATEGORY | AMOUNT (IN US$) |
|---|---|
| **Legal Fees & Expenses** | |
| • King & Spalding | $ 12,337,787.80 |
| *Fees Expenses* (including, *inter alia*, hearing expenses, court reporting, and interpreter fees) | $ 887,203.72 |
| • Bulboaca & Asociatii *Fees and Expenses* | $ 396,569.41 |
| **Experts' Fees & Expenses** | |
| • FTI | $ 1,514,932.87 |
| • Ryder Scott | $ 877,458.14 |
| • Professor Adnan Amkhan Bayno | $ 174,886.48 |
| • Scott Horton | $ 104,244.00 |
| • Professor Maidan Suleymenov | $ 89,437.00 |
| • Professor Aleksey Malinovskiy | $ 37,226.82 |
| • Professor Peter Maggs | $ 33,731.14 |
| **Claimants' Out-of-Pocket Costs and Expenses (including, *inter alia*, client representatives' travel, translation, and other logistical expenses)** | |
| • Translation services | $ 28,429.84 |
| • Travel expenses | $ 39,085.18 |
| • Industry and legal consultant expenses | $ 2,600.00 |
| **SCC Payments** | $ 1,425,448.95 |
| **TOTAL** | **$ 17,950,992.87** |

1866. Claimants note that the Parties have submitted very similar cost claims, with Claimants claiming USD 17,950,993 and Respondent claiming USD 17,625,116. It should be noted, however, that Claimants have already paid USD 1,425,449 of the SCC's and the Tribunal's advances, and Respondent has only paid USD 42,411. (C Costs Reply 14, stating USD 42,411 in reference to the advances. This is likely a typo, since the advance that Respondent states that it paid amounted to USD 38,991.00 and was reported on the line above the USD 42,411 amount, which was for the Hearing Center). It is clear, therefore, that if the Parties had shared the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 99 of 102

costs equally as they were supposed to, Claimants' overall costs claim would be approximately USD 1 million less than Respondent's. Each Party would have paid USD 733,930 in SCC advances, thereby reducing Claimants' claim to USD 17,259,474 and increasing Respondent's claim to USD 18,316,635. This shows not only the reasonableness of Claimants' claim, but also underscores that a significant portion of the costs claimed are directly attributable to Respondent's misconduct. (C Costs ¶¶ 28 – 29; C Costs Reply ¶ 14).

1867. Claimants, contrary to Respondent's argument, have not changed their relief sought. The Statement of Claim was clear that the claim for the Contract 302 properties was one for loss of opportunity. There is authority that the Tribunal may exercise its discretion to fix the amount of damages. This has had no effect on the costs of the proceeding. Second, there was no "*surprise*" introduction of 3D Seismic Data, nor did the production increase the costs of this proceeding. Claimants properly submitted the 3D seismic in order to rebut Respondent's argument made in December 2012 that Claimants had no intention to explore the Interoil Reef. There was no reason to submit the 3D seismic prior to that. Fundamentally, however, this introduction did not increase Respondent's costs – effort to review and analyse the data would have been expended even if the data had been submitted earlier. Importantly, the submission of the 3D seismic had nothing to do with the necessity of the May 2013 Hearing, which occurred because the Parties jointly requested an opportunity for oral closing arguments, in January 2013. The additional costs by addressing the 3D seismic at that hearing were incremental, at best. (C Costs Reply ¶¶ 6 – 9).

1868. Respondent's additional allegations of misconduct are intended only to distract the Tribunal. With regard to the new documents submitted on 20 September 2012 and the Sharing Agreement, those were submitted with the Tribunal's permission. (C Costs Reply ¶¶ 10 – 11).

1869. While Respondent now argues that it would have submitted the KMG EP Due Diligence documents sooner, there is no evidence that KMG considered the documents confidential. In any event, that confidentiality had been waived when it disclosed those to Respondent's counsel and experts. Regarding the so-called "disappearance" of Laura Hardin, that is a non-issue – Ms. Hardin left the employment of FTI in June 2012. The circumstances of her departure were beyond Claimants' knowledge or control. It was immaterial because her partner, Howard Rosen, who was involved in the preparation of all of the damages reports, appeared and gave testimony. In any event, this stands in juxtaposition to Respondent's misconduct regarding the Deloitte TCF report. (C Costs Reply ¶¶ 12 – 13).

1870. Some of the costs claimed by Respondent, including the USD 600,000 for the Deloitte TCF Report, and USD 270,000 for Prof. Olcott, and the USD 60,000 for Neftegazkonsult are related to Respondent's procedural misconduct and are particularly objectionable. Respondent's costs for its quantum and geology experts, Deloitte GmbH and GCA, substantially exceed Claimants' cost submissions for FTI and Ryder Scott, and are particularly excessive when compared to the quality of those reports. (C Costs Reply ¶¶ 15 – 16).

## M.II. Arguments by Respondent

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 98 of 102

1871. Respondent requests the Tribunal to order Claimants to reimburse the Republic for, *inter alia*, the fees and expenses of the experts, consultants, witnesses, and legal counsel. (R-III ¶ 519).

1872. Respondent has incurred **USD 17,625,116.33** in legal fees, expert fees, costs in this arbitration, which it summarizes in the following table (R Costs ¶ 19):

| **Attorneys fees until 21 June 2013** | **USD 11,660,999.61** |
|---|---|
| | |
| **Attorneys expenses until 21 June 2013** | **USD 446,023.06** |
| | |
| **Experts** | |
| **Professor Tietje** | **USD 43,807.50** |
| **Professor Olcott** | **USD 270,000.00** |
| **Professor Didenko** | **USD 50,000.00** |
| **Professor Kogamov** | **USD 50,000.00** |
| **Professor Ilyassova** | **USD 53,875.00** |
| **Professor Balco** | **USD 42,646.25** |
| **Deloitte & Touche GmbH** | **USD 2,151,775.50** |
| **Deloitte TCF** | **USD 600,000.00** |
| **Gaffney Cline & Associates** | **USD 1,217,255.67** |
| **Marc Latman (expert for New York securities law)** | **USD 13,412.50** |
| **Neftegazkonsult** | **USD 60,000.00** |
| **Richard Butler (expert for witness testimony)** | **USD 17,158.88** |
| **Professor Zhanaidarov (expert for Kazakh civil law)** | **USD 37,418.23** |
| **Hassans International Law Firm (experts for Gibraltar law)** | **USD 5,210.70** |
| **Mangat Thapar** | **USD 51,703.74** |
| **Paul Rogers (cost expert)** | **USD 1,651.44** |
| | |
| **Government representatives (travel costs, hotel expenses, allowance)** | **USD 102,779.64** |
| | |
| **Witnesses (travel costs, hotel expenses, allowance)** | **USD 63,678.81** |
| | |
| **Translations** | **USD 474,180.06** |
| | |
| **Courier** | **USD 14,807.26** |
| | |
| **Copy** | **USD 50,134.75** |
| | |

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

| **Costs of the arbitration** | |
|---|---|
| **SCC additional advance** | **USD 38,991.00** |
| **ICC Hearing Centre** | **USD 42,410.66** |
| **Court Reporter** | **USD 29,749.02** |
| **Interpretation Costs** | **USD 35,447.05** |
| | |
| **Total costs** | **USD 17,625,116.33** |

1873. Claimants have forced Respondent to spend three years defending baseless allegations in four hearings, numerous written submissions, and further correspondence. They have blown this case out of proportion and submitted new and contradictory expert opinions and last minute evidence before each hearing. That they changed their claim from their USD 1.4 billion and then put the valuation "*at the discretion of the Tribunal*" is an additional example of how they blew up their claim. Their initial and deliberate ignorance of the complexity of this case was the cornerstone for delay in these proceedings. (R Costs ¶¶ 1 – 4; R Costs Reply ¶¶ 4 – 5).

1874. Claimants' procedural conduct was far from exemplary. Although the first two FTI reports were co-authored by Laura Hardin, Claimants refused to offer her for cross examination and likely never intended to. (RPHB 2 ¶¶ 1041 – 1050). Claimants' procedural misconduct also caused Respondent to incur significant loss, giving the Respondent the right to demand reimbursement of all costs incurred as a result. In particular, their abuse related to the Munaibay 3D seismic rendered much of Respondent's preparation obsolete and subsequently caused additional costs in excess of **USD 500,000**. Respondent's experts, GCA, were forced to study these by surprise in less than 2 months, rather than 2.5 years. Counsel was forced to recruit and coordinate with new experts and GCA's experts had to come to a second hearing. Claimants attempt to make Respondent responsible for the belated introduction of 3D seismic data, but this was Claimants' doing. Whether intentional or not, the delayed introduction of the 3D seismic data led to significant additional costs and delay, for which Claimants are responsible. (R Costs ¶¶ 5 – 11; R Costs Reply ¶¶ 6 – 7).

1875. Claimants' other procedural misconduct, including the disruptive submission of new documents before hearings and outside of the procedural timetable, their ex-post attempt to justify its position in a "*debt gross-up*", the Request to Compel Production of 2 January 2013, and their baseless objections to expert testimony also led to further additional costs and created mounting time pressure for Respondent. (R Costs ¶ 12; RPHB 2 ¶¶ 1041 *et seq*.).

1876. Claimants' arguments that Respondent should pay their costs, in particular every single accusation of procedural misconduct, are without merit. In addition, Claimants' argument that the Respondent espoused positions that it knew to be untrue is particularly far-fetched. The KMG EP Due Diligence documents support Respondent's position. There are sections in that report where the opinions expressed are different from the Respondent's and its experts' views, but that is merely because the due diligence reports are exactly what they purport to be: the

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

professional opinion of the authors of those reports. The Respondent was previously barred from submitted the KMG EP Due Diligence documents by KMG EP's refusal to disclose the documents. (R Costs ¶¶ 13 – 18; R Costs Reply ¶¶ 8 – 10).

1877. Claimants' expert, FTI, made numerous baseless allegations, thereby forcing Deloitte to rebut them, since a diligent expert report must address the other side's arguments, no matter how far-fetched. If Claimants consider that their costs and expenses are appropriate, they cannot deny that this holds true for the Respondent's costs and expenses. (R Costs Reply ¶ 11).

## M.III. The Tribunal

1878. The relevant provisions regarding the costs of arbitration are provided in Art. 43 and 44 SCC Rules.

1879. Pursuant to Art. 43.2, by its letter of 12 December 2013, the SCC Board has determined the costs of this arbitration, and pursuant to Art. 43.4, these are included in this Award as follows:

| Karl-Heinz Böckstiegel | |
|---|---|
| Fee | EUR 400 000 |
| Per diem | EUR 8 500 |
| Expenses | EUR 11 730,39 |
| Secretary | EUR 60 672,74 |
| **David R. Haigh, QC** | |
| Fee | EUR 240 000 |
| Per diem | EUR 12 500 |
| Expenses | EUR 20 857,61 |
| **Sergei Lebedev** | |
| Fee | EUR 240 000 |
| Per diem | EUR 12 500 |
| Expenses | EUR 2 710,24 |
| **Stockholm Chamber of Commerce** | |
| Administrative fee | EUR 60 000 |

1880. According to Art. 43.5, "*the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case and other relevant circumstances.*" Further, regarding the costs incurred by a party, Art. 44 provides the Tribunal a similar discretion at the request of a party, to order one party to pay any reasonable costs incurred by another party, including the costs of legal representation, again "*having regard to the outcome of the case and other relevant circumstances.*"

1881. Such requests for the application of both provisions have been made by the Parties in this case and the Tribunal, therefore, has to decide on them.

1882. The Tribunal is aware of a certain practice in investment treaty arbitration that each party bears its own costs and that the parties divide tribunal costs equally. That



practice is not binding on this Tribunal, which prefers the more recent practice in investment arbitration of applying the general principle of "*costs follow the event.*" That approach is the more compelling one in the present case which is governed by the SCC Rules that expressly contemplate the rule of "*costs follow the event*" in Art. 43.5 and 44 by their emphasis on "*the outcome of the case.*" This conclusion is supported by both sides' arguments that the unsuccessful side in this arbitration should have to bear the full amount of tribunal costs as well as the other side's costs of legal representation.

1883. Regarding the present case, the Tribunal takes into account that Claimants requested a total relief of more than USD 1 billion plus what they call a discretionary portion in the range of USD 1.5 billion, of which this Award only grants an amount in the range of USD 0.5 billion, i.e. some 20%. On the other hand, Claimants prevail on jurisdiction, liability, causation, and part of quantum, all of which were the major objects of the dispute and made up by far the greatest part of the work of the Parties and of the Tribunal in this procedure.

1884. Therefore, the Tribunal concludes that Respondent shall pay to Claimants 50% of Claimants' costs of legal representation. For the same reasons, the Tribunal concludes that, of the arbitration costs for the SCC and the Tribunal as quoted above, Respondent has to bear ¾ and Claimants ¼.

1885. As both sides come out with very similar total costs of their legal representation, the Tribunal accepts the amounts of costs claimed by both sides as reasonable. Both Parties have included in their cost claims the deposits they paid to the SCC for arbitration costs. According to Claimants, they have paid total deposits of USD 1,425,448.95 to the SCC. According to Respondent, it has paid what it calls an "*SCC additional advance*" of USD 38,991.00, though no other deposit payment is mentioned. During the procedure, the SCC has informed the Tribunal by its letters of 11 October 2010 and 20 June 2012 of some of the deposits paid by the Claimants. The SCC did not inform the Tribunal of any deposit payments made by Respondent. With its decision of 12 December 2013, the SCC did not inform the Tribunal of the total deposits paid by the Parties, but pointed out that it will determine the exact amounts due by each Party in its settlement of accounts with the Parties. The SCC costs decision was denominated in Euro, while the Parties have submitted their costs claims in USD. The total arbitration costs set by the SCC amount to EUR 1,069,470.98, of which ¾ are to be borne by Respondent, according to the Tribunal's above ruling. This amounts to EUR 802,103.24. The Tribunal, therefore, concludes that Respondent shall pay to Claimants ½ of Claimants' full cost claim of USD 17,950,992.87, in an amount of **USD 8,975,496.40.** Obviously, this amount comprises the above awarded 50% of Claimants' costs of legal representation and the USD 712,724.47 portion of the EUR 802,103.24 SCC costs which Respondent shall bear. The remaining accounting of the deposits will have to be done between the SCC and the Parties.

**(The Decisions of the Tribunal are placed on a separate page of this Award hereafter.)**



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 1:14-cv-01638-ABJ Document 2-4 Filed 09/30/14 Page 102 of 102

## N. Decisions

For the Reasons set out above in this Award, the Tribunal hereby decides, declares, and awards as follows:

1. The Respondent has violated its obligations under the Energy Charter Treaty with respect to the Claimants' investments.
2. Subtracting the subtotal of debts (USD 10,444,899.00) from the subtotal of compensation due (USD 508,130,000.00), the Tribunal decides that Respondent shall pay to Claimants a net amount of USD 497,685,101.00.
3. This net amount is to be paid from Respondent to Claimants with interest, defined as the rate of 6 months US Treasury Bills from 30 April 2009 to the date of payment, compounded semi-annually.
4. Regarding the costs of arbitration, the Tribunal decides:
   4.1. Of the costs of arbitration as determined by the Arbitration Institute of the Stockholm Chamber of Commerce (SCC), Respondent shall bear ¾ and Claimants ¼. These arbitration costs will be drawn from the advances paid by the Parties to the SCC.
   4.2. Further, Respondent shall pay to Claimants 50% of Claimants' costs of legal representation, i.e. an amount of USD 8,975,496.40.
5. All other claims are dismissed.

Place of Arbitration: Stockholm (Sweden)

David R. Haigh QC
(Co-Arbitrator)
Dissenting with regard to Sections I.IV., I.V., and I.XIII of the Award

Prof. Sergei N. Lebedev
(Co-Arbitrator)
Dissenting with regard to Section H.I. of the Award

Prof. Karl-Heinz Böckstiegel
(Chairman of Tribunal)
19.12.2013

ARBITRATION INSTITUTE OF
THE STOCKHOLM CHAMBER OF COMMERCE
Certified true copy of original

Natalia Petrik, Legal Counsel
Date 28 January 2014

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE