# **Exhibit B**



Svea hovrätt
Box 2290
103 17 Stockholm

Stockholm, 19 March 2014

**APPLICATION**

| | |
|---|---|
| **Applicant** | Republiken Kazakstan<br>Ministry of Justice<br>Orynbor Street 8, House of Ministries, 13 Entrance<br>010000, Astana, Left Bank<br>Republic of Kazakhstan |
| **Representative** | Advokaterna Hans Bagner and Pontus Ewerlöf<br>MAQS Law Firm Advokatbyrå AB<br>Box 7009<br>103 86 Stockholm<br>Tel: 08-407 09 00<br>Fax: 08-407 09 10<br>E-post: hans.bagner@se.maqs.com;<br>pontus.ewerlof@se.maqs.com |
| | Dr. Patricia Nacimiento<br>Norton Rose Fulbright LLP<br>Stephanstrasse 15<br>60313 Frankfurt am Main<br>Germany<br>Tel: +49 69 505096 0<br>Fax; +49 69 505096 100<br>E-post: Patricia.Nacimiento@nortonrosefulbright.com |

Application (Eng) - final - # 615059 v2.docx

**Error! Unknown document property name.**

| | |
|---|---|
| **Defendant 1** | Anatolie Stati<br>20 Dragonmirna Street<br>Chisinau<br>Republic of Moldovia |
| **Defendant 2** | Gabriel Stati<br>1A Ghioceilor Street<br>Chisinau<br>Republic of Moldovia |
| **Defendant 3** | Ascom Group S.A.<br>75 A. Mateevici Street<br>Chisinau, MD-2009<br>Republic of Moldovia |
| **Defendant 4** | Terra Raf Trans Traiding Ltd.<br>Don House, Suite 31<br>30-38 Main Street<br>Gibraltar |
| **Subject:** | Claim re invalidity and challenge pursuant to [the SAA] in respect of an award rendered on 19 December 2013 in Stockholms Handelskammares Skiljedomsinstituts ("**SCC**") case nr. V (116/2010) |

**TABLE OF CONTENT**

APPLICATION.................................................................................................................... 1

1      RELIEF SOUGHT ................................................................................... 4

2      SUMMARY OF ROK'S CLAIMS BEFORE THE COURT OF APPEAL .................. 4

3      INTRODUCTION ..................................................................................... 5

       3.1    The Parties ................................................................................... 5

       3.2    Background ................................................................................... 6

       3.3    The alleged acquisition of KPM and TNG by Stati ............................... 7

       3.4    Financing of Stati's activities in Kazakhstan ...................................... 7

       3.5    Inspections and audits of KPM and TNG ........................................... 7

       3.6    The Arbitration Procedure ............................................................ 10

       3.7    Alleged basis for the Tribunal's jurisdiction ..................................... 11

       3.8    The Award .................................................................................. 11

4      DOCUMENTS AND TRANSLATIONS IN THE COURT OF APPEAL ................. 12

5      CHALLENGE GROUNDS ....................................................................... 13

       5.1    The fact that RoK has been deprived of its right to appoint its own arbitrator is clearly
              incompatible with the basic principles of the Swedish legal system, alternatively a
              deficiency in the appointment, or otherwise an irregularity in the course of the
              proceedings which probably influenced the outcome of the case......................... 13

       5.2    The Award is not covered by a valid arbitration agreement between the Parties because
              Stati failed to abide by the three month "cooling-off" period in Article 26 ECT and which
              constitutes a precondition in RoK's offer ...................................... 33

       5.3    The Award is not covered by a valid arbitration agreement between RoK and Terra Raf .... 44

       5.4    The Tribunal failed to consider pivotal witness evidence regarding the quantum of the
              LPG Plant ................................................................................... 49

       5.5    The Tribunal has exceeded its mandate and has committed several procedural mistakes
              and by ignoring the submission of expert evidence and other evidence regarding almost
              every major disputed issue of the case ............................................ 53

       5.6    The Tribunal failed to consider the RoK's objections that certain deductions would need
              to be made from an eventual award .................................................. 70

       5.7    The Tribunal has exceeded its mandate and has committed procedural irregularities by
              going beyond the submissions of the Parties and by ignoring the parties' submissions and
              the applicable law on multiple occasions.......................................... 74

6      STATEMENT OF EVIDENCE .................................................................. 90

Acting as counsel for Republic of Kazakhstan ("**RoK**"), we hereby submit this summons application against Anatolie Stati, Gabriel Stati, Ascom Group S.A och Terra Raf Trading Ltd. (hereinafter jointly referred to as "**Stati**") as follows.

## 1      RELIEF SOUGHT

(1)      RoK requests that the Court of Appeal, in accordance with section 33 of the Swedish Arbitration Act ("SAA"), declares the arbitral award rendered on 19 December 2013 in SCC's case no. V (116/2010), Exhibit 1, invalid.

(2)      RoK requests, in the second hand, that the Court of Appeal, in accordance with section 34 of the Swedish Arbitration Act, sets aside the stated arbitral award, alternatively parts thereof in accordance with what is set out in this summons.

(3)      RoK requests that Stati shall be ordered to jointly and severally compensate RoK for its costs in the proceedings, including costs for counsel, in by an amount that will be specified later.

## 2      SUMMARY OF ROK'S CLAIMS BEFORE THE COURT OF APPEAL

(4)      This request for the invalidity and challenge of the award regards arbitral proceedings under Energy Charter Treaty (ECT) in which Stati alleged that RoK has breached its obligations according to the ECT. Stati's claim for damages in the proceedings totalled more than USD 3 billion. In an award dated 19 December 2013, with a correction 17 January 2014, the Tribunal sustained Stati's claim with respect to a breach against ECT and awarded a quantum of almost USD 500 million.

(5)      The arbitral proceedings were very extensive and complicated, which is evident from the Award consisting of 414 pages. The proceedings included questions regarding the Tribunal's jurisdiction, matters regarding the applicability of the ECT and relevant law, among them Kazakh law, as well as, questions with respect to liability and causality and matters regarding quantum. The correspondence was extensive and the Parties invoked several experts in geology, law, and economy, as well as, many witnesses. Three rounds of oral hearings were held where these experts and witnesses were examined.

(6)      The arbitral proceedings got off to an unfortunate start when the SCC, and later the Tribunal, incorrectly considered itself to have jurisdiction to try the case and RoK was deprived of its right to appoint its own arbitrator. This start caused that following proceedings in its entirety were out of balance, which also is reflected in the Award. In this invalidity and challenge pleading the errors will be set forth and can be summarized as the following.

> (i)      *The fact that RoK has been deprived of its right to appoint its own arbitrator is clearly incompatible with the basic principles of the Swedish legal system, alternatively a deficiency in the appointment, or otherwise an irregularity in the*

4

course of the proceedings which probably influenced the outcome of the case. This will be set forth in section 5.1 below.

(ii) *The Award is not covered by a valid arbitration agreement between the Parties because STATI failed to abide by the three Month "Cooling Off" Period in article 26 ect and which constitutes a condition in RoK's offer*. This is set out in section 5.2 below.

(iii) *The Award is not covered by a valid arbitration agreement between RoK and Terra Raf*. This is set out in section 5.3 below.

(iv) *The Tribunal failed to consider pivotal witness evidence regarding the Quantum of the LPG Plant*. This is set out in section 5.4 below.

(v) *The Tribunal has exceeded its mandate and has committed several procedural mistakes and by ignoring the submission of expert evidence and other evidence regarding almost every major disputed issue of the case*. This is set out in section 5.5 below.

(vi) *The Tribunal failed to consider the RoK's objections that certain deductions would need to be made from an eventual award*. This is set out in section 5.6 below.

(vii) *The Tribunal has exceeded its mandate and has committed procedural irregularities by going beyond the submissions of the Parties and by ignoring the parties' submissions and the applicable law on multiple occasions*. This is set out in section 5.7 below.

(7) In summary, the Tribunal did not have jurisdiction. Hence the Award, in its entirety, shall be declared invalid in accordance with Section 33 (1) p. 2 in SAA. In any case, this error entails that the Award shall be set aside in accordance with Section 34 (1) p. 4 in SAA. The Tribunal's handling of the arbitral proceedings has also included several excesses of mandate and/or procedural irregularities which influenced the outcome of the case. The arbitral award shall therefore, in any event, be set aside entirely or partially in accordance with Section 34 (1) p. 2 and 6 in SAA.

## 3 INTRODUCTION

### 3.1 The Parties

(8) RoK has been an independent state since 1991. On 17 December 1994, RoK signed the Energy Charter Treaty (the "**ECT**"). On 18 October 1995, the ECT was ratified by RoK and it entered into force on 16 April 1998. In the present challenge proceedings, RoK is represented by the Ministry of Justice, Orynbor Street 8, House of Ministries, 13 Entrance, 010000, Astana, Left Bank, Republic of Kazakhstan.

Error! Unknown document property name.

(9)      Anatolie Stati holds passports of Moldova and Romania.

(10)     Gabriel Stati holds passports of Moldova and Romania.

(11)     Ascom Group S.A. ("**Ascom**") is a joint stock company incorporated under the laws of Moldova, with headquarters in Moldova, and located at 75 A. Mateevici Street, Chisinau, MD-2009, Republic of Moldova. Anatolie Stati claims to own 100% of Ascom.

(12)     Terra Raf Traiding Ltd. ("**Terra Raf**") is a limited liability company incorporated under the laws of Gibraltar, and is located at Don House, Suite 31, 30-38 Main Street, Gibraltar. Anatolie Stati and Gabriel Stati claim to each own 50% of Terra Raf.

## 3.2    Background

(13)     Hydrocarbon in the form of oil and natural gas is RoK's main natural resource. Since RoK became an independent state in the early 1990s, RoK has attracted foreign technical and financial investment to help the country to recover these natural assets in order to develop the country`s economy and by extension to get its people to benefit from it.

(14)     The Government of RoK is the highest authority responsible for managing investments and exploration of the country's natural resources. It should also be noted that RoK has an extensive legislation of subsoil exploration contracts and of those companies operating in this line of business. The reason to the extensive legislation is the immense importance of exploitation of RoK`s natural assets and the necessity to ensure safety of such operations.

(15)     During 1999, Stati researched the possibilities to invest in extraction of RoK`s natural resources. To that end, Stati acquired in several steps 100% of the shares in the companies Kazpolmunai ("**KPM**") and Tolynneftegas ("**TNG**").[1] On 9 December 1999, Ascom acquired 62 percent of the shares in KPM that owned the subsoil use contract to the oil field Borankol. On 17 May 2000, Stati acquired the 75 percent of the shares in TNG, which owned the subsoil use contracts to the natural gas field Tolkyn and also the prospect rights to the so-called Contract 302 Area (also called the Tabyl Area).

(16)     As a result of the transactions, Ascom became the owner of 100% of KPM and Terra Raf became the owner of 100% of TNG. The transactions were not transparent and the objective of the complicated corporate structure, which included a number of intermediaries, was unclear. RoK has questioned the validity of some of these transactions.

(17)     KPM and TNG explored and developed oil and gas fields in the vicinity of Opornaya, in the Mangystau region. Specifically, KPM explored, developed and later produced from the Borankol field, which is a predominantly oil bearing field. TNG explored, developed and later produced from the Tolkyn field, which is predominantly gas bearing. In addition, TNG

---

[1] Award, paras. 221 et seqq, <u>Exhibit 1</u>.

Error! Unknown document property name.

explored the so-called Contract 302 Area (also referred to as "Tabyl Block"), an area in which Stati hoped to find further hydrocarbon reservoirs. Potential leads in the Contract 302 Area were called "Munaibay Main" (also "Munaibay East"), "Munaibay North", "Bahyt", "Tabyl" and "Interoil Reef".[2] Ultimately, Stati never developed any producing fields from the Contract 302 Area. In 2006, TNG also initiated activities to construct a Liquefied Petroleum Gas Plant (the "LPG Plant").[3] The purpose of an LPG Plant is to filter hydrocarbons such as propane and butane out a stream of so-called "wet" or "rich" gas. The LPG Plant was never finished.

(18)  The exploration and development of the fields and the Contract 302 Area was approved by the state under three separate subsoil use contracts, namely Contract No. 305 dated 30 March 1999 (for the Borankol field), Contract No. 210 dated 12 August 1998 (for the Tolkyn field) and Contract No. 302 dated 31 July 1998 (for the Contract 302 Area).[4]

### 3.3    The alleged acquisition of KPM and TNG by Stati

(19)  Of the various acquisition steps regarding the shares in KPM and TNG, the most disputed one in the arbitrational proceedings was the acquisition of 100% of the shares in TNG by Terra Raf from Gheso S.A. In particular, the Parties disputed whether the State's pre-emptive right to acquire shares in a company holding a subsoil use contract applied to this transaction.

### 3.4    Financing of Stati's activities in Kazakhstan

(20)  Throughout their activities in Kazakhstan, Stati relied largely on debt financing. At the end of 2006, Stati refinanced their previous loans by way of a public debt offering of USD 300 million. To that end, Stati established a company called Tristan Oil Ltd. ("**Tristan**"), incorporated in the British Virgin Islands ("B.V.I."). Overall, until the summer of 2009, Tristan issued public debt in the form of debt notes in the amount of USD 531.1 million.[5] The debt was guaranteed by KPM and TNG. The details of the Tristan note structure will be discussed in section 5.7 below.

### 3.5    Inspections and audits of KPM and TNG

(21)  On 6 October 2008, the Moldovan President Vladimir Voronin sent a letter to Kazakhstan's President Nursultan Nazarbayev, accusing Anatolie Stati of using proceeds from Kazakhstan's mineral resources to invest in areas subject to UN sanctions, in

---

[2] Award, paras. 1633, 1637, 1649

[3] Award, para. 250. The rationale behind a LPG-plant is to filter hydrocarbon, such as propane and butane, from natural gas.

[4] Award, paras. 211, 212

[5] Award, para. 254

Error! Unknown document property name.

particular, in South Sudan.[6] Further, the letter alleged that Mr. Stati was concealing profits in offshore territories and that he was bribing officials in Moldova.

(22)   As a response to the allegations by President Voronin, President Nazarbayev issued a letter to Kazakhstan's Deputy Prime Minister and to the Head of Kazakhstan's Financial Police in which he asked "*[a]t the request of the Moldavian party to carry out a thorough inspection of the company activity and to decide on its further operation in the interests of the country*".[7] In the following, in October and November 2008, a phase of inspections of KPM and TNG by various state authorities took place. Those inspections were instigated by the Financial Police and were intended to establish whether there was any truth in President Voronin's allegations.

(23)   The first phase of inspections also resulted in a number of assessments of taxes and duties by the Kazakh Tax and Customs Committees. As a result of the inspections and audits, various irregularities in the operations of KPM and TNG were found. *Inter alia*, a suspicion arose that KPM was operating a trunk pipeline without the necessary license for that kind of operation. Moreover, it was found that KPM and TNG had applied incorrect amortisation rates for certain exploration expenses in their annual tax declarations. What is more, irregularities with regard to the transfer of the shares in TNG from Gheso S.A. to Terra Raf were uncovered.

(24)   The suspicion regarding KPM`s operation of the trunk pipeline without a license led to a criminal investigation with the aim of finding out whether there were any individuals who had committed the crime of Illegal Entrepreneurial Activity (Article 190(2)(b) of the Kazakh Criminal Code). Illegal Entrepreneurial Activity describes any activity conducted without the necessary license leading to profits on a large scale. In the course of the criminal investigation, searches of KPM's and TNG's premises were conducted.[8] Ultimately, Mr. Cornegruta, the General Director of KPM, was charged with the crime. On 18 September 2009, the Aktau City Court found him guilty and convicted him to a four year prison sentence. At the same time, the court determined that a recovery order against KPM was necessary in order to collect the illegal income.

(25)   In February 2009, the Kazakh Tax Committee determined that because of the application of the wrong amortization rate, KPM and TNG had to pay back taxes in the amount of USD 62 million. The companies appealed the decision which was ultimately upheld by the Kazakh Supreme Court.[9]

(26)   In addition, in December 2008, the Kazakh Ministry of Energy and Mineral Resources ("MEMR") re-inspected the matter of the pre-emptive rights waiver in connection to the transfer of shares in TNG from Gheso S.A. to Terra Raf. It was found that the transfer

---

[6] Award, para. 291

[7] President Voronin's Letter to President Nazarbayev

[8] Award, para. 1049.

[9] Award, para. 1018.

Error! Unknown document property name.

occurred only in 2005, making the state's pre-emptive right applicable. Consequentially, the MEMR asked TNG to submit a new application for the transfer.[10]

(27)     In 2008 and 2009, KPM and TNG were hit hard by the effects of the financial crisis. Oil and gas prices as well as demand dropped significantly in that time period, putting considerable pressure on the companies' revenues. At the same time, a successful operation was necessary in order to pay the interest on the Tristan notes. In this time period, KPM and TNG curtailed their expenses for the development of the Borankol and Tolkyn fields, thus skipping necessary well work-overs. In addition, the construction of the LPG Plant was suspended.[11]

(28)     In June and July 2010, the General Prosecutor's Office initiated inspections of KPM and TNG based on allegations that the companies had infringed the rights of their employees as well as breached a number of contractual and legislative obligations. On 28 June 2010 the General Prosecutor's Office had received a complaint from individuals living in the Beyneu District of Mangystau Province, where the Tolkyn and Borankol oil deposits as well as the KPM & TNG oil exploitation infrastructure were situated. The subject of the complaints were violations in the activities of KPM and TNG related to non-payment of salaries, mass dismissal of employees, failure to comply with environmental legislation and legislation on subsoil use. The complainants requested the General Prosecutor's Office to take measures to prevent the loss of hydrocarbon resources and to establish a stable social environment.[12]

(29)     In response to the complaints it received, the General Prosecutor's office instructed a number of agencies to undertake inspections of KPM and TNG (resulting in a so-called complex or comprehensive audit). These inspections revealed a number of infringements by KPM and TNG, in particular violations concerning unauthorised emissions, discharge of sewage water, nonfulfillment of earlier directives toward eliminating violations, non-performing of environmental monitoring activities, absence of a record on waste, failure to meet the target rates on drilling, non-fulfillment of exploratory works, failure to keep a record for flared gas metering, non-fulfillment of obligations regarding accommodation and training of Kazakh employees, violations concerning personnel not receiving safety training, absence of orientation, delays in salaries in June 2010 as well as employees being called back to work from vacation without consent. The obligations regarding payment toward the decommissioning costs fund and reimbursement of past costs were not fulfilled either.

(30)     Ultimately based on these violations, the Kazakh Ministry of Oil and Gas ("MOG", the successor of the MEMR) terminated KPM's and TNG's subsoil use contracts on 21 July 2010.[13] In the following, the fields as well as the facilities on the fields were taken

---

[10] Award, para. 993.

[11] Cf. the Defendants' own admissions at Award, paras. 653, 1436 and the findings of the Tribunal at Award, para. 251.

[12] Award, para. 588.

[13] Award, para. 611.

Error! Unknown document property name.

into trust management by KazMunaiGas National Company ("**KMG NC**")[14], the Kazakh state oil company, and by its subsidiary KazMunaiTeniz ("**KMT**").[15] The operation is not for profit but in order to maintain and preserve the fields. The unfinished LPG Plant does not form part of the trust management. It remains unfinished and mothballed.

## 3.6    The Arbitration Procedure

(31)    On 26 July 2010, only five days after the termination of the subsoil use contracts, Stati filed a Request for Arbitration with the SCC, claiming that RoK had violated its obligations under the ECT. As is set out in further detail in section 5.2 below, by submitting within five days from the cancellation of the contracts, Stati violated the requirement of Article 26(2) ECT to go through a three month "cooling off" period.

(32)    In the arbitrational procedure, Stati stated that an alleged harassment campaign was conducted by RoK's authorities against KPM and TNG. In a "scattergun approach", Stati alleged that RoK had violated practically every substantive investment protection standard contained in the ECT.

(33)    In this submission some events of the proceedings will be stated in following:

- On 23 September 2010, the SCC Board decided that the seat of arbitration for the case is Stockholm.

- The Tribunal consisted of Professor Karl-Heinz Böckstiegel (Chairman, appointed by the SCC), David R. Haigh QC (Defendants' appointee) and Professor Sergei Lebedev (appointed by the SCC). RoK objected against the appointment of Professor Lebedev by the SCC. This will be further set out below.

(34)    The following written submissions were made by the parties:

- Stati's Request for Arbitration dated 26 July 2010;

- Stati's Statement of Claim dated 18 May 2011;

- RoK's Statement of Defence dated 21 November 2011;

- Stati's Reply on Jurisdiction and Liability dated 8 May 2012;

- Stati's Reply on Quantum dated 28 May 2012;

- RoK's Rejoinder on Jurisdiction and Liability dated 13 August 2012;

- RoK's Rejoinder on Quantum dated 1 December 2012;

---

[14] Award, para. 611

[15] Award, para. 1534

Error! Unknown document property name.

- Stati's and RoK's First Post-hearing Briefs dated 8 April 2013;

- Stati's and RoK's Second Post-hearing Briefs dated 3 June 2013.

(35)   Moreover, three hearings were held, each time in Paris:

- Hearing on Jurisdiction and Liability after the submission of RoK's Rejoinder on Jurisdiction and Liability from 1 to 8 October 2012;

- Hearing on Quantum after the submission of the RoK's Rejoinder on Quantum from 28 to 31 January 2013;

- Final Hearing (examination of geological experts and closing submissions) after the submission of the First Post-hearing Briefs on 2 and 3 May 2013.

(36)   Throughout the arbitration, Stati's claim for damages varied considerably.[16] Ultimately, Stati asked for compensation in the amount of USD 478,927,000 for the Tolkyn field, USD 197,013,000 for the Borankol field, USD 96,808,000 for Munaibay Oil, USD 329,077,000 for the LPG Plant and USD 1,626,155,000 for the Contract 302 Area, which totals USD 2,727.980.000 with interest. Further, Stati claimed also compensation for general damages equivalent to 10 percent of the total damages that Stati has claimed.[17]

## 3.7   Alleged basis for the Tribunal's jurisdiction

(37)   Stati based their arbitration claim on Article 26 ECT.[18] According to Stati, RoK offered arbitration under the auspices of the Stockholm Chamber of Commerce (the "**SCC**") by ratifying the ECT including its Article 26, and Stati accepted the offer by initiating arbitration proceedings with their Request for Arbitration submitted to the SCC on 26 July 2010 and therefore a binding arbitrational agreement was reached.

(38)   In the course of the arbitration, RoK rejected the argument that the preconditions for an offer to arbitrate under Article 26 ECT were fulfilled. RoK continues to reject Stati's arguments relating to jurisdiction and denies that jurisdiction existed. The respective grounds for challenge are set out below.

## 3.8   The Award

(39)   On 19 December 2013, the Tribunal rendered the Award finding that RoK had violated its obligations under the ECT and ordering RoK to pay USD 497,685,101.00 in damages and USD 8,975,496.40 in costs of legal representation to Stati. The arbitration costs were to split between the parties, with RoK having to bear ¾ and Stati having to bear ¼. Interest

---

[16] Award, para. 1834

[17] Award, para. 199

[18] Award, para. 691

Error! Unknown document property name.

to the damage sum applies as of 30 April 2009 at the rate of 6 months US Treasury Bills, compounded semi-annually. All other claims were dismissed.[19]

(40)  In substance, the Tribunal rejected all of RoK's jurisdictional objections.[20] Further, the Tribunal found RoK in breach of its obligations under the standard of fair and equitable treatment contained in Article 10(1) ECT.[21] The Tribunal also found that the actions taken by RoK's authorities caused damages and that there was no intervening cause ruling out the awarding of damages.[22] Specifically, the Tribunal awarded USD 277.8 million in combined damages for the Borankol and Tolkyn fields, USD 199 million for the LPG Plant and USD 31,330,000 for the Contract 302 Area.[23] Of these amounts, the Tribunal deducted USD 10,444,899 in debt for which it considered Stati to be no longer liable following the alleged breach by RoK.[24]

(41)  Professor Lebedev dissented on jurisdiction and Mr. Haigh dissented on parts of quantum. None of them provided a separate dissenting opinion.

(42)  On 17 January 2014, the Tribunal issued a correction to the Award according to Article 41 of the SCC-Rules and Section 32 of the SAA. In the correction, the Tribunal stated that after issuing its award, it had discovered that its decision did not sufficiently specify the costs of arbitration as required by the SAA. It hence corrected the operative part of the award contained in section N. by adding sections 4.01, 4.02 and 4.03 setting out the arbitration costs incurred for the arbitrators and in form of the SCC Administrative Fee. Otherwise, the award remained unchanged.

## 4  DOCUMENTS AND TRANSLATIONS IN THE COURT OF APPEAL

(43)  The arbitration was conducted in the English language. The arbitral award, which is attached to this summons application, is drafted in English. We request that the Court of Appeal accepts the arbitrational award in its original form. If the Court of Appeal suggests that the parts of the award, which are cited in this summons and is relevant to these challenge proceedings, we can most certainly provide with such translations. The documentation relied on in the arbitration and which is invoked in these proceedings will be submitted in English, and with an in-house translation into Swedish in relevant parts, if the Court of Appeal so accepts.

---

[19] Award, p. 414

[20] Award, paras. 691 et seqq.

[21] Award, paras. 941 et seqq.

[22] Award, paras. 1325 et seqq.

[23] Award, para. 1625, 1747, 1686.

[24] Award, para. 1538 and p.414 (debt under the so-called Reachcom Facility Agreement, Limozen Facility Agreement and Reachcom Receivables Purchase Agreement).

Error! Unknown document property name.

## 5     CHALLENGE GROUNDS

**5.1**     **The fact that RoK has been deprived of its right to appoint its own arbitrator is clearly incompatible with the basic principles of the Swedish legal system, alternatively a deficiency in the appointment, or otherwise an irregularity in the course of the proceedings which probably influenced the outcome of the case**

**5.1.1**     **Introduction**

(44)     One of the most fundamental principles for an arbitral procedure is party autonomy, i.e. that the parties are in charge of the dispute themselves and have a right to appoint their own arbitrators. The right for a party to appoint its own arbitrator is a matter of legal security. If a party is denied the right to appoint an arbitrator, it affects the balance in the Tribunal and the entire arbitral procedure. Lindskog calls this condition "influence balance" and emphasizes

> *"[t]he fact that the requirement of 'influence balance' shall be set high does just not have a theoretical importance, it also has a practical importance. […] The fact that the order for the appointment of the tribunal is such that there is 'influence balance' ensures a balance of the parties' interests with respect to the composition of the arbitral tribunal."*[25]

(45)     Even in cases when the Tribunal has been entirely impartial, a tangible violation can be at hand if the respondent did not have an opportunity to appoint its own arbitrator.[26]

(46)     Rules which provide for the appointment of an arbitrator on behalf of one party if it defaults are by themselves not unproblematic as this means that one party has a party appointed arbitrator, while the other has not and the parties are therefore not treated equally. This may, however, be considered acceptable or justified if the other party has had a true opportunity to appoint its arbitrator but deliberately failed to do so. It is not, if deadlines are so short and the other party is not informed of the other party's requests.

(47)     Such a case can rather be compared to an arbitration agreement which from the outset only grants one party the right to appoint its own arbitrator while the other party would have an arbitrator imposed on it. There can be no doubt that such an arbitration agreement would violate the principle of equality of the parties. An award that is the result of an arbitration based on such an arbitration agreement would therefore clearly violate public policy and consequently, the award should be considered invalid.

(48)     The Tribunal which decided this dispute consisted of one arbitrator appointed by Stati and two arbitrators appointed by the SCC. The appointment of an arbitrator by the Board of the SCC was brought about by several violations of fundamental procedural rights of RoK

---

[25] Lindskog, *Skiljeförfarande, En kommentar*, 2012, p. 475. See also Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 145 and Redfern and Hunter, *On International Arbitration*, 2009, p. 250 (cited in section 5.1.3 below).

[26] Cf. Heuman, *Arbitration Law of Sweden, Practice and Procedure*, 2003, p. 589.

Error! Unknown document property name.

and the SCC's own Rules; namely, (i) the SCC failed to conduct a proper prima facie review of the Request for Arbitration and thus failed to detect that the arbitration was initiated in breach of the three month cooling-off period, (ii) The SCC incorrectly assumed that RoK should have appointed an arbitrator with its Answer to the Request for Arbitration, (iii) the SCC acted in violation of due process and the principle of equality of the parties by stipulating deadlines that were too short, (iv) the SCC did not afford RoK the right to be heard when appointing an arbitrator on behalf of RoK, and (v) the SCC did not afford RoK the right to be heard when appointing the Chairman of the Tribunal.

(49)     For these reasons, the Award must be declared invalid in accordance with Section 33 p. 2 SAA. Alternatively, the Award should be set aside in accordance with Section 34, p. 4 and 6 SAA, because the Tribunal thus appointed did not have jurisdiction and because the SCC committed a procedural mistake that affected the outcome of the case.

5.1.2  **Facts**

(50)     Stati filed its Request for Arbitration on 26 July 2010. Accordingly, Stati filed its Request for Arbitration merely five days after KPM's and TNG's agreements on subsoil use rights had been terminated. Stati requested arbitration without having adhered to the three month cooling-off period stipulated in Article 26 of the ECT (see section 5.2 below).

(51)     The SCC received the Request for Arbitration on 3 August 2010 and forwarded the Request to RoK two days later, stipulating a deadline to respond only three weeks later.[27] The Request for Arbitration consisted of 40 pages and was accompanied by 42 exhibits. In the Request for Arbitration, Stati had proposed that the two party appointed arbitrators jointly should appoint the Chairman. In its letter, the SCC requested RoK to submit its answer in accordance with Article 5 of the SCC Rules. It did, however, not explicitly inform RoK that RoK also should appoint an arbitrator in its answer.

(52)     The letter was addressed to the Ministry of Justice, the authority referred to in Stati's Request for Arbitration as the "*governmental authority likely to represent Kazakhstan in this proceeding.*"[28] The Request for Arbitration and the SCC Secretariat's letter were drafted in English. The official languages in RoK are Kazakh and Russian. None of the previous communication between the Parties had been in English.

(53)     Apparently, the SCC did not take any further measures to ensure that the request for arbitration was sent to the correct addressee. SCC instead relied on information from Stati that the Ministry of Justice "probably" was going to represent RoK.

(54)     The secretariat of the Ministry of Justice does not formally register letters that are in a foreign language but rather immediately attempts to deliver them to the Vice Minister (Executive Secretary) who supervises the assumed competent department. The Ministry does not have any information as to when the Request for Arbitration was received by the

---

[27] Letter from the SCC to RoK dated 5 August 2010, <u>Exhibit 2</u>.

[28] Request for Arbitration, para. 15.

Error! Unknown document property name.

secretariat of the Ministry. The Ministry's files do however suggest that it received the Request on 11 August 2010. This means that the three weeks deadline for response in fact amounted only to a 15 day deadline.

(55) On 27 August 2010, the SCC reminded RoK to submit an answer to the Request for Arbitration and set a new deadline to 10 September 2010.[29] This letter was received by the secretariat of the Ministry of Justice on 31 August 2010 and by the relevant department on 1 September 2010, thus stipulating effectively a 9 day deadline.

(56) It is stated in the letter of 27 August 2012 that the failure to submit an answer would not prevent the arbitration from proceeding, but it is not stated that the SCC would appoint an arbitrator on behalf of RoK.

(57) Stati made a request on 13 September 2010 to appoint an arbitrator on behalf of RoK. The SCC forwarded this request to RoK on the same day.[30] Unlike the prior and the later communications, this letter was not sent by courier but by registered mail. While this letter was still travelling to RoK, on 20 September 2010, the SCC – without having informed RoK about this - wrote to Professor Lebedev to inform him about his appointment as arbitrator. One day later, Professor Lebedev accepted his appointment[31] and on 23 September 2010 the SCC sent a letter to the Parties to inform them about the appointment.[32] The SCC had thus appointed Professor Lebedev within **40 days** from the Republic's receipt of the Request for Arbitration.

(58) On the same day - 23 September 2010 - that the SCC sent out the letter informing RoK about Professor Lebedev's appointment, RoK received Stati's request that an arbitrator should be appointed on its behalf.

(59) Without further communication, the SCC also promptly appointed Professor Böckstiegel as the Chairman of the Tribunal. On 27 September 2010 he accepted his appointment as Chairman and on the following day, the SCC dispatched a letter to the Parties, again by courier, informing them about the appointment. All of this happened while the internal process in RoK of deciding on the competent authority and then engaging legal counsel was still ongoing.

(60) On 2 December 2010, subsequent to having engaged legal counsel, RoK challenged the appointment of Professor Lebedev as arbitrator on behalf of RoK, arguing that the SCC had appointed Professor Lebedev without RoK's consent and prior consultation with RoK and without giving RoK an adequate opportunity to select its own arbitrator.[33]

---

[29] Letter from the SCC to RoK dated 27 August 2010, Exhibit 3.

[30] Letter from the SCC to RoK dated 13 September 2010, Exhibit 4.

[31] Letter from Professor Lebedev to the SCC dated 21 September 2010, Exhibit 5.

[32] Letter from the SCC to RoK dated 23 September 2010, Exhibit 6.

[33] Letter from RoK to the SCC dated 2 December 2010, Exhibit 7.

Error! Unknown document property name.

(61)     This request was quashed by the SCC by a decision of 15 December 2010 with one sentence stating that no ground for disqualification of Professor Lebedev had been found.[34] RoK reiterated its protest at the Procedural Meeting on 15 December 2010 as evidenced by Procedural Order ("**PO**") No. 1.

(62)     In a further letter to the SCC dated 27 December 2010, RoK maintained its objection. In the same letter, RoK complained that the SCC had not responded to its question whether Margrete Stevens of King & Spalding, Stati's attorneys, had participated in the Board decision. The SCC replied that this had not been the case.

(63)     The sequence of events leading to the appointment of the Tribunal can be summarized as follows:

- 26 July 2010 – Stati filed its Request for Arbitration

- 3 August 2010 – The SCC receives the Request for Arbitration

- 5 August 2010 – The SCC forwards the Request for Arbitration to RoK by courier, sets a deadline until 26 August 2010 for response (no explicit request to appoint an arbitrator)

- 11 August 2010 – Receipt of letter by Ministry of Justice

- 27 August 2010 – SCC asks RoK to respond until 10 September 2010, sent by courier, no explicit request to appoint an arbitrator

- 1 September 2010 – receipt by relevant department of Ministry of Justice

- 13 September 2010 – Stati requests the SCC to appoint an arbitrator on behalf of RoK

- 13 September 2010 – SCC forwards Stati's request to RoK by registered mail

- 20 September 2010 – SCC informs Professor Lebedev about his appointment

- 21 September 2010 - Professor Lebedev accepts his appointment

- 23 September 2010 - SCC sends a letter to the Parties, informing them of Professor Lebedev's appointment, again by courier

- 23 September 2010 - Ministry of Justice receives Stati's request to appoint an arbitrator on its behalf

- 27 September 2010 – Ministry of Justice receives the information that Professor Lebedev has been appointed on behalf of RoK

---

[34] The SCC decision dated 15 December 2010.

**Error! Unknown document property name.**

- 27 September 2010 - Professor Böckstiegel accepts his appointment as the Chairman

- 28 September 2010 - SCC sends a letter to the Parties, informing them of Professor Böckstiegel's appointment, again by courier

- 1 October 2010 - Ministry of Justice receives the information that Professor Böckstiegel has been appointed

### 5.1.3 The SCC has an obligation to safeguard fundamental procedural rights of the Parties such as a Party's right to appoint its own arbitrator

(64)    The SCC as the administrating institution has a duty to safeguard the Parties' fundamental procedural rights, in particular at the time when a Tribunal has not yet been constituted.

(65)    In accordance with Article 47 of the SCC Rules, not only the Tribunal but also the SCC itself in all matters not expressly provided for in these Rules, shall act in the spirit of these Rules and shall make every reasonable effort to ensure that all awards are legally enforceable. Time periods, as well as the process when such time periods have expired, are matters which do not expressly appear from the SCC Rules. Further, in accordance with Appendix 1, Article 9 SCC Rules, the SCC is under a general obligation to deal with the arbitration in an impartial, practical and expeditious manner.

(66)    Both provisions demonstrate that the SCC is under an obligation to observe certain fundamental principles such as due process and equality of the parties. If the SCC does not do so, it undermines the enforceability of an award.

(67)    In the present case, the SCC was under an obligation to ensure that RoK was given a reasonable opportunity to respond to the Request for Arbitration and to appoint its own arbitrator because the right to appoint an arbitrator is a fundamental right in international arbitration. This is particularly so when there is the risk that one party can easily appoint its arbitrator while the other is prevented from doing so.

(68)    In an article, Doak Bishop, now partner with King & Spalding, and Lucy Reed have highlighted the importance of a party's ability to appoint its arbitrator:

> "*In the common international arbitration scenario of a tripartite panel, with each party appointing one arbitrator and the party-appointed arbitrators then selecting the presiding arbitrator, <u>each side's selection of 'its' arbitrator is perhaps the single most determinative step in the arbitration. The ability to appoint one of the decision-makers is a defining aspect of the arbitral system </u>and provides a powerful instrument when used wisely by a party.*"[35] (emphasis added)

---

[35] R. Doak Bishop and Lucy Reed, *Practical Guidelines for Interviewing, Selecting and Challenging Party-Appointed Arbitrators in International Commercial Arbitration*, Arbitration International, (Kluwer Law International 1998, Volume 14 Issue 4) pp. 395 – 430 at p. 395.

Error! Unknown document property name.

(69)     There is agreement among legal scholars that the appointment of a party's arbitrator is
         paramount because this arbitrator also has a certain role to play, in particular to see to it
         that the case of the nominating party is properly understood:

> "*The advantage to a party of being able to nominate an arbitrator is that it gives
> the party concerned a sense of investment in the arbitral tribunal. Each party will
> have at least one 'judge of its choice' to listen to its case. This is particularly
> important in an international arbitration where, in addition to the matters formally
> in issue, there may well be differences of language, tradition, and culture
> between the parties and, indeed, between the members of the arbitral tribunal
> themselves. <u>An arbitrator nominated by a party will be able to make sure that the
> case of the appointing party is properly understood by the arbitral tribunal.</u> In
> particular, such an arbitrator should be able to ensure that any
> misunderstandings that may arise during the deliberations of the arbitral tribunal
> (for instance, because of differences of legal practice, culture, or language) are
> resolved before they lead to injustice.*"[36] (emphasis added)

(70)     The possibility and right of a party to appoint an arbitrator is a safeguard to ensure that the
         arbitration is conducted in a neutral manner taking into consideration the positions of the
         disputing parties.[37] Gary Born states that in case an arbitrator is appointed on behalf of
         one party,

> "*[t]his is the loss of a significant right: a co-arbitrator selected by the arbitral
> institution may be competent, but the party's ability to select its preferred co-
> arbitrator is a key feature of the arbitral process with substantial practical
> importance.*"[38]

(71)     With direct reference to investment arbitrations, Charles Brower states that

> "*The right of the parties to appoint the arbitrators has existed for decades, even
> centuries. (…) [T]he Germany-Pakistan BIT (1959), provided for party-appointed
> arbitrators, as did one of the first BITs providing for investor-State arbitration, the
> Netherlands-Tunisia BIT (1963).*
>
> *Today the right to appoint an arbitrator is included in most BITs, all of the major
> international arbitration rules, and many of the world's domestic arbitration laws,
> including the UNCITRAL Model Law. (…) In light of this extensive historical
> background, it would seem that the right of the parties to appoint the arbitrators
> has become an established principle of law in international arbitration.*"[39]

---

[36] Redfern and Hunter, *On International Arbitration*, (2009) p. 250.

[37] Bühler/Webster, *Handbook of ICC Arbitration*, London 2008, para. 8-23.

[38] Born, *International Arbitration: Law and Practice*, 2012, p. 127.

[39] Brower, *The (Abbreviated) Case for Party Appointments in International Arbitration*, American Bar Association, Section of
International      Law,      International      Arbitration      Committee      2013,      Volume      1,      Issue      1,

(72)     In this case, the appointment by the SCC of Professor Lebedev as arbitrator on behalf of RoK has had unfortunate consequences. Professor Lebedev took a very passive role during the arbitral proceedings and thus has not been able to ensure that RoK's presentation of its case has been correctly perceived by the Tribunal. This deficiency is evidenced in several grounds that form the basis of this challenge of the Award and that are presented below in sections 5.2-5.7 below.

(73)     Certainly, as most arbitral rules accept, a party forfeits its right to appoint an arbitrator if it does not use that right. However, this fundamental right must not be taken away lightly from a party.[40] Indeed, if a party is deprived of this right, this is probably incompatible with the legal system in many countries, including Sweden and therefore a Tribunal thus appointed does not have jurisdiction, which also means that the arbitral award is invalid, if the party has not explicitly has refrained from its right to appoint an arbitrator.[41] This is something that the SCC should avoid at all costs as it is under an obligation to secure the enforceability of an award.

(74)     Safeguarding a party's right to appoint its arbitrator is a question of due process. Equally, it is question of equality of the parties. When one party can exercise its right to appoint its arbitrator and the other party cannot, this is a severe breach of this principle. As for example the French courts have frequently held, the principle of the equality of the parties must be observed in international arbitration "as a general principle of procedure founded in procedural public policy".[42] In the famous *Dutco* case, the French *Cour de cassation* held that the principle of the equality of the parties in the designation of the arbitrators is a matter which concerns public policy.[43]

(75)     All of this should have been clear to the SCC and it was under an obligation to act accordingly in order to ensure the enforceability of an eventual award and in order to treat the parties impartially. It is further under an obligation to act in a practical way, which should entail that all deadlines need to be realistic for the relevant party in regards to relevant circumstances in every case.

---

http://www.sccinstitute.com/filearchive/4/46703/ABA%20SIL%20Newsletter%20sent%20to%20list%20serve%20on%20Arbitrator%20Appointments%20(001%20%20%20%20(1).pdf at pp. 10-11.

[40] Cf Westberg, *Anskaffning av bevisning i dispositiva tvistemål*, 2010, p. 195, *who writes that "[T]he ortodox legal scholars say that is it one thing to* **waiver** *a* **material right**, *but another to* **waiver** *a* **procedural right**. *The first would in principle be acceptable, but not the other. A waiver of a* **procedural right** *would not only be a threat to the individual's fundamental opportunities to defend its* **rights**. *It would also, if it became common to agree on a limitation of judicial review, be a threat to democracy and the state governed by law".*

[41] See *Lenmorniiproekt OAO v. A.L. & Partner Leasing AB*, NJA 2010 p. 219

[42] For references see Fouchard Gaillard Goldman *On International Commercial Arbitration*, para. 791.

[43] Ibid. para. 792 et seqq. Also see NJA 1974 s. 573.

Error! Unknown document property name.

### 5.1.4 The SCC failed to conduct a proper *prima facie* review of the Request for Arbitration and thus failed to detect that the arbitration was initiated in breach of the three month cooling-off period that is provisioned in the ECT

(76)    The SCC should also have noted that Stati submitted the Request for Arbitration without having adhered to the three month "cooling-off" period prescribed by Art. 26 of the ECT. Such a three month period would not only allow the Parties to negotiate a potential settlement, but it also serves the purpose of making RoK aware of the need of seeking legal advice. Had Stati adhered to this cooling-off period, RoK would indeed have been able to prepare for a potential arbitration, *inter alia* by selecting legal counsel that would then have participated in drafting the Answer to the Request for Arbitration and would have prepared the appointment of an arbitrator.[44]

(77)    While Stati in their Request for Arbitration alleged that they had adhered to this cooling-off period,[45] the SCC should have reviewed the documents relied on by Stati in this regard as part of its mandatory prima facie review and would easily have seen that none of them contained a formal request for amicable settlement. Hence, the SCC should have noted the shortage in Stati's Request for Arbitration already in the prima facie assessment of jurisdiction. If that had been accomplished, the following problems about the appointment of Professor Lebedev as an arbitrator on behalf of ROK, would therefore have been avoided.

### 5.1.5 The SCC incorrectly assumed that RoK should appointed an arbitrator with its Answer to the Request for Arbitration

(78)    The letter from the SCC dated 5 August 2010 with the attached Request for Arbitration contained an order for RoK to, within a specified time frame, submit a response to the Request for Arbitration pursuant to Article 5 of the SCC Rules. The letter contained no order for RoK in this response to also appoint its arbitrator. The SCC's reminder on 27 August 2010 contained only a notification that RoK's failure to submit an answer would not hinder the continuing of the arbitration proceedings. Apparently, the SCC assumed that the Answer should include an appointment of an arbitrator even though the SCC Rules do not stipulate this under the circumstances of the case at hand as neither an agreement on the number of arbitrators nor a decision to that effect existed yet.

(79)    It should be noted that the SCC Rules on the appointment of arbitrators deviate from what is stipulated in the mandatory rules of the Swedish Arbitration Act. In short, the SCC Rules entails an obligation of the board of the SCC to order a respondent to appoint an arbitrator within a time limit decided by the SCC Board. Only when it has been established that the respondent has not appointed an arbitrator within this time limit, the SCC Board has a right to appoint an arbitrator on behalf of the respondent.

---

[44] Regarding Stati's failure to abide by the "cooling-off" period cf. also section 5.2 below.

[45] Request for Arbitration, paras. 108 et seqq.

Error! Unknown document property name.

(80)     With regards to situations where the Swedish Arbitration Act applies, the respondent is obliged pursuant to Section 14 of the SAA to notify the claimant in writing of its choice within 30 days from receipt of the notification. The provision entails, firstly, that that a definite time limit is set out by law, i.e. 30 days. Secondly, it states the day from which the time limit is counted, i.e. the day of receipt of the notification (the time limit cannot be amended by court upon the request of a party). Thirdly, it follows the rule that the obligation of a respondent to appoint an arbitrator arises only if it received a notice from the claimant. Thus, the claimant, in its request for arbitration, does not need to request that the respondent shall appoint an arbitrator within the specified time limit. The respondent's obligation to appoint an arbitrator instead follows by law. This is evidenced by the provision in Article 19 of the SAA. However, the claimant must in this document indicate who he has appointed as arbitrator.

(81)     The provisions in the SCC Rules on the appointment of arbitrators differ substantially from what follows from the SAA. A basic difference is that the number of arbitrators shall not invariably be three. If the parties have not agreed upon this, the number of arbitrators shall be decided by the SCC Board pursuant to Article 12 of the SCC Rules. Thus, it is not possible to, in proceedings administrated by the SCC, build the initial stage of the tenets of the SAA, i.e. that each party shall appoint one arbitrator. It should be noted in this regard that Article 2(1) of the SCC Rules states that the request for arbitration shall contain, *inter alia*, comments on the number of arbitrators. The connected provision (vi) shall be understood in light hereof; a request for arbitration shall contain "*if applicable, the name, address, telephone number, facsimile number and e-mail address of the arbitrator appointed by the Claimant*".[46] As the number of arbitrators is not decided at this time, the provision is designed so that the claimant does not have to appoint an arbitrator in its request for arbitration, as opposed to what follows from Article 19 SAA. It is here important to notice that Article 26 ECT does not stipulate the number of arbitrators, but only refers to the SCC Rules.

(82)     With regard to the answer to the Request for Arbitration, the SCC shall specify the time limit within which the respondent shall submit this.[47] In this regard, it should be noted that the obligation to answer, pursuant to Article 5 of the SCC Rules, does not entail an obligation on the respondent to appoint an arbitrator, but instead merely provides that the answer should include details of who the respondent has appointed as arbitrator "*if applicable*", i.e. corresponding to what is stipulated for the Request for Arbitration pursuant to Article 2 of the SCC Rules. Thus, a request from the SCC to a respondent to submit an answer does not entail an obligation to appoint an arbitrator. As appears from SCC's letter to RoK dated 5 August 2010, the event that the respondent fails to answer does not hinder the continuing of the arbitration proceedings.[48] However, the rules do not

---

[46] The Russian version of Article 5(1)(v) of the SCC Rules is worded as follows in the relevant part; "если это предусмотрено избранной процедурой" – in English; "*if it is provided in the chosen procedure*".

[47] Pursuant to Article 13(1) SCC Rules, it is the SCC Board who can make the decision on time limits with regards to the appointment on arbitrators, not its secretariat.

[48] See Article 5(3) SCC Rules

**Error! Unknown document property name.**

entail a right for SCC to appoint an arbitrator on behalf of the respondent if it has failed to answer the Request for arbitration.

(83) The SCC's mandate to appoint arbitrators follows from Article 13 in conjunction with Article 9 (3) of the SCC Rules. Article 13 of the SCC Rules provides for a time limit for the respondent to appoint its arbitrator. In the event any of the parties fails to appoint an arbitrator within the set time limit, the SCC Board has a right pursuant to Article 13(3) of the SCC Rules to appoint the arbitrator. The time limit set for a party to appoint an arbitrator is decided <u>by the Board</u>, and its length may vary.

(84) Before the SCC has decided a time limit pursuant to Article 13(1) SCC Rules, the Board may not appoint an arbitrator on behalf of the respondent. The same should thus apply if the respondent has not received a notification on its obligation to appoint an arbitrator within the stated time limit.[49]

(85) Stati's Request for Arbitration indeed contained a request that the arbitration should be decided by three arbitrators and Stati had further appointed their arbitrator. However, the SCC is not bound by a party's request in this regard, but must, if the counter party does not accept the number of arbitrators, make a decision on the matter pursuant to Article 12 of the SCC Rules. SCC's Board can thereby decide that the arbitration shall be decided by three arbitrators, which is the main rule, or by a sole arbitrator.

(86) In present case, the SCC has deviated from what follows from the SCC Rules. The letter from SCC contained no order for RoK to appoint its own arbitrator. The deadline specified in the letter is only focused on the response to the Request for Arbitration. In any event, any such decision was never made by the SCC in this case.

### 5.1.6 The SCC acted in violation of due process and the principle of equality of the parties by stipulating deadlines that were too short

(87) As has been demonstrated above, the SCC has a duty to ensure that the respondent is provided with sufficient opportunity to appoint its arbitrator. Art. 5 of the SCC Rules stipulates that the Secretariat shall set a time period within which the Respondent shall submit an Answer to the SCC. As the Rules do not provide for a specific time period, this matter is not specifically regulated by the Rules. The SCC therefore has certain discretion to set this time period (however, see below). In exercising such discretion, the SCC needs to ensure that it acts in a practical and impartial way and that it ensures the execution of an eventual award. The SCC should be aware of the limits of this discretion, which also means that there can be no general deadlines but rather that every deadline needs to be carefully considered in view of all relevant circumstances of the case.

---

[49] Cf. NJA 2010 s. 219. It further follows from a statement by Öhrström that the provision entails that the respondent shall be ordered iwithin a certain time limit to appoint an arbitrator: "*After the claimant has appointed an arbitrator, the respondent is requested to appoint an arbitrator and finally the SCC will appoint a chairman*", see Öhrström, *Stockholms Handelskammares skiljedomsinstitut*, 2009, p .121.

**Error! Unknown document property name.**

(88)     In this case, such consideration should have led the SCC to set significantly longer deadlines. Therefore, the deadline of first effectively 15 days from receipt of the Request for Arbitration and then 9 days was a violation of due process and a violation of the principle of equality of the Parties.

(89)     The relevant circumstances that should have been considered by the SCC in this case are mainly the following: (i) the case was complex, (ii) the respondent was a sovereign state, (iii) the arbitration was commenced in breach of the three month cooling-off period, (iv) several days were needed for delivery of documents, (v) the alleged order was unclear (vi) English was not readily understood by the respondent, and (vii) an arbitrator can only be chosen after due consideration and communication. The SCC failed to take these facts into consideration.

*(i)     The case was complex*

(90)     In setting the deadlines for RoK to respond, the SCC should have considered that this was an extremely complex dispute. This should have been obvious from a first review of the Request for Arbitration with 40 pages and its 42 exhibits.

*(ii)     The respondent was a sovereign state*

(91)     In setting the deadlines, the SCC should also have considered that the respondent was a sovereign state. It should be common knowledge that every state has an administrative apparatus that requires certain procedures and routines to be followed. The first would be the identification of the competent governmental authority. The SCC sent the letter to the authority indicated by Stati as the "*likely*" competent authority. The SCC should therefore have been warned that it may not be a straightforward task which authority would be acting for RoK. The question regarding the competent authority would be a matter under Kazakh law in accordance with Article 48, second para. SAA. Under Kazakh law it could be different governmental authorities, which could be the competent one in different arbitral proceedings and finally it is the Prime Minister who decides on such issue.

(92)     It should also have been obvious to the SCC that the intra-governmental decision making process further entails retaining legal counsel. This may be a lengthy process given that an engagement letter in accordance with national legislation has to be drawn up and often even a tender process may have to be initiated. In addition, documents need to be translated into Russian or Kazakh so that they can be understood by the decision makers. Only then can the answer to be provided including the appointment of an arbitrator be agreed and developed with legal counsel.

(93)     The SCC should not be expecting any government authority to communicate with the SCC until it has retained legal counsel, legal counsel has studied the Request and counsel and the government authority have deliberated on how to react.

23

(94)     The fact that states as respondents should be treated differently is widely accepted in international arbitration, including lawyers from the law firm representing Stati in this case. King & Spalding lawyers Doak Bishop and Margrete Stevens, the latter being a member of the SCC board, accepted in an article that

> "[m]any who have been involved in investment arbitration will recognize the delays in the procedural schedule that often occur when a state is the respondent. Postponements attributable to the burden of organizing the government machinery is accepted to some extent as par for the course when arbitrating against a state."[50]

(iii)     *The arbitration was initiated in breach of the provisioned three month cooling-off period*

(95)     The Arbitration was requested with a direct reference to Article 26 in ECT. As seen by the circumstances set out in section 5.2 and in the following, the SCC should, in addition to taking note of that the cooling-off period was not followed by Stati, at least have prolonged the response time limit for RoK in order to give him the opportunity to take stance on the conditions for an arbitration according to the ECT.

(iv)     *Several days needed for delivery of documents*

(96)     The SCC should also have been aware and taken into consideration that, even by courier, it takes a certain time to deliver documents between Sweden and RoK. As the evidence shows even by courier the delivery took at least four days. Further, the SCC should have noticed that Stati had only provided it with the name of the Ministry but no further specification of any person. It therefore had to assume that in addition to the time for the courier, it would take further time within the Ministry for the competent person to receive the letter.

(v)     *The alleged order was unclear*

(97)     Further, the SCC should at least have seen to it that its letters and instructions would be understandable by a party that does not yet have legal counsel. When sending on a request for arbitration, the SCC has to assume that the chances are high that this party has not yet appointed legal counsel. The instructions given should therefore be readily understandable and clear to someone who is not well versed in international arbitration. When SCC received the Request for Arbitration, the starting assumption for SCC must be that RoK most likely did not have a legal counsel.

(98)     The letter from the SCC only refers to an answer to the Request for Arbitration with reference to Article 5 of the SCC Rules. In accordance with what has been discussed

---

[50] R. Doak Bishop and Margrete Stevens, *Safeguarding the Fair Conduct of Proceedings* – Report in Albert Jan van den Berg (ed), *International Arbitration: The Coming of a New Age?*, ICCA Congress Series, Volume 17 (Kluwer Law International 2013) at p. 490.

**Error! Unknown document property name.**

under section 5.1.5 above, this order can hardly, even with an indulgent interpretation, be seen as including a request for whom RoK had appointed as it arbitrator. For a party without legal counsel it would be almost impossible to interpret, into the order of the SCC, such a request.

*(vi)    English not readily understood by respondent*

(99)    The SCC also failed to take into consideration that English is not a language commonly spoken in RoK, a fact that was or should have been known by the Secretariat of the SCC. The official languages in RoK are Kazakh and Russian. In the relevant department of the Ministry of Justice only two people spoke English at the time. From the exhibits sent with the Request for Arbitration, the SCC could also have seen that English was never a language in which the Parties had communicated, it was always Russian.

(100)   The Russian version of Article 5 (1)(v) in SCC rules has the following wording in relevant part: "если это предусмотрено избранной процедурой", translated English meaning, "*if it is provided in the chosen procedure*". If the Ministry of Justice had opportunity to analyze the content of SCC's request, they would most likely have used the Russian version of the SCC rules. Since Article 26 ECT does not contain a provision about amount of the arbitrators, but rather refers to the SCC Rules. Therefore, the SCC's request in the letter about that RoK should answer to the Request for Arbitration can hardly be understood as if it also entailed a requirement of appointing an arbitrator.

*(vii)   An arbitrator can only be chosen after due consideration and communication*

(101)   In addition, the SCC should have taken into consideration that in particular in an investment arbitration, the choice of an arbitrator requires specific care and consideration. It is common to research which stance potential candidates have taken on disputed issues in other investment arbitrations. Often, some exchange with potential candidates occurs before an appointment and this is not only admissible but common practice that requires additional time.

*(viii)  SCC failed to take any of these factors into consideration*

(102)   The SCC, however, failed to take into account any of these circumstances when setting the time limits for RoK to provide an answer and to appoint an arbitrator. Rather, even a respondent that is not a state but an entity in a straightforward commercial arbitration may have struggled with them.

(103)   The effectively 15 days from receipt of the Request for Arbitration are too short a time period even for domestic Swedish arbitrations. Article 14 (1) of the Swedish Arbitration Act prescribes a period of 30 days from receipt of the notice of the other party's

Error! Unknown document property name.

appointment.[51] In this case, the SCC thus granted a state in an investment arbitration about half the time that would have needed to be accorded to a party in a domestic Swedish commercial arbitration according to the SAA. It is obvious that the time frame granted to the RoK was insufficient and did not accord with generally accepted standards.

(104)   The additional 9 days deadline could not help to heal the fact that the deadline was too short. Even if both deadlines are combined, it was only a deadline of 30 days from receipt of the Request for Arbitration. This may be just acceptable for domestic arbitration but it is incompatible with international investment arbitration.

(105)   Disputes under the ICSID Convention are a particularly good measure of established international practice for arbitrations in which states are involved. The ICSID Convention thus takes into account the particularities of state parties in international arbitration. It should also be mentioned that the ECT also provides for the possibility to take recourse to ICSID as an alternative to the SCC and a state's right should not be curtailed by the fact that an investor opts for an SCC arbitration rather than ICSID.

(106)   According to Article 38 of the ICSID Convention, there is at least a 90 day time period after dispatch of the notice of registration of the request before an arbitrator can be appointed on behalf of one party:

> "*If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the arbitrator or arbitrators not yet appointed (…)*"

(107)   Such a deadline would take sufficiently into consideration that a state is party to the arbitration. In this case, where further factors, such as the failure to abide by the cooling-off period and the high complexity of the case (and eventually a claim for more than USD 3 billion) played a role, the SCC should have considered to afford more time to RoK, not less.

(108)   In addition, the SCC aggravated the situation by providing unclear instructions that, at least to a party which had not yet retained legal counsel. In its letters, instead of pointing to the necessary actions, in this case the appointment of an arbitrator, the SCC only requested RoK to submit an answer to the Request for Arbitration in accordance with Article 5 of the SCC Rules. The SCC never explicitly mentioned that this Answer was to include the appointment of an arbitrator. The SCC did not mention that failure in this respect would lead to the SCC appointing an arbitrator on RoK`s behalf.

---

[51] See Hobér, *International Commercial Arbitration in Sweden*, 2011, s. 151, ¶ 4.18, who writes: "*[E]ssentially, under the SCC Rules, the Board has the same role and function as the District Court has under the SAA*".

**Error! Unknown document property name.**

(109)   By stating certain issues that the Answer should include but omitting the fact that an arbitrator should be chosen, the SCC rather created the impression that such an appointment was not necessary. It is obvious that the SCC should explicitly have requested RoK to appoint an arbitrator. Celeste E. Salinas Quero, legal counsel at the SCC, describes the procedure with the following words:

> "*Upon receipt of the request for arbitration, the counsel in charge of the division will send the request to the respondent for comment. Respondents are invited to comment on claims raised, on the number of arbitrators, if called for by the parties' arbitration agreement, or other circumstances of the case.* <u>*If needed, respondents are also invited to appoint their arbitrator.*</u>"[52] (emphasis added)

(110)   Due process requires that a party is given sufficient opportunity to appoint its arbitrator. It entails a right to be heard as well as the equal treatment of the parties.

(111)   In the present case, the SCC, after first having set insufficient time limits, then proceeded with undue haste to appoint Professor Lebedev on behalf of RoK. The SCC's haste in dealing with the appointment is also demonstrated by its appointment of the Chairman within another 7 days, and without suggesting for the Parties to agree on the appointment of Chairman, or neither informing them about that SCC intended on appointing a Chairman (see section 5.1.8 below).

(112)   Under normal circumstances, even if the deadline for a party to appoint has elapsed, it will not find out a mere 5 working days later that its arbitrator has already been appointed by the institution. At the ICC, for example, such an appointment generally does take a certain time and if, in the interim a party nominates an arbitrator, the Court may nevertheless accept this nomination, even though technically made out of time.[53]

(113)   The haste with which the SCC made the appointment thus intensifies the concerns raised regarding the length of the deadlines for the response.

(114)   Ms. Salinas Quero, counsel at the SCC, has written an article on the SCC's appointment process.[54]  She describes it as a two-step procedure, where the Secretariat firstly decides on a list consisting usually of at least three potential arbitrators to be handed over to the Board. This entails a meeting of the Secretariat in which each counsel presents to their colleagues and to the Secretary General and Deputy Secretary General the cases that are

---

[52] Salinas Quero, *Appointment of arbitrators under the SCC Rules*, American Bar Association, Section of International Law, International Arbitration Committee 2013, Volume 1, Issue 1, http://www.sccinstitute.com/filearchive/4/46703/ABA%20SIL%20Newsletter%20sent%20to%20list%20serve%20on%20Arbitrator%20Appointments%20(001%20%20%20%20%20(1).pdf, at p. 54.

[53] Cf Derains/Schwarz, *Guide to the ICC Rules of Arbitration*, Issue 2, 2005, p. 152.

[54] Salinas Quero, *Appointment of arbitrators under the SCC Rules*, American Bar Association, Section of International Law, International Arbitration Committee 2013, Volume 1, Issue 1, http://www.sccinstitute.com/filearchive/4/46703/ABA%20SIL%20Newsletter%20sent%20to%20list%20serve%20on%20Arbitrator%20Appointments%20(001%20%20%20%20%20(1).pdf, at p. 53-56.

Error! Unknown document property name.

to be taken to the Board for appointment and the Secretariat then in a collective decision making process, agrees on a list of candidates.

(115)   It seems unlikely that the appointment process described above could have been completed in the five working days from the SCC's receipt of Stati's request to appoint an arbitrator on behalf of RoK until the appointment of Professor Lebedev.

(116)   Further, in this case the constitution of the full Tribunal was communicated to the Parties on 28 September 2010, i.e. within 54 days of registration of the request for arbitration (less than two months). Ms. Salinas Quero of the SCC states in the same article that on average, the constitution of a tribunal takes no more than three months after registration of a request for arbitration until communication of the Board's decision to the parties.[55] This case should not have been one for the Secretariat to attempt beating the average time frame. The average time frame might apply to the average domestic case which represents more than half the cases administered by the SCC. Notably, this average timeframe of three months also appears to include cases that are subject to expedited proceedings (*Sw. förenklade förfaranden*) and which account for more than one third of the cases at the SCC.[56]

(117)   It should also be added that in the past, the SCC has treated investment arbitration cases very differently than it did in this case. In the arbitration *Al-Bahloul v Tajikistan*, the SCC sent the Request for Arbitration to the Republic of Tajikistan on 3 June 2008 and when not receiving a reply from Tajikistan, it appointed an arbitrator on its behalf on 13 August 2008, i.e. 71 days after dispatch of the Request for arbitration rather than 46 days as in this case.[57] It should also be mentioned that the SCC rather than only sending one reminder, sent three reminders to Tajikistan.[58]

(118)   The SCC's actions were also in contradiction to generally acknowledged international standards, in particular when a state is a party to the arbitration. A survey has shown that on average it takes 180 days or approximately 6 months from registration of a claim for an ICSID tribunal to be constituted.  This is contrasted by little more than 1.5 months in this case. Indeed, ICSID will only appoint an arbitrator on behalf of a party if at least 90 days have passed from dispatch of the notice of registration as mentioned above. In this case, after only half this time, an arbitrator had already been appointed on behalf of RoK.

(119)   The SCC is not a novice either in the administration of investment arbitration cases, nor in handling cases that involve states that do not have English as an official language. The

---

[55] Salinas Quero, *Appointment of arbitrators under the SCC Rules*, American Bar Association, Section of International Law, International Arbitration Committee 2013, Volume 1, Issue 1, http://www.sccinstitute.com/filearchive/4/46703/ABA%20SIL%20Newsletter%20sent%20to%20list%20serve%20on%20Arbitrator%20Appointments%20(001)%20%20%20%20(1).pdf, at p. 56.

[56] Statistics provided by the SCC at http://www.sccinstitute.com/hem-3/statistik-2.aspx.

[57] *Mohammad Ammar Al-Bahloul v. The Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009, available at http://italaw.com/sites/default/files/case-documents/ita0023_0.pdf  at paras. 5 et seq.

[58] *Ibid.*

Error! Unknown document property name.

SCC should therefore have known and respected the complications arising therefrom. However, the SCC not only ignored that a state was party to the arbitration, it also disregarded the complexity of the case with claims running into multi-billion amounts in USD.

(120) The appointment within such a short time is a violation of due process and the principle of equality of the Parties for the reasons mentioned above. RoK should have been given a realistic opportunity to appoint its arbitrator.

(121) Right to a due process should at least require that SCC has put the same effort in appointment of an arbitrator, as a Party would have done. This obligation can be seen in Article 13 (6) SCC rules. The short time period that applied in this case shows that SCC has not even followed its own set of rules.

### 5.1.7 The SCC did not afford RoK the right to be heard when appointing an arbitrator on behalf of RoK

(122) The SCC's appointment of Professor Lebedev as arbitrator on behalf of RoK is a violation of the SAA, of the fundamental procedural rights and of the SCC's own general procedure.

(123) As the timeline demonstrates, RoK received Stati's request for the appointment of an arbitrator 3 days after the SCC had already appointed the arbitrator. Thus, RoK was not given any opportunity to respond to Statis' request. Further, instead of for instance presenting RoK with the name of the arbitrator or arbitrators considered for appointment, the SCC immediately appointed Professor Lebedev.

(124) For cases, in which the District Court acts as appointing authority, Section 14, subsection 3 of the SAA provides that the District Court is obliged to serve the respondent with the application for the appointment of an arbitrator and to give him the opportunity of expressing his views on it.[59]

(125) Under the SCC Rules, the Board has the same role and function as the District Court under the SAA.[60] Therefore, the SCC is under the same obligation to serve the respondent with such an application and to provide him with an opportunity to comment and to react.

(126) In fact, it is not only a question of the SAA but also a question of general procedural principles that it is necessary to provide a party the opportunity to be heard. The request to appoint an author on behalf of another party is an important procedural act and it should be treated accordingly. The SCC chose surprisingly send Stati's request by registered post instead of by carrier.

---

[59] See Heuman, *Law of Arbitration*, 1999, p. 236, who explains that he District Court has to abide by the law on errands (*Sw. ärendelagen*).

[60] Cf Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 151, 4.18.

Error! Unknown document property name.

(127)    Again, the ICSID Rules are a good measure of what should be observed in such a situation. Rule 4 of the ICSID Arbitration Rules specifies that the request to appoint an arbitrator on behalf of one party should be sent to the other party, the ICSID Chairman shall use his best efforts to comply with this request within 30 days of receipt and before proceeding to make an appointment he shall consult both parties as far as possible. None of this occurred here when SCC appointed Professor Lebedev.

(128)    These considerations are aggravated by the fact that the SCC entirely failed to warn RoK that failing an appointment of an arbitrator, the SCC Board would make the appointment. In fact, the SCC letters did mention certain consequences of not responding to the Request for Arbitration but failed to mention this particular consequence explicitly. Thus, only the Claimants' request to appoint an arbitrator would have informed RoK of this potential consequence. Being heard on this request thus was of particular importance.

(129)    Further, the SCC did not comply with its own routines and practice. When Stati requested the SCC to appoint an arbitrator on behalf of RoK, the SCC did so without even first letting RoK receive this request. The latter is particularly improper, given former SCC Deputy Secretary General Marie Öhrström's statement that

> "[i]t is a fundamental principle in the SCC case administration that the parties should take equal note of all briefs, documents and other material submitted to the SCC or to the arbitral tribunal."[61]

(130)    The SCC's actions in this case undermined this fundamental principle since it is only relevant to inform a party about a request from the other party when there is still time to react to such a request.

### 5.1.8    The SCC did not afford RoK the right to be heard when appointing the Chairman of the Tribunal

(131)    The Chairman of the Tribunal, Professor Böckstiegel, was appointed by SCC on 27 September 2010, i.e. only within 4 working days from Professor Lebedev's acceptance of his appointment by the SCC. Again, RoK was not invited to comment on this appointment. Even though Stati had already in the Request for Arbitration also asked the SCC for the opportunity for the parties to jointly appoint the Chairman.

(132)    Although, the SCC Board under Article 13(3) of the SCC Rules has the power to appoint the Chairman of the Tribunal, SCC practice shows that the parties should be invited to comment on such appointment. The parties are even encouraged to agree on the choice of the Chairman and even Stati itself had acknowledged the importance of the Parties' influence on the appointment of the Chairman.

(133)    In an arbitration of this magnitude and importance – an investment arbitration including a state as one of the parties – it is of utmost importance to hear the parties regarding the

---

[61] Öhrström, *Institutional Arbitration* (Schütze (ed.)), http://sccinstitute.com/filearchive/4/45731/Öhrström%20_(2).pdf, p. 822.

Error! Unknown document property name.

choice of the Chairman. In particular, since the Chairman has a very important role within the Tribunal. In investment arbitrations, where awards are frequently published, it is common practice that the parties scrutinize the standpoints taken in previous arbitrations by other arbitrators in issues at hand. This further emphasizes the importance of the parties' rights to be heard regarding the choice of the Chairman.

(134)     In this case, the SCC disregarded both the importance of the appointment of the Chairman and Stati's request by its hasty appointment of Professor Böckstiegel.

### 5.1.9 The SCC's violations of fundamental procedural rights of RoK and the Tribunal`s management entail that the arbitral award is invalid, alternatively it should be set aside

(135)     As has been demonstrated above, the SCC has violated fundamental principles and rights as well as its own rules by (i) failing to conduct a proper prima facie review of the Request for Arbitration and thus failing to detect that the arbitration was initiated in breach of the three month cooling-off period, (ii) wrongly assuming that RoK should appointed an arbitrator with its Answer to the Request for Arbitration, (iii) acting in violation of due process and the principle of equality of the parties by stipulating deadlines that were too short, (iv) not affording RoK the right to be heard when appointing an arbitrator on behalf of RoK, and (v) not affording RoK the right to be heard when appointing the Chairman of the Tribunal. The Tribunal has later, by its own decision determined that they had jurisdiction, thus accepting the SCC's wrongful management of this matter and therefore committed an error themselves.

(136)     In summary, the SCC's initial management of this case – that culminated in the SCC's appointment of Professor Lebedev as an arbitrator, which was later ratified by the Tribunal, must be depicted as tainted by many unfortunate misjudgments. These misjudgments have further entailed that RoK's right to due process and the right to have the arbitration tried in a manner which considered RoK's requests in a fair and equitable way, have been violated.

(137)     This beginning of the proceedings has entailed that the subsequent proceedings were unbalanced, which was further evidenced by the arbitrators' completely varying commitment and behavior during the proceedings[62]. Accordingly, the Award must be declared invalid in accordance with Section 33 p. 2 in SAA, as being clearly incompatible with the basic principles of the Swedish legal system.[63] Alternatively, the Award shall be set aside in accordance with Section 34 p. 4 in SAA, since the Tribunal has been appointed in violation of the Parties' agreement, i.e. the SCC Rules. In any event, the SCC's and the Tribunal's management was an irregularity in the course of the

---

[62] This is for example evident from the transcripts of the Hearings as well as the Tribunal's wrong assumption of acknowledgements by RoK, see section 5.7 below.

[63] See Lindskog, *Skiljeförfarande, En kommentar*, 2012, p. 129, footnote 196, and p. 848 et seq.

Error! Unknown document property name.

proceedings which probably influenced the outcome of the case and the arbitral award shall therefore be set aside in accordance with the Section 34 p. 6 in SAA.[64]

---

[64]  It should hereby noted that the claim for the irregularity in the course of the proceedings which probably influenced the outcome of the case in this matter should be interpreted objectively and with the starting point in the disturbance of the influence balance that the deprivation of ROK`s right to appoint its own arbitrator has caused. Only the fact that ROK`s right to appoint its own arbitrator has been violated through SCC and the Tribunal`s judgment means that there has been an irregularity in the course of the proceedings which probably influenced the outcome of the case. Cf Lindskog, *Skiljeförfarande, En kommentar*, 2012, s. 475.

**Error! Unknown document property name.**

5.2 **The Award is not covered by a valid arbitration agreement between the Parties because Stati failed to abide by the three month "cooling-off" period in Article 26 ECT and which constitutes a precondition in RoK's offer**

5.2.1 **Introduction**

(138)   The arbitral proceedings and the award are based on the arbitration agreement provisioned in Article 26 ECT. Contrary to arbitration agreements between commercial actors, usually established in connection with the commercial agreement, the provision in Article 26 ECT does not constitute a fulfilled arbitration agreement. This provision should instead be counted as a standing offer for an arbitration agreement by the State through the accession to the ECT. A binding arbitration agreement between the investor and the State is established first when the investor accepts the standing offer by a request for arbitration. The State's consent to arbitral proceedings is therefore based entirely on the provisions of Article 26 ECT.

(139)   Article 26 stipulates that arbitral proceedings must be preceded by a "cooling-off" period of three months. Following this cooling-off period is therefore a mandatory precondition for State's consent and the standing offer *per se*. In this case, Stati requested arbitration only five days after RoK had terminated the subsoil contracts. It is therefore obvious that Stati has failed to adhere to the cooling-off period, and the reason why a valid arbitration agreement never was established between the Parties. Stati's failure in this respect has caused an irreparable prejudice to RoK, a damage that consequently could not be healed by a stay of arbitral proceedings. RoK protested against this condition and as a consequence, never waived the right to set forth objections against the Tribunal's jurisdiction.

(140)   The State`s obligation through ECT or BIT is considered a grant for the investors, that is being offered the opportunity to on the prerequisites set in ECT and applicable BIT to have their disputes resolved in an international arbitration. Otherwise, the investor has to use authorized District Court where the investor is not obligated to follow provisions about cooling-off periods or other requirements according to the ECT/bit. Hence, the investor has a choice to have its claim tried. The investor cannot do cherry-picking, i.e. not to choose whatever parts of the both alternatives. If the investor chooses to request for arbitration, he then must accept the conditions and requirements in regards to that alternative, meaning that an arbitration must be preceded by a cool-off period.

5.2.2 **The fulfilment of the three month "cooling off" period was a mandatory condition in ROK's offer to consent to arbitration**

(141)   RoK's standing offer to arbitration was conditioned on the prior fulfilment of the three month "cooling off" period foreseen in Article 26(2) ECT. Article 26(2) ECT provides that a dispute may only be submitted to arbitration if it cannot be settled amicably within a period of three months from the date on which either party to the dispute *"requested amicable settlement"*.

Error! Unknown document property name.

(142)    The parties' agreement to arbitration under an international investment treaty is usually established in two steps: First, the state makes an offer to arbitrate in the investment treaty in question, usually in a specific dispute resolution clause. Second, the investor impliedly accepts the offer to arbitrate by initiating arbitration proceedings. In that regard, it is important to note that dispute resolution clauses in treaties typically provide for a number of prerequisites, such as the existence of a protected "investment" and "investor" in the meaning of the treaty and, in many cases, the fulfilment of further requirements such as a "cooling off" period. If such requirements are not fulfilled, the investor's initiation of arbitration does not constitute the acceptance of the state's offer but rather a counter-offer/new offer with new conditions, namely without the requirements established in the state's offer. In such situation, consent is not existent and cannot be assumed. Pursuant to Swedish contract law, such counter-offer cannot entail that a party is bound unless the counter-offer in turn is accepted by the state. That was not the case.

(143)    Presently, the clear wording of ECT Article 26(2), its purpose and scholarly opinion as well as investment arbitration case law lead to the conclusion that the state's consent to arbitration was conditioned on the fulfilment of the "cooling off" period.

(144)    The relevant parts of Article 26 ECT read as follows:

> *"(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III* shall*, if possible, be settled amicably.*
>
> *(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution: [...]*
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation* in accordance with the provisions of this Article*. [...]*
>
> *(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to: [...]*
>
> *(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce."* (emphasis provided)

(145)    The wording of Article 26 ECT is clear. ECT Article 26(1) uses mandatory language, namely the word "shall" to establish an obligation on the parties to pursue amicable

Error! Unknown document property name.

settlement.[65] Moreover, Article 26(3) ECT provides that the offer of consent is given in accordance with all of the provisions of Article 26 ECT, including those of Article 26(2) ECT. This entails that a state's consent to arbitrate is dependent on the fruitless exhaustion of the amicable settlement requirement within the three month period. It follows therefore that an arbitration agreement will not be concluded unless such an attempt has taken place.[66] Where no notification for amicable settlement has been given and, moreover, no attempts to settle have been made prior to the investor's attempts to invoke the dispute resolution mechanisms in Article 26(2)(c) ECT, the state's standing offer to arbitrate is not met by an acceptance by the investor. Rather, the investor makes a counter-offer/new offer with different conditions.

(146)   The same conclusion follows if one considers the purpose of the "cooling off" period. This purpose is threefold: For one, the "cooling off" period aims to ensure amicable rather than adversarial resolution of disputes.[67] This purpose is best achieved if the investor is forced to request amicable settlement prior to initiating arbitration and to actually pursue settlement talks within the "cooling off" period. Consequentially, the "cooling off" requirement must be understood as a necessary and well-motivated condition to the state's consent to arbitration.

(147)   Secondly, it is procedurally cost effective to have the parties negotiate in order reach an amicable solution before the parties commence a costly arbitration. There is a manifest difference between letting amicable settlement negotiations take place before, instead of after a possible arbitration has been initiated.

(148)   Thirdly, the "cooling off" period also has another, maybe even more important purpose: The "cooling-off" period allows a respondent state time to understand and grapple with the issues underlying the threatened claim and permits it the time required to put into motion the machinery of the state, through the proper channels of government communication, required to prepare itself to engage in the arbitration. Such additional time period is essential for respondent states because typically, numerous state bodies need to be involved in order to assess a claim brought by an investor and it may potentially become necessary to create working groups in order to coordinate the state's reaction to a claim. All of this is very time consuming. The "cooling off" period ensures that there is sufficient time for the state at the beginning of the case in order to e.g. coordinate and assess the issues, appoint counsel, formulate an initial reaction and, if the claim should continue to the stage of arbitration, nominate an arbitrator. In order for this purpose of the "cooling off" period to be fulfilled, it is essential that the "cooling off" requirement is understood as strict and jurisdictional.

---

[65] Cf. *Hochtief AG v. The Argentine Republic*, ICSID Case No. ARB/07/31, Separate and Dissenting Opinion of J. Christopher Thomas, Q.C, 7 October 2011, para. 34.

[66] *Adnan Amkhan Bayno*, Consent To Submit Investment Disputes To Arbitration Under Article 26 Of The Energy Charter Treaty, Investment Disputes To Arbitration [2007] Int. A.L.R. 65, 71

[67] *Adnan Amkhan Bayno*, Consent To Submit Investment Disputes To Arbitration Under Article 26 Of The Energy Charter Treaty, Investment Disputes To Arbitration [2007] Int. A.L.R. 65, 71

Error! Unknown document property name.

(149)   Only if the state is granted the "cooling off" period at the beginning of the dispute is it ensured that both parties to the eventual arbitration are on an equal footing. That is because the investor has all the time in the world to prepare its claim. Equality of the parties can only be ensured if the state is given additional time by means of the "cooling off" period at the beginning of the case. On the other hand, watering down the "cooling off" requirement to a negligible requirement of procedure would entail that an investor could effectively ignore the "cooling off" period and start into the dispute with an unfair advantage.

(150)   Further, scholarly opinion has also interpreted Article 26(2) ECT in this manner. *Professor Adnan Amkhan Bayno*, the Former Head of Legal Affairs Department of the Energy Charter Secretariat, has stated that *"[t]he absence of an attempt to settle the dispute amicably within the prescribed period can be interpreted as the non-existence of the offer by a contracting party to arbitrate."* and that as a result, the tribunal will be unable to decide the dispute for lack of jurisdiction.[68] Importantly, Stati themselves presented an opinion by Professor Bayno in the Arbitration.[69] This opinion covered several issues of international law but sidestepped in a quite apparent manner the question whether the "cooling off" requirement is jurisdictional in nature. Professor Bayno thus apparently still continues to hold his original opinion and could not be convinced by Stati' counsel to change his view.

(151)   While so far, there has been no Swedish case law dealing with the cooling-off period under the ECT, investment tribunals dealing with the interpretation of other investment treaties also confirmed that "cooling off" requirements have to be understood as a precondition for state consent. This proposition was for example recognised by the tribunal in *Murphy v. Ecuador*. The Murphy case described the obligation for a cooling-off period under the BIT between Ecuador and the USA as constituting *"a fundamental requirement that Claimant must comply with, compulsorily, before submitting a request for arbitration".*[70] Further, the *Murphy* tribunal held that the "cooling off" requirement *"is not an inconsequential procedural requirement but rather a key component of the legal framework established in the BIT and in many other similar treaties, which aims for the parties to attempt to amicably settle the disputes that might arise resulting of the investment made by a person or company of the Contracting Party in the territory of the another State".*[71]

(152)   Furthermore, the tribunal in *Enron v. Argentina* also stated in an *obiter dictum* that the "cooling off" requirement in the US-Argentina BIT was *"very much a jurisdictional one".*

---

[68] *Adnan Amkhan Bayno*, Consent To Submit Investment Disputes To Arbitration Under Article 26 Of The Energy Charter Treaty, Investment Disputes To Arbitration [2007] Int. A.L.R. 65, 71 et seq.

[69] Expert Opinion by Professor Adnan Amkhan Bayno dated 6 May 2012.

[70] *Murphy Exploration and Production Co Int'l v Republic of Ecuador*, ICSID Case No. ARB/08/4, Award on Jurisdiction, 15 December 2010, para. 149.

[71] *Murphy Exploration and Production Co Int'l v Republic of Ecuador*, ICSID Case No. ARB/08/4, Award on Jurisdiction, 15 December 2010, para. 151.

According to the *Enron* tribunal, *"[a] failure to comply with that requirement would result in a determination of lack of jurisdiction."*[72]

(153)   Christer *Söderlund*, a Swedish lawyer with extensive experience from international arbitration in general and investment arbitration in particular, has voiced strong support for the finding of the *Enron* tribunal:

> *"'My own view on this issue corresponds to what the Tribunal in the Enron-case stated in the aforementioned part. With respect to procedural issues, which arise in connection with the application of a dispute resolution clause, it cannot be eligible to let practical views or general considerations of the purpose to be decisive. Needless to say, a Tribunal may not deviate from the parties' agreement as to the rules for the proceedings, even if – which, in practice, is rather frequently the case – very strong judicial economy-reasons would speak in favor of such measures. A Tribunal (or indeed a court), which faces the objection that a certain described preamp in a dispute resolution clause has not been fulfilled, must thus adjudicate this issue and, if this is considered to be the case, dismiss the request for arbitration."*[73]

(154)   Notably, the interpretation of conditions to the state's consent to arbitrate also plays a large role in case of so-called "local remedies" requirements in international investment treaties. Such requirements differ from the "cooling off" requirement in Article 26(2) ECT in that they require no settlement negotiations but instead an attempt to litigate the dispute in the local courts of the host state for a certain period of time prior to submitting it to arbitration (typically between six and eighteen months). Considering the legal relevance, these "local remedies" requirements are to some extent comparable to the "cooling off" requirement, given that the "local remedies" requirements also describe the various necessary steps in the process of settlement of the dispute. With regard to these "local remedies" requirements, there is a strong precedent establishing that these impose a precondition on the state's consent to arbitrate and are jurisdictional in nature. For example, the tribunal in *ICS v. Argentina* argued that "local remedies" requirements imposed conditions on state consent and were therefore jurisdictional in nature. [74] The same view was also taken by arbitrator Christopher Thomas in his opinion in the case of *Hochtief v. Argentina*.[75] This precedent can be applied to the present case by way of analogy.

---

[72] *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on Jurisdiction, 14 January 2004, para. 88. The tribunal's subsequent award on the merits was later annulled on unrelated grounds.

[73] *Söderlund, Multimodala tvistlösningsklausuler*, Juridisk Tidskrift 2005-06, Nr. 1, p.195.

[74] *ICS Inspection and Control Services Limited (United Kingdom) v. The Republic of Argentina*, UNCITRAL, PCA Case No. 2010-9, Award on Jurisdiction, 10 February 2012, para. 262.

[75] *Hochtief AG v. The Argentine Republic*, ICSID Case No. ARB/07/31, Separate and Dissenting Opinion of J. Christopher Thomas, Q.C, 7 October 2011, paras. 33 et seqq.

Error! Unknown document property name.

(155)    As an example, the Tribunal in ICS v. Argentina, also stated that the requirement of "local remedies" includes the preconditions for a State`s consent to an arbitration proceeding and therefore affects the Tribunal`s jurisdiction. Same opinion was expressed by the arbitrator Christopher Thomas in the dispute Hochtief v. Argentina. These guiding cases can be applied in this dispute and further supports the requirement of the cooling-off period provisioned in Article 26 (2) ECT being applied strictly and that it has a connection with the Parties consent to an arbitration.

(156)    As a point of interest, it should also be mentioned that Stati seem to have acknowledged that the fulfilment of the "cooling-off" requirement was a precondition for the jurisdiction of the Tribunal. Otherwise, they would not already in their Request for Arbitration have tried to argue that they complied with this requirement.[76] While their arguments were incorrect, they are nonetheless telling in that they show that Stati were aware of their problem with the "cooling off" requirement from early on.

### 5.2.3    Stati's commenced arbitral proceedings without going through with the mandatory three month "cooling-off" period foreseen in Article 26(2) ECT

(157)    Contrary to Article 26(2) ECT, Stati failed entirely to request amicable settlement prior to initiating the arbitration. Instead of requesting amicable settlement and going through with the three month "cooling-off" period after the contract termination on 21 July 2010, Stati simply commenced arbitration within a mere five days by way of submitting their Request for Arbitration on 26 July 2010.

(158)    During the arbitration, Stati suggested that they had fulfilled the "cooling-off" requirement by way of two letters sent already in the spring of 2009.[77] In fact, however, neither of these letters could be understood as a request for amicable settlement within the meaning of Article 26(2) ECT. Hence, these letters are irrelevant.

(159)    For one, Stati referred to a letter sent by TNG and Terra Raf to the Kazakh Ministry of Energy and Mineral Resources ("**MEMR**") on 18 March 2009, i.e. 15 months before the first relevant agreement had been terminated on 21 July 2010. In this letter, TNG and Terra Raf complained about the MEMR's position with regard to the transfer of shares from Gheso to Terra Raf. The letter concludes with the suggestion that the state should either give up its position, or pay USD 1.347 billion to Terra Raf, or, if neither of the two other suggestions was to be accepted, *"submit the litigation for examination and settlement to the Arbitration Institute of the Stockholm Chamber of Commerce in Sweden, without terminating or suspending the subsoil use contracts with 'Tolkynneftegas' LLP".*[78]

(160)    It is beyond clear that this letter does not contain a request for amicable settlement within the meaning of Article 26(2) ECT. No reference to Article 26 ECT or to any other Article of the ECT is made. The word "amicable" or any of its synonyms do not appear in the letter.

---

[76] Request for Arbitration, paras. 108 et seqq.

[77] Cf. Request for Arbitration, paras. 108 et seqq.; Statement of Claim, paras. 37 et seqq.

[78] Letter from TNG and Terra Raf to the MEMR dated 18 March 2009, <u>Exhibit 9</u>.

Error! Unknown document property name.

Moreover, the mere fact that SCC arbitration is mentioned contradicts Stati's position. Arbitration is a means of adversarial, not of amicable dispute resolution. Suggesting arbitration is hence the precise opposite of a request for amicable resolution of the dispute. In any event, the state could not reasonably understand the reference to SCC arbitration to mean that Stati were considering investment arbitration under the ECT at the time (March 2009). That is because TNG's subsoil use contracts also provided for arbitration as a means of settlement. Against this background, the state had to understand the reference to SCC arbitration only to be one to the contractually agreed arbitration mechanism, not to investment arbitration under the ECT.

(161) Stati's reference to Ascom's letter to Kazakh President Nursultan Nazarbayev dated 7 May 2009 does not support Stati's position either. In this letter, Ascom threatened that *"if neither the competent authorities nor the law enforcement or judicial bodies take any action whatsoever against these misdeeds of the controlling bodies, we will have no other choice but to apply to the Arbitration Institute of the Stockholm Chamber of Commerce, Sweden, or another international arbitration court."*[79] Again, this cannot be understood as a request for amicable settlement within the meaning of Article 26(2) ECT. No reference to the ECT was made and the word "amicable" or its synonyms were not used. Rather, the letter contains an announcement that adversarial dispute resolution would be pursued, i.e. the opposite of a request for amicable resolution of the dispute. The reference to arbitration could not be understood to be a reference to investment arbitration under the ECT as, again, arbitration was also foreseen in KPM's and TNG's subsoil use contracts.

(162) RoK's position with regard to these two letters is also vindicated by the Decision on Jurisdiction rendered in the case of *Burlington v. Ecuador*. In this case, the tribunal found that the "cooling off" provision in the bilateral investment treaty between the USA and Ecuador (the "US-Ecuador BIT") *"requires the investor to inform the host State that it faces allegations of Treaty breach which could eventually engage the host State's international responsibility before an international tribunal."*[80] This finding demonstrates that a clear reference to an alleged treaty breach is necessary in order to give notice of a dispute. Notably, Article 26(2) ECT goes even further than the US-Ecuador BIT, in that it requires a formal request for amicable settlement, not only a notice of the dispute pointing out the alleged treaty breach.

(163) What is more, both letters are dated and sent out more than a year and a year and a half, respectively, before the subsoil use contracts with KPM and TNG was terminated and the arbitration was commence. In principal, the letters also referred to a majority of the events which predate the circumstances relied on by Stati in the arbitration. This is a further reason why they cannot be understood as a request for amicable settlement with regard to the present dispute.

---

[79] Letter from Ascom to the President of Kazakhstan dated 7 May 2009, <u>Exhibit 10</u>.

[80] *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, para. 338.

Error! Unknown document property name.

(164)    Finally and in any event, it should be noted that the letters only referred to Terra Raf and and Ascom, which also is a fact illustrating that the letters did not mean a request of cooling-off negotiatitons. Furthermore, even though you were to accept Stati's agreement that these letters implied a request for an amicable settlement, the letters would only cover Terra Raf and Ascom, and not Anatoli and Gabriel Stati who were the other two claimants in the dispute. The Tribunal did then have no jurisdiction regarding Antaoli Stati and Gabriel Stati since they have not respected the cooling-off period in ECT and there were no valid arbitration agreement with them.

### 5.2.4    The failure to abide by the "cooling-off" period caused prejudice to RoK that was not remedied by a later stay of proceedings

(165)    Importantly, Stati' failure to abide by the "cooling off" period was not "healed" by a later stay of proceedings. While it is correct that such stay occurred, it did not remedy the initial failure to abide by the "cooling-off" requirement.

(166)    The relevant facts with regard to this later stay are the following: On 22 February 2011, the Tribunal, in consultation with the Parties, created a revised timetable and moved the various steps of the proceedings to later dates in order to make room for the three month "cooling-off" period. On 10 March 2011, the Parties met in London for settlement negotiations. On 14 May 2011, Stati informed the Tribunal that no settlement had been reached during the suspension period. Thereafter, the arbitral proceedings continued, i.e. written submissions were made and hearings were held.

(167)    The stay of proceedings during the arbitration could not heal the failure to abide by the "cooling-off" requirement both as a matter of logic and with a view to the purpose of the "cooling-off" requirement. Logically, the later stay was irrelevant because there is no state consent to arbitration if the "cooling-off" period has not been fulfilled prior to the initiation to arbitration. State consent to arbitration cannot simply be moved to a later stay in the proceedings. Rather, ROK's consent had been lacking from the beginning and continued to lack after the stay of proceedings, which were executed on the Tribunal's initiative.

(168)    The purpose of the "cooling-off" requirement could not be fulfilled by means of the later stay of proceedings. As outlined above, the "cooling-off" requirement not only aims to ensure the amicable settlement of disputes but also serves as an additional timeframe for the state to understand and grapple with the issues underlying the threatened claim and to put into motion the machinery of the state. Without such additional timeframe at the beginning of the dispute, the state is put on an unequal footing, in that it has limited time to analyse the claim, to appoint counsel and especially to consider its choice of arbitrator. A later stay of proceedings does not help at all when it comes to these potential disadvantages, so that it cannot play a role for the issue of state consent.

(169)    This argument is in fact well illustrated by the present case. Because of Stati' conscious decision to ignore the "cooling-off" requirement, and because of the SCC's unreasonably hasty decision to appoint Professor Lebedev as arbitrator, RoK was deprived of its right to

appoint an arbitrator and to file an answer to Stati' Request for Arbitration, which entailed significant negative consequences for RoK, and could not be remedied by the later "cooling-off" period (see section 5.2.6 below).

(170)   Moreover, even if one only takes into account the purpose of providing a timeframe for settlement, a later stay does not equal a stay at the beginning. As outlined above, an early stay serves procedural economy in that it can ensure a resolution of the dispute at little cost (see also sections 1.5.1 and 1.7.1 above). Hence, in order to force investors to allow such cost effective resolution of the dispute, a later stay cannot be accepted as a means of fulfilling the "cooling-off" requirement.

### 5.2.5   RoK has never waived its jurisdictional objection

(171)   In the course of the arbitration, Stati suggested that RoK had waived its jurisdictional objection since it engaged in discussions about the stay of proceedings and ultimately agreed to the stay of proceedings. This argument is incorrect.

(172)   Before addressing the Stati's argument in detail, the following facts shall serve as a general background to the issue.

(173)   On 18 January 2011, RoK requested a three month stay for amicable settlement discussions with Stati and asked the Tribunal to order Stati to engage in such discussions.[81] On 24 January 2011, Stati informed RoK and the Tribunal that they would be prepared to agree to a sixty day extension, provided that several conditions are fulfilled.[82] One of these conditions was that RoK formally withdraws and waives its objection regarding the notice period.[83] Stati never complied with this condition of Stati and never formally waived its objection regarding the Tribunal's jurisdiction.

(174)   On 2 February 2011, Stati agreed to a 90 day suspension which they proposed should last from 2 February 2011 to 3 May 2011. They also asked RoK for potential dates for settlement discussions in Paris or London.[84]

(175)   In the following, the parties negotiated regarding the necessary amendments to the procedural timetable. On 16 February 2011, a joint proposal for an amended timetable was submitted to the Tribunal.[85] Subsequently, and as mentioned above, on 22 February 2011, the Tribunal, in agreement with the parties, issued a revised timetable which provided for the three month stay of proceedings.[86]

---

[81] Letter from Curtis, Mallet-Prevost, Colt & Mosle to the Arbitral Tribunal dated 18 January 2011, Exhibit 11.

[82] Letter from Stati to RoK dated 24 January 2011, Exhibit 12.

[83] Ibid.

[84] Letter from King & Spalding to Curtis, Mallet-Prevost, Colt & Mosle dated 2 February 2011

[85] Email from King & Spalding to the Arbitral Tribunal dated 16 February 2011

[86] Email from the Arbitral Tribunal dated 22 February 2011.

Error! Unknown document property name.

(176)    Stati's argument that RoK waived its jurisdictional objection is based on the wilful misconstruction of one statement made by RoK in the above mentioned correspondence. This statement is contained in RoK's letter dated 18 January 2011 and reads:

> "[W]e propose that the Tribunal order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three- months period in satisfaction of that jurisdictional requirement. We offer this as a practical solution that best serves the interests of the parties notwithstanding the fact that this jurisdictional defect could result in dismissal after full briefing and hearing on the merits."

(177)    According to Stati, this statement was to mean that RoK considered the belated three month stay to satisfy the "cooling-off" requirement. However, this understanding is in clear disregard of the second sentence of the above quote where it is stated that ROK's jurisdictional objection remained, even if the proceedings were to continue with a hearing on the merits, unless the parties reached an amicable settlement.

(178)    In fact, at the time, this was also clear to Stati. As is evidenced by their response on 24 January 2011, Stati requested as a precondition for their consent to a stay that RoK formally withdraws and waives its objection regarding the notice period. If Stati had already understood the RoK's letter dated 18 January 2011 to contain such waiver, they would not have needed to request a further waiver in their response.

(179)    In point of fact, the matter is quite simple: RoK requested a stay of proceedings. Stati then offered a stay of proceedings but also requested RoK to waive its jurisdictional objection. In the following, RoK did not do so, whereupon Stati agreed to the stay anyway. Against this background, any argument that RoK waived its jurisdictional objection is based on wishful thinking rather than the actual facts of the case.

### 5.2.6    The Tribunal failed to correctly decide the matter

(180)    In the Award, the Tribunal failed almost entirely to properly adjudicate the matter of the "cooling-off" period. In a cursory manner, the Tribunal concluded that the "cooling off" period was procedural rather than jurisdictional in nature, *"at least as long as the Parties have indeed had such a three months opportunity."*[87] The decision whether the "cooling off" requirement is regulated by the arbitral agreement between the parties; in this case Article 26(2) ECT, which clearly states that this is a first step before a subsequent arbitration and constitute an express condition to the offer made by the state to consent to arbitration. There can be no doubt that this is a matter of jurisdiction if this condition has not been satisfied. It can neither depend on later factual circumstances such as whether the parties had the *"three months opportunity"* or not, unless the parties have concluded an express agreement to waive the requirement for a "cooling off" period.

---

[87] Award, para. 829.

Error! Unknown document property name.

(181) The further conclusions of the Tribunal were equally incorrect and underdeveloped. According to the Tribunal, given the purpose of the "cooling off" period and the fact that settlement discussions were held during the stay of proceedings, no prejudice to either party was caused so that there is no reason to deny jurisdiction.[88] This conclusion is in clear disregard of the massive prejudice caused to RoK because RoK was deprived of its right to appoint its own arbitrator which in fact was caused in part by the disregarded 3 months cooling-off period. In any event, it is unclear how prejudice would relate to the question of jurisdiction, i.e. the question of whether the state consented to arbitration.

(182) Considering the SCC's experience and knowledge about the ECT in general and Article 26(2) ECT in particular requiring a three month cooling off period prior to the initiation of arbitration, the SCC and its Secretariat should have had no difficulties to establish that this mandatory requirement had not been met by Stati when they submitted their Request for Arbitration. The two letters attached to the request for arbitration rather confirmed that the requirement had not been satisfied. Hence, the SCC should have established within the framework of its prima facie consideration (Articles 9 (i), 10 (i) SCC Rules) that the case should have been. As it would have turned out, this would also have resolved the problem with the appointment of an arbitrator by ROK.

(183) In light of these clear mistakes committed by the Tribunal, and in light of the above mentioned legal considerations regarding the "cooling off" period, there can be no other conclusion than that the Award needs to be set aside according to Section 34 p. 1 of the SAA because it is not covered by a valid arbitration agreement between the parties.

---

[88] Award, para. 830.

**Error! Unknown document property name.**

5.3     **The Award is not covered by a valid arbitration agreement between RoK and Terra Raf**

(184)     The Award needs to be set aside partially under Section 34 No. 1 SAA insofar as it pertains to Terra Raf. The need to set the Award aside arises from the fact that RoK never consented to arbitration in this dispute with Terra Raf. Terra Raf is no investor according the Article 1(7) ECT. This follows from the fact that Terra Raf is incorporated in Gibraltar that does not fall within the scope of ECT. Terra Raf is hence not *"organized in accordance with the law applicable in [a] Contracting Party"* of the ECT, as is required by Article 1(7) ECT. Consequentially, the preconditions for state consent to arbitration under Article 26 ECT are not fulfilled.

(185)     In the following, we intend to submit background information as to the status of the EU and of Gibraltar in the framework of the ECT. Thereafter, we will state briefly how the issue was presented by the parties and decided by the Tribunal. In substance, we will show that the Gibraltar is not included in the scope of ECT by way of the EU's ratification of the ECT and even if that was the case, Terra Raf is not an investor according to ECT. Lastly, we will demonstrate that the ECT also does not apply to Gibraltar by way of the United Kingdom's signature of the ECT.

5.3.1     **The EU and Gibraltar in the framework of the ECT**

(186)     The ECT is a so-called "mixed agreement". This means that the ECT was not only signed and ratified by the United Kingdom and other EU member states but also by the EU itself. Mixed agreements by both the EU and its member states are concluded where under the EU treaties, neither the EU nor the member states have the sole competence for all matters covered by the treaty. The mixed agreements are necessary where neither the EU nor the member states may act alone when it comes to ratifying the treaty in question.

(187)     Gibraltar is a British Overseas Territory. In 1994, the United Kingdom signed the ECT without ratifying it yet. According to Article 45(1) ECT, signature of the ECT was to lead to its provisional application pending ratification. When signing the ECT, the United Kingdom stated that provisional application of the ECT until ratification would extend to United Kingdom and Northern Ireland, and in Gibraltar".[89] When the United Kingdom ratified the ECT in 1996, the ratification expressly covered the United Kingdom, Jersey and the Isle of Man. No mention was made of Gibraltar.

5.3.2     **Procedural history and decision by the Tribunal**

(188)     During the Arbitration, RoK objected to the Tribunal's jurisdiction with regard to Terra Raf based on the argument that Terra Raf is no investor under Article 1(7) ECT. As Terra Raf was incorporated in Gibraltar and the ECT did not apply to Gibraltar, Terra Raf was no *"company […] organized in accordance with the law applicable in [a] Contracting Party"* in the meaning of Article 1(7)(a)(ii) ECT.

---

[89] Cf. Expert Opinion of Professor Tietje, para. 37.

(189)   Stati replied with two separate arguments, namely that the ECT applied to Gibraltar provisionally by virtue of the United Kingdom's declaration upon signature of the ECT and that the ECT applied by virtue of the EU's ratification of the ECT.

(190)   RoK rejected both suggestions. To that end, RoK provided an expert opinion by Professor Tietje, a renowned German scholar with extensive knowledge about both matters of international investment law and European law. Professor Tietje explained in detail why in particular Stati's reference to the EU's ratification of the ECT was wrong. In short, it was Professor Tietje's view that the ECT was ratified by the EU in the framework of the so-called Common Commercial Policy (CCP). The CCP, however, does not apply to Gibraltar, meaning that any EU act in the framework of the CCP, such as the ratification of the ECT, cannot apply to Gibraltar either.

(191)   In the Award, the Tribunal dealt with the matter in an extremely simplified manner without looking into the detailed arguments provided by RoK and Professor Tietje. The Tribunal held that it had jurisdiction over the claims made by Terra Raf, arguing that *"the ECT applies to Gibraltar on the basis that Gibraltar is a part of the European Community, which is itself party to the ECT. According to Art. 52 of the Treaty on the European Union and Art. 355 of the Treaty on the Functioning of the European Union, Gibraltar is included in its territory."*[90] No further arguments were stated and in particular, no response to RoK's and Professor Tietje's remarks regarding the non-application of the CCP to Gibraltar was given. The CCP was not even mentioned at all.

(192)   Notably, the Tribunal did not determine whether the ECT applies to Gibraltar by means of the United Kingdom's signature, with the conclusion that such decision was not necessary.[91]

### 5.3.3   The ECT does not apply to Gibraltar by way of the EU's ratification of the ECT

(193)   The Tribunal's decision to rely on the EU's ratification of the ECT was wrong. The ECT does not apply to Gibraltar by way of the EU's ratification of the ECT. This follows from the EU's lack of competence for entering into the ECT with effect for Gibraltar.

(194)   In the framework of the EU, Gibraltar has a particular status. On the one hand, Article 355(3) of the Treaty on the Functioning of the European Union (TFEU) provides that the TFEU and the EU Treaty "shall apply to the European territories for whose external relations a Member State is responsible." Declaration 55 to the Final Act of the Lisbon Treaty affirms that Gibraltar is recognised under Article 355(3) TFEU. This is what the Tribunal relied on.

(195)   On the other hand, in the United Kingdom's act of accession to the European Communities (EC) in 1972, provisions were included in order to address the special character of Gibraltar as part of the EC. This was because the specific economic and

---

[90] Award, para. 746.

[91] Ibid.

Error! Unknown document property name.

political relations of Gibraltar made the complete application of the EC Treaty to Gibraltar impossible.[92] One of the provisions in the United Kingdom's act of accession foresees that Gibraltar will not take part in the CCP of the EC (now EU).[93] The fact that Gibraltar does not take part in the CCP, but rather, that it has the status of third country in that regard, was affirmed in the year of 2003 by the ECJ in the case C/30/01 *Commission v. United Kingdom*. Therein, the ECJ stated that

> *"[t]he exclusion of Gibraltar from the customs territory of the Community by virtue of the Act of Accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland implies that neither the Treaty rules on free movement of goods nor the rules of secondary Community legislation intended, as regards free circulation of goods, to ensure approximation of the laws, regulations and administrative provisions of the Member States pursuant to Articles 94 EC and 95 EC are applicable to it."[94]*

(196)   Gibraltar's non-participation in the CCP is entirely decisive in the present case. Because of the CCP not applying to Gibraltar, the EU did not have the competence to ratify the ECT for Gibraltar, this because the EU's competences with regard to the ECT fall squarely within the framework of the CCP. In particular, the EU's competence to enter into investment treaties, as established by the Treaty of Lisbon and now contained in Article 207(1) TFEU, is part of the EU's competences under the CCP.[95]

(197)   The EU's lack of competence for ratifying the ECT for Gibraltar in turn leads to that the EU has not validly ratified the ECT for Gibraltar. In that regard, Article 29 of the Vienna Convention on the Law of Treaties (VCLT) is of particular significance. This provision states that *"[u]nless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory."* The concept "territory" in the meaning of this provision shall be determined based on the constitutional law of the state or international organisation concerned. Hence, the founding treaties of the EU, but also the acts of accession for the various member states must be taken into account when it comes to determining the territory of the EU. As set out above, according to the United Kingdom's accession agreement, the EU's territory does not encompass Gibraltar in matters regarding the CCP. Hence, the EU's ratification of the

---

[92] *Murray*, The European Union and Member State Territories: A New Legal Framework under the EU Treaties (The Hague 2012), p.129.

[93] Act concerning the condition of accession for the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland, 1972, Article 28: *"Acts of the institutions of the Community relating to the products in Annex II to the EEC Treaty and the products subject, on importation into the Community, to specific rules as a result of the implementation of the common agricultural policy, as well as the acts on the harmonisation of legislation of Member States concerning turnover taxes, shall not apply to Gibraltar unless the Council, acting unanimously on a proposal from the Commission, provides otherwise."* Cf. also *Murray*, The European Union and Member State Territories: A New Legal Framework under the EU Treaties (The Hague 2012), p.130.

[94] C/30/01 *Commission v. United Kingdom* [2003] ECR I-9481, para. 59.

[95] This is evidenced by the fact that Article 207 TFEU is contained in the chapter entitled "Common Commercial Policy".

Error! Unknown document property name.

ECT forms no basis for assuming that the ECT applies to Gibraltar and that Terra Raf therefore is a protected investor under Article 1(7) ECT. Hence, there is no state consent to arbitration against Terra Raf.

### 5.3.4 Even if the ECT applied to Gibraltar by way of the EU's ratification, this would still not mean that Terra Raf were an investor

(198) Alternatively and at irrespective of the EU's competences in this matter, the conclusion would be the same through an application of the Article 1(7)(a)(ii) ECT itself. This provision provides that investors are companies *"organized in accordance with the law applicable in that Contracting Party"*. If one were to consequently rely on the EU's ratification of the ECT, this would require that Terra Raf were organised in accordance with the law in force in the EU, i.e. with original EU law. In other words, Terra Raf would have to be a *Societas Europaea* (SE) or have another company form originating in EU law itself. This is however not the case as Terra Raf is organised under Gibraltar law. Hence, Terra Raf can again not be a protected investor under Article 1(7) ECT.

### 5.3.5 The ECT does not apply to Gibraltar by way of the United Kingdom's signature under the ECT

(199) While the Tribunal refrained from discussing the matter, it should be noted that there is also no alternative way to construct state consent to arbitration by relying on the United Kingdom's signature under the ECT in 1994. This signature no longer entails provisional application of the ECT to Gibraltar because provisional application for Gibraltar ended with the United Kingdom's ratification of the ECT in 1996.

(200) As stated above, the United Kingdom initially signed the ECT on 17 December 1994, stating on the occasion that provisional application would extend to "United Kingdom and Northern Ireland, and in Gibraltar".[96] In December 1996, the United Kingdom ratified the ECT, stating that the ratification covered the United Kingdom as such as well as Jersey and the Isle of Man. No mention was made of Gibraltar.[97] It was clear that it was the intention of the United Kingdom upon ratifying the ECT to have the provisional application for Gibraltar end. This was the reason why Gibraltar was not mentioned in the ratification. This clear intention is confirmed by a *note verbale* dated 27 July 2004 filed by the United Kingdom with the Government of Portugal, which is the depositary for the ECT. This *note verbale* stated the following:

> *"The United Kingdom did apply the Energy Charter Treaty provisionally to the United Kingdom and Gibraltar at signature. However, the Government of Gibraltar subsequently informed Her Majesty's Government that they did not wish to seek ratification of the Treaty, since at that time the Treaty would not have had any practical effect for the territory. Gibraltar was therefore not included in the*

---

[96] Put reference

[97] Put reference

*United Kingdom's instrument of ratification relating to the Treaty, deposited on 17 December 1997."*[98]

(201)   Therefore it is clear that at the time, Gibraltar did not want the United Kingdom to ratify the ECT on Gibraltar's behalf and that therefore, the United Kingdom deliberately did not include Gibraltar in the ratification document. Consequentially, provisional application ended with the United Kingdom's ratification.

(202)   RoK is of course aware that a challenge to an arbitral award with view to the application of the ECT to Gibraltar was brought to the Court before, namely in Case No. T 5208-05 (Republic of Kyrgyzstan v. Petrobart Ltd.). However, the present challenge goes far beyond the facts and legal arguments pleaded by the Parties in the Petrobart case. In particular, the EU's ratification of the ECT was not invoked by the parties in the Petrobart case and had not been referred to by the tribunal in that case either. Moreover, it appears that the United Kingdom's *note verbale* had equally not been invoked in the Petrobart case. Hence, the Petrobart case does not serve as useful guidance for deciding on the challenge brought forward in the present case.

(203)   As seen by the stated above, the Tribunal has lacked jurisdiction to try the case between Terra Raf and RoK. This is because RoK never consented to arbitration with Terra Raf, as a company seated in Gibraltar. The arbitral award shall therefore be set aside in accordance with Section 34 (1) in SAA, in parts regarding Terra Raf.

---

[98] United Kingdom Note Verbal No.2004/184 addressed to the Depositary of the ECT dated 27 July 2004.

**Error! Unknown document property name.**

5.4     **The Tribunal failed to consider pivotal witness evidence regarding the quantum of the LPG Plant**

(204)    The Tribunal ignored the submission of material witness evidence regarding the LPG Plant. In awarding damages for this plant, the Tribunal solely relied on allegations which Stati had made rather in passing and later dropped and which had clearly been rebutted by witness evidence submitted by RoK. The Tribunal, however, failed to even notice that this witness, Mr. Khalelov, had testified at the Hearing on Quantum.

5.4.1    **The Parties' positions**

(205)    One of the four assets for which the Tribunal granted Stati compensation is an unfinished LPG Plant. It is a plant for processing natural gas which Stati had started constructing in 2006. Stati halted the construction sometime in the first half of 2009 with the construction being about 90% finished according to their own statements.

(206)    Both Parties submitted differing valuations of the LPG Plant. RoK's experts had assumed a negative value for the construction based on the assumption that due to a lack of secured supply of gas for the next years, even if the construction of the LPG Plant were finalised, it could only be operated for four years until it would need to be shut down. RoK further argued that the LPG Plant had been a failed project with costs exceeding the anticipated budget manifold. It assumed that it would not be commercial to finalise the construction and that the Plant would therefore only have scrap value, which Stati had failed to quantify.[99]

(207)    Stati on the other hand had propagated that the LPG Plant would be completed and operated as a going concern. They therefore ultimately demanded compensation for the alleged investment costs of USD 245 million and a portion of the so-called prospective value of USD 329 million,[100] assuming that sufficient amounts of gas would be available, in particular relying on gas from the Contract No. 302 properties.[101] In one of their 6 submissions, with reference to two hyperlinks to internet pages mentioned by their experts FTI in a footnote that were not even provided as exhibits or translated, Stati had supported their position that the LPG Plant was not scrap by alleging that publicly available information indicated that RoK was "gearing up" to open the LPG Plant in 2012 and that it was clear that RoK had already been in the process of spending additional capital to complete the LPG Plant since its "seizure".[102] RoK rebutted this allegation in its

---

[99] RoK's Statement of Defence, paras 53.1 et seqq.; in some detail in RoK's Rejoinder on Quantum, paras. 139 et seqq.; RoK's First Post-Hearing Brief paras. 814 et seqq.; RoK's Second Post-Hearing Brief paras. 652 et seqq.

[100] At different phases of the arbitration, these claims fluctuated significantly, the investment value was initially asserted to be USD 208.5 million, the prospective value was later asserted to be USD 408 million but then recalculated to USD 329 millon.

[101] The Contract No. 302 properties are described in section 3.2 above. The likelihood of significant amounts of gas in this area was disputed but even the Defendants considered it this chance to be less than 10%, not even taking into account whether it would be economically viable to extract them.

[102] Stati's Reply on Quantum, para. 67.

Error! Unknown document property name.

Rejoinder on Quantum and submitted a witness statement by Mr. Taras Khalelov.[103] Mr. Khalelov works for KazMunaiTeniz (KMT), the company which operated most of the Defendant's assets in trust management after their subsoil use contracts had been terminated and which had also been given the mandate to protect the unfinished LPG Plant construction (which was not part of the trust management). In his witness statement, Mr. Khalelov explicitly stated the following:

> *"The LPG Plant is not part of the trust management. However, as it has been abandoned by the owners, we protect the premises and the equipment by employing guards. Ever since the unfinished LPG Plant was abandoned, no further work has been conducted on the Plant.*
>
> *I have been informed that Claimants allege that Kazakhstan is training specialists for the operation of the LPG plant. However, no such training has taken place and I have never heard about any programme to this objective either. In addition, I do not know of any intention to finish the construction of the plant. As our lawyers told us, we are not entitled to incur any expenses for the plant or to make investments into the plant in any form because the plant neither belongs to KMT nor to KMG NC."*

(208)   In addition, during his testimony, Mr. Khalelov reiterated that no construction had been conducted by RoK:

> *"Q: You state in your witness statement, at paragraph 4.1 to be specific, that: "Ever since the Claimants abandoned the unfinished LPG Plant, no further construction on the Plant has been conducted." Is that correct?*
>
> *A. Absolutely correct.*
>
> *Q. And has any construction been commenced since you submitted your witness statement? (…)*
>
> *A. No. The answer to your question is no. (...)*
>
> *Q. Thank you. And are you aware of any plans to finish the construction?*
>
> *A. No, officially I am not informed of any. I do not know."[104]*

(209)   Stati failed to cross-examine Mr. Khalelov on this issue. Importantly, Stati did not repeat the allegation that RoK had spent any capital to complete the LPG Plant in their further written submissions. Instead Stati did bring forward some other arguments as to why the LPG Plant had more than scrap value, because RoK`s cost calculations for the completion was high, and there were enough gas resources and because the insecurity of the gas

---

[103] RoK's Rejoinder on Quantum, paras. 203 et seqq

[104] Transcript of the Hearing on Quantum, Day 2, p. 143 – p. 144.

resource in any circumstance were not to the detriment for Stati but for RoK who was the alleged guilty Party.[105]

### 5.4.2 The Tribunal's failure to recognise the submission of pivotal witness evidence

(210)   The Tribunal rejected RoK's position that the LPG Plant would only have scrap value. Rather than awarding USD 0, the Tribunal awarded USD 199 million for the unfinished LPG Plant based on an indicative offer by KMG EP. In arriving at this conclusion, the Tribunal did not look at whether sufficient amounts of gas would be available, which was the focus of the Parties' discussions and which was the crucial question according to the experts of both sides. Rather, the Tribunal did not address RoK's arguments assuming that RoK itself had continued the construction of the LPG Plant after Stati had left the country. It stated the following:

> *"The Tribunal is not persuaded by Respondent's and their experts' conclusion that the LPG Plant is a failed project and must be considered to have a negative value and no damages at all can be claimed by Claimants. If that were so, Respondent would not have been ready to invest further expenses in the completion of the Plant, after Respondent had taken control of the Plant. However, there were obviously plans to complete it. Publicly available information indicates that Respondent was in fact preparing to open the LPG Plant in 2012."[106]*

(211)   The Tribunal based this conclusion on two hyperlinks mentioned in a footnote by Stati's experts FTI, namely to the webpage for the Mangystau region of the Kazakh embassy in Israel, which were never submitted as documents and which were never translated. Procedural Order No. 1, which was the result of the Parties' first procedural meeting, stipulated that "all document (…) considered relevant by the Parties shall be submitted with their Briefs (…)". It further stipulated that these would need to be submitted as pdf and in hardcopy. Stati had done neither of the two and had therefore obviously not considered these relevant. The Tribunal ignored this.

(212)   What is more, in arriving at its conclusion the Tribunal did not refer to the written witness statement or the oral testimony of a witness which RoK had presented, Mr. Taras Khalelov, even though he had made statements precisely on the issue cited above.

(213)   The Tribunal not only failed to consider this written witness's statement and testimony. As is obvious from the Award, the Tribunal even failed to note that Mr. Khalelov had testified at the Hearing on Quantum: When describing the witnesses who testified on Day 2 of the Hearing on Quantum, the Tribunal mentioned all witnesses who testified on that day except for one. It mentioned that it heard testimony from Mr. Victor Romanosov, Mr. Catalin Broscaru, Mr. Alexandru Cojin, Mr. Anatolie Stati, and Mr. Nurlan Rahimgaliev.

---

[105] Stati's First Post-Hearing Brief, paras. 558 et seqq.

[106] Award, para. 1745.

However, the Tribunal failed to mention one witness who also testified on that day: Mr. Taras Khalelov.[107]

(214)   The Tribunal thus in one single paragraph decided that the LPG Plant had a positive value, completely ignoring the relevant arguments advanced by both Parties, namely the further costs to finalise the plant and the availability of gas to be processed in the LPG Plant. Instead, the Tribunal chose to rely on an argument that had been clearly rebutted by RoK's witness and which even Stati had advanced but then dropped in their further written submissions once it had been rebutted.

### 5.4.3   The arbitral award shall be set aside in accordance with 34 (1) item 6 of the Swedish Arbitration Act

(215)   In deciding to award Stati USD 199 million in damages for the unfinished LPG Plant without considering Mr. Khalelov's evidence[108], the Tribunal has committed a procedural mistake.

(216)   The Tribunal decided that the LPG Plant had a positive value with one single argument, namely that RoK had prepared the opening of the plant.[109] It thus ignored all arguments advanced by the Parties and narrowed a complex and much discussed question of whether the LPG Plant would have been a going concern down to one issue, namely whether RoK had had plans to finalise the LPG Plant and had started to realise these plans. It is RoK's position that the Tribunal clearly did not at all consider Mr. Khalelov's evidence. The Tribunal seems to have forgotten that this evidence was submitted and presented.

(217)   This is evidenced by the fact that the Tribunal failed to consider Mr. Khalelov's written witness statement and testimony in this context even though it addressed the allegation that RoK had continued to construct the LPG Plant. This is further evidenced by the fact that even in its summary of RoK's position regarding the quantum of the LPG Plant, the Tribunal failed to mention Mr. Khalelov by name. Finally, in its description of the Hearing on Quantum, the Tribunal lists all witnesses who testified, except for Mr. Khalelov.

(218)   The Tribunal's failure to take note of Mr. Khalelov's witness statement and testimony is a procedural mistake within the meaning of section 34 item 6 of the SAA. The Tribunal`s failure to take note of Mr. Khalelov`s witness statement and testimony has probably influenced the outcome of the case.

---

[107] Award, para. 157.

[108] Award, paras. 1743 et seqq.

[109] Award, para. 1745.

**Error! Unknown document property name.**

5.5 **The Tribunal has exceeded its mandate and has committed several procedural mistakes and by ignoring the submission of expert evidence and other evidence regarding almost every major disputed issue of the case**

5.5.1 **Introduction**

(219) The Tribunal has failed to take note of the expert evidence and other evidence that had been submitted by RoK regarding almost every disputed issue and it has thus committed very serious procedural mistakes, each by themselves constituting a reason for setting aside the award. In some instances, the Tribunal also exceeded its mandate. For each and every reason stipulated below, and independent of each other, the award shall be set aside pursuant to section 34 SAA, p.2 and p.6.

(220) The Tribunal failed to recognize (i) the submission of expert reports by Professor Didenko and Mr. Latifov and witness evidence from Mr. Baymaganbetov regarding the classification of pipelines, (ii) the submission of an expert report by Professor Ilyassova regarding the legality of the so called pre-emptive rights waiver, (iii) the submission of an expert report by Professor Balco and witness evidence by Mr. Rahimgaliev regarding the legality of the back tax assessment, (iv) crucial parts of the report by RoK's valuation experts Deloitte GmbH relating to causation, (v)  the submission of an expert report by Professor Tietje regarding RoK's objection to the Tribunal's jurisdiction and finally (vi) material parts of RoK's geological experts Gaffney Cline (6)

(221) This list is by no means exhaustive. RoK, however, is conscious of its duty only to bring such procedural mistakes to the attention of the Court that had an impact on the outcome of the case. All of the issues referred to here, relate to questions that were of utmost importance for the decision in this case. In each case, the Tribunal could not have arrived at the decisions reached if it had taken into account the expert reports and further evidence provided by RoK. These mistakes have therefore affected the outcome of the proceedings.

(222) The fact that the Tribunal ignored virtually all expert evidence, in particular those pertaining to jurisdiction and liability is particularly troublesome. Shortly before the Hearing on Jurisdiction and Liability, the Tribunal apparently was aware that some expert reports had been submitted, certainly because both parties initially requested to hear all of the other Parties' experts at the Hearing. However, the Tribunal expressed its concerns regarding the limited amount of time available and stated by letter of 27 August 2012 that *"[i]n particular, in view of the extensive reports of most experts, the Tribunal considers that oral examination of most experts may not be necessary."* In view of this statement, both Parties subsequently withdrew their requests to examine the other Parties' experts, assuming that the Tribunal would therefore pay specific attention to the written expert reports. However, as it turned out, the Tribunal later seems to not only disregarded these "extensive reports", it would seem that the reports were entirely forgotten or overlooked.

Error! Unknown document property name.

5.5.2     **The Tribunal decided on the classification of pipelines under Kazakh law without considering Kazakh law and related expert evidence**

(223)     One crucial issue of the dispute was the classification of certain pipelines for transportation of oil and gas that Stati' companies KPM and TNG operated. It was a key pillar of Stati' allegations of harassment that they were wrongly accused of operating trunk pipelines rather than field pipelines and were ultimately found guilty of the crime of illegal entrepreneurship, i.e. the operation of a trunk pipeline without the necessary licence. Even though RoK submitted reports by legal and technical experts on this issue as well as witness evidence by the expert who evaluated the pipeline in February 2009, to support its position that Stati had indeed operated trunk pipelines, the Tribunal completely ignored these reports in arriving at its decision that Stati had only operated field pipelines and thus supporting Stati' claims that the criminal proceedings had been "fabricated".

*(i)*     *The Parties' claims*

(224)     It is RoK's position that during inspections in late 2008, a suspicion arose that KPM and TNG were operating trunk pipelines without a license, which constitutes a criminal offence according to Section 190(2)(b) of the Kazakh Criminal Code if the operation generates a certain amount of income.

(225)     Subsequently, criminal proceedings were initiated on the suspicion that a crime was committed. It was obvious and undisputed that Stati had no license for the operation of trunk pipeline but they denied the assertion that they were operating trunk pipelines.

(226)     Ultimately, the competent court found that Defendants were operating trunk pipelines and that therefore in lack of a license for this operation a criminal offence had been committed. KPM's director, Mr. Cornegruta, was convicted and KPM was ordered to return the equivalent to the illegally obtained income.

(227)     RoK submitted reports by two experts, one legal expert report by Professor Didenko and one technical expert report by Mr. Latifov, which both supported RoK's position on the classification of the pipelines.[110] RoK also submitted a witness statement of Mr. Baymaganbetov who had acted as expert in the proceedings before the City Court of Aktau.

(228)     Stati, however, held that RoK had not discovered that KPM and TNG were operating trunk pipelines without a licence but had rather arbitrarily re-classified these pipelines in order to find a pre-text for an eventual take-over of the companies. Stati presented this as one of the central actions of a Kazakh playbook and harassment campaign against Stati. In order to support this position, Stati also provided an expert report which stated that they had not operated trunk pipelines but rather only field pipelines within the meaning of Kazakh law.

---

[110] RoK's position on the classification of the pipelines is summarized in Respondent's Second Post-Hearing Brief, paras. 261 et seqq.

Error! Unknown document property name.

*(ii)*      *The Tribunal's disregard of Kazakh law and relevant expert and witness evidence*

(229)     The Tribunal followed Stati' position that Stati were not operating trunk pipelines. In its presentation of the cornerstones of its finding on liability, the Tribunal's stated that it was persuaded that the at-issue pipelines were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by RoK.[111]

(230)     In arriving at this conclusion, the Tribunal completely ignored the expert reports submitted by RoK, the witness statement and testimony of Mr. Baymaganbetov and indeed it completely ignored Kazakh law, which governs the question of whether a pipeline is classified as a trunk or a field pipeline **under Kazakh law**.

(231)     Several indicators leave no doubt that the Tribunal failed to consider Kazakh law and the relevant evidence.

(232)     First, the Tribunal itself provided what may be an explanation for not looking at the law and the expert reports. Before concluding that Stati were not operating trunk pipelines, the Tribunal first stated that it did not have to decide this question:

> *"The Tribunal need not opine on whether the pipeline was a field or trunk pipeline in order to find that the procedure surrounding the discovery was in violation of the FET standard."[112]*

(233)     Had the Tribunal indeed not decided this question, it would still be a challenge ground because this would have meant that the Tribunal had completely disregarded the central argument by RoK that Stati were indeed operating trunk pipelines and therefore the criminal proceedings as well as the ultimate verdict were perfectly legal. However, as is obvious from reading the Award two paragraphs further down, the Tribunal actually decided that Stati were not operating trunk pipelines by holding that it

> *"is persuaded that the at-issue pipelines, likewise, were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by Respondent. That the City Court of Aktau found that the pipes were trunk does not bind this Tribunal."[113]* (emphasis added)

(234)     What in any event is clear from this somewhat nebulous section of the Award is that not wanting to consider Kazakh law and the expert reports on this question, the immediate consequence of the Tribunal`s judgment was therefore that the Financial Police had "reverse-engineered" a crime and the City Court of Aktau had erred. This conclusion has influence the Tribunal`s assessment of RoK`s alleged breaches of the ECT.

---

[111] Award, para. 1090.

[112] Award, para. 1088.

[113] Award, para. 1090.

55

(235)    Secondly, the fact that the Tribunal failed to look at Kazakh law and the relevant expert reports is obvious from its lack of reference to the applicable law and its requirements and indeed to any of the expert reports submitted by RoK.

(236)    Looking at the Award, it shows that the Tribunal has overlooked or forgotten that such expert evidence was submitted by RoK.

(237)    Together with its Rejoinder on Jurisdiction and Liability, RoK submitted two expert reports regarding classification of pipelines; one by Mr. Latifov, focusing on the technical aspects and one by Professor Didenko focusing on the legal aspects. RoK further submitted a second and a third expert report by Professor Didenko together with the First and Second Post-Hearing Briefs.

(238)    Mr. Latifov's expert report finds no mentioning at any place in the Award. The Tribunal not only fails to mention this expert report in its summary of RoK's position or in its own reasoning. It also fails to mention that RoK even had submitted this expert report. Even though the expert report was submitted with RoK's Rejoinder on Jurisdiction and Liability, the Tribunal fails to expressly acknowledge this in its Procedural History.[114] In fact, a word search of the Award for Mr. Latifov's name delivers no result at all..

(239)    The first and the second expert reports prepared by Professor Didenko are not mentioned at any point in the Award. Even though RoK heavily relied on Professor Didenko's expert reports in support of its position regarding the classification of the pipelines, the Tribunal even fails to mention Professor Didenko's expert reports in its summary of RoK's arguments. It also fails to mention Professor Didenko's expert reports in its reasoning. However, not only does the Tribunal fail to mention Professor Didenko's expert reports in the reasoning of the Award, the Tribunal also fails to mention in the procedural history that RoK had submitted these expert reports in summary of its stand in the arbitration.

(240)    The Tribunal does not expressly mention that Professor Didenko's first expert report was submitted with the Rejoinder on Jurisdiction and Liability.[115] Equally, the Tribunal fails to expressly mention that Professor Didenko's second expert report was submitted with the 1st Post-Hearing Brief.[116] The only report by Professor Didenko that is mentioned anywhere in the Award is Professor Didenko's third expert report but even this report is only mentioned in the procedural history and nowhere else.[117] The fact that two of Professor Didenko's expert reports find no mention in the award at all, while his third report is only mentioned in the Procedural History leads undeniably to the conclusion that the Tribunal entirely ignored but possibly even failed to notice or forgot these pieces of evidence which obviously were crucial to RoK's case.

---

[114] Award, para. 82.

[115] Award, para. 82.

[116] Award, para. 174.

[117] Award, para. 193.

Error! Unknown document property name.

(241)   The Tribunal also did not refer to or otherwise consider in its reasoning the witness statement and testimony of Mr. Baymaganbetov who had acted as an expert in the criminal proceedings.

> (iii)   *The Tribunal exceeded its mandate by deciding a question of Kazakh law without looking at Kazakh law*

(242)   First, the Tribunal by deciding on a question of Kazakh law without even considering or applying Kazakh law exceeded its mandate. The Tribunal stated that it agrees with the Parties that pursuant to Art. 22 (1) SCC Rules and Art. 26(6) ECT, the Tribunal shall decide the merits of the dispute in accordance with the ECT and applicable rules and principles of international law.  By holding that "*the at-issue pipelines, likewise, were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by Respondent*", the Tribunal decided a question of Kazakh law because the classification of pipelines in Kazakhstan without any doubt is a question of Kazakh law. For this reason, both Parties had submitted legal opinions on the question of classification of pipelines under Kazakh law; Stati had submitted legal expert reports by Professor Suleymenov, RoKs had submitted legal expert reports by Professor Didenko. The Parties were therefore in agreement that whether a pipeline should be considered a trunk or field pipeline needed to be decided in accordance with Kazakh law.

(243)   Had the Tribunal indeed not decided whether the pipelines at issue were trunk or not, as it alluded, it may not have needed to refer to Kazakh law. When the Tribunal decided that the pipelines at issue were field pipelines as opposed to trunk pipelines without referring to the legal framework and requirements for such a classification under Kazakh law, the Tribunal certainly exceeded its mandate. The Parties were never in agreement that the Tribunal should decide issues that purely relate to Kazakh law without looking at the relevant law on an *ex aequo et bono* basis. It was within the Tribunal's mandate whether for instance the criminal proceedings violated the ECT but it was not within the Tribunal's mandate to decide a question of Kazakh law without looking at Kazakh law. It is impossible to conclude that a pipeline is trunk (under Kazakh law) by merely looking at a timeline of several events but this is a question that needs to be decided in accordance with the applicable law. Trunk pipeline and field pipeline are terms of Kazakh law that a Tribunal cannot ignore.

> (iv)   *The Tribunal has committed a procedural irregularity which influenced the outcome of the case*

(244)   The Tribunal's complete failure to even take notice of such crucial pieces of evidence such as the reports of Professor Didenko and Mr. Latifov also constitutes a procedural irregularity that affected the outcome of the case.

(245)   It is a well-established principle that a tribunal must examine the expert evidence offered, where it concerns matters of importance for the decision. Offered expert evidence must be

Error! Unknown document property name.

taken into account if the arbitrators are not experts themselves.[118] A party' right to be heard entails that its arguments and evidence are considered when they are important for the decision. The Swiss Supreme Court for example has highlighted that the right to be heard entails that the arbitrators have a minimum duty to examine all relevant issues and that they do not satisfy this duty when they disregard (due to an oversight or a misunderstanding) arguments or evidence in the record which are material to the outcome of the case.[119]

(246)     There can be no doubt that the expert evidence submitted by Professor Didenko and Mr. Latifov, the witness evidence of Mr. Baymaganbetov as well as RoK's arguments that Stati indeed were operating trunk pipelines were matters of utmost importance for the decision. This question goes to the core of the alleged harassment campaign of a "reverse-engineered" crime and an illegal award by the City Court of Aktau.

(247)     The alleged re-classification of the pipelines from field to trunk pipelines obviously was a cornerstone for the Tribunal's finding of a breach of the fair and equitable treatment standard. The Tribunal itself stated that

> *"[t]he re-classification, viewed in light of President Nazarbayev's 23 November 2009 confidential instruction that was attached to the 7 February 2010 Blagovest letter (C-23), appears to have been an important step for the State to have obtained the assets of KPM and TNG, without sacrificing their working ability."[120]*

(248)     The Tribunal could not have come to such a conclusion if the Tribunal had taken RoK's evidence and arguments that Stati were indeed operating trunk pipelines into consideration.

### 5.5.3     The Tribunal decided questions of Kazakh civil law without considering pivotal expert evidence on Kazakh civil law

(249)     In holding RoK liable and in deciding on causation, the Tribunal presented RoK's alleged clouding of Stati' title in TNG as part of a string of measures of co-ordinated harassment. In making this decision, the Tribunal completely disregarded RoK's expert evidence supporting its central counter-argument and evidence that the relevant State actions - in particular the revocation of the authorisation of a transfer of shares in TNG to Terra Raf were - in accordance with Kazakh law and fully justified under the circumstances.

---

[118] See e.g. Germany No. 145, Joint Stock Company A v. Joint Stock Company B, Higher Regional Court of Munich, 34 Sch 10/11, 14 November 2011 (in Albert Jan  van den Berg (ed), Yearbook Commercial Arbitration 2012 – Volume XXXVII, Yearbook Commercial Arbitration, Volume 37 (Kluwer Law International 2012) pp. 231 – 233.

[119] X. v. Y., Federal Supreme Court of Switzerland, 1st Civil Law Chamber, 17 April 2013 (Georg von Segesser, X. v. Y., Federal Supreme Court of Switzerland, 1st Civil Law Chamber, 17 April 2013, A contribution by the ITA Board of Reporters, Kluwer Law International).

[120] Award, para. 1091.

**Error! Unknown document property name.**

(i) *The Parties' claims*

(250)    The shares in TNG are said to be held by Terra Raf. TNG's shares had been transferred several times, before ultimately being transferred from a company called Gheso to Terra Raf.

(251)    One of the main allegations raised be Stati in this case was that in December 2008, RoK had willfully and illegally revoked its authorisation of this last transfer of shares and had thus clouded Terra Raf's title to TNG. Stati' argued that the revocation was illegal under Kazakh law and they provided expert reports by Professor Maggs to support this allegation. Indeed, they referred to this as one of three main acts of wrongdoing, each of which allegedly by itself constituted breaches of the ECT.[121]

(252)    RoK on the other hand argued that its actions were legal. RoK stated that it was fully justified in querying the position with Stati as to the transfer of TNG from Gheso to Terra Raf, specifically, that there were irregularities which caused the Republic to consider its pre-emptive right ignored. The Subsoil Use Law had been amended on 8 December 2004 to introduce a pre-emptive right of the State to acquire shares in an entity that has rights to the subsoil use. This means that before a transfer of shares in such a company can be carried out, the intended transfer needs to be notified to the State that can decide whether the State wants to buy the shares on the terms and conditions agreed by the two parties to the transaction or whether it waives this pre-emptive right. The transfer only becomes effective once the State has waived its pre-emptive right. Before this reform in 2004, the State needed to authorize a transfer but it did not have a pre-emptive right.

(253)    RoK had retrospectively authorized the transfer of shares to Terra Raf under the old law but it had not waived its pre-emptive right. It was RoK's position that it had sufficient grounds to believe that Terra Raf had been registered as shareholder in 2005 without the pre-emptive right being considered and that it should therefore revoke the authorization of the transfer given under the law preceding the 2004 reforms because the State had wrongly been led to believe that its pre-emptive right did not apply.[122]

(254)    Large sections of RoK's expert on Kazakh civil law dealt with these issues and explained that RoK rightfully revoked its prior authorisation.[123]

(ii) *The Tribunal ignored Professor Ilyassova's evidence and Stati' arguments*

(255)    The Tribunal completely ignored RoK's expert report and arguments in arriving at its decision that the dispute about the State's pre-emptive right constituted a part of the alleged coordinated harassment against Stati.

---

[121] Claimants' opening presentation, Hearing on Jurisdiction and Liability, Transcript Day 1, p. 106 et seqq.

[122] RoK's position is summarized in Respondent's Second Post-Hearing Brief, paras. 272-281.

[123] Expert report Professor Ilyassova, pp. 37 – 48, Second Expert report, pp. 42 – 46.

Error! Unknown document property name.

(256)   In deciding liability and causation, the Tribunal heavily relied on the allegation that RoK had clouded Stati ownership in TNG. First, the dispute regarding Terra Raf's acquisition of shares in TNG features prominently in the Tribunal's timeline in its decision on liability,[124] which is referred to as "*a string of measures of coordinated harassment by various institutions.*"[125]

(257)   In its discussion of causation, the Tribunal also refers to the revocation of the authorisation of the transfer as a date of relevance for causation.[126]

(258)   The Tribunal referred to this issue as "*Kazakhstan's alleged pre-emptive rights claim*" which "*was, no doubt, a cloud on Terra Raf's ownership rights which created continuing difficulties for Claimants.*"[127]

(259)   Indeed, the Tribunal even considered this date as one of the potential valuation dates, referring to it as the "*date of MEMR's challenge to Claimants' ownership of TNG.*"[128]

(260)   Despite heavily relying on the events relating to the dispute regarding the pre-emptive rights, the Tribunal at no point in its award even considered the expert report by Professor Ilyassova and the arguments advanced by RoK that it was fully justified to revoke the authorisation and enquire whether its pre-emptive right existed.

> *(iii)*      *The award shall be set aside in accordance of Section 34 (1) p. 6 Swedish Arbitration Act*

(261)   While in contrast to Professor Didenko and Mr. Latifov, the Tribunal actually mentions Professor Ilyassova in its Award, albeit very seldom, it is still obvious that the Tribunal ignored her expert report in its reasoning. The Tribunal nowhere considered the arguments that the revocation of the authorization was legal. Rather the Tribunal simply considered it (without taking into account the counter-arguments) as an improper action. This is also obvious from the Tribunal's depiction as an "*alleged pre-emptive rights claim.*"[129]

(262)   Again, the Tribunal has a duty to examine expert evidence when it concerns a question of importance for the dispute. The events surrounding the dispute relating to the pre-emptive rights waiver were without any doubt an important issue, pleaded as such by the Parties and also decided by the Tribunal to be important as it considered the date of the revocation a potential valuation date.

---

[124] The Award, paras. 993 et seqq.

[125] The Award, para. 1095.

[126] Cf. The Award, paras. 1364, 1368 et seqq.

[127] The Award, para. 1494.

[128] The Award, para. 1417.

[129] The Award, para. 1494.

Error! Unknown document property name.

(263) Nonetheless, the Tribunal failed to fulfill its duty to examine the expert report and the related arguments. Had the Tribunal considered RoK's expert report and arguments, it could not have depicted these events as a part of a string of measures of "concerted harassment" and it could not have referred to them in the section on causation. As they were depicted as crucial parts of both decisions, it has to be assumed that the Tribunal would have decided otherwise on liability and causation if it had considered these arguments.

### 5.5.4 The Tribunal decided questions of Kazakh tax law without considering pivotal expert evidence on Kazakh tax law

(264) The Tribunal also completely ignored RoK's submission of an expert report on tax law. The Tribunal heavily relied on the back tax assessment conducted by RoK's tax committee in its finding of liability and quantum. The Tribunal ultimately – surprisingly - held that it has been RoK's burden of proof to show that its back tax assessment was not part of the alleged harrasments by RoK. While this by itself is procedurally questionable, RoK does not base its challenge on this surprising shift in the burden of proof. Rather the challenge with regard to the tax assessment is based on the fact that in assessing whether RoK had shown that the back tax assessment was legal, the Tribunal decided an issue of Kazakh law without even considering the Kazakh law or the expert evidence submitted by RoK.

*(i)      Pleadings by the Parties*

(265) One of the disputes in the arbitration that initially featured less prominently in the arbitration related to the back tax assessments of the Tax Committee on 10 February 2009. These back tax assessments were the result of audits initiated by the Tax Committee in November of 2008 allegedly on instruction of the Financial Police. Overall, USD 62 million in back taxes and fines were assessed attributable to KPM and TNG. The legal question in dispute was which amortisation rate was to be applied to certain of the drilling expenses of Stati in relation to the exploration of the later operating fields.

(266) Whereas Stati had filed their taxes on the basis of the application of Article 20 of the Kazakh Tax Code (entailing a 100% amortisation rate), the Tax Committee applied Article 23 of the Kazakh Tax Code (leading to only a 25% amortisation rate). Importantly, the application of these Articles was not only determined by the contents of the Kazakh Tax Code but also by the contents of KPM's and TNG's subsoil use contracts.

(267) In the arbitration, Stati argued *inter alia* that the back tax assessment was wrong on its merits. Specifically, Stati argued that Article 20 applied because it covers expenses for acquisition of fixed assets and a well is such fixed asset.[130] Article 23 was not to be applied because the provisions of the Subsoil Use Contracts that provide for the

---

[130] Claimants' First Post-Hearing Brief, para. 242.

Error! Unknown document property name.

application of Article 23 did not call for its application with regard to well drilling expenses.[131]

(268)    Further, Stati stated that the illegality of the back tax assessment was also confirmed by the decisions of two lower instance courts which both overturned the back tax assessment.[132] The Kazakh Supreme Court's decision to overturn these lower instance decisions should be disregarded because (1) it was rendered only after the assets had been expropriated and Stati had left the country;[133] and (2) they were contrary to previous decisions of the Kazakh Supreme Court.[134]

(269)    Conversely, RoK argued that the back tax assessment was correct. To that end, it relied on an analysis provided by Professor Balco who held that both under the wording of Article 23 itself, and under the Subsoil Use Contracts, Article 23 applied.[135] Professor Balco provided two expert reports to that effect.[136] In these reports, he largely set out a grammatical, teleological and historical interpretation of the Subsoil Use Contracts, in particular taking into account the original Russian wording of these contracts.[137] Further, the Republic relied on the decision by the Kazakh Supreme Court.[138] It also showed, by reference to the arguments provided by Professor Balco, that this decision did not contain a change in the Supreme Court's position compared to earlier cases.[139]

>                    *(ii)      The Tribunal's ruling*

(270)    The Tribunal decided on the back tax assessments both as a matter of liability and as a matter of quantum. With regard to liability, it included the audits of the tax committee as well as the back tax assessment of 10 February 2009 in its timeline of state conduct which it considered to form part of a string of measures of concerted harassment.[140]

(271)    In presenting the back tax assessment as part of the alleged harassment, the Tribunal failed to even mention any of RoK's later arguments as evidence to legality of the tax assessment, simply referring briefly to RoK's Statement of Defence[141] which had not yet set out RoK's full position.

---

[131] Claimants' First Post-Hearing Brief, paras. 244 et seqq.

[132] Claimants' First Post-Hearing Brief, para. 254.

[133] Claimants' First Post-Hearing Brief, paras. 257 et seqq.

[134] Claimants' First Post-Hearing Brief, para. 256.

[135] Respondent's First Post-Hearing Brief, para. 1060. For the analysis of the Subsoil Use Contracts cf. Respondent's Rejoinder on Quantum, para. 371 et seq.

[136] Expert Report and 2nd Expert Report of Professor Tomas Balco.

[137] Cf. Respondent's Second Post-Hearing Brief, paras. 966 et seqq.

[138] Respondent's Second Post-Hearing Brief, paras. 975 et seqq.; Respondent's Rejoinder on Jurisdiction and Liability, para. 375.

[139] Respondent's Second Post-Hearing Brief, paras. 978 et seqq.

[140] Award, paras. 967, 972, 1004, 1018.

[141] Cf. Award, para. 935.

Error! Unknown document property name.

(272)   In the section on the deduction of debt, the Tribunal briefly mentioned the back tax assessment and rejected RoK's argument that the back taxes needed to be deducted from Stati' claim. Specifically, the Tribunal held: *"Finally, the alleged **back tax obligations** were created by Respondent's conduct which this Tribunal found above to be a breach of the ECT. Further, KPM and TNG prevailed in their court challenges of the tax assessments. The only appellate decision in favour of Respondent was issued after the seizure of the investment in a review process alleged by Claimants to have been conducted without their knowledge or participation. In any case, the Tribunal considers that Respondent has not fulfilled its burden of proof that the tax assessment would have been valid even without the conduct found to be a breach above in this Award."*[142]

(273)   In a further quantum section of the award, the Tribunal again addressed the back tax assessment[143] although it is not clear what has caused the Tribunal to give these comments. In any event, the Tribunal states that it *"recalls its timeline, above in this Award in the chapter on liability of Respondent's conduct, through which it found Respondent [sic] to be a breach of its ECT obligation for FET. It further recalls its conclusions, above in this Award in the chapter on the relevance of debts, insofar as they deal with tax assessments."*[144] It then goes on to state that all of the alleged back tax obligations were created by and during RoK's conduct after October 2008 which the Tribunal has found to have breached the ECT.[145]

(274)   In consequence, the Tribunal put the burden of proof for showing that the back tax assessments were not part of the breach of RoK, arguing that the tax assessments were all retro-active assessments for back taxes which had not been assessed during a period when the relationship between the Parties had still been normal.[146]

(275)   Importantly, the Tribunal only looked at the Supreme Court decision in favour of RoK and stated that this decision, "*in the judgment of the present Tribunal, is not sufficient to fulfill* Respondent's *burden of proof that the assessment would have been the same without Respondent's breaching conduct.*"[147] It is therefore obvious that this was the only piece of counter-evidence that the Tribunal looked at. The Tribunal completely failed to consider the expert reports and testimony of Professor Balco.

       *(iii)*      *The arbitral award shall be set aside in accordance with the Section 34 (1) point 2 and point 6 Swedish Arbitration Act*

(276)   In depicting RoK's back tax assessment as part of a string of measures of harassment, the Tribunal treated them as illegal. The Tribunal even went so far as to call the back tax assessment "*a major part of this string of measures [in breach of the ECT].*" It is therefore

---

[142] Award, para. 1541 (emphasis by the Tribunal).

[143] Award, paras. 1787 et seq.

[144] Award, para. 1798.

[145] Award, para. 1799.

[146] Ibid.

[147] Award, para. 1800.

Error! Unknown document property name.

obvious that the Tribunal's finding on the back tax assessment were crucial for its decision on liability.

(277)   Nonetheless, the Tribunal ignored RoK's expert report of Professor Balco and RoK's witness evidence from Mr. Rahimgaliev of the tax committee. Similar to RoK's civil law expert, Professor Ilyassova, Professor Balco finds mentioning only in a few cases in the Tribunal's summary of the Parties arguments. However, just as Mr. Rahimgaliev, he is completely ignored in the Tribunal's reasoning.

(278)   As has been demonstrated above, it is the Tribunal's duty to consider expert reports and arguments on important points of dispute. By failing to do so, it committed a procedural mistake.

(279)   It has to be assumed that the Tribunal's decision would have been different if it had correctly considered Professor Balco's report and testimony and Mr. Rahimgaliev's evidence as both contained ample reasons to show that the back tax assessment was legal. As the Tribunal itself highlighted, it considered the tax assessment to be a *"major part"* of RoK's alleged illegal conduct. Without this "major part", the Tribunal could not have upheld its decision on liability issue. Equally, even if it had still found RoK liable, it would have needed to deduct USD 62 million for the tax claim against Stati from the amount totally awarded.

(280)   In treating the back tax assessment as illegal, the Tribunal also decided a question of Kazakh law, without even looking at Kazakh law. As has been demonstrated above (see 1.1.3), it was not the mandate of the Tribunal to decide such a question *ex aequo et bono* but rather the Tribunal could only decide that the back tax assessment was illegal by appliance of the Kazakh law.

### 5.5.5   In deciding on causation, the Tribunal completely ignored RoK's financial experts

(281)   In its finding on causation, the Tribunal completely ignored the report by RoK's experts Deloitte GmbH which showed that Stati companies were in financial difficulties irrespective of the State's actions; therefore, no causation was existent.

#### (i)   Background

(282)   Regarding the issue of causation, one central argument raised by RoK was that of an intervening cause stopping the chain of causation and entailing that no damages to Stati could be due. Specifically, RoK argued that Stati' own actions as well as wholly unrelated events led to the demise of KPM and TNG.[148]

(283)   In that regard, RoK referred in particular to the financing structure of KPM and TNG which aimed at diminishing cash and profits in Kazakhstan and thus made the companies vulnerable to situations of crisis. To that end, RoK provided an analysis by Professor

---

[148] Cf. e.g. Respondent's 2nd PHB, paras. 60 et seqq.

Error! Unknown document property name.

Olcott.[149] Moreover, RoK also argued that the financial crisis at the end of 2008 resulted in a drop in prices and demand that had a negative market effect on KPM and TNG, leading ultimately to Stati' decision to abandon the companies.[150]

(284)  Importantly, the Republic also provided expert evidence by Deloitte GmbH on the financial situation of KPM and TNG prior to Stati' valuation date of 14 October 2008.[151] This evidence intended to show that the financial troubles of the companies existed irrespective of the State's actions. In response to earlier analyses by FTI,[152] Deloitte GmbH stated very clearly that they disagreed with FTI's view that prior to 14 October 2008, there was no risk that KPM and TNG might not be able to meet their debt service obligations.[153] To support their statement, Deloitte GmbH conducted various financial analyses based on a thorough review of the publicly available quarterly financial statements of Tristan. In particular, Deloitte GmbH calculated the so-called current ratio and showed that the current ratio had been in decline throughout 2008 even before Stati' valuation date.[154] Further, Deloitte GmbH also calculated the so-called quick ratio and cash ratio, with both showing a clear deterioration of the financial situation prior to Stati' valuation date.[155] In addition, Deloitte GmbH also conducted a thorough book value of equity analysis, including an analysis of the equity to assets ratio.[156]

(285)  Notably, Deloitte GmbH had also conducted a detailed analysis of the financial situation of KPM, TNG and Tristan by means of looking at the price of the Tristan notes as of 14 October 2008. Deloitte GmbH then found that at the time, the markets were expecting a default of Tristan, i.e. a failure to fully repay the notes.[157] This entails that the market forces considered the financial situation of KPM and TNG to be critical.

*(ii)    The Tribunal disregarded RoK's and Deloitte GmbH's pleaded circumstances on the intervening cause in their entirety*

(286)  Regarding the causation arguments, the Tribunal first of all determined that Stati had established a timeline of events which, in the view of the Tribunal, proved that the actions of RoK had caused harm to Stati' investments.[158] As a result, the Tribunal considered that the burden of proof with regard to any intervening cause stopping the chain of causation was with RoK.[159] In the view of the Tribunal, RoK had not been able to provide sufficient

---

[149] Olcott Expert Report, paras. 162 et seqq.

[150] Cf. e.g. Respondent's 1st PHB, paras. 49 et seqq., 62 et seqq.

[151] 3rd Deloitte GmbH Expert Report, paras. 242 et seqq.

[152] 3rd FTI Expert Report, paras. 11.1 et seqq.

[153] 3rd Deloitte GmbH Expert Report, para. 242.

[154] 3rd Deloitte GmbH Expert Report, para. 248.

[155] 3rd Deloitte GmbH Expert Report, para. 249.

[156] 3rd Deloitte GmbH Expert Report, paras. 250 et seqq.

[157] 2nd Deloitte GmbH Expert report, paras. 198 et seqq.

[158] Award, paras. 1356 et seqq.

[159] Award, para. 1454.

prove to that effect.[160] In particular, the Tribunal considered those financial difficulties of KPM and TNG that were not attributable to the Republic to be only short term and intermediate. Specifically, the Tribunal stated:

> *"Weighing the evidence submitted by the Parties, the Tribunal is not persuaded by the testimony of Prof. Olcott (who is not an economic expert) that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations. As Mr. Gruhn of Deloitte **did not perform any direct analysis of KPM and TNG's abilities to service their debt**, the Tribunal rather accepts FTI's testimony that the finances of KPM and TNG were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0."[161]*

(287)   As a result, the Tribunal concluded that *"Respondent has not submitted sufficient evidence that Claimants' inexperience or own actions caused or contributed in a relevant way to the damages that occurred to Claimants' investment."[162]*

(288)   Evidently, the Tribunal's statement that Deloitte GmbH did not perform any direct analysis of KPM and TNG's abilitiy to service their debt is  entirely incorrect. As set out above, Deloitte GmH analyzed the financial statements of Tristan and came to clear conclusions as regards the financial situation of KPM and TNG. The Tribunal's statement as well as its reference to the current ratios calculated by FTI clearly demonstrates the Tribunal's failure to take note of and evaluate all the evidence offered.

> *(iii)      The arbitral award shall be set aside in accordance with Article 34 (1) p. 2 and p. 6 SAA*

(289)   Due to the Tribunal's error set out above, the Award can be challenged under Article 34 item 6 SAA. This error amounts to a procedural irregularity because the Tribunal patently failed to consider evidence on an important issue that had been submitted by RoK.

(290)   As set out above, a tribunal must examine the expert evidence offered where it concerns matters of importance for its decision. In the present case, the arguments of an intervening cause were clearly of importance. This can be seen from the fact that both Parties devoted extensive pleadings to the issue. Moreover, the fact that both Parties had their experts look into and comment on the matter underscores the relevance that the Parties attributed to the matter. Nonetheless, the Tribunal failed entirely to address the arguments made and the expert evidence provided. The Tribunal's conclusion was thus based on a procedural error.

---

[160] Ibid.

[161] Award, para. 1456.

[162] Award, para. 1458.

Error! Unknown document property name.

(291)    This procedural irregularity has also affected the outcome of the case. Had the Tribunal taken into account the arguments presented by RoK and Deloitte GmbH, it could not have easily dismissed the argument of an intervening cause. Instead, it would have had to take note of the fact that KPM's and TNG's financial situation had been worsening throughout 2008, i.e. prior to the financial crisis. Against this background, it would not have been possible for the Tribunal to simply state that KPM's and TNG's financial troubles were only short term in nature and could have been overcome but for the State's actions. Rather, there were structural deficiencies which should have led the Tribunal to find an intervening cause stopping the chain of causation. In turn, this would have required the Tribunal to dismissed the claim.

### 5.5.6    The Tribunal has decided a matter regarding international law and EU-law without considering RoK`s expert evidence regarding those law areas

(292)    As already explained above in section 5.3, the Tribunal did not have jurisdiction to hear and decide the case insofar as it pertains to Terra Raf, because Terra Raf is a company incorporated in Gibraltar to which the ECT does not apply. While the Tribunal's ruling on this matter is already challengeable for this reason alone, it is noteworthy that the basis for the Tribunal's defective ruling was, again, the Tribunal's disregard for the expert testimony provided by RoK. Had the Tribunal reviewed RoK's pleadings and especially the expert report of Professor Tietje, the Tribunals judgment in this part would have been different.

(293)    The Tribunal's decision and its complete disregard of Professor Tietje's arguments can only be seen as a conscious disregard of the expert report provided by the Professor.

### 5.5.7    The Tribunal relied on Stati's geological experts without providing any reasons and while completely ignoring the expert reports and testimony of RoK's geological experts

(294)    The proceedings regarding the calculation of the damages were dominated by questions of geology and valuation. It was always clear that the geological assessment of the assets, in particular the Tolkyn and Bornakol fields, were the cornerstone of the valuation. The Parties' geological experts provided reserves estimates based on which the valuation experts attributed a certain value to the fields.

(295)    There was a fierce fight between the geological experts regarding methodology and volumes. The Tribunal, however, in one single sentence, decided that it would follow Stati' geological experts for its assessment without giving any kind of explanation. In doing so, the Tribunal did not provide a shred of explanation. Equally, it committed a procedural mistake by failing to consider RoK's expert reports that had provided a detailed criticism of Stati' expert reports.

*(i)      The Parties' submissions*

(296)    The both Parties submitted expert reports on geology in the hearings. RoK submitted in total four expert reports by its geological experts Gaffney Cline & Associates (GCA) and

Error! Unknown document property name.

Stati equally submitted four expert reports by their geology experts Ryder Scott. These expert reports were crucial to the quantum to be awarded because the reserve estimates became the basis for the Parties' respective valuation experts. In addition, GCA also provided expertise regarding the necessary future capital and operational expenditure, which also affect the valuation. The geology experts were also heard at the Hearing on Quantum and at the Final Hearing.

(297)  One difference between experts reserve estimates was due to the fact that Stati instructed their experts to make a reserves estimate as of 14 October 2008 while RoK instructed its experts to make a reserves estimate as of 21 July 2010, the respective valuation dates advanced by the Parties. However, there were also fundamental disputes regarding methodology and volumes for both Borankol and Tolkyn, irrespective of the valuation date. This is best illustrated by the joint issue list, drafted by both experts before the Quantum Hearing.

(298)  Naturally, GCA's reports not only contained justifications of their own findings. They also included detailled criticism of Ryder Scott's findings. RoK summarised the criticism of Ryder Scott's findings for example in its First Post-Hearing Brief.[163]

(299)  In addition, RoK explained in detail why Ryder Scott's work was unreliable.[164] In its second Post-Hearing Brief, RoK explicitly stated that:

> "*there can be no doubt that the work performed by Ryder Scott is unreliable and not adequate to form the basis of a fair market value assessment. It is largely based on fictional recompletion potential that is not supported by the well data or production history.*"[165]

> (ii)  *The Tribunal's choice of Stati' expert report without providing any grounds*

(300)  The Tribunal, in deciding whether to rely on the reserves estimates provided by Ryder Scott simply stated that the Tribunal *"considers that the Ryder Scott reports on reserves estimates are convincing in their approach and results.*"[166]

(301)  In just one single sentence Tribunal stated that it considered the Ryder Scott reports "*convincing in their approach and results*". Such a sentence may be the starting point for an explanation what the approach and the results were and why the Tribunal considered them convincing but there no explanation was given. In fact, not a single reason for this assessment was given.

---

[163] Respondent's First Post-Hearing Brief, paras. 530 et seqq and with more details in paras. 931 and paras. 946 et seqq.

[164] Respondent's First Post-Hearing Brief, paras. 522 et seqq; Respondent's Second Post-Hearing Brief, paras. 433 et seqq.

[165] RoK:s andra *Post-Hearing Brief*, ¶ 745.

[166] The Award, para. 1625.

Error! Unknown document property name.

(iii) *The arbitral award shall be set aside in accordance with Section 34 (1) p. 6 Swedish Arbitration Act*

(302) In deciding to follow the Ryder Scott reports, the Tribunal made two procedural mistakes. First, it did not provide any grounds for its decision to rely on Ryder Scott and secondly, it completely ignored the criticism of Ryder Scott's expert evidence by GCA.

(303) The Parties' choice of the SCC Rules entails an obligation for the Tribunal to provide reasons for its decision. While it is accepted that the Supreme Court has stated that only a complete lack of grounds or grounds that, having regard to the circumstances, must be deemed so incomplete that the situation can be equated to no grounds whatsoever, can constitute a ground for challenge, it is RoK's position that this is one of those rare cases.

(304) As has been stated above, it is obvious that the question of choosing the correct reserves estimates has been pivotal. Whether or not the Tribunal could follow Ryder Scott's expert reports was therefore a question of utmost importance.

(305) Both Parties' expert reports together contained more than 350 pages, for which a fee of USD 2 million was charged (almost USD 900,000 for Ryder Scott, more than USD 1.2 million for GCA). There can be no doubt that the question of making the correct choice regarding the reserves estimates was an extremely important and highly disputed issue. Deciding such an issue by the single sentence provided must be regarded as providing no grounds or reasons at all.

(306) The Supreme Court in *Soyak v Hochtief* held that if such a material procedural error exists, it can also be presumed that the lack of grounds have affected the outcome of the case. This is certainly the case here. The Tribunal could not have followed the Ryder Scott reports if it had considered GCA's criticism.

(307) The Tribunal has also committed a procedural mistake because it has completely ignored to mention or take into consideration the GCA expert reports and their criticism of the Ryder Scott reports in its reasoning.

**Error! Unknown document property name.**

5.6     **The Tribunal failed to consider the RoK's objections that certain deductions would need to be made from an eventual award**

(308)   During the proceedings, RoK raised several objections regarding necessary deductions from Stati' damage claim. Some of these objections, the Tribunal addressed and was the subject for the proceedings.[167] However, the Tribunal completely failed to decide on two of these objections: (i) The Tribunal did not rule on RoK's objection that all revenue siphoned off by Stati' after the valuation date would need to be deducted, and (ii) the Tribunal failed to consider and decide on RoK's objection that any award of compensation for the LPG Plant could only be for half of the value.

(309)   The Tribunal's failure in this regard constitutes an exceeding of mandate pursuant to Section 34(1) point 2 SAA or in any event a procedural mistake pursuant to Section 34(1) point 6 SAA which have affected the outcome of the case. Accordingly, the Award shoall be set aside to the extent it refers to Quantum, i.e. item N.2.

5.6.1   **The Tribunal exceeded its mandate and committed a procedural mistake by failing to decide on RoK's objection that all revenue that Stati siphoned off between the valuation date and the date of the termination of their contracts would need to be deducted from an eventual award**

(310)   The Tribunal has awarded Stati USD 497,685,101.00. In doing so, the Tribunal completely failed to rule on RoK's objection that all revenue siphoned off by Stati between the valuation date and the date of the termination of their subsoil use contracts, i.e. when Stati' actually stopped operating the assets, would need to be deducted from an eventual award. By ignoring this objection, the Tribunal exceeded its mandate and committed a procedural mistake that influenced the outcome of the case.

                          *(i)      Objection by RoK to deduct monies pocketed from an eventual award*

(311)   It is undisputed that Stati continued to operate the relevant assets during the time from the valuation date until the date when their subsoil use contracts were terminated. As the Tribunal chose 31 April 2009 as the valuation date, this means that for almost 15 months after the valuation date, Stati continued to operate the fields and to produce and sell oil and gas. It is obvious that from these sales, Stati generated a certain revenue and RoK pointed to several instances that Defendants diverted this money to related companies or themselves.

(312)   Specifically, RoK argued that the revenue thus siphoned off would need to be deducted from an eventual award as Stati would otherwise be compensated for profits they had already pocketed and would thus receive double-compensation.[168] RoK referred to a

---

[167] The Award, paras. 1727 – 1542 and paras. 1768 – 1771.

[168] Respondent's Rejoinder Memorial on Quantum, para. 442 – 448; Transcript of the Hearing on Quantum, Day 1, p. 148; Respondent's First Post-Hearing Brief, paras. 1038 - 1049; Transcript of the Final Hearing, Day 1, pp. 233-235; Respondent's Second Post-Hearing Brief, paras. 883 – 888.

Error! Unknown document property name.

dividend distribution in the amount of USD 71.9 million from KPM to Ascom in 2010[169] and the extension of the due date and ultimate non-payment of receivables in the amount of USD 143.4 million due from companies owned by Mr. Stati, namely Stadoil Ltd. and General Affinity Ltd.[170] RoK added that further outflows were likely to have occurred but could not be detected due to Stati opaque structure.[171] As RoK showed in the Arbitration, these amounts would in any event have needed to be deducted from the award because the value of an asset is determined by its estimated future cash flows.

(313)    RoK's experts Deloitte GmbH also highlighted with reference to the payment of dividends and the extension of due dates of trade receivables that

> *"… with affecting such payments or transfers of assets, a certain part of the aggregated Asset Values has already been received by the Claimants or the Stati group, respectively. This portion needs to be deducted from the damage amount to avoid double compensation of the alleged damage."*[172]

### (ii)    The Tribunal's failure to decide on RoK's objection

(314)    The Tribunal completely failed to decide on RoK's objection. At no point in the award did it consider any of RoK's objections and at no point these objections were accepted or rejected. The only place where RoK's objections are indicated is in the Tribunal's summary of the Parties' arguments regarding the determination of the correct valuation date.[173] However, RoK had never treated the issue as a question of finding the right valuation date so that this did in no way related to RoK's objection.

(315)    Underscoring the severity of the Tribunal's error is the fact that Stati themselves had acknowledged in their First Post-Hearing Brief that "Kazakhstan repeatedly asserts that 'Claimants disingenuously claim compensation for profit they already have pocketed.'"[174] Indeed it was a point of much debate between the parties whether – if a valuation date prior to the termination of the contracts were chosen – profits made in between those two dates would need to be deducted. Yet, the Tribunal – even though choosing an early valuation date – failed completely to decide on this deduction claim.

### (iii)    The Tribunal violated Section 34 (1) point 2 Swedish Arbitration Act

(316)    The Tribunal has rendered the award and has ordered RoK to pay a sum of nearly USD 500 million without considering RoK's objection that certain monies in excess of USD 200

---

[169] Respondent's Second Post-Hearing Brief, paras. 889 et seqq.

[170] Ibid., paraa. 905 et seqq.

[171] Ibid., para. 886.

[172] Deloitte & Touche Second Supplemental Report, para. 211.

[173] The Award, paras. 1462 et seqq.

[174] Claimants' First Post-Hearing Brief, para. 432.

Error! Unknown document property name.

million, which were siphoned off after the valuation date, would need to be deducted from an eventual award.

(317)   RoK's request to deduct the profits pocketed can easily be equated with a counter-claim or a set-off claim. Due to RoK's objection, the Tribunal was not entitled to limit its examination of the dispute only to Stati' claims and some of RoK's objections to make deductions.

(318)   Indeed, the Tribunal apparently concurred that generally it is under an obligation to address objections that certain deductions from an award would need to be made. RoK had made other objections regarding monies that would need to be deducted from an eventual award, namely debts such as the obligation arising out of the Tristan notes, the Laren loan and back tax obligations. The Tribunal addressed all of these objections, rejected the majority of them but also decided to deduct certain debts, such as obligations under the Reachcom and the Limozen Facility Agreements.[175] However, it failed to address RoK's objection to deduct in excess of USD 200 million without providing any explanation. In doing so, the Tribunal ignored that its mandate was to try the dispute as a whole.[176] The Tribunal`s failure in this matter constitutes an excess of its mandate in accordance with Section 34 (1) p. 2 in SAA.

(319)   RoK does not assume that in case of Section 34 (1) item 2 of the Swedish Arbitration Act, it would need to show that the fact that the Tribunal exceeded its mandate affected the outcome of the case. Even if the court assumed that this was necessary, however, it could easily be shown here. Had the Tribunal considered RoK's objection, it would have needed to deduct at least USD 71.9 million and USD 143.4 million, i.e. in total USD 215.3 million from an eventual award.

> *(iv)   In any event, the Tribunal's failure constitutes a mistake pursuant to Section 34 (1) point 6 SAA which affected the outcome of the case*

(320)   The Tribunal's failure to decide on RoK's objection to deduct all revenue that Stati siphoned off between the valuation date and the date of the termination of their contracts from an eventual award, equally constitutes a procedural mistake within the meaning of Section 34 (1) point 6 Swedish Arbitration Act. It is well accepted that if the Tribunal fails to make a ruling on one of several objections, this constitutes a challengeable procedural mistake.[177] Again, this procedural mistake affected the case because had the Tribunal considered this objection, it would have needed to deduct at least USD 215.3 from the sum of money awarded.

---

[175] The Award, paras. 1527 et seqq.

[176] Cf Heuman, Arbitration Law of Sweden, p. 600.

[177] Ibid., p. 599.

Error! Unknown document property name.

Case 1:14-cv-01638-ABJ   Document 72-5   Filed 02/23/18   Page 74 of 92

5.6.2 **The Tribunal exceeded its mandate and/or committed a procedural irregularity by failing to consider and decide on RoK's objection that any award of compensation for the LPG Plant could only be for half of the assumed value.**

(321) The Tribunal has awarded Stati USD 199 million for the LPG Plant. As shown in section 5.4 above, in arriving at this value, the Tribunal committed a serious procedural mistake and therefore in any event the award needs to be set aside in as far as it contains the USD 199 million in value for the LPG Plant. Even if the court were to reject this, the award would still need to be reduced by USD 99.5 million. This is because the Tribunal failed to consider and decide on RoK's objection that an award of damages for the LPG Plant would need to be halved.

> *(i)     Relevant facts*

(322) The Tribunal in awarding damages in the amount of USD 199 million for the LPG Plant ignored the fact that RoK had continuously argued that if the Tribunal were to award damages for the unfinished LPG Plant, it could only award 50% of this value to Stati. The Tribunal however, has failed to even mention this material argument in its reasoning.

(323) In its submissions and at the Final Hearing RoK had repeatedly argued that any award for damages for the LPG Plant could only be for 50% of the assumed value.[178] RoK explained in detail that TNG had entered into a Joint Operating Agreement with Vitol according to which the profits from the operation of the LPG Plant would be distributed on a 50/50 basis.

(324) RoK initially put Stati to prove that the proceeds they could have earned from operating the LPG Plant under the Joint Venture Agreement were more than half of whichever asset value they were claiming.[179] The Defendant's clearly understood this as an objection to their claim regarding the LPG Plant and addressed this under the heading "*Enterprise Value Damages Likewise Should Not Be Reduced by the Vitol, Tax, and Other Alleged Debts*".[180]

(325) Because Stati provided no proof that they would have earned more than 50% of the profits from the LPG Plant in their next written submission, their First Post-Hearing Brief, RoK in the following demanded that any award of compensation for the LPG Plant could only be for half the assumed value.[181] This was because even though TNG initially retained 100% of the ownership of the unfinished plant at the valuation date chosen by the Tribunal, it would only have received 50% of the profits from its operation because the Joint Operating Agreement specifically stipulates that the bulk of the profits would be generated by a 50/50 Joint Venture between Ascom and Vitol which would have marketed the LPG

---

[178] RoK's Rejoinder on Quantum, paras. 208 – 211; RoK's First Post-Hearing Brief, paras. 907 – 908; RoK's Second Post-Hearing Brief, paras. 714 – 731.

[179] RoK's Rejoinder on Quantum, para. 211.

[180] Stati's First Post-Hearing Brief, paras. 641 - 645.

[181] RoK's Second Post-Hearing Brief, paras. 714 – 731.

products once the plant had been put into operation. Therefore, Stati could only be compensated for 50% of the value of the asset. Otherwise, they would not be put into the situation but for the alleged breach (as they requested) but they would be put into a better position that disregards arrangements on future cash flows.

(326)   The Tribunal did not mention this argument anywhere in its reasoning regarding the value of the LPG Plant. It simply assumed a value of USD 199 million based on an indicative bid by KMG EP without making any deductions. Importantly, this indicative bid had been made based on the assumption that all profits rather than only 50% of the profits would be flowing to the bidder.[182]

> *(ii)     The Tribunal's failure constitutes an exceeding of mandate pursuant to Section 34 (1) point 2 or in any event a procedural irregularity pursuant to Section 34 (1) point 6 SAA, which have affected the outcome of the case*

(327)   RoK's objection that any award of damages for the LPG Plant could only be for 50% of the assumed value - just as the objection to deduct at least USD 215.3 million from an eventual award - can be equated with a counter-claim or offset. Based on the reasoning above, the Tribunal exceeded its mandate by failing to decide on this claim. At the same time, the Tribunal committed a procedural mistake. This obviously affected the outcome of the case.

## 5.7    The Tribunal has exceeded its mandate and has committed procedural irregularities by going beyond the submissions of the Parties and by ignoring the parties' submissions and the applicable law on multiple occasions

### 5.7.1   Introduction

(328)   By the Award it is evident that the Tribunal, on multiple occasions, has based this on (i) circumstances never invoked by the parties, and (ii) alleged concessions never made. In addition the Tribunal has ignored (iii) circumstances actually invoked by a party and (iv) the applicable law.

(329)   On the basis of the above, RoK applies for the setting aside of the Award as a whole because the Tribunal exceeded its mandate (SAA, Article 34 item 2) and committed procedural irregularities that probably influenced the outcome of the case (SAA, Article 34 item 6). All of these occasions are presented below under sections [ ]–[ ]. These irregularities individually form grounds for the setting aside of the Award. In any event, these irregularities put together must lead to the setting aside of the Award.

---

[182] The information memorandum on which the indicative bid was based described the joint venture arrangement only very briefly and did not make reference to the 50% sharing of profits, Project Zenith – Information Memorandum (Exhibit C-70). Moreover, the internal analysis of KMG EP shows that no such sharing of profits was taken into account, KMG 2008 Asset Valuation, p.11 (Exhibit C-722).

**5.7.2    The Tribunal treated the issue of KazAzot as one of liability even though it was argued by both Parties only with regard to gas pricing; in so doing, the Tribunal relied on facts never invoked by either Party and failed to apply the proper law**

(330)    The Tribunal's liability finding is critically undermined by procedural errors relating to the analysis of the actions of KazAzot. With regard to KazAzot, the Tribunal relied on facts never pleaded by either party, it based its findings on liability and causation on facts only pleaded by the parties with a view to quantum; moreover, the Tribunal failed to apply the correct law.

*(i)        Factual and procedural background*

(331)    In 2007 and 2008, Stati negotiated with state-owned oil and gas companies, in particular with KazMunaiGas National Company ("KMG NC"), and KazAzot for the conclusion of the so-called "Tripartite Agreement". Stati' objective in the negotiations was to conclude a contract for the sale of their gas at high "export prices". KazAzot was in turn interested in purchasing gas from Stati in order to supply their fertilizer factory. Since the governor of the Mangystau region was interested in furthering industrial development in his region, it was decided that also the state-owned oil and gas companies would become involved. The idea was that in order to incentivise Stati to supply to KazAzot, KMG NC could share some of its export rights to Russia with Stati, so that Stati could realise high "export prices" for all of the gas not sold to KazAzot.

(332)    Importantly, in the end, the Tripartite Agreement was not concluded. Rather, an agreement dated 17 November 2008 was signed by Stati and KMG NC, but not by KazAzot. At the end of 2008, KazAzot requested time to perform another audit of the project because the developments due to the financial crisis made it necessary to reassess the merits of the project, but KazAzot never came around to signing the agreement.

*(ii)       The Tribunal's ruling*

(333)    The Tribunal's decisions with regard to KazAzot comprise three major procedural flaws, each of them justifying that the Award is set aside. First, in the liability[183] and causation[184] sections of the Award, the Tribunal made crucial findings relying on facts never pleaded by either Party. Second, the Tribunal used the Parties' pleadings relating to KazAzot for liability and causation in spite of the fact that both Parties had exclusively pleaded this matter in relation to the gas pricing. Third, in dealing with the matter, the Tribunal also failed to apply the correct law, namely customary international law on state responsibility, including the so-called ILC Draft Articles on State Responsibility.

---

[183] Award, paras. 976 and 1094.

[184] Award, paras. 1357, 1359, 1366, 1406, 1418.

Error! Unknown document property name.

### (iii) The Tribunal relied on facts never pleaded by either party

(334)   As regards liability, the Tribunal included in its timeline a reference to the 17 November 2008 Tripartite Agreement, mentioning that KazAzot never signed the agreement.[185] This timeline was decisive for the Tribunal to find a breach of the standard of fair and equitable treatment (FET).[186] In addition to the timeline, the Tribunal included a phrase in its reasoning stating that *"[Claimants] point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement."*[187] The Tribunal then went on to state that *"it is more probable than not that there was State influence at play with respect to the failure by KazAzot to sign the Tri-Partite Agreement."*[188]

(335)   Further, in a repetition of the findings on FET, the Tribunal stated: *"The Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State was the cause of the various difficulties they encountered in securing their gas sales and export rights commencing in the fall of 2008* and *continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement."*[189]

(336)   These findings on liability and causation are based on an alleged statement by Stati that Stati have in fact never made. The Tribunal can only be understood to believe Stati to allege that RoK exercised influence on KazAzot through "KMG"[190] and Mr. Kulibayev in order to make KazAzot refuse to sign the Tripartite Agreement. However, Stati have never made such an allegation.

### (iv) The Tribunal relied on the KazAzot matter for liability and quantum even though the Parties had always argued the matter as one of gas pricing

(337)   The second procedural error with regard to KazAzot stems from the fact that the Parties and in particular Stati always argued the issue of KazAzot as one of quantum, namely the price of gas, and not of liability or causation. It is therefore outside the pleadings for the Tribunal to rely on the KazAzot issue as part of liability and causation.

---

[185] Award, para. 976.

[186] Award, para. 1086 ("*Indeed, for the Tribunal, the evaluation of the objective timetable is sufficient.*").

[187] Award, para. 1094.

[188] Ibid.

[189] Award, para. 1418.

[190] The Tribunal presumably meant KMG NC.

**Error! Unknown document property name.**

> *(v)*     *The Tribunal failed to apply the correct law regarding the attribution of KazAzot's actions to the state*

(338)     The Tribunal failed to apply the customary international law on state responsibility to the matter of KazAzot's decision not to sign the Tripartite Agreement.

(339)     In investment arbitration, the actions and omissions of an entity other than the state itself can only be attributed to the state if the requirements of customary international law for such attribution are fulfilled.[191] Investment tribunals as well as the ICJ have regularly considered the customary international law rules on attribution to be codified in the ILC Draft Articles on State Responsibility[192] (the "ILC Draft Articles") and have applied these articles for attribution matters (in particular Articles 4, 5 and 8).[193] Other international bodies such as the WTO Appellate Body also apply the ILC Draft Articles.[194] Since KazAzot is undisputedly a company organised under private law, KazAzot's decision not to sign the Tripartite Agreement could only have been attributed to the State based on customary international as outlined in the ILC Draft Articles.

(340)     The Award however does not make any reference to either Article 4, 5 or 8 of the ILC Draft Articles. Neither does the Award mention the jurisprudence of the ICJ or investment arbitration tribunals relating to these articles or to customary international law in general. Instead, the Tribunal treated the issue of attribution as one of a "close relationship" between Mr. Kulibayev, KMG and KazAzot, without making any reference to the requirements of the Articles or legal considerations in general.[195] This in itself demonstrates that the Tribunal simply ignored the applicable law.

(341)     The Tribunal refers to the ILC Draft Articles in other instances in the Award, namely when setting out the standards for the determination of a causal link between the breach and the damages[196] and with regard to the concept of loss of opportunity in the damage calculation,[197] where the Tribunal stated explicitly that it relied on the ILC Draft Articles.

---

[191] *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, para. 171; *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. The Government of Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011, para. 576.

[192] 2001 Draft articles on Responsibility of States for Internationally Wrongful Acts, see http://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.

[193] *Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, ICJ, Judgement, 19 December 2005, para. 160; *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, para. 171; *White Industries Australia Limited v. The Republic of India*, UNCITRAL, Final Award, 30 November 2011, paras. 8.1.1 et seqq.; *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. The Government of Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011, paras. 576 et seqq.

[194] Cf. *United States – Countervailing Duty Investigation on Dynamic Random Access Memory Semiconductors (DRAMS) from Korea*, (AB–2005–4), Report of the Appellate Body of 27 June 2005, WTO doc. WT/DS296/AB/R, para. 114, footnote 179.

[195] Award, paras. 1094 and 1418.

[196] Award, paras. 1331 et seq., 1452.

[197] Award, para. 1688.

Error! Unknown document property name.

The fact that it did not mention the ILC Draft Articles in connection to KazAzot proves that the Tribunal did not apply these rules when dealing with KazAzot.

> *(vi)    Challenge grounds under Article 34 SAA*

(342)    The errors identified above allow for the setting aside of the Award under Article 34 items 2 and 6 of the SAA.

(343)    To begin with, the Tribunal's reliance on facts never invoked by either Party constitutes an excess of mandate in the meaning of Article 34 item 2 of the SAA.

(344)    It is well recognised that a tribunal exceeds its mandate if it relies on legal grounds not invoked by either party. A tribunal is bound to the legal grounds relied on by the parties when deciding the case. This follows from the consensual nature of arbitration and its basis in party autonomy; the parties are the masters of the proceedings.[198] The scope of the arbitration and the mandate of the Tribunal are thus set by the Parties' oral and written submissions. If a tribunal, as in this case, bases its award on facts or grounds which have not been invoked by the parties, the tribunal thus enlarges the dispute in a way which comes as a surprise to the parties when they receive the award. Such action by a tribunal consequently has to be characterized as an excess of the mandate given to the tribunal.[199]

(345)    Moreover, the Tribunal's use of the KazAzot issue as part of its liability and causation findings constitutes a separate and further instance of the Tribunal exceeding its mandate. The Parties had pleaded the issue as one of gas pricing and thus only with view to the quantum issue. Instead, the Tribunal has transferred what has been submitted regarding KazAzot to the Tribunal's consideration of the issues regarding liability and causation. The Tribunal thus exceeded its mandate given by way of the Parties' written and oral submissions.

(346)    In that regard, the case of *Systembolaget AB v V&S Vin & Sprit Aktiebolag*[200] gives some useful guidance. It shows that a fact invoked by a party in relation to one aspect of a case cannot be used by the tribunal in relation to a different aspect of a case.[201] An error of that kind in itself allows for the setting aside of the award due to the Tribunal's excess of its mandate.

(347)    Lastly, the Tribunal's failure to apply customary international law for the question of attribution of KazAzot's action forms a further reason for the setting aside of the Award.

---

[198] Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 315 (8.79)

[199] See *Systembolaget AB v V&S Vin & Sprit Aktiebolag* in the Svea Court of Appeal's judgment of 1 December 2009 in Case No T 4548-08 and *Soyak International Construction & Investment Inc v Hochtief AG* (NJA 2009 p. 128).

[200] *Systembolaget AB v V&S Vin & Sprit Aktiebolag* in the Svea Court of Appeal's judgment of 1 December 2009 in Case No T 4548-08.

[201] Cf. *Knuts*, in: *Franke et al. (eds.)*, International Arbitration in Sweden – A Practitioner's Guide (2013), Chapter 9, para. 42.

Error! Unknown document property name.

Under Swedish arbitration law, the Tribunal must apply the law chosen by the parties.[202] Presently, according to ECT Article 26(6), the Parties had chosen as the applicable law the ECT as well as "applicable rules and principles of international law". The latter naturally includes customary international law on the attribution of actions to the state. The Tribunal however failed entirely to apply the relevant customary international law.

### 5.7.3  In its finding regarding the INTERFAX press item, the Tribunal invoked a fact never put forward by either Party and then relied on this fact by arguing that it was uncontested by RoK

(348)   The Tribunal's findings regarding liability are compromised by procedural errors committed in connection to the treatment of the INTERFAX press report. Specifically, the Tribunal incorrectly based its findings on a fact that was never invoked by either Party, arguing that such fact was uncontested.

*(i)     Factual and procedural background*

(349)   On 18 December 2008, the Kazakh Ministry of Ministry of Energy and Mineral Resources (the "MEMR") cancelled its decision dated 20 February 2007 to approve the transfer of the shares in TNG from Gheso to Terra Raf and requested TNG to submit a new application for the transfer. On the same day, INTERFAX Kazakhstan ("INTERFAX") published a press report about this decision. According to Stati, the MEMR's decision, combined with the publication by INTERFAX, "clouded" Terra Raf's title to TNG which in turn made it impossible for Stati to obtain debt financing on the market. Also, these circumstances allegedly led to a drop in value of the Tristan notes and to rating agencies downgrading the notes issued. Stati believed that the INTERFAX report was caused by a conscious leak of information by state authorities and they contested the legality of the MEMR's decision. Importantly, Stati never argued that the INTERFAX report was caused by actions of the state taken in October or November 2008. The press report only referred to the pre-emptive rights waiver issue and the MEMR's decision in December 2008, not to the inspections or tax audits that took place in October or November 2008.

(350)   In response, RoK argued that the MEMR's decision was legal and that in any event, the INTERFAX press report could not be attributed to the Republic as it was issued by a private news agency.

*(ii)    The Tribunal's ruling*

(351)   In the Award, the Tribunal included the MEMR decision and the INTERFAX press report in its timeline of events for the finding of a breach of the FET.[203] In so doing, the Tribunal had to deal with RoK's objection that the press report could not be attributed to the State. The Tribunal held:

---

[202] cf *Czech Republic v CME Czech Republic BV* in the Svea Court of Appeal's judgment of 15 May 2003 in CaseNo. T 8735-01 (RH 2003:55).

[203] Award, paras. 993 et seq.

Error! Unknown document property name.

> *"In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and **not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.**"* (emphasis added)

(352)   With this statement, the Tribunal argued that the INTERFAX press report was caused by actions taken by RoK already in October and November 2008. This, however, was a fact never even invoked by Stati. Clearly, the Tribunal's ruling was beyond its scope and constitutes an excess of mandate, resulting in a serious procedural irregularity.

(353)   As a consequence, the Tribunal's statement that RoK never disputed these facts becomes patently absurd. Reasonably, RoK did not contest a fact that was never invoked by Stati. This cannot be held against RoK but rather adds to the Tribunal's procedural mistake.

### (iii)   Challenge grounds under Article 34 SAA

(354)   Because of the error identified above, the Award can be challenged under Article 34 item 2 and item 6 of the SAA.

(355)   As set out above, it is well recognised that a tribunal exceeds its mandate if it relies on facts not invoked by either party. Such a mistake is further aggravated where, as in the present case, a tribunal not only relies on a fact never invoked but also considers this fact obvious and uncontested. In total, there can be no doubt that the Tribunal committed a challengeable error.

(356)   In addition, the Tribunal's ruling, as described above, is a serious violation of the principle of due process. The separate challenge ground in Article 34 item 6 of the SAA is therefore also invoked.[204]

### 5.7.4   In its findings regarding the Financial Police, the Tribunal relied on facts never invoked by either Party and on an alleged admission by RoK that was never made

(357)   On top of the two procedural errors outlined above, the Tribunal's liability finding is further tainted by the fact that the Tribunal committed two major procedural mistakes regarding the conduct of the Kazakh Financial Police. The Tribunal both relied on facts never invoked by either Party and on an alleged admission by RoK that was never made.

### (i)   Factual and procedural background

(358)   A central pillar of Stati' liability argument was the claim that the State orchestrated a harassment campaign against Stati. Central to this claim was the allegation that the

---

[204] See Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 330, cf Govt Bill 1998/99:35, p. 148.

Error! Unknown document property name.

Financial Police was the driving force in criminal inspections and investigations against KPM and TNG. According to Stati, the Financial Police had the goal of finding a crime which could be attributed to KPM and TNG to be able to impose a "crippling fine" which, in turn, would allow expropriating the companies.

(359)   RoK has always denied this allegation and held throughout the Arbitration that the Financial Police merely acted upon reasonable suspicion of a crime having been committed.

*(ii)        The Tribunal's ruling*

(360)   In deciding on the matter, the Tribunal relied on facts never invoked by either Party and also on an alleged admission by RoK that was never made.

(361)   Specifically, in its findings on the alleged breach of the ECT's fair and equitable treatment standard, the Tribunal included in its timeline of events the following statement:

> *"On 10 December 2008, the Financial Police reported to the Deputy Prime Minister that the Financial Police had **determined that KPM and TNG were operating trunk oil and gas pipelines without licenses**."*[205] (emphasis added)

(362)   Such allegations was never even made by Stati.

(363)   Moreover, the Tribunal relied on an alleged admission by RoK that was never made. Specifically with regard to the 10 December 2008 letter of the Financial Police, the Tribunal went on to state:

> *"Although Respondent states that 'no decision had been reached as to whether or not the pipelines were trunk at this point' (RPHB 1 ¶ 197), this statement is belied by C-448. **The Tribunal believes Respondent's earlier statement acknowledging that the Financial Police had, indeed, concluded that KPM and TNG were operating trunk pipelines**, even though they were not legally competent to make that classification. (R-II ¶¶ 473 – 474)."*[206] (emphasis provided)

(364)   A close look at the relevant section of RoK's Rejoinder on Jurisdiction and Liability, to which the Tribunal refers, confirms that the acknowledgement assumed by the Tribunal was never made. This section reads:

> *"Mr Turganbaev reported back to the Prime Minster's [sic] office to explain how the inspections had progressed on 10 December 2008. In his letter, as Claimants note, Mr Turganbaev did mention that 'it is*

---

[205] Award, para. 990.

[206] Award, para. 990.

Error! Unknown document property name.

> ascertained that "Kazpolmunay" LLP and "Tolkyneftegas" LLP are operating trunk oil and gas pipelines'. However, the letter, as Claimants acknowledge, goes on to explain the considerations upon which the Financial Police's statement is based and the fact that further enquiries needed to be made because since, the Financial Police are not the competent authority in relation to the classification of pipelines, 'it is impossible to make a lawful procedural decision in respect of this case'. The letter goes on to explain that requests were being made of the licensing agencies to establish whether they could provide a view on whether the pipelines were trunk or not, taking into account the "functions actually performed" by those pipelines.[207]
>
> So even at this stage, it is clear that the Financial Police, though it had procured information on the amount of profits gained by KPM and TNG and had information about the licences held by the companies, and had also made enquiries of the Ministry of Justice, **had not yet reached a definition [sic] conclusion as to whether the KPM or TNG pipelines were trunk or not**. It is absurd to suggest that the 'classification of pipelines' was premeditated when, even at this stage, two months after the inspection of TNG and KPM's fields, no final conclusion had yet been drawn." (emphasis added)

(365) By reading this statement, it is obvious that rather than acknowledging any premature determination, RoK had stated just the opposite of what the Tribunal then chose to "believe". Hence, the Tribunal not only relied on facts never invoked by either Party, it also relied on an alleged admission by RoK that was never made.

### (iii) Challenge grounds under SAA Article 34

(366) Due to the errors identified above, the Award must be set aside under SAA Article 34 item 2 and item 6.

(367) When deciding a case, an arbitral tribunal is restricted to the legal grounds relied on by the parties.

(368) As set out above, it is well recognised that a tribunal exceeds its mandate if it relies on facts not invoked by either party. Such mistake is further aggravated where, as in the present case, a tribunal not only relies on a fact never invoked but also considers this fact to be admitted. Hence, there can be no doubt that the Tribunal committed a challengeable error.

(369) In addition, the Tribunal's ruling, as described above, constitutes a serious violation of the right to due process.

---

[207] Exhibit C-448.

Error! Unknown document property name.

### 5.7.5   Regarding the issue of debt deduction, the Tribunal incorrectly considered a certain legal understanding as admitted by RoK and thus failed to take into account legal arguments pleaded by RoK

#### (i)   Factual background

(370)   Considerable debates were conducted in the arbitral proceedings related to the issue of the so-called Tristan notes. The Tristan notes were publicly traded notes issued between 2006 and 2009 through which Stati financed their activities in Kazakhstan.[208] The first note issuance at the end of 2006 amounted to USD 300 million. A second volume of notes was issued in Summer of 2007 amounting to USD 120 million. Further, in the summer of 2009, another USD 111.1 million in Tristan notes were issued. The issuer and thus primary debtor under the notes was the B.V.I. company Tristan Oil Ltd. ("Tristan") which was wholly owned by Anatolie Stati.

(371)   The securing mechanisms for the Tristan debt are central to the understanding of the debt structure and its relevance for the case. The obligations under the Tristan Indenture were secured primarily with personal pledges by KPM and TNG. Thus, Tristan, KPM and TNG were liable for the Tristan debt and guaranteed it with practically all their assets. Moreover, the Tristan debt was further guaranteed with pledges by the stockholders in Tristan, KPM and TNG. This means that Anatolie Stati pledged his shares in Tristan, Ascom pledged its shares in KPM and Terra Raf pledged its shares in TNG. Importantly, the pledges by Anatolie Stati, Ascom and Terra Raf were not personal but were limited to these shares. These facts were uncontested in the Arbitration.

#### (ii)   Procedural background

(372)   Throughout the arbitration, Stati claimed for the so-called enterprise value of KPM and TNG, i.e. for the value of all of the assets without deducting the Tristan debt guaranteed by KPM and TNG. Central to Stati' claim in that regard was their allegation that in case an award were to be rendered in favour of Ascom and Terra Raf, Ascom and Terra Raf would be liable towards the Tristan noteholders with any amounts received from RoK in payment of the award. According to Stati, it was due to this potential liability that debt was not to be deducted from their claims. Only if Stati were to be awarded the enterprise value could it be ensured that, after having paid off the debt to the Tristan noteholders, Stati would be able keep the value of their equity in KPM and TNG, i.e. the value of their shares of which they were deprived.

(373)   Importantly, Stati never argued and practically admitted that in case no damages were to be awarded to Ascom and Terra Raf, none of Stati would be liable to the Tristan noteholders.

---

[208] For a summary of the details of the Tristan notes cf. Respondent's 1ˢᵗ PHB, para. 1056.

Error! Unknown document property name.

(374)    RoK's primary objection to Stati' claim for enterprise value was that under their pledges, Ascom and Terra Raf would not be liable with any eventual amounts under an award. However, RoK also provided "fall-back" arguments in case the Tribunal were to disagree.

(375)    For one, RoK referred to several investment arbitration cases that was considered comparable and in which it was held that debt had to be deducted from the claim.

(376)    Moreover, RoK also argued that Stati' logic was flawed. Their argument that they needed to be awarded the enterprise value in order to eventually realise the equity value wrongly presupposed that there was any equity value to realise. In fact, however, there was no such equity value. KPM and TNG only had an enterprise value of USD 186 million (according to RoK's expert Deloitte GmbH) while the debt stood at more than USD 559 million. Hence, no debt needed to be added to the equity value in order to make Stati whole (or, as RoK put it, in order to "gross up" Stati' claim).

(377)    Further, RoK pointed out that in fact, adding debt on top of the equity value would only serve to pay out the Tristan noteholders. However, if the Tristan noteholders were the real party in interest, it would be for the Tristan noteholders to bring their own claim rather than for Stati to serve as a front for the Tristan noteholders' claim. Otherwise, the Tristan noteholders would be allowed to circumvent the substantial barriers that their own investment arbitration claim would face.

        *(iii)*      *The Tribunal's ruling*

(378)    The Tribunal's ruling failed to respond to the legal arguments raised by the Parties. The ruling is defective because it is based in its entirety on an alleged admission by RoK that was never made. Thus, the Tribunal failed to take into account numerous important arguments raised by RoK. This constitutes a clear violation of RoK's right to be heard.

(379)    As a starting point, the Tribunal found that in principle, it is possible to deduct debt from the amount of damages claimed by Stati. It held that Stati *"should not be compensated for any debts for which they now are no longer liable and for which Respondent, or the new owner to which the assets were transferred, is now solely liable."*[209]

(380)    Turning to the Tristan debt in particular, the Tribunal stated that RoK had *"expressly agreed in its Rejoinder on Quantum (R-III ¶ 383) that, insofar as Claimants remain responsible for the Tristan debt, enterprise value is the correct measure of damages."*[210] It went on to state: *"While Respondent's statement at the May 2013 Hearing may perhaps be understood as changing that position, it did not attempt to reconcile its prior statement and the Tribunal still agrees with Respondent's earlier position."*[211]

---

[209] Award, para. 1532.

[210] Award, para. 1536.

[211] Ibid.

**Error! Unknown document property name.**

(381)    In the following, the Tribunal determined that under Ascom and Terra Raf pledges, Stati continue to be liable towards the Tristan Noteholders with the amount due under the award.[212] As a result, the Tribunal declined to deduct the Tristan debt from the enterprise values claimed by Stati. No further reasoning was given.

(382)    The Tribunal was entirely wrong to treat the question of debt as admitted by RoK. Paragraph 383 of the Rejoinder on Quantum referenced by the Tribunal does not contain any admission. In this paragraph, RoK merely addressed a hypothetical situation, without submitting a specific admission.

(383)    In any event, even if the Court should find that the Rejoinder on Quantum contained such admission (Which RoK denies), there is no ground for RoK to be bound by it.

(384)    As a consequence, RoK was at liberty to "take back" its alleged "admission" and it clearly did so. Already at the Hearing on Quantum, RoK introduced one of the alternative arguments outlined above and stated that *"[i]n any event, even if one assumed that an award in these proceedings would be subject to claims of the noteholders, claimants are not entitled to damages […]"*[213] Moreover, in both its 1st and 2nd Post-hearing Briefs and at the May 2013 hearing, it reiterated that the lack of liability under the pledges was only one of several arguments and that even if this argument were not convincing to the Tribunal, Stati' claim had to fail for other reasons.[214]

(385)    The Tribunal completely ignored all of these statements. Instead, it merely formulated the following: *"While Respondent's statement at the May 2013 Hearing may perhaps be understood as changing that position, it did not attempt to reconcile its prior statement and the Tribunal still agrees with Respondent's earlier position."*[215] This statement evidences that the Tribunal disregarded the arguments advanced by RoK on this issue. For one, RoK's closing submission at the May 2013 hearing could not *"perhaps be understood as changing that position"*, it was clear, unambiguous and beyond doubt different from the "position" the Tribunal now reads into paragraph 383 of the Rejoinder on Quantum. Moreover, the Tribunal could not simply limit its review of RoK's pleadings to the May 2013 hearing. Rather, it also had to look at the Hearing on Quantum, and both Post-hearing Briefs. Had it done so, it could not have been in any doubt as to the true position of RoK. The Tribunal's failure to do so is clearly documented in its own reasoning in paragraph 1536 of the Award. This failure constitutes a procedural irregularity mandating the setting aside of the Award.

---

[212] Award, para. 1537.

[213] Hearing on Quantum, Day 1, p.167, l.14-16.

[214] Respondent's 1st PHB, para. 1078 (use of the heading "In any event"); Respondent's 2nd PHB, para. 945 ("Neither did Claimants remain liable for the Tristan noteholder debt nor would such continuing liability render the arguments on international law moot."); May 2013 Hearing, p.245, l.4-5 ("Claimants' argument is fundamentally flawed for a total of five separate reasons." – then listing the lack of liability under the pledges as only one of these separate reasons).

[215] Ibid.

Error! Unknown document property name.

*(iv)     Challenge grounds under Article 34 SAA*

(386)   The above identified error allows for a further challenge under SAA Article 34 item 2 and 6. The Tribunal's decision to hold RoK to its alleged concession constitutes an excess of mandate and a procedural irregularity.

(387)   A tribunal is not allowed to base its awards on concessions never made by a party. Although the principle of free evaluation of evidence is predominant under Swedish procedural law and Swedish arbitration law, this freedom of the tribunal has its limitations. In particular, it is the duty of a tribunal to evaluate <u>all</u> evidence presented to them.[216] Hence, the tribunal cannot completely ignore evidence invoked by the parties. However, if a party has conceded a certain legal fact, the tribunal may base its finding on the concession, rather than evaluating the evidence relating to such fact. Corollary, should the Tribunal base its findings on an alleged concession never made by the party, without evaluating the evidence in this respect, such action will constitute an excess of its mandate and/or a procedural irregularity.

(388)   Moreover, as set out above, Swedish law entitles a party to withdraw a concession made during the arbitral proceedings. Such withdrawal must be taken into account by the Tribunal. Hence, if a tribunal will base its determination on a concession that has been withdrawn, the tribunal will act beyond its mandate and/or commit a procedural irregularity.

## 5.7.6   Regarding the valuation of Borankol and Tolkyn, the Tribunal incorrectly assumed that RoK had admitted a certain valuation result to be correct where in fact, RoK had stated clearly and unambiguously that the valuation result was incorrect and exaggerated

(389)   The Tribunal also went clearly beyond the submissions by the Parties in its valuation assessment for the Borankol and Tolkyn fields. Here, the Tribunal incorrectly assumed that certain valuation results had been admitted by RoK. In fact, RoK as well as its experts from Deloitte GmbH had made it clear that it considered the valuation results in question to be incorrect and overstated.

*(i)     Factual background and pleadings by the Parties*

(390)   During the Arbitration, both Parties' valuation experts valued the Borankol and Tolkyn fields using the so-called "Discounted Cashflow Method" ("DCF method"). For this method, future profits expected from the operation of an asset are calculated using certain assumptions and depreciations based on a discount rate.

(391)   Based on the DCF method, RoK's expert Deloitte GmbH calculated an asset value of USD 186 million for the Borankol and Tolkyn fields. This result was based on a valuation date of 21 July 2010 and a reserve estimate for the fields provided by RoK's reserves experts Gaffney Cline & Associates (GCA).

---

[216] See Hobér, *International Commercial Arbitration in Sweden*, 2011, p. 319.

Error! Unknown document property name.

(392)    On the other hand, Stati' experts FTI ultimately calculated the DCF value for both fields to be USD 676 million. FTI arrived at this number using a valuation date of 14 October 2008 and reserve estimates provided by Stati' reserves experts Ryder Scott.

(393)    Both Parties' experts tried to support their own DCF valuation and to undermine the opposing experts' DCF valuation by means of a so-called "Comparable Companies" and "Comparable Transaction" Analysis (both together forming the so-called "Comparables Analysis").[217]

(394)    FTI submitted that their comparable companies analysis for Borankol and Tolkyn as of the Defendant's valuation date of 14 October 2008 and based on Ryder Scott reserves estimates had rendered a value of USD 682 million[218] and that their comparable transactions analysis for these assets and this date had led to a value ranging between USD 667 million and USD 682 million.[219] Deloitte GmbH also provided a Comparables Analysis for Stati' valuation date of 14 October 2008 based on the Reserves Estimates prepared by Stati' reserves expert Ryder Scott. Deloitte GmbH's Comparable Companies Analysis based on this date and this data led to a combined value for Borankol and Tolkyn of USD 169.6 million[220] whereas the comparable transactions analysis rendered a result of USD 277.8 million.[221]Both experts highlighted that they did not consider the Comparables Analysis to replace or supersede the DCF valuation or to even be of the same relevance as the DCF valuation. They clearly stated that the Comparables Analysis only served to "assess the reasonableness" of the DCF valuation[222] or to "support" the DCF

---

[217] Practically, the Comparables Analysis worked as follows: First, the valuation experts determined certain publicly traded companies and certain publicly known transactions for which they considered the assets at issue to be comparable to the Borankol and Tolkyn fields. Second, they determined so-called "multiples", meaning that they calculated a ratio of the value of the company or transaction in relation to the volume of reserves subject to the deal. The value of a publicly traded company was calculated as the sum of the value of all of its shares. The value of a transaction was taken from publicly available records, as was done with regard to the volume of reserves. The multiple of the comparable companies or transactions thus is an expression of how much value could be realised for a company controlling a certain volume of oil and gas reserves. Specifically, the Comparables Analysis was based on so-called 2P reserves estimates, i.e. the proven and probable reserves of an operating oil and gas field.

Third, the experts looked at all the multiples determined for the individual comparable companies and comparable transactions and calculated an average or median multiple based thereon. Fourth and finally, the experts applied this multiple to the 2P Reserve Estimates prepared for Borankol and Tolkyn by the Parties' respective reserves experts GCA and Ryder Scott. Importantly, the 2P Reserve Estimates for oil and gas were combined into one number by converting the gas reserves estimates which had been given by the reserves experts in cubic feet or cubic meters into the unit "barrel of oil equivalent" (boe). The barrel estimates for oil and the boe estimates for gas are then simply added together. The final calculations were hence simple multiplications of the average/median comparable transactions multiple and the average/median comparable companies multiple with the 2P reserve estimates in boe. Cf. also 1st FTI, paras. 14.1-14.18, and 2nd Deloitte GmbH, paras. 125-181 and 275-294.

[218] 1st FTI, para. 14.12.

[219] 1st FTI, para. 14.18.

[220] 2nd Deloitte GmbH, para. 144.

[221] 2nd Deloitte GmbH, para. 171.

[222] 1st FTI, para. 14.1.

Error! Unknown document property name.

valuation[223] and that they did not *"feel [the Comparables Analysis] may be appropriate as the primary valuation indicator".*[224]

(395)    RoK also made clear that the numbers arrived at by Deloitte GmbH were not provided as a valuation but in order to show that FTI's valuation is an "outlier" that is not to be trusted.[225]

(396)    At the end of its Comparables Analysis for the 2008 date and the Ryder Scott reserve estimates, Deloitte GmbH also clearly stated that it considered the results it had arrived at to still be overstated. That was because Borankol and Tolkyn taken together have a much higher gas ratio than the fields that were considered among the comparable companies and comparable transactions. Gas can only be sold for a lower price than oil, which the Comparables Analysis conducted had not taken into account.[226] Deloitte GmbH concluded that

> *"the EV/2P multiple […] for oil fields should be adjusted downwards to make it applicable to Borankol and Tolkyn fields."*[227]

(397)    However, since the calculations were only done for illustrative purposes and since these purposes were already fulfilled without possible further downward adjustments, Deloitte GmbH did not attempt to provide a further adjusted calculation.

(398)    Importantly, RoK referred very clearly to Deloitte GmbH's submission when referring to the Deloitte GmbH Comparables Analysis.[228] Moreover, in its rebuttal closing presentation at the May 2013 hearing, RoK also made reference to the fact that in the present case, any Comparables Analysis leads to an overstatement of values, given that the gas ratio in the Borankol and Tolkyn fields is higher than in the comparable companies and transactions.[229] In that context, RoK also referred to an internal valuation document of KMG EP in which this limitation of the Comparables Analysis was mentioned. Therein, it was mentioned as one limitation of a Comparables Analysis with regard to Borankol and Tolkyn that the

> *"Bulk of comparable deals are pertinent to the crude oil reserves, while gas portion in estimated reserves in BOE is over 60% (on account of Tolkyn field)".*[230]

---

[223] 2nd Deloitte GmbH, para. 275.

[224] 1st FTI, para. 14.17.

[225] RoK's 2nd PHB, paras. 874 and 875.

[226] 2nd Deloitte GmbH, para. 149 et seqq.

[227] 2nd Deloitte GmbH, para. 152. Cf. also para. 173.

[228] Cf. RoK's 1st PHB, fn. 1143, 1144, RoK's 2nd PHB, fn. 1488.

[229] RoK's Rebuttal Closing Presentation, p.21; Transcript of the May Hearing, Day 2, p.57, l.23 - p.58, l.3.

[230] KMG 2008 Asset Valuation, p.12 (**Exhibit C-722 in the Arbitration**).

Error! Unknown document property name.

*(ii)      The Tribunal's ruling*

(399)    In its considerations on the value of Borankol and Tolkyn, the Tribunal found that Ryder Scott's reports on reserves estimates as of 14 October 2008 were convincing.[231] The Tribunal went on to state that RoK had *"conceded"* Deloitte GmbH's Comparables Analysis based on the 2008 valuation date and the Ryder Scott data in case RoK's valuation date is not accepted.[232] In conclusion, the Tribunal relied on Deloitte GmbH's comparable transactions calculation with a result of USD 277.8 million without making any reference to the comparable companies calculation of USD 169.6 million.[233]

(400)    By reaching this conclusion, the Tribunal treated a fact as admitted that was clearly and demonstrably not admitted. Contrary to the Tribunal's statement, RoK never conceded the comparable transaction calculation for 2008 and the Ryder Scott numbers to be the correct valuation for the 2008 valuation date. In fact, RoK and Deloitte GmbH had both clearly stated that the calculation was incorrect because the high gas ratio in Borankol and Tolkyn requiring the downward adjustment had not been taken into account. Moreover and in any event, the comparable transaction analysis had only been provided for illustrative purposes.

*(iii)      Challenge grounds under Article 34 SAA*

(401)    Due to the errors identified above, the Award must be set aside both under SAA Article 34 item 2 and item 6 SAA.

(402)    A tribunal exceeds its mandate if it considers facts conceded that were never conceded. Such mistake is further aggravated where, as in the present case, a tribunal considers facts as conceded even though they had been expressly contested. RoK had expressly stated that the comparable transactions valuation was overstated, meaning that the Tribunal could not consider this valuation as being admitted. Hence, there can be no doubt that the Tribunal exceeded its mandate.

(403)    In addition, the Tribunal's ruling constitutes a serious violation of due process.[234]

*(iv)      The Tribunal's errors fulfil the necessary causal link required under Article 34 SAA*

(404)    The errors outlined had a sufficient influence on the outcome of the case to warrant the setting aside of the Award.

---

[231] Award, para. 1625.

[232] Ibid. Presently, the Tribunal had chosen to rely on a valuation date of 30 April 2009 which was more than a year earlier than RoK's valuation date of 21 July 2010.

[233] Ibid.

[234] Hobér, *International Commercial Arbitration in Sweden,* 2011, p. 330, cf Govt Bill 1998/99:35 p. 148.

(405)     In the event that the Court would conclude that each one of the errors presented above would not have influenced the Tribunal's findings, the Court should consider these errors as a totality. At least taken together, there can be no doubt that these errors influenced the outcome of the case.

## 6     STATEMENT OF EVIDENCE

(406)     RoK respectfully asks the Court of Appeal to grant a respite for the submission of the Statement of Evidence until Stati has submitted its Statement of Defence or to a later date which the Court of Appeal decides.

(407)     In order to avoid to burden this Summons Application, RoK has chosen not to include all documents to which references are made, in particular in the footnotes. RoK will submit such documents when it is clear which of these that may be relevant for the Court of Appeal's understanding and adjudication of the case.

Error! Unknown document property name.

List of Exhibits

Exhibit 1 – The Award of 19 December 2013 and the correction thereof dated 17 January 2014

Exhibit 2 – Letter from SCC to RoK dated 5 August 2010

Exhibit 3 – Letter from SCC to RoK dated 27 August 2010

Exhibit 4 – Letter from SCC to RoK dated 13 September 2010

Exhibit 5 – Letter from Prof. Lebedev to SCC dated 21 September 2010

Exhibit 6 – Letter from SCC to the Parties dated 23 September 2010

Exhibit 7 – Letter from RoK to SCC dated 2 December 2010

Exhibit 8 – Letter from SCC to the Parties dated 15 December 2010

Exhibit 9 – Letter from Tolkynneftegaz LLP and Terra Raf Trans Trading Limited to RoK's MEMR dated 7 May 2009

Exhibit 10 – Letter from Ascom Group to RoK's president dated 7 May 2009

Exhibit 11 – Letter from RoK to the Tribunal dated 18 January 2011

Exhibit 12 – Letter from Stati to RoK dated 24 Januarry 2011

**Error! Unknown document property name.**