# Exhibit C

| | SVEA COURT OF APPEAL | **JUDGMENT** | Case no. | 1 |
|---|---|---|---|---|
| | Department 02 | 2016-12-09 | T 2675-14 | |
| | Division 020106 | Stockholm | | |

**CLAIMANT**

Republic of Kazakhstan

Ministry of Justice

Orynbor Street 8, House of Ministries, 13 Entrance

010000, Astana, Left Bank, Kazakhstan

Counsel:

1. Attorney at law Pontus Ewerlöf

MAQS Law Firm Advokatbyrå AB

Box 7009, 103 86 Stockholm

2. and 3. Attorney at law Alexander Foerster and lawyer Ludvig Metz

Mannheimer Swartling Advokatbyrå AB

Box 1711, 11 87 Stockholm

4. Attorney at law Karl Guterstam

Frank Advokatbyrå

Box 7009, 103 87 Stockholm

**RESPONDENTS**

1. Ascom Group S.A.

75 A. Mateevici Street

Chisinau, MD-2009, Moldavia

2. Anatolie Stati

20 Dragomirna Street

Chisinau, MD-2008, Moldova

3. Gabriel Stati

1A Ghioceilor Street

Chisinau, MD-2008, Moldova

4. Terra Raf Trans Traiding Ltd

Don House, Suite 31

30-38 Main Street, Gibraltar

Counsel for 1–4: Attorneys at law Bo G H Nilsson, Therese Isaksson and Ginta Ahrel

Advokatfirman Lindahl KB

Box 1065, 101 39 Stockholm

MATTER

Annulment etc. of arbitration award rendered 19 December 2013 in Stockholm with amendment dated 17 January 2014

| Postal address | Visiting address | Telephone | Telefax | Office hours |
|---|---|---|---|---|
| Box 2290 | Birger Jarls Torg 16 | 08-561 670 00 | 08-561 675 09 | Monday – Friday |
| 103 17 Stockholm | | 08-561 675 00 | | 09:00-15:00 |
| | | **E-mail**: svea.avd2@dom.se | | |
| | | www.svea.se | | |

**JUDGMENT**

1. The Court of Appeal dismisses the action of the Republic of Kazakhstan.

2. The Republic of Kazakhstan shall recompense Ascom Group S.A. for litigation costs in the amounts of SEK 4 614 358 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

3. The Republic of Kazakhstan shall recompense Anatolie Stati for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

4. The Republic of Kazakhstan shall recompense Gabriel Stati for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

5. The Republic of Kazakhstan shall recompense Terra Raf Trans Traiding Ltd. for litigation costs in the amounts of SEK 4 114 357 and USD 377 400.65, of which SEK 3 969 852 relates to fees to counsel, plus interest on the first two amounts according to section 6 of the Interest Act (1975:635) from the date of the Court's decision until payment is made.

_____

SVEA COURT OF APPEAL          **JUDGMENT**                                3
Department 02                                          T 2675-14

**TABLE OF CONTENTS**

1. BACKGROUND ...................................................................................5

2. PRAYERS FOR RELIEF ......................................................................6

3. LEGAL GROUNDS REFERRED TO BY THE PARTIES AND LEGALLY
RELEVANT CIRCUMSTANCES .............................................................8

  3.1 Kazakhstan .....................................................................................8

    3.1.1 Legal grounds for the action ......................................................8

    3.1.2 Legally relevant circumstances ..................................................8

      3.1.2.1 Annulment due to the fraudulent arrangement, false evidence, misleading
information etc. ................................................................................8

      3.1.2.2 Setting aside of the award on the ground that it is not covered by a valid
arbitration agreement .......................................................................13

      3.1.2.3 Annulment alternatively setting aside of the award due to the
appointment of the arbitral tribunal ..................................................14

      3.1.2.4 Setting aside of the award on the ground of an excess of mandate
alternatively  procedural error (incorrect evaluation of evidence etc.) ...............16

      3.1.2.5 Other instances of excesses of mandate alternatively procedural errors.19

  3.2 The Investors..................................................................................21

    3.2.1 Legal grounds for contesting the claim.......................................21

    3.2.2 Legally relevant circumstances .................................................21

      3.2.2.1 Annulment due to the allegedly fraudulent arrangement, false evidence,
misleading information etc..................................................................21

      3.2.2.2 The award is covered by a valid arbitration agreement ........................26

      3.2.2.3 The appointment of the arbitral tribunal .................................28

      3.2.2.4 Excesses of mandate or procedural error (alleged faulty assessment of
evidence etc.) ..................................................................................30

      3.2.2.5 Other excesses of mandate or alternatively procedural errors ...............33

4. THE INVESTIGATION .........................................................................35

5. THE COURT'S FINDINGS .....................................................................35

  5.1 The layout of the findings .................................................................35

  5.2 Legal starting points for the Court's examination...................................36

    5.2.1 Ordre public as a ground for annulment .....................................36

    5.2.2 Excess of mandate and procedural errors as grounds for annulment............38

SVEA COURT OF APPEAL **JUDGMENT** 4
Department 02 T 2675-14

5.3 The question of the annulment alternatively setting aside of the award ............... 40

5.3.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc. .................................................................................................... 40

5.3.2 Setting aside the award on the ground that it is not covered by a valid arbitration agreement ........................................................................................... 42

5.3.3 Annulment or setting aside of the award on the grounds of the appointment of the arbitrators ....................................................................................................... 48

5.3.4 Setting aside the award on the ground of an excess of mandate or alternatively a procedural error ............................................................................ 54

5.3.4.1 Taras Khalelov's witness statement and testimony ................................. 54

5.3.4.2 Kazakhstan's expert and testimonial evidence ....................................... 56

5.3.4.3 Consideration of objections to deductions from the damages etc. .......... 57

5.3.4.4 Other alleged excesses of mandate and procedural errors ..................... 58

5.3.5 The Court's summary conclusions and overall assessment of Kazakhstan's action ........................................................................................................................ 62

5.4 Litigation costs ............................................................................................................ 63

5.4.1 The party liable for damages ......................................................................... 63

5.4.2 The Investors' claim for costs ........................................................................ 63

5.4.3 Compensation for the party's own work ........................................................ 64

5.4.4 Compensation for King & Spalding's assistance ........................................... 64

5.4.5 Compensation for King & Spalding's expenses ............................................ 65

5.4.6 The Investors' claim for compensation in general ........................................ 66

5.4.7 Summary assessment .................................................................................... 66

5.5 Appeal .......................................................................................................................... 66

# 1. BACKGROUND

The Republic of Kazakhstan (Kazakhstan) possesses natural resources in the form of oil and natural gas and has expressed a desire for investors to assist it in the exploitation of these resources. For this purpose Kazakhstan has ratified the international Energy Charter Treaty (ECT). Between 1999 and 2003 Anatolie Stati and his son, Gabriel Stati, acquired via Ascom Group S.A. (Ascom) and Terra Raf Trans Traiding Ltd (Terra Raf) all the shares of two Kazakh companies: Kazpolmunay LLP (KPM) and Tolkynneftegaz LLP (TNG). KPM owned exploitation rights to the Borankol oil field, where the so-called LPG Plant which was to be built by TNG. TNG owned the same rights to the Tolkyn natural gas field and also held exploration rights under a contract designated "Contract 302". Anatolie Stati, Gabriel Stati, Ascom and Terra Raf are referred to below as the Investors.

Following the termination of the exploitation agreements by Kazakhstan in 2010, the Investors initiated arbitration, claiming that Kazakhstan had been in breach of its obligations under the ECT through violations of the investor protection rules. In the arbitration the Investors claimed damages of just over USD 3 billion. The arbitration was held at the Stockholm Chamber of Commerce (the SCC) and an award was rendered on 19 December 2013 in SCC case no. V (116/2010), amended on 17 January 2014. The arbitral tribunal consisted of Professor Karl-Heinz Böckstiegel (chairman), attorney at law David Haigh and Professor Sergei Lebedev. During the arbitration each party engaged financial experts and geological experts for the valuation of the assets in question.

The arbitral tribunal rejected certain jurisdictional objections made by Kazakhstan, finding that the latter had breached its obligations regarding "fair and equitable treatment" under Article 10(1) ECT. This article makes clear that investments should be trated fairly and equitably. Further the tribunal found that the measures taken by Kazakhstan had caused loss and that Kazakhstan was liable for damages. The tribunal also found that the Investors were entitled to damages of USD 508 130 000, plus interest from 30 April 2009 at a rate equivalent to the average rate of interest for six-month US treasury bills. An amount of USD 10 444 899 was deducted from the damages, for which the tribunal considered the Investors no longer to be liable. The amount which Kazakhstan according to the arbitral award was ordered to pay to the Investors thus amounted to USD 497 685 101. The arbitration costs were shared

between the parties, with Kazakhstan bearing three-quarters and the Investors one-quarter of them. Kazakhstan was ordered to pay half of the Investors' legal costs amounting to USD 8 975 496.40, which corresponded to halv of the Investors' litigation costs.

Two of the arbitrators were dissenting. Sergei Lebedev dissented in relation to the jurisdiction of the arbitral tribunal and David Haigh in relation to the amount of damages.

# 2. PRAYERS FOR RELIEF

**Kazakhstan** has claimed that the Court of Appeal in the first place should declare the award invalid in its entirety or at least in respect of the LPG Plant, i.e. in an amount of USD 199 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 757 546.

**Kazakhstan** has requested in the alternative that the Court of Appeal should set aside the arbitral award in its entirety or in part.

In the event that the Court of Appeal finds that the arbitral award should be declared invalid or set aside in part, Kazakhstan has requested that the amount awarded be reduced by

1. USD 199 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 757 546) if the Court finds that the tribunal failed to consider crucial witness evidence regarding the value of the LPG facility; and/or

2. USD 277.8 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 2 453 499) if the Court of Appeal finds that the tribunal has relied on the Investors' geological experts without stating reasons for this and has thereby completely disregarded Kazakhstan's geological experts; and/or

3. USD 215.3 million plus interest in accordance with the arbitral award and a corresponding reduction in the litigation cost awarded amounting to USD 1 901 506 if the Court of Appeal finds that the Tribunal has exceeded its mandate and committed a procedural error by failing to

decide on Kazakhstan's objections that all revenues accruing to the
Investors between the valuation date and the date of termination of the
exploration agreement should be deducted from any damages; and/or

4.  USD 99.5 million plus interest in accordance with the arbitral award
    and a corresponding reduction in the litigation cost awarded amounting
    to USD 878 773 if the Court finds that the Tribunal has exceeded its
    mandate and committed a procedural error by failing to consider and
    decide on Kazakhstan's objection that an arbitral award for the LPG
    Plant can cover only half of the assumed value; and/or

5.  USD 277.8 million plus interest in accordance with the arbitral award
    and a corresponding reduction in the litigation cost awarded amounting
    to USD 2 453 499 if the Court finds that the tribunal has exceeded its
    mandate and committed a procedural error by wrongly assuming in
    regard to the valuation of Tolkyn and Borankol that Kazakhstan had
    acknowledged a certain valuation result, when Kazakhstan in fact
    clearly stated that the valuation result was incorrect and exaggerated.

**The Investors** have contested all claims. In the event the Court of Appeal would find
that the tribunal has exceeded its mandate or committed a procedural error; the Investors
have requested that the Court of Appeal stay the proceedings and grant the tribunal an
opportunity to amend its decision.

**Kazakhstan** has objected to the tribunal being given an opportunity to amend its
decision.

**The parties** have claimed compensation for their litigation costs.

# 3. LEGAL GROUNDS REFERRED TO BY THE PARTIES AND LEGALLY RELEVANT CIRCUMSTANCES

## *3.1 Kazakhstan*

### 3.1.1 Legal grounds for the action

1. The award and the manner in which the award arose, is clearly incompatible with the basic principles of the Swedish legal system, i.e. it contravenes so-called *ordre public* and is therefore invalid in its entirety or partially according to section 33(1)(2) of the Swedish Arbitration Act (1999:116) (SAA).

2. The arbitral award should be set aside in its entirety since

> a) it is not covered by a valid arbitration agreement between the parties (section 34(1)(1) SAA).
> b) the arbitral tribunal was appointed contrary to the Arbitration Rules of the Stockholm Chamber of Commerce, the SCC Rules, and to the principle of equal treatment (section 34(1)(4) SAA), and
> c) the appointment of the arbitral tribunal amounts to a procedural error which probably influenced the outcome (section 34(1)(6) SAA).

3. The arbitral award should be set aside in its entirety or in part because the arbitrators exceeded their mandate and/or committed procedural errors which individually, or at least in combination, have influenced the outcome of the case (section 34(1)(2 and 6) SAA).

Given that the arbitrator Sergei Lebedev passed away in April 2016, it is not possible for the tribunal to make any corrections.

### 3.1.2 Legally relevant circumstances

#### *3.1.2.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc.*

The award and the manner in which the award arose, is clearly incompatible with the basic principles of the Swedish legal system, i.e. it is contrary to *ordre public*. It is also incompatible with the basic principles of the legal system to uphold arbitral awards that are based on extensive fraudulent arrangement and corruption or to allow procedural fraud by use of false evidence.

Firstly, the construction of an LPG Plant was surrounded by an extensive and sophisticated fraudulent arrangement, which constitutes corruption by the Investors. The purpose of the structure has been, through sham contracts and sham transactions, to create a substantial fictitious value for the LPG Plant. Secondly, the Investors have indulged in procedural fraud by presenting false evidence in the form of witness statements, witness testimony and expert opinions concerning the fraudulent arrangement and thus LPG Plant's value, which evidence misled Kazakhstan, the SCC and the arbitral tribunal. The Investors have also deliberately withheld information regarding the investment in and the valuation of the LPG Plant to conceal the fraudulent arrangement from Kazakhstan, the SCC and the arbitral tribunal. Thirdly, the Investors' deceptive and misleading approach influenced the outcome of the case since it formed the basis for the indicative bid of KazMunaiGas National Company (KMG) and thus the arbitral tribunal's calculation of damages. Furthermore, the false evidence has affected the tribunal's general valuation of witness testimony, witness statements, expert reports and the Investors' actions at large, which both affected the question of liability and the assessment of the amount of damages.

These circumstances, individually and collectively, have the effect that the arbitral award is in conflict with the basic principles of the Swedish legal system.

The fraudulent and misleading arrangement

The Investors deliberately misled the arbitral tribunal, SCC and Kazakhstan about their investment costs in the LPG Plant. The alleged investment cost of USD 245 consisted largely of fictitious costs. The misleading arrangement includes the following.

The fictitious investment costs were based on an agreement (the Perkwood Agreement) between TNG and the company Perkwood Investment Limited (Perkwood). Despite the fact that Perkwood according to the Perkwood Agreement should have acted as the main supplier of building materials and equipment and as project leader for the construction of the LPG Plant, Perkwood did not supply any goods or performed any services. Instead, the contract between Perkwood and TNG was a sham arrangement. During the arbitration the Investors neglected to inform the arbitral tribunal and Kazakhstan about the Perkwood Agreement and about Perkwood's role in the project for the construction of the LPG Plant. The Investors also neglected to inform the

auditors who examined the annual accounts prepared by the Investors about Perkwood's real function and, in particular, the fact that Perkwood was a related company to TNG and the Investors.

Through this misleading arrangment the Investors created a picture of large sums that had been invested or were due to be invested in the LPG Plant, enabling them to claim greater damages than they would otherwise have been entitled to. The fictitious investment cost comprised the following elements:

i. *Fictitious purchase costs*

Under the Perkwood Agreement, Annex 2, TNG was to pay to Perkwood approximately USD 93 million for equipment that was identical to what had already been delivered by another company, Tractebel Gas Engineering GmbH (TGE). TGE was the actual main supplier of components and equipment for the LPG Plant and had delivered it for a total price of USD 34.5 million expressed in dollars. Furthermore, certain amendments to the Parkwood agreement (Annexes 14 and 16) included objects that were also included in Annex 2 and which had been delivered earlier as well.

ii. *Fictitious component costs*

TNG has posted in its accounts the sum of USD 72 million for components and equipment that allegedly had been delivered but not yet installed in the LPG Plant. In reality, this equipment never existed.

iii. *Fictitious interest costs*

The alleged interest charges of USD 60 million for loans taken in order to finance the construction of the LPG Plant are false, calculated on the fictitious investment costs and thereby false to the same extent as the cost of components and equipment.

iv. *Fictitious management fee*

The alleged investment cost claimed includes the so-called "management fee" of approximately USD 44 million, which was paid to Perkwood without any contractual basis and without counterperformance in the form of performed services.

Furthermore, TNG advanced Perkwood approximately USD 37 million for building materials and equipment that were not needed and were never supplied, "The advance payment for undelivered components". Despite the absent delivery, the amount has not been repaid to TNG.

The misleading arrangement has enabled large sums of money to be channelled out of Kazakhstan, which is contrary to the basic purpose of the ECT, which is to protect "good faith" investments in the host country. The investors then brought a claim against the Republic of Kazakhstan, initiated arbitration proceedings and invoked investor protection under the ECT, despite the lack of such protection due to the above-mentioned circumstances.

<u>The Investors have presented false evidence, submitted misleading information and withheld relevant information in the arbitration</u>

The fraudulent arrangement was intended to mislead the arbitral tribunal as well as Kazakhstan and thus obtain significantly higher damages through arbitration than would otherwise have been possible. To accomplish this, the Investors invoked false evidence in the form of witness statements, witnesses testimony and expert reports as well as made misleading statements in written submissions and during the oral hearing as set out in the following: "statement of claim" of 18 May 2011, "claimant's reply memorial on jurisdiction and liability" of 28 May 2012, "claimant's reply memorial on quantum" of 7 May 2012, "Stati's first post hearing brief" of 8 April 2013, "Stati's second post hearing brief" of 3 June 2013, "transcript from hearing on jurisdiction and the merits" of 1 October 2012, "transcript from hearing on quantum" of 28 January 2013, Arthur Lungu's first witness statement of 17 May 2011, Anatolie Stati's second witness statement of 7 May 2012 and Catalin Broscaru's witness statement of 11 April 2011.

The Investors also misled the arbitral tribunal and Kazakhstan by withholding information that could reveal the fraudulent arrangement. Among other things, the Investors deliberately mislead the tribunal and Kazakhstan about the parties involved in the investment in the LPG Plant project, and thus about how much of the total investment cost was incurred by the Investors. The misleading consisted of the Investors claiming in the arbitration that they alone had borne the entire investment cost despite the fact that it had actually been split with Vitol, which the Investors put forward in a parallel arbitration between Vitol and Montvale Invest Ltd (Montvale), the so-called Montvale case.

The Investors also misled the arbitral tribunal and Kazakhstan regarding the legitimate parties in relation to the LPG Plant project. The misleading consisted of the Investors

neglecting to inform Kazakhstan and the tribunal that Terra Raf had transferred all the
rights and obligations relating to the LPG Plant to the related company Montvale, which
the Investors put forward in the parallel Montvale case. This information would have
been relevant for the tribunal's assessment of Terra Raf's status as an investor under the
ECT as well as for Terra Raf's right to damages in the arbitration.

The Investors withheld information about Perkwood, the Perkwood Agreement and
Perkwood's role in the construction of the LPG Plant. During the arbitration, the
Investors never presented any document explaining Perkwood's role in the project.
Neither Kazakhstan nor the arbitral tribunal had knowledge of the fraudulent
arrangement or the false evidence before the arbitral award was rendered.

It was in the light of this procedural fraud that the Investors presented their claim in the
arbitration and the arbitral award was rendered.

The valuation of the LPG Plant

The arbitral tribunal took note of the false evidence and misleading information referred
to above, which probably influenced the tribunal's evaluation of the evidence generally
and conclusions regarding both jurisdiction and the question of liability. Regarding the
assessment of the amount of damages, however, the tribunal opted not to rely on the
expert reports relied on by the Investors in the case, which were based on fictitious
investment costs. Instead, it took as its starting point KMG's indicative bid, which also
was based on the Investors' misleading information about the LPG Plant's value.

In the arbitration the Investors referred to a so-called indicative bid for the LPG Plant of
USD 199 million made by KMG as an alternative ground for its claim for damages in
the ECT case, ¶1707 of the award. Incorrect and misleading information from the
Investors to the company's accountants KPMG Audit LLC (KPMG), the Russian
investment bank Renaissance Capital and KMG laid at the basis for the indicative bid.

The indicative bid was based on the investment cost for the construction of the LPG
Plant. KMG took the investment cost from the "Information Memorandum" drawn up
by Renaissance Capital upon instruction from the the Investors. "Information
Memorandum" in its turn was based on financial information about the Investors'
Kazakh assets taken from the consolidated annual reports of Tristan Oil Ltd. (Tristan

Oil), KPM and TNG. These annual reports had been drawn up by the respective companies' management, which included Anatolie Stati, and had been examined by KPMG. The information about the amounts invested in the LPG Plant and that were included in the financial statements was inaccurate and misleading because of the fictitious costs described above. The Investors also neglected to inform KPMG that Perkwood was a related party, something which they had an obligation to do according to the International Financial Reporting Standards (IFRS) and the "Information Memorandum".

With regard to the method of valuation set out in the indicative bid, KMG would have valued the LPG Plant at a substantially lower amount if TNG's actual investment costs for the LPG Plant had been reflected in the documents that formed the basis of KMG's indicative bid. The arbitral tribunal's assessment of the LPG Plant's value and hence the damages awarded to the Investors were based on the indicative bid, which is why the Investors' fraudulent and misleading arrangement directly has influenced the outcome of the case, see ¶ 1747 of the award.

### 3.1.2.2 Setting aside of the award on the ground that it is not covered by a valid arbitration agreement

The award is not covered by a valid arbitration agreement between the parties since the Investors submitted their request for arbitration only five days after the termination of KPM's and TNG's agreements about exploitation rights, which breached the mandatory provision of a three-month cooling off period in Article 26(2) ECT. Kazakhstan's offer to enter into an arbitration agreement under the ECT includes a prerequisite for a three-month cooling off period under Article 26(2) ECT. The request for arbitration is therefore regarded as qualified acceptance of Kazakhstan's offer. The Investors did not engage in the settlement negotiations.

It is disputed that the requirement of cooling off period has been remedied by way of settlement negotiations conducted after the arbitration proceedings had been initiated. The requirement stipulated in Article 26 ECT is a mandatory procedural requirement and is a prerequisite for the arbitral agreement's existance.

SVEA COURT OF APPEAL          **JUDGMENT**                              14
Department 02                                              T 2675-14

It is denied that Kazakhstan waived its objection regarding the lack of jurisdiction in connection with the arbitral tribunals' stay of proceedings while awaiting the parties' efforts to reach an amicable settlement.

It is also disputed that the letters that the Investors sent to Kazakhstan could be understood as a request for settlement negotiations in accordance with the ECT. The letters did not include any requests relating to the ECT or requirements for a negotiation aimed at reaching an "amicable settlement". Furthermore, they did not cover Anatolie Stati and Gabriel Stati, but referred only to Terra Raf and Ascom. It is disputed that in the discussions that were held, including *inter alia* on 19 March 2009 at a meeting attended by Kazakhstan, any reference was made to the ECT.

It is disputed that the assessment, in advance, of whether or not a settlement negotiations have any hope of success is irrelevant for the obligation to take part in such a negotiation. It is also disputed that a settlement negotiation in this case would have been futile.

The arbitral tribunal did not decide correctly the question of its jurisdiction at the latest when rendering the arbitral award. It should have examined whether the procedural prerequisites in the ECT had been satisfied and whether there was a valid arbitration agreement in relation to every one of the Investors. (see ¶¶ 828–830 of the award).

### 3.1.2.3 Annulment alternatively setting aside of the award due to the appointment of the arbitral tribunal

Kazakhstan never got an opportunity to appoint an arbitrator. The SCC appointed Professor Sergei Lebedev as arbitrator on Kazakhstan's behalf. This procedure involved a violation of Kazakhstan's basic procedural rights and the SCC Rules. The fact that Kazakhstan was deprived of the right to appoint its own arbitrator means that the manner in which the award has arisen is clearly incompatible with the basic principles of the Swedish legal system. Alternatively, it amounts to a shortcoming in the appointment of the tribunal. In any event, it is a procedural error by the SCC which influenced the outcome of the case.

It is denied that it follows clrearly from the SCC Rules that Kazakhstan had to appoint an arbitrator in its reply. According to the SCC Rules, the respondent, *if applicable*,

shall submit information about the appointed arbitrator. Kazakhstan assumed that the SCC must first, as is the case for other frequently employed arbitration institutes, decide on the number of arbitrators.

The SCC's instructions contained no information that Kazakhstan would have to appoint an arbitrator in its answer to the request for arbitration. Neither did the instruction from the SCC contain information that the SCC would appoint an arbitrator in Kazakhstan's place if Kazakhstan did not itself appoint an arbitrator. Nor did the SCC give Kazakhstan an opportunity to comment on the Investors' request that an arbitrator should be appointed on Kazakhstan's behalf. The SCC thereby violated the principle of equal treatment of the parties which is rooted in the Swedish Arbitration Act.

Further, the SCC acted contrary to the principle of fair procedure and the principle of equal treatment of the parties by setting deadlines that were too short. The time limit for Kazakhstan to reply, according to the SCC Rules, runs at the earliest from 11 August 2010, when Kazakhstan received the instruction. This means that Kazakhstan was granted a time limit of 15 days. The deadlines that were set were too short, given that the dispute was complicated, that Kazakhstan was a sovereign state, that the arbitration had been initiated in contradiction of the prescribed negotiating period, that the delivery of the documents took time, that the SCC's instructions were unclear, that Kazakhstan did not easily understand English, that Kazakhstan needed reasonable time to engage a counsel, and that the appointment of an arbitrator requires careful consideration and communication.

The SCC did not grant Kazakhstan the right to be consulted in connection with the appointment of an arbitrator on its behalf. Kazakhstan should in any event have been given an opportunity to comment on the Investors' request that an arbitrator should be appointed on Kazakhstan's behalf.

It is denied that Kazakhstan waived its right to appoint an arbitrator or its right to take action regarding this in the Court of Appeal. Kazakhstan has met the requirements for a "complaint" in section 34(2) SAA and article 31 of the SCC Rules. Kazakhstan has at no time confirmed that the arbitral tribunal was constituted properly and therefore waived its objection about this. The statements given during the hearing on 8 October 2012, which took place about two years after the constitution of the arbitral tribunal, did

only refer to objection to the arbitral tribunals' actions during the proceedings and not to obstacles of the arbitration in its entirety.

The SCC failed to correct its mistake by not giving Kazakhstan an opportunity to appoint a new arbitrator.

The SCC has not followed its earlier practice regarding the appointment of an arbitrator.

Sergei Lebedev adopted a very passive role during the arbitration and was unable to ensure that Kazakhstan's defence was correctly understood by the arbitral tribunal.

### 3.1.2.4 Setting aside of the award on the ground of an excess of mandate alternatively procedural error (incorrect evaluation of evidence etc.)

<u>Taras Khalelov's witness statement and testimony</u>

The arbitral tribunal based its decision to award the Investors damages in respect of the LPG Plant solely on the assertion that Kazakhstan had worked on the completion of the LPG Plant after the Investors had left the country. This assertion was based on two internet links contained in a footnote in an expert report, the so-called FTI-report, drawn up by the Investors' experts, see ¶ 1745 of the award. The internet links were not submitted in evidence and were not translated, which contravened section 7 of the "Procedural Order No. 1", see ¶ 20 of the award. Furthermore, the Investors withdrew this assertion in subsequent submissions. The tribunal failed to take note of decisive oral testimony in form of Taras Khalelov's witness statement and testimony which rebutted this assertion.

This has influenced the outcome of the case with regard to the LPG Plant's value in respect of an amount of USD 199 million, corresponding to the tribunal's estimate of the value.

<u>Kazakhstan's expert and testimonial evidence</u>

The tribunal failed to take into account

       i.   submitted expert opinions by Professor Anatoly Didenko and Kadirbek Latifov and Salamat Baymaganbetov's testimony concerning the classification of pipelines,

    ii.   expert opinion from Professor Kulyash Ilyassova on the legality of refraining from the pre-emption right,

    iii.  expert opinion from Professor Tomas Balco and Nurlan Rahimgaliev's testimony regarding the legality of the assessment of back taxes,

    iv.  substantial parts of the opinion from Deloitte GmbH (Deloitte) regarding causality, and

    v.   substantial parts of Kazakhstan's geological experts, Gaffney Cline & Associates, report.

The arbitral tribunal, which based its award on a large number of circumstances which together were considered to constitute a concerted harassment campaign ("a string of measures of coordinated harassment"), would not have been able to arrive at such conclusions it made if it had taken into account the evidence invoked by Kazakhstan.

    i.   The tribunal failed to consider the content of Kazakh law on the classification of pipelines, ¶ 1090 of the award, despite the fact that the parties agreed that Kazakh law should be applied. In the arbitration Kazakhstan invoked expert reports from Professors Anatoly Didenko and Kadirbek Latifov as well as written witness statement from Salamat Baymaganbetov, all of which supported Kazakhstan's position concerning the classification of pipelines. The tribunal, however, omitted even to mention that these statements had been filed, cf. ¶¶ 82, 174, 1088 and 1090 of the award.

    ii.   The tribunal decided an issue of Kazakh civil law without taking into account the expert opinion of Professor Kulyash Ilyassova invoked by Kazakhstan, see ¶¶ 1093, 1095, 1417 of the award. The issue in question was Kazakhstan's pre-emtion right to buy the shares in TNG in connection with Terra Raf's acquisition in 2005. Instead of applying Kazakh civil law, the tribunal noted that Kazakhstan's withdrawal of the authorisation of this transfer was part of the concerted harassment campaign.

    iii.  The tribunal has decided an issue of Kazakh tax law without taking into account the expert report from Tomas Balco and the witness statement

from Nurlan Rahimgaliev, which supported the Kazakhstan's position regarding the back tax issue, see ¶¶ 1541 and 1798–1800 of the award. Tomas Balco and Nurlan Rahimgaliev were not even mentioned in the reasons for the award. Instead of applying the Kazakh tax law, the tribunal established that Kazakhstan's imposition of back taxes for KPM and TNG "were created by Respondent's conduct which this Tribunal found above to be a breach of the ECT" and thus a part of the coordinated harassment campaign, see ¶¶ 1541 and 1798-1800 of the award).

iv.  The tribunal has ruled on the question of causation between the alleged harassment campaign and the damage claimed by the Investors without taking into account Kazakhstan's economic expert Deloitte. In the arbitration Kazakhstan invoked expert opinion from Deloitte showing that the Investors' companies were in financial distress, completely regardless of Kazakhstan's actions, and that causation was therefore lacking. The tribunal found that since Deloitte did not make a direct assessment of KPM's and TNG's ability to pay their debts under the bond loan from Tristan, which is obviously wrong, the tribunal accepted the conclusion of the Investors' expert FTI Consulting (FTI) that the companies' financial position was good before October 2008, see ¶ 1456 of the award.

v.  The tribunal in its assessment of damages took into account solely the Investors' geological expert (Ryder Scott) and ignored Kazakhstan's geological experts (Gaffney Cline & Associates) without giving any reasons for this. Despite the fact that the issue of the geological assessment of the assets of the Tolkyn and Borankol fields was very extensive and complex and the fact that each of the experts had submitted four expert statements, the tribunal established in a single sentence that the Investors expert Ryder Scott was convincing in its methodology and conclusion ("considers that the Ryder Scott reports on reserve estimates are convincing in their approach and results"), see ¶ 1625 of the award.

Unconsidered objections to deduction from the damages

The arbitral tribunal took no account of Kazakhstan's objections that certain deductions should be made from any damages eventually to be awarded. The reasons for the arbitral tribunal's decision in this respect are so minimal that they are tantamount to an absence of reasoning, see ¶¶ 1535–1542 of the award. In the arbitration Kazakhstan objected on one hand, that all the revenues accruing to the Investors after the valuation date should be deducted, see ¶¶ 1486 and 1487 of the award, and, on the other hand, that any damages in respect of the LPG Plant could only amount to half its value because Vitol had financed half of the LPG Plant and also, that Vitol had the right to half of the future returns from the LPG Plant; all under an agreement between the Investors and Vitol (the JOA-agreement), see ¶¶ 1738–1741 of the award. In respect of the part financed by Vitol, the Investors could not receive damages from Kazakhstan. The objections can be equated with a counterclaim or a set-off objection. Accordingly, the tribunal did not fulfil its task of examining the dispute in its entirety. The failure to take into account the objections influenced the outcome of the case. Due to the tribunal exceeding its mandate in this way or alternatively procedural error, the award should be set aside in any event in respect of an amount of USD 314.8 million. The amount is equivalent to the revenues accruing to the Investors after the valuation date, USD 215.3 million, and half of the value accepted for the LPG Plant, USD 99.5 million.

### 3.1.2.5 Other instances of excesses of mandate alternatively procedural errors

The arbitral tribunal exceeded its mandate and committed procedural errors by going beyond the references made by the parties on several instances and also by failing to take note of the parties' references and the applicable law, as indicated below.

KazAzot

i.   With regard to Kazakhstan's liability, causality between Kazakhstan's actions and the damage, the amount of damages and also the role of the company KazAzo, the arbitral tribunal based its conclusions on the fact that KMG and Timur Kulibayev had influenced KazAzot, although none of the parties had invoked this, see ¶1418 of the award. The Investors had invoked KazAzot's role only for gas pricing. The tribunal also failed to apply the applicable legislation on the question of ascribing to the Republic of Kazakhstan KazAzot's decision not to sign the tripartite agreement (a customary international law of state liability, including "Articles on Responsibility of States for Internationally

Wrongful Acts" as established by the International Law Commission [ILC Draft Articles][1]). (See ¶¶ 1094 and 1418 of the award.)

Interfax

ii.    The arbitral tribunal based its conclusion that a press release from Interfax, which according to the tribunal was part of the concerted harassment campaign, had been prompted by Kazakhstan's action as early as October and November 2008, despite this not being invoked by any of the parties, and wrongly stressed that this circumstance was not in dispute, see ¶ 994 of the award.

The Financial Police

iii.   Regarding the actions of the Kazakh financial police, the tribunal relied on the allegation that the financial police had reported to the Kazakh deputy prime minister that they had found that KPM and TNG operated trunk pipelines, despite no reference to this having been made by any of the parties. The tribunal also found incorrectly that Kazakhstan had admitted that this was the case, see ¶ 990 of the award.

The Tristan notes

iv.    On the question of whether a deduction should be made from the enterprise values of KPM and TNG for the so-called Tristan notes, the arbitral tribunal failed to take into account the parties' legal arguments, see ¶¶ 1768–1771 of the award. The tribunal also based its decision on an alleged admission by Kazakhstan that had never been made. If there had been such an admission, Kazakhstan had revoked it. The Tristan notes had in any case a value of USD 497 685 101 on 30 April 2009. (See ¶¶ 1536–1537 of the award.

Method of valuation

v.     With regard to the valuation of the Tolkyn and Borankol fields, the arbitral tribunal incorrectly assumed that Kazakhstan had agreed to a specific valuation

---

[1] The ICL Draft Articles is a combination of a codification and progressive development of international law. The United Nations (UN) General Assembly adopted resolution 56/83 on 12 December 2001, through which the ICL Draft Articles were commended to governments without obligations.

method, see ¶ 1625 of the award. For this reason the award should be set aside
in respect of an amount of USD 277.8 million.

On the grounds of each and every one of the excesses of mandate, alternatively the
procedural errors, the award should be set aside. In any case the irregularities taken
together give a reason to set aside the award.

## 3.2 The Investors

### 3.2.1 Legal grounds for contesting the claim

The award, and the manner in which the award arose, is not clearly incompatible with
basic principles of the Swedish legal system.

The award is covered by a valid arbitration agreement between the parties.

The arbitral tribunal was not appointed contrary to the agreement of the parties or the
principle of equal treatment.

The SCC's appointment of the arbitral tribunal did not constitute a procedural error
which influenced the outcome.

The arbitral tribunal neither exceeded its mandate nor committed procedural errors that
influenced the outcome.

The arbital tribunal are competent to act even with two arbitrators.

### 3.2.2 Legally relevant circumstances

#### 3.2.2.1 Annulment due to the allegedly fraudulent arrangement, false evidence, misleading information etc.

The arbitral award, or the manner in which it arose, is not clearly incompatible with the
basis of the Swedish legal system. The award should therefore not be declared invalid.

It is contested that the arbitral award is based on a fraudulent arrangement, corruption or
false evidence.

Ever since the Investors had acquired KPM and TNG, they had invested hundreds of millions of dollars in the development of oil and gas fields and also in the construction of the LPG Plant. These costs are in no way imaginary or fictitious.

The construction of the LPG Plant was not based on a fraudulent arrangement, corruption, sham contracts or sham transactions. The Investors neither presented false evidence (witness statements, witness testimonies and expert opinions) nor did they mislead Kazakhstan, the SCC or the arbitral tribunal or withheld information regarding the valuation of the LPG plant. KMG based its indicative bid also on its own assumptions and calculations. There is no adequate causation between the allegedly misleading measures and the arbitral award as regards the valuation of the LPG Plant.

The arbitral award is not based on false evidence or untrue statements. The information in the "Information Memorandum" and annual reports that are alleged to have been falsified or misleading was not created with the arbitration proceedings in mind, but for other purposes, and also long before the start of the ECT case. Even if Kazakhstan's accusations were to be considered to some extent legitimate, which is denied, neither KMG's indicative bid nor the award were based directly on these documents as regards the value of the LPG Plant.

Even if this part of the award had been based on incorrect documentation or false information, it would not be sufficient for the award to be declared invalid in whole or in part.

<u>The fraudulent and misleading arrangement is fictional</u>

The Investors did not mislead the tribunal, the SCC or Kazakhstan regarding their investment cost for the LPG plant. The investment cost in the LPG plant is not fictitious. It did not consist solely of equipment costs, but also costs of construction materials and labour for the construction of the facility. At the time of its expropriation, the plant was almost complete.

The Perkwood Agreement was not a sham arrangement. Perkwood's role was to take care of the procurement and delivery of equipment for the construction of the LPG Plant. Perkwood imported equipment worth approximately USD 138 million to TNG in Kazakhstan and approximately USD 24.7 million was paid to the Kazakh authorities in

SVEA COURT OF APPEAL                **JUDGMENT**                          23
Department 02                                            T 2675-14

customs duties and taxes. Moreover, the Kazakh customs authorities investigated TNG
in October 2008 without finding that the company violated any laws or regulations in its
dealings with Perkwood or otherwise. In other words, there was no misleading
arrangement or sham agreement between TNG and Perkwood. During the examination
of the annual financial accounts, TNG's auditors, KPMG, had full access to all the
accounting records. KPMG was aware of Perkwood's function. During the arbitration
the Investors submitted several documents in which Perkwood's role in the LPG Plant
project was described.

The Investors invested substantial amounts in the LPG plant, which Kazakhstan was
aware of.

It is denied that the Investors presented fictitious purchase costs. The Perkwood
Agreement was more comprehensive than the agreement between TGE and AzaliaLtd.
(Azalia)/Ascom, and included a large amount of equipment and material which were not
included in the TGE Agreement. The terms of delivery were also different. TGE sold
certain parts of the equipment for the LPG plant to Azalia, but neither TGE nor Azalia
were responsible for the delivery of the equipment to Kazakhstan. It was Perkwood
which sold the equipment to TNG and delivered it to Kazakhstan. The equipment
mentioned in Annexes 2, 14 and 16 to the Perkwood Agreement could therefore not
have been delivered by TGE earlier. Annex 14 did not include the same equipment as in
Annex 2 instead it consisted of spare parts which were ordered by way of back-up to
ensure operation of the Plant. In any event, the advance payment of around USD 37
million for the equipment covered by Annex 14 was later settled between Perkwood and
TNG.

It is denied that the Investors presented fictitious component costs. Perkwood delivered
equipment and materials corresponding to a value of USD 72 million, which were
recorded in the books of TNG as delivered to the LPG Plant but not yet installed. The
same amount for this equipment was presented in a report on an unscheduled inspection
at TNG, which was performed between 25 January and 5 February 2010 by
Kazakhstan's Ministry of Energy and Natural Resources, see ¶ 1072 of the award.

It is denied that the Investors presented fictitious interest costs. The interest expense
amounting to USD 60 million for financing the construction of LPG Plant was recorded
in TNG's accounting and corresponds to the actual cost.

It is contested that the Investors presented a fictitious "management fee". The contractual basis for the payment of the "management fee" is set out in section 10.1 of the Perkwood Agreement.

It is contested that the Investors reported the advance on components not delivered. Perkwood agreed to repay the advance payment to TNG. TNG subsequently transferred its claim against Perkwood regarding the repayment of the advance payment of around USD 37 million to Tristan Oil on 9 February 2010. The parties signed an agreement whereby Tristan Oil notified Perkwood of the transfer and wrote off the corresponding part of TNG's remaining loan.

The allegation that there is no good faith investment in Kazakhstan is contested. Furthermore, this allegation was examined and rejected by the tribunal, see ¶¶ 812-813 of the arbitral award.

<u>The Investors did not submit false evidence, provide misleading information or withhold relevant information in the arbitration</u>

It is denied that the named documents show that the Investors submitted false or misleading information in the arbitration.

It is denied that the Investors withheld "information that could have exposed the deceptive arrangement". The Investors did not mislead the arbitral tribunal or Kazakhstan about the identity of the parties involved in the investment in the project. Vitol has never had an equitable interest in the LPG Plant. The intention was that Vitol would pay half of the funding for the construction of the plant in advance. The Investors did not claim that they alone had been responsible for the entire investment cost, see ¶¶ 1702–1703 and 1740 of the award.

The question of whether Ascom's dispute with Vitol in the so-called JOA arbitration had any bearing on the damages claimed by the Investors for the LPG Plant was examined by the arbitral tribunal. The tribunal concluded that this was irrelevant to the matter on which the tribunal had to decide, namely what constituted a reasonable market value for the LPG Plant under international law and whether Vitol had contributed with

the Investors to the investments made in the LPG Plant. (See ¶¶ 1539 and 1542 of the award).

The Investors did not mislead the tribunal or Kazakhstan concerning the legitimate parties in connection with the LPG Plant project. It was never alleged in the Montvale case that Terra Raf had transferred all of its rights and obligations with regard to the LPG Plant to the related company Montvale. What happened was that Terra Raf transferred all its rights and obligations under the JOA Agreement, regarding the joint financing of the LPG plant with Vitol, to Montvale through a "Novation Agreement" to which also Vitol was a party. Terra Raf's status as TNG's sole shareholder never changed. Consequently, this fact was of no importance at all for the assessment of Terra Raf's status as an investor under the ECT or its right to damages. Information about the "Novation Agreement" was presented in Squire Sanders "Due Diligence" report, which Kazakhstan submitted during the arbitration and which it invoked on several occasions, see ¶¶ 1177, 1197, 1489 and 1793 of the award. In any event, this had no bearing on the outcome of the case.

It is contested that the Investors have committed procedural fraud by withholding information about Perkwood, the Perkwood Agreement and Perkwood's role in the construction of the LPG plant.


The valuation of the LPG Plant


The Investors did not provide misleading information regarding the investment costs to their auditors or anyone else. The information about the investment costs relating to the LPG plant did not affect the assessment of the damages.

From KMG's indicative bid and internal decision data which Kazakhstan submitted during the arbitration, it is clear that the company based its indicative bid partly on the "Information Memorandum" and partly on its own assumptions and estimates.

The Investors did not invoke the indicative bid as an alternative basis for its claim for damages in the arbitration. The information about KMG's indicative bid, along with information about indicative offers of seven other bidders, was submitted in support of the Investors' valuation of the expropriated assets because Kazakhstan challenged the Investors' valuation methods. In the arbitration Kazakhstan took the position that the investment cost was irrelevant since the discounted cash flow method was to be used when calculating the fair market value, and further that the investment costs were, in

fact, much higher and that the Investors had tried to hide them, see ¶¶ 1724 and 1718 of the award.

The tribunal based its estimate of the value of the LPG Plant mainly on the indicative offer of USD 199 million made by KMG. The indicative offer was a preliminary one and was based on a number of uncertain assumptions. KMG took into account not only the Information Memorandum, but also other publicly available information and made its own assumptions and calculations. Nor was the bid based solely on TNG's investment costs in the LPG Plant, but was calculated as an arithmetic average between "the matrix of the comparative methods value and cost method value". The average ended up on USD 199 million since the investment cost was USD 193 million and the amount according to the comparative method of valuation was USD 205 million.

It is disputed that information about the Investors' assets in Kazakhstan contained in the consolidated annual reports of Tristan Oil, KPM and TNG was false or misleading.

KPMG was aware of Perkwood's role.

It is disputed that Anatolie Stati was part of the management of KPM and TNG.

Medet Suleimenov, KMG's witness, testified that the indicative bid was based on limited information and that strategic considerations determined the size of the bid (see ¶ 1736 of the award). It is therefore impossible to say how, if at all, changes in the investment cost would have influenced the value of the bid.

### 3.2.2.2 The award is covered by a valid arbitration agreement

Kazakhstan and all of the Investors entered into an arbitration agreement on the basis of Kazakhstan's standing offer in the ECT of arbitration according to the SCC Rules for investment disputes and the Investors' acceptance through their request for arbitration, referring to this offer.

Observance of the provision on cooling off period is not a condition of the conclusion of an arbitration agreement. It follows from Article 26(3)(a) ECT that Kazakhstan gave its unconditional consent to arbitration. As a result of the Investors' request for arbitration, a binding arbitration agreement arose, which gave the arbitral tribunal jurisdiction.

SVEA COURT OF APPEAL          **JUDGMENT**                                    27
Department 02                                              T 2675-14

The provisions of Article 26 ECT do not constitute mandatory procedural requirements. Failure to observe a preliminary negotiation does not constitute a bar to proceedings.

Under all circumstances, the arbitral proceedings were stayed for three months at the request of Kazakhstan to allow for negotiations under Article 26(2) ECT. Any deficiency before the arbitration was thus corrected and Kazakhstan has lost its right to jurisdictional objection.

The Investors agreed to Kazakhstan's request for stay on condition that Kazakhstan refrained from making any objection on the ground that the time limit had not been observed, which Kazakhstan accepted through its counsel at the time. Kazakhstan then continued to take part in the proceedings without informing the Investors that it maintained the objection. In any event, the Investors had reason to believe that Kazakhstan was abandoning its objection, which Kazakhstan must have been aware of. The parties' agreement was binding on Kazakhstan and Kazakhstan also for this reason was bound by the arbitration agreement with the Investors, in any event after the end of the three-month time limit.

The Investors satisfied the requirements for a preliminary negotiation according to Article 26(2) ECT prior to the initiation of the arbitration. The only requirement laid down regarding the start of a preliminary negotiation is a request for an amicable settlement by one of the investors concerned, which need not be in writing. Thus there is no requirement that all investors must sign all letters or participate in the settlement negotiations. Furthermore, Anatolie Stati was at that time authorised to represent Gabriel Stati. It is enough that a reference is made to the object of a treaty so that the state against which a claim is made is informed that there is an existing or potential dispute regarding this object. It is shown clearly by the Investors' letters to Kazakhstan that they were addressing Kazakhstan's treatment of KPM and TNG, i.e. the Investors' investments on the territory of Kazakhstan. Between 2008 and 2010 the Investors drew Kazakhstan's attention on several occasions to the disputed conditions and tried to enter into a dialogue. The Investors also made both oral and written proposals for settling the dispute and stated that they intended to refer the dispute to international arbitration under the SCC Rules if no solution could be reached. During this period the basic cause of the dispute was the same. Settlement negotiations took place more than a year before the dispute was submitted to arbitration, which is sufficient. That "amicable" or similar words were not used is irrelevant.

There is no requirement to participate in a preliminary negotiation lasting three months if this is clearly futile, as Article 26(1) ECT makes clear. Kazakhstan failed to respond to most of the Investors' representations and showed no interest in negotiating. Kazakhstan's actions before the initiation of arbitration proceedings demonstrate that it was not possible to achieve a settlement of the dispute.

The arbitral tribunal decided the matter of its jurisdiction in a proper manner and in relation to each of the Investors.

### *3.2.2.3 The appointment of the arbitral tribunal*

The SCC was not in breach of the parties' arbitration agreement, of which the SCC Rules form part, or basic principles and rights in regard to the appointment of the arbitral tribunal. Kazakhstan has not been deprived of its right to appoint its own arbitrator, but has either lost its opportunity to do this as a result of its own negligence or has deliberately chosen not to participate in the appointment of the tribunal. It is further denied that there has been an error in the appointment of the tribunal and that there has been a procedural error in respect of the SCC's appointment of the tribunal which influenced the outcome of the case.

It follows from the arbitration agreement that the respondent should appoint an arbitrator in its answer to the request for arbitration. The SCC Rules are clear in this respect. Since the parties had not agreed otherwise, the arbitral tribunal should consist of three arbitrators and each party should have an opportunity to appoint an arbitrator, unless the SCC decides otherwise. The SCC has not made any other decision. It was clear from the SCC Rules, the SCC's letters and the request for arbitration that the proceedings should be decided by three arbitrators.

The instructions from the SCC were clear. Enclosed with the instruction to submit an answer were, among other things, the request for arbitration and a copy of the SCC Rules, which make clear that Kazakhstan needed to give the name of the arbitrator it had appointed in its written reply. In their request for arbitration the Investors had already demanded that, should Kazakhstan fail to appoint an arbitrator, the SCC should appoint one on Kazakhstan's behalf. From the time when it received the request for arbitration until Sergei Lebedev was approached, Kazakhstan had 40 days in which to submit an answer or to request an extension of time. When the deadline ran out,

SVEA COURT OF APPEAL          **JUDGMENT**                                  29
Department 02                                                    T 2675-14

Kazakhstan received a reminder and a further 14 days in which to comply with the instruction, along with information that the absence of any reply from Kazakhstan was no obstacle to the arbitration continuing. The SCC Rules do not lay down that SCC's instructions must contain an explicit request to appoint an arbitrator. Kazakhstan was also requested to comment on the Investors' proposal that the arbitrators appointed by the parties should appoint the chairman of the tribunal. The SCC did not act in breach of the principle of equal treatment.

An answer and an appointment of an arbitrator should take place within the time prescribed by the SCC. The actions of the SCC in this respect were in accordance with the arbitration agreement, the SCC's practice and basic principles and rights. Kazakhstan had competent and experienced officials with the necessary language skills. There is also a Russian translation of the SCC Rules on SCC's website. In addition, Kazakhstan has been involved in a large number of arbitrations at the SCC before this ECT case and was well acquainted with the relevant rules and practices. There is no ground for why Kazakhstan should have been treated more favourably in its capacity as a state or because the matter concerned a complicated investment dispute. Neither the method of sending the documents, Kazakhstan's own bureaucracy, its alleged shortcomings in English or its need for counsel justified the setting of a longer time limit. Kazakhstan did not request an extension and did not participate in any way in the process until more than a month after the SCC appointed an arbitrator on its behalf.

Kazakhstan failed to appoint an arbitrator within the period set by the SCC. The SCC therefore appointed an arbitrator on Kazakhstan's behalf, without consulting any of the parties. In the situation that arose, the arbitration agreement gives Kazakhstan no right to be consulted.

Kazakhstan failed to object in time to the appointment of the arbitral tribunal, thereby forfeiting its right to protest against this potential error. Following the appointment of Sergei Lebedev and Karl-Heinz Böckstiegel Kazakhstan confirmed to the tribunal at the hearing on the jurisdiction issue on 8 October 2012, that there were no objections to the proceedings up until then. Kazakhstan has lost its right to assert the alleged error.

The notion that the SCC should have given Kazakhstan the opportunity to appoint a new arbitrator when Kazakhstan finally engaged in the arbitration is contested.

The SCC did not commit a mistake, but acted in accordance with its rules and followed its practice regarding the appointment of an arbitrator.

It is denied that Sergei Lebedev adopted a passive role, or that an arbitrator appointed by a party has a duty to ensure that the party's case is correctly understood by the tribunal.

### 3.2.2.4 Excesses of mandate or procedural error (alleged faulty assessment of evidence etc.)

Taras Khalelov's witness statement and testimony

The question was whether the LPG Plant should be valued as a "going concern", as the Investors claimed, or at a scrap value, as Kazakhstan claimed. The tribunal did not consider facts or evidence which had not been referred to by the Investors.

The Investors never withdrew the claim that Kazakhstan intended to complete the construction and start up the operation of the LPG Plant. This is not altered by the fact that the Investors did not subsequently repeat this assertion. The Investors also stated in their "Post-Hearing Briefs" that they maintained everything that had been stated earlier in the case.

The evidence in the form of information from publicly available websites for the Mangystau region and the Kazakh embassy in Israel was introduced in the case in a proper manner as a result of the Investors' expert testimony from FTI and as attachments to the Investors' submission dated 7 May 2012. The Investors also put forward other evidence consisting of Victor Romanosov's witness statement.

The arbitral tribunal took account of all the written and oral evidence that had been referred to by the parties, including Taras Khalelov's witness statement and testimony. Even if the tribunal would have committed a procedural error by not taking account of this evidence, this error would not at any rate have influenced the outcome of the case. The evidence was not sufficient to rebut the circumstances on which the tribunal based its conclusions regarding the value of the LPG Plant.

The tribunal has consequently not exceeded its mandate or committed any procedural error that has probably influenced the outcome of the case.

<u>Kazakhstan's expert and testimonial evidence</u>

The arbitral tribunal took note of all the evidence, including evidence relating to:

- the classification of pipelines
- the pre-emptive rights
- the back tax assessment
- causality, and
- geological issues.

Kazakhstan's assertions in this part are groundless and neither individually nor taken together amount to an excess of mandate or procedural errors which probably influenced the outcome of the case.

The arbitral tribunal did take into account Kazakhstan's evidence concerning the content of Kazakh law on the classification of pipelines. The issue of fair and equitable treatment included questions concerning the classification of pipelines under Kazakh law. Even Kazakhstan's arbitrary handling of the classification issue was contrary to the obligation to respect fair and equitable treatment and Kazakh law was of limited significance for the assessment of classification.

The tribunal accounted for the parties' main submissions in chronological order without mentioning expert reports or witness statements. Kazakhstan's assertions regarding Anatoly Didenko, Kadirbek Latifov and Salamat Baymaganbetov are incorrect. Anatoly Didenko's statement is mentioned in the arbitral award, see ¶ 193 of the award). Kadirbek Latifov's statement was submitted as a witness statement (not as an expert report) to Kazakhstan's second submission. Further, Kazakhstan did not account for any costs relating to Kadirbek Latifov's statement, cf. ¶ 1872 of the award. The tribunal noted that Salamat Baymaganbetov was heard on 8 October 2012, see ¶ 117 of the award.

Kazakhstan's allegation regarding the tribunal having decided an issue of Kazakh civil law without taking into account the expert opinion of Kulyash Ilyassova, invoked by Kazakhstan, is unfounded. Kulyash Ilyassova's opinion on Kazakhstan's pre-emptive rights relating to the shares in TNG which were transferred from Gheso to Terra Raf is accounted for in the arbitral award, see ¶¶ 787 and 993 of the award.

The tribunal has correctly decided the issue of Kazakh tax law relating to the back tax issue, taking into account everything put forth by Kazakhstan, including expert testimony by Tomas Balco and the witness Nurlan Rahimgaliev. Both Tomas Balco and Nurlan Rahimgaliev are mentioned on several occasions in the award in connection with the positions of both the Investors and Kazakhstan.

The tribunal has correctly decided the issue of causality – including the issue of intervening cause and the financial structure of KPM and TNG – taking into account everything put forth by Kazakhstan, including the experts from Deloitte, see ¶¶ 1456 and 1503 of the award.

The tribunal has correctly taken note of all geological expertise, including Gaffney Cline & Associates, and the award does not lack reasons regarding the significance of the geological issues in relation to the amount of damage.

Objections regarding deductions from the damages

The arbitral tribunal took note of Kazakhstan's objections that certain deductions should be applied to any damages, as far as both revenues that had accrued to the Investors after the valuation date (USD 215.3 million) and the fact that the damages in respect of the LPG Plant could not exceed half its value by reason of the Investors' agreement with Vitol (USD 99.5 million) were concerned. Kazakhstan's objections related to the question of the amount of damages and did not constitute a counterclaim or a set-off objection. The arbitral tribunal has in the reasons for the award adequately presented their assessments and correctly found that no deductions would be made, see ¶¶ 1530– 1531 and 1539 of the award.

Profits, to which Kazakhstan referred and which had been distributed, had been earned before both the valuation date used by the tribunal and the valuation date on which the Investors relied. Such profits would not be deducted from the damages, which were to correspond to the present value of profits KPM and TNG were expected to generate in the future. (Cf. ¶¶ 1473-1477 of the award).

Vitol did not own any part of the LPG Plant and Vitol's agreement with the Investors for the financing of the LPG Plant, the JOA Agreement, did not motivate any

deductions from damages. The tribunal did not exceed its mandate or committed any procedural error that probably influenced the outcome of the case, see ¶ 1539 of the award.

### *3.2.2.5 Other excesses of mandate or alternatively procedural errors*

The arbitral tribunal made no judgement regarding circumstances that had not been invoked and did not neglect to take account of anything that it should have done. The circumstances that Kazakhstan claims the tribunal made a judgement on without the necessary references are evidentiary facts. The tribunal can take note ex officio of evidentiary facts on the basis of the existing facts and documents presented. The tribunal took into account the applicable law and the principles of international law correctly.

<u>KazAzot</u>

The arbitral tribunal based its considerations in respect of KazAzot on circumstances invoked by the parties. The Investors invoked the fact that Timur Kulibayev, the President's son-in-law, controlled KazAzot and that international legal principles of state liability are applicable on KazAzot's decision not to sign the so-called tripartite agreement. (See ¶¶ 639, 674 and 1094 of the award). Even if the parties treated KazAzot as a question of both liability per se and the size of the damages, the tribunal was free to decide this as a question of liability. The tribunal correctly applied international law and did not neglect to take account of anything.

<u>Interfax</u>

The arbitral tribunal's assessment of Kazakhstan's liability for the press release from Interfax was a legal assessment that lay within the framework of the arbitral tribunal's mandate. The tribunal made no judgement in respect of a circumstance that had not been invoked. The Investors invoked that the press release from Interfax was the result of involvement by the government and was part of a larger campaign aimed at KMP and TNG. (See ¶¶ 348, 1122, 1335 and 1339 of the award).

<u>The financial police's classification of pipelines</u>

As regards the decision of the Kazakh financial police regarding the classification of pipelines, the arbitral tribunal based its decision on circumstances invoked by the Investors. The Investors referred to the fact that on 10 December 2008 the Financial Police informed the Deputy Prime Minister of its decision that KPM's and TNG's pipelines were trunk pipelines and not field pipelines, see ¶ 343 of the award. Kazakhstan admitted in writing that a letter from the finance police to the Deputy Prime Minister stated that the financial police had decided that the pipelines in question were trunk pipelines. The tribunal was entitled to take account of this admission as an evidentiary fact, see ¶ 990 of the award.

The Tristan notes

With regard to the Tristan notes and the enterprise value of KPM and TNG, the arbitral tribunal based its decision on circumstances invoked by the parties. The Investors invoked the fact that they had a continued responsibility for the Tristan notes and that they would have to deduct the debt under the Tristan notes from the awarded damages, see ¶¶ 1752–1758 of the award. Kazakhstan admitted that the "enterprise value" was a correct method of evaluation if the Investors were liable to pay compensation to the holders of the notes. Since the arbitral tribunal concluded that this was the case, it was correct that the parties were in agreement on which valuation method should apply, see ¶¶ 1769–1771 of the award. Kazakhstan was entitled to reconsider its admission, although the tribunal was still free to take note of what evidentiary value the previous admission might have.

Valuation method

With regard to the damages relating to the Tolkyn and Borankol fields, the arbitral tribunal based its decision on the amount of the damages on an alternative calculation that Kazakhstan had introduced and described as suitable, see ¶ 1625 of the award. The arbitral tribunal did not base its decision on a formal admission by Kazakhstan, but instead made an evaluation of the evidence, which is a substantive issue.

The arbitral tribunal has thus not exceeded its mandate or committed any error which probably influenced the outcome of the case.

## 4. THE INVESTIGATION

The parties have relied on fairly extensive testimony, both oral and written. As far as the oral testimony is concerned, certified engineer Ernst Kallweit, project manager Franjo Zaja, authorised public accountant Thomas Gruhn, Professor Thomas Grant and attorney at law Dr Horacio A. Grigera Naón appeared on behalf of Kazakhstan, while attorneys at law Kenneth R. Fleuriet, Johan Gernandt and Gary B. Born appeared on behalf of the Investors.

## 5. THE COURT'S FINDINGS

### 5.1 The layout of the findings

The case involves the annulment and challenge of an award in which the arbitral tribunal examined compensation claims brought by the Investors against Kazakhstan relating to investments they had made on Kazakhstan territory. Kazakhstan's action rests on the ground that the award is invalid since in itself, or in the manner in which it arose, it is clearly incompatible with the basic principles of the Swedish legal system (ordre public). Kazakhstan has also argued that the award should be set aside on the ground that it is not covered by a valid arbitration agreement between the parties and because one of the arbitrators was not appointed in the proper manner. In addition, it has claimed that the award should in any event be set aside on the ground that the arbitrators in several respects exceeded their mandate and a number of procedural errors occurred that affected the outcome of the case.

The Court will first set out the general legal starting points that it has for examining the grounds for annulment and setting aside of the award that Kazakhstan has invoked. However, the preconditions for a valid arbitration agreement in relation to article 26 ECT will be dealt with as a whole by the Court in section 5.3.2.

After setting out the legal starting points for its examination, the Court will reach a view on Kazakhstan's action according to the factual circumstances case that Kazakhstan has referred to and will carry out the examination in the same order as in the layout chosen by Kazakhstan for the presentation of the grounds for its action above in section 3.1.

Finally, the Court will also set out a summary of its conclusions and its overall assessment of the grounds referred to by Kazakhstan in support of the award being annulled or set aside.

In the last part of its findings the Court will set out its decision in regard to litigation costs.

## 5.2 Legal starting points for the Court's examination

### 5.2.1 Ordre public as a ground for annulment

According to s.33 (1) (2) SAA, an award is invalid if it, or the manner in which it arose, is clearly incompatible with the basic principles of the Swedish legal system.

Swedish law takes a restrictive approach to the possibility of having an arbitral award annulled pursuant to the above provision. The legislative history of the provision makes clear that it is intended only to cover extremely invidious cases and that, due to its narrow scope, it will only be applicable extremely rarely, together with the fact that it covers cases where basic legal principles of a substantive or procedural nature have been disregarded (see Bill 1998/99:35 pp. 142 and 234). In this connection it may also be mentioned that the handbook of the SCC's Arbitration Institute states that the term ordre public should be interpreted very narrowly when clearly invidious cases are involved in which elementary principles have been ignored (see Öhrström, Stockholm Chamber of Commerce Arbitration Institute, A Handbook and Rule Commentary for Arbitration Proceedings, 2009, p. 80). Moreover, it follows from the ruling by the Supreme Court in NJA 2015 s. 433 that if the circumstances of the case as presented by the parties support the view that an award would clearly be contrary to the legal system, the court should inform the parties of this of its own accord and give them an opportunity to develop their views in the matter.

In the legislative history of the Swedish Arbitration Act, the following is mentioned as an example of when an award is considered to be clearly incompatible with the basic principles of the Swedish legal system (Bill ibid., p. 141 f.). This is considered to be the case when the arbitral tribunal has examined a question that a public court should not be involved in, such as a claim based on gambling or criminal acts (e.g. an order to pay an agreed bribe). Other cases mentioned are when someone has been forced as a result of

the award to act in a way that is forbidden by law or the award is of such a punitive kind that it cannot be regarded as acceptable. Another example is when the tribunal has heard a dispute without taking account of a mandatory rule of law in favour of a third party or a public interest (ibid.).

The provision of s.33 (1) (2) SAA regarding ordre public also focuses on fundamental legal principles of a procedural nature through its reference to the way in which the award has arisen. An example of such a situation when this may happen is stated in the legislative history to be when the award has arisen after a crime, e.g. following a threat to or bribery of an arbitrator (Bill ibid., p. 142).

Also awards that are based on false evidence seem to be covered by the term ordre public (see the Report of the Arbitration Committee, SOU 1994:81, p. 182). This Committee considered the introduction of an explicit legal provision whereby an award could be set aside on the action of a party if a document invoked in evidence had been forged or misrepresented or if someone other than a party or a representative of a party had deliberately made a false statement and the document or statement could be assumed to have influenced the outcome of the case (ibid., paragraph 6.5). However, making the judicial case review provisions fully applicable to awards was considered by the Committee to be too much at variance with the aim that arbitration should result in a definitive decision without delay. The Committee therefore put forward a proposal which was only to some extent in line with the provision for a case review in the Code of Judicial Procedure (ibid., p. 182). The Government, however, chose not to implement the proposal of the Arbitration Committee in this respect, justifying its position not to allow the option of having an award set aside if false evidence or untrue oral testimony has influenced the outcome mainly with the interest that the regulations should as far as possible satisfy the parties' demands for a swift and efficient procedure and guarantee the finality of an award (Bill ibid., p. 150 ff.). To this end, it was considered to be particularly important to avoid rules that through their construction invite a set aside action and create uncertainty for a long time about the validity of the award (ibid.). The Government, however, also referred to the Committee's conclusion that the situation where false evidence had been invoked should be included in the term ordre public, as in the UNCITRAL Model Law on International Commercial Arbitration and the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (ibid.). In the literature it has been assumed that an award could be considered invalid in certain exceptional cases on the ground of ordre public in the situation just described

(see Heuman, ibid., p. 600 f). Put forward as a reason for this have been, inter alia, attempts to harmonise Swedish law with foreign practice. It has also been pointed out at the same time, however, that the ordre public provision may not be applied in such a way as to create an open-ended opportunity of having the award declared invalid on this ground (see Heuman, ibid., p. 600).

**5.2.2 Excess of mandate and procedural errors as grounds for annulment**

An award may also, according to s. 34 (1) (2, 4 and 6) SAA, be set aside following a challenge if the arbitrators have exceeded their mandate, if an arbitrator has been appointed contrary to the agreement between the parties or the SAA or, without fault of the parties, if there has otherwise been an irregularity during the proceedings which has probably influenced the outcome. The mandate of the arbitral tribunal is governed by the arbitration agreement, by any agreements between the parties about the procedure, and by the actions of the parties in the procedure. It may sometimes be difficult to decide what is included in the term mandate and whether certain procedural errors should be decided according to the provision in paragraph 2 or whether they should be decided according to the general clause in paragraph 6, which is aimed at other procedural errors (see Heuman, ibid., p. 605 f., and Lindskog, Arbitration. A commentary, Zeteo, May 2016, the comments on s. 34, para. 4.2.3).

In the case NJA 2009 s. 128, the Supreme Court, referring to reasons and the literature, summarised its view as to when an error that has been committed should be considered to be an excess of mandate or a procedural error. The Supreme Court also sets out what are the requirements on the reasons given in an award, as follows:

> The provision in s.34 (1) (2) SAA about an excess of mandate is aimed at the framework for the arbitral tribunal's substantive examination of the matter assigned to it. One example of an excess of mandate is when the arbitral tribunal goes beyond the parties' claims, while another is that it has based its decision on a legal fact that has not been invoked (Bill 1998/99:35 p. 145; cf., inter alia, Lindskog, Arbitration. A commentary, 2005, p. 960 f.).

> The parties can also other than through claims and references limit the extent of the arbitral tribunal's examination. For example, they can limit it to the application of a particular legal provision or in another limiting way be in control of the procedure. It follows from s.21 SAA that the tribunal should then abide by what the parties have decided unless there is something that prevents this. Should such a limiting instruction from the parties be disregarded, as a rule there will probably be an excess of mandate (Bill ibid., p. 146, cf., inter alia, Heuman, Arbitration Law, 1999, p. 616).

> The situation is different with instructions aimed at how the procedure should be conducted within the framework that follows from the arbitration agreement, claims, facts invoked and evidence introduced. If the tribunal does not follow an instruction of this kind, there will normally

> be a question of a procedural error according to s.34 (1) (6) SAA (see, for example, Heuman, ibid., p. 652 f. and Lindskog, ibid., p. 965 f.). … There may be different reasons for an instruction in the arbitration agreement that the award should include the reasoning behind it. The parties, in the absence of more detailed provisions about what should be included in the reasons for the decision, may also have more or less far-reaching expectations of the tribunal's account of its deliberations. However, the question of whether the tribunal's reasoning is so deficient that it amounts to a ground for a challenge must be separated from what the parties with or without justification expect of the reasons for the award and what in this respect can be regarded as good practice among arbitrators.

> The setting out of adequate reasoning behind an award amounts to a guarantee of the rule of law, since it obliges the tribunal to analyse the legal issues and the evidence. Against the value of having the reasons for the outcome set out in full, however, should be set the interest of the finality of the award when there is a question of a challenge. A challenge does not allow for a substantive review of the tribunal's viewpoints. For this reason and because a qualitative assessment of its reasoning would give rise to significant difficulties of demarcation, only a complete absence of reasons, or reasons which, under the circumstances, must be regarded as so incomplete that they can be equated with their absence, can imply the existence of a procedural error.

It is usual for an arbitral tribunal in a procedural order to take decisions in different procedural issues and in regard to the detailed forms of the procedure. In many cases a procedural order does not reflect an agreement between the parties that provides the framework for the tribunal's mandate, but is instead a procedural decision taken by the tribunal within the framework of the mandate (cf. Born, International Commercial Arbitration, vol. 2, 2014, p. 2230).

Section 21 of SAA says that the arbitrators shall handle the dispute in an impartial, practical, and speedy manner and that they shall thereupon act in accordance with the decisions of the parties insofar as there is no impediment to so doing. This means that the tribunal, in its handling of the dispute, shall observe, among other things, the principle of equal treatment that follows from this section, namely that the parties should be treated equally in procedural respects.

In the light of these legal starting points, the Court of Appeal will now proceed to examine the grounds adduced for the annulment and setting aside of the award.

## 5.3 The question of the annulment alternatively setting aside of the award

### 5.3.1 Annulment due to the fraudulent arrangement, false evidence, misleading information etc.

Kazakhstan has claimed that the award, and the manner in which it arose, is contrary to ordre public, referring to the detailed circumstances described in para. 3.1.2.1.

The Court of Appeal makes the following assessment:

In the arbitration in question the Investors claimed that Kazakhstan had breached its obligations under the ECT by violating the investment protection rules in the ECT and that Kazakhstan was therefore liable to pay damages to the Investors in respect of the so called LPG Plant, among other things. The existence of the plant is not in dispute in the case and it is also clear from the investigation put forward here that investments were made in it. It is clear from the award that Kazakhstan disputed the Investors' claim, which meant that the arbitral tribunal carried out a substantive examination of the claim. In the light of this, there is no reason to question that there has been a underlying genuine legal relationship between the parties (cf. the decision of the Supreme Court in NJA 2002 C 45), and a claim such as that of the Investors, in the Court's view, is in no way comparable with a claim that a public court would refuse to take note of. Sweden's undertakings under the United Nations Convention against Corruption do not lead to any other assessment. Neither does the award otherwise deals with questions noted in the legislative history as typical examples of when an award can be considered to be contrary to ordre public. In other words, it is already entirely clear on the basis of these conclusions that what Kazakhstan is asserting cannot lead here to the assessment that the award in itself is clearly contrary to the basic principles of the Swedish legal system and is thus invalid.

In the arbitration the Investors invoked evidence in the form of oral testimony, witness statements and expert reports as corroboration of the fact that the investment costs in the LPG Plan corresponded to the amount claimed. It is clear from the award, however, that the tribunal based its decision regarding the damages for the LPG Plant on the so-called indicative bid made by KMG, see ¶¶ 1746–1748 of the award.

As the Court has described above, the scope of the ordre public provision is very narrow and the legislator has also clearly come down on the side of not introducing a provision in the Arbitration Act corresponding to the case review mechanism. In the Court's opinion, there should therefore be no question of annulling an award solely for the reason that there has been false evidence or untrue statements when it is not clear that these have been directly determinative for the outcome (cf. Heuman, ibid., p. 600 f). Situations may, however, be envisaged where the invoking of a false statements may have an indirect effect on the tribunal in its examination of the dispute. However, in view of the narrow area of application and the restrictiveness that should exist on opening the way to a new substantive examination of the matter in dispute within the scope of an annulment process, there should be no question, in the view of the Court, of allowing such an indirect influence on the arbitral tribunal to result in the award being considered to be invalid other than when it is obvious that this indirect influence has been of decisive importance for the outcome of the case.

Since the tribunal based its decision on the indicative bid, the evidence invoked by the Investors in the form of oral testimony, witness statements and expert reports regarding the amount of the investment cost – evidence which Kazakhstan claimed was false – has not been of direct significance for the outcome. This circumstance alone means that this evidence per se, even if it should prove to be false, cannot constitute sufficient grounds, in the Court's view, for considering the award to be invalid. Neither is it obvious, according to the Court, that this evidence, through an indirect influence on the tribunal, was of decisive importance for the outcome of the case.

When it then comes to the question of whether the indicative bid per se amounted to false evidence, it is not disputed that KMG, before the arbitration was initiated, had made the bid in question of USD 199 million for the LPG Plant. The indicative offer per se is thus not to be regarded as false evidence even if potentially incorrect details of the amount invested in the LPG Plant through the annual reports of Tristan Oil, KPM and TNG have been among the factors that KMG took into account when calculating the size of the bid. The allegedly false information in the annual reports thus did not directly lie behind the tribunal's decision regarding the value of the LPG Plant. In this light, the reference made by the Investors to the indicative bid did not amount to an invocation of false evidence.

Finally, in regard to Kazakhstan's assertion that in the arbitration the Investors withheld from the tribunal and Kazakhstan certain information that could have influenced the outcome of the case, the Court observes that one party in a case amenable to out-of-court settlement like arbitration cannot be required to provide the opposite party with information that is prejudicial to its own case. There is no scope for considering that the award is invalid on this ground, particularly in the light of the very narrow scope of the ordre public rule.

In summary, the Court finds that none of the circumstances invoked by Kazakhstan here, either individually or as a whole, are such that the award, or the manner in which it arose, is clearly incompatible with the basic principles of Swedish law.

### 5.3.2 Setting aside the award on the ground that it is not covered by a valid arbitration agreement

Kazakhstan has claimed here that the award is not covered by a valid arbitration agreement between the parties since the Investors submitted their request for arbitration only five days after the KPM and TNG's agreement on exploitation rights had been terminated and so breached the mandatory provision of a three-month preliminary negotiation set out in article 26 (2) ECT. Kazakhstan has invoked here the circumstances described in section 3.1.2.2.

The Court of Appeal makes the following assessment:

In order for an arbitral tribunal to have jurisdiction to examine a dispute, a valid arbitration agreement must exist between the disputing parties. The question of whether in the present case there had been an arbitration agreement between the Investors and Kazakhstan must be decided on the basis of article 26 ECT, which was invoked by the Investors as a ground for the jurisdiction of the tribunal in their request for arbitration against Kazakhstan, which was submitted to the SCC on 26 July 2010.

The ECT is a multilateral so-called investment protection treaty entered into by states. Article 26 ECT contains provisions for the resolution of disputes between a contracting state and an investor from another contracting state. The relevant parts of this article read as follows:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an

obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
(b) in accordance with any applicable, previously agreed dispute settlement procedure; or
(c) in accordance with the following paragraphs of this Article.

(3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to: […]
(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

Article 26 ECT contains an offer from each and every one of the contracting states to investors from another contracting state to resolve certain disputes under the ECT through, among other things, arbitration. In an individual case an arbitration agreement arises between a state and an investor, which gives an arbitral tribunal jurisdiction to examine a dispute between the parties through the investor accepting the state's offer, which it does in the form of a request for arbitration against the state.

The parties disagree about the interpretation of the ECT as to whether the offer of arbitration from a state under article 26 ECT contains a condition whereby the requirements that are stated in paragraph (2) – namely that it has not been possible to resolve the dispute between the parties within three months of when one of them requests an amicable settlement – must have been met at the time an investor requests arbitration against the state in order for an arbitration agreement between the parties to arise as a result of the request. The question is thus whether the provision lays down a condition that must be met in order for an arbitral tribunal to have jurisdiction to examine the dispute.

Since the ECT is a treaty between states, the interpretation of article 26 ECT shall be in accordance with articles 31 and 32 of the Vienna Convention on Treaty Law. Article 31 contains a general rule of interpretation which states that a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty viewed in their context and in the light of the object and purpose of the treaty. The starting point of the interpretation is invariably the wording of the treaty. If the wording is clear, it also basically becomes the endpoint of the interpretation. The object and purpose of a treaty are not an independent means of interpretation, but part of the

interpretation to be carried out under article 31 in order to understand the ordinary meaning of the treaty (cf. the decision of the Court of Appeal on 18 January 2016 in case no. T 9128-14, together with the references there).

According to article 32 of the Vienna Convention, recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order confirm the meaning resulting from the application of article 31, or to establish the meaning when an interpretation under article 31 leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable.

In accordance with what has been stated, the interpretation of article 26 ECT shall be made with the wording of the provision as the starting point.

Article 26 (1) ECT states initially that disputes between a contracting state and an investor should, if possible, be resolved by mutual agreement. According to paragraph (2), if a dispute cannot be resolved in this way within three months of the date on which one of the parties requests an amicable settlement, an investor may choose to refer the dispute to various forms of dispute resolution, including arbitration according to the following paragraphs in the article.

The wording of the provisions concerned does not provide an answer to what may be incumbent on the parties during the three-month deadline, e.g. on the question of the attempts to be made in order to reach a mutually agreed resolution. Nor is it clear what applies if it is already clear before the expiry of the deadline that no mutual agreement can be reached within three months. In the Court's opinion, the circumstances mentioned do not support the view that the provisions are intended to lay down conditions for the jurisdiction of an arbitral tribunal. This interpretation receives further support when account is taken of the drafting of article 27 ECT, which is about dispute resolution between two contracting states. According to this provision, a state may refer a dispute to so-called ad hoc arbitration if its resolution has not proved possible within a reasonable time through diplomatic channels. The difficulties of deciding what constitutes *a reasonable time* support the view that it is not a question of a condition for the jurisdiction of an arbitral tribunal. The fact that the provisions in articles 26 and 27 ECT have a similar construction points towards, in the Court's view, that they should be interpreted in the same way.

While it is clear that the purpose of the provisions in article 26 (1) and (2) ECT is to allow the parties some time to reach a consensus before arbitration starts, the Court notes that the provisions do not explicitly deal with the conditions for consent on the part of a state to arbitration and the conditions for an arbitration agreement arising between the parties. This question is touched upon, on the other hand, in paragraph (3)(a), which states that each contracting state gives its unconditional consent to the referral of a dispute to international arbitration or conciliation in accordance with the provisions of the article. A reservation is made only for the exceptions stated in paragraphs 3(b) and (c), which are not relevant to the case at hand. The Court notes that paragraph (3) contains no mention of paragraph (2) and the conditions stated therein. In the Court's view, the reference to the state giving its consent to arbitration "in accordance with the provisions of this article" cannot be interpreted as saying that additional conditions are thereby laid down for the state's consent.

In summary, the Court is of the opinion that the wording and the formulation of article 26 ECT support the conclusion that the consent of a state to arbitration does not include a condition that the prerequisites mentioned in paragraph (2) must have been met at the time that an investor requests arbitration against the state in order for an arbitration agreement between the parties to arise as a result of the request. The wording of the article alone, however, cannot be considered to give an unambiguous reply to this question.

The Court observes that in the legal literature and among international arbitral tribunals that have had to decide in this matter it is a disputed question whether provisions of this kind – which prescribe that arbitration must be initiated after a certain time has passed from when a party requested an amicable settlement or from when the events that gave rise to the dispute took place – lay down conditions that must be met in order for a tribunal to have or not have jurisdiction to examine a dispute. In the literature there is support for both views (see Gary B. Born's expert opinion of 19 August 2015, p. 5 f. and 10 and Dr Thomas D. Grant's expert opinion of 14 July 2015, pp. 19 and 39 f., together with the references there).

Based on what has been stated in these expert opinions, the Court further notes that there appears to be no uniform practice among international arbitral tribunals regarding the interpretation of article 26 ECT and similar provisions in other investment

protection treaties (see the expert opinions of Gary B. Born of 19 August 2015, pp. 13–20 and Dr Thomas D. Grant of 14 July 2015, pp. 23–38, together with the references there). However, the Court notes that no example has been identified in the opinions where an arbitral tribunal applying the ECT has rejected a claim on the ground that the investor has not taken account of what is stated in article 26 (2) ECT. Furthermore, only a few decisions regarding the application of other investment protection treaties in which the claim of an investor has been rejected on the ground in question have been identified. In other words, even if it is not possible to find a unanimous view about how article 26 ECT should be interpreted in the current respect, there appears, in the Court's opinion, to be some preponderance for the view that such provisions should not be considered to constitute conditions for the arbitral tribunal's jurisdiction.

Since therefore neither the wording in and the formulation of article 26 ECT or legal literature and international practice provide the necessary support for the interpretation, the Court needs also to take account of the object and purpose of the provision.

The provisions governing international dispute resolution in the ECT have arisen against the background of the disquiet that existed in regard to the neutrality, competence and effectiveness of the national courts in some of the contracting states (Energy Charter

Secretariat, The Energy Charter Treaty: A Reader's Guide, 2002, p. 51). One of the purposes of providing in the ECT alternative methods of dispute resolution before international arbitral tribunals was to contribute to greater confidence on the part of investors and to encourage the flow of investments between the contracting states (ibid., p. 51). The main purpose of the dispute resolution provision in article 26 ECT should therefore be considered, according to the Court, to be to give investors an opportunity to resolve disputes under the ECT with a contracting state through international arbitration.

The resolution of disputes through arbitration is aimed at giving the parties a swift and definitive decision regarding their dispute. These interests have been advanced in the literature and by international arbitral tribunals as an argument against interpretation of the provisions as meaning that the parties must have attempted to resolve a dispute by consensus before arbitration can be requested as conditions that must be met if the tribunal is to have jurisdiction to examine the dispute (see the expert opinion of Gary B. Born of 19 August 2015, p. 5 f., together with the references there). In this connection it has been pointed out, among other things, that the prescribed deadline has often passed

when the arbitral tribunal examines the question of its jurisdiction. If the tribunal in such a situation were to reject the investor's claim because the arbitration had been initiated before the deadline had passed, the investor could immediately raise the claim anew. A rejection would in this case only result in the arbitration being unnecessarily delayed.

It may also be noted that it would amount to an unjustified delay in an investor's opportunity to have a claim against a state under the ECT examined by international arbitration to require the investor to postpone raising the claim for three months from when a request for an amicable settlement was made, when it is already clear before the deadline has passed that there are no prospects of obtaining a settlement.

Moreover, the arbitral tribunal's examination of its jurisdiction could be so extensive that the proceedings are delayed in a manner that is not desirable. One example that may be mentioned is that the tribunal would need to examine what requirements should be placed on the request by a party for an amicable settlement and whether the party that has requested arbitration is required first to have made an attempt in good faith to reach a resolution through mutual agreement. As mentioned earlier, article 26 (1) and (2) ECT gives no answer to these questions. The question of the arbitral tribunal's jurisdiction may also be referred to a court for examination (cf. s.2 SAA), which may further delay the procedure.

The interest also that the parties have in an award entailing a final decision of their dispute is evidence against regarding provisions that arbitration should be preceded by settlement negotiations for a certain period as a condition of the tribunal's jurisdiction. Otherwise an award could be challenged on the ground in question and later set aside should the court which hears the set aside action come to another decision on the question of jurisdiction than the one made by the tribunal. Furthermore, for the same reason the enforcement of the award may be withheld for a long time after the arbitral proceedings were concluded.

In this connection the Court further notes that the aims of the provisions in article 26 (1) and (2) ECT in any event may partly be met even after arbitration has commenced. These aims should be considered mainly not only to encourage the parties to try and reach consensus with a view to avoiding unnecessary disputes, but also to give the parties time to prepare for a possible dispute. This can be achieved by the arbitral

tribunal declaring a stay the proceedings for a certain period to give the parties an opportunity to conduct settlement negotiations as well as time in which to prepare. Such action appears to be common among international arbitral tribunals and did also take place in the proceedings between the Investors and Kazakhstan. The provisions thus do not become ineffectual even though they are not considered to lay down conditions for the jurisdiction of the tribunal, but may be dealt with by the tribunal within the scope of the procedure.

In the light of what has been stated, the Court finds that there are weighty reasons in favour of an interpretation of article 26 ECT whereby the conditions stated in paragraph (2) do not constitute conditions that must be met at the time when an investor requests arbitration in order for an arbitration agreement giving the tribunal jurisdiction to examine the dispute to arise through the request. The contracting states have, according to paragraph (3), given their unconditional consent to the resolution of certain disputes under the ECT through arbitration. Additional conditions for an arbitration agreement to arise when an investor accepts the offer by requesting arbitration against the state should not, in the Court's view, be laid down without explicit support in the wording of the provisions. Such support is lacking in the present case.

In summary, the interpretation of article 26 ECT made by the Court means that an arbitration agreement between the Investors and Kazakhstan that gave the tribunal jurisdiction to examine the dispute between the parties arose as a result of the Investors' request for arbitration against Kazakhstan, which was submitted to the SCC on 26 July 2010, regardless of whether or not the conditions stated in paragraph (2) had been met at the time of the request. The award should therefore not be set aside on the grounds that it is not covered by a valid arbitration agreement between the parties.

### 5.3.3 Annulment or setting aside of the award on the grounds of the appointment of the arbitrators

Kazakhstan has argued here both that the award is invalid according to s.33 (1) (2) SAA and that grounds exist for setting aside the award according to s.34 (1) (4 or 6) SAA. Kazakhstan has also invoked the detailed circumstances describe in section 3.1.2.3. In summary, Kazakhstan has mainly argued that it was never given an opportunity to appoint an arbitrator, that the deadlines for submitting a reply were too short and that it was at no time able to comment on the appointment of Sergei Lebedev. According to

Kazakhstan, the SCC in this way breached not only the basic principles of the Swedish legal system, but also its own rules and the Arbitration Act. Kazakhstan has also claimed here that at any rate procedural errors occurred which influenced the outcome of the case, highlighting in this connection the fact that the arbitrator Sergei Lebedev acted passively during the arbitration.

The Investors have objected that there is no ground for either the annulment or setting aside of the award. They have added that Kazakhstan forfeited its right to claim the potential error and that in October 2012, according to what was noted in the award, Kazakhstan stated that there were no objections to the procedure.

The Court will first describe what emerged about what the situation was at the SCC in connection with the appointment of the arbitral tribunal when Sergei Lebedev was nominated.

On 5 August 2010 the SCC sent the Investors' request for arbitration, including appendices, to Kazakhstan, instructing it in English to submit a reply by 26 August 2010 and referring it to Article 5 of the SCC Arbitration Rules, which were also enclosed. It was also pointed out, in particular, that Kazakhstan should comment on the Investors' proposal that the arbitrators appointed by the parties should appoint the chairman. In their request for arbitration the Investors had asked that the tribunal should consist of three arbitrators and that the SCC, according to Article 13 (3) of the SCC Rules, should appoint an arbitrator if Kazakhstan did not appoint anyone. Enclosed with the instruction were also the names of the officials dealing with the matter at the SCC's office, together with their contact details. The documents were sent by courier and reached Kazakhstan on 9 August and were received at the Department of Justice two days later. Fifteen days later the deadline ran out, with no word from Kazakhstan. On 27 August a reminder, also in English, was sent, asking Kazakhstan to submit a statement of defence according to Article 5 of the SCC Rules. Reference was also made to the instruction dated 5 August. In addition, Kazakhstan was informed that the absence of a reply would not prevent the arbitration from proceeding. A new deadline for a statement of defence was given, namely 10 September.

The Department of Justice in Kazakhstan received the reminder on 1 September, but no reply came from Kazakhstan before the deadline passed. On 13 September the Investors asked the SCC to appoint an arbitrator on Kazakhstan's behalf, and notice of this

request was sent to Kazakhstan on the same day. Ten days later the SCC appointed Sergei Lebedev arbitrator on Kazakhstan's behalf, also deciding that the seat of the arbitration should be Stockholm. Kazakhstan received this decision on 27 September. On the following day the SCC appointed Karl-Heinz Böckstiegel chairman of the tribunal and Kazakhstan learned of this decision on 1 October. Just over a month later, on 8 November, Kazakhstan gave notice of its counsel in the arbitration, in which connection a reservation was made for possible objections regarding jurisdiction and the procedure. In a letter to the SCC on 2 December, objections were made against both the procedure and the appointment of Sergei Lebedev as arbitrator. On 15 December the SCC informed the parties and the arbitrators that the objection to Sergei Lebedev had been rejected. On 27 December the SCC was informed by Kazakhstan that it stood by its objections to the procedure and the appointment of Sergei Lebedev.

The Court of Appeal makes the following assessment:

Thus it appears from the investigation that Kazakhstan had an opportunity to submit a reply to the Investors' request for arbitration and that it was then possible for Kazakhstan to appoint an arbitrator. However, in neither the instruction nor the reminder was it explicitly stated that an arbitrator should be appointed by Kazakhstan. The question is whether Kazakhstan was in this way deprived of its right to appoint an arbitrator. Kazakhstan has referred to the fact that in previous cases subject to the SCC Rules, in which Kazakhstan was a party, explicit instructions had been given to appoint an arbitrator and information had been given about the consequences if this was not done. In the Court's view, it is relevant to its assessment that in the instruction in question reference was made to Article 5 of the SCC Rules, which were also enclosed. According to Article 5, the Respondent in its statement should, where applicable, state the name and address of the arbitrator appointed by it. In the request for arbitration the Investors had asked that the tribunal should consist of three members, and it follows from Article 12 of the SCC Rules that the tribunal should consist of three members unless the parties have agreed otherwise and the SCC decides that the dispute should be decided by a single arbitrator. In the present case the SCC had not made any such decision. Through the instruction and the additional documents that were enclosed, Kazakhstan was given sufficiently clear information, in the Court's view, that the arbitral tribunal would consist of three members and that Kazakhstan had an opportunity to appoint one of them.

Kazakhstan has also objected that the deadline for replying to the SCC was too short and that it had some difficulty understanding the documents from the SCC because they were written in English. As far as the length of the deadline is concerned, the Court notes that it cannot be considered to be unacceptably short, even from an international perspective. Of particular significance for the assessment of both the language and time issues is also the fact that Kazakhstan at no time contacted the SCC to request extension of time. In the first instruction the officials dealing with the matter were named, with their email addresses and international direct phone numbers. It also appears from the SCC Rules that it is possible for a party to obtain an extension to a deadline. In this connection account should also be taken of the fact that Kazakhstan had previously been a party in proceedings conducted by the SCC in English.

As for the question that Kazakhstan never had an opportunity to comment on the SCC's proposal that Sergei Lebedev should be appointed arbitrator on Kazakhstan's behalf, it may be observed to start with that the SCC Rules contain no provision allowing such a comment. The fact that the SCC did not afford Kazakhstan an opportunity to comment on the proposed arbitrator in a situation where Kazakhstan had not replied to it at all, cannot in any way, in the Court's view, be judged to be contrary to the basic principles of the Swedish legal system.

In summary, the Court finds that the procedure followed by the SCC regarding the appointment of the arbitrator Sergei Lebedev has not been clearly incompatible with the basic principles of the Swedish legal system. The award is not invalid on this ground either.

Kazakhstan has also requested that the award should be set aside on the ground that the appointment of the arbitrators took place contrary to the arbitration agreement, i.e. it was contrary to the SCC Rules and the Arbitration Act, or that some other error occurred in connection with the appointment of the arbitrators that influenced the outcome. Kazakhstan has referred here to the legal grounds of challenge in s.34 (1) (4 or 6) SAA. Also of significance in this connection is the provision in the second paragraph that a party may lose its right to invoke a circumstance by taking part in the procedure without objection or by otherwise being considered to have refrained from making the objection. The rule in this paragraph is based on the general principle that a party cannot claim a procedural error that it has previously refrained from pointing out. A dissatisfied party must therefore actively protest in order not to subsequently lose the right to make

SVEA COURT OF APPEAL            **JUDGMENT**                                      52
Department 02                                                  T 2675-14

the objection (see, among others, Heuman, ibid., p. 286). The Investors have claimed
that Kazakhstan has lost its right to challenge the award according to the second
paragraph of the provision. The Court will start its examination here by assessing this
question.

Firstly, it may be noted that just under three months went by after Kazakhstan learned of
the SCC's first instruction until it made its first statement. In the meantime Kazakhstan
had also received the SCC's procedural decision regarding the appointment of Sergei
Lebedev. A relatively long time thus went by before Kazakhstan first commented, when
it also made objections to the procedure, among other things. No specific deadline for
the making of an objection follows from the Arbitration Act. In an earlier decision (see
Court of Appeal Case RH 2009:55 with further references to, inter alia, the legislative
history and the literature) the Court stated that objections to jurisdiction in arbitration
should be made no later than in the statement of defence. In the doctrine, it has been
stated with reference to the model law that the objection should be made without
unreasonable delay (see Heuman, ibid., p. 292 f.). Since Kazakhstan made a reservation
for possible objections when its counsel introduced itself in the proceedings and as the
objection was made when it made its first statement to the SCC and was maintained
after the SCC had rejected its request for another arbitrator instead of Sergei Lebedev,
Kazakhstan cannot, in the Court's view be considered to have lost its right to complain
now about possible procedural errors. In the Court's opinion, the note made in ¶ 117 of
the award – referring to Kazakhstan's explanation that the statement related only to the
procedure before the arbitral tribunal – does not show that Kazakhstan thereby waived
or withdrew the objection to the appointment of the arbitrators.

The Court therefore goes on to examine the question of whether an error of the kind
referred to in s.34 (1) (4) SAA had been made in connection with the appointment of
Sergei Lebedev. This provision focuses primarily on the appointment of an arbitrator
contrary to agreed qualifications, although departures from procedural rules in an
arbitration agreement may be covered. Also of importance is the principle of equal
treatment expressed in s.21 SAA. This principle applies not only to arbitrators, but also
to the procedure when they are appointed.

In the present case it may be noted that by way of the arbitration agreement it was
decided that the SCC Rules should apply to the procedure, which included the
appointment of the arbitrators. Provisions governing how the arbitration is initiated,

including the drafting of an answer to the request for arbitration, are found in Articles 2–11 of the SCC Rules. Provisions governing, among other things, the composition of the arbitral tribunal and its appointment are found in Articles 12–17 of the SCC Rules. Of special interest here is Article 13 (3), which regulates the case where the tribunal is to consist of several members. The provision states that "where a party fails to appoint arbitrator(s) within the stipulated time period, the board shall make the appointment." However, no mention is made of what the deadline should be. Article 13 also contains provisions governing what should be taken into account when the SCC appoints an arbitrator, such as language and nationality. As has been described above, on the other hand, there is no mention that the party should also be given an opportunity to comment on who should be appointed when the SCC appoints an arbitrator on its behalf. What has emerged from the investigation in the case about the SCC's administration does not show, in the opinion of the Court, that in relation to the SCC Rules or the Arbitration Act any error of procedure was made when the arbitration was initiated and when Sergei Lebedev was appointed. Accordingly, neither can the principle that parties should receive equal treatment be considered to have been violated, especially in view of the fact that Kazakhstan received all the relevant documents and was given adequate time in which to comment. No ground for setting aside the award with reference to s.34 (1) (4) SAA exists in the present respect.

Kazakhstan has also claimed that a procedural error occurred in connection with the appointment of the arbitrators which influenced the outcome of the case and that the award should in any case be set aside pursuant to s.34 (1) (6) SAA. What other circumstances in the procedure have to do with the appointment of the arbitrators, apart from those which have been referred to and which the Court has had to examine in relation to the provision in s.34 (1) (4) SAA, is not entirely clear to the Court. In connection, however, with the criticism of the procedure made by Kazakhstan concerning the appointment of the arbitrators, Kazakhstan has claimed that Sergei Lebedev adopted a very passive role during the arbitration and that he was therefore unable to ensure that Kazakhstan's action was correctly understood. According to the Court, however, the investigation provides no support for Kazakhstan's assertion here. The Court is thus able to conclude that Kazakhstan likewise has not been able to show that a procedural error was made by the arbitral tribunal based on the appointment of Sergei Lebedev as an arbitrator.

In summary, the Court has therefore come to the conclusion that Kazakhstan has been unable to show that in connection with the appointment of the arbitrators any of the circumstances existed that can constitute a ground for annulment of the award pursuant to s.33 (1) (2) SAA or a ground for setting aside the award pursuant to s.34 (1) (4 or 6) SAA.

### 5.3.4 Setting aside the award on the ground of an excess of mandate or alternatively a procedural error

#### 5.3.4.1 Taras Khalelov's witness statement and testimony

Kazakhstan has relied here upon the detailed circumstances described in section 3.1.2.4 under the heading "Taras Khalelov's witness statement and testimony". Kazakhstan's assertions relate to that part of the arbitration and the award in which the tribunal determined the amount of the damages (see ¶¶ 1743–1748 of the award).

As the Court has noted above, the tribunal's assessment of the damages was based on the indicative bid from the state-owned Kazakh company KMG. However, there was also other evidence, including oral testimony. One statement was made at the request of Kazakhstan by director Taras Khalelov on 29 January 2013. Taras Khalelov had also submitted a written witness statement to the tribunal. Kazakhstan has claimed here that the tribunal failed to take account of Khalelov's oral testimony, which, according to Kazakhstan, amounted to a procedural error that influenced the outcome of the case. According to Kazakhstan, the tribunal also took account of evidence in the form of Internet links that had not been invoked in the case, which, according to Kazakhstan, constituted an excess of mandate. The documents to which the links referred were in Russian.

The Court of Appeal makes the following assessment:

Firstly, as far as Taras Khalelov's oral testimony is concerned, it is clear from the arbitral tribunal's record of the meeting on 29 January 2013 about the amount of damages that Khalelov was questioned on the day in question and that he was also given an opportunity to comment on his written statement. According to the details that Taras Khalelov gave, Kazakhstan had no plans to complete the LPG Plant; nor had any such work been carried out. The information supplied by Khalelov was discussed, in the Court's view, by the tribunal in ¶ 1745 of the award, where reference is made to

"Respondent's and their experts' conclusion", which reportedly did not persuade the tribunal. It is true that the tribunal made no note in ¶ 157 of the award that Khalelov's testimony was held on that day. However, this does not amount to a procedural error in the meaning of s.34 (1) (6) SAA; nor can the oversight lead to the conclusion that it has been shown that the tribunal neglected to take account of Khalelov's evidence in its assessment. There is also no support in the investigation for the view that the Investors had withdrawn their assertion that Kazakhstan had plans to complete the LPG Plant.

Regarding the Internet links, it is also clear from ¶ 1745 of the award that the tribunal paid attention to the documents that could have been studied via the links in question. The links were, however, mentioned and described in the FTI Report, which was referred to by the Investors during the proceedings. According to the Investors, printouts of the documents were enclosed with the FTI Report. Explicit reference is also made in ¶ 1745 to where in the FTI Report the internet links were given. Justification is thus lacking for the assertion that the tribunal took account of evidence that had not been referred to.

The internet links in question, however, were written in Russian in the FTI Report and the documents that they referred to were also in Russian. Kazakhstan has claimed that it was a procedural error in the arbitration to refer to documents that had not been translated into English, which was required by Procedural Order No. 1. In view of what the Court has referred to in the legal starting points for its examination, there cannot normally be a question of an excess of mandate when the arbitral tribunal disregards what has been laid down in a Procedural Order. The question is therefore whether a procedural error was made. The Court notes that it follows from ¶ 1745 of the award that the tribunal also based its decision on what is stated in paragraph 7.7 of the FTI Report, which was written in English. Kazakhstan has therefore at any rate not been able to establish the probability that any procedural errors that may have been entailed by the tribunal's reference to the Russian Internet links have influenced the outcome of the case.

In summary, the Court has therefore found that Kazakhstan has been unable here to show that there was an excess of mandate or a procedural error that can amount to a ground for setting aside the award.

*5.3.4.2 Kazakhstan's expert and testimonial evidence*

Kazakhstan has here relied on the detailed circumstances described in section 3.1.2.4 under the heading "Kazakhstan's expert and testimonial evidence". Kazakhstan has claimed that the tribunal neglected to take account of large parts of the expert and testimonial evidence that Kazakhstan had relied upon in a number of questions. Kazakhstan has also claimed that in certain parts of the award it is not clear how the tribunal arrived at its decisions or that the tribunal's assessments are very brief.

The Court of Appeal makes the following assessment:

In regard first to the question of whether the tribunal took account of the reports of Anatoly Didenko, Kadirbek Latifov and Salamat Baymaganbetov concerning the content of Kazakh law on the classification of pipelines, the parties are in agreement that the reports were invoked in the arbitration. The fact that the tribunal in its reasons did not describe every one of the items of testimony that were relied upon or omitted to mention a particular piece of evidence does not show in itself that the tribunal did not take note of and in its examination did not consider the evidence relied upon. Still less can the conclusion be drawn from the fact that the tribunal came to a different decision from what one party considers to be clear from a particular piece of evidence that the tribunal in its examination did not consider this evidence. In the Court's view, the investigation does not support Kazakhstan's assertion that the tribunal neglected to consider the evidence just mentioned in its examination. Nor has it been shown that the tribunal applied anything other than Kazakh law in this issue.

Regarding the opinion of Kulyash Ilyassova about the content of Kazakh civil law, the parties are in agreement that it was invoked by Kazakhstan. This opinion is considered in ¶¶ 993 and 1368 of the award. The circumstances that Kazakhstan brought up as a ground for its claim here do not provide sufficient support for the view that it has been shown that there was an excess of mandate or a procedural error that was a ground for challenge.

Regarding the opinions of Tomas Balco and Nurlan Rahimgaliev about the content of Kazakh tax law, it appears from both the award and the invoked record of the tribunal's meeting about the amount of damages that the tribunal did take note of these opinions. As the Court has stated above, the fact that the tribunal did not mention a particular

investigation in its reasons may, in fact, just as well reflect the tribunal's active choice of how the tribunal considered that its reasons should be described in the relevant matter. In other words, the mere fact that a particular investigation is not mentioned in the reasons for the judgment does not show that the tribunal did not take note of it in its examination. Nor has Kazakhstan shown here that an excess of mandate or a procedural error occurred.

Kazakhstan has also claimed that the tribunal did not take account of an opinion from the auditing firm Deloitte. It follows from ¶ 1456 of the award, however, that the tribunal did take account of the opinion, although it did not share the conclusion that was drawn about the financial status of KPM and TNG. Here, too, it has not been shown that an excess of mandate or a procedural error took place that is a ground for challenge.

Finally, Kazakhstan has alleged that the tribunal without explanation disregarded the geological experts from the consulting firm Gaffney, Cline & Associates that Kazakhstan had relied upon. Kazakhstan has also claimed that the tribunal discussed the investigation referred to in reasons that were too sketchy. The record from the tribunal's meeting about the amount of the damages shows that the experts from Gaffney, Cline & Associates were heard in the arbitration. In ¶ 1624 of the award the tribunal set out the starting points for its assessment of the different expert reports. In the next paragraph the tribunal considered the expert reports, after which it formed its final viewpoint. The tribunal's formulation of its reasoning in the parts just raised are far from being so inadequate as to amount to a procedural error (see NJA 2009 p. 128). Nor has it been shown that an excess of mandate occurred (see the legal case mentioned).

In summary, the Court has also found here that Kazakhstan has been unable to show that an excess of mandate or a procedural error occurred which can constitute a ground for setting aside the award.

### 5.3.4.3 Consideration of objections to deductions from the damages etc.

Kazakhstan has here referred to the detailed circumstances set out in section 3.1.2.4 under the heading "Unconsidered objections to deduction from the damages". Kazakhstan has claimed that the tribunal did not take account of certain objections that it had made about deductions to be made from the amount of damages and about the

size of the damages. Kazakhstan has also claimed that the reasoning here is so insufficient that it is tantamount to an absence of reasoning.

The Court of Appeal makes the following assessment:

Firstly, regarding the question of deductions from revenues that the Investors would have had after the date of valuation decided by the tribunal, it appears that the tribunal formed a view on this question in ¶¶ 1530 and 1531 of the award. It is also appears that the tribunal described in ¶ 1542 what deductions it considered should be made from the damages and in ¶ 1539 the positions it took regarding Vitol and the JOA agreement. In the Court's opinion, these positions cannot be understood in any way other than that they are also relevant for the objection on the part of Kazakhstan that is described in ¶¶ 1738–1749 of the award. Kazakhstan thus has no justification for its assertions that the tribunal did not consider the objections in question that it made.

Having regard to the starting points stated by the Supreme Court in NJA 2009 s. 128, neither are the grounds for the award, in the Court's view, so inadequate that their formulation could amount to a procedural error.

Here, too, Kazakhstan has thus not shown that there has been an excess of mandate or a procedural error.

### 5.3.4.4 Other alleged excesses of mandate and procedural errors

Kazakhstan has also claimed that the tribunal in several additional points exceeded its mandate and committed procedural errors by neglecting to take account of the parties' arguments and the applicable law. Here Kazakhstan has relied on the detailed circumstances set out in section 3.1.2.5. Kazakhstan's action here concerns the handling by the tribunal of questions about the role of the company KazAzot, the press release from Interfax, the actions of the financial police in regard to the classification of the pipelines, the so-called Tristan notes and the choice of valuation method for the Tolkyn and Borankol fields.

KazAzot

Kazakhstan has claimed that the decision of the tribunal in ¶¶ 1094 and 1418 of the award was based on the uninvoked circumstance that KMG and President Nazarbayev's son-in-law, Timur Kulibayev, who was also the chairman of KMG, exerted an influence

SVEA COURT OF APPEAL             **JUDGMENT**                              59
Department 02                                              T 2675-14

over KazAzot. Kazakhstan has maintained that this circumstance had indeed been
invoked by the Investors, but only in respect of the question about gas pricing.
Kazakhstan has also claimed that the tribunal in regard to its assessment of the so-called
tripartite agreement neglected to apply certain international legislation in this area.
Kazakhstan has here referred to ¶¶ 1094 and 1418 of the award.

The Court of Appeal makes the following assessment:

The Court concludes that it follows from the investigation in the case, including ¶ 674
of the award, that the relationship between KMG, Timur Kulibayev and KazAzot had
been introduced in the case by the Investors. In ¶ 674 it is stated, among other things,
that "Claimants' first allegation that KazAzot was controlled by Mr. Kulibayev was
made at the Hearing on Jurisdiction and Liability." In the view of the Court, Kazakhstan
has been unable to show that the Investors would have limited their reference to this
circumstance in the manner claimed by Kazakhstan, i.e. only in respect of the pricing of
gas. The fact that the circumstance is not mentioned in the recital under sections J and K
in the award as having been specially referred to there by the Investors does not affect
the assessment in the present case. In the opinion of the Court, there is therefore no
justification for the assertion that the tribunal took account of the circumstance without
it having been invoked by a party. No excess of mandate or procedural error that is a
ground for challenge has therefore been shown here.

Kazakhstan has not gone into more detail of the assertion that the tribunal neglected to
apply certain international legislation about state liability and how this omission has
influenced the outcome of the case. The relevant parts of the award, ¶¶ 1094 and 1418,
deal essentially with the tribunal's evaluation of evidence and what conclusions the
tribunal considered that it was able to draw from what its findings in the case. It has not
been shown in the case that the tribunal's decision entailed any incorrect application of
the law that could amount to an excess of mandate or a procedural error that is a ground
for challenge.

The press release from Interfax
On this question, too, Kazakhstan has stated that the tribunal based its decision on a
circumstance that had not been invoked. According to Kazakhstan, the tribunal must
also have assumed that the circumstance was not in dispute. Kazakhstan has referred
here to ¶ 994 of the award.

The Court of Appeal makes the following assessment:

According to the notes made by the tribunal in the relevant section of the award, the parties were at odds about how Interfax had obtained access to the information and whether Kazakhstan had had anything to do with this. Regarding this disputed question, the tribunal then made a overall assessment of what caused the information to be published. The tribunal stated in its reasons that "Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication." The tribunal thus made a customary assessment of the evidence for the relevant circumstance within the scope of the Investors' overall assertion that KPM and TNG were subjected to a campaign of harassment by Kazakhstan. Nor is it possible, according to the Court, to draw any conclusion from the reasoning here other than that the tribunal, apart from establishing that Kazakhstan had not made any objection, made its own examination of the circumstance. Here, too, Kazakhstan has thus been unable to show that the tribunal exceeded its mandate or that there otherwise occurred a procedural error that is a ground for challenge.

The classification by the financial police of pipelines
On this question, too, Kazakhstan has stated that the tribunal based its decision on a circumstance that had not been invoked. According to Kazakhstan, the tribunal also incorrectly assumed in regard to this issue that the circumstance had been admitted by Kazakhstan. Kazakhstan has here referred to ¶ 990 of the award.

The Court of Appeal makes the following assessment:

The following has emerged from the investigation in the case. The Investors' submission to the tribunal on 7 May 2012 shows that they referred to the fact that the financial police had written to the Kazakh Deputy Prime Minister on the subject of how the pipelines should be classified. Kazakhstan confirmed this letter and its contents in its submission to the tribunal on 13 August 2012, but disputed the interpretation of the letter. The tribunal gave a brief description of this letter in ¶ 343 of the award, where it referred to the parties' submissions.

In the Court's view, it is thus entirely clear that the Investors had invoked the circumstance in question. The tribunal's decision in this matter is described in ¶ 990 of the award. Its reasoning clearly shows that it did not make an admission on the part of Kazakhstan a ground for its assessment of the facts. On the contrary, it is clear that the tribunal concurred with the assessment previously voiced by Kazakhstan in the arbitration in this matter. The tribunal's assessment of the investigation here does not constitute a procedural error that is a ground for challenge. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

<u>The Tristan notes</u>
Kazakhstan's ground for challenge here concerns the tribunal's handling and assessment of the question of a deduction for a bond loan to Tristan Oil in connection with the valuation of the companies KPM and TNG. Kazakhstan has claimed here that the tribunal based its decision on an alleged admission from Kazakhstan, despite the absence of such an admission. Kazakhstan has also claimed that the tribunal did not consider the parties' legal arguments. Kazakhstan has referred here to ¶¶ 1536–1537 and 1768–1771 of the award.

The Court of Appeal makes the following assessment:

In the identically worded ¶¶ 1536 and 1769 of the award, the tribunal observed that Kazakhstan had possibly retracted its previous stance in this matter. However, in its assessment the tribunal aligned itself to the stance previously taken by Kazakhstan during the arbitration. In the following ¶¶ 1537 and 1770, also identical in their wording, the tribunal set out its assessment in more detail. In other words, the tribunal did not make an admission a ground for its decision in this matter, but made an assessment of the investigation and took account of the various viewpoints adopted by Kazakhstan in the matter. The tribunal's assessment of whether a deduction should be made for the bonds amounts to neither an excess of mandate nor a procedural error that is a ground for challenge. The same applies to the assertion that the tribunal did not consider the parties' legal arguments in this matter. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

<u>Valuation method</u>
Kazakhstan's claim here concerns the tribunal's decision regarding the choice of the method of calculating damages for the Borankol and Tolkyn fields. Kazakhstan has

claimed that the tribunal incorrectly based its decision on a particular admission by Kazakhstan. Here Kazakhstan has referred to ¶ 1625 of the award.

The Court of Appeal makes the following assessment.

The relevant paragraph of the award shows that the tribunal initially decided that the calculations presented by the Investors were less convincing and that they had therefore not met their burden of proof. However, it considered, according to what is stated in the paragraph in question, that since the Investors had suffered damage, the calculation of the damages could be made on the basis of the alternative method of calculating damage that Kazakhstan had presented in the case. The tribunal also referred to the submission in which Kazakhstan had mentioned the method, referring to various consultants' reports. In other words, the tribunal in the matter of the amount of damages made an assessment of the parties' actions and evidence invoked and took a final view about which calculation method should be used to determine the amount of damages. Such an assessment amounts to neither an excess of mandate nor a procedural error that is a ground for challenge. Here, too, Kazakhstan has thus not shown that there was an excess of mandate or procedural error.

### 5.3.5 The Court's summary conclusions and overall assessment of Kazakhstan's action

The Court's assessment above of the grounds that Kazakhstan has relied on to support its claim amounts to the following.

The Court has not found in any respect that there were circumstances that could constitute grounds for annulment of the award according to the provision in s.33 (1) (2) SAA. This applies both to Kazakhstan's assertions of the so-called fraudulent arrangement, false evidence and misleading information during the arbitration as well as to its assertions of shortcomings in the SCC's actions in connection with the appointment of the arbitrators (see 5.3.1 and 5.3.3 of the judgment.)

Further, the Court, following an interpretation of the provisions concerning cooling off period in article 26 ECT, has found that a valid arbitration agreement arose between the parties as a result of the Investors' request for arbitration, regardless of whether or not

what was laid down regarding cooling off period in this article had been followed or not
(see 5.3.2 of the judgment.)

The Court has also found that there were no shortcomings or procedural errors in
connection with the appointment of the arbitrators (see 5.3.3 of the judgment).

Finally, the Court has found that Kazakhstan has been unable to show that otherwise
alleged excesses of mandate or procedural errors occurred (see 5.3.4 of the judgment).
Accordingly, an overall assessment of the tribunal's actions, in the manner claimed by
Kazakhstan, also cannot lead to the conclusion that there has been an excess of mandate
and a procedural error.

Kazakhstan's action is therefore dismissed.

## 5.4 Litigation costs

### 5.4.1 The party liable for damages

The Court's assessment of Kazakhstan's claim means that Kazakhstan, as the losing
party, must compensate the Investors for their litigation cost (see ch.18 s.1 of the Code
of Judicial Procedure).

### 5.4.2 The Investors' claim for costs

The Investors have claimed damages in the amounts of SEK 16 957 429 and
USD 1 509 602.59. Of the claim in Swedish kronor, SEK 15 879 409 is for fees to
counsel, SEK 578 020 for expenses and SEK 500 000 for the party's own work. Of the
claim in dollars, USD 1 106 317.25 relates to compensation for the assistance of
lawyers from the law firm King & Spalding and USD 403 285 for expenses incurred by
King & Spalding for assistance to the counsel in the case here.

Kazakhstan has left it to the Court of Appeal to examine the reasonableness of the
amount claimed and has raised objections regarding the compensation for the party's
own work, remuneration for assistance from lawyers from King & Spalding and King &
Spalding's expenses.

### 5.4.3 Compensation for the party's own work

Firstly, regarding the compensation claimed for the party's own work, the Investors have stated that this relates to a total of 1 000 hours of work carried out by employees at the legal and finance departments at Ascom. According to the Investors, the work has comprised, among other things, the production of evidence. Kazakhstan has objected that, in the light of the contents and the drafting of the Investors' submissions and their litigation in general, it is improbable that so many hours of work have been involved, particularly as Kazakhstan's questions and requests for clarification and information have not met with a response from or been granted by the Investors. Kazakhstan has also pointed out that no employees or representatives of Ascom have been present during the court proceedings.

The Court of Appeal makes the following assessment.

The Court notes that the Investors are respondents in the case and that they have therefore had to relate to Kazakhstan's formulation of its claim and its conduct of proceedings and that the work that the Investors, as respondents, have had to put in during the case in order to safeguard their rights need not necessarily be reflected in their submissions and conduct of proceedings. At the same time, Kazakhstan's formulation of its claim is of significance for the assessment. Kazakhstan's claim has, among other things, included assertions about a large number of circumstances relating to complex financial conditions. In the light of this, the Court finds that there are no reasons to question the work allegedly performed by employees at Ascom and that it has also been justified in order to safeguard Ascom's and other respondents' rights. The amount claimed therefore is found reasonable.

### 5.4.4 Compensation for King & Spalding's assistance

The Investors have stated that the lawyers at King & Spalding assisted the Swedish counsel throughout the proceedings in the Court of Appeal and that this has been justified since the lawyers at King & Spalding are familiar with both the present arbitration and the JOA and Montvale cases. Kazakhstan has objected that the amount claimed seems large, mainly in the light of the fact that the lawyer Kenneth Fleuriet stated in his testimony that his own assistance to the Swedish counsel had been modest.

The Court of Appeal makes the following assessment.

The Court notes that the arbitration in question has been extraordinary comprehensive. Furthermore, the extent of Kazakhstan's annulment and challenge action in the Court of Appeal has been extensive and has concerned a large number of circumstances from the arbitration proceedings. Since the Swedish counsel did not act for the Investors in the arbitration, there is no reason, in the Court's view, to question the need for the Swedish counsel to obtain detailed information about what occurred in the arbitration in order to respond to Kazakhstan's claim. In the Court's view, the circumstances mentioned no doubt justify the assistance given by the lawyers at King & Spalding. The Court notes in this connection that the compensation requested here does not relate solely to the assistance given by Kenneth Fleuriet and there is no reason to question that assistance has been given in the degree stated. The amount claimed is found reasonable.

### 5.4.5 Compensation for King & Spalding's expenses

According to the Investors' statement of costs, King & Spalding's expenses (apart from food, accommodation and travel) relate essentially to USD 347 745.28 for the expert Gary B. Born. The Investors have stated that his reports have also been relied upon in foreign enforcement proceedings relating to the award, but that the claim has been limited solely to costs directly attributable to the challenge action. Kazakhstan has objected that the compensation claim appears to be high, given that the work done by Gary B. Born can reasonably only relate to work on one of his two expert reports, preparation for and appearance at the main proceedings, and certain additional contacts.

The Court of Appeal makes the following assessment.

While the amount claimed for Gary B. Born's assistance is very large, the Court notes that Kazakhstan has also had expenses for fees for experts amounting to considerable sums. The Court finds no reason to question the information from the Investors that the amount of compensation relates to costs for the assistance of Gary B. Born in the annulment and challenge action, and here, too, it considers the compensation claimed to be reasonable.

**5.4.6 The Investors' claim for compensation in general**

The amount claimed by the Investors relates generally to compensation for the Swedish counsel, plus expenses. Kazakhstan has not made any detailed objections to these items, but has left the assessment of reasonableness to the Court.

The Court of Appeal makes the following assessment.

Here, too, the amounts claimed by the Investors appear to be very large. In view of the extent of the case and compared with the claim for litigation costs made by Kazakhstan in the Court of Appeal, which comes to almost SEK 60 million, the Court finds that the amount claimed by the Investors is acceptable.

**5.4.7 Summary assessment**

The Court's assessment above means that Kazakhstan is obliged to pay compensation for the Investors' litigation costs in the amount claimed plus interest.

The Investors have not given details of the apportionment of the claimed litigation costs between the Respondents. It is clear from the amounts specified by the Investors for their costs that the compensation relating to the party's own work is attributable entirely to Ascom. The compensation claimed here must therefore be considered to have been made on Ascom's behalf. As for the amount otherwise claimed, in the absence of further details, it is considered to go the Investors, who each receive one quarter.

## 5.5 Appeal

According to section 43(2) SAA, the decision of the Court of Appeal may only be appealed if the court considers it to be of importance as a matter of precedent that the appeal be considered by the Supreme Court. The Court of Appeal does not consider that there is reason to grant leave of appeal.

**The decision of the Court of Appeal can not be appealed.**

/signature/                    /signature/                    /signature/

Taking part in this decision have been Court of Appeal judges Ulrika Beergrehn,

Magnus Ulriksson (rapporteur and dissentiente) and Kerstin Norman.


For the dissenting opinion, see the next page.

SVEA COURT OF APPEAL      **JUDGMENT**                     68

Department 02                                        T 2675-14

**Dissenting opinion**

Magnus Ulriksson is of a different opinion regarding the reasons for that a valid agreement has arisen between the parties, commenting as follows:

The jurisdiction of an arbitral tribunal to decide a dispute normally arises as a result of parties having previously entered into a formal agreement whereby any disputes should be resolved in this way. In the present case no such agreement exists. The arbitration was initiated when the Investors wrote to the Arbitration Institute at the Stockholm Chamber of Commerce (SCC), referring with their express approval to article 26 (4 c) ECT as a ground for the procedure. The question is whether an arbitration agreement between the parties in the case thereby arose.

The ECT is an international treaty between states, its purpose being to promote long-term cooperation in the energy sector (article 2 ECT). For the various kinds of dispute mentioned in the treaty, the states offer a number of ways of resolving issues. With regard to disputes between the parties in the treaty, article 27 states that they should in the first place be resolved through diplomatic channels and, if this does not succeed within a reasonable period of time, the dispute can be referred to an ad hoc tribunal. In the case of disputes between a state and an investor from another state that is a party to the agreement, article 26 mentions various way of resolving the dispute, including arbitration under the SCC Rules. If the investor acts in accordance with what is stated in the article, the agreement that gives the arbitral tribunal that is appointed jurisdiction to decide the dispute will thus arise.

The provisions of the article are laid out in such a way that the first paragraph states that disputes should in the first place be settled amicably. The second paragraph states that if disputes cannot be resolved in this way within three months of when the request for a settlement was made, the investor can choose between the different mechanisms, which besides arbitration offer a hearing in the host country's national courts. Regarding the arbitration option, the contracting parties give their unconditional consent in accordance with what is stated in the article. The investor that opts for arbitration shall in its request also give its unconditional consent. This description of the procedure is also made clear, apart from the text of the agreement, in "A Reader's Guide", which is published by the Energy Charter Secretariat (see also Kaj Hobér in the *Journal of International Dispute Settlement*, vol 1. 2010, pp. 153–190). The Investors, too, appear to have understood the

text to say that settlement negotiations must have taken place when the arbitration is requested. In paragraph 108 of the request for arbitration it is stated that "article 26(2) of the ECT provides for a three-month notice before the commencement of arbitration. This requirement is satisfied." In my opinion, article 26 ECT can only be understood to say that the procedure which is stated there must have been observed in order for a valid arbitration agreement to arise when arbitration is requested as in the present case.

Differences of opinion had arisen between the Investors and the Republic of Kazakhstan, among other things in relation to what was referred to in the case as the LPG Plant. The Investors were ready in this connection to sell their assets in Kazakhstan (see F II in the award). These differences of opinion caused the owners of the plant on different occasions in February and March 2009 to send letters to relevant representatives of Kazakhstan, which included a concrete settlement proposal. A meeting was also held between the parties in March 2009. On 7 May 2009 Anatolie Stati sent a letter addressed to President Nazarbaev, in which he referred to the dispute over his operations in the Republic. In the letter Stati asked the President to personally look into the business and to ensure that the dispute was settled. The letter concluded by saying that unless this happened, there remained no other option but to request arbitration. Apparently Stati received no reply from the President. On the other hand, it is clear from a letter dated 28 September 2009 from MEMR to the Ministry of Industry and Trade that negotiations would be initiated with the owners of TNG and other companies about the acquisition of the company's assets. The letter also makes clear that the Ministry was aware that any dispute would be resolved through international arbitration. The negotiations evidently came to nothing and in July 2010 Kazakhstan terminated the agreement about exploitation rights. A few days after this the Investors requested arbitration from the SCC.

There can be no doubt, in my opinion, that the Investors acted entirely in accordance with the procedure stated in article 26 ECT and that it follows for this reason that a valid arbitration agreement must be considered to have arisen between the Investors and Kazakhstan for the resolution of the dispute in question. The letter dated 7 May 2009 from Anatolie Stati was signed by him personally and sent by him as the representative of both the Ascom Group and Terra Raf. Besides this, he also represented Gabriel Stati according to a separate agreement between them. In the light of the intensive contacts between the parties on this occasion, it would appear entirely redundant to lay down a requirement for an explicit reference to the ECT when an amicable settlement is

SVEA COURT OF APPEAL          **JUDGMENT**                                    70
Department 02                                                    T 2675-14

requested. Kazakhstan was well aware of what the dispute concerned. As for the period from the request for settlement negotiations to the request for arbitration, which was about 15 months, this exceeds by a broad margin the three months prescribed in the ECT, although no maximum time limit is stated in the ECT for the conciliation negotiations, which seems to be well founded. Paragraph F II in the award makes clear the relatively intensive contacts that took place between the parties in autumn 2009 and winter/spring 2010 and at other times. In the light of this, it must be found reasonable that the request for arbitration was delayed somewhat, given, among other things, the complex nature of the issue. When the agreement was terminated in July 2010, there was thus no requirement that the Investors should wait any longer before requesting arbitration. The dispute remained the same.

I am thus in agreement with the majority that a valid arbitration agreement arose between the Investors and Kazakhstan when the arbitration was requested in July 2010 and that there is therefore no need to assess the correspondence which took place between the parties' counsel in the winter of 2011 and which resulted in a three-month delay in the arbitration.