# Exhibit D

**MANNHEIMER SWARTLING**

To

The Supreme Court

# APPEAL ON GRAVE PROCEDURAL ERROR

| | |
|---|---|
| **Apellant:** | The Republic of Kazakhstan<br>Ministry of Justice<br>Orynbor Street 8, House of Ministries, 13 Entrance<br>01000, Astana, Left Bank, Kazakhstan |
| **Counsel:** | *Advokaten* Alexander Foerster and *jur.kand.* Ludwig Metz<br>Mannheimer Swartling Advokatbyrå AB<br>Box 1711<br>111 87 Stockholm<br>Phone: 08-595 060 00<br>Email: alexander.foerster@msa.se, ludwig.metz@msa.se |
| **Appealed judgment:** | The Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14 |

MANNHEIMER SWARTLING ADVOKATBYRÅ AB • NORRLANDSGATAN 21 • BOX 1711 • 111 87 STOCKHOLM, SWEDEN
TEL +46 8 595 060 00 • FAX +46 8 595 060 01 • WWW.MANNHEIMERSWARTLING.SE

STOCKHOLM • GÖTEBORG • MALMÖ • HELSINGBORG • MOSCOW • SHANGHAI • HONG KONG • BRUSSELS • NEW YORK

Case 1:14-cv-01638-ABJ-ZMF   Document 73-7   Filed 04/23/18   Page 2 of 19
Case 1:14-cv-01638-ABJ   Document 46-7   Filed 02/03/17   Page 2 of 42

2(18)

# TABLE OF CONTENTS

| | | |
|---|---|---|
| A. | INTRODUCTION | 3 |
| B. | REQUEST FOR RELIEF | 4 |
| C. | GROUNDS | 4 |
| D. | CIRCUMSTANCES | 5 |
| | D.1 Summary of Kazakhstan's case on *ordre public* in the case before the Svea Court of Appeal | 5 |
| |     D.1.1 Introduction | 5 |
| |     D.1.2 The ECT Arbitration and the ECT Award | 5 |
| |     D.1.3 The fraudulent scheme | 7 |
| |     D.1.4 The false evidence in the ECT Arbitration | 9 |
| | D.2 The Court of Appeal has committed a grave procedural error which has affected the outcome of the case by omitting to address parts of Kazakhstan's case concerning Swedish *ordre public* | 10 |
| |     D.2.1 Introduction – the requirements to quash a judgment due to a grave procedural error | 10 |
| |     D.2.2 The Court of Appeal has not tried whether the arbitral tribunal's jurisdiction was affected | 12 |
| |     D.2.3 The Court of Appeal has not tried whether the arbitral tribunal's assessment of the question of liability was affected | 13 |
| |     D.2.4 The grave procedural error may be assumed to have affected the outcome of the case | 15 |
| | D.3 The Court of Appeal's trial is contrary to Article 6 ECHR | 15 |
| E. | THE CONTINUED PROCEEDINGS | 16 |
| F. | EVIDENCE | 17 |

Case 1:14-cv-01638-ABJ-ZMF Document 73-7 Filed 04/23/18 Page 2 of 42
Case 1:14-cv-01638-ABJ Document 46-3 Filed 02/03/17 Page 4 of 19

3(18)

## A. INTRODUCTION

1. On 9 December 2016, the Svea Court of Appeal rendered its judgment in case no. T 2675-14. In that case, the Republic of Kazakhstan ("**Kazakhstan**") had requested that the Court of Appeal annul or invalidate an arbitral award rendered on 19 December 2013 in an arbitration based on the Energy Charter Treaty ("**ECT**") between on the one hand Kazakhstan and on the other Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Traiding Ltd (the "**Investors**"). This submission will refer to the arbitration as the "**ECT Arbitration**" and to the arbitral award following it as the "**ECT Award**".

2. The background of the ECT Arbitration is briefly described in section D.1.2. At this stage, however, it bears mentioning that the ECT Arbitration concerned an alleged investment made by the Investors in Kazakhstan. In the case before the Svea Court of Appeal, Kazakhstan's position was that the Investors' investment was part of a fraudulent scheme and that the Investors invoked false evidence before the arbitral tribunal in the ECT Arbitration.

3. In the Court of Appeal case, Kazakhstan alleged that the Investors' fraudulent scheme and false evidence had affected the outcome of the ECT Arbitration, since they had affected the arbitral tribunal's assessments of the questions of (i) the arbitral tribunal's jurisdiction; (ii) Kazakhstan's potential liability for damages; and, (iii) the quantum of damages. The Court of Appeal however only tried the question of whether the false evidence and the fraudulent scheme had affected the arbitral tribunal's assessment of the question of quantum of damages. The Court of Appeal did not try whether the false evidence and the fraudulent scheme affected the arbitral tribunal's assessment of its jurisdiction and of Kazakhstan's potential liability for damages. The fact that the Court of Appeal omitted its trial of these two questions means that the Court of Appeal's judgment is to be quashed due to a grave procedural error under Ch. 59, section 1, para. 1, item 4 of the Code of Judicial Procedure.

Case 1:14-cv-01638-ABJ-ZMF   Document 73-7   Filed 04/23/18   Page 5 of 19
Case 1:14-cv-01638-ABJ   Document 46-23   Filed 02/03/17   Page 26 of 42

4(18)

## B. REQUEST FOR RELIEF

4. Kazakhstan requests that the Supreme Court quash the Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14 and remand the case to the Court of Appeal for continued proceedings.

## C. GROUNDS

5. In the case before the Court of Appeal, Kazakhstan argued that the Investors' fraudulent scheme and the false evidence invoked by the Investors before the arbitral tribunal in the ECT Arbitration affected the arbitral tribunal's jurisdiction in such a way that the fraudulent scheme and the false evidence prevented the arbitral tribunal from having jurisdiction. Kazakhstan also claimed that the arbitral tribunal's assessments of Kazakhstan's potential liability for damages and the quantum of damages were affected. Against that backdrop, Kazakhstan's position in the case was that the ECT Award was to be invalidated under section 33, para. 1, item 2 of the Arbitration Act (SFS 1999:116).

6. In its judgment of 9 December 2016, the Court of Appeal rejected Kazakhstan's claim to this end without having tried whether the Investors' fraudulent scheme and the false evidence invoked by the Investors before the arbitral tribunal in the ECT Arbitration had affected the arbitral tribunal's assessment of the questions of its jurisdiction and of Kazakhstan's potential liability for damages. The Court of Appeal's omission has, or may in any event be assumed to have, affected the substantive outcome of the case.

7. By omitting to try all grounds invoked by Kazakhstan, the Court of Appeal has deprived Kazakhstan of its right to a fair trial under Article 6(1) of the European Convention on Human Rights ("**ECHR**").

## D. CIRCUMSTANCES

### D.1 Summary of Kazakhstan's case on *ordre public* in the case before the Svea Court of Appeal

#### D.1.1 Introduction

8. Below, Kazakhstan will first present the background of the ECT Arbitration and the ECT Award and will then present the Investors' fraudulent scheme and the false evidence invoked by the Investors in the ECT Arbitration.

#### D.1.2 The ECT Arbitration and the ECT Award

9. In 2006, the Investors made an investment in Kazakhstan by acquiring companies that held the exploitation rights to two oil and gas fields. The Investors also initiated the building of a gas processing unit (an "**LPG Plant**", where LPG is an acronym for Liquefied Petroleum Gas). In March 2009, the Investors abandoned the LPG Plant which, at that time, was 80–90 per cent complete. The Investors alleged in the ECT Arbitration that the reason for abandoning the construction of the LPG Plant was that they were in dire financial straits because Kazakhstan had orchestrated a "*harassment campaign*" against them. In contrast, Kazakhstan argued that the Investors decided to abandon the unfinished construction in early 2009 for reasons within their own sphere and related to the worldwide financial crisis. This is also the reason given by the Investors at the time of the construction stop to the main contractor TGE. The alleged "*harassment campaign*" formed the background of the Investors' claim in the ECT Arbitration, which resulted in the ECT Award.

10. In the ECT Arbitration, the Investors sought damages for the LPG Plant. The Investors primarily sought compensation for the prospective value of the LPG Plant, *i.e.*, the value which the LPG Plant would have generated during its entire lifetime if it would have been completed. In subordinate, the Investors sought compensation for the book value of the LPG Plant, *i.e.*, the recorded construction cost until the LPG Plant was abandoned. According to Tolkynneftegaz LLP's ("**TNG**") 2009 financial statements, the one company of the Investors' which had the LPG Plant built, the construction costs were stated to be USD 245 million. In support of the assertion that the construction costs amounted to USD 245 million, the Investors invoked TNG's financial statements; expert reports from the Investors' financial expert; and written statements from Anatolie Stati, the ultimate beneficial owner of

6(18)

11. During the main hearing of the ECT Arbitration, Anatolie Stati and Artur Lungu testified that the Investors had invested USD 245 million in the LPG Plant. To further underpin their valuation case, the Investors invoked a number of indicative bids which had been tendered by potential buyers in conjunction with the Investors' attempt to sell the LPG Plant before it was abandoned. Those bids were produced against the backdrop of an Information Memorandum, which in turn had been drafted on the Investors' instructions and which heavily relied on the financial information derived from the Investors' financial statements. The Information Memorandum reproduced the then current investment cost which was stated in the interim financial statement for the period ended on 30 June 2008 of TNG, which company held the LPG plant.

12. Kazakhstan objected to its alleged liability and to the Investors' position on valuation during the ECT Arbitration. Kazakhstan did not call into question, and had no reason to call into question, that the Investors had in fact invested USD 245 million in the LPG Plant. This was because the construction costs were presented through the Investors' audited and unaudited financial statements, which were prepared by KPMG, one of the world's leading auditing company.

13. In the ECT Award, the arbitral tribunal concluded that the measures carried out by Kazakhstan, taken together, contravened the state's obligations under the ECT. However, the arbitral tribunal ruled that the Investors' valuation case was to a large extent unfounded.

14. As to the LPG Plant, the Investors were granted damages of USD 199 million. The arbitral tribunal relied on this value because on 25 September 2008, the Kazakh state-owned company KazMunaiGas ("**KMG**") had tendered an indicative bid of USD 199 million for the LPG Plant (the "**Indicative Bid**"). The Indicative Bid set forth explicitly that it was based on a mathematical formula in which the investment cost was one out of two factors. The investment cost in the Indicative bid – which was derived from the Information Memorandum and TNG's financial statements – was decisive for the tendered price and thus for the awarded compensation.

15. After the ECT Award had been rendered, Kazakhstan obtained access to a number of documents, by way of discovery proceedings in the U.S., from a variety of parallel arbitrations – previously unknown to Kazakhstan – that the Investors were part of about the same time as the ECT Arbitration. The parallel arbitrations concerned, to a large extent, the same subject matter as the ECT Arbitration, namely the valuation of the LPG Plant. The documents which Kazakhstan obtained access to revealed that the alleged investment of USD 245 million, which the Investors had requested and been granted damages for by the ECT Award, was the product of a comprehensive and advance fraudulent scheme on the Investors' part: The Investors had inflated the construction costs recorded in TNG's financial statements. This had been done by way of an arrangement of which the full extent is known to the Investors only. Through this scheme, the Investors diverted funds from their Kazakh enterprises to Anatolie Stati's offshore companies through fictitious transactions and letterbox companies. A review of the documents showed that a major part of the alleged investment – at least SEK 1 billion – was fabricated.

D.1.3 <u>The fraudulent scheme</u>

16. In this submission, Kazakhstan will not repeat all circumstances that constitute the fraudulent scheme, but instead refers principally to pages 8–14 of the Court of Appeal's judgment; Kazakhstan's submissions before the Court of Appeal dated 5 October 2015, <u>Exhibit 1</u>, 22 August 2016, <u>Exhibit 2</u> and 5 September 2016, <u>Exhibit 3</u>; and the Powerpoint presentations used by Kazakhstan during its opening statement and closing argument on *ordre public* before the Court of Appeal, <u>Exhibit 4</u> and <u>Exhibit 5</u>. A brief description is however required in order for the Supreme Court to be able to assess this appeal on grave procedural error. In short, the elements of the fraudulent scheme were the following:

17. The Investors set up an anonymous letterbox company in the U.K. named Perkwood Ltd ("**Perkwood**"). Two well-known sham directors were appointed to constitute the board. From excerpts of Perkwood's bank account, it is apparent that Perkwood has never paid any taxes, salaries, rent or incurred any other cost normally incurred by companies that carry out business. Further, during the approximate five years of its existence, Perkwood has filed annual accounts for dormant companies (dormant accounts) with the British Companies House. In order for a company to be able to file dormant accounts, that company must not have carried out any business

Case 1:14-cv-01638-ABJ-ZMF   Document 73-7   Filed 03/17/23   Page 2 of 19
Case 1:14-cv-01638-ABJ   Document 46-23   Filed 02/03/17   Page 32 of 42

8(18)

transaction during the period covered by the accounts. However, from the documents obtained by Kazakhstan by way of the discovery proceedings, it emerged that Perkwood was purported to have "sold" equipment worth approximately USD 134 million during the company's lifetime.

18. Perkwood was used to fictitiously increase the investment cost for the LPG Plant. This was done by way of the companies Ascom Group S.A. ("**Ascom**") and its sister company Azalia Limited ("**Azalia**"), which purchased the main equipment for the LPG Plant from the German company TGE Gas Engineering GmbH ("**TGE**") at a price of USD 35 million. Subsequently, the Investors inflated the investment costs by a series of fictitious intragroup transactions.

19. In these fictitious transactions, Azalia "sold" the equipment to Perkwood and Perkwood then "re-sold" the equipment to TNG. To paper over the transactions, the Investors created a sham agreement (the "**Perkwood Agreement**"). By the Perkwood Agreement, the price of the equipment was increased from USD 35 million to USD 93 million, *i.e.*, by USD 58 million, without any services having been carried out or any added value. Accordingly, the Investors inflated the investment cost for the LPG Plant by way of this intragroup transaction. The accounting system of the Investors only stated the "purchase price" from Perkwood, and not the actual price that had been paid to TGE for the equipment.

20. To further their fraudulent scheme, the Investors concealed in the above-referenced TNG audited financial statements that Perkwood was a related party. This was one of the key planks of the fraud. The Investors pretended to the world (including to their own auditors) that Perkwood was an independent third party and that all transactions made with Perkwood thus were made at arm's length.[1]

21. The fraudulent scheme also contained other elements such as a fictitious "*management fee*" of USD 44 million, which was invoiced by Perkwood to TNG. This happened although Perkwood had no employees, lacked business transactions and the name Perkwood was entirely unknown to, for instance, the witness before

---

[1] During the Court of Appeal proceedings, the Investors initially stated that they could not concede that they were in any way related to Perkwood. After Kazakhstan, assisted by Latvian authorities, submitted general powers of attorney for Anatolie Stati and Gabriel Stati showing that only Anatolie Stati and Gabriel Stati were the beneficiaries of the company's bank account, the Investors conceded that they were related. This happened during Kazakhstan's opening statement before the Court of Appeal.

|  | the Court of Appeal, Franjo Zaja from the principal supplier TGE, who had spent months on-site in Kazakhstan. This fictitious fee amounting to USD 44 million was yet another way for the Investors to increase the investment cost without basis. |
|---|---|
| 22. | Further, the alleged investment included equipment worth USD 72 million that, according to the Investors, had been ordered by TNG but never installed into the LPG Plant. By the documents produced in the U.S. discovery proceedings and by expert and witness testimony, Kazakhstan could prove that this equipment – allegedly worth USD 72 million – had never existed. |
| 23. | The essential facts underlying the Many circumstances of the fraudulent scheme were unrefuted or even conceded by the Investors during the main hearing before the Court of Appeal. The most important circumstance conceded by the Investors was that Perkwood was a related company. |
| 24. | Finally, during the main hearing, the Investors could neither explain nor comment on the serious accusations that were brought by Kazakhstan (that the equipment prices were inflated; that TNG paid a large management fee without consideration; that fictitious costs and interests were recorded in TNG's financial statements; and that the same equipment which was already installed in the LPG Plant was bought again). The Investors invoked no evidence that spoke in favour of the alleged equipment's actual existence or the costs' legitimacy. It bears noting that the Investors invoked no oral evidence concerning the *ordre public* ground. During the Court of Appeal hearing, neither Anatolie Stati nor Artur Lungu appeared or gave evidence, and no witness for the Investors repeated the statement that the investment cost amounted to USD 245 million. |
| 25. | During the main hearing, Kazakhstan presented these circumstances and the remainder of the fraudulent scheme in a detailed manner. The circumstances were not known before the ECT Award had been rendered, but were revealed only subsequently by way of the U.S. discovery proceedings. The Court of Appeal was thus the court of first instance in which the fraudulent scheme was subject to trial. |

D.1.4 <u>The false evidence in the ECT Arbitration</u>

| 26. | The fraudulent scheme was systematic, advanced and conducted for a number of years. Despite knowing that the investment in the LPG Plant was only a fraction of |
|---|---|

        the USD 245 million stated in TNG's annual accounts, the Investors invoked this document and other annual accounts, setting forth the same inflated investment cost, as evidence in the ECT Arbitration.

27.      Also, the Investors provided their financial experts with the inflated investment cost, which formed the basis of the experts' reports and testimonies. Further, the Investors' two most important persons to be heard; Anatolie Stati and Artur Lungu, lied in both their witness statements and their testimonies when stating that the investment cost amounted to USD 245 million.

28.      Finally, the Investors invoked the Indicative Bid in the ECT Arbitration and argued that it was an accurate and true reflection of the LPG Plant's value. The Investors did this despite knowing that the Indicative Bid was directly based on the inflated investment cost in TNG's annual accounts and that the bid should have been at least SEK one half billion lower had it been based on the real investment cost.

**D.2**      **The Court of Appeal has committed a grave procedural error which has affected the outcome of the case by omitting to address parts of Kazakhstan's case concerning Swedish *ordre public***

D.2.1      <u>Introduction – the requirements to quash a judgment due to a grave procedural error</u>

29.      In the Court of Appeal proceedings, Kazakhstan alleged that the ECT Award was contrary to procedural *ordre public* since the Investors had invoked false evidence that had affected the outcome of the arbitration.[2] As set forth above, Kazakhstan also alleged that the false evidence consisted of false witness statements, lies during testimonies, false information in experts' reports, false information in annual accounts and false information in indicative offers. Kazakhstan further asserted that the false evidence prevented the arbitral tribunal from having jurisdiction and

---

[2] It should be noted that the legislature has not intended for it to be shown that the outcome of the case has been affected, but that the standard of proof is that it "*may be assumed*" that the outcome has been affected. This is apparent from SOU 1994:81, p. 32 and 182–184, where the legislature considered implementing a special provision on false evidence (which finally was deemed unnecessary). In the presentation of the wording of the contemplated provision, however, the standard of proof "*may be assumed*" was set forth. There is no reason to assume that the legislature intended for any other standard of proof to apply only because the question of false evidence was considered covered by the general provision and required no special provision.

affected its assessments of the questions of liability and quantum of damages.[3] As is evident from the Court of Appeal's reasoning, the Court of Appeal has only tried whether the false evidence affected the arbitral tribunal's assessment of the quantum of damages.[4]

30. From Ch. 59, section 1, para. 1, item 4 of the Code of Judicial Procedure, it follows that a judgment which has entered into final force and effect is to be quashed due to a grave procedural error, after appeal by the one who has a right affected by the judgment, if, during the proceedings, there occurred a grave procedural error – other than those concerned in items 1–3 of the same section – which may be assumed to have affected the outcome of the case. Accordingly, there are two requirements that must be met in order for a lower court's judgment to be quashed on the present ground: (i) the occurrence of a grave procedural error which (ii) may be assumed to have affected the outcome of the case.

31. The case cited in NJA 2016, p. 668 shows that a procedural error of the instant type is at hand when a procedural provision normative to the proceedings has been disregarded or applied erroneously. In that case, the Supreme Court held that a Court of Appeal's omission to try all parts required in order to grant a party's request for relief was a procedural error that was to entail a quashing and remanding under Ch. 59, section 1, para. 1, item 4 of the Code of Judicial Procedure.

32. The Court of Appeal case, which was a dispute between an estate and a limited liability company, concerned whether the company had been appointed to find a purchaser for real estate held by the estate and whether the company was entitled to

---

[3] Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14, p. 9–10, where it is stated that "[f]urthermore, the false evidence has influenced the arbitral tribunal's general assessment of testimony, witness affidavits, expert reports and the Investors' case in general, which has influenced both the issue of liability and the assessment of the size of the damages", p. 11, where it is stated that "[a]s result of the misleading scheme, it has been possible to make large outflows of money from Kazakhstan, which violates the fundamental purpose of the ECT, which is aimed at protecting good faith investments in the host country. Thereafter, the Investors brought a claim against the state of Kazakhstan, initiated arbitration and invoked investor protection under the ECT, despite the fact that such investor protection lacked any basis due to the aforementioned circumstances" and p. 12, where it is stated that "[t]he arbitral tribunal reviewed the false evidence and misleading information referred to above, and it is likely that this influenced the arbitral tribunal's assessment of evidence in general and conclusions regarding both jurisdiction as well as the liability issue."

[4] Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14, p. 40–44.

Case 1:14-cv-01638-ABJ-ZMF   Document 163-7   Filed 04/23/18   Page 13 of 19
Case 1:14-cv-01638-ABJ   Document 73-7   Filed 02/03/17   Page 36 of 42

12(18)

33. In its appeal on grave procedural error, the estate alleged that the Court of Appeal had omitted trying three issues in its assessment of whether there existed a right to payment. The Supreme Court, which concurred, concluded that the Court of Appeal's assessment had not encompassed all parts necessary to grant the company's request for relief and which were disputed amongst the parties and, also, that the omission was to be assumed to have affected the substantive outcome of the case. Accordingly, the Supreme Court held that the conditions to quash the Court of Appeal's judgment on this basis were met. It is apparent from the judgment that the Supreme Court did not thoroughly analyse whether the procedural error committed by the Court of Appeal could be assumed to have affected the outcome of the case.

34. As concerns the question of the procedural error's influence on the outcome of the case, the Supreme Court's assessment appears to align with what legal scholars have stated, namely that courts presume that a disregard of a material warranty for legal certainty – which is often synonymous to a grave procedural error – affects the outcome of the case.[5] It is not required that anything speaks in favour of the error having affected the outcome. Instead, it is required that nothing speaks in favour of the error not having affected the outcome.[6]

D.2.2  The Court of Appeal has not tried whether the arbitral tribunal's jurisdiction was affected

35. Before the Court of Appeal, Kazakhstan alleged that the false evidence and the fraudulent scheme had affected the arbitral tribunal's jurisdiction.[7] The arbitral tribunal based its jurisdiction on Article 26 of the ECT, which includes certain requirements for the arbitral tribunal's jurisdiction. The contracting parties of the

---

[5] Welamson, L. & Munck, J., *Processen i hovrätt och Högsta domstolen. Rättegång VI*, 5th ed., Wolters Kluwer Sverige AB, 2016, Zeteo, p. 229–230. See also Fitger, P., Sörbom, M., Eriksson, T., Hall, P., Palmkvist, R. & Renfors, C., *Rättegångsbalken*, version October 2016, Zeteo [Fitger et al., *Rättegångsbalken*], commentaries on Ch. 50, section 28 and Ch. 59, section 1.

[6] Fitger et al., *Rättegångsbalken*, commentary on Ch. 50, section 28. Cf. the cases cited in NJA 2001, p. 731 and NJA 2004, p. 561.

[7] Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14, p. 11–12 and Powerpoint presentation from Kazakhstan's opening statement on *ordre public* before the Court of Appeal, Exhibit 4, p. 122–123.

Case 1:14-cv-01638-ABJ-ZMF   Document 173-7   Filed 04/23/18   Page 14 of 19
Case 1:14-cv-01638-ABJ   Document 46-3   Filed 02/03/17   Page 37 of 42

13(18)

        ECT intended to protect investors and investments which were made on their territories under the assumption that they were made in good faith. An investment which has not been made in good faith is not considered to fall within the scope of the ECT's definition of an investment. The existence of an investment in the ECT's sense is a requirement in order for an arbitral tribunal to have jurisdiction over a dispute under the ECT. This question has previously been tried in several investment disputes. In support of this allegation, Kazahkstan invoked nine arbitral awards from investment disputes and an expert report from Professor Thomas Grant.

36.        The ECT Arbitration did not concern a good faith investment, since the investment in the LPG Plant was part of the fraudulent scheme described above. If the arbitral tribunal had had knowledge of the false evidence and of the circumstances that constituted the fraudulent scheme – which it did not – it would have declared that it lacked jurisdiction, and the ECT Award would never have been rendered.

37.        This statement, which formed basis of Kazakhstan's request to invalidate the ECT Award, was never tried by the Court of Appeal. The Court of Appeal's omission in this respect means that the Court of Appeal did not try a part of Kazakhstan's case which it had to try in order to conclude that the ECT Award should not be invalidated. The Court of Appeal's omission constitutes a grave procedural error.

D.2.3      <u>The Court of Appeal has not tried whether the arbitral tribunal's assessment of the question of liability was affected</u>

38.        Before the Court of Appeal, Kazakhstan also alleged that the false evidence and the fraudulent scheme affected the arbitral tribunal's assessment of the question of liability, since the arbitral tribunal's evaluation of evidence had been affected.[8]

39.        As stated above, parts of the false evidence consisted of testimonies and witness statements from Anatolie Stati and Artur Lungu. In their testimonies and witness statements, these persons alleged that the value of the LPG Plant was

---

[8] See references made to the Court of Appeal's judgment in footnote 3. See also Powerpoint presentation from Kazakhstan's opening statement on *ordre public* before the Court of Appeal, Exhibit 4, p. 122 and 124–125; and Powerpoint presentation from Kazakhstan's closing argument on *ordre public* before the Court of Appeal, Exhibit 5, p. 32–33.

Case 1:14-cv-01638-ABJ-ZMF   Document 173-7   Filed 04/23/18   Page 15 of 19
Case 1:14-cv-01638-ABJ   Document 46-3   Filed 02/03/17   Page 38 of 42

14(18)

USD 245 million, *i.e.*, at least SEK 1 billion higher than what was in fact the case. Both persons thus deliberately gave erroneous information.

40. Anatolie Stati and Artur Lungu were not only heard about the value of the LPG Plant, but they were also key persons to be heard about the alleged "*harassment campaign*" which the arbitral tribunal found contravened the ECT and which was also the basis for the Investors' case on damages. The information given from these persons was of decisive importance to the arbitral tribunal's assessment of the issue of liability. This is evident from the arbitral tribunal's reasoning, which Kazakhstan referred to before the Court of Appeal.[9]

41. The arbitral tribunal's evaluation of evidence concerning Anatolie Stati's and Artur Lungu's witness statements and testimonies would have been significantly affected if the arbitral tribunal had known that these persons were responsible for the fraudulent scheme, concealed this from the arbitral tribunal and lied about the size of the investment. The arbitral tribunal would have given all information given by these two persons a much lower evidentiary value, if any. The Investors' case in the ECT Arbitration was supported by the false witness information. If the arbitral tribunal had known about the fraudulent scheme and the false witness evidence, this would have had a dramatic impact on the assessment, by the arbitral tribunal, of the question of liability and the Investors' claim in the ECT Arbitration would have been dismissed.

42. Despite what is stated above, it should be noted that the Investors' case in the ECT Arbitration was that Kazakhstan, by way of various investigations and measures, had made the Investors subject of a "*harassment campaign*" with no legitimate reason. The arbitral tribunal would have assessed differently whether Kazakhstan had reason to investigate the Investors' business if the arbitral tribunal had known of the fraudulent scheme. Thus, the Investors' false evidence and the fraudulent scheme affected the arbitral tribunal's assessment of the question of liability in this way too.

---

[9] Powerpoint presentation from Kazakhstan's opening statement on *ordre public* before the Court of Appeal, Exhibit 4, p. 124–125 and Powerpoint presentation from Kazakhstan's closing argument on *ordre public* before the Court of Appeal, Exhibit 5, p. 20.

Case 1:14-cv-01638-ABJ-ZMF   Document 46-3   Filed 02/03/17   Page 39 of 42
Case 1:14-cv-01638-ABJ   Document 73-7   Filed 04/23/18   Page 16 of 19

15(18)

43. Against this backdrop, Kazakhstan alleged before the Court of Appeal that the false evidence had affected the arbitral tribunal's assessment of the question of liability. This allegation, which formed basis of Kazakhstan's request to invalidate the ECT Award, was never tried by the Court of Appeal. This is evident from its reasoning. As with the question of the arbitral tribunal's jurisdiction, the Court of Appeal's omission to adjudge the question of liability constitutes a grave procedural error, see sections D.2.1 and D.2.2.

D.2.4    <u>The grave procedural error may be assumed to have affected the outcome of the case</u>

44. As set forth in section D.2, the Court of Appeal has omitted trying two separate grounds and thus committed a grave procedural error. If the Court of Appeal had tried whether the false evidence or the fraudulent scheme affected the outcome of the issues of jurisdiction and liability in the ECT Arbitration, the Court of Appeal would have invalidated the ECT Award. It may thus be assumed that the Court of Appeal's omission has affected the outcome of the case.

D.3    **The Court of Appeal's trial is contrary to Article 6 ECHR**

45. It follows from the European Court of Human Rights' case law that the Court of Appeal was under an obligation to apply Article 6(1) ECHR when trying Kazakhstan's claim.[10]

46. On several occasions, the European Court of Human Rights has held that in order for the right to a fair trial to be effectively protected, a party's claim must also be considered by the court. In other words, it is incumbent upon a court to conduct a proper examination of the submissions, arguments and evidence adduced by a party.[11] Already by omitting to try material bases for Kazakhstan's claim, namely whether the fraudulent scheme or the false evidence affected the arbitral tribunal's

---

[10] See, for instance, *Suovaniemi and others* v. *Finland*, application no. 31737/96, decision by the European Court of Human Rights on 23 February 1999.

[11] See, for instance, *Kraska* v. *Switzerland*, application no. 13942/88, decision by the European Court of Human Rights on 19 April 1993 (item 30), *van de Hurk* v. *The Netherlands*, application no. 16034/90, decision by the European Court of Human Rights on 19 April 1994 (item 59) and *Perez* v. *France*, application no. 47287/99, decision by the European Court of Human Rights on 12 February 2004 (item 80).

Case 1:14-cv-01638-ABJ-ZMF   Document 46-3   Filed 02/03/17   Page 40 of 42
Case 1:14-cv-01638-ABJ   Document 73-7   Filed 04/23/18   Page 17 of 19

16(18)

assessments of the issues of jurisdiction and liability, the Court of Appeal has deprived Kazakhstan of its right to a fair trial under Article 6(1) ECHR.

47. This is particularly severe as the fraudulent scheme and the false evidence were not tried during the ECT Arbitration, since these circumstances were unknown to Kazakhstan prior to the rendering of the ECT Award. These new circumstances were thus to be tried for the first time before the Court of Appeal.

48. The fact that the Court of Appeal did not grant leave to appeal to the Supreme Court in turn means that no court or arbitral tribunal will try the question of whether the false evidence affected the arbitral tribunal's assessment of its jurisdiction and the issue of liability. This is another flaw in the effective protection of Article 6(1) which Sweden has agreed to give under the ECHR. In the event that the Supreme Court does not quash the Court of Appeal's judgment and remand the case for further proceedings before the Court of Appeal, the violation of the right to a fair trial committed by the Court of Appeal will be entrenched and perpetuated.[12] To the Republic of Kazakhstan, who agreed on Sweden as the seat of the arbitration proceedings because of Sweden's reputation as being a fair jurisdiction with courts which are experienced in dealing with matters of arbitration, this would be shocking.

## E. THE CONTINUED PROCEEDINGS

49. Presently, two parallel enforcement cases are pending – one in the U.K. and one in the U.S. – which both concern the ECT Award. The case pending in the U.S. was previously stayed awaiting the Court of Appeal's judgment. The U.S. judge has recently prolonged the stay after being informed that Kazakhstan intends to bring an appeal on grave procedural error. Kazakhstan thus wishes that the present case be managed promptly.

---

[12] See, for instance, *Ruiz-Mateos* v. *Spain*, application no. 12952/87, decision by the European Court of Human Rights on 23 June 1993 (items 65–67). See also *Schuler-Zgraggen* v. *Switzerland*, application no. 14518/89, decision by the European Court of Human Rights on 24 June 1993 (item 52).

Case 1:14-cv-01638-ABJ-ZMF   Document 73-7   Filed 04/23/18   Page 18 of 19
Case 1:14-cv-01638-ABJ   Document 46-2   Filed 02/03/17   Page 41 of 42

17(18)

## F.      EVIDENCE

| Ex. | Description | Invoked to prove |
|---|---|---|
| 4 | Kazakhstan's Powerpoint presentation for the opening statement on *ordre public* before the Court of Appeal | *that* before the Court of Appeal, Kazakhstan alleged that the false evidence and the fraudulent scheme had affected the arbitral tribunal's jurisdiction; <br><br>*that* before the Court of Appeal, Kazakhstan alleged that the false evidence and the fraudulent scheme affected the arbitral tribunal's assessment of the question of liability, since the arbitral tribunal's evaluation of evidence had been affected; and <br><br>*that* the Court of Appeal failed to assess those grounds. |
| 5 | Kazakhstan's Powerpoint presentation for the closing argument on *ordre public* before the Court of Appeal | *that* before the Court of Appeal, Kazakhstan alleged that the false evidence and the fraudulent scheme had affected the arbitral tribunal's jurisdiction; <br><br>*that* before the Court of Appeal, Kazakhstan alleged that the false evidence and the fraudulent scheme affected the arbitral tribunal's assessment of the question of liability, since the arbitral tribunal's evaluation of evidence had been affected; and <br><br>*that* the Court of Appeal failed to assess those grounds. |

---

Stockholm, 3 February 2017

Alexander Foerster                              Ludwig Metz

18(18)

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Kazakhstan's submission dated 5 October 2015 before the Court of Appeal |
| 2 | Kazakhstan's submission dated 22 August 2016 before the Court of Appeal |
| 3 | Kazakhstan's submission dated 5 September 2016 before the Court of Appeal |
| 4 | Kazakhstan's Powerpoint presentation for the opening statement on *ordre public* before the Court of Appeal |
| 5 | Kazakhstan's Powerpoint presentation for the closing argument on ordre public before the Court of Appeal |