# Exhibit F

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANATOLIE STATI; GABRIEL STATI; ASCOM GROUP, S.A.; TERRA RAF TRANS TRAIDING LTD., | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 14-1638 (ABJ) |
| REPUBLIC OF KAZAKHSTAN, | ) ) | |
| Respondent. | ) ) | |

## ORDER

Pursuant to Federal Rules of Civil Procedure 54(b) and 58, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that respondent's Motion for Reconsideration of the Court's May 11, 2016, Order [Dkt. # 37] is **DENIED**. It is **FURTHER ORDERED**

that petitioners' Petition to Confirm the Arbitral Award [Dkt. # 1] is **GRANTED**. This is a final and appealable order.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE: March 23, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————————
|  | ) |
| ANATOLIE STATI; GABRIEL STATI; | ) |
| ASCOM GROUP, S.A.; TERRA RAF | ) |
| TRANS TRAIDING LTD., | ) |
|  | ) |
| Petitioners, | ) |
|  | ) |
| v. | ) Civil Action No. 14-1638 (ABJ) |
|  | ) |
| REPUBLIC OF KAZAKHSTAN, | ) |
|  | ) |
| Respondent. | ) |
————————————————————————

## MEMORANDUM OPINION

Petitioners, Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. ("Stati parties")[1] have brought this action to enforce an international arbitration award against the respondent, the Republic of Kazakhstan ("Kazakhstan"), in the United States.  The matter is fully briefed and ripe for decision, but before the Court can turn to the merits of the dispute, it must address respondent's motion for reconsideration of the Court's May 11, 2016, Order denying respondent's motion for leave to submit additional defense grounds in opposition to the motion to confirm the arbitral award.  For the reasons that follow, the Court will deny respondent's motion and it will confirm the award.[2]

---

1    Anatolie Stati is the father of Gabriel Stati. Both are citizens of Moldova and Romania. ASCOM Group S.A. is a joint stock company incorporated and located in Moldova and owned entirely by Anatolie Stati.  Terra Raf Trans Traiding Ltd. is a limited liability company incorporated and located in Gibraltar and owned in equal shares by Anatolie Stati and Gabriel Stati.  Pet. to Confirm Arbitral Award ("Pet.") [Dkt. # 1] ¶¶ 2–5.

2    In its prior Memorandum Opinion, the Court found that it has subject matter jurisdiction over this action under the Federal Arbitration Act and the Foreign Sovereign Immunities Act.  *See Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 181 (D.D.C. 2016).

# BACKGROUND

## A.    Factual Background

Petitioners have been involved in the oil and gas business in Kazakhstan for approximately 17 years.  Between 1999 and 2000, petitioners purchased controlling shares in two Kazakh companies, Kazpolmunay LLP ("KPM") and Tolkynneftagaz LLP ("TNG").  Pet. ¶¶ 28–30.  The companies owned the subsoil use rights to the Borankol oil field, the Tolkyn gas field, and the Tabyl exploration block in Kazakhstan.  *Id.* ¶¶ 29–30.  Petitioners eventually came to own 100% of KPM and TNG, and in 2000, those companies obtained approval from Kazakhstan to explore and develop various oil and gas fields located in the country.  *Id.* ¶ 31; Arb. Award [Dkt. # 2-1, 2-2, 2-3, 2-4] ("Award") ¶ 229.  A year later, in 2001, petitioners, through KPM and TNG, invested more than one billion dollars in the development of the Borankol and Tolkyn fields, and the Tabyl Block.  Pet. ¶ 32.

In 2008, Kazakhstan began a government investigation of Anatolie Stati and his companies, including his compliance with export tax laws.  Award ¶¶ 296–99.  Petitioners and respondent disagree on what followed.  According to petitioners, the government of Kazakhstan began to intimidate and harass petitioners into selling their investments to the state-owned company KazMunaiGas at a substantial discount.  Pet. ¶ 33.  Specifically, petitioners claim that Kazakhstan "baselessly" accused petitioners of fraud and forgery, levied more than $70 million dollars in back taxes, arrested KPM's general manager for "illegal entrepreneurial activity," and ultimately seized all of KPM and TNG's assets.  *Id.*  And on July 21, 2010, Kazakhstan terminated petitioners' subsoil use contracts.  Award ¶ 611.

Kazakhstan's version of events is that the Kazakh Tax and Customs Committee properly assessed $62 million dollars in taxes to petitioners, and that a lawful criminal investigation by the Kazakh authorities led to the arrest and imprisonment of KPM's General Director.  Award ¶¶ 394,

430, 440, 492.  Respondent maintains that it was the investigation that led to the termination of KPM and TNG's subsoil use contracts on July 21, 2010, and it disputes the claim that Kazakhstan expropriated petitioners' assets.  *Id.* ¶¶ 591–611.  Instead, respondent takes the position that the Kazakh state oil company and its subsidiary placed petitioners' oil and gas fields into trust management on a temporary basis only.  *Id.* ¶ 611.

## B.   Procedural Background

On July 26, 2010, petitioners filed a Request for Arbitration with the Stockholm Chamber of Commerce ("SCC") in Sweden.  Req. for Arb., Ex. C to Decl. of Charlene C. Sun [Dkt. # 2-6] ("Req. for Arb.").  The request states:

> Over the past two years, Kazakhstan has engaged in a campaign of harassment and illegal acts against [petitioners] that culminated on July 21, 2010 with the State's notice of unilateral termination of the companies' Subsoil Use Contracts, the illegal expropriation of [petitioners'] Kazakh investments, and the subsequent commandeering of [petitioners'] offices by personnel of State-owned KazMunaiGas and the Kazakh Ministry of Oil and Gas.

*Id.* ¶ 4.  Petitioners further alleged that Kazakhstan's harassment "clearly had expropriation as its ultimate goal, and it had the effect in the process of destroying both the market value and alienability of [petitioners'] investments." *Id.* ¶¶ 4, 8.  The request invoked the Energy Charter Treaty ("ECT"), an international agreement signed by the respondent, which allows investors to submit disputes to the SCC for arbitration.  Energy Charter Treaty, art. 26(4)(c), Dec. 17, 1994, 2080 U.N.T.S. 95, 121–22.  Accordingly, the arbitral proceedings were governed by the SCC's Arbitration Rules.  Pet. ¶ 22.

On December 19, 2013, the SCC tribunal issued an award in favor of petitioners and against respondent.  Pet. ¶ 27.  The tribunal determined that Kazakhstan breached its obligation to provide fair and equitable treatment under Article 10(1) of the ECT.  Award ¶¶ 1085–95.  It awarded

petitioners $497,685,101 for the alleged expropriation of petitioners' assets in Kazakhstan.
*Id.* ¶ 1859. This total included $277.8 million for the Borankol and Tolkyn oil and gas fields,
$31.3 million for the subsoil use contracts, $199 million for an unfinished liquefied petroleum gas
plant ("LPG plant"), and $8,975,496.40 in legal costs. *Id.* ¶¶ 1856–61, 1885.[3]

On September 30, 2014, petitioners asked this Court to confirm the arbitral award in the
United States pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.*, which
codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral
Awards, June 10, 1958, 330 U.N.T.S. 38, commonly known as the "New York Convention."
Pet. ¶ 1. The Stati parties sought to enforce the foreign arbitral award here on the grounds that
Kazakhstan maintains assets in the United States. *Id.* ¶ 46. Respondent opposed the petition to
confirm based on five grounds under the New York Convention, focusing primarily on the SCC's
appointment of respondent's arbitrator and its alleged failure to enforce the requirement that there
be a three-month settlement period prior to the initiation of an arbitration. Resp't's Opp. to Pet.
[Dkt. # 20] ("Resp't's Opp."). Petitioners filed a reply, Pet'rs' Reply Mem. in Supp. of Pet. [Dkt.
# 24] ("Pet'rs' Reply"), and the Court granted respondent leave to file a sur-reply. Resp't's Sur-
Reply in Supp. of Resp't's Opp. [Dkt. # 28] ("Resp't's Sur-Reply"). By May 26, 2015, the parties
had completed briefing on the merits.

1.      **Respondent's motion for leave to include additional defense grounds**.

According to respondent, in June of 2015, it became aware of "new evidence" that
petitioners had "obtained the [arbitral] [a]ward through fraud." Resp't's Mot. for Leave to Submit

---

3       In the Petition to Confirm the Award, petitioners assert that respondent must pay them
"$506,660,597.40 plus (a) compound prejudgment interest as set forth in the Award from April 9,
2009 to the date that judgment is entered herein, and (b) post-judgment interest from the date that
judgment is entered to the date of satisfaction." Pet. ¶ 48.

Additional Grounds in Supp. of Opp. to Pet. [Dkt. # 32] ("Initial Mot.") at 4, 6.  Respondent waited till April 5, 2016, though – nearly a year after learning about the alleged fraud and completing the merits briefing in this case – to file a motion seeking leave to submit additional defenses to enforcement of the arbitral award.  *Id.* at 1, 4.

In that motion, respondent argued that petitioners procured the award through fraud by submitting "false testimony and evidence to the SCC Arbitration tribunal" that "materially misrepresented the LPG Plant construction costs for which they claimed reimbursement in the [arbitration]."  *Id.* at 4.  Respondent contended that the newly discovered fraud afforded it two additional defenses under Article V(2)(b) and Article V(1)(b) of the New York Convention.  *Id.* at 4–6.  Under Article V(2)(b) the Court could refuse recognition of the award because enforcement of a fraudulently obtained arbitral award would be contrary to United States public policy.  *Id.* at 4–5.  And respondent also asserted that "the intentional giving of false evidence" during the arbitration "denied [respondent] the opportunity to present its case," thus rendering the arbitral award unenforceable under Article V(1)(b) of the New York Convention.  *Id.* at 5–6.

In the absence of an applicable rule setting forth the standard to be applied to respondent's motion, the Court considered whether justice required permitting respondent to "add new grounds to its opposition to the petition to confirm the award, more than a year after the original opposition was filed."  Order (May 11, 2016) [Dkt. # 36] at 2–3 ("Order").  The Court reviewed the SCC arbitration award and denied the motion, reasoning that "it [would] not be in the interest of justice to conduct a mini-trial on the issue of fraud here when the arbitrators expressly disavowed any reliance on the allegedly fraudulent material."  *Id.* at 4.  In other words, the evidence respondent sought to discredit was not material to the decision.

The Court derived this conclusion based on its own detailed review of the award, which stated in relevant part:

> Regarding the value of damages caused by Respondent's action, the Tribunal has taken note of the various extensive arguments submitted by the Parties relying on their respective experts' reports. However, the Tribunal considers that it does not have to evaluate these reports and the very different results they reach. In the view of the Tribunal, the relatively best source for the valuation . . . are the contemporaneous bids that were made for the LPG Plant by third parties after Claimants' efforts to sell the LPG Plant . . . .

Award ¶ 1746. The panel concluded:

> [T]he Tribunal considers it to be of particular relevance that an offer was made for the LPG Plant by state-owned KMG at that time for USD 199 million. The Tribunal considers that to be the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation for the LPG Plant during the relevant period . . . . Therefore, this is the amount of damages the Tribunal accepts in this context.

*Id.* ¶¶ 1747–48.

Kazakhstan then filed the instant motion for reconsideration, Resp't's Mot. for Recons. of May 11, 2016, Order [Dkt. # 37] ("Mot. for Recons."), and petitioners opposed the motion. Pet'rs' Mem. of P. & A. in Opp. to Resp't's Mot. for Recons. [Dkt. # 38] ("Pet'rs' Opp."). Petitioners pointed out that Kazakhstan "has the opportunity to litigate the very same fraud allegations in the courts of Sweden, which is the seat of the arbitration and primary jurisdiction in this case." *Id.* at 5. Respondent confirmed that the parties were litigating the fraud issue in Sweden, where it was seeking to vacate the award, but it argued that the Swedish proceeding should not affect the Court's review of the petition to confirm, or the motion for reconsideration. *See* Reply in Supp. of Mot. for Recons. [Dkt. # 39] at 3–5.

6

2.      **The Swedish proceedings to vacate the arbitral award.**

In light of the pendency of the Swedish proceedings to vacate the award, this Court exercised its discretion to stay this case pending the resolution of the proceedings before the Svea Court of Appeal in Sweden, noting that they "could have a dramatic impact on the petition to confirm the arbitration award." *Stati*, 199 F. Supp. 3d at 193.  It observed that if "respondent [was] successful in the set-aside proceeding [in Sweden], confirmation of the award [would] be unlikely" in the United States.  *Id.*, citing New York Convention, art. V(1)(e) (providing that enforcement of an award may be refused when the "award . . . has been set aside . . . by a competent authority of the country in which, or under the law of which, that award was made").  In that same ruling, the Court found that it had subject matter jurisdiction over the dispute under the FAA and the Foreign Sovereign Immunities Act.  *Id.* at 184–190.

On December 9, 2016, the Svea Court of Appeal issued its decision upholding the Award and rejecting Kazakhstan's arguments, including the argument that the Award should be vacated in light of the alleged fraud.  Svea Court of Appeal J., Exs. 1–3 to Joint Report (Dec. 30, 2016) [Dkt. # 45-1, 45-2, 45-3] § 5.3.1 ("Svea Court of Appeal Opinion").  Kazakhstan presented at least two theories of fraud before the Svea Court of Appeal.  First, it argued, much as it had before this Court, that the Stati parties had submitted false evidence on the value of the LPG plant in the form of sworn testimony and expert reports during the arbitration.  *Id.* § 3.1.2.1.  Second, respondent argued that the award was tainted by fraud that took place prior to the start of the arbitration.  *Id.* It alleged that representatives for the Stati parties presented financial statements that falsely inflated the amounts invested in the LPG plant to a third-party company, KMG, and that KMG was fraudulently induced into bidding $199 million for the LPG plant.  *Id.*   According to

respondent, since it was the KMG bid that was used by the tribunal to value the LPG plant, the arbitral award was procured by fraud. *Id.*

Following a review of the full record, the Svea Court of Appeal rejected all of Kazakhstan's contentions. First, it concluded that "[s]ince the arbitral tribunal based its assessment [of the LPG plant] on the indicative bid" and not the allegedly false "witness testimony, witness affidavits, and expert reports" submitted by the Stati parties during the arbitration, this evidence did not have "immediate importance for the outcome." Svea Court of Appeal J., Ex. 3 to Joint Report (Dec. 30, 2016) [Dkt. # 45-3] at 45.[4] The Svea Court of Appeal recited the legal principle that "there can be no question of declaring an arbitral award invalid solely on the ground that false evidence or untrue testimony has occurred, when it is not clear that such have been directly decisive for the outcome." *Id.* Since "even if [the evidence] were proven to be false," it would not have changed the outcome of the arbitration, the court deemed it insufficient to invalidate the award. *Id.*

Second, the Svea Court of Appeal concluded that because the KMG indicative bid was made "prior to the initiation of the arbitration," the bid did not constitute "*per se*" false evidence, even if "possibly incorrect information regarding the amount invested in the LPG plant was among the factors that KMG took into account when calculating the size of its offer." *Id.* at 46. It concluded that the allegedly false financial statements "did not directly constitute any basis for the arbitral tribunal's assessment of the value of the LPG plant." *Id.* In other words, any alleged

---

[4]     In its August 5, 2016 Memorandum Opinion and Order, the Court directed the parties to file an English translation of the Svea Court of Appeal decision when it issued. *Stati*, 199 F. Supp. 3d at 193. Instead of submitting a single version, each of the parties submitted their own separate versions and averred that an agreed-upon translation of the entire decision would be "involved and likely controversial" and ultimately "unnecessary." Joint Status Report [Dkt. # 46] at 16–17. The Court has reviewed the sections it has referenced in its opinion and finds that they are not inconsistent. Compare petitioners' translation, Ex. 2 to Joint Status Report (Dec. 30, 2016) [Dkt. # 45-2] at 40–42, and respondent's translation, Ex. 3 Joint Status Report (Dec. 30, 2016) [Dkt. # 45-3] at 44–46.

dishonesty in business transactions that preceded the arbitration proceedings did not constitute a fraud on the tribunal and was too remote to warrant annulment of the award.

Kazakhstan then challenged the decision in the Swedish Supreme Court, arguing that the Svea Court of Appeal committed "grave procedural error" when it issued its decision. Ex. B. to Decl. of Alexander Foerster [Dkt. # 46-2] ¶ 3. This Court continued its stay pending the resolution of that proceeding, Min. Order (Apr. 3, 2017); Min. Order (Aug. 15, 2017), and petitioners moved to lift the stay on September 29, 2017. Pet'rs' Mot. to Lift Stay [Dkt. # 60]. Before this Court ruled on that motion, the Swedish Supreme Court ruled in favor of the Stati parties on October 24, 2017. Pet'rs' Suppl. Status Report Concerning Status of Proceedings in Sweden [Dkt. # 64]. This marked the end of Kazakhstan's efforts to set aside the arbitral award in the jurisdiction with the sole authority to vacate the arbitral award.

Since the Swedish award was now final and binding, the Court granted petitioners' motion to lift the stay on November 6, 2017, and it invited the parties to file supplemental briefs discussing what impact, if any, the decisions by the Swedish authorities should have on the resolution of Kazakhstan's pending motion for reconsideration of the Court's May 11, 2016, Order denying respondent's request to introduce additional defense grounds based upon its fraud allegations. Min. Order (Nov. 6, 2017).

Kazakhstan argued that the decisions by the Svea Court of Appeal and the Swedish Supreme Court based on Swedish law should have no impact on the issue presented in its motion for reconsideration because "neither of these decisions made factual findings regarding the merits of Kazakhstan's fraud allegations, nor did they apply the New York Convention," as this Court is required to do. Kazakhstan's Resp. to Nov. 6, 2017, Min. Order [Dkt. # 65] ("Resp't's Resp. to Nov. 6 Min. Order"). Meanwhile, petitioners emphasized that respondent presented its "fraud case

in full" to the Svea Court of Appeal, the seat of the arbitral award, which concluded "[t]hat the Award was not the product of fraud," and its ruling was left undisturbed by the Swedish Supreme Court. Pet'rs' Suppl. Submission in Opp. to Mot. for Recons. [Dkt. # 66] at 1–2. Petitioners also argued that the Court should deny respondent's motion based on the principles of preclusion and comity, *id.* at 3–10, and respondent argued in a sur-reply that the principles of preclusion and comity are inapplicable. Kazakhstan's Resp. to Pet'rs' Suppl. Submission in Opp. to Mot. for Recons. [Dkt. # 68] at 25.

## I.   THE MOTION FOR RECONSIDERATION

### STANDARD OF REVIEW

The Court evaluates respondent's motion for reconsideration under Rule 54(b) of the Federal Rules of Civil Procedure, which governs reconsideration of non-final decisions. The rule states that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Court may grant relief under Rule 54(b) "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (internal citations omitted); *see also Parker v. John Moriarty & Assocs.*, 221 F. Supp. 3d 1, 2 (D.D.C. 2016). While this standard "affords considerable discretion to the district courts," *Bldg. Indus. Ass'n of Superior Cal. v. Babbitt*, 161 F.3d 740, 743 (D.C. Cir. 1998), it is limited by the principle that once the parties have "battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 30–31 (D.D.C. 2013), quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 224 (D.D.C. 2011). "In this Circuit, it is well-established that 'motions for reconsideration,' whatever their procedural

basis, cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.'" *Loumiet v. United States*, 65 F. Supp. 3d 19, 24 (D.D.C. 2014), quoting *Estate of Gaither ex rel. Gaither v. Dist. of Columbia,* 771 F. Supp. 2d 5, 10 (D.D.C. 2011).

The "as justice requires" standard under Rule 54(b) involves concrete considerations of whether the court "has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the [c]ourt." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citations omitted). Other courts in this district have read the standard to require that the court grant a motion for reconsideration "only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Stewart v. Panetta,* 826 F. Supp. 2d 176, 177 (D.D.C. 2011), quoting *Zeigler v. Potter,* 555 F. Supp. 2d 126, 129 (D.D.C. 2008).

Here, respondent does not point to a change in the law. Nor does it argue that it discovered new evidence after it had already filed its motion. It simply repeats arguments made unsuccessfully before and couples them with arguments it chose not to raise at that time, and it suggests that the Court's ruling was erroneous. But none of the reasons advanced at this time requires a change in the outcome.

## ANALYSIS

Respondent argues first that the Court's conclusion that the "arbitrators did not rely upon" the alleged fraud is "factually incorrect." Mot. for Recons. at 1. Second, it maintains that the Court applied the wrong legal standard when it interpreted respondent's public policy defense

under Article V(2)(b) of the New York Convention.  *Id.* at 10–11.  And third, it contends that the May 11, 2016, Order failed to consider its alternate defense under Article V(1)(b) of the New York Convention.  *Id.* at 11–12.

## A.    The Court did not err as a matter of fact.

The Court did not err as a matter of fact in its May 11, 2016, Order for the simple reason that respondent did not present the facts it now seeks to introduce in its motion for reconsideration. And because respondent does not claim that these facts were not available to it at the time it filed its initial motion to include additional defenses, they are improperly raised now.  Furthermore, the Court did not err in evaluating the facts that *were* before it when respondent filed its initial motion, and accordingly reconsideration on this ground is denied.

In its initial motion to include additional defenses, respondent alleged that petitioners and their representatives had submitted false sworn testimony and expert reports "during the SCC Arbitration" that "fraudulently and materially misrepresented the LPG Plant construction costs for which they claimed reimbursement."  Initial Mot. at 3, 4.  In other words, respondent accused petitioners of defrauding the tribunal directly.  The Court found that since the arbitrators expressly disavowed reliance on either parties' valuations in determining the amount of the damages, the alleged fraud had no effect on the outcome of the arbitration.  *See* Order at 3–4, citing Award ¶¶ 1746–48.

Kazakhstan attempts to discredit the Court's finding by positing, without support, that the Court simply "relied on the Stati party's representations in their Opposition Brief" when it reached its conclusion.  Resp't's Resp. to Nov. 6 Min. Order at 4; Mot. for Recons. at 3.  Since the Court's ruling was expressly based upon the language in the arbitral award, this hypothesis does not

warrant serious consideration, much less a revision of the terms of the Order.  So the Court did not err as a matter of fact in this regard.[5]

In its motion for reconsideration, respondent now claims that the indicative bid the arbitrators did select as a measure of the value the LPG plant – the "KMG bid" – was itself the product of fraud.  Mot. for Recons. at 3, 9–10.  Kazakhstan alleges that prior to the start of the arbitration, representatives for the Stati parties presented KMG with false financial statements that inflated the value of the plant and fraudulently induced KMG to offer $199 million for the plant.  *Id.* at 9.  Since the bid was tainted by fraud, respondent argues that the fee award predicated on the amount of the bid was procured by fraud.  *Id.* at 10. [6]

The problem is that none of these facts were presented to the Court in respondent's initial motion to include additional defenses.  Indeed, there was not a single reference to "KMG" or the facts supposedly suggesting fraudulent inducement.  So the Court did not err in failing to grant relief on this basis.

Respondent attempts to minimize its omission by characterizing these facts as mere "details" it planned to brief once it was granted leave by the Court.  Mot. for Recons. at 1 n. 3.  But it is apparent that these facts go to the very heart of respondent's current defense and that they support an entirely separate theory of fraud that respondent did not seek leave to introduce.  Since respondent is not claiming that the evidence of KMG's fraudulent inducement was not available to it at the time it filed its initial motion, but rather that it simply elected not to raise it, the Court finds that those facts are improperly raised now.  A motion for reconsideration is not "an

---

5  Indeed, the Svea Court of Appeal arrived at the same conclusion when it was presented with the same fraud theory.  Svea Court of Appeal Opinion § 5.3.1.

6  The Svea Court of Appeal rejected respondent's attempt to invalidate the award on this basis as well.  Svea Court of Appeal Opinion § 5.3.1.

opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier." *Estate of Gaither ex rel. Gaither*, 771 F. Supp. 2d at 10, quoting *Secs. & Exch. Comm'n*, 729 F. Supp. 2d at 14 (D.D.C. 2010).

Accordingly, the Court did not commit an error of fact, and it denies reconsideration based on this ground.

## B.   The Court did not err as a matter of law.

Respondent argues in the alternative that the Court's conclusion that the alleged fraud was not "germane to the petition to confirm" because "the arbitrators did not rely upon the allegedly fraudulent evidence" is incorrect as a matter of law.  Mot. for Recons. at 10.  Respondent objects to what it characterizes as the Court's "outcome-determinative" approach; it argues that when considering a public policy defense under Article V(2)(b) of the New York Convention, evidence of fraud is "germane . . . whether or not the arbitral tribunal relied on the fraud," Mot. for Recons. 10–11, and "the submission of false evidence, in itself, constitutes a basis for non-recognition" of the arbitral award.  Resp't's Resp. to Nov. 6 Min. Order at 6.  Respondent mischaracterizes both the Court's ruling and the applicable legal standard.

In determining whether to enforce a foreign arbitral award in the United States, the Court must follow the FAA which codifies the New York Convention.  The "Convention authorizes the recipient of a foreign arbitral award to seek confirmation and enforcement of the award in federal court."  *In Re Arbitration of Certain Controversies Between Getma Int'l & Republic of Guinea*, 191 F. Supp. 3d 43, 48–49 (D.D.C. 2016), *aff'd sub nom. Getma Int'l v. Republic of Guinea*, 862 F.3d 45 (D.C. Cir. 2017), citing 9 U.S.C. §§ 202, 207.  Under the FAA, courts "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention."

*TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007), quoting *Yusuf Ahmed*

*Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997).

Under Article V(2)(b) of the New York Convention, a court may refuse to enforce a foreign

arbitral award if it "would be contrary to the public policy" of the country where enforcement is

sought. *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1110–11 (D.C. Cir.), *cert. denied,* 138

S. Ct. 448 (2017), quoting New York Convention art. V(2)(b). The D.C. Circuit has recognized

that an arbitral award obtained through fraud would be contrary to U.S. public policy under Article

V(2)(b) of the New York Convention. *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of*

*Nigeria*, 844 F.3d 281, 287 (D.C. Cir. 2016). However, the public policy defense is "construed

narrowly," and it requires a respondent to meet the "heavy burden" of proving that the arbitral

award "tends clearly to undermine the public interest, the public confidence in the administration

of the law, or security for individual rights of personal liberty or of private property." *Id.*, at 289,

quoting *TermoRio S.A. E.S.P.*, 487 F.3d at 938. The evidence proffered in support of the motion

for reconsideration does not rise to that standard.

When determining whether an arbitration award is so tainted by fraud that its recognition

would violate U.S. public policy under Article V(2)(b) of the New York Convention, courts have

applied the three-prong test used to determine whether an award should be vacated as fraudulently

obtained under Section 10(a) of the FAA.[7] Under this test:

> (1) the movant must establish the fraud by clear and convincing evidence;
> (2) the fraud must not have been discoverable upon the exercise of due
> diligence before or during the arbitration; and (3) the person challenging the
> award must show that the fraud materially related to an issue in the
> arbitration.

---

[7] Under 9 U.S.C. § 10(a)(1), courts may vacate an arbitral award where "the award was
procured by corruption, fraud, or undue means."

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004), citing *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir.1988) (collecting cases applying the three-prong test under Section 10(a) of the FAA).

Respondent complains that this Court placed undue emphasis on whether the fraud affected the outcome when it applied this test, and it states that "federal courts of appeals have held that . . . 'it is not necessary to establish that the result of the arbitration would have been different if the fraud had not occurred.'" Mot. for Recons. at 10, quoting *Karaha Bodas Co.*, 364 F.3d. at 306–07.[8] But a review of the Court's Order reveals that it did not articulate or apply the standard recited by respondent, and that the holding was consistent with the well-established principle that a party seeking to resist enforcement of an award on the basis of fraud must demonstrate a connection between the alleged fraud and the decision.

Although the D.C. Circuit has not clearly articulated the materiality standard necessary to vacate or deny enforcement of an arbitral award due to fraud, the nexus requirement has been widely recognized in the appellate courts, including in the cases cited by respondent. *See Odeon Capital Grp. LLC*, 864 F.3d at 196 ("petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators"); *Envtl. Barrier Co., LLC*, 540 F.3d at 608 ("[the court] must find a nexus between the purported fraud and the arbitrator's final decision"); *Forsythe*

---

8    While some courts have used that language, *see, e.g., Odeon Capital Grp. LLC v. Ackerman,* 864 F.3d 191, 196 (2d Cir. 2017) ("For fraud to be material . . . petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators, although petitioner need not demonstrate that the arbitrators would have reached a different result."); *Bonar,* 835 F.2d at 1383 (holding that the legal standard "does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred"), at least one circuit has questioned its logic. *Envtl. Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008) (expressing skepticism over the "odd proposition that something might be material to an issue in an arbitration, but immaterial to the outcome").

16

*Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990) ("requiring a nexus between the alleged fraud and the basis for the panel's decision").

Courts in this district have consistently looked for proof of a nexus as well.  As one court on this district summarized:

> Courts in this District have . . . demanded proof that the misconduct or fraud had some bearing on the arbitrator's final decision.  *See Owen–Williams v. BB & T Inv. Servs., Inc*., 717 F. Supp. 2d at 17–18 (D.D.C. 2010) (finding that even if party had made fraudulent misrepresentations in order to secure delay in arbitral proceedings, no proof that this changed outcome of arbitration and so conduct was immaterial); *Pigford v. Johanns*, 421 F. Supp. 2d 130, 135 (D.D.C. 2006) (unethical misrepresentation as to counsel's bar status not enough to satisfy nexus requirement because no showing that it led to different result); *Bryson v. Gere*, 268 F. Supp. 2d 46, 50 (D.D.C. 2003) (movant must prove that substantial misconduct actually prejudiced outcome of arbitration).

*ARMA, S.R.O. v. BAE Sys. Overseas, Inc*., 961 F. Supp. 2d 245, 255 (D.D.C. 2013).

So, even applying the case law identified by respondent, which recites the broadly recognized principle that a party seeking to invalidate an award based on fraud must be able to point to at least some connection between the complained-of fraud and the decision, the Court did not err in its initial ruling.

## C.     Respondent's alternate argument does not support reconsideration.

Respondent complains that the Court's May 11, 2016, Order "did not address Kazakhstan's alternate argument" that respondent was "denied the opportunity to present its case" before the arbitral panel because it had to "respon[d] to fraudulent evidence," and that this constitutes an independent ground on which to deny enforcement of the arbitral award under Article V(1)(b) of the New York Convention.  Mot. for Recons. 11–12.  While the Court's Order did not expressly address respondent's alternate argument under Art. V(1)(b) of the Convention, its conclusion that the evidence of alleged fraud that respondent sought to introduce was immaterial, disposed of this

alternate argument, and thus, reconsideration on this ground is also unwarranted.  Moreover, the

arbitrators' decision reflects that respondent presented expert valuations of its own, and that it had

a full and fair opportunity to present its case to the tribunal.

**D.**     **Reconsideration is not required by justice.**

In the end, respondent has not established that reconsideration of the Court's May 11, 2016,

Order is "required by justice" under Federal Rule of Civil Procedure 54(b).  *Capitol Sprinkler*

*Inspection, Inc.*, 630 F.3d at 227.  This is particularly true since Kazakhstan does not deny that it

had an opportunity to litigate the very issues it belatedly seeks to raise here in the jurisdiction

where the arbitration took place.  While the Court acknowledges that the legal standards to be

applied in each situation are different, the fact that the Svea Court of Appeal heard and rejected

respondent's fraud claims, and that its ruling was upheld by the Swedish Supreme Court, lends

force to this Court's view that it would not be contrary to the public policy of the United States,

and it would not violate this country's "most basic notions of morality and justice," *see Belize*

*Bank Ltd.,* 852 F.3d at 1111, to let the Court's May 11, 2016, Order stand and decline to hear the

evidence again in the limited context of this enforcement proceeding.  In other words, there is a

difference between enforcing an award that is alleged to be tainted by fraud that has never been

addressed and enforcing an award after the jurisdiction that issued it has heard and rejected the

allegations.  As noted earlier, the public policy defense is "construed narrowly" *Enron Nigeria*

*Power Holding, Ltd.*, 844 F.3d at 289, and this heavy burden exists precisely because the public

policy exception is not an invitation to re-try valid, final arbitral awards.

In sum, "[t]he Supreme Court has recognized an 'emphatic federal policy in favor of

arbitral dispute resolution.'" *TermoRio S.A. E.S.P.*, 487 F.3d at 933, quoting *Mitsubishi Motors*

*Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631 (1985).  And since the United States

became a signatory of the New York Convention in 1970, "that federal policy applies with special force in the field of international commerce." *Id.*, quoting *Mitsubishi Motors Corp.*, 473 U.S. at 631. This framework militates against re-examining the award and conducting a "mini-trial" on a substantive issue in the arbitration, especially in the context of a motion for reconsideration of a prior ruling of this Court.

## II.    THE PETITION TO CONFIRM THE ARBITRAL AWARD

### STANDARD OF REVIEW

Under the FAA, a district court "shall confirm the [arbitral] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207. "Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012), quoting *Mitsubishi Motors Corp.*, 473 U.S. at 631. As noted earlier, courts "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P.*, 487 F.3d at 935, quoting *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23; *see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 19 (D.D.C. 2011) (collecting cases).

Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading*, 763 F. Supp. 2d at 20, citing *Zeiler v. Deitsch*, 500 F.3d 157, 167 (2d Cir. 2007). The party resisting confirmation bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V applies. *See* New York Convention, art. V; *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976); *see also*

*Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987) ("[T]he showing required to avoid summary confirmation is high.").

The New York Convention provides seven exemptions to recognition and enforcement of an arbitral award. New York Convention, art. V(1)–(2). Respondent contends that the arbitration agreement is unenforceable under four of them: Article V sections 1(a), (b), (d), and 2(b).

## ANALYSIS

**A.    Article V(1)(a) of the New York Convention is inapplicable.**

Respondent argues first that the arbitral award is unenforceable under Article V(1)(a) of the New York Convention because petitioners failed to comply with a requirement in the Energy Charter Treaty that there be a three-month settlement period prior to the initiation of the arbitration. Resp't's Opp. at 27–35.

Under Article V(1)(a) of the New York Convention, an award may be refused if the "agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made." New York Convention, art. V(1)(a).

The ECT, to which Kazakhstan is a signatory, provides that if a dispute cannot be solved "within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution" before an international arbitration. ECT, art. 26(2)–(3)(a). This provision is referred to by the parties as the "cooling-off period." Respondent claims that this requirement was a jurisdictional prerequisite to the tribunal's authority. Resp't's Opp. at 28. It asserts that the SCC's failure to enforce the cooling-off period prior to the arbitration means that Kazakhstan "made no valid offer to

[p]etitioners to arbitrate and certainly did not consent to arbitrate" even though Kazakhstan participated in the arbitration for nearly three years. *Id.* at 27.

The Court's prior Memorandum Opinion concerning its subject matter jurisdiction in this case addressed the arguments brought by respondent under this defense. *Stati*, 199 F. Supp. 3d at 184–90. Based on the language of the ECT, the Court concluded that Kazakhstan gave its unconditional consent to arbitrate subject only to two exceptions that do not relate to the cooling-off period. The Court reasoned:

> While it does appear that the contractual requirement to attempt to come to a negotiated resolution is mandatory [under the ECT], that provision does not serve as a condition precedent to the contracting parties' consent to international arbitration. Article 26(3)(a) of the ECT specifies: "[s]ubject *only* to subparagraphs (b) and (c), each Contracting Party hereby gives its *unconditional* consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." *Id.* at 29-30, art. 26(3)(a) (emphasis added). Although respondent is correct that article 26(3) requires arbitration to proceed in accordance with article 26's provisions, including the three-month settlement period, the international arbitration provision does not act as a condition precedent to a party's consent, which is "[s]ubject *only* to subparagraphs (b) and (c)."

*Id.* at 185–86. Accordingly, the Court ruled that the cooling-off period is a procedural requirement under the ECT, not a jurisdictional one.[9] *Id.* at 188. Under the Supreme Court's precedent "such procedural prerequisites are for the tribunal, not the Court, to interpret and apply." *Id.* at 189, *citing BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1207 (2014). Therefore, this Court deferred to the tribunal's conclusion that the procedural hurdle had been satisfied, and found that there was a valid agreement to arbitrate between the parties. *Id.*; *see also* Award ¶ 830.

---

9       The SCC tribunal also concluded that the cooling-off period was a procedural requirement, rather than a jurisdictional one, based on the express language of Article 26 of the ECT. Award ¶ 829.

The Court sees no reason to depart from its prior ruling. In *BG Grp., PLC* the Supreme Court analyzed whether a precondition in an investment treaty between Argentina and the United Kingdom was procedural or jurisdictional in nature. 134 S. Ct. 1198. In that case, the provision required a claimant to submit a dispute to a local court and allow 18 months to lapse without a decision before submitting the dispute to arbitration. Argentina alleged that the arbitrators did not have jurisdiction because BG Group initiated arbitration without waiting the requisite 18 months. *Id.* at 1205. The Supreme Court found that the eighteen-month provision was procedural, not jurisdictional in nature, because it governed when the duty to arbitrate arose, rather than whether the duty existed at all. *Id.* at 1207. As a result, the Court held that satisfaction of the condition was for the arbitrators to decide, not the courts, because parties "normally expect a forum-based decision-maker to decide forum-specific procedural gateway matters." *Id.*, quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 86 (2002).[10]

Respondent's separate defense under Article(1)(a) is equally unavailing. It argues that the tribunal lacked jurisdiction over petitioner Terra Raf Trans Traiding Ltd. ("Terra Raf") because it

---

[10]    The Court also notes that the tribunal's decision is worthy of deference given respondent's own actions during the arbitration proceedings. On January 18, 2011, Kazakhstan sent a letter to the SCC objecting to petitioners' failure to await the expiration of the three-month period, and it proposed a stay of the arbitration to cure the defect. Ex. 26 to Resp't's Opp. [Dkt. # 20-26] at 1. Specifically, Kazakhstan proposed that:

> [T]he Tribunal order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three-month period in satisfaction of that jurisdictional requirement . . . notwithstanding the fact that this jurisdictional defect could result in dismissal after full briefing and hearing on the merits.

*Id.* at 3. With the consent of both parties, the tribunal granted the stay on February 22, 2011. Award ¶ 830. Because respondent proposed and obtained a means to cure the alleged procedural deficiency, its claim that the initial failure to wait still invalidates the arbitration is not persuasive.

did not qualify as an "investor" under the ECT, and therefore that petitioner cannot seek to enforce the award.  Resp't's Opp. 58–59.

Petitioner Terra Raf is a limited liability company incorporated and located in Gibraltar, a territory controlled by the United Kingdom.  Resp't's Opp. 58; Pet. ¶ 5.  Half of the company is owned by petitioner Anatolie Stati, and the other half is owned by his son, petitioner Gabriel Stati. Pet. ¶¶ 2–5.  Respondent argues that because Gibraltar is not a party to the ECT, Terra Raf does not qualify as an "investor" under the treaty, and therefore, Kazakhstan was not bound by a valid agreement to arbitrate with the company.  Resp't's Opp. 58–59.

Respondent raised this argument before the tribunal.  Award ¶¶ 733–38.  The tribunal rejected it, finding that the ECT provides protections to investors from Gibraltar because Gibraltar is part of the "European Community," which is a party to the ECT.  *Id.* ¶ 746.  The Court finds no reason to second-guess the tribunal's conclusion since respondent itself acknowledges that "both the United Kingdom and the European Union are signatories of the ECT," Resp't's Opp. at 58, and the Court's review is "extremely limited."  *Kurke v. Oscar Gruss & Son, Inc*., 454 F.3d 350, 354 (D.C. Cir. 2006); *see also Misco, Inc.*, 484 U.S. at 38.  ("Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.").

## B.    Article V(1)(b) of the New York Convention is inapplicable.

Respondent contends that the Court should reject confirmation of the award because it was not given adequate notice to appoint an arbitrator.  Resp't's Opp. at 36–48.  Article V(1)(b) of the New York Convention authorizes a court to refuse recognition and enforcement of an award if "the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator, or of the arbitration proceeding or was otherwise unable to present his case."  Article

V(1)(b) "essentially sanctions the application of the forum state's standards of due process." *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145–46 (2d Cir. 1992), quoting *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (Rakta)*, 508 F.2d 969, 975 (2d Cir. 1974).

### 1.    The SCC's notices to respondent.

As noted earlier, on July 26, 2010, petitioners submitted a formal Request for Arbitration to the Stockholm Chamber of Commerce, claiming that Kazakhstan's actions violated its obligations under the Energy Charter Treaty, to which Kazakhstan is a signatory. Pet. ¶ 21.  In its Request for Arbitration, petitioners proposed that the dispute be resolved by a tribunal composed of three arbitrators, with each party nominating one.  Req. for Arb ¶¶ 111–12.  Petitioners also proposed to Kazakhstan that the two party-appointed arbitrators select a chairman for the panel, and that if they could not agree, that the SCC would appoint the chairman pursuant to the SCC Arbitration Rules. *Id.* ¶ 113.

On August 5, 2010, the SCC Secretariat forwarded petitioners' Request for Arbitration to Kazakhstan by courier and attached its own cover letter which requested an answer from Kazakhstan by August 26, 2010.  Ex. 2 to Resp't's Opp. [Dkt. # 20-3] at 2 ("First Notification"). The SCC letter explained, "[i]n accordance with Article 5 of the SCC Rules, you are requested to submit an Answer to the SCC," and indicated that the Answer "shall contain comment on the seat of arbitration and on the proposition of the Claimants that the Chairperson be selected by the party-appointed arbitrators." *Id.*   The Kazakh Ministry of Justice received the SCC's letter on August 9, 2010, but it did not respond.  Ex. 3 to Resp't's Opp. [Dkt. # 20-4] at 2–3; Resp't's Opp. at 22.

On August 27, 2010, having not received an Answer, the SCC Secretariat sent a second letter by courier to Kazakhstan, extending the deadline.  Ex. 4 to Resp't's Opp. [Dkt. # 20-5]

("Second Notification").  The second letter requested that Kazakhstan "submit an Answer in accordance with Article 5" by September 10, 2010 "at the latest," and it warned that "failure to submit an Answer does not prevent the arbitration from proceeding." *Id.* Kazakhstan received the second letter on August 31, 2010, but again, it did not respond by the deadline.  Resp't's Opp. at 22.

On September 13, 2010, three days after the extended deadline to submit an Answer had passed, petitioners submitted a request to the SCC to appoint an arbitrator on behalf of Kazakhstan pursuant to Article 13(3) of the SCC rules.  Ex. 6 to Resp't's Opp. [Dkt. # 20-7].  Although the SCC Secretariat forwarded the request to Kazakhstan on that day, the request was not delivered to the Kazakh Ministry of Justice until September 23, 2010 because it was sent by registered mail rather than by courier.  *See* Ex. 7 to Resp't's Opp. [Dkt. # 20-8]; Resp't's Opp. 22.  The SCC appointed an arbitrator on behalf of Kazakhstan on September 20, 2010, three days before Kazakhstan received petitioners' forwarded request.  Ex. 8 to Resp't's Opp. [Dkt. # 20-9].

On September 23, 2010, the SCC Secretariat issued a letter to the parties notifying them that the SCC had appointed Professor Lebedev as the arbitrator on behalf of Kazakhstan.  Ex. 9 to Resp't's Opp. [Dkt. # 20-10].  The letter further noted that the "Chairperson will be appointed shortly." *Id.* Kazakhstan received the letter via courier on September 27, 2010.  Ex. 10 to Resp't's Opp. [Dkt. # 20-11].

Approximately two months later, on December 2, 2010, respondent objected through its counsel to the SCC's appointment of Professor Lebedev and requested an opportunity to appoint its own arbitrator.  Ex. 15 to Resp't's Opp. [Dkt. # 20-16].  Kazakhstan argued that it had not been given sufficient time to select an arbitrator due in part to bureaucratic hurdles involving the

allocation of state funds for legal services and language barriers. *Id.*[11] Petitioners opposed respondent's request, arguing that respondent failed to invoke any of the grounds for challenging an arbitrator set forth in the SCC Arbitration Rules, which pertain to impartiality, independence, or lack of qualifications. Ex. 17 to Resp't's Opp. [Dkt. # 20-18]. On December 15, 2010, the SCC Board found no grounds to disqualify the arbitrator and dismissed Kazakhstan's challenge. Ex. 18 to Resp't's Opp. [Dkt. # 20-19].

### 2. Respondent received proper notice.

"Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016), quoting *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C. Cir. 1993) (internal quotation marks omitted). A notice "must be of such a nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950). This standard was satisfied by the two letters sent by the SCC dated August 5, 2010, and August 27, 2010.

Respondent does not dispute that it received the two SCC letters. Instead it argues that the content of the communications was inadequate because the letters did not state explicitly that Kazakhstan was supposed to appoint an arbitrator by a specific deadline. Resp't's Opp. at 16–17, 40. This is not borne out by the documents themselves.

---

11      *See also* Resp't's Opp. at 20. But respondent does not elaborate on how language issues interfered with its ability to respond or to make a timely request for additional time.

The first SCC letter dated, August 5, 2010, stated:

> In accordance with Article 5 of the SCC Rules, you are requested to submit and Answer to the SCC, by 26 August 2010 at the latest.[12]

First Notification at 2.  Article 5(1)(v) of the SCC Arbitration Rules provides that an Answer:

> Shall include . . . if applicable, the name, address, telephone number, facsimile number and e-mail address of the arbitrator appointed by Respondent.

Ex. 1 to Resp't's Opp. [Dkt. # 20-2] ("SCC Arbitration Rules") at 7.  So the notice plainly informed respondent of the date by which it was to name an arbitrator.  In the event there was any ambiguity about that, the SCC included two attachments with the letter:  the Arbitration Rules and petitioners' Request for Arbitration, which laid out petitioner's proposal on how to constitute the tribunal.  *Id.*; Req. for Arb. ¶¶ 111–12.

Furthermore, Article 5(3) establishes that, "[f]ailure by the [r]espondent to submit an Answer shall not prevent the arbitration from proceeding."  SCC Arbitration Rules at 8.  Both provisions were plainly applicable in this situation and the Court finds that the first letter along with its attachments reasonably put respondent on notice of its obligation to submit an Answer and proffer an arbitrator.  Furthermore, the respondent received a second opportunity to be heard, when the SCC sent a second notification and extended its deadline.  In the second letter, the SCC again directed respondent to "submit an Answer in accordance with Article 5 of the SCC Rules" and warned that "failure to submit an Answer does not prevent the arbitration from proceeding." Second Notification at 2.

---

12      The letter went on: "Your Answer shall contain comment on the seat of arbitration and on the proposition of the Claimants that the Chairperson be selected by the party-appointed arbitrators."  First Notification at 2.

Faced with respondent's failure to respond, the SCC Board reasonably went ahead and appointed an arbitrator on respondent's behalf as it is permitted to do under the SCC's default rules.  Under Article 12 of the SCC rules, "[w]here the parties have not agreed on the number of arbitrators, the Arbitral Tribunal shall consist of three arbitrators . . . ."  SCC Arbitration Rules at 9.  Article 13(1) of the SCC Arbitration Rules allows the SCC to set the time period by which to appoint an arbitrator if the parties have not agreed to a time period.  *Id.*  And Article 13(3) further provides that "[w]here a party fails to appoint an arbitrator(s) within the stipulated time period, the Board shall make the appointment."  *Id.* at 10.

Respondent later chose to object to the appointment of its arbitrator and the SCC took its arguments into consideration, along with petitioners' objections, and found that there were no grounds on which to disqualify the arbitrator appointed on behalf of respondent.  Ex. 18 to Resp't's Opp. [Dkt. # 20-19].

Thus, the Court finds that respondent was "reasonably" informed of the proceeding and its obligation to appoint an arbitrator and given an "opportunity to be heard."  *Mullane,* 339 U.S. at 314.  Respondent's inability to appoint its arbitrator was not due to a lack of notice but rather a lack of timely participation on its part.  *See Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 729 (5th Cir. 1987) ("[D]ue process is not violated if the hearing proceeds in the absence of one of the parties when the party's absence is the result of his decision not to attend.").

Respondent argues in the alternative that 32 days was simply not enough time to appoint an arbitrator and that this time period "constitutes a substantial deviation from the norm of international arbitration."  Resp't's Opp. at 46–47.  Respondent never sought an extension of time and the SCC gave it additional time on its own initiative.  Moreover, the Court finds that the amount of time was reasonable particularly since the parties agreed to conduct the arbitral

proceedings under the SCC rules, and respondent does not claim that the 32 day timeframe was inconsistent with those rules.

Given all of these reasons, the Court finds that respondent received "proper notice of the appointment of the arbitrator" and it rejects its defenses under Article V(1)(b) of the New York Convention.

## C.  Article V(1)(d) of the New York Convention is inapplicable.

Next, respondent asserts that that the arbitral award is unenforceable under Article V(1)(d) of the New York Convention which allows a court to deny enforcement of an arbitral award if:

> [T]he composition of the arbitral authority or the arbitral procedure was not in accordance with the alleged agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place.

New York Convention, art. V(1)(d).

Respondent makes three arguments under this provision, two of which simply repeat prior arguments. First, respondent argues that the SCC failed to comply with its own rules relating to the appointment of arbitrators. Second, it asserts that the SCC failed to enforce the cooling-off period as it was required to do under the ECT. Last, it maintains that the tribunal committed other procedural errors relating to the admission and weight of evidence during the proceeding.

The Court has already addressed the first two points in Sections II.A–B and finds that the same reasoning applies here. The Court finds that the SCC did not violate its rules when it appointed an arbitrator on respondent's behalf. The rules plainly allow for the SCC to do so when, as here, a party fails to appoint an arbitrator by the set deadline. And a party's failure to respond does not halt the proceedings, including the appointment of the arbitrator. As to the cooling-off period, the Court defers to the tribunal's conclusion that this procedural requirement was satisfied when the tribunal imposed a three-month stay at respondent's request. Furthermore, the Court

notes that when a "party's challenge involves an application of the arbitral institution's own rules, courts typically have deferred to the arbitral panel's interpretation of them." *Belize Bank Ltd.*, 191 F. Supp. 3d at 37, citing *York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir.1991).

Respondent also complains that the tribunal committed three types of procedural errors:

> (1) ignoring the submission of expert evidence and other evidence regarding almost every major disputed issues of the case; (2) failing to consider Kazakhstan's objections that certain deductions would need to be made from any eventual award to [p]etitioners; and (3) going beyond the submissions of the [p]arties and ignoring the [p]arties' submissions and the applicable law on multiple occasions.

Resp't's Opp. at 53–54. But respondent points to only one example of these alleged irregularities. It argues that the testimony of one of its expert witnesses on the value of the LPG plant was not afforded sufficient weight in deciding the amount of the award. *Id*. at 55–56.

This is not a basis to decline to enforce the award. It is not for this Court, given its limited scope of review, to second-guess the tribunal's weighing of evidence. Respondent's invitation to re-try the merits of the arbitration undermines the very purpose of the New York Convention. *See TermoRio S.A. E.S.P.*, 487 F.3d at 934, quoting *Mitsubishi Motors Corp.*, 473 U.S. at 639 ("The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own."); *see also Bosack v. Soward*, 586 F.3d 1096, 1105 (9th Cir. 2009) ("[The court] 'ha[s] no authority to re-weigh the evidence' presented to the arbitration panel.") (citations omitted).

The Court finds that the tribunal acted within its authority when it chose to disregard *both* parties' experts, and to instead value the LPG plant using a contemporaneous third-party bid. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 592 (7th Cir. 2001), quoting *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997) ("The extent of an arbitrator's

latitude is such that an "arbitrator is not bound to hear all of the evidence tendered by the parties . . . [H]e must [merely] give each of the parties to the dispute an adequate opportunity to present its evidence and arguments."). Based on the single example that respondent provides, it is apparent that the issue is not that respondent was not given an adequate opportunity to be heard but rather that it takes issue with the result. This is precisely what the Court is not allowed to consider in an enforcement proceeding under the New York Convention.

**D.      Article V(2)(b) of the New York Convention is inapplicable.**

Finally, respondent argues again, this time under Article V(2)(b) of the New York Convention, that the arbitral award is unenforceable because it was not given notice of its opportunity to appoint its arbitrator. Article V(2)(b) of the New York Convention prevents the enforceability of an arbitral award when the arbitral award "would be contrary to the public policy" of the country where enforcement is sought, *Belize Bank Ltd*., 852 F.3d at 1110–11, quoting New York Convention, art. V(2)(b), and respondent asserts that the lack of notice contravenes public policy in the United States. As noted earlier, "[t]he public-policy exception under the New York Convention is construed narrowly and applied 'only where enforcement would violate the forum state's most basic notions of morality and justice.'" *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 69 (D.D.C. 2013), quoting *Parsons*, 508 F.2d at 974; *see also TermoRio S.A. E.S.P*., 487 F.3d at 938. Since the Court has already concluded that respondent received adequate notice, respondent has certainly not met this high burden.

## CONCLUSION

For the reasons set forth above, respondent's motion for reconsideration pursuant to Federal Rule of Civil Procedure 54(b) is denied. It is further ordered that the petition to confirm the arbitral award is granted because none of the grounds for refusal or deferral of the award set

forth in the New York Convention apply.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 23, 2018